# UNITED STATES DISTRICT COURT
## FOR THE
## MIDDLE DISTRICT OF NORTH CAROLINA

RYAN MCFADYEN; MATTHEW WILSON; and
BRECK ARCHER,

Plaintiffs,

v.

DUKE UNIVERSITY; DUKE UNIVERSITY POLICE
DEPARTMENT; AARON GRAVES; ROBERT DEAN;
LEILA HUMPHRIES; PHYLLIS COOPER; WILLIAM F.
GARBER, II; JAMES SCHWAB; JOSEPH FLEMING;
JEFFREY O. BEST; GARY N. SMITH; GREG
STOTSENBERG; ROBERT K. STEEL; RICHARD H.
BRODHEAD, Ph.D., PETER LANGE, Ph.D.; TALLMAN
TRASK, III, Ph.D.; JOHN BURNESS; LARRY MONETA,
Ed.D.; VICTOR J. DZAU, M.D.; ALLISON HALTON;
KEMEL DAWKINS; SUZANNE WASIOLEK; STEPHEN
BRYAN; MATTHEW DRUMMOND; DUKE
UNIVERSITY HEALTH SYSTEMS, INC.; PRIVATE
DIAGNOSTIC CLINIC, PLLC; JULIE MANLY, M.D.;
THERESA ARICO, R.N.; TARA LEVICY, R.N.; THE
CITY OF DURHAM, NORTH CAROLINA; MICHAEL B.
NIFONG; PATRICK BAKER; STEVEN CHALMERS;
RONALD HODGE; LEE RUSS; STEPHEN MIHAICH;
BEVERLY COUNCIL; EDWARD SARVIS; JEFF LAMB;
MICHAEL RIPBERGER; LAIRD EVANS; JAMES T.
SOUKUP; KAMMIE MICHAEL; DAVID W. ADDISON;
MARK D. GOTTLIEB; BENJAMIN W. HIMAN;
LINWOOD WILSON; RICHARD D. CLAYTON; DNA
SECURITY, INC.; RICHARD CLARK; and BRIAN
MEEHAN, Ph.D.

Defendants.

Civil Action No. 1:07CV953

## COMPLAINT

## JURY TRIAL DEMAND

**SUMMARY OF THE ACTION**.................................................................................2

**THE PARTIES** .........................................................................................6

I.      THE PLAINTIFFS.........................................................................6

II.     THE DEFENDANTS ......................................................................6

    A.  Duke University Defendants..............................................................6

        1.    Duke Police Defendants ..................................................7

            a.  Duke Police Supervising Defendants..................................8

            b.  Duke Police Investigator Defendants................................11

        2.    Duke Officials Defendants .............................................13

            a.  Crisis Management Team Defendants ...............................13

            b.  Duke Administrator Defendants .......................................17

        3.    Duke SANE Defendants.................................................19

    B.  City of Durham Defendants.............................................................22

        1.    Durham Police Supervising Defendants...................................23

        2.    Durham Police Spokesperson Defendants................................27

        3.    Durham Investigator Defendants............................................28

    C.  DNASI Defendants ........................................................................30

**JURISDICTION & VENUE**............................................................................32

**THE FACTS**.............................................................................................33

III.    THE SECRET ..............................................................................33

    A.  This was the Duke Police Department's Case. ................................33

    B.  The Statutory Basis of Duke Police Department's Jurisdiction ......35

    C.  Durham and Duke Police Departments had an Established Practice of Strictly Dividing Cases According to the Jurisdiction Allocation Agreement..............37

    D.  The Duke Police Department Conducted Itself at all Times as an Independent Law Enforcement Agency, Equal to Any Municipal Police Department ........39

        1.    Durham 911 Automatically Dispatches 911 Calls Related to Duke-Owned Property to Duke Police, Not Durham Police. .........................................40

        2.    The Duke Police Department was Sufficiently Competent to Investigate Mangum's Allegations and to Find the Same Facts that Convinced the Attorney General to Declare Mangum's Allegations a Hoax .................42

E. At all times, the Duke Police Department's Jurisdiction Over 610 N. Buchanan Boulevard Gave it the Authority to Intervene ................................................... 43

IV. ORIGINS OF THE DUKE-DURHAM CONSPIRACY ..................................... 43

A. Duke-Durham Policy to Target Duke Students for Disproportionate Enforcement of the Criminal Laws .................................................................... 44

B. Duke and Durham Publicly Condone and Ratify the Targeting of Duke Students ........................................................................................................... 47

V. "ZERO-TOLERANCE FOR DUKE STUDENTS": AN ESTABLISHED POLICY AND PRACTICE IN THE FALL OF 2005 ......................................... 48

A. The Consortium's Warrantless Raids of Duke Students' Homes ..................... 48

1. The Planning and Execution of the Student Home Invasions .................. 48

B. In One Weekend, Consortium Agents Charged Roughly 200 Duke Students Without Admissible Evidence .......................................................................... 53

1. Duke Officials Condone the Warrantless Raids, Condemn the Violated Students and Promise Cumulative Prosecution of the Students Within the University's Disciplinary System. ............................................................. 55

C. Durham Judge Declares the Warrantless Raids and Interrogations of Duke Students Illegal .................................................................................................. 57

D. Police Misconduct and Student Abuse Escalates and Turns Violent Through the Fall of 2005, Culminating in the Investigation of Mangum's False Allegations ........................................................................................................ 58

1. Violent Police Raid of Student Gathering at the Belmont Apartments' Pool ........................................................................................................... 58

E. Gottlieb's Raid of 203 Watts ........................................................................... 61

1. A "Permanent Resident" of Trinity Park Reports a Non-Citizen "Disturbance" at 203 Watts Street the Day the Rolling Stones Played at Wallace Wade Stadium ............................................................................ 61

