28.    DUKE   POLICE   INVESTIGATOR   DEFENDANTS.    Collectively, Smith  and

       Stotsenberg, are referred to herein as the "Duke Police Investigator Defendants."

                        _____

29.    DUKE   POLICE   DEFENDANTS.    Collectively, the  Duke  University  Police

       Department, Duke  Police  Supervising  Defendants,  and  the  Duke  Police

       Investigator Defendants, are referred to herein as the "Duke Police Defendants."

              2.    **Duke Officials Defendants**

                    a.    **Crisis Management Team Defendants**

30.    ROBERT K. STEEL is the Chairman of the Executive Committee of the Duke

       University Board of Trustees.  In that capacity, Steel served in a supervisory and

       policymaking role for Duke University and all of its employees, agents, and

       constituent entities.  In addition, upon information and belief, Steel directed the

       University's "Crisis Management Team" ("CMT") from its formation on March

       25, 2006 onward.  The CMT was formed to direct the University's conduct in the

       investigation of Mangum's false allegations.  From time to time, Steel directed the

       conduct of the Duke Police Department in the investigation of Mangum's false

       allegations of rape and sexual assault, and in this capacity, acted under color of

       state law.  Upon information and belief, Steel is, and at all times relevant to this

       action, was a citizen and resident of Connecticut.

31.    RICHARD H. BRODHEAD, Ph.D. is, and at all times relevant to this action, was

       the President  of  Duke  University.   As  President,  Brodhead  was  the  Chief

                                    13

Administrative Officer of the University.  In that capacity, Brodhead served in a supervisory and policymaking role for Duke University and all of its employees, agents and constituent entities.  Brodhead is responsible to the Board of Trustees.  His responsibilities include supervising, managing, and governing the University; interpreting and carrying out the policies of the Board; presiding at meetings of the University faculty, where he enjoys unbridled authority to overrule the decisions of the faculty, so long as he states his reasons for doing so; and has exclusive standing to recommend individuals to the Trustees to hold the other offices of the University.  Brodhead was a member of the University's Crisis Management Team.  Upon information and belief, Brodhead is, and at all times relevant to this action, was a citizen and resident of North Carolina.

32.     PETER LANGE, Ph.D. is, and at all times relevant to this action, was the University's Provost.   In that capacity, Lange served in a supervisory and policymaking role for Duke University and all of its employees, agents, and constituent entities.  Lange is the University's Chief Academic Officer; his duties include directing the University's academic operations and overseeing the University's teaching and research missions.   Lange was a member of the University's Crisis Management Team.  Upon information and belief, Lange is, and at all times relevant to this action, was a citizen and resident of North Carolina.

33. TALLMAN TRASK, III, Ph.D. is, and at all times relevant to this action, was the University's Executive Vice President. In that capacity, Trask served in a supervisory and policymaking role for Duke University and all of its employees, agents, and constituent entities. Trask is the University's Chief Financial and Administrative Officer; his duties include directing the University's financial operations and overseeing the University's central administrative services and capital projects. Trask was a member of the University's Crisis Management Team. Upon information and belief, Trask is, and at all times relevant to this action, was a citizen and resident of North Carolina.

34. JOHN BURNESS is, and at all times relevant to this action, was the Senior Vice President for Public Affairs & Government Relations. In that capacity, Burness served in a supervisory and policymaking role for Duke University and all of the public relations employees, agents, and constituent entities. Burness' duties include acting as the Official Spokesperson for the University, and as the University's liaison to the Duke-Durham Partnership Campaign, and as primary liaison to the City of Durham and the Durham Police Department. Burness was a member of the University's Crisis Management Team. Upon information and belief, Burness is, and at all times relevant to this action, was a citizen and resident of North Carolina.

35. LARRY MONETA, Ed.D. is, and at all times relevant to this action, was Vice President for Student Affairs. In that capacity, Moneta served in a supervisory and

policymaking role for Duke University and all of the public relations employees, agents and constituent entities. Moneta's duties include supporting undergraduate students in their academic, social, personal, physical and emotional needs. Moneta was responsible for the welfare of all students, and for coordinating the University's emergency responses. Moneta was a member of the University's Crisis Management Team. Upon information and belief, Moneta is, and at all times relevant to this action, was a citizen and resident of North Carolina.

36.    VICTOR J. DZAU, M.D. is, and at all times relevant to this action, was the Chancellor for Health Affairs, and President and Chief Executive Officer of Duke University Health Systems, Inc. In that capacity, Dzau served in a supervisory and policymaking role for Duke University Health Systems, Inc., all of its employees, agents, and constituent entities. Dzau's duties include oversight of DUHS entities' financial affairs, their prompt disclosure of threats to the health, safety and welfare of the public created by DUHS's medical professionals, and those special powers and duties that are assigned to him by the President in his discretion. Dzau was a member of the University's Crisis Management Team. Upon information and belief, Dzau is, and at all times relevant to this action, was a citizen and resident of North Carolina.

37.    ALLISON HALTON was, at all times relevant to this action, the University Secretary. Halton is now retired from the University. At all times relevant to this action, Halton's duties included the maintenance of all records of the University.

Further, Halton had all of those powers and duties specifically granted to her by President Brodhead, in his sole discretion. Halton was a member of the University's Crisis Management Team. Upon information and belief, Halton is, and at all times relevant to this action, was a citizen and resident of North Carolina.

_____

38. CRISIS MANAGEMENT TEAM DEFENDANTS. Collectively, Brodhead, Lange, Trask, Burness, Moneta, Dzau, and Halton, are referred to herein as the "CMT Defendants."

### b. Duke Administrator Defendants

39. KEMEL DAWKINS is, and at all times relevant to this action, was Vice President for Campus Services. At all times relevant to this action, Dawkins' duties included supervising and directing operations of auxiliary services with facilities management, police, and capital assets. Dawkins reported directly to Duke University's Executive Vice President, Defendant Trask. Dawkins is, and at all times relevant to this action, was the direct supervisor of Graves, Drummond and the Duke Card Office. Dawkins also attended command staff retreats with the Duke Police Department. Upon information and belief, Dawkins is, and at all times relevant to this action, was a citizen and resident of North Carolina.

40. SUZANNE WASIOLEK is, and at all times relevant to this action, was the Assistant Vice President for Student Affairs and Dean of Students. Wasiolek

received her J.D. from N.C.C.U. and worked as a practicing attorney for 9 months. Upon information and belief, she has no experience in the practice of criminal law in North Carolina or any other jurisdiction. Her duties include assisting Vice President Moneta in carrying out his obligations to coordinate the University's emergency responses. Upon information and belief, Wasiolek is, and at all times relevant to this action, was a citizen and resident of North Carolina.

41. STEPHEN BRYAN is, and at all times relevant to this action, was the Associate Dean of Students and Director of Judicial Affairs. Bryan's responsibilities include actively collecting the Duke and Durham Police reports for indications of student misconduct, imposing discipline—unilaterally or through a student Judicial Board he selects and largely controls; keeping records of student incidents of misconduct; reporting those statistics to the Durham community and other agencies; and, relevant to the instant action, compiling the misleading and unreliable "data" upon which the Lacrosse Ad Hoc Review Committee drew its conclusions that misconduct on the part of members of the lacrosse team was disproportionate to that of other groups and the student body generally. Upon information and belief, Bryan is, and at all times relevant to this action, was a citizen and resident of North Carolina.

42. MATTHEW DRUMMOND is, and at all times relevant to this action, was the Senior Manager IT in Auxiliary Services and Head of the University's Duke Card

Office.  Upon information and belief, Drummond is, and at all times relevant to this action, was a citizen and resident of North Carolina.

_____

43.     DUKE ADMINISTRATOR DEFENDANTS.  Collectively, Dawkins, Wasiolek, Bryan, and Drummond, are referred to herein as the "Duke Administrator Defendants."

_____

44.     DUKE OFFICIALS DEFENDANTS. Collectively, Steel, the CMT Defendants, and the Duke Administrator Defendants, are referred to herein as the "Duke Officials Defendants."

### 3.      Duke SANE Defendants

45.     DUKE UNIVERSITY HEALTH SYSTEMS, INC. ("DUHS") is a corporation formed under the laws of the State of North Carolina, with its principal place of business in Durham, North Carolina.  Duke University Medical Center ("DUMC") and the Durham Center Access are, and at all times relevant to this action, were constituent entities of DUHS. At all times relevant to this action, DUHS was retained by the State of North Carolina, the City of Durham, and/or the Durham Police Department, and/or the Duke Police Department to provide forensic medical evidence collection and analysis services in the investigation of Mangum's false accusations of rape, sexual assault and kidnapping; and, in this

capacity, DUHS, its supervisors, employees, and agents were acting under color of state law.

46.    PRIVATE DIAGNOSTIC CLINIC, PLLC ("PDC") is a corporation formed under the laws of the State of North Carolina, with its principal place of business in Durham, North Carolina. Its members/employees are healthcare providers with privileges at DUHS facilities. At all times relevant to this action, the PDC was retained by the State of North Carolina, the City of Durham, and/or the Durham Police Department, and/or the Duke Police Department directly or through DUHS to provide competent medical personnel in order to provide and/or supervise the provision of forensic medical evidence collection and analysis services in the investigation of Mangum's false accusations of rape, sexual assault and kidnapping; and, in this capacity, the PDC acted under color of state law.

47.    JULIE MANLY, M.D. is, and at all times relevant to this action, was a member of the DUHS House Staff, a physician member of the Private Diagnostic Clinic, PLLC, and an affiliated physician at Duke University. Upon information and belief, in that capacity, Manly served in a supervisory capacity with respect to DUHS personnel. At all times relevant to this action, Manly was retained by the State of North Carolina, the City of Durham, and/or the Durham Police Department, and/or the Duke Police Department to provide forensic medical evidence collection and analysis services in the investigation of Mangum's false accusations of rape, sexual assault and kidnapping; and, in that capacity, PDC

acted under color of state law. Upon information and belief, Manly is, and at all times relevant to this action, was a citizen and resident of North Carolina.

48. THERESA ARICO, R.N. is, and at all times relevant to this action, was a clinical nurse on DUHS's staff. In that capacity, Arico served in a supervisory capacity with respect to all forensic Sexual Assault Nurse Examiner ("SANE") services provided by DUMC, including, but not limited to the forensic medical evidence collection and analysis services provided by Tara Levicy in the investigation of Mangum's false accusations of rape, sexual assault, and kidnapping; and, in that capacity, at all times relevant to this action, Arico acted under color of state law. Upon information and belief, Arico is, and at all times relevant to this action, was a citizen and resident of North Carolina.

49. TARA LEVICY, R.N. was, at all times relevant to this action, a nurse employed as a member of the DUMC nursing staff, and on March 14, 2006, was a SANE-in-Training. At all times relevant to this action, Levicy was retained by the State of North Carolina, the City of Durham, and/or the Durham Police Department, and/or the Duke Police Department to provide forensic medical evidence collection and analysis services in the investigation of Mangum's false accusations of rape, sexual assault, and kidnapping; and, in that capacity, Levicy acted under color of state law. Upon information and belief, Levicy is a citizen and resident of New Hampshire; and, at all times relevant to this action, Levicy was a citizen and resident of North Carolina.

_____

50. DUKE SANE DEFENDANTS.  Collectively, DUHS, PDC, Manly, Arico, and Levicy, are referred to herein as the "Duke SANE Defendants."

_____

51. DUKE UNIVERSITY DEFENDANTS. Collectively, Duke University, Duke Police Defendants, Duke Officials Defendants, and the Duke SANE Defendants, are referred to herein as the "Duke University Defendants."

**B.    City of Durham Defendants**

52. The CITY OF DURHAM is a municipal corporation formed under the laws of the State of North Carolina. Upon information and belief, the City of Durham has waived its immunity from civil liability pursuant to N.C.G.S. § 160A-485 by, among other things, procuring a liability insurance policy or participating in a municipal risk-pooling scheme.  The City of Durham operates the Durham Police Department, which shares law enforcement authority in the City of Durham with the Duke University Police Department according to an Agreement between the City of Durham and Duke University.

53. MICHAEL B. NIFONG was disbarred for his conduct in the criminal investigation of Mangum's false allegations.  At all times relevant to this action, Nifong was the District Attorney for the Fourteenth Prosecutorial District in North Carolina.  Beginning on or before March 24, 2006 and continuing through January 12, 2007, Nifong directed the Durham Police Department's factual investigation of

Mangum's false allegations. In that capacity, Nifong served in a supervisory and policymaking role for the Durham Police Department with respect to that investigation. After handing the case over to the Attorney General, in January 2007, contrary to his testimony at his Bar Disciplinary Hearing on June 15, 2007, Nifong had initiated his retirement process with the State of North Carolina, but withdrew the request. On June 16, 2007, Nifong was disbarred by the North Carolina Bar for his misconduct in the investigation of Mangum's allegations and the subsequent prosecution of three innocent members of the Duke lacrosse team On June 19, 2007, Nifong was suspended from his position as District Attorney. On July 2, 2007, Nifong tendered his resignation as District Attorney. On August 31, 2007, Nifong was found guilty of criminal contempt by the Honorable W. Osmond Smith III and incarcerated for misconduct relating to the investigation of Plaintiffs and the subsequent prosecution of Plaintiffs' three teammates. Upon information and belief, Nifong is, and at all times relevant to this action, was a citizen and resident of North Carolina.

### 1. Durham Police Supervising Defendants

54. PATRICK BAKER is, and at all times relevant to this action, was the City Manger for the City of Durham. In that capacity, Baker served in a supervisory and policymaking role for the City of Durham and all of its constituent entities, including the Durham Police Department. Upon information and belief, on or shortly after March 14, 2006, Baker assumed the duties of the Chief of Police for

the Durham Police Department and retained those duties during the extended period of time in which Defendant Chalmers was on leave during the police investigation of Mangum's false allegations. Upon information and belief, Baker is, and at all times relevant to this action, was a citizen and resident of North Carolina.

55. STEVEN CHALMERS was, at all times relevant to this action, the Chief of Police for the Durham Police Department. In that capacity, Chalmers served in a supervisory and policymaking role for the Durham Police Department. Upon information and belief, Chalmers is, and at all times relevant to this action, was a citizen and resident of North Carolina.

56. RONALD HODGE is, and at all times relevant to this action, was the Deputy Chief of Police for the Durham Police Department. In that capacity, Hodge served in a supervisory and policymaking role for the Durham Police Department. At all times relevant to this action, Hodges' duties included supervising Defendant Mihaich and Defendant Council. Upon information and belief, Hodge is, and at all times relevant to this action, was a citizen and resident of North Carolina.

57. LEE RUSS is, and at all times relevant to this action, was the Executive Officer to the Chief of Police in the Durham Police Department. In that capacity, Russ served in a supervisory and policymaking role for the Durham Police Department. At all times relevant to this action, Russ' duties included supervising Defendant

Michael and Defendant Addison. Upon information and belief, Russ is, and at all times relevant to this action, was a citizen and resident of North Carolina.

58. STEPHEN MIHAICH is, and at all times relevant to this action, was the Commander of Investigative Services for the Durham Police Department. In that capacity, Mihaich served in a supervisory and policymaking role for the Durham Police Department. Upon information and belief, Mihaich is, and at all times relevant to this action, was a citizen and resident of North Carolina.

59. BEVERLY COUNCIL is, and at all times relevant to this action, was the Commander of the Uniform Patrol Bureau for the Durham Police Department. In that capacity, Council served in a supervisory and policymaking role for the Durham Police Department. Upon information and belief, Council is, and at all times relevant to this action, was a citizen and resident of North Carolina.

60. EDWARD SARVIS has since been promoted, but, at all times relevant to this action, was the Commander of the Durham Police Department's District 2. In that capacity, Sarvis served in a supervisory and policymaking role for the Durham Police Department. Upon information and belief, Sarvis is, and at all times relevant to this action, was a citizen and resident of North Carolina.

61. JEFF LAMB is, and at all times relevant to this action, was the Commander of the District 2 Uniform Patrol Division of the Durham Police Department. In that capacity, Lamb served in a supervisory and policymaking role for the Durham

Police Department. Upon information and belief, Lamb is, and at all times relevant to this action, was a citizen and resident of North Carolina.

62. MICHAEL RIPBERGER is, and at all times relevant to this action, was a Lieutenant in the Durham Police Department's District 2. In that capacity, Ripberger served in a supervisory and policymaking role for the Durham Police Department. At all times relevant to this action, Ripberger's duties included supervising Defendant Gottlieb. Upon information and belief, Ripberger is, and at all times relevant to this action, was a citizen and resident of North Carolina.

63. LAIRD EVANS is, and at all times relevant to this action, was a Sergeant in District 2 Criminal Investigations Division, employed as a Uniformed Patrol Officer and then Investigations Supervisor in the District 2 Criminal Investigations Division of the Durham Police Department. At all relevant times to this action, Evans' duties included supervising Defendant Himan. Upon information and belief, Evans is, and at all times relevant to this action, was a citizen and resident of North Carolina.

64. JAMES T. SOUKUP is, and at all times relevant to this action, was the Director of the Durham Emergency Communications Center ("DECC"). In that capacity, Soukup served in a supervisory and policymaking role with respect to the DECC. Upon information and belief, Soukup is, and at all times relevant to this action, was a citizen and resident of North Carolina.

_____

65. DURHAM POLICE SUPERVISING DEFENDANTS. Collectively, Baker, Chalmers, Hodge, Russ, Mihaich, Council, Sarvis, Lamb, Ripberger, Evans, and Soukup are referred to herein as the "Durham Police Supervising Defendants."

## 2. Durham Police Spokesperson Defendants

66. KAMMIE MICHAEL is, and at all times relevant to this action, was the Durham Police Department's Public Relations Coordinator and Public Information Officer. Upon information and belief, at all relevant times to this action, Michael's duties included disseminating truthful, factual information to the press and the public in response to their inquiries, and providing complete and accurate information, documentation, and other materials responsive to requests from the public for publicly available information. Upon information and belief, Michael is, and at all times relevant to this action, was a citizen and resident of North Carolina.

67. DAVID W. ADDISON has since been promoted to the rank of Sergeant, but, at all times relevant to this action, was a Corporal employed by the Durham Police Department and served as the Durham CrimeStoppers Coordinator. Upon information and belief, in that capacity, Addison's duties included serving as an official spokesperson for the Durham Police Department. Upon information and belief, Addison is, and at all times relevant to this action, was a citizen and resident of North Carolina.

_____

68. DURHAM POLICE SPOKESPERSON DEFENDANTS. Collectively, Michael and Addison, are referred to herein as the "Durham Police Spokesperson Defendants."

### 3. Durham Investigator Defendants

69. MARK D. GOTTLIEB was recently transferred to a new District but, at all times relevant to this action, was a Sergeant in District 2 Criminal Division, employed as a Uniformed Patrol Officer and then Investigations Supervisor in the District 2 Criminal Investigations Division of the Durham Police Department, primarily supervising property related crimes. At all relevant times to this action, Gottlieb served in a supervisory role with respect to Defendant Himan and the Durham Police investigation of Mangum's false allegations of rape, sexual assault, and kidnapping. Upon information and belief, Gottlieb is, and at all times relevant to this action, was a citizen and resident of North Carolina.

70. BENJAMIN W. HIMAN is, and at all times relevant to this action, was an Investigator in the Durham Police Department's District 2 Criminal Investigations Division. Himan's primary duties include the investigation of property crimes. Upon information and belief, Himan is, and at all times relevant to this action, was a citizen and resident of North Carolina.

71. LINWOOD WILSON at all times relevant to this action, held himself out as an investigator, and was employed by the District Attorney for the Fourteenth Prosecutorial District in North Carolina. Nine days after Nifong's disbarment, on

or about June 25, 2007, Interim District Attorney Jim Hardin fired Wilson from his employment with the District Attorney's Office. Upon information and belief, Wilson is, and at all times relevant to this action, was a citizen and resident of North Carolina.

72.     RICHARD D. CLAYTON is, and at all times relevant to this action, was a District 2 Investigator in the Durham Police Department. Upon information and belief, Clayton is, and at all times relevant to this action, was a citizen and resident of North Carolina.

———————————

73.     DURHAM INVESTIGATOR DEFENDANTS. Collectively, Gottlieb, Himan, Wilson, and Clayton, are referred to herein as the "Durham Investigator Defendants."

———————————

74.     DURHAM POLICE DEFENDANTS. Collectively, Durham Police Supervising Defendants, Durham Police Spokesperson Defendants, and Durham Investigator Defendants, are referred to herein as the "Durham Police Defendants."

———————————

75.     CITY OF DURHAM DEFENDANTS. Collectively, the City of Durham, Nifong, Durham Police Supervising Defendants, Durham Police Spokesperson Defendants, and Durham Investigator Defendants, are referred to herein as the "City of Durham Defendants."

_____

76. POLICYMAKING DEFENDANTS. Collectively, Duke Police Supervising Defendants, Steel, CMT Defendants, Dawkins, Nifong, and Durham Police Supervising Defendants are referred to herein as the "Policymaking Defendants."

## C. DNASI Defendants

77. DNA SECURITY, INC. ("DNASI") is a corporation formed under the laws of the State of North Carolina with its principal place of business in Burlington, North Carolina. At all relevant times to this action, DNASI was retained by the State of North Carolina, the City of Durham, and/or the Durham Police Department, and/or the Duke Police Department to provide forensic DNA testing and analysis services in the investigation of Mangum's false allegations of rape, sexual assault, and kidnapping; and, in this capacity, acted under color of state law.

78. RICHARD CLARK is, and at all times relevant to this action, was the President of DNASI. At all relevant times to this action, Clark participated in DNASI's efforts to obtain a contract with the City of Durham for the provision of DNA testing and analysis services, and, in particular, Clark participated in the engagement of DNASI by the State of North Carolina, the City of Durham, and/or the Durham Police Department, and/or the Duke Police Department to provide forensic DNA testing and analysis services in the investigation of Mangum's false allegations of rape, sexual assault, and kidnapping; and, in this capacity, acted under color of state law. Upon information and belief, Clark is the controlling shareholder of

DNASI, and serves in a supervisory capacity with respect to DNASI's personnel. Upon information and belief, Clark is, and at all times relevant to this action, was a citizen and resident of North Carolina.

79. BRIAN MEEHAN, Ph.D. was, at all times relevant to this action, the Laboratory Director of DNASI. Upon information and belief, Meehan served in a supervisory capacity with respect to DNASI's laboratory personnel. At all relevant times to this action, Meehan was retained by the State of North Carolina, the City of Durham, and/or the Durham Police Department, and/or the Duke Police Department to provide forensic DNA testing and analysis services in the Durham Police investigation of Mangum's false allegations of rape, sexual assault, and kidnapping; and, in this capacity, acted under color of state law. Upon information and belief, Meehan is, and at all times relevant to this action, was a citizen and resident of North Carolina.

———————————

80. DNASI DEFENDANTS. Collectively, DNA Security, Inc., Clark and Meehan, are referred to herein as the "DNASI Defendants."

———————————

81. CONSORTIUM. Collectively, the Duke University Defendants, City of Durham Defendants, DNASI Defendants and other parties not yet named as Defendants in this action comprise a group, who conspired to violate the statutory and

constitutional rights of Duke University students are sometimes referred to herein as the "Consortium."

## JURISDICTION & VENUE

82. This is an action for damages arising out of violations of 42 U.S.C. §1983, 42 U.S.C. § 1985, 42 U.S.C. § 1986, 42 U.S.C. § 1988, the North Carolina statutes and its common law.

83. Pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343(a), this Court has original jurisdiction over Plaintiffs' claims arising under the Constitution of the United States as well as those arising under federal law.

84. Pursuant to 28 U.S.C. 1367(a), this Court has jurisdiction over Plaintiffs' claims arising under North Carolina law because those claims are part of the same case and controversy that give rise to Plaintiffs' federal law claims.

85. Pursuant to 28 U.S.C. § 1391(b)(1), (2), and (3), venue is proper in the Middle District of North Carolina because most or all of the Defendants reside and/or may be found in the Middle District of North Carolina and a substantial portion of the events that give rise to this action took place in the Middle District of North Carolina.

# THE FACTS

## III.     THE SECRET

### A.     This was the Duke Police Department's Case.

86.     The Duke Police Department had original, primary, and continuing authority to investigate Crystal Mangum's false accusations from March 14, 2006 through January 12, 2007, and it abdicated its obligation to do so.

87.     At the time Mangum claimed she was sexually assaulted at 610 N. Buchanan, the residence at 610 N. Buchanan was within the jurisdiction of the Duke Police Department—not the Durham Police Department. Pursuant to its statutory grant of authority, the Duke Police Department had an obligation to "initiate and conclude an investigation" of Mangum's false allegations "with or without the assistance of another law enforcement agency."

88.     After Mangum's allegations became a national media story, the Duke University Defendants and Durham Police Defendants conspired, agreed, and understood that the Duke Police Department would abandon its investigation of Mangum's false claims, and cede the investigation to Sgt. Mark D. Gottlieb, a known rogue officer, who, upon information and belief, only weeks before, was taken off the patrol beat due to his abusive tactics with Duke students, and to Inv. Benjamin W. Himan, a property crimes investigator with 2 months' experience.

89.     After the Duke Police Department abdicated its jurisdictional obligation to investigate Mangum's false claims, the Duke University Defendants, Ex-District

Attorney Michael B. Nifong, and the City of Durham Defendants colluded to conceal from the public the fact that the Duke Police Department had the authority and obligation to initiate and conclude an investigation of Mangum's false claims. For example, Defendant Richard H. Brodhead, Duke University's President, made the following statement in his prepared remarks to a national and international audience on March 28, 2006:

90.    "To determine responsibility, we need to learn the full truth as quickly as possible. While I have urged and while I continue to urge everyone to cooperate with this inquiry to the fullest.  Unavoidably, we have to look to the Durham Police to take the lead in the investigation.  Duke doesn't have the power to compel testimony from citizens of this city, and Duke lacks access to warrants, DNA records, and other confidential information. I have confidence in the authorities to find the truth and I have confidence that the authorities will take whatever legal steps are necessary in the best interests of this community."

91.    The video of Defendant Brodhead's prepared remarks is digitally annexed hereto as **<u>ATTACHMENT 1</u>**, and may be viewed below:



92.     Several Duke University Defendants cascaded this message and variations upon it in both public and private statements, beginning on March 28, 2006 and continuing as late as September 29, 2007.

93.     Duke Police Defendants, Duke Officials Defendants, and Durham Police Supervising Defendants then stood idly by as Nifong decapitated the police chain of command, and a miscarriage of justice began to unfold in plain view. They refused to be presented with the same evidence of innocence that ultimately exonerated the team when it was offered to them by undersigned counsel in March of 2006, and repeated their refusal when it was offered again and again. When it became clear that Mangum's allegations were a hoax, Duke University Defendants refused to intervene. When it became plainly obvious that Nifong and Durham Police Defendants were colluding to conceal evidence of innocence and conspiring to manufacture false inculpatory evidence, Duke Police Defendants and Duke Officials Defendants did not change course. Despite having the clear authority to do so, the Duke Police Department refused to intervene.

**B.     The Statutory Basis of Duke Police Department's Jurisdiction**

94.     North Carolina law enforcement agencies have only that power which is granted to them by the North Carolina Legislature.

95.     On July 18, 2003, the North Carolina Legislature enacted Session Law 2003-329 House Bill 736, Section 2 which amended N.C.G.S. § 116-40.5(b). The new law was enacted explicitly to authorize the City of Durham to enter into an agreement

with Duke University "to extend the jurisdiction" of the Duke Police Department "into the City of Durham." Shortly thereafter, on November 6, 2003, under North Carolina General Statutes N.C.G.S. § 116-40.5(b) as amended and N.C.G.S. § 160A-288, the City of Durham and Duke University agreed that the Duke Police Department would have primary jurisdiction over all properties owned or controlled by Duke University, regardless of location. A true and accurate copy of the 2003 Agreement ("2003 Agreement") is digitally annexed hereto as **ATTACHMENT 2**, and may be viewed within this document via the link below:



96.     Five months later, on April 6, 2004, the City of Durham and Duke University made technical amendments to the Agreement. The April 2004 Agreement (the "Police Jurisdiction Allocation Agreement") was the agreement in effect on March 14, 2006, and continues to govern the division of jurisdiction between the Durham Police Department and Duke Police Department today. A true and accurate copy of the Police Jurisdiction Allocation Agreement is annexed hereto as **ATTACHMENT 3**, and may be viewed within this document via the link below:



**C.** **Durham and Duke Police Departments had an Established Practice of Strictly Dividing Cases According to the Jurisdiction Allocation Agreement**

97. From the time Duke Police Department obtained primary jurisdiction over all Duke-owned property within city limits, the Duke Police Department was required to—and did—initiate and conclude investigations of crimes alleged to have occurred on Duke University's property, regardless of whether the property was situated on-campus or elsewhere within the city limits, and regardless of the severity of the crimes reported. Throughout 2006 the Duke Police Department responded to approximately 57,000 service calls. A cumulative report of the Duke Police Department stated that a total of 22 forcible sex offenses and rapes were reported to the Duke Police Department between 2003 and 2005. For example, Duke Police initiated and concluded investigations of, among others, the following alleged crimes:

   (1) An alleged rape was reported to have occurred at a Duke University dormitory on April 26, 2006. In the course of the investigation, Duke Police obtained key card access reports, a search warrant to search a Keohane dormitory room, and obtained DNA samples for testing. The Duke Police Department initiated, and upon information and belief, concluded their investigation and submitted a final investigative report to Nifong, all without the assistance of Durham Police. When asked why he

had not intervened in the rape case, Nifong replied that, "Duke police are handling the case the way I would expect it to be handled."

(2)   An alleged Assault and Second-degree Sexual Offense was reported within the Duke Police Department's jurisdiction, at 2100 DUMC North Hospital, on July 27, 2005.  The Duke Police Department initiated and concluded the investigation of that report. The Officer in Charge ("OIC") of the investigation was Duke Police Officer Scott Bolden.  The investigation was closed by arrest.  The supervisory signature on the report was Duke Police Lt. Davis J. Trimmer.  Upon information and belief, Durham Police played no role in the investigation.

(3)   An alleged Sexual Offense and Kidnapping was reported within the Duke Police Department's jurisdiction, at 2017 Yearby Street, on July 31, 2006. The OIC of the investigation was Duke Police Officer Christopher Day. The investigation was closed after exhausting all available leads without establishing a factual basis sufficient to arrest and charge any suspect.  The supervisory signature on the report was Duke Police Sgt. William C. Copley.  Upon information and belief, Durham Police played no role in the investigation.

(4)   A Breaking or Entering of a Motor Vehicle and Injury to Personal Property was reported to have occurred, within Duke Police Department's primary jurisdiction, at 704 N. Buchanan Blvd. on September 29, 2006.   The

property of 704 N. Buchanan Blvd. became Duke property in the same transaction in which Duke took ownership of 610 N. Buchanan Blvd., and, therefore, 704 N. Buchanan Blvd. was within the Duke Police Department's jurisdiction when the report was made. Duke Police Officer David R. Johnson was the OIC of the investigation. Officer Johnson closed the investigation without arrest after exhausting all leads. The supervisory signature on the report was Duke Police Sgt. Mark S. Faust. Upon information and belief, Durham Police played no role in the 704 N. Buchanan Blvd. investigation.

**D.  The Duke Police Department Conducted Itself at all Times as an Independent Law Enforcement Agency, Equal to Any Municipal Police Department**

98.  Prior to March 14, 2006 and after, the Duke Police Department proudly and aggressively asserted to the public that the Duke Police Department was no different than a city police department, or other "municipal polities," that it was a "full-fledged" police department with its own jurisdiction, high-tech resources, and a complete staff of fully commissioned police officers, investigators and crime-scene technicians. An example of the audio of a Duke Police officer is digitally annexed hereto as **ATTACHMENT 4**, and may be played within this document via the audio link below:



99.  Since the Police Jurisdiction Allocation Agreement in 2004, the Durham Police
     Department had an established policy and practice of automatically referring all
     reports of criminal activity within the Duke Police Department's jurisdiction to the
     Duke Police Department exclusively for its response and investigation.

     **1.  Durham 911 Automatically Dispatches 911 Calls Related to
          Duke-Owned Property to Duke Police, Not Durham Police.**

100. Upon information and belief Durham Police and Duke Police utilize the same
     Computer Aided Dispatch ("CAD") system and Durham Emergency
     Communications Center ("DECC").

101. At some time prior to December 5, 2005 the DECC received a new updated CAD
     System.  At the onset, Defendant James T. Soukup, Director of DECC, described
     the system upgrade from the 1988 CAD system version to the 2005 version:

     *"This upgrade will provide us with the capability to tie into
     similar systems in the Triangle so we can share information
     and better assist each other in times of crisis.  The upgrade
     will also result in the DECC having a system that is equal to
     the best of any 911 center in the nation."*

102. The 2005 version included among other things: GIS information with maps to
     assist telecommunicators with quicker and more accurate dispatch help to Durham
     residents and increased record keeping capabilities.

103. With its upgraded system DECC dispatched Kim Pittman's phony 911 call
     reporting a racial epithet at 610 N. Buchanan, Blvd. to the Duke Police
     Department because Pittman repeated the address, again and again, to be 610 N.

Buchanan Blvd., which, on March 14, 2006, was in Duke Police Department's jurisdiction.

104.   Examples of DECC automatically routing reports of criminal behavior on Duke-owned property to Duke Police, among others, include:

(1)   On April 12, 2006 at 8:47 p.m., Duke Police Department received a call from DECC about a break-in in progress at Duke-owned 1111 Urban Street.   Duke Police Officer Milan Sabanosh and Duke Police Officer Reggie Mills responded to the call.   Durham Police Officer W.K. Barfield, the officer who transported Mangum to the Durham Center Access on March 14, 2006, also responded to the call.   Because the property was owned by Duke and thus in Duke's primary jurisdiction, Barfield ceded the investigation to the Duke Police officers.   Duke purchased 1111 Urban Street at the same time it purchased 610 N. Buchanan Blvd.

(2)   On September 29, 2006 at 4:38 a.m., Duke Police Department officers were dispatched to Duke-owned 702 N. Buchanan Blvd. in reference to a vehicle break-in.   Duke Police Officer David Johnson, Duke Police Officer Reggie Mills, and Duke Police Officer Gideon Lecraft responded to the call.   Duke purchased this property at the same time it purchased 610 N. Buchanan Blvd.

### 2. The Duke Police Department was Sufficiently Competent to Investigate Mangum's Allegations and to Find the Same Facts that Convinced the Attorney General to Declare Mangum's Allegations a Hoax

105. Upon information and belief, if Defendant Robert Dean, Director and Chief of the Duke Police Department, Defendant Aaron Graves, Associate Vice President for Campus Safety and Security, Defendant Robert K. Steel, Chairman of the Executive Committee of the Duke University Board of Trustees, and CMT Defendants had not directed the Duke Police Department not to intervene, the Duke Police Department would have concluded a full and fair investigation of Mangum's claims. Among other things, upon information and belief:

(1) Duke Police investigators would have received the same evidence of innocence that compelled the Special Prosecutors to conclude that Mangum's allegations were categorically false.

(2) Duke Police would not have fabricated inculpatory evidence.

(3) Duke Police would not have concealed exculpatory evidence.

(4) Duke Police would not have intimidated witnesses essential to the defense.

(5) Duke Police would not have vilified Ryan McFadyen by placing the text of his email in a search warrant affidavit after Mangum could not recognize him in a photo identification procedure.

(6) Further, by March 21, 2006, if not sooner, Duke Police investigators would have concluded from the evidence that:

(a)     Mangum was not sexually assaulted at 610 N. Buchanan; and

(b)     Even if Duke Police thought Mangum had been sexually assaulted sometime prior to her arrival at DUMC on March 14, 2006, the members of the Duke University's Men's Lacrosse Team were ruled out as suspects by Mangum's own testimony.

### E.     At all times, the Duke Police Department's Jurisdiction Over 610 N. Buchanan Boulevard Gave it the Authority to Intervene

106.   At all times relevant to this action, beginning on March 14, 2006 and continuing each and every day through January 12, 2007 when the Attorney General's Office of North Carolina and its Special Prosecutors Section obtained jurisdiction, Duke Police Department had the statutory right and authority to initiate and conclude an investigation concerning Mangum's false allegations of rape, sexual assault, and kidnapping.

## IV.     ORIGINS OF THE DUKE-DURHAM CONSPIRACY

107.   The gross misconduct rampant in the investigation and prosecution of Mangum's false allegations was an aberration of the North Carolina justice system, but was not an aberration of Durham's justice system, at least insofar as Durham justice was applied to Duke students.  This aberration of justice was foreshadowed in Duke University's acquiescence—even participation—in similar misconduct by law enforcement that predated Mangum's allegations by years.  So much so that

by the fall of 2005, the egregious misconduct alleged herein was virtually inevitable. It was only a matter of time.

A. **Duke-Durham Policy to Target Duke Students for Disproportionate Enforcement of the Criminal Laws**

108. Sometime prior to the 2005-2006 school year, Duke University and the City of Durham colluded, conspired, and agreed to establish a law enforcement policy whereby Durham Police and Duke Police would target Duke students who lived or strayed off-campus for disproportionate enforcement of the criminal laws. Specifically, the policy required patrol officers to charge Duke students with criminal violations where Durham citizens would not be incarcerated. The policy will be referred to herein as the "Zero-Tolerance for Duke Students Policy."

109. The primary tools in the Zero-Tolerance for Duke Students Policy was the City of Durham's Noise Ordinance (§ 11-1) (2005); the City of Durham's Open Container Ordinance (§ 12-16.1); and the North Carolina statutes criminalizing underage possession of alcohol (N.C.G.S §18Bb-302(b), et seq.). These are all misdemeanors under North Carolina law, and a conviction under any one of them results in a permanent criminal record.

110. Duke University Defendants and City of Durham Defendants agreed and understood that each would act in furtherance of the Zero-Tolerance for Duke Students Policy.

111. City of Durham Defendants acted in furtherance of the Zero-Tolerance for Duke Students Policy, by, among other things:

(1)     Dramatically increasing enforcement of criminal ordinances and laws that were believed to be committed by Duke students, with an explicit emphasis on the City's Noise Ordinance;

(2)     Suspending patrol officers' discretion to warn or otherwise not charge an offense in cases involving Duke students by directing patrol officers bring criminal charges against every Duke student who was reported by a "permanent resident" of making noise that disturbed them or committed any other petty offense, without exception; and

(3)     In cases involving Duke students, directing patrol officers to arrest Duke students they charged with misdemeanors in direct violation of the General Order 4050 R-1 ("G.O. 4050 R-1"), which strongly discourages arresting and incarcerating misdemeanants.

112.    Duke University Defendants acted in furtherance of the Zero-Tolerance for Duke Students Policy by, among other things:

(1)     Directing the Duke Police Department not to intervene to prevent or aid in the prevention of the Durham Police Department's bias-based policing; and, instead, directing the Duke Police Department to aid the Durham Police Department's bias-based policing of Duke Students.

(2)     Enacting a new, unwritten "policy" to prosecute students charged with petty crimes off-campus through the University's undergraduate disciplinary processes.

(3)     To reach the off-campus conduct involved in the Zero-Tolerance for Duke Students Policy's campaign, Defendant Larry Moneta, Vice President for Student Affairs, and Defendant Bryan, Associate Dean of Students and Director of Judicial Affairs, had to expand the jurisdictional scope of the University's disciplinary system to reach these petty offenses committed off-campus that had no nexus with the University's legitimate interests or its educational mission.

(4)     Under Defendant Moneta's supervision, Defendant Bryan arrogated to himself the role of investigator, prosecutor, and judge in all of these cases. In Judicial Board hearings, Bryan would remain in the room during the panel's deliberations on punishment.  One of the unwritten "policies" that Bryan established, *sua sponte*, in the effort to reach all of the Zero-Tolerance for Duke Students Policy charges was to prosecute students who were acquitted at a trial on the charges, or whose cases were dismissed due to unlawful tactics employed by the police.

(5)     Upon information and belief, Defendant Bryan prosecuted off-campus conduct only if it was reported to him by police or by "permanent residents."

**B. Duke and Durham Publicly Condone and Ratify the Targeting of Duke Students**

113. In a letter dated August 10, 2005, Defendant Edward Sarvis, Durham Police Captain and District 2 Commander, spelled out the rationale for the Zero-Tolerance for Duke Students Policy. According to Defendant Sarvis' letter:

(1) The "permanent residents" in the neighborhoods off of East Campus resented Duke students; and

(2) Defendant Sarvis stated he was committed to putting an end to the permanent residents' problems with Duke students during the 2005-2006 school year, beginning with the out-of-state students living in the Trinity Park neighborhood.

114. Defendant Sarvis also stated that District 2 would accomplish this by, among other things, responding to complaints from "permanent residents" in the following way:

(1) If the Durham Police Department is called to a rental home concerning a party considered to be loud, the patrol officer responding would locate the out-of-state residents, and, at a minimum, charge them with misdemeanor Durham City Noise Ordinance violations.

(2) In violation of the G.O. 4050 R-1, which strongly discourages arrests of misdemeanants, patrol officers assigned to the Trinity Park beat were strongly encouraged to arrest and incarcerate Duke students if their response to being charged was not satisfactory to the officer.

(3)     Patrol officers would also charge the student-tenants of the homes based upon misdemeanors committed by individuals inside or near a Duke student's home, upon theories of vicarious criminal liability.

115.    For his part, Nifong would observe a "no drop" policy, pursuant to which his office refused to unilaterally dismiss charges brought against Duke students in the Trinity Park neighborhoods.

116.    Duke University Defendants and City of Durham Defendants involved in crafting the Zero-Tolerance for Duke Students Policy knew or reasonably should have known that the Policy itself violated the constitutional rights of Duke students; and that the primary tool of the policy—the Durham City Noise Ordinance—was facially unconstitutionally vague. Its vagueness was its chief virtue in the Zero-Tolerance for Duke Students Policy's campaign; it allowed patrol officers' unfettered discretion to arbitrarily and capriciously charge the out-of-state Duke students in the effort to rid the "permanent residents'" neighborhoods of the out-of-state students they "resented."

## V.     "ZERO-TOLERANCE FOR DUKE STUDENTS": AN ESTABLISHED POLICY AND PRACTICE IN THE FALL OF 2005

### A.     The Consortium's Warrantless Raids of Duke Students' Homes

#### 1.     The Planning and Execution of the Student Home Invasions

117.    On August 26, 2005, two days after many parents moved their sons and daughters into Duke University's East Campus dorms to begin their freshman year,

something took place in the neighborhoods off of East Campus that was more disturbing than the Zero-Tolerance for Duke Students Policy prefigured.

118. Over the summer, the Consortium's law enforcement agencies, including the Durham Police Department, the Duke Police Department, and the Alcohol Law Enforcement Division ("ALE"), planned a series of warrantless raids on Duke students' homes. They named the home invasion plan the "Back-to-School Operation." The first of the raids would take place the day after freshman students attended Convocation.

119. Although planned well in advance, the Consortium deliberately chose to raid the homes without obtaining warrants, despite the fact that the planned raids would require Consortium Agents to enter, seal off, and seize private homes for purposes of detaining, interrogating, and charging every student then inside.

120. The Back-to-School Operation began on August 26, 2005 and continued through August 28, 2005. As planned, the Consortium identified student homes where the greatest number of students appeared to be congregating at the time.

121. During the three-day Operation, roughly 200 Duke students were charged with misdemeanors.

122. The only evidence offered to support the charges against the Duke students were the fruits of the Consortium agents' unlawful entry, unlawful detention, and unlawful interrogation of the Duke students in private homes.

123. The Consortium's warrantless home-invasions were conducted in a virtually identical, unlawful manner each time:

(1)    After illegally entering the private home, multiple Consortium Agents surrounded the home, others stood guard at the doors to "seal off" all exits, and still others stood guard at the perimeter of the property to catch any Duke students who found a means of escaping the house, via unguarded windows or otherwise. At least one Duke student found a way to escape through an open window, but was captured by Consortium Agents and dragged back inside to be charged with resisting, obstructing, or delaying an officer, in violation of N.C.G.S. § 14-223.

(2)    Once Agents sealed off all means of exit, a pre-designated Agent announced to all of the Duke students inside the home that the home had been seized by law enforcement, that they were all in the custody of law enforcement, and no one would be permitted to leave until they were interrogated by the Consortium Agents stationed in each room of the house.

(3)    The interrogations proceeded in the same unconstitutional manner for each of the Duke students in the home:

(4)    Once the general announcement was made that no one inside was allowed to leave until interrogated, the Consortium Agents forced the students to line up in the rooms where the interrogating Agents were stationed.

(5)     The interrogations were conducted according to the same unconstitutional pattern in almost every case:

(a)     No student was advised of their *Miranda* rights, as required by the Fifth and Fourteenth Amendments to the United States Constitution.

(b)     First, the Consortium Agent demanded that the student confess to consuming alcohol that evening.

(c)     If the student admitted to consuming any alcohol that evening:

(i)      The Consortium Agent asked the student if he or she was 21 years old.

(ii)     If the student claimed to be 21 years or older, the Consortium Agent then demanded that the Student prove their innocence by showing "positive identification."

(iii)    If the student could not produce positive identification, the Agent charged the student with Underage Possession of Alcohol.

(iv)     If the student produced positive identification, the Agent would either charge the student with Aiding and Abetting Underage Possession of Alcohol, or, rarely, the student would be allowed to leave uncharged.

(d)     If the student denied consuming alcohol that evening:

(i)     The Consortium Agent would insult, intimidate, and otherwise degrade the student, insist the student was a liar, and demand that the Student prove his or her innocence by submitting to an Alcosensor Test;

(ii)    The Agents failed to bring an adequate supply of replaceable exhalation tubes for their Alcosensor devices, so they forced the students to perform the test with exhalation tubes that had been used and reused countless times.

(iii)   If the student refused to submit to the Alcosensor tests, the Agent charged the student with underage possession of a malted beverage, a misdemeanor, under N.C.G.S. § 18B-302.

(iv)    If the student submitted to the test and the Alcosensor produced no indication of alcohol present in the device, the student was released from the home uncharged.  However, if the Alcosensor produced any indication of the presence of alcohol in the device, the Agent charged the student with underage possession of a malted beverage, a misdemeanor, under N.C.G.S. § 18B-302.

(v)     In subsequent court proceedings, the charging Agents would testify that there was no evidence that any particular Duke student charged actually possessed alcohol in violation of the

North Carolina statute under which the students were charged. The evidence, such as it was, would come in the form of "admissions" the Agents obtained in violation of the Duke students' Fourth, Fifth, and Fourteenth Amendment rights.

**B.    In One Weekend, Consortium Agents Charged Roughly 200 Duke Students Without Admissible Evidence**

124.    The Agents did not have any legally obtained, admissible evidence to support the roughly 200 charges they filed against Duke students in the Back-to-School Operation. They did not have any evidence (admissible or not) that any of the Duke students charged actually possessed alcohol, in violation of North Carolina law.

125.    Shortly after the raids, undersigned counsel and other lawyers representing the students informed Nifong of the circumstances that made it plainly obvious that the raids were illegal; that they were conducted without warrants or exigent circumstances, and the students were interrogated without Miranda warnings. Nifong acknowledged the raids were unlawful at their inception and throughout, but, nevertheless, refused to dismiss the charges. The students were forced to retain counsel to defend the charges.

126.    The warrantless raids of student homes and unlawful detention and interrogation of the students therein were widely reported in the major Durham, Raleigh, and Duke University newspapers.

127. Upon information and belief, Duke University Defendants and City of Durham Defendants were aware of and approved the planned raids and the plainly unconstitutional manner in which they would be carried out. Further, knowing in advance of the agreement to conduct unconstitutional raids, and despite having the authority and opportunity to intervene, the Duke Police Supervising Defendants failed and/or refused to intervene. In fact, the Duke Police Department participated in the raids by providing assistance to the ALE Agents and the Durham Police Department.

128. The Consortium's plan to open the 2005-2006 school year with unconstitutional warrantless raids and Miranda-less interrogations of Duke students en masse was the opening salvo in what can only be described as a "war on Duke students." The police misconduct and abuse that was authorized and condoned in the raids did not merely continue unabated to March 14, 2006: it escalated. Further, the nature of the police abuse of Duke students revealed that several officers harbored contempt for Duke students.

129. Quickly, the pattern and practice of abusing Duke students escalated, and took on a personal cast. Early on, the escalating pattern of abuse became so alarming that Duke University's Senior Administrators were aware that the abuse posed a clear threat to the welfare of Duke students. Specifically, the abusive tactics, coupled with the University's tacit approval of it, created an obvious risk of serious irreparable harm to its students. Duke University Defendants had the authority

and opportunity to prevent the continuing conspiracy to violate their students' fundamental rights, but neglected or refused to intervene. Upon information and belief, Duke Police Defendants and Duke Officials Defendants did not withdraw their participation in the conspiracy.

   1.   **Duke Officials Condone the Warrantless Raids, Condemn the Violated Students and Promise Cumulative Prosecution of the Students Within the University's Disciplinary System.**

130.  No Duke Official publicly objected to the blatant violations of their students' constitutional rights in plain view. Instead, several of the Duke Officials Defendants publicly ratified and condoned the willful violations of their students' rights, and condemned their students for "boorish behavior." For example, the University endorsed the following public statements:

(1)   Defendant Bryan, the Associate Dean of Students and Director of Judicial Affairs, stated, "We're committed to investigating each incident and determining if a University policy violation is at issue and what response is appropriate."

(2)   Defendant Moneta, the University's Vice President for Student Affairs, assured the public that the University will "…likely take campus judicial actions [sic]…Duke can take actions for off-campus behavior."

(3)   Defendant Brodhead was also immediately aware of the warrantless raids of Students' homes. He did not condemn the open violations of his

students' constitutional rights. Instead, he went on National Public Radio stating, "I have great regret for what the neighbors of these party houses have had to experience. They have been the victims of boorish behavior."

(4)  The University's silence in response to the well-publicized abuse of Duke's students and their rights ratified and condoned it. Upon information and belief, the University never acknowledged that its students had been subjected to plainly illegal police conduct—*en masse*—or expressed concern about the escalating abusive tactics employed against its students by the Duke Police Department, the Durham Police Department, or the ALE Division.

131.  Pursuant to the University's Charter, Defendant Moneta is the Duke Official charged with responsibility for the students' welfare. Defendant Moneta and his Assistant Dean, Defendant Bryan, issued several press releases publicly promising internal University prosecutions of the students caught up in the home invasions, through Bryan's Judicial Affairs Office. Upon information and belief, every one of the students charged by Consortium Agents in the warrantless raids was subjected to Judicial Affairs inquiry upon the same evidence illegally obtained in the raids.

132.  Further, Defendants Moneta and Bryan did not have jurisdiction over the off-campus conduct they were prosecuting. Moneta and Bryan were authorized to reach off-campus conduct only if it was necessary:

*"to protect the safety and well being of the campus
community…[because the conduct] constitutes a direct or
indirect threat to the University community."*

133.    Students suspected of possessing beer does not fall within the ambit of a "threat to

the university community" sufficient to trigger the "safety and well being of the

campus community" exemption to Moneta's jurisdictional reach.  Nevertheless,

Defendants Moneta and Bryan arrogated to themselves the authority to prosecute

the students in the University's disciplinary system.

134.    Defendant Bryan's office received University funding to hire additional staff to

meet the demands of the expected volume of beer possession prosecutions his

office would handle.

**C.      Durham Judge Declares the Warrantless Raids and Interrogations of
          Duke Students Illegal**

135.    The students were forced to try their cases in Durham County District Court.  The

students retained counsel, many in joint representations to defray the costs of their

defense.  Undersigned counsel, together with several lawyers representing students

in these cases, filed a Motion to Dismiss and an extensive Memorandum of Law

detailing the primary violations of the students' rights.

136.    After a 3-day hearing beginning on October 27, 2005 and concluding on

November 3, 2005, a Durham County Judge, the Honorable Craig Brown, ruled on

the students' motion from the bench.  He summarily dismissed all of the roughly

200 cases brought by the Consortium, and called the Consortium's raids and

interrogations exactly what they were: plainly illegal.  Judge Brown ruled that the

evidence at the hearing established that the Consortium Agents had violated the students' Fourth, Fifth, and Fourteenth Amendments to the U.S. Constitution.

137. Judge Brown expressed his hope and expectation that law enforcement would quickly "get it right" in its investigation of Duke students suspected of violating the law.

138. They did not. The abuse of Duke students continued to escalate and soon culminated in the police investigation of Mangum's claims only four months later.

**D. Police Misconduct and Student Abuse Escalates and Turns Violent Through the Fall of 2005, Culminating in the Investigation of Mangum's False Allegations**

**1. Violent Police Raid of Student Gathering at the Belmont Apartments' Pool**

139. On September 17, 2005, four students were arrested by Consortium Agents at the Belmont Apartments. One student, Joseph Freimuth, was tackled from behind and his slammed into the pool-side concrete by Durham Police officers. Pictures published in local newspapers widely distributed at Duke University showed Freimuth tackled on the ground (below), and others showed his face bloodied.



140. Freimuth is a resident of the Belmont Apartments. He was charged with 2nd degree trespassing at his own apartment complex.

141. Consistent with the University's agreement and understanding with Durham Police, the University responded to the bloody raid of the Belmont pool by publicly promising that the University will "likely take campus judicial actions [sic]" against the students who, like Freimuth, were arrested at the Belmont. Defendant Moneta stated that, "the fundamental issue is responsibility and the level of responsibility one demands of intelligent students." Moneta added, (again) that "Duke can take actions for off-campus behavior."

142. On May 3, 2006, Freimuth was tried and acquitted on all charges. The judge ordered that all court records related to Freimuth's arrest and charges be expunged. Freimuth's acquittal was based, in part, on photographic evidence taken at the incident showing that Freimuth did not instigate or in any way prompt the officers' attack.

143. The police violence at the Belmont pool raid was unprovoked, and was but one example of the clearly escalating abuse Duke students were suffering at the hands of Duke and Durham law enforcement agencies and ALE agents in the Fall of 2005. Much of the police abuse and misconduct alleged herein was carried out in plain view of all of the Defendants.

144. It would have been clear to a reasonable policymaker that publicly condoning and ratifying the police abuse of Duke students and neglecting or refusing to intervene

would lead to further abuse and greater constitutional deprivations. Duke Police Supervising Defendants and Durham Police Supervising Defendants did not take remedial action in response to the misconduct known to them. As a consequence of the Defendants' failure to adequately supervise, reprimand or terminate the officers who abused their law enforcement authority in their dealings with Duke students in plan view of the University, the officers were emboldened. As a direct result, the Plaintiffs were subjected to police violations and abuses in geometrically greater dimensions, they were vilified before an audience of millions, and they were irreparably harmed.

145. Upon information and belief, Duke Police Supervising Defendants and Durham Police Supervising Defendants were aware of the facts relating to the police raid of the student gathering at the Belmont pool, and that the raid was conceived and executed solely out of an animus for Duke students, who were perceived as transient citizens of other states, and, on that basis were subjected to grossly disproportionate enforcement of the criminal laws; and yet were deliberately indifferent, willfully ignored and/or were grossly negligent with respect to the police misconduct, and its attendant physical, verbal, and psychological abuse that attended the Zero-Tolerance for Duke Student Policy's campaign.

### E. Gottlieb's Raid of 203 Watts

#### 1. A "Permanent Resident" of Trinity Park Reports a Non-Citizen "Disturbance" at 203 Watts Street the Day the Rolling Stones Played at Wallace Wade Stadium

146. On October 8, 2005, the Rolling Stones held a concert at Duke University's Wallace Wade Stadium.

147. Earlier that day, alumni and students gathered at 203 Watts Street, a student-rented home near East Campus. In the late afternoon, a person thought to be a guest at the party threw a bottle that broke on the walk of a neighbor's house, and drove away.

148. One of the student-residents of 203 Watts saw his neighbor in some distress and went over to her to ask if she needed help. The neighbor advised him that she had called the police and he should tell his guests to leave before the police arrived, which he did. The guests quickly dispersed, aware that automatic charges were likely imminent for anyone who remained at the residence. Many began walking to the concert. When the police arrived, no one was present at the home. There was no one to charge.

#### 2. Gottlieb Adopts the Case of the Noise Complaint at 203 Watts, and Obtains Search and Arrest Warrants for the Residents with the Aid of Duke Police

149. While Durham's attention turned to the concert, Sgt. M.D. Gottlieb, then a District 2 Patrol Supervisor, was assembling an affidavit to support his application for warrants to search 203 Watts and to arrest all of its residents. The crimes Gottlieb

was investigating were: (1) Violation of the City's Noise Ordinance; (2) Violations of the City's Open Container Ordinance; and (3) Possession of Stolen Property (a flag) reported as having been stolen from the front of Duke's main administration building (the Allen Building) during the previous school year.

150. Gottlieb did not know the identities of all of the residents of 203 Watts. He needed to describe the residents in order to obtain a warrant to arrest them. He obtained the detail he needed about the student-residents of 203 Watts from Duke University's Duke Card Office. The Duke Card Office did not notify the students before or after divulging their FERPA-protected educational records to Gottlieb.

151. Gottlieb incorporated the students' personal information and identification photos obtained from the Duke Card Office into his search and arrest warrants for the students the Duke Card Office and/or Duke Police Department identified as residents of 203 Watts. A true and accurate copy of Gottlieb's warrant application is digitally as **ATTACHMENT 5**, and may be viewed within this document via the link below:



152. Gottlieb would later compound the FERPA violations by sending a broadcast email to the PAC2 and Trinity Park Listservs, republishing all of the Students' FERPA-protected information (except the student pictures, which were too large to send via Gottlieb's email system). A true and accurate copy of the email sent

by Gottlieb is digitally annexed hereto as **ATTACHMENT 6**, and may be viewed

within this document via the following link: 

153. Gottlieb's factual basis for the noise and open container violations was the report

of the "permanent resident." The factual basis for the stolen flag allegation was

Duke Police Officer David Dyson's claim that he saw a Duke flag hanging on an

upstairs bedroom wall in the 203 Watts house that matched the description of a

flag that was stolen from the Allen Building the year before. In the warrant

application, Gottlieb reports the description of the stolen flag as follows: "4' x 6',

blue in color with a Duke logo." Nothing more. Gottlieb's eyewitness

identification, in essence, describes nearly any Duke University flag.

Nevertheless, the warrants were issued at 2:43 a.m. on October 9, 2005.

### 3. Gottlieb Recruited a Team to Execute the Watts Warrants

154. Armed with warrants to search the residence at 203 Watts Street and arrest the

students who lived there, Gottlieb, Duke Police Officer Dyson, and several other

Duke and Durham police officers converged on the Watts Street home at

approximately 3:00 a.m. Several officers took positions outside the house to

establish a perimeter, sealing off routes of escape for the sleeping residents.

155. Gottlieb and other officers broke into the home and dispersed into the living

quarters upstairs. Most of the student-residents were sleeping in their beds. All of

them were handcuffed, some while sleeping in their beds, rushed or dragged

outside, and placed in police cars. One witness recalls seeing a resident

handcuffed, in only boxer shorts, being dragged by his feet down the stairs, helpless as his head banged against each step all the way down the staircase. All of those present were transported to the Durham County Jail where Gottlieb formally charged them with violations of noise and open container ordinances. Bail was set for each of them.

### 4. The Trial of the 203 Watts Cases

156. Having no evidence to establish that any of the residents of 203 Watts actually violated the City Noise Ordinance or Open Container Ordinance, Nifong, upon information and belief, directed Assistant District Attorney ("A.D.A") Ashley Cannon to prosecute the students on amended charges. The amended charging instrument included the prior charge of the Noise Ordinance Violation and an amended charge of aiding and abetting unknown principals in the violation of the Open Container Ordinance. On this theory, all the A.D.A. needed to prove was that the students were present at 203 Watts at the relevant time.

157. All of the residents were acquitted of all charges, except the boy who went to help his neighbor. The neighbor testified that he was, in fact, at the residence at the relevant time.

### a. Defendant Trask Testifies for the State

158. In the "stolen flag" case, Gottlieb had seized the suspect flag in the raid, and charged one of the residents with possession of stolen property. Upon inspection at trial, however, the "stolen flag" that Gottlieb claimed "matched" the flag that

once flew in front of the Allen Building was actually made of cheap synthetic material, so thin as to be nearly transparent. The tell-tale "Duke Logo" on the flag was printed only on one side.

159. In an effort to save his flagging case, Gottlieb asked for a recess and returned within thirty minutes with Duke Executive Vice President Trask in tow. Defendant Trask was there to testify that the transparent vinyl flag with Duke's logo printed on one side appeared to him to be the same flag that flew in front of the Allen Building until it had been stolen roughly a year before.

160. The student was acquitted on the possession of stolen property charge.

## F.   Judicial Affairs Investigates the Students

161. After running the gauntlet of the criminal justice system in Durham, Defendant Bryan directed Kendra Sims to investigate the 203 Watts students for suspected violations of university policies on the same factual basis upon which they were acquitted.

162. Defendant Moneta's Assistant Vice President for Student Affairs, Defendant Suzanne Wasiolek, responded to reports of the Watts raids by issuing public statements assuring the community that the University was taking disciplinary action against the 203 Watts residents and other off-campus students who cause problems in the community.

163. No University Administrator objected to the gratuitous physical abuse that attended the arrests of Duke Students sleeping in their home, or noted the oddity

that the animating charge in all of the arrest warrants was an alleged noise ordinance violation committed the day the Rolling Stones played at Wallace Wade Stadium.

164.   Upon information and belief, Gottlieb, Duke Officer Dyson, and the Duke and Durham police officers who aided them in the raid of 203 Watts were aware that the raid was conducted solely because the subject of the neighbor's complaint was a home rented by Duke students pursuant to the Zero-Tolerance for Duke Students Policy's campaign, and yet were deliberately indifferent to the police misconduct, and its attendant physical, verbal, and psychological abuse, in furtherance of the conspiracy disproportionate enforcement to use the criminal laws to force Duke students out of neighborhoods where the "permanent residents" resent them.

165.   Upon information and belief, Duke Police Supervising Defendants and Durham Police Supervising Defendants were aware that the officers' raid of 203 Watts was conceived and executed solely out of an animus for Duke students, perceived as transients, and pursuant to the Zero-Tolerance for Duke Students Policy's conspiracy to rid Trinity Park of Duke student renters, and yet were deliberately indifferent, willfully ignored and/or were grossly negligent with respect to the police misconduct, and its attendant physical, verbal, and psychological abuse in their quest to force Duke students out of neighborhoods where the "permanent residents" resent them.

### G. Defendant Sarvis Ratifies and Condones the Escalating Police Abuse of Duke Students

166. Four days after police officers split open Joseph Freimuth's head on the pavement of his own swimming pool, Defendant Sarvis re-ratified and re-condoned the disproportionate enforcement of the criminal laws against Duke students. Further, he ratified and condoned the escalating police misconduct, physical abuse, and verbal abuse in their dealings with Duke students.

167. On September 21, 2005 Captain Sarvis wrote to the parents of students charged in the early weeks of the new policy's implementation to advise them that their son or daughter had been criminally charged, and included a copy of the citation. Sarvis went on to write the following:

> *"Although your son/daughter may be new to the Duke community...years of parties hosted by the Duke student residents...have led to a very negative perception by many permanent residents toward student [sic] living and visiting in these communities. It is our goal to change that perception this year... Although we consider your son/daughter an adult, we feel that you should be informed of the citation that he/she has received. First, we believe that in most cases parents assist students in rent and tuition payments and have a right to know of such activity. Second, we hope that you will use any influence you have on your son/daughter to discourage any recurrence of this activity. Please take the time to explain to him/her the potential long-term consequences of violating laws and facing criminal charges."*

**H.     District 2 Officer's January Encounter with the Residents of 610 N. Buchanan**

168.    On January 10, 2006, a "permanent resident" in the Trinity Park neighborhood called 911 to report a "banging" noise emanating from the trash cans next to 610 N. Buchanan.

169.    District 2 Police Officer K. Watt was dispatched to 610 N. Buchanan to respond. When Watt arrived at the house, he heard no trash cans banging. Watt entered the residence at 610 without a warrant and without consent. He asked a guest in the living room to speak with the tenants. Daniel Flannery and David Evans emerged, introduced themselves and advised Officer Watt that they lived there. Watt then charged both with City Noise Ordinance violations. Watt stated that he had no choice: he was dispatched to 610 N. Buchanan with a "directive from [his] supervisor" to charge the residents with misdemeanor violations of the City Noise Ordinance.

170.    Officer Watt claimed that both Evans and Flannery were cooperative, very polite, and were understanding about the directive compelling Watt to charge them even in the absence of any evidence to corroborate the noisy trash can reported by the 911 caller.

171.    Flannery tried his case and was acquitted. Evans accepted a deferred prosecution agreement.

## VI.    M.D. GOTTLIEB

### A.    Even Amidst Rampant Police Misconduct in the Fall of 2005, Gottlieb Emerged as a Unique Threat to the Safety and Welfare of Duke Students

172.    By March 13, 2006, Gottlieb was a known rogue officer with a proclivity for abusing Duke students.

173.    Student accounts revealed Gottlieb's disturbing behavior towards them.  Many students reported a police cruiser driving up on a sidewalk to block their path; and an officer racing at them from around the vehicle to either arrest them straight away or to fly into a raging interrogation on the street in plain view of passersby. Almost invariably they were arrested.  Once in the car on the way to jail, Gottlieb sometimes calmly explained that he was "on [their] side" and that he was doing this for their own good.  At least once, he suggested his arrest might well save their lives one day.  Alternatively, he would continue to verbally abuse the students on the way to their booking.  In one case threatening a student who believed he was here on a student visa with deportation.  In another, he threatened to put the students "in a cell with a couple of crack whores to show them what life was really like."

### B.    The Gottlieb Dossier

174.    Out of concern over Gottlieb's increasingly alarming tactics in his arrests of Duke students, undersigned counsel supervised an inquiry into Gottlieb's work.  The results of the inquiry came to be referred to as the "Gottlieb Dossier."  The Dossier

summarized representative student accounts of their personal interactions with Gottlieb as arrestees or as third party witnesses. In addition, the Dossier analyzed Gottlieb's arrest data collected from court records. The data revealed Gottlieb's grossly disproportionate pattern of arresting Duke students for misdemeanors as compared to his rate of arresting Durham citizens. For example, one of the statistical conclusions drawn from Gottlieb's arrest statistics included the following:

(1)     Gottlieb charged a total of 32 people. 19 were Duke students. Of the 19 Duke students charged, 16 were incarcerated; of the 13 Durham citizens charged only 6 were incarcerated.

(2)     Further research done by the *News & Observer* revealed that during the 10 months from May 2005 to February 2006, 71% of Gottlieb's formal arrests were Duke students (20 out of 28). Only 3% of the formal arrests made by Sgt. Dale Gunter, Sgt. John Shelton, and Sgt. Paul Daye were Duke students (2 out of 64).

175.   Further, at least 15 of the Duke students arrested by Gottlieb were taken to jail for alcohol and noise violations while non-students and "permanent residents" were not taken to jail for more severe offenses, including, for example, carrying a concealed .45-caliber gun.

176.   The Dossier also examined Duke students' accounts of their experiences with Gottlieb. The student accounts revealed the depth of the contempt Gottlieb

harbored for Duke students; and it was plainly obvious that his aggression in encounters with Duke students was escalating.

177. In court, Gottlieb would regularly fabricate his testimony to close holes in the State's case. Occasionally, he would fabricate his account beyond what was required to close holes, solely to disparage the student-defendant.

178. With the law enforcement power at his disposal, the only apparent limitation on the damage Gottlieb could do to students was the severity of the crimes he could charge them with. Duke students presented him with conduct that never exceeded misdemeanor charges. Long before March 14, 2006, it was plainly obvious that the harm Gottlieb could do to Duke students would be geometrically greater if Gottlieb was ever in a position to charge a Duke student with a serious felony.

### C. The Dossier was Delivered to Duke Officials and Gottlieb was Transferred Off the Patrol Beat in a Matter of Days

179. The Dossier was delivered to Defendant Burness' office, at his request, via hand delivery on February 16, 2006. Upon information and belief, Defendant Burness, Defendant Trask and/or other as yet unknown Duke University Defendants discussed the Gottlieb Dossier and its findings and shared them with Durham Police Supervising Defendants.

180. On or about February 21, 2006, five days after the Dossier was delivered to Defendant Burness, Gottlieb was taken off of the District 2 patrol beat. He was transferred to a desk job, as a Supervisor in District 2's Investigations Unit, to supervise investigations of property crimes reported in District 2.

**D.      Defendant Sarvis Publicly Ratifies and Condones Gottlieb's Abuses**

181.   Months later, in September of 2006, after Gottlieb's fraudulent "Supplemental case notes" in the investigation of Mangum's false claims became world-famous, the substance of the Gottlieb Dossier was released to the media and was widely reported in newspapers and television news programs.

182.   When the statistical analysis and several student interviews detailed in the Gottlieb Dossier were published in local newspapers, Defendant Sarvis emerged as the Spokesperson for the Durham Police Department on the matter, Defendant Sarvis did not deny the accuracy of Gottlieb's disproportionate arrest record, nor did he deny the specific students' accounts of Gottlieb's abuse.   Instead, Defendant Sarvis told representatives of the media that Gottlieb was doing what the Durham Police Supervising Defendants—including Defendant Sarvis himself—directed Gottlieb to do.   Specifically, on September 12, 2006, Defendant Sarvis stated to a reporter for the *Herald Sun*:

> *"I fully stand behind the decision to make an actual, physical arrest...   I sent every off-campus student in the Trinity Park area a letter and warned them of this very thing.   They knew to expect it.   Maybe they didn't like it, but they certainly can't say they weren't warned.   They were warned...   [Gottlieb] was doing his job, and doing what I asked him to do."*

183.   Defendant Sarvis, in his capacity as District 2 Commander, unequivocally admitted that he knew of the details of Gottlieb's abusive tactics with Duke students, his grossly disproportionate arrest record, and the disturbing accounts of the students interviewed for the news reports on the Gottlieb Dossier.   Further,

Defendant Sarvis, in his capacity as Commander of District 2, insisted that Durham Police Supervising Defendants condoned and ratified Gottlieb's misconduct in dealings with Duke students throughout the time period documented in the Dossier and in news accounts.

184. Shortly after Defendant Sarvis' public endorsement of Gottlieb's record of abuse, the Durham Police Department rewarded Defendant Sarvis with a promotion to the Professional Standards Division.

**E.    Duke University Officials Ratify and Condone Gottlieb's Abuses and Reveal that the University was an Author of the Zero-Tolerance for Duke Students Policy.**

185. As Defendant Sarvis aggressively defended Gottlieb's record of abusing Duke students, Defendant Burness feigned ignorance of the Dossier to a reporter for the *Herald Sun* and suggested that it was a matter for the City Manager and the Durham Police Department to address.

186. Defendant Brodhead, in the same time period, during a talk with a group of Duke students on campus, was asked by one of the students whether Duke was going to do anything to protect its Students from the abusive police tactics that Defendant Sarvis had publicly condoned. Defendant Brodhead replied, "No," and advised the students that, in fact, Duke was an author of the Zero-Tolerance for Duke Students Policy.

187. Shortly after Gottlieb was removed from the patrol beat, Gottlieb privately claimed that "something big" was going to happen that would ameliorate the rising

tensions between Duke students and Durham Police who patrolled the neighborhoods along Markham and Buchanan Blvd. Gottlieb claimed that the "big" event would be made public at the end of February. Upon information and belief, Gottlieb was referring to the imminent purchase of a group of properties off East Campus in Trinity Park.

**VII.    DUKE UNIVERSITY'S PURCHASES OF PROPERTIES ALONG THE EAST CAMPUS BORDER, INCLUDING 610 N. BUCHANAN BLVD., THEREBY ASSUMING PRIMARY POLICE JURISDICTION OVER THOSE PROPERTIES**

188.   On February 28, 2006, the Durham County Register of Deeds recorded a deed conveying to Duke University fee simple ownership of 610 N. Buchanan Blvd.

189.   Duke purchased 610 N. Buchanan Blvd., along with a raft of other properties that border East Campus, including:

(1)     508 N. Buchanan Blvd.;

(2)     702 N. Buchanan Blvd.;

(3)     704 N. Buchanan Blvd.;

(4)     708 N. Buchanan Blvd.;

(5)     710 N. Buchanan Blvd.;

(6)     814 Lancaster St.;

(7)     700 Maplewood Ave.;

(8)     1105 Urban Ave.;

(9)     1107 Urban Ave.;

(10) 1111 Urban Ave.;

(11) 203 Watts St.;

(12) 601 Watts St.;

(13) 913 Wilkerson Ave.; and

(14) 921 ½ Wilkerson Ave.

190. A true and accurate copy of the deed transferring 610 N. Buchanan Blvd. and the other properties listed above is digitally annexed hereto as **<u>ATTACHMENT 7</u>**, and may be viewed within this document via the link below:



191. Prior to Duke's purchase, 610 N. Buchanan was within the "Extraterritorial Jurisdiction" of the Duke Police Department, and, as such, jurisdiction over it was shared between the two departments, with Durham Police having "primary responsibility."

192. When the University took ownership of 610 N. Buchanan, the residence was swept within the ambit of the Duke Police Department's primary jurisdiction, and, as such, the Duke Police Department assumed the "authority and primary responsibility" to "initiate and conclude" a police investigation of any criminal activity reported to occur at 610 N. Buchanan on or after February 28, 2006.

193. When Mangum falsely reported a gang rape at 610 N. Buchanan on March 14, 2006, the Duke Police Department was the law enforcement agency with "primary responsibility" to initiate and conclude an investigation of her false claims.

## VIII.    THE FIRST 48 HOURS

### A.    Overwhelming Evidence that Mangum was not Assaulted at 610 N. Buchanan is Amassed in the First 48 Hours of Mangum's False Accusation.

#### 1.    The Party, Such as it Was

194. The residents of 610 N. Buchanan hosted a party on March 13, 2006. The party, such as it was, began at midnight and ended at 12:04 a.m.

195. During the afternoon hours of March 13, 2006, hosts of the party made arrangements by telephone for two dancers to perform at 610 N. Buchanan, beginning at 11:00 p.m.

196. The first dancer, Kim Pittman, arrived at 610 N. Buchanan at roughly 11:15 p.m. Pittman was wearing jeans and a blouse, with her performance attire in a bag. Pittman remained outside of the residence, speaking with some of the young men, waiting for the second dancer to arrive.

197. Mangum's driver, Brian Taylor, dropped her off 40 minutes late, at approximately 11:40 p.m. She appeared to have come to 610 N. Buchanan directly from a prior event; she was wearing her dancing attire, not street clothes. Wherever she had been prior to her arrival at 610 N. Buchanan, her activities there had left her dazed and stumbling. Many believed she was impaired from alcohol or perhaps drugs;

others thought it was something else but did not know what—they had never seen anyone behave like that before.

198. Jason Bissey, who lived in the neighboring house, watched the two women plan their routine outside of the house. He watched them enter the residence. Shortly thereafter, he looked at his clock, which read midnight.

199. A picture captured the two dancers as the dance began in the living room. The metadata in the digital file containing the image automatically recorded the time the picture was taken: 12:00:29 a.m. An analog watch worn by a party guest is visible in the picture reads midnight. The analog watch in the pictures corroborates the photo's metadata.

200. Mangum was incapable of dancing in any fashion. As she took off her shoes in the living room, she leaned heavily on Pittman, and fell to the ground. She was speaking unintelligibly to no one in particular.

201. A sequence of pictures from 12:00:21 a.m. to 12:03:57 a.m. corroborates the party guests' accounts that they quickly became uncomfortable and/or disinterested. Pittman made an effort, but Mangum's behavior morphed from odd to bizarre. The dance, such as it was, was over within four minutes.

202. Another digital picture captured Pittman and Mangum departing the room without objection from the guests, at 12:03:57 a.m. The two women did not return to the living room again. In that same picture, Crystal's right shoe is visible, abandoned on the living room floor. Durham Police affidavits would later claim that

Mangum's right shoe was lost in a violent struggle as she attempted to flee from her "attackers."

203. At 12:26 a.m., Mangum called her agency, Centerfold, from her cell phone. The party was clearly over, and Mangum was looking for more work elsewhere.

204. Jason Bissey told police that, at around 12:30 a.m., he saw that Mangum had exited the car, and was walking alone towards the rear of the house. Bissey could hear Mangum talking loudly to no one in particular, saying she lost her shoe.

205. At 12:30:24 a.m., a digital photo shows Mangum is standing outside of the closed back door of 610 N. Buchanan. She has opened the screen door, but is apparently locked out of the house.

206. In the picture taken at 12:30:47 a.m. shows Mangum smiling. She is in no apparent distress whatsoever. She is not fleeing from a violent rape. She is not being beaten by her "attackers" in the back yard. Instead, at 12:30:47 a.m., Mangum is smiling. She is also rummaging through Dave Evans' travel kit, which she inexplicably took from his bathroom.

207. At 12:31:26 a.m., a short video clip captured Mangum stumbling down the stairs and around the backyard. She was clearly impaired and professing to be "a cop" to no one in particular. As the video clip ends, she is heading back toward the stairs, where she fell in an effort to climb them.

208. At 12:37:58 a.m., a picture captured Mangum still lying down on the back stoop from falling. In the fall, she sent Evans' travel kit and some of her belongings

flying into the yard. She was helped to her feet and assisted in the walk from the back stoop to Pittman's car.

209. At 12:41:32 a.m., another picture captured Mangum being assisted into Pittman's car, before Pittman drove away for the evening. Pittman asked Mangum if she had her money, and Mangum insisted that she did. Not seeing the money, Pittman drove off nevertheless.

210. Plaintiffs' defense counsel assembled the pictures, video, their metadata, and Bissey's statement into an immutable timeline that was the foundation for all 47 team members' digital alibis. The digital alibis were in place by March 26, 2006.

211. As early as March 27, 2006, undersigned counsel offered to present this evidence of innocence to Brodhead or any designee he chose. Brodhead refused the offer.

212. On two separate occasions before indictments, Nifong was also offered the opportunity to view this evidence of innocence. Like Brodhead, Nifong refused to see it.

213. Special Prosecutors Coman and Winstead relied on the same digital evidence that Brodhead and Nifong refused to see, and to be confident enough in their conclusion to declare the Plaintiffs and their teammates "Innocent."

## 2. The "Anonymous" 911 Call

214. As she drives off, Pittman engaged some of the party guests in verbal banter outside of 610 N. Buchanan. As she was driving away, Pittman made a

derogatory racial remark and received one in turn. Pittman stopped her car and shouted "That's a hate crime!"

215. Pittman then made a show of calling the police. Making sure dispatch got the address, Pittman was heard saying "610 N. Buchanan!" again and again. The students who were still present knew that, in this neighborhood, Pittman's 911 Call would bring "automatic citations" to anyone who was still present when the police arrived. They all left quickly.

216. Pittman's phony 911 call was received by DECC at 12:53:17 a.m., and completed at 12:54:12 a.m.

217. It was plainly obvious from the 911 call itself that that the call was a poorly veiled ruse. Among other things:

(1)    The caller says that she was "driving down near Duke's campus" when the slur was made. Later in the call she repeated the account—incorrectly— stating that she and her girlfriend were "walking by" the house.

(2)    The caller first claimed that the epithet was made by a "guy by the Duke wall." Later in the call, Pittman repeated the account—again incorrectly— stating that the epithet came from someone in a group that came out like "a big frat house" from the residence. The house and the wall are on opposite sides of the street.

(3)    It is clear that the caller is feigning hysterics; she is alternatively calm, analytical, and sobbing from one moment to the next.

(4)     Perhaps the clearest indication of fraud was Pittman's repetition of the house address three times during the call.  The façade of 610 N. Buchanan does not bear its number; it fell off long before Pittman's call.  A passerby could not know the street address of the residence merely by walking (or driving) by the house.  Pittman, of course, got the address from her agency.

### 3.     Sgt. J.C. Shelton Responds to Pittman's 911 Call

218.    The Emergency Telecommunicator routed Pittman's call to the Duke Police Department.  Durham Sgt. John C. Shelton was stationed nearby the 610 N. Buchanan residence when he heard the call on the radio; he proceeded to 610 N. Buchanan, and joined Durham Officer J.M. Stewart there.

219.    Sgt. Shelton and Officer Stewart walked around the house.  They found no one there.  Like the party guests at the 203 Watts house in the fall, the last few remaining party guests scattered when they heard Pittman shouting "610 N. Buchanan" into her phone.  Only a few months earlier, several team members looked on as Officer Watt explained to Evans and Flannery that a "directive" gave him no choice but to charge them when he got to the location of the "disturbance."  It mattered little that Pittman's allegations did not constitute a crime, it was safe to assume that anyone still there when the police arrived would be charged with something.

220.    15 months later Nifong would testify that he still believed "something happened" in that bathroom, "to make everybody leave that scene very quickly."  Nifong

himself has insisted on prosecuting hundreds of Duke students solely because "they were there" when police arrived.

221. The video of Nifong's remarks is digitally annexed hereto as **ATTACHMENT 8**, and may be viewed below:



### 4. On the Drive Away from 610 N. Buchanan: Evidence of Psychosis

222. As Pittman and Mangum drove away, Pittman recalled to police that Mangum was "talking crazy." Police notes do not elaborate on what Pittman meant. However, Pittman told reporters that the "trip in that car from the house went from happy to crazy. I tried all different ways to get through to her. I tried to be funny and nice. Then I tried to, you know, be stern with her." Nothing worked. Mangum seemed unaware Pittman was even there. As a last-ditch attempt to get Mangum out of her car, Pittman began pushing Mangum out, shouting at Mangum "Get out of my car. Get out of my car." Then Mangum, with her head hanging down, said to Pittman: "Go ahead, put marks on me. That's what I want. Go ahead."

223. At that, Pittman drove straight to the 24-hour Kroger, to find an off-duty officer there to help get Mangum out of her car. Pittman quickly found the security guard, Angel Altmon, inside the Kroger,.

### 5. Angel Altmon: "Ain't No Way."

224. Angel Altmon tried, but could not coax Mangum out Pittman's car, so she called 911 for police assistance. Altmon's call was received by DECC at 1:22:29 p.m.

225. The audio of Altmon's 911 call is digitally annexed hereto as **ATTACHMENT 9**, and may be played within this document via the audio link below:



226. DECC dispatched Altmon's call as a "10-56 female refusing to get out of dark colored Honda Accord in the Kroger parking lot." "10-56" means "drunk and disorderly pedestrian."

227. Altmon saw no indication that Mangum may be the victim of a sexual assault.

228. Durham Officer W. K. Barfield and Sgt. Shelton were dispatched to the Kroger.

229. When Sgt. Shelton arrived, Pittman immediately admitted to him that she was the one who placed the prank 911 call reporting a racial epithet at 610 N. Buchanan.

230. Pittman told Sgt. Shelton that Mangum was a total stranger to her; just someone she picked up as Mangum was staggering down the sidewalk along the East Campus wall when Pittman was driving by. Pittman also told Sgt. Shelton about Mangum's bizarre behavior in the car.

231.    When Sgt. Shelton approached Mangum, she was still inside the car, feigning unconsciousness.  Sgt. Shelton suspected a ruse, so he broke open an ammonia capsule under Mangum's nose, and Mangum began mouth-breathing, confirming his suspicions.

232.    Sgt. Shelton then began pulling on Mangum to get her out of the car.  Mangum sprung to life, grabbed the parking break and held on so tightly that Sgt. Shelton and another officer could not get her out of the car.  To break Mangum's resistance, Sgt. Shelton used a "bent-wrist come-along" and had to apply significant pressure to force Mangum to let go of the parking break.  When Sgt. Shelton finally got Mangum out of the car, Mangum resumed feigning unconsciousness.

233.    The entire time Mangum was in the Kroger parking lot, she did not say or suggest that she had been assaulted.  No one there had any reason to believe that Mangum had been sexually assaulted.

    **B.    Mangum's Bizarre Behavior Meets the Criteria for Emergency Involuntary Commitment**

234.    After observing Mangum in the Kroger parking lot, Sgt. Shelton believed that Mangum's bizarre behavior was best explained by impairment (drugs or alcohol).  Sgt. Shelton decided to take Mangum to the Durham County Jail to be detained there on "twenty-four hour lock up status," until she sobered up.  DECC was notified of the decision and Mangum was placed in the backseat of Officer Barfield's patrol car.  The officer told DECC: "She's breathing, appears to be fine.

She's not in distress. She's just passed out drunk." The audio of the dispatch notifying DECC of the decision to take Mangum to a 24 hour hold is digitally annexed hereto as **<u>ATTACHMENT 10</u>**, and may be played within this document via the audio link below:



235. Thereafter, Mangum's behavior could not be explained by drugs or alcohol. Based on his experience, Sgt. Shelton believed Mangum's behaviors indicated a severe mental illness, that she was imminently dangerous to herself or others, and that she was in need of immediate psychiatric care. Shelton withdrew his 24-hour-hold order, and directed the officers to initiate emergency involuntary commitment proceedings.

236. The dispatch audio recordings of these DECC communications relating to Mangum's involuntary commitment were not released and were later destroyed after undersigned counsel demanded in writing that they be produced or preserved.

237. On April 3, 2006, Private Investigators Allison Blackman and Dennis Lane, retained by undersigned counsel, found and interviewed Angel Altmon, the Kroger security guard. The Durham Police had not yet interviewed Altmon or asked for her statement. It would be 9 months before a Durham Police investigator interviewed Altmon, on December 7, 2006.

238. Altmon was an important witness. She was the first fact witness not at the party to encounter Mangum after she left from 610 N. Buchanan. Like Sgt. Shelton, Altmon was confident that Mangum had not been sexually assaulted. Altmon also was privy to some of the same behavior that caused Sgt. Shelton to conclude that Mangum met the criteria for involuntary commitment.

239. In the interview conducted by Blackman and Lane, Altmon told the investigators that neither Mangum nor Pittman mentioned anything at all about an assault of any kind. When they asked Altmon if there was anything about Mangum's appearance or behavior that even suggested Mangum had been sexually assaulted, Altmon replied, "Ain't no way!" The audio segment of the interview with Altmon is digitally annexed hereto as **ATTACHMENT 11**, and may be played within this document via the audio link below:



C.      **Durham Center Access**

1.      **The Involuntary Commitment Proceedings**

240. After the decision had been made to initiate involuntary commitment proceedings at the Durham Center Access, Mangum overheard a radio exchange between Durham Officers. One officer reported that Mangum had two young children at home, possibly alone. Mangum also overheard the responding officer direct a police unit to go to Mangum's house to check on the children, and, if there was no

adult supervision there, to call the Department of Social Services ("DSS") for intervention.

241. Based upon her prior commitments, Mangum would have known that she would be helpless in a DSS investigation if she was involuntarily committed at its inception, and would fear that DSS would take her children away from her.

### 2. Mangum "Nods" Rape

#### a. Mariecia Smith

242. Supervisor Mariecia Smith was on duty at the Durham Center Access when Officer Barfield presented Mangum for involuntary commitment. Mangum told Ms. Smith her name was "Honey" and she did not want to go to jail. Ms. Smith smelled alcohol on Mangum's breath.

243. Mangum did not tell Smith she had been raped or assaulted in any way.

#### b. Alycia Wright, RN

244. In the assessment room, a Durham Center nurse, Alycia Wright, asked Mangum questions as part of the commitment evaluation. Mangum refused to respond to her questions. Instead, Mangum wrote the names of her children on a piece of paper.

245. Wright saw Mangum writing her children's names, and asked if they were her children's names. Mangum nodded, yes.

246. Wright then asked, "did something happen to your children?" Mangum said "no."

247. Wright then asked Mangum, "did something happen to you?" Mangum nodded, yes.

248. Wright then asked Mangum, "were you raped?" Mangum nodded, yes.

249. By nodding "yes," Mangum extracted herself from the involuntary commitment proceedings, and spared herself the possibility of being separated from her children. Police protocol required immediate suspension of the commitment proceedings to obtain a Sexual Assault Examination ("SAE"), Mangum was transported to Duke University Medical Center's Emergency Department ("E.D.") for that purpose, and DECC dispatched a female officer to meet Mangum at the E.D. all pursuant to protocol.

250. Nurse Wright claimed that she believed Mangum was neither drunk nor high; instead, she thought Mangum's bizarre behavior was consistent with fractured thinking, and a break with reality. Both observations are DSM-IV symptoms of psychosis.

251. During the entire time Mangum was at the Durham Center Access, she did not provide any detail of the rape or her attacker(s).

### c. Officer Barfield

252. Officer Barfield transported Mangum from the Durham Center Access to DUMC. Mangum did not provide to Officer Barfield the number, names, aliases, or descriptions of her "attacker(s)" nor did Mangum provide Officer Barfield any details of the alleged attack. Mangum did, however, provide Officer Barfield with

a detailed description of the property she insisted was stolen by Pittman:  her money ($2,000), her ID, her cell phone, and her bag.

253.    Upon information and belief, Duke Police Supervising Defendants, Duke Police Investigator Defendants, Steel, CMT Defendants, Wasiolek, SANE Defendants, Nifong, Durham Police Supervising Defendants, and Durham Police Investigator Defendants, were aware of Mangum's bizarre behavior; of Nurse Wright's observations that Mangum exhibited in the midst of a break with reality; that Sgt. Shelton concluded she was exhibiting signs of a serious mental illness requiring emergency psychiatric intervention; and of the likelihood that Mangum was suffering from a severe mental illness, that, at a minimum, mimicked the symptomology of schizophrenia (or severe mania).  Aware of these things, the Defendants conspired to conceal, willfully ignored, and/or were deliberately indifferent to this evidence.  They also conspired to conceal, willfully ignored, and/or were deliberately indifferent to evidence demonstrating Mangum's false claim of rape was the product of duress caused by the threatened loss of her children in the involuntary commitment that was already underway.

254.    Upon information and belief, Duke Police Supervising Defendants, Duke Police Investigator Defendants, Steel, CMT Defendants, Wasiolek, Duke SANE Defendants, Nifong, Durham Police Supervising Defendants, and Durham Police Investigator Defendants, were aware of the foregoing and, in addition, that Mangum overheard the police radio exchange ordering a patrol unit to Mangum's

house to see if her children were alone; the suggestive questioning that prompted Mangum's half-hearted false claim of rape; the specious circumstances surrounding it; and Mangum's troubled psychiatric history, revealed at the Durham Center Access, including Mangum's previous involuntary commitments. Aware of these facts, said Defendants conspired to conceal, willfully ignored, and/or were deliberately indifferent or grossly negligent with respect to this evidence of Plaintiffs' and their teammates' actual innocence.

255. To the contrary, upon information and belief, beginning in March of 2006, Duke Police Supervising Defendants, Duke Police Investigator Defendants, Steel, CMT Defendants, Wasiolek, Duke SANE Defendants, Nifong, Durham Police Supervising Defendants, and Durham Police Investigator Defendants agreed to conceal the evidence of the events at the Durham Center Access on March 14th, knowing their obvious relevance to Mangum's credibility.

256. The conspiracy to conceal and/or willfully ignore this evidence of innocence was in furtherance of the Defendants' efforts to retaliate against the members of the team because all of them were perceived as and understood to be citizens of other (northern) states, and because they refused to confess to crimes they did not commit or bear false witness to events that did not happen.

257. Upon information and belief, Duke Police Defendants, Steel, and CMT Defendants, were aware of all of the foregoing, had the authority and opportunity to intervene, and refused or failed to do so.

### D. Additional Overwhelming Evidence of Innocence Is Gathered During Mangum's 11 Hours at DUMC on March 14, 2006

#### 1. Sgt. Shelton Questions Mangum, and She Recants

258. When Mangum arrived at DUMC, police did not know where Mangum's alleged rape occurred. Sgt. Shelton went to DUMC to question Mangum, who was then "cooperative". Sgt. Shelton questioned Mangum about her rape claim, and Mangum recanted it. Mangum insisted, however, that her money had been taken, and she wanted the police to get it back.

259. Sgt. Shelton emerged from his interview of Mangum and told the officers assembled there that Mangum had lied at the Durham Center Access. As Sgt. Shelton was reporting that Mangum had recanted her rape claim to his Watch Commander, someone advised him that Mangum was now claiming she was raped again. The Watch Commander instructed Sgt. Shelton that "C.I.D. had been notified." Sgt. Shelton left while Duke Police began to initiate an investigation.

260. The audio recording of Sgt. Shelton reporting that Mangum recanted was erased by City of Durham Defendants after undersigned counsel made requests to produce or preserve all audio recordings relating to Mangum's claims.

261. Sgt. Shelton knew that Mangum was lying.

#### 2. Officer Gwen Sutton's Interview of Mangum

262. After Mangum recanted and renewed her rape claim to Sgt. Shelton, Durham Officer Gwen Sutton interviewed Mangum. Officer Sutton learned from Sgt. Shelton that the last known place Mangum had been prior to her arrest was 610 N.

Buchanan. The only address Mangum had given to the Police was "610 Mangum."

263. Mangum told Officer Sutton that the rape occurred at a "bachelor party." In this telling, Mangum claimed:

(1)     Twenty men were present at the bachelor party;

(2)     Five men raped her in a bathroom at the bachelor party;

(3)     She was not dragged into the bathroom, but "ended up" there;

(4)     Mangum provided only one of the (then 5) attackers' names: Brett. Brett (in this account) penetrated her vagina with his hands and penis. Mangum told Officer Sutton that she was bleeding vaginally, a claim that proved to be a lie.

(5)     Mangum accused "Nikki" (Pittman) of stealing her money and cell phone. However, Mangum then admitted to Officer Sutton that she may have deposited that money into the Agency's account at an ATM.

264. In addition, Mangum told Officer Sutton that she and three other women, named Nikki, Angel, and Tammy performed together at a bachelor party held at 610 N. Buchanan. Mangum was improvising an account of events, transparently drawing upon details from recent unrelated events and the individuals involved in them. Here, in Mangum's account to Officer Sutton of three other women, "Nikki," of course, was Pittman; "Angel" was Angel Altmon, the Kroger Security Guard; "Tammy" was Tammy Rose, Mangum's contact at the escort service.

265.  Sutton knew that Mangum was lying.

266.  In all of her initial accounts of the events during multiple interviews, Mangum gave no descriptions of her alleged attackers; she did not mention Duke, Duke students, a team, athletes or any sport of any kind.  She did not mention lacrosse.  She only named one "attacker" (Brett), and reversed herself on that detail.  In the first account, she claimed Brett sexually assaulted her "with his fingers and his penis;" however, in a later account, "Brett" did nothing to her, she said only that "Brett knew the deal" and that "the guys weren't with it."

267.  The only element of Mangum's account that remained somewhat consistent in her many versions were that Pittman had stolen her money, her purse, her ID, and her phone.  Mangum was not interested in pursuing her false allegations of rape; she recanted her claim in the first police interview at the hospital.  However, Mangum was keenly interested in getting her property back.

**E.    Durham Police Determine that 610 N. Buchanan is in the Duke Police Department's Jurisdiction and the Case is Transferred to Duke Police Investigators**

268.  The location of Mangum's allegations was not established until Mangum was interviewed at DUMC.  As Mangum was being transported from the Durham Center Access to DUMC for a SANE exam, an officer reported over the radio that Pittman had lied when she claimed that she had picked up Mangum on the street in front of 610 N. Buchanan.  Another officer replied incredulously, "the one that we

talked to at the Kroger knew her?" The first officer responded, "it is quite possible that they worked together." That exchange was recorded at 2:39:03 a.m.

269. Sgt. Shelton would establish shortly thereafter that the two worked at the address Pittman complained of in her 911 call: 610 N. Buchanan.

270. Shortly thereafter, it was established that Duke owned 610 N. Buchanan, and as such, the investigation of Mangum's false allegations fell within the Duke Police Department's jurisdiction.

271. The Durham Police Watchdog Timer that tracked Durham Police activity in the case was reset at 3:07 a.m. At 3:08 a.m., Duke Police Lieutenant Jeffrey O. Best was dispatched to DUMC to take over the investigation.

272. Pursuant to the Durham Police Departments written protocol, General Order No. 1006 R-1, a transfer of the investigation to the Duke Police Department was initiated. Duke police officers and supervisors proceeded to DUMC to be briefed on Mangum's claims.

273. Immediately a cadre of Duke Police officers and supervisors descended upon the E.D. in response. At the E.D. Duke Police were briefed on Mangum's bizarre behavior, the aborted involuntary commitment, and the specious circumstances surrounding her rape claim.

274. The transfer briefing took place on the loading dock of the E.D. shortly after 3:08 a.m. on March 14, 2006.

**F.     Duke Police Take Control of the Investigation**

**1.     Duke Police and Durham Police execute the Case Transfer Protocol**

275.    When the transfer protocol was initiated, the Officer in Charge ("OIC") at DUMC, Duke Officer William Mazurek, responded to the E.D.  He found Mangum being examined there by DUMC medical staff.  From his observations of Mangum's interactions with nurses, doctors, and police, OIC Mazurek's impression was that Mangum was "faking."   Pursuant to protocol, OIC Mazurek contacted his supervisor, Defendant Best.

276.    Duke Police Officer Sara Beth Falcon was also stationed at DUMC when Mangum's rape claim was transferred to Duke Police.  Pursuant to protocol, Officer Falcon, the only female Duke Police Officer present, was directed to assist Mangum.  As she was assisting Mangum, Officer Falcon watched as at least four Duke Police officers and "all of the supervisors" meet on the loading dock of the E.D. to be briefed by Durham Police on the case, pursuant to the transfer protocol.

277.    At or around 3:08 a.m., after arriving at DUMC  to coordinate the Duke Police investigation, pursuant to protocol, Defendant Best was advised by OIC Mazurek that the complaining witness was in the E.D., and claimed that she had been sexually assaulted at 610 N. Buchanan, during a "frat Party."  The "bachelor party" Mangum reported earlier was now a "frat party."

278. Officer Falcon observed Defendant James Schwab, Duke Police Major, at the E.D. loading dock. In addition to Defendant Best, Schwab was present to oversee the coordination of the investigation by Duke Police.

279. Defendant Best instructed Duke Officers Christopher Day, Larry Eason, and Julius Robertson to go to 610 N. Buchanan to follow-up and try to make contact with the occupants of the house.

280. After clearing from the 610 N. Buchanan, Officer Day was dispatched to the E.D. to assist Defendant Best.

281. Shortly thereafter, Durham officers, one by one, cleared from the E.D.

282. While at the E.D., Officer Day took a full report of the findings of the Durham Police investigation up to that point. Among other things, Durham Police related to Duke Police:

   (1)   Mangum was picked up by Durham Police at the Kroger on Hillsborough Road, where her behavior was at first bizarre and then alarming; and involuntary commitment proceedings were underway when Mangum nodded yes, when asked if she was raped;

   (2)   Mangum claimed she was raped by approximately 20 males at a bachelor party.

   (3)   Mangum had already given several conflicting accounts in interviews with doctors, nurses, and Durham Police, and recanted the claim when questioned by Sgt. Shelton;

(4)     Durham Police decided that the rape investigation should not be pursued any further, leaving open only the possibility of misdemeanors arising out of Mangum's claim that Pittman stole her money, ID, cell phone, and purse;

(5)     Duke Police did not file charges based on the reports from the Durham officers.

283.    Defendant Best was advised that the 911 call reporting a racial epithet at 610 N. Buchanan was a ruse made by Mangum's cohort, Pittman, and, that the professionals who interacted with Mangum earlier did not believe her rape claim.

284.    Some, but not all, of these findings were included in Officer Day's written report, submitted the same morning, and reviewed and approved by Duke Police Supervising Defendants Dean and Best, and Duke Police Investigator Defendant Gary N. Smith, the same day, March 14, 2006.

285.    On March 15, 2006, Defendant Robert Dean, Director and Chief of the Duke Police Department, notified Defendant Wasiolek, Assistant Dean of Students, of Mangum's allegations.  Wasiolek, in turn, immediately contacted the lacrosse coach, Mike Pressler, the Director of Athletics, Joe Alleva, Associate Athletics Director, Dr. Chris Kennedy, Defendant Moneta, Vice President of Student Affairs, and Defendant Trask, the University's Executive Vice President. Consistent with Officer Day's summary of the Duke and Durham Police encounters with Mangum, the Duke Senior Administrators and Officials were

advised that Mangum "kept changing her story and was not credible." This synopsis was derived directly from the transition report written by Officer Day.

286. Officer Day's report was an accurate synopsis of the Durham police reports he obtained that night. However, weeks later, Defendant Brodhead commissioned a report by William G. Bowen and Julius Chambers to review his own handling of the case. Bowen and Chambers did not know that the Duke Police Department's initial response and investigation during the early morning hours of March 14, 2006 were facts that had been buried. To support their thesis that Brodhead's poor initial response was caused by the lack of good information early on, Bowen and Chambers pointed to Officer Day's report as an example of the poor police work that misled Brodhead into believing an aggressive response was not required early on. When Bowen and Chambers' report revealed the existence of Officer Day's report and what it said, the media began asking a barrage of questions about Day's report and why he was involved in the investigation.

287. Duke Police and Durham Police agreed to misrepresent what transpired on the loading dock of the E.D. and told reporters that Officer Day was "eavesdropping" on Durham Police conversations, and had no place in the investigation. Defendant Patrick Baker, Durham's City Manager, orchestrated the agreement and the ensuing media campaign to mislead the public about the Duke Police Department's role in the case. Defendants Baker, Graves, Dean, and Burness all

participated in the media campaign to impeach Officer's Day's Report. Graves and Dean even held a press conference for that purpose.

### 2. Inv. B. Jones Interviews Mangum

288. Pursuant to Duke Police Department protocol, at approximately 3:50 a.m., the "on-call" investigator, Inv. B. Jones, was dispatched to DUMC's E.D. to interview Mangum. Inv. Jones immediately smelled a strong odor of alcohol coming from Mangum. Inv. Jones asked Mangum if her first name was Crystal. Mangum told Inv. Jones her name was "Precious." Mangum claimed she was from Durham, and then claimed she was from Raleigh. She did not describe or name any "attacker." She named only one person, "Brett." Shortly before, Mangum had told Officer Sutton that "Brett" was an attacker; however, in this telling, he was not. Mangum claimed only that "Brett knew the deal." She told Jones "the guys weren't with it," and insisted that Pittman stole her purse and phone. Mangum refused to answer Inv. Jones's questions about her rape claim, saying "all I want to do is go home." With that she went back to sleep. Inv. Jones left her contact information with Mangum and the Duke Police officers that were still present.

289. In the initial 11 recorded encounters with and/or interviews of Mangum conducted during the early morning hours of March 14, 2006, Mangum gave no descriptions of her alleged attackers. Mangum did not claim there were 3 attackers, but did claim there were 1, 5, and 20. The trio named "Adam, Bret and Matt" had not been mentioned. The only name she gave was the name "Brett." On that lone

detail, she contradicted herself. Brett an "attacker" in one account, and in another, Brett merely "knew the deal." Mangum recanted her rape claim. Mangum is emphatic about one claim only: Pittman stole her property, and she wants the police to get it back.

**G. The Clinical and Forensic Medical Evidence Collected at DUMC Corroborates Mangum's Recantation and Adds to the Already Overwhelming Proof That Mangum was Lying**

**1. The Clinical Medical Evidence**

290. Mangum was present at DUMC for approximately 11 hours. During that time, many physicians, nurses, and other providers observed, examined, and interviewed Mangum. To the extent that Mangum responded at all to inquiries about her rape claim, she never gave the same account twice. In addition, Mangum also revealed a propensity to lie when self-reporting her symptoms with a particular proclivity for reporting pain that doesn't exist. The DUMC providers' clinical observations and reports of Mangum's various accounts of the alleged assault were documented in Mangum's DUMC charts.

**a. Nurse Jeni Hauver, R.N.**

291. At 2:53 a.m. Jeni Hauver, R.N. was the triage nurse who first interviewed Mangum when she presented to the E.D. Mangum told Nurse Hauver that she had been "sexually assaulted," and Nurse Hauver noted that Mangum appeared to be "anxious." On the pain scoring scale, ranging from 1 ("mild") to 10 ("worst ever"), Mangum scored her pain as a perfect "10." Nurse Hauver performed

several tests designed to test the veracity of a high self-report of pain. Nurse Hauver tested Mangum for symptoms associated with pain and found none. In Mangum's chart, Nurse Hauver noted that Mangum appeared to her to be "in no acute distress, no obvious discomfort."

### b. Dr. Jaime Snarski, M.D.

292. From 3:14 a.m. – 3:40 a.m., Mangum was clinically examined and interviewed by Dr. Jaime Snarski, M.D. Mangum reported to Dr. Snarski that she was "stripping at a bachelor party," and "the bachelor [and] other guys…put their fingers and penises" in her "vagina against her will." To Dr. Snarski, Mangum complained of extreme pain. Mangum denied being hit. When asked to describe the pain, Mangum said it was "only in her vagina." Dr. Snarski examined Mangum for symptoms that would corroborate Mangum's self-report of pain but found none.

### c. Nurse Carole Schumoski, R.N.

293. At 3:28 a.m., as Mangum was being interviewed by a police officer, a nurse, Carole Schumoski, examined Mangum and asked Mangum to score her pain. Mangum reported that her pain was a "10." When Nurse Schumoski asked Mangum to describe the pain, Mangum said it was "down there." Nurse Schumoski examined Mangum for symptoms associated with pain, and found none. Shortly thereafter, Nurse Schumoski found Mangum, alone, resting quietly in no apparent distress.

## 2. The Forensic Medical Evidence

294. Roughly 6 hours after Mangum presented to the E.D. complaining of a sexual assault, Mangum's Sexual Assault Examination ("SAE") began.

### a. Tara Levicy Misrepresented Her Involvement in the SAE and Her Competence to Conduct an SAE

295. Defendant Tara Levicy did not perform Mangum's SAE. Levicy's report of the exam, Sexual Assault Examination Report ("SAER"), however, fails to disclose that fact or the fact that Dr. Julie Manly actually performed Mangum's SAE.

296. Defendant Levicy did not perform the SAE because she was not qualified or authorized to do so pursuant to DUMC policy. By signing the SAER and failing to clearly document those facts on the SAER, Levicy knowingly created a false and misleading medical record in order to create the false impression that DUMC deemed her qualified and competent to collect and interpret forensic medical evidence, and to give credibility to her unfounded observations.

297. Defendant Levicy's supervisor, Defendant Theresa Arico, R.N., would also knowingly and willfully bolster Levicy's false claims about Mangum's SAE in public statements to the media. Arico knowingly and willfully added credibility to forensic findings that Levicy in fact did not—and could not—make.

298. Upon information and belief, Defendant Levicy was not deemed competent or qualified pursuant to DUMC's competency standards, or qualitative evaluations of her made by DUMC Administrators and/or Supervisors. At the time of Mangum's

exam, Levicy was a "SANE in Training" and was not qualified or competent to administer an SAE or to identify, collect, or interpret forensic medical evidence.

**b.    Mangum's SAE was Abandoned and Never Completed**

299.    At approximately 9:00 a.m., Defendant Julie Manly, Duke Physician, initiated the SAE with Defendant Levicy in tow. Manly conducted the SAE, while Levicy filled in the blanks and checked boxes on the pre-printed SAER.

300.    Defendant Manly never completed Mangum's SAE; it was abandoned in midstream because Mangum refused to allow the exam to continue.

301.    To initiate the pelvic exam, Defendant Manly inserted a speculum, which allows the examiner to use a coloposcope to visually inspect the vaginal walls and cervix at high levels of magnification. Mangum quickly protested and insisted that the examination cease. According to Levicy, Mangum was responding to intense pain. However, if Defendant Manly believed Mangum's pain was too severe to continue with the pelvic exam, the appropriate medical response was to diagnose the source of the pain and treat it. Once the pain (and its source) is treated, the exam can continue. That did not happen.

302.    When Defendant Manly abandoned the SAE, much of the SAE had not been done. For example:

(1)    No pelvic exam was conducted.

(2)    No rectal exam was conducted.

(3)    No forensic toxicology tests had been ordered.

(4)     No forensic blood draw was taken.

303.    Defendant Manly found no injury to Mangum's pelvic region whatsoever, including the vaginal walls, cervix, rectum, or anus.  The only notation Manly made was "diffuse edema of the vaginal walls."  Diffuse edema is not an injury; it is a symptom.  It can be caused by many things.  Further, diffuse edema cannot be clinically identified to a reasonable degree of medical certainty without a baseline reference for comparison (e.g., a prior observation of the vaginal walls at a time when they were not edemic).

> **c.     The only evidence of injury observed in the SAE were injuries that demonstrably pre-dated Mangum's arrival at 610 N. Buchanan**

304.    Several photographs were taken in the SAE that did, in fact, show injury to Mangum's feet and knees.  However, even the nominal injuries documented in the SAER were not new.   Specifically, the minor injuries photographed and documented in the SAER included:

(1)     A scratch on Mangum's right heel, about 2cm in length.  The same scratch can be seen on Mangum's right heel in a photograph taken at 12:00:21 a.m. during the dance.

(2)     A scratch on Mangum's right knee about 7cm in length.  The same scratch can be seen on Mangum's right knee in a photograph taken at 12:00:40 a.m. during the dance.  If she sustained the injury from a sexual assault, the sexual assault took place before Mangum appeared at 610 N. Buchanan.

305. If she sustained those injuries from a sexual assault, the sexual assault took place before Mangum appeared at 610 N. Buchanan. Further, the remainder of the SAER indicates no evidence was found of a brutal sexual assault. For example:

(1) Mangum denied receiving any physical blows by the hand.

(2) There was no swelling, edema, cuts or abrasions (even microscopic) of the anus or the exterior pelvic region.

(3) Contrary to Mangum's occasional claim that she was bleeding "down there," neither the SBI nor DNASI labs detected even a trace amount of blood on the vaginal or rectal swabs in Mangum's Sexual Assault Kit.

(4) No cuts, abrasions, or abnormalities on or around Mangum's vagina or anus were observed or documented with the high-magnification coloposcope.

306. In the many "Systems Examinations" that were done by DUMC doctors and nurses on the morning of March 14, 2006 (and the UNC doctors and nurses the next day), they all concluded, upon examination, that Mangum's head, back, neck, chest, breast, nose, throat, mouth, abdomen, and upper and lower extremities were all "normal," and Mangum was consistently noted to be in "no obvious discomfort," even when she was scoring her pain as a "10 out of 10." With the exception of Levicy, every provider who examined Mangum for symptoms to corroborate Mangum's pain scores found none.

307. At the conclusion of the SAE, according to Levicy's notes the evidence was collected, gathered up, and delivered to the custody of a representative of the "Law Enforcement Agency," Duke Police Officer Joyce Sale.

308. On her discharge, Mangum was instructed to set an appointment to check for bacteria in her throat, vagina, cervix, and anus. Mangum pursued a doctor's visit the next day, but not to obtain a bacteria check.

## H. MARCH 15TH; ADDITIONAL EVIDENCE OF A HOAX EMERGES AT UNC HOSPITALS

### 1. New Hospital, New Story, New Motive

309. On March 14, 2006 at 1:40 p.m., on-call Inv. Jones awoke to find a voicemail from Mangum. Upon information and belief, Mangum's message insisted that Inv. Jones get her property back from Pittman. The rape case was closed, but a property crime investigation remained open. Inv. Jones called Mangum back and left her a message that Gottlieb, who was in charge of Property Crimes Investigations in District 2, would be handling her case from this point on and gave her his contact information.

310. The day after Mangum was discharged from DUMC's E.D., she presented to UNC Hospital's E.D., complaining of intense pain, seeking prescription pain medications.

311. Mangum reported that she had been sexually assaulted the night before. Mangum gave no specifics of the attackers or the sexual assault itself to UNC doctors and nurses who inquired for them. However, consistent with her purposes at UNC,

Mangum added an entirely new dimension to her account: she claimed she had been beaten, knocked to the floor multiple times, and had hit her head on the sink. The pain was intense, the worst ever.

312. Mangum admitted she had been at DUMC the day before, and did not receive a prescription then because she drank so much alcohol the night of the assault that she "did not feel pain" at DUMC; she felt the intense pain only after she sobered up. In fact, at DUMC, Mangum consistently reported pain scores of "10 / 10" at DUMC.

     **2.**     **Evidence Emerges of Mangum's Long History of Mental Illness and Addictions**

313. UNC, as Mangum's primary healthcare provider, had an extensive electronic chart on Mangum. It revealed some of Mangum's history of mental illness and addictions, and a host of other facts that weighed heavily against her credibility. For example, the UNC records from that visit alone revealed:

(1)     Mangum had a long psychiatric history that included severe psychological disorders;

(2)     One of Mangum's current prescriptions was Seroquel, an anti-psychotic drug synthetically designed to target the core symptoms of schizophrenia (delusions, hallucinations, fractured thinking and breaks with reality);

(3)     Mangum frequently presented to UNC's clinics and E.D. with somatic complaints, typically seeking prescriptions for muscle relaxers and narcotic pain killers;

(4)     Mangum was deemed a "very high risk" for narcotic abuse, and her doctor noted that, "at clinic, we have recommended that she not be prescribed any narcotics."

314.    Complaining of unrelenting pain that doctors could not corroborate with evidence of symptoms associated with pain, Mangum described the assault several more times. As she did at DUMC the day before, each time Mangum told the story, the story changed.

### a.     Dr. John Sherrod

315.    Mangum reported to Dr. Sherrod that she was paid to dance at a bachelor party; she wanted to leave, but "the other girls" she was working with wanted to stay. Mangum claimed that she was pushed into the bathroom and locked in there while three men assaulted her orally, rectally and vaginally. Mangum did not provide Dr. Sherrod any names of "the attackers," nor did she suggest any school team affiliation. She did not suggest that they used aliases to conceal their identities. She described her attackers as "white," and, then, only to distinguish them from the attackers in a prior sexual assault.

316.    Mangum told Dr. Sherrod that, during the assault, she was "knocked to the floor multiple times," and she "hit her head on the sink." Dr. Sherrod inquired into Duke's course of treatment for those injuries. Mangum admitted that she did not claim anything of the sort at DUMC, but that was only because she had consumed so much alcohol, she "did not feel pain." The pain became exquisite, she reported,

after she sobered up. She claimed neck pain, knee pain, ankle pain, and facial pain. Mangum asked for a neck brace.

317. Despite the warning against prescribing narcotics, Mangum ultimately obtained prescriptions for Percocet, Valium, Flexeril, and Ibuprofin.

**I.    The Body of Evidence Amassed in the First 48 Hours Proved Mangum's Rape Claim was a Hoax**

318. Within 48 hours of Mangum's original claim of rape, the following facts were clearly established:

(1)    Mangum had a long psychiatric history that included serious mental illness and involuntary commitments;

(2)    Mangum's primary healthcare providers concluded that Mangum was a clinically unreliable reporter of her own experience, particularly when reporting her own experience of pain and what is causing it;

(3)    Mangum feigned symptoms of pain in order to obtain prescription narcotics so frequently that the clinic she regularly presented to recommended not prescribing them to her;

(4)    Mangum had no grasp on her present reality on the evening of March 13th and exhibited signs of psychosis.

    (a)    Mangum said she was from Durham, and then changed her mind and said she was from Raleigh;

    (b)    In describing the events of the evening, she consistently said she had been at a bachelor party, and that she had an encounter with police

109

officers.  However, her accounts alleged almost every possible variation on them.

(5)   Mangum claimed she was raped as her involuntary commitment was underway, under circumstances akin to duress and gave no detail of the assault (she only nodded, yes).

(6)   In the first interview after she was released from the commitment proceedings, Mangum recanted her rape claim.

(7)   Mangum then re-claimed the rape.  When pressed for detail, Mangum's accounts of the most basic facts varied wildly.  For example, while at DUMC:

(a)   Mangum claimed that 1 man raped her;

(b)   Mangum claimed that 20 men raped her; and

(c)   Mangum claimed that 5 men raped her.

(8)   Mangum claimed she was dancing with "Nikki" (Pittman), Angel (the Kroger Security Guard), and Tammy (her agency contact)." Later she claimed it was just "Nikki."

(9)   Mangum claimed that her money was:

(a)   not stolen;

(b)   stolen by "Nikki";

(c)   stolen by one or several of "the attackers";

     (d)      deposited into a nearby ATM account, as required by the escort

               Agency; and

     (e)      left in the back seat of Officer Barfield's patrol car.

(10)   Mangum claimed that the amount of money stolen was $400, then $2000.

(11)   Mangum reported that, on the evening in question:

     (a)      she drank one beer; and

     (b)      she drank so much alcohol that she "didn't feel pain."

319.   She did not identify anyone by name or aliases with the exception of "Brett" who she mentions only twice. In one account, he was an attacker, and, in the other, he was not.

320.   She did not claim the men used each other's names, aliases or numbers to refer to one another or otherwise acted to "create an atmosphere of confusion." The only aliases Mangum claimed were used on March 13th -14th, 2006 were Mangum's and Pittman's aliases, "Precious" and "Nikki." Pittman identified herself with her real name when she encountered authorities. Mangum continued to refer to herself as "Precious" and also as "Honey" throughout the morning of the 14th.

321.   The SAE did not reveal any physical injuries indicative of rape or sexual assault of any kind. Certainly, she did not have any injuries that corroborated the brutal 30 minute gang rape or violent struggle that Gottlieb would later concoct.

322. Mangum reported that she was in the most severe pain possible, but doctors and nurses who sought to corroborate her report could not; found no associated symptoms of any pain at all.

323. The only documented injuries in the SAER were injuries to Mangum's knees and ankles. However, digitally time-stamped photos taken during the dance show the exact same injuries were present on her knees and ankles when Mangum arrived at 610 N. Buchanan. Moreover, these injuries are not evidence of rape. They are typical of one who frequently stumbles.

324. The elements of Mangum's wildly varying statements that were marginally consistent in the first 48 hours were:

    (1)     No condoms were used;

    (2)     The party was a "bachelor party";

    (3)     She wanted her property back.

325. In the first 48 hours after Mangum claimed she was sexually assaulted, to at least 8 different medical providers and at least 3 Durham Police Officers. In the 11 renditions, Mangum never gave the same story twice. The only version of events that was supported by the evidence was her recantation.

326. All of the foregoing facts were established within the first 48 hours of Mangum's rape claim, and were either known by or readily available to the Duke Police Supervising Defendants, Duke Police Investigator Defendants, Steel, CMT Defendants, Nifong, Durham Police Supervising Defendants, and Durham

Investigator Defendants. The facts established in the first 48 hours were sufficient to end the inquiry as a false claim made to avoid commitment by a disturbed woman who also appeared to be an addict. The foregoing facts alone establishes that Mangum's basic claim was false with such clarity, that, in order to justify continuing the investigation, the foregoing facts had to be concealed, and, in addition, new, false evidence would have to be fabricated. Otherwise, as Angel Altmon said when asked if it was possible that Mangum had been sexually assaulted that night, "Ain't no way."

327. Nevertheless, Duke Police Supervisors, Duke Officials, and Durham Police Supervisors would overrule their investigators' decision to wind up the investigation, and, instead, agree to put Mangum's false claims into the hands of a known rogue officer, who they knew had a documented, alarming pattern and practice of abusing Duke students, falsifying testimony and fabricating evidence to close holes in his many baseless prosecutions of Duke students on misdemeanor charges.

## IX. THE SECOND INVESTIGATION (MARCH 16 – 21): DUKE UNIVERSITY DEFENDANTS AND DURHAM POLICE COLLABORATE TO IDENTIFY THE PERPETRATORS OF A GANG RAPE THAT DID NOT HAPPEN

### A. Gottlieb "Adopts" the Case

328. Gottlieb learned of Mangum's allegations while working off duty at City Hall on March 15, 2006 and immediately, Gottlieb launched a campaign to adopt it. After

a flurry of phone calls and internal maneuvering, Gottlieb's request to "adopt" the case was approved by Duke Police Supervisors and Durham Police Supervisors, who were aware of Gottlieb's documented abusive tactics with Duke students.

329.  Upon information and belief, the Duke Police Supervising Defendants, Durham Supervising Defendants, and Gottlieb himself knew that the officers involved in the "First Investigation" believed Mangum's rape claim to be a dodge calculated to avoid involuntary commitment and a DSS investigation, and that Inv. Jones had decided to close the rape investigation, leaving open Mangum's accusation that Pittman stole her property.

330.  Inv. Jones and Sgt. Fansler released the property crime investigation to Gottlieb who had lobbied them aggressively to "adopt" the case.   When Gottlieb obtained control of the case, he was well aware of the overwhelming evidence that Mangum was not credible, Gottlieb undertook to breathe life into the dead rape case by constructing a myth.  Gottlieb's original myth was that Mangum was raped.

331.  Before he even met Mangum, Gottlieb concocted the myth and sent broadcast emails to the "PAC 2/Trinity Park Neighborhood" listserv. The first Gottlieb email, sent on March 15, 2006 at 4:49 p.m., stated:

> *"The Durham Police District 2 Criminal Investigations Violent Crimes Unit is conducting an investigation concerning a rape of a young woman by three males at 610 N. Buchanan that was reported on 3/14/06 in the early morning hours.  The female arrived at the residence for a party close to 11:30p.m. on Monday 3/13/2006 and left on Tuesday 3/14/2006 reportedly after midnight.  Anyone in the*

*area who saw or heard anything unusual, please contact*
*Investigator Himan at 919-560-4582 or I at 560-4582 x228."*

332. Without any evidence to corroborate the claim or infuse it with detail, Gottlieb simply asserted it as an established fact. He did not offer any descriptions of the three males, or where the number "3" came from (Mangum had not settled on any number of attackers in her prior reports). Upon information and belief, Gottlieb decided on the number "3" because he knew the house at 610 N. Buchanan Blvd. was occupied by three Duke students. According to his notes, he had not even met or questioned Mangum yet or been officially assigned to the case. From long experience, he knew that the members of this particular listserv included the Trinity Park "permanent residents" who "resented" Duke students that Defendant Sarvis referred to in his August letter. The email to them was calculated to breathe life into the case by inflaming their passions.

**B.    Gottlieb Assigns the Case to Ben Himan, a Rookie Property Crimes Investigator**

333. On March 16, 2006 at 8:00 a.m., Gottlieb assigned the rape case to Inv. Himan. Himan had been an investigator for roughly two months. Himan had never worked directly with a District Attorney before, and did not know what a DNA report looked like.

334. Himan's assignment to the investigation violated the Durham Police Department's written protocol governing the assignment of rape and sexual offense cases.

Durham Police Department's Standard Operating Procedures ("SOPs") required all sexual assaults in which the victim is 18 years of age or older must be assigned to the Criminal Investigations Division's ("CID") Violent Crimes Unit.

335. Neither Gottlieb nor Himan were employed in the CID's Violent Crimes Unit. Within the Violent Crimes Unit, rape and sexual assault cases are assigned to investigators according to the following criteria:

(1)     The investigator's experience in the Criminal Investigations Division;

(2)     The specialized law enforcement training of the investigator;

(3)     The "needs of the Department as it [sic] relates to Affirmative Actions [sic]"; and, last,

(4)     The needs of the Division at the time of the assignment.

336. Even if Himan (and Gottlieb) were in the Violent Crimes Unit, Himan's assignment to the case was contrary to the Department's stated criteria. Himan had no experience in the Criminal Investigations Division. Himan had no specialized training in rape and sexual assault cases. Himan did not promote any affirmative action goals of the Department.

**C.     Duke Police and Durham Police Collaborate in a Re-Investigation of Mangum's Fictitious Claims**

337. On the evening of March 15, 2006, Defendant Wasiolek spoke with the captains of the Duke University Men's Lacrosse Team via telephone, mainly through Flannery. Wasiolek informed Flannery that the police are investigating the allegations and will search their home sometime soon, they do not need lawyers,

116

and they should cooperate with the police fully.  Wasiolek did not advise them that the 3 occupants of 610 N. Buchanan were suspects in Gottlieb's investigation.

338.    At the same time, Duke Police investigators were compiling information from Duke University's records on the three renters of 610 N. Buchanan, Plaintiffs, and their teammates, and relaying the information to Durham Police.

339.    Duke Police compiled a CD-ROM of all of the identification photos of the members of the lacrosse team that were kept by the Athletics Department.

### D.    Duke Police Cede Control of their Investigation to Gottlieb

340.    Duke Police Defendants, Duke Officials Defendants, and City of Durham Defendants, conspired, understood, and agreed that, despite the evidence of a hoax and the lack of inculpatory evidence, the investigation would continue.  Gottlieb was placed in charge of the investigation, and Defendants Graves, Dean, and Steel, and CMT Defendants agreed to cede the Department's jurisdictional authority to Gottlieb and collaborate with him in his investigation.  Gottlieb's investigation began by assuming the sexual assault occurred, and launched an effort to identify "the attackers."

341.    The Durham Police Supervising Defendants and Duke Police Supervising Defendants knew or should have known Department policy and common sense indicates Gottlieb and Himan should not have been assigned the case. Nevertheless, they willfully ignored and/or were deliberately indifferent or grossly negligent with respect to the assignment of these investigators to this case.

342. On March 16, 2006 at 8:52 a.m. prior to interviewing Mangum, the investigators began preparation for a "special operation" targeting the three residents of 610 N. Buchanan, Evans, Flannery and Zash. Following a tip from Duke Police, Breck Archer was also considered as a potential target for the "special operation."

343. On March 16, 2006 at 9:30 a.m. Gottlieb and Inv. Soucie met with Defendant Smith, Duke Police Sergeant and Investigator, at Duke Police Headquarters. Defendant Smith provided a CD containing identification photos of Plaintiffs and their teammates for identification procedures, and also provided them a document entitled "Duke PD Report."

344. Duke University gave the keys to the home at 610 N. Buchanan Blvd. to the Durham investigators.

### E. Mangum's Interview

345. On March 16, 2006 at 11:47 a.m., Gottlieb and Himan interviewed Mangum for the first time. During the interview, the investigators claimed Mangum told them her attackers' names were "Adam, Bret, and Matt." She also gave descriptions of her (now) 3 "attackers." According to Himan's contemporaneous, handwritten notes, she described her attackers as follows:

| "Adam" | Short, red cheeks, fluffy brown hair, chubby face |
| "Matt" | Heavy set, short hair cut, 260 lbs to 270 lbs |
| "Bret" | Chubby |

### 1. Mangum's Descriptions Eliminate Eleven Team Members as Plausible Suspects

#### a. Devon Sherwood

346. Because Mangum described her attackers as white men, Devon Sherwood, an African-American team member, was eliminated as a suspect (though not necessarily as a witness).

#### b. All Notably "Tall and Lean" Team Members

347. Because Mangum described all 3 attackers' height as short or medium, and their build as either chubby or heavy set (260-270lbs.), she excluded those team members who were notably "tall and lean." All 10 of the notably "tall and lean" team members were excluded from consideration as suspects. For that reason, those 10, like Devon Sherwood, were excluded from the March photo arrays prepared by police in the effort to identify "the attackers."

348. Collin Finnerty was one of the more notably "tall and lean" team members, and he was eliminated as a plausible suspect on that basis on March 16th. Finnerty also would be excluded from every photo array police compiled on that basis, until the April 4th "pick three" procedure.

### 2. Identification Procedures conducted on March 16th Eliminated Another Twenty-Four Team Members as Plausible Suspects

349. Gottlieb and Himan reported that Mangum claimed "the attackers" names were "Adam, Bret, and Matt." Gottlieb does not say whether or not he showed Mangum the team roster he obtained from Defendant Smith just before he went to Mangum's home to interview her.

350. While team members included one Adam, one Brett, one Breck and three Matts, Mangum's descriptions bore almost no relationship to any of those individuals. In fact, Mangum's descriptions ruled out Matt Danowski as a plausible suspect, because Danowski was notably tall and thin.

351. Nevertheless, Inv. M. Soucie prepared four photo arrays ("six-packs") based upon the remaining two Matts (Wilson and Zash), Adam Langley, and Brett Thompson.

352. Each array contained six photos, one suspect and five fillers. The "fillers" for each of the four arrays were other team members who were similar to the "suspect" in their body type, build, height, and weight. The four arrays were named "A" through "D".

353. Of course, it would have been obvious to Mangum that the "fillers" were not fillers, but instead were team members because they were all wearing the same game jersey.

354. Defendant Richard D. Clayton, Durham Investigator, showed Mangum each of the 24 lacrosse players in the arrays, one picture at a time, and, each time, asked Mangum if she could identify any of them as being present at the party.

### 3. Ryan, Matt, and Breck were Eliminated as Plausible Suspects in the March 16th Array

355. Plaintiffs Ryan McFadyen, Matthew Wilson, and Breck Archer were all shown to Mangum in "Array D" in the March 16th Identification Procedure, and Mangum did not identify any of them as an "attacker." Further, she did not even recognize Ryan, Matt, or Breck.

356. Ryan, Matt, and Breck were eliminated as plausible suspects two days after the party, on March 16, 2006. Nevertheless, within ten days of being eliminated as plausible suspects, each of them would be subjected to an unprecedented vilification as criminal suspects in the year that followed.

357. Mangum did not identify any of the other 21 team members as her "attackers" shown to her in the photo arrays presented in the March 16th Identification Procedure.

358. Other results from the same procedures cast even more doubt on Mangum's credibility:

(1)   Mangum "recognized" only 5 of the 24 players as being present at the party at all, and only with varying degrees of certainty. Notably, she was 70% sure that she remembered seeing Reade Seligmann at the party, but certain he was not one of her "attackers." Reade Seligmann therefore became a possible witness in the case, but was eliminated as a plausible suspect.

(2)   Mangum was 100% certain that Brad Ross was at the party. However, Brad Ross was in Raleigh while Mangum was at 610 N. Buchanan on

March 13th. Ross personally told Gottlieb and Himan this directly, and they were provided documentation establishing this fact prior to any indictments in the case.

(3)     Mangum did not recognize the remaining 19 players at all, despite being given the option of identifying individuals with fractional certainty (e.g., 1/10 through 10/10).

**F.     The March 21st Identification Procedures Eliminated the Remaining Twelve Team Members as Plausible Suspects.**

359.   On March 21, 2006, when Mangum arrived at District 2, her first concern was getting her property back.  Himan asked Mangum if she could give a better description of the suspects, but Mangum could not remember anything further about the suspects than the generic descriptions she gave on March 16th.

360.   Having failed to identify any "attacker" (or even those present at the party) from 24 pictures on March 16th.  Durham Police compiled two more photo arrays using a total of 12 team members who Mangum had not seen in the March 16th arrays, and who were not ruled out by Mangum's description.  Again, police used the standard "six-pack" array.

361.   The suspects in the arrays this time were two of the renters of the residence at 610 N. Buchanan, Evans and Flannery.  Police did not compile an array for Zash because he was ruled out when Mangum failed to recognize him in the "Matt" array on March 16th.

362. Again, there were no "fillers." The arrays contained only pictures of lacrosse players. Mangum knew they were all lacrosse players because, again, they were all wearing the same jerseys in the photos.

363. Mangum looked at all twelve pictures in the two arrays. She did not recognize a single person. Not one. She was shown both arrays again. Again, she recognized no one. Mangum told Clayton, "They all look the same."

364. David Evans was included in the "F" array on March 21st. Mangum saw his picture twice and had no recollection of him whatsoever. Two weeks later, Mangum would claim that she not only recognized him but also he was (or "looks like") one of her attackers ("without the moustache").

## X. AS OF MARCH 21, 2006, THERE WAS NO RATIONAL BASIS TO CONTINUE THE INVESTIGATION OF THE DUKE LACROSSE TEAM

### A. Mangum was not Credible

365. The evidence collected in the first 48 hours demonstrated—overwhelmingly—that Mangum was not credible. The evidence discrediting Mangum included, for example:

(1) Mangum's conduct in the car with Pittman, including encouraging Pittman to "put marks on [her]," was so alarming to Pittman that Pittman took Mangum to the authorities immediately; and

(2) Mangum's behavior in the brief time she was at the Kroger with police met the written criteria for initiating emergency involuntary commitment procedures.

(3) Mangum "nodded yes" when asked if she had been raped, under circumstances akin to duress, after she had become aware that commitment could lead her to lose custody of her children;

(4) Mangum recanted her rape claim in the first interview after she was extracted her the involuntary commitment proceedings;

(5) Mangum had a long psychiatric history, including other involuntary commitments;

(6) Mangum's primary healthcare providers had concluded she was clinically an unreliable reporter of her own experience;

(7) Mangum gave an account of the alleged attack to at least 11 different medical providers and police officers, and never told the same account twice;

**B. Even if Credible, Mangum Eliminated Every Member of the Team as a Plausible Suspect**

366. To the extent that police actually believed that Mangum was attacked and sexually assaulted by someone, by March 21, 2006, Mangum herself had already eliminated every member of the Duke lacrosse team as a plausible suspect:

(1) 11 team members were eliminated as plausible suspects by Mangum's March 16 descriptions of "the attackers."

(2)    24 of the remaining 36 team members were eliminated as plausible suspects in Mangum's March 16th Identification Procedure;

(3)    The remaining 12 team members were eliminated as plausible suspects in Mangum's March 21st Identification Procedure;

(4)    When police transformed the "identification procedures" into "recognition procedures" Magnum claimed she "recognized" only 5 of the 36 team members shown to her. Police knew that one of the five individuals Mangum "recognized," Brad Ross, was not present at the party at the relevant time and had significant evidence that another one of the five Mangum recognized Reade Seligmann, was not present at the party at the relevant time. The three renters of 610 N. Buchanan had told the police they had no recollection of either Ross or Seligmann at the party; and

(5)    Mangum did not recognize 31 of the 36 team members shown to her (many of them were shown to her twice) with even a 10% degree of certainty. Police knew many of those individuals were, in fact, present at the party.

367.    Therefore, by March 21st, the "Second Investigation" of Mangum's false accusations produced more overwhelming evidence that Mangum's claims were false, and, even if it was plausible to believe that Mangum was attacked and sexually assaulted on March 13th or March 14th, it was certain that Plaintiffs and their teammates were not "the attackers." They had all been eliminated as potential suspects—by Mangum herself.

### C.  Gottlieb and Himan Use Coerce a Fabricated Window of Opportunity for a Sexual Assault Out of Pittman

368.  On March 20, 2006, Pittman told Himan over the phone that she was at the party with Mangum, that she had heard of Mangum's claims and called Mangum's claims "a crock."  On March 22, 2006, Pittman appeared at the District 2 substation to gave her written statement.  She was served with an outstanding warrant for her arrest, on a probation violation from which she had absconded and for which she had made no payments.  At some point after she completed her statement by saying "where my night was over," Pittman wrote an addendum to her statement, transparently fabricated or coached to create a window of opportunity for a sexual assault to have occurred.  The addendum reads, *in toto*: "I forgot to mention that the first time Precious came to the car, she left because she felt there was more money to be made.  It was after then, that the boys helped her to the car."

### XI.  THE CONSPIRACY TO ORCHESTRATE THE MASS INTERROGATION OF UNCOUNSELED STUDENTS

369.  Instead of closing the case or following the extant, (though unpromising leads of the non-lacrosse team members who attended the party), Duke Police Defendants. Duke Officials Defendants, and Durham Police Defendants agreed to keep the case to remain open, and colluded to deliver to Gottlieb to every member of the team for interrogation, *en masse*.

### A.  Duke University Defendants' Acts in Furtherance of the Conspiracy

370. Duke Police and Duke Officials understood and agreed to:

(1) Deliver all 47 team members to Gottlieb and Himan, at a designated location, to be interrogated by Durham Police;

(2) Create a false sense of security in the team members by minimizing the seriousness of the investigation and the charges being investigated, and encourage team members not to seek legal counsel or to reveal the planned interrogations to anyone;

(3) Provide no information to the Plaintiffs or their teammates about the nature or scope of the interrogations;

(4) The team members would not be informed that, during the interrogations, every one of them would be asked to volunteer to give their DNA and a "mug shot" photograph, or that a team of CSIs from the Durham Forensic Services Unit ("FSU") had been mobilized for purpose of taking DNA swabs, mug shot photographs, and pictures of any scars or marks on the team members' arms and torso.

(5) The team members would also not be advised that if they submit DNA samples and mug shot photographs voluntarily, they waive their right to a report of the results of all  DNA testing and photo identification procedures as soon as they are available; and, further, that they could have that right merely by requesting a Nontestimonial ("NTID") Order be obtained for the same purposes; and, further that, absent an NTID Order, a right to that

information would not arise again unless the individual is indicted, and then only pursuant to constitutional and/or statutory discovery; and

(6)     Provide a primary location and/or a satellite location(s) for isolated interrogations of individuals.

**B.     The Durham Police Defendants' Acts in Furtherance of Conspiracy**

371.    Durham Police, for their part, understood and agreed to:

(1)     Conduct interrogations of the team members individually.  Upon information and belief, the interrogators would employ all of the rudimentary interrogation techniques, including, but not limited to, dividing them, exhausting them, falsely reporting to one individual that a teammate's account contradicts theirs in material respects, and the many other standard tools of interrogation.

(2)     Coordinate the overstaffing of the FSU to take DNA swabs and "mug shot" photographs.

(3)     Provide Duke Police and Duke Officials with information relating to their charging decisions.

**C.     Implementation of the Conspiracy**

372.    Consistent with the agreement, Duke Police, Duke Officials and their agents implemented the plan to deliver the team members to Gottlieb.  The Plaintiffs and their teammates had no notice of the interrogations until approximately 7:00 p.m.

on March 21st. They were instructed to report to the Duke Police Department 20 hours later, at 3:00 p.m. on March 22nd.

373. There was very little time for Plaintiffs or their teammates to consult meaningfully with their parents or to retain, much less consult meaningfully with counsel. They were advised that they did not need lawyers; they were merely "going in to answer one or two questions." They were not told that the FSU would be on hand to take DNA samples and photographs of their face, arms, and upper torso. Defendant Wasiolek had not revised the advice she gave to the lacrosse team captains the week before, and it was disseminated to the remainder of the team. The gist of it was, "you don't need a lawyer," and "don't tell anyone this is happening, not even your parents." All they knew about the questions they would face was that it related somehow to the party held at the lacrosse team captains' house the week prior. They were not told that the punishment for the charges being investigated, if run consecutively, would amount to a *de facto* life term.

**D. Counsel Intervenes Overnight to Advise the Plaintiffs and their Teammates of the Nature of the Charges and Individual Investigating Them**

374. Beginning at 9:00 p.m. on the night of March 21st and continuing until 9:30 a.m. the next morning, Plaintiffs' defense counsel spoke with nearly all of the team members, and many of their parents. The team members requested a postponement of the police questioning.

375. Defendant Wasiolek's assurances that the allegations would simply "go away" or would be "swept under the rug" were recklessly made. The central elements of the allegation were alarming and provocative. Further, those elements had already been published in several newspaper articles, with Gottlieb as the source in each. Further, Gottlieb and Himan had already testified—under oath—that they believed there was probable cause to believe that Mangum was gang raped at a party hosted by three lacrosse team captains and attended by mostly team members. Finally, over ten days after the party, and a week after the search of 610 N. Buchanan and the interrogation of the residents, police were still investigating, and, in fact, were staging a massive interrogation of the entire men's lacrosse team.

376. Furthermore, under North Carolina law, the team members who were present at the party could be indicted and convicted on the same charges—as accomplices—based solely on an admission that they were present at the party. In, N.C. the punishment of accomplices is the same as the punishment for principals.

377. It was clear that an intelligent decision about submitting to police questioning under the circumstances would require more than the few hours available under the scheme agreed to by the University and Durham Police.

378. The University Officials' agent responsible for coordinating the mass interrogation was directed to notify the Durham Police that the team members were told of the planned interrogations without sufficient time to discuss it fully with their parents. The message Plaintiffs'' defense counsel prepared to be conveyed to Durham

Police was simple and clear: "The team members wished to postpone the interrogations to allow sufficient time to tell their parents what they were doing. There is nothing magical about Wednesday."

379. The interrogations were postponed.

380. Duke University Defendants and City of Durham Defendants independently and collectively undertook to retaliate against them for their decision to exercise their constitutional rights.

## XII. THE CONSPIRACY TO RETALIATE AGAINST PLAINTIFFS FOR EXERCISING CONSTITUTIONAL RIGHTS

### A. Gottlieb and Himan abused the NTID Order Process to Retaliate Against Plaintiffs and Their Teammates for Exercising Constitutional Rights

381. When Gottlieb and Himan received word that the team members postponed the mass interrogation, Gottlieb and Himan immediately retaliated against them by:

    (1)    knowingly making false, sensational allegations in the NTID Affidavit supporting their application for an NTID Order;

    (2)    seeking a NTID Order directed to every white team member, after every team member had already been excluded as a plausible suspect and after three of them had already given DNA samples; and

    (3)    leaking the NTID Order and the fabricated NTID Affidavit to representatives of the media in advance of their appearance at the Durham

P.D. Forensics Unit to ensure that the sensationalized allegations would be widely reported by the media in order to subject Plaintiffs to public condemnation.

**B.     The Fabricated NTID Affidavit**

382.   Immediately after Gottlieb and Himan were advised that team members postponed the mass interrogation, Gottlieb and Himan retaliated against them by drafting entirely new Affidavit to request an NTID Order.  There was no need to revise the Affidavit as a practical matter.  The existing Probable Cause Affidavit was sufficient to obtain a Search Warrant for 610 N. Buchanan.  To obtain an NTID Order, the only modification required was an allegation that each individual on the team was present at the party (an allegation they could not truthfully make).

383.   Instead, for the NTID Order Application, Gottlieb and Himan added an array of new, fabricated allegations to the original search warrant Affidavit.  The new allegations were designed to ignite public outrage at the Plaintiffs.

384.   The new scandalous allegations were attributed to Mangum, but Mangum did not provide them.  Instead, most of them were fictionalized, gross distortions of innocuous facts given to Police by Evans, Flannery, and Zash in their voluntary statements and interrogations on March 16th.

385.   Gottlieb's fabricated allegations in the NTID Order added a sinister dimension to the already fabricated account of the evening in the Search Warrant Affidavit. Among them was, for example, the allegation that the women were sexually

threatened with a broomstick, the accuser lost several fingernails in the violent struggle, and the team members used each other's names to disguise their "true identity" and to avoid identification. These facts were demonstrably false, and they did not come from Mangum or any witness. Upon information and belief, they came from Gottlieb's brain.

### 1. The Broomstick

386. The NTID Affidavit alleged that "'[o]ne male stated to the women 'I'm gonna shove this up you' while holding a broom stick in the air so they could see it.'"

387. There is no mention whatsoever of a broomstick in the initial Search Warrant Affidavit and a broomstick was not listed in the "Description of items to be seized" in the search of 610 N. Buchanan, written based on Gottlieb and Himan's March 16th interview of Mangum   The Search Warrant for 610 N. Buchanan does not mention a broomstick because Mangum did not say anything about it in her interview with Gottlieb, Himan, or anyone else.

388. Gottlieb and Himan learned of "the broomstick exchange" from the March 16th statements of Evans, Flannery, and Zash, who each independently characterized the comment as harmless, and said in jest.

389. Gottlieb and Himan took the statements Evans, Flannery, and Zash voluntarily gave them, and twisted them into a complete fabrication:  "One male stated to the women 'I'm gonna shove this up you'  while holding a broom stick in the air so

they could see it.' "  No witness said that—or anything like that—to Gottlieb or Himan.

### 2.    The Fingernails

390.  The facts in the NTID Order asserted that:

> "During a search warrant at 610 N. Buchanan on 3-16-2006 the victim's four red polished fingernails were recovered inside the residence consistent to her version of the attack. She claimed she was clawing at one of the suspect's arms in an attempt to breath [sic ] while being strangled.  During that time the nails broke off."

391.  Mangum did not tell Gottlieb and Himan that she lost her fingernails in a struggle, nor would she ever make that claim.  Mangum did not make that claim in any of the multiple, varying accounts that she gave police officers and medical providers on March 14th, 15th, or 16th, or in her written statement on April 6th.  However, Mangum did tell Gottlieb and Himan that she had started affixing and painting her false nails just before she left for the party at 610 N. Buchanan.

392.  Further, other unpainted fingernails and nail polishing and painting accessories were found in the bathroom, inside Mangum's purse, and on a computer component, which were seized by police in the search of 610 N. Buchanan.

393.  There were still more unpainted fingernails sitting in plain view on the sink counter in the same bathroom where Mangum claimed they flew off.  Police did

not seize these unpainted nails.  Upon information and belief, Police did not seize the unpainted nails in order to avoid reporting their existence on the Inventory of Seized Property.  That, in turn, enabled them to report the horrifying fiction that Mangum's nails flew off in a violent struggle in the bathroom.

394.  Private Investigators Blackman and Lane and Forensics Expert W.E. Hensley photographed the loose, unpainted nails where they found them, days after the police search of 610 N. Buchanan, shown below:



Mangum's Unpainted Acrylic Nails.

395.  The unpainted nails and nail accessories reveal that the nails were not torn off in a struggle; Mangum was painting and applying them while Pittman was getting changed into her street clothes in the bathroom and bickering with some of the

guests on the other side of the closed door who believed $800.00 was too much to pay for a 4 minute routine.

396.    Gottlieb and Himan were fully aware of those facts and their obvious meaning, and they deliberately omitted them from the NTID Affidavit in order to generate public outrage, and to suggest the nails potentially contained DNA evidence they could use to compare with team members' DNA in order to identify "the attackers."   In collusion with Gottlieb and Himan, Defendant Addison made the same false claim in public statements in his capacity as an official spokesperson for the Durham Police Department, in furtherance of the conspiracy to subject Plaintiffs to public condemnation in retaliation for exercising their constitutional rights.

397.    Further, pictures taken of Mangum during the dance showed that several of Mangum's fake nails were missing during the dance.  Mangum never claimed she was raped before the dance, so the nails were missing before the alleged rape occurred. The relevant portions of those photos are reproduced below:

 

### C.    Aliases to Conceal Identities

#### 1.    Individual Identities

398.    The NTID Affidavit falsely asserts that team members used "aliases" to hide their true identity and create an atmosphere of confusion.  This, too, is false and did not come from Mangum; Mangum did not make that claim in any of the multiple, varying accounts that she gave police officers and medical providers on March 14th, 15th, or 16th, or in her written statement on April 6th.  Instead, like the broomstick and fingernail myths, the alias myth is Gottlieb's and Himan's perversion of a detail that Evans, Flannery, and Zash volunteered to police when they agreed to "answer a few questions."

399.    During Police questioning on March 16th, Dan Flannery, told police that, when he called the agency, he gave the name Dan Flanagan.  No witness ever said that Dan identified himself as Adam, but that "everyone was calling him Dan."

400.    Mangum never claimed "the attackers" or anyone else was using each others' names or fake names.  Further, the allegation is belied by the investigators' decision to create photo arrays with team members named Adam, Bret, or Matt as the suspects.  That decision is irrational if police actually believed "the attackers" were using aliases.

401.  It was only after Mangum failed to identify anyone with the name Adam, Bret, or Matt that Gottlieb and Himan claimed that team members were using aliases to conceal their identities.

### 2.  Team Affiliation

402.  The NTID Affidavit falsely claims that the team members made efforts to conceal "the true identity of their sports affiliation – Duke Lacrosse Team Members."

403.  Both Gottlieb and Himan were involved in the search of 610 N. Buchanan, and, it was obvious that no one who lived there sought to conceal their team or school affiliation.  To the contrary, the walls were covered with "Duke Lacrosse" posters, banners, and other insignia.

404.  For example, this banner was hanging along the path Mangum took to and from the living room for the dance:



(2)    In the room where Mangum and Pittman danced, there were several indications that Duke lacrosse players lived there:



### D. Police Deliberately Concealed from the Court the Facts that Established Plaintiffs Were Already Excluded as Plausible Suspects

405.    In addition to the fabricated detail added to the application for the NTID Order, the sworn facts failed to reveal to the Court the fact that Devon Sherwood was not the only member of the team who had been excluded as a plausible suspect by Mangum.

### 1.    The NTID Order Correctly Excluded Devon Sherwood.

406.    The NTID Order exempted Devon Sherwood because, as an African-American, he was ruled out by Mangum's descriptions of "the attackers" as white. However, ten other players, including Collin Finnerty, were also eliminated by Mangum's

descriptions of "the attackers" as medium height, and either chubby or heavy set (260-270lbs). (i.e., not tall and lean)

> **2.** **Ryan, Matt, and Breck should have been Excluded from the NTID Order, but Police Willfully Concealed from the Court the Fact that Mangum did not Identify—or Recognize—Them.**

407. When Gottlieb and Himan submitted their NTID Order Application, Ryan, Matt, and Breck were each ruled out as plausible suspects two days after the party. On March 16th, Police showed Mangum a photo of Ryan, Matt, and Breck and she did not recognize any of them—at all.

408. Further, Evans, Flannery, and Zash had already provided complete suspect kits, including a blood draw, head hair and pubic hair samples to police on March 16th. They did that after they voluntarily provided everything else police asked them for and offered to submit to a polygraph examination as well.

409. Knowing those facts, Gottlieb and Himan willfully ignored them and concealed them from their Application for an NTID Order directed to Plaintiffs and every other white member of the lacrosse team intentionally and maliciously generating race-based animus in the community against Plaintiffs.

410. All of the foregoing acts and omissions were in furtherance of the conspiracy to retaliate against the team members for their perceived exercise of constitutional rights by subjecting Plaintiffs and their teammates to public humiliation, contempt, and condemnation.

## XIII.   THE CONSPIRACY TO CONCEAL DUKE POLICE DEPARTMENT'S STATUTORY AUTHORITY TO INTERVENE AND INVESTIGATE

### A.   Chairman Steel's Solution:  Direct the Duke Police to Not Intervene

411.   Upon information and belief, Defendant Robert K. Steel, Chairman of the Executive Committee of the Duke University Board of Trustees, through the CMT and/or Duke Police Supervising Defendants understood, agreed, and conspired to direct the Duke Police officers and investigators to (1) cease all participation in the investigation, (2) conceal evidence of their prior role in the investigation and evidence of their authority to intervene and control the investigation, and (3) fabricate false and misleading "witness" statements calculated to conceal their personal observations of Mangum's bizarre behavior.

412.   From the time the CMT directed the Duke Police Department not to intervene in this matter (on or about March 25, 2006 until January 12, 2006), the Duke Police Department had the power to intervene, to prevent or aid in preventing the unlawful conspiracies alleged herein; Duke Police had the statutory authority and obligation to conduct the police investigation of Mangum's claims, and yet, the refused to do so.

413.   At all times relevant to this action after March 25, 2006, Defendant Steel and/or the CMT Defendants directed the Duke Police Department not to intervene to prevent or aid in preventing the wrongs that they knew were conspired to be done to Plaintiffs and their teammates by their co-defendants in this action.

**B.      The CMT'S Acts in Furtherance of the Conspiracy**

414.   On or before March 25, 2006, Defendant Steel directed Defendant Brodhead to create a Crisis Management Team ("CMT") to manage the University's actions relating to the investigation of Mangum's claims.   The original participants in the CMT were Defendants Steel, Brodhead, Lange, Trask, Burness, and Moneta. Defendant Victor J. Dzau (Chancellor for Health Affairs, and President and CEO of Duke University Health Systems, Inc.) was added to the CMT shortly after it became clear that DUHS and Tara Levicy were critical to the State's case. Defendant Allison Halton (the University's Secretary) was also added to the CMT following its first meeting on March 25, 2006.

415.   Both Defendants Trask and Burness had personal knowledge of the Gottlieb Dossier and the fact that Gottlieb had been removed from the patrol beat as a result of his misconduct in dealings with Duke students.   Upon information and belief, Defendant Steel and CMT Defendants were all aware of these facts on or before March 25, 2006.

**C.      Duke Officials Cascade the Message that Only the Durham Police have the Authority to Investigate and Find the Truth.**

416.   Nevertheless, Defendant Steel and CMT Defendants directed the Duke Police Department to abdicate its jurisdictional responsibility to investigate, and allow the Gottlieb investigation to proceed unabated.   Further, having tied the hands of the Duke Police Department, Steel and the CMT, together with Duke Police Supervising Defendants, Duke Police Investigator Defendants, Durham Police

Supervising Defendants, Durham Investigator Defendants, and others colluded, agreed, and conspired to mislead Plaintiffs and the public into believing: (1) that the only law enforcement agency with the authority to investigate Mangum's allegations was the Durham Police Department, and (2) that Duke Police Department had no power or authority to investigate Mangum's allegations.

417. Immediately, the University issued press statements cascading those messages. For example:

(1) On March 28, 2006, President Brodhead held a press conference that was carried to local, national and international audiences. In his prepared remarks, Brodhead asserted,

> *"To determine responsibility we need to learn the full truth as quickly as possible... Unavoidably we have to look to the Durham Police to take the lead in the investigation. Duke doesn't have the power to compel testimony from citizens of this city, and Duke lacks access to warrants, DNA records, and other confidential information."*

418. These statements were false and misleading, and they were made with the intent to conceal the fact that the Duke Police Department had the power and statutory authority to intervene, to prevent, or aid in preventing the wrongs they knew were conspired to be done to Plaintiffs and their teammates.

419. In furtherance of the conspiracy to conceal Duke's responsibility to investigate Mangum's allegations, Duke Officials, particularly the CMT Defendants, cascaded that message to national and local television and print journalists. For example:

(1)     On March 26, 2006, Provost Peter Lange told ABC News, "Do I know that those crimes happened in a way that would allow me to take a position on that? No…[t]hat's why we have the police.  That's why the police have the means to undertake steps to investigate the crime that Duke could never have."

(2)     On March 27, 2005, Provost Lange told the student newspaper, *The Chronicle*, "[i]f the University investigates, it could, in fact, somehow affect the ability to pursue the criminal investigation."

(3)     On March 27, 2006, Duke's Official Spokesperson, John Burness said, "There are some folks who want us to do a full investigation ourselves.  But the fact of the matter is this is a police investigation, and we can't impede it."

(4)     On April 4, 2006, President Brodhead, in his address to the InterCommunity Council, said, "You could lose a police case because of a university's involvement."

(5)     On April 4, 2006, Brodhead told the Graduate and Professional Student Council ("GPSC"), "If we were to conduct our own separate parallel investigation, there's all kinds of ways that could interfere—without meaning to—with the police investigation."

(6)     On April 5, 2006, in his "Letter to the Community," Brodhead wrote:

> *"Many have urged me to have Duke conduct its own inquiry into these charges.  Frustrating though it is, Duke must defer*

144

*its own investigation until the police inquiry is completed,
first because the police have access to key witnesses,
warrants, and information that we lack, and second because
our concurrent questioning could create a risk of
complications—for instance, charges of witness tampering—
that could negatively affect the legal proceedings."*

(7)     A year later, on April 8, 2007, Burness told *The Daily Progress*:

*"Obviously, we have a lot of information that we did not have
then. But you're making your decisions based on the best
information you have at the time. Nonetheless, the decision
made by the president with the strong support of the board of
trustees was made in the best long-term interest of the
university and the athletic programs."*

(8)     On September 29, 2007, Brodhead issued a statement to all of the team

        members, and provided several reasons for the University's failures. One

        reason was Brodhead's fear that, "if Duke spoke out in an overly aggressive

        fashion, it would be perceived that a well-connected institution was

        improperly attempting to influence the judicial process, which could have

        caused the case to miscarry in a variety of ways." Brodhead also claimed

        that there was "no legal recourse against the District Attorney, for me or

        anyone else. Under North Carolina laws, no one had authority to take an

        active case from a DA absent the DA's own request, as finally happened in

        January."

420.    The foregoing statements were all false and/or misleading, and intended to conceal

        the fact that the Duke Police Department had jurisdiction over the investigation of

        Mangum's false allegations, and to conceal the fact that University had the power

to intervene to prevent or aid in preventing the wrongs conspired to be done to Plaintiffs and their teammates.

**D.    Duke Police Officers' and Misleading "Witness Statements"**

421.    On or about March 27, 2006, in response to a request for Duke Police Officers' statements from Nifong's assistant, Sheila Eason, Duke Police Supervising Defendants directed the Duke Police Officers who interacted with Mangum at DUMC to violate protocol and standing General Orders by not writing a standard incident report or operations report on the forms prescribed for that purpose. Instead, the Officers were directed to write what can only be characterized as "bystander witness statements" that conceal the exculpatory evidence they derived from their interactions with Mangum.

422.    Further, the same Defendants directed the officers who were present at DUMC on March 14th to write the functional equivalent of a bystander's witness statement. The Duke Officers' statements were all remarkably consistent in substance, and identical in form.  They were all one-page statements written on plain paper, and identically styled in the following way:

> To:            Office of District Attorney, Durham County
>
> From:        [Officer's Name]
>
> Statement Ref:        Alleged Gang Rape by the Duke Lacrosse Team Members of Crystal Mangum.

423. There is no Duke Police Department insignia anywhere on the officers' statements. In the statements, the Duke Officers repeatedly refer to the investigation of Mangum's claims as "the Durham Police investigation." They also uniformly describe their role in the investigation as the functional equivalent of a bystander witness. Among other things, the Duke Police Supervising Defendants directed the officers to:

(1) Conceal the fact that the Duke Police had jurisdiction over the investigation;

(2) Conceal the fact that the investigation was a Duke Police investigation, until Duke abdicated its jurisdictional responsibility to initiate and conclude an investigation of Mangum's allegations;

(3) Conceal their observations during their interactions with Mangum that tended to prove Mangum's claim was a fraud;

(4) Reveal observations of Mangum's behavior only to the extent that the observations tended to enhance the reliability of Mangum's claim.

424. Two officers who wrote these "witness statements" have since taken employment at other law enforcement agencies. Their accounts changed significantly when they left the Duke Police Department. For example:

**1. Officer Mazurek**

425. In his March 29, 2006 "witness statement" as a Duke Police Officer, Mazurek wrote:

> "On 03-14-06, I was the Officer in Charge at Duke Hospital. I was informed by security that...a male nurse was evaluating Ms. Mangum. When he tried to gather information about her injuries she started to cry and asked him to leave her alone.... Ms. Mangum's shirt appeared to be torn on the left shoulder....[The Durham Officers] told me that this incident may have occurred at 610 N. Buchanan involving several Duke Students. After my initial observation of Ms. Mangum I did not have any further contact with her."

426. After obtaining employment elsewhere, Mazurek was free to report any exculpatory information he obtained at DUMC on March 14th, and he did. On November 2, 2006, Mazurek reported, among other things, his belief—formed at the time he observed Mangum—that Mangum was "faking" the whole thing.

### 2. Officer Falcon

427. In her March 28, 2006 "witness statement" regarding her observations of Mangum, Officer Falcon wrote that Mangum "was shaking, crying, and upset. … She kept crying out to the male nurse and Durham Officers (in the doorway) that she was violated and raped and that her friend stole her money and left her at the event that she was working at." Regarding her role in the investigation, Falcon wrote:

> "I stood outside the ED Triage area as a Duke Representative, while Durham City proceeded with their investigation.... Not at any time did I direct any questions to Ms. Mangum concerning the investigation by Durham City PD. Not at any time was I a direct party to any investigation(s) of Durham City PD of this alleged incident, other than to assist the outside agency of Durham City PD."

428. After obtaining employment elsewhere, Falcon was free to report any exculpatory information she obtained at DUMC on March 14th, and she did. On October 30, 2006, Falcon reported, among other things, that an unusual number of Duke Officers, even Major Schwab, were called in shortly after Mangum arrived at the E.D.; she thought it was odd that "all the supervisors met out on the loading and had a meeting."

429. Further, Duke Police Supervising Defendants had required Falcon to conceal from her written "statement" her recollection that "a Durham Police Sergeant kept going in and out of Mangum's room, saying 'I have to conduct an investigation' …." After some time passed, the Sergeant emerged from Mangum's room, and "he said loudly so everyone around heard him, 'I think she is lying!'"

### 3. Officer Day

430. Officer Day had already submitted a police report on March 14th before the directive was issued to write "witness statements" that conceal Duke Officers' involvement and any evidence harmful to the State's case. Day's report is therefore not written on plain paper styled as a witness statement; it was written on a pre-printed Duke Police Department standard police report form, it contained a synopsis of much of the exculpatory evidence gathered by Durham Police and Duke Police on March 14th, and concluded that the felony investigation had been closed.

431. Because everything in Day's report was already approved by the chain of command and was at odds with the directive to conceal exculpatory material, Day was directed to write a "Continuation" report, in which he states:

> *This narrative is a continuation to an operations report in reference to assisting Durham Police at 610 N. Buchanan Street. After all Duke Police officers cleared from 610 N. Buchanan Street [sic] I went to the Duke Emergency Department to meet with Lt. Best (watch commander for Duke Police). While standing at the emergency department entrance, I overheard the District 2 Sergeant state that the victim (which [sic] was inside the ED) had changed her story several times, and that if charges were filed they would probably not exceed that of a misdemeanor.*
>
> *In reference to the conversation with Durham Officers I did not speak directly with the victim or with an investigator, nor did I ask questions regarding the case. The information was second hand from the patrol Sergeant standing on the emergency room dock outside the ED."*

432. Day's "Continuation Report" deliberately impeaches his own contemporaneously written synthesis of the reports he received in the transition briefing at the E.D. in the early morning hours of March 14, 2006. The result of Day's Continuation Report is to nullify the evidentiary value of his report of the many immediate impressions of the Durham officers who interacted with Mangum throughout the evening and believed Mangum's claims were a hoax.

### E. Duke Police Department's Public Efforts to Conceal its Authority to Intervene

433. The Duke Police Supervising Defendants made numerous public statements designed to conceal the fact that Duke Police had the responsibility to investigate Mangum's claims. For example:

(1) On May 11, 2006, Defendant Graves told the Charlotte Observer that "[i]t would be somewhat inappropriate for us [Duke Police] to pry into the (Durham Police Department's) investigation because it's their case. It's really up to them to share as much or as little information as they desire."

(2) Defendant Graves also told a representatives of the news media often that, "Duke…is cooperating fully with the police investigation and urges anyone with information pertinent to the events of March 13 to cooperate with the authorities."

434. In addition to their public acts in furtherance of the conspiracy to conceal their own responsibility to investigate, Duke Police Defendants acted privately to further its purposes. For example, in response to a University professor's suspicions, expressed in an email to a discussion group, that the Duke Police Department was concealing its role in the investigation, Duke Police Officer Dyson (Gottlieb's cohort in the Watts Raids), personally appeared at the professor's office the following morning to quell her suspicions. Dyson falsely explained to the professor that there is nothing to disclose about Duke Police involvement in the investigation of Mangum's allegations because "the assault

happened in the Durham Police jurisdiction," and Duke Police investigate only incidents that happen within Duke Police Department's jurisdiction.

## XIV. THE THIRD INVESTIGATION (MARCH 24 – JANUARY 11): NIFONG ARROGATES TO WIN ELECTION

### A. Nifong's Non-Electability

435. Nifong had never been elected to office before March of 2006. The prior year, Nifong was appointed to serve the remainder of then-District Attorney Jim Hardin's term as a lame-duck. As a condition of his appointment, Nifong promised the Governor he would not to run for election.

436. Once appointed, Nifong had forced his personal and professional rival, Assistant District Attorney Freda Black, to resign. When Black began her run for election as District Attorney, Nifong knew she would likely win, and she would simply fire him. The only way to avoid his own firing at the hands of Black was to run against her and win, so he broke his promise to the Governor and entered the race.

### B. Nifong's First Identification Crisis: Name Recognition

437. Unlike Nifong, Durham voters knew who Black was. She had prevailed in the murder prosecution of Michael Peterson, which brought national attention. Nifong had not tried a felony in over ten years.

438. Black was well known to Durham voters. The vast majority of Durham voters had never heard of Mike Nifong.

439. As March approached, Nifong's funding dried up almost entirely. Between February 20 and April 1, Black out fund-raised Nifong by a margin of greater than 4-to-1. It was becoming clear that Nifong would lose.

440. Instead of exiting the race, he began to fund his campaign with personal funds. He first loaned his campaign $6,601.00, and, subsequently, a loan of $22,388. All told, nearly 80 percent of Nifong's campaign fundraising in the ten weeks preceding the May 2 primary came out of Nifong's pocket. With his job and pension already on the line, Nifong had put his own household finances at risk as well.

### 1. A Late-March Poll Confirmed Nifong Was Hopelessly Trailing

441. A poll of Durham voters in March showed Nifong trailing Black by 17 points (37% - 20%) with 5 weeks remaining in the Primary race. The poll also revealed that Black was polling close to 40%, which, if she reached it, would preclude a runoff. Still, most Durham voters did not know who Mike Nifong was.

### C. Nifong's "Million Dollars Worth of Advertising"

442. Nifong claims he first learned of the investigation when he found an abandoned copy of the NTID Order on a copier. Nifong admitted at his Bar trial that he immediately recognized the enormous media interest the allegations in the NTID Affidavit would generate.

443. On March 24, 2006, Nifong told Gottlieb's supervisor and the Durham Police Supervising Defendants that he was taking over the investigation of the case. The

Durham Police Supervising Defendants agreed to allow Nifong to take over the investigation. The same day, Captain Lamb advised Gottlieb that Nifong is in charge of the investigation, and they were to conduct the investigation as Nifong directed them, and to undertake no investigative activity without Nifong's prior approval.

444. Nifong took Gottlieb's fabrications, and launched a media campaign that would enable him to ride this case into office. The make-up of the "suspect group" was fortuitous; Nifong perceived them all to be citizens of other states, which would mean they had no vote and no natural political base of support in North Carolina. Nifong would also use their perceived alienage in his effort to galvanize public condemnation of the Plaintiffs and their teammates. He claimed to countless media representatives, without any factual basis whatsoever, that he "was convinced" Mangum was raped by three members of the Duke lacrosse team and their teammates aided and abetted them. Quickly, he had several interviews set up for the weekend and well into the next week.

445. The case, he knew, would bring him more than enough attention to overcome his greatest disadvantage in the race against Black; it would bring him celebrity, which he needed to sustain only for six weeks to secure his job and the elected-DA's pension he coveted.

446. Mike Nifong then launched an unprecedented media campaign.

447. Prior to March 23, 2006, the name "Mike Nifong" appeared in only 51 news articles in Westlaw's "ALLNEWS" database. In the subsequent eight weeks alone, Mike Nifong's name appeared in 3,605 news publications in the same Westlaw database.

448. Early on in Nifong's media saturation, Nifong's campaign manager confronted him, insisting that he stop giving interviews about the case. Nifong promised he would stop, but the next day, Nifong was all over the television again. His campaign manager demanded to know why he broke his promise. Nifong answered, "because its worth a million dollars of advertising."

## XV. THE UNIVERSITY'S EFFORT TO FORCE WAIVERS OF THE PLAINTIFFS' FIFTH AND SIXTH AMENDMENT RIGHTS

449. By March 24, 2006, Duke University Defendants knew that Plaintiffs and their teammates had postponed the mass interrogations orchestrated by Duke Police and Durham Police; they knew that Plaintiffs had sought the advice of counsel; and they knew that counsel's advice was not to discuss the events of the evening with anyone except counsel until an independent decision could be made regarding waiver of any of their rights.

450. Knowing these things, Defendant Trask immediately demanded meetings with team members for the purpose of forcing them to effectively waiver their First, Fifth, Sixth, and Fourteenth Amendment rights. In other words, Trask sought to obtain from them what the Duke Police and Durham Police could not once the

team members chose not to waive their Fifth and Sixth Amendment rights only days before.

451. On March 24, 2006, the lacrosse team captains were called to a meeting with Defendant Trask and other University Administrators. The meeting began with Trask demanding, "tell us what happened." When the team members stated that their counsel advised them not to discuss the details of the evening, Trask insisted they answer his question. Trask suggested that the conversation was protected from disclosure by a privilege that did not exist. The captains, fearing their status as students was in jeopardy, told Trask what happened, and emphatically denied the allegations.

452. By leveraging the University's disciplinary power over Plaintiffs and their teammates, Trask and other CMT members attempted to coerce what was effectively the waiver of their asserted First, Fifth, and Fourteenth Amendment rights. They also subverted their right to counsel by insisting the team members speak in the absence of counsel, falsely assuring the captains their conversations were privileged when they were not, was a deliberate subversion of their right to counsel. Shortly thereafter, every administrator at that meeting was compelled, under threat of a subpoena, to tell the police what the team members had told them.

# XVI. THE CONSPIRACY TO RETALIATE AGAINST PLAINTIFFS AND THEIR TEAMMATES FOR EXERCISING THEIR CONSTITUTIONAL RIGHTS

453. In retaliation for the assertion (real or perceived), of First, Fifth, and Fourteenth Amendment rights, Duke University Defendants, Nifong, and Durham Police Spokesperson Defendants agreed and understood that each party would actively participate in the media campaign to publicly vilify Plaintiffs and their teammates and subject them to public condemnation.

454. In furtherance of the conspiracy, the parties to it engaged in public and private acts that promoted, reinforced or asserted four false and interrelated claims: (1) a woman was raped by three men at 610 N. Buchanan Boulevard; (2) the perpetrators were members of the team, (3) all members of the team were involved as principals or accomplices, and (4) all members of the team were "stonewalling" the police investigation. At all times during the conduct of this conspiracy, Duke University Defendants and City of Durham Defendants knew or should have known that these assertions were demonstrably false, and, yet they callously disregarded and/or were willfully blind and deliberately indifferent to the truth.

## A. Nifong's Public Acts and Statements

455. In furtherance of the conspiratorial objective, Nifong made numerous public statements to representatives of the news media, including, for example:

(1) Nifong told a reporter for MSNBC, "I am convinced that there was a rape, yes, sir."

(2)    Nifong told a reporter for the Durham *Herald Sun*, "We don't know who the assailants are, but we know they came from this group.  It's perfectly logical that we concentrate our efforts on this group."

(3)    Nifong told a reporter for NBC, "The information that I have does lead me to conclude that a rape did occur.  I'm making a statement to the Durham community and, as a citizen of Durham, I am making a statement for the Durham community.  This is not the kind of activity we condone, and it must be dealt with quickly and harshly."

(4)    Nifong told a reporter for ABC, "I don't think you can classify anything about what went on as a prank that got out of hand or drinking that took place by people who are underage."

(5)    Nifong told a reporter for WRAL, "what happened here was one of the worst things that's happened since I have become district attorney [sic]."

(6)    Nifong told representatives of the media that the lacrosse team members were "standing together" and "refusing to talk with investigators" and threatened aiding and abetting charges "if they did not come forward."

(7)    Nifong stated to a reporter for the *New York Times*, "[t]here are three people who went into the bathroom with the young lady, and whether the other people there knew what was going on at the time, they do now and have not come forward.  And if they would have spoken up at the time, this may never have happened."

(8)     Nifong stated to a reporter for the Raleigh *News & Observer*, "I would think that somebody [not involved in the attack] has the human decency to call up and say, 'What am I doing covering up for a bunch of hooligans?'"

(9)     Nifong stated to a CNN reporter, "It just seems like a shame that they are not willing to violate this seeming sacred sense of loyalty to team for loyalty to community."

(10)    Nifong told a nationally syndicated Fox News television host in a live nationally televised interview, "Well, frankly I'm disappointed.   I understand that it's likely what they're doing is as result of advice of counsel…But although that might be good legal advice, I don't think its good moral advice."

(11)    Nifong told a reporter for the *News & Observer*, "I'd like to be able to think there were some people in that house that were not involved in this and were as horrified by it as the rest of us are."

(12)    Nifong told a CBS reporter in nationally televised interview, "The lacrosse team clearly has not been fully cooperative in the investigation ….  The University, I believe, has done pretty much everything that they can under the circumstances.   They, obviously, don't have a lot of control over whether or not the lacrosse team members actually speak to police.  I think that their silence is as a result of advice of counsel."

(13)    Nifong told a reporter for the *Charlotte Observer* that he believed it was the University's reaction to the allegations that pushed the case to the forefront nationally.

(14)    Nifong told a nationally syndicated Fox News television host in a live nationally televised interview, "I still hope that at some point conscience and courage will stop forward in somebody and that someone will come forward with information."

(15)    Nifong told a reporter for ESPN, "one would wonder why one needs an attorney if one has not been charged and had not done anything wrong."

### B.    Addison's Acts and Public Statements

456.    In furtherance of the conspiratorial objective, Defendant David W. Addison, Durham Police Spokesperson, made numerous public statements to representatives of the news media, including, by way of example:

(1)    On March 24, 2006, Spokesperson Addison told representatives of the media that the police investigation had produced "really, really strong, physical evidence" of rape, and that the same evidence would allow the SBI Lab to establish a match with DNA from the lacrosse players who committed it.

(2) Spokesperson Addison falsely asserted to a representative of the media that "…all of the [lacrosse team] members refused to cooperate with the investigation."

(3) Spokesperson Addison falsely stated to representatives of the media that the Plaintiffs' and their teammates' "refusal to cooperate with the investigation" caused Judge Stephens to issue the Non-Testimonial Order for every players' DNA

(4) Spokesperson Addison falsely stated to representatives of the media that the Plaintiffs' and their teammates, "got several chances to cooperate with police … [but] still kept silent."

(5) Spokesperson Addison falsely stated to representatives of the media that police, "never would have had to do those swabs if [the Plaintiffs and their teammates] would've cooperated."

(6) On March 25, 2006, the *News & Observer* reported that Durham Police Spokesperson Addison stated "We're asking someone from the lacrosse team to step forward. We will be relentless in finding out who committed this crime."

457. At the time Defendant Addison made the foregoing and other, similar statements, he knew or callously disregarded and/or was willfully blind to the fact that they were false, and, in particularly that no lacrosse player had refused to "step forward," but instead three team members spent a total of 21 hours with Durham

Police answering all of their questions, provided written statements, suspect kits, and even offered to submit to a polygraph examination. Addison made his statements knowing or callously indifferent to the fact that they would inflame the passions of the public against the team members, and hopelessly prejudice the petit and grand jury pools. Further, all of Addison's statements were made in direct violation of the Durham Police Department's General Orders and Standard Operating Procedures relating to public statements about an active investigation.

### C. Addison's Incendiary Neighborhood Flyer

458. On March 28, 2006, at 3:20p.m., Defendant Addison, Durham Police Spokesman, sent an electronic flyer with the following text

> *"On Monday, March 13, 2006 about 11:00 p.m., the Duke University Lacrosse Team solicited a local escort service for entertainment. The victim was paid to dance at the residence located at 610 Buchanan. The Duke Lacrosse Team was hosting a party at the residence. The victim was sodomized, raped, assaulted and robbed. This horrific crime sent shock waves throughout our community. Durham CrimeStoppers needs your assistance in solving this case. Although, we have received many calls expressing concerns and anger about this incident, we have not received any calls which will allow us to assist in resolving this case. We are extending our plea for information and help to our Duke family, who are also part of our community. We are asking anyone who has any information which will allow the Durham Police Department to make an arrest in this case, please contact Durham CrimeStoppers at 683-1200. Please feel free to email me at david.addison@durhamnc.gov with any information. Please use an anonymous email account. Durham CrimeStoppers will pay cash for any information which leads to an arrest in this case."*

459. The email was sent to Durham governmental entities, news organizations, and community list-servs. It asserts that the allegations were true. The same email was resent several times during the course of the investigation including on April 3, 2006. Subsequently, Addison would create a flyer with the same text printed with the Durham Police Department's insignia on its masthead, for distribution by Durham Police Officers in neighborhood canvases conducted on April 5, 2006 and April 8, 2006.

460. Addison's glaring failure to employ the word "alleged" was noted immediately by defense counsel who demanded that he and/or the Durham Police Supervising Defendants alter the text to reflect the fact that Mangum's allegations were not established facts. Addison would not amend the electronic version of the flyer until April 10, 2006. The original inflammatory version was emailed to representatives of the media as late as May 26, 2006.

461. A true and accurate copy of the flyer distributed during the canvasses is digitally annexed hereto as **ATTACHMENT 12**, and may be viewed within this document via the link below:



462. Durham Sergeant D. Hampton sent an email to Addison after receiving Addison's corrected version of the flyer, saying, "Boy I wish you had done this Friday...I

used the old text for a flyer we did on a canvass Saturday night…. :)". (Smiling face in the original).

463. Addison replied, "It is alright… I was instructed to change this today so everything prior is fair game."

**D. The Wanted Poster**

464. On March 28, 2006, a hundred copies of a "Wanted" poster were distributed on campus and in the Trinity Park neighborhood, and hung on campus kiosks and bulletin boards.

465. A true and accurate copy of the "Wanted" poster is digitally annexed hereto as **ATTACHMENT 13**, and may be viewed within this document via the link below:



466. Upon information and belief, Gottlieb, Himan, CrimeStoppers, Duke Police, and Durham Police in conjunction with Duke University faculty and staff created, mass-produced, and broadly disseminated the "Wanted" poster on campus and in Durham.

**1. The Duke-CrimeStoppers Partnership**

467. Both Addison's incendiary email and the "Wanted" poster are perfectly consistent with the Duke Police Department's protocol for collaboration with Durham CrimeStoppers ("CrimeStoppers") for all felonies reported within Duke Police Department's jurisdiction. Pursuant to the established Duke-CrimeStoppers'

policy, custom or protocol, written in a document circulated within the Duke Police Department, when a felony was reported in Duke Police Department's jurisdiction:

(1)     The Duke Police investigator assigned to the case would schedule a meeting with Addison;

(2)     A "poster" would be developed in a collaborative effort by CrimeStoppers and Duke Police;

(3)     The "poster" would be distributed widely on and off campus;

(4)     An email alert would be written in by Duke Police in collaboration with CrimeStoppers, for mass distribution to an email list maintained by the City of Durham, which included media contacts;

(5)     Subsequently, all "tips" reported to the 24-hour CrimeStoppers center in response to the posters and/or email, would be delivered to Duke Police Liaison to CrimeStoppers; and

(6)     The Duke Police Liaison would then transmit valid tips and information to the investigator assigned to the case.

468.    Upon information and belief, at all times relevant to this action, Defendant Greg Stotsenberg, Duke Police Sergeant and Investigator, was one of the Duke Police liaisons to CrimeStoppers and the designated recipient of "tips" generated by posters and emails in the investigation of Mangum's claims after Duke Police abandoned their jurisdiction over the investigation.

**E. Duke Officials Defendants Acts and Statements**

469. In furtherance of the conspiratorial objective, The CMT Defendants made numerous public statements to representatives of the media, including, by way of example:

(1)     In tandem with the statements of Addison and other Defendants, during the days following the vigil and "Potbanger Protest", Duke Officials began to cascade another message in press releases and in statements to representatives of the media that lent credibility the "stonewalling" myth. Again and again, they urged those involved "to come forward" and to provide any information they have to the police.

(2)     On March 27, 2006 Peter Lange was quoted by both the Associated Press and Fox News: "the students would be well-advised to come forward. They have chosen not to."

(3)     On March 28, 2006, Brodhead held a press conference and made statements that were designed to, or obviously would, galvanize the public outrage against the team members for not submitting to Gottlieb's interrogation. President Brodhead told the assembled representatives of the media:

(a)     "No employee has advised the players not to speak."

(b)     "Indeed I will tell you the first member of my staff uh to begin an inquiry into this episode was on the well within thirty, 24 hours of

the event itself. And I know from her that the first thing she told

them was uh to speak fully and be honest."

(c)     "You know what can I say to you? I urged them the notion to come

forward."

(d)     When asked if he was surprised at the unprecedented open outrage

displayed by his faculty in plain view of the national media,

President Brodhead told the assembled representatives of the

national media, "How can I be surprised at the outrage?"

(4)     On March 27, 2006, the University Spokesperson, John Burness, told a

representative of the student newspaper that, "[m]y understanding is that

some people who have talked to the players have suggested it would be

very much in their advantage to get their side of the story out in one way or

another."

470.    All of the foregoing acts and statements were made after Brodhead personally

received and rejected Plaintiffs' defense counsel's first offer to detail for him or

any designee he chose all of the evidence of innocence—including the digital

alibis of every team member—already established in his office by Stefanie Sparks,

Private Investigators Lane and Blackman, and later corroborated by Computer

Forensic Analyst and Expert Raymond J. Grunch. The statements were made with

deliberate indifference and callous disregard of the truth and of Plaintiffs' rights.

167

### F. The Duke University Faculty's Public Acts

471. On March 25, 2006, after the CMT directed Athletic Director Joe Alleva to forfeit two lacrosse games, Duke University faculty members orchestrated a "candlelight vigil" for "the victim" Crystal Mangum. It was to be held on the lawn of the 610 N. Buchanan residence. The primary organizer of the vigil, Professor Faulkner Fox, insisted publicly that "[t]he students need to realize they live in a community, and people are going to talk back if they do something, or potentially do something, that is disrespectful to women."

472. By the next morning, March 26, 2006, the "candlelight vigil" for the "victim" transformed into a "Wake-up Call" held by largely the same protestors, who surrounded 610 N. Buchanan, banging pots and pans, and shouted at the residents to come out and confess.

473. Video footage of the "Potbanger Protest" is digitally annexed hereto as **ATTACHMENT 14**, and may be viewed below:



474. Upon information and belief, none of the Potbangers were arrested and jailed; nor were any charged with violations of the City Noise Ordinance. The Potbangers also brought threatening signs and enormous banners, echoing the public statements, sentiments and actions of the University's Crisis Management Team and of Durham Police Spokesperson Addison. For example:

(1)     One sign read, "Get a conscience not a lawyer."



(2)     Another sign read, "Sunday Morning: Time To Confess."



(3)     Another banner read, "CASTRATE!"



475.    The menacing slogans were compounded by "speakers" who addressed the crowd and the home of three of the lacrosse team captains through a bull horn.  The Potbanger-Speakers variously asserted that a rape occurred and demanded a confession.   The statements of Potbanger-Speakers, many of whom were University Professors, Administrators, and students, included, for example:

(1)     "We are making this kind of noise because we are standing in solidarity with the women who have gone through this horrible atrocity."

(2)     "Wake up! Wake up! The Sun is up!  It's Sunday morning!  Time to confess!"

(3)     "We want the members of the Duke Lacrosse team to come clean."

(4)     "They haven't been convicted, but 30-something kids are remaining silent."

476.    Several Durham Police and Duke Police Officers were standing a short distance away, watching the mob in front of 610 N. Buchanan, and did nothing to intervene.  One officer appeared to be taking pictures.

## G. Duke University Clergy's Public Acts

477. In the Duke Chapel, on the evening of the Potbanger Protest, March 26, 2006, Father Joseph Vetter gave a homily in the Duke Chapel that presumed the guilt of the Plaintiffs and their teammates. In his homily, Father Vetter stated, among other things:

> "All of us are very much aware of what is going on at Duke this week; how Duke is in the news in an unfavorable way. As I was going to Mass this morning going down Buchanan Boulevard, there were a hundred people or so sitting out in the front yard of this house where this incident took place with the Duke Lacrosse team or at least some of the members of some of the team that live in that house. And we don't yet fully know what happened and no one is guilty until they're uh everybody's innocent until they're proven guilty. But it seems pretty apparent that something was going on there that was pretty bad the other night and at the least it involved a bunch of guys getting together and getting drunk. That's not too hard to believe because that happens around here a lot a bunch of guys getting together and getting drunk and getting rowdy and apparently they hired an exotic dancer to come in and strip for them, two exotic dancers to come in and strip for them and I know that's not very uncommon either…. It just becomes kind of part of the culture… and when we get caught up in patterns like that sometimes it really gets out of control. And apparently something happened the other night where it really got out of control. And at least the person claims that that she was raped, that she was beaten, that she had racial slurs used against her. And if all that's true and if and if the people that were involved are convicted then some young people are going to go to jail and pay a really serious penalty for those crimes. That's really tragic because I'm sure that none of those people that were involved in that incident had any idea that something like that was going to happen. Nobody, nobody would set that up. Nobody wanted that to turn bad-but it did. And that's what happens a lot of times when we make mistakes when we become desensitized when we deceive ourselves and start thinking that it's ok for us to just get drunk…where people are treated like objects rather than people….*

*There are consequences to our sins. There are consequences to our actions…God will help us recognize the seriousness of consequences to bad choices that we make…"*

**H.**   **Duke University and the City of Durham Ratified, Condoned and Adopted the Foregoing Public Acts as their Own.**

478.   Duke Officials Defendants and the City Officials Defendants all were aware of the foregoing public acts of their employees, agents, and representatives, including but not limited to the statements made, slogans chanted, and banners hung on the 610 N. Buchanan residence during the Potbanger Protest; the candlelight vigil on the lawn of three of the lacrosse team captains' home; and the homilies in church services held over the weekend of March 25-26, 2006. It was plainly obvious, and the Duke Officials Defendants and the City Officials Defendants knew that the Duke Faculty, the City Leaders, and the Duke Clergy who presumed the team's guilt and publicly condemned them would be perceived to be speaking for the University and the City, unless the University Officials and the City Officials expressly clarified that those individuals did not speak for the University or the City of Durham. Nevertheless, the University Officials and the City Officials all failed and/or refused to expressly state or otherwise clarify that those who publicly proclaimed Plaintiffs' guilt and condemned them did not speak for the University or the City of Durham. In failing to do so, the University Officials Defendants and the City of Durham Defendants adopted, ratified, and condoned their public acts and statements.

## I.    There Never was a Stone Wall of Silence

479.  When the Plaintiffs' voices were heard over the din of banging pots and amplified

demands for confessions, the "Stone Wall of Silence" myth unraveled.  Plaintiffs

and their teammates were able to establish in the maelstrom swirling around them

that:

(1)    They never refused to speak to police; they asked to postpone

interrogations scheduled for them by the University's agents without their

knowledge and with negligible prior notice; and

(2)    The three lacrosse team captains who lived in the home the Potbangers

vandalized with signs that demanded they "come forward" had, in fact,

already voluntarily submitted to police interrogation, assisted police in

locating evidence listed in their search warrant, steadfastly insisted that no

one at the party had any sexual contact whatsoever with either dancer,

provided all the assistance, answers, evidence police could think to ask for,

and actually suggested the police give them a "lie-detector" test, which the

police refused to provide.

480.  Further, it was readily apparent that Nifong, who had taken over the investigation,

and Addison, Durham Police Department's Official Spokesperson, both insisted

that any claim of innocence was, to them, a lie.  Nifong told representatives of the

New York Times, "[Evans, Flannery and Zash] denied any sex acts took place,

and I don't believe that is the case." In the face of statements like that, submitting

to interrogation conducted under Nifong's direction would have been futile.

481. Further, overwhelming evidence of the Plaintiffs' innocence had been established

long before the Potbangers vandalized three of the Captains' home on March 26,

2006. The overwhelming evidence of innocence was not only present and

available, it was growing. Knowing these facts, Duke University Defendants and

City of Durham Defendants continued to retaliate against Plaintiffs and their

teammates for exercising of their constitutional rights.

## XVII. PLAINTIFFS "COME FORWARD" WITH AN UNEQUIVOCAL DENIAL AND ASSERT THAT THE DNA WILL PROVE THEIR INNOCENCE (AGAIN)

482. On March 28, 2006, the Plaintiffs and their teammates issued the following joint

press release:

> *"The captains of the team met this morning with President Brodhead, and expressed sincere regret over the lapse in judgment in having the party on March 13 which has caused so much anguish for the Duke community and shame to our families and ourselves. We have also stated unequivocally that any allegation that a sexual assault occurred is totally and transparently false. The team has cooperated with the police in their investigation. We have provided authorities with DNA samples. The understanding is that the results of the DNA testing will be available sometime next week. The DNA results will demonstrate that these allegations are absolutely false. Because of the intense emotions surrounding these allegations, we feel it is in the best interest of the University, the community and our families that the team should not play competitively until the DNA results verify our unequivocal denial of these allegations."*

483. The Plaintiffs and their teammates issued that press release knowing that modern DNA technology is sensitive enough to detect skin cells and other genetic material in microscopic quantities. For that reason, among many others, the statement was an unprecedented risk taken by all 47 team members. A prominent criminal defense lawyer stated in a televised interview that she would authorize that press release only if she knew her client had been in a body cast for a month prior to the relevant time. The statement demonstrated the Plaintiffs' perfect confidence that none of them engaged in any sexual contact with Mangum whatsoever.

### A. Unbeknownst to the Plaintiffs, the SBI Lab's DNA Testing Already Proved Their Innocence

484. When the Plaintiffs' press statement declaring their innocence was released, Nifong had already received a preliminary report from the SBI that proved their innocence. On March 28, 2006, an SBI serologist, Rachel Winn, advised Himan that she had completed the serology tests on the rape kit items. It was all negative. There was no semen, blood, or saliva on any of them. As a result, she advised Himan that the rape kit items will probably not be sent to the DNA section for further testing.

## XVIII. THE CONSPIRACY TO RETALIATE BY FABRICATING A "RACIST" DIMENSION TO MANGUM'S FALSE ACCUSATIONS

485. Durham Police Spokesperson Defendants, Nifong, Gottlieb, and Himan fabricated false evidence to support their contention that the alleged rape was motivated by racial animus.

### A.    Pittman's 911 Call

486.    Durham's Public Information Office ("DPIO") and/or DECC deleted all of the audio recordings of Sgt. Shelton and other officers reporting Mangum's bizarre behavior; her recantation; and the police directive Mangum overheard while at Durham ACCESS to send officers to Mangum's home and to contact DSS if they find Mangum's children there without adult supervision; and untold other exculpatory statements contained in those communications.

487.    While concealing (and then destroying) the foregoing audio recordings, DPIO disseminated and willfully misrepresented Pittman's 911 call reporting a racial slur at 610 N. Buchanan.

488.    DPIO released the 911 call after Nifong and Addison falsely proclaimed with certainty that a rape occurred, the victim was African-American, and "the attackers" were white members of the Duke Lacrosse team.

489.    From the beginning of the investigation, Durham Police knew that the 911 call was made by Pittman, and that it was a ruse. This was the first thing Pittman told Sgt. Shelton when he approached her in the Kroger Parking lot.

490.    In spite of that knowledge, and in callous disregard for Plaintiffs' rights, DPIO released the 911 recording as an "unknown, anonymous" caller who was fearful of a racist mob spilling out of the residence at 610 N. Buchanan earlier in the evening.  As detailed above, Pittman's call impeaches itself.

491. As reporters began to suspect the call was a fraud and likely was made by Pittman, they begin to ask Defendant Kammie Michael, Durham Police Department's Public Relations Coordinator and Public Information Officer, questions. In particular, many representatives of the media ask Michael if the caller is "the second dancer." Michaels, caught in the lie, nevertheless, continues to make the false claim that Durham Police do not know the identity of the caller. As late as April 4, 2006, Michaels falsely told representatives of the media that the 911 caller "**was not** the woman who accompanied the victim to 610 N. Buchanan."

   (1) Pittman told Sgt. Shelton upon his arrival at Kroger that she was the one who made the 911 call from 610 N. Buchanan; it was the first thing she said to Sgt. Shelton.

   (2) On March 16, 2006, Evans, Flannery, and Zash wrote in their statements the fact that Pittman shouted that she was calling the police to report a "hate crime."

   (3) One of the lacrosse team captains told Himan directly that he observed Pittman making the call.

   (4) Pittman herself told Himan and Gottlieb that she made the 911 call during Pittman's first police interview on March 22, 2006.

492. Nevertheless, Nifong, Durham Police Spokespersons, Duke University agents, and others used the gross misrepresentation of Pittman's 911 call to open a new "racist" dimension of the false rape claim.

**B.** **Nifong's Acts in Furtherance of the Conspiracy to Fabricate a "Racist" Dimension to Mangum's False Rape Accusation**

493. On or before March 27, 2006, Nifong made the following statements to representatives of the news media:

(1) Nifong told a reporter for the Associated Press, "The circumstances of the rape indicated a deep racial motivation for some of the things that were done. It makes a crime that is by its nature one of the most offensive and invasive even more so."

(2) Nifong told a reporter for ABC, "The contempt that was shown for the victim, based on her race was totally abhorrent. It adds another layer of reprehensibleness [sic], to a crime that is already reprehensible."

(3) Nifong told a reporter for ABC, "In the case, where you have the act of rape—essentially a gang rape—is bad enough in and of itself, but when it's made with racial epithets against the victim, I mean, it's just absolutely unconscionable."

(4) Nifong told a reporter for the Durham *Herald Sun*, "Every rape is a serious case. But some speak to the community in a different manner. This is one of them." He said that the racial aspect is "particularly abhorrent."

(5) Nifong told a reporter for MSNBC, "On top of the rape which is already an abhorrent crime enough, you have the additional racial animus and the hostility that seems totally out of place for this community in this day and age. And I felt this was a case that we needed to make a statement, as a

community, that we would not tolerate this kind of behavior here in Durham. And I felt that the best way to make the statement was to take this case."

(6)     Nifong told a reporter for CBS, "The racial slurs involved are relevant to show the mindset…involved in this particular attack."

(7)     Nifong would suggest to several representatives of the media that he was considering charging the crimes as hate crimes, because, as he told reporters, since the victim appeared to have been "targeted because of her race."

494.     Himan met with Nifong to brief him on the 27th, 29th, and 30th, and almost every day thereafter through May 15th. In the briefings, Himan told Nifong everything he knew, and provided witness statements to Nifong witness statements when he obtained them. Even so, in a nationally televised interview with Dan Abrams on March 31st, Nifong falsely claimed that he did not know who the 911 caller was:

        ABRAMS: Have you identified the person who made the 911 call?

        NIFONG: Have I personally identified...

        ABRAMS: Yes.

        NIFONG: Do I know if the...

        ABRAMS: Do you know who it is?

        NIFONG: I ... to my knowledge that -- I do not.

495. Upon information and belief, Duke Police Supervising Defendants and Durham Police Supervising Defendants were also aware of the fact that Pittman made the 911 call, and it was a ruse. Nevertheless, the Duke Police Supervising Defendants and Durham Police Supervising Defendants continued to allow Nifong and Defendant Michael to portray the call as being from an unknown woman unrelated to the case.

496. In those—and other—ways, Nifong created, promoted and perpetuated a completely fabricated racist dimension to the mythology of the evening that implicated "the attackers" and the remainder of the team alike.

C. **Brodhead's Acts in Furtherance of the Conspiracy to Fabricate the "Racist" Dimension to Mangum's False Rape Accusation**

497. On March 29, 2006, Duke University issued the following statement from Defendant Brodhead:

> *"Yesterday evening, Director of Athletics Joe Alleva and I met with members of the news media to discuss the situation involving the Duke men's lacrosse team....At the news conference I was asked about the 911 tape involving a racial slur, which only became known late yesterday. I have now had the opportunity to listen to the tape. It is disgusting. Racism and its hateful language have no place in this community. I am sorry the woman and her friend were subjected to such abuse."*

498. Before issuing the press release, Defendant Brodhead did not inquire with defense counsel for any team member about the legitimacy of the plainly fraudulent 911 call.

### D. The Duke Faculty's Acts in Furtherance of the Fabrication of a "Racist" Dimension to Mangum's False Allegations

#### 1. William Chafe

499. Professor William Chafe, former Dean of Arts and Sciences at Duke, wrote an editorial published on March 31, 2006, falsely claiming facts that were not disputed and equated the team to actors responsible for some of the most horrific events in American history. Among other things, Professor Chafe asserted that:

> *"So sex and race have always interacted in a vicious chemistry of power, privilege, and control. Emmett Till was brutalized and lynched in Mississippi in 1954[5] for allegedly speaking with too easy familiarity to a white woman storekeeper....What has all this to do with America today, and with Duke? Among other things, it helps to put into context what occurred in Durham two weeks ago. This mixture of race and sex that transpired on Buchanan Boulevard is not new....there is no question that racial epithets were hurled at black people. Nor is there any question that white students hired a black woman from an escort service to perform an exotic dance. The intersection of racial antagonism and sexual exploitation is all too familiar."*

#### 2. Professor Houston Baker

500. Professor Houston Baker wrote an open letter to be published as broadly as possible in the Duke and Durham communities asserting that the team's "culture of silence…seeks to protect white, male, athletic violence." He goes on to state "The lacrosse team—15 of whom have faced misdemeanor charges for drunken misbehavior in the past three years—may well feel they can claim innocence and sport their disgraced jerseys on campus, safe under the cover of silent whiteness. But where is the black woman who their violence and raucous witness injured for

life? Will she ever sleep well again? And when will the others assaulted by racist epithets while passing 610 Buchanan ever forget that dark moment brought on them by a group of drunken Duke boys? Young, white, violent, drunken men among us -- implicitly boasted by our athletic directors and administrators -- have injured lives." In the letter, Baker invokes the word "whiteness" more than a dozen times.

501. Only Provost Lange spoke out to protest Baker's ranting letter, and that was only to call Baker's letter racist itself.

### E. The Duke Clergy's Acts in Furtherance of the Fabrication of the "Racist" Dimension to Mangum's False Accusations

502. On April 2, 2006, Duke University's Reverend Sam Wells cited Ecclesiastes 3.7, "There is a time to keep silent, and a time to speak." Reverend Wells then launched into a speech in which he asserted, among other things:

> *"Speculation about this disputed case has nonetheless brought to attention a host of other stories that are undisputed, but have hitherto remained in the shadows, and together explain why these allegations have catalyzed such anger. These portray a disturbingly extensive experience of sexual violence, of abiding racism, of crimes rarely reported and perpetrators seldom named, confronted, or convicted, of lives deeply scarred, of hurt and pain long suppressed. The activists among us shout loudly about reckless drinking, the reputation of particular sports teams, the sense of entitlement, the need to reassess what it means to be a man, and the urgency of rules and penalties and enforcement..."*

503. An obvious result of the faculty's public excoriation of their own students was the near universal conclusion articulated by Trinity Park permanent resident Bettie Crigler, who put it, "I am sort of assuming it happened."

504. Before indictments were handed down, Nifong initiated an effort to impeach the character of the putative defendants, their fact witnesses, and their character witnesses before charges were brought. Duke University, Durham Police, and others understood and agreed to pursue the same course of action. The impeachment campaign was waged by the Plaintiffs' own teachers, Duke University faculty, Administrators, and, in particular the CMT Defendants. It was so successful that, as the trial drew near, a defense survey revealed that 17% of African-Americans eligible to serve as jurors in Durham stated that they would vote to convict the defendants even if they had a perfect alibi.

## XIX. THE CONSPIRACY TO ABUSE THE WARRANT PROCESS

### A. Himan and Gottlieb Brief Nifong on the Investigation for the First Time

505. On March 27th, Nifong summoned Gottlieb and Himan to his office to brief him on the evidence for the first time. Already, however, Nifong had painted himself into a corner; he had told multiple press representatives that he was certain Mangum was raped at the 610 N. Buchanan residence by members of the team.

506. Himan and Gottlieb detailed the findings of the investigations thus far. Among many other things, the officers told Nifong that Mangum had eliminated every

member of the lacrosse team as a plausible suspect through her descriptions and the two March Identification Procedures. From another source, Nifong had already been told of Mangum's multiple, contradicting accounts of the events.

507. Nifong erupted at them, shouting, "You know, we're f*****d!" Nifong made it clear to Himan and Gottlieb that he was already committed; Nifong told them that he had already given several interviews about the case, he had more scheduled that day, and even more already scheduled through the week. Nifong ridiculed their inexperience, particularly in rape investigations. He dispatched the officers with instructions to obtain emails sent by team members after the party ended on March 14th.

## B. Ryan's Email

508. Shortly thereafter, Nifong released Gottlieb and Himan from their morning meeting with orders to obtain incriminating email evidence, Gottlieb obtained an email written by Ryan McFadyen. Within 10 minutes, the two investigators were back in Nifong's office, as instructed, with a copy of an email chain containing Ryan's email.

509. Nifong, Himan and Gottlieb discussed what to do with the email. Upon information and belief, they discussed the fact that Mangum did not identify or even recognize Ryan in the March 16th Identification Procedure. Nevertheless, Nifong instructed Himan and Gottlieb to obtain a warrant to search Ryan's room. The point of obtaining the search warrant was not to search for evidence; it was to

place Ryan's email in a public document, stripped of the reply emails that reveal that Ryan's email is a parody.

## C. The Agreement to Abuse the Warrant Power

510. Nifong, Himan, and Gottlieb agreed and understood that the investigators would include Ryan's email in the Search Warrant application. It was plainly obvious that the facts alleged in the application for the NTID Order were sufficient to obtain Judge Stephens' authorization to search Ryan's dorm room. Only four days prior, Judge Stephens relied upon it to authorize an NTID Order directed to all 46 team members, including Ryan.

511. Upon information and belief, Nifong, Gottlieb, and Himan understood that the fact sections of the application for the NTID Order would be sufficient; they agreed to add Ryan's email to these sections of the NTID Order solely to transform Ryan's email into a public document. Nifong, Gottlieb, and Himan were all acutely aware that the intense media interest that had emerged over the weekend was touched off by the publication of the fact sections in the NTID Order. They knew that Ryan's email, taken out of context, would accelerate the firestorm.

512. It was obvious that Ryan's email was a parody of a book or movie that was readily identifiable as such to the recipients of the email. In fact, the first reply to Ryan's email was "I'll bring the Phil Collins." Phil Collins' music was played in the background during the movie's "dream scenes" in the movie *American Psycho*.

513. The movie was taught in several courses at Duke, including a freshman cluster called "Forging Social Ideals" and the English Department's "Companionate Love" and "Literary Grotesques: Of Gods and Monsters, Richard III to *American Psycho*." In fact, literary critics hail the novel a "classic" of the "American Gothic" genre. The *American Psycho* DVD was available in Duke's undergraduate library. iTunes now offers its sequel, *American Psycho* II.

514. Nifong, Gottlieb, and Himan knew that Ryan had been ruled out as a plausible suspect two weeks before. Nifong, Gottlieb, and Himan agreed not to investigate the indications that the email was a parody and that the reference was known to and understood by others. They also agreed to incorporate Ryan's parody of *American Psycho* into the search warrant out of its clarifying context in order to transform the intense media interest into a full-blown firestorm. In particular they agree to eliminate the obvious reference to *American Psycho*, "I'll bring the Phil Collins."

515. Nifong, Gottlieb, and Himan agreed to include in the new Description of Crimes the assertion that Police are investigating a "Conspiracy to Commit Murder," with strippers as the putative victims. It is obvious that the Investigators did not believe a conspiracy to commit murder was afoot. Their actions were totally at odds with any such belief. For example, they did not obtain warrants for all of the email's recipients, even the recipient who replied, "I'll bring the Phil Collins." They also

added to the original list of "items to be seized" in the search, "Property belonging to 27 y/o B/F victim to include but not limited to a white 6 inch shoe."

516. Mangum left the white shoe Gottlieb was searching for in the living room when she and Pittman quit the dance. A photo captures the shoe on the floor of the living room as the two are leaving the room.



517. The three renters of 610 N. Buchanan told Gottlieb and Himan that many pictures were taken, they told them who took them, and they referred to them in their written statements. Knowing that pictures of the evening (from beginning to end) existed and where to find them, Nifong, Gottlieb, and Himan did not apply for a warrant to search the premises where they knew the pictures would be. Instead, they chose to apply only for a warrant to search Ryan's dorm room.

518. Gottlieb and Himan also added to the Probably Cause Affidavit: "In addition, further interviews showed that. [sic] The players also used numbers when calling for one and another across the room again to hide their identities." No witness ever told Gottlieb or Himan this. The investigators made this up only after noting that Ryan's email was signed with the number 41.

187

**D.    Judge Stephens Frustrated the Conspiracy, Temporarily**

519.    Gottlieb and Himan immediately began the unnecessary work of revising the Probable Cause Affidavit consistent with their agreement with Nifong. They presented the search warrant application for Ryan's dorm room to Judge Stephens at 5:00 p.m. the same day, March 27, 2006. Judge Stephens signed the search warrant, but he ordered that the warrant be sealed indefinitely.

520.    Judge Stephens' Order sealing the warrant frustrated its only purpose, namely, the publication of Ryan's email, stripped of its context.

521.    Thwarted, Gottlieb, and Himan, and Inv. Soucie "searched" Ryan's room, knowing that Ryan had already been excluded as a plausible suspect in the March 16th Identification Procedures. Gottlieb, in particular, was raging. The officers destroyed furniture, and needlessly threw clothes, papers, cords, and books everywhere.

522.    There was no news of Gottlieb's incendiary Probable Cause Affidavit—for 9 days, until April 5, 2006, when Judge Stephens unsealed the warrant, and Ryan was vilified before a global audience.

**XX.    THE DNA CONSPIRACIES**

**A.    March 27th:  the SBI Lab's Testing of the Rape Kit Begins, and Ends.**

523.    On or before March 27, 2006, the SBI received the rape kit items, Mangum's clothing, and the reference DNA samples from the lacrosse team members.

524. On March 27, 2006, the Attorney General directed the Lab to expedite the DNA testing in this case. On that basis, the lab began work on the testing immediately. On the same day, the SBI Lab's Serology section initiated the testing process by examining the rape kit items for the presence of semen, saliva, and blood to determine which items would be sent to the DNA lab for further analysis.

525. The SBI Lab serologist assigned to the case, Rachel Winn, concluded that DNA analysis of the rape kit items would be futile. There was no semen. There was no saliva. There was no blood. There was nothing to test.

526. Upon information and belief, Nifong received this news in a verbal preliminary report on the afternoon of March 27, 2006.

**B.      March 28th: SBI Lab Tells Himan and Nifong There Will be No Match**

527. On March 28, 2006, SBI Lab Analyst Winn called Himan to advise him that the SBI Lab has examined the rape kit items and clothing and was unable to find semen, saliva, or blood on any of those items, and, as such, the SBI's testing in the case was concluded, and would be wrapped up soon unless Himan could produce additional evidence to test.

528. Himan, under directives from Nifong, scrambled CSI Agent Ashby to tell Wynn not to close the case; they would find more evidence to send. Ashby sent swabs of a four-foot area of the bathroom floor and a towel collected in the search of 610 N. Buchanan. Based on a visual examination with a Wood's light, both items were believed to contain semen. Even if the presence of semen was confirmed, it would

be meaningless unless Mangum's DNA was also found in the sample.   It was the forensic equivalent to a "Hail Mary."

529.   Upon information and belief, on March 28, 2006, Himan notified Nifong and the Durham Police Supervising Defendants that the SBI Lab tests would produce no DNA match between Mangum's rape kit and any member of the lacrosse team.

530.   On March 28, 2006, at 10:40 p.m., Himan spoke with Mangum about the case and, upon information and belief, about the negative DNA test results.   Himan concealed the fact of this conversation by not reporting the existence of it in his investigative notes.   Upon information and belief, Himan told Mangum that there would be no match and the obvious consequences that fact had upon the viability of the case.

531.   On or before March 28th, Nifong and Addison's public statements convinced the millions watching the spectacle unfold in Durham that the DNA tests would identify the three perpetrators of the crime that Nifong was "convinced" had happened.

532.   Nifong's public statements about his certainty that a rape occurred had focused on the DNA testing.  For example, between March 24, 2006 and 28, 2006 and:

(1)    Nifong told dozens of reporters that the DNA would reveal who "the attackers" were, and that he would charge those individuals after the DNA testing was complete.   He told a local reporter, and at least one radio talk show host that the DNA evidence would be bullet proof.

(2)     On March 27, 2006, Nifong told a reporter for ABC 11, "My guess is that some of this stonewall of silence that we have seen may tend to crumble once charges start to come out" after the DNA test results are back.

(3)     Nifong's office, in a sworn affidavit, office unequivocally stated that the DNA test results would identify the suspects and exonerate the innocent.

## C.     March 29th:  The Duke—Durham Joint Command Meets

533.    On March 29, 2006, a Joint Command meeting was held at Durham Police Headquarters.  Those in attendance included Duke Police Supervisors, Durham Police Supervisors, Defendant Baker, and, upon information and belief, other as yet unknown Duke University Defendants and City of Durham Defendants. Nifong, Gottlieb, and Himan were summoned to attend and provide a report on the investigation.

534.    This was the first of several Joint Command meetings held during the 13 month investigation.

535.    The investigation notes do not reveal any detail of meetings of the Joint Command Staff.  Like meetings the investigators had with Mangum, DNASI, Meehan, Levicy, Arico, and Baker, only the fact of the meeting is recorded-not the substance of it.

536.    Gottlieb's notes for this meeting include the same three words he used to describe meetings with other co-conspirators, including Nifong, Mangum, and the DNASI Defendants:  "discussed the case."

537. At the time of the March 29, 2006 Joint Command meeting, Gottlieb, Himan and Nifong knew and reported that the SBI Lab's testing of the rape kit contradicted the basic allegation of rape. They knew and reported that Mangum's descriptions ruled out 11 members of the lacrosse team as plausible suspects, and her March 16th and 21st Identification Procedures eliminated the remaining 36 team members. They knew and reported that Mangum had recanted and then gave multiple self-contradicting accounts to multiple different individuals in the first 48-hours of the investigation. The Duke University Defendants in attendance knew, or should have known, that all 47 team members had alibis based exclusively on digitally recorded evidence that rendered Mangum's claims impossible and that a standing offer had been made to present such evidence of innocence to Defendant Brodhead or a designee of his choice.

538. After Joint Command meeting on March 29, 2006, Duke Police Defendants, Duke Officials Defendants, and City of Durham Defendants all knew, or were willfully blind to the overwhelming evidence of innocence that had been amassed in the case. Instead of shutting down the investigation, those Defendants callously ignored and /or were deliberately indifferent to the established fact that Mangum's claims were a hoax, and that Plaintiffs and their teammates had already been and would continue to be harmed in extraordinary and unconscionable ways if the investigation were allowed to continue. However, Nifong's, Addison's, and the Duke University Defendants' public statements vilifying the Plaintiffs and their

teammates had so enraged the community that the Joint Command staff feared riots would break out if the investigation was closed without arrests. From that point forward, the "investigation" was replaced by a series of conspiracies whose objects were to fabricate evidence to be used at a trial and to conceal exculpatory evidence from Plaintiffs and their teammates and evidence that would expose their joint enterprise and its purpose.

XXI. **THE FIRST DNA CONSPIRACY: NIFONG, HIMAN, AND GOTTLIEB CONSPIRED TO WITHHOLD DNA TEST RESULTS THAT PROVED MANGUM'S CLAIMS WERE A HOAX IN VIOLATION OF N.C.G.S. § 15A-282**

A. **Plaintiffs' Entitlement to DNA Results Pre-Indictment**

539. Pursuant to N.C.G.S. §15A-282, plaintiffs were entitled to a written report of the test results that the SBI reported to Nifong on March 28, 2006 and March 30, 2006 as early as March 31, 2006.

540. Specifically, the written report of the SBI Lab's testing required by the statute would have had to include, at a minimum:

(1) The fact that the serology lab found no evidence of any blood, saliva, or semen on any of the items in Mangum's rape kit, including the oral swabs and smears, the rectal swabs and smears, the vaginal swabs and smears, and the underwear collected in Mangum's Sexual Assault Exam;

(2) The absence of any blood, saliva, semen, or human tissue on any of these items precluded any DNA testing of the items, since the SBI lab's testing

193

equipment could not produce any DNA profiles against which its scientists could compare the DNA profiles of the 46 members of the lacrosse team who were compelled to provide DNA samples.

(3)     The SBI's finding that no human tissue of any kind was visible on any of the painted or unpainted fingernails found in Mangum's purse or in the bathroom which had been seized during the search of 610 N. Buchanan.

541.    It is a simple written report for Nifong to have provided.  He did not provide it immediately, however, because it was plainly obvious that those three findings alone gave the lie to Nifong's and Addison's incendiary false statements in their early media campaign, and they proved that Gottlieb's version of Mangum's account of the attack and sexual assault was a pure fabrication.  It was simply not rational to believe that a 30 minute gang rape in a small bathroom would leave no trace of male genetic material behind.  This is particularly true in this case, where Mangum had repeatedly and consistently reported that no condoms were used, and that one of "the attackers" ejaculated in her mouth.   In three places, the SAER memorializes Mangum's claim that no condoms were used.  Even if condoms were used, it is still a practical impossibility to carry out a gang rape involving four people in close quarters without leaving any blood, saliva, semen, hairs, or fibers of any kind, anywhere.  It was also obvious that those three findings provided powerful corroboration to Plaintiffs' unequivocal claim that no sexual contact of any kind occurred.

**B.**  **Nifong, Gottlieb and Himan Delay Disclosure of the SBI Lab's Test Results to Buy Time.**

542. The legitimate investigation of the Plaintiffs and their teammates ended on March 21st . The perversion of the investigation into a media circus would have ended on March 30th, if Nifong, Gottlieb and Himan obeyed the plain command of the NTID Order statute's discovery requirement.  If they had done so, they would have been ruined professionally.  Nifong would have been subjected to immediate Bar proceedings based upon his unprecedented public statements condemning the accused Plaintiffs, and Himan and Gottlieb would have been subjected to civil and administrative remedies.

**1.**  **Knowing that the Media Will Not Give Him a Dignified Retreat, Nifong Resolves to Fabricate a Case against Three—Any Three—Lacrosse Players.**

543. On March 30th, after receiving the SBI Lab results, Nifong appeared to change course.  He told reporters that the "attackers" may not be on the lacrosse team. For example, on March 30th, Michelle Hofland, a national correspondent for NBC reported live in the late afternoon that:

> *"Well, tonight it appears that the district attorney here is backpedaling a little bit. When I spoke with him late today, he says that he still is confident that the woman was raped, and that she was raped at that off-campus apartment.  But now he says that he's not so sure that it was a lacrosse player after all, that he's really not sure. He's waiting for the DNA results. Now, I said how can that be, when you told me that everyone inside that party was a lacrosse player?  And this is what he said, is that all he knows about who was inside that apartment came from the lacrosse players, and maybe all of*

> *them omitted three other people who could have been at that*
> *party. A little bit confusing and we're waiting now."*

544.  Nifong did not tell Hofland (or any other reporter) that he already knew the DNA

tests of rape kit items were negative.  In the wake of these reports, Nifong resolved

to fabricate a case against three—any three—lacrosse players.

### a.    DUMC SANE Nurse Tara Levicy

545.  Nifong's refusal to reveal the explosive SBI test results in violation of N.C.G.S. §

15A-282 afforded him time to cultivate the false public belief that negative DNA

test results would not alter the credibility of Mangum's claims.  To that end,

Nifong renewed his campaign of unprecedented statements to reporters about his

certainty that Mangum was raped and sexually assaulted.   In this phase of

Nifong's media barrage, however, Nifong discounted the significance of DNA

evidence, and began promoting a new basis for his conviction that Mangum was

raped:  Duke SANE Nurse Tara Levicy.

(1)    On March 28, 2006, Nifong told a reporter for MSNBC that, "There is

evidence of trauma in the victim's vaginal area that was noted when she

was examined by a nurse at the hospital."

(2)    On March 28, 2006, Nifong told a reporter for MSNBC that, "…[and] her

general demeanor was suggested-suggestive of the fact that she had been

through a traumatic situation."

(3)    On March 30, 2006, Nifong told a reporter for *The Early Show* (CBS) that,

"And the investigation at that time was certainly consistent with a sexual

assault having taken place, as was the victim's demeanor at the time of the examination."

(4)     Repeatedly, Nifong stated that his conviction that Mangum was raped was based on what he read in Tara Levicy's SANE report.

546.   In the 11 days between the time the SBI lab concluded there would be no DNA match and the time Nifong provided a written report of those results, (March 29, 2006 through April 10, 2006), Nifong made numerous statements discounting the significance of the absence of DNA evidence generally, and/or explaining why, in this case, he would not be surprised if no DNA evidence emerged.  For example:

547.   (1)     On March 31, 2006, Nifong explained to MSNBC that, "But let me point out that the evidence that [Mangum] would present with respect to [the fingernails] is that she was grabbed from behind. So that in essence, somebody had an arm around her like this, which she then had to struggle with in order to be able to breathe, and it was in the course of that struggle that the fingernails -- the artificial fingernails broke off.  Now as you can see from my arm, if I were wearing a shirt, a long-sleeved shirt or a Jacket of some sort, even if there were enough force used to press down, to break my skin through the clothing, there might not be any way that anything from my arm could get on to those fingernails. So again, whether or not there would be any [DNA] evidence would depend on exactly the situation. Were the fingernails actually in contact with the skin or were

they in contact with clothing?" The video of Nifong is digitally annexed hereto as

**ATTACHMENT 15**, and may be viewed below:



(2)    On March 31, 2006, Nifong told a reporter for MSNBC that, "Obviously, if there is a DNA match, then that is very strong evidence. But the absence of DNA doesn't necessarily mean anything other than that no DNA was left behind.   DNA is a relative latecomer to the forensic scene.   There have been many successful rape prosecutions involving nothing more than the statement by the victim that she was raped by a particular individual."

(3)    On March 31, 2006, Nifong told a reporter for MSNBC that, "If a condom were used, then we might expect that there would not be any DNA evidence recovered from say a vaginal swab."

(4)    In a March interview which was then published on April 11, 2006, Nifong told a reporter for the *Charlotte Observer* that, "I would not be surprised if condoms were used.  Probably an exotic dancer would not be your first choice for unprotected sex."

(5)     On March 30, 2006, Nifong told a reporter for the *News & Observer* that, "How does DNA exonerate you?  It's either a match or there's not a match…If the only thing that we ever have in this case is DNA, then we wouldn't have a case."

**C.      On April 4th, Nifong Receives the Final SBI Report Of All Test Results; and Nifong Seeks Assistance From a Private DNA Lab that was Aggressively Lobbying for the City's Business**

548.    On April 4, 2006, the SBI reported to Nifong, Gottlieb, and Himan the results of all of the testing they would do in the case.   Nifong immediately instructed Gottlieb and Himan to get quotes on additional DNA testing of the rape kit items, and possible DNA analysis of any genetic material found.

549.    Upon information and belief, Nifong knew that Defendant Brian Meehan had been lobbying for business from the City of Durham for months.  He met with city leaders, administrators, anyone who would give him an audience to pitch his DNA lab's services to the City.  DNASI has the more sensitive Y-plex technology, capable of locating male (Y-chromosome) DNA in minuscule quantities.  Durham Inv. Soucie contacted Meehan.  Meehan told Soucie that he wanted to be involved in the high profile case so much, he would reduce his rates to get the job.

550.    Nifong was running out of time.  Nifong should have asked for the required written report from the SBI lab days earlier, and the primary was still a month away.

551. It was clear that the SBI's DNA report would destroy Nifong's credibility, end the case, humiliate him as the Primary approached, cost him the election, the more lucrative elected-D.A.'s pension, and probably end his career in the Durham County DA's Office. Upon information and belief, Nifong knew that Meehan's lab had been desperately seeking the City's business for months, and Meehan might be as willing to bend the rules as he was to bend his rates. Meehan's lab could stall the completion of DNA testing, thereby delaying the damage to his case and his electability in the eyes of the public.

552. For days, he had made innumerable public and private statements claiming he was relying upon the DNA testing to determine who he would charge. Upon information and belief, after learning of the SBI's lab tests he determined to delay providing a report of the DNA test results to the team members in order to change the subject in the media frenzy he created. On the day Nifong learned there would be no DNA evidence from the rape kit, March 28, 2006, Nifong told Anne Blythe, a reporter for the *News & Observer*—on the record—that another search warrant was issued in the case, but the judge who signed it ordered it sealed. Nifong knew that the *News & Observer's* lawyers (and those of other news organizations he told) would file motions to unseal the order on First Amendment grounds within days.

# XXII. THE IDENTIFICATION CONSPIRACIES

553. On March 30th, the SBI Lab conducted a conference call with Nifong, Gottlieb, and Himan to inform them of the SBI's formal, final report on the testing of the rape kit items. The SBI Lab confirmed Agent Wynn's early report to Himan and Nifong on March 28th: the rape kit would not provide DNA evidence linking any team member to Mangum's rape allegations.

554. Nifong's case was decimated. Nevertheless, beginning March 31st, Nifong ceased hedging the investigation's focus on the lacrosse team was gone. Nifong's public statements derided the value of DNA evidence; at one point, he asked rhetorically, "How does DNA evidence exonerate you?" Nifong stated that the case would not end if the DNA came back negative. Instead, he promised that, if the DNA did not identify the assailants, then Mangum would do it "the old fashioned way" by identifying them herself through identification procedures. In extolling the virtues of the "old fashioned" way, Nifong did not reveal that police had already tried to do that, and Mangum failed to identify every team member that remotely fit her generic descriptions as an "attacker. Nifong also deliberately concealed from reporters, Plaintiffs, and their counsel that he already knew the DNA test results were all negative as to Plaintiffs and their teammates.

555. After SBI Agent Wynn told Nifong on March 28th that there would be no DNA match to the rape kit items, Nifong knew the members of the lacrosse team could not be legitimately identified. Mangum had already failed to identify 36 team

members in the March 16th and 21st Identification Procedures, and her descriptions ruled out the remaining 11 members of the team. By March 31st, Nifong had found a way to manufacture identification evidence against three team members. The Durham Police had used a similar identification procedure to resolve similar, intractable identification problems and convicted at least one indigent defendant individual with it in the recent past.

556. On March 31, 2006, Nifong summoned Gottlieb and Himan to his office to explain the procedure and direct them to do it. The "yearbook" identification procedure Nifong directed them to employ was simple: tell Mangum she would see pictures of people they believe were present at the party, and have her pick three.

557. It was a multiple choice test with no wrong answers. Nifong, Gottlieb, and Himan conspired to conduct the procedure in that manner, and, in doing so, set themselves on a fixed course to frame three Duke students they knew to be innocent.

558. On April 3rd, Mangum presented to UNC Hospitals again, complaining of neck pain again. She reported her pain score was a "10 out of 10." The next morning, a videotape of Mangum's "pick three" April 4th identification procedure shows Mangum rolling her neck with ease.

## A. THE CONSPIRACY TO FABRICATE IDENTIFICATION EVIDENCE

### 1. The April 4th "Pick Three" Identification Procedure

559. On April 4, 2006 at 8:00 a.m., Gottlieb called Mangum to set the time for their identification procedure, and then, at 9:00a.m. Gottlieb spoke with Defendant Graves at Duke University via telephone. Gottlieb notes the fact of the meeting, but does not state its substance.

560. Two hours later, Mangum was at the police station, engaged in another identification procedure. This one was a PowerPoint presentation of photos of every team members prepared by Gottlieb. The PowerPoint was a novel method for suspect identification, and it violated nearly all of the Department's safeguards against negligent and malicious misidentification codified in Durham Police Department's G.O. 4077.

561. In response to the collapse of the case, Nifong, Gottlieb, Himan, and Clayton had conspired to obtain identifications of three lacrosse players in a manner that obviated nearly all of the safeguards adopted in G.O. 4077 to protect against both negligent and malicious misidentifications. For example, in the April 4th identification procedure:

(1) Police did not "use an independent administrator." Gottlieb oversaw and administered or was involved in the identification procedure and was intimately familiar with the case.

(2)     Police did not use any true fillers.  A true filler operates as a "foil."  The 46

        pictures shown to Mangum were the 46 white members of the Duke

        lacrosse team.  In fact, none of the March photo arrays shown to Crystal

        Mangum used true fillers or foils either.  All together, through the March

        16th, March 21st, and April 4th identification procedures, police showed

        Mangum a total of 84 pictures.  Every picture shown to Mangum was a

        member of the 2005-2006 Duke University Men's Lacrosse Team.  Police

        never intended to include any foils in any array; however, unknown to

        them, a few foils were there, because several lacrosse players were, in fact,

        not present at the party.

(3)     Police included photos of individuals Mangum had already seen in prior

        arrays.

(4)     Mangum was instructed very differently than she was in the March 16th and

        March 21st Identification Procedures.

(5)     In this April 4 procedure, Mangum was not instructed that the suspect may

        not be included in the photos.  Just the opposite. Mangum was told that the

        photos were an exhaustive collection of the individuals who police believed

        were at the party and, therefore, had the opportunity to commit the sexual

        assault.  This was a radical departure from the instructions Mangum was

        given prior to each of the six March arrays.

(6)     In the April 4th procedure, the Administrator, Gottlieb, gave Mangum
        feedback throughout the procedure, inconsistently prompting Mangum with
        questions, probing for detail in some and not others.

(7)     The April 4th procedure failed to pursue one of the two required aim of
        G.O. 4077 identification procedures (identifying a suspect and testing the
        witness's veracity).  The PowerPoint Identification procedure was designed
        to avoid any test of Mangum's veracity.  As one parent described it, the
        procedure was a multiple choice test with no wrong answers.

## XXIII.    MANGUM'S SHARPENING MEMORY

562.    In the April 4th Identification Procedures, Mangum recalled seeing individuals at
        the party in fine detail, who, when they were shown to Mangum in the March 16th
        or March 21st arrays, she could not recognize them at all.  For example, in the
        April 4th Identification Procedure:

(1)     In response to one Image, Mangum claimed she recalled the individual
        from the party.  Her memory was so vivid that she knew what color shorts
        he was wearing: "he had on some brown shorts, khaki shorts."  In a photo
        identification procedure two weeks earlier—a week after the party—
        Mangum could not recognize the same individual at all.  A photo in police
        custody shows that same young man, pictured sitting on the couch wearing
        (brown) khaki shorts.

(2)     In response to another Image, Mangum recalled seeing him men at the party. She remembered him. "Sitting on the couch, in front of the TV." A photograph in police custody shows the same young man sitting on a couch, in front of the TV.

(3)     In response to another image, Mangum says she recalled seeing the individual, and she knew where he was; she said she remembered that he was sitting in the living room. In an identification procedure three weeks earlier—and two days after the party—police showed Mangum the same person's picture, and she did not recognize him at all. A photograph in police custody at the time shows that same young man at the party, sitting in the living room.

(4)     In response to another image, Mangum said she remembered seeing the individual at the party. She said she remembered him sitting in the kitchen making a drink. In her identification procedure three weeks earlier—and two days after the party—Mangum could not recognize the same individual at all. A photo in police custody shows that same individual sitting under the doorway that leads to the kitchen.

563. Upon information and belief, Mangum was provided the pictures that were in the possession of the Durham Police at some point prior to her April 4th Identification Procedure; it appears to be the only explanation for her remarkable performance in

remembering detail about individuals that she could not recognize two and three weeks earlier.

## XXIV. THE CONSPIRACY TO CONCEAL IDENTIFICATION PROCEDURE RESULTS IN VIOLATION OF N.C.G.S. § 15A-282.

564. After two identification procedures in March, Mangum had failed to identify any of the 36 lacrosse team members who were not ruled out by Mangum's descriptions of her "attackers." Nifong, Gottlieb, and Himan deliberately excluded these facts from the NTID Order Application, the Search Warrant for Ryan's dorm room, and the Investigation Timeline that Gottlieb prepared for the City Council in response to his supervisors' request.

565. Furthermore, Plaintiffs had a statutory right, pursuant to N.C.G.S. § 15A-282 to a written report of the "power point" identification procedure conducted on April 4, 2006, because the procedure was conducted with every team member's NTID Order mug shot. Of course, the April 4th Identification Procedure was the only basis to bring an indictment against anyone on the team. The procedure, concocted by Nifong, violated virtually every safeguard against misidentification that was required under G.O. 4077. This fact was not revealed until after the first indictments. Further, Mangum's performance in the April 4th Identification Procedure produced overwhelming evidence that Mangum was—alone or in collusion with others—fabricating her responses so that Nifong could indict before the primary election. These facts, also, could not be known by Plaintiffs or their

counsel until after the indictments were returned, and the investigation had been transformed into a full-blown criminal case that would perpetuate the ordeal for nearly a year.

566. In the April 4th Identification procedure, Mangum was shown pictures of 46 team members. A written report of her performance in that procedure would have enabled Plaintiffs to know, among other things, the following facts:

(1) Mangum recognized only 17 of the 46 of team members;

(2) Of those 17 individuals, 11 were individuals who Mangum said she did not recognize at all in the March 16th and 21st Identification Procedures. Somehow, Mangum's memory clarified instead of faded over time; eleven people wholly unrecognizable to Mangum in March were somehow vividly in her memory of the night on April 4th.

(3) In those March Identification Procedures, Mangum recognized 4 team members with "10/10" certainty. When those same four were shown to Mangum on April 4th, she did not recognize three of them at all. The only one among the four that she did recognize on April 4th was Brad Ross. Brad Ross was demonstrably not at the party and not in Durham on the evening of March 13th. Cell phone records and multiple witnesses established that he was in Raleigh with his girlfriend that evening. Ross was able to convey this to Gottlieb and Himan as the two were searching

the dorm room he shared with Ryan McFadyen on March 27, 2006—a week prior to the April 4th Identification Procedure.

567. Plaintiffs and their teammates did not receive the very simple written report required until four days after Collin Finnerty and Reade Seligmann were indicted.

568. Just as they did with DNA testing, Nifong, Gottlieb, and Himan willfully violated Plaintiffs' absolute rights under the NTID Order statute to a written report of the April 4th Identification Procedure. Plaintiffs' defense attorney demanded that reports of any such procedure be submitted without delay, and, further, counsel also inquired directly with Nifong and with Himan directly, beginning as early as April 6, 2006.

569. When counsel inquired with Himan about whether any identification procedures had been conducted with the NTID Order mug shots, Himan deliberately and willfully evaded his statutory obligation to advise counsel that a procedure had, in fact, been conducted. The exchange between Plaintiffs' defense counsel and Himan on this point was as follows:

> Plaintiffs' Defense Counsel: Can you tell us if there has been a photo identification attempt?
>
> Himan: I can't comment on that, really, I'm not allowed to comment on the investigation.
>
> Plaintiffs' Defense Counsel: Can you tell us if you used the mug shots of the boys from the Nontestimonial procedures?
>
> Himan: No, I'm sorry, I can't comment on that.

Plaintiffs' Defense Counsel: Is [Nifong] willing to take someone out of the investigation?

Himan: I don't know. I can only present the information that I have to Mr. Nifong, and he has to make the decisions about what to do with it. I'm giving him all the information I have, so that's basically, um, that's where I'm coming from.

570. While Himan was not present for the April 4th Identification Procedures, he was summoned out of his class by Gottlieb as soon as the procedures were concluded to be briefed on the results. Further, he knew on March 31st that an identification procedure using the NTID Order photos was planned for April 4th. Knowing that an identification procedure had been conducted using the NTID Order mug shots, Himan deliberately and willfully concealed the fact from Plaintiffs' defense counsel who had a right to know if such procedures had been conducted in order to seek an order compelling production of a written report on behalf of each of the Plaintiffs.

571. By saying "I can't comment on that" in response to Plaintiffs' counsel's direct inquiry, Himan willfully acted in furtherance of a conspiracy to violate N.C.G.S. § 15A-282 with regard to the NTID Order photographs, just as he had participated in the conspiracy to violate N.C.G.S. § 15A-282 with regard to the NTID Order DNA samples.

572. Further, in these pre-indictment conversations with Plaintiffs' defense counsel, Himan's words and actions revealed that he was not the "lead investigator" in the case by any stretch of the phrase. In the foregoing exchange and in others, Himan

stated repeatedly that he had no control over the investigation, its direction or the interpretation of evidence. Himan had become merely a conduit of information that Nifong directed him to obtain. Himan deliberately concealed the fact of the April identification because he was colluding with Nifong and Gottlieb (and others) to avoid being compelled to disclose to Plaintiffs' defense counsel the blatant violations of G.O. 4077 pursuant to the NTID Order statute's discovery requirement.

573. Himan's willful refusal to disclose the existence of the April 4th Identification Procedure until April 21st, after the first two indictments were returned, eviscerated Plaintiffs' rights to exculpatory information under the NTID Order statutes. Under the circumstances, in which Plaintiffs were subjected to world-wide obloquy and local taunts, threats, and harassment, the delay served to compound the irreparable harm Plaintiffs continue to suffer. Having abused the NTID Order process to humiliate Plaintiffs on a global stage, Gottlieb, Himan, and Nifong abused it further to deny them the critically important, mandatory benefit the statute conferred on them.

574. Further, Himan's willful refusal to disclose the results of the April 4th Identification Procedures until after indictments foreclosed Plaintiffs' opportunity to seek the Court's authorization to petition the Court to be called as witnesses to provide testimony to the Grand Jury relating to Collin and Reade, pursuant to N.C.G.S. § 15A-623(d). Their testimony, together with other witness testimony,

would have established that both Collin and Reade had no opportunity to commit the alleged sexual assault and/or that no member of the team had the opportunity to commit the alleged assault.

575. Further, if Himan, Gottlieb, or Nifong had followed their statutory obligations, instead of colluding with one another to conceal the April 4th Identification Procedure results, Plaintiffs would not have been subjected to world-wide obloquy when the sensationalized Search Warrant Affidavit was released on April 5th.

## XXV. APRIL 5TH: A SEALED DNA ORDER WAS ISSUED AND RYAN'S SEARCH WARRANT AFFIDAVIT WAS UNSEALED.

### A. Nifong Obtained an Order Authorizing DNA Evidence Transfer to DNASI.

576. On April 5, 2006, the day after Mangum picked three team members, Nifong revealed to Judge Stephens in an ex parte motion that the SBI's DNA testing was completed and the results provided no link to any member of the lacrosse team. Judge Stephens signed an Order directing Y STR DNA analysis of certain items of evidence by DNA Security, Inc. Nifong did not reveal the motion to Plaintiffs or their counsel, and, upon information and belief, the motion and order were sealed.

577. In support of the petition, Nifong's petition advised Judge Stephens that "the tests conducted by S.B.I. laboratory failed to reveal the presence of semen on swabs from the rape kit or the victim's underwear." Because the SBI Laboratory did not have Y-Plex technology, Nifong asked for an Order directing the transfer of

evidence items to DNA Security, Inc., a private laboratory in Burlington, North Carolina that had Y-plex technology and could conduct Y STR DNA analysis.

578. Judge Stephens signed the limited order directing the testing of only "the oral, anal, vaginal and underwear swabs" from Mangum's rape kit, along with the "46 cheek swabbings taken from the group containing the suspects."

579. David Saaks, then Assistant District Attorney, prepared the motion and order pursuant to Nifong's explicit instructions to only include only the swabs, and to not include, among other possibilities, any of the fingernails.

580. Had Nifong's Motion or the Order been disclosed to the public, or to the Plaintiffs, the failure of the SBI's DNA testing would have emerged as explosive news on April 5, 2006.  Nifong's DNA Motion and Order were not made public, however.

###    1.    The Same Day, the McFadyen Search Warrant was Unsealed and Duke Unilaterally Suspended Ryan from School

581. That very same day, April 5, 2006, Judge Stephens ordered that Ryan McFadyen's warrant be unsealed, making it a public record.

582. Within hours, local, national, and cable news were reporting that Ryan's email revealed "a secret Duke lacrosse team plot to kill strippers."

583. When the news broke, Ryan was in the library, working on a term paper.

584. At the same time, Defendants Moneta, Bryan, and Wasiolek unilaterally suspended Ryan, without notice, hearing, or inquiry.  They did not consult with Ryan, his counsel, or with anyone in the English Department who would have

readily told them that the email was a parody of *American Psycho*, which was on the syllabus in several University courses.

585. Defendant Wasiolek searched frantically for Ryan demanding that Ryan come to her office on campus to sign a waiver of his FERPA rights. The waiver was necessary only insofar as the CMT Defendants intended to publicly condemn Ryan and/or reveal that the University had taken disciplinary action against him. Within hours of his suspension, the CMT Defendants were giving interviews to local, national, and cable news reporters to reveal Ryan's suspension.

586. That evening, believing that Ryan had waived his rights to privacy under FERPA, Defendant Brodhead opened his office to numerous reporters, provided on the record comments in which he condemned Ryan, revealed that the University had suspended him under the "safety of the community" provisions of the student code of conduct, failed to disclose that the email was a parody of *American Psycho*, reported that the University had taken disciplinary action against him, that he would be held to answer for his "conduct" in the University's disciplinary proceedings, and claimed that he was free to say all of these things because Ryan had signed a waiver of his FERPA rights.

587. At home, Ryan's younger sister learned Ryan was suspended from Duke from the television in a common area in her high school. She saw Ryan's picture on the television screen, and news of his suspension was soon on every channel. She found her younger sister and told her something awful was happening to Ryan.

588. Due to the fierce media scrutiny that was already upon him, Ryan was forced to incur the additional expense of retaining independent counsel; his representation in a large joint defense had been sufficient to that point. Ryan's father immediately traveled to Durham to take Ryan home safely. The Durham Police were notified that Ryan planned to return home immediately, unless the police intended to pursue the charges that were plastered all over the news programs that day. The Durham Police advised that they had no such plans.

589. Ryan returned home with his father. When they approached their home, they saw that a horde of media trucks had already arrived. News reporters, photographers, and camera men swarmed their front lawn for weeks. They would ultimately leave their encampment in front of Ryan's home on April 18th, to move the short distance from Ryan's front yard to Reade Seligmann's.

### 2. Contemporaneous with Ryan's Suspension, Defendants Moneta and Brodhead Treat the Emailer of an Weeks Earlier, University Administrators Treated an Actual Email Threat Differently

590. On March 31st, a Duke student named Chauncey Nartey sent an email to the men's lacrosse coach, Mike Pressler, with "WHAT IF JANET LYNN WERE NEXT???" as its subject line. Mike and Sue Pressler had long guarded the identities of their children; it required a significant effort to obtain the name of their daughter. According to Nartey, he raised the hypothetical rape of Coach Pressler's daughter in the subject line, to draw Pressler's attention to Nartey's earlier emails to Pressler, one of which directed the Coach to "END THE SEASON UNTIL THE

ALLEGED RAPISTS ARE FOUND!" The email put the Presslers in fear for the safety of their children.

591. On March 31, 2006 Sue Pressler filed a report with the Duke Police Department, which took no action on it. Mike Pressler then met with Defendant Moneta to show him the emails Nartey sent to him. Pressler asked Moneta to submit the incident to the Undergraduate Judicial Board. Moneta knew that Nartey was the President of a fraternity that had recently been disciplined for a hazing incident. Moneta refused to take any action on Nartey's email, or submit the matter to the Undergraduate Judicial Board.

592. Shortly thereafter, Nartey was one of five students appointed to Defendant Brodhead's Campus Culture Initiative. Defendant Moneta was vice-chairman of the CCI, whose charge was to "evaluate and suggest improvements in the ways Duke educates students in the values of personal responsibility, consideration for others, and mutual respect in the face of difference and disagreement." Later, Defendant Brodhead invited Nartey to be one of two Duke students to appear with him at "A Duke Conversation- *Making A Difference*" event in Charlotte. Finally, before graduation, Nartey was a recipient of the 2007 William J. Griffith University Service Award. Defendant Moneta awarded Nartey with honor that is given to graduating students "whose contributions to the Duke and larger community have significantly impacted University life. Students who demonstrate

an understanding of the responsibilities of effective university, communal and global citizenship…"

### 3. Matthew Wilson and Breck Archer were also subject to sanctions when other, similarly situated students were not.

#### a. Matthew Wilson

593. Six days after David Evans was indicted, Matthew was pulled over in Chapel Hill, and charged with Driving While Impaired. When this occurred, Matthew was not in Durham County, he was not enrolled as a student in the summer session at Duke, he was not at a school related function, and he was not with any individual who attended Duke.

594. Matthew accepted responsibility for his mistake and entered a guilty plea at his first appearance in the case. Shortly thereafter, Matthew contacted the Duke University counseling program for students (CAPS). Matthew was told that, because he was not enrolled in the summer session, he was not eligible for an appointment

595. Shortly thereafter, a reporter checked the Orange County criminal filings to see if any lacrosse players had been charged in recent weeks. She cross-referenced the new court files against the CrimeStoppers Wanted poster, and found Matthew's name. The next day, it was front page news. Eventually, Matthew's name appeared in *Sports Illustrated*, the *New York Times*, his hometown paper, the Durham *Herald Sun* and the Raleigh *News & Observer*, among many, many others.

596. From March 23, 2006, until April 20, 2006, Matthew, like all of his teammates lived at the center of a national maelstrom. A resident of Durham, he and his family had no safe place. Like Matthew and his teammates, Matthew's parents and sister were also subjected to death threats and their own community's outrage. When the team members' home addresses were posted on a website calling for a violent response to the rape allegations, the Wilsons were the only family from Durham on the list, and a Durham officer appeared at the Wilson's home to notify them that they were concerned that the Wilsons may be targets for drive-by shootings.

597. On April 17, 2006, Matthew prepared—like every one of this teammates—to be indicted. The likelihood of indictment for each one of them was roughly the same. That same day Matthew was told that there would be one more indictment, on May 15th. Matthew only knew that it was an individual that Mangum identified with less than 100% certainty.

598. On April 21, 2006, Matthew learned that Mangum appeared to identify him in the April 4, 2006, photo identification procedure with less than 100% certainty. In the procedure, Mangum said the Matthew's photo "looks like Bret, but I'm not sure." Gottlieb asked, "Who is Bret?" and Mangum said "one of the guys that assaulted me." David Evans appeared to be the only other possibility.

599. Matthew believed he would be the third player indicted until May 12, 2006, when he learned that Nifong was submitting David Evans to the Grand Jury, and not him.

600. Duke University unilaterally suspended Matthew from the lacrosse team indefinitely, and made multiple public statements to representatives of the press to ensure the University's disciplinary action against Matthew was widely known.

601. That was not the end of Matthew's punishment, however. After submitting to the punishment of the Court and being excommunicated from his teammates, the University was not yet through.

602. When Defendant Bryan learned of Matthew's citation, he summoned Matthew immediately to the Judicial Affairs Offices to answer for his conduct. Matthew did not expect Judicial Affairs action, since he was not enrolled in school at the time, and was not on campus or in the county at the time. Nevertheless, Defendant Bryan told Matthew and his father that he was referring Matthew to a Judicial Board hearing, in which he expressly stated that Matthew would be suspended for two semesters.

603. Defendant Bryan falsely stated—repeatedly—that it was "the policy" to suspend for two semesters all students who are charged with Matthew's offense. The policy Bryan referred to was not written in the Student Bulletin, which requires such policies to be subjected to a review process, and, if approved, to be written in

the Bulletin. Defendant Bryan's statement that his office suspended for two semesters every student cited with that charge was false.

604. The Wilsons were so fearful that the media attention Matthew's citation generated, coupled with Duke's public announcement of his suspension from the lacrosse team, and were putting Matthew in jeopardy for being charged. They asked Defendants Moneta and Bryan to allow Matthew to transfer in lieu of a judicial affairs hearing. Moneta and Bryan both claimed that there was a "policy" forbidding that; he could transfer but not as a student in good standing. Upon information and belief, Moneta and Bryan allowed many students before Matthew's case and after who were in the same position to transfer in lieu of being suspended. There was no such policy, written or otherwise.

605. Prior to the hearing, Defendant Moneta told Matthew's father directly that the UJB was going to suspend Matthew for two semesters, regardless of jurisdiction or any other rationale. Moneta stated he and Bryan had no choice "because he's a lacrosse player," rhetorically asking, "What would we say to people if we didn't suspend him?" FERPA does not allow Moneta to discuss disciplinary action taken against Matthew. Bryan selected the hearing panel, and claimed that he picked a sympathetic group who would look favorably on Matthew's extraordinary efforts in the summer. The panel hearing, as it happened, was filled with questions—not about the driving incident—but about the events of March 13th-14th at the 610 Buchanan house.

606. The Board suspended Matthew for two semesters, and their ruling was modified to a suspension for the summer sessions by the Appeals Board. Neither body addressed the fact that the Student Code of Conduct clearly does not authorize the Undergraduate Judicial Board to subject students to disciplinary proceedings for conduct that occurs off-campus, out of county, while not enrolled, and not even eligible for a 30 minute CAPS appointment.

607. Matthew incurred significant legal expenses in preparing to defend himself in the hearing and avoiding any consequence in the criminal case at the same time.

### b.    Breck Archer

608. In the Summer of 2005, Breck Archer was called into Defendant Stephen Bryan's office to answer to a charge that damage was done to his room during a party. The room was only technically Breck's at the time of the party; he had not moved in, he did not have a key to it, and he was not present at the party.

609. Nevertheless, Bryan punished Breck with community service hours at the Duke Gardens. Breck completed the hours, notified Defendant Bryan of his completion, but did not submit a form Bryan expected to receive.

610. Based upon Beck's failure to submit the form after completing all of his community service requirements, Defendant Bryan convened a Judicial Affairs panel of students and faculty hand-picked by Bryan. At the close of evidence, Defendant Bryan remained in the room with the panel for the deliberations. Upon

information and belief, Bryan influenced the panel to vote to suspend Breck, in violation of the Student Code of Conduct and the Faculty Handbook.

611.   The panel suspended Breck for the 2005 fall semester for "failure to comply."

612.   Upon information and belief, until Breck, no one in the history of Duke University has been suspended or otherwise separated from the University for a semester for failing to submit a form documenting work that was completed as required.

613.   Defendant Bryan did not have a basis in the Student Code of Conduct to punish Breck for damage done at a party he did not attend, nor did Defendant Bryan have a basis in the Student Code of Conduct to suspend Breck for failing to turn in a form.

## XXVI.   THE CONSPIRACY TO CONCEAL DNASI'S DNA TEST RESULTS IN VIOLATION OF N.C.G.S. § 15A-282

614.   On April 6, 2006 the panties, cheek scrapings, oral, vaginal, and rectal swabs from the rape kit, along with the 46 lacrosse player swabbings were transferred from SBI to DNASI for Y chromosome DNA testing.   The fingernails were not transferred.

615.   DNASI worked through the weekend to complete its testing of the swabs. Between April 7 and April 10, 2006, DNASI performed initial testing and analysis of DNA characteristics found on the rape kit items.   The analysis and testing revealed the existence of DNA characteristics from up to four different males.

616. Prior to the meeting on April 10, 2006, DNASI had excluded with 100% certainty Ryan, Matt, Breck and their 43 teammates as potential contributors of the DNA that had been analyzed from the rape kit.

617. On April 10, 2006 Meehan called with results of DNASI's tests. Nifong, Himan, and Gottlieb drove to Burlington to receive the results verbally in person. Defendant Clark, President of DNASI was present at the meeting as well. Meehan reported the results of the initial testing and analysis. DNASI had identified up to four different sources of male DNA on the rape kit swabs alone. Further, DNASI had concluded—with 100% scientific certainty—that Ryan, Matt, Breck and their 43 teammates were excluded as potential contributors to any of the male DNA sources found.

618. The testing was completed, and the news shattered the "case." Further, that same afternoon, Nifong would have to produce the SBI's report showing there was no genetic material belonging to any lacrosse player found on any rape kit item.

619. As he did with the SBI testing, he delayed the "final" results of the DNASI testing by directing Himan and Gottlieb to send in more evidence for testing. Judge Stephens' order, however, only directed that the rape kit and reference swabs be transferred, nothing more. Nifong did not obtain a third Order from Stephens for the transfer of these additional items; Nifong just directed Himan and Gottlieb to do it.

620. Nifong did not reveal the DNASI results to defense counsel along with the SBI report he released that day. Instead, he told defense counsel that he had decided to obtain additional testing at a private lab. Nifong would not reveal to defense counsel the name or location of the private lab.

621. A press conference held by defense counsel revealed the exonerating results publicly. Segments of video footage of this press conference is digitally annexed hereto as **ATTACHMENT 16**, and may be viewed below:



622. The investigation should have been concluded. Again, it was not concluded, however, because, during the time that Nifong was concealing the SBI's March 27th findings that there was no semen on the rape kit items, Nifong obtained sufficient identification evidence in the rigged April 4th identification procedure. With Mangum's identifications, Nifong did not need DNA evidence to get the case to a jury. Like many states, North Carolina abandoned its corroboration rule in sexual assault cases. So long as an accuser will testify that she was sexually assaulted and identifies someone as the perpetrator, the case will go to the jury.

623. Additional meetings with Nifong, Gottlieb, Himan, Meehan, and Clark took place on April 21, 2006 and May 12, 2006.

624. On May 12, 2006 with agreement among Nifong, Gottlieb, Himan, Meehan, and Clark to conceal the entirety of DNASI findings, DNASI provided a report that was considered to be the final report, to Nifong. The report violated DNASI and industry protocol in that it did not contain the entirety of DNASI's findings.

625. As of the present date, Ryan, Matt, and Breck have still not received a copy of either of the additional final reports DNASI provided to Evans, Finnerty, and Seligmann counsel dated January 12, 2007 and Special Prosecutors Jim Coman and Mary Winstead dated March 28, 2007.

**A.      Pursuant to N.C.G.S. § 15A-282, Plaintiffs were Entitled to a Written Report of Every Test Conducted by DNASI with their DNA.**

626. A report of every DNASI test conducted with each of the Plaintiffs' DNA samples would have revealed to the Plaintiffs the presence of multiple unknown unidentified male sources of genetic material in Mangum's rape kit, including the rectal swab, the oral swab, and multiple portions of her underwear.

627. A plain reading of the statute required that Ryan, Matt, and Breck be provided a written report showing the results of at least five tests conducted with their DNA profiles; one test result for each attempt to compare their DNA with that of the male sources of DNA found in the rape kit. One of many examples of a proper

report of tests conducted by DNASI with all three Plaintiffs DNA samples might look like this:

| Test # | Evidence Item | Result of Comparison with Mangum Reference | Result of Comparison with McFadyen Reference | Result of Comparison with Wilson Reference | Result of Comparison with Archer Reference |
|---|---|---|---|---|---|
| 1 | Unknown Male DNA SOURCE #1 | MATCH | NO MATCH | NO MATCH | NO MATCH |
| 2 | Unknown Male DNA SOURCE #2 | MATCH | NO MATCH | NO MATCH | NO MATCH |
| 3 | Unknown Male DNA SOURCE #3 | MATCH | NO MATCH | NO MATCH | NO MATCH |
| 4 | Unknown Male DNA SOURCE #4 | MATCH | NO MATCH | NO MATCH | NO MATCH |
| 5 | Unknown Male DNA SOURCE #5 | MATCH | NO MATCH | NO MATCH | NO MATCH |

628. Nifong knew he had an obligation to provide a written report to every team member who submitted DNA that revealed the existence of at least five sources of male DNA in Mangum's rape kit that DNASI concluded—with 100% certainty—did not match their DNA.

629. In a letter dated April 6, 2006, undersigned counsel put Nifong on notice of his obligations to produce a report of every test or experiment conducted with the DNA of any team member (the "Counsel's Demand Letter"). A true and accurate copy of the Counsel's Demand Letter is digitally annexed hereto as **ATTACHMENT 17**, and may be viewed within this document via the link below:

630.    Counsel's Demand Letter specifically stated that the demand includes but is not

limited to:

(1)    The results of any analysis made to compare team members' DNA with any

other material.

(2)    The results of any identification procedures using the "mug shot

photographs" taken at the NTID Order procedures.

(3)    The results of any analysis of those photographs, including reports of any

witness interviews regarding the comparison and identification of such

injuries that have been made available to Nifong.

(4)    Preliminary or partial results of any tests conducted that have been made

available to Nifong.

631.    Nifong fully understood his obligation to report those results to the team members

whose DNA was used in any experiment.

632.    Nifong plainly understood his obligations to Ryan, Matt, and Breck under the

statute.   By faxed correspondence dated April 12, 2006, Nifong confirmed he

knew he was obligated to submit a written report of all of the foregoing test

results, once complete.   To date, Plaintiffs have not received a report showing the

tests conducted with their DNA and the results of those tests.

## 1. Nifong, Gottlieb, Himan, Meehan and Clark Construct a Reporting Method that—By Design—Conceals Exculpatory Test Results

633. Himan, Gottlieb, Nifong, Meehan, and Clark met several times to discuss the results of DNASI's testing, and how the exculpatory results of DNASI's test results could be concealed. They colluded in those meetings to construct a novel reporting methodology that, by design, would conceal from Plaintiffs the fact that multiple male sources of DNA were found in the rape kit and did not match Plaintiffs or any lacrosse player.

634. The DNASI report failed to disclose not only the results of examinations for the presence of spermatozoa, but also failed to disclose whether any such examinations were conducted.

635. While testifying in court, Meehan asserted that he and Nifong discussed including all of the evidence, but decided not to include those who were not suspects in the interests of "protecting their privacy" due to the intense media spotlight on the case.

636. There is absolutely no evidence whatsoever of any concern for the privacy of anyone whose DNA was analyzed by DNASI. DNASI did not redact a single digit on a single allele, nor did they redact a single letter from the full name of any one of the players whose DNA was analyzed.

### 2. Use of the DNASI Report to Harass and Intimidate the Most Important Fact Witness for all Three Defendants

637. The report included special analysis of one "crime scene fingernail." The report falsely and misleadingly included a comparison of a non-indicted team member's DNA as a "probative" test result. Further, even a close study of this test result fails to reveal any indication that the "crime scene fingernail" is, in fact, not probative. While it is true that Plaintiffs' non-indicted teammate could not be excluded as a contributor of trace amounts of DNA on the fingernail, it is equally true that Crystal Mangum <u>did</u> <u>not</u> contribute to any DNA found the fingernail. Therefore, the "crime scene fingernail" fully reported in the DNASI report as a "probative" result was, in fact, forensically irrelevant to Mangum's allegations.

638. Because the "crime scene fingernail" result was "non-probative" viz. Mangum's allegations, it should have been excluded from the report pursuant to the novel reporting criteria DNASI agreed to use in determining what results to conceal. That is all the more strengthened by the "privacy concerns" that Nifong and Meehan asserted (among many other conflicting rationales) to justify their wholly new approach to DNA test reporting. If the concern for the privacy of innocent team members justified the exclusion of certain test results, no result required exclusion more obviously than the "crime scene fingernail" result.

639. Instead, the non-probative result was included in the report solely for purposes of intimidating a material and critical witness who Nifong already knew was critical to the digital and testimonial alibis of Evans, Seligmann and Finnerty.

229

640. A year later, Special Prosecutors Coman and Winstead would rely heavily upon this particular team member's testimony and the evidence only he could authenticate in drawing the conclusion that Mangum's allegations were impossible. Further, when Special Prosecutor Winstead confronted Mangum with Coleman's evidence, Mangum concocted patently ludicrous explanations that convinced all those involved in the Special Prosecutor's re-investigation— including Himan—that Mangum was not only lying, but also appeared to be incapable of telling the truth.

      **3.**      **Manipulation of the Media to Create Public Perception that the DNA Test Results Implicated Team Members in the Alleged Crime**

641. The media reports of Nifong's statements and his not-for-attribution comments to the media are replete with insinuations that the DNA reports will favor Mangum's allegations. In a telling, impromptu interview conducted by Trish Regan of CBS News hours after the results of the SBI DNA testing was made public by Defense Counsel. Nifong falsely claims the defense counsel misrepresented the results of the SBI Lab's report.

642. The video of these comments made by Nifong to CBS Reporter Trish Regan is digitally annexed hereto as **ATTACHMENT 18**, and may be viewed below:



643. Nifong presented David Evans' indictment to the Grand Jury on May 15, 2006. On May 11, 2006, the Herald Sun published leaks of false and/ or misleading evidence from "several well-placed sources." Those sources made assertions that led a seasoned courthouse reporter to write that the DNA test results (not yet released) included a "fingernail tissue match [that] would offer the first DNA evidence potentially linking the dancer and an alleged attacker.... the tissue in question was found under one of those nails, the sources said." The sources went further by claiming that the "match" or "consistency" involves the individual who the accuser "was able to identify with 90% certainty."

644. The article went on to state: "In addition, the sources said a male pubic hair had been linked to the case. But because the hair lacked a root, no identifiable DNA was obtained from it, he said. The only thing that could be determined was

whether the hair came from a white man, the sources said.  They did not pinpoint where the hair was found.  But when police investigate rape cases, they normally comb through the alleged victim's pubic hair to determine whether male hairs are intermingled."

    (1)    The author stated that he would have never published a story like that if he did not have absolute assurances from sources with personal knowledge of the facts that the leaks were credible and complete.  He had four separate sources for this information, three of whom were in the District Attorney's office.

645.    After the release of this article, virtually every news outlet in the country was reporting that there was a report of "a match" or "consistency" between the lacrosse player who was identified with 90% certainty and genetic material found "under the fingernail of the victim."

## XXVII.   THE SANE CONSPIRACY

646.    When Nifong, Himan, and Gottlieb learned on March 28th that there would be no DNA evidence, he lost the two fundamental elements of proof in his case at once.  DNA evidence is not only identification evidence; it is also physical evidence of sexual contact, if not sexual assault.  Without either, the investigation could not reasonably go forward.  To perpetuate the investigation beyond March 28, 2006, Nifong, Himan, and Gottlieb solved their identification problem by rigging an identification procedure that totally disregarded G.O. 4077.  They solved the

physical evidence problem by colluding with Defendant Tara Levicy to fabricate proof of "trauma" where none, in fact, existed.

**A.    Levicy's False Claims of Corroborating Evidence**

647.    At the inception of the media firestorm that erupted around Mangum's allegations, Defendant Levicy was at the center.  In the falsified factual sections of the NTID Order that grabbed national headlines, Gottlieb included the gist of what he claimed Levicy reported to him, namely that:

> "The victim was treated and evaluated at Duke University Medical Center Emergency Room shortly after the attack took place.  A Forensic Sexual Assault Nurse (SANE) and Physician conducted the examination.  Medical records and interviews that were obtained by a subpoena revealed the victim had signs, symptoms, and injuries consistent with being raped and sexually assaulted vaginally and anally. Furthermore, the SANE nurse stated the injuries and her behavior were consistent with a traumatic experience."

648.    Defendant Levicy's role in Nifong's public statements about the case became central when Nifong learned that DNA testing would not provide any physical evidence of sexual contact, much less sexual assault.  Nifong learned there would be no DNA evidence to prove sexual contact on March 28, 2006.  Beginning on that day, when Nifong was asked why he was so certain there had been a rape, he pointed to Tara Levicy and DUMC.  For example:

(1)     On March 28, 2006, Nifong told Dan Abrams of MCNBC that he was convinced there was a rape because "[t]here is evidence of trauma in the victim's vaginal area that was noted when she was examined by a nurse at

the hospital, and her general demeanor was suggestive of the fact that she had been through a traumatic situation."

(2)     On March 28, 2006, Nifong told Rita Cosby of MSNBC that he believed "that rape did occur…  [because] the victim's demeanor and the fact that when she was examined by a nurse trained in sexual assault, there was swelling, and pain in the area that would have been affected by the rape. The victim gave signs of having been through a traumatic situation." Cosby responded "Mr. District Attorney, good luck in tracking down the guys who have done a horrible thing."

(3)     On March 29, 2006, Nifong told a reporter for the *Charlotte Observer* that "there were bruises that were consistent with a sexual assault…. there was also behavior that was consistent with having gone through a traumatic experience."

(4)     On March 30, 2006, Nifong told a reporter for CBS's nationally televised "The Early Show" that he was convinced a rape occurred because of the medical evidence in the case.  The  video of this interview is digitally annexed hereto as **<u>ATTACHMENT 19</u>**, and may be viewed below:



(5)    On April 4, 2006, a reporter a reporter for the *Charlotte Observer*, Mark Johnson, was interviewed about the case by Greta Van Susteren. Based on Nifong's statements to him, Johnson told the national audience "[Mangum] was examined at Duke University Medical Center, which as you know is a top flight hospital. This was a nurse who was trained in dealing with these types of cases and that examination is largely what the district attorney is basing his opinion on when he says that he believes an attack did occur."

649.    Levicy avidly followed the movements of the case in the media and on the internet. It was plainly obvious from Nifong's statements that he would rely exclusively upon Levicy to "convince" a jury that a rape occurred.

**B.    Theresa Arico, Levicy's Supervisor, Vouched for Levicy's Fabricated SANE Evidence**

650.    Immediately after Nifong publicly proclaimed his reliance upon Levicy's putative testimony in the case, Theresa Arico, Levicy's DUMC supervisor, gave an interview to the Durham *Herald Sun*. Arico held herself out as "a sexual nurse examiner and coordinator of that program at Duke." Arico was not present for Mangum's SANE exam, yet she asserted, in her *Herald Sun* interview published on April 1, 2006, "you can say with a high degree of certainty that there was a certain amount of blunt force trauma present to create injury." Arico told the reporter that this conclusion was based upon in the SANE nurse's examination with a coloposcope, a device used to magnify minute injuries that are consistent

with a sexual assault.  Further, Arico told the reporter from the *Herald Sun*, "I can reasonably say these injuries are consistent with the story she told."

**C.    Levicy Produced Falsified Medical Records to Support Her Fabrications.**

651.    Levicy falsified the SANE report to support her own and the Investigators' fabrications.  For example:

(1)    Levicy did not produce a significant portions of the SAER until April 5, 2006 weeks after DUMC's March 21, 2006, production of medical records. In the intervening time, Levicy re-created those portions of the SAER that were not completed on March 14th after the SAE was abandoned.  On April 5, 2006, Levicy produced the remaining material portions of the SAER to Gottlieb, including what Levicy claims to be a handwritten transcription of the SANE interview of Mangum, and several pages containing strike-outs and other addenda that do not conform to the facts of the SANE exam, but instead attempted to conform the SANE exam to what Levicy understood to be the evidence at the time.  For example:

(a)    Levicy falsified the medical record of Mangum's SAE by fabricating a transcript of her interview of Mangum in order to conform the SANE interview to what Gottlieb reported in his sensationalized application for the NTID Order to be Mangum's account of the sexual assault;

(b)     Levicy falsified the medical record of Mangum's SAE by revising and annotating Mangum's contemporaneous responses on the pre-printed SAER forms to conform them to the evidence police believed existed at the time.  By way of illustration, on one of the late-submitted pages of the SAER, a question asked if any efforts were made to conceal evidence.  Levicy's original notation, "no," was struck through, and the (formerly empty) "yes" blank was checked.  Further, a handwritten notation near the revision states, "wiped her off with a rag."  In this revision Levicy conformed the SAER with the fact a towel containing semen had been seized during the search of 610 N. Buchanan.  However, after Levicy submitted this page on April 5th, police and Nifong learned that, although the towel did contain semen matching one of the residents (who was then a suspect), Mangum's DNA was not on the towel.

(c)     The next day, on April 6th, Mangum gave her first (and only) written statement in the case.  She wrote an account remarkably consistent with the SAER interview transcript Levicy gave Himan the day before.  In a move transparently designed to conform her account to the existent evidence of semen found by police in the bathroom, in the case, Mangum writes an "add-on" paragraph at the end of her statement.  The add-on paragraph reads, *in toto*, "I would like to add

> that Adam ejaculated in my mouth and I spit it out onto the floor,
>
> part of it fell onto the floor [scratch out] after he pulled his penis
>
> out."

652. The falsifications in the SAER were plainly designed to conceal the fact that Mangum did not report any of the detail that appeared in Gottlieb's application for a NTID Order that was published widely on the internet. In other words, the fabrications were designed to corroborate the sensationalized version of Mangum's account that Gottlieb falsely reported in his factual sections of the application for the NTID Order.

### D. Levicy Proffered Falsified Testimony to Perpetuate the Investigation from March 16, 2006 until January 11, 2007

653. Further, over the course of several meetings and interviews with Nifong, Gottlieb, Himan, and Wilson, Levicy repeatedly proffered false testimony that was clearly designed to fill the chasms in Mangum's case and/or to restore Mangum's glaring credibility problems. For example, in those meetings and interviews with Nifong, Gottlieb, Himan and /or Wilson:

(1) Levicy agreed with Nifong, Gottlieb, and Wilson that she would testify to forensic medical evidence that she did not observe and did not exist.

(2) Further, Levicy falsely claimed that "diffuse edema of the vaginal walls" corroborated Mangum's claims.

(3) Levicy fabricated a forensic medical observation that the SAE revealed evidence of penetrating blunt force trauma. Her supervisor Arico, had

already echoed publicly supported this false claim in Arico's on-the-record *Herald Sun* Interview, given the day after the SBI formally notified Nifong that the rape kit had no DNA evidence that would corroborate Mangum's allegations.

(4)     Levicy, Arico, and DUMC all condoned and ratified Nifong's repeated recitation of the claim of trauma in interviews televised locally and nationally, and in local and national newspapers and magazines. Yet, there was no evidence of blunt force trauma consistent with rape. According to the SAER documentation that Levicy submitted on March 21st, it is plainly obvious that the pelvic exam was abandoned at its inception because Mangum protested Manly's use of a speculum. Penetrating blunt force trauma, if it existed, would be found on Mangum's cervix. Mangum's cervix, however, could not be observed without the aid of (1) a speculum and (2) a coloposcope. The March 21st SAER documents make it clear that the coloposcope was never used in the pelvic exam because Mangum refused the insertion of a speculum.

(5)     Levicy claimed the speculum could not be inserted because Mangum was in too much pain. If that were true, the pain would be treated, and its source diagnosed. There was no effort to diagnose the source of Mangum's pain, nor was her pain treated. Furthermore, there is no evidence that Dr. Manly requested an E.D. attending physician to examine Mangum to

diagnose the source of Mangum's pain and to treat it. Upon information and belief, Dr. Manly, like every other provider at DUMC, could not corroborate Mangum's reports of pain with any symptoms associated with pain.

(6)     In three separate places, the SAER notes that no condoms were used. Nearly a year after the SAE, Levicy claimed that she felt Mangum could not be sure that condoms were used. Throughout Levicy's SAER, Mangum's unequivocal report that no condoms were used is noted again and again. For example, when asked if condoms were used, the "not sure" blank was not checked in favor of the "no" blank. Further, in Step 2 of the SAER, the SANE is required to write a "[b]rief account of the assault us[ing] the patient's own words." In the small space provided, Levicy volunteered, "No condoms used."

(7)     After the DNA testing revealed the impossibility that Mangum could have been assaulted vaginally, rectally, and orally by any lacrosse player, Nifong claimed publicly and falsely that he believed condoms were used. Nothing in science or the human experience suggests that the violent rape Mangum falsely alleged can be perpetrated without leaving so much as a skin cell somewhere—anywhere. Knowing this, on January 10, 2007, Levicy proffered additional fraudulent testimony that the absence of DNA could be explained by the use of condoms.

(8)     Further, Levicy proffered additional fabricated testimony that to explain why the SAER is rife with statements indicating "no condoms" were used. As of January 10, 2007, Levicy's testimony would have been that Mangum, in fact, "wasn't sure." Levicy explained that no one can ever really be sure whether a condom is used, unless they actually see the condom.

(9)     Further, Levicy proffered that she "wasn't surprised when [she] heard no DNA was found because rape is not about passion or ejaculation but about power." Levicy's statement belied her ignorance of modern DNA testing, particularly Y-STR testing employed in this matter, which does not depend upon an ejaculatory event. Y-STR testing has the capacity to detect male-sourced human cells of all kinds, including a skin cell.

(10)    Further, Levicy proffered testimony calculated to save Mangum's identifications from suppression. One of the factors in the legal analysis for suppression of identification testimony is the ability to attend and to recall (acuity) things at the time in question. The evidence that Mangum was incoherent, if not suffering from psychotic delusion, in the early morning hours of March 14th was significant. Levicy proffered testimony to rebut that evidence. Nearly a year after the SAE, Levicy proffered new testimony claiming Mangum was "very alert." To support that claim, Levicy proffered testimony that Mangum "knew what she was missing (meaning her money, her bag and her phone.)"

241

654. Levicy proffered the foregoing fabricated testimony on the evening of January 10, 2007. Two days later, Nifong quit the case, and asked the Attorney General to take over the prosecutions and still continuing "investigation." Shortly thereafter, when Levicy learned that Nifong, Himan, and Gottlieb were no longer controlling the case, Levicy called Wilson to make a "clarification" to her proffered testimony. In her clarification, Levicy said—for the first time—that the absence of DNA matching the lacrosse team members could also be explained by the fact that the alleged gang rape "didn't happen."

## XXVIII. APRIL 10th—14th: NIFONG DETERMINES TO INDICT TO WIN ELECTION

### A. April 10th: Two DNA Labs Report No DNA Match

655. On April 10, 2006, the report of the SBI Lab's testing was produced to Plaintiffs. The SBI results were made public on April 10, 2006. The result of the SBI Lab's testing was stunning in their simplicity. The SBI Lab could not match any lacrosse player with any genetic material in, on or about Mangum's person, her acrylic fingernails, her cell phone, purse, or any of her possessions. No swab or smear in the rape kit matched any one of the members of the lacrosse team. There were two DNA matches found by SBI. The SBI found DNA of one of the residents of 610 N. Buchanan matched the DNA found on his own towel in his home. In addition, the SBI matched another one of the resident's of 610 N. Buchanan DNA to genetic material found on the floor of his own bathroom.

Crystal Mangum's DNA was not present on the first resident's towel or on the second resident's bathroom floor.

656. Also on April 10, 2006, the SBI report alone was sufficient to end any rational inquiry into Mangum's allegations. Unbeknownst to Plaintiffs and their counsel, on the same day, Nifong, Gottlieb, and Himan received a report of the DNASI Lab's testing in the case. DNASI's Meehan and Clark advised Nifong, Gottlieb, and Himan that its DNASI's Y-plex technology had detected a significant number of male sources of male sperm and epithelial DNA in Mangum's rape kit. Further, Meehan and Clark reported that the Lab had already compared each of the Plaintiffs' DNA with the DNA profiles produced from the unknown male sources of DNA in the rape kit, and had concluded— with 100% scientific certainty— that Plaintiffs and their teammates did not match any of the male DNA found in the rape kit.

657. Meehan's testing pursuant to Judge Stephens' Order was completed, and Meehan had prepared and/or advised Nifong that he was able to prepare a written report of every test conducted in the Lab's testing of Nifong's case (consistent with the requirements of this lab's protocol, as well as the national standards for forensic labs). Nifong declined Meehan's report offer, knowing that a written report would have to be turned over to the Plaintiffs' counsel under N.C.G.S. § 15A-282, and Meehan did not insist that he follow his own protocol, the national standards or those of his accrediting agency. Meehan's decision to acquiesce in Nifong's wish

that he not write a report of its test results, did not absolve Nifong of the requirement that he produce a report of the results of all tests conducted with all of the tests conducted by DNASI.

658. Further, on April 10, 2006, the following results of DNASI's testing were made available to Nifong, Gottlieb and Himan:

(1)     DNASI testing revealed the presence of at least 5 different sources of male DNA were present in swabs from Mangum's rape kit, and

(2)     DNASI found at least two male sources of DNA in the sperm fraction of Stain "A" on Mangum's rape kit panties, and, with 100% scientific certainty, DNASI concluded that Ryan, Matt, and Breck did not match any of those male sources of DNA;

(3)     DNASI found at least four male sources of DNA in the epithelial fraction of Stain "A" on Mangum's rape kit panties, and, with 100% scientific certainty, DNASI concluded that Ryan, Matt, and Breck did not match any of those male DNA sources of  DNA;

(4)     DNASI found at least one male source of DNA in the sperm fraction of the rectal swab in Mangum's rape kit, and, with 100% scientific certainty, DNASI concluded that Ryan, Matt, and Breck did not match that male source of DNA;

(5)      DNASI found at least two male sources of DNA in the epithelial fraction of Stain "B" on Mangum's rape kit panties, and, with 100% scientific

certainty, DNASI concluded that Ryan, Matt, and Breck did not match any of those male sources of DNA;

(6)    DNASI found at least two male sources of DNA in the epithelial fraction of Stain "D" on Mangum's rape kit panties, and, with 100% scientific certainty, DNASI concluded that Ryan, Matt, and Breck did not match any of those male sources of DNA; and

(7)    DNASI also concluded that Plaintiffs' teammates, as well as all of Mangum's known recent sexual partners, did not match any of the male sources of DNA detailed above.

659.    On the evening of April 10th, Nifong was considering whether to appear at a forum to be held at NCCU the next day.  In light of the results of the SBI Lab's testing released earlier that day, Mayor Bell told Nifong not to attend.  Nifong promised he would not attend.

## B.    April 11:  The NCCU Forum

660.    The next morning, Mayor Bell arrived at the NCCU forum and saw that Nifong had broken his promise; he was already there.  Nifong's opening remarks appear to be designed to signal a shift in the investigation away from the Duke University Men's Lacrosse Team.  For example in his prepared remarks, Nifong said:

> "And the thing about DNA is it not it's that it can point the finger to who the guilty people are but it can also tell us who the guilty people are not.  And it's important to remember that there are 46 members of the Duke University lacrosse team who were asked to submit to uh giving samples for DNA testing.  And only three of those people are alleged to have been involved in the assault.  So until we identify all

245

*three of those people that means that some of these young men are going to be walking around under a cloud where innocent people are being thought perhaps they're guilty just because of their association. You know part of the job of- of being the District Attorney is not just convicting the guilty; part of the job is freeing the innocent. And we always need to be aware the fact that being associated with a particular group does not acquaint to guilt....The fact is that this case is proceeding the way a case should proceed. I am trying to determine exactly what the evidence is that we have to proceed on and to assemble that evidence before anyone is charged."*

661. Nifong quickly learned that any discussion of looking beyond members of the lacrosse team drew an angry reaction from many of the students and citizens at the NCCU Forum. Again and again, students, faculty and others at the NCCU forum were outraged that Nifong had not arrested a single lacrosse player yet. An example of this outrage is digitally annexed hereto as **ATTACHMENT 20**, and may be viewed below:



662. Many demanded to know why Nifong had not already arrested someone, especially in light of the fact that, in their experience, suspects in rape investigations are usually arrested quickly and often cannot post bail. An example

of these demands is digitally annexed hereto as **ATTACHMENT 21**, and may be viewed below:



663. By the time the NCCU forum had concluded, Nifong had learned that his failure to arrest and charge any member of the lacrosse team had already, by all appearances, cost him a substantial portion of the African-American vote in Durham. Nifong entered the NCCU forum believing that he would be applauded for his willingness to continue on with the investigation, but he left the NCCU forum knowing that he would lose a substantial portion of the African-American vote unless he charged three lacrosse players.

664. Defendant Hodge also appeared at the NCCU Forum on April 11th. When he was asked by a reporter about the strength of the case in light of the DNA results, Hodge replied, "I don't think we would be here if it wasn't (a strong case)." Upon information and belief, Hodge was present for and privy to all Command Staff and Joint Command Staff meetings, and his statement was a deliberate

misrepresentation of the state of the evidence designed to perpetuate the investigation of claims he knew or should have known were false.

## C.     April 12, 2006:  Nifong Commits to Indicting Finnerty and Seligmann

665.    When he returned to his office the next day, Nifong prepared a motion requesting an a court order sealing the indictments of Collin Finnerty and Reade Seligmann until the Durham police are able to apprehend and arrest them.  A true and accurate copy of the motion and order is digitally annexed hereto as **ATTACHMENT 22**, and may be viewed within this document via the link below:



666.    Nifong's motion claimed that sealed indictments were required in this case, on the grounds that Seligmann and Finnerty were flight risks.  Nifong's actual motive in securing the order sealing the indictments of Seligmann and Finnerty was simply to abuse the indictment process as a means to orchestrate a nationally televised "perp walk," for no other reason than to secure the voting block he feared he would lose if he did not arrest somebody.  Upon information and belief, Nifong's intention was to direct Durham police officers to arrest Seligmann and Finnerty in their classes after the Grand Jury indicted them.

667. Nifong's public comments after the NCCU Forum reveal that he is on a fixed course for indictments. For example, on April 12th at the public forum held at the Durham County Courthouse that featured Nifong and his two opponents Freda Black and Keith Bishop, Nifong made several more incendiary public statements. The video of Nifong's remarks at the public forum is digitally annexed hereto as **ATTACHMENT 23**, and may be viewed below:



**D.** **April 14th: Gottlieb, Himan, Duke Police Conspire to Force the Waiver of Plaintiffs' and their Teammates' Asserted Constitutional Rights**

668. When Gottlieb informed Himan that Nifong had decided to indict Seligmann and Finnerty, Himan reflexively asked, "with what?"

669. Himan and Gottlieb both knew that they have very little, if any, evidence that either Collin or Reade were present at the party at the relevant time. They both feared that they may obtain indictments from the grand jury only to be confronted with evidence that one or both of those young men could immediately prove that they had no opportunity to commit the brutal gang rape that was alleged. As it happened, they both could, and one did. After Nifong informed Gottlieb and

Himan that they would be presenting bills of indictment naming Collin Finnerty and Reade Seligmann in a week's time, Himan and Gottlieb colluded with Duke Police officers to compel several team members to provide the information necessary to place Collin and Reade at 610 N. Buchanan Blvd. at some point on March 13th if not March 14th. The scheme would proceed in two parts, both on the same day: April 13th.

**1.      Fraudulent Email Sent Through Breck Archer's Email Account**

670.    On April 13, 2006, in the mid-morning hours, conspirators whose identities are not as yet known to Plaintiffs sent an email through Breck Archer's "duke.edu" email account. The email stated, "I am going to go to the police tomorrow to tell them everything that I know."

671.    Breck never sent the foregoing email to his teammates, nor did he authorize anyone to send any email through his account for any reason.

**2.      Gottlieb and Himan, aided by the Duke Police Department, Enter Dorms to Obtain Information from Represented Lacrosse Players.**

672.    On that evening, April 13th, Duke Police officers assisted Himan and Gottlieb in gaining access to locked dorms where most of the sophomore team members lived. Their purpose was to interrogate those they found there to develop evidence that Seligmann and Finnerty were actually present at the party before the two would encourage a Grand Jury to indict them. They feared that the already planned indictments of Seligmann and Finnerty would be followed by a defense

press conference revealing that one or both of them were not and could not have been at the party at the relevant time.

673. When the officers finally cornered team members in their dorms, they did not demand to know what happened at the party, or ask for any detail or evidence they may have. Gottlieb and Himan only asked who was (and was not) present at the party.

674. They cornered Michael Young, and coaxed him into his room. Police directed Michael's roommate to leave and close the door, which he did. Young was not given Miranda warnings, and Gottlieb had no warrant to enter Young's room. Under Gottlieb's questioning over the course of an estimated 30 minutes, Young guessed that Collin and Reade were both at the party because he did not see them in the dorms until after midnight. Himan had specifically been told by Young's attorney that he was not to speak with his client. Young had already provided the investigators with evidence that he was in not in attendance at the party on March 13-14[th] held at 610 N. Buchanan.

**E.    Duke Facilitated and Subsequently Condoned the Investigators' Warrantless Entry into the Dorms and the Subsequent Interrogation of Represented Team Members**

675. Duke Police facilitated Himan's and Gottlieb's entry into one of the dorms, and then left them there to sneak into other dorm buildings.

676. When news broke of the police misconduct at the dorms on April 13th, Defendant Graves quickly and publicly condoned it by issuing the following press release in his official capacity as the Vice President for Campus Safety and Security:

> *"Two Durham police detectives visited a residence hall on the Duke University campus yesterday evening. They were there as part of the ongoing police investigation of the March 13 incident on North Buchanan Boulevard, and they notified the Duke Police Department ahead of time. The purpose of the visit was to conduct interviews. We do not know who they interviewed during the hour and 15 minutes they were in the Edens Residence Hall. Duke reiterates its earlier statements that it is cooperating fully with the police investigation and urges anyone with information pertinent to the events of March 13 to cooperate with the authorities."*

677. Consistent with Addison, Gottlieb, and other Defendants in this action, Defendant Graves failed to use the qualifier, "alleged" when referring to the "March 13 incident on North Buchanan Boulevard."

## XXIX.   UNIVERSITY SPONSORED PRE-TRIAL, PRE-INDICTMENT IMPEACHMENT OF PLAINTIFFS AND THEIR TEAMMATES

678. One day before Nifong's primary election, Duke University staged a press conference to unveil a false and misleading "Committee Investigation Report" that ratified the myth of Plaintiffs and their teammates as a monolithic, irredeemable pack of "hooligans." At the direction of the CMT Defendants, the fraudulent report was issued in the name of the University itself.

679. In essence, the University impeached the character of every putative defendant and nearly every putative defense witness by broadcasting to millions of people the

Committee's unsupportable conclusion that their own students—members of the men's lacrosse program—routinely engaged in "alarming" conduct; that they roamed in "packs," frequently abused alcohol, and behaved "deplorabl[y]" when they did.

680. Further, the CMT Defendants used the Ad Hoc Report to propagate the myth that the team's conduct was aberrant compared to Duke students generally. However, the Committee itself admitted that a comparison to Duke students generally was not possible because the University did not regularly keep statistics of Duke students' misconduct, at least not instances of misconduct that were as trivial as the infractions for which lacrosse team members had been cited. Pursuant to its obligations under the Cleary Act, the University kept regular statistics of Duke students' serious misconduct, such as assaults, sexual offenses, and other serious crimes, as well as instances of student alcohol abuse that led to hospitalization. Plaintiffs and their teammates had not engaged in any instance of such serious misconduct or alcohol abuse.

681. Instead of concluding that the team members' did not appear in any of the statistics of serious misconduct or alcohol abuse that are systematically kept by the University, the Committee undertook to compare the frequency of team members' petty infractions as compared to selected other teams.

682. In a rush to publicly condemn the character of the team, on behalf of the University, the Committee pressed on to initiate, conclude, and report on its

investigation of the history of lacrosse team's misconduct within the three-week period allotted to them. The Committee was aided by Defendant Bryan. The University's analog to Gottlieb, who, like Gottlieb, plainly harbored contempt for Duke students. Also like Gottlieb, Defendant Bryan provided the committee with false and misleading "data" designed to lead the Committee to falsely conclude that the frequency of lacrosse team members' misconduct was aberrant, when it plainly was not.

683. The report's negative conclusions were based solely upon facially skewed data provided by Defendant Bryan. All of the other evidence received by the Committee was favorable to the team members and the program.

684. The Committee ignored the only body of systematically kept statistics of the nature and frequency of student misconduct; and relied instead upon incidents that allegedly occurred before October of 2004.

685. October 2004 is when the University began systematically recording data of incidents of all alcohol policy violations involving students. Per a "Campus Committee" initiative, all Residential Life staff were required to document and report each and every observed alcohol policy violation on campus. Prior to October 2004, records of such misconduct were maintained only to the extent that Defendant Bryan wished to keep them for his own enforcement purposes. It was Bryan's arbitrary enforcement of the alcohol policy that prompted the Campus Committee's 2004 Initiative.

686. It would have made sense to utilize the systematically kept data post-October 2004. However, the Committee inexplicably relied upon Defendant Bryan's arbitrarily-kept records of pre-October 2004 violations.

687. Upon information and belief, no statistically valid study of the incidents of student misconduct would support the conclusion that the conduct of the Duke University Men's Lacrosse Team was aberrant or otherwise out-of-step with the male student population at Duke University.

688. Upon information and belief, Defendant Bryan knew the Committee was relying upon him to either provide accurate, reliable data; and, yet, Defendant Bryan knowingly provided data to the Committee that were wholly unreliable and could only lead to false and misleading conclusions.

689. Upon information and belief, Defendant Bryan concealed the existence of more reliable data and provided the Committee with unreliable and grossly misleading data sets in order to induce the Committee to conclude that the lacrosse team members' conduct was out of step with that of comparison groups.

690. Defendant Bryan's conduct was compounded by the testimony of Eddie Hull to the Committee. Hull was the Executive Director of Housing Services and Dean of Residential Life. Hull described in detail the role and assignments of Residence Coordinators during the 2003-2004 school year. Hull did not advise the Committee that there was no systematic collection of student misconduct data in

that year; and, further, Hull did not advise the Committee that systematic collection of the kind of data the Committee was studying began the next year.

691. As a result, the Committee Report is rife with false premises and facially implausible conclusions. By way of example:

(1)     The Committee claimed that lacrosse team members were responsible for 50% of student noise violations in the period studied. This conclusion depends upon the plainly false premise that there were a total of 4 noise ordinance violations involving Duke Students in the period studied (two of which were issued to members of the lacrosse team).

(2)     The Committee claimed that 33% of open container violations were issued to lacrosse players. This conclusion depended upon the false premise that there were only 3 open container violations involving students (one of which was a lacrosse player).

(3)     The Committee Report led reporters to broadcast to local and national audiences that, at Duke University, lacrosse players were responsible for 50% of noise violations and 33% of open container violations.

(4)     As the members of the Committee and the University knew or should have known, the 7 students charged, arrested, and dragged from their home at 203 Watts in the fall of 2006 accumulated 7 noise violations and 7 open container violations in one day.

692.	Further, the Chairman of a companion committee of the Ad Hoc Committee asked District 2 Captain Ed Sarvis if it was possible to get "annual totals" of the number of complaints received, number of citations issued, and any breakdown (e.g., noise, property damaged) related to off-campus Duke students. "Data going back 4-5 years would be great if it is readily available." Defendant Sarvis advised the Chairman all of his reports were forwarded to Defendant Bryan. Sarvis explicitly noted in his reply that the majority of the citations were noise ordinance violations.

693.	A host of favorable statistical conclusions were readily available to the Ad Hoc Committee that it did not report. By way of example, all of the "incidents" allegedly involving lacrosse team members over the five-year period studied by the Committee:

(1)	None involved assaults of any kind.

(2)	None involved injury to any person.

(3)	None involved fights or affrays.

(4)	None involved threats of any kind to anyone.

694.	As planned, the Ad-Hoc Committee Report was issued three weeks after it was commissioned: the day before the election. Further, two Duke students had already been indicted. Both Seligmann and Finnerty had irrefutable digital alibis. Seligmann released the fundamental elements of his alibi to an NBC reporter Dan Abrams who detailed it to a national audience the day after his indictment was made public, well before the Ad-Hoc Report was produced. Weeks earlier,

Plaintiffs' defense counsel had offered the digital evidence of innocence to Defendant Brodhead or his designee. Plaintiffs' defense counsel's paralegal had prepared a power point presentation of the alibis and the evidence that gave the lie to the fingernail myth, the injuries myth, and the alias myth. While Defendant Brodhead and the other CMT Defendants "eagerly awaited" the Ad-Hoc Committee's report, they willfully ignored the digital alibis and the photographic evidence that proved Mangum's nails were already off and her injuries were already present during the dance. Brodhead did not even avail himself of the option to have investigators with the Duke Police Department review that evidence.

695. At the time the CMT Defendants forced the conclusion of the Ad Hoc Committee's investigation, two Duke students had been indicted for a crime that never happened, a third student's indictment was imminent, and the remaining 44 team members were under a continuing public threat of indictment on an accomplice theory. The Ad Hoc report was unveiled in a press conference attended by virtually every national and local media outlet, which were told extemporaneously by Chairman James Coleman that the "pattern" of behavior of the team members was "deplorable."

696. The Ad Hoc Report, coupled with Coleman's gratuitous remarks at the nationally televised press conference, peremptorily impeached the credibility of the every

putative defendant and every defense witness who could offer testimony to establish the fact that no sexual assault occurred or could have occurred.

697.	There was no evidence to corroborate Mangum's account. The jury would convict or acquit based upon which witnesses they believed were credible. The Committee report peremptorily impeached the character and credibility of every defense eyewitness (except Pittman) whose testimony would compete with Mangum's at the trial on her accusations.

698.	Further, the Ad-Hoc Committee Report, with scant, if any, evidence, ratified the premises of Gottlieb's sensationalized application for the NTID Order: that the team hung together, roamed in "packs," abused alcohol and behaved deplorably when they did so. The Ad Hoc Report aided Nifong, Himan, and Gottlieb in perpetuating the world-wide condemnation of the team, and ratified Defendant Brodhead's statement to the Chamber of Commerce on April 20, 2006: "If they didn't do it, whatever they did was bad enough." It was nearly a slogan.

699.	The press accounts of the Committee reports revealed how grossly misleading the Committee Report was. For example:

(1)	On May 1, 2006, NBC reported that the University's report "found that alcohol abuse is a major factor behind [the lacrosse team's] disciplinary problems both on and off campus"

(2) On May 2, 2006, a *New York Times* article began, " 'Deplorable,' said James E. Coleman Jr., describing how team members behaved when they drank excessively."

(3) On May 1, 2006, ESPN reported that the University's report concluded that "the team needed strict monitoring because of a history of problems tied to alcohol."

(4) On May 3, the Raleigh *News & Observer* wrote that "a large number of the members of the team have been socially irresponsible when under the influence of alcohol."

(5) Early in May, the *Herald Sun* wrote an editorial entitled "Alcohol Abuse and Rape Related."

700. Defendant Burness delivered an advance copy of the Ad Hoc Committee Report to City of Durham Defendants so they could prepare statements for the press conferences. Burness did not send a copy of the Ad Hoc Report—in advance or after its release—to the Plaintiffs, their teammates or their counsel.

701. The myth of the Plaintiffs and their teammates as out-of-control, aberrant, abusers of alcohol, with a history of "deplorable" behavior persists up to the present day, as does the belief that the alleged incident at 610 N. Buchanan Blvd. represents a microcosm Duke in Durham. By way of examples:

(1) In a lecture in Williamstown, Massachusetts, during the Spring of 2007, then Duke Professor Grant Farred stated: ""The Duke lacrosse program is indicted

here not for whatever happened on that night, but for its past — its blemished past," Farred said. "The lacrosse team has a history of being inhospitable, of being bad neighbors to Durham ... it is the history of racism in the South."  Farred's lecture was promoted with the following poster which is digitally annexed hereto as **ATTACHMENT 24**, and may be viewed within this document via the link below:



(2)    On October 26, 2007, Greater Boston host Ellen Rooney declared that "We don't know what happened in the Duke case. We never will...Something happened."

## XXX.    UNAUTHORIZED DISCLOSURE OF FERPA RECORDS AND SUBSEQUENT CONSPIRACY TO CONCEAL THE PRIOR DISCLOSURE

702.    On March 31, 2006 at 3:00 p.m. Defendants Smith and Stotsenberg, Duke Police Sergeants and Investigators, obtained the Duke Card transaction reports of Plaintiffs and every member of the lacrosse team in violation of FERPA, and delivered the reports to Gottlieb.

703.    On April 4, 2006 Gottlieb turned them over to Himan, who, under a continuing directive to do so, provided a copy of the Duke Card reports to Nifong.  The University did not advise any member of the team or their counsel that the Duke

Card records were sought by or produced to Durham Police Investigator Defendants.

704. Among other things, the Duke Cards were critical elements in many of the digital alibis that Plaintiffs' defense counsel and his paralegal developed for every member of the team.

705. On May 31, 2006, Nifong issued subpoenas directed to Duke University's Duke Card Office ordering production of the Duke Card Transaction Reports for every member of the team. Of course, Nifong had received the reports two months earlier, and Gottlieb and Himan used them as evidence to indict Collin and Reade. The three were playing out an orchestrated charade to launder the Duke Card evidence that they obtained illegally.

706. Duke University sent a notice to the Plaintiffs and their teammates indicating that the subpoenas had been issued, and the protected materials would be produced pursuant to the subpoenas unless they obtained a court order quashing the subpoenas. The notice did not disclose that all of their Duke Card reports covering at least the same time period had already been produced to the State by Duke Police officers.

707. Plaintiffs retained counsel to file Motions to Quash Nifong's Subpoenas on their behalf. They believed the University's false statement that the records would not be disclosed to the State if they obtained a court order quashing the subpoenas directed to their records. Defendants Nifong, Himan, Gottlieb, Smith,

Stotsenberg, Matthew Drummond, Senior Manager IT in Auxiliary Services and Head of the University's Duke Card Office, and Kemel Dawkins, Vice President for Campus Services, among others, all knew that Duke University had previously produced to the State the same Duke Card transaction reports that were sought in the subpoena, and that the subpoena was a fraud. When the Plaintiffs filed their Motions to Quash Nifong's Subpoena, none of them notified Plaintiffs that Duke University had released the information to Nifong two months earlier.

708. The written Motion to Quash Nifong's Subpoena emphasized Nifong's failure to state any factual basis to establish that Nifong needed the information for some legitimate investigative or judicial purpose. Defendants Nifong, Himan, Gottlieb, Smith, Stotsenberg, Drummond, and Dawkins, among others, all knew that Nifong, Gottlieb and Himan had unlawfully obtained the subpoenaed Duke Card transaction reports from Duke University previously. None of them notified Plaintiffs, their Counsel or the Court, in fact, Nifong could not show his need for the FERPA protected information because Duke University had already released it to him, in violation of FERPA.

709. On July 17, 2006, a hearing was held on Plaintiffs' and their teammates' Motions to Quash the Subpoena. The hearing was televised. Himan was present for the entire proceeding. Nifong, Himan, Gottlieb, Smith, Stotsenberg, Drummond and Dawkins, among others, all knew that Nifong, Gottlieb and Himan had unlawfully obtained the subpoenaed Duke Card Transaction Reports from Duke University

previously.  They were all aware of the subpoenas, Plaintiffs motions to quash and the hearing on the motion.  Himan (who used them to secure Grand Jury Indictments) was present at the prosecution's table for the entire hearing, and said nothing to Plaintiffs' counsel or the Court about the fact that he already had contested reports and had given them to Nifong, who was strenuously arguing against the motion to quash.

710.    At argument on the motion, Nifong only railed against the Plaintiffs, their teammates and their counsel, who were, according to Nifong, "the same attorneys that tell their clients not to talk with the investigators who are looking into this matter. …  We have history here of the students not speaking to investigators looking into this on the advice of counsel."

711.    The trial court granted Plaintiffs' Motion to Quash Nifong's Subpoena on the basis that the Duke Card Transaction Reports were FERPA protected educational records for which the State could not demonstrate a sufficient, legitimate need.

712.    For months after, Nifong, Himan, Gottlieb, Smith, Stotsenberg, Drummond, and Dawkins, among others, all knew that Nifong, Gottlieb and Himan had unlawfully obtained the subpoenaed Duke Card transaction reports from Duke University previously, yet did not notify the Plaintiffs or their counsel that the educational records that the trial court's Order protected from disclosure had already been produced to Nifong, Himan and Gottlieb by Duke University, long before the subpoenas were issued.    It was not until Plaintiffs' defense counsel's office

noticed a suspicious entry in Gottlieb's belatedly written "Supplemental Report" that Plaintiffs counsel made an inquiry with the University, and the University confirmed that it had released the Plaintiffs' Duke Card reports to Himan, Gottlieb, and Nifong two months before Nifong issued his ill-fated, post-indictment subpoenas to the University seeking federally protected educational records the University provided to him prior to indictments.

713.    Nifong persisted at the Hearing in July that "[t] here was nothing secretive, there was nothing underhanded, there was nothing suggestive about the subpoena other than the fact that we may need to have some of these young men as witnesses." The video of Nifong's remarks to the Court is digitally annexed hereto as **ATTACHMENT 25**, and may be viewed below:



## XXXI.    DUKE UNIVERSITY SHUT DOWN PLAINTIFFS' EFFORTS TO REGISTER STUDENTS TO VOTE IN NOVEMBER 7, 2006, ELECTIONS

714.    Nifong openly claimed that the Attorney General's office would get control of the continuing investigation and prosecution of the Duke lacrosse team if one of two

things happened: (1) he lost the election in November, or (2) "they pry it from [his] cold dead hands."  Nifong didn't count on the third way.

715.   It was plainly obvious that if Nifong lost the election, the continuing conspiracy to perpetuate the investigation and prosecutions based on Mangum's false accusations would fail.

### A.   Plaintiffs' Voter Registration Campaign

716.   Plaintiffs and their teammates undertook to register new voters who were registered to vote in other states but were eligible to transfer their registration to North Carolina for purposes of voting in the November 2006 general election for federal and state offices.  Some of their efforts were individual efforts; others were coordinated through a new organization named Students for an Ethical Durham ("S.E.D."), registered as a Political Action Committee ("PAC") under the shortened name: "Ethical Durham."

717.   Plaintiffs and their fellow students in the effort believed that a recall Nifong vote would come from those who, like them, were perceived to be citizens of other states, and were subjected to police harassment, including but not limited to the disproportionate enforcement of the criminal laws.  The effort began in the summer and was to culminate in a large registration effort at the Duke Homecoming gatherings on campus, particularly in and around the football stadium.

718.  In furtherance of the objective of the CMT and Nifong, among others, to force a trial on Mangum's allegations, the CMT directed University Officials, Administrators and/or staff to force the Plaintiffs and their teammates to shut down the registration effort during the Homecoming game.

719.  The voter registration efforts were done in a deliberately non-partisan way, they carried with them no partisan insignia, slogan, badge, sign, symbol, or emblem of any kind.  The slogan they handwrote on T-shirts for the Homecoming registration effort was simply, "Voice Your Choice!"

720.  Duke University regularly held open its campus for registration efforts, often allowing tables to be set up for that purpose.  In the weeks before the Homecoming game, Duke Officials allowed a registration table to be set up on one of Duke's main arteries.  The walkway connecting the Bryan Center to the Main Quad, and, further, volunteers were permitted to encourage and assist passersby who wished to register as North Carolina voters for the upcoming State and Federal elections.

721.  Similarly, Duke University allowed a group of student volunteers to register voters from a table stationed in the campout site of the Graduate Student Basketball Ticket Campout Weekend in the University's Blue Zone parking lot on September 16, 2006.

722.  Beginning on September 17, 2006, S.E.D. representatives contacted the appropriate Duke Administrators to request permission to register voters in the

"Voice Your Choice" campaign at a voter registration table inside Wallace Wade stadium during Duke Football's Homecoming Game on September 30, 2006. There would not be another opportunity to register voters at a Saturday football game before the deadline for registrations. S.E.D.'s request was denied, upon information and belief, by Members of the CMT Defendants and/or Duke Officials Defendants. The University's rationale that the University did not wish to be associated with a registration drive that could be seen as an attempt to bring new voters to the local District Attorney election. A similar request to register voters inside the stadium, but without a table, was denied on the same rationale.

723. The students responded to these rejections with grace, saying they disagreed with the judgment, would honor the Administration's refusal, and notified Administration that the students would simply continue to register as they had done, offering passersby on their own campus an opportunity to register to vote, without a centralized table or designated location.

724. On the morning of the Homecoming game, Plaintiffs and their fellow students met at the Murray Building. Wearing their shirts that read "Voice Your Choice," they collected clipboards and a stack of registration cards.

725. The students left the Murray building in waves of two and three at a time, and proceeded to their designated registration area. Within ten minutes, one of the groups—all members of the lacrosse team—had walked to the edge of the Blue

Zone parking lot when they were stopped and detained by two men in a golf cart: a University Administrator and a uniformed Duke Police officer.

726. The University's agents demanded that the students cease and desist the registration activity they had not yet started. Under the clearly implied threat of University and criminal punishment, the students abandoned their registration materials. Next, the University's agents forced the team members to take off their shirts that read "Voice Your Choice." One student said he did not want to walk home without a shirt on, and the Consortium Agents allowed him to wear his shirt—but only if he turned it inside out.

727. The same scenario played out with the students who had not even made it out of the Murray Building with their registration cards and clipboards. Other University agents found the students there preparing to go to their designated spot on campus. The Consortium Agents sealed off the only means of exiting the Murray Building and commanded the students to put their registration materials and their "Voice Your Choice" shirts in their lockers. The Agents physically blocked the doors, and warned the students they would not be allowed to leave with registration materials in their hands—or their "Voice Your Choice"—shirts on their backs.

728. The Agents inside Murray told the students that he was in direct contact with "his bosses" who were meeting at the time and monitoring his actions. According to the Agent inside Murray, the decision to shut down the registration effort was made at the "highest levels" of the University's governing structure. Upon

information and belief, the "bosses" referred to were among the CMT Defendants and Steel, and the meetings referred to were Board of Trustees meetings.

729. Fearing the consequences of violating the clear command to abandon their plans to register voters, and believing that there was no way out of Murray unless they did, the students abandoned their registration cards, their Voice Your Choice shirts, and their planned registration activities Homecoming weekend.

**B.     The University's Effort to Conceal Its Efforts to Shut Down Voter Registration Campaign**

730. On October 27, 2006, The Chronicle, reported an on-the-record interview of Defendant Burness, University Spokesperson, in an article addressing the University's interference with Plaintiffs' and their fellow students' voter registration efforts. Burness truthfully claimed that a University investigation was conducted, but falsely claimed the findings of the investigation. Burness claimed the investigation found that the students involved had failed to request permission in time. In fact, the investigation found that there was no legitimate basis for interfering with Plaintiffs' and their fellow students' registration effort in the Blue Zone parking lot; one of the candidate committees in the race for Durham County District Attorney was actively registering voters—wearing partisan insignia— inside of the stadium during the football game in the same manner that plaintiffs had requested but were prohibited from doing.

731. At the time the University's CMT quashed Plaintiffs' voter registration efforts, the election was a statistical dead heat in a two-way race, with a "spoiler" write-in

candidate siphoning off votes from the challenger, Lewis Cheek. The University allowed the write-in, "spoiler" candidate (Steve Monks) to conduct highly visible campaign activities inside of the stadium during the homecoming game. Nifong won the election with less than a majority of votes. The difference was the spoiler candidate.

## THE CLAIMS

### FIRST CAUSE OF ACTION:
### ABUSE OF PROCESS AND SEARCH & SEIZURE
### IN VIOLATION OF 42 U.S.C. § 1983

**(Against Nifong, Gottlieb, Himan, Clayton, Levicy, Arico,
and DUHS in their individual capacities)**

732.    The allegations set forth in the preceding paragraphs are incorporated herein by reference.

733.    Nifong, Gottlieb, Himan, Clayton, Levicy, Arico, and DUHS are "persons" for purposes of 42 U.S.C. § 1983, and, at all times relevant to this cause of action, acted under color of state law.

734.    Under color of state law, Gottlieb, Himan, Levicy, Arico, and DUHS, acting individually and in concert, initiated legal process directed to the Plaintiffs by applying for a Nontestimonial Identification Order ("NTID Order") directed to Plaintiffs on March 23, 2006.

735. Pursuant to N.C.G.S. § 15A-271 et seq., each Plaintiff was subjected to an NTID Order compelling each of them to present themselves to the Durham P.D. Forensics Unit and submit to cheek swabbings to obtain DNA samples, "mug shot" photographs, and photographs of their upper torso and upper extremities.

736. At the time Nifong, Gottlieb, Himan, and Clayton applied for an NTID Order from the Court, (1) there was no probable cause to believe that any of the offenses listed in the NTID Order, or any other felony, Class A1 or Class 1 misdemeanor had been committed; (2) there were no reasonable grounds to suspect that the Plaintiffs committed any such offense; and (3) the results of the specific NTID procedures to which Plaintiffs were subjected would not be of material aid in determining whether Ryan, Matt, or Breck committed any of the offenses listed in the NTID Application.

737. To obtain the NTID Order, Gottlieb, Himan, Levicy, Arico, and DUHS colluded to produce and subsequently publicly ratify and/ or falsely verify the false and sensationalized allegations made in the Affidavit to support the March 23, 2006, application for an NTID Order directed to Plaintiffs, knowing the Affidavit's material allegations were false.

738. An NTID Order was issued and directed to Plaintiffs because of the false allegations made by Gottlieb and Himan in the NTID Affidavit.

739. After obtaining the NTID Order, Nifong, Gottlieb, Addison, Himan, Clayton and/or others within the City of Durham and/or Duke University abused the

process that was issued by notifying representatives of the press of the existence of the NTID Order compelling Plaintiffs and all of their white teammates to present themselves to the Durham PD Forensics Unit at 4:00 p.m. on March 23, 2006, so that they would be present to photograph their arrival and report on the scandalous false allegations contained in the NTID.

740.   Subsequently, in their public statements and in not-for-attribution statements to the media, Nifong, Gottlieb, Himan, Clayton, Addison, Levicy, Arico, and DUHS falsely ratified, verified, and/or condoned the sensationalized false statements made in the NTID Affidavit, in order to galvanize the public outrage that they had initiated in procuring mass publicity of the false allegations contained in the NTID.

741.   Nifong, Gottlieb, Himan, Clayton, Addison, Levicy, Arico, and DUHS's actions were malicious and evinced a callous disregard for and deliberate indifference to Plaintiffs' constitutional rights.

742.   As a result of the wrongful NTID Order, Plaintiffs were seized, subjected to public humiliation and condemnation and deprived of their rights under Article IV of the United States Constitution and the First, Fourth, Fifth, Sixth, and Fourteenth Amendments thereto.

743.   As a direct and foreseeable consequence of these deprivations, Plaintiffs have suffered loss of education, loss of privacy, loss of property, loss of liberty, physical harm, emotional trauma, and irreparable harm to their reputations, and

economic loss, including but not limited to the costs of retaining counsel, forensic experts, investigators and others in order to defend themselves against the false claims and fabrication of evidence throughout the 13-month police investigation of Mangum's claims, as both witnesses and putative defendants in a subsequent prosecution of 'accomplices' to the alleged sexual assault.

## SECOND CAUSE OF ACTION:
## DEPRIVATION OF RIGHT TO REPORTS OF DNA TEST RESULTS IN VIOLATION OF 42 U.S.C. § 1983 and CONSPIRACY

### (Against Nifong, Gottlieb, Himan, Meehan, Clark, and DNASI)

744. The allegations set forth in the preceding paragraphs are incorporated herein by reference.

745. Nifong, Gottlieb, Himan, Meehan, Clark, and DNASI are "persons" for purposes of 42 U.S.C. § 1983, and, at all times relevant to this cause of action, acted under color of state law.

746. Pursuant to N.C.G.S. § 15A-271 et seq., each of the Plaintiffs had been the subject of NTID procedures in which they provided DNA samples pursuant to an Order of the court. On that basis, each of the Plaintiffs was entitled under state law to be provided with reports of the results of any test conducted with their DNA test results as soon as the reports [were] available.

747. Under state law, Plaintiffs were entitled to a report of the SBI Lab test results, showing that no DNA from Plaintiffs was present on the rape kit items, when

those results were formally conveyed to Nifong on March 30, 2006, if not earlier when the SBI Lab informally conveyed the preliminary lab test results to Himan and to Nifong on or before March 28, 2006.

748. On or before March 30, 2006, the SBI Lab made available to Nifong, Gottlieb, and Himan the SBI Serology Unit's reports of its testing, which revealed that there was no male genetic material belonging to Ryan, Matt, or Breck, or any other member of the lacrosse team on any of the rape kit items, including the vaginal swab and smear, the rectal swab and smear, the cheek scrapings, and the stains on the rape kit panties. Plaintiffs were entitled to receive those same reports when they were made available, on or before March 30, 2006. Plaintiffs did not receive any report of the results of the SBI Lab's testing until April 10, 2006.

749. Further, on April 10, 2006, the following results of DNASI's testing were made available to Nifong, Gottlieb, and Himan:

(1)     DNASI testing revealed the presence of at least 5 different sources of male DNA were present in swabs from Mangum's rape kit, and

(2)     DNASI found at least two male sources of DNA in the sperm fraction of Stain "A" on Mangum's rape kit panties, and, with 100% scientific certainty, DNASI concluded that Ryan, Matt, and Breck did not match any of those male sources of DNA;

(3)     DNASI found at least four male sources of DNA in the epithelial fraction of Stain "A" on Mangum's rape kit panties, and, with 100% scientific

275

certainty, DNASI concluded that Ryan, Matt, and Breck did not match any of those male DNA sources of DNA;

(4)     DNASI found at least one male source of DNA in the sperm fraction of the rectal swab in Mangum's rape kit, and, with 100% scientific certainty, DNASI concluded that Ryan, Matt, and Breck did not match that male source of DNA;

(5)     DNASI found at least two male sources of DNA in the epithelial fraction of Stain "B" on Mangum's rape kit panties, and, with 100% scientific certainty, DNASI concluded that Ryan, Matt, and Breck did not match any of those male sources of DNA;

(6)     DNASI found at least two male sources of DNA in the epithelial fraction of Stain "D" on Mangum's rape kit panties, and, with 100% scientific certainty, DNASI concluded that Ryan, Matt, and Breck did not match any of those male sources of DNA; and

(7)     DNASI also concluded that Plaintiffs' teammates, as well as all of Mangum's known recent sexual partners, did not match any of the male sources of DNA detailed above.

750.    On April 10, 2006, the foregoing test results were made available to Nifong, Gottlieb, and Himan, and, that same day, instead of requesting a written report, Nifong, Gottlieb, and Himan drove to Burlington to receive the report of DNASI's test results orally.

751.  On April 10, 2006, Ryan, Matt, and Breck had a statutory right to a report of each of the foregoing test results.  Nevertheless, DNASI, Meehan, Nifong, Gottlieb, and Himan conspired and agreed to delay any report of DNASI's results to Plaintiffs until after the Primary election on May 2, 2006, and, then, they conspired and agreed not to report the foregoing test results to Plaintiffs at all.

752.  DNASI and Meehan created a report that—by its  design—excluded exculpatory test results.

753.  By conspiring to issue reports of DNASI's testing that—by design—excluded the results of all of the tests conducted with Plaintiffs' DNA, DNASI, Meehan, Nifong, Gottlieb, and Himan intentionally withheld reports to which Plaintiffs were entitled by virtue an affirmative, clearly established right created by North Carolina law, an express and/ or implied order of the Court, and the Fourteenth Amendment to the United States Constitution.

754.  DNASI, Meehan, Nifong, Gottlieb, and Himan's actions and conduct evinced a reckless and callous disregard for, and deliberate indifference to, Plaintiffs' constitutional rights.

755.  As a result of Defendant's conduct, Plaintiffs were deprived of their rights under Article IV of the United States Constitution as well as the First, Fourth, Fifth, and Sixth Amendments thereto.

756.  As a direct and foreseeable consequence of these deprivations, Plaintiffs have suffered loss of education, loss of privacy, loss of property, loss of liberty,

physical harm, emotional trauma, and irreparable harm to their reputations, and economic loss, including but not limited to the costs of retaining counsel, forensic experts, investigators and others in order to defend themselves against the false claims and fabrication of evidence throughout the 13-month police investigation of Mangum's claims, as both witnesses and putative defendants in a subsequent prosecution of 'accomplices' to the alleged sexual assault.


### THIRD CAUSE OF ACTION:
### DEPRIVATION OF RIGHT TO REPORTS OF PHOTO IDENTIFICATION TEST RESULTS IN VIOLATION OF 42 U.S.C. § 1983

### (Against Nifong, Gottlieb, Himan, and Clayton in their individual capacities)

757. The allegations set forth in the preceding paragraphs are incorporated herein by reference.

758. Nifong, Gottlieb, Himan, and Clayton are "persons" for purposes of 42 U.S.C. § 1983, and, at all times relevant to this cause of action, acted under color of state law.

759. Pursuant to N.C.G.S. § 15A-271 et seq., each of the Plaintiffs had been the subject of NTID procedures in which they provided DNA samples pursuant to an Order of the court. On that basis, each of the Plaintiffs were entitled under state law to reports of the results of any test conducted with their "mug shot" photographs obtained pursuant to the NTID Order "as soon as the reports [were] available."

760. On April 4th Gottlieb and Clayton administered identification procedures conducted with the "mug shots" of Ryan, Matt, and Breck obtained in the NTID procedures.

761. While not required to perfect their affirmative right to a report of the results of those NTID procedures, Plaintiffs' defense counsel sent a letter to Nifong that clearly asserted Plaintiffs' claim of their statutory right to a report of the results of any identification procedures in which Plaintiffs' NTID mug shots were used, pursuant to N.C.G.S. § 15A-282. Nifong received Plaintiffs' counsel's demand letter on April 6, 2006.

762. The results of the April 4th identification procedures were available on April 4, 2006, in the form of a DVD recording of the entire procedure, which could have easily been duplicated and delivered to Plaintiffs the same day.

763. Under state law, Plaintiffs were entitled to a copy of the DVD recording of the April 4th identification procedure on April 4, 2006. However, Nifong, Gottlieb, Himan and Clayton did not produce to Plaintiff the results of the April 4, 2006, identification procedures until April 21, 2006, after they were used to indict Collin Finnerty and Reade Seligmann.

764. Among other things, the willful and unjustified delay in producing the results of the April 4th identification procedures concealed from Plaintiffs and their teammates evidence that Mangum's identifications were unreliable. Further, Mangum expressed 100% certainty that Finnerty and Seligmann were her

attackers.  Plaintiffs' defense counsel had already assimilated irrefutable digital evidence that Finnerty and Seligmann had no opportunity to commit the violent sexual assault alleged because they were demonstrably elsewhere at the relevant time.  She also appeared to make a qualified identification of Matt Wilson, whose counsel had already compiled irrefutable digital evidence proving that Matt also had no opportunity to commit the crimes alleged because he, too, was elsewhere at the relevant time.  Additionally, Ryan McFadyen, would not have been defenseless in the unprecedented vilification of him that transpired the next day when Judge Stephens unsealed the search warrant for his dorm room; Mangum did not recognize him at all.

765.   Nifong, Gottlieb, Himan and Clayton colluded to deny Plaintiffs of their right to those results by concealing even the fact that the identification procedures even occurred until March 21, 2006, well after Finnerty and Seligmann were indicted and long after Ryan McFadyen was subjected to national vilification and condemnation.

766.   Nifong withheld the explosive identification procedure results from April 4, 2006, to April 21, 2006, in order to continue subjecting Plaintiffs to public condemnation, humiliation and obloquy until he could indict Finnerty and Seligmann, and fabricate a false and misleading DNA result of testing on Mangum's acrylic fingernails (produced on April 21, 2006) that Nifong claimed to

the media corroborated Mangum's bogus identification of David Evans; all in order to secure his election in the May 2nd primary.

767. Nifong, Gottlieb, Himan, and Clayton knowingly and intentionally failed to provide Plaintiffs with a report of the April 4, 2006, identification procedures, to which each Plaintiff had a constitutionally protected property right under the Fifth and Fourteenth Amendment and North Carolina Law.

768. Nifong, Gottlieb, Himan, Clark, Meehan and DNASI's conduct evinced a reckless and callous disregard for and deliberate indifference to Plaintiffs' constitutional rights.

769. As a result of Defendant's conduct, Plaintiffs were deprived of their rights under Article IV of the United States Constitution as well as the First, Fourth, Fifth and Sixth Amendments thereto.

770. As a direct and foreseeable consequence of these deprivations, Plaintiffs have suffered loss of education, loss of privacy, loss of property, loss of liberty, physical harm, emotional trauma, and irreparable harm to their reputations, and economic loss, including but not limited to the costs of retaining counsel, forensic experts, investigators and others in order to defend themselves against the false claims and fabrication of evidence throughout the 13-month police investigation of Mangum's claims, as both witnesses and putative defendants in a subsequent prosecution of 'accomplices' to the alleged sexual assault.

## FOURTH CAUSE OF ACTION:
## FALSE PUBLIC STATEMENTS IN VIOLATION OF 42 U.S.C. §1983

**(Against Addison, Nifong, Hodge, Wilson, the City of Durham, Meehan, Clark, DNASI, Levicy, Arico, Dzau, DUHS, Steel, Brodhead, Burness, and Duke University, in their individual capacities)**

771.   The allegations set forth in the preceding paragraphs are incorporated herein by reference.

772.   Addison, Nifong, Hodge, Wilson, the City of Durham, Meehan, Clark, DNASI, Levicy, Arico, Dzau, DUHS, Steel, Brodhead, Burness, and Duke University, are "persons" for purposes of 42 U.S.C. § 1983.

773.   Under color of law, Addison, Nifong, Hodge, Wilson, Arico, Dzau, DUMC, Steel, Brodhead and Burness, and Duke University, acting individually and in concert, made consciously parallel false and misleading public statements about and relating to the Plaintiffs and the investigation and prosecution of Mangum's false accusations.   These Defendants public statements all were intended to and did vilify Plaintiffs as suspects and establish the public's presumption of their guilt, in reckless disregard of their innocence.

774.   Beginning in March 2006 and continuing through January 11, 2007, Addison, Nifong, Hodge, Wilson, the City of Durham, Meehan, Clark, Levicy, Arico, Dzau, DUMC, Steel, Brodhead and Burness, and Duke University Nifong, Hodge, Michael and Addison made, condoned, ratified, and/or acquiesced in various public statements of and concerning the Plaintiffs as suspects and the police investigation of them.   By way of example :

(1)     Addison publicly stated to an audience of millions of people, among other

       things, that:

    (a)     The horrific, brutal gang rape described in the fabricated NTID

         Affidavit did, in fact, occur at the party held at 610 N. Buchanan;

    (b)     The Plaintiffs and their teammates were criminally culpable for the

         gang rape, either as principals or as accomplices;

    (c)     The Plaintiffs' and their teammates were obstructing justice by

         covering up for one another and creating "Stone Wall of Silence" as

         a team;

    (d)     That the Plaintiffs refused to cooperate with authorities, which

         forced the Durham Police to obtain an NTID Order in order to

         determine which three team members of were the principals in the

         crimes (the remainder being the accomplices);

    (e)     That "the attackers" left substantial genetic material that was

         collected in by Levicy in Mangum's SAE, and that DNA testing

         would reveal who among the team members were "the attackers;"

         and

    (f)     Addison encouraged the untold millions watching him to imagine

         that their own daughter was violently gang raped by the lacrosse

         team, in order to galvanize public outrage against the team members.

(2)     Nifong falsely stated, among other things, that:

(a)     Three members of the Duke lacrosse team had committed a vicious, racially-motivated gang rape;

(b)     Mangum had identified Plaintiffs as her assailants;

(c)     There was substantial physical evidence that corroborated Mangum's horrific allegations;

(d)     The evidence left "no doubt" a rape occurred;

(e)     The team members' decision to seek the advice of counsel suggested their guilt;

(f)     Those members of the Duke lacrosse team who were not principals in the gang rape were accomplices to it, for which the punishments were equivalent; and

(g)     The members of the Duke lacrosse team were actively covering up their culpability in the crime by "hiding behind the Fifth Amendment" and erecting a "Stone Wall of Silence."

(h)     Plaintiffs and other members of the Duke lacrosse team were "a bunch of hooligans" engaged in a "stonewall of silence";

(i)     None of the members of the lacrosse team "has been enough of a man to come forward."

(j)     The team members had subsumed their allegiance to the team beneath their obligations to society and the Durham community;

(k)     The absence of DNA results could be explained by condom use during the alleged assault;

(l)     None of the facts that Nifong knew as of June 19, 2006 raised any doubt that a rape might not have occurred; and

(m)     Based on the results of medical evidence obtained by Duke University in the SANE exam, there was no question that a rape occurred.

(3)     Theresa Arico falsely stated, among other things, that the medical evidence obtained in the SANE exam corroborated Mangum's claim that she was violently gang raped.

(4)     Steel, Brodhead, Burness and other members of the CMT made similar false statements to representatives of the media, often on the condition that the statements not be attributed to them.   The CMT members developed a set of false statements or "talking points" that the CMT members repeatedly asserted to representatives of the media and others almost verbatim ("the CMT Talking Points").   Among other things, the CMT Talking Points, included the following, false statements:

(a)     "We know far more than you know about what happened in that house [610 N. Buchanan]."

(b)     What happened in the house was worse than what has been reported.

(c)     The team members were capable of the kind of horrific violence alleged; and

(d)     None of the team members "leaned against the spirit of the moment" to intervene in the horrible acts taking place.

(5)     Duke University faculty members made a multitude of false public statements that were consistent with one another to the media and in their own published writings expressly written in their capacity as faculty members of Duke University, including but not limited to:

(a)     Professor Baker's ranting letters, television interviews and emails excoriating team members as "white, violent, drunken men . . . veritably given license to rape, maraud, deploy hate speech," who "claim innocence …, safe under the cover of silent whiteness," whose "violence and raucous witness injured [a black woman] for life," who were emblems of "abhorrent sexual assault, verbal racial violence;"

(b)     Professor Chafe's essay associating Plaintiffs with the racist mob that dragged Emmit Till to the noose and other historical atrocities visited upon African Americans; and

(c)     Professor John Huston's "lecture to his History class, attended by lacrosse players, that he began by" falsely asserting a number of "facts" he claimed to be privy to, including the "fact" that "we know

a rape occurred in the house" because, "among other things, semen was found in the a bathroom;"

(d)     Professor Lubiano's claim that lacrosse players were "almost perfect offenders" because they were "exemplars of the upper end of the class hierarchy, the politically dominant race and ethnicity, the dominant gender, the dominant sexuality, and the dominant social group on campus;" and

(e)     The faculty-sponsored, full page advertisement encouraging and even thanking those who presumed guilt "for not waiting" to express their outrage publicly.

(6)     Hodge ratified and condoned Addison's false statements with his own public statements, including his April 11, 2006, statement that the police investigation had produced a "strong case" in support of Mangum's false accusation.  The body of evidence Hodge was referring to was, in fact, far worse than it was when Nifong reviewed it and concluded, "we're f*****d."

(7)     Graves falsely stated that the rape had, in fact, occurred, and made other public statements that that supported and ratified Addison's false statements, or condoned them by failing to speak, that the rape Mangum falsely claimed had, in fact, occurred.

775. Addison, Nifong, Hodge, Wilson, the City of Durham, Meehan, Clark, DNASI, Levicy, Arico, Dzau, DUMC, Graves, Steel, Brodhead and Burness, and Duke University's false statements, including the Nifong, DUKE SANE and Durham Police Statements, were published through the local, national, and international media, with the intent to convey these false statements to a world-wide audience.

776. The false statements were intended to create, galvanize and then sustain the public's outrage at the Plaintiffs and to establish a presumption of their guilt until those sentiments were rife in the Durham community, from which the grand and petit juries would be selected to sit in judgment on Plaintiffs and their teammates, in order to deprive Plaintiffs and their teammates of a fair trial and/or peremptorily impeach their character and credibility as defense witnesses.

777. The defendants' statements so eviscerated the presumption of innocence that a reputable newspaper published a column on March 27, 2006, entitled "Team's Silence is Sickening," which began,

> *Members of the Duke men's lacrosse team: You know.*
>
> *We know you know.*
>
> *Whatever happened in the bathroom at the stripper party gone terribly terribly bad, you know who was involved. Every one of you does.*
>
> *And one of you needs to come forward and tell the police.*

778. Further, many of the Duke University Defendants named herein, particularly the CMT Defendants, continued to make these false statements and/or condoned the

similarly malicious false statements of their subordinates, long after they were aware that Mangum's accusations were false. Upon information and belief, these Defendants continued to make false public statements and/or condone those of their subordinates in furtherance of an agreement, understanding and conspiracy to impeach the credibility of the Plaintiffs and otherwise prejudice putative jurors in any civil action(s) brought by Plaintiffs against the Defendants.

779. These Defendants' conduct evinced a reckless and callous disregard for, and deliberate indifference to, Plaintiffs' constitutional rights.

780. Defendant's conduct deprived Plaintiffs of their rights under Article IV of the United States Constitution and the First, Fourth, Fifth and Sixth and Fourteenth Amendments thereto.

781. As a direct and foreseeable consequence of these deprivations, Plaintiffs have suffered loss of education, loss of privacy, loss of property, loss of liberty, physical harm, emotional trauma, and irreparable harm to their reputations, and economic loss, including but not limited to the costs of retaining counsel, forensic experts, investigators and others in order to defend themselves against the false claims and fabrication of evidence throughout the 13-month police investigation of Mangum's claims, as both witnesses and putative defendants in a subsequent prosecution as 'accomplices' to the same crimes.

## FIFTH CAUSE OF ACTION:
## MANUFACTURE OF FALSE INCULPATORY EVIDENCE
## IN VIOLATIONOF 42 U.S.C. § 1983

### (Against Nifong, Gottlieb, Himan, Clayton, Wilson, DNASI, Clark, Meehan, Levicy, Arico, Duke University Medical Center, Bryan, Moneta, Steel, and the Crisis Management Team)

782. The allegations set forth in the preceding paragraphs are incorporated herein by reference.

783. Nifong, Gottlieb, Himan, Clayton, Wilson, DNASI, Clark, Meehan, Levicy, Arico, Duke University Medical Center, Bryan, Moneta, Steel and the Crisis Management Team are "persons" for purposes of 42 U.S.C. § 1983, and, at all times relevant to this cause of action, acted under color of law.

784. Under color of law, Nifong, Gottlieb, Himan, Levicy, Arico, the PDC, DUHS and Duke University, acting individually and in concert, conspired to fabricate inculpatory forensic medical evidence to corroborate Mangum's claims and/or to conform the forensic medical evidence to the existing and/or expected evidence in the case. These Defendants engaged in overt acts in furtherance of this conspiracy, including, for example, the fabrication of the SANE interview of Mangum, the falsification of the SAER to conform it to the existing and/or expected evidence by scratching out a contemporaneous note and replacing it with a completely different note to conform the record of Mangum's responses to (1) the presence of semen on a towel seized by police, and (2) the presence of semen on the floor of the bathroom, among other things. These Defendants conspired to

fabricate forensic medical evidence for use by Nifong, Gottlieb, and Himan in securing search warrants, NTID Orders, access to Plaintiffs email accounts, and other investigative process that requires a showing of probable cause or reasonable suspicion; for use in securing indictments against Plaintiffs and their teammates (as principals or as accomplices to the same crimes), and, in due course, securing convictions of Plaintiffs and their teammates, either as principals or accessories.

785.    Under color of law, Nifong, Gottlieb, Himan, Wilson, and Baker, acting individually and in concert, abused their police and law enforcement authority to intimidate witnesses favorable to the defense in an effort to coerce them to abandon their exculpatory accounts of the events or fabricate false statements to falsely corroborate existing and/or expected evidence in the case.    These defendants engaged in these unlawful acts in order to secure search warrants, orders compelling NTID procedures, authorizing access to Plaintiffs email accounts, and other investigative court orders and/or legal process that require a showing of probable cause or reasonable suspicion; in order to secure indictments against Plaintiffs and their teammates (as principals or as accomplices to the same crimes), and, in due course, the convictions of Plaintiffs and their teammates, either as principals or accessories.

786.    Under color of law, Nifong, Gottlieb, Himan, Wilson, and Baker, acting individually and in concert, designed an identification procedure in violation of G.O. 4077 that was—by its design—intended to facilitate the misidentification of

three members of the lacrosse team, knowing that the identifications would be used to secure court orders authorizing searches and seizures of Plaintiffs, subjecting Plaintiffs to NTID procedures, authorizing access to Plaintiffs email and other private accounts, and other investigative court orders and/or legal process directed to Plaintiffs that require a showing of probable cause or reasonable suspicion; in order to secure indictments against Plaintiffs and their teammates (as principals or as accomplices to the same crimes); and, in due course, to obtain convictions of Plaintiffs and their teammates, either as principals or accessories, in the crimes Mangum falsely alleged.

787.   Under color of law, Nifong, Gottlieb, Himan, Clark, Meehan, and DNASI, acting individually and in concert, conspired to produce a DNA report that included a false and misleading report of a probative "match" between plaintiff's non-indicted teammate and a "crime scene fingernail." The report falsely claims this match is "probative" or inculpatory; the "crime scene fingernail" does not contain even a cell of genetic material belonging to Crystal Mangum. To facilitate the fabrication, the report fails to address the required "conclusion" that the crime scene fingernail also match Mangum. These defendants fabricated this evidence with the specific intention to intimidate Plaintiffs' non-indicted teammate and prevent him from authenticating the photographic evidence that was the foundation of the digital alibis for Plaintiffs and all of their teammates who attended the party.

788.  As a result of Defendants' conduct, each of the Plaintiffs was deprived the rights guaranteed to each of them under the North Carolina Statutes, as well as the First, Fourth, Fifth, Sixth and Fourteenth Amendments to the United States Constitution.

789.  The conduct of Nifong, Gottlieb, Himan, Meehan and Clark was done maliciously and with a reckless and callous disregard for and deliberate indifference to plaintiffs' constitutional and statutory rights.

790.  As a result of the wrongful manufacture and fabrication of inculpatory evidence, each Plaintiff was deprived of his rights guaranteed to them by Article IV of the United States Constitution, and the First, Fourth, Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.

791.  As a direct and foreseeable consequence of these deprivations, Plaintiffs have suffered loss of education, loss of privacy, loss of property, loss of liberty, physical harm, emotional trauma, and irreparable harm to their reputations, and economic loss, including but not limited to the costs of retaining counsel, forensic experts, investigators and others in order to defend themselves against the false claims and fabrication of evidence throughout the 13-month police investigation of Mangum's claims, as both witnesses and putative defendants in a subsequent prosecution as 'accomplices' to the same crimes.

## SIXTH CAUSE OF ACTION:
## CONCEALMENT OF EXCULPATORY EVIDENCE
## IN VIOLATION OF 42 U.S.C. § 1983

### (Against Nifong, Gottlieb, Himan, Meehan, Clark, Wilson, Hodge
### and DNASI in their Individual Capacity)

792.     The allegations set forth in the preceding paragraphs are incorporated herein by reference.

793.     Nifong, Gottlieb, Himan, Meehan, Wilson, Hodge, Clark and DNASI "persons," as that term is used in the text of 42 U.S.C. § 1983, and, at all times relevant to this cause of action, acted under color of law.

794.     Nifong, Gottlieb, Himan, Meehan, Wilson, Hodge, Clark, and DNASI acting individually and in concert, concealed evidence of Plaintiffs' and their teammates' actual innocence under color of law.

795.     Nifong, Gottlieb, Himan, Meehan, and Clark conspired to produce a report of the DNA test results that would—by its design—systematically and completely conceal from Plaintiffs, their counsel and the Court convincing evidence that Mangum's allegations were, in fact, total fabrications.

796.     Nifong, Gottlieb, Himan, Meehan, and Clark knowingly and intentionally concealed critical exculpatory DNA evidence and expert reports to which Plaintiffs were entitled under, *inter alia*, N.C.G.S. §15A-282, various Orders of the Court, Article IV and the Fourteenth Amendment to the United States Constitution, and North Carolina Law.

797. On April 10, 2006, Nifong, Gottlieb, and Himan were advised by Meehan, Clark and DNASI that multiple male sources of DNA were found in Mangum's rape kit, that DNASI had tested each of the Plaintiffs' DNA to determine whether their DNA matched the unknown male sources, and that DNASI had concluded with 100% scientific certainty that Ryan, Matt, and Breck, or any other lacrosse team member matched any DNA found in Mangum's rape kit.

798. Ryan Matt and Breck were entitled to a report of those test results as soon as they were available to Nifong, Gottlieb and Himan—April 10, 2006. Instead of complying with the NTID statue, however, Nifong, Gottlieb, Himan, Meehan, and Clark knowingly and intentionally concealed those results until Nifong's primary election had passed, and, on May 12, 2006, produced to Plaintiffs a report that Defendants falsely held out to be a report of every test conducted with each Plaintiffs' DNA samples. The May 12, 2006 DNASI Report—by its design—concealed the results of numerous tests conducted with Plaintiffs' DNA, and, by concealing those results, also concealed the fact of multiple unidentified male sources of DNA in Mangum's rape kit that did not match any of her known recent sexual partners.

799. Nifong, Gottlieb, Himan, Meehan, and Clark continued to conceal the exculpatory DNA evidence until the eve of the General Election in November to ensure that the conspiracy was not revealed until Nifong was elected to the office from which he could prosecute Plaintiffs and their teammates.

800. When a court Order compelled these Defendants' to produce the exculpatory information they chose not to simply amend the report to include the exculpatory test results. Instead, they only raw data to Plaintiffs' indicted teammates, a move that was calculated to stall the revelation of multiple unknown sources of male DNA in the rape kit indefinitely if possible, but at least until the polls closed on November 7, 2006.

801. Along the way, Nifong, Clark, Gottlieb, Himan, Meehan, Wilson, and DNASI intentionally withheld notes memorializing Meehan's multiple oral reports that he gave to Nifong, Himan and Gottlieb during their meetings on April 10, April 21 and May 12, in addition to other conversations and meetings conducted by various means among them.

802. The Defendants withheld the notes and memorializations of the results of DNASI's testing, to which Plaintiffs were entitled as they were of an concerning test results with Plaintiffs' DNA samples, in violation of North Carolina law and the Constitution of the United States.

803. As a result of the Defendants' agreement to continue to conceal the existence of substantive discussions regarding the existence of unidentified male DNA in the rape kit, the public contempt for Plaintiffs that was generated by the Nifong, Addison, and Hodge statements were perpetuated.

804. As a result of falsely claiming that "a match" was found in the DNASI testing of the lacrosse players' DNA, the public contempt for Plaintiffs, originally caused by

the Nifong, Addison and Hodge Statements, increased geometrically as the public was falsely led to believe that there was DNA evidence consistent with Mangum's false allegations.

805.    The conduct of Nifong, Gottlieb, Himan, Meehan, and Clark shows a reckless and callous disregard for, and deliberate indifference to, Plaintiffs' constitutional rights.

806.    Defendant's conduct deprived Plaintiffs of their rights under Article IV of the United States Constitution as well as the First, Fourth, Fifth and Sixth Amendments thereto.

807.    As a direct and foreseeable consequence of these deprivations, Plaintiffs have suffered loss of education, loss of privacy, loss of property, loss of liberty, physical harm, emotional trauma, and irreparable harm to their reputations, and economic loss, including but not limited to the costs of retaining counsel, forensic experts, investigators and others in order to defend themselves against the false claims and fabrication of evidence throughout the 13-month police investigation of Mangum's claims, as both witnesses and putative defendants in a subsequent prosecution as 'accomplices' to the same crimes.

## SEVENTH CAUSE OF ACTION:
## CONSPIRACY IN VIOLATION OF 42 U.S.C. § 1983
## (INTERFERING WITH RIGHT TO ENGAGE IN POLITICAL PROCESSES)

**(Against Nifong In His Individual Capacity; The Policymakers, Durham Supervising Defendants, Durham Police, Duke Police, Duke Supervising Defendants, And Duke University Officials, all in their Individual and Official Capacities)**

808.    The allegations set forth in the preceding paragraphs are incorporated herein by reference.

809.    Nifong, the Policymakers, the Durham Supervising Defendants, Durham Police, Duke Police, Duke Supervising Dependents, and Duke Officials (in their individual and official capacities) are "persons," as that term is used in the text of 42 U.S.C. § 1983.

810.    Under color of state law, Nifong, the Durham Supervising Defendants, Durham Police, Duke Police, Duke Supervising Defendants, and Duke Officials conspired and entered into express and/or implied agreements, understandings, or meetings of the minds among themselves to facilitate Nifong's election in the November 7, 2006, General Election by interfering with and depriving Plaintiffs of their First Amendment rights to participate in the electoral process and voter registration efforts in the weeks prior to the General Election on November 7, 2006.

811.    In furtherance of the agreement Duke University Officials and Administrators acting on behalf of Duke University confronted Plaintiffs and their teammates as they were preparing to register students to vote on their own campus during

Homecoming weekend. The University Officials and Administrators, some accompanied by uniformed police officers, commanded the lacrosse team members, under color of law, to abandon their registration efforts, surrender their voter registration forms, and take off their shirts, which read only "Voice Your Choice." At the same time, the "spoiler" write-in candidate for District Attorney, Steve Monks, actively campaigned and registered voters within the stadium itself.

812. These Defendants' conduct evinced a reckless and callous disregard for, and deliberate indifference to, Plaintiffs' First Amendment rights.

813. As a result of these Defendant's conduct deprived Plaintiffs of their rights under Article IV of the United States Constitution as well as the First, Fourth, Fifth and Sixth Amendments thereto.

814. As a direct and foreseeable consequence of these deprivations, Plaintiffs have suffered loss of education, loss of privacy, loss of property, loss of liberty, physical harm, emotional trauma, and irreparable harm to their reputations, and economic loss, including but not limited to the costs of retaining counsel, forensic experts, investigators and others in order to defend themselves against the false claims and fabrication of evidence throughout the 13-month police investigation of Mangum's claims, as both witnesses and putative defendants in a subsequent prosecution as 'accomplices' to the same crimes.

**EIGHTH CAUSE OF ACTION:**
**RETALIATION IN VIOLATION OF 42 U.S.C. §1983**

**(Against the Policymakers, Nifong, Addison, Brodhead, Burness, Steel, Lange, the Duke University Police Department, Duke University, the Durham Police Department, and the City of Durham)**

815.    The allegations set forth in the preceding paragraphs are incorporated herein by reference.

816.    Nifong, Addison, Brodhead, Burness, Steel, Lange, the Duke University Police Department, Duke University, the Durham Police Department, and the City of Durham are "persons" as that term is used in the text of 42 U.S.C. § 1983, and at all relevant times were acting under color of state law.

817.    Acting under color of law Nifong, Addison, Gottlieb, Himan, the CMT Defendants, the CMT Defendants and Duke University faculty members under their supervision and control, acting individually and in concert, retaliated against Plaintiffs for exercising their rights under the First, Fifth, Sixth and Fourteenth Amendment by generating, galvanizing and sustaining public outrage directed at the Plaintiffs and their teammates; by making false public statements about Plaintiffs' character and prior conduct; by entirely new University committees to conduct public investigations of Plaintiffs and their teammates' and publish defamatory "investigation" reports that draw false and unsupportable conclusions from unreliable data about Plaintiffs' and their teammates' conduct; and their teammates' history of "deplorable" conduct; staged public rallies and protests

against Plaintiffs; impeached their character in public statements and in "not for attribution" statements to representatives of the press; harass, humiliate, intimidate, and subject Plaintiffs and their teammates to public condemnation in retaliation for their continuing assertion of constitutional rights (real or perceived) in the investigation.

818. Under color of law, Nifong, Gottlieb, Himan, Clayton, and the Durham Police Supervising Defendants retaliated against Plaintiffs for exercising their constitutional rights in the investigation of Mangum's false accusations by depriving plaintiffs of their statutory right, pursuant to N.C.G.S. 15a-271 *et seq.*, to reports of the results of the results of any tests conducted with the DNA samples and photographs Plaintiffs provided in the NTID procedures.

819. Under color of law, Nifong, Gottlieb, and Himan, acting individually and in concert, retaliated against Plaintiffs for exercising their constitutional rights by causing court orders to be issued based upon fabricated worn Affidavits to the Court, including, but not limited to, the March 23rd NTID Order and the March 27th Search Warrant, and after which they engaged in overt acts in furtherance of conspiracies to use the process to accomplish a purpose or purposes for which the process was not intended.

820. Under color of law, Nifong, Gottlieb, Levicy, Arico, Manly, the PDC, Dzau, DUHS and Duke University, acting individually and in concert, retaliated against Plaintiffs for their exercise of their First, Fifth, Sixth and Fourteenth Amendment

rights by concealing forensic medical proof of Plaintiffs' and their teammates' actual innocence acquired in Mangum's Sexual Assault Exam ("SAE"); fabricating false and misleading forensic medical opinion evidence; falsifying forensic medical documents including, *inter alia*, Mangum's SAER documents by, among other things, striking truthful entries in the SAER that were made contemporaneously with the SAE, and replacing them with false, misleading and fabricated entries in the SAER in order to conform the forensic medical evidence to other known and/or expected evidence; and by fabricating the written report of Mangum's SANE interview in order to conform it to the account of events given in Gottlieb's and Himan's fabricated NTO Affidavit.

821. Under color of law, Nifong, Gottlieb, Himan, and Clayton, acting individually and in concert, retaliated against Plaintiffs for exercising their constitutional rights by abusing their law enforcement powers to intimidate witnesses, including Plaintiffs, who had personal knowledge of facts that established Plaintiffs' and their teammates' innocence, and coercing several witnesses to make false statements to corroborate their own fabricated account of the events.

822. The Defendants actions evinced a reckless and callous disregard for, and deliberate indifference to Plaintiffs' constitutional rights.

823. As a result of Defendants' conduct, each of the Plaintiffs was deprived of his rights under Article IV of the United States Constitution, and the First, Fourth, Fifth and Fourteenth Amendments thereto.

824.    As a direct and foreseeable consequence of these deprivations, Plaintiffs have suffered loss of education, loss of privacy, loss of property, loss of liberty, physical harm, emotional trauma, and irreparable harm to their reputations, and economic loss, including but not limited to the costs of retaining counsel, forensic experts, investigators and others in order to defend themselves against the false claims and fabrication of evidence throughout the 13-month police investigation of Mangum's claims, as both witnesses and putative defendants in a subsequent prosecution as 'accomplices' to the same crimes.

## NINTH CAUSE OF ACTION:
### *MONELL* LIABILITY FOR VIOLATIONS OF 42 USC § 1983

**(Against the Durham Police Supervisors in their Official Capacities, the Duke Police Supervisors in their Official Capacities, Baker, in his Official Capacity, Nifong, in his Official Capacity but only with Respect to the Durham Police and Duke Police, the CMT Defendants in their Official Capacities, Duke University and the City of Durham)**

825.    The allegations set forth in the preceding paragraphs are incorporated herein by reference.

826.    The Durham Police Supervisors in their Official Capacities, the Duke Police Supervisors in their Official Capacities, Baker, in his Official Capacity, Nifong, in his Official Capacity but Only With Respect to the Durham Police and Duke Police, the CMT Defendants in their Official Capacities, Duke University and the City of Durham, (collectively referred to in this Cause of Action as the "*Monell* Defendants") are "persons" pursuant to 42 U.S.C. § 1983.

827. At all times relevant to this action the *Monell* Defendants were acting under color of state law.

**A.    The *Monell* Defendants' Established "Zero Tolerance" Policy of Subjecting Duke Students to Disproportionate Enforcement of the Criminal Laws**

828. Upon information and belief, the *Monell* Defendants and others with final policy making authority over Duke Police and Durham Police had enacted a "Zero Tolerance for Duke Students" policy or custom, pursuant to which police disproportionately and unconstitutionally enforced the criminal laws against Duke Students.   For example, pursuant to the Zero Tolerance Policy, police were encouraged, authorized and/or instructed to:

(1)    execute warrantless raids of Duke students' homes in the absence of exigent circumstances, including, for example, the "Back to School Operations,"

(2)    physically and verbally abuse Duke students under circumstances where "permanent residents" were not so abused;

(3)    intentionally deprive Duke students of their rights during police investigations involving Duke Students, where the rights of similarly situated "permanent residents" were honored;

(4)    target Duke students for grossly disproportionate enforcement of the criminal laws in police decisions to charge, to arrest and incarcerate, and to require bail, where similarly situated "permanent residents" would not be

subjected to such enforcement, and in contravention of Duke Police Department and Durham Police Department General Orders and Standard Operating Procedures.

829. To a reasonable policymaker, it would be clear that the foregoing established policy or custom constituted a deprivation of the constitutional rights of Duke Students, and would lead to the deprivation of Plaintiffs' constitutional rights.

830. Nevertheless, the *Monell* Defendants crafted jointly the unconstitutional policy and the unconstitutional manner in which it was pursued by their subordinates, particularly Gottlieb.

831. As a direct and foreseeable consequence of the *Monell* Defendants' policy decisions, Plaintiffs were deprived of their rights under Article IV of the United States Constitution and First, Fourth, Fifth, Sixth and Fourteenth Amendments thereto.

**B. The Established Policy or Custom Authorizing Duke Police Officers and Durham Police Officers, in collusion with CrimeStoppers, to Publish Incendiary Public Statements, Posters, Leaflets, and other Communications Precipitately Asserting the Guilt of Suspects.**

832. Upon information and belief, the *Monell* Defendants and others with final policy making authority over Duke Police and Durham Police had an established policy or custom authorizing Duke Police and Durham Police, in collusion with Defendant Addison acting in his official capacity as spokesman of the Durham Police Department, to publish incendiary public statements, emails sent to an email list maintained by the City of Durham, posters, leaflets and other

communications in which statements presuming the guilt of suspects before the facts of the matter are or could be known, resulting in the public condemnation and humiliation of the accused.

833. The *Monell* Defendants acquiesced in, condoned and/or approved of this established policy or custom.

834. Pursuant to the policy or custom of the Duke Police Department and the Durham Police Department, Defendants Gottlieb, Nifong Addison, Hodge, and Graves made public statements beginning on March 24, 2006, in which they asserted the official conclusion of Durham and Duke police investigators that Mangum had been raped, sexually assaulted, and kidnapped, every member of the lacrosse team were principals or accessories to it the crimes; and every member of the lacrosse team was obstructing justice by refusing to "come forward" to confess their involvement in, or knowledge about, an assault that, in fact, never happened. These acts, pursuant to the same policy or custom, were done in retaliation against Plaintiffs for the exercise of their constitutional rights. In furtherance of the retaliatory motive, Defendants produced and distributed "Wanted" posters asserting conclusively that Mangum's false accusations actually happened, and that Plaintiffs and their teammates were principals and accomplices in the "horrific crime" that "sent shock waves through our community."

835. Defendant Graves and Defendant Hodge were among the Duke Police Supervising Defendants and Durham Police Supervising who themselves engaged in the

wrongful conduct they condoned as custom or authorized as policy. Hodge and Graves both made their statements knowing or deliberately indifferent to the evidence made available to them that Mangum's accusations were false.

836. To a reasonable policymaker, it would be clear that the foregoing established policy or custom constituted a deprivation of the constitutional rights of Duke Students, and would lead to the deprivation of Plaintiffs' constitutional rights.

837. Nevertheless, the *Monell* Defendants crafted jointly the unconstitutional policy and the unconstitutional manner in which it was pursued by their subordinates, particularly Gottlieb.

838. As a direct and foreseeable consequence of the *Monell* Defendants' policy decisions, Plaintiffs were deprived of their rights under Article IV of the United States Constitution and First, Fourth, Fifth, Sixth and Fourteenth Amendments thereto.

**C.  Officials with Final Policymaking Authority for Durham Police and for Duke Police Approved of Nifong's and Their Other Subordinates' Unconstitutional Conduct.**

839. Upon information and belief, the *Monell* Defendants and other Duke University and City of Durham officials having final policymaking authority over Durham Police and Duke Police had knowledge—through their respective chains of command and/or the Duke-Durham Joint Command established for the investigation of Mangum's claims, and/or from their respective employees, and/or from other non-traditional mass media sources—that Nifong, Wilson, Gottlieb and

Himan, Addison, Michael, Duke faculty members, Duke Administrators and others over whom they had final policymaking authority were individually and in collusion with one another:  unlawfully retaliating against plaintiffs and their teammates for exercising their Constitutional rights, for publicly declaring their innocence, and because of their status (actual or perceived) as citizens of other states; concealing DNA evidence that demonstrated Mangum's accusations were false; concealing identification evidence that eliminated every member of the team as a plausible potential suspect and manufacturing inculpatory identification evidence to falsely claim otherwise;  concealing forensic medical SANE evidence that proved no sexual assault occurred, and fabricating inculpatory forensic medical evidence to falsely claim otherwise; intimidating witnesses—including Plaintiffs—who had information tending to prove Mangum's accusations were false; otherwise interfering with Plaintiffs' rights to give evidence and participate in the judicial proceedings by, *inter alia*, publicly impeaching their character, threatening them with prosecution as accomplices in the absence of evidence to do so, subjecting them to public condemnation, scorn, disgrace, obloquy, and contempt; publicly declaring Plaintiffs' guilt as accessories or principals in Mangum's false accusations, while concealing evidence that proved their innocence.

840. To a reasonable policymaker, it would have been clear that the foregoing conduct constituted a deprivation of Plaintiffs' constitutional rights, and that such conduct would lead to further deprivations of Plaintiffs' constitutional rights.

841. Nevertheless, the *Monell* Defendants approved of and ratified the unconstitutional conduct of their subordinates.

842. As a direct and foreseeable consequence of the *Monell* Defendants policy decisions, Plaintiffs were deprived of their rights under Article IV of the United States Constitution and the First, Fourth, Fifth, Sixth and Fourteenth Amendments thereto.

843. Upon information and belief, the Duke Supervising Defendants and other officials at Duke University and the Duke Police nevertheless agreed to, approved, and ratified this unconstitutional conduct by Nifong, Wilson, and their other subordinates.

844. As a direct and foreseeable consequence of these policy decisions, Plaintiffs were deprived of their rights under the First, Fourth, Fifth, Sixth and Fourteenth Amendments to the United States Constitution.

**D.    Officials with Final Policymaking Authority Failed to Exercise Adequate Supervising Responsibility over Gottlieb.**

845. Upon information and belief, as of March 13, 2006, the Policymakers were aware of Gottlieb's documented history of disproportionate, malicious, spiteful abuse of his police powers in the administration of criminal laws against Duke students, as well as his documented history of Gottlieb's pattern of using excessive force,

309

fabricating evidence and filing false reports in cases involving Duke students. Upon information and belief, they were also aware that Gottlieb knew he had been transferred off of the patrol beat in District 2 because of his documented history showing he was a danger to Duke students. Further, However, upon information and belief, the Duke Police Supervising Defendants and Durham Police Supervising Defendants were aware of the policy, that Duke and Durham police officers, particularly Sgt. Gottlieb, pursed it aggressively by, *inter alia*, his selective and malicious prosecutions of Duke students, his excessive use of force against Duke students, his abuse of the warrant process in matters involving Duke students, the manufacturing of false evidence to implicate Duke students, and his filing false police reports against Duke students. Further, the *Monell* Defendants had contemporaneous knowledge of the fact that Sgt. Gottlieb:

(1)     Openly demonstrated his contempt for Duke students by verbally and physically abusing them;

(3)     Reflexively abused his police authority in his enforcement of the criminal laws against Duke students; and

(3)     Exhibited a proclivity for bearing false witness against Duke University students that he falsely accused of crimes.

846.    The Durham Police Supervising Defendants other officials in the City of Durham and the Durham Police Department consistently failed to take adequate or

meaningful steps to discipline Gottlieb, correct his behavior, or terminate his employment.

847.   By these omissions, and by allowing him to supervise the investigation of Mangum's false allegations against 47 Duke students, these officials endorsed and ratified Gottlieb's unconstitutional conduct, established a custom or practice of targeting Duke University students for harsh or disproportionate treatment, or established a custom and practice of failing to correct the unconstitutional conduct of Durham Police officers in their dealings with Duke students.

848.   To a reasonable policymaker, it would have been clear that the decision to allow Gottlieb to supervise the investigation of Mangum's false accusations would lead to the same and other deprivations of Plaintiffs' constitutional rights.

849.   Nevertheless, the CMT, Duke Police Supervising Defendants, the Durham Police Supervising Defendants, and other officials in the City of Durham and the Durham Police Department, assigned Gottlieb to supervise the investigation of Mangum's false allegations, knowing, consciously disregarding, and/or deliberately indifferent to the likelihood that their decision to do so would result in violations of Plaintiffs' constitutional rights.

850.   As a direct and foreseeable consequence of these policies and official actions, Plaintiffs were deprived of their rights under the First, Fourth, Firth and Fourteenth Amendments to the United States Constitution.

E.     **After Policymakers Gave Gottlieb Final Policymaking Authority Over the Duke Police Investigation of Mangum's False Accusations, Gottlieb Directed Officers to Engage in Constitutional Violations.**

851.   On or about March 16, 2006, the Durham Police Supervising Defendants, the Duke Police Supervising Defendants and other officials with final policymaking authority within Duke University and the City of Durham, agreed that Duke Police would relinquish to Gottlieb the primary responsibility to initiate and conclude an investigation of Mangum's false accusations of rape and sexual assault.

852.   On or about the same day, Duke Police Supervising Defendants instructed Duke Police investigators to take their direction from Gottlieb regarding the Duke Police investigation of Mangum's false accusations, rather than the usual Duke Police chain of command and protocols, and, further, that Duke Police officers and investigators involved in Gottlieb's investigation should report to Duke Police Department's senior command staff on all developments in the investigation.

853.   By relinquishing control over the investigation of Mangum's claims to Gottlieb, and by instructing Duke officers to take direction from Gottlieb, instead of the usual chain of command and investigative protocol, Duke University, the Duke Police Supervising Defendants, and the Duke Police Department delegated to Gottlieb final policymaking authority over the investigative decisions and procedures implemented by the Duke Police Department as well as the Duke Police Department's personnel involved in Gottlieb's continuing investigation.

854. Gottlieb, acting pursuant to that delegated authority from Duke University and the City of Durham, implemented investigative policies and engaged in investigative conduct that violated universally applied General Orders, Standard Operating Procedures, and other rules and regulations of both the Durham Police Department and Duke Police Department. Among other things, Gottlieb coordinated the fabrication of forensic medical evidence with Tara Levicy and others; concealed the exculpatory results of photo identification procedures; concealed exculpatory descriptions given by Mangum; conspired with others to coerce fabricated inculpatory witness statements from Kim Pittman, Jarriel Johnson, Brian Taylor and Crystal Mangum; launched an unprecedented media campaign subject Plaintiffs and their teammates to public condemnation and obloquy in retaliation for their constitutionally protected decision not to be interrogated by him or those he supervised; repeatedly attempted to push the provocative details of the allegations into the media; repeatedly published assertions that Mangum's false accusations had, in fact, occurred for the purpose of galvanizing media attention and public outrage at Plaintiffs and their teammates; published or caused to be published fabricated false allegations in the NTID Affidavit that were designed to galvanize the public outrage directed at Plaintiffs and their teammates; and orchestrated an identification procedure that violated G.O. 4077 and that he knew was calculated to obtain identifications of three team members from among the 46 lacrosse team members he knew were all innocent.

855.  Gottlieb implemented these policies and engaged in that conduct knowing or deliberately indifferent to the likelihood that they would result in violations of Plaintiffs' constitutional rights.

856.  The Duke Police Supervising Defendants and the Durham Police Supervising Defendants and other officials in Duke University and the City of Durham, also knew or were deliberately indifferent to the likelihood that Gottlieb's investigative policies and conduct would result in violations of Plaintiffs' constitutional rights; nevertheless, they ratified Gottlieb's investigative policies and his conduct in the investigation of Mangum's false accusations.

857.  As a direct and foreseeable consequence of Gottlieb's investigative policies and conduct, Plaintiffs were deprived of their rights under Article IV of the United States' Constitution, as well as the First, Fourth, Fifth, Sixth and Fourteenth Amendments thereto.

**F.    Those with Final Policymaking Authority Failed to Adequately Supervise Nifong.**

858.  On or before March 24, 2006, the Duke Police Supervising Defendants, the Durham Police Supervising Defendants and other officials with final policymaking authority within Duke University and the City of Durham agreed, understood and colluded to allow Nifong to control and direct the Duke Police investigation into Mangum's false accusations.  Further, they agreed that the Duke Police Supervising Defendants would direct Duke police officers and investigators to cease all direct activity in the investigation, except as Nifong or Gottlieb

directed them to act.  Further, they agreed to direct the Duke Police Supervisors to take all steps necessary to abandon the its jurisdictional responsibility to investigate Mangum's claims, and, further to conceal all evidence that Duke Police had primary jurisdiction over the investigation.   Finally, they agreed to direct the Duke Police Supervisors to take all necessary steps to ensure that Duke police officers and investigators did not intervene to thwart the conspiracy to violate the civil rights of Plaintiffs' and their teammates.

859.   Before the Duke Police Department and the Durham Police Department ceded their policymaking and supervising authority over the investigation of Mangum's false allegations to Nifong, the Policymaking Defendants, and other officials with final policymaking authority over the City of Durham and Duke University, had actual or constructive knowledge that Nifong and those who would be directed by him were incapable of investigating the allegations fully or fairly.  This should include for example:

   (1)   Nifong had no experience or training in directing a complex investigation of a sexual offense or the use of advanced forensic techniques available in 2006;

   (2)   Nifong was in the midst of an election campaign against a bitter personal and professional rival, Freda Black, in which, he was hopelessly trailing in the polls and fundraising, largely due to a large disparity in name

recognition; and, further, that Nifong's campaign lacked the financial means to bridge the name recognition gap at the time.

(3)     Nifong's behavior historically was unstable and irrational, and, like Gottlieb, Nifong was known to harbor resentment, malice, and ill-will for Duke University and its students.

(4)     Due to the inexperience of Gottlieb and Himan, there would be no check on Nifong's decisions.  For example:

(a)     Himan's assignment as "lead investigator" of Mangum's allegations violated the established, written rules and criteria governing the assignment of cases because, *inter alia*, Inv. Himan was not an investigator in the CID's Sexual Crimes Unit, he was a property crimes investigator; Himan had roughly two months experience as property crimes investigator at all, and no experience as a rape case investigator.   Inv. Himan had no knowledge of forensic DNA testing, forensic SANE procedures and eyewitness identification procedures.

(b)     Likewise, Gottlieb's assignment as "supervisor" of the investigation of Mangum's allegations violated the written rules and criteria on assignments of such cases; Gottlieb was not an investigator or supervisor in the CID's violent crimes unit; Gottlieb had been a supervisor in District 2's investigations division for roughly two

weeks; Gottlieb appeared to have investigated one rape case to its conclusion in his career; and, further, Gottlieb had the penchant for abusing Duke students described above.

860. Soon after the decision to allow Nifong to commandeer the investigation, Nifong began making historically unprecedented public statements broadcast by local and national media outlets, that clearly violated the cannons of ethics because they subjected plaintiffs to heightened public condemnation and were clearly in retaliation for their (actual or perceived) exercise of constitutional rights. At the inception of taking over the investigation, Nifong publicly claimed to national and international audiences that, *inter alia*, (1) Mangum was brutally gang raped at a lacrosse team party; (2) the three principals in the gang rape were members of the Duke lacrosse team; (3) the non-principals were accessories to the crime(s) and may be charged as such; and (4) the team was "covering up" and "stonewalling" the investigation. Nifong made these claims contemporaneously with the decision to cede complete control over the police investigation to him, despite the obvious effect these false assertions would have on his direction of the investigation, namely, to put it on an inexorable course to establish the guilt of Plaintiffs and their teammates (as principals or accomplices), as opposed to a search for the truth.

861. Collectively, adequate scrutiny of the facts and circumstances available at the time, would have made it plainly obvious to a reasonable policymaker that the

decision to allow Nifong to direct this investigation—and these investigators—would lead to the deprivation of Plaintiffs' constitutional rights. Nevertheless, the Duke Police Supervising Defendants and the Durham Police Supervising Defendants, as well as other officials with final policymaking authority in Duke University and the City of Durham allowed Nifong to direct the investigation, knowing or deliberately indifferent to the likelihood that their decision would result in the deprivation of Plaintiffs' constitutional rights.

G.  **After Nifong Was Given Final Policymaking Authority Over the Duke Police Investigation, Nifong Directed Police and Private Actors in Collusion With Them to Violate Plaintiffs' Constitutional Rights.**

862. After permitting Nifong to control the investigation, the Duke Police Supervising Defendants, the Durham Police Supervising Defendants, and others officials with final policymaking authority in the City of Durham and Duke University obtained actual or constructive knowledge that Nifong was acting and directing the investigation in a manner that, to a reasonable policymaker, would obviously result in violations of constitutional rights, including unprecedented public statements made by Nifong and Addison; the incendiary false allegations made in the NTID Affidavit, the willful and continuing failure to provide plaintiffs with a written report of the results of all tests conducted with their DNA, in violation of N.C.G.S. § 15A-282; the fabrication and misrepresentation of DNA evidence associated with the fingernails of the false accuser, and the concealment of DNA evidence that proved Plaintiffs' innocence; the willful concealment of powerful

exculpatory identification evidence produced in the March identification procedures, and the intentional fabrication of false identification evidence in the April 4th identification procedure; the harassment, humiliation and intimidation of material witnesses who had personal knowledge of facts that would prove Plaintiffs' and their teammates' innocence; among other acts and directives.

863.  When all of these and other foreseeable deprivations did, in fact occur, no remedial or corrective action was taken by the Duke Police Supervising Defendants or the Durham Police Supervising Defendants.  Neither the Duke Police Supervising Defendants, the CMT, nor the Durham Police Supervising Defendants intervened; instead, they callously disregarded or willfully ignored Nifong's misconduct, which was playing out before them in historical dimensions.

864.  The Policymakers, the Duke Police Supervising Defendants and the Durham Police Supervising Defendants acquiesced in and condoned Nifong's arrogation of the police investigation of Mangum's allegations, despite knowing, recklessly disregarding and/or deliberately indifferent to the likelihood that their decisions would result in violations of Plaintiffs' constitutional rights.

865.  As a direct and foreseeable consequence of these policy decisions, Plaintiffs were deprived of their rights under Article IV of the United States Constitution and the First, Fourth, Fifth and Fourteenth Amendments thereto.

866.  Upon information and belief, the Duke Police Supervising Defendants, Durham Police Supervising Defendants, and other officials with final policymaking

authority within Duke University and the City of Durham ratified Nifong's investigative policies and conduct.

867. As a direct and foreseeable consequence of these investigative policies and actions, Plaintiffs were deprived of their rights under Article IV of the United States Constitution, and the First, Fourth, Fifth, Sixth and Fourteenth Amendments thereto.

868. As a direct and foreseeable consequence of these deprivations, Plaintiffs have suffered loss of education, loss of privacy, loss of property, loss of liberty, physical harm, emotional trauma, and irreparable harm to their reputations, and economic loss, including but not limited to the costs of retaining counsel, forensic experts, investigators and others in order to defend themselves against the false claims and fabrication of evidence throughout the 13-month police investigation of Mangum's claims, as both witnesses and putative defendants in a subsequent prosecution as 'accomplices' to the same crimes.

## TENTH CAUSE OF ACTION:
## SUPERVISORY LIABILTIY FOR VIOLATIONS OF 42 U.S.C. § 1983

**(Against Duke Police Supervising Defendants, Duke Officials Defendants, Durham Supervising Defendants, in their Individual Capacities; and the City of Durham and Duke University)**

869. The allegations set forth in the preceding paragraphs are incorporated herein by reference.

870. Duke Police Supervising Defendants, Duke Officials Defendants, Durham Police Supervising Defendants, in their individual capacities, and the City of Durham and Duke University are "persons" within the meaning of 42 U.S.C. § 1983.

A. **The Durham Police Supervising Defendants and the Durham Police Supervising Defendants' Failure to Supervise the Investigation Caused the Violations of Plaintiffs' Constitutional Rights.**

871. On or about March 16, 2006, the Duke Police Department delegated its "primary responsibility" to initiate and conclude an investigation of Mangum's claims to a known rogue officer, M.D. Gottlieb. With the acquiescence or approval of the Durham Police Supervising Defendants and Duke Police Supervising Defendants, Gottlieb assumed Duke Police Department's primary responsibility for the police investigation into Mangum's false allegations.

872. While ceding authority to direct the investigation, Duke Police Supervising Defendants required Duke police officers to collaborate with and report directly to Gottlieb, the Duke police officers were also required to report back to the Duke Police chain of command all information relating to the investigation as it evolved. The Duke Police chain of command, in turn, was required to report the same information to the CMT Defendants.

873. During the course of the Gottlieb-controlled investigation, Gottlieb and Himan, in collusion with Duke University Defendants, individually and in concert, engaged in investigative abuses, including the fabrication of false testimonial evidence, concealment of exculpatory identification evidence, making false statements to the

public and to the media, and abuse of the NTID Order process, including but not limited to making false and sensationalized documents for public consumption in the documents supporting the application for an NTID Order.

874. On or about March 24, 2006, the Duke Police Department re-delegated its "primary responsibility" to initiate and conclude an investigation of Mangum's claims to Nifong. They agreed to and/or acquiesced in Nifong's arrogation to himself of complete control over the investigation of Mangum's accusations despite having overwhelming evidence that (1) Mangum's claims were false, and, (2) even if believed, every member of the Duke lacrosse team was excluded as a possible "attacker."

875. Subsequent to Nifong's assumption of control over the investigation, Duke Police Supervising Defendants and Durham Police Supervising Defendants both required their respective police officers to collaborate with and report directly to Nifong, but, at the same time, required those officers to report all information relating to the investigation as it evolved back to their chain of command.

876. During the Nifong-directed investigation, Nifong, Gottlieb, Wilson, Himan, and various Duke University Defendants, acting individually and in concert, engaged in a number of investigative abuses, including retaliating against Plaintiffs and their teammates for the exercise (real or perceived) of constitutional rights; intimidating Plaintiffs, their teammates, and other witnesses who would be necessary to establish the fact that the sexual assault Mangum alleged never

occurred; the manufacture of false forensic medical and DNA evidence; the secretion of exculpatory evidence; the fabrication of identification evidence and the secretion of exculpatory identification evidence, and the deliberate disregard of safeguards designed to prevent negligent and intentional misidentifications in photo identification procedures.

877. The Durham Supervising Defendants and Duke Police Supervising Defendants knew, or should have known, about these abuses, but failed to take meaningful preventative or remedial action.

878. The Durham Supervising Defendants and Duke Police Supervising Defendants actions evinced a reckless and callous disregard for, and deliberate indifference to, Plaintiffs' constitutional rights.

879. As a direct and foreseeable consequence of these investigative policies and actions, Plaintiffs were deprived of their rights under Article IV of the United States Constitution, and the First, Fourth, Fifth, Sixth and Fourteenth Amendments thereto.

880. As a direct and foreseeable consequence of these deprivations, Plaintiffs have suffered loss of education, loss of privacy, loss of property, loss of liberty, physical harm, emotional trauma, and irreparable harm to their reputations, and economic loss, including but not limited to the costs of retaining counsel, forensic experts, investigators and others in order to defend themselves against the false claims and fabrication of evidence throughout the 13-month police investigation of

323

Mangum's claims, as both witnesses and putative defendants in a subsequent

prosecution of 'accomplices' to the alleged sexual assault.

**B.** **The Failure of the Durham Supervising Defendants and the Duke Police Supervising Defendants to Control and Supervise Gottlieb Led to Violations of Plaintiffs' Constitutional Rights.**

881.  When Gottlieb assumed control of the investigation, his proclivity for abusing the

criminal laws and investigative powers in matters involving Duke students was

well documented and well known.  The details of Gottlieb's history were readily

available, in distilled form, to the Duke Police Supervising Defendants and

Durham Police Supervising Defendants. Among other things, the information

available showed that Gottlieb frequently—and predictably—used excessive force,

abused his arrest powers, filed false and fabricated charges, and fabricated

evidence in cases involving Duke students.

882.  The Duke Supervising Defendants and the Durham Supervising Defendants knew

or should have known about Gottlieb's history with Duke students, but failed to

take adequate remedial action.  Further, they should have known that Gottlieb's

assignment to this investigation violated Duke's and Durham's written protocol

for the assignment of investigations.   In particular, the Duke Supervising

Defendants and the Durham Supervising Defendants knew or should have known

that Gottlieb's assignment to this case violated written criteria for the assignment

of supervisors to investigations of complex or serious crimes, in that they are to be

assigned to supervisors with significant experience, particular expertise, and a host

of other criteria that Gottlieb could not plausibly meet with his brief experience in that position

883. In light of Gottlieb's history of abusing Duke students, and his lack of experience or training to supervise the investigation of Mangum's allegations, the Duke Supervising Defendants and the Durham Supervising Defendants acted recklessly when they transferred the Supervision of the investigation to Gottlieb, and when they agreed that the Duke Police Department would abdicate its jurisdictional responsibility to initiate and conclude an investigation of Mangum's claims.

884. The Duke Police Supervising Defendants and the Durham Police Supervising Defendants' actions and decisions evinced a reckless and callous disregard for and deliberate indifference to the Plaintiffs constitutional rights.

885. As a direct and foreseeable consequence of the foregoing acts and decisions, Plaintiffs were deprived of their rights under Article IV of the United States Constitution, and the First, Fourth, Fifth, Sixth and Fourteenth Amendments thereto.

886. As a direct and foreseeable consequence of these deprivations, Plaintiffs have suffered loss of education, loss of privacy, loss of property, loss of liberty, physical harm, emotional trauma, and irreparable harm to their reputations, and economic loss, including but not limited to the costs of retaining counsel, forensic experts, investigators and others in order to defend themselves against the false claims and fabrication of evidence throughout the 13-month police investigation of

Mangum's claims, as both witnesses and putative defendants in a subsequent prosecution of 'accomplices' to the alleged sexual assault.

C. **The Durham Supervising Defendants' Failure to Train, Control, and Supervise Addison Led to Violation of Plaintiffs' Constitutional Rights.**

887. In March 2006, Addison was the official spokesperson of the Durham Police Department, the coordinator of the Durham CrimeStoppers program, and the communications liaison to the Duke Police Department.

888. Both prior to placing Addison in those roles, the Durham Supervising Defendants and Duke Police Supervising Defendants demonstrated reckless or callous indifference to the rights of potential criminal suspects by failing to educate or train Addison in the Durham Police Department's General Orders or the limits that the constitution, statutes, common law and rules of ethics place upon his public statement and his position generally.

889. Further, while acting in those roles, Addison demonstrated a consistent pattern of publishing statements with conclusory statements relating to the existence of a crime and/or the guilt of suspects, before the facts were established.

890. In March and April 2006, Addison, acting in his role as spokesman for the Durham Police Department, Durham Police liaison to the Duke Police Department, and a representative of Durham CrimeStoppers, published a series of inflammatory statements expressing the Department's official conclusion that Mangum had been raped, sodomized, sexually assaulted, and kidnapped by members of the Duke lacrosse team. In addition, Addison, repeatedly expressed

the Department's official view that Plaintiffs and other members of the Duke lacrosse team were obstructing justice by failing to confess their knowledge of or involvement in the alleged assault on Crystal Mangum. Further, Addison made these statements—knowing he had no factual basis for them—in retaliation against Plaintiffs and their teammates for the exercise of their First, Fifth and Fourteenth Amendment rights.

891. The Durham Supervising Defendants knew or should have known about these statements and/or Addison's propensity to make inflammatory, prejudicial statements like them, and to retaliate against suspects who exercise their constitutional rights, but demonstrated a reckless disregard or deliberate indifference by failing to take prompt and meaningful preventative or remedial action.

892. In fact the Supervising Defendants and CMT Defendants compounded Addison's abuses by making similar, conclusory statements relating to the crime and the participation of Plaintiffs' and their teammates in it, when they knew or should have known from information available to them that such statement were false.

893. The Duke Police Supervising Defendants and the Durham Police Supervising Defendants' actions and decisions evinced a reckless and callous disregard for and deliberate indifference to the Plaintiffs constitutional rights.

894. As a direct and foreseeable consequence of the foregoing acts and decisions, Plaintiffs were deprived of their rights under Article IV of the United States

Constitution, and the First, Fourth, Fifth, Sixth and Fourteenth Amendments thereto.

895. As a direct and foreseeable consequence of these deprivations, Plaintiffs have suffered loss of education, loss of privacy, loss of property, loss of liberty, physical harm, emotional trauma, and irreparable harm to their reputations, and economic loss, including but not limited to the costs of retaining counsel, forensic experts, investigators and others in order to defend themselves against the false claims and fabrication of evidence throughout the 13-month police investigation of Mangum's claims, as both witnesses and putative defendants in a subsequent prosecution as 'accomplices' to the same crimes.

**D. The Durham Police Supervising Defendants' Failure to Train, Control, and Supervise Defendant Michael led to Violations of Plaintiffs' Constitutional Rights.**

896. In March 2006, Michael was the Public Communications Officer for the Durham Police Department and the coordinator of the Durham CrimeStoppers program

897. During her tenure as Police Communications coordinator, Michael demonstrated a consistent pattern of publishing false and misleading statements relating to evidence in active investigations and of willfully failing to preserve audio and communications evidence under her control.

898. The Durham Supervising Defendants demonstrated reckless or callous indifference to the rights of potential criminal suspects by failing to take meaningful action to correct this conduct.

899. The Durham Supervising Defendants knew or should have known that Defendant Michael:

(1)     Released Pittman's inflammatory 911 call to the media, and then, for weeks, falsely claimed that Durham Police did not know who the anonymous caller was, despite the fact that Officer Shelton stated in his report that the 911 call was made by Pittman, Pittman told Himan on March 22, 2006 that she made the call, and then Pittman wrote it in her statement as well.   In furtherance of the ongoing conspiracy to create a racist dimension to the false accusations, Michael misrepresented the identity of the first 911 caller as an anonymous caller and not the accuser or her co-worker, Pittman.

(2)     Deliberately concealed from the public and Plaintiffs' counsel the CAD reports and dispatch audio recordings relating to the incident (despite repeated requests for them pre-indictments), and, further, that the concealed CAD reports and dispatch audio recordings revealed:

(3)      the present-sense impressions of numerous police officers who interacted with Mangum in the early morning hours of March 14, 2006, conveying that, based on their interactions with Mangum, they did not believe that Mangum had been sexually assaulted; and

(4)     The events that took place when Mangum was taken to ACCESS that caused Mangum to respond to the Nurse's questions by writing the names

of her children in response to the ACCESS nurse's questioning and to nod "yes" when asked if she had been raped;

(5) Gottlieb's "adoption" of the case from Inv. Jones, as well as, according to Gottlieb, the large majority of his "investigative notes," which he claimed he had "radioed in" as he went along; and

(6) All of the dispatch and officer exchanges relating to Mangum's behavior, her conflicting accounts on March 14, 2006, and other, unrevealed meetings and activities in the investigation from March 14, 2006 through January 11, 2007.veracity due to Defendant Michael's failure to preserve or take steps to preserve

900. The Durham Police Supervising Defendants' actions and decisions with respect to Michael evinced a reckless and callous disregard for and deliberate indifference to the Plaintiffs constitutional rights.

901. As a direct and foreseeable consequence of the foregoing acts and decisions, Plaintiffs were deprived of their rights under Article IV of the United States Constitution, and the First, Fourth, Fifth, Sixth and Fourteenth Amendments thereto.

902. As a direct and foreseeable consequence of these deprivations, Plaintiffs have suffered loss of education, loss of privacy, loss of property, loss of liberty, physical harm, emotional trauma, and irreparable harm to their reputations, and economic loss, including but not limited to the costs of retaining counsel, forensic

experts, investigators and others in order to defend themselves against the false claims and fabrication of evidence throughout the 13-month police investigation of Mangum's claims, as both witnesses and putative defendants in a subsequent prosecution as 'accomplices' to the same crimes.


## ELEVENTH CAUSE OF ACTION:
## CONSPIRACY IN VIOLATION OF 42 U.S.C. § 1983

**(Against Nifong in his Individual Capacity and in his Official Capacity with Respect to the Durham Police and the City of Durham; and against Wilson, the DNASI Defendants, the Duke University Defendants, and the City of Durham Defendants in their Individual and Official Capacities)**

903.    The allegations set forth in the preceding paragraphs are incorporated herein by reference.

904.    Nifong, Wilson, the DNASI Defendants, the Duke University Defendants, and the City of Durham Defendants are "persons," within the meaning given that term under 42 U.S.C. § 1983.

905.    Under color of law, Nifong, Wilson, the DNASI Defendants, the Duke University Defendants, and the City of Durham Defendants conspired and entered into express and/or implied agreements, understandings, or meetings of the minds among themselves and others to deprive Plaintiffs of their constitutional rights by retaliating against Plaintiffs for exercising their First and Fifth Amendment rights, publicly excoriating their character and that of their teammates, falsely claiming a they and their teammates had history of deplorable conduct, and by charging and

331

prosecuting the three innocent Duke lacrosse players on charges of rape, sexual assault, and kidnapping, which these Defendants knew were not supported by probable cause.

906. These Defendants participated in the conspiracy by engaging in overt acts with the intent to further some unlawful purpose of the conspiracy or with the intent to further some lawful purpose of the conspiracy by unlawful means, including, by way of example:

(1) Obtaining search warrants, the March 23rd NTID Order and other process without probable cause by knowingly presenting the Court with sworn affidavits and statements containing fabricated, false allegations, and condoning the acquisition of those orders and other process with fabricated sworn statements;

(2) Making false public statements to vilify Plaintiffs at the apex of their vulnerability in the criminal justice system; convening University "ad hoc" committees for purposes of unearthing accounts and other evidence of historical misconduct alleged to have been committed by Plaintiffs and their teammates as a rogue prosecutor is threatening indictments of every team member as principals and accomplices in crimes that never occurred; provide those investigative committees with skewed, unreliable data designed to generate an official statement from the Committee damning the conduct of Plaintiffs and their teammates conduct as "deplorable" among

other entirely unsupportable conclusions, despite substantial evidence inconsistent with such conclusions; willfully refusing to be presented with irrefutable evidence of innocence concerning Plaintiffs and every member of the team in order to perpetuate the public condemnation, continue waging a collaborative media campaign to peremptorily impeach the credibility of Plaintiffs and their teammates at a time when they are all putative defendants and witnesses for the defense;

(3)     Continuing the investigation of Plaintiffs, or condoning or directing the continuation of it, long after it has been established that (1) the complaining witness is not credible for a host of compelling reasons; (2) the complaining witness is incapable of reciting the same account of events twice; and (3) the complaining witness did not recognize any of the Plaintiffs at all two days after the party; and (4) the complaining witness' descriptions ruled out 11 members of the team, and her failure to identify one of the remaining 36 as an "attacker" in the six March photo arrays.

(4)     Depriving, or condoning or directing the deprivation of Plaintiffs' statutory right to reports of the results of all DNA tests and all identification procedures conducted with the DNA samples or mug shot photographs that police obtained pursuant to the March 23rd NTID Order, as soon as the results were available, and condoning the deliberate deprivation of Plaintiffs right to those reports;

(5) Manufacturing misidentifications of Plaintiffs and their teammates as perpetrators or as accomplices to a crime that did not occur;

(6) Manufacturing the complaining witness's recollection testimony about details of certain individuals at the party by providing her with photographs containing those details for her to recite during the identification procedures in an effort to conceal the fact that the complaining witness has no significant recollections from the evening in question, and could not reliably recollect those team members who were actually present at the party, all to avoid suppression of the only identification evidence that was available in the absence of any DNA identification evidence (i.e., the victim's identification testimony);

(7) Participating in the DNA conspiracy to manufacture false and misleading DNA evidence, and the conspiracy to conceal the powerful exculpatory findings made by DNASI through Y-plex technology;

(8) Manufacturing false testimonial evidence by intimidating, harassing and threatening defense witnesses with criminal legal process, criminal prosecution, and revocation of probationary status; intimidating, harassing and threatening police witnesses who interacted with Mangum at DUMC on March 14, 2006; and ignoring other witnesses known to have powerful exculpatory evidence based upon their interactions with Mangum, including but not limited to, Mangum's UNC primary providers, Mangum's

psychiatrists who attended to her during involuntary commitments and in outpatient treatments, and others who have personal knowledge of Mangum's psychotic episodes, her clinical unreliability, and her drug seeking propensities.

(9)     Fabricating false forensic medical evidence; falsifying forensic medical records, and concealing the overwhelming forensic medical evidence of innocence.

(10)   Agreeing to present the foregoing false and misleading evidence to the Grand Jury to obtain indictments on April 17, 2006, and May 12, 2006.

(11)   Fabricating false evidence to close gaps in the evidence, to avoid the proof of innocence, and otherwise frame Plaintiffs and their teammates as principals and/or accomplices in the crimes charged in the Grand Jury's indictments, including but not limited to Gottlieb's transparent fabrication of notes of Mangum's description of her "attackers" that contradicts Himan's contemporaneous handwritten notes, and Wilson's "interview" of Mangum in which he brought pictures of the defendants in the criminal case in anticipation of a hearing on their motion to suppress Mangum's identifications of them, and to create a new timeline of events with Mangum that Wilson, Nifong, Gottlieb and Himan (incorrectly) believed avoided the irrefutable digital evidence that proved Plaintiffs and their teammates innocent.

(12)    Abdicating jurisdictional responsibilities to initiate and conclude an investigation of Mangum's false allegations;

(13)    Making false statements to the Superior Court of Durham County and the Plaintiffs' defense counsel in an effort to conceal the unlawful conspiracy.

(14)    Destroying, condoning or directing the destruction of exculpatory evidence of police officers' present sense impressions and critical events contained in the audio recordings of police officer's communications with dispatch and with each other during the time they interacted with Mangum on the evening in question, after a specific written request to preserve those audio recordings was made by counsel for the accused; and

(15)    Condoning, ratifying, instructing and/or directing any of those wrongful acts.

907.    These Defendants' actions evinced a reckless and callous disregard for, and deliberate indifference to, Plaintiffs' constitutional rights.

908.    As a direct and foreseeable consequence of the conspiracy, Plaintiffs were deprived of their rights under Article IV of the United States Constitution and the First, Fourth, Fifth, Sixth and Fourteenth Amendments thereto.

909.    As a direct and foreseeable consequence of these deprivations, Plaintiffs have suffered loss of education, loss of privacy, loss of property, loss of liberty, physical harm, emotional trauma, and irreparable harm to their reputations, and economic loss, including but not limited to the costs of retaining counsel, forensic

experts, investigators and others in order to defend themselves against the false claims and fabrication of evidence throughout the 13-month police investigation of Mangum's claims, as both witnesses and putative defendants in a subsequent prosecution as 'accomplices' to the same crimes.

## TWELFTH CAUSE OF ACTION:
## CONSPIRACY IN VIOLATION OF 42 USC § 1985(2)
## (OBSTRUCTION OF JUSTICE)

### (Nifong, Gottlieb, Himan, Wilson, Levicy, Arico, DUMC and Duke University in their individual capacities)

910.   The allegations set forth in the preceding paragraphs are incorporated herein by reference.

911.   Nifong, Gottlieb, Himan, Wilson, Levicy, Arico, DUHS, and Duke University, in their individual and official capacities, and the City of Durham are "persons," as that term is used in 42 U.S.C. § 1985, and, at all times relevant to this cause of action, acted under color of law.

912.   On March 28, 2006, Nifong was advised by the SBI that there would be no evidence to corroborate Mangum's claim, and that the actual evidence that did exist contradicted her story.  Duke SANE nurse Levicy, her DUMC supervisor Arico, Gottlieb and Nifong agreed that the medical records relating to Mangum's SAER would be falsified to conform the information contained therein to the expected forensic and testimonial evidence, and provide fabricated opinions relating to the medical evidence derived from the forensic exam, the use of condoms, the absence of semen, among other things, all for purposes of presenting

337

that false, misleading and baseless material to the pool of potential grand and petit jurors, the Grand Jury, the Court, the plaintiffs and their teammates in discovery, and ultimately a jury empanelled to try the cases brought upon Mangum's false accusations of first degree rape, first degree sexual offense, and kidnapping.

913.    Shortly after Nifong was advised by the SBI Lab that the there would be no DNA evidence to support the alleged, violent 30-minute gang rape, Nifong began making statements to local and national reporters that (1) the medical evidence is what convinced him that Mangum was raped; and (2) suggesting there would be no DNA evidence because condoms were probably used by the three attackers.  In collusion with Nifong, Gottlieb and Himan:

(1)    Levicy modified the Sexual Assault Examination Report ("SAER") to conform it to the evidence of semen on a certain objects left in a hallway of 610 and seized by police;

(2)    Levicy fabricated evidence by falsifying several of the medical records of Mangum's Sexual Assault Examination, by altering her record of the accuser's account of the assault to conform to the details provided by the three students who spoke to police, the anticipated forensic DNA evidence, and the accuser's selection of three team members;

(3)    Levicy repeatedly advised Gottlieb and other law enforcement agents that the medical evidence was consistent with the accuser's account;

(4)    Arico, Levicy's Supervisor and the Supervisor of the Duke University SANE program and its forensic nurses, ratified and publicly supported Levicy's conclusions in discussions with law enforcement, Nifong and the press;

(5)    Shortly after Nifong's new public pronouncements indicating he would be relying on the evidence in collected by Duke University's SANE program, Arico provided an on-the-record interview to the Durham Herald-Sun. In the article reporting on the Arico interview, Arico claimed, on-the-record, that the forensic medical evidence corroborated Mangum's allegations. In doing so, Arico deliberately concealed from the Herald Sun reporter that:

    (a)    The SANE nurse whose work Nifong claimed to be relying upon was not competent to conduct a forensic SAE; or that the SANE nurse whose work Nifong claimed to be relying upon did not, in fact, do that work.

    (b)    That, in light of the SBI Lab's conclusion that there was no semen present on any of the swabs or smears in the rape kit, the physician who performed the forensic exam concluded that the "white substance" found only in the accuser's vaginal cavity was a yeast infection, which eliminated the only quasi-forensic evidence that tended to support the accuser's claim.

(c)     The portions of the written SAER that were completed contemporaneously with Mangum's SAE completely contradicted Nifong's claims, Levicy's and Arico's claims.

(d)     The consensus among the medical professionals at DUMC who encountered Ms. Mangum while she was there was that Mangum was plainly lying about many things including her rape claim.

(e)     Later, on the eve of the collapse of the case, Levicy proffered new, fabricated opinion testimony to explain the absence of DNA, to falsify testimony to support Mangum's mental acuity on the evening in question, and otherwise fix the cases as they headed to trial.

914.    Under color of state law, Nifong, Gottlieb, Himan, the CMT Defendants and the Duke SANE Defendants conspired and/or entered into express and/or implied agreements, understandings, or meetings of the minds among themselves for the purpose of impeding, hindering, obstructing or defeating the due course of justice in the State of North Carolina, with the intent to deny Plaintiffs the equal protection of the laws, and in furtherance of this conspiracy, one or more of these Defendants engaged in overt acts that were motivated by invidious racial animus, intended to incite and then galvanize invidious racial animus against Plaintiffs in the Durham community, and/or intended to take advantage of the invidious racial and/or alienage-based animus that they had fomented in the Durham community against Plaintiffs.

915. These Defendants actions evinced a reckless and callous disregard for, and deliberate indifference to, Plaintiffs' constitutional rights.

916. As a direct and foreseeable consequence of these deprivations, Plaintiffs were deprived of their rights under Article IV of the United States Constitution, and the First, Fourth, Fifth, Sixth and Fourteenth Amendments thereto.

917. As a direct and foreseeable consequence of these deprivations, Plaintiffs have suffered loss of education, loss of privacy, loss of property, loss of liberty, physical harm, emotional trauma, and irreparable harm to their reputations, and economic loss, including but not limited to the costs of retaining counsel, forensic experts, investigators and others in order to defend themselves against the false claims and fabrication of evidence throughout the 13-month police investigation of Mangum's claims, as both witnesses and putative defendants in a subsequent prosecution of 'accomplices' to the alleged sexual assault.

**THIRTEENTH CAUSE OF ACTION:**
**CONSPIRACY IN VIOLATION OF 42 U.S.C. § 1985(2)**
**(OBSTRUCTING JUSTICE)**

**(Against Nifong in his Individual Capacity and in his Official Capacity with Respect to Durham Police; Addison, Clark, Gottlieb, Himan, Meehan, Wilson, Durham Police Supervising Defendants, DNASI, the CMT Defendants, Duke Police Supervising Defendants, in their Individual and Official Capacities; and the City of Durham)**

918. The allegations set forth in the preceding paragraphs are incorporated herein by reference.

919. Nifong, Addison, Clark, Gottlieb, Himan, Meehan, Wilson, Durham Police Supervising Defendants, Duke Police Supervising Defendants, DNASI, the CMT Defendants and the City of Durham are "persons," as that term is used in 42 U.S.C. § 1985, and, at all relevant times, acted under color of law.

920. Under color of state law, Nifong, Addison, Clark, Gottlieb, Himan, Meehan, Wilson, Durham Police Supervising Defendants, Duke Police Supervising Defendants, DNASI, the CMT Defendants and the City of Durham conspired and/or entered into express and/or implied agreements, understandings, or meetings of the minds among themselves for the purpose of impeding, hindering, obstructing or defeating the due course of justice in the State of North Carolina, with the intent to deny Plaintiffs the equal protection of the laws, and in furtherance of this conspiracy, one or more of these Defendants engaged in overt acts that were motivated by invidious racial animus, intended to incite and then galvanize invidious racial animus against Plaintiffs in the Durham community, and/or intended to take advantage of the invidious racial animus that they had fomented in the Durham community against Plaintiffs.

921. These Defendants actions evinced a reckless and callous disregard for, and deliberate indifference to, Plaintiffs' constitutional rights.

922. As a direct and foreseeable consequence of these deprivations, Plaintiffs were deprived of their rights under Article IV of the United States Constitution, and the First, Fourth, Fifth, Sixth and Fourteenth Amendments thereto.

923. As a direct and foreseeable consequence of these deprivations, Plaintiffs have suffered loss of education, loss of privacy, loss of property, loss of liberty, physical harm, emotional trauma, and irreparable harm to their reputations, and economic loss, including but not limited to the costs of retaining counsel, forensic experts, investigators and others in order to defend themselves against the false claims and fabrication of evidence throughout the 13-month police investigation of Mangum's claims, as both witnesses and putative defendants in a subsequent prosecution as 'accomplices' to the same crimes.

## FOURTEENTH CAUSE OF ACTION:
## CONSPIRACY IN VIOLATION OF 42 U.S.C. § 1985(2)
## (WITNESS TAMPERING)

**(Against Nifong in his Individual Capacity and in his Official Capacity as Lead Investigator for Durham Police and Duke Police; Gottlieb, Himan, Wilson, the Durham Police Supervising Defendants, Duke Police Supervising Defendants, and Duke University Officials, in their Individual and Official Capacities, and the City Of Durham)**

924. The allegations set forth in the preceding paragraphs are incorporated herein by reference.

925. Nifong, Gottlieb, Himan, Wilson, the Durham Supervising Defendants, Duke Supervising Dependents, and Duke University Officials, in their individual and official capacities, and the City of Durham are "persons," as that term is used in 42 U.S.C. § 1985.

926. Under color of state law, Nifong, Gottlieb, Himan, Wilson, the Supervising Defendants, and the City of Durham conspired and entered into express and/or implied agreements, understandings, or meetings of the minds among themselves for the purpose of deterring alibi and other defense witnesses, including Plaintiffs and others who were necessary to establish the proof of Plaintiffs' and their teammates' innocence, by force, intimidation, and threats, from appearing in the Durham County Superior court to testifying freely, fully, and truthfully to matters that these Defendants knew were, or would be, pending therein.

927. The conduct of these Defendants evinced a reckless and callous disregard for, and deliberate indifference to, Plaintiffs' constitutional rights.

928. As a direct and foreseeable consequence of this conspiracy, Plaintiffs were deprived of their rights under Article IV of the United States Constitution, and the First, Fourth, Fifth, Sixth and Fourteenth Amendments thereto.

929. As a direct and foreseeable consequence of these deprivations, Plaintiffs have suffered loss of education, loss of privacy, loss of property, loss of liberty, physical harm, emotional trauma, and irreparable harm to their reputations, and economic loss, including but not limited to the costs of retaining counsel, forensic experts, investigators and others in order to defend themselves against the false claims and fabrication of evidence throughout the 13-month police investigation of Mangum's claims, as both witnesses and putative defendants in a subsequent prosecution as 'accomplices' to the same crimes.

## FIFTEENTH CAUSE OF ACTION:
## CONSPIRACY IN VIOLATION OF 42 U.S.C. § 1985(3)

**(Against Nifong in his Individual Capacity and in his Official Capacity with Respect to Durham Police; Addison, Clark, Gottlieb, Himan, Meehan, Wilson, Duke Police Supervising Defendants, Durham Police Supervising Defendants, DNASI in their Individual and Official Capacities; and the City of Durham)**

930. The allegations set forth in the preceding paragraphs are incorporated herein by reference.

931. Nifong, in his individual and official capacities with respect to Durham Police, Addison, Clark, Gottlieb, Himan, Meehan, Wilson, DNASI, in their individual and official capacities, Duke Supervising Defendants, Durham Supervising Defendants, and the City of Durham are "persons," as that term is used in 42 U.S.C. § 1985.

932. Under color of state law, Nifong, Addison, Clark, Gottlieb, Himan, Meehan, Wilson, DNASI, the Supervising Defendants, and the City of Durham conspired and entered into express and/or implied agreements, understandings, or meetings of the minds among themselves for the purpose of depriving, either directly or indirectly, Plaintiffs of equal protection of the laws and equal privileges and immunities under the laws.

933. Further, at least one of these Defendants committed an overt act in furtherance of this conspiracy that was motivated by invidious racial animus, intended to incite and then galvanize invidious racial animus against Plaintiffs in the Durham

345

community, and/or intended to take advantage of the invidious racial animus that they had incited and galvanized in the Durham community against Plaintiffs.

934. Nifong, Addison, Clark, Gottlieb, Himan, Meehan, Wilson, DNASI, the Supervising Defendants, and the City of Durham's actions evinced a reckless and callous disregard for, and deliberate indifference to, Plaintiffs' constitutional rights.

935. As a direct and foreseeable consequence of these deprivations, Plaintiffs were deprived of their rights under Article IV of the United States Constitution, and the First, Fourth, Fifth, Sixth and Fourteenth Amendments thereto.

936. As a direct and foreseeable consequence of these deprivations, Plaintiffs have suffered loss of education, loss of privacy, loss of property, loss of liberty, physical harm, emotional trauma, and irreparable harm to their reputations, and economic loss, including but not limited to the costs of retaining counsel, forensic experts, investigators and others in order to defend themselves against the false claims and fabrication of evidence throughout the 13-month police investigation of Mangum's claims, as both witnesses and putative defendants in a subsequent prosecution as 'accomplices' to the same crimes.

# SIXTEENTH CAUSE OF ACTION:
## FAILURE TO INTERVENE IN VIOLATION OF 42 U.S.C. § 1986

### (Against the Duke Police Defendants, the Duke Administrator Defendants, the CMT Defendants, and Duke University)

937. The allegations set forth in the preceding paragraphs are incorporated herein by reference.

938. The Duke Police Defendants, the Duke Administrator Defendants, the Duke SANE Defendants, the CMT Defendants, and Duke University are "persons," as that term is used in 42 U.S.C. § 1986.

939. The Duke Police Defendants, the Duke Administrator Defendants, the Duke SANE Defendants, the CMT Defendants, and Duke University had prior knowledge of the wrongs conspired to be committed in violation of 42 U.S.C. § 1985 by Nifong, Gottlieb, Himan, Wilson, Addison, Baker, Levicy, Arico, the City of Durham, DUHS, and Duke University.

940. The Duke Police Defendants, the Duke Administrator Defendants, the Duke SANE Defendants, the CMT Defendants, and Duke University had the power to prevent or aid in preventing the commission of the wrongs conspired to be committed in violation of 42 U.S.C. § 1985 by Nifong, Gottlieb, Himan, Wilson, Addison, Baker, Levicy, Arico, the City of Durham, DUHS, and Duke University, and which by reasonable diligence could have been prevented, but they neglected and/or refused to exercise their power to intervene.

941.  As a direct and proximate result of Duke Police Defendants, the Duke Administrator Defendants, the SANE Defendants, the CMT Defendants, and Duke University's neglect and/or refusal to intervene to prevent or to aid in preventing the commission of the wrongs conspired to be committed 42 U.S.C. § 1985 by Nifong, Gottlieb, Himan, Wilson, Addison, Baker, Levicy, Arico, the City of Durham, DUHS, and Duke University, the Plaintiffs suffered injuries and damages as alleged herein.

942.  The Duke Police Defendants, the Duke Administrator Defendants, the SANE Defendants, the CMT Defendants, and Duke University's neglect and/or refusal to intervene to prevent or aid in preventing evinced a reckless and callous disregard for, and deliberate indifference to, Plaintiffs' constitutional rights.

943.  As a direct and foreseeable consequence of these Defendants' neglect, failure and/or refusal to intervene, Plaintiffs were deprived of their rights under Article IV of the United States Constitution, and the First, Fourth, Fifth, Sixth and Fourteenth Amendments thereto.

944.  As a direct and foreseeable consequence of these deprivations, Plaintiffs have suffered loss of education, loss of privacy, loss of property, loss of liberty, physical harm, emotional trauma, and irreparable harm to their reputations, and economic loss, including but not limited to the costs of retaining counsel, forensic experts, investigators and others in order to defend themselves against the false claims and fabrication of evidence throughout the 13-month police investigation of

Mangum's claims, as both witnesses and putative defendants in a subsequent prosecution as 'accomplices' to the same crimes.

## SEVENTEENTH CAUSE OF ACTION:
## FAILURE TO INTERVENE IN VIOLATION OF 42 U.S.C. § 1986

### (Against the Durham Police Supervising Defendants in Their Individual and Official Capacities, and the City Of Durham)

945. The allegations set forth in the preceding paragraphs are incorporated herein by reference.

946. The Durham Police Supervising Defendants, in their individual and official capacities, and the City of Durham are "persons," as that term is used in 42 U.S.C. § 1986.

947. The Durham Supervising Defendants, and the City of Durham had prior knowledge of the wrongs conspired to be committed by Nifong, Gottlieb, Himan, Wilson, Addison, the Durham Police Supervising Defendants, the City of Durham, Clark, Meehan, DNASI, Levicy, Arico, DUHS, the CMT Defendants, and Duke University.

948. The Durham Police Supervising Defendants and the City of Durham had the power to prevent or aid in preventing the commission of the wrongs conspired to be committed by Nifong, Gottlieb, Himan, Wilson, Addison, the Durham Police Supervising Defendants, the City of Durham, Clark, Meehan, DNASI, Levicy, Arico, DUHS, the CMT Defendants, and Duke University, and which by

reasonable diligence could have been prevented, but they neglected and/or refused to exercise such power.

949. As a direct and proximate result of the neglect and/or refusal of the Supervising Defendants and the City of Durham to prevent or to aid in preventing the commission of the wrongs conspired to be committed by Nifong, Gottlieb, Himan, Wilson, Addison, the Durham Police Supervising Defendants, the City of Durham, Clark, Meehan, DNASI, Levicy, Arico, DUHS, the CMT Defendants, and Duke University the Plaintiffs suffered injuries and damages as alleged herein.

950. The Supervising Defendants, Durham Police Department, and the City of Durham's actions evinced a reckless and callous disregard for, and deliberate indifference to, Plaintiffs' constitutional rights.

951. As a direct and foreseeable consequence of this conspiracy, Plaintiffs were deprived of their rights under the First, Fourth, Fifth, Sixth and Fourteenth Amendments to the United States Constitution.

952. As a direct and foreseeable consequence of these deprivations, Plaintiffs have suffered loss of education, loss of privacy, loss of property, loss of liberty, physical harm, emotional trauma, and irreparable harm to their reputations, and economic loss, including but not limited to the costs of retaining counsel, forensic experts, investigators and others in order to defend themselves against the false claims and fabrication of evidence throughout the 13-month police investigation of

Mangum's claims, as both witnesses and putative defendants in a subsequent prosecution as 'accomplices' to the same crimes.

### EIGHTEENTH CAUSE OF ACTION:
### FAILURE TO INTERVENE IN VIOLATION OF 42 U.S.C. § 1986

**(Against Clark, Meehan, and DNASI in Their Individual and Official Capacities)**

953. The allegations set forth in the preceding paragraphs are incorporated herein by reference.

954. Clark, Meehan, and DNASI are "persons," as that term is used in 42 U.S.C. § 1986.

955. Clark, Meehan, and DNASI had prior knowledge of the wrongs conspired to be committed by Defendants Nifong, Clark, Gottlieb, Himan, Meehan, and DNASI.

956. Clark, Meehan, and DNASI had the power to prevent or aid in preventing the commission of the wrongs conspired to be committed by Defendants Nifong, Clark, Gottlieb, Himan, Meehan, and DNASI, and which by reasonable diligence could have been prevented, but they neglected and/or refused to exercise such power.

957. As a direct and proximate result of the neglect and/or refusal of Clark, Meehan, and DNASI to prevent or to aid in preventing the commission of the wrongs conspired to be committed by Defendants Nifong, Clark, Gottlieb, Himan, Meehan, and DNASI, the Plaintiffs suffered injuries and damages as alleged herein.

958. Clark, Meehan, and DNASI's actions evinced a reckless and callous disregard for, and deliberate indifference to, Plaintiffs' constitutional rights.

959. As a direct and foreseeable consequence of this conspiracy, Plaintiffs were deprived of their rights under Article IV of the United States Constitution, and the First, Fourth, Fifth, Sixth and Fourteenth Amendments thereto.

960. As a direct and foreseeable consequence of these deprivations, Plaintiffs have suffered loss of education, loss of privacy, loss of property, loss of liberty, physical harm, emotional trauma, and irreparable harm to their reputations, and economic loss, including but not limited to the costs of retaining counsel, forensic experts, investigators and others in order to defend themselves against the false claims and fabrication of evidence throughout the 13-month police investigation of Mangum's claims, as both witnesses and putative defendants in a subsequent prosecution as 'accomplices' to the same crimes.

### NINETHEENTH CAUSE OF ACTION: FAILURE TO INTERVENE IN VIOLATION OF 42 U.S.C. § 1986

**(Against Duke Police Defendants, the SANE, the CMT Defendants in Their Individual And Official Capacities and Duke University)**

961. The allegations set forth in the preceding paragraphs are incorporated herein by reference.

962. The Duke Police Supervising Defendants, Duke Investigator Defendants, DUHS, Manly, Dzau, Steel, the CMT Defendants and Duke University are "persons," as that term is used in 42 U.S.C. § 1986.

963. The Duke Police Supervising Defendants, Duke Investigator Defendants, DUHS, Manly, Dzau, Steel, the CMT Defendants and Duke University had prior knowledge of the wrongs conspired to be committed by Defendants Nifong, Gottlieb, Himan, Wilson, Levicy, Arico, and DUHS.

964. The Duke Police Supervising Defendants, Duke Investigator Defendants, DUHS, Manly, Dzau, Steel, the CMT Defendants Duke University had the power to prevent or aid in preventing the commission of the wrongs conspired to be committed by Defendants Nifong, Gottlieb, Himan, Wilson, Levicy, Arico, and DUHS and which by reasonable diligence could have been prevented, but they neglected and/or refused to exercise such power.

965. As a direct and proximate result of the neglect and/or refusal of the Duke Police Supervising Defendants, Duke Investigator Defendants, DUHS, Manly, Dzau, Steel, the CMT Defendants and Duke University to prevent or to aid in preventing the commission of the wrongs conspired to be committed by Defendants Nifong, Gottlieb, Himan, Wilson, Levicy, Arico, and DUHS, the Plaintiffs suffered injuries and damages as alleged herein.

966. The Duke Police Supervising Defendants, Duke Investigator Defendants, the CMT Defendants and Duke University's actions evinced a reckless and callous disregard for, and deliberate indifference to, Plaintiffs' constitutional rights.

967. As a direct and foreseeable consequence of this conspiracy, Plaintiffs were deprived of their rights under the First, Fourth, Fifth, Sixth and Fourteenth Amendments to the United States Constitution.

968. As a direct and foreseeable consequence of these deprivations, Plaintiffs have suffered loss of education, loss of privacy, loss of property, loss of liberty, physical harm, emotional trauma, and irreparable harm to their reputations, and economic loss, including but not limited to the costs of retaining counsel, forensic experts, investigators and others in order to defend themselves against the false claims and fabrication of evidence throughout the 13-month police investigation of Mangum's claims, as both witnesses and putative defendants in a subsequent prosecution of 'accomplices' to the alleged sexual assault.

## TWENTIETH CAUSE OF ACTION:
## COMMON LAW OBSTRUCTION OF JUSTICE &
## CONSPIRACY TO OBSTRUCT JUSTICE

**(Against Nifong in his Individual Capacity and in his Official Capacity with Respect to Durham Police; Clark, Gottlieb, Himan, Meehan, Wilson, DNASI, Levicy, Arico, DUMC and Duke University)**

969. The allegations set forth in the preceding paragraphs are incorporated herein by reference.

970. Nifong, Clark, Gottlieb, Himan, Meehan, Wilson, DNASI, Levicy, Arico, DUMC, and Duke University are "persons," as that term is used in 42 U.S.C. § 1986.

971. Between March 14, 2006 and April 11, 2007, Nifong, Clark, Gottlieb, Himan, Meehan, Wilson, DNASI, Levicy, Arico, DUMC and Duke University, acting individually and in concert, engaged in acts that attempted to and did prevent, obstruct, impede, and hinder public and legal justice in the State of North Carolina.

972. Nifong, Clark, Gottlieb, Himan, Meehan, Wilson, DNASI, Levicy, Arico, DUMC and Duke University engaged in this obstruction of justice by conspiring to manufacture and by manufacturing false and misleading expert reports with the knowledge that these reports would be used to advance and perpetuate the criminal process against Defendants.

973. Nifong, Addison, Gottlieb, Himan, Wilson, Arico, CMT Defendants, and Duke University engaged in this obstruction of justice by conspiring, colluding and acting in conscious parallelism to make false public statements to galvanize the public outrage and condemnation of every team member, to harass and attempting to place them in fear of their personal safety for bearing witness to the innocence of their teammates and themselves and to otherwise facilitate the perpetuation of the criminal process against Defendants.

974. Nifong, Gottlieb, Himan, and Wilson engaged in this obstruction of justice by conspiring to manufacture and by manufacturing false and misleading investigative reports with the knowledge that these reports would be used to advance and perpetuate the criminal process against Defendants.

975. Nifong, Clark, Gottlieb, Himan, Meehan, Wilson, and DNASI engaged in this obstruction of justice by attempting to hide exculpatory DNA evidence in hundreds of pages of raw data rather than disclosing Meehan and DNASI's distilled findings and conclusions.

976. Nifong, Gottlieb, Himan, and Wilson engaged in this obstruction of justice by intimidating Kimberly Pittman and attempting to intimidate Moezeldin Elmostafa and Sergeant John Shelton with the purpose of altering their statements exonerating Plaintiffs.

977. Nifong, Gottlieb, and Himan, engaged in this obstruction of justice by manipulating witness identification procedures, in order to perpetuate the investigation of Plaintiffs and their teammates as well as the subsequent criminal proceedings.

978. Nifong, Gottlieb, Himan, Levicy, Arico, DUMC and Duke University engaged in the obstruction of justice by manipulating medical evidence that did exist and fabricating medical evidence that did not exist, in order to perpetuate the investigation of Plaintiffs and their teammates as well as the subsequent criminal proceedings.

979. As a direct and foreseeable consequence of Defendants' conduct, Plaintiffs were unreasonably and unlawfully subjected to an indictment and criminal prosecution that were sustained by Defendants' continuing unlawful actions.

980. As a direct and foreseeable consequence of these deprivations, Plaintiffs have suffered loss of education, loss of privacy, loss of property, loss of liberty, physical harm, emotional trauma, and irreparable harm to their reputations, and economic loss, including but not limited to the costs of retaining counsel, forensic experts, investigators and others in order to defend themselves against the false claims and fabrication of evidence throughout the 13-month police investigation of Mangum's claims, as both witnesses and putative defendants in a subsequent prosecution of 'accomplices' to the alleged sexual assault.

## TWENTY-FIRST CAUSE OF ACTION: ABUSE OF PROCESS & CONSPIRACY

**(Against Nifong In His Individual Capacity; Addison, Clark, Gottlieb, Himan, Meehan, Wilson, Levicy, Arico, Dzau In His Capacity On The CMT,  The CMT, DUMC, The Duke University Defendants, And DNASI in their Individual and Official Capacities; and Nifong in his Official Capacity with Respect to Durham Police)**

981. The allegations set forth in the preceding paragraphs are incorporated herein by reference.

982. Nifong, Gottlieb, Himan, and Wilson demonstrated malice, spite, ill-will, and wanton disregard for Plaintiffs' rights by conspiring to manufacture and by fabricating false statements for incorporation into the NTID Affidavit, manufacturing false and misleading investigative reports with the knowledge that these reports would be used to advance and perpetuate the criminal investigation against Plaintiffs.

983. Nifong, Gottlieb, and Himan utilized the NTID process for purposes of launching the cased into the public spotlight, creating a media firestorm around the bogus NTID allegations, and subjecting Plaintiffs to an historically unprecedented media attacks by investigators.

984. Nifong, Hodge, and Addison demonstrated malice, spite, ill-will, and wanton disregard for Plaintiffs' rights by making repeated false, inflammatory, and misleading statements regarding the Duke lacrosse team and the Plaintiffs.

985. Levicy, Arico, Gottlieb and Nifong agreed to produce fabricated medical records of Mangum's SAE and provide false and baseless opinions relating to the medical evidence derived from the forensic exam through public statements. Further,

986. Levicy falsified the SAER and advised or acquiesced in Gottlieb's false claim that the medical evidence was were consistent with the Mangum's false accusations. Further, Arico, as Levicy's supervisor, condoned and ratified Levicy's malicious, spiteful conduct, by publicly affirming the false claims attributed to Levicy. Similarly, Manly, as Levicy's supervising physician—and the individual who actually conduced the SAE—acquiesced in false claims attributed to Levicy and to Manly herself in the NTID and in subsequent public statements.

987. Dzau, supervised and oversaw the maintenance and collection of the falsified records, and did not act to correct the public record when evidence from Mangum's SAER was falsely reported by Arico, Gottlieb and Nifong in the media. Further, Dzau failed to adequately remediate Levicy's gross negligence and/or

wanton fabrication of false medical evidence in the medical records of the SAER or Arico's ratification of it.

988. As a direct and foreseeable consequence of Defendants' conduct, Plaintiffs were deprived of their rights under Article IV of the United States Constitution, and the First, Fourth, Fifth, Sixth and Fourteenth Amendments thereto.

989. As a direct and foreseeable consequence of these deprivations, Plaintiffs have suffered loss of education, loss of privacy, loss of property, loss of liberty, physical harm, emotional trauma, and irreparable harm to their reputations, and economic loss, including but not limited to the costs of retaining counsel, forensic experts, investigators and others in order to defend themselves against the false claims and fabrication of evidence throughout the 13-month police investigation of Mangum's claims, as both witnesses and putative defendants in a subsequent prosecution of 'accomplices' to the alleged sexual assault.


## TWENTY-SECOND CAUSE OF ACTION:
## NEGLIGENCE OF DURHAM POLICE

**(Against Addison, Gottlieb, Himan, and Hodge in their Individual and Official Capacities, and the City of Durham)**

990. The allegations set forth in the preceding paragraphs are incorporated herein by reference.

991. At the time of the Durham Police Statements described above, Addison and Hodge each owed Plaintiffs a duty to use due care with respect to his public statements concerning the investigation of Mangum's claims.

992. At the time of the events alleged above, Gottlieb and Himan owed Plaintiffs a duty to use due care with respect to the investigation of Mangum's allegations.

993. At the time they made their respective Durham Police Statements, Addison and Hodge each knew or should have known that such statements were false and inflammatory and likely to cause Plaintiffs harm.

994. At the time Gottlieb and Himan committed the acts and omissions alleged above, they knew or should have known that they violated or departed from Durham Police policies and procedures, violated or departed from professional standards of conduct, violated constitutional rights, and were likely to cause Plaintiffs harm.

995. In committing the aforementioned acts and/or omissions, Addison, Gottlieb, Himan, and Hodge negligently breached said duties to use due care, which directly and proximately resulted in the injuries and damages to the Plaintiffs as alleged herein.

996. As a direct and foreseeable consequence of these deprivations, Plaintiffs have suffered loss of education, loss of privacy, loss of property, loss of liberty, physical harm, emotional trauma, and irreparable harm to their reputations, and economic loss, including but not limited to the costs of retaining counsel, forensic experts, investigators and others in order to defend themselves against the false

claims and fabrication of evidence throughout the 13-month police investigation of Mangum's claims, as both witnesses and putative defendants in a subsequent prosecution of 'accomplices' to the alleged sexual assault.


## TWENTY-THIRD CAUSE OF ACTION:
## NEGLIGENT HIRING, RETENTION, SUPERVISION, TRAINING & DISCIPLINE BY DURHAM POLICE

### (Against The Durham Supervising Defendants In Their Individual And Official Capacities, And The City Of Durham)

997.   The allegations set forth in the preceding paragraphs are incorporated herein by reference.

998.   At the time of the events alleged above, each of the Durham Supervising Defendants, and the City of Durham owed Plaintiffs a duty to use due care in the hiring, training, supervision, discipline, and retention of Durham Police personnel, including the personnel involved in the investigation of Mangum's claims.

999.   The Durham Supervising Defendants negligently supervised Defendant Gottlieb by failing to discipline him, retrain him, and/or terminate his employment when they knew of his propensity to abuse his charging and arrest authority,  and otherwise engage in misconduct in his encounters with Duke students that was escalating prior to March 14, 2006, but instead, assigned him or acquiesced in his assignment to the police investigation of Mangum's false accusations against 47 Duke students.

1000.  The Durham Supervising Defendants negligently supervised Defendant Himan by allowing him to be assigned to the police investigation into Mangum's allegations, notwithstanding Himan's lack of prior experience in major felony investigations.

1001.  The Durham Supervising Defendants negligently supervised Defendants Addison, Gottlieb, and Himan, failed to provide them with proper training, and failed to outline proper procedure to them in various respects relating to the appropriate conduct of criminal investigations, as established by Durham Police, including by way of example:

(1)     The appropriate division for the assignment of cases;

(2)     The General Orders prohibiting bias-based policing;

(3)     The issuance of public statements relating to an open investigation outside of the protocol established by the Department;

(3)     The conduct of eyewitness identification procedures;

(4)     The service of outstanding warrants on witnesses in a criminal investigation or proceeding;

(5)     Prohibiting threats, inducements, or intimidation of witnesses;

(6)     The standards for police reports, investigator's notes, and other reports of investigations, including the timely and truthful preparation of such documents;

(7)     The requirements for obtaining NTID Orders, including the requirement of a 90-day return inventory, the requirement that Affiants supporting NTID

Orders must be truthful and must not knowingly allege false or fabricated assertions of fact, that NTID Orders shall not be used for ulterior purposes not contemplated by the laws authorizing them; and that citizens subjected to NTID Orders are entitled to the results of any tests conducted with the products of their Nontestimonial procedures as soon as they are available.

(8)     The supervision of private companies engaged to provide scientific testing or other services in connection with a police investigation; and

(9)     The standards for probable cause.

1002. The Durham Supervising Defendants further negligently supervised Gottlieb and Himan by ignoring evidence demonstrating the misconduct underlying the investigation, and instead continuing to allow Nifong to have primary responsibility for the police investigation, ordering Gottlieb and Himan to look to Nifong for direction as to the conduct of that investigation, and having Gottlieb and Himan continue to serve on that investigation.

1003. The Durham Supervising Defendants further negligently supervised Addison by ignoring the false and inflammatory Addison Statements, failing to retract such statements, failing to reprimand Addison for such statements, and failing to remove Addison from his role as a spokesperson for the Durham Police Department. To the contrary, Hodge joined Addison by publicly stating that Durham Police had a strong case.

1004. In committing the aforementioned acts or omissions, each Durham Supervising Defendant negligently breached said duty to use due care, which directly and proximately resulted in the injuries and damages to Plaintiffs as alleged herein.

1005. As a direct and foreseeable consequence of the Durham Supervising Defendant's' conduct Plaintiffs suffered irreparable injury to their reputations; loss of future earning capacity; economic loss caused by their need to retain counsel in the ongoing criminal investigation and to defend themselves against the threatened criminal charges of the most serious kind, as either principles or as accomplices; physical and emotional harm, loss of liberty and property, loss of privacy, and permanent harm to their reputations.


## TWENTY-FOURTH CAUSE OF ACTION:
## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS BY DURHAM POLICE

### (Against Gottlieb, Himan, Durham Police Supervising Defendants, in their Individual and Official Capacities; and the City of Durham)

1006. The allegations set forth in the preceding paragraphs are incorporated herein by reference.

1007. Gottlieb, Himan, Durham Police Supervising Defendants, and the City of Durham acted individually and in concert to manufacture false evidence and to conceal the evidence of Plaintiffs' innocence for the purpose of charging and prosecuting the three innocent Duke Lacrosse players on charges of rape, sexual assault, and

kidnapping, which charges they knew or reasonably believed were false and unsupported by probable cause.

1008. Gottlieb, Himan, and the Durham Police Supervising Defendants' conduct subjected Plaintiffs to public infamy, made them pariahs in their communities, and forced them to endure harsh media scrutiny.

1009. Gottlieb, Himan, and the Durham Police Supervising Defendants' conduct violated or departed from Durham Police policies and procedures, as well as the NTID Statutes' requirement that those subjected to NTID procedures are entitled to a report of results of any tests conducted with the products of their NTID procedures as soon as the results are available.

1010. Gottlieb, Himan, and the Durham Police Supervising Defendants were negligent in engaging in this conduct, from which it was reasonably foreseeable that Plaintiffs would suffer emotional and psychological harm.

1011. As a direct and foreseeable consequence of Gottlieb, Himan, and the Durham Police Supervising Defendants' conduct, Plaintiffs have suffered and continue to suffer from diagnosable emotional and mental conditions causing disabling emotional, mental, and physical harm.

**TWENTY-FIFTH CAUSE OF ACTION:**
**NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**
**(DURHAM POLICE STATEMENTS)**

**(Against Nifong in his Individual Capacity and his Official Capacity with respect to the Durham Police; Addison, in his Individual and Official Capacity; the Durham Police Supervising Defendants, in their Individual and Official Capacities; and the City of Durham)**

1012. The allegations set forth in the preceding paragraphs are incorporated herein by reference.

1013. Nifong, Addison, and the Durham Police Supervising Defendants acted individually and in concert to make consciously parallel false and inflammatory public statements accusing Plaintiffs of criminal conduct, including first degree rape, first degree sexual offense, conspiracy to commit murder, kidnapping, and obstruction of justice—as either principals or accomplices in those crimes—while ignoring or in willful blindness to the overwhelming evidence that their statements were false, the Plaintiffs were innocent of those crimes, and that none of those crime occurred.

1014. Addison, Nifong and the Durham Police Supervising Defendants acted individually and in concert to publish false and inflammatory statements accusing Plaintiffs of refusing to cooperate and obstruction of justice and the police investigation into Mangum's claims, ignoring the evidence of Evans, Flannery, and Zash's and complete and total cooperation with the search warrant at 610 N.

Buchanan and subsequent interviews and medical testing, and the entire Duke lacrosse team's total cooperation with the NTID Order procedure.

1015. Addison, Nifong and the Durham Police Supervising Defendants' conduct subjected Plaintiffs to public outrage and condemnation in their own communities, and before a national and international audience of millions.

1016. Addison, Nifong and the Durham Police Supervising Defendants were negligent in engaging in this conduct, in that it would have been reasonably foreseeable that Plaintiffs would suffer emotional and psychological harm as a result of their conduct.

1017. As a direct and foreseeable consequence of Nifong, Addison and the Durham Police Supervising Defendants' conduct, Plaintiffs have suffered and continue to suffer from diagnosable conditions causing disabling emotional, mental, and physical harm, and as a result, Plaintiffs are entitled to damages in an amount to be determined at trial.


## TWENTY-SIXTH CAUSE OF ACTION:
## NEGLIGENCE BY THE DNA SECURITY DEFENDANTS

### (Against Clark And Meehan In Their Individual And Official Capacities, And DNASI)

1018. The allegations set forth in the preceding paragraphs are incorporated herein by reference.

1019. At the time of the events alleged above, Clark, Meehan, and DNASI owed Plaintiffs a duty of due care with respect to their involvement in the police investigation of Mangum's claims.

1020. On April 10, 2006, and thereafter, Clark, Meehan and DNASI agreed not to produce a written report of every test conducted with each Plaintiffs' DNA, and, subsequently, employed a reporting method that—by design—omitted exculpatory results of tests conducted with each Plaintiffs' DNA.

1021. In April and May 2006, Clark, Meehan, and DNASI acted individually and in concert to produce the May 12 Report that misstated the purported results of DNASI's scientific testing relating to the investigation of Mangum's claims and omitted exculpatory findings that resulted from their scientific testing of Mangum's rape kit items.

1022. DNASI's acts and omissions failed to comply with DNASI's internal protocols, Federal Bureau of Investigation standards, and regulations governing accredited DNA testing facilities.

1023. Beginning on April 10, 2006, and continuing thereafter, Clark, Meehan, and DNASI knew, or should have known, that these acts and omissions would result in the continuation of a false and malicious investigation of Plaintiffs and their teammates and the criminal prosecutions of some or all of them.

1024. In September 2006, Clark, Meehan, and DNASI were ordered by the Superior Court of Durham County to disclose all evidence relating to the testing of samples gathered from Mangum and the rape kit items.

1025. In response to that order, Clark, Meehan, and DNASI released roughly 2,000 pages of raw data, but still failed to indicate by notation, report or otherwise that DNA from at least four unidentified males were detected in rape kit items, and in continuing violation of N.C.G.S. 15A-282, did not provide Plaintiffs' counsel with those documents or the amended reports filed subsequent to the revelation of the conspiracy to conceal exculpatory DNA evidence.

1026. At the time they produced this raw data, Clark, Meehan, and DNASI knew, or should have known, that the concealment of their exculpatory findings would prolong the investigation of Mangum's claims, the public condemnation of Plaintiffs, the threat of Plaintiffs' prosecution for serious crimes, and the prosecution of Plaintiffs' teammates.

1027. In committing the aforementioned acts and omissions, Clark, Meehan, and DNASI negligently breached their aforementioned duties to use due care, which directly and proximately resulted in damages to Plaintiffs alleged herein, in an amount to be determined at trial.

## TWENTY-SEVENTH CAUSE OF ACTION:
## NEGLIGENT HIRING, RETENTION, SUPERVISION, TRAINING AND
## DISCIPLINE BY THE DNA SECURITY DEFENDANTS

### (Against Clark And Meehan In Their Individual And Official Capacities, And DNASI)

1028. The allegations set forth in the preceding paragraphs are incorporated herein by reference.

1029. At the time of the events alleged above, Clark and Meehan held Supervising positions at DNASI.

1030. At the time of the events alleged above, Clark, Meehan, and DNASI owed Plaintiffs a duty to use due care with respect to the scientific testing described above.

1031. Clark and DNASI negligently hired, supervised, and retained Meehan, failed to provide Meehan with proper training and discipline, and failed to outline proper procedure to Meehan with respect to the preparation and issuance of reports of scientific testing conducted by DNASI in a criminal investigation.

1032. Clark, Meehan, and DNASI negligently hired, supervised, and retained the DNASI personnel assisting Meehan in the scientific testing and preparation of the May 12 Report described above, failed to provide them with proper training, and failed to outline proper procedure to them with respect to the preparation and issuance of reports of scientific testing conducted by DNASI in a criminal investigation.

1033. In committing the aforementioned acts or omissions, Clark, Meehan, and DNASI each negligently breached said duty to use due care, which directly and proximately resulted in the injuries and damages to Plaintiffs as alleged herein.

1034. As a direct and foreseeable consequence of these deprivations, Plaintiffs have suffered loss of education, loss of privacy, loss of property, loss of liberty, physical harm, emotional trauma, and irreparable harm to their reputations, and economic loss, including but not limited to the costs of retaining counsel, forensic experts, investigators and others in order to defend themselves against the false claims and fabrication of evidence throughout the 13-month police investigation of Mangum's claims, as both witnesses and putative defendants in a subsequent prosecution of 'accomplices' to the alleged sexual assault.

## TWENTY-EIGHTH CAUSE OF ACTION: NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS BY THE DNA SECURITY DEFENDANTS

### (Against Clark And Meehan In Their Individual And Official Capacities, And DNASI)

1035. The allegations set forth in the preceding paragraphs are incorporated herein by reference.

1036. Clark, Meehan, and DNASI acted individually and in concert to manufacture false evidence and to conceal the evidence of Plaintiffs' innocence for the purpose of charging and prosecuting the three innocent Duke Lacrosse players on charges of

rape, sexual assault, and kidnapping, which charges they knew or reasonably believed were false and unsupported by their own scientific testing.

1037. Clark, Meehan, and DNASI's conduct subjected Plaintiffs to public obloquy, made them pariahs in their communities, and forced them to endure harsh media scrutiny.

1038. Clark, Meehan, and DNASI's conduct violated DNASI's internal protocols, Federal Bureau of Investigation standards, and accreditation rules governing DNA testing facilities.

1039. Clark, Meehan, and DNASI were negligent in engaging in this conduct, from which it was reasonably foreseeable that Plaintiffs would suffer emotional and psychological harm.

1040. As a direct and foreseeable consequence of Clark, Meehan, and DNASI's conduct, Plaintiffs have suffered and continue to suffer from diagnosable emotional and mental conditions causing disabling emotional, mental, and physical harm.

1041. As a direct and foreseeable consequence of these deprivations, Plaintiffs have suffered loss of education, loss of privacy, loss of property, loss of liberty, physical harm, emotional trauma, and irreparable harm to their reputations, and economic loss, including but not limited to the costs of retaining counsel, forensic experts, investigators and others in order to defend themselves against the false claims and fabrication of evidence throughout the 13-month police investigation of

Mangum's claims, as both witnesses and putative defendants in a subsequent prosecution of 'accomplices' to the alleged sexual assault.

## TWENTY-NINTH CAUSE OF ACTION:
## NEGLIGENCE

## (AGAINST DUKE UNIVERSITY AND THE DUKE POLICE DEPARTMENT)

1042. The allegations set forth in the preceding paragraphs are incorporated herein by reference.

1043. Duke Police Department had jurisdiction over the investigation of Mangum's gang-rape allegations.

1044. At all relevant times, Duke Police Department expressly and impliedly represented to the general public and to Plaintiffs that its officers conducted investigations of criminal allegations in a skilled and proper manner and possessed the skill and degree of professional learning ordinarily possessed by other law enforcement agencies conducting investigations and enforcing the laws in the same or similar communities.

1045. Mangum reported to law enforcement that she had been gang-raped sometime in the late evening of March 13, 2006 or the early morning hours of March 14, 2006, at a party held in the private residence at 610 N. Buchanan Boulevard.

1046. At the time Ms. Mangum claimed she was raped and sexually assaulted at 610 N. Buchanan Blvd., Duke Police had a statutory obligation to initiate and conclude an investigation of Mangum's claims. That statutory obligation to investigate was

also incorporated into the Jurisdictional Agreement between Duke University and the City of Durham

1047. To carry out its statutory obligation to investigate, North Carolina statutes and the Jurisdictional Agreement gave the Duke Police Department all of the powers and authority granted to every municipal police department in North Carolina.

1048. Duke Police initiated an investigation of Mangum's claims, beginning at approximately 3:00 a.m. on March 14, 2006, shortly after responding officers concluded that the sexual assault Mangum reported allegedly occurred at 610 N. Buchanan Blvd.

1049. Duke Police failed to pursue its investigation beyond March 16, 2006, and never concluded it. Instead, Duke Police abdicated its statutory obligation to conclude an investigation.

1050. Compounding the injury resulting from Duke Police's failure to investigate, Duke Police ceded all of its investigative authority to an investigator with roughly two months experience, who was to be supervised by Gottlieb, who was known to Duke Police and Duke Administrators to harbor unmitigated contempt for Duke students, and who had exhibited a propensity to abuse his police authority in virtually all of his dealings with Duke students.

1051. Duke Police handed a known rogue officer the power to inflict geometrically greater damage to Plaintiffs and their teammates than Gottlieb was given by the Durham Police Department in the past. In fact, Duke Police gave Gottlieb the

power to destroy plaintiff's lives and their reputations only weeks after Durham Police moved to take Gottlieb off the patrol beat in order to preclude him from abusing his charging authority by fabricating misdemeanor charges.

1052. Defendant Duke Police officers were negligent in that:

(1)     They did not possess the degree of professional learning skill, and ability which other law enforcement officers similarly situated ordinarily possess;

(2)     They negligently failed to insist that the command staff implement adequate and immediate tests and investigative procedures in order to establish the truth or falsity of the accuser's account;

(3)     Duke Police Department Officers negligently failed to observe the conduct of the investigation, the evidence obtained in the investigation, and convey to Command Staff and Duke Administrators the quickly accumulating and overwhelming evidence of innocence or the conspiracy to obstruct justice that was being carried out in plain view in an investigation within Duke Police Department's primary jurisdiction;

(4)     Duke Police Department Officers negligently failed to insist or demand that Duke Police Department immediately intervene in the  investigation or attend to the open misconduct that was rampant in the investigation from its outset;

(5)     Duke Police Officers negligently failed to notify a Duke Supervising Officers of changes or developments in the investigation;

(6)     Duke Police Officers negligently failed to use their own judgment in getting a Duke Supervising Defendants and Duke Officials to examine the evidence of the Students' innocence or the evidence of the Durham police and prosecutor's misconduct in the investigation; and

(7)     They negligently failed or refused offers made by the Students and their agents to provide them with evidence that established that Mangum's s account (every version of it) was a fraud.

1053.   As a direct and proximate result of the foregoing negligence, Plaintiffs suffered damages in an amount to be determined at trial.

## THIRTIETH CAUSE OF ACTION:
## NEGLIGENCE OF THE SANE DEFENDANTS

### (Against the Levicy, Arico, the PDC, DUHS, and Duke University)

11.     The allegations set forth in the preceding paragraphs are incorporated herein by reference.

12.     At all times relevant to this action, Levicy and Arico were employees and/or agents of the PDC, DUHS, Duke University, and were acting with the scope of their employment and/or agency with the PDC, DUHS and Duke University.

13.     At all times relevant to this action, those times Levicy and Arico made public statements and statements to law enforcement authorities, they both owed

Plaintiffs a duty to use due care with respect to public statements and statements to law enforcement concerning the investigation of Mangum's claims.

14.     At the time of the acts and events alleged above, Levicy, Arico, the PDC DUHS and Duke University owed Plaintiffs a duty to use due care with respect to forensic medical evidence relating to the investigation of Mangum's allegations.

15.     At the time they made their respective public statements and statements to law enforcement, Levicy and Arico each knew or should have known that such statements were false and inflammatory and likely to cause Plaintiffs harm.

16.     At the time Levicy and Arico committed the acts and omissions alleged above, they knew or should have known that they violated or departed from DUHS policies and procedures, violated or departed from professional standards of conduct, violated constitutional rights, and were likely to cause Plaintiffs harm.

17.     In committing the aforementioned acts and/or omissions, Levicy, Arico,  the PDC, DUHS and DUMC negligently breached said duties to use due care, which directly and proximately resulted in the injuries and damages to the Plaintiffs as alleged herein and in an amount to be shown at trial.

**THIRTY-FIRST CAUSE OF ACTION:**
**NEGLIGENT HIRING, RETENTION, SUPERVISION, TRAINING &**
**DISCIPLINE BY THE SANE DEFENDANTS**

**(Against Arico, Manly, the PDC, DUHS and Duke University)**

18.     The allegations set forth in the preceding paragraphs are incorporated herein by

reference.

19.     At the time of the events alleged above, each of Arico, Manly, the PDC, DUHS

and Duke University owed Plaintiffs a duty to use due care in the hiring, training,

supervision, discipline, and retention of forensic SANE nurses, record keepers,

and other related personnel, including the personnel involved in the investigation

of Mangum's claims and the preservation of the records relating to Mangum's

SAER..

20.     Arico, Manly, the PDC, DUHS and Duke University negligently supervised

Defendant Levicy by failing to monitor her, discipline her, retrain her, and/or

terminate her employment when they knew of her propensity to abuse her status as

a forensic nurse examiner to prop up or fabricate evidence to support plainly false

claims of sexual assault, fabricate forensic medical records, and otherwise engage

in misconduct in the performance of her duties as a SANE nurse, but instead,

assigned her or acquiesced in her assignment to conduct Mangum's SANE exam

while still a SANE in training.

21. Arico, Manly, the PDC, DUHS and Duke University negligently supervised Defendant Levicy, failed to provide her with proper training, and failed to outline proper procedure to them in various respects relating to the appropriate conduct of a SAE and the appropriate protocol for documenting findings in the SAER, as established by DUHS

22. Arico (viz. Levicy), Manly, the PDC, DUHS and Duke University further negligently supervised Levicy and Arico by ignoring evidence demonstrating their misconduct in their public statements and statements to law enforcement and prosecutorial authorities, and instead continuing to allow Levicy to hold herself out to law enforcement and prosecutorial authorities and to the public as an expert qualified to render opinions as to observations during an SAE that she did not conduct, nor was qualified to evaluate, and, throughout the 13 month investigation, to allow Levicy and Arico to continue to proffer testimony, expert and otherwise.

23. Arico (viz. Levicy), Manly, the PDC, DUHS and Duke University further negligently supervised Levicy and Arico by ignoring their false, unsupportable, reckless and inflammatory statements to the public and to law enforcement and/or prosecutorial authorities, failing to retract such statements, failing to reprimand Levicy or Arico for making such statements, and failing to remove Levicy or Arico from their roles within DUHS's and/or DUMC's SANE program.

24.     In committing the aforementioned acts or omissions, Arico, Manly, the PDC, DUHS and Duke University each negligently breached their respective duties to use due care, which directly and proximately resulted in the injuries and damages to Plaintiffs as alleged herein.

25.     As a direct and foreseeable consequence of Arico, Manly, the PDC, DUHS and Duke University's conduct, Plaintiffs suffered irreparable injury to their reputations; loss of future earning capacity; economic loss caused by their need to retain counsel in the ongoing criminal investigation and to defend themselves against the threatened criminal charges of the most serious kind, as either principles or as accomplices; physical and emotional harm, loss of liberty and property, loss of privacy, and permanent harm to their reputations.

**THIRTY-SECOND CAUSE OF ACTION:**
**NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**
**BY THE SANE DEFENDANTS**

**(Against Levicy, Arico, Manly, the PDC, DUHS and Duke University)**

26.     The allegations set forth in the preceding paragraphs are incorporated herein by reference.

27.     Levicy, Arico, Manly, the PDC, DUHS and Duke University acted individually and in concert to manufacture false evidence and to conceal the forensic medical evidence that proved Mangum's claims were false, for the purpose of enabling Durham Police to obtain and abuse an NTID Order,  perpetuating the 13 month

investigation, and in an attempt to force a trial on Mangum's claims, placing Plaintiffs and their teammates in grave danger of wrongful convictions, which charges they knew or reasonably should have known and believed were false and not supported by probable cause.

28. Levicy, Arico, Manly, the PDC, DUHS and Duke University conduct subjected Plaintiffs to public outrage and infamy, made them outcasts in their communities, and forced them to endure a the condemnation of millions who watched Defendants' fabrications unfold in the media.

29. Levicy, Arico, Manly, the PDC, DUHS and Duke University's conduct violated or departed from PDC, DUHS, and Duke University's policies and procedures, as well as state and federal guidelines and regulations governing the qualification of SANEs, the conduct of SAEs and the documentation of SAE findings on SAER forms and related documents.

30. Levicy, Arico, Manly, the PDC, DUHS and Duke University were negligent in engaging in this conduct, from which it was reasonably foreseeable that Plaintiffs would suffer emotional and psychological harm.

31. As a direct and foreseeable consequence of Gottlieb, Himan, and the Durham Police Supervising Defendants' conduct, Plaintiffs have suffered and continue to

suffer from diagnosable emotional and mental conditions causing disabling emotional, mental, and physical harm.

### THIRTY-THIRD CAUSE OF ACTION: NEGLIGENCE OF DUKE UNIVERSITY

1054. The allegations set forth in the preceding paragraphs are incorporated herein by reference.

1055. At all relevant times, Duke University Police Department was a fully accredited law enforcement agency under the laws and the regulations of the State of North Carolina, and held itself out to the general public and to Plaintiffs that it operated a law enforcement agency with professional staff of fully commissioned police officers, criminal investigators and patrol personnel, equipment and the statutory authority to render skilled and adequate service.

1056. At all relevant times, the Duke Police Defendants were agents, servants, and employees of Duke University, and were acting within the scope of their employment.

(1) The foregoing negligence of the Duke Police Department Officers was committed on behalf of Duke University and Duke University is liable to Plaintiff for its agents' negligence.

(2) The foregoing negligence of the Duke Police Department Officers was committed on direct orders of Senior Duke Administrators, and, therefore, Duke University is directly liable for its agents' negligence.

1057. Additionally, Defendant Duke University was negligent in that:

(1)     Duke University failed to provide competent professional personnel to supervise and staff its Police Department who would have been capable of properly conducting an investigation of Mangum's allegations, from March 14, 2006 until April 11, 2007;

(2)     Duke University failed to provide proper and necessary support with which the evidence of innocence would have been properly and promptly established and reported to the prosecuting authority; and

(3)     Duke University negligently permitted incompetent, untrained, and poorly supervised professional personnel to investigate a crime alleged to have occurred within its primary jurisdiction on March 13-14, 2006.

1058. As a direct and foreseeable consequence of these deprivations, Plaintiffs have suffered damages in the form of loss of education, loss of privacy, loss of property, loss of liberty, physical harm, emotional trauma, and irreparable harm to their reputations, and economic loss, including but not limited to the costs of retaining counsel, forensic experts, investigators and others in order to defend themselves against the false claims and fabrication of evidence throughout the 13-month police investigation of Mangum's claims, as both witnesses and putative defendants in a subsequent prosecution of 'accomplices' to the alleged sexual assault.

## THIRTY-FOURTH CAUSE OF ACTION:
## NEGLIGENT ENTRUSTMENT

**(Against Duke University, Duke Police Supervising Defendants, Duke Police)**

1059. The allegations set forth in the preceding paragraphs are incorporated herein by reference.

1060. At all times relevant to this action, Defendant Duke University operated the Duke University Police Department.

1061. Sometime after March 16, 2006, Duke University, by and through its agents, negligently entrusted the Duke Police Department's investigative and law enforcement authority and primary responsibility to Gottlieb, Himan, Nifong, Baker and the Durham Police Supervising Defendants to initiate and conclude their investigation of the sexual assault that Mangum alleged took place within Duke Police Department's jurisdiction.

1062. The entrustment of Duke University Police Department's investigative authority to Defendants Gottlieb and Himan by Defendant Duke University and Duke Police Supervising Defendants was negligent in that Duke University knew, or should have known, of Gottlieb's propensity for bearing false witness against Duke University students accused of crimes and otherwise abusing Duke students with whom he came into contact, Gottlieb's, Nifong's and Baker's complete lack of experience supervising and/or directing complex, violent sexual assault

investigations, and Himan's complete lack of experience in violent sexual assault investigations.

1063. In addition to its actual or constructive knowledge of Gottlieb's prior misconduct as well as Gottlieb's, Himan's, Nifong's and Baker's complete inexperience in complex violent crimes investigations, Duke University, through its agents and officers, had a duty to vest its jurisdictional law enforcement authority in employees who were competent to perform their duties without injuring others, and, upon delegating to employees of an outside agency or agencies, had a duty to make reasonable investigation of those to whom its law enforcement powers were delegated, prior to entrusting them with powers and instrumentalities likely to cause injury if negligently employed.

1064. Defendant Duke University's negligent failure to ascertain Gottlieb's propensities for misconduct and Gottlieb, Himan, Nifong and Baker's inexperience and incompetence, and Duke University's entrustment of the investigative powers the State of North Carolina vested in Duke University to Gottlieb and Himan was a further proximate cause of the injury and damage to Plaintiffs.

1065. As a direct and foreseeable consequence of Duke University's negligent entrustment of its primary jurisdictional power and responsibility to investigate Mangum's claims, Plaintiffs have suffered damages in the form of loss of education, loss of privacy, loss of property, loss of liberty, physical harm, emotional trauma, and irreparable harm to their reputations, and economic loss,

including but not limited to the costs of retaining counsel, forensic experts, investigators and others in order to defend themselves against the false claims and fabrication of evidence throughout the 13-month police investigation of Mangum's claims, as both witnesses and putative defendants in a subsequent prosecution of 'accomplices' to the alleged sexual assault.


## THIRTY-FIFTH CAUSE OF ACTION:
## FRAUD

### (Against Drummond, Smith, Dean, Graves and Duke University)

1066. The allegations set forth in the preceding paragraphs are incorporated herein by reference.

1067. On or about June 1, 2006, Defendant Drummond caused a letter (Drummond's Subpoena Letter") to be delivered to each of the Plaintiffs stating that Defendant Nifong issued the May 31 Subpoena for Duke Card Records, directed to each Plaintiffs' educational records, in particular, seeking a full report of all of Plaintiffs' Duke Card transactions during a specified period between March 13, 2006 and March 14, 2006.

1068. Drummond's Subpoena Letter advised each of the Plaintiffs that, if he wished to preserve the privacy of their financial and/or educational records contained in their individual Duke Card account, he would be required to file pleadings with the court to quash and/or modify the subpoena directed to his records.

1069. Drummond's Subpoena Letter did not advise the Plaintiffs that, in fact, the University had produced and delivered the same records to Gottlieb, Himan and Nifong on March 31, 2006, as part of the planning of the conspiracy to manufacture identification evidence in the April 4th identification procedure.

1070. Drummond was, at all relevant times, acting for and on behalf of Defendant and within the course and scope of his employment.

1071. Drummond's representations to each of the Plaintiffs concerning the protected and private status of their Duke Card records at the time Drummond's Subpoena Letter was sent were false, and Drummond knew they were false at the time that he made them.

1072. Drummond's false representations were made with intent to deceive Plaintiffs and to induce them to retain counsel to file a motion to quash, written argument in support of the motion and to appear in court to argue the merits of the motion on their behalf. Upon information and belief, the subpoena and Drummond's and Duke University's false representations were produced with the intent cover up and conceal from Plaintiffs the fact that the critical private banking and/or educational records and information sought in the subpoena had already been disclosed illegally by Drummond and Duke University months before.

1073. Drummond's and Duke University's misrepresentations did in fact deceive Plaintiff, and in reliance upon them, Plaintiff retained counsel to prepare and file a motion to quash the subpoena to preserve the privacy of Plaintiffs' banking and/or

educational records, prepare and file written argument in support of the motion; and to appear in court to argue the merits of each of the Plaintiffs' motions.

1074. Further, at all times relevant to this cause of action, several other Duke University employees, including but not limited to Defendants Smith, Stotsenberg, Dean and Graves, knew that Gottlieb, Himan and Nifong already had in their possession the same materials identified in the Nifong's subpoenas, and at issue in the motions and hearings because Smith and Stotsenberg had participated in producing, compiling and delivering the Plaintiffs' private financial, banking and/or educational records from the Duke Card office months before on March 31, 2006, and Dean and Graves directed, oversaw, condoned or subsequently ratified their production and delivery of Plaintiffs' private materials.

1075. Defendants' prior disclosure of Plaintiffs private financial, banking and/or educational records was not revealed until Plaintiffs' counsel inquired about a vague reference in Gottlieb's "Supplemental Case Notes." Plaintiffs' counsel inquired about the matter with university counsel on January 31, 2007. Shortly thereafter, university counsel inquired with Defendants Smith and/or Stotsenberg, and reported to Plaintiffs' counsel that Smith admitted that he and Stotsenberg had disclosed the private information to Himan, Gottlieb, and Nifong on March 31, 2006.

1076. Drummond, Smith, Stotsenberg, Dean and Graves, at all relevant times relevant to this cause of action, were acting for and on behalf of Duke University and within the course and scope of their employment with Duke University.

1077. As a direct and proximate result of the Defendants Smith, Stotsenberg, Drummond and Duke University's fraud, Plaintiffs have been damaged in an amount to be determined by a jury, and, additionally, as a result of Defendants' fraud, Plaintiffs are entitled to recover punitive damages in an amount to be determined by a jury.

## JURY DEMAND

1078. Plaintiffs hereby request a trial by jury on all claims and issues so triable.

## RULE 9(j) PRECERTIFICATION

1079. To the extent that any of the foregoing Causes of Action is construed to constitute a cause of action or complaint alleging medical malpractice by a health care provider as defined in G.S. 90-21.11 in failing to comply with the applicable standard of care under G.S. 90-21.12, undersigned counsel hereby specifically asserts that the medical care has been reviewed by a person who is reasonably expected to qualify as an expert witness under Rule 702 of the Rules of Evidence and who is willing to testify that the medical care did not comply with the applicable standard of care.

## PRAYER FOR RELIEF

WHEREFORE, to redress the injuries proximately and directly caused by Defendants' conduct as stated in the foregoing paragraphs, and to prevent the substantial risk of irreparable injury to other Duke University Students resulting from the policies, customs, practices, and supervising misconduct alleged herein, Plaintiffs hereby requests the following relief:

(1)     Compensatory damages for constitutional deprivations; past and future economic loss, physical harm, emotional trauma, loss of privacy, and reputational harm; loss of education and the expenses associated with the criminal investigation and subsequent proceedings maintained by Defendants' unlawful conduct;

(2)     Damages in an amount to be established at trial to exemplify and punish those Defendants whose conduct in this matter was outrageous, pursued out of actual malice, a reckless and callous disregard, and a deliberate indifference to Plaintiffs' rights sufficient to dissuade them from engaging in similar conduct in the future, and to deter others similarly situated from engaging in similar misconduct in the future.

(3)     Damages in an amount to be established at trial to exemplify and punish those defendants whose wrongful conduct in this matter was aggravated by fraud, malice, or willful or wanton conduct, as well as those Defendants

whose officers, directors, or managers participated in or condoned the conduct constituting the of the entities that participated in or condoned the wrongful conduct that was aggravated by fraud, malice, or willful or wanton conduct.

(4)     An award for reasonable and customary costs, expenses, and interest incurred in pursuit of this action; and

(5)     All other and further relief the Court may deem just and proper.

Dated:  December   17, 2007                    Respectfully submitted by:

EKSTRAND & EKSTRAND, LLP

_____
Robert C. Ekstrand   (NC Bar #26673)
811 Ninth Street, Suite 260
Durham, North Carolina   27705
Telephone:    (919) 416-4590
Email:          rce@ninthstreetlaw.com

Attn:  Stefanie Sparks
(603)494-1865
sas233@law.georgetown.edu