2. Gottlieb Adopts the Case of the Noise Complaint at 203 Watts, and Obtains Search and Arrest Warrants for the Residents with the Aid of Duke Police .............................................................................................. 61

3. Gottlieb Recruited a Team to Execute the Watts Warrants ..................... 63

4. The Trial of the 203 Watts Cases ............................................................ 64

F. Judicial Affairs Investigates the Students ........................................................ 65

G. Defendant Sarvis Ratifies and Condones the Escalating Police Abuse of Duke Students...........................................................................................67

H. District 2 Officer's January Encounter with the Residents of 610 N. Buchanan68

VI. M.D. GOTTLIEB..............................................................................69

A. Even Amidst Rampant Police Misconduct in the Fall of 2005, Gottlieb Emerged as a Unique Threat to the Safety and Welfare of Duke Students......69

B. The Gottlieb Dossier.........................................................................69

C. The Dossier was Delivered to Duke Officials and Gottlieb was Transferred Off the Patrol Beat in a Matter of Days....................................................71

D. Defendant Sarvis Publicly Ratifies and Condones Gottlieb's Abuses .............72

E. Duke University Officials Ratify and Condone Gottlieb's Abuses and Reveal that the University was an Author of the Zero-Tolerance for Duke Students Policy. ...............................................................................................73

VII. DUKE UNIVERSITY'S PURCHASES OF PROPERTIES ALONG THE EAST CAMPUS BORDER, INCLUDING 610 N. BUCHANAN BLVD., THEREBY ASSUMING PRIMARY POLICE JURISDICTION OVER THOSE PROPERTIES.....................................................................................74

VIII. THE FIRST 48 HOURS.....................................................................76

A. Overwhelming Evidence that Mangum was not Assaulted at 610 N. Buchanan is Amassed in the First 48 Hours of Mangum's False Accusation..................76

1. The Party, Such as it Was........................................................76

2. The "Anonymous" 911 Call ....................................................79

3. Sgt. J.C. Shelton Responds to Pittman's 911 Call....................................81

4. On the Drive Away from 610 N. Buchanan: Evidence of Psychosis......82

5. Angel Altmon: "Ain't No Way."................................................83

B. Mangum's Bizarre Behavior Meets the Criteria for Emergency Involuntary Commitment ....................................................................................84

C. Durham Center Access .....................................................................86

1. The Involuntary Commitment Proceedings..............................................86

2. Mangum "Nods" Rape..........................................................87

a. Mariecia Smith ...........................................................87

b. Alycia Wright, RN ......................................................87

       c.  Officer Barfield ................................................................................ 88

D.  Additional Overwhelming Evidence of Innocence Is Gathered During Mangum's 11 Hours at DUMC on March 14, 2006 ......................................... 91

    1.  Sgt. Shelton Questions Mangum, and She Recants.................................. 91

    2.  Officer Gwen Sutton's Interview of Mangum........................................... 91

E.  Durham Police Determine that 610 N. Buchanan is in the Duke Police Department's Jurisdiction and the Case is Transferred to Duke Police Investigators ................................................................................................... 93

F.  Duke Police Take Control of the Investigation ................................................ 95

    1.  Duke Police and Durham Police execute the Case Transfer Protocol ..... 95

    2.  Inv. B. Jones Interviews Mangum........................................................... 99

G.  The Clinical and Forensic Medical Evidence Collected at DUMC Corroborates Mangum's Recantation and Adds to the Already Overwhelming Proof That Mangum was Lying ....................................................................................... 100

    1.  The Clinical Medical Evidence ............................................................. 100

        a.  Nurse Jeni Hauver, R.N. ................................................................. 100

        b.  Dr. Jaime Snarski, M.D................................................................... 101

        c.  Nurse Carole Schumoski, R.N. ...................................................... 101

    2.  The Forensic Medical Evidence ............................................................ 102

        a.  Tara Levicy Misrepresented Her Involvement in the SAE and Her Competence to Conduct an SAE....................................................... 102

        b.  Mangum's SAE was Abandoned and Never Completed.................. 103

        c.  The only evidence of injury observed in the SAE were injuries that demonstrably pre-dated Mangum's arrival at 610 N. Buchanan ...... 104

H.  MARCH 15TH; ADDITIONAL EVIDENCE OF A HOAX EMERGES AT UNC HOSPITALS........................................................................................ 106

    1.  New Hospital, New Story, New Motive.................................................. 106

    2.  Evidence Emerges of Mangum's Long History of Mental Illness and Addictions............................................................................................... 107

        a.  Dr. John Sherrod ............................................................................ 108

I.  The Body of Evidence Amassed in the First 48 Hours Proved Mangum's Rape Claim was a Hoax ......................................................................................... 109

IX.  THE SECOND INVESTIGATION (MARCH 16 – 21):  DUKE UNIVERSITY
     DEFENDANTS AND DURHAM POLICE COLLABORATE TO IDENTIFY
     THE PERPETRATORS OF A GANG RAPE THAT DID NOT HAPPEN ...... 113

     A.  Gottlieb "Adopts" the Case ............................................................. 113

     B.  Gottlieb Assigns the Case to Ben Himan, a Rookie Property Crimes
         Investigator ..................................................................................... 115

     C.  Duke Police and Durham Police Collaborate in a Re-Investigation of
         Mangum's Fictitious Claims ........................................................... 116

     D.  Duke Police Cede Control of their Investigation to Gottlieb ......................... 117

     E.  Mangum's Interview ....................................................................... 118

         1.  Mangum's Descriptions Eliminate Eleven Team Members as Plausible
             Suspects ................................................................................. 119

             a.  Devon Sherwood .................................................................. 119

             b.  All Notably "Tall and Lean" Team Members ................................. 119

         2.  Identification Procedures conducted on March 16th Eliminated Another
             Twenty-Four Team Members as Plausible Suspects ............................ 120

         3.  Ryan, Matt, and Breck were Eliminated as Plausible Suspects in the
             March 16th Array ..................................................................... 121

     F.  The March 21st Identification Procedures Eliminated the Remaining Twelve
         Team Members as Plausible Suspects ................................................... 122

X.  AS OF MARCH 21, 2006, THERE WAS NO RATIONAL BASIS TO
    CONTINUE THE INVESTIGATION OF THE
    DUKE LACROSSE TEAM ..................................................................... 123

     A.  Mangum was not Credible ............................................................... 123

     B.  Even if Credible, Mangum Eliminated Every Member of the Team as a
         Plausible Suspect .......................................................................... 124

XI.  THE CONSPIRACY TO ORCHESTRATE THE MASS INTERROGATION OF
     UNCOUNSELED STUDENTS ................................................................ 126

     A.  Duke University Defendants' Acts in Furtherance of the Conspiracy .......... 126

     B.  The Durham Police Defendants' Acts in Furtherance of Conspiracy ............ 128

     C.  Implementation of the Conspiracy ..................................................... 128

     D.  Counsel Intervenes Overnight to Advise the Plaintiffs and their Teammates of
         the Nature of the Charges and Individual Investigating Them ..................... 129

XII.    THE CONSPIRACY TO RETALIATE AGAINST PLAINTIFFS FOR
        EXERCISING CONSTITUTIONAL RIGHTS................................................. 131

    A.  Gottlieb and Himan abused the NTID Order Process to Retaliate Against
        Plaintiffs and Their Teammates for Exercising Constitutional Rights........... 132

    B.  The Fabricated NTID Affidavit ..................................................... 132

        1.   The Broomstick ...................................................... 133

        2.   The Fingernails...................................................... 134

    C.  Aliases to Conceal Identities........................................................ 137

        1.   Individual Identities................................................... 137

        2.   Team Affiliation ...................................................... 138

    D.  Police Deliberately Concealed from the Court the Facts that Established
        Plaintiffs Were Already Excluded as Plausible Suspects ................................ 139

        1.   The NTID Order Correctly Excluded Devon Sherwood........................ 139

        2.   Ryan, Matt, and Breck should have been Excluded from the NTID Order,
             but Police Willfully Concealed from the Court the Fact that Mangum did
             not Identify—or Recognize—Them....................................... 140

XIII.   THE CONSPIRACY TO CONCEAL DUKE POLICE DEPARTMENT'S
        STATUTORY AUTHORITY TO INTERVENE AND INVESTIGATE ......... 141

    A.  Chairman Steel's Solution:  Direct the Duke Police to Not Intervene ........... 141

    B.  The CMT'S Acts in Furtherance of the Conspiracy ....................................... 142

    C.  Duke Officials Cascade the Message that Only the Durham Police have the
        Authority to Investigate and Find the Truth. .................................... 142

    D.  Duke Police Officers' and Misleading "Witness Statements" ....................... 146

        1.   Officer Mazurek ...................................................... 147

        2.   Officer Falcon........................................................ 148

        3.   Officer Day .......................................................... 149

    E.  Duke Police Department's Public Efforts to Conceal its Authority to Intervene 151

XIV.    THE THIRD INVESTIGATION (MARCH 24 – JANUARY 11): NIFONG
        ARROGATES TO WIN ELECTION ................................................. 152

    A.  Nifong's Non-Electability.................................................. 152

    B.  Nifong's First Identification Crisis:  Name Recognition................................ 152

        1.     A Late-March Poll Confirmed Nifong Was Hopelessly Trailing .......... 153

   C.  Nifong's "Million Dollars Worth of Advertising" ......................................... 155

XV.     THE UNIVERSITY'S EFFORT TO FORCE WAIVERS OF THE PLAINTIFFS' FIFTH AND SIXTH AMENDMENT RIGHTS ............................................... 155

XVI.    THE CONSPIRACY TO RETALIATE AGAINST PLAINTIFFS AND THEIR TEAMMATES FOR EXERCISING THEIR CONSTITUTIONAL RIGHTS .. 157

   A.  Nifong's Public Acts and Statements ............................................................. 157

   B.  Addison's Acts and Public Statements .......................................................... 160

   C.  Addison's Incendiary Neighborhood Flyer .................................................... 162

   D.  The Wanted Poster ....................................................................................... 164

        1.     The Duke-CrimeStoppers Partnership .................................................... 164

   E.  Duke Officials Defendants Acts and Statements ............................................ 166

   F.  The Duke University Faculty's Public Acts .................................................... 168

   G.  Duke University Clergy's Public Acts ............................................................ 171

   H.  Duke University and the City of Durham Ratified, Condoned and Adopted the Foregoing Public Acts as their Own. .............................................................. 172

   I.  There Never was a Stone Wall of Silence ...................................................... 173

XVII.   PLAINTIFFS "COME FORWARD" WITH AN UNEQUIVOCAL DENIAL AND ASSERT THAT THE DNA WILL PROVE THEIR INNOCENCE (AGAIN) ...................................................................................................... 174

   A.  Unbeknownst to the Plaintiffs, the SBI Lab's DNA Testing Already Proved Their Innocence ........................................................................................... 175

XVIII.  THE CONSPIRACY TO RETALIATE BY FABRICATING A "RACIST" DIMENSION TO MANGUM'S FALSE ACCUSATIONS ............................. 175

   A.  Pittman's 911 Call ....................................................................................... 176

   B.  Nifong's Acts in Furtherance of the Conspiracy to Fabricate a "Racist" Dimension to Mangum's False Rape Accusation ........................................... 178

   C.  Brodhead's Acts in Furtherance of the Conspiracy to Fabricate the "Racist" Dimension to Mangum's False Rape Accusation ........................................... 180

   D.  The Duke Faculty's Acts in Furtherance of the Fabrication of a "Racist" Dimension to Mangum's False Allegations ................................................... 181

        1.     William Chafe ....................................................................................... 181

        2.     Professor Houston Baker ....................................................................... 181

E.  The Duke Clergy's Acts in Furtherance of the Fabrication of the "Racist" Dimension to Mangum's False Accusations .................................................. 182

XIX.  THE CONSPIRACY TO ABUSE THE WARRANT PROCESS .................... 183

A.  Himan and Gottlieb Brief Nifong on the Investigation for the First Time..... 183

B.  Ryan's Email.................................................................................................. 184

C.  The Agreement to Abuse the Warrant Power.................................................. 185

D.  Judge Stephens Frustrated the Conspiracy, Temporarily ............................... 188

XX.  THE DNA CONSPIRACIES.......................................................................... 188

A.  March 27th:  the SBI Lab's Testing of the Rape Kit Begins, and Ends. ......... 188

B.  March 28th:  SBI Lab Tells Himan and Nifong There Will be No Match...... 189

C.  March 29th:  The Duke—Durham Joint Command Meets............................. 191

XXI.  THE FIRST DNA CONSPIRACY:  NIFONG, HIMAN, AND GOTTLIEB CONSPIRED TO WITHHOLD DNA TEST RESULTS THAT PROVED MANGUM'S CLAIMS WERE A HOAX IN VIOLATION OF N.C.G.S. § 15A-282........................................................................................... 193

A.  Plaintiffs' Entitlement to DNA Results Pre-Indictment ................................. 193

B.  Nifong, Gottlieb and Himan Delay Disclosure of the SBI Lab's Test Results to Buy Time. ...................................................................................................... 195

1.  Knowing that the Media Will Not Give Him a Dignified Retreat, Nifong Resolves to Fabricate a Case against Three—Any Three—Lacrosse Players. .................................................................................................. 195

a.  DUMC SANE Nurse Tara Levicy .................................................... 196

C.  On April 4th, Nifong Receives the Final SBI Report Of All Test Results; and Nifong Seeks Assistance From a Private DNA Lab that was Aggressively Lobbying for the City's Business ................................................................... 199

XXII.  THE IDENTIFICATION CONSPIRACIES .................................................... 201

A.  THE CONSPIRACY TO FABRICATE IDENTIFICATION EVIDENCE... 203

1.  The April 4th "Pick Three" Identification Procedure.............................. 203

XXIII.  MANGUM'S SHARPENING MEMORY ....................................................... 205

XXIV.  THE CONSPIRACY TO CONCEAL IDENTIFICATION PROCEDURE RESULTS IN VIOLATION OF N.C.G.S. § 15A-282......................................... 207

XXV.  APRIL 5TH:  A SEALED DNA ORDER WAS ISSUED AND RYAN'S SEARCH WARRANT AFFIDAVIT WAS UNSEALED. ................................................. 212

Case 1:07-cv-00953-JAB-JEP   Document 1-2   Filed 12/18/07   Page 9 of 25

    A.  Nifong Obtained an Order Authorizing DNA Evidence Transfer to DNASI.213

        1.   The Same Day, the McFadyen Search Warrant was Unsealed and Duke Unilaterally Suspended Ryan from School ...........................................215

        2.   Contemporaneous with Ryan's Suspension, Defendants Moneta and Brodhead Treat the Emailer of an Weeks Earlier, University Administrators Treated an Actual Email Threat Differently.................217

        3.   Matthew Wilson and Breck Archer were also subject to sanctions when other, similarly situated students were not. ...........................................217

           a.  Matthew Wilson...............................................................217

           b.  Breck Archer .................................................................221

XXVI.   THE CONSPIRACY TO CONCEAL DNASI'S DNA TEST RESULTS IN VIOLATION OF N.C.G.S. § 15A-282 .............................................................222

    A.  Pursuant to N.C.G.S. § 15A-282, Plaintiffs were Entitled to a Written Report of Every Test Conducted by DNASI with their DNA....................................225

        1.   Nifong, Gottlieb, Himan, Meehan and Clark Construct a Reporting Method that—By Design—Conceals Exculpatory Test Results............228

        2.   Use of the DNASI Report to Harass and Intimidate the Most Important Fact Witness for all Three Defendants ...................................................229

        3.   Manipulation of the Media to Create Public Perception that the DNA Test Results Implicated Team Members in the Alleged Crime ....................230

XXVII.  THE SANE CONSPIRACY .............................................................232

    A.  Levicy's False Claims of Corroborating Evidence........................................233

    B.  Theresa Arico, Levicy's Supervisor, Vouched for Levicy's Fabricated SANE Evidence...........................................................................235

    C.  Levicy Produced Falsified Medical Records to Support Her Fabrications. ...236

    D.  Levicy Proffered Falsified Testimony to Perpetuate the Investigation from March 16, 2006 until January 11, 2007 ........................................238

XXVIII.APRIL 10TH—14TH: NIFONG DETERMINES TO INDICT TO WIN ELECTION ...................................................................242

    A.  April 10th: Two DNA Labs Report No DNA Match ....................................242

    B.  April 11: The NCCU Forum........................................................245

    C.  April 12, 2006: Nifong Commits to Indicting Finnerty and Seligmann........248

    D.  April 14th: Gottlieb, Himan, Duke Police Conspire to Force the Waiver of Plaintiffs' and their Teammates' Asserted Constitutional Rights ..................249

        1.     Fraudulent Email Sent Through Breck Archer's Email Account........... 250

        2.     Gottlieb and Himan, aided by the Duke Police Department, Enter Dorms to Obtain Information from Represented Lacrosse Players. .................. 250

   E.  Duke Facilitated and Subsequently Condoned the Investigators' Warrantless Entry into the Dorms and the Subsequent Interrogation of Represented Team Members ....................................................................................................... 251

XXIX.  UNIVERSITY SPONSORED PRE-TRIAL, PRE-INDICTMENT IMPEACHMENT OF PLAINTIFFS AND THEIR TEAMMATES ................ 252

XXX.    UNAUTHORIZED DISCLOSURE OF FERPA RECORDS AND SUBSEQUENT CONSPIRACY TO CONCEAL THE PRIOR DISCLOSURE ...................................................................................................................... 261

XXXI.  DUKE UNIVERSITY SHUT DOWN PLAINTIFFS' EFFORTS TO REGISTER STUDENTS TO VOTE IN NOVEMBER 7, 2006, ELECTIONS.................... 265

   A.  Plaintiffs' Voter Registration Campaign ....................................................... 266

   B.  The University's Effort to Conceal Its Efforts to Shut Down Voter Registration Campaign ....................................................................................................... 270

**THE CLAIMS**............................................................................................................. **271**

FIRST CAUSE OF ACTION:
ABUSE OF PROCESS AND SEARCH & SEIZURE IN
VIOLATION OF 42 U.S.C. § 1983 ................................................................. 271

SECOND CAUSE OF ACTION:
DEPRIVATION OF RIGHT TO REPORTS OF DNA TEST RESULTS IN
VIOLATION OF 42 U.S.C. § 1983 AND CONSPIRACY ................................ 274

THIRD CAUSE OF ACTION:
DEPRIVATION OF RIGHT TO REPORTS
OF PHOTO IDENTIFICATION TEST RESULTS IN VIOLATION OF
42 U.S.C. § 1983 ............................................................................................. 278

FOURTH CAUSE OF ACTION:
FALSE PUBLIC STATEMENTS IN VIOLATION OF 42 U.S.C. §1983 ........ 282

FIFTH CAUSE OF ACTION:
MANUFACTURE OF FALSE INCULPATORY EVIDENCE IN
VIOLATIONOF 42 U.S.C. § 1983 ................................................................. 290

SIXTH CAUSE OF ACTION:
CONCEALMENT OF EXCULPATORY EVIDENCE IN
VIOLATION OF 42 U.S.C. § 1983 ................................................................. 294

SEVENTH CAUSE OF ACTION:  CONSPIRACY IN VIOLATION OF
    42 U.S.C. § 1983 .................................................................................... 298

EIGHTH CAUSE OF ACTION:  RETALIATION IN VIOLATION OF
    42 U.S.C. §1983 .................................................................................... 300

NINTH CAUSE OF ACTION:
    MONELL LIABILITY FOR VIOLATIONS OF 42 USC § 1983 .................... 303

    A.  The Monell Defendants' Established "Zero Tolerance" Policy of Subjecting
        Duke Students to Disproportionate Enforcement of the Criminal Laws ........ 304

    B.  The Established Policy or Custom Authorizing Duke Police Officers and
        Durham Police Officers, in collusion with CrimeStoppers, to Publish
        Incendiary Public Statements, Posters, Leaflets, and other Communications
        Precipitately Asserting the Guilt of Suspects. ................................................ 305

    C.  Officials with Final Policymaking Authority for Durham Police and for Duke
        Police Approved of Nifong's and Their Other Subordinates' Unconstitutional
        Conduct. ......................................................................................................... 307

    D.  Officials with Final Policymaking Authority Failed to Exercise Adequate
        Supervising Responsibility over Gottlieb. ..................................................... 309

    E.  After Policymakers Gave Gottlieb Final Policymaking Authority Over the
        Duke Police Investigation of Mangum's False Accusations, Gottlieb Directed
        Officers to Engage in Constitutional Violations. ........................................... 312

    F.  Those with Final Policymaking Authority Failed to Adequately Supervise
        Nifong. ........................................................................................................... 314

    G.  After Nifong Was Given Final Policymaking Authority Over the Duke Police
        Investigation, Nifong Directed Police and Private Actors in Collusion With
        Them to Violate Plaintiffs' Constitutional Rights. ........................................ 318

TENTH CAUSE OF ACTION:
    SUPERVISORY LIABILTIY FOR VIOLATIONS OF 42 U.S.C. § 1983 ........ 320

    A.  The Durham Police Supervising Defendants and the Durham Police
        Supervising Defendants' Failure to Supervise the Investigation Caused the
        Violations of Plaintiffs' Constitutional Rights. .............................................. 321

    B.  The Failure of the Durham Supervising Defendants and the Duke Police
        Supervising Defendants to Control and Supervise Gottlieb Led to Violations of
        Plaintiffs' Constitutional Rights. ................................................................... 324

    C.  The Durham Supervising Defendants' Failure to Train, Control, and Supervise
        Addison Led to Violation of Plaintiffs' Constitutional Rights. ...................... 326

D.  The Durham Police Supervising Defendants' Failure to Train, Control, and Supervise Defendant Michael led to Violations of Plaintiffs' Constitutional Rights. .................................................................................................. 328

ELEVENTH CAUSE OF ACTION:
CONSPIRACY IN VIOLATION OF 42 U.S.C. § 1983 .................................... 331

TWELFTH CAUSE OF ACTION:
CONSPIRACY IN VIOLATION OF 42 USC § 1985(2)
(OBSTRUCTION OF JUSTICE) ..................................................................... 337

THIRTEENTH CAUSE OF ACTION:
CONSPIRACY IN VIOLATION OF 42 U.S.C. § 1985(2)
(OBSTRUCTING JUSTICE) ............................................................................ 341

FOURTEENTH CAUSE OF ACTION:
CONSPIRACY IN VIOLATION OF 42 U.S.C. § 1985(2) (WITNESS
TAMPERING) ................................................................................................. 343

FIFTEENTH CAUSE OF ACTION:
CONSPIRACY IN VIOLATION OF 42 U.S.C. § 1985(3) ............................... 345

SIXTEENTH CAUSE OF ACTION:
FAILURE TO INTERVENE IN VIOLATION OF 42 U.S.C. § 1986 ............... 347

SEVENTEENTH CAUSE OF ACTION:
FAILURE TO INTERVENE IN VIOLATION OF 42 U.S.C. § 1986 ............... 349

EIGHTEENTH CAUSE OF ACTION:
FAILURE TO INTERVENE IN VIOLATION OF 42 U.S.C. § 1986 ............... 351

NINETEENTH CAUSE OF ACTION:
FAILURE TO INTERVENE IN VIOLATION OF 42 U.S.C. § 1986 ............... 352

TWENTIETH CAUSE OF ACTION:
COMMON LAW OBSTRUCTION OF JUSTICE & CONSPIRACY TO
OBSTRUCT JUSTICE ..................................................................................... 354

TWENTY-FIRST CAUSE OF ACTION:
ABUSE OF PROCESS & CONSPIRACY ........................................................ 357

TWENTY-SECOND CAUSE OF ACTION:
NEGLIGENCE OF DURHAM POLICE........................................................... 359

TWENTY-THIRD CAUSE OF ACTION:
NEGLIGENT HIRING, RETENTION, SUPERVISION, TRAINING &
DISCIPLINE BY DURHAM POLICE.............................................................. 361

TWENTY-FOURTH CAUSE OF ACTION:
    NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS BY DURHAM
    POLICE ..........................................................................................................364

TWENTY-FIFTH CAUSE OF ACTION:
    NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
    (DURHAM POLICE STATEMENTS)..............................................................366

TWENTY-SIXTH CAUSE OF ACTION:
    NEGLIGENCE BY THE DNA SECURITY DEFENDANTS ..........................367

TWENTY-SEVENTH CAUSE OF ACTION:
    NEGLIGENT HIRING, RETENTION, SUPERVISION, TRAINING AND
    DISCIPLINE BY THE DNA SECURITY DEFENDANTS..............................370

TWENTY-EIGHTH CAUSE OF ACTION:
    NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS BY THE DNA
    SECURITY DEFENDANTS...............................................................................371

TWENTY-NINTH CAUSE OF ACTION:
    NEGLIGENCE ...................................................................................................373

THIRTIETH CAUSE OF ACTION:
    NEGLIGENCE OF THE SANE DEFENDANTS ............................................376

THIRTY-FIRST CAUSE OF ACTION:
    NEGLIGENT HIRING, RETENTION, SUPERVISION, TRAINING &
    DISCIPLINE BY THE SANE DEFENDANTS .................................................378

THIRTY-SECOND CAUSE OF ACTION:
    NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS BY THE SANE
    DEFENDANTS ..................................................................................................380

THIRTY-THIRD CAUSE OF ACTION:
    NEGLIGENCE OF DUKE UNIVERSITY .......................................................382

THIRTY-FOURTH CAUSE OF ACTION:
    NEGLIGENT ENTRUSTMENT ......................................................................384

THIRTY-FIFTH CAUSE OF ACTION:
    FRAUD................................................................................................................386

**JURY DEMAND**.......................................................................................................**389**

**PRAYER FOR RELIEF** ...........................................................................................**389**

## SUMMARY OF THE ACTION

1.     This action arises out of a combination of actors and entities that, from time to time, we refer to herein as the Consortium. The Consortium included a world-renowned University, its faculty, its police department, its medical center, and a SANE nurse; a city, its city manager, its police department, and a rogue officer; a private DNA lab, its lab director, and its owner; and a prosecutor who was disbarred, and subsequently convicted of contempt and incarcerated for certain of his acts in furtherance of the Consortium's conspiracy.

2.     Plaintiffs' claims arise out of the Consortium's conspiracy to railroad 47 Duke University students as either principals or accomplices based upon the transparently false claim of rape, sexual offense, and kidnapping made by a clinically unreliable accuser on March 14, 2006. The conspiracy was facilitated by overt acts and by the refusal to intervene on the part of those in the Consortium who knew of the wrongs conspired to be done to Plaintiffs, had the power and authority to intervene, and refused to do so.

3.     The conspiracy's vehicle was the false accusation of rape made under circumstances akin to duress, by a woman with a long, troubling psychiatric history. When the duress was removed, Mangum quickly recanted the rape claim. However, in the hands of the Consortium, Mangum's recanted accusation of rape morphed into a brutal gang rape, the horror of which grew in each retelling. It

2

would never be the same story twice. Her claim was taken virtually from her lips and fashioned into a weapon in the hands of those who would leverage   outrage was animated by racial was unleashed at once on 47 of them.

4.     The Consortium's conspiratorial objectives in the matter of 610 N. Buchanan Blvd. were motivated by a racial animus and also by an animus based upon Plaintiffs' their perceived status as non-citizens of the state of North Carolina. The defendants retaliated against the team members for having the temerity to reach for the protections of the United States Constitution, the only thing that could keep them safe from wrongful convictions upon false allegations of the most horrific kind and from a rogue prosecutor and a rogue police officer who wanted and needed to prove they were true.

5.     Over the course of the 13 month investigation into Mangum's false accusations, defendants conspired to achieve the retaliatory purposes of their conspiracy by, among other things, agreeing to conceal the overwhelming evidence of innocence they found or knew to exist very early on; agreeing to fabricate forensic medical evidence, including the falsification of medical records associated with Mangum's Sexual Assault Examination,   agreeing to conceal from Plaintiffs powerful exculpatory DNA evidence to which Plaintiffs were entitled by law before indictments in the matter were handed down; agreeing to fabricate witness testimony from the State's witnesses, and to harass, intimidate and threaten the witnesses who would prove Mangum's claims a lie; and by agreeing to make

3

consciously parallel public false statements impeaching the character and credibility of the accused 47 members of the men's lacrosse team.

6.      All of the foregoing conspiracies depended for their continuation upon an overarching conspiracy between Duke University and its co-defendants to conceal the fact that, at all times relevant to this action, the investigation of Mangum's claims was the Duke Police Department's investigation.  Mangum alleged she was raped and sexually assaulted at a residence that was within the Duke Police Department's jurisdiction, and, by statute and agreement, Duke University Police had the primary responsibility to "initiate and conclude" an investigation of Mangum's allegations.

7.      The fact of Duke Police Department's jurisdictional obligation to investigate Mangum's false accusations was kept secret through another overarching conspiracy among all Defendants to publicly and privately conceal it.

8.      So great was the damage done the 47 Duke University students on the men's lacrosse team that even the unequivocal exoneration after a re-investigation led by two of this State's most revered respected prosecutors could not repair it.  For 13 months, the defendants and others not yet named in this action conspired and colluded to subject plaintiffs and their teammates to public outrage and condemnation before a national and international audience, day after day. Throughout this affair, those who had the power to destroy Ryan, Matt, Breck, and

4

their teammates acted to destroyed them; and Duke University, with the statutory authority and power to intervene to prevent the wrongs being committed upon their own students, refused to intervene.

9.  It was not until North Carolina's Attorney General's Office and its special Special Prosecutors, Senior Deputy Attorney General James J. Coman and Special Deputy Attorney General Mary D. Winstead obtained jurisdiction that the truth of what happened at 610 N. Buchanan became the aim of the investigation in this matter.

10.  The word "innocent" does not trip lightly off the tongue of a prosecutor. Coman and Winstead, with State Bureau of Investigation ("SBI") Agents DeSilva and Tart, sought the truth, found the truth, and insisted upon a declaration of innocence. On April 11, 2007, the North Carolina Attorney General declared Plaintiffs and their teammates innocent. For the tireless work of Special Prosecutors Coman and Winstead, SBI Agents DeSilva and Tart, and the Attorney General's declaration that Mangum's allegations were a hoax, Ryan, Matt, and Breck are enormously grateful. This case is not about them, nor is it about the justice system in North Carolina. This case is a reckoning; it is an accounting of those who were willing to obstruct and pervert justice to serve their own selfish aims, those who had the power to intervene and did not, and the damage they have done.

5

## I.      THE PLAINTIFFS

11.     Plaintiff Ryan McFadyen is a citizen and resident of New Jersey.

12.     Plaintiff Matthew Wilson is a citizen and resident of North Carolina.

13.     Plaintiff Breck Archer is a citizen and resident of New York.

14.     When Crystal Mangum falsely claimed that she was sexually assaulted, the Plaintiffs were students in good standing at Duke University and members of the 2005-2006 Duke University Men's Lacrosse Team.

## II.      THE DEFENDANTS

### A.      Duke University Defendants

15.     DUKE UNIVERSITY.   Duke University is an educational institution formed under the laws of North Carolina, with its primary place of business in Durham, North Carolina.   At all times relevant to this action, the Defendants identified herein as the Duke Police Defendants, Duke Officials Defendants and the SANE Defendants, were constituent entities, agents and/or employees of Duke University.   Further, at all times relevant to this action, Plaintiffs were enrolled as students at Duke University pursuant to enrollment agreements entered into between them.

6

### 1.  Duke Police Defendants

16.  DUKE UNIVERSITY POLICE DEPARTMENT.  The Duke Police Department is a North Carolina law enforcement agency authorized and existing under the North Carolina General Statutes.  Duke Police officers are commissioned under North Carolina General Statutes without limitation; they have the full range of police authority that the State grants to all other municipal law enforcement officers in their respective jurisdictions.  The Duke Police Department has primary police jurisdiction over, among other things, crimes reported to have occurred on property owned or controlled by Duke University, including adjacent streets and roadways, within the Durham city limits.  The Duke Police Department's duties include providing comprehensive law enforcement services throughout its territorial jurisdiction including, but not limited to the academic campus, a large medical center complex, an 8,000 acre research forest, and all property owned or controlled by Duke University within the Durham city limits.  The Duke Police Department has 176 authorized positions, including 67 commissioned Police Officers, 83 Security Officers, 12 Emergency Communications and Records Officers, a 24-hour 911 center, Criminal Investigations Unit, and various administrative support personnel.

7

### a. Duke Police Supervising Defendants

17.   AARON GRAVES is, and at all times relevant to this action, was Duke University's Associate Vice President for Campus Safety & Security. In that capacity, Graves served in a supervisory and policymaking role for the Duke Police Department. At all relevant times to this action, Graves' duties included developing and supervising the implementation of a strategic law enforcement plan for the Duke Police Department's territorial jurisdiction and strategies and initiatives for enhanced safety and security at the University and DUHS. Upon information and belief, Graves is, and at all times relevant to this action, was a citizen and resident of North Carolina.

18.   ROBERT DEAN is, and at all times relevant to this action, was the Director and Chief of the Duke Police Department. Dean reported directly to Duke University's Associate Vice President for Campus Safety and Security, Defendant Graves. In his capacity as Director and Chief of Police, Dean served in a supervisory and policymaking role for the Duke Police Department. Dean's primary responsibilities include directing and supervising the day-to-day management of the Duke Police Department, and directing a senior Department management team composed of the Commander of the Duke Police Department's Uniform Patrol Division (a police Major), the Commander of the Duke Police Support Division (a police Major); and the Manager of Medical Center Affairs. Upon information and

8

belief, Dean is, and at all times relevant to this action, was a citizen and resident of North Carolina.

19. LEILA HUMPHRIES was, at all times relevant to this action, the Assistant Police Chief for the Duke Police Department. In that capacity, Humphries served in a supervisory and policymaking role for the Duke Police Department. Upon information and belief, Humphries is, and at all times relevant to this action, was a citizen and resident of North Carolina.

20. PHYLLIS COOPER is, and at all times relevant to this action, was a fully commissioned North Carolina law enforcement officer, with the rank of Major for the Duke Police Department, serving as the Department's PIO Commander and Commander for the Investigations Division. In that capacity, Cooper served in a supervisory and policymaking role for the Duke Police Department. Cooper's duties include maintaining the Police Department's accreditation and supervising special projects and investigations conducted by the Duke Police Department. In addition, Cooper was, at all relevant times, one of the Department's liaisons to CrimeStoppers. Upon information and belief, Cooper is, and at all times relevant to this action, was a citizen and resident of North Carolina.

21. WILLIAM F. GARBER, II is, and at all times relevant to this action, was the Medical Center Affairs Manager for the Duke Police Department. In that capacity, Garber served in a supervisory and policymaking role for the Duke Police Department. Garber's primary responsibilities include serving as liaison to

9

the medical center administration for police and security issues on the Duke University Medical Center campus. Upon information and belief, Garber is, and at all times relevant to this action, was a citizen and resident of North Carolina.

22.     JAMES SCHWAB was, and at all time relevant to this action, a fully commissioned North Carolina law enforcement officer, with the rank of Major for the Duke Police Department. In that capacity, Schwab served in a supervisory and policymaking role for the Duke Police Department. Upon information and belief, Schwab is, and at all times relevant to this action, was a citizen and resident of North Carolina.

23.     JOSEPH FLEMING is, and at all times relevant to this action, was a fully commissioned North Carolina law enforcement officer, with the rank of Lieutenant for the Duke Police Department, serving as the Department's Supervisor of Investigations. In that capacity, Fleming served in a supervisory and policymaking role for the Duke Police Department. Fleming's duties include supervising and directing the investigation of crimes alleged to have occurred within the Duke Police Department's jurisdiction, including any crime reported to have occurred inside the residence at 610 N. Buchanan. At all times relevant to this action, Fleming's duties included supervising Defendant Smith. Upon information and belief, Fleming is, and at all times relevant to this action, was a citizen and resident of North Carolina.

24. JEFFREY O. BEST is, and at all times relevant to this action, was a fully commissioned North Carolina law enforcement officer, with the rank of Lieutenant for the Duke Police Department and the Department's Commander of the Duke Patrol Division "B" Squad. Best's duties include supervising and directing the activities of the "B" Squad of the Duke Police Department's Patrol Division. In that capacity, Best served in a supervisory and policymaking role for the Duke Police Department. Best was the Duke Police Watch Commander on the evening and early morning hours of March 13, 2006. Best personally appeared at Duke University Medical Center when it became clear that Mangum's false claim of rape was alleged to have occurred at 610 N. Buchanan, a residence within Duke Police Department's jurisdiction. Upon information and belief, Best is, and at all times relevant to this action, was a citizen and resident of North Carolina.

25. DUKE POLICE SUPERVISING DEFENDANTS. Collectively, Graves, Dean, Humphries, Cooper, Garber, Schwab, Fleming and Best, are referred to herein as the "Duke Police Supervising Defendants."

### b. Duke Police Investigator Defendants

26. GARY N. SMITH is, and at all times relevant to this action, was a fully commissioned North Carolina law enforcement officer, with the rank of First Sergeant, serving as an Investigator in the Duke Police Department. Smith's duties include supervising investigations of reports of criminal conduct reported to have occurred within Duke Police Department's jurisdiction, which, at all times

11

relevant to this action, included the residence at 610 N. Buchanan. Smith is a certified criminal investigator. In addition, Smith was, at all relevant times, one of the Department's liaisons to CrimeStoppers. Upon information and belief, Smith is, and at all times relevant to this action, was a citizen and resident of North Carolina.

27. GREG STOTSENBERG is, and at all times relevant to this action, was a fully commissioned North Carolina law enforcement officer, with the rank of First Sergeant in the Duke Police Department's "D" Patrol Squad. Stotsenberg's duties include conducting and coordinating investigative functions of the Duke Police Department. In addition, Stotsenberg was, at all relevant times, one of the Department's liaisons to CrimeStoppers. At all times relevant to this action, Stotsenberg coordinated several of the Duke Police Department's efforts to assist Defendants Gottlieb and Himan in the investigation of Plaintiffs and their teammates, including the failed attempt to induce all 47 members of the team to be interrogated by Durham police officers without counsel, where the students, unbeknownst to them, would be asked to voluntarily provide their DNA samples and mug shots for identification purposes. Upon information and belief, Stotsenberg is, and at all times relevant to this action, was a citizen and resident of North Carolina.

———————————