# UNITED STATES DISTRICT COURT FOR THE
# MIDDLE DISTRICT OF NORTH CAROLINA

|  |  |
|---|---|
| RYAN McFADYEN; MATTHEW WILSON; and BRECK ARCHER,<br><br>     Plaintiffs,<br><br>  v.<br><br>DUKE UNIVERSITY; DUKE UNIVERSITY POLICE DEPARTMENT; AARON GRAVES; ROBERT DEAN; LEILA HUMPHRIES; PHYLLIS COOPER; WILLIAM F. GARBER, II; JAMES SCHWAB; JOSEPH FLEMING; JEFFREY O. BEST; GARY N. SMITH; GREG STOTSENBERG; ROBERT K. STEEL; RICHARD H. BRODHEAD, Ph.D.; PETER LANGE, Ph.D.; TALLMAN TRASK, III, Ph.D.; JOHN BURNESS; LARRY MONETA, Ed.D.; VICTOR J. DZAU, M.D.; ALLISON HALTOM; KEMEL DAWKINS; SUZANNE WASIOLEK; STEPHEN BRYAN; MATTHEW DRUMMOND; DUKE UNIVERSITY HEALTH SYSTEMS, INC.; PRIVATE DIAGNOSTIC CLINIC, PLLC; JULIE MANLY, M.D.; THERESA ARICO, R.N.; TARA LEVICY, R.N.; THE CITY OF DURHAM, NORTH CAROLINA; MICHAEL B. NIFONG; PATRICK BAKER; STEVEN CHALMERS; RONALD HODGE; LEE RUSS; STEPHEN MIHAICH; BEVERLY COUNCIL; JEFF LAMB; MICHAEL RIPBERGER; LAIRD EVANS; JAMES T. SOUKUP; KAMMIE MICHAEL; DAVID W. ADDISON; MARK D. GOTTLIEB; BENJAMIN W. HIMAN; LINWOOD WILSON; RICHARD D. CLAYTON; DNA SECURITY, INC.; RICHARD CLARK; and BRIAN MEEHAN, Ph.D.<br><br>     Defendants. | Case No. 1:07-cv-953 |

# FIRST AMENDED COMPLAINT

# JURY TRIAL DEMANDED

# TABLE OF CONTENTS

SUMMARY OF THE ACTION .................................................................. 2

THE PARTIES ................................................................................ 4

I.      THE PLAINTIFFS ................................................................. 4

II.     THE DEFENDANTS ............................................................... 4

     A.     Duke University Defendants ........................................... 4

     B.     City of Durham Defendants ........................................... 17

     C.     DNASI Defendants ..................................................... 27

JURISDICTION & VENUE .................................................................. 30

FACTUAL ALLEGATIONS .................................................................. 31

I.      THE SECRET:  THIS WAS THE DUKE POLICE
DEPARTMENT'S CASE ...................................................... 31

     A.     The Duke Police Department Had the Primary
Responsibility to Investigate Mangum's False Accusations........... 31

     B.     The University's False-Helplessness Message .................... 33

     C.     The Duke Police Department's Established Practice of
Taking Exclusive Responsibility for Investigating Crimes
Reported in its Primary Jurisdiction................................ 35

     D.     At All Times, the Duke Police Department Had a Realistic
Opportunity to Prevent the Harms Done to Plaintiffs, But
Instead 'Turned a Blind Eye' to the Plainly Obvious
Violations of Plaintiffs' Rights, and Did Nothing ........................ 41

II.     ORIGINS OF THE DUKE-DURHAM CONSPIRACY:  THE
"ZERO-TOLERANCE FOR DUKE STUDENTS" POLICY ................... 41

     A.     Duke-Durham Policy to Target Duke Students for
Disproportionate Enforcement of the Criminal Laws..................... 42

     B.     Duke and Durham Publicly Condone and Ratify the
Targeting of Duke Students ........................................... 45

III.     "ZERO-TOLERANCE FOR DUKE STUDENTS":  AN ESTABLISHED POLICY AND PRACTICE IN THE FALL OF 2005 ..................................................................... 46

     A.     The Consortium's Warrantless Raids of Duke Students' Homes ................................................................. 46

     B.     In One Weekend, Consortium Agents Charged Roughly 200 Duke Students Without Admissible Evidence ................................. 49

     C.     Duke Officials with Final Policymaking Authority Ratified the Warrantless Raids, and Initiated Cumulative Prosecution of the Students Within the University's Disciplinary System ......... 51

     D.     Durham Judge Declares the Warrantless Raids and Interrogations of Duke Students Illegal ........................................... 53

     E.     Police Misconduct and Student Abuse Escalates and Turns Violent Through the Fall of 2005, Culminating in the Investigation of Mangum's False Allegations ................................. 54

     F.     Gottlieb's Raid of 203 Watts ............................................................. 57

     G.     Sarvis Ratifies and Condones the Escalating Police Abuse of Duke Students .................................................................... 63

IV.     THE GOTTLIEB DOSSIER ...................................................................... 64

     A.     M.D. Gottlieb ...................................................................................... 64

     B.     Duke and Durham Receive Notice that Gottlieb is Dangerous to the Welfare of Duke Students ................................... 65

     C.     Shortly After the Gottlieb Dossier Was Delivered, Sgt. Gottlieb Was Transferred Off the Patrol Beat .................................. 67

     D.     Gottlieb's Replacement: Sgt. John Shelton ..................................... 67

     E.     Captain Sarvis Ratified and Condoned Gottlieb's Abuses From His Post in Internal Affairs ....................................................... 68

     F.     Duke University Officials Ratify and Condone Gottlieb's Abuses and Reveal that the University was an Author of the Zero-Tolerance for Duke Students Policy ........................................ 69

V.     IN FEBRUARY, 2006, DUKE UNIVERSITY ASSUMED PRIMARY POLICE JURISDICTION OVER 610 N. BUCHANAN AND A RAFT OF NEARBY PROPERTIES ALONG DUKE'S EAST CAMPUS ........................................................... 70

VI.      THE FIRST 48 HOURS ............................................................ 71

      A.     Overwhelming Evidence that Mangum was not Assaulted at 610 N. Buchanan is Amassed in the First 48 Hours of Mangum's False Accusation ........................................... 71

      B.     The "Anonymous" 911 Call ............................................ 75

VII.    THE FIRST INVESTIGATION:  GOTTLIEB'S REPLACEMENT, SERGEANT SHELTON, AND INVESTIGATOR JONES CONCLUDE MANGUM'S CLAIMS ARE FABRICATIONS .................................... 76

      A.     Sgt. J.C. Shelton Responds to Pittman's 911 Call ........... 76

      B.     On the Drive Away from 610 N. Buchanan:  Evidence of Psychosis ..................................................................... 78

      C.     Kroger Security Guard, Angel Altmon: "Ain't No Way" .............. 78

      D.     Mangum's Bizarre Behavior Meets the Criteria for Emergency Involuntary Commitment ............................. 80

      E.     Angel Altmon: Ain't No Way. ....................................... 81

VIII.   MANGUM NODS 'RAPE' ................................................... 82

      A.     Mangum's Involuntary Commitment Proceedings ........... 82

      B.     Mariecia Smith ............................................................ 82

      C.     Alycia Wright, R.N. ..................................................... 83

      D.     Officer Barfield .......................................................... 84

IX.     ADDITIONAL OVERWHELMING EVIDENCE OF INNOCENCE GATHERED DURING MANGUM'S 11 HOURS AT DUMC ON MARCH 14, 2006 ............................... 86

      A.     Sgt. Shelton Questions Mangum, and She Recants ......... 86

      B.     Officer Gwen Sutton's Interview of Mangum ................. 87

      C.     Durham Police Determine that 610 N. Buchanan is in the Duke Police Department's Jurisdiction and the Case is Transferred to Duke Police Investigators ....................... 88

      D.     Duke Police Department Initiates Its Investigation ......... 90

      E.     Inv. B. Jones Interviews Mangum .................................. 93

F.     The Clinical and Forensic Medical Evidence Collected at DUMC Corroborates Mangum's Recantation and Adds to the Already Overwhelming Proof That Mangum was Lying .......... 94

X.     MARCH 15TH:  ADDITIONAL EVIDENCE OF MANGUM'S FRAUD EMERGES AT UNC HOSPITALS .................... 100

     A.     New Hospital, New Story, New Motive ........................................ 100

     B.     Evidence Emerges of Mangum's Long History of Mental Illness and Addictions .................................................................. 101

XI.     THE BODY OF EVIDENCE AMASSED IN THE FIRST 48 HOURS PROVED MANGUM'S RAPE CLAIM WAS A HOAX ................................................................................................ 102

XII.     THE SECOND INVESTIGATION (MARCH 16 – 21): DUKE UNIVERSITY DEFENDANTS AND DURHAM POLICE COLLABORATE TO IDENTIFY THE PERPETRATORS OF A GANG RAPE THAT DID NOT HAPPEN ................................................................................................ 107

     A.     Gottlieb "Adopts" the Case ........................................................ 107

     B.     Gottlieb's First Investigative Act Was to Stigmatize the Plaintiffs in the Eyes of the Community by Falsely Asserting That a Rape Had, In Fact, Occurred ............................. 109

     C.     Gottlieb Assigns the Case to Ben Himan, a Rookie Property Crimes Investigator ....................................................................... 110

     D.     Duke Police and Durham Police Aid in Gottlieb's Re-Investigation of Mangum's Fictitious Claims................................ 111

     E.     Gottlieb Launches his Re-Investigation with Effort to Identify the "Attackers" .................................................................. 113

     F.     Gottlieb and Himan "Interview" Mangum and Obtain Even More Evidence of Plaintiffs' Innocence ........................................ 114

     G.     Mangum's Descriptions and the March 16th and 21st Identification Procedures Eliminated Every Team Member as a Plausible Suspect.................................................................... 115

XIII.     AS OF MARCH 21ST, THERE WAS NO RATIONAL BASIS TO CONTINUE INVESTIGATING THE DUKE LACROSSE TEAM .................................................................................. 119

     A.     Mangum was not Credible ........................................................... 119

B. Even if Mangum were Credible, Mangum had Already Eliminated Every Member of the Team as a Plausible Suspect ........................................................................ 120

C. Gottlieb and Himan Coerce Pittman to Recant her Statement that Mangum's Claim was a Crock and Provide a New Statement that Created a Window of Opportunity for a Sexual Assault to have Occurred .................................... 121

XIV. MANY, MANY STONES LEFT UNTURNED ....................................... 122

XV. THE CONSPIRACY TO ORCHESTRATE THE MASS INTERROGATION OF UNCOUNSELED STUDENTS ...................... 126

A. Duke University Defendants' Acts in Furtherance of the Conspiracy .................................................................... 126

B. The Durham Police Defendants' Acts in Furtherance of Conspiracy .................................................................... 127

C. Implementation of the Conspiracy ................................. 128

D. Counsel Intervenes Overnight to Advise the Plaintiffs and their Teammates of the Nature of the Charges and the Nature of the Individual Investigating Them ................................. 129

XVI. THE CONSPIRACY TO RETALIATE AGAINST PLAINTIFFS FOR EXERCISING CONSTITUTIONAL RIGHTS ........................................................................... 130

A. Gottlieb and Himan Abused the NTID Order Process in Retaliation Against Plaintiffs for Exercising Their Constitutional Rights ....................................................... 130

B. WHEN POLICE SOUGHT THE NTID ORDER DIRECTED TO PLAINTIFFS, MANGUM HAD ALREADY EXCLUDED THEM AS PLAUSIBLE SUSPECTS ........................................................................ 137

XVII. THE CHAIRMAN'S DIRECTIVE ........................................................ 139

XVIII. THE CONSPIRACY TO CONCEAL THE DUKE POLICE DEPARTMENT'S STATUTORY AUTHORITY TO INTERVENE AND INVESTIGATE ...................................... 140

A. The CMT'S Acts in Furtherance of the Conspiracy .................... 141

B. Duke Officials Cascade the Message that Only the Durham Police have the Authority to Investigate and Find the Truth. ........ 142

C.      Duke Police Officers Concealed Exculpatory Evidence by Fabricating False and Misleading Hospital "Witness Statements".................................................................................... 145

D.      Duke Police Department's Public Efforts to Conceal its Authority to Intervene ................................................................ 149

XIX.      THE THIRD INVESTIGATION (MARCH 24TH – JANUARY 11TH ): NIFONG ARROGATED THE INVESTIGATION TO HIMSELF TO WIN ELECTION........................ 150

A.      Nifong's Non-electability.............................................................. 150

XX.      THE UNIVERSITY'S EFFORT TO COERCE CONFESSIONS IN THE ABSENCE OF COUNSEL ............................ 153

XXI.      THE CONSPIRACY TO CONVICT BY STIGMATIZTION IN RETALIATION FOR PLAINTIFFS' EXERCISE OF THEIR CONSTITUTIONAL RIGHTS .................................................... 154

A.      Nifong's Public Acts and Statements............................................. 155

B.      Addison Publicly Stigmatized the Plaintiffs .................................. 158

C.      The Established Policy or Custom of Disseminating Defamatory Posters in Potentially High-Profile Cases ................. 164

D.      Duke Officials Publicly Stigmatized the Plaintiffs ....................... 166

E.      Duke University's Clergy Publicly Stigmatize the Plaintiffs ........ 173

F.      Duke University and City of Durham Officials with Final Policymaking Authority Ratified and Condoned the Foregoing Faculty and Employee Statements................................ 174

XXII.      THERE NEVER WAS A STONE WALL OF SILENCE........................ 176

A.      Plaintiffs did not Refuse to Cooperate Until it was Plainly Obvious they were Being Framed for Crimes Police Knew Never Happened ............................................................................ 176

B.      Plaintiffs did "Come Forward" to Unequivocally Deny the Allegations and Assert that the DNA Will Prove Their Innocence (Again) ........................................................................ 177

C.      Unbeknownst to the Plaintiffs, the DNA Test Results Already Proved Mangum's Accusations were False .................... 178

XXIII.     THE RACIST DIMENSION OF THE CONSPIRACY TO
           CONVICT ............................................................................ 178

    A.     Spoilation of DECC Evidence ....................................... 179

    B.     Nifong's Acts in Furtherance of the Conspiracy to Fabricate
           a "Racist" Dimension to Mangum's False Rape Accusation ......... 182

    C.     Brodhead's Acts in Furtherance of the Conspiracy to
           Fabricate the "Racist" dimension to Mangum's False Rape .......... 184

    D.     The Duke Faculty's Acts in Furtherance of the Fabrication
           of a "Racist" Dimension to Mangum's False Allegations ............. 184

XXIV.      THE CONSPIRACY TO ABUSE THE WARRANT
           PROCESS............................................................................ 187

    A.     Himan and Gottlieb Brief Nifong and Conspire to
           Stigmatize the Plaintiffs ................................................. 187

    B.     Ryan's Email ............................................................... 188

    C.     The Agreement to Abuse the Warrant Power ................................ 188

    D.     Judge Stephens Frustrated the Conspiracy, Temporarily.............. 193

XXV.       THE DNA CONSPIRACY ....................................................... 194

    A.     March 27th:  The SBI Lab's Testing of the Rape Kit Begins,
           and Ends ...................................................................... 194

    B.     March 28th:  SBI Lab Notifies Himan and Nifong that There
           will be No DNA Match Between any Player and Mangum's
           Rape Kit Items................................................................ 194

XXVI.      MARCH 29TH:  THE DUKE—DURHAM JOINT
           COMMAND MEETS.............................................................. 196

XXVII.     NIFONG, HIMAN, AND GOTTLIEB CONSPIRED TO
           WITHHOLD DNA TEST RESULTS THAT PROVED
           MANGUM'S CLAIMS WERE A FRAUD IN VIOLATION
           OF N.C.G.S. § 15A-282 .......................................................... 201

    A.     Plaintiffs' Entitlement to Results Pre-indictment .......................... 201

    B.     Nifong, Himan, and the Himan Chain of Command Agree to
           Delay Disclosure of the SBI Lab's Test Results in Violation
           of N.C.G.S. §15A-282.................................................... 203

C. Faced with Irrefutable Evidence of Plaintiffs' Innocence, Nifong and the Himan Chain of Command Resolved to Fabricate a Case Against Plaintiffs and/or Their Teammates........ 203

D. With No Forensic Evidence of a Violent Assault from the SBI Lab, Nifong Traded Horses..................................................... 204

XXVIII. ON APRIL 4TH, NIFONG RECEIVES THE FINAL SBI REPORT OF ALL TEST RESULTS; AND NIFONG SEEKS ASSISTANCE FROM A PRIVATE DNA LAB THAT WAS AGGRESSIVELY LOBBYING FOR THE CITY'S BUSINESS ...................................................................................... 207

XXIX. THE IDENTIFICATION CONSPIRACIES............................................. 209

XXX. THE CONSPIRACY TO FABRICATE IDENTIFICATION EVIDENCE ...................................................................................... 211

A. The April 4th "Pick Three" Identification Procedure .................... 211

B. Mangum's Sharpening Memory ..................................... 213

XXXI. THE CONSPIRACY TO CONCEAL IDENTIFICATION PROCEDURE RESULTS IN VIOLATION OF N.C.G.S. § 15A-282.................................................................................................. 214

XXXII. APRIL 5TH: A SEALED DNA ORDER WAS ISSUED AND RYAN'S SEARCH WARRANT AFFIDAVIT WAS UNSEALED. ........................................................................................... 219

A. Nifong Obtained an Order Authorizing DNA Evidence Transfer to DNASI ........................................................................ 219

B. The Same Day, the McFadyen Search Warrant was Unsealed and Duke Unilaterally Suspended Ryan from School ............................................................................................ 220

C. Contemporaneously with Ryan's Suspension, Defendants Moneta and Brodhead Respond Differently to an Actually Threatening Student Email............................................................. 222

D. Matthew Wilson and Breck Archer were also Subject to Sanctions when Other, Similarly Situated Students were not, and in Violation of the University's Student Bulletin.................... 224

E. The University-Student Contract Created by Duke University ....................................................................................... 229

XXXIII.    THE CONSPIRACY TO CONCEAL DNASI'S TEST
           RESULTS IN VIOLATION OF N.C.G.S. § 15A-282 ............................ 233

     A.    Pursuant to N.C.G.S. § 15A-282, Plaintiffs were Entitled to
           a Written Report of Every Test Conducted by DNASI with
           their DNA ................................................................................................. 236

     B.    Nifong, Gottlieb, Himan, Meehan, and Clark Developed a
           Novel Reporting Method that—by Design—Concealed
           Exculpatory Test Results .............................................................................. 238

     C.    Use of the DNASI Report to Harass and Intimidate the Most
           Important Fact Witness for all Three Defendants .......................... 239

     D.    Nifong and City Defendants Manipulate the Media to Create
           Public Perception that the DNA Test Results Implicated
           Plaintiffs or Their Teammates ...................................................................... 241

XXXIV.     THE SANE CONSPIRACY ................................................................... 242

     A.    Levicy's False Claims of Corroborating Evidence ........................ 243

     B.    Theresa Arico Publicly Ratified Levicy's Fabricated SANE
           Evidence ........................................................................................................ 246

     C.    Levicy Produced Falsified Medical Records to Support her
           Fabrications .................................................................................................. 246

XXXV.      APRIL 10TH —14TH:  NIFONG DETERMINES TO
           INDICT TO WIN ELECTION ............................................................... 252

     A.    April 10th:  Two DNA Labs Reports, No DNA Match .................. 252

     B.    April 11, 2006:  The NCCU Forum ................................................ 254

     C.    April 12, 2006:  Nifong Sought Sealed Indictments to
           Further Stigmatize the Plaintiffs ...................................................... 257

XXXVI.     APRIL 14TH:  GOTTLIEB, HIMAN, AND DUKE POLICE
           CONSPIRE TO FORCE THE WAIVER OF   PLAINTIFFS'
           AND THEIR TEAMMATES' ASSERTED
           CONSTITUTIONAL RIGHTS ............................................................... 258

     A.    Fraudulent Email Sent Through Breck Archer's Email
           Account .......................................................................................................... 259

     B.    Gottlieb and Himan, Aided by the Duke Police Department,
           Enter Dorms to Obtain Information from Represented
           Lacrosse Players ............................................................................................ 259

C.    Duke Facilitated and Condoned the Investigators' Warrantless Entry into the Dorms and the Custodial Interrogation of Represented Team Members............................... 260

XXXVII.    THE CHAIRMAN'S DIRECTIVE SPAWNED AN "AD HOC" INVESTIGATIVE COMMITTEE TO IMPEACH PLAINTIFFS' CHARACTER AND CREDIBILITY AS PUTATIVE WITNESSES, CRIMINAL DEFENDANTS, AND CIVIL PLAINTIFFS. ...................................................... 261

XXXVIII.    THE CHAIRMAN'S CMT DIRECTED THE UNIVERSITY TO VIOLATE FEDERAL BANKING AND EDUCATIONAL PRIVACY LAWS IN FURTHERANCE OF CONSPIRACY TO CONVICT PLAINTIFFS ........................................ 269

XXXIX.    THE CHAIRMAN AND THE DUKE CMT DEFENDANTS DIRECTED UNIVERSITY'S VIOLATIONS OF FEDERAL ELECTIONS LAWS IN FURTHERANCE OF THE CONSPIRACY TO CONVICT PLAINTIFFS ........................................ 275

A.    Plaintiffs' Voter Registration Campaign........................................ 276

B.    The Chairman Participated in the University's Cover-Up of its Federal Election Law Violations ............................... 279

XL.    THE CITY OF DURHAM AND DUKE UNIVERSITY FORMALLY AND PUBLICLY RATIFIED THEIR OFFICERS AND EMPLOYEES CONDUCT........................................ 280

XLI.    NIFONG HAS BEEN PROFESSIONALLY REBUKED, DISBARRED, CONVICTED AND INCARCERATED FOR HIS ACTS IN FURTHERANCE OF THE CONSPIRACIES ALLEGED HERE ................................................................... 283

A.    North Carolina's Attorney General Professionally AACondemned Nifong's Acts in Furtherance of the Conspiracies Alleged Herein.......................................... 283

B.    The State Bar of North Carolina Disbarred Nifong ....................... 284

C.    The State Judiciary Charged, Tried, Convicted, and Incarcerated Nifong for his Acts in Furtherance of the DNA Conspiracy...................................................................... 284

**CAUSES OF ACTION**..................................................................................**286**

FIRST CAUSE OF ACTION:......................................................................286

    SEARCH AND SEIZURE IN VIOLATION OF 42 U.S.C. § 1983
    & CONSPIRACY ..........................................................................286

SECOND CAUSE OF ACTION:.................................................................289

    SEARCH AND SEIZURE IN VIOLATION OF 42 U.S.C. § 1983
    & CONSPIRACY ..........................................................................289

THIRD CAUSE OF ACTION: ....................................................................291

    ABUSE OF PROCESS AND CONSPIRACY IN VIOLATION OF
    42 U.S.C. § 1983 ..........................................................................291

FOURTH CAUSE OF ACTION:..................................................................294

    DEPRIVATION OF property IN VIOLATION OF 42 U.S.C. §
    1983 ..............................................................................................294

FIFTH CAUSE OF ACTION:......................................................................298

    FALSE PUBLIC STATEMENTS IN VIOLATION OF 42 U.S.C.
    §1983 ............................................................................................298

SIXTH CAUSE OF ACTION: .....................................................................305

    MANUFACTURE OF FALSE INCULPATORY EVIDENCE &
    CONSPIRACY IN VIOLATIONOF 42 U.S.C. § 1983 ...............305

SEVENTH CAUSE OF ACTION: ...............................................................308

    CONCEALMENT OF EXCULPATORY EVIDENCE &
    CONSPIRACY IN VIOLATION OF 42 U.S.C. § 1983 ..............308

EIGHTH CAUSE OF ACTION:...................................................................310

    INTERFERING WITH RIGHT ENGAGE IN POLITICAL
    PROCESSES IN VIOLATION OF 42 U.S.C. § 1983 &
    CONSPIRACY................................................................................310

NINTH CAUSE OF ACTION: ....................................................................311

    RETALIATION IN VIOLATION OF 42 U.S.C. § 1983 &
    CONSPIRACY..............................................................................311

TENTH CAUSE OF ACTION:..................................................................... 314

    DEPRIVATION OF THE PRIVILEGES AND IMMUNITIES OF
        NORTH CAROLINA CITIZENS IN VIOLATION OF 42
        U.S.C. §1983 ................................................................. 314

ELEVENTH CAUSE OF ACTION:............................................................ 315

    FAILURE TO PREVENT DEPRIVATION OF
        CONSTITUTIONAL RIGHTS    IN VIOLATION OF 42
        U.S.C. § 1983 ................................................................. 315

TWELFTH CAUSE OF ACTION: ............................................................. 322

    MONELL LIABILITY FOR VIOLATIONS OF 42 USC § 1983 .......... 322

    A.    City and University Policies Were the Moving Force Behind
        the Deprivations of Plaintiffs' Constitutional Rights..................... 322

    B.    Officials with Final Policymaking Authority Participated in
        or Directed the Violations of Plaintiffs' Constitutional
        Rights .............................................................................. 329

    C.    Duke University and City of Durham Officials with Final
        Policymaking Authority with Respect to the Investigation
        Delegated Some or All of their Policymaking Authority But
        Failed to Exercise Adequate Supervising Responsibility
        over the Delegate's Exercise of said final policymaking
        authority. .......................................................................... 331

THIRTEENTH CAUSE OF ACTION:........................................................ 346

    SUPERVISORY LIABILTIY FOR VIOLATIONS OF 42 U.S.C. §
        1983 .............................................................................. 346

    A.    The Failure to Control and Supervise the Investigation
        Caused the Violations of Plaintiffs' Constitutional Rights. ........... 346

    B.    Durham Police Supervising Defendants' Failure to Control
        and Supervise Gottlieb Led to Violations of Plaintiffs'
        Constitutional Rights. ....................................................... 349

    C.    The Durham Supervising Defendants' Failure to Control and
        Supervise Addison Led to the Violations of Plaintiffs'
        Constitutional Rights. ....................................................... 351

    D.    The Durham Police Supervising Defendants' Failure to
        Control and Supervise Defendant Michael Led to Violations
        of Plaintiffs' Constitutional Rights ................................... 353

FOURTEENTH CAUSE OF ACTION: ....................................................... 356

    FAILURE TO TRAIN in VIOLATION OF 42 U.S.C. §1983 ................ 356

FIFTEENTH CAUSE OF ACTION: ........................................................ 360

    CONSPIRACY IN VIOLATION OF 42 U.S.C. § 1983 ......................... 360

SIXTEENTH CAUSE OF ACTION: ......................................................... 365

    CONSPIRACY IN VIOLATION OF 42 U.S.C. § 1985 ......................... 365

SEVENTEENTH CAUSE OF ACTION: ................................................... 369

    FAILURE TO INTERVENE IN VIOLATION OF 42 U.S.C. §
    1986 ...................................................................................................... 369

EIGHTEENTH CAUSE OF ACTION: ...................................................... 375

    COMMON LAW OBSTRUCTION OF JUSTICE &
    CONSPIRACY ..................................................................................... 375

NINETEENTH CAUSE OF ACTION: ..................................................... 379

    COMMON LAW ABUSE OF PROCESS & CONSPIRACY ................. 379

TWENTIETH CAUSE OF ACTION: ....................................................... 381

    INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
    AND CONSPIRACY ............................................................................ 381

TWENTY-FIRST CAUSE OF ACTION: .................................................. 384

    BREACH OF CONTRACT ................................................................... 384

TWENTY-SECOND CAUSE OF ACTION: .............................................. 386

    INVASION OF PRIVACY .................................................................... 386

TWENTY-THIRD CAUSE OF ACTION: ................................................. 387

    BREACH OF fiduciary duty & AIDING AND ABETTING .................. 387

TWENTY-FOURTH CAUSE OF ACTION: .............................................. 391

    FRAUD .................................................................................................. 391

TWENTY-FIFTH CAUSE OF ACTION: .................................................. 394

    NEGLIGENCE (DURHAM POLICE) .................................................... 394

TWENTY-SIXTH CAUSE OF ACTION: ................................................. 395

    NEGLIGENT HIRING, RETENTION, SUPERVISION,
    TRAINING & DISCIPLINE (DURHAM POLICE) ..................... 395

TWENTY-SEVENTH CAUSE OF ACTION: ............................................................. 398

    NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
        (DURHAM POLICE) ...................................................... 398

TWENTY-EIGHTH CAUSE OF ACTION: ............................................................. 399

    NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS ................. 399

TWENTY-NINTH CAUSE OF ACTION: ............................................................. 401

    NEGLIGENCE (DUKE POLICE) ........................................... 401

THIRTIETH CAUSE OF ACTION: ............................................................. 404

    NEGLIGENCE (DUKE) ...................................................... 404

THIRTY-FIRST CAUSE OF ACTION: ............................................................. 409

    NEGLIGENCE (SANE) ...................................................... 409

THIRTY-SECOND CAUSE OF ACTION: ............................................................. 410

    NEGLIGENT HIRING, RETENTION, SUPERVISION,
        TRAINING & DISCIPLINE (SANE) ......................... 410

THIRTY-THIRD CAUSE OF ACTION: ............................................................. 413

    NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
        (SANE) ........................................................................ 413

THIRTY-FOURTH CAUSE OF ACTION: ............................................................. 414

    NEGLIGENCE (DNASI) ...................................................... 414

THIRTY-FIFTH CAUSE OF ACTION: ............................................................. 415

    NEGLIGENT SUPERVISION, HIRING, TRAINING,
        DISCIPLINE, AND RETENTION (DNASI) ............... 415

THIRTY-SIXTH CAUSE OF ACTION: ............................................................. 416

    NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
        (DNASI) ...................................................................... 416

THIRTY-SEVENTH CAUSE OF ACTION: ............................................................. 417

    NEGLIGENCE (DUKE POLICE) ........................................... 417

THIRTY-EIGHTH CAUSE OF ACTION: ............................................................. 419

    NEGLIGENT SUPERVISION (DUKE POLICE) ................. 419

THIRTY-NINTH CAUSE OF ACTION: ............................................................. 420

NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
(DUKE POLICE) ........................................................................... 420

FORTIETH CAUSE OF ACTION: ................................................................ 422

NEGLIGENT ENTRUSTMENT (DUKE POLICE) ............................... 422

RULE 9(j) PRECERTIFICATION ......................................................... 425

JURY DEMAND ...................................................................................... 425

PRAYER FOR RELIEF ......................................................................... 426

**CERTIFICATE OF SERVICE** .................................................................... **428**

# SUMMARY OF THE ACTION

1.     This action arises out of a combination of actors and entities that we will call the Consortium. Consortium members include the Chairman of Duke University's Board of Trustees, the University, its faculty, and its SANE program; the City of Durham and its police department; a forensic DNA lab, DNASI, its controlling shareholder, and its lab director; and a (now) disbarred prosecutor.

2.     The Consortium's ultimate objective was to railroad the Plaintiffs and their 44 teammates into convictions as either principals or accomplices to a horrific, violent crime they knew never happened. The conspiracy involved multiple dimensions, including:

- A conspiracy to abuse the Nontestimonial Identification Order ("NTID Order") process;

- A conspiracy to abuse the Search Warrant process;

- A conspiracy to conceal exculpatory police witness testimony;

- A conspiracy to conceal exonerating forensic DNA evidence;

- A conspiracy to conceal exonerating forensic SANE evidence;

- A conspiracy to manufacture inculpatory forensic SANE evidence; and

- A conspiracy to stigmatize the Plaintiffs by subjecting them to public outrage, public condemnation, and infamy in the eyes of millions of people for crimes that the Defendants named in this action knew did not happen.

3.     The cumulative effect of the willful, malicious, and calculating manner in which Nifong, Gottlieb, the Chairman, his Crisis Management Team, the SANE Defendants, the DNASI Defendants, and their co-defendants participated in these unlawful conspiracies over the course of more than a year—even as national news cameras were upon them—shocks the contemporary conscience.

4.     Each dimension of the conspiracy was facilitated by the Defendants' refusal to intervene to prevent the harms conspired to be done to Plaintiffs, when they knew of the wrongs conspired to be done to them, and had the power to prevent or aid in preventing them. They 'turned a blind eye' and did nothing. So great was the damage done to these young men that even the unequivocal exoneration after a re-investigation led by two of this State's most revered prosecutors could not repair it.

5.     The word "innocent" does not trip lightly off the tongue of a prosecutor. Special Prosecutors James Coman and Mary Winstead, with State Bureau of Investigation ("SBI") Agents DeSilva and Tart, sought the truth, found the truth, and insisted upon a declaration of innocence. On April 11, 2007, the North Carolina Attorney General declared that the horrific rape and sexual offense allegations that transfixed the nation did not happen. For that and for the tireless work of special prosecutors Coman and Winstead, SBI Agents DeSilva and Tart, Ryan, Matt, and Breck are enormously grateful. This case is not about them, nor is it about the justice system in North Carolina. This case is a reckoning; it is an accounting of those who were willing to obstruct and pervert justice to serve their own selfish aims, those who had the power to intervene and did not, and the damage they have done.

# THE PARTIES

## I. THE PLAINTIFFS

6.      Plaintiff Ryan McFadyen is a citizen and resident of New Jersey.

7.      Plaintiff Matthew Wilson is a citizen and resident of North Carolina.

8.      Plaintiff Breck Archer is a citizen and resident of New York.

9.      When Crystal Mangum falsely claimed that she was sexually assaulted, the Plaintiffs were students in good standing at Duke University and members of the 2005-2006 Duke University Men's Lacrosse Team.

## II. THE DEFENDANTS

### A.   Duke University Defendants

10.     DUKE UNIVERSITY.  Duke University is an educational institution formed under the laws of North Carolina, with its primary place of business in Durham, North Carolina.  At all times relevant to this action, the Defendants identified herein as the Duke Police Department Defendants, Duke CMT Defendants, Duke Officials Defendants, Duke Administrator Defendants, and SANE Defendants were acting as constituent entities, agents and/or employees in the course and scope of their agency or employment with Duke University, and in furtherance of the University's business interests.  Further, at all times relevant to this action, Plaintiffs were enrolled as students at Duke University pursuant to enrollment agreements entered into between them.

### 1. Duke Police Department Defendants

11. DUKE UNIVERSITY POLICE DEPARTMENT.  The Duke Police Department is a
North Carolina law enforcement agency authorized and existing under the North
Carolina General Statutes.  Duke Police officers are commissioned under North
Carolina General Statutes without limitation; they have the full range of police
authority that the State grants to all other municipal law enforcement officers in their
respective jurisdictions.  The Duke Police Department has primary police jurisdiction
over, among other things, crimes reported to have occurred on property owned or
controlled by Duke University, including adjacent streets and roadways, within the
Durham city limits.  The Duke Police Department's duties include providing
comprehensive law enforcement services throughout its territorial jurisdiction
including, but not limited to the academic campus, a large medical center complex, an
8,000 acre research forest, and all property owned or controlled by Duke University
within the Durham city limits.  The Duke Police Department has 176 authorized
positions, including 67 commissioned Police Officers, 83 Security Officers, 12
Emergency Communications and Records Officers, a 24-hour 911 center, Criminal
Investigations Unit, and various administrative support personnel.

### 2. Duke Police Supervising Defendants

12. AARON GRAVES is, and at all times relevant to this action, was Duke University's
Associate Vice President for Campus Safety and Security.  In that capacity, Graves
was a supervisory official with final policymaking authority with respect to the Duke
Police Department.  At all relevant times to this action, Graves' duties included
developing and supervising the implementation of a strategic law enforcement plan

for the Duke Police Department's territorial jurisdiction and strategies and initiatives for enhanced safety and security at the University and DUHS. Graves is, and at all times relevant to this action, was a citizen and resident of North Carolina.

13. ROBERT DEAN was, at all times relevant to this action, the Director and Chief of the Duke Police Department. In that capacity, Dean was a University supervisory official with final policymaking authority with respect Duke Police Department activities and personnel, including the investigation of Mangum's claims. Dean supervised the day-to-day management of the Duke Police Department, and directed the Department's management team of Majors, including the Commander of the Duke Police Department's Uniform Patrol Division, the Commander of the Duke Police Support Division, and the Commander of Medical Center Affairs. Dean is, and at all times relevant to this action, was a citizen and resident of North Carolina.

14. LEILA HUMPHRIES was, at all times relevant to this action, the Assistant Police Chief for the Duke Police Department. In that capacity, Humphries was a supervisory University official with final policymaking authority with respect to the activities of the Duke Police Department. Humphries is, and at all times relevant to this action, was a citizen and resident of North Carolina.

15. PHYLLIS COOPER is, and at all times relevant to this action, was a Major for the Duke Police Department, acting as the Department's PIO Commander and Commander for the Investigations Division. In that capacity, Cooper was a supervisory University official with final policymaking authority with respect to the investigation of Mangum's false accusations. Cooper was, at all relevant times, one of the Department's liaisons to CrimeStoppers, and was responsible for obtaining and

tracking student citations from Durham and state law enforcement authorities. Cooper is, and at all times relevant to this action, was a citizen and resident of North Carolina.

16.     WILLIAM F. GARBER, II is, and at all times relevant to this action, was the Medical Center Affairs Manager for the Duke Police Department.  In that capacity, Garber was a supervisory University official with final policymaking authority with respect to the investigation of Mangum's false accusations. Garber's primary responsibilities include management of the police and security personnel within the Duke University Medical Center campus.  Upon information and belief, Garber is, and at all times relevant to this action, was a citizen and resident of North Carolina.

17.     JAMES SCHWAB was, and at all time relevant to this action, a fully commissioned North Carolina law enforcement officer, with the rank of Major for the Duke Police Department.  In that capacity, Schwab was a supervisory University official with final policymaking authority with respect to the investigation of Mangum's false accusations. Upon information and belief, Schwab is, and at all times relevant to this action, was a citizen and resident of North Carolina.

18.     JOSEPH FLEMING is, and at all times relevant to this action, was a fully commissioned North Carolina law enforcement officer, with the rank of Lieutenant for the Duke Police Department, serving as the Department's Supervisor of Investigations.  In that capacity, Fleming was an official with final policymaking authority with respect to the investigation of Mangum's false accusations.  At all times relevant to this action, Defendant Smith reported directly to Lt. Fleming.  Upon information and belief, Fleming is, and at all times relevant to this action, was a citizen and resident of North Carolina.

19.     JEFFREY O. BEST is, and at all times relevant to this action, was a fully
        commissioned North Carolina law enforcement officer, with the rank of Lieutenant
        for the Duke Police Department and the Department's Commander of the Duke Patrol
        Division "B" Squad.  Best's duties included supervising and directing the activities of
        the "B" Squad of the Duke Police Department's Patrol Division.  In that capacity,
        Best was a supervisor with official policymaking authority with respect to the Duke
        Police Department's investigation of Mangum's allegations.  Best was the Duke
        Police Watch Commander on the evening and early morning hours of March 14,
        2006, and supervised Duke Police officers' activities with respect to the investigation
        of Mangum's claims thereafter.  Upon information and belief, Best is, and at all times
        relevant to this action, was a citizen and resident of North Carolina.

### 3.      Duke Police Investigator Defendants

20.     GARY N. SMITH is, and at all times relevant to this action, was a fully
        commissioned North Carolina law enforcement officer, with the rank of First
        Sergeant, serving as an Investigator in the Duke Police Department.  In that capacity,
        Smith was a supervisor with official policymaking authority for Duke Police
        Department's investigation of Mangum's false accusations.  Smith is a certified
        criminal investigator and one of the Department's liaisons to CrimeStoppers.  Upon
        information and belief, Smith is, and at all times relevant to this action, was a citizen
        and resident of North Carolina.

21.     GREG STOTSENBERG is, and at all times relevant to this action, was a fully
        commissioned North Carolina law enforcement officer, with the rank of First Sergeant
        in the Duke Police Department's "D" Patrol Squad.  In that capacity, Stotsenberg was

a supervisor with final policymaking authority over Duke University's investigation of Mangum's false accusations. Stotsenberg's duties include conducting and coordinating investigative functions of the Duke Police Department. In addition, Stotsenberg was, at all relevant times, one of the Department's liaisons to CrimeStoppers. Upon information and belief, Stotsenberg is, and at all times relevant to this action, was a citizen and resident of North Carolina.

### 4.     The "Crisis Management Team"

22.     ROBERT K. STEEL ("The Chairman") is, and, at all times relevant to this action, was acting as the Chairman of the Executive Committee of the Duke University Board of Trustees; a University official with supervisory and policymaking authority with respect to all of Duke University's affairs, its employees, agents and constituent entities. Steel directed the University's ad-hoc "Crisis Management Team" ("CMT") from its formation on March 25, 2006 onward. The CMT was formed to direct the University's conduct in the investigation of Mangum's false allegations. From time to time, Steel directed the conduct of the Duke Police Department in the investigation of Mangum's false allegations of sexual assault, and in this capacity, acted under color of state law. Upon information and belief, Steel is, and at all times relevant to this action, was a citizen and resident of Connecticut.

23.     RICHARD H. BRODHEAD, Ph.D. is, and at all times relevant to this action, was acting as the President of Duke University. As President, Brodhead was the Chief Educational and Administrative Officer of the University; a University official with supervisory and policymaking authority with respect to all of Duke University's employees, agents, and constituent entities. Brodhead reports directly to the

Chairman of the Board of Trustees. His responsibilities include supervising, managing, and governing the University; interpreting and carrying out the policies of the Board; presiding over meetings of the University faculty, where he enjoys unbridled authority to overrule the decisions of the faculty, so long as he states his reasons for doing so; and has exclusive standing to recommend individuals to the Trustees to hold the other offices of the University. Brodhead was a member of the University's Crisis Management Team. Upon information and belief, Brodhead is, and at all times relevant to this action, was a citizen and resident of North Carolina.

24.     PETER LANGE, Ph.D. is, and at all times relevant to this action, was acting as the University's Provost; a University official with supervisory and policymaking authority with respect to all of Duke University's faculty, employees, agents, and constituent entities. Lange is the University's Chief Academic Officer; his duties include directing the University's academic operations and overseeing the University's teaching and research missions. Lange was a member of the University's Crisis Management Team. Upon information and belief, Lange is, and at all times relevant to this action, was a citizen and resident of North Carolina.

25.     TALLMAN TRASK, III, Ph.D. is, and at all times relevant to this action, was acting as the University's Executive Vice President; a University official with supervisory and policymaking authority with respect to all of Duke University's employees, agents, and constituent entities. Trask is the University's Chief Financial and Administrative Officer; his duties include directing the University's financial operations and overseeing the University's central administrative services and capital projects. Trask was a member of the University's Crisis Management Team. Upon

information and belief, Trask is, and at all times relevant to this action, was a citizen and resident of North Carolina.

26. JOHN BURNESS is, and at all times relevant to this action, was acting as the University's Senior Vice President for Public Affairs and Government Relations; a University official with supervisory and policymaking authority with respect to all of Duke University's interactions with local and national media, elected officials, community leaders, the Trustees, Deans, Faculty, *The Chronicle*, and student leaders. Burness was directly responsible for the Offices of News and Communications, Community Affairs, and Government Relations in Durham, Burness' duties include acting as the Official Spokesperson for the University, the University's liaison to the Duke-Durham Partnership Campaign, and as primary liaison to the City of Durham and the Durham Police Department. Burness was a member of the University's Crisis Management Team. Upon information and belief, Burness is, and at all times relevant to this action, was a citizen and resident of North Carolina.

27. LARRY MONETA, Ed.D., is, and at all times relevant to this action, was acting as Vice President for Student Affairs. In that capacity, Moneta served in a supervisory official with final policymaking authority with respect to issues relating to the University's undergraduate students, Judicial Affairs employees, agents, and constituent entities. Moneta's duties include supporting undergraduate students in their academic, social, personal, physical, and emotional needs. Moneta was responsible for the welfare of all students, and for coordinating the University's emergency responses. Moneta was a member of the University's Crisis Management

Team.  Upon information and belief, Moneta is, and at all times relevant to this action, was a citizen and resident of North Carolina.

28. VICTOR J. DZAU, M.D. is, and at all times relevant to this action, was acting as the Chancellor for Health Affairs, and President and Chief Executive Officer of Duke University Health Systems, Inc.  In that capacity, Dzau was supervisory official with final policymaking authority with respect to Duke University Health Systems, Inc., ("DUHS"), all of its employees, agents, and constituent entities.  Dzau's duties include oversight of DUHS entities' financial affairs, their prompt disclosure of threats to the health, safety, and welfare of the public created by DUHS's medical professionals, and those special powers and duties that are assigned to him by the President in his discretion.  Dzau was a member of the University's Crisis Management Team.  Upon information and belief, Dzau is, and at all times relevant to this action, was a citizen and resident of North Carolina.

29. ALLISON HALTOM, now retired from the University, was, at all times relevant to this action, acting as the University Secretary.  At all times relevant to this action, Haltom's duties included the maintenance of all records of the University.  Further, Haltom had all of those powers and duties specifically granted to her by President Brodhead, in his sole discretion, including the duty to convey to the Board of Trustees information designated by the Chairman to be conveyed.  Haltom was a member of the University's Crisis Management Team.  Upon information and belief, Haltom is, and at all times relevant to this action, was a citizen and resident of North Carolina.

**5.    Duke Administrator Defendants**

30.    KEMEL DAWKINS is, and at all times relevant to this action, was acting as Vice President for Campus Services; a University official with supervisory and policymaking authority with respect to, among other things, the University's Duke Card Office and Duke Police.  Dawkins reported directly to Duke University's Executive Vice President, Defendant Trask.  Dawkins is, and at all times relevant to this action, was the direct supervisor of Graves and Drummond.  Dawkins also attended command staff retreats with the Duke Police Department.  Dawkins is, and at all times relevant to this action, was a citizen and resident of North Carolina.

31.    SUZANNE WASIOLEK is, and at all times relevant to this action, was the Assistant Vice President for Student Affairs and Dean of Students.  Wasiolek received her J.D. from N.C.C.U. and worked as a practicing attorney for 9 months.  Upon information and belief, she has no experience in the practice of criminal law in North Carolina or any other jurisdiction.  Her duties include assisting Vice President Moneta in carrying out his obligations to coordinate the University's emergency responses.  Upon information and belief, Wasiolek is, and at all times relevant to this action, was a member of the North Carolina Bar and a citizen and resident of North Carolina.

32.    STEPHEN BRYAN is, and at all times relevant to this action, was acting as the Associate Dean of Students and Director of Judicial Affairs; a University official with supervisory and policymaking authority with respect to Duke University's disciplinary processes and the collection of disciplinary data.  Bryan's responsibilities include actively collecting the Duke and Durham Police reports for indications of student misconduct, imposing discipline—unilaterally or through a student Judicial

Board he selects and largely controls; keeping records of student incidents of misconduct; reporting those statistics to the Durham community and other agencies; and, relevant to the instant action, compiling the misleading and unreliable "data" upon which the Lacrosse Ad Hoc Review Committee drew its conclusions that misconduct on the part of members of the lacrosse team was disproportionate to that of other groups and the student body generally. Upon information and belief, Bryan is, and at all times relevant to this action, was a citizen and resident of North Carolina.

33.     MATTHEW DRUMMOND is, and at all times relevant to this action, was acting as the Senior Manager IT in Auxiliary Services and Head of the University's Duke Card Office; a University official with supervisory and policymaking authority with respect to the administration and protection of University students' Duke Card financial accounts and records. Upon information and belief, Drummond is, and at all times relevant to this action, was a citizen and resident of North Carolina.

**6.      The SANE Defendants**

34.     DUKE UNIVERSITY HEALTH SYSTEMS, INC. ("DUHS") is a corporation formed under the laws of the State of North Carolina, with its principal place of business in Durham, North Carolina. At all times relevant to this action, DUHS was a constituent entity of Duke University, and operated Duke University Medical Center ("DUMC") and the Durham Center Access. DUHS was an independent contractor retained by the City of Durham to provide forensic medical evidence collection and analysis services with respect to the investigation of Mangum's false accusations; in this capacity, DUHS, its supervisors, employees, and agents were acting under color of state law.

14

35. PRIVATE DIAGNOSTIC CLINIC, PLLC ("PDC") is a corporation formed under the laws of the State of North Carolina, with its principal place of business in Durham, North Carolina. Its members are healthcare providers with privileges at DUHS facilities. At all times relevant to this action, the PDC was an independent contractor retained by the City of Durham and/or Duke University to provide competent medical personnel to administer and supervise the provision of forensic medical evidence collection and analysis services in the investigation of Mangum's accusations; in this capacity, the PDC acted under color of state law.

36. JULIE MANLY, M.D. is, and at all times relevant to this action, was acting as a member of the DUHS House Staff and an employee physician of the PDC and Duke University, with supervisory and policymaking authority with respect to Levicy, Arico, DUHS and Duke University record-keeping personnel. At all times relevant to this action, Manly was retained by the City of Durham to provide and/or supervise forensic medical evidence collection and analysis services with respect to the police investigation of Mangum's accusations, and in that capacity, Manly acted under color of state law. Manly is, and at all times relevant to this action, was a citizen and resident of North Carolina.

37. THERESA ARICO, R.N., is, and at all times relevant to this action, was acting as a clinical nurse employed by DUHS as Supervisor of DUMC's SANE services, with supervisory and policymaking authority with respect to Duke University's SANE services and personnel. In that capacity, Arico supervised Levicy and the provision SANE services, record keeping, and witness services provided by Levicy and Manly in the investigation of Mangum's allegations. In that capacity, Arico was acting

under color of state law. Arico is, and at all times relevant to this action, was a citizen and resident of North Carolina.

38. TARA LEVICY, R.N. was, at all times relevant to this action, acting as a member of the DUHS and Duke University nursing staff and the DUHS SANE program as a SANE-in-Training. Levicy was retained by the City of Durham, to provide forensic medical evidence collection and analysis services in the investigation of Mangum's false accusations; and, in that capacity, Levicy acted under color of state law. Upon information and belief, Levicy is a citizen and resident of New Hampshire. At all times relevant to this action, Levicy was a citizen and resident of North Carolina.

_____

39. DUKE UNIVERSITY DEFENDANTS. Collectively, Duke University, Duke CMT Defendants, Duke Police Department Defendants, Duke Officials Defendants, Duke Administrator Defendants, and SANE Defendants, are referred to herein as the "Duke University Defendants."

40. CRISIS MANAGEMENT TEAM DEFENDANTS. Collectively, Steel, Brodhead, Lange, Trask, Burness, Moneta, Dzau, and Haltom, are referred to herein as the "CMT Defendants."

41. DUKE OFFICIALS DEFENDANTS. Collectively, Steel, the CMT Defendants, and the Duke Administrator Defendants, are referred to herein as the "Duke Officials Defendants."

42. SANE DEFENDANTS. Collectively, Levicy, Manly, Arico, PDC, DUHS, and Duke University, are referred to herein as the "SANE Defendants."

43.     DUKE POLICE DEPARTMENT DEFENDANTS.  Collectively, the Duke University
        Police Department, Duke Police Supervising Defendants, and the Duke Police
        Investigator Defendants, are referred to herein as the "Duke Police Department
        Defendants."

44.     DUKE POLICE SUPERVISING DEFENDANTS. Collectively, Brodhead, Trask,
        Dawkins, Graves, Dean, Humphries, Cooper, Garber, Schwab, Fleming, and Best, are
        referred to herein as the "Duke Police Supervising Defendants."

45.     DUKE POLICE INVESTIGATOR DEFENDANTS.  Collectively, Smith and
        Stotsenberg are referred to herein as the "Duke Police Investigator Defendants."

46.     DUKE ADMINISTRATOR DEFENDANTS.  Collectively, Dawkins, Wasiolek,
        Bryan, and Drummond, are referred to herein as the "Duke Administrator
        Defendants."

47.     DAY CHAIN OF COMMAND.  Collectively, the individuals comprising the line of
        authority from Day to Steel, including Best, Smith, Fleming, Cooper, Humphries,
        Dean, Graves, Dawkins, Trask, Brodhead, and Steel, will be referred to herein as the
        "Day Chain of Command."

### B.    City of Durham Defendants

48.     The CITY OF DURHAM (the "City") is a municipal corporation formed under the
        laws of the State of North Carolina.  Upon information and belief, the City of Durham
        has waived its immunity from civil liability pursuant to N.C.G.S. § 160A-485 by,
        among other things, procuring a liability insurance policy or participating in a
        municipal risk-pooling scheme.  The City of Durham operates the Durham Police

Department, which shares law enforcement authority in the City of Durham with the Duke University Police Department, pursuant to a statutory grant of authority and an agreement between the City of Durham and Duke University.

49.     MICHAEL B. NIFONG was disbarred for his conduct in the criminal investigation of Mangum's false allegations.  At all times relevant to this action, Nifong was the District Attorney for the Fourteenth Prosecutorial District in North Carolina. Beginning on or before March 24, 2006 and continuing through January 12, 2007, by virtue of delegated final policymaking authority from the City of Durham, Nifong was acting as a City of Durham supervisory official with final policymaking authority with respect to the investigation of Mangum's false accusations.  On June 16, 2007, a State Bar's Disciplinary Hearing Committee, after hearing five days of testimony, found him responsible for dozens of violations of the State Bar's Rules of Professional Responsibility for his misconduct in the investigation and prosecution of Mangum's claims.  The DHC disbarred Nifong his misconduct.  On June 19, 2007, Nifong was suspended from his position as District Attorney.  On July 2, 2007, Nifong tendered his resignation as District Attorney.  On August 31, 2007, the Honorable W. Osmond Smith III, upon charges of contempt, found Nifong guilty of criminal contempt, and sentenced him to a period of active incarceration for one of the instances of Nifong's misconduct in the prosecutions arising out of Mangum's false accusations.  Upon information and belief, Nifong is, and at all times relevant to this action, was a citizen and resident of North Carolina.

### 1.    Durham Police Supervising Defendants

50.    PATRICK BAKER is, and at all times relevant to this action, was acting as the City

Manger for the City of Durham.  In that capacity, Baker directly supervised the

Durham Police Department.  The Chief of Police reporting directly to him.  Baker was

the final element in the Himan Chain of Command, the Addison Chain of Command,

and the Michael Chain of Command. Baker was a City of Durham official with final

policymaking authority with respect to, among other things, the Durham Police

Department, the Durham Emergency Communications Center, and the investigation

of Mangum's false accusations.  Upon information and belief, Baker is, and, at all

times relevant to this action, was a citizen and resident of North Carolina.

51.    STEVEN CHALMERS was, at all times relevant to this action, the Chief of Police for

the Durham Police Department.  Chalmers reported directly to Baker, and shared final

policymaking authority for all matters relating to the Durham Police Department.  In

that capacity, Chalmers was a supervisory official with final policymaking authority

over all activities of the Durham Police Department.  Upon information and belief,

Chalmers is, and at all times relevant to this action, was a citizen and resident of

North Carolina.

52.    RONALD HODGE is, and at all times relevant to this action, was the Deputy Chief of

Police for the Durham Police Department. In that capacity, Hodge served as a

supervisory official with final policymaking authority with respect to the investigation

of Mangum's false accusations.  At all times relevant to this action, Hodge's duties

included directly supervising Russ, Mihiach, Council, Soukup, Addison and Michael.

Upon information and belief, on or shortly after March 14, 2006, Hodge assumed the

responsibilities of the Chief of Police for the Durham Police Department during the extended period of time in which Defendant Chalmers was on leave or made unavailable during the investigation of Mangum's false accusations, and retained them even after Chalmers returned. Hodge is, and at all times relevant to this action, was a citizen and resident of North Carolina.

53. LEE RUSS is, and at all times relevant to this action, was the Executive Officer to the Chief of Police in the Durham Police Department with the rank of Major. In that capacity, Russ was a supervisory officer with final policymaking authority with respect to the Durham Police Department's media and community relations activities, and the investigation of Mangum's false accusations. At all times relevant to this action, Russ' duties included supervising Defendant Michael and Defendant Addison. Upon information and belief, Russ is, and at all times relevant to this action, was a citizen and resident of North Carolina.

54. STEPHEN MIHAICH was, at all times relevant to this action, the Commander of Investigative Services for the Durham Police Department. In that capacity, Mihaich was a supervisor and official with final policymaking authority for the Durham Police Department with respect to all investigations of violent crimes, including rape, sexual offense and kidnapping. Mihaich was responsible for assigning investigators to cases based upon established criteria focused upon the level of experience and expertise of the investigator and the complexity and sensitivity of the case. Mihaich was also responsible for the Department's adherence to its case management system, and its investigators' compliance with the constitutions and laws of the State of North

Carolina and the United States. Mihaich is, and at all times relevant to this action, was a citizen and resident of North Carolina.

55. BEVERLY COUNCIL was, at all times relevant to this action, the Commander of the Uniform Patrol Bureau for the Durham Police Department. In that capacity, Council was an official with supervisory and final poicymaking authority for the Durham Police Department's Patrol Units and Districts, including District Two, Lamb, Ripberger, Gottlieb and Himan. Council was in the Chain of Command from Himan to Baker with respect to the investigation of Mangum's false accusations. After the City of Durham conducted an investigation of its Police Department's conduct in that investigation, Council was promoted to Deputy Chief of Police. Upon information and belief, Council is, and at all times relevant to this action, was a citizen and resident of North Carolina.

56. JEFF LAMB is now retired. Effective no later than March 6, 2006, and at all times relevant to this action, Captain Lamb was the Commander of the Durham Police Department's Patrol District Two. In that capacity, Captain Lamb had supervisory and final policymaking authority over District Two's patrol and property crimes personnel and activities. Captain Lamb was the Captain in the Chain of Command from Himan to Baker for the investigation of Mangum's allegations. Upon information and belief, Captain Lamb is, and at all times relevant to this action, was a citizen and resident of North Carolina.

57. MICHAEL RIPBERGER was, at all times relevant to this action, a Lieutenant in the Durham Police Department's District Two. In that capacity, Lt. Ripberger had supervisory and final policymaking authority with respect to property crimes

investigators and investigations in District Two, including the investigation of Mangum's allegations. Lt. Ripberger was the Patrol Lieutenant in the Chain of Command from Himan to Baker with respect to the investigation of Mangum's claims. After the City of Durham conducted an investigation of its Police Department's conduct in that investigation, the City of Durham promoted him. Lt. Ripberger was Sgt. Gottlieb's direct supervisor, and was in the chain of command established for the investigation of Mangum's false accusations. Lt. Ripberger is, and at all times relevant to this action, was a citizen and resident of North Carolina.

58. LAIRD EVANS is, and at all times relevant to this action, was a Sergeant in the Durham Police Department's District Two. At the inception of the investigation of Mangum's accusations, the City employed Evans as a uniformed patrol officer. Beginning in October of 2006, Evans replaced Gottlieb as Himan's direct supervisor in the continuing investigation of Mangum's false accusations. In that capacity, Evans had supervisory and final policymaking authority over Himan and the investigation. Upon information and belief, Evans is, and at all times relevant to this action, was a citizen and resident of North Carolina.

59. JAMES T. SOUKUP is, and at all times relevant to this action, was the Director of the Durham Emergency Communications Center ("DECC"). In that capacity, Soukup supervised all of the activities and personnel within the DECC, and had final policymaking authority over the retention, destruction, and public dissemination of DECC's audio recordings of Durham Police and Duke Police communications. Soukup delegated to Hodge and Michael all of his official policymaking authority with respect to records and recordings relating to the investigation of Mangum's false

accusations, including but not limited to the destroyed audio recordings of police exchanges on the evening in question. Soukup is, and at all times relevant to this action, was a citizen and resident of North Carolina.

### 2. Durham Police Spokesperson Defendants

60. KAMMIE MICHAEL is, and at all times relevant to this action, was the Durham Police Department's Public Relations Coordinator and Public Information Officer, a constituent office of the Office of the Chief. As such, Michael reported directly to Russ, the Chief of Police (or Acting Chief as the case may be), and Baker. Upon information and belief, at all relevant times to this action, Michael had supervisory and final policymaking authority with respect to the dissemination of information to the media and the public. Upon information and belief, Michael is, and at all times relevant to this action, was a citizen and resident of North Carolina.

61. DAVID W. ADDISON was promoted to Sergeant following the Department's internal investigation of its handling of Mangum's false accusations. At all times relevant to this action, Addison was Corporal, employed by the Durham Police Department as the Department's CrimeStoppers Coordinator, one of the four constituent officers stationed within the Office of the Chief of Police. As the Department's CrimeStoppers Coordinator, Addison reported directly to Russ, the Chief of Police or Acting Chief (as the case may be), and Baker, and was an official spokesperson for the Department. In that capacity, he was responsible for obtaining information pertaining to unsolved crimes and wanted fugitives through mass media publicity and reward incentives, and was responsible for channeling such information

from anonymous sources to investigators assigned to cases. Addison is, and at all times relevant to this action, was a citizen and resident of North Carolina.

### 3. Durham Investigator Defendants

62. MARK D. GOTTLIEB resigned from the Durham Police Department in the aftermath of an internal police investigation of allegations of sexual harassment brought by a female officer. At all times relevant to this action, Gottlieb was a Sergeant in District Two; first as a Patrol Sergeant, and, beginning in March of 2006, as an on-call supervisory of District Two's property crimes investigations. In that capacity, he had supervisory and final policymaking authority with respect to District Two's property crimes investigators and investigations. Gottlieb obtained control over the investigation of Mangum's false allegations by ordering the assigned Investigator, B. Jones, whom Gottlieb outranked, not to rule the allegations "unfounded" as she had determined to do, and to release the investigation to him. By virtue of that act and Mihiach's, Hodge's, Chalmers', and Baker's acquiescence in it, Gottlieb had supervisory and final policymaking authority with respect to the investigation of Mangum's false accusations. Upon information and belief, Gottlieb is, and at all times relevant to this action, was a citizen and resident of North Carolina.

63. BENJAMIN W. HIMAN resigned from the Durham Police Department in the aftermath of the revelation that his investigation had concealed and manufactured evidence in an attempt to frame innocents in an investigation of crimes that never happened. At all times relevant to this action, Himan was employed by the City as a property crimes investigator. Of the five property crimes investigators in District Two, Himan was, in his own words, "at the bottom of the list" in terms of seniority,

experience, training and skill. Gottlieb personally assigned Himan as "lead investigator" with respect to the investigation of Mangum's false accusations. The City had retained Himan as a rookie investigator shortly before its investigation of Mangum's false accusations began; prior to that, he was employed temporarily by Ocean City, Maryland during the seasonal spike in population at the beach. Himan's primary duties included the investigation of property crimes. Upon information and belief, Himan is, and at all times relevant to this action, was a citizen and resident of North Carolina.

64. LINWOOD WILSON was fired nine days after Nifong's disbarment by Interim District Attorney Jim Hardin in one of the Hardin's first acts as Interim District Attorney. At all times relevant to this action, Wilson held himself out as many things, but primarily as "an investigator." He was employed by the District Attorney for the Fourteenth Prosecutorial District in North Carolina to "assist" Nifong in undefined ways. For purposes of this action, Wilson shared with Nifong certain final policymaking authority, delegated from City officials, with respect to the investigation of Mangum's false accusations. Further, with supervisory and final policymaking authority delegated to him by the Durham Police Internal Affairs Unit and by Captain Lamb, Wilson conducted an "internal investigation" of District Two Sergeant John Shelton. Lamb directed the investigation of Shelton in retaliation for his intention to testify that he knew Mangum's claims were false, that Gottlieb, Himan and the Himan Chain of Command were conspiring to frame innocents, that the investigation was the Duke Police Department's responsibility, and his refused to abandon his intention to testify to those facts and others that would necessarily expose

the Department's misconduct.  Wilson is, and at all times relevant to this action, was a citizen and resident of North Carolina.

65.    RICHARD D. CLAYTON was, at all times relevant to this action, a District Two Patrol Officer employed by the Durham Police Department.  Prior to the investigation of Mangum's false accusations, Clayton was the frequent patrol partner of Sgt. Gottlieb in and around Duke University's East Campus.  Gottlieb frequently had Clayton sign off on charges he brought against Duke students to conceal his own participation in the arrest and abuse of Duke students in and around Duke's East Campus.  During the investigation of Magum's false accusations, Clayton reported directly to Gottlieb.  Clayton is, and at all times relevant to this action, was a citizen and resident of North Carolina.

_____

66.    CITY OF DURHAM DEFENDANTS.  Collectively, the City of Durham, Nifong, Durham Police Supervising Defendants, Durham Police Spokesperson Defendants, and Durham Investigator Defendants, are referred to herein as the "City of Durham Defendants."  At all times relevant to this action, the City of Durham Defendants were acting within the course and scope of their employment or agency with the City of Durham, and in furtherance of the City of Durham's interests.

67.    DURHAM POLICE DEPARTMENT DEFENDANTS.  Collectively, Durham Police Supervising Defendants, Durham Police Spokesperson Defendants, and Durham Investigator Defendants, are referred to herein as the "Durham Police Department Defendants."

68. DURHAM POLICE SUPERVISING DEFENDANTS. Collectively, Baker, Chalmers, Hodge, Russ, Mihaich, Council, Lamb, Ripberger, Evans, and Soukup, are referred to herein as the "Durham Police Supervising Defendants."

69. DURHAM INVESTIGATOR DEFENDANTS. Collectively, Gottlieb, Himan, Wilson, and Clayton, are referred to herein as the "Durham Investigator Defendants."

70. DURHAM POLICE SPOKESPERSON DEFENDANTS. Collectively, Michael and Addison, are referred to herein as the "Durham Police Spokesperson Defendants."

71. THE HIMAN CHAIN OF COMMAND. Collectively, Himan, Gottlieb/Evans, Ripberger, Lamb, Council, Hodge/Chalmers, and Baker are referred to herein as the "Himan Chain of Command."

72. THE ADDISON / MICHAEL CHAIN OF COMMAND. The chain of command running from Addison to Baker and from Michael to Baker were the same: Russ, Hodge/Chalmers, and Baker. They are referred to herein as the "Addison Chain of Command" or "Michael Chain of Command" as the case may be.

## C. DNASI Defendants

73. DNA SECURITY, INC. ("DNASI") is a corporation formed under the laws of the State of North Carolina with its principal place of business in Burlington, North Carolina. At all relevant times to this action, DNASI was an independent contractor retained by the State of North Carolina, the City of Durham, and/or the Durham Police Department, and/or the Duke Police Department to provide forensic DNA testing and analysis services with respect to the investigation of Mangum's false allegations; and, in this capacity, DNASI acted under color of state law. At all times

relevant to this action, the DNASI defendants were acting within the course and scope of their agency and/or employment with DNASI, and in furtherance of DNASI's identified business interests.

74.     RICHARD CLARK is, and at all times relevant to this action, was DNASI's President and controlling shareholder.  At all relevant times to this action, Clark participated in DNASI's lobbying efforts directed to City of Durham Officials to obtain contracts for the provision of DNA testing and analysis services to the City of Durham.  In particular, Clark participated in City's the engagement of DNASI on behalf of the City of Durham to provide forensic DNA testing and analysis services in the City's investigation of Mangum's false accusations; and, in this capacity, Clark acted under color of state law.  As President and controlling shareholder of DNASI, Clark was, at all relevant times, a DNASI official with final policymaking authority for DNASI in all matters relating to DNASI's personnel, its services, and reports of those services.  Upon information and belief, Clark is, and at all times relevant to this action, was a citizen and resident of North Carolina.

75.     BRIAN MEEHAN, Ph.D. was, at all times relevant to this action, employed as the Laboratory Director of DNASI.  Upon information and belief, Meehan served in a supervisory capacity with respect to DNASI's laboratory personnel, and was an official who shared with Clark official policy-making authority over all matters relating to DNASI's forensic testing and its reporting of the results of such tests.  Meehan negotiated with Durham Police Officers for the provision of DNA testing services, and conducted the testing and reporting of DNASI's forensic DNA testing and analysis services relating to the investigation of Mangum's false accusations; and,

in this capacity, he acted under color of state law.  Upon information and belief, Meehan is, and at all times relevant to this action, was a citizen and resident of North Carolina.

---

76.    DNASI DEFENDANTS.  Collectively, DNA Security, Inc., Clark, and Meehan, are referred to herein as the "DNASI Defendants."

77.    THE CONSORTIUM.  Collectively, Duke University Defendants, City of Durham Defendants, DNASI Defendants, and other parties not yet named in this action comprise a group, who conspired to violate the statutory and constitutional rights of Duke University students, are sometimes referred to herein as the "Consortium."

## JURISDICTION & VENUE

78. This is an action for damages arising out of violations of 42 U.S.C. §1983, 42 U.S.C. § 1985, 42 U.S.C. § 1986, 42 U.S.C. § 1988, the North Carolina statutes and its common law.

79. Pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343(a), this Court has original jurisdiction over Plaintiffs' claims arising under the Constitution and laws of the United States.

80. Pursuant to 28 U.S.C. 1367(a), this Court has jurisdiction over Plaintiffs' claims arising under North Carolina law because those claims are part of the same case and controversy that give rise to Plaintiffs' federal law claims;

81. Pursuant to 28 U.S.C. § 1391(b)(1), (2), and (3), venue is proper in the Middle District of North Carolina because most or all of the Defendants reside and/or may be found in the Middle District of North Carolina and a substantial portion of the events that give rise to this action took place in the Middle District of North Carolina.

## FACTUAL ALLEGATIONS

### I. THE SECRET: THIS WAS THE DUKE POLICE DEPARTMENT'S CASE

#### A. The Duke Police Department Had the Primary Responsibility to Investigate Mangum's False Accusations

82. From March 14, 2006 through January 12, 2007, the Duke Police Department had original, primary, and continuing statutory authority to investigate Crystal Mangum's false accusations.

83. At the time Mangum claimed she was sexually assaulted at 610 N. Buchanan, the residence at 610 N. Buchanan was within the Duke Police Department's primary jurisdiction—not the Durham Police Department's. Pursuant to its statutory grant of police authority, the Duke Police Department had an obligation to "initiate and conclude an investigation" of Mangum's false allegations "with or without the assistance of another law enforcement agency."

84. After Mangum's allegations were determined to be false and unfounded by both the Durham Police Department and the Duke Police Department, the Duke University Defendants and Durham Police Department Defendants would conspire to conceal the fact that the claims had been determined to be false; that the City of Durham and Duke University would, in concert with Nifong, support and promote a second investigation conducted by Himan, a rookie investigator who described himself as "at the bottom of the list" of property crimes investigators in District Two, and directly supervised by M.D. Gottlieb, who officials with final policymaking authority for the

City and Duke University knew habitually violated the constitutional rights of Duke students, and otherwise abused his power over them.

85. The Chairman determined that Duke University's interests were best served if the Plaintiffs and their teammates were tried and convicted upon charges arising out of Mangum's false accusations. In pursuit of what the Chairman claimed was "best for Duke," the Chairman issued a number of directives to promote the miscarriage of justice occurring in plain view. For example, the Chairman directed Duke University officials, employees and agents, over all of whom he had final policymaking authority:

A. To delegate all of Duke University's supervisory power and final policymaking authority with respect to the investigation of Mangum's false accusations to Himan, Gottlieb, Addison, Michael, their chains of command, and/or Nifong.

B. To not act to intervene to prevent City officials and police officers and others acting in concert with them from obstructing justice, violating Plaintiffs' constitutional rights, and otherwise acting in furtherance of the conspiracy to frame Plaintiffs and their teammates for horrific crimes the Chairman and those acting at his direction knew did not happen.

C. To affirmatively act to assist City officials and police officers and others acting in concert with them in obstructing justice, violating Plaintiffs' constitutional rights in the manner alleged herein, and in other acts and omissions in furtherance of the conspiracy to frame Plaintiffs and their teammates for horrific crimes the Chairman and those acting at his direction knew did not happen.

D. To refuse the presentation of evidence of Plaintiffs' innocence—beyond that which the University already had amassed—when Plaintiffs' defense counsel

expressly offered it without condition or limitation in March of 2006 and repeatedly thereafter.

E.  To avoid obtaining independent knowledge of additional evidence of Plaintiffs' innocence by any other means.

86.  Duke University officials with policymaking authority over the investigation of Mangum's claims followed the Chairman's directives, aware that Mangum's accusations were false and Plaintiffs were being subjected to repeated, ongoing violations of their federally protected rights.  As the Chairman directed, Duke University officials with final policymaking authority, administrators, and faculty actively promoted and facilitated the framing of their own students.  As the Chairman directed, while Plaintiffs' constitutional rights were being violated with impunity and in the plain view of Duke Police Officers and policymakers, although the officers and policymakers had a clear opportunity to intervene to prevent the harms being done to Plaintiffs, they 'turned a blind eye' and did nothing.

**B.  The University's False-Helplessness Message**

87.  To facilitate the Chairman's directives, the Chairman directed the development and mass dissemination of the message that the University was impotent in the investigation of Mangum's false accusations.

88.  The University's "impotence message" was carefully prepared in consultation with private, as-yet-unidentified media consultants retained by the Chairman.

89.  The Chairman directed the University's formidable public relations staff to cascade the "impotence message" via on-the-record and not-for-attribution commentary to

local, national and international media outlets. The first University Official to publicly deliver the "impotence" message was the University President, Defendant Brodhead. On March 28, 2006, he read the following prepared statement to a national and international audience:

> *"To determine responsibility, we need to learn the full truth as quickly as possible. While I have urged and while I continue to urge everyone to cooperate with this inquiry to the fullest. Unavoidably, we have to look to the Durham Police to take the lead in the investigation. Duke doesn't have the power to compel testimony from citizens of this city, and Duke lacks access to warrants, DNA records, and other confidential information. I have confidence in the authorities to find the truth and I have confidence that the authorities will take whatever legal steps are necessary in the best interests of this community."*

90.     A true and accurate video recording of the relevant segment of Brodhead's prepared remarks is digitally embedded herein as **ATTACHMENT 1**, below:

*To activate the embedded video below,*
*left-click on the screen with the Adobe Hand Tool.*



91.     Once delivered by Brodhead, the Chairman directed the CMT Defendants and University's formidable public relations staff to cascade the "impotence message" via

on-the-record and not-for-attribution commentary to local, national and international media outlets.

92. The Chairman's messaging scheme began on March 28, 2006, and, upon information and belief, continues today.

### C. The Duke Police Department's Established Practice of Taking Exclusive Responsibility for Investigating Crimes Reported in its Primary Jurisdiction

#### 1. The Statutory Basis for Duke Police Jurisdiction

93. North Carolina law enforcement agencies have only that power which is granted to them by the North Carolina Legislature.

94. On July 18, 2003, the North Carolina Legislature enacted Session Law 2003-329 House Bill 736, Section 2 which amended N.C.G.S. § 116-40.5(b). The new law was enacted explicitly to authorize the City of Durham to enter into an agreement with Duke University "to extend the jurisdiction" of the Duke Police Department "into the City of Durham." Shortly thereafter, on November 6, 2003, under North Carolina General Statutes N.C.G.S. § 116-40.5(b) as amended and N.C.G.S. § 160A-288, the City of Durham and Duke University agreed that the Duke Police Department would have primary jurisdiction over all properties owned or controlled by Duke University, regardless of location. A true and accurate copy of the 2003 Agreement ("2003 Agreement") is digitally annexed hereto as **ATTACHMENT 2**.

95. Five months later, on April 6, 2004, the City of Durham and Duke University made technical amendments to the Agreement. The April 2004 Agreement (the "Police Jurisdiction Allocation Agreement") was the agreement in effect on March 14, 2006,

and continues to govern the division of jurisdiction between the Durham Police Department and Duke Police Department today. A true and accurate copy of the Police Jurisdiction Allocation Agreement is digitally annexed hereto as **ATTACHMENT 3** . 

   2.   **Durham Police and Duke Police Strictly Divided Cases According to the Jurisdiction Allocation Agreement**

96.   From the time Duke Police Department obtained primary police jurisdiction over all crimes reported to have occurred on Duke-owned property, the Durham Police and Duke Police strictly divided investigations according to the Police Jurisdiction Allocation Agreement, regardless of the severity of the crime.

97.   In 2006, the Duke Police Department responded to approximately 57,000 calls for police services. Between 2003 and 2005, 22 forcible sex offenses and rapes were reported to the Duke Police Department. Duke Police initiated and concluded the investigations of those reports without the assistance of investigators from Durham Police Department. For example:

A.   Most recently, a woman reported she was violently raped by an African-American male unknown to her at an off-campus location owned by Duke University. Duke Police investigators conducted an investigation, obtained evidence that contradicted the accuser's account, and re-interviewed the accuser. The accuser recanted. Duke University has refused requests to release details relating to the closed case. Defendant Burness has publicly stated he expects Duke Police to charge the accuser for making a false report to police. Durham Police played no role in the rape investigation.

B.   Similar reports of rape and sexual offenses on property owned by Duke University, and all of the investigations of those reports have been initiated, conducted, and concluded by the Duke Police Department without the assistance of the Durham Police.  For example:

C.   On April 26, 2006, a woman reported she was raped in a dormitory on April 26, 2006.  Duke Police investigators obtained transaction reports of the Duke Card accounts belonging to the students involved, obtained a search warrant to search for additional evidence, and obtained DNA samples for testing by the SBI Lab. The Duke Police Department conducted and concluded that without the assistance of the Durham Police.  Nifong, also, did not intervene as he did in the investigation of Mangum's allegations, because, as he said, "Duke police are handling the case the way I would expect it to be handled."

D.   A woman reported an alleged assault and second-degree sexual offense on property owned by Duke University (2100 DUMC North Hospital), on July 27, 2005. The Duke Police Department initiated and concluded the investigation of that report with an arrest.  Duke Officer Day investigated the case, supervised by Duke Lt. Trimmer, and without the assistance of the Durham Police.

E.   A woman reported an alleged Sexual Offense and Kidnapping on property owned by Duke University (2017 Yearby Street), on July 31, 2006.  The Duke Police Department initiated and concluded the investigation without arrest due to the absence of evidence to substantiate the complaining witness's claims. Durham Police played no role in that investigation.

### 3. The Duke Police Department Conducted Itself at all Times as an Independent Law Enforcement Agency, Equal to Any Municipal Police Department

98.     Prior to March 14, 2006, and after, officers in the Duke Police Department vociferously and publicly claimed that the Duke Police Department was no different than any city police department; that it was a "full-fledged" police department with its own jurisdiction, high-tech resources, and a complete staff of fully commissioned police officers, investigators, and crime-scene technicians.  One example of this is a Duke Police Officer's public speech about her Department's jurisdictional reach. The relevant portion of her speech is digitally embedded herein as **ATTACHMENT 4**, and may be heard within this document via the embedded audio file below:



To activate the embedded audio below,
left-click on this screen using the Adobe Hand Tool.

### 4. Durham 911 Automatically Dispatched 911 Calls Related to Duke-Owned Property to Duke Police, Not Durham Police

99.     Since the Police Jurisdiction Allocation Agreement in 2004, the Durham Emergency Communications Center has configured its Computer Aided Dispatch ("CAD") system to direct all emergency calls reporting criminal activity on property owned by Duke University to the Duke Police Department, exclusively, for its response and investigation.

100. Similarly, Durham Police Officers who directly receive citizens' reports of possible criminal activity on property owned by Duke University habitually direct those reports to the Duke Police Department in the same way.

101. Defendant James T. Soukup, Director of DECC, described the 2005 upgrade of the Duke-Durham CAD system and providing the Departments with "the capability to tie into similar systems in the Triangle so we can share information and better assist each other in times of crisis. The upgrade will also result in the DECC having a system that is equal to the best of any 911 center in the nation."

102. DECC had already incorporated the jurisdictional transfer of 610 N. Buchanan Boulevard to Duke Police when Kim Pittman made her phony 911 call reporting a racial epithet at 610 N. Buchanan, Blvd. The CAD system directed the call to Duke Police, based upon the location Pittman gave: 610 N. Buchanan Boulevard.

> **5.** **The Duke Police Department was Capable of Investigating Mangum's Allegations and Competent to Rule Them Unfounded**

103. The Duke Police Department was amply competent to conduct and conclude a full and fair investigation of Mangum's claims. Among other things, upon information and belief, in the absence of a directive from the Chairman forbidding them from acting, Duke Police would have concluded their investigation of Mangum's allegations, if they had not already, and declared the allegations false and unsubstantiated. Upon information and belief, Duke Police would have done what they did in their most recent rape investigation: confront the accuser with evidence that contradicts her account. When the Special Prosecutors did so, Mangum

"improvised" in Himan's words, new and even more incredible claims.  In the absence of the Chairman's directives to the contrary:

A.  Duke Police investigators would not have refused the same evidence of innocence that Nifong, Brodhead, and Durham Police refused, and which compelled the Special Prosecutors to conclude that Mangum's allegations never happened.

B.  Duke Police would not have fabricated inculpatory evidence.

C.  Duke Police would not have concealed exculpatory evidence.

D.  Duke Police would not have intimidated witnesses essential to the defense.

E.  Duke Police would not have vilified Ryan McFadyen by placing the text of his email in a search warrant affidavit after Mangum could not recognize him in a photo identification procedure.

F.  Further, by March 21, 2006, if not sooner, Duke Police investigators would have concluded from the evidence that:

    i.  Mangum was not sexually assaulted at 610 N. Buchanan; and

    ii.  Even if Duke Police thought Mangum had been sexually assaulted sometime prior to her arrival at DUMC on March 14, 2006, the members of the Duke University's Men's Lacrosse Team were ruled out as suspects by Mangum's own testimony.

**D. At All Times, the Duke Police Department Had a Realistic Opportunity to Prevent the Harms Done to Plaintiffs, But Instead 'Turned a Blind Eye' to the Plainly Obvious Violations of Plaintiffs' Rights, and Did Nothing**

104. At all times relevant to this action, beginning on March 14, 2006 and continuing through January 12, 2007, when the Attorney General's Office of North Carolina and its Special Prosecutors Section obtained jurisdiction, Duke Police Department had the statutory right and authority to initiate and conclude an investigation concerning Mangum's false allegations of rape, sexual offense, and kidnapping.

105. From March 14, 2006 to January 12, 2007, the Duke University Police Department had the original, primary, and continuing statutory authority to investigate and charge Crystal Mangum for her demonstrably and plainly obvious false report of rape, sexual offense, and kidnapping.

106. From March 14, 2006, to the present, the Duke University Police Department had—and has—the primary responsibility to investigate the potentially criminal conduct of those who aided, abetted, and acted in concert with Mangum, including but not limited to Tara Levicy, Theresa Arico, Gottlieb, Himan, Lamb, Meehan, Wilson, Nifong, the Chairman, the President, Burness, and others, in their attempt to convict innocents for crimes they knew never happened.

## II. ORIGINS OF THE DUKE-DURHAM CONSPIRACY: THE "ZERO-TOLERANCE FOR DUKE STUDENTS" POLICY

107. The systematic, ongoing violations of Plaintiffs' constitutional rights in the investigation and prosecution of Mangum's false allegations was an aberration of the North Carolina justice system, but was not an aberration of Durham's justice system,

at least insofar as Durham justice was applied to Duke students. The systematic violations of Plaintiffs' rights were of a piece with a policy previously established by Duke University and City of Durham officials that directed Duke and Durham police officers to engage in conduct that violated students' constitutional rights. Duke and Durham officials with policymaking authority with respect to the enforcement of the criminal laws directed, participated in, and subsequently ratified the unconstitutional conduct of Duke and Durham police officers in their interactions with students. This policy and custom predated Mangum's allegations by years (and continues today), and the regular violations of students' constitutional rights were plainly obvious. So much so that, by the fall of 2005, the egregious official misconduct alleged herein was inevitable. It was only a matter of time.

### A. Duke-Durham Policy to Target Duke Students for Disproportionate Enforcement of the Criminal Laws

108. Sometime prior to the 2005-2006 school year, Duke University and the City of Durham colluded, conspired, and agreed to establish a law enforcement policy whereby Durham Police and Duke Police would target Duke students who lived or strayed off-campus for disproportionate enforcement of the criminal laws. Specifically, the policy required patrol officers to charge Duke students with criminal violations where Durham citizens would not be incarcerated. The policy will be referred to herein as the "Zero-Tolerance for Duke Students Policy."

109. Baker directed police officers to use, as the primary tools in the Zero-Tolerance for Duke Students Policy, the City of Durham's Noise Ordinance (§ 11-1) (2005); the City of Durham's Open Container Ordinance (§ 12-16.1); the City's Public Urination

Ordinance; and the North Carolina statutes criminalizing underage possession of alcohol (N.C.G.S §18Bb-302(b), *et seq*.). These are all misdemeanors under North Carolina law, and a conviction under any one of them results in a permanent criminal record.

110. Duke University Defendants and City of Durham Defendants agreed and understood that each would act in furtherance of the Zero-Tolerance for Duke Students Policy.

111. City of Durham Defendants acted in furtherance of the Zero-Tolerance for Duke Students Policy, by, among other things:

    A. Dramatically increasing enforcement of criminal ordinances and laws that were believed to be committed by Duke students, with an explicit emphasis on the City's Noise Ordinance;

    B. Suspending patrol officers' discretion to warn or otherwise not charge an offense in cases involving Duke students by directing patrol officers to criminally charge every Duke student who was reported by a "permanent resident" of making noise that disturbed them or committed any other petty offense, without exception; and

    C. In cases involving Duke students, directing patrol officers to arrest Duke students they charged with misdemeanors in direct violation of the General Order 4050 R-1 ("G.O. 4050 R-1"), which strongly discourages arresting and incarcerating misdemeanants.

112. Duke University Defendants acted in furtherance of the Zero-Tolerance for Duke Students Policy by, among other things:

A.    Directing the Duke Police Department not to intervene to prevent or aid in the prevention of the Durham Police Department's bias-based policing; and, instead, directing the Duke Police Department to aid the Durham Police Department's bias-based policing of Duke Students.

B.    Enacting a new, unwritten "policy" to prosecute students charged with petty crimes off-campus through the University's undergraduate disciplinary processes.

C.    To reach the off-campus conduct involved in the Zero-Tolerance for Duke Students Policy's campaign, Defendant Larry Moneta, Vice President for Student Affairs, and Defendant Stephen Bryan, Associate Dean of Students and Director of Judicial Affairs, had to exceed the jurisdictional scope of the University's disciplinary system to reach these petty offenses committed off-campus that had no nexus with the University's legitimate interests or its educational mission.  They did so unilaterally and without any amendment to the Student Code of Conduct.

D.    Under Defendant Moneta's supervision, Defendant Bryan arrogated to himself the role of investigator, prosecutor, and judge in all of these cases.  In Judicial Board hearings, Bryan would remain in the room during the panel's deliberations on punishment.  One of the unwritten "policies" that Bryan established, *sua sponte*, in the effort to reach all of the Zero-Tolerance for Duke Students Policy charges was to prosecute students who were acquitted at a trial on the charges, or whose cases were dismissed due to unlawful tactics employed by the police.

E.    Upon information and belief, Defendant Bryan prosecuted off-campus conduct only if it was reported to him by police or by "permanent residents."

**B.    Duke and Durham Publicly Condone and Ratify the Targeting of Duke Students**

113.    Pursuant to the policy and at Baker's direction, then-District Two Commander Edward Sarvis wrote a letter to Duke students, dated August 10, 2005, that spelled out the rationale for the Zero-Tolerance for Duke Students Policy.  According to the letter:

A.    Duke students living near East Campus are not "permanent residents" of Durham;

B.    The "permanent residents" in the neighborhoods off of East Campus resented Duke students;

C.    The City was committed to putting an end to the permanent residents' problems with Duke students during the 2005-2006 school year, beginning with the out-of-state students living in the Trinity Park neighborhood;

D.    District Two would accomplish this by, among other things, responding to complaints from "permanent residents" in the following way:

i.    If the Durham Police Department is called to a rental home concerning a party considered to be loud, the patrol officer responding would locate the out-of-state residents, and, at a minimum, charge them with misdemeanor Durham City Noise Ordinance violations.

ii.    In violation of the G.O. 4050 R-1, which strongly discourages arrests of misdemeanants, patrol officers assigned to the Trinity Park beat were strongly encouraged to arrest and incarcerate Duke students if their response to being charged was not satisfactory to the officer.

iii.      Patrol officers would also charge the student-tenants of the homes based upon misdemeanors committed by individuals inside or near a Duke student's home, upon theories of vicarious criminal liability.

iv.      Duke University officers and administrators have assured the City that the University will assist in the implementation of the Policy.

114.    For his part, Nifong would observe a "no drop" policy, pursuant to which his office refused to unilaterally dismiss charges brought against Duke students in the Trinity Park neighborhoods.

115.    Duke University Defendants and City of Durham Defendants involved in crafting the Zero-Tolerance for Duke Students Policy knew or reasonably should have known that the Policy itself violated the constitutional rights of Duke students; and that the primary tool of the policy—the Durham City Noise Ordinance—was facially unconstitutionally vague.  Its vagueness was its chief virtue in the Zero-Tolerance for Duke Students Policy's campaign; it allowed patrol officers' unfettered discretion to arbitrarily and capriciously charge the out-of-state Duke students in the effort to rid the "permanent residents" neighborhoods of the out-of-state students they "resented."

### III.      "ZERO-TOLERANCE FOR DUKE STUDENTS":  AN ESTABLISHED POLICY AND PRACTICE IN THE FALL OF 2005

#### A.      The Consortium's Warrantless Raids of Duke Students' Homes

116.    On August 26, 2005, two days after many parents moved their sons and daughters into Duke University's East Campus dorms to begin their freshman year, something took place in the neighborhoods off of East Campus that was more disturbing than the Zero-Tolerance for Duke Students Policy prefigured.

117. Over the summer, the Consortium's law enforcement agencies, including the Durham Police Department, the Duke Police Department, and the Alcohol Law Enforcement Division ("ALE"), planned a series of warrantless raids on Duke students' homes. They named the home invasion plan the "Back-to-School Operation." The first of the raids would take place the day after freshman students attended Convocation.

118. Although planned well in advance, the Consortium deliberately chose to raid the homes without obtaining warrants, despite the fact that the planned raids would require Consortium Agents to enter, seal off, and seize private homes for purposes of detaining, interrogating, and charging every student then inside.

119. The Back-to-School Operation began on August 26, 2005 and continued through August 28, 2005. As planned, the Consortium identified student homes where the greatest number of students appeared to be congregating at the time.

120. During the three-day Operation, roughly 200 Duke students were charged with misdemeanors.

121. The only evidence offered to support the charges against the Duke students were the fruits of the Consortium agents' unlawful entry, unlawful detention, and unlawful interrogation of the Duke students in private homes.

122. The Consortium's warrantless home-invasions were conducted in a virtually identical, unlawful manner each time:

A. After illegally entering the private home, multiple Consortium Agents surrounded the home, others stood guard at the doors to "seal off" all exits, and still others stood guard at the perimeter of the property to catch any Duke

students who found a means of escaping the house, via unguarded windows or otherwise.  At least one Duke student found a way to escape through an open window, but was captured by Consortium Agents and dragged back inside to be charged with resisting, obstructing, or delaying an officer, in violation of N.C.G.S. § 14-223.

B.  Once Agents sealed off all means of exit, a pre-designated Agent announced to all of the Duke students inside the home that the home had been seized by law enforcement, that they were all in the custody of law enforcement, and no one would be permitted to leave until they were interrogated by the Consortium Agents stationed in each room of the house.  Consortium Agents forced the students to line up in the rooms where the interrogating Agents were stationed.

C.  The interrogations were conducted according to the same unconstitutional pattern in almost every case:

    i.      No student was advised of their Miranda rights, as required by the Fifth and Fourteenth Amendments to the United States Constitution.

    ii.      First, the Consortium Agent demanded that the student confess to consuming alcohol that evening.  If the student admitted to consuming any alcohol that evening, the Consortium Agent asked the student if he or she was 21 years old.  If the student claimed to be 21 years or older, the Consortium Agent then demanded that the Student prove their innocence by showing "positive identification."

    iii.      If the student could not produce positive identification, the Agent charged the student with Underage Possession of Alcohol.  If the student produced positive identification, the Agent either charged the

student with Aiding and Abetting Underage Possession of Alcohol, or, rarely, allowed the student to leave uncharged.

iv. If the student denied consuming alcohol that evening, the Consortium Agent would insult, intimidate, and otherwise degrade the student, insist the student was a liar, and demand that the Student prove his or her innocence by submitting to an Alcosensor Test. The Agents failed to bring an adequate supply of replaceable exhalation tubes for their Alcosensor devices, so they forced the students to perform the test with exhalation tubes that had been used and reused countless times.

v. If the student refused to submit to the Alcosensor tests, the Agent charged the student with underage possession of a malted beverage, a misdemeanor, under N.C.G.S. § 18B-302.

vi. If the student submitted to the test and the Alcosensor produced no indication of alcohol present in the device, the student was released from the home uncharged. If the Alcosensor produced any indication of the presence of alcohol in the device, the Agent charged the student with underage possession of a malted beverage, a misdemeanor, under N.C.G.S. § 18B-302.

**B.    In One Weekend, Consortium Agents Charged Roughly 200 Duke Students Without Admissible Evidence**

123.  The Agents did not have any legally obtained, admissible evidence to support the roughly 200 charges they filed against Duke students in the Back-to-School Operation. They did not have any evidence (admissible or not) that any of the Duke students charged actually possessed alcohol, in violation of North Carolina law.

124.    Shortly after the raids, undersigned counsel and other lawyers representing the students informed Nifong of the circumstances that made it plainly obvious that the raids were illegal; that they were conducted without warrants or exigent circumstances, and the students were interrogated without Miranda warnings. Nifong acknowledged the raids were unlawful at their inception and throughout, but, nevertheless, refused to dismiss the charges. The students were forced to retain counsel to defend the charges.

125.    The warrantless raids of student homes and unlawful detention and interrogation of the students therein were widely reported in the major Durham, Raleigh, and Duke University newspapers.

126.    Upon information and belief, Duke University Defendants and City of Durham Defendants were aware of and approved the planned raids and the plainly unconstitutional manner in which they would be carried out. Further, knowing in advance of the agreement to conduct unconstitutional raids, and despite having the authority and opportunity to intervene, the Duke Police Supervising Defendants failed and/or refused to intervene. In fact, the Duke Police Department participated in the raids by providing assistance to the ALE Agents and the Durham Police Department.

127.    The Consortium's plan to open the 2005-2006 school year with unconstitutional warrantless raids and Miranda-less interrogations of Duke students en masse was the opening salvo in what can only be described as a "war on Duke students." The police misconduct and abuse that was authorized and condoned in the raids did not merely continue unabated to March 14, 2006: it escalated. Further, the nature of the police

abuse of Duke students revealed that several officers harbored contempt for Duke students.

128. Quickly, the pattern and practice of abusing Duke students escalated, and took on a personal cast.  Early on, the escalating pattern of abuse became so alarming that Duke University's Senior Administrators were aware that the abuse posed a clear threat to the welfare of Duke students.  Specifically, the abusive tactics, coupled with the University's tacit approval of it, created an obvious risk of serious irreparable harm to its students.  Duke University Defendants had the authority and opportunity to prevent the continuing conspiracy to violate their students' fundamental rights, but neglected or refused to intervene.  Upon information and belief, Duke Police Defendants and Duke Officials Defendants did not withdraw their participation in the conspiracy.

  **C.**  **Duke Officials with Final Policymaking Authority Ratified the Warrantless Raids, and Initiated Cumulative Prosecution of the Students Within the University's Disciplinary System**

129. No Duke Official publicly objected to the blatant violations of their students' constitutional rights in plain view.  Instead, several of the Duke Officials Defendants publicly ratified and condoned the willful violations of their students' rights, and condemned their students for "boorish behavior."  For example, the University endorsed the following public statements:

A. Defendant Bryan, the Associate Dean of Students and Director of Judicial Affairs, stated, "We're committed to investigating each incident and determining if a University policy violation is at issue and what response is appropriate."

B.	Defendant Moneta, the University's Vice President for Student Affairs, assured the public that the University will "…likely take campus judicial actions [sic]…Duke can take actions for off-campus behavior."

C.	Defendant Brodhead was also immediately aware of the warrantless raids of Students' homes. He did not condemn the open violations of his students' constitutional rights. Instead, he went on National Public Radio stating, "I have great regret for what the neighbors of these party houses have had to experience. They have been the victims of boorish behavior."

D.	The University's silence in response to the well-publicized abuse of Duke's students and their rights ratified and condoned it. Upon information and belief, the University never acknowledged that its students had been subjected to plainly illegal police conduct—en masse—or expressed concern about the escalating abusive tactics employed against its students by the Duke Police Department, the Durham Police Department, or the ALE Division.

130.	Pursuant to the University's Charter, Defendant Moneta is the Duke Official charged with responsibility for the students' welfare. Defendant Moneta and his Assistant Dean, Defendant Bryan, issued several press releases publicly promising internal University prosecutions of the students caught up in the home invasions, through Bryan's Judicial Affairs Office. Upon information and belief, every one of the students charged by Consortium Agents in the warrantless raids was subjected to Judicial Affairs inquiry upon the same evidence illegally obtained in the raids.

131.	Further, Defendants Moneta and Bryan did not have jurisdiction over the off-campus conduct they were prosecuting. Moneta and Bryan were authorized to reach off-campus conduct only if it was necessary, "to protect the safety and well being of the

campus community…[because the conduct] constitutes a direct or indirect threat to the University community."

132.  Students suspected of possessing beer does not fall within the ambit of a "threat to the university community" sufficient to trigger the "safety and well being of the campus community" exemption to Moneta's jurisdictional reach.  Nevertheless, Defendants Moneta and Bryan arrogated to themselves the authority to prosecute the students within the University's disciplinary system.

133.  Defendant Bryan's office received University funding to hire additional staff to meet the demands of the expected volume of beer possession prosecutions his office would handle.

### D.    Durham Judge Declares the Warrantless Raids and Interrogations of Duke Students Illegal

134.  The students were forced to try their cases in Durham County District Court.  The students retained counsel, many in joint representations to defray the costs of their defense.  Undersigned counsel, together with several lawyers representing students in these cases, filed a Motion to Dismiss and an extensive Memorandum of Law detailing the primary violations of the students' rights.

135.  After a 3-day hearing beginning on October 27, 2005 and concluding on November 3, 2005, a Durham County Judge, the Honorable Craig Brown, ruled on the students' motion from the bench.  He summarily dismissed all of the roughly 200 cases brought by the Consortium, and called the Consortium's raids and interrogations exactly what they were: plainly illegal.  Judge Brown ruled that the evidence at the hearing

established that the Consortium Agents had violated the students' Fourth, Fifth, and Fourteenth Amendments to the U.S. Constitution.

136.    Judge Brown expressed his hope and expectation that law enforcement would quickly "get it right" in its investigation of Duke students suspected of violating the law.

137.    They did not.  The abuse of Duke students continued to escalate and soon culminated in the police investigation of Mangum's claims only four months later.

### E. Police Misconduct and Student Abuse Escalates and Turns Violent Through the Fall of 2005, Culminating in the Investigation of Mangum's False Allegations

#### 1. Violent Police Raid of Student Gathering at the Belmont Apartments' Pool

138.    On September 17, 2005, four students were arrested by Consortium Agents at the Belmont Apartments.  One student, Joseph Freimuth, was tackled from behind by officers who slammed his face into the pool-side concrete.  Pictures published in local newspapers widely distributed at Duke University showed Freimuth tackled on the ground and blood flowing down his face.



139.    Freimuth is a resident of the Belmont Apartments.  He was charged with 2nd degree trespassing at his own apartment complex.

140. Consistent with the University's agreement and understanding with Durham Police, the University responded to the bloody raid of the Belmont pool by publicly promising that the University will "likely take campus judicial actions [sic]" against the students who, like Freimuth, were arrested at the Belmont apartment complex. Defendant Moneta stated that, "the fundamental issue is responsibility and the level of responsibility one demands of intelligent students." Moneta added, (again) that "Duke can take actions for off-campus behavior."

141. On May 3, 2006, Freimuth was tried and acquitted on all charges. The judge ordered that all court records related to Freimuth's arrest and charges be expunged. Freimuth's acquittal was based, in part, on photographic evidence taken at the incident showing that Freimuth did not instigate or in any way prompt the officers' attack.

142. The police violence at the Belmont pool raid was unprovoked, and was but one example of the clearly escalating abuse Duke students were suffering at the hands of Durham law enforcement agencies and ALE agents in the Fall of 2005. Much of the police abuse and misconduct alleged herein was carried out in plain view of all of the Defendants. Durham Police Officers were present, observing the violation of Duke students' constitutional rights occurring in their presence, however, pursuant to an established policy or custom, those "stand-by" officers refused to intervene to prevent the violations or the harm to Duke students that flowed from them.

143. It would have been clear to a reasonable policymaker that publicly condoning and ratifying the police abuse of Duke students and neglecting or refusing to intervene would lead to further abuse and greater constitutional deprivations. Duke Police

Supervising Defendants and Durham Police Supervising Defendants did not take remedial action in response to the misconduct known to them. As a consequence of the Defendants' failure to adequately supervise, correct, reprimand, or terminate the officers who abused their law enforcement authority in their dealings with Duke students in plain view of the University, the officers were emboldened. As a direct result, the Plaintiffs were subjected to police violations and abuses in geometrically greater dimensions, they were vilified before an audience of millions, and they were irreparably harmed.

144. Upon information and belief, Duke Police Supervising Defendants and Durham Police Supervising Defendants were aware of the facts relating to the police raid of the student gathering at the Belmont pool, and that the raid was conceived and executed solely out of an animus for Duke students, who were perceived as transient citizens of other states, and, on that basis were subjected to grossly disproportionate enforcement of the criminal laws; and yet willfully ignored and/or were deliberately indifferent to the police misconduct in plain view and the attendant physical, verbal, and psychological abuse that was by then a hallmark of the Zero-Tolerance for Duke Student Policy.

### F.  Gottlieb's Raid of 203 Watts

#### 1.  A "Permanent Resident" of Trinity Park Reports a Non-Permanent Resident "Disturbance" at 203 Watts Street the Day the Rolling Stones Played Wallace Wade Stadium

145.  On October 8, 2005, the Rolling Stones held a concert at Duke University's Wallace Wade Stadium.

146.  Earlier that day, alumni and students gathered at 203 Watts Street, a student-rented home near East Campus.  In the late afternoon, a person thought to be a guest at the party threw a bottle that broke on the walk of a neighbor's house, and drove away.

147.  One of the student-residents of 203 Watts saw his neighbor in some distress and went over to her to ask if she needed help.  The neighbor advised him that she had called the police and he should tell his guests to leave before the police arrived, which he did.  The guests quickly dispersed, aware that automatic charges were likely imminent for anyone who remained at the residence.  Many began walking to the concert. When the police arrived, no one was present at the home.  There was no one to charge.

#### 2.  Gottlieb 'Adopted' the 203 Watts Case, and Obtained Search and Arrest Warrants for the Residents with the Aid of Duke Police

148.  While Durham's attention turned to the concert, Sgt. M.D. Gottlieb, then a District Two Patrol Supervisor, was assembling an affidavit to support his application for warrants to search 203 Watts and to arrest all of its residents.  The crimes Gottlieb was investigating were:  (1) Violation of the City's Noise Ordinance; (2) Violations of the City's Open Container Ordinance; and (3) Possession of Stolen Property (a flag)

reported as having been stolen from the front of Duke's main administration building (the Allen Building) during the previous school year.

149.   Gottlieb did not know the identities of all of the residents of 203 Watts.  He needed to describe the residents in order to obtain a warrant to arrest them.  He obtained the detail he needed about the student-residents of 203 Watts from Duke University's Duke Card Office.  The Duke Card Office did not notify the students before or after divulging their federally protected financial records to Gottlieb.

150.   Gottlieb incorporated the students' personal information and identification photos obtained from the Duke Card Office into his search and arrest warrants for the students identified as the residents of 203 Watts.  A true and accurate copy of Gottlieb's warrant application is digitally annexed hereto as **ATTACHMENT 5** .

151.   Gottlieb would later compound the FERPA violations by sending a broadcast email to the PAC2 and Trinity Park Listservs, republishing all of the Students' FERPA-protected information (except the student pictures, which were too large to send via Gottlieb's email system).  A true and accurate copy of the email sent by Gottlieb is digitally annexed hereto as **ATTACHMENT 6**.

152.   Gottlieb's factual basis for the noise and open container violations was the report of the "permanent resident."  The factual basis for the stolen flag allegation was Duke Police Officer David Dyson's claim that he saw a Duke flag hanging on an upstairs bedroom wall in the 203 Watts house that matched the description of a flag that was stolen from the Allen Building the year before.  In the warrant application, Gottlieb reports the description of the stolen flag as follows:  "4' x 6', blue in color with a

Duke logo." Nothing more. Gottlieb's eyewitness identification, in essence, describes nearly any Duke University flag. Nevertheless, the warrants were issued at 2:41 a.m. on October 9, 2005.

### 3. Gottlieb Recruited a Team to Execute the Watts Warrants

153. Armed with warrants to search the residence at 203 Watts Street and arrest the students who lived there, Gottlieb, Duke Police Officer Dyson, and several other Duke and Durham police officers converged on the Watts Street home at approximately 3:00 a.m. Several officers took positions outside the house to establish a perimeter, sealing off routes of escape for the sleeping residents.

154. Gottlieb and other officers broke into the home and dispersed into the living quarters upstairs. Most of the student-residents were sleeping in their beds. All of them were handcuffed, some while sleeping in their beds, rushed or dragged outside, and placed in police cars. One witness recalls seeing a resident handcuffed, in only boxer shorts, being dragged by his feet down the stairs, helpless as his head banged against each step all the way down the staircase. All of those present were transported to the Durham County Jail where Gottlieb formally charged them with violations of noise and open container ordinances. Bail was set for each of them.

### 4. The Trial of the 203 Watts Cases

155. Having no evidence to establish that any of the residents of 203 Watts actually violated the City Noise Ordinance or Open Container Ordinance, Nifong, upon information and belief, directed Assistant District Attorney ("A.D.A") Ashley Cannon to prosecute the students on amended charges. The amended charging instrument

included the prior charge of the Noise Ordinance Violation and an amended charge of aiding and abetting unknown principals in the violation of the Open Container Ordinance. On this theory, all the A.D.A. needed to prove was that the students were present at 203 Watts at the relevant time.

156. All of the residents were acquitted of all charges, except the boy who went to help his neighbor. The neighbor testified that he was, in fact, at the residence at the relevant time.

### 5. Defendant Trask Testifies for the State

157. In the "stolen flag" case, Gottlieb had seized the suspect flag in the raid, and charged one of the residents with possession of stolen property. Upon inspection at trial, however, the "stolen flag" that Gottlieb claimed "matched" the flag that once flew in front of the Allen Building was actually made of cheap synthetic material, so thin as to be nearly transparent. The tell-tale "Duke Logo" on the flag was printed only on one side.

158. In an effort to save his flagging case, Gottlieb asked for a recess and returned within thirty minutes with Duke Executive Vice President Trask in tow. Defendant Trask was there to testify that the transparent vinyl flag with Duke's logo printed on one side appeared to him to be the same flag that flew in front of the Allen Building until it had been stolen roughly a year before.

159. The student was acquitted on the possession of stolen property charge.

**6. Judicial Affairs Investigates the Residents of 203 Watts**

160. After running the gauntlet of the criminal justice system in Durham, Defendant Bryan directed Kendra Sims to investigate the 203 Watts students for suspected violations of university policies on the same factual basis upon which they were acquitted.

161. Defendant Moneta's Assistant Vice President for Student Affairs, Defendant Suzanne Wasiolek, responded to reports of the 203 Watts raid by issuing public statements assuring the community that the University was taking disciplinary action against the residents 203 Watts and other off-campus students who cause problems for the permanent residents in the community.

162. No University Administrator objected to the gratuitous physical abuse that attended the arrests of Duke Students sleeping in their home, or noted the oddity that the animating charge in all of the arrest warrants was an alleged noise ordinance violation committed the day the Rolling Stones played at Wallace Wade Stadium.

163. Upon information and belief, Gottlieb, Duke Officer Dyson, and the Duke and Durham police officers who aided them in the raid of 203 Watts were aware that the raid was conducted solely because the subject of the neighbor's complaint was perceived to be a non-citizen of North Carolina and therefore subject to the Zero-Tolerance for Duke Students Policy, and yet were deliberately indifferent to the police misconduct, and its attendant physical, verbal, and psychological abuse, in furtherance of the policy to employ disproportionate enforcement of the criminal laws to force Duke students out of neighborhoods where the "permanent residents" lived.

164. Upon information and belief, Duke Police Supervising Defendants and Durham Police Supervising Defendants were aware of the plainly obvious constitutional violations occurring pursuant to the Zero Tolerance Policy that the officers' raid of 203 Watts was conceived and executed solely out of an animus for Duke students, perceived as non-citizens of North Carolina, pursuant to the Zero-Tolerance for Duke Students Policy's conspiracy to rid Trinity Park of Duke student renters, and yet were deliberately indifferent to and/or willfully ignored the police misconduct, and its attendant physical, verbal, and psychological abuse in their quest to force Duke students out of neighborhoods where the "permanent residents" resented them and the perceived impact they had on their property values.

### 7. District Two Officer's January Encounter with the Residents of 610 N. Buchanan

165. On January 10, 2006, a "permanent resident" in the Trinity Park neighborhood called 911 to report a "banging" noise emanating from the trash cans next to 610 N. Buchanan.

166. District Two Police Officer K. Watt was dispatched to 610 N. Buchanan to respond. When Watt arrived at the house, he heard no trash cans banging. Watt entered the residence at 610 without a warrant and without consent. He asked a guest in the living room to speak with the tenants. Daniel Flannery and David Evans emerged, introduced themselves and advised Officer Watt that they lived there. Watt then charged both with City Noise Ordinance violations. Watt stated that he had no choice: he was dispatched to 610 N. Buchanan with a "directive from [his]

supervisor" to charge the residents with misdemeanor violations of the City Noise Ordinance, regardless of whether any violations had, in fact, occurred.

167.    Officer Watt claimed that both Evans and Flannery were cooperative, very polite, and were understanding about the directive compelling Watt to charge them even in the absence of any evidence to corroborate the noisy trash can reported by the 911 caller.

168.    Flannery tried his case and was acquitted. Evans accepted a deferred prosecution agreement.

### G.    Sarvis Ratifies and Condones the Escalating Police Abuse of Duke Students

169.    Four days after police officers split open Joseph Freimuth's head on the pavement of his own swimming pool, Sarvis re-ratified and re-condoned the disproportionate enforcement of the criminal laws against Duke students. Further, he ratified and condoned the escalating police misconduct, physical abuse, and verbal abuse in their dealings with Duke students.

170.    On September 21, 2005, then-District Two Commander Sarvis wrote a letter to the parents of students charged in the early weeks of the new policy's implementation to advise them that their son or daughter had been criminally charged, and included a copy of the citation. Sarvis went on to write the following:

> "Although your son/daughter may be new to the Duke community... [y]ears of parties hosted by the Duke student residents...have led to a very negative perception by many permanent residents toward student [sic] living and visiting in these communities. It is our goal to change that perception this year... Although we consider your son/daughter an adult, we feel that you should be informed of the citation that he/she has

*received. First, we believe that in most cases parents assist students in rent and tuition payments and have a right to know of such activity. Second, we hope that you will use any influence you have on your son/daughter to discourage any recurrence of this activity. Please take the time to explain to him/her the potential long-term consequences of violating laws and facing criminal charges."*

## IV.    THE GOTTLIEB DOSSIER

### A.    M.D. Gottlieb

171.    By March 13, 2006, Gottlieb was a known rogue officer with a proclivity for abusing Duke students.

172.    Student accounts revealed Gottlieb's disturbing behavior towards them. Many students reported a police cruiser driving up on a sidewalk to block their path; and an officer racing at them from around the vehicle to either arrest them straight away or to fly into a raging interrogation on the street in plain view of passersby. He routinely arrested them. Once in the car on the way to jail, Gottlieb sometimes calmly explained that he was "on [their] side" and that he was doing this for their own good. Alternatively, he would continue to verbally abuse the students on the way to their booking. In one case Gottlieb threatened with deportation a student who he wrongly believed was in the United States on a student visa. In another, he threatened to put the students "in a cell with a couple of crack whores to show them what life was really like."

### B. Duke and Durham Receive Notice that Gottlieb is Dangerous to the Welfare of Duke Students

173.   In response to the spike in student accounts of disturbing interactions with Gottlieb and his frequent enabler, R.D. Clayton, a private an inquiry was conducted into Gottlieb's work.  The results of the inquiry came to be referred to in Duke University circles as the "Gottlieb Dossier."  The Dossier described several representative student encounters with Gottlieb and Clayton, and analyzed Gottlieb's arrest records collected from the Durham County court files.  From the data alone, it was plainly obvious that Gottlieb perseverated over Duke students; his roster of arrests was filled with them; it was also plainly obvious that Gottlieb had an established pattern over time of enforcing the criminal law disproportionately with respect to Duke students in both charging decisions and in decisions to make a formal arrest in cases involving petty crimes.  Simply put, Gottlieb habitually arrested Duke students in circumstances that a "permanent resident" would not be arrested.  The statistics corroborated the students' accounts.  For example:

A.   Gottlieb charged a total of 32 people.  19 were Duke students.  Of the 19 Duke students charged, 16 were incarcerated; of the 13 Durham citizens charged only 6 were incarcerated.

B.   Further research done by the *Raleigh News & Observer* revealed that during the 10 months from May 2005 to February 2006, 71% of Gottlieb's formal arrests were Duke students (20 out of 28).  The rate of Duke student arrests for the other three District Two Sergeants was 3% Duke students (2 out of 64).

C.   Further, at least 15 of the Duke students arrested by Gottlieb were taken to jail for alcohol and noise violations while non-students and "permanent residents"

were not taken to jail for more severe offenses, including, for example, carrying a concealed .45-caliber gun.

174. The Dossier also examined Duke students' accounts of their experiences with Gottlieb. From the student accounts alone, it was plainly obvious that Gottlieb's interactions with Duke students invariably involved violations of the student's constitutional rights. It was also clear that Gottlieb held them up for scorn because they were from other states, typically northern states; in most cases he assumed they were and said so. It was plainly obvious that Gottlieb's continued assignment to District Two's East Campus patrol beat would almost certainly lead to continued and more severe violations of the constitutional rights of the Duke students he would encounter.

175. In court, Gottlieb would regularly fabricate his testimony to close holes in the State's case. Occasionally, he would fabricate his account beyond what was required to close holes, solely to disparage the student-defendant.

176. With the law enforcement power at his disposal, the only apparent limitation on the damage Gottlieb could do to students was the severity of the crimes he could charge them with. Duke students presented him with conduct that never exceeded misdemeanor charges. Long before March 14, 2006, it was plainly obvious that the harm Gottlieb could do to Duke students would be geometrically greater if Gottlieb was ever in a position to charge a Duke student with a serious felony.

### C. Shortly After the Gottlieb Dossier Was Delivered, Sgt. Gottlieb Was Transferred Off the Patrol Beat

177. The Dossier was delivered to Defendant Burness' office, at his request, via hand delivery on February 16, 2006. Upon information and belief, Defendant Burness, Defendant Trask, and other as-yet-unknown Duke University Defendants discussed the Gottlieb Dossier and its findings and shared them with Duke University and Durham Officials with policymaking authority over matters relating to law enforcement personnel in Durham.

178. Soon after the Dossier was delivered to Defendant Burness, but no later than March 6, 2006, Gottlieb was taken off the District Two patrol beat, but failed to remove him from District Two. Chalmers transferred Gottlieb to a desk job, as an on-call supervisor of property crimes investigations in District Two.

### D. Gottlieb's Replacement: Sgt. John Shelton

179. Chief Chalmers selected Sgt. John Shelton to replace Gottlieb as the Patrol Sergeant for District Two's D-Squad. Sgt. Shelton was one of Durham's highest rated officers; he was a consistent top performer on objective tests and evaluations conducted by the Police Department. On the same tests, Gottlieb was a chronic bottom-dweller. Sgt. Shelton was transferred to District Two from the Department's Training Division, where Shelton had been responsible for instructing new and veteran officers in proper patrol and investigation protocols and procedures.

### E. Captain Sarvis Ratified and Condoned Gottlieb's Abuses From His Post in Internal Affairs

180. Months later, in September of 2006, the substance of the Gottlieb Dossier was published in local newspapers and was widely reported in newspapers and television news programs.

181. In response to those news stories, Captain Sarvis admitted that the accounts of students and the statistics were accurate, and confessed publicly that he approved of Gottlieb's misconduct, his disproportionate arrests, and abusive tactics with Duke students. He further confessed that he directed Gottlieb to engage in the reported misconduct in his prior capacity as Gottlieb's supervisor and an official with final policymaking authority with respect to controlling, disciplining, and/or retraining Gottlieb. Among other things, Sarvis stated to a reporter for the *Durham Herald Sun*:

> *"I fully stand behind the decision to make an actual, physical arrest... I sent every off-campus student in the Trinity Park area a letter and warned them of this very thing. They knew to expect it. Maybe they didn't like it, but they certainly can't say they weren't warned. They were warned... [Gottlieb] was doing his job, and doing what I asked him to do."*

182. Sarvis personally knew of the details of Gottlieb's abusive tactics, his grossly disproportionate arrest record, and the disturbing accounts of the Duke students interviewed for the news reports on the Gottlieb Dossier.

183. Further, in his capacity as an Internal Affairs official with final policymaking authority with respect to the investigating, correcting, disciplining, retraining, and terminating police officers who engage in misconduct, Sarvis fully and publicly ratified Gottlieb's habitual abuse of Duke students and pattern of unconstitutional

conduct in his encounters with Duke students, the details of which were personally known to him.

184. Sarvis had been transferred to Internal Affairs at the same time Gottlieb was taken off the beat; he was replaced by Captain Jeff Lamb.

> **F.** **Duke University Officials Ratify and Condone Gottlieb's Abuses and Reveal that the University was an Author of the Zero-Tolerance for Duke Students Policy**

185. As Sarvis aggressively defended Gottlieb's record of abusing Duke students, Defendant Burness feigned ignorance of the Dossier to a reporter for the *Durham Herald Sun* and suggested that, now that it had come to light, it seemed to him to be a matter for the City Manager and the Durham Police Department to address.

186. Defendant Brodhead, in the same time period, during a talk with a group of Duke students on campus, was asked by one of the students whether Duke was going to do anything to protect its Students from the abusive police tactics that Sarvis had publicly condoned. Defendant Brodhead replied, "No," and advised the students that, in fact, Duke was an author of the Zero-Tolerance for Duke Students Policy.

187. Shortly after Gottlieb was removed from the patrol beat, Gottlieb privately claimed that "something big" was going to happen that would ameliorate the rising tensions between Duke students and Durham Police who patrolled the neighborhoods along Markham and Buchanan Blvd. Gottlieb claimed that the "big" event would be made public at the end of February. Upon information and belief, Gottlieb was referring to the imminent purchase of a group of properties off East Campus in Trinity Park.

## V.    IN FEBRUARY, 2006, DUKE UNIVERSITY ASSUMED PRIMARY POLICE JURISDICTION OVER 610 N. BUCHANAN AND A RAFT OF NEARBY PROPERTIES ALONG DUKE'S EAST CAMPUS

188.    On February 28, 2006, the Durham County Register of Deeds recorded a deed conveying to Duke University fee simple ownership of 610 N. Buchanan Blvd.

189.    Duke purchased 610 N. Buchanan Blvd., along with a raft of other properties that border East Campus, including:

A.    508 N. Buchanan Blvd.;

B.    702 N. Buchanan Blvd.;

C.    704 N. Buchanan Blvd.;

D.    708 N. Buchanan Blvd.;

E.    710 N. Buchanan Blvd.;

F.    814 Lancaster St.;

G.    700 Maplewood Ave.;

H.    1105 Urban Ave.;

I.    1107 Urban Ave.;

J.    1111 Urban Ave.;

K.    203 Watts St.;

L.    601 Watts St.;

M.    913 Wilkerson Ave.; and

N.    921 ½ Wilkerson Ave.

190. A true and accurate copy of the deed transferring 610 N. Buchanan Blvd. and the other properties listed above and the legal descriptions of lots sold are digitally annexed hereto as **ATTACHMENT 7.**

191. . Prior to Duke's purchase, 610 N. Buchanan was within the "Extraterritorial Jurisdiction" of the Duke Police Department, and, as such, jurisdiction over it was shared between the two departments, with Durham Police having "primary responsibility."

192. When the University took ownership of 610 N. Buchanan, the residence was swept within the ambit of the Duke Police Department's primary jurisdiction, and, as such, the Duke Police Department assumed the "authority and primary responsibility" to "initiate and conclude" a police investigation of any criminal activity reported to occur at 610 N. Buchanan on or after February 28, 2006.

193. When Mangum falsely reported a gang rape at 610 N. Buchanan on March 14, 2006, the Duke Police Department was the law enforcement agency with "primary responsibility" to initiate and conclude an investigation of her false claims.

## VI. THE FIRST 48 HOURS

### A. Overwhelming Evidence that Mangum was not Assaulted at 610 N. Buchanan is Amassed in the First 48 Hours of Mangum's False Accusation

#### 1. The Party, Such as it Was

194. The residents of 610 N. Buchanan hosted a party on March 13, 2006. The party, such as it was, began at midnight and ended at 12:04 a.m.

195. During the afternoon hours of March 13, 2006, hosts of the party made arrangements by telephone for two dancers to perform at 610 N. Buchanan, beginning at 11:00 p.m.

196. The first dancer, Kim Pittman, arrived at 610 N. Buchanan at roughly 11:15 p.m. Pittman was wearing jeans and a blouse, with her performance attire in a bag. Pittman remained outside of the residence, speaking with some of the young men, waiting for the second dancer to arrive.

197. Mangum's driver, Brian Taylor, dropped her off 40 minutes late, at approximately 11:40 p.m. She appeared to have come to 610 N. Buchanan directly from a prior event; she was wearing her dancing attire, not street clothes. Wherever she had been prior to her arrival at 610 N. Buchanan, her activities there had left her dazed and stumbling. Many believed she was impaired from alcohol or perhaps drugs; others thought it was something else but did not know what—they had never seen anyone behave like that before.

198. Mangum presented herself to Coman and Winstead, almost one year later, in much the same state. A blood test that Mangum consented to revealed a cocktail of pharmaceutical drugs was at least partially responsible for what they were seeing.

199. Jason Bissey, who lived in the neighboring house, watched the two women plan their routine outside of the house. He watched them enter the residence. Shortly thereafter, he looked at his clock, which read midnight.

200. A picture captured the two dancers as the dance began in the living room. The metadata in the digital file containing the image automatically recorded the time the picture was taken: 12:00:29 a.m. An analog watch worn by a party guest is visible in

the picture reads midnight. The analog watch in the pictures corroborates the photo's metadata.

201. Mangum was incapable of dancing in any fashion. As she took off her shoes in the living room, she leaned heavily on Pittman, and fell to the ground. She was speaking unintelligibly to no one in particular.

202. A sequence of pictures from 12:00:21 a.m. to 12:03:57 a.m. corroborates the party guests' accounts that they quickly became uncomfortable and/or disinterested. Pittman made an effort, but Mangum's behavior morphed from odd to bizarre. The dance, such as it was, was over within four minutes.

203. Another digital picture captured Pittman and Mangum departing the room without objection from the guests, at 12:03:57 a.m. The two women did not return to the living room again. In that same picture, Crystal's right shoe is visible, abandoned on the living room floor. Durham Police affidavits would later claim that Mangum's right shoe was lost in a violent struggle as she attempted to flee from her "attackers."

204. At 12:26 a.m., Mangum called her agency, Centerfold, from her cell phone. The party was clearly over, and Mangum was looking for more work elsewhere.

205. Jason Bissey told police that, at around 12:30 a.m., he saw that Mangum had exited the car, and was walking alone towards the rear of the house. Bissey could hear Mangum talking loudly to no one in particular, saying she lost her shoe.

206. A picture taken at 12:30:24 a.m. shows Mangum standing outside of the closed back door of 610 N. Buchanan. She has opened the screen door, but is apparently locked out of the house.

207. A picture taken at 12:30:47 a.m. shows Mangum smiling. She is in no apparent distress whatsoever. She is not fleeing from a violent rape. She is not being beaten by her "attackers" in the back yard. Instead, at 12:30:47 a.m., Mangum is smiling. She is also rummaging through Dave Evans' travel kit, which she inexplicably took from his bathroom.

208. At 12:31:26 a.m., a short video clip captured Mangum stumbling down the stairs and around the backyard. She was clearly impaired and professing to be "a cop" to no one in particular. As the video clip ends, she is heading back toward the stairs, where she fell in an effort to climb them.

209. At 12:37:58 a.m., a picture captured Mangum still lying down on the back stoop from falling. In the fall, she sent Evans' travel kit and some of her belongings flying into the yard. She was helped to her feet and assisted in the walk from the back stoop to Pittman's car.

210. At 12:41:32 a.m., another picture captured Mangum being assisted into Pittman's car, before Pittman drove away for the evening. Pittman asked Mangum if she had her money, and Mangum insisted that she did. Not seeing the money, Pittman drove off nevertheless.

211. Plaintiffs' defense counsel assembled the pictures, video, their metadata, and Bissey's statement into an immutable timeline that was the foundation for all 47 team members' digital alibis. The digital alibis were in place by March 26, 2006.

212. As early as March 27, 2006, undersigned counsel offered to present this evidence of innocence to Brodhead or any designee he chose. Brodhead refused the offer.

213. On two separate occasions before indictments, Nifong was also offered the opportunity to view this evidence of innocence.   Like Brodhead, Nifong refused to see it.

214. Special Prosecutors Coman and Winstead relied on the same digital evidence that Brodhead and Nifong refused to see, and to be confident enough in their conclusion to declare the Plaintiffs and their teammates "Innocent."

## B. The "Anonymous" 911 Call

215. As she drives off, Pittman engaged some of the party guests in verbal banter outside of 610 N. Buchanan.  As she was driving away, Pittman made a derogatory racial remark and received one in turn.  Pittman stopped her car and shouted "That's a hate crime!"

216. Pittman then made a show of calling the police.  Making sure dispatch got the address; Pittman was heard saying "610 N. Buchanan!" again and again.  The students who were still present knew that, in this neighborhood, Pittman's 911 Call would bring "automatic citations" to anyone who was still present when the police arrived. They all left quickly.

217. Pittman's phony 911 call was received by DECC at 12:53:17 a.m., and completed at 12:54:12 a.m.

218. It was plainly obvious from the 911 call itself that that the call was a poorly veiled ruse.  Among other things:

A.    The caller says that she was "driving down near Duke's campus" when the slur was made. Later in the call she repeated the account—incorrectly—stating that she and her girlfriend were "walking by" the house.

B.    The caller first claimed that the epithet was made by a "guy by the Duke wall." Later in the call, Pittman repeated the account—again incorrectly—stating that the epithet came from someone in a group that came out like "a big frat house" from the residence. The house and the wall are on opposite sides of the street.

C.    It is clear that the caller is feigning hysterics; she is alternatively calm, analytical, and sobbing from one moment to the next.

D.    Perhaps the clearest indication of fraud was Pittman's repetition of the house address three times during the call. The façade of 610 N. Buchanan does not bear its number; it fell off long before Pittman's call. A passerby could not know the street address of the residence merely by walking (or driving) by the house. Pittman, of course, got the address from her agency.

## VII.    THE FIRST INVESTIGATION: GOTTLIEB'S REPLACEMENT, SERGEANT SHELTON, AND INVESTIGATOR JONES CONCLUDE MANGUM'S CLAIMS ARE FABRICATIONS

### A.    Sgt. J.C. Shelton Responds to Pittman's 911 Call

219.    The Emergency Telecommunicator routed Pittman's call to the Duke Police Department. Durham Sgt. John C. Shelton was stationed nearby the 610 N. Buchanan residence when he heard the call on the radio; he proceeded to 610 N. Buchanan, and joined Durham Officer J.M. Stewart there.

220.    Gottlieb's replacement, Sgt. Shelton, and Officer Stewart walked around the house. They found no one there. Like the party guests at the 203 Watts house in the fall, the

last few remaining party guests scattered when they heard Pittman shouting "610 N. Buchanan" into her phone. Only a few months earlier, several team members looked on as Officer Watt explained to Evans and Flannery that a "directive" gave him no choice but to charge them when he got to the location of the "disturbance." It mattered little that Pittman's allegations did not constitute a crime, it was safe to assume that anyone still there when the police arrived would be charged with something.

221. Fifteen months later Nifong would testify that he still believed "something happened" in that bathroom, "to make everybody leave that scene very quickly." Nifong himself had insisted on prosecuting hundreds of Duke students solely because "they were there" when police arrived.

222. The video of Nifong's remarks is digitally embedded herein as **ATTACHMENT 8**, below:

*To activate the embedded video below,*
*left-click on the screen with the Adobe Hand Tool.*



**B.  On the Drive Away from 610 N. Buchanan:  Evidence of Psychosis**

223.   As Pittman and Mangum drove away, Pittman recalled to police that Mangum was "talking crazy."  Police notes do not elaborate on what Pittman meant.  However, Pittman told reporters that the "trip in that car from the house went from happy to crazy.  I tried all different ways to get through to her.  I tried to be funny and nice.  Then I tried to, you know, be stern with her."  Nothing worked.  Mangum seemed unaware Pittman was even there.  As a last-ditch attempt to get Mangum out of her car, Pittman began pushing Mangum out, shouting at Mangum "Get out of my car.  Get out of my car."  Then Mangum, with her head hanging down, said to Pittman: "Go ahead, put marks on me.  That's what I want.  Go ahead."

224.   At that, Pittman drove straight to the 24-hour Kroger, to find an off-duty officer there to help get Mangum out of her car.  Pittman quickly found the security guard, Angel Altmon, inside the Kroger.

**C.  Kroger Security Guard, Angel Altmon: 'Ain't No Way.'**

225.   Angel Altmon tried, but could not coax Mangum out of Pittman's car, so she called 911 for police assistance.  Altmon's call was received by DECC at 1:22:29 a.m.

226.   The audio of Altmon's 911 call is digitally annexed hereto as **ATTACHMENT 9**, and may be heard within this document via the embedded audio file below:



*To activate the embedded audio below,
left-click on this screen using the Adobe Hand Tool.*

227. DECC dispatched Altmon's call as a "10-56 female refusing to get out of dark colored Honda Accord in the Kroger parking lot." "10-56" means "intoxicated pedestrian."

228. Altmon saw no indication that Mangum was a victim of any form of sexual assault.

229. Durham Officer W. K. Barfield and Sgt. Shelton were dispatched to the Kroger.

230. When Sgt. Shelton arrived, Pittman immediately admitted to him that she was the one who placed the prank 911 call reporting a racial epithet at 610 N. Buchanan.

231. Pittman told Sgt. Shelton that Mangum was a total stranger to her; just someone she picked up as Mangum was staggering down the sidewalk along the East Campus wall when Pittman was driving by. Pittman also told Sgt. Shelton about Mangum's bizarre behavior in the car.

232. When Sgt. Shelton approached Mangum, she was still inside the car, feigning unconsciousness. Sgt. Shelton suspected a ruse, so he broke open an ammonia capsule under Mangum's nose, and Mangum began mouth-breathing, confirming his suspicions.

233. Sgt. Shelton then began pulling on Mangum to get her out of the car. Mangum sprung to life, grabbed the parking brake and held on so tightly that Sgt. Shelton and another officer could not get her out of the car. To break Mangum's resistance, Sgt. Shelton used a "bent-wrist come-along" and had to apply significant pressure to force Mangum to let go of the parking break. When Sgt. Shelton finally got Mangum out of the car, Mangum resumed feigning unconsciousness.

234. The entire time Mangum was in the Kroger parking lot, she did not say or suggest that she had been assaulted. No one there had any reason to believe that Mangum had been sexually assaulted.

### D. Mangum's Bizarre Behavior Meets the Criteria for Emergency Involuntary Commitment

235. After observing Mangum in the Kroger parking lot, Sgt. Shelton first interpreted Mangum's bizarre behavior as the product of impairment (drugs or alcohol). He decided to take Mangum to the Durham County Jail to be detained there on "twenty-four hour lock up status," until she sobered up. DECC was notified of the decision and Mangum was placed in the backseat of Officer Barfield's patrol car. Barfield told DECC: "She's breathing, appears to be fine. She's not in distress. She's just passed out drunk."

236. The audio recording of this communication survived the deletion of DECC's audio recordings relating to the investigation of Mangum's claims. It is digitally embedded herein as **ATTACHMENT 10**, below:



237. Soon thereafter, Mangum's behavior could not be explained by drugs or alcohol. Based on his experience, both on patrol and in his training of officers on the methods of making such distinctions, Sgt. Shelton identified signs and symptoms of a severe

mental illness. Sgt. Shelton further concluded that that Mangum was imminently dangerous to herself or others, and that she was in need of immediate psychiatric care. Shelton withdrew his 24-hour-hold order, and directed the officers to initiate emergency involuntary commitment proceedings.

238. The dispatch audio recordings of these DECC communications relating to Mangum's involuntary commitment were not released and were later destroyed or secreted by Captain Lamb or upon his direction after Plaintiffs' defense counsel demanded in writing on May 1, 2006, that the recordings be produced and/or preserved.

## E. Angel Altmon: Ain't No Way.

239. On April 3, 2006, Private Investigators Allison Blackman and Dennis Lane, retained by Plaintiffs' defense counsel, found and interviewed Angel Altmon, the Kroger security guard. The Durham Police had not yet interviewed Altmon or asked for her statement. It would be 9 months before a Durham Police investigator interviewed Altmon, on December 7, 2006.

240. Altmon was an important witness. She was the first fact witness not at the party to encounter Mangum after she left from 610 N. Buchanan. Like Sgt. Shelton, Altmon was confident that Mangum had not been sexually assaulted. Altmon also was privy to some of the same behavior that caused Sgt. Shelton to conclude that Mangum met the criteria for involuntary commitment.

241. In the interview conducted by Blackman and Lane, Altmon told the investigators that neither Mangum nor Pittman mentioned anything at all about an assault of any kind.

242. When they asked Altmon if there was anything about Mangum's appearance or behavior that even suggested Mangum had been sexually assaulted, Altmon replied, "Ain't no way!" The audio segment of the interview with Altmon is digitally embedded herein as **ATTACHMENT 11**, below:



## VIII. MANGUM NODS 'RAPE'

### A. Mangum's Involuntary Commitment Proceedings

243. After the decision had been made to initiate involuntary commitment proceedings at the Durham Center Access, Mangum overheard a radio exchange between Durham Officers. One officer reported that Mangum had two young children at home, possibly alone. Mangum also overheard the responding officer direct a police unit to go to Mangum's house to check on the children, and, if there was no adult supervision there, to call the Department of Social Services ("DSS") for intervention.

244. Based upon her prior commitments, Mangum would have known that she would be helpless in a DSS investigation if she was involuntarily committed at its inception, and would fear that DSS would take her children away from her.

### B. Mariecia Smith

245. Supervisor Mariecia Smith was on duty at the Durham Center Access when Officer Barfield presented Mangum for involuntary commitment. Mangum told Ms. Smith

her name was "Honey" and she did not want to go to jail. Ms. Smith smelled alcohol on Mangum's breath.

246. Mangum did not tell Smith she had been raped or assaulted in any way.

### C. Alycia Wright, R.N.

247. In the assessment room, a Durham Center Access nurse, Alycia Wright, asked Mangum questions as part of the commitment evaluation. Mangum refused to respond to her questions. Instead, Mangum wrote the names of her children on a piece of paper.

248. Wright saw Mangum writing her children's names, and asked if they were her children's names. Mangum nodded, yes.

249. Wright then asked, "Did something happen to your children?" Mangum said "no."

250. Wright then asked Mangum, "Did something happen to you?" Mangum nodded, yes.

251. Wright then asked Mangum, "Were you raped?" Mangum nodded, yes.

252. By nodding "yes," Mangum extracted herself from the involuntary commitment proceedings, and spared herself the possibility of being separated from her children. Police protocol required immediate suspension of the commitment proceedings to obtain a Sexual Assault Examination ("SAE"), Mangum was transported to Duke University Medical Center's Emergency Department ("E.D.") for that purpose, and DECC dispatched a female officer to meet Mangum at the E.D. all pursuant to protocol.

253. Nurse Wright claimed that she believed Mangum was neither drunk nor high; instead, she thought Mangum's bizarre behavior was consistent with fractured thinking, and a break with reality. Both observations are DSM-IV symptoms of psychosis.

254. During the entire time Mangum was at the Durham Center Access, she did not provide any detail of the rape or her attacker(s).

### D. Officer Barfield

255. Officer Barfield transported Mangum from the Durham Center Access to DUMC. Mangum did not provide to Officer Barfield the number, names, aliases, or descriptions of her "attacker(s)" nor did Mangum provide Officer Barfield any details of the alleged attack. Mangum did, however, provide Officer Barfield with a detailed description of the property she insisted was stolen by Pittman: her money ($2,000), her ID, her cell phone, and her bag.

256. Upon information and belief, Duke Police Supervising Defendants, Duke Police Investigator Defendants, the Chairman, the Duke CMT Defendants, Wasiolek, SANE Defendants, Nifong, Durham Police Supervising Defendants, and Durham Police Investigator Defendants, were aware of Mangum's bizarre behavior; of Nurse Wright's observations that Mangum exhibited in the midst of a break with reality; that Sgt. Shelton concluded she was exhibiting signs of a serious mental illness requiring emergency psychiatric intervention; and of the likelihood that Mangum was suffering from a severe mental illness, that, at a minimum, mimicked the symptomology of schizophrenia (or severe mania).

257. Aware of these things, the Defendants conspired to conceal, willfully ignored, and/or were deliberately indifferent to this evidence. They also conspired to conceal, willfully ignored, and/or were deliberately indifferent to evidence demonstrating Mangum's false claim of rape was the product of duress caused by the threatened loss of her children in the involuntary commitment that was already underway.

258. Upon information and belief, Duke Police Supervising Defendants, Duke Police Investigator Defendants, Steel, CMT Defendants, Wasiolek, SANE Defendants, Nifong, Durham Police Supervising Defendants, and Durham Police Investigator Defendants, were aware of the foregoing and, in addition, that Mangum overheard the police radio exchange ordering a patrol unit to Mangum's house to see if her children were alone; the suggestive questioning that prompted Mangum's half-hearted false claim of rape; the specious circumstances surrounding it; and Mangum's troubled psychiatric history, revealed at the Durham Center Access, including Mangum's previous involuntary commitments. Aware of these facts, said Defendants conspired to conceal, willfully ignored, and/or were deliberately indifferent or grossly negligent with respect to this evidence of Plaintiffs' actual innocence.

259. To the contrary, upon information and belief, beginning in March of 2006, Duke Police Supervising Defendants, Duke Police Investigator Defendants, Steel, CMT Defendants, Wasiolek, SANE Defendants, Nifong, Durham Police Supervising Defendants, and Durham Police Investigator Defendants agreed to conceal the evidence of the events at the Durham Center Access on March 14th, knowing their obvious relevance to Mangum's credibility.

260. The conspiracy to conceal and/or willfully ignore this evidence of innocence was in furtherance of the Defendants' efforts to retaliate against the members of the team because all of them were perceived as and understood to be citizens of other (northern) states, and because they refused to confess to crimes they did not commit or bear false witness to events that did not happen.

261. Upon information and belief, Duke Police Department Defendants, Steel, and CMT Defendants, were aware of all of the foregoing, had the authority and opportunity to intervene, and refused or failed to do so.

## IX. ADDITIONAL OVERWHELMING EVIDENCE OF INNOCENCE GATHERED DURING MANGUM'S 11 HOURS AT DUMC ON MARCH 14, 2006

### A. Sgt. Shelton Questions Mangum, and She Recants

262. When Mangum arrived at DUMC, police did not know where Mangum's alleged rape occurred. Sgt. Shelton went to DUMC to question Mangum, who was then "cooperative." Sgt. Shelton questioned Mangum about her rape claim, and Mangum recanted it. Mangum insisted, however, that her money had been taken, and she wanted the police to get it back.

263. Sgt. Shelton emerged from his interview of Mangum and told the officers assembled there that Mangum had lied at the Durham Center Access. As Sgt. Shelton was reporting that Mangum had recanted her rape claim to his Watch Commander, someone advised him that Mangum was now claiming she was raped again. The Watch Commander instructed Sgt. Shelton that "C.I.D. had been notified." Sgt. Shelton left while Duke Police began to initiate an investigation.

264. The audio recording of Sgt. Shelton reporting that Mangum recanted was erased by City of Durham Defendants after Plaintiffs' defense counsel made requests to produce or preserve all audio recordings relating to Mangum's claims.

265. Sgt. Shelton knew that Mangum was lying.

**B.     Officer Gwen Sutton's Interview of Mangum**

266. After Mangum recanted and renewed her rape claim to Sgt. Shelton, Durham Officer Gwen Sutton interviewed Mangum. Officer Sutton learned from Sgt. Shelton that the last known place Mangum had been prior to her arrest was 610 N. Buchanan. The only address Mangum had given to the Police was "610 Mangum."

267. Mangum told Officer Sutton that the rape occurred at a "bachelor party." In this telling, Mangum claimed:

A.     Twenty men were present at the bachelor party;

B.     Five men raped her in a bathroom at the bachelor party;

C.     She was not dragged into the bathroom, but "ended up" there;

D.     Mangum provided only one of the (then 5) attackers' names: Brett. Brett (in this account) penetrated her vagina with his hands and penis. Mangum told Officer Sutton that she was bleeding vaginally, a claim that proved to be a lie.

E.     Mangum accused "Nikki" (Pittman) of stealing her money and cell phone. However, Mangum then admitted to Officer Sutton that she may have deposited that money into the Agency's account at an ATM.

268. In addition, Mangum told Officer Sutton that she and three other women, named Nikki, Angel, and Tammy performed together at a bachelor party held at 610 N.

Buchanan. Mangum was improvising an account of events, transparently drawing upon details from recent unrelated events and the individuals involved in them. Here, in Mangum's account to Officer Sutton of three other women, "Nikki," of course, was Pittman; "Angel" was Angel Altmon, the Kroger Security Guard; "Tammy" was Tammy Rose, Mangum's contact at the escort service.

269. Sutton knew that Mangum was lying.

270. In all of her initial accounts of the events during multiple interviews, Mangum gave no descriptions of her alleged attackers; she did not mention Duke, Duke students, a team, athletes, or any sport of any kind. She did not mention lacrosse. She only named one "attacker" (Brett), and reversed herself on that detail. In the first account, she claimed Brett sexually assaulted her "with his fingers and his penis;" however, in a later account, "Brett" did nothing to her, she said only that "Brett knew the deal" and that "the guys weren't with it."

271. The only element of Mangum's account that remained somewhat consistent in her many versions were that Pittman had stolen her money, her purse, her ID, and her phone. Mangum was not interested in pursuing her false allegations of rape; she recanted her claim in the first police interview at the hospital. However, Mangum was keenly interested in getting her property back.

      **C.**    **Durham Police Determine that 610 N. Buchanan is in the Duke Police Department's Jurisdiction and the Case is Transferred to Duke Police Investigators**

272. The location of Mangum's allegations was not established until Mangum was interviewed at DUMC. As Mangum was being transported from the Durham Center

Access to DUMC for a SANE exam, an officer reported over the radio that Pittman had lied when she claimed that she had picked up Mangum on the street in front of 610 N. Buchanan.  Another officer replied incredulously, "the one that we talked to at the Kroger knew her?"  The first officer responded, "it is quite possible that they worked together."  That exchange was recorded at 2:39:03 a.m.

273.   Sgt. Shelton shortly thereafter established that the two worked at the address Pittman complained of in her 911 call:  610 N. Buchanan.  As such, the investigation of Mangum's false allegations fell within the Duke Police Department's jurisdiction.

274.   The Durham Police Watchdog Timer that tracked Durham Police activity in the case was reset at 3:07 a.m.  At 3:08 a.m., Duke Police Lieutenant Jeffrey O. Best was dispatched to DUMC to initiate the Duke Police Department's investigation

275.   Pursuant to the Durham Police Departments written protocol, General Order No. 1006 R-1, a transfer of the investigation to the Duke Police Department was initiated.  Duke Police Officers and Supervisors proceeded to DUMC to be briefed on Mangum's claims.

276.   Immediately a cadre of Duke Police Officers and Supervisors descended upon the E.D. in response.  At the E.D. Duke Police were briefed on Mangum's bizarre behavior, the aborted involuntary commitment, and the specious circumstances surrounding her rape claim.

277.   The transfer briefing took place on the loading dock of the E.D. shortly after 3:08 a.m. on March 14, 2006.

### D. Duke Police Department Initiates Its Investigation

#### 1. Duke Police and Durham Police execute the Case Transfer Protocol

278. When the transfer protocol was initiated, the Officer in Charge ("OIC") at DUMC, Duke Officer William Mazurek, responded to the E.D. He found Mangum being examined there by DUMC medical staff. From his observations of Mangum's interactions with nurses, doctors, and police, OIC Mazurek's impression was that Mangum was "faking." Pursuant to protocol, OIC Mazurek contacted his supervisor, Defendant Best.

279. Duke Police Officer Sara Beth Falcon was also stationed at DUMC when Mangum's rape claim was transferred to Duke Police. Pursuant to protocol, Officer Falcon, the only female Duke Police Officer present, was directed to assist Mangum. As she was assisting Mangum, Officer Falcon watched as at least four Duke Police Officers and "all of the supervisors" meet on the loading dock of the E.D. to be briefed by Durham Police on the case, pursuant to the transfer protocol.

280. At or around 3:08 a.m., after arriving at DUMC to coordinate the Duke Police investigation, pursuant to protocol, Defendant Best was advised by OIC Mazurek that the complaining witness was in the E.D., and claimed that she had been sexually assaulted at 610 N. Buchanan, during a "frat Party." The "bachelor party" Mangum reported earlier was now a "frat party."

281. Officer Falcon observed Defendant James Schwab, Duke Police Major, at the E.D. loading dock. In addition to Defendant Best, Schwab was present to oversee the coordination of the investigation by Duke Police.

282. Defendant Best instructed Duke Officers Christopher Day, Larry Eason, and Julius Robertson to go to 610 N. Buchanan to follow-up and try to make contact with the occupants of the house.

283. After clearing from the 610 N. Buchanan, Officer Day was dispatched to the E.D. to assist Defendant Best.

284. Shortly thereafter, Durham officers, one by one, cleared from the E.D.

285. While at the E.D., Officer Day took a full report of the findings of the Durham Police investigation up to that point. Among other things, Durham Police related to Duke Police:

A. Mangum was picked up by Durham Police at the Kroger on Hillsborough Road, where her behavior was at first bizarre and then alarming; and involuntary commitment proceedings were underway when Mangum nodded yes, when asked if she was raped;

B. Mangum claimed she was raped by approximately 20 males at a bachelor party;

C. Mangum had already given several conflicting accounts in interviews with doctors, nurses, and Durham Police, and recanted the claim when questioned by Sgt. Shelton;

D. Durham Police decided that the rape investigation should not be pursued any further, leaving open only the possibility of misdemeanors arising out of Mangum's claim that Pittman stole her money, ID, cell phone, and purse; and

E. Duke Police did not file charges based on the reports from the Durham officers.

286. Defendant Best was advised that the 911 call reporting a racial epithet at 610 N. Buchanan was a ruse made by Mangum's cohort, Pittman, and, that the professionals who interacted with Mangum earlier did not believe her rape claim.

287. Some, but not all, of these findings were included in Officer Day's written report, submitted the same morning, and reviewed and approved by Duke Police Supervising Defendants Dean and Best, and Duke Police Investigator Defendant Gary N. Smith, the same day, March 14, 2006.

288. On March 14, 2006, Defendant Robert Dean, Director and Chief of the Duke Police Department, notified Defendant Wasiolek, Assistant Dean of Students, of Mangum's allegations. Wasiolek, in turn, immediately contacted the lacrosse coach, Mike Pressler, the Director of Athletics, Joe Alleva, Associate Athletics Director, Dr. Chris Kennedy, Defendant Moneta, Vice President of Student Affairs, and Defendant Trask, the University's Executive Vice President. Consistent with Officer Day's summary of the Duke and Durham Police encounters with Mangum, the Duke Senior Administrators and Officials were advised that Mangum "kept changing her story and was not credible." This synopsis was derived directly from the transition report written by Officer Day.

289. Officer Day's report was an accurate synopsis of the Durham Police Officers' reports he obtained that night. However, weeks later, Defendant Brodhead commissioned a report by William G. Bowen and Julius Chambers to review his own handling of the case. Bowen and Chambers did not know that the Duke Police Department's initial response and investigation during the early morning hours of March 14, 2006 were facts that had been buried. To support their thesis that Brodhead's poor initial

response was caused by the lack of good information early on, Bowen and Chambers pointed to Officer Day's report as an example of the poor police work that misled Brodhead into believing an aggressive response was not required early on. When Bowen and Chambers' report revealed the existence of Officer Day's report and what it said, the media began asking a barrage of questions about Day's report and why he was involved in the investigation.

290. Duke Police and Durham Police agreed to misrepresent what transpired on the loading dock of the E.D. and told reporters that Officer Day was "eavesdropping" on Durham Police conversations, and had no place in the investigation. Defendant Patrick Baker, Durham's City Manager, orchestrated the agreement and the ensuing media campaign to mislead the public about the Duke Police Department's role in the case. Defendants Baker, Graves, Dean, and Burness all participated in the media campaign to impeach Officer's Day's Report. Graves and Dean even held a press conference for that purpose.

### E. Inv. B. Jones Interviews Mangum

291. Pursuant to Duke Police Department protocol, at approximately 3:50 a.m., the "on-call" investigator, Inv. B. Jones, was dispatched to DUMC's E.D. to interview Mangum. Inv. Jones immediately smelled a strong odor of alcohol coming from Mangum. Inv. Jones asked Mangum if her first name was Crystal. Mangum told Inv. Jones her name was "Precious." Mangum claimed she was from Durham, and then claimed she was from Raleigh. She did not describe or name any "attacker." She named only one person, "Brett." Shortly before, Mangum had told Officer Sutton that "Brett" was an attacker; however, in this telling, he was not. Mangum claimed only

that "Brett knew the deal."   She told Inv. Jones "the guys weren't with it," and insisted that Pittman stole her purse and phone.  Mangum refused to answer Inv. Jones's questions about her rape claim, saying "all I want to do is go home."  With that she went back to sleep.  Inv. Jones left her contact information with Mangum and the Duke Police Officers that were still present.

292.    In the initial 11 recorded encounters with and/or interviews of Mangum conducted during the early morning hours of March 14, 2006, Mangum gave no descriptions of her alleged attackers. Mangum did not claim there were 3 attackers, but did claim there were 1, 5, and 20.  The trio named "Adam, Bret and Matt" had not been mentioned.  The only name she gave was the name "Brett."  On that lone detail, she contradicted herself.  Brett an "attacker" in one account, and in another, Brett merely "knew the deal."  Mangum recanted her rape claim.  Mangum is emphatic about one claim only:  Pittman stole her property, and Mangum wanted the police to get it back.

### F.    The Clinical and Forensic Medical Evidence Collected at DUMC Corroborates Mangum's Recantation and Adds to the Already Overwhelming Proof That Mangum was Lying

#### 1.    The Clinical Medical Evidence

293.    Mangum was present at DUMC for approximately 11 hours.  During that time, many physicians, nurses, and other providers observed, examined, and interviewed Mangum.  To the extent that Mangum responded at all to inquiries about her rape claim, she never gave the same account twice.  In addition, Mangum also revealed a propensity to lie when self-reporting her symptoms with a particular proclivity for reporting pain that did not exist.  The DUMC providers' clinical observations and

reports of Mangum's various accounts of the alleged assault were documented in Mangum's DUMC charts.

### a. Nurse Jeni Hauver, R.N.

294.	At 2:53 a.m. Jeni Hauver, R.N. was the triage nurse who first interviewed Mangum when she presented to the E.D.  Mangum told Nurse Hauver that she had been "sexually assaulted," and Nurse Hauver noted that Mangum appeared to be "anxious." On the pain scoring scale, ranging from 1 ("mild") to 10 ("worst ever"), Mangum scored her pain as a perfect "10."  Nurse Hauver performed several tests designed to test the veracity of a high self-report of pain.  Nurse Hauver tested Mangum for symptoms associated with pain and found none.  In Mangum's chart, Nurse Hauver noted that Mangum appeared to her to be "in no acute distress, no obvious discomfort."

### b. Dr. Jaime Snarski, M.D.

295.	From 3:14 a.m. – 3:40 a.m., Mangum was clinically examined and interviewed by Dr. Jaime Snarski, M.D.  Mangum reported to Dr. Snarski that she was "stripping at a bachelor party," and "the bachelor [and] other guys…put their fingers and penises" in her "vagina against her will."  To Dr. Snarski, Mangum complained of extreme pain. Mangum denied being hit.  When asked to describe the pain, Mangum said it was "only in her vagina."  Dr. Snarski examined Mangum for symptoms that would corroborate Mangum's self-report of pain but found none.

### c.     Nurse Carole Schumoski, R.N.

296.   At 3:28 a.m., as Mangum was being interviewed by a police officer, a nurse, Carole

Schumoski, examined Mangum and asked Mangum to score her pain.  Mangum

reported that her pain was a "10."  When Nurse Schumoski asked Mangum to

describe the pain, Mangum said it was "down there."  Nurse Schumoski examined

Mangum for symptoms associated with pain, and found none.  Shortly thereafter,

Nurse Schumoski found Mangum, alone, resting quietly in no apparent distress.

### 2.     The Forensic Medical Evidence

297.   Roughly 6 hours after Mangum presented to the E.D. complaining of a sexual assault,

Mangum's Sexual Assault Examination ("SAE") began.

### a.     Tara Levicy Misrepresented Her Involvement in the SAE and Her Competence to Conduct an SAE

298.   Defendant Tara Levicy did not perform Mangum's SAE.  Levicy's report of the

exam, Sexual Assault Examination Report ("SAER"), however, fails to disclose that

fact or the fact that Dr. Julie Manly actually performed Mangum's SAE.

299.   Defendant Levicy did not perform the SAE because she was not qualified or

authorized to do so pursuant to DUMC policy.  By signing the SAER and failing to

clearly document those facts on the SAER, Levicy knowingly created a false and

misleading medical record in order to create the false impression that DUMC deemed

her qualified and competent to collect and interpret forensic medical evidence, and to

give credibility to her unfounded observations.

300.   Defendant Levicy's supervisor, Defendant Theresa Arico, R.N., would also

knowingly and willfully bolster Levicy's false claims about Mangum's SAE in public

statements to the media.  Arico knowingly and willfully added credibility to forensic findings that Levicy in fact did not—and could not—make.

301. Upon information and belief, Defendant Levicy was not deemed competent or qualified pursuant to DUMC's competency standards, or qualitative evaluations of her made by DUMC Administrators and/or Supervisors.  At the time of Mangum's exam, Levicy was a "SANE-in-Training" and was not qualified or competent to administer an SAE or to identify, collect, or interpret forensic medical evidence.

### b. Mangum's SAE was Abandoned and Never Completed

302. At approximately 9:00 a.m., Defendant Julie Manly, Duke Physician, initiated the SAE with Defendant Levicy in tow. Manly conducted the SAE, while Levicy filled in the blanks and checked boxes on the pre-printed SAER.

303. Defendant Manly never completed Mangum's SAE; it was abandoned in midstream because Mangum refused to allow the exam to continue.

304. To initiate the pelvic exam, Defendant Manly inserted a speculum, which allows the examiner to use a coloposcope to visually inspect the vaginal walls and cervix at high levels of magnification.  Mangum quickly protested and insisted that the examination cease.  According to Levicy, Mangum was responding to intense pain.  However, if Defendant Manly believed Mangum's pain was too severe to continue with the pelvic exam, the appropriate medical response was to diagnose the source of the pain and treat it.  Once the pain (and its source) is treated, the exam can continue.  That did not happen.

305. When Defendant Manly abandoned the SAE, much of the SAE had not been done. For example:

    A.   No pelvic exam was conducted.

    B.   No rectal exam was conducted.

    C.   No forensic toxicology tests had been ordered.

    D.   No forensic blood draw was taken.

306. Defendant Manly found no injury to Mangum's pelvic region whatsoever, including the vaginal walls, cervix, rectum, or anus. The only notation Manly made was "diffuse edema of the vaginal walls." Diffuse edema is not an injury; it is a symptom. It can be caused by many things. Further, diffuse edema cannot be clinically identified to a reasonable degree of medical certainty without a baseline reference for comparison (e.g., a prior observation of the vaginal walls at a time when they were not edemic).

        **c.**      **The only evidence of injury observed in the SAE were injuries that demonstrably pre-dated Mangum's arrival at 610 N. Buchanan**

307. Several photographs were taken in the SAE that did, in fact, show injury to Mangum's feet and knees. However, even the nominal injuries documented in the SAER were not new. Specifically, the minor injuries photographed and documented in the SAER included:

    A.   A scratch on Mangum's right heel, about 2 cm in length. The same scratch can be seen on Mangum's right heel in a photograph taken at 12:00:21 a.m. during the dance.

B.  A scratch on Mangum's right knee about 7 cm in length.  The same scratch can be seen on Mangum's right knee in a photograph taken at 12:00:40 a.m. during the dance.  If she sustained the injury from a sexual assault, the sexual assault took place before Mangum appeared at 610 N. Buchanan.

308.  Further, the remainder of the SAER indicates no evidence was found of a brutal sexual assault.  For example:

A.  Mangum denied receiving any physical blows by the hand.

B.  There was no swelling, edema, cuts or abrasions (even microscopic) of the anus or the exterior pelvic region.

C.  Contrary to Mangum's occasional claim that she was bleeding "down there," neither the SBI nor DNASI labs detected even a trace amount of blood on the vaginal or rectal swabs in Mangum's Sexual Assault Kit.

D.  No cuts, abrasions, or abnormalities on or around Mangum's vagina or anus were observed or documented with the high-magnification coloposcope.

309.  In the many "Systems Examinations" that were done by DUMC doctors and nurses on the morning of March 14, 2006 (and the UNC doctors and nurses the next day), they all concluded, upon examination, that Mangum's head, back, neck, chest, breast, nose, throat, mouth, abdomen, and upper and lower extremities were all "normal," and Mangum was consistently noted to be in "no obvious discomfort," even when she was scoring her pain as a "10 out of 10."  With the exception of Levicy, every provider who examined Mangum for symptoms to corroborate Mangum's pain scores found none.

310. At the conclusion of the SAE, according to Levicy's notes the evidence was collected, gathered up, and delivered to the custody of a representative of the "Law Enforcement Agency," Duke Police Officer Joyce Sale.

311. On her discharge, Mangum was instructed to set an appointment to check for bacteria in her throat, vagina, cervix, and anus. Mangum pursued a doctor's visit the next day, but not to obtain a bacteria check.

## X. MARCH 15TH: ADDITIONAL EVIDENCE OF MANGUM'S FRAUD EMERGES AT UNC HOSPITALS

### A. New Hospital, New Story, New Motive

312. The day after Mangum was discharged from DUMC's E.D., she presented to University of North Carolina ("UNC") Hospital's E.D., complaining of intense pain, and seeking prescription pain medications.

313. Mangum reported that she had been sexually assaulted the night before. Mangum gave no specifics of the attackers or the sexual assault itself to UNC doctors and nurses who inquired for them. However, consistent with her purposes at UNC, Mangum added an entirely new dimension to her account: she claimed she had been beaten, knocked to the floor multiple times, and had hit her head on the sink. The pain was intense, the worst ever.

314. Mangum admitted she had been at DUMC the day before, and did not receive a prescription then because she drank so much alcohol the night of the assault that she "did not feel pain" at DUMC; she felt the intense pain only after she sobered up. Mangum consistently reported pain scores of "10 / 10" at DUMC.

### B. Evidence Emerges of Mangum's Long History of Mental Illness and Addictions

315. UNC, as Mangum's primary healthcare provider, had an extensive electronic chart on Mangum. It revealed some of Mangum's history of mental illness and addictions, and a host of other facts that weighed heavily against her credibility. For example, the UNC records from that visit alone revealed:

A. Mangum had a long psychiatric history that included severe psychological disorders;

B. One of Mangum's current prescriptions was Seroquel, an anti-psychotic drug synthetically designed to target the core symptoms of schizophrenia (delusions, hallucinations, fractured thinking, and breaks with reality);

C. Mangum frequently presented to UNC's clinics and E.D. with somatic complaints, typically seeking prescriptions for muscle relaxers and narcotic pain killers; and

D. Mangum was deemed a "very high risk" for narcotic abuse, and her doctor noted that, "at clinic, we have recommended that she not be prescribed any narcotics."

316. Complaining of unrelenting pain that doctors could not corroborate with evidence of symptoms associated with pain, Mangum described the assault several more times. As she did at DUMC the day before, each time Mangum told the story, the story changed.

### a. Dr. John Sherrod

317. Mangum reported to Dr. Sherrod that she was paid to dance at a bachelor party; she wanted to leave, but "the other girls" she was working with wanted to stay. Mangum

claimed that she was pushed into the bathroom and locked in there while three men assaulted her orally, rectally, and vaginally. Mangum did not provide Dr. Sherrod any names of "the attackers," nor did she indicate her "attackers" had any school or team affiliation. She did not suggest that they used aliases to conceal their identities. She described her attackers as "white," and, then, only to distinguish them from the attackers in a prior sexual assault.

318. Mangum told Dr. Sherrod that, during the assault, she was "knocked to the floor multiple times," and she "hit her head on the sink." Dr. Sherrod inquired into Duke's course of treatment for those injuries. Mangum admitted that she did not claim anything of the sort at DUMC, but that was only because she had consumed so much alcohol, she "did not feel pain." The pain became exquisite, she reported, after she sobered up. She claimed neck pain, knee pain, ankle pain, and facial pain.

319. Mangum asked for a neck brace, but her treating physician declined.

320. Despite the warnings against prescribing narcotics, Mangum ultimately obtained prescriptions for Percocet, Valium, Flexeril, and Ibuprofin.

### XI. THE BODY OF EVIDENCE AMASSED IN THE FIRST 48 HOURS PROVED MANGUM'S RAPE CLAIM WAS A HOAX

321. Within 48 hours of Mangum's original claim of rape, the following facts were clearly established:

A. Mangum had a long psychiatric history that included serious mental illness and involuntary commitments;

B.    Mangum's primary healthcare providers concluded that Mangum was a clinically unreliable reporter of her own experience, particularly when reporting her own experience of pain and what was causing it;

C.    Mangum feigned symptoms of pain in order to obtain prescription narcotics so frequently that the clinic she regularly presented to recommended not prescribing them to her;

D.    Mangum had broken with her present reality on the evening of March 13th –14th and exhibited that through multiple signs of psychosis;

E.    Mangum said she was from Durham, and then changed her mind and said she was from Raleigh;

F.    In describing the events of the evening, she consistently said she had been at a bachelor party, and that she had an encounter with police officers.  However, her accounts alleged almost every possible variation on them;

G.    Mangum claimed she was raped as her involuntary commitment was underway, under circumstances akin to duress and gave no detail of the assault (she only nodded, yes);

H.    In the first interview after she was released from the commitment proceedings, Mangum recanted her rape claim;

I.    Mangum then re-claimed the rape.  When pressed for detail, Mangum's accounts of the most basic facts varied wildly.  For example, while at DUMC:

    i.      Mangum claimed that 1 man raped her;

    ii.     Mangum claimed that 20 men raped her; and

    iii.    Mangum claimed that 5 men raped her.

J.   Mangum claimed she was dancing with "Nikki" (Pittman), Angel (the Kroger Security Guard), and Tammy (her agency contact)." Later she claimed it was just "Nikki";

K.   Mangum claimed that her money was:

    i.   not stolen;

    ii.   stolen by "Nikki";

    iii.   stolen by one or several of "the attackers";

    iv.   deposited into a nearby ATM account, as required by the escort Agency; and

    v.   left in the back seat of Officer Barfield's patrol car.

L.   Mangum claimed that the amount of money stolen was $400, then $2000; and

M.   Mangum reported that, on the evening in question:

    i.   she drank one beer; and

    ii.   she drank so much alcohol that she "didn't feel pain."

322.   She did not identify anyone by name or aliases with the exception of "Brett" who she mentions only twice. In one account, he was an attacker, and, in the other, he was not.

323.   She did not claim the men used each other's names, aliases, or numbers to refer to one another or otherwise acted to "create an atmosphere of confusion." The only aliases Mangum claimed were used on March 13th -14th, 2006, were Mangum's and Pittman's aliases, "Precious" and "Nikki." Pittman identified herself with her real name when

she encountered authorities.  Mangum continued to refer to herself as "Precious" and also as "Honey" throughout the morning of the 14th.

324.    The SAE did not reveal any physical injuries indicative of rape or sexual assault of any kind.  Certainly, she did not have any injuries that corroborated the brutal 30 minute gang rape or violent struggle that Gottlieb would later concoct.

325.    Mangum reported that she was in the most severe pain possible, but doctors and nurses who sought to corroborate her report could not; they found no associated symptoms of any pain at all.

326.    The only documented injuries in the SAER were injuries to Mangum's knees and ankles.  However, digitally time-stamped photos taken during the dance show the exact same injuries were present on her knees and ankles when Mangum arrived at 610 N. Buchanan.  Moreover, these injuries are not evidence of rape.  They are typical of one who frequently stumbles.

327.    The elements of Mangum's wildly varying statements that were marginally consistent in the first 48 hours were:

A.    No condoms were used;

B.    The party was a "bachelor party"; and

C.    She wanted her property back.

328.    In the first 48 hours after Mangum claimed she was sexually assaulted, to at least 8 different medical providers and at least 3 Durham Police Officers.  In her 11 renditions, Mangum never gave the same story twice.  The only version of events that the evidence supported was Mangum's recantation.

329. The facts established in the first 48 hours were sufficient to end the inquiry and to conclude Mangum's allegations were improvised in order to avoid involuntary commitment and the loss of her children to the State, made by a disturbed woman who, in the considered judgment of one of Durham's most highly trained officers, also appeared to be an addict

330. The foregoing facts alone established that Mangum's basic claim was false with such clarity, that, in order to justify continuing the investigation, those facts had to be concealed, and, in addition, new, false evidence would have to be fabricated.

331. Soon after March 14th word of Mangum's bizarre claims and behavior and her doctors and nurses disbelief of her claims spread throughout the hospital.

332. Upon information and belief, the Durham Police Department Defendants, the Duke Police Department Defendants, the CMT Defendants, the Duke Administrator Defendants, the Duke Police Department Defendants and the Chairman were all aware of these facts, yet willfully ignored and/or were deliberately indifferent to this evidence of Plaintiffs' innocence in their drive to convict Plaintiffs. The Chairman directed all Duke University Defendants to 'turn a blind eye' to the evidence, after determining that Plaintiffs' convictions were "best for Duke," regardless of Plaintiffs' innocence.

**XII.    THE SECOND INVESTIGATION (MARCH 16 – 21):  DUKE UNIVERSITY DEFENDANTS AND DURHAM POLICE COLLABORATE TO IDENTIFY THE PERPETRATORS OF A GANG RAPE THAT DID NOT HAPPEN**

**A.    Gottlieb "Adopts" the Case**

333.    On March 14, 2006, Sgt. Gottlieb learned of Mangum's rape allegations early in the day while off-duty.  He quickly identified the investigator assigned to the investigation as Inv. Jones, and contacted her.  Jones advised Gottlieb that Mangum's claims were false and she had determined to rule Mangum's rape allegations "unsubstantiated."  Gottlieb was Jones' superior in rank, and he ordered Jones not to close the investigation, not to make any formal findings, and turn the investigation over to him.

334.    Inv. Jones called Mangum and left her a message that Sgt. Gottlieb was going to be handling her case from that point forward.

335.    Upon information and belief, Defendant Stephen Mihiach authorized the assignment of the investigation of Mangum's rape allegations to Gottieb, or delegated his final decisionmaking authority with respect to assignments to Sgt. Fansler or another supervisory official within the Central Investigations Division ("CID"), who pursuant to that authority assigned the investigation to Gottlieb.

336.    The transfer of the investigation to Gottlieb removed the investigation from the centralized Criminal Investigations Division, which employs skilled investigators trained in the science and techniques of violent crimes investigations, in clear violation of the Department's General Orders and CID's Standard Operating

Procedures governing the City's Case Management System and assignments of skilled investigators to violent sexual assault investigations.

337. A further consequence was to supplant the trained CID Investigations Chain of Command with the Himan Chain of Command, thereby delegating all of CID's policymaking authority to a Patrol Chain of Command, which lacked sufficient training, skill, and experience in complex investigations, and which would soon include Nifong. The chain of command for the investigation was therefore structurally incompetent to supervise the investigation of Mangum's false accusations.

338. To a reasonable policymaker it would have been plainly obvious that placing the investigation of Mangum's racially charged allegations in the hands of Himan, subject to a patrol chain of command comprised of Gottlieb, Ripberger, Lamb, Council, Hodge, and Baker, would inexorably lead to deprivations of Plaintiffs' constitutional rights; and, in fact, did lead to the deprivations of Plaintiffs' constitutional rights.

339. Aware of the ongoing violations of Plaintiffs' constitutional rights, Mihiach, Baker, Chalmers, Hodge and other City officials with policymaking authority with respect to the investigation of Mangum's false accusations failed or refuse to act to return the case to an experienced Violent Crimes Investigator and a proper Violent Crimes Chain of Command; or otherwise to correct, replace, reprimand, suspend, terminate, or remove Gottlieb, Himan, Ripberger, Lamb, and Nifong from active participation in the investigation of a rape allegation they were incompetent (or worse) to handle.

340. Mihiach, aware of the plainly obvious constitutional violations committed pursuant to his delegated authority to assign, monitor and reassign investigators to particular

cases, subsequently condoned, approved, and ratified the unconstitutional conduct by

Nifong, Gottlieb, Himan and other subordinates in the Durham Police Department;

yet, took no corrective action to prevent or aid in preventing the harms being caused

by Nifong and their subordinates.

341.    As a direct and foreseeable consequence of these policy decisions, Plaintiffs were

deprived of their rights under the First, Fourth, Fifth, and Fourteenth Amendments to

the United States Constitution.

### B.    Gottlieb's First Investigative Act Was to Stigmatize the Plaintiffs in the Eyes of the Community by Falsely Asserting That a Rape Had, In Fact, Occurred

342.    Before he even met Mangum, Gottlieb violated protocol and initiated what would

inexorably lead to the stigmatization of the Plaintiffs in connection with other

violations of Plaintiffs' constitutional rights.  Gottlieb's first act as Himan's direct

"supervisor" in the investigation was to send a broadcast email to the "PAC 2/Trinity

Park Neighborhood Listserv."  Sent on March 15, 2006 at 4:49 p.m., Gottlieb's email

read:

> *"The Durham Police District 2 Criminal Investigations Violent Crimes Unit is conducting an investigation concerning a rape of a young woman by three males at 610 N. Buchanan that was reported on 3/14/06 in the early morning hours.  The female arrived at the residence for a party close to 11:30p.m. on Monday 3/13/2006 and left on Tuesday 3/14/2006 reportedly after midnight.  Anyone in the area who saw or heard anything unusual, please contact Investigator Himan at 919-560-4582 or I at 560-4582 x228."*

343.    Knowing only that the universal conclusion of everyone who interacted with Mangum

believed she was lying, and without any information that could corroborate the claim

or infuse it with detail, Gottlieb simply asserted the phrase "a rape of a young woman by three males at 610 N. Buchanan" as though it was an established fact. He did not offer any descriptions of the three males, or where the number "3" came from (Gottlieb knew that Mangum's claims as to the number of her attackers had varied wildly at the hospital).

344. Upon information and belief, Gottlieb decided on three attackers because he knew the house at 610 N. Buchanan Blvd. was occupied by three Duke students. According to his notes, such as they are, at the time of his email, the case had not yet been transferred to him.

345. From long experience, Gottlieb knew that the members of the Listserv included the Trinity Park "permanent residents" who "resented" their Duke student neighbors that Sarvis referred to in his August letter and drove Baker and the University to enact the Zero Tolerance Policy the year before. Gottlieb's email was maliciously calculated to stigmatize the Plaintiffs and breathe life into the case by inflaming the passions of the "permanent residents" of Trinity Park.

### C. Gottlieb Assigns the Case to Ben Himan, a Rookie Property Crimes Investigator

346. On March 16, 2006 at 8:00 a.m., Gottlieb assigned the rape case to Inv. Himan. Himan had been an investigator for roughly two months. Himan had never worked directly with a District Attorney before, and did not know what a DNA report looked like.

347. Himan's assignment to the investigation violated the Durham Police Department's written protocol governing the assignment of rape and sexual offense cases. Durham

Police Department's Standard Operating Procedures ("SOPs") required all sexual assaults in which the victim is 18 years of age or older must be assigned to the Criminal Investigations Division's ("CID") Violent Crimes Unit.

348. Neither Gottlieb nor Himan were employed in the CID's Violent Crimes Unit. Within the Violent Crimes Unit, rape and sexual assault cases are assigned to investigators according to the following criteria:

A. The investigator's experience in the Criminal Investigations Division;

B. The specialized law enforcement training of the investigator;

C. The "needs of the Department as it [sic] relates to Affirmative Actions [sic]"; and, last,

D. The requirements of the Division at the time of the assignment.

349. Even if Himan (and Gottlieb) were in the Violent Crimes Unit, Himan's assignment to the case was contrary to the Department's stated criteria. Himan had no experience in the Criminal Investigations Division. Himan had no specialized training in rape and sexual assault cases. Himan did not promote any affirmative action goals of the Department.

### D. Duke Police and Durham Police Aid in Gottlieb's Re-Investigation of Mangum's Fictitious Claims

350. On the evening of March 15, 2006, Defendant Wasiolek spoke with the captains of the Duke University Men's Lacrosse Team via telephone, mainly through Flannery. Wasiolek informed Flannery that the police were investigating allegations of a rape

alleged to have occurred at 610 N. Buchanan during their party, and would search their home sometime soon.

351. Wasiolek advised the residents that they did not need lawyers, and they should cooperate with the police fully. Wasiolek did not advise them that they were suspects in Gottlieb's investigation.

352. At the same time, Duke Police Investigators compiled private information from Duke University's records pertaining to Plaintiffs and their teammates, and relaying the information to Durham Police.

353. Duke Police compiled a CD-ROM of all of the identification photos of the members of the lacrosse team that were maintained by the Athletics Department pursuant to their status as student-athletes.

354. Despite knowing of the overwhelming evidence that Mangum's claims were a hoax, the glaring lack of inculpatory evidence, and the prior determination by Duke and Durham investigators to close the case as an unsubstantiated, false allegation, Duke officials with policymaking authority with respect to the investigation directed Duke Police Department Officers and employees to assist Gottlieb in his Second Investigation in any way that Gottlieb directed. In doing so, Duke Police Supervising Defendants delegated their primary supervisory and final policymaking authority with respect to the supervision and conduct of the investigation to Himan, Gottlieb, Nifong, and the Himan Chain of Command.

355. The Duke Police Supervising Defendants delegated their policymaking authority with respect to the investigation, aware that doing so created the high likelihood that

Plaintiffs' First, Fourth, Fifth, and Fourteenth Amendments would be violated. As alleged herein, the delegation of policymaking authority and supervisory authority did, in fact, lead to those particular violations of Plaintiffs' constitutional rights.

356. The Duke Police Supervising Defendants decision to delegate their authority to Gottlieb, Nifong, and the Himan Chain of Command, in the face of those known, pervasive risks, was made pursuant to the policy and custom of the Duke Police Department not to intervene and to aid if necessary when a law enforcement officer is engaged in or poses a pervasive and unreasonable risk of violating a Duke student's constitutional rights.

357. The Duke Police Supervising Defendants decision not to revoke the authority they delegated to Gottlieb, Nifong, and the Himan Patrol Chain of Command when it was plainly obvious that the delegation of authority had led to violations of Plaintiffs' constitutional rights was the product of an established policy or custom not to intervene when Duke students' constitutional rights are being violated in their presence or within their knowledge.

### E. Gottlieb Launches his Re-Investigation with Effort to Identify the "Attackers"

358. Predictably, Gottlieb's investigation began by assuming the sexual assault occurred at 610 N. Buchanan, and so he launched an effort to identify "the attackers."

359. On March 16, 2006 at 8:52 a.m. prior to interviewing Mangum, the investigators began preparation for a "special operation" targeting the three residents of 610 N. Buchanan, Evans, Flannery, and Zash. Following a tip from Duke Police, Breck Archer was also considered as a potential target for the "special operation."

360. On March 16, 2006 at 9:30 a.m. Gottlieb and Inv. Soucie met with Defendant Smith, Duke Police Sergeant and Investigator, at Duke Police Headquarters. Defendant Smith provided a CD containing identification photos of Plaintiffs and their teammates for identification procedures, and also provided them a document entitled "Duke PD Report."

361. Duke University gave the keys to the home at 610 N. Buchanan Blvd. to the Durham investigators.

### F. Gottlieb and Himan "Interview" Mangum and Obtain Even More Evidence of Plaintiffs' Innocence

362. On March 16, 2006 at 11:47 a.m., Gottlieb and Himan interviewed Mangum for the first time. During the interview, the investigators claimed Mangum told them her attackers' names were "Adam, Brett, and Matt." She also gave descriptions of the (now) three "attackers." According to Himan's contemporaneous, handwritten notes, she described her attackers as follows:

| "Adam" | Short, red cheeks, fluffy brown hair, chubby face |
| "Matt" | Heavy Set, short hair, 260 lbs. to 270 lbs. |
| "Brett" | Chubby |

### G. Mangum's Descriptions and the March 16th and 21st Identification Procedures Eliminated Every Team Member as a Plausible Suspect

#### 1. Mangum's Descriptions Eliminated 11 Team Members as Plausible Suspects

##### a. The Descriptions Eliminated Devon Sherwood

363. Because Mangum described her attackers as white men, Devon Sherwood, an African-American team member, was eliminated as a plausible suspect (though not necessarily as a witness).

##### b. The Descriptions Eliminated "Tall and Lean" Team Members

364. Because Mangum described all three attackers' height as short or medium, and their build as either chubby or heavy set (260-270lbs.), she excluded those team members who were notably "tall and lean." All ten of the notably "tall and lean" team members were excluded from consideration as plausible suspects. For that reason, those ten team members, like Devon Sherwood, were excluded from the March photo arrays prepared by police in the effort to identify "the attackers."

365. Collin Finnerty was one of the more notably "tall and lean" team members, and he was eliminated as a plausible suspect on that basis on March 16th. Finnerty also would be excluded from every photo array police compiled on that basis, until the April 4th "pick three" procedure.

## 2. The March 16th Identification Procedures Eliminated Another 24 Team Members as Plausible Suspects

366. Gottlieb and Himan reported that Mangum claimed "the attackers" names were "Adam, Bret, and Matt." Gottlieb does not say whether or not he showed Mangum the team roster he obtained from Defendant Smith just before he went to Mangum's home to interview her.

367. While team members included one Adam, one Bret, one Breck and three Matts, Mangum's descriptions bore almost no relationship to any of those individuals. In fact, Mangum's descriptions ruled out Matt Danowski as a plausible suspect, because Danowski was notably tall and thin.

368. Nevertheless, Inv. M. Soucie prepared four photo arrays ("six-packs") based upon the remaining two Matts (Wilson and Zash), Adam Langley, and Bret Thompson.

369. Each array contained six photos, one suspect and five fillers. The "fillers" for each of the four arrays were other team members who were similar to the "suspect" in their body type, build, height, and weight. Inv. Soucie labeled the four arrays "A" through "D."

370. Of course, it would have been obvious to Mangum that the "fillers" were not fillers, but instead were team members because they were all wearing the same, v-neck game jersey.

371. Defendant Richard D. Clayton, Durham Investigator, showed Mangum each of the 24 lacrosse players in the arrays, one picture at a time, and, each time, asked Mangum if she could identify any of them as being present at the party.

### a. Ryan, Matt, and Breck were Eliminated as Plausible Suspects in the March 16th Array

372.    Plaintiffs Ryan McFadyen, Matthew Wilson, and Breck Archer were all shown to Mangum in "Array D" in the March 16th Identification Procedure, and Mangum did not identify any of them as an "attacker." Further, she did not even recognize Ryan, Matt, or Breck.

373.    Ryan, Matt, and Breck were eliminated as plausible suspects two days after the party, on March 16, 2006. Nevertheless, within 10 days of being eliminated as plausible suspects, each of them would be subjected to an unprecedented vilification as criminal suspects in the year that followed.

374.    Mangum did not identify any of the other 21 team members as her "attackers" shown to her in the photo arrays presented in the March 16th Identification Procedure.

375.    Other results from the same procedures cast even more doubt on Mangum's credibility:

A.      Mangum "recognized" only 5 of the 24 players as being present at the party at all, and only with varying degrees of certainty. Notably, she was 70% sure that she remembered seeing Reade Seligmann at the party, but certain he was not one of her "attackers." Reade Seligmann therefore became a possible witness in the case, but was eliminated as a plausible suspect.

B.      Mangum was 100% certain that Brad Ross was at the party. However, Brad Ross was in Raleigh while Mangum was at 610 N. Buchanan on March 13th. Ross personally told Gottlieb and Himan this directly, and they were provided documentation establishing this fact prior to any indictments in the case.

C. Mangum did not recognize the remaining 19 players at all, despite being given the option of identifying individuals with fractional certainty (e.g., 1/10 through 10/10).

### 3. The March 21st Identification Procedures Eliminated the Remaining 12 Team Members as Plausible Suspects

376. On March 21, 2006, when Mangum arrived at District Two, her first concern was getting her property back. Himan asked Mangum if she could give a better description of the suspects, but Mangum could not remember anything further about the suspects than the generic descriptions she gave on March 16th.

377. Having failed to identify any "attacker" (or even those present at the party) from 24 pictures on March 16th. Durham Police compiled two more photo arrays using a total of 12 team members who Mangum had not seen in the March 16th arrays, and who were not ruled out by Mangum's description. Again, Durham Police used the standard "six-pack" array.

378. The suspects in the arrays this time were two of the renters of the residence at 610 N. Buchanan, Evans and Flannery. Police did not compile an array for Zash because he was ruled out when Mangum failed to recognize him in the "Matt" array on March 16th.

379. Again, there were no "fillers." The arrays contained only pictures of lacrosse players. Mangum knew they were all lacrosse players because, again, they were all wearing the same jerseys in the photos.

380. Mangum looked at all 12 pictures in the two arrays. She did not recognize a single person. Not one. She was shown both arrays again. Again, she recognized no one. Mangum told Clayton, "They all look the same."

381. David Evans was included in the "F" array on March 21st. Mangum saw his picture twice and had no recollection of him whatsoever. Two weeks later, Mangum would claim that she not only recognized him, but also claimed he was (or "looks like") one of her attackers ("without the moustache").

### XIII. AS OF MARCH 21ST, THERE WAS NO RATIONAL BASIS TO CONTINUE INVESTIGATING THE DUKE LACROSSE TEAM

#### A. Mangum was not Credible

382. The evidence collected in the first 48 hours demonstrated—overwhelmingly—that Mangum was not credible. The evidence discrediting Mangum included, for example:

A. Mangum's conduct in the car with Pittman, including encouraging Pittman to "put marks on [her]," was so alarming to Pittman that Pittman took Mangum to the authorities immediately;

B. Mangum's behavior in the brief time she was at the Kroger with police met the written criteria for initiating emergency involuntary commitment procedures;

C. Mangum "nodded yes" when asked if she had been raped, under circumstances akin to duress, after she had become aware that commitment could lead her to lose custody of her children;

D. Mangum recanted her rape claim in the first interview after she was released from the involuntary commitment proceedings;

E.   Mangum had a long psychiatric history, including other involuntary commitments;

F.   Mangum's primary healthcare providers had concluded she was clinically an unreliable reporter of her own experience; and

G.   Mangum gave an account of the alleged attack to at least 11 different medical providers and police officers, and never told the same account twice.

### B.   Even if Mangum were Credible, Mangum had Already Eliminated Every Member of the Team as a Plausible Suspect

383.   To the extent that police actually believed that Mangum was attacked and sexually assaulted by someone, by March 21, 2006, Mangum herself had already eliminated every member of the Duke lacrosse team as a plausible suspect:

A.   11 team members were eliminated as plausible suspects by Mangum's March 16th descriptions of "the attackers;"

B.   24 of the remaining 36 team members were eliminated as plausible suspects in Mangum's March 16th Identification Procedure;

C.   The remaining 12 team members were eliminated as plausible suspects in Mangum's March 21st Identification Procedure;

D.   When police transformed the "identification procedures" into "recognition procedures" Magnum claimed she "recognized" only 5 of the 36 team members shown to her.  One of them, Brad Ross, police knew was not in Durham at the time of the party.  Another, Reade Seligmann, police also believed was not at the party because none of the residents they interrogated remembered seeing Reade at the party; and

E.   Mangum did not recognize 31 of the 36 team members shown to her (many of them were shown to her twice) with even a 10% degree of certainty.  Police knew many of those individuals were, in fact, present at the party.

384.   Therefore, by March 21st, the "Second Investigation" of Mangum's false accusations produced more overwhelming evidence that Mangum's claims were false, and, even if it was plausible to believe that Mangum was attacked and sexually assaulted on March 13th or March 14th, it was certain that Plaintiffs and their teammates were not "the attackers."   They had all been eliminated as plausible suspects—by Mangum herself.

C.   **Gottlieb and Himan Coerce Pittman to Recant her Statement that Mangum's Claim was a Crock and Provide a New Statement that Created a Window of Opportunity for a Sexual Assault to have Occurred**

385.   On March 20, 2006, Pittman told Himan over the phone that she was at the party with Mangum, that she had heard of Mangum's claims and called Mangum's claims "a crock."   On March 22, 2006, Himan and Gottlieb commanded her to appear at the District Two substation to give them a new, written statement.  She completed her written statement without allowing for the possibility that there was enough time in which she was not with Mangum for the sexual assault to have occurred.  Her original complete statement concluded with the phrase, "where my night was over."

386.   Upon information and belief, Pittman was then served with an outstanding warrant for her arrest, on a probation violation that posed a high likelihood of revocation.  Pittman then wrote an addendum to her statement, which transparently fabricated a window of opportunity for a sexual assault to have occurred.  The addendum reads, *in toto*:   "I

forgot to mention that the first time Precious came to the car, she left because she felt there was more money to be made. It was after then, that the boys helped her to the car."

## XIV.     MANY, MANY STONES LEFT UNTURNED

### 1.     Police did not Follow-Up with Jason Bissey

387. Himan and Gottlieb, with the approval of the Himan Chain of Command, deliberately avoided taking investigative steps that would have produced even more evidence of Plaintiffs' innocence.

388. Jason Bissey was a critical witness; he literally watched most of the events outside of the house that evening unfold form his neighboring porch. He was a critical link in the digital alibis of Plaintiffs and their teammates. In particular, he watched Pittman and Mangum going into the residence at midnight. He also observed Mangum staggering back toward the back of the house saying she had lost her shoe. He watched as those team members remaining launched a determined effort to find the shoe to hasten Mangum's departure.

389. Bissey was interviewed in person by virtually every national and local media outlet. He was never interviewed in person by Himan. Instead, after a phone call he made to District Two in response to Gottlieb's incendiary email, he was asked to write a statement. He did, providing the exact time that he saw the women enter the house, among other events he witnessed.

390. In early April, Himan went to Bissey's house, quickly grabbed Bissey's statement, asked no questions, and left without reading the statement. Himan never followed up

to question Bissey about his statement later. When Wilson and Mangum fabricated a new version of events to move the timeline of events back to start the sequence at 11:30 p.m. instead of midnight and to claim that Mangum had departed the residence by midnight, Himan did not question Bissey about the times he wrote in his statement or confront Mangum with Bissey's contradicting statement.

### 2. Police did not Investigate Mangum's Prior Unfounded Claims

391. A rudimentary record check would have revealed to Himan that Mangum was the source of a number of prior, scandalous claims. She claimed she was raped by three men in a virtually identical scenario roughly ten years before her 610 N. Buchanan allegations. She also made several reports of child abuse. Every one of the follow up investigations conducted by Durham Police, Creedmoor Police, and the Department of Social Services were ruled false reports and closed as "unfounded."

392. Himan, with the approval and ratification of the Himan Chain of Command, was willfully blind and/or callously disregarded their knowledge of Mangum's extraordinary history of making false reports of acts evincing extreme immorality or wickedness.

### 3. Police did not Investigate Mangum's Joyride Risking the Life of a Police Officer

393. Himan never investigated Mangum's arrest and conviction for felony speeding to elude arrest. After Mangum threatened the life of a police officer with her vehicle, she was arrested and placed in the back of the charging officer's patrol car, where she quickly appeared to be sleeping or unconscious. When the charging officer's

commander arrived on the scene, he opened the back door of the patrol car. Mangum looked up at him and, without any undergarments, spread her legs and made a vulgar suggestion to the senior officer in an absurd bid to avoid incarceration.

394. Himan, with the approval and ratification of the Himan Chain of Command, was willfully blind and/or callously disregarded their knowledge of Mangum's criminal past, particularly those details that demonstrated that Mangum knew few limits in designing means to avoid incarceration.

### 4. Police Never Confronted Mangum with Contradictory Photographic Evidence Released to the Media

395. From the beginning of the investigation, Himan and Gottlieb were aware that photographs that were taken during the relevant time showed Mangum could not have been sexually assaulted at 610 N. Buchanan.

396. Evans, Zash, and Flannery told their District Two interrogators about the photos, and where they could find them. The digitally created metadata for each photograph gave the precise time the pictures were taken, and the metadata could not be altered without detection. Police never obtained a warrant, issued a subpoena, or otherwise tried to obtain the digital photos.

397. The day after Finnerty and Seligmann were arrested, Plaintiffs' defense counsel released several photos to NBC to use in a presentation that demonstrated that Mangum's claims were a fraud. One of the photos showed Mangum on the back porch of the residence, obviously locked out, rummaging around Dave Evans' travel kit (which she had stolen from his bathroom). She was smiling. Not a stitch of clothing was out of place, except her shoe was missing. Another picture captured the

missing shoe abandoned on the living room floor as the women were leaving. The metadata showed the picture was taken at 12:31 a.m.

398. The photo refuted every element of her account.

399. Himan, Nifong, nor anyone in the Himan Chain of Command questioned Mangum about this flatly contradictory evidence.

400. When Mary Winstead confronted Mangum with this photo, Mangum claimed the photo was taken when she arrived at the residence to explain her smile and her obviously untrammeled appearance. When Winstead pointed out to Mangum that she couldn't have just arrived at the house because her shoe was already missing, Mangum offered explanations that were facially absurd or contradicted claims she had just made to explain something else.

401. Himan was present for the Special Prosecutors' interviews of Mangum. According to Himan, it was when the Special Prosecutors confronted Mangum with that and other contradictory evidence that he became convinced Mangum was lying. Upon information and belief, Nifong, Himan, Gottlieb, the Himan Chain of Command, and Mihiach were aware that Himan had not confronted Mangum with the photographic or any of the other voluminous contradictory evidence, they were aware that doing so would produce exonerating results, and, to avoid those results, they directed Himan not to confront Mangum with the evidence and/or were deliberately indifferent to the fact that Himan had no experience or training that would prompt him to confront Mangum.

## XV.     THE CONSPIRACY TO ORCHESTRATE THE MASS INTERROGATION OF UNCOUNSELED STUDENTS

402.    Instead of closing the investigation of the Plaintiffs and their teammates after they had been eliminated as plausible suspects, Gottlieb pressed on.  He wanted to conduct a massive interrogation of all 47 members of the team.  Knowing that the investigation had produced all of the foregoing, overwhelming evidence of their innocence, the Duke Police Defendants, pursuant to their established policy and custom to 'turn a blind eye' to police misconduct, did not act to prevent Gottlieb's misconduct and abuses, but instead, acted in aid of the violations.  Duke Police and Defendant Wasiolek, individually and in concert with Gottlieb and Himan orchestrated the interrogation of all 47 team members, *en masse*.

### A.     Duke University Defendants' Acts in Furtherance of the Conspiracy

403.    Duke Police and Duke Officials understood and agreed to:

A.     Deliver all 47 team members to Gottlieb and Himan, at a designated location, to be interrogated by Durham Police;

B.     Create a false sense of security in the team members by minimizing the seriousness of the investigation and the charges being investigated, and encourage team members not to seek legal counsel or to reveal the planned interrogations to anyone;

C.     Provide no information to Plaintiffs or their teammates about the nature or scope of the interrogations;

D.     The team members would not be informed that, during the interrogations, every one of them would be asked to volunteer to give their DNA and a "mug shot"

photograph, or that a team of CSIs from the Durham Forensic Services Unit ("FSU") had been mobilized for purpose of taking DNA swabs, mug shot photographs, and pictures of any scars or marks on the team members' arms and torso;

E.   The team members would also not be advised that if they submit DNA samples and mug shot photographs voluntarily, they waive their right to a report of the results of all DNA testing and photo identification procedures as soon as they are available; and, further, that they could have that right merely by requesting a Nontestimonial ("NTID") Order be obtained for the same purposes; and, further that, absent an NTID Order, a right to that information would not arise again unless the individual is indicted, and then only pursuant to constitutional and/or statutory discovery; and

F.   Provide a primary location and/or a satellite location(s) for isolated interrogations of individuals.

## B.   The Durham Police Defendants' Acts in Furtherance of Conspiracy

404.   Durham Police, for their part, understood and agreed to:

A.   Conduct interrogations of the team members individually. Upon information and belief, the interrogators would employ all of the rudimentary interrogation techniques, including, but not limited to, dividing them, exhausting them, falsely reporting to one individual that a teammate's account contradicts theirs in material respects, and the many other standard tools of interrogation;

B.   Coordinate the overstaffing of the FSU to take DNA swabs and "mug shot" photographs; and

127

C. Provide Duke Police and Duke Officials with information relating to their charging decisions.

## C. Implementation of the Conspiracy

405. Consistent with the agreement, Duke Police, Duke Officials, and their agents implemented the plan to deliver the team members to Gottlieb. The Plaintiffs and their teammates had no notice of the interrogations until approximately 7:00 p.m. on March 21st. They were instructed to report to the Duke Police Department 20 hours later, at 3:00 p.m. on March 22nd.

406. There was very little time for Plaintiffs or their teammates to consult meaningfully with their parents or to retain, much less consult meaningfully with counsel. They were advised that they did not need lawyers; they were merely "going in to answer one or two questions." They were not told that the FSU would be on hand to take DNA samples and photographs of their face, arms, and upper torso. Defendant Wasiolek had not revised the advice she gave to the lacrosse team captains the week before, and it was disseminated to the remainder of the team. The gist of it was, "you don't need a lawyer," and "don't tell anyone this is happening, not even your parents." All they knew about the questions they would face was that they related somehow to the party held at the lacrosse team captains' house the week prior. They were not told the allegation was rape, sexual offense and kidnapping or that the punishment for the charges being investigated, if run consecutively, would amount to a *de facto* life term.

### D. Counsel Intervenes Overnight to Advise the Plaintiffs and their Teammates of the Nature of the Charges and the Nature of the Individual Investigating Them

407. Beginning at 9:00 p.m. on the night of March 21st and continuing until 9:30 a.m. the next morning, Plaintiffs' defense counsel spoke with nearly all of the team members, and many of their parents. The team members requested a postponement of the police questioning.

408. Defendant Wasiolek's assurances that the allegations would simply "go away" or would be "swept under the rug" were recklessly made. The central elements of the allegation were alarming and provocative. Further, those elements had already been published in several newspaper articles, with Gottlieb as the source in each. Further, Gottlieb and Himan had already testified—under oath—that they believed there was probable cause to believe that Mangum was gang raped at a party hosted by three lacrosse team captains and attended by mostly team members. Finally, over ten days after the party, and a week after the search of 610 N. Buchanan and the interrogation of the residents, police were still investigating, and, in fact, were staging a massive interrogation of the entire men's lacrosse team.

409. Furthermore, under North Carolina law, the team members who were present at the party could be indicted and convicted on the same charges—as accomplices—based solely on an admission that they were present at the party. In North Carolina, the accomplices to a crime are punished no differently than its principals.

410. It was clear that an intelligent decision about submitting to police questioning under the circumstances would require more than the few hours available under the scheme agreed to by the University and Durham Police.

411.   The University Officials' agent responsible for coordinating the mass interrogation was directed to notify the Durham Police that the team members were told of the planned interrogations without sufficient time to discuss it fully with their parents. The message Plaintiffs' defense counsel prepared to be conveyed to Durham Police was simple and clear:  "The team members wished to postpone the interrogations to allow sufficient time to tell their parents what they were doing.  There is nothing magical about Wednesday."

412.   The interrogations were postponed.

413.   Duke University Defendants and City of Durham Defendants independently and collectively undertook to retaliate against them for their decision to exercise their constitutional rights.

### XVI.   THE CONSPIRACY TO RETALIATE AGAINST PLAINTIFFS FOR EXERCISING CONSTITUTIONAL RIGHTS

#### A.   Gottlieb and Himan Abused the NTID Order Process in Retaliation Against Plaintiffs for Exercising Their Constitutional Rights

414.   When Gottlieb and Himan received word that the team members postponed the mass interrogation, Gottlieb and Himan immediately retaliated against them by:

   A.   Knowingly making false, sensational allegations in the NTID Affidavit supporting their application for an NTID Order;

   B.   Seeking a NTID Order directed to every white team member, after every team member had already been excluded as a plausible suspect and after three of them had already given DNA samples; and

C.   Leaking the NTID Order and the fabricated NTID Affidavit to representatives of the media in advance of their appearance at the Durham Police Department's Forensics Unit to ensure that the sensationalized allegations would be widely reported by the media and to subject Plaintiffs to public condemnation.

### 1.   The Fabricated NTID Affidavit

415.   Immediately after Gottlieb and Himan were advised that team members postponed the mass interrogation, Gottlieb and Himan retaliated against them by drafting an entirely new Affidavit to request an NTID Order.  There was no need to revise the Affidavit as a practical matter.  The existing Probable Cause Affidavit was sufficient to obtain a Search Warrant for 610 N. Buchanan.  To obtain an NTID Order, the only modification required was an allegation that each individual on the team was present at the party (an allegation they could not truthfully make).

416.   Instead, for the NTID Order Application, Gottlieb and Himan added an array of new, fabricated allegations to the original search warrant Affidavit.  The new allegations were designed to ignite public outrage at the Plaintiffs.

417.   The new scandalous allegations were attributed to Mangum, but Mangum did not provide them.  Instead, most of them were fictionalized, gross distortions of innocuous facts given to Himan and Gottlieb by Evans, Flannery, and Zash in their voluntary statements and interrogations on March 16th.

418.   Gottlieb's fabricated allegations in the NTID Order added a sinister dimension to the already fabricated account of the evening in the Search Warrant Affidavit.  Among them was, for example, the allegation that the women were sexually threatened with a broomstick, the accuser lost several fingernails in the violent struggle, and the team

members used each other's names to disguise their "true identity" and to avoid identification. These facts were demonstrably false, and they did not come from Mangum or any witness. Upon information and belief, they came from Gottlieb's brain.

### a. The Broomstick

419. The NTID Affidavit alleged that "[o]ne male stated to the women 'I'm gonna shove this up you' while holding a broom stick in the air so they could see it."

420. There is no mention whatsoever of a broomstick in the initial Search Warrant Affidavit and a broomstick was not listed in the "Description of items to be seized" in the search of 610 N. Buchanan, written based on Gottlieb and Himan's March 16th interview of Mangum  The Search Warrant for 610 N. Buchanan does not mention a broomstick because Mangum did not say anything about it in her interview with Gottlieb, Himan, or anyone else.

421. Gottlieb and Himan learned of "the broomstick exchange" from the March 16th statements of Evans, Flannery, and Zash, who each independently characterized the comment as harmless, and said in jest.

422. Gottlieb and Himan took the statements Evans, Flannery, and Zash voluntarily gave them, and twisted them into a complete fabrication: "One male stated to the women 'I'm gonna shove this up you' while holding a broom stick in the air so they could see it." That never happened, and no witness ever said that—or anything like that—to Gottlieb or Himan.

### b.    The Fingernails

423.    The facts in the NTID Order asserted that:

> *"During a search warrant at 610 N. Buchanan on 3-16-2006 the victim's four red polished fingernails were recovered inside the residence consistent to her version of the attack. She claimed she was clawing at one of the suspect's arms in an attempt to breath [sic ] while being strangled. During that time the nails broke off."*

424.    Mangum did not tell Gottlieb and Himan that she lost her fingernails in a struggle, nor would she ever make that claim. Mangum did not make that claim in any of the multiple, varying accounts that she gave police officers and medical providers on March 14th, 15th, or 16th, or in her written statement on April 6th. However, Mangum did tell Gottlieb and Himan that she had started affixing and painting her false nails just before she left for the party at 610 N. Buchanan.

425.    Further, other unpainted fingernails and nail polishing and painting accessories were found in the bathroom, inside Mangum's purse, and on a computer component, which were seized by police in the search of 610 N. Buchanan.

426.    There were still more unpainted fingernails sitting in plain view on the sink counter in the same bathroom where Mangum claimed they flew off. Police did not seize these unpainted nails or indicate that they were, in fact, still unpainted. Upon information and belief, Police did not seize the unpainted nails in order to avoid reporting their existence on the Inventory of Seized Property. That, in turn, enabled them to report the horrifying fiction that Mangum's nails flew off in a violent struggle in the bathroom.

427.   Private Investigators Blackman and Lane and Forensics Expert W.E. Hensley photographed the loose, unpainted nails where they found them, days after the police search of 610 N. Buchanan.  Some, for example, are shown in the photograph below:



428.   The unpainted nails and nail accessories reveal that the nails were not torn off in a struggle; Mangum was painting, applying, or repairing them while Pittman was getting changed into her street clothes in the bathroom.

429.   Gottlieb and Himan were fully aware of those facts and their obvious meaning, and they deliberately omitted them from the NTID Affidavit in order to generate public outrage, and to suggest the nails potentially contained DNA evidence they could use to compare with team members' DNA in order to identify "the attackers."  In collusion with Gottlieb and Himan, Defendant Addison made the same false claim in public statements in his capacity as an official spokesperson for the Durham Police Department, in furtherance of the conspiracy to subject Plaintiffs to public condemnation in retaliation for exercising their constitutional rights.

430. Further, pictures taken of Mangum during the dance showed that several of Mangum's fake nails were missing during the dance. Mangum never claimed she was raped before the dance, so the nails were missing before the alleged rape occurred. The relevant portions of those photos are reproduced below:

 

## 2.    Use of Aliases to Conceal Individual Identities

431. The NTID Affidavit falsely asserts that team members used "aliases" to hide their true identity and create an atmosphere of confusion. This, too, is false and did not come from Mangum; Mangum did not make that claim in any of the multiple, varying accounts that she gave police officers and medical providers on March 14th, 15th, or 16th, or in her written statement on April 6th. Instead, like the broomstick and fingernail myths, the alias myth is Gottlieb's and Himan's perversion of a detail that Evans, Flannery, and Zash volunteered to police when they agreed to "answer a few questions."

432. During Police questioning on March 16th, Dan Flannery, told police that, when he called the agency, he gave the name Dan Flanagan. No witness ever said that Dan identified himself as Adam, but that "everyone was calling him Dan."

433. Mangum never claimed "the attackers" or anyone else was using each others' names or fake names. Further, the allegation is belied by the investigators' decision to create photo arrays with team members named Adam, Bret, or Matt as the suspects. That decision is irrational if police actually believed "the attackers" were using aliases.

434. It was only after Mangum failed to identify anyone with the name Adam, Bret, or Matt that Gottlieb and Himan claimed that team members were using aliases to conceal their identities.

### 3. Attempts to Conceal their Team Affiliation

435. The NTID Affidavit falsely claims that the team members made efforts to conceal "the true identity of their sports affiliation – Duke Lacrosse Team Members."

436. Both Gottlieb and Himan were involved in the search of 610 N. Buchanan, and, it was obvious that no one who lived there sought to conceal their team or school affiliation. To the contrary, the walls were covered with "Duke Lacrosse" posters, banners, and other insignia.

437. For example, this banner was hanging along the path Mangum took to and from the living room for the dance:



438. In the room where Mangum and Pittman danced, there were several indications that Duke lacrosse players lived there:



**B.     WHEN POLICE SOUGHT THE NTID ORDER DIRECTED TO PLAINTIFFS, MANGUM HAD ALREADY EXCLUDED THEM AS PLAUSIBLE SUSPECTS**

439. In addition to the fabricated detail added to the application for the NTID Order, the sworn facts failed to reveal to the Court the fact that Devon Sherwood was not the only member of the team who had been excluded as a plausible suspect by Mangum.

### 1.     The NTID Order Correctly Excluded Devon Sherwood

440.   The NTID Order exempted Devon Sherwood because, as an African-American, he was ruled out by Mangum's descriptions of "the attackers" as white.  However, ten other players, including Collin Finnerty, were also eliminated by Mangum's descriptions of "the attackers" as medium height, and either chubby or heavy set (260-270lbs). (i.e., not tall and lean)

### 2.     Ryan, Matt, and Breck should have been Excluded from the NTID Order, but Police Willfully Concealed from the Court the Fact that Mangum did not Identify—or Recognize—them

441.   When Gottlieb and Himan submitted their NTID Order Application, Ryan, Matt, and Breck were each ruled out as plausible suspects two days after the party.  On March 16th, Police showed Mangum a photo of Ryan, Matt, and Breck and she did not recognize any of them—at all.

442.   Further, Evans, Flannery, and Zash had already provided complete suspect kits, including a blood draw, head hair, and pubic hair samples to police on March 16th.  They did that after they voluntarily provided everything else police asked them for and offered to submit to a polygraph examination as well.

443.   Knowing those facts, Gottlieb and Himan willfully ignored them and concealed them from their Application for an NTID Order directed to Plaintiffs and every other white member of the lacrosse team intentionally and maliciously generating race-based animus in the community against Plaintiffs.

444.   All of the foregoing acts and omissions were in furtherance of the conspiracy to retaliate against the team members for the exercise of their constitutional rights by

subjecting Plaintiffs and their teammates to public humiliation, contempt, and condemnation.

## XVII.     THE CHAIRMAN'S DIRECTIVE

445.    The Chairman was aware that Mangum was a deeply disturbed young woman who exhibited signs of psychosis, and that her accusations were false.

446.    The Chairman was aware that Gottlieb was on a vendetta in response to the Gottlieb Dossier.

447.    The Chairman was aware that Nifong was preparing to ride the case into office.

448.    The Chairman knew that Addison was lying publicly about the evidence.

449.    The Chairman was aware that the investigation belonged to the Duke Police Department.

450.    The Chairman knew that, if the public perceived Duke abandoning the Plaintiffs, the public would conclude that Duke knew they were guilty.

451.    The Chairman knew Plaintiffs were innocent, and, to the extent he was not certain, he ensured that neither he nor any senior University officials saw the evidence of innocence that he knew was offered.

452.    To the Chairman, Plaintiffs' innocence was irrelevant:  what was "best for Duke" turned upon perception.

453.    Aware of these things, the Chairman announced that it would be "best for Duke" if Plaintiffs were tried and convicted on Mangum's false accusations.

454. In response to a plea for Duke to show some measure of support for the students who were being framed in plain view of the University's leadership, the Chairman explained, "sometimes individuals have to be sacrificed for the good of the Organization."

455. The Chairman's Directive, as it was understood by one who received it, was straightforward: "Steel is going to f**k those lacrosse players."

XVIII. **THE CONSPIRACY TO CONCEAL THE DUKE POLICE DEPARTMENT'S STATUTORY AUTHORITY TO INTERVENE AND INVESTIGATE**

456. To that end, the Chairman directed the Duke Police Department to act in furtherance of that objective. For example, the Chairman, through Brodhead, Trask, Burness, and Graves, directed the Duke Police Department:

A. To cease all efforts to find evidence of the truth, particularly evidence that contradicted the accuser's account;

B. To conceal evidence of Duke Police Officers' prior investigative role in the investigation;

C. To conceal all evidence of the Duke Police Department's primary jurisdictional authority to control the investigation and its power to intervene to prevent the wrongs conspired to be done;

D. To fabricate false and misleading police reports, disguise them as bystander "witness" statements, that covered-up the Duke Police witnesses' personal knowledge of Mangum's psychosis, her radically changing story, the overwhelming consensus among her doctors and nurses at DUMC that she was

lying, and the inability of any doctor, nurse, or police officer to find even a spider-web of evidence that she was raped or sexually assaulted; and

E.  To direct those who were at the hospital on March 14th to give "not-for-attribution" false reports about Mangum's appearance at DUMC in order to lend credibility to Mangum's false claims in the eyes of the public.

457.  At all times subsequent to the Chairman's Directive to force a trial and convictions, the Duke Police Department had the power to revoke its delegated authority and/or to intervene to prevent or aid in preventing the unlawful conspiracies and violations of Plaintiffs' constitutional rights as alleged herein, and, yet, refused to do so.

458.  At all times relevant to this action after March 25, 2006, the Chairman and the members of the CMT directed the Duke Police Department not to intervene to prevent or aid in preventing the wrongs that they knew were conspired to be done to Plaintiffs and their teammates by their co-defendants in this action. In compliance with the Chairman's Directive, the Durham Police 'turned a blind eye,' and did nothing.

## A.  The CMT'S Acts in Furtherance of the Conspiracy

459.  On or before March 25, 2006, the Chairman directed Defendant Brodhead to create a Crisis Management Team ("CMT") to manage the University's actions relating to the investigation of Mangum's claims.  The original participants in the CMT were Defendants Steel, Brodhead, Lange, Trask, Burness, and Moneta.  Defendant Victor J. Dzau (Chancellor for Health Affairs, and President and CEO of Duke University Health Systems, Inc.) was added to the CMT shortly after it became clear that DUHS and Tara Levicy were critical to the State's case.  Defendant Allison Haltom (the

University's Secretary) was also added to the CMT following its first meeting on March 25, 2006.

460. Both Defendants Trask and Burness had personal knowledge of the Gottlieb Dossier and the fact that Gottlieb had been removed from the patrol beat as a result of his misconduct in dealings with Duke students, and, upon information and belief, informed the Chairman and the CMT Defendants of these facts about Gottlieb on or before March 25, 2006.

### B. Duke Officials Cascade the Message that Only the Durham Police have the Authority to Investigate and Find the Truth.

461. Nevertheless, the Chairman and CMT Defendants directed the Duke Police Department to abdicate its jurisdictional responsibility to investigate, and allow the Gottlieb investigation to proceed unabated. Further, having tied the hands of the Duke Police Department, the Chairman and the CMT, together with Duke Police Supervising Defendants, Duke Police Investigator Defendants, Durham Police Supervising Defendants, Durham Investigator Defendants, and others colluded, agreed, and conspired to mislead Plaintiffs and the public into believing: (1) that the only law enforcement agency with the authority to investigate Mangum's allegations was the Durham Police Department, and (2) that Duke Police Department had no power or authority to investigate Mangum's allegations.

462. Immediately, the University issued press statements cascading those messages. For example:

A.  On March 28, 2006, President Brodhead held a press conference that was carried to local, national and international audiences.  In his prepared remarks, Brodhead asserted,

> *"To determine responsibility we need to learn the full truth as quickly as possible…  Unavoidably we have to look to the Durham Police to take the lead in the investigation.  Duke doesn't have the power to compel testimony from citizens of this city, and Duke lacks access to warrants, DNA records, and other confidential information."*

463.  These statements were false and misleading, and they were made with the intent to conceal the fact that the Duke Police Department had the power and statutory authority to intervene, to prevent, or aid in preventing the wrongs they knew were conspired to be done to Plaintiffs and their teammates.

464.  In furtherance of the conspiracy to conceal Duke's responsibility to investigate Mangum's allegations, Duke Officials, particularly the CMT Defendants, cascaded that message to national and local television and print journalists.  For example:

A.  On March 26, 2006, Provost Peter Lange told ABC News, "Do I know that those crimes happened in a way that would allow me to take a position on that?  No…[t]hat's why we have the police.  That's why the police have the means to undertake steps to investigate the crime that Duke could never have."

B.  On March 27, 2006, Provost Lange told the student newspaper, *The Chronicle*, "[i]f the University investigates, it could, in fact, somehow affect the ability to pursue the criminal investigation."

C.  On March 27, 2006, Duke's Official Spokesperson, John Burness said, "There are some folks who want us to do a full investigation ourselves.  But the fact of the matter is this is a police investigation, and we can't impede it."

D.    On April 4, 2006, President Brodhead, in his address to the InterCommunity Council, said, "You could lose a police case because of a university's involvement."

E.    On April 4, 2006, Brodhead told the Graduate and Professional Student Council ("GPSC"), "If we were to conduct our own separate parallel investigation, there's all kinds of ways that could interfere—without meaning to—with the police investigation."

F.    On April 5, 2006, in his "Letter to the Community," Brodhead wrote:

*"Many have urged me to have Duke conduct its own inquiry into these charges.  Frustrating though it is, Duke must defer its own investigation until the police inquiry is completed, first because the police have access to key witnesses, warrants, and information that we lack, and second because our concurrent questioning could create a risk of complications—for instance, charges of witness tampering—that could negatively affect the legal proceedings."*

G.    A year later, on April 8, 2007, Burness told *The Daily Progress*:

*"Obviously, we have a lot of information that we did not have then.  But you're making your decisions based on the best information you have at the time.  Nonetheless, the decision made by the president with the strong support of the board of trustees was made in the best long-term interest of the university and the athletic programs."*

H.    On September 29, 2007, Brodhead issued a statement to all of the team members, and provided several reasons for the University's failures.  One reason was Brodhead's fear that, "if Duke spoke out in an overly aggressive fashion, it would be perceived that a well-connected institution was improperly attempting to influence the judicial process, which could have caused the case to miscarry in a variety of ways."  Brodhead also claimed that there was "no legal recourse

against the District Attorney, for me or anyone else. Under North Carolina laws, no one had authority to take an active case from a DA absent the DA's own request, as finally happened in January."

465. The foregoing statements were all false and/or misleading, and intended to conceal the fact that the Duke Police Department had the power and opportunity to intervene to prevent or aid in preventing the wrongs conspired to be done to Plaintiffs, but 'turned a blind eye' and refused to intervene.

### C. Duke Police Officers Concealed Exculpatory Evidence by Fabricating False and Misleading Hospital "Witness Statements"

466. On or about March 27, 2006, Nifong directed the Duke Police Officers who interacted with Mangum to submit reports of those interactions to his assistant, Sheila Eason. In response, Duke Police Supervising Defendants directed those Duke Police Officers who interacted with or observed Mangum at the hospital to write—not reports—but instead what can only be described as "bystander witness statements" that deliberately concealed their exculpatory observations of Mangum during the early morning hours of March 14th.

467. As a result of The Duke Officers' statements were all remarkably consistent in substance. They were identical in form. Each one was a one-page statement written on plain paper, and identically styled. The Duke Officers' statements repeatedly refer to the investigation of Mangum's claims as "the Durham Police investigation." They also uniformly disavow any role whatsoever in an investigative capacity; describe their role in the investigation as the functional equivalent of a bystander witness. Among other things, the Duke Police Supervising Defendants directed the officers to:

A.  Conceal the fact that the Duke Police had jurisdiction over the investigation;

B.  Conceal the fact that the investigation was a Duke Police investigation, until Duke abdicated its jurisdictional responsibility to initiate and conclude an investigation of Mangum's allegations;

C.  Conceal their observations during their interactions with Mangum that tended to prove Mangum's claim was a fraud;

D.  Reveal observations of Mangum's behavior only to the extent that the observations tended to enhance the reliability of Mangum's claim; and

E.  Two officers who wrote these "witness statements" have since taken employment at other law enforcement agencies. Their accounts changed significantly when they left the Duke Police Department.

### 1. Officer Mazurek

468. In his March 29, 2006 "witness statement" as a Duke Police Officer, Mazurek wrote:

> "On 03-14-06, I was the Officer in Charge at Duke Hospital. I was informed by security that...a male nurse was evaluating Ms. Mangum. When he tried to gather information about her injuries she started to cry and asked him to leave her alone.... Ms. Mangum's shirt appeared to be torn on the left shoulder.... [The Durham Officers] told me that this incident may have occurred at 610 N. Buchanan involving several Duke Students. After my initial observation of Ms. Mangum I did not have any further contact with her."

469. After obtaining employment elsewhere, Mazurek was free to reveal the exculpatory information he obtained at DUMC on March 14th, and he did. On November 2, 2006, Mazurek reported, among other things, his belief—formed at the time he observed Mangum—that Mangum was "faking" the whole thing.

146

### 2. Officer Falcon

470. In her March 28, 2006 "witness statement" regarding her observations of Mangum, Officer Falcon wrote that Mangum "was shaking, crying, and upset. … She kept crying out to the male nurse and Durham Officers (in the doorway) that she was violated and raped and that her friend stole her money and left her at the event that she was working at." Regarding her role in the investigation, Falcon wrote:

> *"I stood outside the ED Triage area as a Duke Representative, while Durham City proceeded with their investigation.… Not at any time did I direct any questions to Ms. Mangum concerning the investigation by Durham City PD. Not at any time was I a direct party to any investigation(s) of Durham City PD of this alleged incident, other than to assist the outside agency of Durham City PD."*

471. After obtaining employment elsewhere, Falcon was free to report any exculpatory information she obtained at DUMC on March 14th, and she did. On October 30, 2006, Falcon reported, among other things, that an unusual number of Duke Officers, even Major Schwab, were called in shortly after Mangum arrived at the E.D.; she thought it was odd that "all the supervisors met out on the loading and had a meeting."

472. Further, Duke Police Supervising Defendants had required Falcon to conceal from her written "statement" her recollection that "a Durham Police Sergeant kept going in and out of Mangum's room, saying 'I have to conduct an investigation' …." After some time passed, the Sergeant emerged from Mangum's room, and "he said loudly so everyone around heard him, 'I think she is lying!'"

### 3.    Officer Day

473.    Officer Day had already submitted a bona fide Duke Police Department report on March 14, 2006, before the Chairman's Directive was issued transforming the Duke Police investigators into bystanders.  Day's original report is therefore not written on plain paper styled as a witness statement; it was written on a pre-printed Duke Police Department standard police report form, it contained a synopsis of much of the exculpatory evidence gathered by Durham Police and Duke Police on March 14th, and concluded that the felony investigation had been closed.

474.    Because everything in Day's report was already approved by the Day Chain of Command and was at odds with the directive to conceal exculpatory material, Duke Police did not submit his original report with the "bystander" statements.  Instead, Duke Police sent a "Continuation Report" that the supervisors in the Day Chain of Command directed him to write.  Day's "Continuation" report states:

> *This narrative is a continuation to an operations report in reference to assisting Durham Police at 610 N. Buchanan Street [sic].  After all Duke Police officers cleared from 610 N. Buchanan Street [sic] I went to the Duke Emergency Department to meet with Lt. Best (watch commander for Duke Police).  While standing at the emergency department entrance I overheard the District 2 Sergeant state that the victim (which [sic] was inside the ED) had changed her story several times, and that if charges were filed they would probably not exceed that of a misdemeanor.*
>
> *In reference to the conversation with Durham Officers I did not speak directly with the victim or with an investigator, nor did I ask questions regarding the case.  The information was second hand from the patrol Sergeant standing on the emergency room dock outside the ED."*

148

475. Day's "Continuation Report" deliberately impeaches his own contemporaneously written report of the events he observed that evening, including his synthesis of all the reports he received from the Durham Police Officers in the transition briefing at the E.D. in the early morning hours of March 14, 2006. The effect of Day's Continuation Report was to nullify the evidentiary value of his report of the many immediate impressions of the Durham officers who interacted with Mangum throughout the evening and believed Mangum's claims were a hoax.

### D. Duke Police Department's Public Efforts to Conceal its Authority to Intervene

476. The Duke Police Supervising Defendants made numerous public statements designed to conceal the fact that Duke Police had the responsibility to investigate Mangum's claims. For example:

A. On May 11, 2006, Defendant Graves told the *Charlotte Observer* that "[i]t would be somewhat inappropriate for us [Duke Police] to pry into the (Durham Police Department's) investigation because it's their case. It's really up to them to share as much or as little information as they desire."

B. Defendant Graves also told a representatives of the news media often that, "Duke…is cooperating fully with the police investigation and urges anyone with information pertinent to the events of March 13 to cooperate with the authorities."

477. In addition to their public acts in furtherance of the conspiracy to conceal their own responsibility to investigate, Duke Police Defendants acted privately to further its purposes. For example, in response to a University professor's suspicions, expressed

in an email to a discussion group, that the Duke Police Department was concealing its role in the investigation, Duke Police Officer Dyson (Gottlieb's cohort in the Watts raid), personally appeared at the professor's office the following morning to quell her suspicions. Dyson falsely explained to the professor that there is nothing to disclose about Duke Police involvement in the investigation of Mangum's allegations because "it [the assault] happened in the Durham Police jurisdiction," and Duke Police investigate only incidents that happen within Duke Police Department's jurisdiction.

### XIX. THE THIRD INVESTIGATION (MARCH 24TH – JANUARY 11TH ): NIFONG ARROGATED THE INVESTIGATION TO HIMSELF TO WIN ELECTION

#### A. Nifong's Non-electability

478. Nifong had never been elected to office before March of 2006. The prior year, Nifong was appointed to serve the remainder of then-District Attorney Jim Hardin's term as a lame-duck. As a condition of his appointment, Nifong promised the Governor he would not to run for election.

479. Once appointed, Nifong had forced his personal and professional rival, Assistant District Attorney Freda Black, to resign. When Black began her run for election as District Attorney, Nifong knew she would likely win, and she would simply fire him. The only way to avoid his own firing at the hands of Black was to run against her and win, so he broke his promise to the Governor and entered the race.

## 1. Nifong's First Identification Crisis:  Name Recognition

480.  Unlike Nifong, Durham voters knew who Black was.  She had prevailed in the murder prosecution of Michael Peterson, which brought national attention.  Nifong had not tried a felony in over ten years.

481.  Black was well known to Durham voters.  The vast majority of Durham voters had never heard of Mike Nifong.

482.  As March approached, Nifong's funding dried up almost entirely.  Between February 20th and April 1st, Black out fund-raised Nifong by a margin of greater than 4-to-1. It was becoming clear that Nifong would lose.

483.  Instead of exiting the race, he began to fund his campaign with personal funds.  He first loaned his campaign $6,601.00, and, subsequently, a loan of $22,388.  All told, nearly 80 percent of Nifong's campaign fundraising in the ten weeks preceding the May 2nd primary came out of Nifong's pocket.  With his job and pension already on the line, Nifong had put his own household finances at risk as well.

## 2. Late-March Poll Confirmed Nifong was Hopelessly Trailing

484.  A poll of Durham voters in March showed Nifong trailing Black by 17 points (37% - 20%) with 5 weeks remaining in the primary race.  The poll also revealed that Black was polling close to 40%, which, if she reached it, would preclude a runoff.  Still, most Durham voters did not know who Mike Nifong was.

485.  Nifong admitted at his Bar trial that he immediately recognized the enormous media interest and attention the allegations in the NTID Affidavit would generate.

486.   Nifong's first known act in the case was a call to Captain Lamb, the Commander of District Two on March 24, 2006, soon after the Plaintiffs arrived at the Forensics Unit.

487.   On March 24, 2006, as the Plaintiffs' were arriving at the Forensics Unit, Nifong called the new Commander of District Two, Captain Lamb.  Nifong explained that he wanted to take control of the investigation.  By the end of the conversation, Lamb agreed to delegate to Nifong his official policymaking authority over the investigation.  Lamb then instructed Gottlieb, Himan, and Ripberger to conduct the investigation only in the manner that Nifong directs.  Lamb thereby put Nifong into Lambs position on Himan's Chain of Command.

488.   Nifong had determined that he would ride Mangum's allegations case into office.

489.   The make-up of the "suspect group" was fortuitous.  Nearly all of them were from other states.  They had no vote.  They had no natural base of political support.

490.   Nifong used the Plaintiffs' non-citizen status as part of his strategy to galvanize public condemnation of the Plaintiffs.

491.   On the record, Nifong claimed to countless media representatives, without any factual basis whatsoever, that he "was convinced" Mangum was raped by three members of the Duke lacrosse team and that their teammates aided and abetted them.  He quickly scheduled several interviews for the weekend and well into the next week.

492.   The case, he knew, would bring him more than enough attention to overcome his greatest disadvantage in the race against Black; it would bring him celebrity, which he

needed to sustain only for six weeks to secure his job and the elected-DA's pension he coveted.

493. Mike Nifong then launched an unprecedented media campaign.

494. Prior to March 23, 2006, the name "Mike Nifong" appeared in only 51 news articles in Westlaw's "ALLNEWS" database. In the subsequent eight weeks alone, Mike Nifong's name appeared in 3,605 news publications in the same Westlaw database.

495. Early on in Nifong's media saturation, Nifong's campaign manager confronted him, insisting that he stop giving interviews about the case. Nifong promised he would stop, but the next day, Nifong was all over the television again. His campaign manager demanded to know why he broke his promise. Nifong answered, "because it's worth a million dollars of advertising."

## XX. THE UNIVERSITY'S EFFORT TO COERCE CONFESSIONS IN THE ABSENCE OF COUNSEL

496. By March 24, 2006, Duke University Defendants knew that Plaintiffs and their teammates had postponed the mass interrogations orchestrated by Duke Police and Durham Police; they knew that Plaintiffs had sought the advice of counsel; and they knew that Plaintiffs' defense counsel's advice was not to discuss the events of the evening with anyone except counsel until an independent decision could be made regarding waiver of any of their rights.

497. Knowing these things, Defendant Trask immediately demanded meetings with team members for the purpose of forcing them to effectively waive their First, Fifth, Sixth, and Fourteenth Amendment rights. In other words, Trask sought to obtain from them

what the Duke Police and Durham Police could not once the team members chose not to waive their Fifth and Sixth Amendment rights only days before.

498. On March 24, 2006, the lacrosse team captains were called to a meeting with Defendant Trask and other University Administrators. The meeting began with Trask demanding, "tell us what happened." When the team members stated that their counsel advised them not to discuss the details of the evening, Trask insisted they answer his question. Trask suggested that the conversation was protected from disclosure by a privilege that did not exist. The captains, fearing their status as students was in jeopardy, told Trask what happened, and emphatically denied the allegations.

499. By leveraging the University's disciplinary power over Plaintiffs and their teammates, Trask and other CMT Defendants and Duke Administrators attempted to coerce what was effectively the waiver of their asserted First, Fifth, and Fourteenth Amendment rights. They also subverted their right to counsel by insisting the team members speak in the absence of counsel, falsely assuring the captains their conversations were privileged when they were not, was a deliberate subversion of their right to counsel. Shortly thereafter, every administrator at that meeting was compelled, under threat of a subpoena, to tell the police what the team members had told them.

## XXI. THE CONSPIRACY TO CONVICT BY STIGMATIZTION IN RETALIATION FOR PLAINTIFFS' EXERCISE OF THEIR CONSTITUTIONAL RIGHTS

500. In retaliation for the assertion (real or perceived), of First, Fifth, and Fourteenth Amendment rights, Duke University Defendants, Nifong, and Durham Police

Spokesperson Defendants agreed and understood that they would, individually and collectively, participate in the media campaign to publicly vilify Plaintiffs and their teammates and subject them to public condemnation.

501.    In furtherance of the conspiracy, the parties to it engaged in public and private acts that promoted, reinforced, or asserted four false and interrelated claims: (1) a woman was raped by three men at 610 N. Buchanan Boulevard; (2) the perpetrators were members of the team, (3) all members of the team were involved as principals or accomplices, and (4) all members of the team were "stonewalling" the police investigation. At all times during the conduct of this conspiracy, Duke University Defendants and City of Durham Defendants knew or should have known that these assertions were demonstrably false, and, yet they callously disregarded and/or were willfully blind and deliberately indifferent to the truth.

### A.    Nifong's Public Acts and Statements

502.    In furtherance of the conspiratorial objective, Nifong made numerous public statements to representatives of the news media, including, for example:

A.    Nifong told a reporter for MSNBC News, "I am convinced that there was a rape, yes, sir."

B.    Nifong told a reporter for the *Durham Herald Sun*, "We don't know who the assailants are, but we know they came from this group. It's perfectly logical that we concentrate our efforts on this group."

C.    Nifong told a reporter for NBC News, "The information that I have does lead me to conclude that a rape did occur. I'm making a statement to the Durham community and, as a citizen of Durham, I am making a statement for the

Durham community.  This is not the kind of activity we condone, and it must be dealt with quickly and harshly."

D.      Nifong told a reporter for ABC News, "I don't think you can classify anything about what went on as a prank that got out of hand or drinking that took place by people who are underage."

E.      Nifong told a reporter for WRAL News, "what happened here was one of the worst things that's happened since I have become district attorney."

F.      Nifong told representatives of the media that the lacrosse team members were "standing together" and "refusing to talk with investigators" and threatened aiding and abetting charges if they did not come forward.

G.      Nifong stated to a reporter for the *New York Times*, "[t]here are three people who went into the bathroom with the young lady, and whether the other people there knew what was going on at the time, they do now and have not come forward. And if they would have spoken up at the time, this may never have happened."

H.      Nifong stated to a reporter for the *Raleigh News & Observer*, "I would think that somebody has the human decency to call up and say, 'What am I doing covering up for a bunch of hooligans?'"

I.      Nifong stated to a CNN reporter, that Plaintiffs were "not willing to violate this seeming sacred sense of loyalty to team for loyalty to community."

J.      Nifong told a nationally syndicated Fox News television host in a live nationally televised interview, "Well, frankly I'm disappointed.  I understand that it's likely what they're doing is as result of advice of counsel…  but although that might be good legal advice, I don't think it's good moral advice."

K.    Nifong told a reporter for the *Raleigh News & Observer*, "I'd like to be able to think there were some people in that house that were not involved in this and were as horrified by it as the rest of us are."

L.    Nifong told a CBS reporter in a nationally televised interview, "The lacrosse team clearly has not been fully cooperative in the investigation …. The University, I believe, has done pretty much everything that they can under the circumstances. They, obviously, don't have a lot of control over whether or not the lacrosse team members actually speak to police. I think that their silence is as a result of advice of counsel."

M.    Nifong told a reporter for the *Charlotte Observer* that he believed it was the University's reaction to the allegations that pushed the case to the forefront nationally.

N.    Nifong told a nationally syndicated Fox News television host in a live nationally televised interview, "I still hope that, at some point, conscience and courage will step forward in somebody and that someone will come forward with information."

O.    Nifong told a reporter for ESPN, "one would wonder why one needs an attorney if one has not been charged and had not done anything wrong."

503.    Fifteen months later Nifong would testify that his intention at the time in making the statements was to make Plaintiffs and their teammates "feel a sense of duty to come forward…and cooperate with the law enforcement investigation." The video of Nifong's remarks is digitally annexed hereto as **ATTACHMENT 12**, and may be viewed via the video embedded below:

*To activate the embedded video below,*
*left-click on the screen with the Adobe Hand Tool*



### B. Addison Publicly Stigmatized the Plaintiffs

504. Corporal David Addison reported directly Russ and to the Chief of Police. He held one of only four constituent offices in the Police Department's Office of the Chief.

505. In his capacity as spokesperson for the City of Durham Police Department, Addison made numerous public statements to representatives of the news media designed to stigmatize the Plaintiffs in the local community and in the eyes of hundreds of millions of people ("the Addison's Statements"). Addison's on-the-record statements included, by way of example:

A. On March 24, 2006, Addison told local and national reporters that the police investigation had produced "really, really strong, physical evidence" of rape, and that the same evidence would allow the SBI Lab to establish a match with DNA from the lacrosse players who committed the rape.

B. Spokesperson Addison falsely asserted to a representative of the media that "…all of the [lacrosse team] members refused to cooperate with the investigation."

C. Addison falsely stated to representatives of the media that the Plaintiffs' "refusal to cooperate with the investigation" caused Judge Stephens to issue the NTID Order for their DNA.

D. Addison falsely stated to representatives of the media that the Plaintiffs were given "several chances to cooperate with police … [but] still kept silent."

E. On March 26, 2006, Addison characterized the sexual assault that did not happen to representatives of ABC News, as "[t]hat brutal assault, that brutal rape that occurred within that house, cannot be explained by anyone."

F. Addison falsely stated to representatives of the media that police, "never would have had to do those swabs if [the Plaintiffs] would've cooperated."

G. On March 25, 2006, the *Raleigh News & Observer* reported that Durham Police Spokesperson Addison stated "We're asking someone from the lacrosse team to step forward. We will be relentless in finding out who committed this crime."

H. On March 29, 2006, Addison told representatives of CBS News that police knew Plaintiffs were present or participated in the gang-rape, and that police "need[ed] them to come forward" because they "do know that some of the players" know "what transpired" and are stonewalling the investigation.

506. Like Nifong and Burness, Addison made even more strident statements that provided far richer, fabricated details to stir up the outrage of the media, and, like Nifong and Burness, he did so on condition of anonymity or "not-for-attribution."

### 1.    Addison's Incendiary Neighborhood Flyer

507.   On March 28, 2006, at 3:20p.m., Addison, in his capacity as a spokesperson for the City of Durham Police Department, broadcast via email an electronic flyer with the following text

> *"On Monday, March 13, 2006 about 11:00 p.m., the Duke University Lacrosse Team solicited a local escort service for entertainment. The victim was paid to dance at the residence located at 610 Buchanan. The Duke Lacrosse Team was hosting a party at the residence. The victim was sodomized, raped, assaulted and robbed. This horrific crime sent shock waves throughout our community. Durham CrimeStoppers needs your assistance in solving this case. Although, we have received many calls expressing concerns and anger about this incident, we have not received any calls which will allow us to assist in resolving this case. We are extending our plea for information and help to our Duke family, who are also part of our community. We are asking anyone who has any information which will allow the Durham Police Department to make an arrest in this case, please contact Durham CrimeStoppers at 683-1200. Please feel free to email me at david.addison@durhamnc.gov with any information. Please use an anonymous email account. Durham CrimeStoppers will pay _cash_ for any information which leads to an arrest in this case."*

508.   When Addison sent this email, the Durham Police Department had been notified by the SBI that, in fact, there was no DNA evidence that any assault occurred whatsoever. No blood, tissue, semen, saliva, or any other evidence of a sexual assault was found in Mangum's rape kit. This news directly contradicted Addison's false claim that there was substantial genetic material collected in the SAE and at the crime scene. Addison did not correct his prior statements upon the Department's receipt of this news; instead, he wrote the foregoing email for mass distribution and to further

stigmatize the Plaintiffs in the community and in the eyes of hundreds of millions of people worldwide.

509. In the absence of any extant evidence to support it, Addison simply asserts that Mangum was raped, sodomized, assaulted, and robbed. The email was sent to Durham governmental entities, news organizations, and community Listservs. The same email was resent several times during the course of the investigation including on April 3, 2006. Later Addison would create a flyer with the same text printed with the Durham Police Department's insignia on its masthead, for distribution by Durham Police Officers in neighborhood canvasses conducted on April 5, 2006 and April 8, 2006.

510. Addison's glaring failure to even employ the word "alleged" was noted immediately by defense counsel who demanded that he and/or the Durham Police Supervising Defendants alter the text to reflect the fact that Mangum's allegations were not established facts. The Addison Chain of Command, which extended from Addison to Russ to Chalmers or Acting Chief Hodge, to Baker knew of his incendiary email, and failed or refused to correct, discipline, suspend, or terminate Addison. Addison would not be required to amend the electronic version of the flyer until April 10, 2006, long after the damage was done. Even still, Addison's original inflammatory version continued to be emailed from the Department to representatives of the media as late as May 26, 2006.

511. A true and accurate copy of Addison's flyer distributed during the neighborhood canvasses police conducted is digitally annexed hereto as **ATTACHMENT 13**.

512. Durham Sergeant D. Hampton sent an email to Addison after receiving Addison's corrected version of the flyer, saying, "Boy I wish you had done this Friday…I used the old text for a flyer we did on a canvass Saturday night….  :)  ." (Smiling face in the original).

513. Addison replied, "It is alright…  I was instructed to change this today so everything prior is fair game."

514. Addison engaged in the foregoing conduct with malice.  Addison he knew and callously disregarded and/or was willfully blind to the fact that his statements were false and would perhaps permanently stigmatize the Plaintiffs in the national community; would cause a universal public condemnation of Plaintiffs; and would hopelessly prejudice the petit and grand jury pools in any criminal case brought against them.  This was also plainly obvious to Addison's supervisors, including Defendants Russ, Chalmers, and Baker (and, in Chalmers' absence, Hodge).

515. Further, all of Addison's statements were made in direct violation of the Durham Police Department's General Orders (e.g., G.O. 4060 R-2) and Standard Operating Procedures relating to public statements about an active investigation.

516. Day after day, Addison made his statements on national television, local television, radio programs, in local and national newspapers, and email chains that metastasized out to a national and international audience.

517. Defendants Baker, Chalmers, Russ, and Hodge each had final policymaking authority for the City of Durham to correct, retrain, discipline, and otherwise remediate Addison's misconduct; they each had independent, actual knowledge of Addison's

conduct, and each was deliberately indifferent to it.  Baker, Chalmers, Russ, and

Hodge made an affirmative decision not to act to remedy Addison's violations; they

simply 'turned a blind eye' to Addison's conduct' and did nothing as Addison

repeatedly violated  Plaintiffs' federally protected rights.  Further, Addison's direct

supervisor in the Office of the Chief admitted that the foregoing statements and

publications were "what Addison always does."

### 2.    The Duke-Durham Vigilante Poster

518.   On March 28, 2006, a hundred copies of a "Wanted" poster were distributed on

campus and in the Trinity Park neighborhood, and hung on campus kiosks and

bulletin boards.

519.   A true and accurate copy of the "Wanted" vigilante poster is digitally annexed hereto

as **ATTACHMENT 14** .

520.   Under District Two Commander Jeff Lamb's direction, Durham Police and Duke

University personnel created the "Wanted" poster using the Plaintiffs' photographs,

which were provided to the City of Durham at the direction of Duke University Police

Department and University officials with final policymaking authority with respect to

the public dissemination of Plaintiffs' personal information and likeness.

521.   The poster was then mass-produced at publishing facilities in the John Hope Franklin

Center for Human Rights, which was owned and operated by Duke University, with

the assistance and express permission of Duke University officials who had the

authority to prohibit the mass production of those posters in Duke University

facilities.

522. The poster was then widely disseminated across Duke University's campus by Duke University personnel at the direction of Duke University officials, and across the City of Durham at the direction of City of Durham officials by City of Durham personnel.

523. City of Durham and Duke University officials with final policymaking authority directed their subordinates to participate in the creation, mass-production, and dissemination of the posters.

524. City of Durham and Duke University officials, who had authority to institute corrective measures on behalf of the City of Durham and Duke University had independent, actual knowledge of the plainly obvious harm that would flow from the Wanted Poster's creation and dissemination. Each official knew the poster would further stigmatize the Plaintiffs in the eyes of the local and national community in violation of Plaintiffs' federally protected rights; yet, they were all deliberately indifferent to it. Officials with the authority to correct the conduct made an official decision on behalf of the City of Durham and Duke University not to address the conduct at all. They simply 'turned a blind eye' to it and did nothing to prevent the ongoing violations of Plaintiffs' federally protected rights occurring in plain view.

### C. The Established Policy or Custom of Disseminating Defamatory Posters in Potentially High-Profile Cases

525. Just as Addison's conduct was "what Addison always did" in response to reports of violent crimes, the Wanted Poster was the product of a policy and protocol that had long before been established to govern the concerted response of Duke Police and Durham Police whenever a potentially high-profile crime is reported within Duke Police Department's jurisdiction.

526. Pursuant to the established Duke-CrimeStoppers' policy, custom or protocol, written in a document circulated within the Duke Police Department, when a felony was reported in Duke Police Department's jurisdiction:

   A. The Duke Police investigator assigned to the case would schedule a meeting with Addison;

   B. A "poster" would be developed in a collaborative effort by CrimeStoppers and Duke Police;

   C. The "poster" would be distributed widely on and off campus;

   D. An email alert would be written in by Duke Police in collaboration with CrimeStoppers, for mass distribution to an email list maintained by the City of Durham, which included media contacts;

   E. Subsequently, all "tips" reported to the 24-hour CrimeStoppers center in response to the posters and/or email, would be delivered to Duke Police Liaison to CrimeStoppers; and

   F. The Duke Police Liaison would then transmit valid tips and information to the investigator assigned to the case.

527. Upon information and belief, at all times relevant to this action, Defendants Sgt. Stotsenberg, Sgt. Smith, and Major Cooper were the Duke Police liaisons to CrimeStoppers. They were responsible for receiving and transmitting to investigators all "anonymous tips" generated by posters, public statements, and emails solicitations in the investigation of Mangum's claims.

**D.    Duke Officials Publicly Stigmatized the Plaintiffs**

528.    In furtherance of the Chairman's objective to force a trial and convictions, members of his Crisis Management Team personally participated in making stigmatizing comments of and concerning Plaintiffs.

**1.    Burness Stigmatized the Plaintiffs**

529.    Burness was (and remains) the University's Official Spokesperson. In that capacity, he launched what he called "an exhausting" media initiative in which he privately claimed, among other things:

A.    I know far more about what happened in that house than anyone in the press;

B.    What the Plaintiffs' did was far worse than anything that has been reported;

C.    Everyone on the team was involved in it; and

D.    They've done things like this before.

530.    Burness made these statements habitually; they were his "talking points." To avoid being held to account for making these false statements, Burness never made these statements "on the record, for attribution." He made them on the condition that the reporter was allowed to quote him, but the quote could never be attributed to him.

531.    Burness became so reflexive in making those false points, he was overheard in a restaurant, at dinner with a Trustee, saying the same thing.

532.    On the eve of the Attorney General's exoneration, Burness attempted to dull the news of the imminent declaration that the infamous rape could not have happened by telling reporters that, while it may not have happened, Plaintiffs were capable of it. Burness

made that statement on the record, for attribution, and it was published by a nationally distributed news paper.

533. Burness has persisted in his stigmatization of the Plaintiffs to the present day; even in his speeches at media relations conventions.

## 2. Duke's Senior Officials Stigmatized the Plaintiffs

534. In tandem with Addison's public statements and Burness's "not-for-attribution" media campaign, the Duke officials with final policymaking authority for Duke University's media relations, Faculty, and Administrators issued a flurry of public statements and protests for the purpose of bolstering the myth that Plaintiffs had erected a "Stonewall of Silence."

### a. The CMT's "Stone Wall of Silence" Myth

535. In the aftermath of the Potbanger protests, Duke Officials began to cascade another message in press releases and in statements to representatives of the media that lent credibility to the "stonewalling" myth. Again and again, they urged those involved "to come forward" and to provide any information they have to the police.

A. On March 27, 2006 Provost Lange was quoted by the Associated Press, CBS, and Fox News, saying: "the students would be well-advised to come forward. They have chosen not to."

B. On March 28, 2006, President Brodhead held a press conference and made statements that were designed to, or obviously would, galvanize the public outrage against the team members for not submitting to Gottlieb's interrogation. President Brodhead told the assembled representatives of the media:

i.  "No employee has advised the players not to speak."

ii.   "Indeed I will tell you the first member of my staff uh to begin an inquiry into this episode was on the, well within thirty, twenty-four hours of the event itself.   And I know from her that the first thing she told them was- uh- to speak fully and be honest."

iii.  "You know what can I say to you?   I urged them the notion to come forward."

iv.  When asked if he was surprised at the unprecedented open outrage displayed by his faculty in plain view of the national media, President Brodhead told the assembled representatives of the national media, "How can I be surprised at the outrage?"

C.  On March 27, 2006, the University Official Spokesperson, John Burness, told a representative of the student newspaper that, "[m]y understanding is that some people who have talked to the players have suggested it would be very much in their advantage to get their side of the story out in one way or another."

### b.  Brodhead and Steel Consciously Participating in the Framing of Their Own Students

536.  When all of the foregoing statements were made, Brodhead and the other members of the Crisis Management Team knew that the captains had submitted to indefinite interrogation by the police, and the police chose not to believe them (or polygraph them).

537.  Brodhead also knew that Plaintiffs' submission to Gottlieb's interrogation would enable Gottlieb to fabricate a record of confessions that never happened, and, in other ways, would ensure Plaintiffs' convictions.

538. To continue his participation in the framing of the Plaintiffs, Brodhead flatly refused defense counsel's offer to present to him the overwhelming evidence that Plaintiffs were being framed, including the digital alibis of every team member—already synthesized by Stefanie Sparks, Private Investigators Lane and Blackman, and later authenticated by Computer Forensic Analyst Raymond Grunch.

539. Brodhead's steadfast refusal to see the evidence that proved his students were being framed by the police and prosecutor were the product of his agreement to participate in the framing of his own students for crimes that never happened.

540. Another product of Brodhead's agreement to participate in the framing of his students was his tacit approval of the Faculty's massive public stigmatization of the Plaintiffs.

### c. Duke's Athletics Director Stigmatized the Plaintiffs

541. On March 25, 2006, the Chairman directed Brodhead and Athletic Director Joe Alleva to publicly announce the University had forfeited two lacrosse games as "punishment for the party."

542. The punishment was historic:  upon information and belief, Duke University has never forfeited games to punish any team's alleged misconduct.

543. The forfeiture was the first official act of the University in furtherance of the Chairman's Directive.  It sent a clear signal to the public that the University had evidence that the alleged horrific sexual assault actually happened.

### 3. Duke University's Faculty Stigmatized the Plaintiffs

### a. On Campus and in the Streets of Durham

544.     Duke University faculty members orchestrated a "candlelight vigil" for "the victim" Crystal Mangum.  It was to be held on the lawn of the 610 N. Buchanan residence. The primary organizer of the vigil, Professor Faulkner Fox, insisted publicly that "[t]he students need to realize they live in a community, and people are going to talk back if they do something, or potentially do something, that is disrespectful to women."

545.     By the next morning, March 26, 2006, the "candlelight vigil" for the "victim" transformed into a "Wake-up Call" held by largely the same protestors, who surrounded 610 N. Buchanan, banged pots and pans, and shouted at the residents to come out and confess.

546.     A true and accurate copy of a video recording of the "Potbanger Protest" is digitally embedded herein as **ATTACHMENT 15**.

*To activate the embedded video below,*
*left-click on the screen with the Adobe Hand Tool.*



547. Upon information and belief, the Potbangers were not arrested or jailed, or charged with violations of the City Noise Ordinance.

548. The Potbangers also brought menacing signs and banners, exhibiting the degree of their outrage at the Plaintiffs for acts that never happened. By way of example:

A. One sign read, "Get a conscience not a lawyer."



B. Another poster board sign read, "SUNDAY MORNING, TIME TO CONFESS," and a banner read, "GIVE THEM EQUAL MEASURE."



C. Another banner read, "CASTRATE!"



549. The menacing slogans were amplified and expounded upon by faculty and administration "speakers" who led the mob to the home of three of the lacrosse team captains. The Potbanger-Speakers proceeded with the presumption that the rape had occurred; they were demanding—in outrage—a confession.

550. The statements of Potbanger-Speakers, many of whom were University Professors, Administrators, and students, included, for example:

A. "We are making this kind of noise because we are standing in solidarity with the women who have gone through this horrible atrocity."

B. "Wake up! Wake up! The Sun is up! It's Sunday morning! Time to confess!"

C. "We want the members of the Duke Lacrosse team to come clean."

D. "They haven't been convicted, but 30-something kids are remaining silent."

551. Duke and Durham police officers stood a short distance away, watching the mob in front of 610 N. Buchanan. As the University's faculty and administrators vandalized the home, banging pots, pans, drums, and spoke hysterically through megaphones, the Duke Police 'turned a blind eye,' and did nothing. Video shows one officer appearing to be taking pictures of the mob vandalizing the home.

### b.    Inside the Classroom

552.  Inside the classrooms at the University, Plaintiffs were treated as putative convicts. History Professor, John ("Reeve") Huston, for example, opened his "lecture" by telling the class:

A.    "It is a fact" that a rape occurred in the lacrosse house.

B.    We know that a rape occurred because police found semen on the bathroom floor.

C.    "It is a fact" that team members are covering up for their teammates.

553.  Members of the lacrosse team, including two of the Plaintiffs were enrolled in the class, and were present.  Professor Huston was well aware of their presence when he accused them of perpetrating and/or facilitating a racially-motivated, horrific gang rape.

### E.    Duke University's Clergy Publicly Stigmatize the Plaintiffs

554.  In the Duke Chapel, on the evening of the Potbanger Protest, March 26, 2006, Father Joseph Vetter gave a homily in the Duke Chapel that presumed the guilt of the Plaintiffs and their teammates.  In his homily, Father Vetter stated, among other things:

*"All of us are very much aware of what is going on at Duke this week; how Duke is in the news in an unfavorable way.  As I was going to Mass this morning going down Buchanan Boulevard, there were a hundred people or so sitting out in the front yard of this house where this incident took place with the Duke Lacrosse team or at least some of the members of some of the team that live in that house.  And we don't yet fully know what happened and no one is guilty until they're uh everybody's*

*innocent until they're proven guilty. But it seems pretty apparent that something was going on there that was pretty bad the other night and at the least it involved a bunch of guys getting together and getting drunk. That's not too hard to believe because that happens around here a lot a bunch of guys getting together and getting drunk and getting rowdy and apparently they hired an exotic dancer to come in and strip for them, two exotic dancers to come in and strip for them and I know that's not very uncommon either.... It just becomes kind of part of the culture... and when we get caught up in patterns like that sometimes it really gets out of control. And apparently something happened the other night where it really got out of control. And at least the person claims that that she was raped, that she was beaten, that she had racial slurs used against her. And if all that's true and if and if [sic] the people that were involved are convicted then some young people are going to go to jail and pay a really serious penalty for those crimes. That's really tragic because I'm sure that none of those people that were involved in that incident had any idea that something like that was going to happen. Nobody, nobody would set that up. Nobody wanted that to turn bad-but it did. And that's what happens a lot of times when we make mistakes when we become desensitized when we deceive ourselves and start thinking that it's ok for us to just get drunk...where people are treated like objects rather than people.... There are consequences to our sins. There are consequences to our actions...God will help us recognize the seriousness of consequences to bad choices that we make..."*

### F. Duke University and City of Durham Officials with Final Policymaking Authority Ratified and Condoned the Foregoing Faculty and Employee Statements

555. Duke University and City of Durham officials with policymaking authority were

aware of the foregoing public acts of their employees, agents, and representatives,

including but not limited to the statements made, slogans chanted, and banners hung

on the 610 N. Buchanan residence during the Potbanger Protest; the candlelight vigil

on the lawn of three of the lacrosse team captains' home; the homilies in church

services held over the weekend of March 25-26, 2006; and the campus protests that continued throughout the following week.

556. It was plainly obvious that Duke faculty, city leaders, and the Duke Clergy who publicly presumed the team's guilt and publicly condemned them would be perceived to be speaking for the University and the City, unless officials with policymaking authority for Duke University and the City of Durham clarified that those individuals did not speak for either the University or the City of Durham. Further, to a reasonable policymaker, it would have been plainly obvious that the conduct of these employees would lead to the deprivation of Plaintiffs' constitutional rights.

557. Further, Duke University and City of Durham officials with policymaking authority with respect to the public statements of University and City of Durham employees participated in the stigmatizing conduct themselves.

558. Nevertheless, the Duke University officials with policymaking authority and City of Durham officials with policymaking authority with respect to public pronouncements and positions of the University and the City failed or refused to correct, reprimand, suspend, terminate, or otherwise respond to their employees who participated in the public stigmatization of the Plaintiffs, or clarify that those who publicly proclaimed Plaintiffs' guilt, called for their castration, or otherwise publicly condemned them did not speak for the University or the City of Durham. In failing to do so, the University Officials Defendants and the City of Durham Defendants adopted, ratified, and condoned their public acts and statements.

**XXII.    THERE NEVER WAS A STONE WALL OF SILENCE**

> **A.    Plaintiffs did not Refuse to Cooperate Until it was Plainly Obvious they were Being Framed for Crimes Police Knew Never Happened**

559.    Plaintiffs did not refuse to cooperate with the police investigation; instead, they invoked their Fifth Amendment right to have more than roughly four business hours to obtain the advice of counsel before submitting to interrogations supervised by Sgt. Gottlieb, which were scheduled for them, without consultation or consent by official policymakers for the University; and

560.    The residents of the home that the Potbangers vandalized in the presence of Durham and Duke Police Officers, tormenting them with banners calling them rapists and demanding that they break their "silence" and "come forward" had, in fact, already "come forward." The residents to whom the Potbangers directed their hysterical taunts had voluntarily submitted to limitless police interrogation without counsel, assisted police in locating evidence listed in the search warrant, steadfastly insisted that no sexual assault occurred, that no sexual contact had occurred with either dancer, provided all the assistance, answers, evidence police could think to ask for, and, when the police ran out of investigative tools, the residents—all three independent of each other—requested that the police administer a polygraph, which the police refused to provide.

561.    Further, it was readily apparent that Nifong, Gottlieb, Himan, the Himan Chain of Command, as well as Addison, Michael, and the Addison and Michael Chain of Command, all insisted that Plaintiffs' claims of innocence were, to them, a lie. For example, the *New York Times* quoted Nifong saying, "[Evans, Flannery, and Zash]

denied any sex acts took place, and I don't believe that is the case." In the face of statements like that, submitting to interrogation conducted under Nifong's direction would have been futile.

562. Further, overwhelming evidence of the Plaintiffs' innocence had been established long before the Potbangers vandalized three of the Captains' home on March 26, 2006. The overwhelming evidence of innocence was not only present and available, it was growing. Knowing these facts, Duke University Defendants and City of Durham Defendants continued to stigmatize the Plaintiffs and to ratify the parallel conduct of their employees.

> **B.** **Plaintiffs did "Come Forward" to Unequivocally Deny the Allegations and Assert that the DNA Will Prove Their Innocence (Again)**

563. On March 28, 2006, Plaintiffs issued a press statement in response to the accusations of the angry mob, the media firestorm, and other manifestations of the Chairman's Directive. They issued the following joint press release with their teammates:

> *"The captains of the team met this morning with President Brodhead, and expressed sincere regret over the lapse in judgment in having the party on March 13 which has caused so much anguish for the Duke community and shame to our families and ourselves. We also stated unequivocally that any allegation that a sexual assault occurred is totally and transparently false. The team has cooperated with the police in their investigation. We have provided authorities with DNA samples. The understanding is that the results of the DNA testing will be available sometime next week. The DNA results will demonstrate that these allegations are absolutely false. Because of the intense emotions surrounding these allegations, we feel it is in the best interest of the University, the community and our families that the team should not play*

*competitively until the DNA results verify our unequivocal denial of these allegations."*

564.  The Plaintiffs and their teammates issued that press release knowing that modern DNA technology is sensitive enough to detect skin cells and other genetic material in microscopic quantities.  For that reason, among many others, the statement was an unprecedented risk taken by all 47 team members.  A prominent criminal defense lawyer stated in a televised interview that she would authorize that press release only if she knew her client had been in a body cast for a month prior to the relevant time. The statement demonstrated the Plaintiffs' perfect confidence that none of them engaged in any sexual contact with Mangum whatsoever.

### C.   Unbeknownst to the Plaintiffs, the DNA Test Results Already Proved Mangum's Accusations were False

565.  When the Plaintiffs' press statement declaring their innocence was released, Nifong had already received a preliminary report from the SBI that proved their innocence. On March 28, 2006, an SBI serologist, Rachel Winn, advised Himan that she had completed the serology tests on the rape kit items.  It was all negative.  There was no semen, blood, or saliva on any of them.  As a result, she advised Himan that the rape kit items will probably not be sent to the DNA section for further testing.

### XXIII.   THE RACIST DIMENSION OF THE CONSPIRACY TO CONVICT

566.  Aware that the DNA results had demonstrated that Mangum's allegations were a lie, Nifong, Michael, Addison, Lamb, Michael, Hodge, and Baker, individually and in concert, fabricated and released to the public false evidence that Plaintiffs were racists

and that there was a "deep racial motivation" for the sexual assault they knew did not happen.

567. The object of the "racist dimension" of the conspiracy was to stir up and then galvanize racial hostility in the community (and in the minds of hundreds of millions of people around the world) against the Plaintiffs.

## A. Spoliation of DECC Evidence

568. Defendant Soukup delegated his official policymaking authority with respect to the DECC's recorded police exchanges, dispatches and 911 calls to Hodge, Addison, and Michael.

569. Pursuant to that delegated authority, Hodge, Addison, and Michael deleted, destroyed, despoiled or otherwise secreted from Plaintiffs the audio recordings from the early morning hours of March 14, 2006, because they contained the contemporaneous reports of Sgt. Shelton and other officers attending to Mangum. Among other things, the recordings would accurately describe Mangum's bizarre behavior; her recantation; her wildly varying claims; the directive to patrol officers to proceed to Mangum's home to confirm that her children were supervised by an adult, and, if not, to initiate DSS procedures; perhaps even Mangum's reaction to that directive as she overheard it while being involuntarily committed, triggering her rape claim; and unknown other, exculpatory evidence contained in those communications.

## 1. Pittman's 911 Call

570. While concealing (and then destroying) DECC's audio recordings of the police exchange recordings, Michael, under the direction and supervision of Russ, Chalmers,

and Baker, disseminated and then knowingly misrepresented the source and credibility of Pittman's 911 call reporting a racial slur at 610 N. Buchanan.

571. Michael released the 911 call in conscious parallelism with Nifong and Addison's false public statements expressing their certainty that a rape occurred and the voluminous evidence to support it, and their subsequent emphasis on the victim's race—a "young, African-American mother"—and that of her "attackers"—"white members of the Duke Men's Lacrosse Team."

572. From the beginning of the investigation, Durham Police knew that the 911 call was made by Pittman, and that it was a ruse. This was the first thing Pittman told Sgt. Shelton when he approached her in the Kroger Parking lot.

573. In spite of that knowledge, and in callous disregard for Plaintiffs' rights, Durham Public Information Office ("DPIO") released the 911 recording as an "unknown, anonymous" caller who was fearful of a racist mob spilling out of the residence at 610 N. Buchanan earlier in the evening. As detailed above, Pittman's call impeaches itself.

574. As reporters began to suspect the call was a fraud and likely was made by Pittman, they begin to ask Defendant Kammie Michael, Durham Police Department's Public Relations Coordinator and Public Information Officer, questions. In particular, many representatives of the media ask Michael if the caller was "the second dancer." Michael, caught in the lie, nevertheless, continues to make the false claim that Durham Police do not know the identity of the caller. On March 28, 2006, Michael falsely told representatives of the media that the 911 caller "**was not** the woman who

accompanied the victim to 610 N. Buchanan." As late as April 4, 2006, Michael falsely told representatives of the media "[w]e **have not** identified the caller in the first call, according to investigators."

A. Pittman told Sgt. Shelton upon his arrival at Kroger that she was the one who made the 911 call from 610 N. Buchanan; it was the first thing she said to Sgt. Shelton.

B. On March 16, 2006, Evans, Flannery, and Zash wrote in their statements the fact that Pittman shouted that she was calling the police to report a "hate crime."

C. One of the lacrosse team captains told Himan directly that he observed Pittman making the call.

D. Pittman herself told Himan and Gottlieb that she made the 911 call during Pittman's first police interview on March 22, 2006.

575. Nevertheless, Nifong, Durham Police Spokespersons, Duke University agents, and others deliberately and maliciously misrepresented the nature of Pittman's 911 call to create a new "racist" dimension of the false rape claim.

576. After Michael, Hodge, Russ, Baker, and Nifong deliberately abused the final policymaking authority Soukup delegated to them in a transparent effort to frame the Plaintiffs for crimes that did not happen, Soukup approved and ratified the abuses. Upon information and belief, even after Nifong represented to the Court that the DECC audio files were destroyed (by recording over them), Soukup did not intervene to either find the tapes or attempt to recover the despoiled tapes.

### B. Nifong's Acts in Furtherance of the Conspiracy to Fabricate a "Racist" Dimension to Mangum's False Rape Accusation

577. On or before March 27, 2006, Nifong made the following statements to representatives of the news media:

A. Nifong told a reporter for the Associated Press, "The circumstances of the rape indicated a deep racial motivation for some of the things that were done. It makes a crime that is by its nature one of the most offensive and invasive even more so."

B. Nifong told a reporter for ABC, "The contempt that was shown for the victim, based on her race was totally abhorrent. It adds another layer of reprehensibleness [sic], to a crime that is already reprehensible."

C. Nifong told a reporter for ABC, "In the case, where you have the act of rape—essentially a gang rape—is bad enough in and of itself, but when it's made with racial epithets against the victim, I mean, it's just absolutely unconscionable."

D. Nifong told a reporter for the *Durham Herald Sun*, "Every rape is a serious case. But some speak to the community in a different manner. This is one of them." He said that the racial aspect is "particularly abhorrent."

E. Nifong told a reporter for MSNBC, "Well, this is the type of case that, because of the—on top of the rape—which is already an abhorrent crime enough, you have the additional racial animus and the hostility that seems totally out of place for this community in this day and age. And I felt this was a case that we needed to make a statement, as a community, that we would not tolerate this kind of behavior here in Durham. And I felt that the best way to make the statement was to take this case myself."

F.    Nifong told a reporter for CBS, "The racial slurs that were involved-um-are relevant to show the mindset… that was involved in this particular attack."

G.    When asked by a reporter for MSNBC, "where is she saying that this rape took place," Nifong replied as though it were fact, "the rape and the other sexual assaults took place in the bathroom."

H.    Nifong would suggest to several representatives of the media that he was considering charging the crimes as hate crimes, because, as he told reporters, since the victim appeared to have been "targeted because of her race."

578.    Himan met with Nifong to brief him on the 27th, 29th, and 30th, and almost every day thereafter through May 15th.  In the briefings, Himan told Nifong everything he knew, and provided witness statements to Nifong when he obtained them.  Even so, in a nationally televised interview with Dan Abrams on March 31st, Nifong falsely claimed that he did not know who the 911 caller was:

> *ABRAMS: Have you identified the person who made the 911 call?*
> *NIFONG: Have I personally identified...*
> *ABRAMS: Yes.*
> *NIFONG: Do I know if the...*
> *ABRAMS: Do you know who it is?*
> *NIFONG: I ... to my knowledge that -- I do not.*

579.    Upon information and belief, Duke Police Supervising Defendants and Durham Police Supervising Defendants were also aware of the fact that Pittman made the 911 call, and that it was a ruse.  Nevertheless, the Duke Police Supervising Defendants

and Durham Police Supervising Defendants continued to allow Nifong and Defendant Michael to portray the call as being from an unknown woman unrelated to the case.

580. In those—and other—ways, Nifong created, promoted and perpetuated a completely fabricated racist dimension to the mythology of the evening that implicated "the attackers" and the remainder of the team alike.

### C. Brodhead's Acts in Furtherance of the Conspiracy to Fabricate the "Racist" dimension to Mangum's False Rape

581. On March 29, 2006, Duke University issued the following statement from Defendant Brodhead:

582. "Yesterday evening, Director of Athletics Joe Alleva and I met with members of the news media to discuss the situation involving the Duke men's lacrosse team.…At the news conference I was asked about the 911 tape involving a racial slur, which only became known late yesterday. I have now had the opportunity to listen to the tape. It is disgusting. Racism and its hateful language have no place in this community. I am sorry the woman and her friend were subjected to such abuse."

583. Before issuing the press release, Defendant Brodhead did not inquire with defense counsel for any team member about the legitimacy of the plainly fraudulent 911 call.

### D. The Duke Faculty's Acts in Furtherance of the Fabrication of a "Racist" Dimension to Mangum's False Allegations

#### 1. William Chafe

584. Professor William Chafe, former Dean of Arts and Sciences at Duke, published an editorial on March 31, 2006, falsely asserting as "facts" allegations that were hotly disputed by Plaintiffs, and equating Plaintiffs with historical figures who were

responsible for the worst of America's history of racist episodes. Professor Chafe wrote:

> *"So sex and race have always interacted in a vicious chemistry of power, privilege, and control. Emmett Till was brutalized and lynched in Mississippi in 1954[5][sic] for allegedly speaking with too easy familiarity to a white woman storekeeper….What has all this to do with America today, and with Duke? Among other things, it helps to put into context what occurred in Durham two weeks ago. The mixture of race and sex that transpired on Buchanan Boulevard is not new….[T]here is no question that racial epithets were hurled at black people. Nor is there any question that white students hired a black woman from an escort service to perform an exotic dance. The intersection of racial antagonism and sexual exploitation is all too familiar."*

### 2.  Professor Houston Baker

585.   Professor Houston Baker wrote an open letter to be published as broadly as possible in the Duke and Durham communities asserting that the team's "culture of silence…seeks to protect white, male, athletic violence." He goes on to state "The lacrosse team—15 of whom have faced misdemeanor charges for drunken misbehavior in the past three years—may well feel they can claim innocence and sport their disgraced jerseys on campus, safe under the cover of silent whiteness. But where is the black woman who their violence and raucous witness injured for life? Will she ever sleep well again? And when will the others assaulted by racist epithets while passing 610 Buchanan ever forget that dark moment brought on them by a group of drunken Duke boys? Young, white, violent, drunken men among us— implicitly boasted by our athletic directors and administrators—have injured lives." In the letter, Baker is plainly attempting to stir up racial animus against the Plaintiffs; he invokes variations on the Plaintiffs' "whiteness" more than a dozen times.

586. Only Provost Lange spoke out to protest Baker's ranting letter, and that was only to call Baker's letter racist itself.

### 3. The Duke Clergy's Acts in Furtherance of the Fabrication of the "Racist" Dimension to Mangum's False Accusations

587. On April 2, 2006, Duke University's Reverend Sam Wells, Dean of Duke Chapel, cited Ecclesiastes 3.7, "There is a time to keep silent, and a time to speak." Reverend Wells then launched into a speech in which he asserted, among other things:

> *"Speculation about this disputed case has nonetheless brought to attention a host of other stories that are undisputed, but have hitherto remained in the shadows, and together explain why thes [sic] allegations have catalyzed such anger. These portray a disturbingly extensive experience of sexual violence, of abiding racism, of crimes rarely reported and perpetrators seldom named, confronted, or convicted, of lives deeply scarred, of hurt and pain long suppressed. The activists among us shout loudly about reckless drinking, the reputation of particular sports teams, the sense of entitlement, the need to reassess what it means to be a man, and the urgency of rules and penalties and enforcement..."*

588. An obvious result of the faculty's public excoriation of their own students was the near universal conclusion articulated by Trinity Park permanent resident Bettie Crigler, who put it, "I am sort of assuming it happened."

589. Before indictments were handed down, Nifong initiated an effort to impeach the character of the putative defendants, their fact witnesses, and their character witnesses before charges were brought. Duke University, Durham Police, and others understood and agreed to pursue the same course of action. The Plaintiffs' impeachment by Duke University faculty, Administrators, and CMT Defendants was

so successful that, as the trial drew near, a defense survey revealed that 17% of African-Americans eligible to serve as jurors in Durham said they would vote to convict the defendants even if they had a perfect alibi.

590. Many far more damaging and incendiary statements intended to be used by the media were made by the foregoing Defendants "not-for-attribution." For example, Nifong told to one reporter in March , 2006, that Mangum's vagina had been disfigured in the "attack."

## XXIV. THE CONSPIRACY TO ABUSE THE WARRANT PROCESS

### A. Himan and Gottlieb Brief Nifong and Conspire to Stigmatize the Plaintiffs

591. On March 27th, Nifong summoned Gottlieb and Himan to his office to brief him on the evidence for the first time. Already, however, Nifong had painted himself into a corner; he had told multiple press representatives that he was certain Mangum was raped at the 610 N. Buchanan residence by members of the team.

592. Himan and Gottlieb detailed some of the findings of the investigation up to that point. Among other things, they advised Nifong that they had found Mangum's missing shoe. Nifong asked about contradictions in Mangum's story, which he had learned about from another source. Gottlieb and Himan did not have any evidence to counterbalance that glaring problem in the case.

593. Nifong erupted at them, shouting, "You know, we're f****d!" Nifong made it clear to Himan and Gottlieb that he was already committed; Nifong told them that he had already given several interviews about the case, he had more scheduled that day, and

even more already scheduled through the week.  Nifong ridiculed their inexperience, particularly in rape investigations.  He dispatched the officers with instructions to obtain emails sent by team members after the party ended on March 14th.

## B. Ryan's Email

594.  Shortly thereafter, Nifong released Gottlieb and Himan from their morning meeting with orders to obtain incriminating email evidence, Gottlieb obtained an email written by Ryan McFadyen.  Within 10 minutes, the two investigators were back in Nifong's office, as instructed, with a copy of an email exchange that contained Ryan's email parody of *American Psycho*, which the responding emailers obviously understood as such.

595.  Nifong, Himan, and Gottlieb discussed what to do with the email.  Upon information and belief, they discussed the fact that Mangum did not identify or even recognize Ryan in the March 16th Identification Procedure.  Nevertheless, Nifong instructed Himan and Gottlieb to obtain a warrant to search Ryan's room.  The point of obtaining the search warrant was not to search for evidence; it was to place Ryan's email in a public document, stripped of the reply emails that reveal that Ryan's email is a parody.

## C. The Agreement to Abuse the Warrant Power

596.  Nifong, Gottlieb, and Himan agreed and understood that the investigators would include Ryan's email in the Search Warrant application.  It was plainly obvious that the facts alleged in the application for the NTID Order were sufficient to obtain Judge Stephens' authorization to search Ryan's dorm room.  Only four days prior, Judge

Stephens relied upon it to authorize an NTID Order directed to all 46 team members, including Ryan.

597. Upon information and belief, Nifong, Gottlieb, and Himan knew and believed that their fabricated NTID Affidavit, which had already succeeded in obtaining an NTID Order directed to McFadyen, would also be sufficient to obtain a warrant to search his room.

598. Nevertheless, because their agreed purpose for obtaining the warrant was not to search Ryan McFadyen's room, but to vilify him (and by extension his teammates) in the local community and in the eyes of millions of people, they agreed that Himan and Gottlieb would revise the Affidavit. The revised Affidavit would add the text of Ryan's email to the NTID Affidavit. The purpose was to convert Ryan's private email into a public document, stripped of the contextualizing replies of others which made it plainly obvious that Ryan's email was a parody of a movie assigned to Duke students who studied American Gothic literature in their courses.

599. Nifong, Gottlieb, and Himan were all acutely aware that the intense media firestorm that had exploded over the weekend had been ignited by their leak of the NTID Affidavit to the media. They knew that Ryan's email, stripped of its context and held out to be evidence of a 'conspiracy to commit murder,' would explode into nuclear dimensions.

600. It was plainly obvious to Nifong, Gottlieb, and Himan, as well as those who aided them in obtaining the email, that its release to the public, particularly in the toxic climate they had created, would cause the unprecedented public vilification of an

innocent young man, and would irrevocably stigmatize Ryan in the eyes of hundreds of millions of people throughout his lifetime.

601. Knowing these consequences would ensue to a moral certainty, and with the specific intention to bring them about, Gottlieb and Himan revised and submitted the Affidavit in application for a warrant to search Ryan's room.

602. It was the risk of precisely this injury to which the Chairman was deliberately indifferent in directing the delegation of all Duke Police Department official policymaking authority to Nifong, Gottlieb, Himan, and the Himan Chain of Command. Gottlieb habitually humiliated and stigmatized Duke students, as was demonstrated in the Gottlieb Dossier and the student narratives of their experiences with him on the street, in the jail, and in the courtroom. The Chairman and other Duke University officials with policymaking authority were aware of that, and were deliberately indifferent to the near certainty that Gottlieb would use this investigation as a means of humiliating McFadyen and his teammates, in keeping with his habitual practice and fueled by his desire to retaliate against Duke students for having the temerity to submit a complaint detailing this very pattern of misconduct.

603. It was obvious that Ryan's email was a parody of a book or movie that was readily identifiable as such to the recipients of the email, who, like many Duke students, were required to watch the movie or read the novel as part of the curriculum in many courses offered at Duke. In fact, the first reply to Ryan's email was "i'll bring the phil collins." That reference was to the music of Phil Collins, whose music provided the incongruous background music in *American Psycho's* shocking "dream scenes."

604. The movie was taught in several courses at Duke, including a freshman cluster called "Forging Social Ideals" and the English Department's "Companionate Love" and "Literary Grotesques: Of Gods and Monsters, Richard III to American Psycho." In fact, literary critics hail the novel a "classic" of the "American Gothic" genre. The *American Psycho* DVD was available in Duke's undergraduate library, and on popular internet video sites. iTunes now offers its sequel, *American Psycho* II.

605. Nifong, Gottlieb, and Himan agreed to include in the new Description of Crimes the assertion that police are investigating a "Conspiracy to Commit Murder," with strippers as the putative victims. No reasonable officer would believe a conspiracy to commit murder was afoot; if they did, a warrant would be sought for those who indicated they would attend, and the objective was to be consummated the day following the email, two weeks prior. Their actions were totally at odds with any such belief in such a conspiracy.

606. To further galvanize the public's outrage, Nifong, Gottlieb and Himan added to the list of "items to be seized" Mangum's white shoe, described as "Property belonging to 27 y/o B/F victim to include but not limited to a white 6 inch shoe." However, the investigators had already found and seized that shoe over a week earlier.

607. This photo captures the shoe on the floor of the living room as the two are leaving the room:



608.   The three renters of 610 N. Buchanan told Gottlieb and Himan that many pictures were taken, they told them who took them, and they referred to them in their written statements.  Knowing that pictures of the evening (from beginning to end) existed and where to find them, Nifong, Gottlieb, and Himan did not apply for a warrant to search the premises where they knew the pictures would be.  Instead, they chose to apply only for a warrant to search Ryan's dorm room.

609.   Gottlieb and Himan also added to the Probably Cause Affidavit:  "In addition, further interviews showed that.  [sic] The players also used numbers when calling for one and another across the room again to hide their identities."  No witness ever told Gottlieb or Himan this.  It is another fabrication; this one was derived from Ryan's signing his email "41."

610.   Knowing the explosive consequences of submitting the incendiary Affidavit in support of their application for a warrant to search Ryan's room, Gottlieb, Himan and Nifong proceeded with it, thereby evincing a malicious, evil motive animating the intentional violation of Ryan's Fourth and Fourteenth Amendment right to be free from government searches without probable cause.

## D. Judge Stephens Frustrated the Conspiracy, Temporarily

611. Gottlieb and Himan immediately began the unnecessary work of revising the Probable Cause Affidavit consistent with their agreement with Nifong. They presented the search warrant application for Ryan's dorm room to Judge Stephens at 5:00 p.m. the same day, March 27, 2006. Judge Stephens signed the search warrant, but he ordered that the warrant be sealed indefinitely.

612. Judge Stephens' Order sealing the warrant frustrated its only purpose, namely, the publication of Ryan's email, stripped of its context.

613. Thwarted, Gottlieb, Himan, Clayton, and Inv. Soucie "searched" Ryan's room, knowing that Ryan had already been excluded as a plausible suspect in the March 16th Identification Procedures. Gottlieb, in particular, was in a rage. The officers destroyed furniture, and needlessly threw clothes, papers, cords, and books everywhere.

614. Duke Police Sgt. Smith escorted Himan and Gottlieb into McFadyen's dorm and stood-by the room throughout the search. While there, he indicated that he knew the warrant was not supported by probable cause or reasonable suspicion.

615. Aware that Gottlieb and Himan had falsified the material allegations in the Warrant Affidavit and that there was no probable cause to believe the crimes alleged had been committed, much less that McFadyen had committed them, Sgt. Smith 'turned a blind eye' to the violations of McFadyen's constitutional rights occurring in his presence, and did nothing.

616.   There was no news of Gottlieb's incendiary Probable Cause Affidavit—for 9 days, until April 5, 2006, when Judge Stephens unsealed the warrant, and Ryan was vilified before a global audience.

### XXV.   THE DNA CONSPIRACY

#### A.   March 27th:  The SBI Lab's Testing of the Rape Kit Begins, and Ends

617.   On or before March 27, 2006, the SBI received the rape kit items, Mangum's clothing, and the reference DNA samples from the lacrosse team members.

618.   On March 27, 2006, the Attorney General directed the Lab to expedite the DNA testing in this case.  On that basis, the lab began work on the testing immediately.  On the same day, the SBI Lab's Serology section initiated the testing process by examining the rape kit items for the presence of semen, saliva, and blood to determine which items would be sent to the DNA lab for further analysis.

619.   The SBI Lab serologist assigned to the case, Rachel Winn, concluded that DNA analysis of the rape kit items would be futile.   There was no semen.  There was no saliva.  There was no blood.  There was nothing to test.

620.   Upon information and belief, Nifong received this news in a verbal preliminary report on the afternoon of March 27, 2006.

#### B.   March 28th:  SBI Lab Notifies Himan and Nifong that There will be No DNA Match Between any Player and Mangum's Rape Kit Items

621.   On March 28, 2006, SBI Lab Serologist Winn called Himan to advise him that the SBI Lab has examined the rape kit items and clothing and was unable to find semen,

saliva, or blood on any of those items, and, as such, the SBI's testing in the case was concluded, and would be wrapped up soon unless Himan could produce additional evidence to test.

622. Himan, under directives from Nifong, scrambled CSI Agent Ashby to tell Agent Winn not to close the case; they would find more evidence to send. Ashby sent swabs of a four-foot area of the bathroom floor and a towel collected in the search of 610 N. Buchanan. Based on a visual examination with a Wood's light, both items were believed to contain semen. Even if the presence of semen was confirmed, it would be meaningless unless Mangum's DNA was also found in the sample. It was the forensic equivalent to a "Hail Mary."

623. Upon information and belief, on March 28, 2006, Himan notified Nifong and the Durham Police Supervising Defendants that the SBI Lab tests would produce no DNA match between Mangum's rape kit and any member of the lacrosse team.

624. On March 28, 2006, at 10:40 p.m., Himan spoke with Mangum about the case and, upon information and belief, about the negative DNA test results. Himan concealed the fact of this conversation by not reporting the existence of it in his investigative notes. Upon information and belief, Himan told Mangum that there would be no match and the obvious consequences that fact had upon the viability of the case.

625. On or before March 28th, Nifong and Addison's public statements convinced the millions watching the spectacle unfold in Durham that the DNA tests would identify the three perpetrators of the crime that Nifong was "convinced" had happened.

626. Nifong's public statements about his certainty that a rape occurred had focused on the DNA testing. For example, between March 24, 2006 and the SBI's verbal report that there would be no DNA match:

   A. Nifong told dozens of reporters during this period that the DNA would "reveal who the attackers" were, and that he would charge them as soon as the DNA testing was complete.

   B. He told a local reporter and a radio talk show host that the DNA evidence from the SBI Lab would be "bullet proof."

   C. On March 27, 2006, Nifong told a reporter for ABC 11, "My guess is that some of this stonewall of silence that we have seen may tend to crumble once charges start to come out" after the DNA test results are back.

   D. Nifong's senior A.D.A. offered to the Court in an ex parte hearing, an Affidavit that unequivocally stated that the DNA test to be conducted with Plaintiffs' DNA would identify the suspects and exonerate the innocent.

   E. Nifong told a reporter for MSNBC, "if there is DNA evidence within the victim, then this will enable us to definitely establish who the perpetrators of the offense were."

### XXVI.    MARCH 29TH: THE DUKE—DURHAM JOINT COMMAND MEETS

627. On March 29, 2006, a Joint Command meeting was held at Durham Police Headquarters. Those in attendance included Duke University and City of Durham officials with final policymaking authority over their respective institutions' and employees' involvement in the investigation. The final policymakers present

included Nifong, Baker, Hodge, Russ, Graves, and Dean, and others who at least one Durham Police Officer knew to be senior Duke University Administrators.

628. Gottlieb and Himan were summoned to Durham Police Headquarters to report to the Joint Command on the status of the evidence in the investigation. This was one of the first of numerous Joint Command meetings held during the 13 month investigation.

629. Gottlieb and Himan failed to take (or produce in discovery) any notes they may have taken at any of the meetings they attended with the Duke-Durham Joint Command Staff or the Durham Command Staff. This was a practice in keeping with their failure to take or produce notes of meetings held with other co-conspirators, including Mangum, Nifong, Meehan, Clark, Levicy, Arico, Ripberger, Lamb, Hodge and Baker. The sum total of Gottlieb's notes taken in meetings with their co-conspirators are three words—"discussed the case"—to describe the meeting in which Meehan and Clark advised Nifong, Gottlieb, and Himan of DNASI's exonerating test results, and the meeting in which they all conspired to deprive Plaintiffs of their absolute right to those results.

630. Gottlieb has testified that there were so many Duke-Durham Joint Command Meetings that, if he had kept notes of what was said in them, he would notebooks full of them. Gottlieb prepared a typewritten timeline of the investigation early on for Baker's use in briefing the City Council; however Baker deleted segments "to the point where it didn't say anything, and that is what [Baker] finally turned in." No copy of Gottlieb's complete timeline was preserved.

631. Upon information and belief, at the March 29, 2006, Joint Command meeting, Nifong, Gottlieb, and Himan reported to the Duke University and City of Durham officials, among other things:

A.   The SBI Lab's testing of the rape kit contradicted Mangum's basic allegation of rape;

B.   Mangum's descriptions ruled out 11 members of the lacrosse team as plausible suspects and two separate identification procedures utilizing only photos of the remaining 36 members of the lacrosse team ruled out those 36 members as plausible suspects;

C.   They had no suspects, and  no evidence that a rape occurred;

D.   They had obtained a warrant to search Ryan McFadyen's room, which was sealed by Judge Stephens, but when released would almost certainly cause his immediate and irreparable vilification;

E.   The medical evidence was not consistent with a violent gang-rape, and the examination of Mangum was abandoned, clearly indicating the physician conducting the SAE did not believe Mangum's claims;

F.   Mangum made her rape claim under the threat of involuntary commitment in response to what appeared to be symptoms of a psychotic break with reality; and

G.   Mangum recanted her claim when the threat of involuntary commitment was removed, and otherwise gave multiple self-contradicting accounts to multiple different individuals—all of whom were employed by either Duke University or the City of Durham—in the initial investigation conducted by Duke and Durham officers.

632. The Duke University and City of Durham policymakers present also knew or were then advised that alibis based upon machine generated, digital evidence had been prepared for each of the 47 team members, which individually proved each team member had no opportunity to commit the crime alleged, and collectively proved that the crime alleged could not have occurred. Further, they knew that Brodhead had refused a standing offer made by Plaintiffs' defense counsel to present to him or his designee that evidence of innocence, and, further, that a similar offer was or would soon be refused by Nifong.

633. After the Joint Command meeting on March 29, 2006, the Chairman, the CMT Defendants, Duke Police Supervising Defendants, and the Durham Police Supervising Defendants all were aware of and willfully blind and/or deliberately indifferent to the repeated and ongoing violations of Plaintiffs' constitutional rights by Nifong, Himan, the Himan Chain of Command, Addison, Michael, and the Addison/Michael Chain of Command, who, at the same time, willfully refused or failed to acknowledge, receive or seize the overwhelming evidence of innocence that had been amassed in the case.

634. Consistent with the Chairman's Directive to force the trial and convictions—and a similar policy directive from Baker—the Joint Command directed Nifong, Himan, and the Himan Chain of Command to act swiftly to charge, prosecute, and convict Plaintiffs and/or their teammates.

635. The conduct of these Duke University and City of Durham officials with final policymaking authority with respect to the investigation of Mangum's claims evinced their malicious and corrupt intent, and their deliberate indifference to the Plaintiffs' constitutional rights.

636.	Knowing that Plaintiffs were innocent and that the course the policymakers had set for the investigation in the Joint Command meeting would cause extraordinary and unconscionable harms if allowed to continue, the Defendants nevertheless proceeded on that course.  As a direct result, Plaintiffs were further subjected to public humiliation and vilification and the universal condemnation of  hundreds of millions of people around the world.

637.	The public acts and statements of Duke University's policymaking officials, faculty, administrators, and staff, in concert with or consciously parallel to the acts and statements of Nifong, Addison and Gottlieb, the City of Durham and Duke University had stirred up local racial animus to a degree that the City and the University openly admitted that they feared that the outrage they had fomented would be turned, and directed upon City and University officials if  there were no charges, no trial, and no convictions. The Duke-Durham Joint Command officials predicted race riots would ensue and "Durham would surely burn" if lacrosse players were not charged.

638.	From this point forward, the City's purposes coincided completely with those fixed for the University by the Chairman; what was "best for Duke" was also best for the City.  Shortly thereafter, the City, Duke, and NCCU launched a media campaign, called "A Community of One."  It was designed to promote the image of the City, Duke, and NCCU all standing in solidarity against the white, "racist-rapists" on the lacrosse team.  The media campaign culminated on the day of the first indictments with a large "Community of One" ad placed strategically in various newspapers.

639.	All appearances of a legitimate investigation were abandoned, and replaced by a conspiracy whose final object was to prosecute and convict Plaintiffs and/or their

teammates in the absence of probable cause, reasonable suspicion, or factual possibility for that matter, in violation of Plaintiffs' constitutional rights.

640. In furtherance of that conspiracy, multiple conspiracies emerged, including but not limited to: an overarching conspiracy to stigmatize the Plaintiffs in conjunction with multiple deprivations of Plaintiffs' significant interests for purposes of depriving Plaintiffs of a fair, impartial jury; several conspiracies to conceal exculpatory tangible, testimonial, and forensic evidence, several conspiracies to manufacture inculpatory tangible, testimonial, and forensic evidence; conspiracies to abuse multiple forms of legal process; conspiracies to invade the Plaintiffs' federally protected private financial, banking, communications, and educational records and accounts without legal cause, and an overarching conspiracy not to intervene among all Defendants who had the power to prevent the wrongs they knew were conspired to be done to Plaintiffs over the course of the next year.

## XXVII. NIFONG, HIMAN, AND GOTTLIEB CONSPIRED TO WITHHOLD DNA TEST RESULTS THAT PROVED MANGUM'S CLAIMS WERE A FRAUD IN VIOLATION OF N.C.G.S. § 15A-282

### A. Plaintiffs' Entitlement to Results Pre-indictment

641. Pursuant to N.C.G.S. §15A-282, Plaintiffs were entitled to the same report of test results that Nifong received from the SBI on March 28, 2006 and March 30, 2006, as soon as they were made available to him and no later than March 31, 2006.

642. Specifically, the written report of the SBI Lab's testing required by the statute would have had to include, at a minimum:

A. The fact that the serology lab found no evidence of any blood, saliva, or semen on any of the items in Mangum's rape kit, including the oral swabs and smears, the rectal swabs and smears, the vaginal swabs and smears, and the underwear collected in Mangum's Sexual Assault Exam;

B. The absence of any blood, saliva, semen, or human tissue on any of these items precluded any DNA testing of the items, since the SBI lab's testing equipment could not produce any DNA profiles against which its scientists could compare the DNA profiles of the 46 members of the lacrosse team who were compelled to provide DNA samples; and

C. The SBI's finding that no human tissue of any kind was visible on any of the painted or unpainted fingernails found in Mangum's purse or in the bathroom which had been seized during the search of 610 N. Buchanan.

643. Nifong refused to provide the report to Plaintiffs because it was plainly obvious that those three findings alone proved Mangum's allegation of a violent gang rape was false, and, at the same time, belied Nifong's and Addison's incendiary false statements in their early media campaign. It was simply not rational to believe that a 30 minute gang rape in a small bathroom would leave no trace of male genetic material behind. This is particularly true in this case, where Mangum had repeatedly and consistently reported that no condoms were used, and that one of "the attackers" ejaculated in her mouth. In three places, the SAER memorializes Mangum's claim that no condoms were used. Even if condoms were used, it is still a practical impossibility to carry out a violent gang rape involving four people in close quarters without leaving any detectible blood, saliva, semen, hairs, or fibers of any kind, anywhere. Those findings

also corroborated Plaintiffs' unequivocal claim that no sexual contact of any kind occurred.

**B.** **Nifong, Himan, and the Himan Chain of Command Agree to Delay Disclosure of the SBI Lab's Test Results in Violation of N.C.G.S. §15A-282**

644. The legitimate investigation of Plaintiffs and their teammates ended on March 21st. The perversion of the investigation into a media circus would have ended on March 30th, if Nifong, Gottlieb, and Himan obeyed the plain command of the NTID Order statute's discovery requirement. If they had done so, they would have been ruined professionally. Nifong would have been subjected to immediate Bar proceedings based upon his unprecedented public statements condemning the accused Plaintiffs, and Himan and Gottlieb would have been subjected to civil and administrative remedies.

**C.** **Faced with Irrefutable Evidence of Plaintiffs' Innocence, Nifong and the Himan Chain of Command Resolved to Fabricate a Case Against Plaintiffs and/or Their Teammates**

645. On March 30th, after receiving the SBI Lab results, Nifong appeared to change course. He told reporters that the "attackers" may not be on the lacrosse team. For example, on March 30th, Michelle Hofland, a national correspondent for NBC reported live in the late afternoon that:

> *"Well, this afternoon, I asked the district attorney about [Plaintiffs' claim that the DNA will prove their innocence], and he's kind of backpedaling... what he explained to me is that he is confident that a rape took place here, he is confident that it took place inside that home. But about the three people that they believe did it, he said, well, it may not be the lacrosse team members. You've got to wait for the DNA*

*evidence. And if it's not any of those lacrosse players, maybe there were three other guys who were at that party. So that's where it stands now. ...*

In another report of the same exchange with Nifong, Hofland reported:

*Now, I said how can that be, when you told me that everyone inside that party was a lacrosse player? And this is what he said, is that all he knows about who was inside that apartment came from the lacrosse players, and maybe all of them omitted three other people who could have been at that party. A little bit confusing and we're waiting now."*

646.    Nifong spoke freely about the DNA results, but failed to reveal to Hofland (or any other reporter) that he already knew the results were negative, as Plaintiffs publicly predicted. In the wake of reports of his personal ambivalence, Nifong resolved to fabricate a case against three—any three—lacrosse players.

### D.    With No Forensic Evidence of a Violent Assault from the SBI Lab, Nifong Traded Horses

### 1.    DUMC SANE-in-Training Tara Levicy

647.    Nifong's refusal to reveal the explosive SBI test results in violation of N.C.G.S. § 15A-282 afforded him time to cultivate the false public belief that negative DNA test results would not alter the credibility of Mangum's claims. To that end, Nifong renewed his campaign of unprecedented statements to reporters about his certainty that Mangum was raped and sexually assaulted. In this phase of Nifong's media barrage, however, Nifong discounted the significance of DNA evidence, and began promoting a new basis for his conviction that Mangum was raped: Duke's SANE-in-Training, Tara Levicy.

A. Late on March 28, 2006, Nifong told a reporter for MSNBC that, "There is evidence of trauma in the victim's vaginal area that was noted when she was examined by a nurse at the hospital."

B. Late on March 28, 2006, Nifong told a reporter for MSNBC that, "… her general demeanor was suggested—suggestive of the fact that she had been through a traumatic situation."

C. On March 28 and 29, 2006, Nifong told reporters for the *New York Times*, the *Raleigh News & Observer* and others that his certainty that a rape had occurred was based on the report of the SANE nurse who conducted the SAE

D. On March 30, 2006, Nifong told a reporter for *The Early Show* (CBS) that the SAE and reports of the SANE nurse were "certainly consistent with a sexual assault having taken place, as was the victim's demeanor at the time of the examination."

E. Repeatedly, from March 28, 2006, through his disbarment hearing, Nifong claimed that his publicly expressed conviction that Mangum was raped was based on what he read in Tara Levicy's SANE report.

648. In the eleven days between the time the SBI lab concluded there would be no DNA match and the time Nifong provided a written report of those results, (March 29, 2006 through April 10, 2006), knowing there would be no DNA evidence, Nifong made numerous statements discounting the significance of the absence of DNA evidence, deriding DNA evidence generally, and explaining why he would not be surprised if no DNA evidence emerged. For example:

649. On March 31, 2006, Nifong explained to MSNBC how Plaintiffs could have been the "strangler" in Mangum's latest version of events without leaving any DNA under her fingernails:

> *"But let me point out that the evidence that [Mangum] would present with respect to [the fingernails] is that she was grabbed from behind. So that in essence, somebody had an arm around her like this, which she then had to struggle with in order to be able to breathe, and it was in the course of that struggle that the fingernails -- the artificial fingernails broke off. Now as you can see from my arm, if I were wearing a shirt, a long-sleeved shirt or a Jacket of some sort, even if there were enough force used to press down, to break my skin through the clothing, there might not be any way that anything from my arm could get on to those fingernails. So again, whether or not there would be any [DNA] evidence would depend on exactly the situation. Were the fingernails actually in contact with the skin or were they in contact with clothing?"*

650. The video of Nifong is digitally embedded herein as **ATTACHMENT 16.**

*To activate the embedded video,*
*left-click on the screen with the Adobe Hand Tool.*



651. On March 31, 2006, Nifong told a reporter for MSNBC, "Now, obviously, if there is a DNA match, then that's very strong evidence, but the absence of DNA doesn't necessarily mean anything other than that no DNA was left behind…. Well you have

to remember that DNA is a relative latecomer to the forensic scene. There have been many successful rape prosecutions involving nothing more than the statement by the victim that she was raped by a particular individual."

652. On March 31, 2006, Nifong told a reporter for MSNBC, "For instance, if a condom were used, then we might expect that there would not be any DNA evidence recovered from say a vaginal swab."

653. In a March interview which was then published on April 11, 2006, Nifong told a reporter for the *Charlotte Observer* that, "I would not be surprised if condoms were used. Probably an exotic dancer would not be your first choice for unprotected sex."

654. On March 30, 2006, Nifong told a reporter for the *Raleigh News & Observer*, "How does DNA exonerate you? It's either a match or there's not a match…If the only thing that we ever have in this case is DNA, then we wouldn't have a case."

### XXVIII. ON APRIL 4TH, NIFONG RECEIVES THE FINAL SBI REPORT OF ALL TEST RESULTS; AND NIFONG SEEKS ASSISTANCE FROM A PRIVATE DNA LAB THAT WAS AGGRESSIVELY LOBBYING FOR THE CITY'S BUSINESS

655. On April 4, 2006, the SBI reported to Nifong, Gottlieb, and Himan the results of all of the testing they would do in the case. Nifong immediately instructed Gottlieb and Himan to get quotes on additional DNA testing of the rape kit items, and possible DNA analysis of any genetic material found.

656. Upon information and belief, Nifong knew that Defendant Brian Meehan had been lobbying for business from the City of Durham for months. He met with city leaders, administrators, anyone who would give him an audience to pitch his DNA lab's

services to the City.  DNASI has the more sensitive Y-plex technology, capable of locating male (Y-chromosome) DNA in minuscule quantities.  Durham Inv. Soucie contacted Meehan.  Meehan told Inv. Soucie that he wanted to be involved in the high profile case so much, he would reduce his rates to get the job.

657.    Nifong was running out of time.  Nifong should have asked for the required written report from the SBI lab days earlier, and the primary was still a month away.

658.    It was clear that the SBI's DNA report would destroy Nifong's credibility, end the case, humiliate him as the primary election approached, cost him the election, the more lucrative elected-D.A.'s pension, and probably end his career in the Durham County DA's Office.  Upon information and belief, Nifong knew that Meehan's lab had been desperately seeking the City's business for months, and Meehan might be as willing to bend the rules as he was to bend his rates.  Meehan's lab could stall the completion of DNA testing, thereby delaying the damage to his case and his electability in the eyes of the public.

659.    For days, he had made innumerable public and private statements claiming he was relying upon the DNA testing to determine who he would charge.  Upon information and belief, after learning of the SBI's lab tests he determined to delay providing a report of the DNA test results to the team members in order to change the subject in the media frenzy he created.  On the day Nifong learned there would be no DNA evidence from the rape kit, March 28, 2006, Nifong told reporters for the *Raleigh News & Observer*, *Durham Herald Sun*, representatives of NBC, and other national media outlets that another search warrant was issued in the case, but the judge who signed it ordered it sealed.  Nifong knew that the *Raleigh News & Observer's* lawyers

(and those of other news organizations he told) would file motions to unseal the order on First Amendment grounds within days.

### XXIX. THE IDENTIFICATION CONSPIRACIES

660. On March 30th, the SBI Lab conducted a conference call with Nifong, Gottlieb, and Himan to inform them of the SBI's formal, final report on the testing of the rape kit items. The SBI Lab confirmed Agent Winn's early report to Himan and Nifong on March 28th: the rape kit would not provide DNA evidence linking any team member to Mangum's rape allegations.

661. Nifong's case was decimated. Nevertheless, beginning March 31st, Nifong ceased hedging the investigation's focus on the lacrosse team was gone. Nifong's public statements derided the value of DNA evidence; at one point, he asked rhetorically, "How does DNA evidence exonerate you?" Nifong stated that the case would not end if the DNA came back negative. Instead, he promised that, if the DNA did not identify the assailants, then Mangum would do it "the old fashioned way" by identifying them herself through identification procedures. In extolling the virtues of the "old fashioned" way, Nifong did not reveal that police had already tried to do that, and Mangum failed to identify every team member that remotely fit her generic descriptions as an "attacker. Nifong also deliberately concealed from reporters, Plaintiffs, and their defense counsel that he already knew the DNA test results were all negative as to Plaintiffs and their teammates.

662. After SBI Agent Winn told Nifong on March 28th that there would be no DNA match to the rape kit items, Nifong knew the members of the lacrosse team could not be

legitimately identified. Mangum had already failed to identify 36 team members in the March 16th and 21st Identification Procedures, and her descriptions ruled out the remaining 11 members of the team. By March 31st, Nifong had found a way to manufacture identification evidence against three team members. The Durham Police had used a similar identification procedure to resolve similar, intractable identification problems and used it to convict at least one indigent defendant with it in the recent past.

663. On March 31, 2006, Nifong summoned Gottlieb and Himan to his office to explain the procedure and direct them to do it. The "yearbook" identification procedure Nifong directed them to employ was simple: tell Mangum she would see pictures of people they believe were present at the party, and have her pick three.

664. It was a multiple choice test with no wrong answers. Nifong, Gottlieb, and Himan conspired to conduct the procedure in that manner, and, in doing so, set themselves on a fixed course to frame three Duke students they knew to be innocent.

665. On April 3rd, Mangum presented to UNC Hospitals again, this time complaining of neck pain. Again, Mangum reported her pain score was a "10 out of 10." The next morning, a video recording of Mangum's "pick three" April 4th Identification Procedure shows Mangum rolling her neck with ease.

# XXX.     THE CONSPIRACY TO FABRICATE IDENTIFICATION EVIDENCE

## A.     The April 4th "Pick Three" Identification Procedure

666.    On April 4, 2006 at 8:00 a.m., Gottlieb called Mangum to set the time for their identification procedure, and then, at 9:00a.m. Gottlieb spoke with Defendant Graves at Duke University via telephone. Gottlieb notes the fact of the meeting, but does not state its substance.

667.    Two hours later, Mangum was at the police station, engaged in another identification procedure. This one was a PowerPoint presentation of photos of every Caucasian team member prepared by Gottlieb.  The PowerPoint was a novel method for suspect identification, and it violated nearly all of the Department's safeguards against negligent and malicious misidentification codified in Durham Police Department's G.O. 4077.

668.    In response to the collapse of the case, Nifong, Gottlieb, Himan, and Clayton had conspired to obtain identifications of three lacrosse players in a manner that obviated nearly all of the safeguards adopted in G.O. 4077 to protect against both negligent and malicious misidentifications.  For example, in the April 4th Identification Procedure:

A.    Police did not "use an independent administrator."  Gottlieb administered the April 4th Identification Procedure and was known to Mangum as perhaps the most active officer in the investigation.

B.    Police did not use any true fillers.  A true filler operates as a "foil" and, as such, will test the witness's reliability.  The 46 pictures shown to Mangum were the 46 white members of the Duke lacrosse team.  In fact, none of the March photo

arrays shown to Crystal Mangum used true fillers or foils either. All together, through the March 16th, March 21st, and April 4th Identification Procedures, police showed Mangum a total of 82 pictures. Every picture shown to Mangum was a member of the 2005-2006 Duke University Men's Lacrosse Team. Police never intended to include any foils in any array; however, unknown to them, a few foils were there, because several lacrosse players were, in fact, not present at the party.

C.    Police included photos of individuals Mangum had already seen in prior arrays.

D.    Mangum was instructed very differently than she was in the March 16th and March 21st Identification Procedures.

E.    In the April 4th Identification Procedure, Mangum was not instructed that the suspect may not be included in the photos. Just the opposite. Mangum was told that the photos were an exhaustive collection of the individuals who police believed were at the party and, therefore, had the opportunity to commit the sexual assault. This was a radical departure from the instructions Mangum was given prior to each of the six March arrays.

F.    In the April 4th Identification Procedure, the Administrator (Gottlieb), gave Mangum feedback throughout the procedure, inconsistently prompting Mangum with questions, probing for detail in some and not others.

G.    Prior to the procedure, Mangum was provided photographs from the party to study so that she would be able to identify as her attackers three individuals the police could prove (through the pictures) were, in fact, present at the party.

669.    The April 4th Identification Procedure failed to pursue one of the two required aim of G.O. 4077 identification procedures (identifying a suspect and testing the witness's

veracity).  The PowerPoint Identification procedure was transparently designed not to test Mangum's veracity.

### B.    Mangum's Sharpening Memory

670.   In the April 4th Identification Procedure, Mangum recalled seeing individuals at the party in fine detail, who, when they were shown to Mangum in the March 16th or March 21st arrays, she could not recognize them at all.  For example, in the April 4th Identification Procedure:

671.   In response to one Image, Mangum claimed she recalled the individual from the party. Her memory was so vivid that she knew what color shorts he was wearing: "he had on some brown shorts, khaki shorts."  In a photo identification procedure two weeks earlier—a week after the party—Mangum could not recognize the same individual at all.  A photo in police custody shows that same young man, pictured sitting on the couch wearing (brown) khaki shorts.

672.   In response to another Image, Mangum recalled seeing him at the party.  She remembered him "[s]itting on the couch, in front of the TV."  A photograph in police custody at the time showed the same young man, sitting on a couch, in front of the TV.

673.   In response to another image, Mangum said she recalled seeing the individual, and she knew where he was; she said she remembered that he was sitting in the living room.  In an identification procedure three weeks earlier—and two days after the party—police showed Mangum the same person's picture, and she did not recognize

him at all.  A photograph in police custody at the time shows that same young man at the party, sitting in the living room.

674.    In response to another image, Mangum said she remembered seeing the individual at the party.  She said she remembered him sitting in the kitchen making a drink.  In her identification procedure two weeks earlier—a week after the party—Mangum could not recognize the same individual at all.  A photo in police custody shows that same individual sitting under the doorway that leads to the kitchen.

675.    Upon information and belief, Mangum was provided the pictures that were in the possession of the Durham Police at some point prior to her April 4th Identification Procedure; it appears to be the only explanation for her remarkable performance in remembering remarkable detail about individuals that she could not recognize two and three weeks earlier.

### XXXI.    THE CONSPIRACY TO CONCEAL IDENTIFICATION PROCEDURE RESULTS IN VIOLATION OF N.C.G.S. § 15A-282

676.    After two identification procedures in March, Mangum had failed to identify any of the 36 lacrosse team members who were not ruled out by Mangum's descriptions of her "attackers."  Nifong, Gottlieb, and Himan deliberately excluded these facts from the NTID Order Application, the Search Warrant for Ryan's dorm room, and the Investigation Timeline that Gottlieb prepared for the City Council in response to his supervisors' request.

677.    Furthermore, Plaintiffs had a statutory right, pursuant to N.C.G.S. § 15A-282 to a written report of the PowerPoint identification procedure conducted on April 4, 2006,

because the procedure was conducted with every team member's NTID Order mug shot.  Of course, the April 4th Identification Procedure was the only basis to bring an indictment against anyone on the team.  The procedure, concocted by Nifong and Gottlieb, violated virtually every safeguard against misidentification that was required under G.O. 4077.  This fact was not revealed until after the first indictments.  Further, Mangum's performance in the April 4th Identification Procedure produced overwhelming evidence that Mangum was—alone or in collusion with others— fabricating her responses so that Nifong could indict before the primary election.  These facts, also, could not be known by Plaintiffs or their defense counsel until after the indictments were returned, and the investigation had been transformed into a full-blown criminal case that would perpetuate the ordeal for nearly a year.

678.    In the April 4th Identification Procedure, Mangum was shown pictures of 46 team members.  A written report of her performance in that procedure would have enabled Plaintiffs to know, among other things, the following facts:

A.    Mangum recognized only 17 of the 46 team members;

B.    Of those 17 individuals, 11 were individuals who Mangum said she did not recognize at all in the March 16th and 21st Identification Procedures.  Somehow, Mangum's memory clarified instead of faded over time; 11 people wholly unrecognizable to Mangum in March were somehow vividly in her memory of the night on April 4th.

C.    In those March Identification Procedures, Mangum recognized 4 team members with "10/10" certainty.   When those same four were shown to Mangum on April 4th, she did not recognize three of them at all.  The only one among the four that

she did recognize on April 4th was Brad Ross. Brad Ross was demonstrably not at the party and not in Durham on the evening of March 13th. Cell phone records and multiple witnesses established that he was in Raleigh with his girlfriend that evening. Ross was able to convey this to Gottlieb and Himan as the two were searching the dorm room he shared with Ryan McFadyen on March 27, 2006—a week prior to the April 4th Identification Procedure.

679.  Plaintiffs and their teammates did not receive the very simple written report required until four days after Collin Finnerty and Reade Seligmann were indicted.

680.  Just as they did with DNA testing, Nifong, Gottlieb, and Himan willfully violated Plaintiffs' absolute rights under the NTID Order statute to a written report of the April 4th Identification Procedure. Plaintiffs' defense counsel demanded that reports of any such procedure be submitted without delay, and, further, Plaintiffs' defense counsel also inquired directly with Nifong and with Himan directly, beginning as early as April 6, 2006.

681.  When Plaintiffs' defense counsel inquired with Himan about whether any identification procedures had been conducted with the NTID Order mug shots, Himan deliberately and willfully evaded his statutory obligation to advise Plaintiffs' defense counsel that a procedure had, in fact, been conducted. The exchange between Plaintiffs' defense counsel and Himan on this point was as follows:

| | |
|---|---|
| Counsel: | *Can you tell us if there has been a photo identification attempt?* |
| Himan: | *I can't comment on that, really, I'm not allowed to comment on the investigation.* |
| Counsel: | *Can you tell us if you used the mug shots of the boys from the Nontestimonial procedures?* |
| Himan: | *No, I'm sorry, I can't comment on that.* |
| Counsel: | *Is [Nifong] willing to take someone out of the investigation?* |
| Himan: | *I don't know.  I can only present the information that I have to Mr. Nifong, and he has to make the decisions about what to do with it.  I'm giving him all the information I have, so that's basically-um-that's where I'm coming from.* |

682.   While Himan was not present for the April 4th Identification Procedure, he was immediately briefed on the results on April 4, 2006.  Knowing that an identification procedure had been conducted using the NTID Order mug shots, Himan deliberately concealed the fact from Plaintiffs' defense counsel who asked a direct question seeking information her client had an unqualified statutory right to know.

683.   By saying "I can't comment on that" in response to Plaintiffs' defense counsel's direct inquiry, Himan was acting in furtherance of a conspiracy to violate N.C.G.S. § 15A-282 with regard to the Plaintiffs' photographs obtained in the NTID procedures, just as he was, at the same time, actively participating in the conspiracy to violate

N.C.G.S. § 15A-282 with respect to Plaintiffs' DNA samples obtained in the NTID procedures.

684. Further, in these pre-indictment conversations with Plaintiffs' defense counsel, Himan's words and actions revealed that he was not the "lead investigator" in the case by any stretch of the phrase. The foregoing exchange plainly reveals that Himan was being tightly controlled by officials directing Himan with the City's final policymaking authority with respect to the investigation of Mangum's allegations. In the foregoing exchange and in others, Himan stated repeatedly that he had no control over the investigation, its direction, or the interpretation of evidence. Himan was a self-described conduit of information that Nifong and /or others with final policymaking authority directed him to obtain.

685. Himan's willful refusal to disclose the existence of the April 4th Identification Procedure until April 21st, after the first two indictments were returned, eviscerated Plaintiffs' rights to exculpatory information under the NTID Order statutes. Under the circumstances, in which Plaintiffs were subjected to world-wide obloquy and local taunts, threats, and harassment, the delay served to compound the irreparable harm Plaintiffs continue to suffer. Having abused the NTID Order process to humiliate Plaintiffs on a global stage, Gottlieb, Himan, and Nifong abused it further to deny them the critically important, mandatory benefit the statute conferred on them.

686. Further, Himan's willful refusal to disclose the results of the April 4th Identification Procedure until after indictments foreclosed Plaintiffs' opportunity to seek the Court's authorization to petition the Court to be called as witnesses to provide testimony to the Grand Jury relating to Collin and Reade, pursuant to N.C.G.S. § 15A-623(d).

Their testimony, together with other witness testimony, would have established that both Collin and Reade had no opportunity to commit the alleged sexual assault and /or that no member of the team had the opportunity to commit the alleged assault.

687. Further, if Himan, Gottlieb, or Nifong had followed their statutory obligations, instead of colluding with one another to conceal the April 4th Identification Procedure results, Plaintiffs would not have been subjected to world-wide obloquy when the sensationalized Search Warrant Affidavit was released on April 5th.

## XXXII. APRIL 5TH: A SEALED DNA ORDER WAS ISSUED AND RYAN'S SEARCH WARRANT AFFIDAVIT WAS UNSEALED.

### A. Nifong Obtained an Order Authorizing DNA Evidence Transfer to DNASI

688. On April 5, 2006, the day after Mangum picked three team members, Nifong revealed to Judge Stephens in an ex parte motion that the SBI's DNA testing was completed and the results provided no link to any member of the lacrosse team. Judge Stephens signed an Order directing Y STR DNA analysis of certain items of evidence by DNA Security, Inc. Nifong did not reveal the motion to Plaintiffs or their defense counsel, and, upon information and belief, the motion and order were sealed.

689. In support of the petition, Nifong's petition advised Judge Stephens that "[t]he tests conducted by the SBI laboratory failed to reveal the presence of semen on swabs from the rape kit or the victim's underwear." Because the SBI Laboratory did not have Y-Plex technology, Nifong asked for an Order directing the transfer of evidence items to DNA Security, Inc., a private laboratory in Burlington, North Carolina that had Y-plex technology and could conduct Y STR DNA analysis.

690. Judge Stephens signed the limited order directing the testing of only "the oral, anal, vaginal, and underwear swabs" from Mangum's rape kit, along with the "46 cheek swabbings taken from the group containing the suspects."

691. David Saaks, then Assistant District Attorney, prepared the motion and order pursuant to Nifong's explicit instructions to include only the swabs from the rape kit and cheek swabbings from the team members, and not to include, among other possibilities, the fingernails.

692. Had Nifong's Motion or the Order been disclosed to the public, or to the Plaintiffs, the failure of the SBI's DNA testing would have emerged as explosive news on April 5, 2006. Nifong's DNA Motion and Order were not made public, however.

**B.   The Same Day, the McFadyen Search Warrant was Unsealed and Duke Unilaterally Suspended Ryan from School**

693. The same day, April 5, 2006, Judge Stephens ordered that Ryan McFadyen's warrant be unsealed, making it a public record.

694. Within hours, local, national, and cable news were reporting that Ryan's email revealed "a secret Duke lacrosse team plot to kill strippers."

695. When the news broke, Ryan was in the library, working on a term paper.

696. At the same time, Defendants Moneta, Bryan, and Wasiolek unilaterally suspended Ryan, without notice, hearing, or inquiry. They did not consult with Ryan, his defense counsel, or with anyone in the English Department who would have readily told them that the email was a parody of *American Psycho*, which was on the syllabus in several University courses.

697. Defendant Wasiolek searched frantically for Ryan demanding that Ryan come to her office on campus to sign a waiver of his FERPA rights. The waiver was necessary only insofar as the CMT Defendants intended to publicly condemn Ryan and/or reveal that the University had taken disciplinary action against him. Within hours of his suspension, the CMT Defendants were giving interviews to local, national, and cable news reporters to reveal Ryan's suspension.

698. That evening, believing that Ryan had waived his rights to privacy under FERPA, Defendant Brodhead opened his office to numerous reporters, provided on the record comments in which he condemned Ryan, revealed that the University had suspended him under the "safety of the community" provisions of the student code of conduct, failed to disclose that the email was a parody of *American Psycho*, reported that the University had taken disciplinary action against him, that he would be held to answer for his "conduct" in the University's disciplinary proceedings, and claimed that he was free to say all of these things because Ryan had signed a waiver of his FERPA rights.

699. A true and accurate copy of a video recording of Brodhead's statements is digitally embedded herein as **ATTACHMENT 17**, and may be viewed below:

*To activate the embedded video below,*
*left-click on the screen with the Adobe Hand Tool.*



221

700. At home, Ryan's younger sister learned Ryan was suspended from Duke from the television in a common area in her high school. She saw Ryan's picture on the television screen, and news of his suspension was soon on every channel. She found her younger sister and told her something awful was happening to Ryan.

701. Due to the fierce media scrutiny that was already upon him, Ryan was forced to incur the additional expense of retaining independent counsel; his representation in a large joint defense had been sufficient to that point. Ryan's father immediately traveled to Durham to take Ryan home safely. The Durham Police were notified that Ryan planned to return home immediately, unless the police intended to pursue the charges that were plastered all over the news programs that day. The Durham Police advised that they had no such plans.

702. Ryan returned home with his father. When they approached their home, they saw that a horde of media trucks had already arrived. News reporters, photographers, and camera men swarmed their front lawn for weeks. They would ultimately leave their encampment in front of Ryan's home on April 18th, to move the short distance from Ryan's front yard to Reade Seligmann's.

**C. Contemporaneously with Ryan's Suspension, Defendants Moneta and Brodhead Respond Differently to an Actually Threatening Student Email**

703. On March 31st, a Duke student named Chauncey Nartey sent an email to the men's lacrosse coach, Mike Pressler, with "WHAT IF JANET LYNN WERE NEXT???" as its subject line. Mike and Sue Pressler had long guarded the identities of their children; it required a significant effort to obtain the name of their daughter.

According to Nartey, he raised the hypothetical rape of Coach Pressler's daughter in the subject line, to draw Pressler's attention to Nartey's earlier emails to Pressler, one of which directed the Coach to "END THE SEASON UNTIL THE ALLEGED RAPISTS ARE FOUND!"  The email put the Presslers in fear for the safety of their children.

704.   On March 31, 2006 Sue Pressler filed a report with the Duke Police Department, which took no action on it.  Mike Pressler then met with Defendant Moneta to show him the emails Nartey sent to him.  Pressler asked Moneta to submit the incident to the Undergraduate Judicial Board.  Moneta knew that Nartey was the President of a fraternity that had recently been disciplined for a hazing incident.  Moneta refused to take any action on Nartey's email, or submit the matter to the Undergraduate Judicial Board.

705.   Shortly thereafter, Brodhead appointed Nartey to serve as one of five students appointed to Defendant Brodhead's Campus Culture Initiative.  Defendant Moneta was vice-chairman of the CCI, whose charge was to "evaluate and suggest improvements in the ways Duke educates students in the values of personal responsibility, consideration for others, and mutual respect in the face of difference and disagreement."  Later, Brodhead invited Nartey to be one of two Duke students to appear with him at "A Duke Conversation- Making A Difference" event in Charlotte.  Finally, before graduation, Nartey was a recipient of the 2007 William J. Griffith University Service Award.  Defendant Moneta awarded Nartey with honor that is given to graduating students "whose contributions to the Duke and larger community have significantly impacted University life.  Students whose efforts demonstrate an

understanding of the responsibilities of effective university, communal and global citizenship…"

### D. Matthew Wilson and Breck Archer were also Subject to Sanctions when Other, Similarly Situated Students were not, and in Violation of the University's Student Bulletin

#### 1. Matthew Wilson

706. Six days after David Evans was indicted, Matthew was pulled over in Chapel Hill, and charged with Driving While Impaired.  When this occurred, Matthew was not in Durham County, he was not enrolled as a student in the summer session at Duke, he was not at a school related function, and he was not with any individual who attended Duke.

707. Matthew accepted responsibility for his mistake and entered a guilty plea at his first appearance in the case.  Shortly thereafter, Matthew contacted the Duke University counseling program for students (CAPS).  Matthew was told that, because he was not enrolled in the summer session, he was not eligible for an appointment.

708. Shortly thereafter, a reporter checked the Orange County criminal filings to see if any lacrosse players had been charged in recent weeks.  She cross-referenced the new court files against the CrimeStoppers Wanted poster, and found Matthew's name. The next day, it was front page news.  Eventually, Matthew's name appeared in *Sports Illustrated*, the *New York Times*, his hometown paper, the *Durham Herald Sun* and the *Raleigh News & Observer*, among many, many others.

709. From March 23, 2006, until April 20, 2006, Matthew, like all of his teammates lived at the center of a national maelstrom.  A resident of Durham, he and his family had no

safe place. Like Matthew and his teammates, Matthew's parents and sister were also subjected to death threats and their own community's outrage. When the team members' home addresses were posted on a website calling for a violent response to the rape allegations, the Wilsons were the only family from Durham on the list, and a Durham officer appeared at the Wilson's home to notify them that they were concerned that the Wilsons may be targets for drive-by shootings.

710.   On April 17, 2006, Matthew prepared—like every one of this teammates—to be indicted. The likelihood of indictment for each one of them was roughly the same. That same day Matthew was told that there would be one more indictment, on May 15th. Matthew only knew that it was an individual that Mangum identified with less than 100% certainty.

711.   On April 21, 2006, Matthew learned that Mangum appeared to identify him in the April 4th Identification Procedure with less than 100% certainty. In the procedure, Mangum said that Matthew's photo "looks like Bret, but I'm not sure." Gottlieb asked, "Who is Bret?" and Mangum said "one of the guys that assaulted me." David Evans appeared to be the only other possibility.

712.   Matthew believed he would be the third player indicted until May 12, 2006, when he learned that Nifong was submitting David Evans to the Grand Jury, and not him.

713.   Duke University unilaterally suspended Matthew from the lacrosse team indefinitely, and made multiple public statements to representatives of the press to ensure the University's disciplinary action against Matthew was widely known.

714.  That was not the end of Matthew's punishment, however.  After submitting to the punishment of the Court and being excommunicated from his teammates, the University was not yet through.

715.  When Defendant Bryan learned of Matthew's citation, he summoned Matthew immediately to the Judicial Affairs Offices to answer for his conduct.  Matthew did not expect Judicial Affairs action, since he was not enrolled in school at the time, and was not on campus or in the county at the time.  Nevertheless, Defendant Bryan told Matthew and his father that he was referring Matthew to a Judicial Board hearing, after which he expressly stated that Matthew would be suspended for two semesters.

716.  Defendant Bryan falsely stated—repeatedly—that it was "the policy" to suspend for two semesters all students who are charged, on campus or off, with Matthew's offense.  The policy Bryan referred to was not written in the Student Bulletin, which requires such policies to be subjected to a review process, and, if approved, to be written in the Bulletin.  Defendant Bryan's statement that his office suspended for two semesters every student cited with that charge was false.

717.  The Wilsons were so fearful that the media attention Matthew's citation generated, coupled with Duke's public announcement of his suspension from the lacrosse team, and were putting Matthew in jeopardy of being charged.  University officials with final policymaking authority with respect to the Office of Judicial Affairs and undergraduate disciplinary processes, including President Brodhead, were directly advised of all of these facts.  The same officials were asked to allow Matthew to voluntarily transfer to another school to avoid the publicity of an Undergraduate Judicial Board proceeding.  The officials refused to allow Matthew to do that without

formally being designated as a student not in good standing with the University. Again, the officials explained that a "policy" dictated that result. Upon information and belief, the University allowed many students, before Matthew's case and after, who were in the same position and were permitted to transfer as students in good standing in lieu of being suspended. There was no such "policy," written or otherwise.

718. Prior to the hearing, Defendant Moneta told Matthew's father that the Undergraduate Judicial Board was going to suspend Matthew for two semesters, regardless of the limitations of his office's jurisdictional reach written in the Student Bulletin that facially precluded even the hearing. Moneta stated he and Bryan had no choice but to suspend Matthew "because he's a lacrosse player," rhetorically asking, "What would we say to people if we didn't suspend him?" FERPA does not allow Moneta to discuss disciplinary action taken against Matthew.

719. Bryan selected the hearing panel, and claimed that he picked a sympathetic group who would look favorably on Matthew's extraordinary efforts in the aftermath of the charge. The panel, as it happened, questioned Matthew—not entirely about the driving incident or Matthew's response to it—but instead about the events of March 13th-14th at the 610 N. Buchanan residence, and the lacrosse team's conduct generally.

720. The Board suspended Matthew for two semesters, and, on appeal, modified to one semester. Neither body addressed the fact that the Student Code of Conduct clearly does not authorize the Undergraduate Judicial Board to subject students to disciplinary proceedings for conduct that occurs off-campus, out of county, while not

enrolled in University courses, and on that basis ineligible to obtain even a 30 minute CAPS appointment.

721. Matthew incurred significant legal expenses in preparing to defend himself in the hearing and mitigating the consequence of the University's public disciplinary actions against him in the criminal case at the same time.

## 2. Breck Archer

722. In the Summer of 2005, Breck Archer was called into Defendant Stephen Bryan's office to answer to a charge that damage was done to his room during a party. The room was only technically Breck's at the time of the party; he had not moved in, he did not have a key to it, and he was not present at the party.

723. Nevertheless, Bryan punished Breck with community service hours at the Duke Gardens. Breck completed the hours, notified Defendant Bryan of his completion, but did not submit a form Bryan expected to receive.

724. Based upon Breck's failure to submit the form after completing all of his community service requirements, Bryan convened a Judicial Affairs panel of students and faculty Bryan knew would suspend Breck. At the close of evidence, Bryan remained in the room with the panel for the deliberations. Upon information and belief, Bryan influenced the panel to vote to suspend Breck, in violation of the Student Code of Conduct and the Faculty Handbook.

725. The panel suspended Breck for the 2005 fall semester for "failure to comply."

726. Upon information and belief, until Breck, no one in the history of Duke University has been suspended or otherwise separated from the University for a semester for failing to submit a form documenting work that was completed as required.

727. Defendant Bryan did not have a basis in the Student Code of Conduct to punish Breck for damage done at a party he did not attend, nor did Defendant Bryan have a basis in the Student Code of Conduct to suspend Breck for failing to turn in a form.

### E. The University-Student Contract Created by Duke University

728. The 2005-2006 Duke University Student Bulletin ("the Contract"), which incorporates the University's Code of Conduct pursuant to which McFadyen, Wilson, and Archer were suspended, from the University, is a contract entered into between the University and McFadyen, Wilson, and Archer. In addition to disciplinary procedures, the Contract also establishes other rights and responsibilities of the University and its students.

729. The University was contractually bound to provide whatever procedural safeguards the University promises its students in the published Student Bulletin. Among other things, the 2005-06 Student Bulletin promised McFadyen, Wilson, and Archer that they would not be suspended without due process, particularly in the form of the procedural safeguards that are established for the suspension of students from the University.

730. The University breached its contractual promise to provide Plaintiffs with the procedural and substantive protections established in the Student Bulletin. For example:

### 1. The University's Breach of McFadyen's Contract

731. Under the 2005-06 Contract, only Brodhead and Lange had the authority to impose an interim suspension, and, upon information and belief, Brodhead, Lange, and Moneta were responsible for imposing an interim sanction upon McFadyen in violation of the most rudimentary, express terms of the Contract.

732. The Contract characterizes "interim suspension" as an "extraordinary remedy which will be invoked only in extreme cases where the interest of the university and members of its community require immediate action before the Hearing Committee can adjudicate formal charges against the suspended individual." The interest of the university and members of its community did not require the immediate and indefinite removal of McFadyen from the campus, or the deprivation of his continued participation in his classes.

733. The Contract's required factual predicate for imposing an "interim suspension" upon McFadyen did not exist.

734. The University failed to provide McFadyen with timely notice, in writing or verbally, of the particular provision of the Contract's Code of Conduct he was charged with violating.

735. McFadyen had not "demonstrate[d] that, by his conduct, his continued presence on the campus constitute[d] an immediate threat to the physical well-being or property of the members of the university community or the orderly functioning of the university." While the local and national community were outraged by McFadyen's email, the campus was hardly shocked; most knew the source of the quote was

assigned reading at Duke, and thereby understood that it was McFadyen's satirical protest of the party, and most of them knew—and were very fond of—McFadyen.

736. After Brodhead and Lange imposed the interim suspension, the university deprived McFadyen of his "entitle[ment] to a hearing within three (3) days before the Hearing Committee on the formal charges," and, further, deprived McFadyen of his "entitle[ment] to an informal review of the decision imposing interim suspension by a three-person committee chosen from members of the University Judicial Board by its chair"; and

737. After imposing the interim suspension and later finding McFadyen innocent of any violation of the Code of Conduct, the University did not seek restitution in breach of the Contract term providing that "the university shall seek restitution as provided by the Hearing Committee with respect to the student's academic responsibilities incurred during the period of suspension."

738. The University imposed an "interim suspension" on McFadyen despite the absence of any of the factual bases enumerated in the Contract for imposition of an interim suspension.

739. As a direct and proximate result of the foregoing conduct, Brodhead, Lange, and Moneta intentionally deprived McFadyen of his "entitle[ments]" to "a fair and impartial hearing;" "to be found responsible only if the evidence meets a clear and convincing burden of proof," and to the panoply of procedural safeguards required to comply with the University's obligations to provide what the Contract calls "academic due process."

## 2. The University Breached its Contract with Matthew Wilson

740. Defendants Moneta and Bryan confessed to Matthew's parents and others that the Contract expressly limited its jurisdictional authority to discipline students who engage in any of the enumerated violations on campus. The only off-campus conduct that the Contract authorizes Judicial Affairs to discipline include (1) conduct that results in a felony conviction; (2) violations of the "harassment" policies while participating in a university-related activity off campus; conduct occurring on "university-affiliated programs/outings;" and (3) off-campus conduct that poses a threat to the university community.

741. Apart from those narrow exceptions, the Contract expressly does not authorize the initiation of disciplinary proceedings against a student for off-campus conduct. Moneta, Bryan, Brodhead, and other Duke University officials were notified that the University was violating the Contract by subjecting Matthew to disciplinary proceedings in the absence of a jurisdictional basis for them; yet, all of them 'turned a blind eye' and did nothing.

742. Moneta also admitted that the outcome of Matthew's case was predetermined; the Panel members—to be selected by Bryan—were going to suspend Matthew for two semesters, in violation of Matthew's contractual "entitle[ments]" to "a fair and impartial hearing," "to be found responsible only if the evidence meets a clear and convincing burden of proof," and the panoply of procedural safeguards required to comply with the University's promise to provide "academic due process."

743. Bryan hand-selected Panelists for Matthew's hearing who would vote to suspend Matthew as he and Moneta had preordained. At Bryan's urging before and during the deliberations in Matthew's case, the Panelists voted to suspend him for two-semesters. The Panelists, however, did not vote to trespass him from campus.

### 3. The University's Breached its Contract with Breck Archer

744. The University's suspension of Archer was unprecedented and remains inexplicable by reason and common sense. The conduct alleged does not form the basis for actionable conduct by the university.

745. As he has confessed to doing in Wilson's case, Bryan selected Panel members he knew would vote to suspend, or, were amenable to his influence. In Archer's absence, Bryan remained in the deliberations to influence and/or direct the Panel members to suspend Archer, which they ultimately did. Bryan's rigging of the hearing process and outcome intentionally deprived Archer of his "entitle[ments]" to "a fair and impartial hearing;" "to be found responsible only if the evidence meets a clear and convincing burden of proof," and to the panoply of procedural safeguards required to comply with the University's obligations to provide what the Contract calls "academic due process."

## XXXIII. THE CONSPIRACY TO CONCEAL DNASI'S TEST RESULTS IN VIOLATION OF N.C.G.S. § 15A-282

746. On April 6, 2006 the panties, cheek scrapings, oral, vaginal, and rectal swabs from the rape kit, along with the 46 lacrosse player swabbings were transferred from SBI to DNASI for Y chromosome DNA testing. The fingernails were not transferred.

747. DNASI worked through the weekend to complete its testing of the swabs. Between April 7 and April 10, 2006, DNASI performed initial testing and analysis of DNA characteristics found on the rape kit items. The analysis and testing revealed the existence of DNA characteristics from up to four different males.

748. Prior to the meeting on April 10, 2006, DNASI had excluded with 100% certainty Ryan, Matt, Breck, and their 43 teammates as potential contributors of the DNA that had been analyzed from the rape kit.

749. On April 10, 2006 Meehan called with results of DNASI's tests. Nifong, Himan, and Gottlieb drove to Burlington to receive the results verbally in person. Defendant Clark, President of DNASI was present at the meeting as well. Meehan reported the results of the initial testing and analysis. DNASI had identified multiple sources of male DNA on the rape kit swabs alone. Further, DNASI had concluded—with 100% scientific certainty—that Ryan, Matt, Breck, and their 43 teammates were excluded as potential contributors to any of the male DNA sources found.

750. The testing was completed, and the news shattered "the case" against the Men's Lacrosse team. Further, that same afternoon, Nifong would have to produce the SBI's report showing there was no genetic material belonging to any lacrosse player found on any rape kit item.

751. As he did with the SBI testing, he delayed the "final" results of the DNASI testing by directing Himan and Gottlieb to send in more evidence for testing. Judge Stephens' order, however, only directed that the rape kit and reference swabs be transferred,

nothing more.  Nifong did not obtain a third Order from Stephens for the transfer of these additional items; Nifong just directed Himan and Gottlieb to do it.

752.  Nifong did not reveal the DNASI results to Plaintiffs' defense counsel along with the SBI report he released that day.  Instead, he told defense counsel that he had decided to obtain additional testing at a private lab.  Nifong would not reveal to defense counsel the name or location of the private lab.

753.  A press conference held by defense counsel revealed the exonerating results publicly.  A true and accurate copy of segments of the press conference is embedded below as **ATTACHMENT 18**.

*To activate the embedded video,*
*left-click on the screen with the Adobe Hand Tool.*



754.  The investigation should have been concluded.  Again, it was not concluded, however, because, during the time that Nifong was concealing the SBI's March 27th findings that there was no semen on the rape kit items,  Nifong obtained sufficient identification evidence in the rigged April 4th Identification Procedure.  With Mangum's identifications, Nifong did not need DNA evidence to get the case to a jury.  Like many states, North Carolina abandoned its corroboration rule in sexual

assault cases.  So long as an accuser will testify that she was sexually assaulted and identifies someone as the perpetrator, the case will go to the jury.

755.    Additional meetings with Nifong, Gottlieb, Himan, Meehan, and Clark took place on April 21, 2006 and May 12, 2006.

756.    On May 12, 2006 with agreement among Nifong, Gottlieb, Himan, Meehan, and Clark to conceal the entirety of DNASI findings, DNASI provided a report that was considered to be the final report, to Nifong.  The report violated DNASI and industry protocol in that it did not contain the entirety of DNASI's findings.

757.    As of the present date, Ryan, Matt, and Breck have still not received a copy of either of the additional final reports DNASI provided to Evans', Finnerty's, and Seligmann's counsel dated January 12, 2007 and Special Prosecutors Jim Coman and Mary Winstead dated March 28, 2007.

> **A.    Pursuant to N.C.G.S. § 15A-282, Plaintiffs were Entitled to a Written Report of Every Test Conducted by DNASI with their DNA**

758.    A report of every DNASI test conducted with each of the Plaintiffs' DNA samples would have revealed to the Plaintiffs the presence of multiple unknown unidentified male sources of genetic material in Mangum's rape kit, including the rectal swab, the oral swab, and multiple portions of her underwear.

759.    A plain reading of the statute required that Ryan, Matt, and Breck be provided a written report showing the results of at least five tests conducted with their DNA profiles; one test result for each attempt to compare their DNA with that of the male sources of DNA found in the rape kit.  One of many examples of a proper report of

tests conducted by DNASI with all three Plaintiffs' DNA samples might look like this:

| Test # | Evidence Item | Result of Comparison with Mangum Reference | Result of Comparison with McFadyen Reference | Result of Comparison with Wilson Reference | Result of Comparison with Archer Reference |
|---|---|---|---|---|---|
| 1 | Unknown Male DNA SOURCE #1 | MATCH | NO MATCH | NO MATCH | NO MATCH |
| 2 | Unknown Male DNA SOURCE #2 | MATCH | NO MATCH | NO MATCH | NO MATCH |
| 3 | Unknown Male DNA SOURCE #3 | MATCH | NO MATCH | NO MATCH | NO MATCH |
| 4 | Unknown Male DNA SOURCE #4 | MATCH | NO MATCH | NO MATCH | NO MATCH |
| 5 | Unknown Male DNA SOURCE #5 | MATCH | NO MATCH | NO MATCH | NO MATCH |

760.  Nifong knew he had an obligation to provide a written report to every team member who submitted DNA that revealed the existence of at least five sources of male DNA in Mangum's rape kit that DNASI concluded—with 100% certainty—did not match their DNA.

761.  In a letter dated April 6, 2006, Plaintiffs' defense counsel put Nifong on notice of his obligations to produce a report of every test or experiment conducted with the DNA of any team member (the "Counsel's Demand Letter").  A true and accurate copy of the Counsel's Demand Letter is digitally annexed hereto as **ATTACHMENT 19**.

762.  Counsel's Demand Letter specifically stated that the demand includes but is not limited to:

A.   The results of any analysis made to compare team members' DNA with any other material;

B.    The results of any identification procedures using the "mug shot photographs" taken at the NTID Order procedures;

C.    The results of any analysis of those photographs, including reports of any witness interviews regarding the comparison and identification of such injuries that have been made available; and

D.    Preliminary or partial results of any tests conducted that have been made available.

763.    Nifong fully understood his obligation to report those results to the team members whose DNA was used in any experiment.

764.    Nifong plainly understood his obligations to Ryan, Matt, and Breck under the statute. By faxed correspondence dated April 12, 2006, Nifong confirmed he knew he was obligated to submit a written report of all of the foregoing test results, once complete. To date, Plaintiffs have not received a report of the results of DNASI's tests conducted with their DNA, a copy of the video recording of Mangum's April 4th Identification Procedure, or a copy of the results of Pittman's May 11th Identification Procedure, also conducted with Plaintiffs' NTID mug shots.

**B.    Nifong, Gottlieb, Himan, Meehan, and Clark Developed a Novel Reporting Method that—by Design—Concealed Exculpatory Test Results**

765.    Himan, Gottlieb, Nifong, Meehan, and Clark met several times to discuss the results of DNASI's testing and how to conceal from Plaintiffs the explosive findings DNASI had made. In those meetings they agreed the reporting of DNASI's tests would be done utilizing an entirely novel reporting methodology that, by design, would conceal

from Plaintiffs the fact that multiple male sources of DNA were found in the rape kit and did not match Plaintiffs or any lacrosse player.

766. The DNASI report failed to disclose not only the results of examinations for the presence of spermatozoa, but also failed to disclose whether any such examinations were conducted.

767. In testimony, Meehan asserted that he and Nifong discussed including all of the evidence, but affirmatively decided not to include those results relating to those who were not suspects in the interests of "protecting their privacy."

768. There is absolutely no evidence whatsoever of any concern for the privacy of Plaintiffs or their teammates in methodology DNASI utilized. DNASI did not redact a single digit from a single allele, and DNASI listed every suspect's name in its final report. Further, the report was a consolidated report that included every individual tested; a report design that reflects privacy concerns would likely be individualized— each individual would receive a report of his own test DNA test results but no other.

### C. Use of the DNASI Report to Harass and Intimidate the Most Important Fact Witness for all Three Defendants

769. The report included special analysis of one "crime scene fingernail." The report falsely and misleadingly included a comparison of a non-indicted team member's DNA as a "probative" test result. Further, even a close study of this test result fails to reveal any indication that the "crime scene fingernail" is, in fact, not probative. While it is true that Plaintiffs' non-indicted teammate could not be excluded as a contributor of trace amounts of DNA on the fingernail, it is equally true that Crystal Mangum <u>did not</u> contribute to any DNA found on the fingernail. Therefore, the "crime scene

fingernail" fully reported in the DNASI report as a "probative" result was, in fact, forensically irrelevant to Mangum's allegations.

770.    Because the "crime scene fingernail" result was "non-probative" viz. Mangum's allegations, it should have been excluded from the report pursuant to the novel reporting criteria DNASI agreed to use in determining what results to conceal. That is all the more strengthened by the "privacy concerns" that Nifong and Meehan asserted (among many other conflicting rationales) to justify their wholly new approach to DNA test reporting. If the concern for the privacy of innocent team members justified the exclusion of certain test results, no result required exclusion more obviously than the "crime scene fingernail" result.

771.    Instead, the non-probative result was included in the report solely for purposes of intimidating a material and critical witness who Nifong already knew was critical to the digital and testimonial alibis of Evans, Seligmann, and Finnerty.

772.    A year later, Special Prosecutors Coman and Winstead would rely heavily upon this particular team member's testimony and the evidence only he could authenticate in drawing the conclusion that Mangum's allegations were impossible. Further, in an interview, Special Prosecutor Winstead confronted Mangum with the photographic evidence that contradicted her account. When confronted, Mangum reflexively "improvised" and concocted patently ludicrous explanations. Mangum's response to the digital evidence that contradicted her accounts was critical to the determination made by those involved in the Special Prosecutor's re-investigation—including Himan—that Mangum was not only lying, but also appeared to be incapable of telling (or knowing) the truth of her prior experiences.

### D. Nifong and City Defendants Manipulate the Media to Create Public Perception that the DNA Test Results Implicated Plaintiffs or Their Teammates

773. The media reports of Nifong's statements and his not-for-attribution comments to the media are replete with insinuations that the DNA reports will favor Mangum's allegations. In a telling, impromptu interview conducted by Trish Regan of CBS News hours after the results of the SBI DNA testing was made public by Defense Counsel, Nifong falsely claimed that defense counsel were misrepresenting the results of the SBI Lab's report.

774. A true and accurate copy of the video of Nifong's April 10th CBS interview is digitally embedded below as **ATTACHMENT 20**.

*To activate the embedded video below,*
*left-click on the screen with the Adobe Hand Tool.*



775. Nifong presented David Evans' indictment to the Grand Jury on May 15, 2006. On May 11, 2006, the *Durham Herald Sun* published leaks of false and / or misleading evidence from "several well-placed sources." Those sources made assertions that led a seasoned courthouse reporter to write that the DNA test results (not yet released) included a "fingernail tissue match [that] would offer the first DNA evidence

potentially linking the dancer and an alleged attacker.... the tissue in question was found under one of those nails, the sources said." The sources went further by claiming that the "match" or "consistency" involves the individual who the accuser "was able to identify… with only 90 percent certainty."

776. The article went on to state: "In addition, the sources said a male pubic hair had been linked to the case. But because the hair lacked a root, no identifiable DNA was obtained from it, he said. The only thing that could be determined was whether the hair came from a white man, the sources said. They did not pinpoint where the hair was found. But when police investigate rape cases, they normally comb through the alleged victim's pubic hair to determine whether male hairs are intermingled."

777. The author stated that he would have never published a story like that if he did not have absolute assurances from sources with personal knowledge of the facts that the leaks were credible and complete. He had four separate sources for this information, three of whom were in the District Attorney's office.

778. After the release of this article, virtually every news outlet in the country was reporting that there was a report of "a match" or "consistency" between the lacrosse player who was identified with 90% certainty and genetic material found "under the fingernail of the victim."

## XXXIV. THE SANE CONSPIRACY

779. When Nifong, Himan, and Gottlieb learned on March 28th that there would be no DNA evidence, Nifong had lost the two fundamental elements of proof in his case at once. DNA evidence is not only identification evidence; it is also physical evidence

of sexual contact, if not sexual assault.  Without either, the investigation could not reasonably go forward.  To perpetuate the investigation beyond March 28, 2006, Nifong, Himan, and Gottlieb solved their identification problem by rigging an identification procedure that totally disregarded G.O. 4077.  They solved the physical evidence problem by colluding with Defendant Tara Levicy to fabricate proof of "trauma" where none, in fact, existed.

### A.    Levicy's False Claims of Corroborating Evidence

780.  At the inception of the media firestorm that erupted around Mangum's allegations, Defendant Levicy was at the center.  In the falsified factual sections of the NTID Order that grabbed national headlines, Gottlieb included the gist of what he claimed Levicy reported to him, namely that:

781.  "The victim was treated and evaluated at Duke University Medical Center Emergency Room shortly after the attack took place.  A Forensic Sexual Assault Nurse (SANE) and Physician conducted the examination.  Medical records and interviews that were obtained by a subpoena revealed the victim had signs, symptoms, and injuries consistent with being raped and sexually assaulted vaginally and anally.  Furthermore, the SANE nurse stated the injuries and her behavior were consistent with a traumatic experience."

782.  Defendant Levicy's role in Nifong's public statements about the case became central when Nifong learned that DNA testing would not provide any physical evidence of sexual contact, much less sexual assault.  Nifong learned there would be no DNA evidence to prove sexual contact on March 28, 2006.  Beginning on that day, when

Nifong was asked why he was so certain there had been a rape, he pointed to Tara Levicy and DUMC.  For example:

A.   On March 28, 2006, Nifong told Dan Abrams of MSNBC that he was convinced there was a rape because "[t]here is evidence of trauma in the victim's vaginal area that was noted when she was examined by a nurse at the hospital.  And her general demeanor was suggestive of the fact that she had been through a traumatic situation."

B.   On March 28, 2006, Nifong told Rita Cosby of MSNBC that he believed "that rape did occur… [because] the victim's demeanor and the fact that when she was examined by a nurse who was trained in sexual assault, there was swelling, and pain in the area that would have been affected by the rape.  The victim gave signs of having been through a traumatic situation.  She seemed to be absolutely honest about what had occurred."  Cosby responded "Mr. District Attorney, good luck in tracking down the guys who obviously may have done this horrible thing."   A true and accurate video recording of the relevant segment of the Cosby interview is digitally embedded below as **ATTACHMENT 21**:

*To activate the embedded video below,*
*left-click on the screen with the Adobe Hand Tool.*



C.  On March 29, 2006, Nifong told a reporter for the *Charlotte Observer* that "[t]here were bruises that were consistent with a sexual assault…. There was also behavior that was consistent with having gone through a traumatic experience."

D.  On March 30, 2006, Nifong told a reporter for CBS's nationally televised *The Early Show* that he was convinced a rape occurred because of the medical evidence in the case.  A true and accurate copy of the relevant segment of that interview is digitally embedded as **ATTACHMENT 22**, below:

*To activate the embedded video below,*
*left-click on the screen with the Adobe Hand Tool.*



E.  On April 4, 2006, a reporter for the *Charlotte Observer*, Mark Johnson, was interviewed about the case by Greta Van Susteren.  Based on Nifong's statements to him, Johnson told the national audience "[Mangum] was examined at Duke University Medical Center, which as you know is a top flight hospital. This was a nurse who was trained in dealing with these types of cases and that examination is largely what the district attorney is basing his opinion - - is basing his opinion on when he says that he believes an attack did occur."

783.   Levicy avidly followed the movements of the case in the media and on the internet.  It was plainly obvious from Nifong's statements that he would rely exclusively upon Levicy to "convince" a jury that a rape occurred.

## B.   Theresa Arico Publicly Ratified Levicy's Fabricated SANE Evidence

784.   Immediately after Nifong publicly proclaimed his reliance upon Levicy's putative testimony in the case, Defendant Theresa Arico, Levicy's DUMC supervisor, gave an interview to the *Durham Herald Sun*.  Arico held herself out as "a sexual nurse examiner and coordinator of that program at Duke."  Arico was not present for Mangum's SANE exam, yet she asserted, in her *Durham Herald Sun* interview published on April 1, 2006, "[y]ou can say with a high degree of certainty that there was a certain amount of blunt force trauma present to create injury."  Arico told the reporter that this conclusion was based upon in the SANE nurse's examination with a coloposcope, a device used to magnify minute injuries that are consistent with a sexual assault.  Further, Arico told the reporter from the *Durham Herald Sun*, "I can reasonably say these injuries are consistent with the story she told."

## C.   Levicy Produced Falsified Medical Records to Support her Fabrications

785.   Levicy did not produce significant portions of the SAER until April 5, 2006, weeks after DUMC's March 21, 2006, subpoena and subsequent production of medical records to Gottlieb.  In the intervening time, Levicy re-created those portions of the SAER that were not completed on March 14th after the SAE was abandoned.  On April 5, 2006, Levicy produced the remaining material portions of the SAER to

Himan, including what Levicy claims to be a handwritten transcription of the SANE interview of Mangum, and several pages containing strike-outs and other addenda that do not conform to the facts of the SANE exam, but instead attempted to conform the SANE exam to what Levicy understood to be the evidence at the time. For example:

A.  Levicy falsified the medical record of Mangum's SAE by fabricating a transcript of her interview of Mangum in order to conform the SANE interview to what Gottlieb reported in his sensationalized application for the NTID Order to be Mangum's account of the sexual assault.

B.  Levicy falsified the medical record of Mangum's SAE by revising and annotating Mangum's contemporaneous responses on the pre-printed SAER forms to conform them to the evidence police believed existed at the time. By way of illustration, on one of the late-submitted pages of the SAER, a question asked if any efforts were made to conceal evidence. Levicy's original notation, "no," was struck through, and the (formerly empty) "yes" blank was checked. Further, a handwritten notation near the revision states, "wiped her off with a rag." In this revision Levicy conformed the SAER with the fact a towel containing semen had been seized during the search of 610 N. Buchanan. However, after Levicy submitted this page on April 5th, police and Nifong learned that, although the towel did contain semen matching one of the residents (who was then a suspect), Mangum's DNA was not on the towel.

C.  The next day, on April 6th, Mangum gave her first (and only) written statement in the case. She wrote an account remarkably consistent with the SAER interview transcript Levicy gave Himan the day before. In a move transparently designed to conform her account to the existent evidence of semen found by police in the bathroom, in the case, Mangum writes an "add-on" paragraph at the

end of her statement. The add-on paragraph reads, *in toto*, "I would like to add that Adam ejaculated in my mouth and I spit it out onto the floor, part of it fell onto the floor [scratch out] after he pulled his penis out."

786. The falsifications in the SAER were plainly designed to conceal the fact that Mangum did not report any of the detail that appeared in Gottlieb's application for a NTID Order that was published widely on the internet. In other words, the fabrications were designed to corroborate the sensationalized version of Mangum's account that Gottlieb falsely reported in his factual sections of the application for the NTID Order.

787. Levicy Proffered Falsified Testimony to Perpetuate the Investigation from March 16, 2006 until January 11, 2007.

788. Further, over the course of several meetings and interviews with Nifong, Gottlieb, Himan, and Wilson, Levicy repeatedly proffered false testimony that was clearly designed to fill the chasms in Mangum's case and/or to restore Mangum's glaring credibility problems. For example, in those meetings and interviews with Nifong, Gottlieb, Himan and /or Wilson:

789. Levicy agreed with Nifong, Gottlieb, Himan, and Wilson that she would testify to forensic medical evidence that she did not observe and did not exist, and, in particular that "diffuse edema of the vaginal walls" and objective signs of pain and/or discomfort corroborated Mangum's claims, yet neither symptom existed or was observed by Levicy.

790. Levicy fabricated a forensic medical observation that the SAE revealed evidence of penetrating blunt force trauma. Her supervisor Arico, had already echoed publicly support for this false claim in Arico's on-the-record *Durham Herald Sun* interview,

given the day after the SBI formally notified Nifong that the rape kit had no DNA evidence that would corroborate Mangum's allegations.

791. Levicy, Arico, and DUMC all condoned and ratified Nifong's repeated recitation of the claim of trauma in interviews televised locally and nationally, and in local and national newspapers and magazines. Yet, there was no evidence of blunt force trauma consistent with rape. According to the SAER documentation that Levicy submitted on March 21st, it is plainly obvious that the pelvic exam was abandoned at its inception because Mangum protested Manly's use of a speculum. Penetrating blunt force trauma, if it existed, would be found on Mangum's cervix. Mangum's cervix, however, could not be observed without the aid of (1) a speculum and (2) a coloposcope. The March 21st SAER documents make it clear that the coloposcope was never used in the pelvic exam because Mangum refused the insertion of a speculum.

792. Levicy claimed the speculum could not be inserted because Mangum was in too much pain. If that were true, the pain would be treated, and its source diagnosed. There was no effort to diagnose the source of Mangum's pain, nor was her pain treated. Furthermore, there is no evidence that Dr. Manly requested an E.D. attending physician to examine Mangum to diagnose the source of Mangum's pain and to treat it. Upon information and belief, Dr. Manly, like every other provider at DUMC, could not corroborate Mangum's reports of pain with any symptoms associated with pain.

793. In three separate places, the SAER notes that no condoms were used. Nearly a year after the SAE, Levicy claimed that she felt Mangum could not be sure that condoms

were used.  Throughout Levicy's SAER, Mangum's unequivocal report that no condoms were used is noted again and again.  For example, when asked if condoms were used, the "not sure" blank was not checked in favor of the "no" blank.  Further, in Step 2 of the SAER, the SANE is required to write a "[b]rief account of the assault us[ing] the patient's own words."  In the small space provided, Levicy volunteered, "No condoms used."

794.  After the DNA testing revealed the impossibility that Mangum could have been assaulted vaginally, rectally, and orally by any lacrosse player, Nifong claimed publicly and falsely that he believed condoms were used.  Nothing in science or the human experience suggests that the violent rape Mangum falsely alleged can be perpetrated without leaving so much as a skin cell somewhere—anywhere.  Knowing this, on January 10, 2007, Levicy proffered additional fraudulent testimony that the absence of DNA could be explained by the use of condoms.

795.  Further, Levicy proffered additional fabricated testimony to explain why the SAER is rife with statements indicating "no condoms" were used.  As of January 10, 2007, Levicy's testimony would have been that Mangum, in fact, "wasn't sure."  Levicy explained that no one can ever really be sure whether a condom is used, unless they actually see the condom.

796.  Further, Levicy proffered that she "wasn't surprised when [she] heard no DNA was found because rape is not about passion or ejaculation but about power."  Levicy's statement belied her ignorance of modern DNA testing, particularly Y-STR testing employed in this matter, which does not depend upon an ejaculatory event.  Y-STR

testing has the capacity to detect male-sourced human cells of all kinds, including a skin cell.

797. Further, Levicy proffered testimony calculated to save Mangum's identifications from suppression. One of the factors in the legal analysis for suppression of identification testimony is the ability to attend and to recall (acuity) things at the time in question. The evidence that Mangum was incoherent, if not suffering from psychotic delusion, in the early morning hours of March 14th was significant. Levicy proffered testimony to rebut that evidence. Nearly a year after the SAE, Levicy proffered new testimony claiming Mangum "could always speak articulately" and that she was "very alert." To support that claim, Levicy proffered testimony that Mangum "knew what she was missing (meaning her money, her bag and her phone.)"

798. Levicy proffered the foregoing fabricated testimony on the evening of January 10, 2007. Two days later, Nifong quit the case because of an irreconcilable conflict of interest became known to the Court during the December 15, 2006 hearing.

799. When Levicy learned of Nifong's withdrawal from the case and their conspiracy, and the Attorney General's decision to thoroughly review all of the evidence in a "re-investigation," Levicy attempted her own formal withdrawal from the conspiracy. Levicy called the District Attorney's office within four days of Nifong's withdrawal and advised that she wished to make a "clarification" in her proffered testimony that she had never proffered before. For the first time in the investigation, Levicy stated that she now believed that the absence of any DNA matching a member of the lacrosse team could be explained by the fact that the rape "didn't happen."

## XXXV.   APRIL 10TH —14TH: NIFONG DETERMINES TO INDICT TO WIN ELECTION

### A.   April 10th: Two DNA Labs Reports, No DNA Match

800.   On April 10, 2006, the report of the SBI Lab's testing was produced to Plaintiffs. The SBI results were made public on April 10, 2006. The result of the SBI Lab's testing was stunning in their simplicity. The SBI Lab could not match any lacrosse player with any genetic material in, on or about Mangum's person, her acrylic fingernails, her cell phone, purse, or any of her possessions. No swab or smear in the rape kit matched any one of the members of the lacrosse team. There were two DNA matches found by SBI. The SBI found DNA of one of the residents of 610 N. Buchanan matched the DNA found on his own towel in his home. In addition, the SBI matched another one of the resident's of 610 N. Buchanan the DNA to genetic material found on the floor of his own bathroom.   Crystal Mangum's DNA was not present on the first resident's towel or on the second resident's bathroom floor.

801.   Also on April 10, 2006, the SBI report alone was sufficient to end any rational inquiry into Mangum's allegations. Unbeknownst to Plaintiffs and their defense counsel, on the same day, Nifong, Gottlieb, and Himan received a report of the DNASI Lab's testing in the case. DNASI's Meehan and Clark advised Nifong, Gottlieb, and Himan that its DNASI's Y-plex technology had detected a significant number of male sources of male sperm and epithelial DNA in Mangum's rape kit. Further, Meehan and Clark reported that the Lab had already compared each of the Plaintiffs' DNA with the DNA profiles produced from the unknown male sources of DNA in the rape kit, and had concluded— with 100% scientific certainty— that Plaintiffs and their teammates did not match any of the male DNA found in the rape kit.

802. Meehan's testing pursuant to Judge Stephens' Order was completed, and Meehan had prepared and/or advised Nifong that he was able to prepare a written report of every test conducted in the Lab's testing of Nifong's case (consistent with the requirements of this lab's protocol, as well as the national standards for forensic labs). Nifong declined Meehan's report offer, knowing that a written report would have to be turned over to the Plaintiffs' defense counsel under N.C.G.S. § 15A-282, and Meehan did not insist that he follow his own protocol, the national standards, or those of his accrediting agency. Meehan's decision to acquiesce in Nifong's wish that he not write a report of its test results, did not absolve Nifong of the requirement that he produce a report of the results of all tests conducted with all of the tests conducted by DNASI.

803. Further, on April 10, 2006, the following results of DNASI's testing were made available to Nifong, Gottlieb and Himan:

A. At least five different sources of male DNA were present in swabs from Mangum's rape kit;

B. At least two male sources of DNA were present in the sperm fraction of Stain "A" on Mangum's rape kit panties, and, with 100% scientific certainty, DNASI concluded that Ryan, Matt, and Breck did not match any of those male sources of DNA;

C. At least four male sources of DNA were present in the epithelial fraction of Stain "A" on Mangum's rape kit panties, and, with 100% scientific certainty, DNASI concluded that Ryan, Matt, and Breck did not match any of those male DNA sources of DNA;

D. At least one male source of DNA was present in the sperm fraction of the rectal swab in Mangum's rape kit, and, with 100% scientific certainty, DNASI concluded that Ryan, Matt, and Breck did not match that male source of DNA;

E. At least two male sources of DNA were present in the epithelial fraction of Stain "B" on Mangum's rape kit panties, and, with 100% scientific certainty, DNASI concluded that Ryan, Matt, and Breck did not match any of those male sources of DNA;

F. At least two male sources of DNA were present in the epithelial fraction of Stain "D" on Mangum's rape kit panties, and, with 100% scientific certainty, DNASI concluded that Ryan, Matt, and Breck did not match any of those male sources of DNA; and

G. Plaintiffs' teammates, as well as several of Mangum's known recent sexual partners, did not match any of the male sources of DNA detailed above.

804. In light of the results of the SBI Lab's testing released earlier that day, Mayor Bell told Nifong not to attend a forum scheduled to be held at North Carolina Central University the following day. Nifong promised he would not attend, but the next morning, Nifong and Hodge were present at the NCCU Forum.

## B. April 11, 2006: The NCCU Forum

805. The next morning, Mayor Bell arrived at the NCCU forum and saw that Nifong had broken his promise; he was already there. Nifong's opening remarks appear to be designed to signal a shift in the investigation away from the Duke University Men's Lacrosse Team. For example in his prepared remarks, Nifong said:

"And the thing about DNA is it not it's that it can point the finger to who the guilty people are but it can also tell us who the guilty people are not. And it's important to remember that there are 46 members of the Duke University lacrosse team who were asked to submit to uh giving samples for DNA testing. And only three of those people are alleged to have been involved in the assault. So until we identify all three of those people that means that some of these young men are going to be walking around under a cloud where innocent people are being thought perhaps they're guilty just because of their association. You know part of the job of- of being the District Attorney is not just convicting the guilty; part of the job is freeing the innocent. And we always need to be aware the fact that being associated with a particular group does not acquaint to guilt….The fact is that this case is proceeding the way a case should proceed. I am trying to determine exactly what the evidence is that we have to proceed on and to assemble that evidence before anyone is charged."

806.    Nifong quickly learned that any discussion of looking beyond members of the lacrosse team drew an angry reaction from many of the students and citizens at the NCCU Forum. NCCU Forum participants spoke angrily about the fact that no lacrosse player had been arrested yet; pointing to the fact that rape suspects are typically arrested quickly and often cannot post bail.

807.    Two examples evincing the stigmatization Plaintiffs had already suffered in the community are the public comments of NCCU Forum participants, digitally embedded herein as **ATTACHMENT 23** below:

*To activate the embedded video below,*
*left-click on the screen with the Adobe Hand Tool.*

 

808. By the time the NCCU forum had concluded, Nifong had learned that his failure to arrest and charge any member of the lacrosse team would cost him a substantial portion of the African-American vote in Durham, and with that, his job.

809. Deputy Chief of Police Hodge also appeared at the NCCU Forum on April 11th. When asked by a reporter about the strength of the case in light of the DNA results, Hodge replied, "I don't think we would be here if it wasn't (a strong case)" against the Plaintiffs.

810. At the time Hodge made this statement or soon thereafter, he was the Acting Chief of Police in the unexplained absence of Chalmers.

811. Hodge made these statements with actual knowledge gleaned from his participation in supervising the investigation and in the Duke-Durham Joint Command staff meetings convened to review the evidence and status of the investigation of Mangum's false accusations. By virtue of his status as Deputy or Acting Chief of Police, Hodge knew

that his endorsement of the strength of the case would further stigmatize the Plaintiffs and garner continued public support for the investigation.

### C. April 12, 2006: Nifong Sought Sealed Indictments to Further Stigmatize the Plaintiffs

812. The day after Nifong's angry reception at the NCCU Forum, Nifong prepared a motion requesting a court order sealing the indictments of Collin Finnerty and Reade Seligmann until the Durham Police are able to apprehend and arrest them. A true and accurate copy of the motion and order is digitally annexed hereto as **ATTACHMENT 24**. 

813. Nifong's motion claimed that sealed indictments were required in this case, on the grounds that Seligmann and Finnerty were flight risks. Nifong's actual motive in securing the order sealing the indictments of Seligmann and Finnerty was simply to abuse the indictment process as a means to orchestrate a nationally televised "perp walk," to serve his electoral interest in the mass of outraged voters that he feared he would lose if he did not arrest somebody. Just as Nifong, Gottlieb, and Himan had abused the NTID Order, Nifong, Baker, Gottlieb, and Himan intended to create video footage of Seligmann and Finnerty walking to police cruisers in handcuffs across Duke's campus main campus.

814. After the NCCU Forum, from April 12, 2006 onward, Baker's and Nifong's acts and public statements reveal that, despite being on notice that their acts and those of Duke and Durham Police were continuing violations of Plaintiffs' federally protected rights, they were deliberately indifferent to those violations and the harms that flowed from

them.  For example, knowing that there was no credible evidence that a rape had occurred and clear proof that it did not:

815.  On April 12th at public forum held inside of the Durham County Courthouse, Nifong made several more incendiary public statements.  An example of one extraordinarily inflammatory statement that carried by local, national and international news programs is digitally embedded herein as **ATTACHMENT 25**, below:

*To activate the embedded video below,*
*left-click on the screen with the Adobe Hand Tool.*



### XXXVI. APRIL 14TH:  GOTTLIEB, HIMAN, AND DUKE POLICE CONSPIRE TO FORCE THE WAIVER OF   PLAINTIFFS' AND THEIR TEAMMATES' ASSERTED CONSTITUTIONAL RIGHTS

816.  When Gottlieb informed Himan that Nifong had decided to indict Seligmann and Finnerty, Himan reflexively asked, "with what?"

817.  Himan and Gottlieb both knew that they have very little, if any, evidence that either Collin or Reade were present at the party at the relevant time.  They both feared that they may obtain indictments from the grand jury only to be confronted with evidence that one or both of those young men could immediately prove that they had no

opportunity to commit the brutal gang rape that was alleged. As it happened, they both could, and one did. After Nifong informed Gottlieb and Himan that they would be presenting bills of indictment naming Collin Finnerty and Reade Seligmann in a week's time, Himan and Gottlieb colluded with Duke Police officers to compel several team members to provide the information necessary to place Collin and Reade at 610 N. Buchanan Blvd. at some point on March 13th if not March 14th. The scheme would proceed in two parts, both on the same day: April 13th.

### A. Fraudulent Email Sent Through Breck Archer's Email Account

818. On April 13, 2006, in the mid-morning hours, conspirators whose identities are not as yet known to Plaintiffs sent an email through Breck Archer's "duke.edu" email account. The email stated, "I am going to go to the police tomorrow to tell them everything that I know."

819. Breck never sent the foregoing email to his teammates, nor did he authorize anyone to send any email through his account for any reason.

### B. Gottlieb and Himan, Aided by the Duke Police Department, Enter Dorms to Obtain Information from Represented Lacrosse Players

820. On that evening, April 13th, Duke Police Officers assisted Himan and Gottlieb in gaining access to locked dorms where most of the sophomore team members lived. Their purpose was to interrogate those they found there to develop evidence that Seligmann and Finnerty were actually present at the party before the two would encourage a Grand Jury to indict them. They feared that the already planned indictments of Seligmann and Finnerty would be followed by a defense press

conference revealing that one or both of them were not and could not have been at the party at the relevant time.

821. When the officers finally cornered team members in their dorms, they did not demand to know what happened at the party, or ask for any detail or evidence they may have. Gottlieb and Himan only asked who was (and was not) present at the party.

822. They cornered Michael Young, and coaxed him into his room. Police directed Michael's roommate to leave and close the door, which he did. Young was not given Miranda warnings, and Gottlieb had no warrant to enter Young's room. Under Gottlieb's questioning over the course of an estimated 30 minutes, Young guessed that Collin and Reade were both at the party because he did not see them in the dorms until after midnight. Himan had specifically been told by Young's attorney that he was not to speak with his client. Young had already provided the investigators with evidence that he was in not in attendance at the party on March 13-14[th] held at 610 N. Buchanan.

## C. Duke Facilitated and Condoned the Investigators' Warrantless Entry into the Dorms and the Custodial Interrogation of Represented Team Members

823. Duke Police facilitated Himan's and Gottlieb's entry into one of the dorms, and then left them there to sneak into other dorm buildings.

824. When news broke of the police misconduct at the dorms on April 13th, Defendant Graves quickly and publicly condoned it by issuing the following press release in his official capacity as the Associate Vice President for Campus Safety and Security:

825. "Two Durham police detectives visited a residence hall on the Duke University campus yesterday evening. They were there as part of the ongoing police investigation of the March 13 incident on North Buchanan Boulevard, and they notified the Duke Police Department ahead of time. The purpose of the visit was to conduct interviews. We do not know who they interviewed during the hour and 15 minutes they were in the Edens Residence Hall. Duke reiterates its earlier statements that it is cooperating fully with the police investigation and urges anyone with information pertinent to the events of March 13 to cooperate with the authorities."

826. Consistent with Addison, Gottlieb, and other Defendants in this action, Defendant Graves failed to use the qualifier, "alleged" when referring to the "March 13 incident on North Buchanan Boulevard."

## XXXVII. THE CHAIRMAN'S DIRECTIVE SPAWNED AN "AD HOC" INVESTIGATIVE COMMITTEE TO IMPEACH PLAINTIFFS' CHARACTER AND CREDIBILITY AS PUTATIVE WITNESSES, CRIMINAL DEFENDANTS, AND CIVIL PLAINTIFFS.

827. On the eve of the primary election, the Chairman delivered to Nifong the credibility he needed amid a faltering prosecution to narrowly win the election. He did so through the publication of the University's "Ad Hoc" Committee's report on the history of the Lacrosse Team's "deplorable" conduct.

828. President Brodhead publicly announced the formation of the Ad Hoc Committee on April 5, 2006, the same day Plaintiffs' and their teammates' season was cancelled and their coach resigned.

829. In an interview with WRAL's Kelcey Carlson Brodhead again emphasized that Duke had no power to investigate the criminal allegations but that "enough behavior [was] known and is acknowledged that the day has come…, as the President of this University,… to step up and take some serious steps in response to what is clear in front of us." Brodhead announced the University's intention to investigate the Plaintiffs' and their teammates' past in search of prior bad acts. Whatever "evidence" the investigation produced would be used to impeach Plaintiffs' and their teammates' credibility as witnesses and/or defendants in the criminal prosecutions and the subsequent civil actions they assumed the team members would bring against the University.

830. A true and accurate copy of the relevant segment of that interview is digitally embedded as **ATTACHMENT 26**, below:

*To activate the embedded video below,*
*left-click on the screen with the Adobe Hand Tool.*



831. Like Nifong's prosecution of Plaintiffs, the conclusion of the Committee Chairman, James Coleman, lacked a factual basis.

832. The Committee was charged with investigating the "history" of the lacrosse team's conduct, synthesizing irregularly kept "data" of such conduct, taking formal, public

testimony about the team's conduct, evaluating the evidence and its reliability, and drawing conclusions about the "history of misconduct."

833. Like Nifong's investigation of Plaintiffs, the Chairman gave the Ad Hoc Committee three weeks to compete that work, so that it could be presented in a nationally televised press conference prior to the primary, in order to assure Nifong's election and the continuation of the case to trial and convictions.

834. Like Nifong, Coleman began his investigation on television and radio programs. He explained to NPR, for example, that Duke University had its own Police Department with all the capabilities of any municipal police department; and he intended to use the Duke Police Departments' vast resources to aid him in his investigation.

835. On television and news programs broadcast throughout the state and region, in local papers, including *The Chronicle*, Coleman asked for people with knowledge of Plaintiffs' prior misconduct to come forward to testify before his committee.

836. No one, it turned out, could offer personal knowledge of any incident of misconduct. Those who testified told the Committee of a team that, year after year, is comprised of kind, respectful, young men who take their academic obligations seriously.

837. In the absence of evidence of misconduct, the Chairman directed the manufacture of evidence that would.

838. Defendants Moneta and Bryan provided false and misleading statistics and a body of misleading data for the Committee to use in drawing the preordained public conclusion that Plaintiffs and the members of the men's lacrosse program routinely

engaged in "alarming" conduct, they roamed in "packs," abused alcohol and behaved "deplorabl[y]" when they did.

839. The Committee admitted that it lacked a body of data relating to Duke students generally, and it was therefore not possible to make a meaningful comparison of the lacrosse team to Duke students . Then, inexplicably, the Committee proceeded to make comparative judgments, finding the lacrosse players' conduct to be aberrant when compared to students who do not abuse alcohol, and consistent with the conduct of those Duke students who do abuse alcohol. Notably, no member of the lacrosse team was among the scores of students the University reported as having so abused alcohol that emergency medical intervention was required.

840. Further, the Committee ignored the only body of systematically kept statistics of the nature and frequency of student misconduct; and relied instead upon incidents that allegedly occurred before October of 2004.

841. October 2004 is when the University began systematically recording data of incidents of all alcohol policy violations involving students.

842. Defendants Moneta and Bryan were aware that the Committee was relying upon them to provide accurate, reliable data; and, yet, Moneta and Bryan knowingly provided data to the Committee that were wholly unreliable and could only lead to false and misleading conclusions.

843. Moneta and Bryan did not reveal to the Committee the existence of a more reliable data set in order to induce the Committee to conclude that the lacrosse team members' conduct was out of step with that of comparison groups.

844. Defendant Moneta's and Bryan's conduct was compounded by the testimony of Eddie Hull to the Committee, who oversaw the systematic data collection in the dorms after October of 2004. Hull testified before the Committee, but failed to inform the Committee that the data provided to the committee was not systematically kept, and therefore likely to produce results that bear no relationship to the facts. As a result, the Committee Report is rife with false premises and facially implausible conclusions. By way of example:

A. The Committee claimed that lacrosse team members were responsible for 50% of student noise violations in the period studied. This conclusion depends upon the plainly false premise that there were a total of 4 noise ordinance violations involving Duke Students in the period studied (two of which were issued to members of the lacrosse team).

B. The Committee claimed that 33% of open container violations were issued to lacrosse players. This conclusion depended upon the false premise that there were only 3 open container violations involving students (one of which was a lacrosse player).

C. The Committee Report led reporters to broadcast to local and national audiences that, at Duke University, lacrosse players were responsible for 50% of noise violations and 33% of open container violations.

D. As the members of the Committee and the University knew or should have known, the 7 students charged, arrested, and dragged from their home at 203 Watts in the fall of 2005 accumulated 7 noise violations and 7 open container violations in one day.

E.   Further, the Chairman of a companion committee of the Ad Hoc Committee asked District Two Captain Edward Sarvis if it was possible to get "annual totals of the number of complaints received, number of citations issued, and any breakdown (e.g., noise, property damage) related to off-campus Duke students. Data going back 4-5 years would be great if it is readily available." Sarvis advised the Chairman of a companion committee that all of his reports were forwarded to Defendant Bryan. Sarvis explicitly noted in his reply that the majority of the citations were noise ordinance violations.

845.   A host of favorable statistical conclusions were readily available to the Ad Hoc Committee that it did not report. By way of example, all of the "incidents" allegedly involving lacrosse team members over the five-year period studied by the Committee:

A.   None involved assaults of any kind.

B.   None involved injury to any person.

C.   None involved fights or affrays.

D.   None involved threats of any kind to anyone.


846.   As planned, the Ad Hoc Committee Report was issued three weeks after it was commissioned: the day before the election. Further, two Duke students had already been indicted. Both Seligmann and Finnerty had irrefutable digital alibis. Seligmann released the fundamental elements of his alibi to NBC reporter Dan Abrams who detailed it to a national audience the day after his indictment was made public, well before the Ad Hoc Committee Report was produced. Weeks earlier, Plaintiffs' defense counsel had offered the digital evidence of innocence to Defendant Brodhead or his designee. Plaintiffs' defense counsel's paralegal had prepared a power point

presentation of the alibis and the evidence that gave the lie to the fingernail myth, the injuries myth, and the alias myth. While Defendant Brodhead and the other CMT Defendants "eagerly awaited" the Ad Hoc Committee's Report, they willfully ignored the digital alibis and the photographic evidence that proved Mangum's nails were already off and her injuries were already present during the dance. Brodhead did not even avail himself of the option to have investigators with the Duke Police Department review that evidence.

847.    At the time the CMT Defendants forced the conclusion of the Ad Hoc Committee's investigation, two Duke students had been indicted for a crime that never happened, a third student's indictment was imminent, and the remaining 44 team members were under a continuing public threat of indictment on an accomplice theory. The Ad Hoc Committee Report was unveiled in a press conference attended by virtually every national and local media outlet, which were told extemporaneously by Chairman James Coleman that the "pattern" of behavior of the team members was "deplorable."

848.    There was no evidence to corroborate Mangum's account. The jury would convict or acquit based upon which witnesses they believed were credible. The Ad Hoc Committee Report, coupled with James Coleman's gratuitous remarks at the nationally televised press conference, peremptorily impeached the character and credibility of every defense eyewitness (except Pittman) whose testimony would compete with Mangum's at the trial on her accusations.

849.    Further, the Ad Hoc Committee Report, with scant, if any, evidence, ratified the premises of Gottlieb's sensationalized application for the NTID Order: that the team hung together, roamed in "packs," abused alcohol and behaved deplorably when they

did so.  The Ad Hoc Committee Report aided Nifong, Himan, and Gottlieb in perpetuating the world-wide condemnation of the team, and ratified Defendant Brodhead's statement to the Chamber of Commerce on April 20, 2006: "If they didn't do it, whatever they did was bad enough."  It was nearly a slogan.

850.   The press accounts of the Ad Hoc Committee Report revealed how grossly misleading the Committee Report was.   For example:

A.   On May 1, 2006, NBC reported that the University's report "found that alcohol abuse is a major factor behind [the lacrosse team's] disciplinary problems both on and off campus"

B.   On May 2, 2006, a *New York Times* article opened, "'Deplorable,' said James E. Coleman Jr., describing how team members behaved when they drank excessively."

C.   On May 1, 2006, ESPN reported that the University's report concluded that "the team needed strict monitoring because of a history of problems tied to alcohol."On May 3, the *Raleigh News & Observer* wrote that "a large number of the members of the team have been socially irresponsible when under the influence of alcohol."

D.   Early in May, the *Durham Herald Sun* wrote an editorial entitled "Alcohol Abuse and Rape Related."

851.   Defendant Burness delivered an advance copy of the Ad Hoc Committee Report to City of Durham Defendants so they could prepare statements for the press conferences.  Burness did not send a copy of the Ad Hoc Committee Report—in

advance or after its release—to the Plaintiffs, their teammates, or their defense counsel.

852. The myth of Plaintiffs and their teammates as out-of-control, aberrant, abusers of alcohol, with a history of "deplorable" behavior persists up to the present day, as does the belief that the alleged incident at 610 N. Buchanan Blvd. represents a microcosm Duke in Durham. By way of example:

A. In a lecture in Williamstown, Massachusetts, during the Spring of 2007, then Duke Professor Grant Farred stated: "The Duke lacrosse program is indicted here not for what it did, on the night of the 13th of March, 2006, or for what its members did not do that night, but for its past behavior, a blemished past made even uglier." Farred added that "[t]he history of the lacrosse team is the history of being inhospitable....At the heart of the lacrosse team's behavior is the racist history of the South." Farred's lecture was promoted with a poster capturing Plaintiffs running behind yellow and black "crime scene" tape. The poster digitally annexed hereto as **ATTACHMENT 27**.

B. On October 26, 2007, WGHB's *Greater Boston* host Ellen Rooney declared that "We don't know what happened in the Duke case. We never will....Something happened."

XXXVIII.    THE CHAIRMAN'S CMT DIRECTED THE UNIVERSITY TO VIOLATE FEDERAL BANKING AND EDUCATIONAL PRIVACY LAWS IN FURTHERANCE OF CONSPIRACY TO CONVICT PLAINTIFFS

853. In response to the police declaration of a "stalemate" in their investigation due to a lack of evidence to support the charges or even to establish the whereabouts of lacrosse team members at the relevant time, Duke University employees, pursuant to

Chairman Steel's directive, accessed Plaintiffs' federally protected financial records and produced to Durham Police complete, unredacted reports of all activity in Plaintiffs' Duke-issued transaction card accounts between March 13 and March 14, 2006.

854. The Plaintiffs' transaction reports are financial records protected by, *inter alia*, federal banking laws.

855. No warrant was obtained to authorize Duke University's access to or disclosure of Plaintiffs' transaction records; no request was made of Plaintiffs or their defense counsel to voluntarily provide their transaction card records; and the University gave no notice—before or after the disclosure—to Plaintiffs or their defense counsel that University employees would invade and produce to police their private financial records.

856. Plaintiffs had a reasonable expectation that private financial records entrusted to the University would not be invaded or disclosed without their authorization, a court order or even after-the-fact notice of the disclosure.

857. Pursuant to the Chairman's Directive, on March 31, 2006 at 3:00 p.m., Duke Police Officers Smith and Stotsenberg delivered Plaintiffs' financial records to Sgt. Gottlieb. Gottlieb retained and used them in his effort to ensure that, in the planned identification procedure on April 4, 2006, Mangum would select three team members whose transaction records were not inconsistent with having been present at the party at the relevant time.

858. Gottlieb did not give the transaction reports to Himan until April 4, 2006, after Mangum's identification procedures were concluded. At some point thereafter, but prior to the convening of the Grand Jury on April 17, 2006, Himan gave a copy of the transaction reports to Nifong.

859. Gottlieb and Nifong confessed in sworn testimony that they believed the Duke transaction card reports were necessary to indicting anyone, since they lacked any other reliable means of proving "opportunity" and moreover, they all feared that they would indict someone who could prove he was on an airplane bound for interviews in New York at the relevant time.

860. The Chairman, Brodhead, Trask, Moneta, Dawkins, Graves, Dean, and others were advised by Baker, Nifong, Gottlieb, and Himan, at the March 29th Joint Command Meeting and in other venues, that the DNA evidence would not link any lacrosse player to Crystal Mangum or any form of sexual assault, and that Plaintiffs would not be charged, tried, or convicted unless they had some evidence that Plaintiffs were at the party.

861. Pursuant to the Chairman's Directive, Duke Police Investigators Smith and Stotsenberg, Matthew Drummond, Senior Manager IT in Auxiliary Services and Head of the University's Duke Card Office, and Kemel Dawkins, Vice President for Campus Services, among other Duke University employees acted individually and in concert, invaded, copied, and produced Plaintiffs' confidential Duke Card accounts and records to Gottlieb, Himan, and Nifong.

862. Like the University's unauthorized and secret disclosure of producing email accounts, photographs, and other confidential information and accounts, the moving force behind this invasion and disclosure was the Chairman's Directive to facilitate the indictment, trial, and/or conviction of the Plaintiffs because that was "best for Duke."

863. On May 31, 2006, Nifong issued subpoenas directed to Duke University's Duke Card Office ordering production of the Duke Card Transaction Reports for every member of the team. Of course, Nifong had received the reports two months earlier, and Gottlieb and Himan used them as evidence to indict Collin and Reade. The three were playing out an orchestrated charade to launder the Duke Card evidence that they obtained illegally.

864. Duke University sent a notice to Plaintiffs and their teammates indicating that the subpoenas had been issued, and the protected materials would be produced pursuant to the subpoenas unless they obtained a court order quashing the subpoenas. The notice did not disclose that all of their Duke Card reports covering at least the same time period had already been produced to the State by Duke Police Officers.

865. Plaintiffs retained counsel to file Motions to Quash Nifong's Subpoenas on their behalf. They believed the University's false statement that the records would not be disclosed to the State if they obtained a court order quashing the subpoenas directed to their records. Defendants Nifong, Himan, Gottlieb, Smith, Stotsenberg, Drummond, and Dawkins, among other Duke University employees, all knew that Duke University had previously produced to the State the same Duke Card transaction reports that were sought in the subpoena, and that the subpoena was a fraud. When the Plaintiffs filed their Motions to Quash Nifong's Subpoena, none of them notified

Plaintiffs that Duke University had released the information to Nifong two months earlier.

866. The written Motion to Quash Nifong's Subpoena emphasized Nifong's failure to state any factual basis to establish that Nifong needed the information for some legitimate investigative or judicial purpose. Defendants Nifong, Himan, Gottlieb, Smith, Stotsenberg, Drummond, and Dawkins, among others, all knew that Nifong, Gottlieb, and Himan had unlawfully obtained the subpoenaed Duke Card transaction reports from Duke University previously. None of them notified Plaintiffs, their defense counsel or the court, in fact, Nifong could not show his need for the federally protected information because Duke University had already released it to him, in violation of federal laws.

867. On July 17, 2006, a hearing was held on Plaintiffs' and their teammates' Motions to Quash the Subpoena. The hearing was televised. Himan was present for the entire proceeding. Nifong, Himan, Gottlieb, Smith, Stotsenberg, Drummond, and Dawkins, among others, all knew that Nifong, Gottlieb, and Himan had unlawfully obtained the subpoenaed Duke Card Transaction Reports from Duke University previously. They were all aware of the subpoenas, Plaintiffs' Motions to Quash and the hearing on the motion. Himan (who used them to secure Grand Jury Indictments) was present at the prosecution's table for the entire hearing, and said nothing to Plaintiffs' defense counsel or the Court about the fact that he already had the contested reports and had given them to Nifong, who was strenuously arguing against the motion to quash.

868. At argument on the motion, Nifong only railed against the Plaintiffs, their teammates, and their defense counsel, who were, according to Nifong, "the same attorneys that

tell their clients not to talk with the investigators who are looking into this matter. …
We have history here of the students not speaking to investigators looking into this on
the advice of counsel."

869. The trial court granted Plaintiffs' Motion to Quash Nifong's Subpoena on the basis
that the Duke Card Transaction Reports were FERPA protected educational records
for which the State could not demonstrate a sufficient, legitimate need.

870. For months after, Nifong, Himan, Gottlieb, Smith, Stotsenberg, Drummond, and
Dawkins, among others, all knew that Nifong, Gottlieb, and Himan had unlawfully
obtained the subpoenaed Duke Card transaction reports from Duke University
previously, yet did not notify the Plaintiffs or their defense counsel that the
educational records that the trial court's Order protected from disclosure had already
been produced to Nifong, Himan, and Gottlieb by Duke University, long before the
subpoenas were issued.  It was not until Plaintiffs' defense counsel's office noticed a
suspicious entry in Gottlieb's belatedly written "Supplemental Report" that Plaintiffs'
defense counsel made an inquiry with the University, and the University confirmed
that it had released the Plaintiffs' Duke Card reports to Himan, Gottlieb, and Nifong
two months before Nifong issued his ill-fated, post-indictment subpoenas to the
University seeking federally protected educational records the University provided to
him prior to indictments.

871. Nifong persisted at the Hearing in July that "[t]here was nothing secretive, there was
nothing underhanded, there was nothing suggestive about the subpoena other than the
fact that we may need to have some of these young men as witnesses."  A true and

accurate copy of the video of Nifong's remarks to the Court is digitally embedded as

**ATTACHMENT 28**, below:

*To activate the embedded video below,*
*left-click on the screen with the Adobe Hand Tool.*



**XXXIX.    THE CHAIRMAN AND THE DUKE CMT DEFENDANTS
DIRECTED UNIVERSITY'S VIOLATIONS OF FEDERAL
ELECTIONS LAWS IN FURTHERANCE OF THE CONSPIRACY
TO CONVICT PLAINTIFFS**

872.    Nifong openly claimed that the Attorney General's office would get control of the

continuing investigation and prosecution of the Duke lacrosse team if one of two

things happened: (1) he lost the election in November, or (2) "they pry it from [his]

cold dead hands."  Nifong didn't count on the third way.

873.    It was plainly obvious that if Nifong lost the election, the continuing conspiracy to

perpetuate the investigation and prosecutions based on Mangum's false accusations

would fail.

## A.      Plaintiffs' Voter Registration Campaign

874.   Plaintiffs and their teammates undertook to register new voters who were registered to vote in other states but were eligible to transfer their registration to North Carolina for purposes of voting in the November 2006 general election for federal and state offices.  Some of their efforts were individual efforts; others were coordinated through a new organization named Students for an Ethical Durham ("S.E.D."), registered as a Political Action Committee ("PAC") under the shortened name: "Ethical Durham."

875.   Plaintiffs and their fellow students in the effort believed that a recall Nifong vote would come from those who, like them, were perceived to be citizens of other states, and were subjected to police harassment, including but not limited to the disproportionate enforcement of the criminal laws.  The effort began in the summer and was to culminate in a large registration effort at the Duke Homecoming gatherings on campus, particularly in and around the football stadium.

876.   In furtherance of the objective of the CMT Defendants and Nifong, among others, to force a trial on Mangum's allegations, the CMT Defendants directed University Officials, Administrators and/or staff to force the Plaintiffs and their teammates to shut down the registration effort during the Homecoming game.

877.   The voter registration efforts were done in a deliberately non-partisan way, they carried with them no partisan insignia, slogan, badge, sign, symbol, or emblem of any kind.  The slogan they handwrote on T-shirts for the Homecoming registration effort was simply, "Voice Your Choice!"

878. Duke University regularly held open its campus for registration efforts, often allowing tables to be set up for that purpose. In the weeks before the Homecoming game, Duke Officials allowed a registration table to be set up on one of Duke's main arteries: the walkway connecting the Bryan Center to the Main Quad. Volunteers were permitted to encourage and assist passersby who wished to register as North Carolina voters for the upcoming State and Federal elections.

879. Similarly, Duke University allowed a group of student volunteers to register voters from a table stationed in the campout site of the Graduate Student Basketball Ticket Campout Weekend in the University's Blue Zone parking lot on September 16, 2006.

880. Beginning on September 17, 2006, S.E.D. representatives contacted the appropriate Duke Administrators to request permission to register voters in the "Voice Your Choice" campaign at a voter registration table inside Wallace Wade stadium during Duke Football's Homecoming Game on September 30, 2006. There would not be another opportunity to register voters at a Saturday football game before the deadline for registrations. S.E.D.'s request was denied, upon information and belief, by Members of the CMT Defendants and/or Duke Officials Defendants. A similar request to register voters inside the stadium, but without a table, was denied on the same rationale. The Duke Administrator who conveyed the CMT Defendants' rejection of S.E.D. stated that the CMT Defendants were rejecting the requests for "PR" reasons.

881. The students responded to these rejections with grace, saying they disagreed with the judgment, would honor the Administration's refusal, and notified Administration that the students would simply continue to register as they had done, offering passersby on

their own campus an opportunity to register to vote, without a centralized table or designated location.

882. On the morning of the Homecoming game, Plaintiffs and their fellow students met at the Murray Building. Wearing their shirts that read "Voice Your Choice," they collected clipboards and a stack of registration cards.

883. The students left the Murray building in waves of two and three at a time, and proceeded to their designated registration area. Within ten minutes, one of the groups—all members of the lacrosse team—had walked to the edge of the Blue Zone parking lot when they were stopped and detained by two men in a golf cart: a University Administrator and a uniformed Duke Police Officer.

884. The University's agents demanded that the students cease and desist the registration activity they had not yet started. Under the clearly implied threat of University and criminal punishment, the students abandoned their registration materials. Next, the University's agents forced the team members to take off their shirts that read "Voice Your Choice." One student said he did not want to walk home without a shirt on, and the Consortium Agents allowed him to wear his shirt—but only if he turned it inside out.

885. The same scenario played out with the students who had not even made it out of the Murray Building with their registration cards and clipboards. Other University agents found the students there preparing to go to their designated spot on campus. The Consortium Agents sealed off the only means of exiting the Murray Building and commanded the students to put their registration materials and their "Voice Your

Choice" shirts in their lockers. The Agents physically blocked the doors, and warned the students they would not be allowed to leave with registration materials in their hands—or their "Voice Your Choice"—shirts on their backs.

886. The Agents inside Murray told the students that he was in direct contact with "his bosses" who were meeting at the time and monitoring his actions. According to the Agent inside Murray, the decision to shut down the registration effort was made at the "highest levels" of the University's governing structure. Upon information and belief, the "bosses" referred to were among the CMT Defendants and Steel, and the meetings referred to were Board of Trustees meetings.

887. Fearing the consequences of violating the clear command to abandon their plans to register voters, and believing that there was no way out of Murray unless they did, the students abandoned their registration cards, their Voice Your Choice shirts, and their planned registration activities Homecoming weekend.

### B. The Chairman Participated in the University's Cover-Up of its Federal Election Law Violations

888. On October 27, 2006, *The Chronicle*, reported an on-the-record interview of Defendant Burness, the University's Official Spokesperson, in an article addressing the University's interference with Plaintiffs' and their fellow students' voter registration efforts. Burness truthfully claimed that a University investigation was conducted, but then falsified its findings. Burness claimed that the investigation revealed that the University shut down the student's voter registration efforts because the student registrants did not request permission until the eve of the event. Burness knew that, in fact, the investigation confirmed that the student organizers were

seeking permission for the registration drive weeks in advance, were denied permission for "PR" reasons, and that there was no legitimate basis for interfering with Plaintiffs' registration effort during the Homecoming events in any location. Further, the investigation confirmed the students' account that the "spoiler" candidate for District Attorney, Steve Monks, was given the University's permission to actively register voters—wearing partisan insignia—inside of the stadium during the Homecoming game.

889. At the time the University's CMT quashed Plaintiffs' voter registration efforts, the election was a statistical dead heat in a two-way race, with a "spoiler" write-in candidate siphoning off votes from the challenger, Lewis Cheek. The University allowed the write-in, "spoiler" candidate (Steve Monks) to conduct highly visible campaign activities inside of the stadium during the homecoming game. Nifong won the election with less than a majority of votes. The difference was the spoiler candidate.

XL.     THE CITY OF DURHAM AND DUKE UNIVERSITY FORMALLY AND PUBLICLY RATIFIED THEIR OFFICERS AND EMPLOYEES CONDUCT

890. Durham and Duke both conducted investigations of their employees conduct during the investigation; both investigations produced formal written reports detailing their findings. Both Duke University's investigative report and the City of Durham's investigative report found no wrongdoing on the part of the officials who directed their respective entities actions in the affair; condoned and ratified the ongoing violations of Plaintiffs' federally protected rights. Both reports found no fault with

the conduct of the officers and employees most intimately involved in the case. Both reports praised with particularity the individuals who directed and participated in the plainly obvious violations of Plaintiffs' rights. Both reports unequivocally condoned and ratified the conduct of employees and officers who participated in the ongoing violations of Plaintiffs' rights.

891. Further, the investigation reports conducted by Duke University and the City of Durham placed the blame upon individuals who acted to protect the rights of the students and stood in the way of the framing of Plaintiffs and their teammates. The City's report blamed defense attorneys, citing, among other things, their refusal to instruct their clients to submit to police interrogation. The University also concluded that defense attorneys were to blame, but directed its most forceful attack toward Officer Day. Officer Day's fault lay in his memorialization of the fact that every Durham Police Officer who interacted with Mangum in the early morning hours of March 14th had concluded that Mangum was lying.

892. Since then, Duke University, in particular, has continued its campaign to protect the "Duke Brand." The campaign is entirely a public relations campaign conducted through the local and national media. The University's officials continue—to the present day—to implement the PR strategy adopted in the earliest days of the case. The strategy, at its core, is to disparage Plaintiffs, their teammates, and their former coach. They continue to employ many of the same "talking points" developed for the University by its public relations and legal consultants.

893. The purpose of Duke University's press strategy is the same as it was when Duke University officials became convinced that the Plaintiffs were innocent in late March

of 2006.  Specifically, to protect the University against civil liability for the University's officers' wrongful conduct in this affair.  The strategy involves an unrelenting effort to impeach the Plaintiffs' character through "anonymous" and "not-for-attribution" with the purpose of dissuading Plaintiffs from bringing a civil action against the University, and/or depriving Plaintiffs of a fair jury trial in any civil action they brought against Duke University.

894.  Because the strategy has not changed, the talking points have remained the same.  For example, in July of 2007, Duke University's chief spokesman, John Burness, gave a speech at a convention hosted by Duke University, for which the University charged attendees hundreds of dollars.  In his speech at the convention, Burness claimed that the University had no choice but to fire Coach Pressler, forfeit the games and ultimately cancel the season.  He explained those decisions in June of 2007 in precisely the same way that he explained them to a *Sports Illustrated* reporter in the early weeks of the criminal case:  He falsely accused the Plaintiffs and their teammates of habitual, gross misconduct over the course of years, and then rhetorically asked, "Do you think Coach K would put up with this sh*t for five seconds?"

895.  In his speech, Burness confesses that he was the source for the *Sports Illustrated* writer's damning quote from an "anonymous" source close to the University administration.

896.  Burness's public comments, then and now, are in furtherance of the Chairman's Directive  to obstruct justice by perpetuating the false claims that stigmatized the Plaintiffs with the conscious purpose of intimidating and otherwise dissuading

Plaintiffs from petitioning the courts for civil redress of the wrongs they suffered at the hands of the Chairman and his co-defendants in this action.

## XLI. NIFONG HAS BEEN PROFESSIONALY REBUKED, DISBARRED, CONVICTED AND INCARCERATED FOR HIS ACTS IN FURTHERANCE OF THE CONSPIRACIES ALLEGED HERE

### A. North Carolina's Attorney General Professionally AACondemned Nifong's Acts in Furtherance of the Conspiracies Alleged Herein

897. North Carolina's top prosecutor—the State's Attorney General—condemned Nifong and his co-conspirators for their "tragic rush to accuse" and their "failure to verify serious allegations."

898. The Attorney General specifically reported that Nifong, Himan, and the Himan Chain of Command failed to do the obvious: they all conspicuously failed to confront Mangum with her own contradictory prior statements, and they all conspicuously failed to confront Mangum with geometrically expanding body of contradictory physical, testimonial and digital evidence.

899. The Attorney General also found that Nifong, Gottlieb, Himan, the Himan Chain of Command, and other Defendants in this action failed to make a serious assessment of Mangum's credibility, particularly because they were aware of those contradictions, as well as the cumulative effect of Mangum's abuse of alcohol, abuse of prescription drugs, and her significant psychiatric history.

900. On June 5, 2006, Deputy Chief /Acting Chief Hodge told a public forum of Durham citizens "I don't recall that the Durham Police Department has been involved in something where we made major mistakes in the last five years."

**B.** **The State Bar of North Carolina Disbarred Nifong**

901. Nifong was disbarred largely because of his participation in the stigmatization of the Plaintiffs during the pre-indictment period, beginning on or before March 24th. The Bar concluded that nothing short of disbarment would be sufficient to restore the public's faith in the profession and our system of justice. As alleged herein, Nifong did not participate in the public vilification of the Plaintiffs alone; the Chairman's Directive leveraged the University's prestige in Nifong's effort, and the University President, Provost, and spokesman publicly signaled to the public the rightness of Nifong's rhetoric. While Nifong, Addison, Michael, and Hodge publicly claimed the Plaintiffs and their teammates violently raped an African-American mother of two; Duke was cascading the false message that Plaintiffs were capable of it; and Burness was telling reporters that what they actually did was worse than that. The Chairman, Brodhead, and Burness are, more than any other participant, the *sine qua non* of ordeal.

**C.** **The State Judiciary Charged, Tried, Convicted, and Incarcerated Nifong for his Acts in Furtherance of the DNA Conspiracy**

902. On August 31, 2007, the Honorable Osmond W. Smith, III convicted Nifong of criminal contempt for acts that were in furtherance of the DNA conspiracies alleged herein; specifically, his September 22, 2006, false and misleading representations to the Court that no one had made any statements to him relating to the DNA evidence beyond was included published in the May 12, DNASI report. This was, of course, an unlawful act in furtherance of the unlawful DNA conspiracies. At the time, Nifong had, for almost six months, conspired with Meehan, Clark, DNASI, Gottlieb, Himan,

and others to conceal from the Plaintiffs the exonerating DNA evidence they were required to produce to Plaintiffs immediately.

903. Judge Smith acknowledged the impotence of the Court's broach contempt powers given the enormity of what Nifong and his co-Defendants have done, saying, "[i]f what I impose, with regard to Mr. Nifong, would make things better or different for what's already happened, I don't know what it would be or how I could do it."

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION:
### SEARCH AND SEIZURE IN VIOLATION OF 42 U.S.C. § 1983 & CONSPIRACY

*(Against Nifong in his Individual Capacity and Official Capacity with respect to the City of Durham; Gottlieb, Himan, Levicy, Arico, in Their Individual and Official Capacities, the City of Durham, DUHS and Duke University)*

904.  Plaintiffs incorporate the preceding allegations by reference here.

905.  Nifong, Gottlieb, Himan, Levicy, Arico, the City of Durham, DUHS, and Duke University are "persons" for purposes of 42 U.S.C. § 1983, and, at all times relevant to this cause of action, acted under color of state law.

906.  At all relevant times, Arico, Manly, and Dzau shared final policymaking authority with respect to the records contained in Mangum's SAER.

907.  Gottlieb, Himan, Levicy, and Arico, acting individually and in concert, caused legal process directed to the Plaintiffs to be issued in the form of a Nontestimonial Identification Order ("NTID Order"), pursuant to N.C.G.S. § 15A-271 *et seq*., on March 23, 2006.

908.  The NTID Order compelled the Plaintiffs to surrender themselves to the Durham Police and submit to cheek swabbings to obtain DNA samples, to submit to "mug shot" photographing of their fact, and to disrobe for purposes of close physical inspection and photographing of their bodies. The Plaintiffs were thereby seized and searched for Fourth and Fourteenth Amendment purposes.

909. At the time Gottlieb, Himan, Gottlieb and Nifong agreed to seek the NTID Order from the Court, (1) probable cause did not exist to believe that any of the offenses listed in the NTID Order had been committed; (2) reasonable grounds did not exist to suspect that the Plaintiffs committed any such offense; and (3) the results of the specific NTID procedures contemplated would not be of material aid in determining that Ryan, Matt, or Breck committed any of the listed offenses.

910. Nifong, Gottlieb and Himan knew that the requisite grounds did not exist to justify the NTID Order authorizing Plaintiffs' search and seizure; therefore they conspired to and did fabricate a false affidavit that would be facially sufficient to obtain the NTID Order.

911. The fabricated statements were all material to the judicial determination to issue the NTID Order directed to Plaintiffs; in their absence, the Order would not have issued.

912. No reasonable officer would have believed that the facts as they actually existed provided sufficient grounds for the NTID Order directed to Plaintiffs.

913. To cover-up the conspiracy to falsify the NTID Affidavit, Levicy, Manly, Arico, Dzau, DUHS, and Duke University agreed to act in concert with Nifong, Gottlieb, and Himan by falsifying Mangum's SAER to harmonize it with the fabricated NTID Affidavit, and, subsequently, further falsified the SAER to harmonize it with Mangum's written statement and evidence they hoped would emerge from the DNA testing.

914. As a result of the concerted conduct of these Defendants, the NTID Affidavit's material assertions of fact were all fabricated, and Plaintiffs were seized and searched in violation of their Fourth and Fourteenth Amendment rights.

915. Further, Stotsenberg, Smith, at the direction of Graves and Dean, pried into and searched through Plaintiffs' private, password protected email accounts, their private banking records, their private educational records, among other things, all without issuance of any notice, subpoena or warrant, or other legal process, and in the absence of probable cause or reasonable suspicion. They compounded these violations of Plaintiffs' constitutional rights by aiding Gottlieb and the Himan Chain of Command in identifying and delivering to them any privately kept material that would increase the likelihood of Plaintiffs' conviction and/ or subject Plaintiffs to further public humiliation, outrage, infamy, and stigmatization.

916. As a result of the Defendants' conduct, Plaintiffs were deprived of their Fourth and Fourteenth Amendment rights.

917. As a direct and foreseeable consequence of these deprivations, Plaintiffs have suffered loss of education, loss of privacy, loss of property, loss of liberty, physical harm, emotional trauma, and irreparable harm to their reputations, and economic loss, including but not limited to the costs of retaining counsel, forensic experts, investigators and others in order to defend themselves against the false claims and fabrication of evidence throughout the 13-month police investigation of Mangum's claims, as both witnesses and putative defendants in a subsequent prosecution as 'accomplices' to the same crimes.

## SECOND CAUSE OF ACTION:

## SEARCH AND SEIZURE IN VIOLATION OF 42 U.S.C. § 1983 & CONSPIRACY

*(Against Nifong, Gottlieb, Himan, Levicy, Arico, Stotsenberg, Smith, the
Day Chain of Command, In Their Individual And Official Capacities)*

918.    Plaintiffs incorporate the preceding allegations by reference here.

919.    Nifong, Gottlieb, and Himan, Levicy, Arico, and DUHS are "persons" for purposes of
42 U.S.C. § 1983, and, at all times relevant to this cause of action, acted under color
of state law.

920.    Gottlieb, Himan and Nifong, Levicy, and Arico acting individually and in concert,
initiated legal process directed at McFadyen in the form of a Search Warrant
Application ("Search Warrant"), pursuant to N.C.G.S. § 15A-241 *et seq.,* on March
27, 2006.

921.    The Warrant authorized Gottlieb and Himan to execute a search of Plaintiffs dwelling
and his vehicle, and pursuant to the warrant, McFadyen's constitutionally protected
places, things and effects were seized and searched, within the meaning of the Fourth
and Fourteenth Amendments, by Himan, Gottlieb,  and agents of the Forensics Unit.

922.    Duke Police Sgt. Smith stood-by, outside the door of McFadyen's dorm room
throughout the entire search and took no affirmative acts to intervene, aware that there
was no probable cause to believe the crimes alleged had been committed, much less
that McFadyen had committed them.

923.    At the time Gottlieb, Himan, Gottlieb and Nifong agreed to seek the Warrant from the
Court, probable cause did not exist to support it.

924. Nifong, Gottlieb and Himan knew that the requisite grounds did not exist to justify the Warrant authorizing the search and seizure of McFadyen's room or vehicle; therefore, they conspired to fabricate and did fabricate a false affidavit that would be facially sufficient to obtain the Warrant.

925. In furtherance of that conspiracy, Levicy and Arico agreed to act in concert with Nifong, Gottlieb and Himan by, among other things, providing and/or ratifying the false claims relating to the forensic medical evidence obtained in the SAE that Levicy and Arico falsely claimed was conducted by Levicy.

926. As a result of the concerted conduct of these Defendants, the Warrant's material factual assertions were all fabrications, and, in the absence of the fabricated factual assertions, the Search Warrant would not have issued.

927. As a result of the Defendants' conduct, McFadyen was subjected to an unconstitutional search and seizure in deprivation of his Fourth and Fourteenth Amendment rights.

928. As a direct and foreseeable consequence of the deprivation of Plaintiffs' Fourth Amendment rights, McFadyen suffered the loss of education, loss of privacy, loss of property, loss of liberty, physical harm, humiliation, public condemnation, emotional trauma, irreparable harm to their reputations, and economic loss, including but not limited to the costs of retaining counsel, forensic experts, investigators and other professionals reasonably necessary to prove his innocence and retain his status as a student over the course of a 13-month police effort to obtain convictions of Plaintiffs

and their teammates as principals or accomplices to a rape and sexual assault that never happened.

## THIRD CAUSE OF ACTION:
## ABUSE OF PROCESS AND CONSPIRACY IN VIOLATION OF 42 U.S.C. § 1983

*(Against Gottlieb, Himan, Levicy, and Arico, in their individual and official capacities; Nifong in his individual capacity and his official capacity viz. the City of Durham; The Chairman, Dzau, DUHS, and Duke University)*

929.   All of the foregoing allegations are incorporated here by reference.

930.   Nifong, Gottlieb, Himan, Levicy and Arico, individually and in concert, obtained the NTID Order and McFadyen Search Warrant, subjecting Plaintiffs to unconstitutional searches and seizures, through an extortionate perversion of legal process unrelated to the purposes for which NTID Orders or Search Warrants were intended.   For example, the Defendants conspired to obtain the NTID Order and Search Warrant for the unauthorized purposes of:

A.   Stigmatizing Plaintiffs in their local community and in the eyes of millions of people around the world;

B.   Generating and then galvanizing the public condemnation of Plaintiffs;

C.   Retaliating against Plaintiffs for asserting their constitutional rights; and

D.   Subjecting Plaintiffs to extortionate pressures that naturally flow from public outrage and infamy with the intent to coerce Plaintiffs to abandon their asserted constitutional rights and provide false information that Himan, Gottlieb and Nifong could use to wrongfully convict Plaintiffs and their teammates for crimes that did not happen.

931. With those extortionate purposes in mind, the Defendants, acting individually and in concert, fabricated a false and incendiary Affidavit in order to secure an NTID Order directed to Plaintiffs (and, later, a Search Warrant directed to Ryan McFadyen). They then leaked the NTID Order and Affidavit to the press in advance of the time the Plaintiffs were compelled to submit to the Forensics Unit to publicly stigmatize them.

932. As designed, representatives of the media were present at the Forensics Unit to take video footage and photographs of the Plaintiffs as they surrendered themselves to the Durham Police Department, as directed by the NTID Order.

933. As designed, while Plaintiffs were submitting to the NTID procedures, local and national news programs began reporting that "the 46 white members of the Duke Lacrosse Team" stood accused of committing a brutal, horrific, racially motivated gang rape of an African-American woman, and that a Judge had found there were reasonable grounds to believe the accusations.

934. By virtue of these Defendants' abuse of the NTID Order and Search Warrant processes, Plaintiffs were stigmatized in the eyes of their local community and millions of people around the world via every licensed news organization in this country, for months.

935. By design, the Defendants used the NTID Order and Search Warrant processes for the unauthorized purpose of subjecting Plaintiffs to extortionate pressures and extraordinary humiliation, fear, shame and distress.

936. Further, for purposes of continuing the Plaintiffs' stigmatization indefinitely, these Defendants conspired to conceal from the public the fact that the NTID and Search

Warrant Affidavits' allegations were fabricated, and, in furtherance of this conspiracy, Nifong, Gottlieb, Himan, Levicy, and Gottlieb repeatedly ratified, verified, and/or manufactured evidence to support the sensationalized false statements made in the NTID and Search Warrant Affidavits.

937. Upon information and belief, the Chairman's Directive and Dzau's enforcement of it was the moving force behind the subsequent ratifications and verifications made by Levicy and Arico.

938. The conduct of Nifong, Gottlieb, Himan, Clayton, Levicy, Arico, DUHS, and Duke University were malicious and evinced a callous disregard for and deliberate indifference to Plaintiffs' constitutional rights.

939. As a result of the wrongful application for an NTID Order and Search Warrant directed to Plaintiffs, the Plaintiffs were seized, detained and searched without probable cause or reasonable suspicion in deprivation of their rights guaranteed by Article IV of the United States Constitution and the First, Fourth, and Fourteenth Amendments thereto.

940. As a direct and foreseeable consequence of these deprivations, Plaintiffs have suffered loss of education, loss of privacy, loss of property, loss of liberty, physical harm, emotional trauma, and irreparable harm to their reputations, and economic loss, including but not limited to the costs of retaining counsel, forensic experts, investigators and others in order to defend themselves against the false claims and fabrication of evidence throughout the 13-month police investigation of Mangum's

claims, as both witnesses and putative defendants in a subsequent prosecution as 'accomplices' to the same crimes.

## FOURTH CAUSE OF ACTION:
## DEPRIVATION OF PROPERTY IN VIOLATION OF 42 U.S.C. § 1983

*(Against Nifong, Gottlieb, Himan, Clayton, Meehan, and Clark in their individual capacities; DNASI and the City of Durham)*

941.    Plaintiffs incorporate the preceding allegations by reference here.

942.    Nifong, Gottlieb, Himan, and Clayton are "persons" for purposes of 42 U.S.C. § 1983, and, at all times relevant to this cause of action, acted under color of state law.

943.    Plaintiffs are "persons" as that term is used in N.C.G.S. § 15A-282.

944.    Pursuant to N.C.G.S. § 15A-271 et seq., Plaintiffs were ordered to submit to NTID procedures conducted by the City of Durham Police Department.  To obtain the order, Gottlieb and Himan stated—under oath—that the Court that tests conducted with the products of the NTID would exonerate the innocent.  N.C.G.S. §15A-282 granted Plaintiffs had an unconditional, immediate right to copies of reports of any tests conducted with the DNA and photographs taken in the NTID procedures'.  Durham Police took DNA samples, mug shots, and multiple photographs for use in the investigation.

945.     While in the possession, custody and control of the Durham Police, multiple tests were conducted with Plaintiffs' DNA and photographs, and the exonerating results of them, including, for example:

A. On March 28, 2006, the SBI Serology Lab provided Himan with a stunning report that exonerated the Plaintiffs, corroborated Mangum's recantation, and made it plainly obvious that Addison's and Nifong's public statements were outright lies.

B. On March 30, 2006, the SBI Lab Director made a report of results of SBI Lab tests available to Himan, Gottlieb, and Nifong. The results exonerated the Plaintiffs and corroborated Mangum's recantation.

C. On April 4, 2006, the SBI Lab provided Himan, Gottlieb and Nifong with another report of serology and DNA tests conducted with Plaintiffs' DNA that exonerated Plaintiffs and corroborated Mangum's recantation.

D. The results of the April 4th Identification Procedure, which utilized Plaintiffs' NTID photographs, was to Plaintiffs were available that same day in the form of a digital video recording.

E. On or before April 10, 2006, Meehan and Clark presented copies of all tests conducted with Plaintiffs' DNA and the rape kit items to Gottlieb, Himan and Nifong. DNASI's results excluded Plaintiffs as possible contributors of so much as a cell of genetic material in Mangum's rape kit, with 100% scientific certainty.

F. On or before April 21, 2006, Meehan and Clark presented a report to Himan, Gottlieb and Nifong of additional (unauthorized) Y-STR DNA tests conducted all other evidence police obtained and Plaintiffs' DNA. These results concluded that not so much as a cell belonging to Plaintiffs was present in any rape kit specimen, excluding them as a possible contributor of male genetic material on those items with 100% scientific certainty.

G.  On May 11, 2006, Clayton, Gottlieb, and Himan conducted a photographic identification procedure with Kim Pittman, using Plaintiffs' NTID photographs. The results of that procedure were available the same day, and were never produced to Plaintiffs.

946.  Knowing of Plaintiffs' rights to reports of DNASI's test results Himan, Gottlieb, Nifong, Meehan, Clark and DNASI individually and in concert, conspired to conceal and withhold from Plaintiffs the reports of DNASI's test results.  In furtherance of the conspiracy, Himan, Gottlieb and Nifong withheld the reports from Plaintiffs and their defense counsel, while Meehan and Clark created an entirely novel reporting criteria that they carefully designed for the purpose of concealing from Plaintiffs the existence of the explosive, exonerating results of tests conducted with their DNA.

947.  Knowing of Plaintiffs' rights to immediate reports of the April 4th and May 11th Photo ID Procedures, Himan, Gottlieb, Clayton and Nifong, conspired to conceal from Plaintiffs and their defense counsel both the fact that the procedure was conducted with their NTID photographs, as well as the exonerating results of those procedures.

948.  In furtherance of the conspiracy, Nifong falsely claimed to Plaintiffs' defense counsel that no test results were available, Himan refused to disclose the fact that identification procedures had been conducted using Plaintiffs' NTID photos when he was asked a direct question about them by Plaintiffs' defense counsel on or about April 15, 2006; and Nifong, Himan and Gottlieb, refused to produce to Plaintiffs or their defense counsel the foregoing reports when the reports were available to them.

949. Knowing that Plaintiffs had an unqualified right to the foregoing reports, Nifong, through final policy making authority delegated to him from the City of Durham with respect to the investigation, directed Himan and Gottlieb not to produce the reports or reveal the fact of the tests and procedures from Plaintiffs and their defense counsel. Subsequently, Baker, Chalmers, Hodge, Lamb, and Ripberger, each having shared final policymaking authority over the investigation, ratified Nifong's direction to conceal and withhold from Plaintiffs the exonerating test results.

950. The Durham Police Supervising Defendants knew of Plaintiffs' unqualified rights to those reports and the ongoing conspiracy to withhold them from Plaintiffs, and each member of the Chain of Command had the authority to command Himan to produce the reports when they were available; yet, each member failed to act, condoned, approved and/or ratified Himan's refusal to produce the reports, evincing their deliberate indifference to the ongoing intentional violations of Plaintiffs' constitutional rights.

951. The conspiracy to deprive Plaintiffs of these reports was connected with the other deprivations of Plaintiffs' federally protected rights alleged herein, and was motivated a malicious and evil intent to deprive Plaintiffs of the obvious means of clearing their names in the public arena in which they were being crucified, thereby compounding and prolonging Plaintiffs' public condemnation and stigmatization.

952. As a direct and proximate result of Defendants' conduct, Plaintiffs were deprived of their rights under Article IV of the United States Constitution, and the First, Fifth, Fourteenth Amendments thereto.

953.    As a direct and foreseeable consequence of these deprivations, Plaintiffs have suffered loss of education, loss of privacy, loss of property, loss of liberty, physical harm, emotional trauma, and irreparable harm to their reputations, and economic loss, including but not limited to the costs of retaining counsel, forensic experts, investigators and others in order to defend themselves against the false claims and fabrication of evidence throughout the 13-month police investigation of Mangum's claims, as both witnesses and putative defendants in a subsequent prosecution as 'accomplices' to the same crimes.

## FIFTH CAUSE OF ACTION:
## FALSE PUBLIC STATEMENTS IN VIOLATION OF 42 U.S.C. §1983

*(Against Addison, Gottlieb, Hodge, and Wilson, in their individual and official capacities; Nifong in his individual capacity and his official capacity with respect to the Durham Police; Arico, Steel, Brodhead, Burness, in their individual capacities and official capacities with Duke University)*

954.    Plaintiffs incorporate the foregoing allegations by reference here.

955.    Addison, Gottlieb, Nifong, Hodge, Wilson, the City of Durham, Levicy, Arico, Steel, Brodhead, Burness, and Duke University are "persons" for purposes of 42 U.S.C. § 1983, and, at all times relevant to this cause of action, were acting under color of law.

956.    Addison, Gottlieb, Nifong, Hodge, Michael, Wilson, the City of Durham, Steel, Brodhead, Burness, and Duke University, acting individually and in concert, published false and stigmatizing statements about and relating to the Plaintiffs. Examples of the Defendants' stigmatizing false public statements include:

A.    Gottlieb's published statements falsely asserting as fact that Mangum "was raped, sodomized and strangled" by Plaintiffs or by their teammates in their presence.

B.    Addison's published statements falsely asserting as fact that investigators had "really, really strong physical evidence" to support Mangum's claims; that Mangum was, in fact, "sodomized, raped, assaulted and robbed" by Plaintiffs or in their presence; that "the attackers" left substantial genetic material that was collected in the SAE; that the DNA testing would reveal which team members were "the attackers," that Mangum was "brutally raped" in a "brutal assault… that occurred within that house," which Plaintiffs refused to explain.  He suggested that the millions of viewers watching him imagine that Plaintiffs brutally raped their daughter, and accused Plaintiffs of stonewalling the police investigation, claiming that the NTID Order (and its Affidavit) were necessary only because Plaintiffs knew who raped Mangum but refused to tell the police.

C.    Deputy/Acting Chief Hodge's statements falsely claiming that the police had a "strong" case against Plaintiffs, conveying police had amassed evidence that Mangum was raped and sodomized by the Plaintiffs or in their presence.

D.    Wilson's published statements falsely asserting as fact that Mangum's account of the number of "attackers" did not change.

E.    Nifong's published statements—volumes of them—falsely conveying, among many other things, that a rape occurred, that the medical evidence was convincing, and that he was personally convinced and  there was "no doubt in [his] mind" that Mangum was raped by Plaintiffs or in their presence.  He claimed that the physical evidence contradicted Plaintiffs' claims of innocence, and they had not confessed because, alternately, they were not "enough of a man

to come forward," or they did not "want to admit to the enormity of what they've done;" he characterized Plaintiffs as 'racist-rapists,' asserting "there was a deep racial motivation" animating the gang rape. He publicly mused, "I would like to think that somebody [not involved in the attack] has the human decency to call up and say, 'What am I doing covering up for a bunch of hooligans?'" He accused Plaintiffs of covering up their own culpability in the crimes by "hiding behind the Fifth Amendment" and erecting a "Stone Wall of Silence." Nifong wound up his initial stigmatization of the Plaintiffs by saying he "refuse[d] to allow Durham's view in the minds of the world to be a bunch of lacrosse players at Duke raping a black girl from Durham."

F.   Michael published false public statements that a woman unrelated to Mangum and Pittman called 911 earlier in the evening to report a mob of white men hurling racial epithets at her, and that the police had determined that the caller was not Pittman, that Mangum reported she was raped at the Kroger, that Mangum was taken from Kroger to Duke Hospital (to avoid revelation of Mangum's involuntary commitment procedures at Durham Access).

G.   Levicy published statements falsely asserting that she conducted Mangum's SAE herself, that Mangum exhibited objective indices of actual pain, that there was evidence of blunt force trauma visible in the SAE; and her written narrative in the SAER was an accurate demoralization of a SANE interview she conducted herself; and that the SAE corroborated Mangum's claim that she was violently gang raped.

H.   Arico published statements falsely asserting that a complete SAE was performed, it was done by a competent SANE, and produced evidence of blunt force trauma via a coloposcope.

I. Chairman Steel, President Brodhead, and John Burness, pursuant to a script of "talking points" they carefully crafted with the aid of media consultants, repeatedly published false statements conveying that Plaintiffs had participated in conduct that was "far worse" than even the horrific race-motivated gang-rape that was reported, either as participants or as accomplices.

957. The Defendants' statements charging Plaintiffs with multiple forms and instances of illegality, dishonesty or immorality were false, and were made in conjunction with and/or in connection with deprivations of Plaintiffs' tangible interests as alleged herein; for example:

A. The deprivation of Plaintiffs' rights under Article IV of the United States Constitution and the First, Fourth, Fifth, and Fourteenth Amendments thereto as alleged in this Complaint;

B. The deprivation of Plaintiffs' statutory right to reports of all tests conducted with the products of the NTID Procedures to which Plaintiffs were subjected;

C. The malicious and public deprivations Plaintiffs' right to compete and participate in Division I intercollegiate athletics;

D. The deprivation of Plaintiffs' educational status as students enrolled in the University.

E. The deprivation of Plaintiffs' privacy rights under federal and state banking laws.

F. The deprivation of Plaintiffs' rights to privacy in their confidential financial transaction card accounts under federal and state banking laws.

G.   The deliberate deprivation of Plaintiffs' rights under the federal and state elections laws.

958.   The foregoing deprivations were temporally and causally connected and proximate to the stigma to which Defendants subjected Plaintiffs, and those same Defendants who imposed the stigma explicitly or implicitly adopted the stigmatizing statements.

959.   The Defendants' statements were false, and were published via local, national, and international media outlets, with the malicious and evil intent to stigmatize the Plaintiffs in the eyes of millions of people throughout the world, and deprive Plaintiffs and their teammates of a fair trial or to peremptorily impeach Plaintiffs' character and credibility as defense witnesses.  The false public statements were made in connection with the violations of Plaintiffs' constitutional rights, as alleged herein, and also in connection with the deprivation of the other tangible interests alleged herein.

960.   The false statements were designed by Defendants to create, galvanize and then sustain the public's outrage at the Plaintiffs and to establish a presumption of their guilt and to stir up racial hostility towards the Plaintiffs in their local community and throughout the nation.  The Defendants conduct quickly succeeded in that; those very sentiments were rife in the Durham community, the state and the nation, and had so completely and universally stigmatized the Plaintiffs, that Nifong stated that a change of venue would be futile, unless the trial were moved to China.

961.   Plaintiffs had no opportunity before or after their stigmatization to formally and directly clear their good names through any form of proceedings.

962. As a direct and proximate result of Defendants' conduct, Plaintiffs were deprived of their rights under Article IV of the United States Constitution, and the First, Fourth, Fifth, Sixth, Ninth and Fourteenth Amendments thereto.

*(As Against Duke University and the City of Durham)*

963. Steel, Brodhead, and Burness, shared final policy-making authority for the University with respect to controlling or correcting public statements attributable to the University. Steel, Brodhead and Burness participated in publishing stigmatizing false public statements of their own. Further, each of them knew of the outrageous, false and stigmatizing Faculty Statements being made publicly in demonstrations on- and off-campus, lectures in University classrooms, in speeches at professional conferences, in local and national newspapers, and on local and national television news programs. They knew or were deliberately indifferent to the likelihood that their subordinates' conduct was violating or would likely lead to the violations of Plaintiffs' constitutional rights; yet they, individually and in concert with the City of Durham officials, refused to intervene to correct the unconstitutional conduct. They refused even to publicly say that the Faculty Statements were not those of the University. When asked, Brodhead responded to the stigmatizing faculty statements and conduct by asking rhetorically, "how can I be surprised at the outrage?"

964. Hodge and Graves, who had delegated their final policy-making authority to Nifong, Gottlieb, and Addison, ratified and subsequently participated their stigmatizing statements. They did not revoke the delegated policy-making authority or take any act to correct the stigmatizing effects of the false public statements. Further, both ratified the stigmatizing false statements knowing that the evidence Hodge and

Graves relied upon was so weak that, when Nifong reviewed it, he concluded, "We're f*****d," and, when Himan was directed to obtain an indictment of Reade Seligman from the Grand Jury, he asked, "With what?"

965. Further, many of the Duke University Defendants named herein, particularly the CMT Defendants, continued to make these false statements and/or condoned the similarly malicious false statements of their subordinates, long after they were aware of the stigmatizing effects with respect to the criminal case and that Mangum's accusations were false. Upon information and belief, these Defendants continued to make false public statements and/or condone those of their subordinates impeach the Plaintiffs' character in the eyes of putative jurors and to dissuade Plaintiffs from petitioning the courts for redress for the Defendants' violations of their civil rights.

966. Defendants' conduct evinced a malicious, corrupt intent and can only be attributed to evil motives. It was plainly obvious that those to whom Defendants had delegated their final policy making authority were violating or would violate Plaintiffs' constitutional rights that their failure to act to prevent or stop the ongoing violations of Plaintiffs' constitutional rights evinces a reckless and callous disregard for, and deliberate indifference to the Plaintiffs' constitutional rights.

967. As a direct and proximate result, Plaintiffs were deprived of their rights under Article IV of the United States Constitution, and the First, Fourth, Fifth, Sixth, Ninth and Fourteenth Amendments thereto.

968. As a direct and foreseeable consequence of the foregoing deprivations, Plaintiffs have suffered loss of education, loss of privacy, loss of property, loss of liberty, physical

harm, emotional trauma, and irreparable harm to their reputations, and economic loss,

including but not limited to the costs of retaining counsel, forensic experts,

investigators and others in order to defend themselves against the false claims and

fabrication of evidence throughout the 13-month police investigation of Mangum's

claims, as both witnesses and putative defendants in a subsequent prosecution as

'accomplices' to the same crimes.


## SIXTH CAUSE OF ACTION:

## MANUFACTURE OF FALSE INCULPATORY EVIDENCE & CONSPIRACY IN VIOLATIONOF 42 U.S.C. § 1983

*(Against Nifong, in his individual capacity and in his official capacity with respect to the Durham Police, Gottlieb, Himan, Clayton, the SANE Defendants, the DNASI Defendants, Duke University and the City of Durham)*

969. Nifong, Gottlieb, Himan, Clayton, the SANE Defendants, the DNASI Defendants,

Duke University and the City of Durham are "persons" for purposes of 42 U.S.C. §

1983, and, at all times relevant to this cause of action, acted under color of law.

970. Under color of law, Nifong, Himan, Gottlieb and the SANE Defendants, acting

individually and in concert, conspired to fabricate inculpatory forensic medical

evidence for the purpose of corroborating Mangum's false accusations by altering the

SAER and other medical records that contradicted Mangum's claims to conform them

to the fabricated NTID Affidavit as well as the expected evidence in the case.

971. In furtherance of the conspiracy, Levicy, under Arico's supervision, fabricated and

falsified the medical records relating to Mangum's SAE by revising contemporaneous

notes of Mangum's responses to the standard SAE questions and replacing them with

fabricated responses that harmonized the SAER with the record of Mangum's police statements and the existing or expected evidence in the case, including, for example, revising the SAER in an attempt to falsely establish that two sources of semen found on a towel and another swabbed from the floor in the residence during the police search would connect Plaintiffs or their teammates to the assault.

972. Under color of law, Nifong, Gottlieb, Clayton, and Himan, acting individually and in concert, designed an identification procedure in violation of G.O. 4077 that was—by its design—intended to facilitate the misidentification of Plaintiffs and/or Plaintiffs' teammates, knowing that the identifications would be used to secure indictments against Plaintiffs and their teammates (as principals or as accomplices to the same crimes); and, in due course, to obtain convictions of Plaintiffs and their teammates, either as principals or accessories, in the crimes Mangum falsely alleged.

973. Under color of law, Nifong, Gottlieb, Himan, Clark, Meehan, and DNASI, acting individually and in concert, conspired to produce a DNA report that included a false and misleading report of a probative "match" between Plaintiffs' non-indicted teammate and a "crime scene fingernail." The report falsely claims this match is "probative" or inculpatory; the "crime scene fingernail" does not contain even a cell of genetic material belonging to Crystal Mangum. To facilitate the fabrication, the report omitted the standard "conclusion" with respect to whether any material on the fingernail also matched Mangum, which it did not. These defendants fabricated this evidence with the specific intention to intimidate Plaintiffs' non-indicted teammate and prevent him from authenticating the photographic evidence that was the foundation of the digital alibis for Plaintiffs and all of their teammates who attended

the party. It sent "the message" to Plaintiffs that if they offered testimony exonerating their three indicted teammates, they would themselves be linked by one fabrication or another to the sexual assault they knew did not happen.

974. These Defendants engaged in this conduct knowing that it would lead to the deprivation of other of Plaintiffs' federally protected rights and with the intention of securing indictments and eventually convictions of Plaintiffs and their teammates (as principals or as accomplices to crimes they knew never did not happen.

975. The Defendants' conduct evinces a malicious and corrupt intent, and a reckless and callous disregard for and deliberate indifference to Plaintiffs' constitutional and statutory rights.

976. As a result of the conduct of Nifong, Gottlieb, Himan, the SANE Defendants, and the DANSI Defendants, the Plaintiffs were deprived of their rights under Article IV of the United States Constitution, and the First, Fourth, Fifth, and Fourteenth Amendments to the United States Constitution.

977. As a direct and foreseeable consequence of these deprivations, Plaintiffs suffered loss of education, loss of privacy, loss of property, loss of liberty, physical harm, emotional trauma, and irreparable harm to their reputations, and economic loss, including but not limited to the costs of retaining counsel, forensic experts, investigators and others in order to defend themselves against the false claims and fabrication of evidence throughout the 13-month police investigation of Mangum's claims, as both witnesses and putative defendants in a subsequent prosecution as 'accomplices' to the same crimes.

## SEVENTH CAUSE OF ACTION:

## CONCEALMENT OF EXCULPATORY EVIDENCE & CONSPIRACY IN VIOLATION OF 42 U.S.C. § 1983

*(Against Nifong, in his official capacity with respect to the Durham Police, Gottlieb, Himan, Clayton, the DNASI Defendants, and the SANE Defendants, Steel, Best, Graves, Dean, the City of Durham and Duke University)*

978. Plaintiffs incorporate the preceding allegations by reference here.

979. Himan, Clayton, the DNASI Defendants, and the SANE Defendants, Steel, Best, Graves, Dean, the City of Durham and Duke University are "persons," as that term is used in the text of 42 U.S.C. § 1983, and, at all times relevant to this cause of action, they were acting acted under color of state law.

980. Gottlieb, Himan, Nifong, Clark, Meehan and DNASI, acting individually and in concert, intentionally and maliciously concealed explosive, exonerating evidence of Plaintiffs' innocence in furtherance of their conspiracy to obtain indictments and ultimately convict Plaintiffs as principals or accessories to crimes Defendants knew could not have happened. They knew the crimes did not happen precisely because DNASI performed the tests that established that fact. The exonerating evidence was concealed by the Defendants' invention of a reporting form that—by design— excluded it.

981. Nifong, Clark, Gottlieb, Himan, Meehan, Wilson, and DNASI continued to conceal the exculpatory DNA evidence until October 2006, when they produced 2,000 pages of electropherograms and bench notes from the tests conducted with every team member's DNA. The exonerating electropherogram reports of Plaintiffs' DNA testing with the rape kit specimens were printed on April 9, 2006 and April 10, 2006.

982. When the conspiracy was thwarted by Nifong's abrupt withdrawal from it, the DNASI Defendants hastily produced a complete report of all of the testing done, which revealed the extent of these Defendants' concealment.

983. The conduct of Nifong, Gottlieb, Himan, and the DNASI Defendants evinces a reckless and callous disregard for, and deliberate indifference to, Plaintiffs' constitutional rights.

984. Defendants' conduct deprived Plaintiffs of their rights under Article IV of the United States Constitution as well as the First, Fourth, Fifth, and Fourteenth Amendments thereto.

985. As a direct and foreseeable consequence of these deprivations, Plaintiffs have suffered loss of education, loss of privacy, loss of property, loss of liberty, physical harm, emotional trauma, and irreparable harm to their reputations, and economic loss, including but not limited to the costs of retaining counsel, forensic experts, investigators and others in order to defend themselves against the false claims and fabrication of evidence throughout the 13-month police investigation of Mangum's claims, as both witnesses and putative defendants in a subsequent prosecution as 'accomplices' to the same crimes.

# EIGHTH CAUSE OF ACTION:

## INTERFERING WITH RIGHT ENGAGE IN POLITICAL PROCESSES IN VIOLATION OF 42 U.S.C. § 1983 AND CONSPIRACY

*(Against Steel, Brodhead, Burness, and Unknown Duke University Employees, in Their Individual and Official Capacities, and Duke University)*

986. Plaintiffs incorporate the foregoing allegations by reference here.

987. Steel, Brodhead, Burness, and Unknown Duke University Employees are "persons," as that term is used in the text of 42 U.S.C. § 1983.

988. Under color of state law, Steel, Brodhead, Trask and Burness, directed unknown Duke University employees and Duke University Police Officers to direct team members who were registering students and other Durham residents to vote in the then-upcoming federal and state elections to abandon their registration efforts, surrender their voter registration forms, and take off their shirts, which read "Voice Your Choice."

989. The Defendants' conduct was directed by Steel, Brodhead, Trask and/or Burness, and evinced a reckless and callous disregard for, and deliberate indifference to, Plaintiffs' constitutional rights.

990. As a result of the conduct of these Defendants, Plaintiffs were deprived of their rights under Article IV of the United States Constitution as well as the First and Fourteenth Amendments thereto.

991. As a direct and foreseeable consequence of these deprivations, Plaintiffs have suffered loss of education, loss of privacy, loss of property, loss of liberty, physical harm, emotional trauma, and irreparable harm to their reputations, and economic loss,

including but not limited to the costs of retaining counsel, forensic experts, investigators and others in order to defend themselves against the false claims and fabrication of evidence throughout the 13-month police investigation of Mangum's claims, as both witnesses and putative defendants in a subsequent prosecution as 'accomplices' to the same crimes.

## NINTH CAUSE OF ACTION:
## RETALIATION IN VIOLATION OF 42 U.S.C. § 1983 & CONSPIRACY

*(Against Nifong in his individual capacity and official capacity with respect to the Durham Police Department, Gottlieb, Himan, Addison, Michael, Hodge, Steel, Brodhead, Burness, Lange, Stotsenberg, Smith, in their individual and official capacities, the Duke Police Supervising Defendants, Duke University, DUHS, PDC, and the City of Durham)*

992. Plaintiffs incorporate the foregoing allegations by reference here.

993. Nifong, Gottlieb, Himan, Addison, Michael, Hodge, Steel, Brodhead, Burness, Lange, Stotsenberg, Smith, in their individual and official capacities, the Duke Police Supervising Defendants, Duke University, DUHS, PDC, and the City of Durham are "persons" as that term is used in the text of 42 U.S.C. § 1983, and, at all relevant times, were acting under color of state law.

994. Nifong, Gottlieb, Himan, Addison, Michael, Hodge, Steel, Brodhead, Burness, Lange, Stotsenberg, Smith, in their individual and official capacities, the Duke Police Supervising Defendants, Duke University, DUHS, PDC, and the City of Durham, individually and in concert, directed, participated, condoned or ratified the violations of Plaintiffs' constitutional rights as alleged herein in retaliation for Plaintiffs'

decision to exercise their constitutional right not to submit to police interrogation without the benefit of counsel.

995. Nifong, Gottlieb, and Himan, acting individually and in concert, retaliated in this manner by causing court orders to be issued based upon fabricated sworn Affidavits to the Court, including, but not limited to, the March 23rd NTID Order and the March 27th Search Warrant, and conspiring with others to abuse those processes for purposes for which they were neither intended or authorized. Duke University officials with final policymaking authority with respect to the investigation of Mangum's claims ratified this misconduct by failing to revoke the policymaking authority over the investigation that they delegated to Baker, Nifong, Himan, and the Himan Chain of Command.

996. Nifong, Gottlieb, Levicy, Arico, and Manly, individually and in concert, retaliated against Plaintiffs in this manner by concealing forensic medical proof of Plaintiffs' actual innocence acquired in Mangum's Sexual Assault Exam ("SAE"); fabricating false and misleading forensic medical opinion evidence; falsifying forensic medical documents in order to conform the forensic medical evidence to other known and/or expected evidence; and by fabricating the written report of Mangum's SANE interview in order to conform it to the account of events given in Gottlieb's and Himan's fabricated NTO Affidavit. The Chairman's Directive was the moving force behind Levicy's, Arico's, and Manly's conduct, and/or, aware of their misconduct, Dzau, with official policymaking authority for PDC, DUHS, and Duke University, ratified and condoned their participation in these unconstitutional acts.

997. Nifong, Gottlieb, Himan, and Clayton, acting individually and in concert, retaliated against Plaintiffs by abusing their law enforcement powers to intimidate witnesses, including Plaintiffs, who had personal knowledge of facts that established Plaintiffs' and their teammates' innocence, and coercing several witnesses to make false statements to corroborate their own fabricated account of the events.

998. The Chairman, Nifong, and the Duke Police Supervising Defendants, acting individually and in concert, retaliated against Plaintiffs by directing those Duke Police Officers who interacted with Mangum on March 14, 2006, to produce reports concealing their exculpatory observations of Mangum at the hospital.

999. The Defendants' conduct evinced a malicious and corrupt intent, and their callous disregard for and/or deliberate indifference to Plaintiffs' constitutional rights.

1000. As a result of Defendants' conduct, each of the Plaintiffs was deprived of his rights under Article IV of the United States Constitution, and the First, Fourth, Fifth and Fourteenth Amendments thereto.

1001. As a direct and foreseeable consequence of these deprivations, Plaintiffs have suffered loss of education, loss of privacy, loss of property, loss of liberty, physical harm, emotional trauma, and irreparable harm to their reputations, and economic loss, including but not limited to the costs of retaining counsel, forensic experts, investigators and others in order to defend themselves against the false claims and fabrication of evidence throughout the 13-month police investigation of Mangum's claims, as both witnesses and putative defendants in a subsequent prosecution as 'accomplices' to the same crimes.

## TENTH CAUSE OF ACTION:

## DEPRIVATION OF THE PRIVILEGES AND IMMUNITIES OF NORTH CAROLINA CITIZENS IN VIOLATION OF 42 U.S.C. §1983

*(Against All Defendants in their individual and official capacities)*

1002. Plaintiffs incorporate the preceding allegations by reference here.

1003. All Defendants are "persons" as that term is used in the text of 42 U.S.C. § 1983, and at all relevant times were acting under color of state law.

1004. Defendants' conduct deprived Plaintiffs of the same privileges and immunities they bestowed upon similarly situated citizens of the State of North Carolina because of Plaintiffs' real or perceived status as citizens of other states.

1005. The Defendants' discriminatory conduct was not closely tailored or rationally related to any legitimate or substantial state interest.

1006. As a direct and proximate result, Plaintiffs were deprived of their rights under Article IV of the United States Constitution and the Fourteenth Amendment thereto.

1007. As a direct and foreseeable consequence of the deprivation of Plaintiffs' federally protected rights, Plaintiffs suffered the loss of education, loss of privacy, loss of property, loss of liberty, physical harm, humiliation, public condemnation, emotional trauma, irreparable harm to their reputations, and economic loss, including but not limited to the costs of retaining counsel, forensic experts, investigators and other professionals reasonably necessary to prove their innocence over the course of a 13-month police effort to obtain convictions of Plaintiffs and their teammates as principals or accomplices to a rape and sexual assault that never happened.

## ELEVENTH CAUSE OF ACTION:

## FAILURE TO PREVENT DEPRIVATION OF CONSTITUTIONAL RIGHTS IN VIOLATION OF 42 U.S.C. § 1983

*(Against Steel, the CMT Defendants, Dawkins, the Duke Police Department Defendants, the Durham Police Department Defendants, Duke University and the City of Durham)*

1008. Steel, the CMT Defendants, Dawkins, the Duke Police Department Defendants, the Durham Police Department Defendants, Duke University and the City of Durham are "persons" as that term is used in the text of 42 U.S.C. § 1983, and, at all relevant times, were acting under color of state law.

*(As Against the Duke Police Department Defendants, in Their Individual and Official Capacities)*

1009. The Duke Police Department Defendants, including the Day Chain of Command Defendants, the Duke Police Supervising Defendants, and their subordinate officers in the Duke Police Department (collectively, "Duke Bystander Officers), at all times relevant to this cause of action, were "persons" as that term is used in 42 U.S.C. § 1983, and were acting under color of state law.

1010. In the presence and within the knowledge of the Duke Bystander Officers, Plaintiffs were subjected to ongoing and repeated violations of their constitutional rights by Duke Police Officers and Durham Police Officers, individually and in concert with others, within the Duke Bystander Officers' territorial jurisdiction, as alleged herein.

1011. The Duke Bystander Officers had a reasonable opportunity to prevent the harm caused by their fellow public officers' ongoing violations of Plaintiffs' constitutional

rights and the harm those violations were causing; yet, they 'turned a blind eye' to the violations and did nothing.

1012. As a direct and proximate result of the Bystander Officers' failure or refusal to act when they had a reasonable opportunity to prevent those harms, Plaintiffs were deprived of their rights under Article IV of the United States Constitution, and the First, Fourth, Fifth and Fourteenth Amendments thereto.

1013. As a direct and foreseeable consequence, Plaintiffs suffered the loss of education, loss of privacy, loss of property, loss of liberty, physical harm, humiliation, public condemnation, emotional trauma, irreparable harm to their reputations, and economic loss, including but not limited to the costs of retaining counsel, forensic experts, investigators and other professionals reasonably necessary to prove their innocence over the course of a 13-month police effort to obtain convictions of Plaintiffs and their teammates as principals or accomplices to a rape and sexual assault that never happened.

*(As Against Steel, Brodhead, Trask, the Duke Police Supervising Defendants in their individual and official capacities, and Duke University)*

1014. The Chairman and the Duke Police Supervising Defendants were Duke University officials with shared final policy making authority with respect to the Duke Bystander Officers authority to intervene to prevent other officers' violations of the constitutional rights of Plaintiffs and others occurring in their presence or within their knowledge.

1015. Aware of the ongoing violations of Plaintiffs' federally protected rights within the Duke Police Department's jurisdiction, the Chairman and the Duke Police

316

Supervising Defendants directed the all Duke Police Department officers to 'turn a blind eye' and do nothing when Plaintiffs' federally protected rights were occurring in their presence or within their knowledge and the officers had the opportunity and ability to prevent the violations or harms.

1016. The Chairman's Directive, and the enabling orders of the Duke Police Supervising Defendants directing the Duke Bystander Officers not to act in these circumstances, was the moving force and direct and proximate cause of the Duke Bystander Officers decisions not to act to prevent the violations of Plaintiffs' federally protected rights when they had the opportunity and ability to do so.

1017. Under the circumstances, the Chairman's Directive and the enabling orders of the Duke Police Supervising Defendants evinced a malicious and corrupt motive, as well as their deliberate indifference to the Plaintiffs' constitutional rights.

1018. As a direct result of the policymakers' command not to act in these circumstances, the Bystander Officers did not act when they had an opportunity to prevent the violations of Plaintiffs' federally protected rights.

1019. As a direct and proximate result of Defendants' conduct, Plaintiffs were deprived of their rights under Article IV of the United States Constitution, and the First, Fourth, Fifth, and Fourteenth Amendments thereto.

1020. As a direct and foreseeable consequence of the deprivations of Plaintiffs' federally protected rights, Plaintiffs suffered the loss of education, loss of privacy, loss of property, loss of liberty, physical harm, humiliation, public condemnation, emotional trauma, irreparable harm to their reputations, and economic loss, including but not

limited to the costs of retaining counsel, forensic experts, investigators and other professionals reasonably necessary to prove their innocence over the course of a 13-month police effort to obtain convictions of Plaintiffs and their teammates as principals or accomplices to a rape and sexual assault that never happened.

*(As Against the Durham Police Department Defendants in Their Individual and Official Capacities)*

1021. The Durham Police Supervising Defendants and their subordinate officers within the Durham Police Department ("Durham Bystander Officers") were, at all times relevant to this cause of action, "persons" as that term is used in 42 U.S.C. § 1983, and were acting under color of state law.

1022. Officers of the Durham and Duke Police Departments committed violations of Plaintiffs' constitutional rights described in this action in the presence of and/or within the knowledge of the Durham Bystander Officers.

1023. The Durham Bystander Officers had the opportunity to prevent the constitutional violations of Plaintiffs' rights and the harms that continued to flow from those violations, but did not act to do so; instead, they 'turned a blind eye' to the violations of Plaintiffs' rights and did nothing.

1024. As a direct and foreseeable consequence of the Defendants' failure to act to prevent the violations and harm, Plaintiffs have suffered loss of education, loss of privacy, loss of property, loss of liberty, physical harm, humiliation, public condemnation, emotional trauma, irreparable harm to their reputations, and economic loss, including but not limited to the costs of retaining counsel, forensic experts, investigators and other professionals reasonably necessary to prove their innocence over the course of a

13-month police effort to obtain convictions of Plaintiffs and their teammates as principals or accomplices to a rape and sexual assault that never happened.

*(Against the Durham Police Supervising Defendants in their individual and official capacities, and the City of Durham)*

1025. The Durham Police Supervising Defendants were City of Durham officials with final policy making authority to decide whether the Durham Bystander Officers under their supervision within the Durham Police Department would be prohibited from acting to prevent the ongoing violations of Plaintiffs' constitutional rights in their presence or within their knowledge.

1026. The Durham Police Supervising Defendants were aware, and it was plainly obvious, that Durham and Duke police officers were engaging in ongoing and systematic violations of the Plaintiffs' constitutional rights within the Durham Police Department's Jurisdiction.

1027. The Defendants' conduct evinced a callous disregard and/or deliberate indifference to the ongoing violations of Plaintiffs' federally protected rights.

1028. Further, the Durham Police Supervising Defendants participated in the failure to intervene to prevent the ongoing violations of Plaintiffs' constitutional rights, and, further directed Durham Police Officers to 'turn a blind eye' and do nothing when violations of Plaintiffs' federally protected rights occurred in their presence or were within their knowledge and the officers had the opportunity and ability to prevent the violations or harms.

1029. As a direct result of the policy-makers' command not to act in these circumstances, the Durham Bystander Officers did not act when they had an opportunity to prevent the violations of Plaintiffs' federally protected rights.

1030. As a direct and proximate result, Plaintiffs were deprived of their rights under Article IV of the United States Constitution, and the First, Fourth, Fifth, and Fourteenth Amendments thereto.

1031. As a direct and foreseeable consequence of the deprivations of Plaintiffs' federally protected rights, Plaintiffs suffered the loss of education, loss of privacy, loss of property, loss of liberty, physical harm, humiliation, public condemnation, emotional trauma, irreparable harm to their reputations, and economic loss, including but not limited to the costs of retaining counsel, forensic experts, investigators and other professionals reasonably necessary to prove their innocence over the course of a 13-month police effort to obtain convictions of Plaintiffs and their teammates as principals or accomplices to a rape and sexual assault that never happened.

*(As against Duke University and the City of Durham)*

1032. Prior to March 13, 2006, the City of Durham and Duke University had an established policy or custom whereby Duke Police Officers and Durham Police Officers, as a rule, did not act to prevent violations of Duke students' constitutional rights occurring in their presence or within their knowledge (the "Bystander Officer Policy").

1033. The Bystander Officer Policy was habitually followed by both Duke Police Officers and Durham Police Officers. As such, the Bystander Officer Policy was followed leading to the continuing violations of Duke students' constitutional rights. For

example, in the presence or within the knowledge of Duke Police Officers or Durham Police Officers, another law enforcement officer was engaged in or about to engage in violations of Duke students' federally protected rights in the course of police investigations of Duke students, street encounters with Duke students, stops of Duke students' vehicles, raids of Duke students' homes (with and without warrants), interrogations of Duke students, testifying against Duke students in criminal trials, and in other contexts in the administration of justice in Durham, North Carolina.

1034. The Bystander Officer Policy was the moving force behind and the direct cause of the violations of Plaintiffs' federally protected rights, as alleged herein.

1035. The Bystander Officer Policy was the moving force behind, and the direct and proximate cause of the deprivation of Plaintiffs' rights guaranteed by Article IV of the United States Constitution, and the First, Fourth, Fifth, and Fourteenth Amendments thereto.

1036. As a direct and foreseeable consequence the deprivations of Plaintiffs' federally protected rights, Plaintiffs have suffered the loss of education, loss of privacy, loss of property, loss of liberty, physical harm, humiliation, public condemnation, emotional trauma, irreparable harm to their reputations, and economic loss, including but not limited to the costs of retaining counsel, forensic experts, investigators and other professionals reasonably necessary to prove their innocence over the course of a 13-month police effort to obtain convictions of Plaintiffs and their teammates as principals or accomplices to a rape and sexual assault that never happened.

**TWELFTH CAUSE OF ACTION:**

**MONELL LIABILITY FOR VIOLATIONS OF 42 USC § 1983**

*(Against the City of Durham and Duke University)*

1037. Plaintiffs incorporate the preceding allegations by reference here.

1038. The City of Durham and Duke University are "persons" whose employees were acting under color of state law for purposes of the application of 42 U.S.C. § 1983.

      **A.**      **City and University Policies Were the Moving Force Behind the Deprivations of Plaintiffs' Constitutional Rights**

            **1.**      **The Duke—Durham Established "Zero Tolerance" Policy of Subjecting Duke Students to Police Abuse and Disproportionate Enforcement of the Criminal Laws Caused the Deprivation of Plaintiffs' Constitutional Rights**

1039. The City of Durham and Duke University devised and enacted a "Zero Tolerance for Duke Students" policy or custom, pursuant to which Durham Police and Duke Police disproportionately and unconstitutionally enforced the criminal laws against Duke Students. For example, pursuant to the Zero Tolerance Policy, Duke and Durham Police are encouraged, authorized, and/or instructed to:

    A.    Execute warrantless raids of Duke students' homes in the absence of exigent circumstances, including, for example, the "Back to School Operations,"

    B.    Obtaining warrants and causing other legal process to issue against Duke students for ulterior and unauthorized purposes unrelated to the purposes of the legal process;

    C.    Physically and verbally abuse Duke students under circumstances where "permanent residents" were not so abused

D.    Subject Duke students to protracted, unconstitutional searches, seizures and investigations, in the absence of probable cause or long after probable cause and/or reasonable suspicion has been extinguished for purposes of publicly humiliating and otherwise abusing Duke students;

E.    Fabricate witness accounts of events that never happened to facilitate convictions in court or to subject Duke students to condemnation of the community, the University Administration, and to trigger University sanctions for conduct that never happened;

F.    Turn a blind eye and do nothing when deprivations of Duke students constitutional rights are occurring in their officers' presence or within their knowledge;

G.    Retaliate against those officers—no matter how accomplished the officer—who act to prevent the deprivation of students' constitutional rights, by initiating bogus investigations outside of normal channels and/or threaten the officers and/or their close relations with disproportionate and retaliatory enforcement of the criminal laws.

H.    Intentionally deprive Duke students of their rights during police investigations involving Duke Students, where the rights of similarly situated "permanent residents" were honored;

I.    Willfully and intentionally act to subject Duke students to public humiliation on the streets and in commercial establishments of Durham;

J.    Target Duke students for grossly disproportionate enforcement of the criminal laws in police decisions to charge, to arrest and incarcerate, and to require bail, where similarly situated "permanent residents" would not be subjected to such

enforcement, and in contravention of Duke Police Department and Durham Police Department General Orders and Standard Operating Procedures.

1040. After all the foregoing policies and customs were exposed publicly, Captain Sarvis, in his role as a Supervisor within Internal Affairs and an official policymaking authority with respect to police investigating and punishing or correcting instances of police misconduct for the Durham Police, publicly and privately ratified the unconstitutional conduct of his officers, particularly the unconstitutional and malicious abuse inflicted upon Duke students by Gottlieb and Clayton.

1041. These policies and customs were also ratified and perpetuated by Captain Lamb after he replaced Sarvis as Commander of District Two. Lamb's endorsement of Gottlieb and contemporaneous retaliation against Shelton—one of Durham's highest performing officers—by launching an investigation of Shelton's conduct was more plain than a direct command to the Durham Police to continue the policy and custom of abusing Duke students or face dire consequences.

1042. The Chairman--and Brodhead, Burness and Trask acting at the Chairman's bidding— admitted to the existence of the Zero-Tolerance Policy for Duke Students, admitted the University was an equal partner in "crafting" it, and ratified it as Sarvis did.

1043. Baker boasted that he was another policymaker who developed the policy with the intention of ridding the Trinity Park neighborhood of Duke students by way of the criminal law.

1044. To a reasonable policymaker, it would be clear that the foregoing established policy or custom constituted a deprivation of the constitutional rights of Duke Students, and would lead to the deprivation of Plaintiffs' constitutional rights.

1045. As a direct and foreseeable consequence of the Zero-Tolerance for Duke Students policy, Plaintiffs were deprived of their rights under Article IV of the United States Constitution and First, Fourth, Fifth, and Fourteenth Amendments thereto.

> **2.** **The Duke—Durham Policy or Custom of Expediting Criminal Investigations by Inflaming the Public's Outrage at the Accused, Depriving Them of a Functional Presumption of Innocence, Through Incendiary, Stigmatizing Propaganda Was a Moving Force Behind the Deprivations of Plaintiffs' Constitutional Rights.**

1046. The City of Durham and Duke University, through employees with final policy making authority with respect to mass communications and publicity relating to the Departments' investigations had an established policy or custom of expediting criminal investigations by subjecting the accused to extortionate public condemnation and outrage through inflammatory, incendiary and stigmatizing messages transmitted through multiple mass communications devices, including but not limited to broadcast emails, wide dissemination of posters, and other media. The communications policy and custom of the department is to avoid acquittals by depriving the accused of the presumption (or possibility) of innocence in the minds of the public and prospective jurors; to declare the guilt of the accused without knowing the facts, and to do so with emotional, inflammatory rhetoric, and to stigmatize the accused so thoroughly that a plea may be hastily entered or a false confession extracted; all the while ignoring

evidence of innocence and/or the blatant unconstitutionally of the means by which Durham and/or Duke Police obtained the claimed evidence of guilt.

1047. The City of Durham and Duke University officials with final policymaking authority created, acquiesced in, condoned and/or directed of this established policy or custom, as evidenced by, for example, the retention and promotion of Cpl. Addison, whom one supervisor defended by saying that "Addison was just doing what he always does."

1048. Pursuant to the policy or custom of the Duke Police Department and the Durham Police Department, Defendants Gottlieb, Addison, Hodge, Graves, and Nifong, acting pursuant to delegated final policymaking authority from the Durham and Duke Police Departments, individually and in concert with one another, made public statements beginning on March 24, 2006, in which they asserted the official conclusion of the City of Durham and Duke University that Mangum had been raped, sexually assaulted, and kidnapped, every member of the lacrosse team were principals or accessories to it the crimes; and every member of the lacrosse team was obstructing justice by refusing to "come forward" to confess their involvement in, or knowledge about, the sexual assault, which they knew or should have known never happened.

1049. Further, these acts, pursuant to the same policy or custom, were done in retaliation against Plaintiffs for the exercise of their constitutional rights and with for the purpose of subjecting Plaintiffs to extortionate pressures to force them to falsely confess and/or falsely implicate their teammates. City and University produced and widely distributed "Wanted" posters asserting conclusively that Mangum's false accusations

actually happened, and that Plaintiffs and their teammates were principals and accomplices in the "horrific crime" that "sent shock waves through our community."

1050. Defendant Graves and Defendant Hodge were among the Duke Police Supervising Defendants and Durham Police Supervising Defendants who themselves engaged in the wrongful conduct they condoned as custom or authorized as policy. Hodge and Graves both made their statements knowing or deliberately indifferent to the evidence that had been offered to them that Mangum's accusations were false. These actions were part of an established course of conduct—a formal protocol—established by the Office of the Chief of Durham Police through Addison, CrimeStoppers, Duke University, and Duke Police.

1051. The University heightens the impact of the customary public stigmatization of the accused when the accused is a student, by, among other things, publicly separating the student from the University and "trespassing" them from campus to prevent their return.

1052. To a reasonable policymaker, it would be clear that the foregoing established policy or custom constituted or created the high risk that it would lead to the deprivations of the constitutional rights of the accused, particularly when the accused is also a student at Duke University.

1053. Nevertheless, Duke University and the City of Durham jointly crafted, implemented and, after the constitutional deprivations occurred, ratified the policy or custom by refusing to repeal it, and/or continuing to enforce or observe the policy or custom and

by failing to correct, retrain, discipline, or otherwise address those officers who violated the rights of the accused pursuant to the policy or custom.

1054. As a direct and foreseeable consequence of the decisions of the Duke University and City of Durham officials with policymaking authority, Plaintiffs were deprived of their rights under Article IV of the United States Constitution and First, Fourth, Fifth, Sixth and Fourteenth Amendments thereto.

### 3. The Duke—Durham "Bystander Officer Policy" Was a Moving Force Behind the Deprivation of Plaintiffs' Constitutional Rights.

1055. The City of Durham and Duke University officials having final policymaking authority over Durham Police and Duke Police were made aware, via their chains of command, the Joint Command, and it was otherwise plainly obvious that Nifong, Wilson, Lamb, Ripberger, Gottlieb and Himan, Addison, Michael, Levicy, Arico, Duke faculty members, Duke Administrators and others, acting individually and in concert, were engaged in a sweeping and ongoing deprivation of Plaintiffs' constitutional rights over the course of a 13-month investigation conducted *after* Plaintiffs and their teammates were conclusively proven innocent by the evidence.

1056. To a reasonable policymaker, it would have been obvious that the failure to act to intervene in the ongoing constitutional violations would lead to further deprivations of Plaintiffs' constitutional rights.

1057. Nevertheless, the City of Durham and Duke University, through their officials with final policymaking authority, approved of and ratified the unconstitutional acts and failures to act of their subordinates.

1058. As a direct and foreseeable consequence of the foregoing policy decisions and the actions and inactions of Durham and Duke University officials with final policymaking authority with respect to the Duke Police Department and Durham Police Department, Plaintiffs were subjected to an ongoing campaign of misconduct that deprived of their rights under Article IV of the United States Constitution and the First, Fourth, Fifth, Sixth and Fourteenth Amendments thereto.

1059. Nevertheless, the City of Durham officials with policymaking authority and Duke University officials with final policymaking authority with respect to the investigation of Mangum's false accusations agreed to, approved, condoned, directed, and subsequently ratified the unconstitutional conduct of their subordinates in the investigation.

1060. As a direct and foreseeable consequence of these policy decisions, Plaintiffs were deprived of their rights under Article IV of the United States Constitution and the First, Fourth, Fifth, and Fourteenth Amendments thereto.

### B. Officials with Final Policymaking Authority Participated in or Directed the Violations of Plaintiffs' Constitutional Rights

1061. As alleged in the independent causes of action for violations of 42 U.S.C. §1983, *supra*, Duke University and City of Durham officials with final policymaking authority participated in conduct that directly and proximately caused the violations of Plaintiffs' constitutional rights, as alleged in the foregoing causes of action.

1062. Duke University officials with final policymaking authority, including the Chairman, the CMT Defendants, and the Duke Police Supervising Defendants, Dzau, Arico, and

Manly all directed conduct that directly and proximately caused the deprivation of Plaintiffs' constitutional rights.

1063. Similarly, Baker was at all relevant times, a City of Durham official with final policymaking authority with respect to Durham Police Department and the investigation of Mangum's claims. Like the Chairman, Baker's decision in that capacity created the unreasonably high likelihood that Plaintiffs' constitutional rights would be violated by officers following Baker's directives and decisions.

1064. To a reasonable policymaker, it would have been plainly obvious that the final policymakers directives and decisions would lead to the deprivation of Plaintiffs' constitutional rights.

1065. As a direct and proximate result of the directives and decisions of University officials with final policymaking authority and City of Durham officials with final policymaking authority with respect to Mangum's allegations, Plaintiffs were deprived of their constitutional rights under Article IV of the United States Constitution, and the First, Fourth, Fifth and Fourteenth Amendments thereto.

**C.** **Duke University and City of Durham Officials with Final Policymaking Authority with Respect to the Investigation Delegated Some or All of their Policymaking Authority But Failed to Exercise Adequate Supervising Responsibility over the Delegate's Exercise of said final policymaking authority.**

       **1.** **Final Policymakers Who Delegated Their Authority to the Himan Chain of Command Failed to Exercise Adequate Supervising Authority over the Himan Chain of Command.**

1066. Upon information and belief, as of March 13, 2006, the Chairman, the Duke CMT Defendants, the Duke Police Supervising Defendants, and CID Commander Mihiach were all aware of Gottlieb's substandard performance on the standard officer competency evaluations, his complete lack of experience, his documented history of disproportionate, malicious, spiteful abuse of his police powers in the administration of criminal laws against Duke students, as well as his documented history of Gottlieb's pattern of using excessive force, fabricating evidence and filing false reports in cases involving Duke students.

1067. Upon information and belief, these policymaking Defendants were also aware that Gottlieb knew he had been transferred off of the patrol beat in District 2 because of the documented, accelerating danger he posed to Duke students with whom he came in contact.

1068. Further, these final policymaking Defendants had contemporaneous knowledge of the fact that Sgt. Gottlieb:

    A.    Openly demonstrated his contempt for Duke students by verbally and physically abusing them;

B.    Reflexively abused his police authority in his enforcement of the criminal laws against Duke students; and

C.    Exhibited a proclivity for bearing false witness against Duke University students that he falsely accused of crimes.

1069.  The Durham Police Supervising Defendants other officials in the City of Durham and the Durham Police Department consistently failed to take adequate or meaningful steps to discipline Gottlieb, correct his behavior, or terminate his employment.

1070.  By these omissions, and by allowing him to directly supervise the investigation of Mangum's false allegations against 47 Duke students, these officials endorsed and ratified Gottlieb's unconstitutional conduct, established a custom or practice of targeting Duke University students for harsh or disproportionate treatment, or established a custom and practice of failing to correct the unconstitutional conduct of Durham Police Officers in their dealings with Duke students.

1071.  To a reasonable policymaker, it would have been clear that the decision to allow Gottlieb to supervise the investigation of Mangum's false accusations would lead to the same and other deprivations of Plaintiffs' constitutional rights.

1072.  Nevertheless, the CMT, Duke Police Supervising Defendants, the Durham Police Supervising Defendants, and other officials in the City of Durham and the Durham Police Department, assigned Gottlieb to supervise the investigation of Mangum's false allegations, knowing, consciously disregarding, and/or deliberately indifferent to the likelihood that their decision to do so would result in violations of Plaintiffs' constitutional rights.

1073. As a direct and foreseeable consequence of these policies and official actions, Plaintiffs were deprived of their rights under the First, Fourth, Fifth, and Fourteenth Amendments to the United States Constitution.

**2. After Duke and Durham Policymakers Delegated Their Policymaking Authority with Respect to the Investigation, to Nifong and the Himan, Addison, and Michael Chains of Command Their Delegates Engaged in and/or Directed Other Officers to Engage in Constitutional Violations, which the Policymakers Ratified**

1074. On or about March 16, 2006, the Durham Police Supervising Defendants, the Duke Police Supervising Defendants, Mihiach, Soukup, and other City and University officials with final policymaking authority agreed to delegate their policymaking authority with respect to the investigation of Mangum's claims to Nifong, Gottlieb, Himan, Michael, Addison, and the Himan, Michael, and Addison Chains of Command. Duke University Police Department delegated to the same Delegates its complete primary jurisdiction over Mangum's allegations.

1075. On or about the same day, Duke Police Supervising Defendants instructed Duke Police investigators to take their direction from Himan, Gottlieb, Nifong, and the Himan Chain of Command regarding the Duke Police investigation of Mangum's false accusations, rather than the Day Chain of Command and usual protocols, and, further, that Duke Police Officers and investigators involved in Gottlieb's investigation should report to Duke Police Department's senior command staff on all developments in the investigation.

1076. By delegating this final policymaking authority with respect to the investigation of Mangum's claims in foregoing manner, these Defendants created the unreasonably high likelihood that Plaintiffs would suffer deprivations of their constitutional rights.

1077. As the direct and foreseeable result, Plaintiffs were deprived of their rights under Article IV of the United States Constitution, and the First, Fourth, Fifth and Fourteenth Amendments thereto.

### 3. Those with Final Policymaking Authority Failed to Adequately Supervise Gottlieb, Himan, and Clayton

1078. Gottlieb, acting pursuant to that delegated authority from Duke University and the City of Durham, implemented investigative policies and engaged in investigative conduct that violated or caused Himan and Clayton to violate universally applied General Orders, Standard Operating Procedures, and other rules and regulations of both the Durham Police Department and Duke Police Department.   Among other things, Gottlieb, directly or in concert with Himan and Clayton:

A.   Coordinated the fabrication of forensic medical evidence with Tara Levicy and others;

B.   Concealed the exculpatory results of photo identification procedures;

C.   Concealed exculpatory  descriptions given by Mangum;

D.   Conspired with others to coerce fabricated inculpatory witness statements from Kim Pittman, Jarriel Johnson, Brian Taylor, and Crystal Mangum;

E.   Launched what became a historically unprecedented media campaign to subject Plaintiffs and their teammates to public condemnation and obloquy in retaliation

for their constitutionally protected decision not to be interrogated by him or those he supervised;

F.  Repeatedly published assertions that Mangum's false accusations had, in fact, occurred for the purpose of galvanizing media attention and public outrage at Plaintiffs and their teammates; published or caused to be published fabricated false allegations in the NTID Affidavit that were designed to galvanize the public outrage directed at Plaintiffs and their teammates; and

G.  Orchestrated an identification procedure that violated G.O. 4077 and that he knew was calculated to obtain identifications of three team members from among the 46 lacrosse team members he knew were all innocent.

1079.  Gottlieb, Nifong, Ripberger, and Lamb implemented these policies and engaged in that conduct knowing or deliberately indifferent to the likelihood that they would result in violations of Plaintiffs' constitutional rights.

1080.  The Duke Police Supervising Defendants and the Durham Police Supervising Defendants and other officials in Duke University and the City of Durham, also knew or were deliberately indifferent to the likelihood that Nifong, Gottlieb, Himan, Ripberger and Lamb, among others, would cause violations of Plaintiffs' constitutional rights through their incompetence and the known malice they harbored for the Plaintiffs.  Nevertheless, after they received the delegated final policymaking authority, those with delegated final policymaking authority caused the deprivations of Plaintiffs' constitutional rights.

1081.  The delegating officials then ratified the violations caused by their delegates.  For example:

A. Mihiach ratified the decisions of Nifong, Himan and the Himan Chain of Command by never revoked his delegation of policymaking authority with respect to the assignment of the investigation of Mangum's claims to Himan, who was "at the bottom" of the list of property crimes investigators in District Two, which, itself, was at the bottom with respect to expertise in complex violent crime investigations.

B. Soukup ratified the destruction, spoliation, and/or concealment of DECC evidence that Hodge, Russ, and Michael directed and/or participated in with the policymaking authority Soukup delegated to them;

C. The Duke Police Department ratified the delegation of its primary investigative responsibility to Nifong, Himan, Gottlieb, and the Himan Chain of Command. Duke Police Supervising Defendants ratified Nifong's conduct of the investigation with the delegated final policymaking authority of both the Duke and Durham Police Supervising Defendants.

D. The Duke Police Supervising Defendants and the Durham Police Supervising Defendants ratified the abuse of the NTID Process and the Warrant Process approving the use of fabricated Affidavits to obtain those orders, and permitting the general public to continue to believe that the false statements made in the Affidavits were true for over a year, despite having the capacity to correct the public's belief in the accuracy of the NTID and Warrant Affidavits.

1082. As a direct and foreseeable consequence of Gottlieb's investigative policies and conduct, Plaintiffs were deprived of their rights under Article IV of the United States' Constitution, as well as the First, Fourth, Fifth, and Fourteenth Amendments thereto.

### 4. Those with Final Policymaking Authority Failed to Adequately Supervise Nifong

1083. On or before March 24, 2006, the Duke Police Supervising Defendants, the Durham Police Supervising Defendants and other officials with final policymaking authority within Duke University and the City of Durham agreed, understood and colluded to allow Nifong to control and direct the Duke Police investigation into Mangum's false accusations. Further, they agreed that the Duke Police Supervising Defendants would direct Duke Police Officers and investigators to cease all direct activity in the investigation, except as Nifong or Gottlieb directed them to act. Further, they agreed to direct the Duke Police Supervisors to take all steps necessary to abandon the its jurisdictional responsibility to investigate Mangum's claims, and, further to conceal all evidence that Duke Police had primary jurisdiction over the investigation. Finally, they agreed to direct the Duke Police Supervisors to take all necessary steps to ensure that Duke Police Officers and investigators did not intervene to thwart the conspiracy to violate the civil rights of Plaintiffs and their teammates.

1084. Before the Duke Police Department and the Durham Police Department ceded their policymaking and supervising authority over the investigation of Mangum's false allegations to Nifong, the policymaking defendants, and other officials with final policymaking authority over the City of Durham and Duke University, had actual or constructive knowledge that Nifong and those who would be directed by him were incapable of investigating the allegations fully or fairly. This should include for example:

A.	Nifong had no experience or training in directing a complex investigation of a sexual offense or the use of advanced forensic techniques available in 2006;

B.	Nifong was in the midst of an election campaign against a bitter personal and professional rival, Freda Black, in which, he was hopelessly trailing in the polls and fundraising, largely due to a large disparity in name recognition; and, further, that Nifong's campaign lacked the financial means to bridge the name recognition gap at the time.

C.	Nifong's behavior historically was unstable and irrational, and, like Gottlieb, Nifong was known to harbor resentment, malice, and ill-will for Duke University and its students.

D.	Due to the inexperience of Gottlieb and Himan, there would be little check on Nifong's authority over the direction and control of the investigation. For example:

E.	Himan's assignment as "lead investigator" of Mangum's allegations violated the established, written rules and criteria governing the assignment of cases because, inter alia, Inv. Himan was not an investigator in the Durham Police Department's Criminal Investigations Division's Sexual Crimes Unit or Violent Crimes Unit. Himan was not employed as an investigator within any of the Criminal Investigations Division's Units. Himan was a property crimes investigator assigned to one of the Department's Patrol Districts. In terms of experience among the five property crimes investigators in District Two, Himan was, in his own words, "at the bottom." Himan had roughly two months experience as property crimes investigator at all, and no experience investigating rape cases. Inv. Himan had no formal training, knowledge or understanding of

forensic DNA testing, forensic SANE procedures or eyewitness identification procedures.

F. Likewise, Gottlieb's assignment as "supervisor" of the investigation of Mangum's allegations violated the written rules and criteria on assignments of such cases; Gottlieb was not an investigator or supervisor in the CID's violent crimes unit; Gottlieb had been a supervisor in District 2's investigations division for roughly two weeks; Gottlieb appeared to have investigated one rape case to its conclusion in his career; and, further, Gottlieb had the penchant for abusing Duke students described above.

G. In stark contrast, Sergeant Shelton was transferred to District Two to replace Sergeant Gottlieb because a complaint had been lodged against Gottlieb detailing his pattern of misconduct in interacting with Duke students. Sergeant Shelton, in other words, was transferred to District Two to clean up Gottlieb's patrol unit. Sergeant Shelton was transferred to that post from the Department's Training Unit, where he supervised the instruction of new and experienced police officers in proper police techniques and procedures. As between Sergeant Shelton's judgment and Gottlieb's judgment of whether Mangum's claims were unsubstantiated, District Two's Commander, Captain Lamb, ratified Gottlieb's and initiated an investigation of Shelton in violation of the Department's designated procedures and channels, designed to intimidate Sergeant Shelton.

1085. Contemporaneous with the Durham Police Department and Duke Police Department Policymakers' decision to allow Gottlieb, Nifong, and Baker to commandeer the investigation, Nifong, in concert with Addison, began a barrage of public statements to local and national television, radio and print media outlets, that clearly violated the cannons of ethics because they subjected Plaintiffs to heightened public condemnation

and were clearly in retaliation for their (actual or perceived) exercise of constitutional rights. At the inception of taking over the investigation, Nifong publicly claimed to national and international audiences that, inter alia, (1) Mangum was brutally gang raped at a lacrosse team party; (2) the three principals in the gang rape were members of the Duke lacrosse team; (3) every other member of the team was an accessory to the crime(s) and could be charged as such; and (4) every member of the team was either lying to the police or "covering up" and "stonewalling" the investigation.

1086. Nifong began making these claims before City of Durham and Duke University officials with final policymaking authority over the Durham Police Department and the Duke Police Department decided to delegate significant control over the police investigation to him. At the time and for months after, it was plainly obvious that Nifong's and Addison's public assertions of guilt would cause Nifong and others to put the investigation on an inexorable course to establish the guilt of Plaintiffs and their teammates (as principals or accomplices), as opposed to a search for the truth.

1087. Collectively, adequate scrutiny of the facts and circumstances available at the time, would have made it plainly obvious to a reasonable policymaker that the decision to allow Nifong to direct this investigation—and these investigators—would lead to the deprivation of Plaintiffs' constitutional rights. Nevertheless, the Duke Police Supervising Defendants and the Durham Police Supervising Defendants, as well as other officials with final policymaking authority in Duke University and the City of Durham allowed Nifong to direct the investigation, knowing or deliberately indifferent to the likelihood that their decision would result in the deprivation of Plaintiffs' constitutional rights.

**5. After Duke University and City of Durham officials delegated final policymaking authority to Nifong with respect to the conduct of the investigation of Mangum's allegations, Nifong directed their subordinates to engage in conduct that violated the Plaintiffs' constitutional rights.**

1088. After delegating shared or complete policymaking authority with respect to the investigation of Mangum's allegations to Nifong, officials with final policymaking authority for Duke University and the City of Durham obtained actual or constructive knowledge that Nifong was violating Plaintiffs' constitutional rights and/or directing their subordinates to engage in such violations. Further, Nifong's direction of the investigation and the investigators, to a reasonable policymaker, would obviously result in violations of constitutional right to individuals in Plaintiffs' position. Such violations included unprecedented public statements made by Nifong and Addison; the incendiary false allegations made in the NTID Affidavit, the willful and continuing failure to provide Plaintiffs with a written report of the results of all tests conducted with their DNA, in violation of N.C.G.S. § 15A-282; the fabrication and misrepresentation of DNA evidence associated with the fingernails of the false accuser, and the concealment of DNA evidence that proved Plaintiffs' innocence; the intentional concealment of powerful exculpatory identification evidence produced in the March identification procedures, and the intentional fabrication of false identification evidence in the April [4th] identification procedure; the harassment, humiliation and intimidation of material witnesses who had personal knowledge of facts that proved Plaintiffs' and their teammates' innocence; among other acts and directives.

1089.  When all of these and other foreseeable deprivations did, in fact occur in the delegating policymakers' presence and/or within their knowledge, no remedial or corrective action was taken by Duke University or City of Durham officials with policy making authority for their respective entities.  Further, Baker, Hodge, Chalmers, Lamb, and Ripberger all ratified and condoned Nifong's violations of Plaintiffs' federally protected rights committed directly by Nifong himself and/or by their own subordinates acting pursuant to Nifong's delegated final policy-making authority with respect to the investigation of Mangum's allegations.

1090.  The Policymakers, the Duke Police Supervising Defendants and the Durham Police Supervising Defendants acquiesced in and condoned Nifong's arrogation of the police investigation of Mangum's allegations, despite knowing, recklessly disregarding and/or deliberately indifferent to the likelihood that their decisions would result in violations of Plaintiffs' constitutional rights.

1091.  As a direct and foreseeable consequence of these policy decisions, Plaintiffs were deprived of their rights under Article IV of the United States Constitution and the First, Fourth, Fifth, and Fourteenth Amendments thereto.

1092.  The Duke University and City of Durham officials with final policymaking authority, aware of Nifong's misconduct and the constitutional violations he was committing or directed by virtue of his delegated policymaking authority, ratified and condoned Nifong's investigative policies and conduct.

1093.  As a direct and foreseeable consequence of Nifong's directives and actions with the delegated final policymaking authority of Duke University and the City of Durham,

Plaintiffs were deprived of their rights under Article IV of the United States Constitution, and the First, Fourth, Fifth, Sixth and Fourteenth Amendments thereto.

1094. As a direct and foreseeable consequence of these deprivations, Plaintiffs have suffered loss of education, loss of privacy, loss of property, loss of liberty, physical harm, emotional trauma, and irreparable harm to their reputations, and economic loss, including but not limited to the costs of retaining counsel, forensic experts, investigators and others in order to defend themselves against the false claims and fabrication of evidence throughout the 13-month police investigation of Mangum's claims, as both witnesses and putative defendants in a subsequent prosecution as 'accomplices' to the same crimes.

1095. After Duke University officials delegated shared final policymaking authority to Baker with respect to the conduct of the Duke Police investigation of Mangum's allegations, Nifong directed their subordinates to engage in conduct that violated the Plaintiffs' constitutional rights.

1096. After Duke University officials with final policymaking authority delegated shared or complete policymaking authority with respect to the investigation of Mangum's allegations to Nifong, they obtained actual or constructive knowledge that Nifong was violating Plaintiffs' constitutional rights and/or directing their subordinates to engage in such violations.

1097. Nifong's violations included unprecedented public statements made by Nifong and Addison; the incendiary false allegations made in the NTID Affidavit, the willful and continuing failure to provide Plaintiffs with a written report of the results of all tests

conducted with their DNA, in violation of N.C.G.S. § 15A-282; the fabrication and misrepresentation of DNA evidence associated with the fingernails of the false accuser, and the concealment of DNA evidence that proved Plaintiffs' innocence; the intentional concealment of powerful exculpatory identification evidence produced in the March identification procedures, and the intentional fabrication of false identification evidence in the April [4th] identification procedure; the harassment, humiliation and intimidation of material witnesses who had personal knowledge of facts that proved Plaintiffs' and their teammates' innocence; among other acts and directives.

1098. To a reasonable policymaker, it would be obvious that Nifong's conduct with respect to the investigation of Mangum's allegations would result in violations of the constitutional rights of Plaintiffs and/or others similarly situated.

1099. When all of these and other foreseeable constitutional deprivations occurred in the delegating policymakers' presence and/or within their knowledge, no remedial or corrective action was taken by the delegating Duke University officials or others with shared policymaking authority over the investigation of Mangum's allegations.

1100. Nifong was directing the Duke Police Department's investigation with final policymaking authority delegated to him by Duke University.

1101. Further, Duke University and City of Durham officials with final policymaking authority with respect to the investigation of Mangum's false accusations all ratified and condoned Nifong's violations of Plaintiffs' federally protected rights committed directly by Nifong himself and/or by their own subordinates acting pursuant to

Nifong's delegated final policy-making authority with respect to the investigation of Mangum's allegations.  Aware of Nifong's misconduct, none of the policymakers who delegated their authority to Nifong revoked it, or corrected Nifong's misconduct.

1102.  The Policymakers, the Duke Police Supervising Defendants and the Durham Police Supervising Defendants acquiesced in and condoned Nifong's arrogation of the police investigation of Mangum's allegations, despite knowing, recklessly disregarding and/or deliberately indifferent to the likelihood that their decisions would result in violations of Plaintiffs' constitutional rights.

1103.  As a direct and foreseeable consequence of these policy decisions, Plaintiffs were deprived of their rights under Article IV of the United States Constitution and the First, Fourth, Fifth and Fourteenth Amendments thereto.

1104.  The Duke University and City of Durham officials with final policymaking authority, aware of Nifong's misconduct and the constitutional violations he was committing or directed by virtue of his delegated policymaking authority, ratified and condoned Nifong's investigative policies and conduct.

1105.  As a direct and foreseeable consequence of Nifong's directives and actions with the delegated final policymaking authority of Duke University and the City of Durham, Plaintiffs were deprived of their rights under Article IV of the United States Constitution, and the First, Fourth, Fifth, Sixth and Fourteenth Amendments thereto.

1106.  As a direct and foreseeable consequence of these deprivations, Plaintiffs have suffered loss of education, loss of privacy, loss of property, loss of liberty, physical harm, emotional trauma, and irreparable harm to their reputations, and economic loss,

including but not limited to the costs of retaining counsel, forensic experts, investigators and others in order to defend themselves against the false claims and fabrication of evidence throughout the 13-month police investigation of Mangum's claims, as both witnesses and putative defendants in a subsequent prosecution as 'accomplices' to the same crimes.

## THIRTEENTH CAUSE OF ACTION:
## SUPERVISORY LIABILTIY FOR VIOLATIONS OF 42 U.S.C. § 1983

*(Against Duke Police Supervising Defendants, Duke Officials Defendants, Durham Police Supervising Defendants, in their Individual Capacities; and the City of Durham and Duke University)*

1107. Plaintiffs incorporate the preceding allegations by reference here.

1108. Duke Police Supervising Defendants, Duke Officials Defendants, Durham Police Supervising Defendants, in their individual capacities, and the City of Durham and Duke University are "persons" within the meaning of 42 U.S.C. § 1983.

### A. The Failure to Control and Supervise the Investigation Caused the Violations of Plaintiffs' Constitutional Rights.

1109. On or about March 16, 2006, the Duke Police Department delegated its "primary responsibility" to initiate and conclude an investigation of Mangum's claims to a known rogue officer, M.D. Gottlieb. With the acquiescence or approval of the Durham Police Supervising Defendants and Duke Police Supervising Defendants, Gottlieb assumed Duke Police Department's primary responsibility for the police investigation into Mangum's false allegations.

1110. While ceding authority to direct the investigation, Duke Police Supervising Defendants required Duke Police Officers to collaborate with and report directly to Gottlieb, the Duke Police Officers were also required to report back to the Duke Police chain of command all information relating to the investigation as it evolved. The Duke Police chain of command, in turn, was required to report the same information to the CMT Defendants.

1111. During the course of the Gottlieb-controlled investigation, Gottlieb and Himan, in collusion with Duke University Defendants, individually and in concert, engaged in investigative abuses, including the fabrication of false testimonial evidence, concealment of exculpatory identification evidence, making false statements to the public and to the media, and abuse of the NTID Order process, including but not limited to making false and sensationalized documents for public consumption in the documents supporting the application for an NTID Order.

1112. On or about March 24, 2006, the Duke Police Department re-delegated its "primary responsibility" to initiate and conclude an investigation of Mangum's claims to Nifong. They agreed to and/or acquiesced in Nifong's arrogation to himself of complete control over the investigation of Mangum's accusations despite having overwhelming evidence that (1) Mangum's claims were false, and, (2) even if believed, every member of the Duke lacrosse team was excluded as a possible "attacker."

1113. Subsequent to Nifong's assumption of control over the investigation, Duke Police Supervising Defendants and Durham Police Supervising Defendants both required their respective police officers to collaborate with and report directly to Nifong, but,

at the same time, required those officers to report all information relating to the investigation as it evolved back to their chain of command.

1114. During the Nifong-directed investigation, Nifong, Gottlieb, Wilson, Himan, and various Duke University Defendants, acting individually and in concert, engaged in a number of investigative abuses, including retaliating against Plaintiffs and their teammates for the exercise (real or perceived) of constitutional rights; intimidating Plaintiffs, their teammates, and other witnesses who would be necessary to establish the fact that the sexual assault Mangum alleged never occurred; the manufacture of false forensic medical and DNA evidence; the secretion of exculpatory evidence; the fabrication of identification evidence and the secretion of exculpatory identification evidence, and the deliberate disregard of safeguards designed to prevent negligent and intentional misidentifications in photo identification procedures.

1115. The Durham Police Supervising Defendants and Duke Police Supervising Defendants knew, or should have known, about these abuses, but failed to take meaningful preventative or remedial action.

1116. The Durham Police Supervising Defendants and Duke Police Supervising Defendants actions evinced a reckless and callous disregard for, and deliberate indifference to, Plaintiffs' constitutional rights.

1117. As a direct and foreseeable consequence of these investigative policies and actions, Plaintiffs were deprived of their rights under Article IV of the United States Constitution, and the First, Fourth, Fifth, Sixth, and Fourteenth Amendments thereto.

1118. As a direct and foreseeable consequence of these deprivations, Plaintiffs have suffered loss of education, loss of privacy, loss of property, loss of liberty, physical harm, emotional trauma, and irreparable harm to their reputations, and economic loss, including but not limited to the costs of retaining counsel, forensic experts, investigators and others in order to defend themselves against the false claims and fabrication of evidence throughout the 13-month police investigation of Mangum's claims, as both witnesses and putative defendants in a subsequent prosecution of 'accomplices' to the alleged sexual assault.

      **B.**     **Durham Police Supervising Defendants' Failure to Control and Supervise Gottlieb Led to Violations of Plaintiffs' Constitutional Rights.**

1119. When Gottlieb assumed control of the investigation, his proclivity for abusing the criminal laws and investigative powers in matters involving Duke students was well documented and well known. The details of Gottlieb's history were readily available, in distilled form, to the Duke Police Supervising Defendants and Durham Police Supervising Defendants. Among other things, the information available showed that Gottlieb frequently—and predictably—used excessive force, abused his arrest powers, filed false and fabricated charges, and fabricated evidence in cases involving Duke students.

1120. The Duke Police Supervising Defendants and the Durham Police Supervising Defendants knew or should have known about Gottlieb's history with Duke students, but failed to take adequate remedial action. Further, they should have known that Gottlieb's assignment to this investigation violated Duke's and Durham's written protocol for the assignment of investigations. In particular, the Duke Police

Supervising Defendants and the Durham Police Supervising Defendants knew or should have known that Gottlieb's assignment to this case violated written criteria for the assignment of supervisors to investigations of complex or serious crimes, in that they are to be assigned to supervisors with significant experience, particular expertise, and a host of other criteria that Gottlieb could not plausibly meet with his brief experience in that position

1121. In light of Gottlieb's history of abusing Duke students, and his lack of experience or training to supervise the investigation of Mangum's allegations, the Duke Police Supervising Defendants and the Durham Police Supervising Defendants acted recklessly when they transferred the Supervision of the investigation to Gottlieb, and when they agreed that the Duke Police Department would abdicate its jurisdictional responsibility to initiate and conclude an investigation of Mangum's claims.

1122. The Duke Police Supervising Defendants' and the Durham Police Supervising Defendants' actions and decisions evinced a reckless and callous disregard for and deliberate indifference to the Plaintiffs' constitutional rights.

1123. As a direct and foreseeable consequence of the foregoing acts and decisions, Plaintiffs were deprived of their rights under Article IV of the United States Constitution, and the First, Fourth, Fifth, and Fourteenth Amendments thereto.

1124. As a direct and foreseeable consequence of these deprivations, Plaintiffs have suffered loss of education, loss of privacy, loss of property, loss of liberty, physical harm, emotional trauma, and irreparable harm to their reputations, and economic loss, including but not limited to the costs of retaining counsel, forensic experts,

investigators and others in order to defend themselves against the false claims and fabrication of evidence throughout the 13-month police investigation of Mangum's claims, as both witnesses and putative defendants in a subsequent prosecution of 'accomplices' to the alleged sexual assault.

### C. The Durham Supervising Defendants' Failure to Control and Supervise Addison Led to the Violations of Plaintiffs' Constitutional Rights

1125. In March 2006, Addison was the official spokesperson of the Durham Police Department, the coordinator of the Durham CrimeStoppers program, and the communications liaison to the Duke Police Department.

1126. Both prior to placing Addison in those roles, the Durham Police Supervising Defendants and Duke Police Supervising Defendants demonstrated reckless or callous indifference to the rights of potential criminal suspects by failing to educate or train Addison in the Durham Police Department's General Orders or the limits that the constitution, statutes, common law and rules of ethics place upon his public statement and his position generally.

1127. Further, while acting in those roles, Addison demonstrated a consistent pattern of publishing statements with conclusory statements relating to the existence of a crime and/or the guilt of suspects, before the facts were established.

1128. In March and April 2006, Addison, acting in his role as spokesman for the Durham Police Department, Durham Police liaison to the Duke Police Department, and a representative of Durham CrimeStoppers, published a series of inflammatory statements expressing the Department's official conclusion that Mangum had been

raped, sodomized, sexually assaulted, and kidnapped by members of the Duke

lacrosse team.  In addition,  Addison,  repeatedly expressed the Department's official

view that Plaintiffs and other members of the Duke lacrosse team were obstructing

justice by failing to confess their knowledge of or involvement in the alleged assault

on Crystal Mangum.  Further, Addison made these statements—knowing he had no

factual basis for them—in retaliation against Plaintiffs and their teammates for the

exercise of their First, Fifth and Fourteenth Amendment rights.

1129.  The Durham Police Supervising Defendants knew or should have known about these

statements and/or Addison's propensity to make inflammatory, prejudicial statements

like them, and to retaliate against suspects who exercise their constitutional rights, but

demonstrated a reckless disregard or deliberate indifference by failing to take prompt

and meaningful preventative or remedial action.

1130.  In fact the Durham Police Supervising Defendants, Duke Police Supervising

Defendants, and CMT Defendants compounded Addison's abuses by making similar,

conclusory statements relating to the crime and the participation of Plaintiffs and their

teammates in it, when they knew or should have known from information available to

them that such statement were false.

1131.  The Duke Police Supervising Defendants' and the Durham Police Supervising

Defendants' actions and decisions evinced a reckless and callous disregard for and

deliberate indifference to the Plaintiffs' constitutional rights.

1132. As a direct and foreseeable consequence of the foregoing acts and decisions, Plaintiffs were deprived of their rights under Article IV of the United States Constitution, and the First, Fourth, Fifth, Sixth, and Fourteenth Amendments thereto.

1133. As a direct and foreseeable consequence of these deprivations, Plaintiffs have suffered loss of education, loss of privacy, loss of property, loss of liberty, physical harm, emotional trauma, and irreparable harm to their reputations, and economic loss, including but not limited to the costs of retaining counsel, forensic experts, investigators and others in order to defend themselves against the false claims and fabrication of evidence throughout the 13-month police investigation of Mangum's claims, as both witnesses and putative defendants in a subsequent prosecution as 'accomplices' to the same crimes.

### D. The Durham Police Supervising Defendants' Failure to Control and Supervise Defendant Michael Led to Violations of Plaintiffs' Constitutional Rights

1134. In March 2006, Michael was the Public Communications Officer for the Durham Police Department and the coordinator of the Durham CrimeStoppers program

1135. During her tenure as Police Communications coordinator, Michael demonstrated a consistent pattern of publishing false and misleading statements relating to evidence in active investigations and of willfully failing to preserve audio and communications evidence under her control.

1136. The Durham Police Supervising Defendants demonstrated reckless or callous indifference to the rights of potential criminal suspects by failing to take meaningful action to correct this conduct.

1137. The Durham Police Supervising Defendants knew or should have known that Defendant Michael:

A.  Released Pittman's inflammatory 911 call to the media, and then, for weeks, falsely claimed that Durham Police did not know who the anonymous caller was, despite the fact that Officer Shelton stated in his report that the 911 call was made by Pittman, Pittman told Himan on March 22, 2006 that she made the call, and then Pittman wrote it in her statement as well. In furtherance of the ongoing conspiracy to create a racist dimension to the false accusations, Michael misrepresented the identity of the first 911 caller as an anonymous caller and not the accuser or her co-worker, Pittman.

B.  Concealed from the public and Plaintiffs' defense counsel the CAD reports and dispatch audio recordings relating to the incident (despite repeated requests for them pre-indictments), and, further, that the concealed CAD reports and dispatch audio recordings revealed:

C.  The present-sense impressions of numerous police officers who interacted with Mangum in the early morning hours of March 14, 2006, conveying that, based on their interactions with Mangum, they did not believe that Mangum had been sexually assaulted;

D.  The events that took place when Mangum was taken to ACCESS that caused Mangum to respond to the Nurse's questions by writing the names of her children in response to the ACCESS nurse's questioning and to nod "yes" when asked if she had been raped;

E. Gottlieb's "adoption" of the case from Inv. Jones, as well as, according to Gottlieb, the large majority of his "investigative notes," which he claimed he had "radioed in" as he went along; and

F. All of the dispatch and officer exchanges relating to Mangum's behavior, her conflicting accounts on March 14, 2006, and other, unrevealed meetings and activities in the investigation from March 14, 2006 through January 11, 2007.veracity due to Defendant Michael's failure to preserve or take steps to preserve.

1138. The Durham Police Supervising Defendants' actions and decisions with respect to Michael evinced a reckless and callous disregard for and deliberate indifference to the Plaintiffs' constitutional rights.

1139. As a direct and foreseeable consequence of the foregoing acts and decisions, Plaintiffs were deprived of their rights under Article IV of the United States Constitution, and the First, Fourth, Fifth, Sixth, and Fourteenth Amendments thereto.

1140. As a direct and foreseeable consequence of these deprivations, Plaintiffs have suffered loss of education, loss of privacy, loss of property, loss of liberty, physical harm, emotional trauma, and irreparable harm to their reputations, and economic loss, including but not limited to the costs of retaining counsel, forensic experts, investigators and others in order to defend themselves against the false claims and fabrication of evidence throughout the 13-month police investigation of Mangum's claims, as both witnesses and putative defendants in a subsequent prosecution as 'accomplices' to the same crimes.

## FOURTEENTH CAUSE OF ACTION:
## FAILURE TO TRAIN IN VIOLATION OF 42 U.S.C. §1983
### *Against the City of Durham, Duke University, and DNASI*

1141. The City of Durham In light of the assignment and delegation of investigative and supervisory responsibilities to Nifong, Gottlieb, Clayton, Himan, Wilson, Ripberger, and Lamb, the need for more or different training was so obvious, and the inadequacy so likely to result in a violation of constitutional rights as to evince the City's deliberate indifference to it.

1142. Specifically, the City's training of Nifong, Gottlieb, Himan and Clayton was obviously deficient in virtually every skill that was required for the proper investigation of Mangum's claims and in any investigation of an alleged violent gang rape. For example, it was plainly obvious that their training was grossly deficient in:

   A.   Their training in methods of obtaining evidence that either corroborates or contradicts the complaining witness's claims, particularly where copious evidence is available, and even more so when all of the available evidence tends to negate the complaining witness's factual claims;

   B.   Their training was obviously deficient in the proper use, methodology and interpretation of photo identification procedures;

   C.   Their training was obviously deficient in forensic science generally, but, in particular, their training was obviously deficient in even rudimentary DNA testing; Gottlieb and Himan both claimed to fail to comprehend the significance of the SBI or DNASI test results.

D.  Their training was obviously deficient in rudimentary discovery rules, but, in particular, their training was obviously deficient in compliance with the plainly obvious statutory command to produce copies of test results to individuals subjected to NTID Orders as soon as the results are available;

E.  Their training was obviously deficient in the constitutional prohibition against retaliating against a suspects because they exercised a constitutional right or the use of public stigmatization as an extortionate coercive to force suspects to waive their constitutional rights;

F.  Their training was obviously deficient in the proper use of the media during the investigative and adjudicative phase of a criminal case and the prejudicial effect and personal injuries that inexorably flow from statements made to the mass media, particularly statements declaring or implying a suspect's guilt, and even more so when the suspect is factually and demonstrably innocent;

G.  Their training was obviously deficient in the proper maintenance of contemporaneous case notes, particularly the need to memorialize the substance of interviews of a complaining witness whose testimony constitutes the only evidence that a crime occurred; and, further, their training was obviously deficient in the need to refrain from concealing exculpatory facts and fabricating inculpatory facts through such investigative notes.

H.  Their training was obviously deficient in the proper role of a SANE and the proper qualifications of a SANE in a sexual assault investigation, and the importance of the integrity of a SAER as well as the other medical records relating to an SAE.

I.  Their training was obviously deficient in the constitutional prohibition against enforcing the criminal laws disproportionately against individuals because of

their real or perceived status as citizens of other states, or for ulterior, malicious purposes unrelated to those of the criminal laws being enforced.

J.   Their training was obviously deficient in the legitimate use and the abuse of legal process.

K.   Their training was obviously deficient in the need to interview the medical professionals who interacted with a complaining witness immediately after the alleged event, particularly when they were present at the time the complaining witness recanted her allegations; and, further, in the need to interview the medical professional who actually conducted the SAE in a rape investigation, as well as the perils of relying instead upon a nurse who did not actually conduct the SAER because she was not qualifications to do so.

L.   Their training was obviously deficient in the scope of the legitimate and authorized purposes of an NTID Order, and the importance of truthful affidavits and other representations to the Court, particularly in ex parte proceedings;

M.   The proper division of responsibilities between the police investigators and the prosecuting authority in every criminal case, but particularly the heightened need for strict adherence to it in high-profile cases or others in which an elected prosecutor may have a conflict of interest between the interests of justice and selfish, personal or professional interests, among other obvious deficiencies that may be inferred from the allegations herein and others to be proven at trial;

N.   The constitutional duty to act to prevent constitutional violations occurring an officer's presence or within their knowledge in circumstances where the officer has the opportunity to do so.

1143. These specific failures to train and others to be proven at trial directly caused the deprivation of Plaintiffs' constitutional rights as alleged herein.

1144. In light of the duties assigned or delegated to Nifong, Gottlieb, Himan, Clayton, Ripberger, and Lamb, the need for more or different training was so obvious, and the inadequacy so likely to result in a violation of federally protected rights that the City's failure to train these individuals evinces the City's deliberate indifference to the need.

1145. As a direct and proximate result of the City's deliberate indifference to the plainly obvious need to train these individuals in these rudimentary dimensions of sexual assault investigations and investigations generally, the individuals violated the Plaintiffs' constitutional rights under Article IV of the United States Constitution, and the First, Fourth, Fifth, Sixth, Ninth and Fourteenth Amendments thereto.

1146. As a direct and foreseeable consequence of the deprivation of Plaintiffs' federally protected rights, Plaintiffs suffered the loss of education, loss of privacy, loss of property, loss of liberty, physical harm, humiliation, public condemnation, emotional trauma, irreparable harm to their reputations, and economic loss, including but not limited to the costs of retaining counsel, forensic experts, investigators and other professionals reasonably necessary to prove their innocence over the course of a 13-month police effort to obtain convictions of Plaintiffs and their teammates as principals or accomplices to a rape and sexual assault that never happened.

# FIFTEENTH CAUSE OF ACTION:
## CONSPIRACY IN VIOLATION OF 42 U.S.C. § 1983

*(Against Nifong in his Individual Capacity and in his Official Capacity with Respect to the Durham Police and the City of Durham; and against Wilson, the DNASI Defendants, the Duke University Defendants, and the City of Durham Defendants in their Individual and Official Capacities)*

1147. Plaintiffs incorporate the preceding allegations by reference here.

1148. Nifong, Wilson, the DNASI Defendants, the Duke University Defendants, and the City of Durham Defendants are "persons," within the meaning given that term under 42 U.S.C. § 1983.

1149. Under color of law, Nifong, Wilson, the DNASI Defendants, the Duke University Defendants, and the City of Durham Defendants conspired and entered into express and/or implied agreements, understandings, or meetings of the minds among themselves and others to deprive Plaintiffs of their constitutional rights by retaliating against Plaintiffs for exercising their First and Fifth Amendment rights, publicly excoriating their character and that of their teammates, falsely claiming a they and their teammates had history of deplorable conduct, and by charging and prosecuting the three innocent Duke lacrosse players on charges of rape, sexual assault, and kidnapping, which these Defendants knew were not supported by probable cause.

1150. These Defendants participated in the conspiracy by engaging in overt acts with the intent to further some unlawful purpose of the conspiracy or with the intent to further some lawful purpose of the conspiracy by unlawful means, including the predicate acts and omissions giving rise to the foregoing causes of action; by way of example:

A.   Obtaining search warrants, the March 23rd NTID Order, the March 27th Search Warrant, and other process without probable cause by knowingly presenting the Court with sworn affidavits and statements containing fabricated, false allegations, and condoning the acquisition of those orders and other process with fabricated sworn statements;

B.   Making false public statements to vilify Plaintiffs at the apex of their vulnerability in the criminal justice system; convening University "ad hoc" committees for purposes of unearthing accounts and other evidence of historical misconduct alleged to have been committed by Plaintiffs and their teammates as a rogue prosecutor is threatening indictments of every team member as principals and accomplices in crimes that never occurred; provide those investigative committees with skewed, unreliable data designed to generate an official statement from the Committee damning the conduct of Plaintiffs and their teammates conduct as "deplorable" among other entirely unsupportable conclusions, despite substantial evidence inconsistent with such conclusions; willfully refusing to be presented with irrefutable evidence of innocence concerning Plaintiffs and every member of the team in order to perpetuate the public condemnation, continue waging a collaborative media campaign to peremptorily impeach the credibility of Plaintiffs and their teammates at a time when they are all putative defendants and witnesses for the defense;

C.   Continuing the investigation of Plaintiffs, or condoning or directing the continuation of it, long after it had been established that (1) the complaining witness was not credible for a host of compelling reasons; (2) the complaining witness was incapable of reciting the same account of events twice; and (3) the complaining witness did not recognize any of the Plaintiffs at all two days after the party; and (4) the complaining witness' descriptions ruled out every member

of the team as a plausible suspect either by her descriptions or through the six March photo arrays.

D.  Depriving, or condoning or directing the deprivation of Plaintiffs' statutory right to reports of the results of all DNA tests and all identification procedures conducted with the DNA samples or mug shot photographs that police obtained pursuant to the March 23rd NTID Order, as soon as the results were available, and condoning the deliberate deprivation of Plaintiffs' right to those reports;

E.  Manufacturing misidentifications of Plaintiffs and their teammates as perpetrators or as accomplices to a crime that did not occur;

F.  Manufacturing the complaining witness's recollection testimony about details of certain individuals at the party by providing her with photographs containing those details for her to recite during the identification procedures in an effort to conceal the fact that the complaining witness has no significant recollections from the evening in question, and could not reliably recollect those team members who were actually present at the party, all to avoid suppression of the only identification evidence that was available in the absence of any DNA identification evidence (i.e., the victim's identification testimony);

G.  Participating in the DNA conspiracy to manufacture false and misleading DNA evidence, and the conspiracy to conceal the powerful exculpatory findings made by DNASI through Y-plex technology;

H.  Manufacturing false testimonial evidence by intimidating, harassing and threatening defense witnesses with criminal legal process, criminal prosecution, and revocation of probationary status; intimidating, harassing and threatening police witnesses who interacted with Mangum at DUMC on March 14, 2006; and ignoring other witnesses known to have powerful exculpatory evidence

based upon their interactions with Mangum, including but not limited to, Mangum's UNC primary providers, Mangum's psychiatrists who attended to her during involuntary commitments and in outpatient treatments, and others who have personal knowledge of Mangum's psychotic episodes, her clinical unreliability, and her drug seeking propensities.

I.   Fabricating false forensic medical evidence; falsifying forensic medical records, and concealing the overwhelming forensic medical evidence of innocence.

J.   Agreeing to present the foregoing false and misleading evidence to the Grand Jury to obtain indictments on April 17, 2006, and May 12, 2006.

K.   Fabricating false evidence to close gaps in the evidence, to avoid the proof of innocence, and otherwise frame Plaintiffs and their teammates as principals and/or accomplices in the crimes charged in the Grand Jury's indictments, including but not limited to Gottlieb's transparent fabrication of notes of Mangum's description of her "attackers" that contradicts Himan's contemporaneous handwritten notes, and Wilson's "interview" of Mangum in which he brought pictures of the defendants in the criminal case in anticipation of a hearing on their motion to suppress Mangum's identifications of them, and to create a new timeline of events with Mangum that Wilson, Nifong, Gottlieb and Himan (incorrectly) believed avoided the irrefutable digital evidence that proved Plaintiffs and their teammates innocent.

L.   Abdicating jurisdictional responsibilities to initiate and conclude an investigation of Mangum's false allegations;

M.   Making false statements to the Superior Court of Durham County and the Plaintiffs' defense counsel in an effort to conceal the unlawful conspiracy.

N. Destroying, condoning or directing the destruction of exculpatory evidence of police officers' present sense impressions and critical events contained in the audio recordings of police officers' communications with dispatch and with each other during the time they interacted with Mangum on the evening in question, after a specific written request to preserve those audio recordings was made by counsel for the accused; and

O. Condoning, ratifying, instructing and/or directing any of those wrongful acts.

1151. These Defendants' actions evinced a reckless and callous disregard for, and deliberate indifference to, Plaintiffs' constitutional rights.

1152. The Defendants were acting pursuant to a preordained plan that was developed in quiet deliberation and discussions among officials with policymaking authority over the investigation of Mangum's claims, over a significant period of time.

1153. The Defendants' combined and concerted conduct evinces a malicious and corrupt intent to harm the Plaintiffs, and was so willful, wanton, and depraved that it shocks the contemporary conscience, in violation of the Fourteenth Amendment to the United States Constitution.

1154. As a direct and foreseeable consequence of the conspiracy, Plaintiffs were deprived of their rights under Article IV of the United States Constitution and the First, Fourth, Fifth, and Fourteenth Amendments thereto.

1155. As a direct and foreseeable consequence of these deprivations, Plaintiffs have suffered loss of education, loss of privacy, loss of property, loss of liberty, physical harm, emotional trauma, and irreparable harm to their reputations, and economic loss, including but not limited to the costs of retaining counsel, forensic experts,

investigators and others in order to defend themselves against the false claims and fabrication of evidence throughout the 13-month police investigation of Mangum's claims, as both witnesses and putative defendants in a subsequent prosecution as 'accomplices' to the same crimes.

### SIXTEENTH CAUSE OF ACTION:
### CONSPIRACY IN VIOLATION OF 42 U.S.C. § 1985

*(Against Nifong in his Individual Capacity and his Official Capacity with respect to the Duke Police and Durham Police; Gottlieb, Himan, Wilson, Addison, Michael, Durham Police Supervising Defendants, the Chairman, the Crisis Management Team Defendants, the Duke Police Supervising Defendants, the SANE Defendants, Meehan, Clark, DNASI, in their Individual and Official Capacities, and Nifong in his official capacity with respect to the Durham Police and Duke Police; the City of Durham and Duke University)*

1156. Plaintiffs incorporate the foregoing allegations by reference here.

1157. Nifong, Gottlieb, Himan, Wilson, Addison, Michael, Durham Police Supervising Defendants, the Chairman, the Crisis Management Team Defendants, the Duke Police Supervising Defendants, the SANE Defendants, Meehan, Clark, DNASI, Duke University, PDC, DUHS, the City of Durham are "persons," as that term is used in 42 U.S.C. § 1985, and, at all relevant times with respect to the following conspiracies, acted under color of state law.

### I

1158. Under color of state law, Addison, Michael, Nifong, Gottlieb, Himan, Wilson, the Durham Police Supervising Defendants, the City of Durham, Meehan, Clark, DNASI,

Steel, the Crisis Management Team Defendants, the SANE Defendants, Graves, Dean, the Duke Police Supervising Defendants, and Duke University conspired and/or entered into express and/or implied agreements, understandings, or meetings of the minds among themselves for the purpose of impeding, hindering, obstructing or defeating the due course of justice in the State of North Carolina, with the intent to deny Plaintiffs the equal protection of the law.

1159. In furtherance of this conspiracy, one or more of these Defendants engaged in overt acts that were motivated by invidious racial animus, intended to incite and then galvanize invidious racial animus against Plaintiffs in the Durham community, and/or were intended to take advantage of the invidious racial animus that these Defendants had fomented in the Durham community against Plaintiffs.

1160. In furtherance of this conspiracy, one or more of these Defendants engaged in overt acts that were motivated by invidious animus based upon Plaintiffs' state citizenship—real or perceived—as being citizens of other states only temporarily residing in Durham, North Carolina, and/or was intended to take advantage of the extant invidious animus based upon their belief that Plaintiffs were citizens of other states.

**II**

1161. Under color of state law, Nifong, Clayton, Gottlieb, Himan, Wilson, Addison, the Durham Police Supervising Defendants, City of Durham, Steel, the Crisis Management Team Defendants, the Duke Police Supervising Defendants, conspired and entered into express and/or implied agreements, understandings, or meetings of

the minds among themselves, to elicit false statements and subsequent testimony from Plaintiffs and other witnesses who were important and/or essential to the proof of Plaintiffs' innocence, by force, by intimidation, and threats, from testifying freely, fully, and truthfully to matters that these Defendants knew were the factual basis of prosecutions that would be brought therein, and with the general objective of ultimately securing Plaintiffs' convictions as principals or accessories to crimes they knew did not happen.

## III

1162. Under color of state law, Nifong, Gottlieb, Himan, Clayton, Addison, Michael, the Durham Police Supervising Defendants, Steel, the Crisis Management Team Defendants, the Duke Police Supervising Defendants, the SANE Defendants, the City of Durham, and Duke University conspired and entered into express and/or implied agreements, understandings, or meetings of the minds among themselves for the purpose of depriving Plaintiffs, directly or indirectly, of the equal protection of the laws and/or equal privileges and immunities of the laws.

1163. In furtherance of this conspiracy, one or more of these Defendants engaged in overt acts that were motivated by invidious racial animus, intended to foment extant invidious racial animus against Plaintiffs in the Durham, national and global community, and/or intended to take advantage of the invidious racial animus that they had fomented against Plaintiffs.

1164. In furtherance of this conspiracy, one or more of these Defendants engaged in overt acts that were motivated by invidious animus based upon Plaintiffs' state

citizenship—real or perceived—as being citizens of other states only temporarily residing in Durham, North Carolina, and/or was intended to take advantage of the extant invidious animus based upon their belief that Plaintiffs were citizens of other states.

1165. The conduct of the Defendants evinced a callous disregard of /or deliberate indifference to Plaintiffs' constitutional rights.

**IV**

1166. Steel, the Crisis Management Team Defendants and the Duke Police Department Defendants conspired and entered into express and/or implied agreements, understandings, or meetings of the minds among themselves for the purpose of preventing or hindering the Duke Police Department and the Durham Police Department and other duly constituted authorities of the City of Durham and the State of North Carolina from giving or securing to Plaintiffs the equal protection of the laws.

1167. The conduct of the Defendants evinced a callous disregard of /or deliberate indifference to Plaintiffs' constitutional rights.

_____

1168. As a direct and foreseeable consequence of each of the foregoing conspiracies to violate 42 U.S.C.§ 1985, Plaintiffs were deprived of their rights under Article IV of the United States Constitution, and the First, Fourth, Fifth and Fourteenth Amendments thereto.

1169. As a direct and foreseeable consequence of the deprivations occasioned by each of the foregoing conspiracies, Plaintiffs have suffered loss of education, loss of privacy, loss of property, loss of liberty, physical harm, emotional trauma, and irreparable harm to their reputations, and economic loss, including but not limited to the costs of retaining counsel, forensic experts, investigators and others in order to defend themselves against the false claims and fabrication of evidence throughout the 13-month police investigation of Mangum's claims, as both witnesses and putative defendants in a subsequent prosecution as 'accomplices' to the same crimes.

## SEVENTEENTH CAUSE OF ACTION:
## FAILURE TO INTERVENE IN VIOLATION OF 42 U.S.C. § 1986

*(Against Nifong in his individual capacity and his official capacity with respect to the Durham Police Department; Steel, Brodhead, Wilson, the Crisis Management Team Defendants, the Duke Police Department Defendants, the SANE Defendants, the DNASI Defendants, the Durham Police Department Defendants, in their individual and official capacities; the City of Durham and Duke University)*

1170. Plaintiffs incorporate all of the foregoing allegations by reference here.

1171. Steel, Brodhead, Wilson, Nifong, the Crisis Management Team Defendants, the Duke Police Department Defendants, the SANE Defendants, the DNASI Defendants, the Durham Police Department Defendants, the City of Durham and Duke University are "persons," as that term is used in 42 U.S.C. § 1986.

## I

1172. Steel, the Crisis Management Team Defendants, the Duke Police Department Defendants, the SANE Defendants, and the Durham Police Department Defendants

had prior knowledge of the wrongs conspired to be done by Addison, Michael, Nifong, Gottlieb, Himan, Wilson, the Durham Police Supervising Defendants, the City of Durham, Meehan, Clark, DNASI, Steel, the Crisis Management Team Defendants, the Duke SANE Defendants, Graves, Dean, the Duke Police Supervising Defendants, and Duke University.

1173. Steel, the Crisis Management Team Defendants, the Duke Police Department Defendants, the SANE Defendants, and the Durham Police Department Defendants had the power to prevent or aid in preventing the commission of the wrongs conspired to be committed by Addison, Michael, Nifong, Gottlieb, Himan, Wilson, the Durham Police Supervising Defendants, the City of Durham, Meehan, Clark, DNASI, Steel, the Crisis Management Team Defendants, the SANE Defendants, Graves, Dean, the Duke Police Supervising Defendants, and Duke University, and which by reasonable diligence could have been prevented, but they neglected and/or refused to exercise such power.

1174. The conduct of Steel, the Crisis Management Team Defendants, the Duke Police Department Defendants, the SANE Defendants, and the Durham Police Department Defendants evinced a reckless and callous disregard for, and deliberate indifference to, Plaintiffs' constitutional rights.

1175. As a direct and proximate result of these Defendants' failure to intervene, the Plaintiffs suffered injuries and damages as alleged herein.

1176. Steel, the Crisis Management Team Defendants, Duke Police Supervising Defendants, Duke University, Wilson, Nifong, and the Durham Police Supervising Defendants, and the City of Durham had prior knowledge of the wrongs conspired to be committed by Nifong, Clayton, Gottlieb, Himan, Wilson, Addison, the Durham Police Supervising Defendants, City of Durham, Steel, the Crisis Management Team Defendants, the Duke Police Supervising Defendants,.

1177. Steel, the Crisis Management Team Defendants, Duke Police Supervising Defendants, Duke University, Wilson, Nifong, and the Durham Police Supervising Defendants, and the City of Durham had the power to prevent or aid in preventing the commission of the wrongs conspired to be committed by Nifong, Clayton, Gottlieb, Himan, Wilson, Addison, the Durham Police Supervising Defendants, City of Durham, Steel, the Crisis Management Team Defendants, the Duke Police Supervising Defendants,, and which by reasonable diligence could have been prevented, but they neglected and/or refused to exercise such power.

1178. As a direct and proximate result, the Plaintiffs suffered injuries and damages as alleged herein.

1179. The conduct of Steel, the Crisis Management Team Defendants, Duke Police Supervising Defendants, Duke University, Wilson, Nifong, and the Durham Police Supervising Defendants, and the City of Durham evinced a reckless and callous disregard for, and deliberate indifference to Plaintiffs' constitutional rights.

1180. Steel, the Crisis Management Team, the SANE Defendants, the Duke Police Department Defendants, the DNASI Defendants, the Durham Police Supervising Defendants, the City of Durham and Duke University had prior knowledge of the wrongs conspired to be committed by Nifong, Gottlieb, Himan, Clayton, Addison, Michael, the Durham Police Supervising Defendants, Steel, the Crisis Management Team Defendants, the Duke Police Supervising Defendants, the SANE Defendants, the City of Durham, and Duke University.

1181. Steel, the Crisis Management Team, the SANE Defendants, the Duke Police Department Defendants, the DNASI Defendants, the Durham Police Supervising Defendants, the City of Durham and Duke University had the power to prevent or aid in preventing the commission of the wrongs conspired to be committed by Nifong, Gottlieb, Himan, Clayton, Addison, Michael, the Durham Police Supervising Defendants, Steel, the Crisis Management Team Defendants, the Duke Police Supervising Defendants, the SANE Defendants, the City of Durham, and Duke University, and which by reasonable diligence could have been prevented, but they neglected and/or refused to exercise such power.

1182. The conduct of Steel, the Crisis Management Team, the SANE Defendants, the Duke Police Department Defendants, the DNASI Defendants, the Durham Police Supervising Defendants, the City of Durham and Duke University evinced a reckless and callous disregard for, and deliberate indifference to, Plaintiffs' constitutional rights.

1183. Steel, Brodhead, and the Duke Police Department Defendants knew of and had the power to prevent or aid in preventing the commission of the wrongs conspired to be committed in violation of 42 U.S.C. § 1985 by Nifong, Steel, the Crisis Management Team Defendants, the Duke Police Department Defendants, and Duke University, which by reasonable diligence could have been prevented, but they neglected and/or refused to exercise their power to intervene.

1184. The conduct of Steel, Brodhead, and the Duke Police Department Defendants evinced a callous disregard and/or deliberate indifference to the Plaintiffs' constitutional rights.

1185. As a direct and proximate result of the refusal or failure to intervene on the part of Steel, Brodhead, Wilson, Nifong, the Crisis Management Team Defendants, the Duke Police Department Defendants, the SANE Defendants, the DNASI Defendants, the Durham Police Department Defendants, the City of Durham and Duke University neglect and/or refusal to intervene to prevent or to aid in preventing the commission of the wrongs conspired to be committed 42 U.S.C. § 1985 by Nifong, Gottlieb, Himan, Wilson, Addison, Baker, Levicy, Arico, the City of Durham, DUHS, and Duke University, the Plaintiffs suffered injuries and damages as alleged herein.

––––––––––––––––––

1186. The refusal and/or failure on the part of Steel, Brodhead, Wilson, Nifong, the Crisis Management Team Defendants, the Duke Police Department Defendants, the SANE Defendants, the DNASI Defendants, the Durham Police Department Defendants, the City of Durham, and Duke University, knowing of the wrongs conspired to be done to

Plaintiffs in violation of 42 U.S.C. §1985 evinced their willful and malicious intent and a reckless and callous disregard for and/or deliberate indifference to Plaintiffs' constitutional rights.

1187. As a direct and foreseeable consequence of these Defendants' neglect, failure and/or refusal to intervene, Plaintiffs were deprived of their rights under Article IV of the United States Constitution, and the First, Fourth, Fifth, and Fourteenth Amendments thereto.

1188. As a direct and foreseeable consequence of these deprivations, Plaintiffs have suffered loss of education, loss of privacy, loss of property, loss of liberty, physical harm, emotional trauma, and irreparable harm to their reputations, and economic loss, including but not limited to the costs of retaining counsel, forensic experts, investigators and others in order to defend themselves against the false claims and fabrication of evidence throughout the 13-month police investigation of Mangum's claims, as both witnesses and putative defendants in a subsequent prosecution as 'accomplices' to the same crimes.

## EIGHTEENTH CAUSE OF ACTION:

## COMMON LAW OBSTRUCTION OF JUSTICE & CONSPIRACY

*(Against Nifong in his Individual Capacity and in his Official Capacity with Respect to Durham Police; Steel, Brodhead, Burness, Gottlieb, Himan, Lamb, Wilson, Meehan, Clark, DNASI, Levicy, Manly, Arico, and Dzau, in their Individual and Official Capacities; DNASI, PDC, DUHS, and Duke University)*

1189. Plaintiffs incorporate the preceding allegations by reference here.

1190. Beginning on March 14, 2006 and continuing to the present Nifong Steel, Brodhead, Burness, Gottlieb, Himan, Lamb, Wilson, Meehan, Clark, DNASI, Levicy, Manly, Arico, Dzau, DNASI, PDC, DUHS, and Duke University, acting individually and in concert, attempted to and did, in fact, prevent obstruct, impede and hinder public and legal justice in the State of North Carolina as alleged herein.

1191. Gottlieb, Himan, Wilson, Nifong, Meehan, Clark and DNASI obstructed justice by conspiring to manufacture and by manufacturing false and misleading reports with respect to the forensic testing of evidence in the investigation of Mangum's allegations, knowing that the reports of forensic testing would forensic with the knowledge that these reports would be used to bring and maintain criminal prosecutions against Plaintiffs, as principals or accessories to crimes Defendants knew never happened, or to intimidate Plaintiffs and other witnesses who had personal knowledge necessary to prove their innocence.

1192. Gottlieb, Himan, Wilson, Nifong, Steel, Graves, Dean, and Best obstructed justice by conspiring to manufacture and manufacturing  false and misleading investigative reports designed to conceal exculpatory witness accounts with the knowledge that these reports would be used bring and maintain criminal prosecutions against

Plaintiffs, as principals or accessories to crimes Defendants knew never happened, or to intimidate Plaintiffs and other witnesses who had personal knowledge necessary to prove their innocence.

1193. Gottlieb, Himan, Wilson, Nifong, Steel, Dzau, Manly, Arico, Levicy, DUHS, and Duke University obstructed justice by conspiring to manufacture and manufacturing false and misleading forensic medical records and reports with respect to the SAE conducted at DUHS reports designed to conceal exculpatory witness accounts with the knowledge that these reports would be used bring and maintain criminal prosecutions against Plaintiffs, as principals or accessories to crimes Defendants knew never happened, or to intimidate Plaintiffs and other witnesses who had personal knowledge necessary to prove their innocence.

1194. Gottlieb, Himan, Wilson, Nifong, Meehan, Clark, and DNASI obstructed justice by conspiring to deprive Plaintiffs of copies of reports exonerating DNA test results that existed on or before April 10, 2006, in the form of copies of the raw data from tests conducted with their DNA, which Plaintiffs' retained forensic experts could have expeditiously interpreted—within hours—as conclusively exonerating them when those reports were available on or before April 10, 2006.

1195. Gottlieb, Himan, Wilson, and Nifong conspired to obstruct justice and obstructed justice by intimidating and attempting to intimidate Plaintiffs, as putative witnesses in their own defense or the defense of their teammates, and other witnesses with personal knowledge necessary to prove the Plaintiffs' innocence, including Plaintiffs' teammates, Sergeant Shelton, Kimberly Pittman, and Moezeldin Elmostafa, who had

personal knowledge and/or possession, custody or control of evidence their innocence, with the purpose of altering these witnesses' exonerating testimony.

1196.  Nifong, Gottlieb, Clayton, and Himan, individually and in concert, conspired to obstruction of justice and obstructed justice by manipulating witness identification procedures with the purpose of charging and convicting Plaintiffs for crimes these Defendants knew never occurred.

1197.  Nifong, Addison, Gottlieb, Himan, Wilson, Arico, Burness, CMT Defendants, and Duke University, individually and in concert, obstructed public justice by making false public statements intended to generate and galvanize public outrage, racial animus, and to subject Plaintiffs to national and international infamy and condemnation for the purpose of coercing false confessions and/or facilitating their wrongful convictions for crimes they knew never occurred; and to harass, intimidate, and place them in fear of their personal safety for their insistence upon bearing witness to the innocence of their teammates and their own innocence; and to intimidate, harass and otherwise subject Plaintiffs to local and national infamy for the purpose of dissuading Plaintiffs from petitioning the federal or state courts for civil redress of the harms that flowed from the violations of their rights as alleged herein.

1198.  After it the Attorney General publicly exonerated Plaintiffs and declared that no crime had ever occurred, Steel, Brodhead, Dzau, Burness, Lange, Moneta, Graves, Dean, Wasiolek, individually and collectively, obstructed public justice by making plans to conceal their participation in the conspiracies alleged herein.  By way of example, after the conspiracies disbanded in January, 2007, Moneta sent an email to a list of senior University administrators requesting that the recipients meet with him

immediately for the express purpose of  the stated purpose of  fabricating a uniform explanation for their conduct, or, in Moneta's words, "get[ing their] stories straight." Moneta also directed the recipients of his email to destroy the email immediately. The purpose of that and other efforts by University officials with policymaking authority with respect to the investigation of Mangum's claims was to defeat or diminish the award of damages in civil actions they assumed would be brought against them and the University by Plaintiffs and/or their teammates.

1199. In the context of and in combination with the events and conduct described in this action, these Defendants' conduct evinced a malicious and corrupt intent to harm Plaintiffs.

1200. As a direct and foreseeable consequence of Defendants' conduct, Plaintiffs were unreasonably and unlawfully subjected to threat of indictment and criminal prosecution as principals or accomplices in crimes that the Defendants knew never happened, which they endured for over a year because of the Defendants' conspiracies to impede, hinder and obstruct public and legal justice.

1201. As a direct and foreseeable consequence of being subjected to these obstructions of justice and conspiracies to obstruction of justice, Plaintiffs have suffered economic loss, physical harm, emotional trauma, loss of liberty, loss of privacy, loss of education, irreparable harm to their reputations, and were required to retain counsel to represent themselves in a protracted criminal investigation, and incurred expenses that were reasonable and necessary to defend themselves against these unlawful conspiracies and in the criminal prosecutions wrongfully maintained by Defendants

against Plaintiffs' teammates as principals in the same crimes that Plaintiffs were accused of aiding and abetting.

1202. As a direct and foreseeable consequence of these conspiracies, Plaintiffs have suffered loss of education, loss of privacy, loss of property, loss of liberty, physical harm, emotional trauma, and irreparable harm to their reputations, and economic loss, including but not limited to the costs of retaining counsel, forensic experts, investigators and other professionals to defend against the false claims and fabrication of evidence throughout the 13-month police investigation of Mangum's claims, as both witnesses and putative defendants in a subsequent prosecution of 'accomplices' to the alleged sexual assault.


## NINETEENTH CAUSE OF ACTION:
## COMMON LAW ABUSE OF PROCESS & CONSPIRACY

*(Against Nifong in his individual capacity and in his official capacity with respect to Durham Police; Addison, Gottlieb, Himan, Clayton, Wilson, the CMT Defendants, the SANE Defendants; the in their individual and official capacities; Duke University and the City of Durham)*

1203. Plaintiffs incorporate the preceding allegations by reference here.

1204. Nifong, Gottlieb, Himan, and Wilson demonstrated malice, spite, ill-will, and wanton disregard for Plaintiffs' rights by conspiring to manufacture and by fabricating false statements for incorporation into the NTID Affidavit, manufacturing false and misleading investigative reports with the knowledge that these reports would be used to advance and perpetuate the criminal investigation against Plaintiffs.

1205. Nifong, Gottlieb, and Himan utilized the NTID process for purposes of launching the case into the public spotlight, creating a media firestorm touched off by the fraudulent NTID Affidavit and Order. The Plaintiffs were thereby subjected to unprecedented public condemnation, public outrage, and infamy.

1206. Nifong, Hodge, and Addison repeatedly and knowingly made false, inflammatory, and misleading statements regarding the Duke lacrosse team and the Plaintiffs.

1207. The SANE Defendants, Gottlieb, and Nifong, individually and in concert, agreed to produce fabricated medical records of Mangum's SAE and provide false and baseless opinions relating to the medical evidence derived from the forensic exam through public statements. Further, Levicy falsified the SAER and advised or acquiesced in Gottlieb's false claim that the medical evidence was were consistent with the Mangum's false accusations. Further, Arico, as Levicy's supervisor, condoned and ratified Levicy's malicious, spiteful conduct, by publicly affirming the false claims attributed to Levicy. Similarly, Manly, as Levicy's supervising physician—and the individual who actually conduced the SAE—acquiesced in false claims attributed to Levicy and to Manly herself in the NTID and in subsequent public statements.

1208. Dzau, a University official with policymaking authority over the record-keeping function at DUHS facilities, aware of the fabrications and falsifications of Mangum's SAER, did not act to correct his subordinates misconduct nor to correct the public record when Arico, Gottlieb and Nifong falsely reported there was corroborating forensic medical evidence collected by Levicy in the mass media.

1209. Further, Dzau failed to adequately remediate Levicy's gross negligence and/or wanton fabrication of false medical evidence in the medical records of the SAER or Arico's ratification of it.

1210. In the context of and in combination with the events and conduct described in this action, these Defendants' conduct evinced a malicious and corrupt intent to harm Plaintiffs.

1211. As a direct and foreseeable consequence of Defendants' conduct, Plaintiffs were deprived of their rights under Article IV of the United States Constitution, and the First, Fourth, Fifth, Sixth and Fourteenth Amendments thereto.

1212. As a direct and foreseeable consequence of these deprivations, Plaintiffs have suffered loss of education, loss of privacy, loss of property, loss of liberty, physical harm, emotional trauma, and irreparable harm to their reputations, and economic loss, including but not limited to the costs of retaining counsel, forensic experts, investigators and others in order to defend themselves against the false claims and fabrication of evidence throughout the 13-month police investigation of Mangum's claims, as both witnesses and putative defendants in a subsequent prosecution of 'accomplices' to the alleged sexual assault.

## TWENTIETH CAUSE OF ACTION:
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS AND CONSPIRACY

*(Against Gottlieb, Himan, Lamb, Wilson, Meehan, Clark, Addison, Hodge, Steel, Brodhead, Burness, Levicy, Manly, Arico, and Dzau in their in their individual and official capacities; Nifong in his individual and official*

*capacity as an official with delegated policymaking authority from the City of Durham; DUHS, PDC, Duke University, and DNASI )*

1213. Plaintiffs incorporate the preceding allegations by reference here.

1214. Addison, Hodge, Steel, Brodhead, Burness, Levicy and Arico repeatedly made—and continue to make—false, insulting, offensive, and inflammatory statements, flyers and other materials about Plaintiffs and their teammates, calculated to shame, to humiliate, and to generate and galvanize the public condemnation of the Plaintiffs.

1215. Nifong, Clark, Gottlieb, Himan, Meehan, Wilson, DNASI, Levicy, Manly, Arico, Dzau, and DUHS acted individually and in concert to manufacture inculpatory forensic evidence and to conceal exculpatory forensic evidence for the purpose of lending scientific credibility to Mangum's accusation that Plaintiffs committed a horrific, violent, racially motivated crime, which these Defendants knew never happened, thereby subjecting Plaintiffs to false charges of rape, sexual offense and kidnapping, charges that were calculated to shame, humiliate and generate and galvanize racially charged outrage directed at the Plaintiffs and subject Plaintiffs to global infamy and condemnation.

1216. Nifong, Gottlieb, Himan, and Wilson, acting individually and in concert, intimidated witnesses, including Plaintiffs themselves, manipulated witness identification procedures, and otherwise obstructed justice with the intention of convicting Plaintiffs as principals or accessories to violent, racially motivated criminal acts that they knew never happened.

1217. In combination with conduct described above, these Defendants' actions evinced a malicious and corrupt intent and a pattern of extreme and outrageous behavior pursued with the intent to cause Plaintiffs to suffer severe emotional distress.

1218. At the time the Defendants entered into these conspiracies, they knew that their conduct would stigmatize the Plaintiffs as violent criminals motivated by "deep racial animus" in the eyes of hundreds of millions of people; would subject Plaintiffs to global infamy and condemnation; would deprive Plaintiffs of their constitutional rights; would deprive Plaintiffs of complete scientific proof of their innocence; would perpetuate their stigmatization; and would cause Plaintiffs to continue to suffer under the continuing threat of prosecution on charges—as principals or accomplices—to crimes of the most serious kind and terms of incarceration for the better part of their natural lives, for over a year.

1219. The Defendants' conduct was extreme and outrageous, was intended to cause Plaintiffs to suffer severe emotional distress.

1220. In light of their knowledge of the concerted conduct of others, the foreseeable consequence of the Defendants' own conduct evinces their deliberate or reckless indifference to the likelihood that their conduct would cause Plaintiffs to suffer severe emotional distress.

1221. Defendants' conduct will continue to cause harm to Plaintiffs by virtue of Plaintiffs' now-unseverable association with the false accusations maliciously advanced and supported by Defendants through these conspiracies and maliciously publicized by Addison, Nifong, Hodge, Burness, Brodhead, and Steel.

1222. As a direct and foreseeable consequence of the Defendants' actions, Plaintiffs have suffered and continue to suffer diagnosable emotional and mental conditions causing Plaintiffs disabling emotional, mental, and/or physical harm.


## TWENTY-FIRST CAUSE OF ACTION:
## BREACH OF CONTRACT

*(Against Steel Brodhead, Lange, Moneta, Bryan and Duke University)*

1223. Plaintiffs incorporate all of the foregoing allegations by reference here.

1224. Upon Plaintiffs' enrollment, the Plaintiffs and University entered into a contractual relationship. The Student Bulletin is a contract between Plaintiffs and the University (the "University Contract").

1225. The University Contract incorporates the Undergraduate Student Code of Conduct, the policies forbidding harassment, and the disciplinary processes and procedures attendant to violations of the Code, and is therefore a binding contract with respect to the extent of the University's authority to regulate, discipline, punish and suspend Plaintiffs from the University, among other limitations and obligations.

1226. The University willfully breached material terms of the University Contract with each Plaintiff in this action as alleged herein, including for example:

   A. At the direction of the Chairman, Brodhead, Lange, Moneta, Wasiolek, and Bryan, acting individually and in concert, caused McFadyen, Wilson, and Archer to be subjected to suspensions that were themselves violations of Plaintiffs' contract rights;

B.  Further, those extreme sanctions were imposed pursuant to procedures that clearly and intentionally violated Plaintiffs' contractual rights, as alleged with respect to each Plaintiff herein.

C.  Steel, Brodhead, and Burness, and other University officials with final policymaking authority permitted, condoned, ratified, and even participated in the ongoing public humiliation, condemnation, harassment by the University's faculty, administrators and staff, in a clear violation of the University Contract's promise of protection from such abuse at the hands of faculty, administrators, staff or other University employees on campus, in their classrooms, and on University-owned property situated off-campus, particularly when the Faculty's harassment and condemnation of their students is carried by internationally syndicated news programs.

D.  Invading, collecting, and synthesizing federally protected, private financial information that the University was contractually bound to safeguard by virtue of the Duke Transaction Card Agreement, as well as the federal and state banking and education laws.

E.  Upon disclosure of the private banking and educational records the University contractually promised to protect, failing to provide notice before or within a reasonable time after a massive breach of Plaintiffs' contractual privacy rights orchestrated by the Chairman of the University and senior University Officials.

1227.  As a direct and proximate result of the University's deprivations of Plaintiffs' contractual rights to the procedural and substantive safeguards the University promised to each of them, Plaintiffs suffered damages in an amount to be determined by a jury.

1228. As a direct result of those violations of Plaintiffs' contractual rights, Plaintiffs have suffered damages in an amount to be awarded by a jury at trial.

## TWENTY-SECOND CAUSE OF ACTION:
## INVASION OF PRIVACY

*(Against the Chairman, the CMT Defendants, Duke Police Supervising Defendants, and Duke University)*

1229. Plaintiffs incorporate the preceding allegations by reference here.

1230. Duke University, by and through the Chairman, the CMT Defendants, Duke Police Supervising Defendants and other employees and agents, intentionally intruded, physically and otherwise, upon the Plaintiffs' solitude or seclusion and/or Plaintiffs' private affairs or concerns, as alleged herein, including, but not limited to the invasion of their homes and other private places, unauthorized invasion, collection, and dissemination of Plaintiffs' private financial and educational records maintained by the University, opening the Plaintiffs' private electronic mail accounts, and subjecting them to harassment, taunting, death threats, and threats of violence on campus and in their homes.

1231. The intrusions upon Plaintiffs' privacy as alleged herein would be highly offensive to a reasonable person.

1232. The invasions of Plaintiffs' privacy were for the purpose of obtaining and then distorting evidentiary material to subject the Plaintiffs to public condemnation, public outrage, and infamy in the eyes of hundreds of millions of people.

1233. The deliberate, purposeful conduct of the Chairman, the CMT Defendants, the Duke Supervising Defendants, and Duke University was accomplished by fraud and deceit, as alleged herein, and evinces the Defendants' malicious and corrupt motives and their deliberate indifference to the Plaintiffs federally protected rights

1234. As a direct and proximate result of the University's invasion of Plaintiffs' privacy, Plaintiffs suffered damages as alleged herein in an amount to be determined by a jury at trial.

## TWENTY-THIRD CAUSE OF ACTION:
## BREACH OF FIDUCIARY DUTY & AIDING AND ABETTING

*(Against Steel, Drummond, Dawkins, Moneta, Bryan, Duke University, Gottlieb, Himan, Ripberger, Lamb, Council, Hodge, Chalmers, and Baker, in their individual and official capacities, and Nifong in his individual and official capacity with respect to the City of Durham, and the City of Durham)*

1235. Plaintiffs incorporate the foregoing allegations by reference here.

1236. A fiduciary relationship existed between Plaintiffs and Steel, Drummond, Dawkins, Moneta, Bryan, and Duke University.

1237. Plaintiffs placed Steel, Drummond, Dawkins, Moneta, Bryan, and Duke University in a position of special confidence and trust with respect to their financial records, banking records, educational records, and email accounts, including but not limited to protecting those records and accounts against the unauthorized or malicious disclosure of and dissemination to third parties, without prior or subsequent notice of third-party access and disclosure.

1238. Plaintiffs entrusted and confided in these Defendants the due protection of their private, confidential records and accounts against invasion and disclosure; thereby putting Defendants in a position of control over Plaintiffs' interests in these records and accounts.

1239. The agreement between Plaintiffs and Duke University governing the Plaintiffs' Duke-issued transaction cards required Duke University to safeguard the privacy of Plaintiffs' personal financial accounts on deposit with Duke University and the privacy of reports of Plaintiffs' account activity with their Duke financial transaction cards.

1240. Federal banking laws and state banking laws required Duke University to safeguard the privacy of Plaintiffs' Duke Card Account transactions.

1241. At a minimum, this relation of trust and confidence imposed a fiduciary duty upon the Defendants to protect Plaintiffs' accounts and records from unauthorized access and/or disclosure; the duty to notify Plaintiffs before their invasion and disclosure of their intent to invade and disclose information in Plaintiffs' accounts and records in a manner injurious to Plaintiffs' interests; and—at a bare minimum—the duty to notify Plaintiffs after their private accounts and records have been invaded, reproduced and disseminated.

1242. At the direction of the Chairman, Drummond, Dawkins, Moneta, Bryan , other, as yet unknown Duke University employees, and Duke University deliberately breached their fiduciary duties to Plaintiffs with respect to these private, confidential records and accounts by, for example:

A. Accessing, copying and disclosing to M.D. Gottlieb, Nifong, and others all or portions of Plaintiffs' private, personal email accounts;

B. Accessing, copying and disclosing to M.D. Gottlieb, Nifong, and others all or portions of Plaintiffs' personal, private transaction card accounts;

C. Accessing, copying and disclosing to M.D. Gottlieb, Nifong and others, all or portions of Plaintiffs' educational records.

1243. Plaintiffs relied and acted in reliance upon Defendants to honor their fiduciary obligations.

1244. Steel, Drummond, Dawkins, Moneta, Bryan, and Duke University were aware of the grave peril Plaintiffs were facing, and knew specifically, from the March 29th Joint Command Meeting, that the investigation was at a "stalemate," (a euphemism coined by Inv. Himan in testimony at Nifong's disbarment trial to describe the complete absence of evidence to corroborate Mangum's story); and they knew that the information in Plaintiffs' private accounts and records would be sufficient to break the "stalemate" Defendants, individually and in concert.

1245. To break the "stalemate," and pursuant to Steel's direction, Drummond, Dawkins, Graves, Dean, Moneta, Bryan, Duke University breached the University's fiduciary duties with the intent to injure Plaintiffs' interests and promote the University's interests by collecting and divulging to third-parties Plaintiffs' Duke Card financial accounts and records.

1246. As a direct and proximate result of the Defendants' breach of their fiduciary duties, Plaintiffs suffered damages in an amount to be determined by a jury at trial.

_____

1247. Further, Himan, Gottlieb, Nifong, Ripberger, Lamb, Council, Hodge, Chalmers, Baker, and the City of Durham were actually aware that Steel, Drummond, Dawkins, Moneta, Bryan, and Duke University violated their fiduciary duties as alleged herein; and, aware of those violations, provided substantial assistance in the achievement of their violations by, for example:

    A.    Directly assisting in accessing, retrieving, mining and synthesizing the contents of Plaintiffs' private, confidential financial, educational and communications accounts and records;

    B.    Retaining forensic experts and applying specialized computer programs to expedite the collection and analysis of information in Plaintiffs' accounts and records; and

    C.    Participating in the cover-up of the violations in numerous ways, but most dramatically, in the staging of a nationally televised hearing in the Durham County Superior Court upon Plaintiffs' Motion to Quash subpoenas issued for the purpose of obtaining *ex post facto* judicial authorization for the prior unauthorized disclosures of Plaintiffs' confidential accounts and records and further concealing from Plaintiffs the violations.

1248. As a direct and proximate result of Defendants' aiding and abetting of the primary violations, Plaintiffs have suffered damages in an amount to be determined at trial.

## TWENTY-FOURTH CAUSE OF ACTION:
## FRAUD

*(Against Drummond, Smith, Dean, Graves and Duke University)*

1249. Plaintiffs incorporate the preceding allegations by reference here.

1250. On or about June 1, 2006, Defendant Drummond caused a letter to be delivered to each of the Plaintiffs stating that Defendant Nifong issued the May 31 Subpoena for Duke Card Records, directed to each Plaintiffs' educational records, in particular, seeking a full report of all of Plaintiffs' Duke Card transactions during a specified period between March 13, 2006 and March 14, 2006.

1251. Drummond's Subpoena Letter advised each of the Plaintiffs that, if he wished to preserve the privacy of their financial and/or educational records contained in their individual Duke Card account, he would be required to file pleadings with the court to quash and/or modify the subpoena directed to his records.

1252. Drummond's Subpoena Letter did not advise the Plaintiffs that, in fact, the University had produced and delivered the same records to Gottlieb, Himan, and Nifong on March 31, 2006, as part of the planning of the conspiracy to manufacture identification evidence in the April 4th identification procedure.

1253. Drummond was, at all relevant times, acting for and on behalf of Duke University and within the course and scope of his employment.

1254. Drummond's representations to each of the Plaintiffs concerning the protected and private status of their Duke Card records at the time Drummond's Subpoena Letter

was sent were false, and Drummond knew they were false at the time that he made them.

1255. Drummond's false representations were made with intent to deceive Plaintiffs and to induce them to retain counsel to file a motion to quash, written argument in support of the motion and to appear in court to argue the merits of the motion on their behalf. Upon information and belief, the subpoena and Drummond's and Duke University's false representations were produced with the intent cover up and conceal from Plaintiffs the fact that the critical private banking and/or educational records and information sought in the subpoena had already been disclosed illegally by Drummond and Duke University months before.

1256. Drummond's and Duke University's misrepresentations did in fact deceive Plaintiffs, and in reliance upon them, Plaintiffs retained counsel to prepare and file a motion to quash the subpoena to preserve the privacy of Plaintiffs' banking and/or educational records, prepare and file written argument in support of the motion; and to appear in court to argue the merits of each of the Plaintiffs' motions.

1257. Further, at all times relevant to this cause of action, several other Duke University employees, including but not limited to Defendants Smith, Stotsenberg, Dean and Graves, knew that Gottlieb, Himan and Nifong already had in their possession the same materials identified in the Nifong's subpoenas, and at issue in the motions and hearings because Smith and Stotsenberg had participated in producing, compiling and delivering the Plaintiffs' private financial, banking and/or educational records from the Duke Card office months before on March 31, 2006, and Dean and Graves

directed, oversaw, condoned or subsequently ratified their production and delivery of Plaintiffs' private materials.

1258. Defendants' prior disclosure of Plaintiffs' private financial, banking and/or educational records was not revealed until Plaintiffs' defense counsel inquired about a vague reference in Gottlieb's "Supplemental Case Notes." Plaintiffs' defense counsel inquired about the matter with university counsel on January 31, 2007. Shortly thereafter, university counsel inquired with Defendants Smith and/or Stotsenberg, and reported to Plaintiffs' defense counsel that Smith admitted that he and Stotsenberg had disclosed the private information to Himan, Gottlieb, and Nifong on March 31, 2006.

1259. Drummond, Smith, Stotsenberg, Dean and Graves, at all relevant times relevant to this cause of action, were acting for and on behalf of Duke University and within the course and scope of their employment with Duke University.

1260. As a direct and proximate result of the Defendants Smith, Stotsenberg, Drummond and Duke University's fraud, Plaintiffs have been damaged in an amount to be determined by a jury, and, additionally, as a result of Defendants' fraud, Plaintiffs are entitled to recover punitive damages in an amount to be determined by a jury.

## TWENTY-FIFTH CAUSE OF ACTION:
## NEGLIGENCE (DURHAM POLICE)

*(Against Gottlieb, Himan, Addison, Michael, Russ and Hodge in their
Individual and Official Capacities, and the City of Durham)*

1261. Plaintiffs incorporate the preceding allegations by reference here.

1262. At the time of the Durham Police Statements described above, Gottlieb, Himan, Addison, Michael and Hodge each owed Plaintiffs a duty to use due care with respect to his public statements concerning the investigation of Mangum's claims.

1263. At the time of the events alleged above, Gottlieb and Himan owed Plaintiffs a duty to use due care with respect to the investigation of Mangum's allegations.

1264. At the time they made their respective Durham Police Statements, Addison and Hodge each knew or should have known that such statements were false and inflammatory and likely to cause Plaintiffs harm.

1265. At the time Gottlieb and Himan committed the acts and omissions alleged above, they knew or should have known that they violated or departed from Durham Police policies and procedures, violated or departed from professional standards of conduct, violated constitutional rights, and were likely to cause Plaintiffs harm.

1266. In committing the aforementioned acts and/or omissions, Addison, Gottlieb, Himan, and Hodge negligently breached said duties to use due care, which directly and proximately resulted in the injuries and damages to the Plaintiffs as alleged herein.

1267. As a direct and foreseeable consequence of these deprivations, Plaintiffs have suffered loss of education, loss of privacy, loss of property, loss of liberty, physical harm, emotional trauma, and irreparable harm to their reputations, and economic loss,

including but not limited to the costs of retaining counsel, forensic experts, investigators and other professionals reasonably necessary to aid in their defense throughout the 13-month police investigation of Mangum's false claims and under constant threat of prosecution as accomplices or principals in a rape, sexual offense and kidnapping that the Defendants knew never occurred.

## TWENTY-SIXTH CAUSE OF ACTION:
## NEGLIGENT HIRING, RETENTION, SUPERVISION, TRAINING & DISCIPLINE (DURHAM POLICE)
*(Against the Durham Police Supervising Defendants in Their Individual and Official Capacities, and the City Of Durham)*

1268. Plaintiffs incorporate the preceding allegations by reference here.

1269. At the time of the events alleged above, each of the Durham Police Supervising Defendants, and the City of Durham owed Plaintiffs a duty to use due care in the hiring, training, supervision, discipline, and retention of Durham Police personnel, including the personnel involved in the investigation of Mangum's claims.

1270. The Durham Police Supervising Defendants negligently supervised Defendant Gottlieb by failing to discipline him, retrain him, and/or terminate his employment when they knew of his propensity to abuse his charging and arrest authority, and otherwise engage in misconduct in his encounters with Duke students that was escalating prior to March 14, 2006, but instead, assigned him or acquiesced in his assignment to the police investigation of Mangum's false accusations against 47 Duke students.

1271. The Durham Police Supervising Defendants negligently trained, assigned and
supervised Defendant Himan by allowing him to be assigned to the police
investigation into Mangum's allegations, notwithstanding Himan's lack of prior
experience in major felony investigations.

1272. The Durham Police Supervising Defendants negligently supervised Defendants
Addison, Michael, Gottlieb, and Himan, with respect to the conduct of criminal
investigations, as alleged herein, including by way of example:

A.    The appropriate division for the assignment of case;

B.    The General Orders prohibiting bias-based policing;

C.    The issuance of public statements relating to an open investigation outside of the
protocol established by the Department;

D.    The conduct of eyewitness identification procedures;

E.    The service of outstanding warrants on witnesses in a criminal investigation or
proceeding;

F.    Prohibiting threats, inducements, or intimidation of witnesses;

G.    The standards for police reports, investigator's notes, and other reports of
investigations, including the timely and truthful preparation of such documents;

H.    The requirements for obtaining NTID Orders, including the requirement of a 90-
day return inventory, the requirement that Affiants supporting NTID Orders
must be truthful and must not knowingly allege false or fabricated assertions of
fact, that NTID Orders shall not be used for ulterior purposes not contemplated
by the laws authorizing them; and that citizens subjected to NTID Orders are

entitled to the results of any tests conducted with the products of their Nontestimonial procedures as soon as they are available.

I.    The supervision of private companies engaged to provide scientific testing or other services in connection with a police investigation; and

J.    The standards for probable cause and reasonable suspicion.

1273.  The Durham Police Supervising Defendants further negligently supervised Gottlieb and Himan by ignoring evidence demonstrating the misconduct underlying the investigation, and instead continuing to allow Nifong to have primary responsibility for the police investigation, ordering Gottlieb and Himan to look to Nifong for direction as to the conduct of that investigation, and having Gottlieb and Himan continue to serve on that investigation.

1274.  The Durham Police Supervising Defendants further negligently supervised Addison by ignoring the false and inflammatory Addison Statements, failing to retract such statements, failing to reprimand Addison for such statements, and failing to remove Addison from his role as a spokesperson for the Durham Police Department. To the contrary, Hodge joined Addison by publicly stating that Durham Police had a strong case.

1275.  In committing the aforementioned acts or omissions, each Durham Police Supervising Defendant negligently breached said duty to use due care, which directly and proximately resulted in the injuries and damages to Plaintiffs as alleged herein.

1276.  As a direct and foreseeable consequence of the Durham Police Supervising Defendants' conduct Plaintiffs suffered irreparable injury to their reputations; loss of

future earning capacity; economic loss caused by their need to retain counsel in the ongoing criminal investigation and to defend themselves against the threatened criminal charges of the most serious kind, as either principles or as accomplices; physical and emotional harm, loss of liberty and property, loss of privacy, and permanent harm to their reputations.

## TWENTY-SEVENTH CAUSE OF ACTION:
## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS (DURHAM PD)

*(Against Gottlieb, Himan, Ripberger, Lamb, Council, Hodge, Mihiach, Addison, Russ and Chalmers, in their Individual and Official Capacities; and the City of Durham and Duke University)*

1277. Plaintiffs incorporate the preceding allegations by reference here.

1278. Addison, Michael, Hodge, Chalmers, the City of Durham, and Duke University acted individually and in concert to subject Plaintiffs to national and international public infamy, made them pariahs in their communities and around the world, and forced them to endure the extortionate pressures caused by their conduct for over a year, while under the threat of criminal prosecution for the horrific crimes they alleged and which never happened.

1279. Gottlieb, Himan, Hodge, Ripberger, Lamb, Chalmers, and the City of Durham acted individually and in concert to manufacture false evidence and to conceal evidence of proving Plaintiffs' innocence with the purpose and intent of ensuring that Plaintiffs and/or their teammates were prosecuted, convicted, and incarcerated on allegations of rape, sexual assault, and kidnapping, which they knew to be false and unsupported by any credible evidence.

1280. Gottlieb, Himan, Nifong, Meehan, Clark and DNASI acted individually and in concert in violation of Durham Police policies and procedures, professional standards, a judicial order, state statutes and constitutional commands in failing or refusing to provide Plaintiffs copies of the reports of DNASI test results that were made available to Gottlieb, Nifong and Himan on or before April 10, 2006.

1281. It was reasonably foreseeable that Plaintiffs would suffer emotional and psychological harm as a result of these Defendants' conduct.

1282. As a direct and foreseeable consequence of Gottlieb, Himan, and the Durham Police Supervising Defendants' conduct, Plaintiffs have suffered and continue to suffer from diagnosable emotional and mental conditions causing disabling emotional, mental, and physical harm.


### TWENTY-EIGHTH CAUSE OF ACTION:
### NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

*(Against Nifong in his individual capacity and his official capacity with respect to the Durham Police; Addison, Michael in their individual and official capacities; the Durham Police Supervising Defendants, in their individual and official capacities; and the City of Durham)*

1283. Plaintiffs incorporate the preceding allegations by reference here.

1284. Nifong, Addison, and the Durham Police Supervising Defendants acted individually and in concert to make consciously parallel false and inflammatory public statements accusing Plaintiffs of criminal conduct, including first degree rape, first degree sexual offense, conspiracy to commit murder, kidnapping, and obstruction of justice—as

either principals or accomplices in those crimes—while ignoring or willfully blind to the overwhelming evidence that their statements were false, the Plaintiffs were innocent of those crimes, and that none of those crime occurred.

1285. Addison, Nifong and the Durham Police Supervising Defendants acted individually and in concert to publish false and inflammatory statements accusing Plaintiffs of refusing to cooperate and obstruction of justice and the police investigation into Mangum's claims, ignoring the evidence of Evans, Flannery, and Zash's and complete and total cooperation with the search warrant at 610 N. Buchanan and subsequent interviews and medical testing, and the entire Duke lacrosse team's total cooperation with the NTID Order procedure.

1286. Addison, Nifong and the Durham Police Supervising Defendants' conduct subjected Plaintiffs to public outrage and condemnation in their own communities, and before a national and international audience of millions.

1287. Addison, Nifong and the Durham Police Supervising Defendants were negligent in engaging in this conduct; it would have been reasonably foreseeable that Plaintiffs would suffer emotional and psychological harm as a result of their conduct.

1288. As a direct and foreseeable consequence of Nifong, Addison and the Durham Police Supervising Defendants' conduct, Plaintiffs have suffered and continue to suffer from diagnosable conditions causing disabling emotional, mental, and physical harm, and as a result, Plaintiffs are entitled to damages in an amount to be determined at trial.

## TWENTY-NINTH CAUSE OF ACTION:
## NEGLIGENCE (DUKE POLICE)

*(Against Duke University and the Duke University Police Department)*

1289. Plaintiffs incorporate the preceding allegations by reference here.

1290. Duke Police Department had primary jurisdiction over the investigation of Mangum's gang-rape allegations.

1291. At all relevant times, Duke Police Department expressly and impliedly represented to the public and to Plaintiffs that its officers conducted investigations of criminal allegations in a skilled and proper manner and possessed the skill and degree of professional learning ordinarily possessed by other law enforcement agencies conducting investigations and enforcing the laws in the same or similar communities.

1292. Mangum reported to law enforcement that she had been gang-raped sometime in the late evening of March 13, 2006 or the early morning hours of March 14, 2006, at a party held in the private residence at 610 N. Buchanan Boulevard.

1293. At the time Ms. Mangum claimed she was raped and sexually assaulted at 610 N. Buchanan Blvd., Duke Police had a statutory obligation to initiate and conclude an investigation of Mangum's claims.  That statutory obligation to investigate was also incorporated into the Jurisdictional Agreement between Duke University and the City of Durham

1294. To carry out its statutory obligation to investigate, North Carolina statutes and the Jurisdictional Agreement gave the Duke Police Department all of the powers and authority granted to every municipal police department in North Carolina.

1295. Duke Police initiated an investigation of Mangum's claims; beginning at approximately 3:00 a.m. on March 14, 2006, shortly after responding officers concluded that the sexual assault Mangum reported allegedly occurred at 610 N. Buchanan Blvd.

1296. Duke Police failed to pursue its investigation beyond March 16, 2006, and never concluded it. Instead, Duke Police abdicated its statutory obligation to conclude their investigation of Mangum's false accusations, in favor of participating in the framing of the Plaintiffs and their teammates for the commission of crimes that they knew did not happen.

1297. Compounding the injury resulting from Duke Police's failure to investigate, Duke Police ceded all of its investigative authority to an investigator with roughly two months experience, who was to be supervised by Gottlieb, who was known to Duke Police and Duke Administrators to harbor unmitigated contempt for Duke students, and who had exhibited a propensity to abuse his police authority in virtually all of his dealings with Duke students.

1298. Duke Police handed a known rogue officer the power to inflict geometrically greater damage to Plaintiffs and their teammates than Gottlieb was given by the Durham Police Department in the past. In fact, Duke Police gave Gottlieb the power to destroy Plaintiffs' lives and their reputations only weeks after Durham Police moved to take Gottlieb off the patrol beat in order to preclude him from abusing his charging authority by fabricating misdemeanor charges.

1299. Duke Police Department Defendants were negligent in that:

A. They did not possess the degree of professional learning skill, and ability which other law enforcement officers similarly situated ordinarily possess;

B. They negligently failed to insist that the command staff implement adequate and immediate tests and investigative procedures in order to establish the truth or falsity of the accuser's account;

C. Duke Police Department Officers negligently failed to observe the conduct of the investigation, the evidence obtained in the investigation, and convey to Command Staff and Duke Administrators the quickly accumulating and overwhelming evidence of innocence or the conspiracy to obstruct justice that was being carried out in plain view in an investigation within Duke Police Department's primary jurisdiction;

D. Duke Police Department Officers negligently failed to insist or demand that Duke Police Department immediately intervene in the investigation or attend to the open misconduct that was rampant in the investigation from its outset;

E. Duke Police Officers negligently failed to notify a Duke Police Supervising Officer of changes or developments in the investigation;

F. Duke Police Officers negligently failed to use their own judgment in getting Duke Police Supervising Defendants and Duke Officials to examine the evidence of the Students' innocence or the evidence of the Durham Police and prosecutor's misconduct in the investigation; and

G. Duke Police Officers negligently failed or refused offers made by the Students and their agents to provide them with evidence that established that Mangum's s account (every version of it) was a fraud.

1300. As a direct and proximate result of the foregoing negligence, Plaintiffs suffered damages in an amount to be determined at trial.

## THIRTIETH CAUSE OF ACTION:
## NEGLIGENCE (DUKE)

*(Duke University Defendants in their Individual and Official Capacities and Duke University)*

1301. Plaintiffs incorporate the foregoing allegations by reference herein.

1302. Duke University and the Duke University Defendants owed Plaintiffs a duty of care to warn and otherwise affirmatively act to protect Plaintiffs from harm by virtue of unique relationships that existed between the University and the Plaintiffs as students and as student-athletes. The special relationship is predicated upon unique features of the relationship between the University and the Plaintiffs, including, for example:

A. Plaintiffs were (and Ryan McFadyen remains) members of a University-sponsored, Division I, revenue-generating intercollegiate team;

B. The University vigorously recruited Plaintiffs to attend the University and participate in the University's nationally prominent Division I Men's Lacrosse Program.

C. By virtue of their status as members of that Program, Plaintiffs were particularly vulnerable and dependent upon the University who, correspondingly, held considerable power over the Plaintiffs' welfare;

D. The University retained existing and/or potential economic advantage by virtue of their relationship with Plaintiffs to an extent that fairness required the University to help and/or protect the Plaintiffs, based upon the Plaintiffs'

reasonable expectation of protection, which itself was, in part, based upon the University's expectation of financial gain;

E.   The University's dependence upon the Plaintiffs for a variety of benefits, the Plaintiffs' dependence upon the University for a variety of benefits, and/or a mutual dependence between the Plaintiffs and the University for a variety of benefits.  For example:

F.   Plaintiffs were responsible for competing at the highest levels of competition in intercollegiate lacrosse at games sponsored by the school and from which the school generated significant revenues and goodwill in a sector of the country that the University relies upon for student recruiting and alumni donations generally;

G.   Plaintiffs were responsible for representing the University at athletic events, media events, tournaments, community outreach events and alumni events, all of which are designed, at least in part, to enhance the University's image, attract donations and increase the University's goodwill nationally; and

H.   Plaintiffs received significant benefits from the University as a result of participating in the Men's Lacrosse program, including the provision of school uniforms purchased by the University; the provision of transportation by the University; and the use of the University's facilities and equipment for practices.

I.   Further, the University's exercised significant control over many aspects of the Plaintiffs' lives by virtue of their membership on the Men's Lacrosse team.  As a result, Plaintiffs had greater reasonable expectations viz. the protections they would receive from the University.  Among other things, by virtue of the University's control over their lives and decisions, Plaintiffs had a reasonable expectation that, in the absence of the University's warning that particular

circumstances known to the University posed significant risk, the University had determined such circumstances to involve nominal or no risk.

1303. The Duke University Defendants breached breach the duty of care it owed to the Plaintiffs as alleged herein and by, for example:

A.  Failing to act with respect to the known and foreseeable dangers relating to Mangum's allegations.

B.  Failing to act with respect to the known and foreseeable dangers relating to Mangum herself;

C.  Failing to act with respect to the known and foreseeable dangers relating to Nifong, Gottlieb, Clayton, Himan, Himan's Chain of Command, the Durham Police Supervising Defendants, and the City of Durham's policies and customs;

D.  Failing to act with respect to the known and foreseeable dangers relating to Levicy, Arico, Manly, Dzau, and the policies or customs of DUHS.

E.  Failing to act with respect to the known and foreseeable dangers relating to the policies and customs of the Duke Police Department

F.  Failing to act with respect to the known and foreseeable dangers relating to the Durham Police Department.

G.  Failing to act with respect to the known and foreseeable dangers relating to the Chairman's

H.  The known and foreseeable dangers known to them with respect to the need failure to advise Plaintiffs to seek qualified, competent legal counsel to advise them during the course of the investigation;

I.    The University's failure to provide a qualified, competent supervisor familiar with the Plaintiffs' legal rights and with standard investigative practices to oversee the investigation and particularly to intervene to prevent Gottlieb's likely retaliatory efforts;

J.    The University's failure to notify Plaintiffs' parents of the accusations;

K.    The University's failure to safeguard Plaintiffs' private email accounts, private financial records, private banking records, and materials (including their pictures) that were made publicly available by virtue of the Plaintiffs' membership in the University's Men's lacrosse program.

L.    The University's failure to evaluate the skill, experience or judgment of legal counsel that the University's Dean of Students Administrators recommended to the Plaintiffs long after;

M.    The University's failure to evaluate course of action to be pursued by the University's chosen counsel, or to advise the Plaintiffs after selecting counsel that they should consider obtaining counsel independent of that offered by the University's Dean of Students Administrators;

N.    Having undertaken to recommend counsel, the University's to exercise due care in doing so;

O.    The University's failure to correct the false and misleading statements, which Administrators knew to be demonstrably false, made to the media by the University's faculty and staff who were acting in the course and scope of their employment; and

P.    The University's failure to clarify that those faculty members and staff did not speak for the University when they falsely condemned Plaintiffs before a

national and international audience for having committed acts they never, in fact, committed.

1304. As an actual and proximate result of the University's negligence, the Plaintiffs suffered significant damages in an amount to be proven at trial and determined by a jury.

1305. Further, it was reasonably foreseeable that Plaintiffs would suffer emotional and psychological harm as a result of Defendants' failures to act or warn of dangers known to them as alleged herein.

1306. The Defendants' negligence was the product of Duke University's negligent hiring, retention, supervision, and training of those whose negligence caused the Plaintiffs' injuries and damages as alleged herein.

1307. As a direct and proximate result of Defendants' negligence, Plaintiffs were subjected to the continuing threat of prosecution for perpetrating and/or aiding horrific crimes, subjected Plaintiffs to public outrage and infamy, made them outcasts in their communities, and subjected them to the condemnation of millions who watched Defendants' fabrications unfold in the media.

1308. As a direct and foreseeable consequence, Plaintiffs have suffered and continue to suffer from diagnosable emotional and mental conditions causing disabling emotional, mental, and physical harm.

## THIRTY-FIRST CAUSE OF ACTION:
## NEGLIGENCE (SANE)

*(Against the Levicy, Arico, Manly and Dzau, in their individual and official capacities; PDC, DUHS, and Duke University)*

1309. Plaintiffs incorporate the preceding allegations by reference here.

1310. At all times relevant to this action, Levicy, Manly, and Arico were acting within the course and scope of their employment with PDC, DUHS, and/or Duke University.

1311. At all times relevant to this action, those times Levicy and Arico made public statements and statements to law enforcement authorities, they both owed Plaintiffs a duty to use due care with respect to public statements and statements to law enforcement concerning the investigation of Mangum's claims.

1312. At the time of the acts and events alleged above, Levicy, Arico, the PDC, DUHS and Duke University owed Plaintiffs a duty to use due care with respect to their involvement in the investigation of Mangum's false accusations, including the provision forensic medical evidence relating to the investigation.

1313. At the time they made their respective public statements and statements to law enforcement falsely claiming the medical evidence supported Mangum's accusations, Levicy and Arico each knew or should have known that such statements were false and inflammatory and likely to cause Plaintiffs harm.

1314. At the time they fabricated the records of Mangum's SAE and delivered them to the police investigators, Levicy and Arico knew or should have known that such conduct was likely to cause Plaintiffs harm.

1315. At the time DUHS, PDC, or Duke University assigned Levicy to conduct Mangum's SAE, they knew or should have known that Levicy was incompetent to perform the SAE, and that her participation in the SAE was likely to cause Plaintiffs harm.

1316. At the time Levicy, Arico, Manly, DUHS, PDC and Duke University committed the acts and omissions alleged herein, they knew or should have known that such conduct violated or departed from DUHS policies and procedures, violated and deviated from the professional standard of care in the same or similar communities, would likely lead to the violation of Plaintiffs' constitutional rights, and would likely cause Plaintiffs harm.

1317. In committing the aforementioned acts and/or omissions, Levicy, Arico, PDC, DUHS, and DUMC negligently breached their duties to use due, failed to meet the professional standard of care established for the provision of SANE services and the conduct and record keeping of forensic sexual assault examinations in the same or similar communities, which directly and proximately resulted in the injuries and damages to the Plaintiffs as alleged herein and in an amount to be shown at trial.

### THIRTY-SECOND CAUSE OF ACTION:
### NEGLIGENT HIRING, RETENTION, SUPERVISION, TRAINING & DISCIPLINE (SANE)
*(Against Arico, Manly, the PDC, DUHS, and Duke University)*

1318. Plaintiffs incorporate the preceding allegations by reference here.

1319. Arico, Manly, the PDC, DUHS and Duke University owed Plaintiffs a duty to use due care in the hiring, training, supervision, discipline, and retention of forensic SANE

nurses, record keepers, and other related personnel, including the personnel with respect to the investigation of Mangum's claims and the preservation of the records relating to Mangum's SAER..

1320. Arico, Manly, the PDC, DUHS and Duke University negligently supervised Defendant Levicy by failing to monitor her conduct and performance, to discipline her, retrain her, and/or terminate her employment when they knew of her propensity to abuse her status as a forensic nurse examiner to prop up or fabricate evidence to support plainly false claims of sexual assault, fabricate forensic medical records, and otherwise engage in misconduct in the performance of her duties as a SANE nurse, but instead, assigned her or acquiesced in her assignment to conduct Mangum's SANE exam while still a SANE in training.

1321. Arico, Manly, the PDC, DUHS and Duke University negligently supervised Defendant Levicy, failed to provide her with proper training, and failed to outline proper procedure to them in various respects relating to the appropriate conduct of a SAE and the appropriate protocol for documenting findings in the SAER, as established by DUHS

1322. Arico (viz. Levicy), Manly, the PDC, DUHS and Duke University further negligently supervised Levicy and Arico by ignoring evidence demonstrating their misconduct in their public statements and statements to law enforcement and prosecutorial authorities, and instead continuing to allow Levicy to hold herself out to law enforcement and prosecutorial authorities and to the public as an expert qualified to render opinions as to observations during an SAE that she did not conduct, nor was

qualified to evaluate, and, throughout the 13 month investigation, to allow Levicy and Arico to continue to proffer testimony, expert and otherwise.

1323. Arico (viz. Levicy), Manly, the PDC, DUHS and Duke University further negligently supervised Levicy and Arico by ignoring their false, unsupportable, reckless and inflammatory statements to the public and to law enforcement and/or prosecutorial authorities, failing to retract such statements, failing to reprimand Levicy or Arico for making such statements, and failing to remove Levicy or Arico from their roles within DUHS's and/or DUMC's SANE program.

1324. In committing the aforementioned acts or omissions, Arico, Manly, the PDC, DUHS and Duke University each negligently breached their respective duties to use due care, which directly and proximately resulted in the injuries and damages to Plaintiffs as alleged herein.

1325. As a direct and foreseeable consequence of Arico, Manly, the PDC, DUHS and Duke University's conduct, Plaintiffs suffered irreparable injury to their reputations; loss of future earning capacity; economic loss caused by their need to retain counsel in the ongoing criminal investigation and to defend themselves against the threatened criminal charges of the most serious kind, as either principles or as accomplices; physical and emotional harm, loss of liberty and property, loss of privacy, and permanent harm to their reputations.

## THIRTY-THIRD CAUSE OF ACTION:
## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS (SANE)
*(Against Levicy, Arico, Manly, the PDC, DUHS and Duke University)*

1326. Plaintiffs incorporate the preceding allegations by reference here.

1327. Levicy, Arico, Manly, the PDC, DUHS and Duke University acted individually and in concert to manufacture false evidence and to conceal the forensic medical evidence that proved Mangum's claims were false, for the purpose of enabling Durham Police to obtain and abuse an NTID Order, perpetuating the 13 month investigation, and in an attempt to force a trial on Mangum's claims, placing Plaintiffs and their teammates in grave danger of wrongful convictions, which charges they knew or reasonably should have known and believed were false and not supported by probable cause.

1328. Levicy, Arico, Manly, the PDC, DUHS and Duke University's conduct violated or departed from PDC, DUHS, and Duke University's policies and procedures, as well as state and federal guidelines and regulations governing the qualification of SANEs, the professional standard of care in conducting forensic sexual assault examinations and documenting the findings obtained therein for evidentiary purposes in criminal investigations.

1329. Levicy, Arico, Manly, the PDC, DUHS, and Duke University were negligent in engaging in this conduct, from which it was reasonably foreseeable that Plaintiffs would suffer emotional and psychological harm.

1330. Levicy, Arico, Manly, the PDC, DUHS and Duke University's conduct subjected Plaintiffs to the continuing threat of prosecution for perpetrating and/or aiding horrific crimes, subjected Plaintiffs to public outrage and infamy, made them outcasts in their

communities, and subjected them to the condemnation of millions who watched Defendants' fabrications unfold in the media.

1331. As a direct and foreseeable consequence of Gottlieb, Himan, and the Durham Police Supervising Defendants' conduct, Plaintiffs have suffered and continue to suffer from diagnosable emotional and mental conditions causing disabling emotional, mental, and physical harm.

## THIRTY-FOURTH CAUSE OF ACTION:
## NEGLIGENCE (DNASI)

*(Against Clark and Meehan in their individual and official capacities, and DNASI)*

1332. Plaintiffs incorporate the preceding allegations by reference here.

1333. At the time of the events alleged above, Clark, Meehan, and DNASI owed Plaintiffs a duty of due care with respect to their involvement in the police investigation of Mangum's claims.

1334. In April 2006, Clark, Meehan, and DNASI agreed to omit exculpatory findings that resulted from their scientific testing of Mangum's rape kit items from DNASI's report of the results of its scientific testing relating to the investigation.

1335. In April and May 2006, Clark, Meehan, and DNASI acted individually and in concert to produce the May 12 Report that misstated the purported results of DNASI's scientific testing relating to the investigation of Mangum's claims and omitted exculpatory findings that resulted from their scientific testing of Mangum's rape kit items.

1336. DNASI's acts and omissions failed to comply with DNASI's internal protocols, Federal Bureau of Investigation standards, and regulations governing accredited DNA testing facilities.

1337. At the time the April 10, 2006 meeting, it was plainly obvious and Clark, Meehan, and DNASI knew, or should have known, that their acts and omissions would result in the filing and prosecution of serious criminal charges against the Plaintiffs.

1338. At the time they presented copies of the results of each test conducted with Plaintiffs' DNA, they knew or should have known that the DNA testing exonerated Plaintiffs of horrific, violent crimes and that concealing of this explosive evidence could only serve to continue Plaintiffs' public ordeal and cause further damage to Plaintiffs.

1339. In committing the aforementioned acts and omissions, Clark, Meehan, and DNASI negligently breached the duties to use due care, which directly and proximately resulted in the injuries and damages to Plaintiffs as alleged herein.

### THIRTY-FIFTH CAUSE OF ACTION:
### NEGLIGENT SUPERVISION, HIRING, TRAINING, DISCIPLINE, AND RETENTION (DNASI)

1340. (Against Clark and Meehan in their individual and official capacities, and DNASI)

1341. Plaintiffs incorporate the preceding allegations by reference here.

1342. At the time of the events alleged above, Clark and Meehan held supervisory and policymaking positions at DNASI.

1343. At the time of the events alleged above, Clark, Meehan, and DNASI owed Plaintiffs a duty to use due care with respect to the scientific testing described above.

1344. Clark and DNASI negligently hired, supervised, and retained Meehan, failed to provide Meehan with proper training and discipline, and failed to instruct and enforce the protocol with respect to the reports of tests conducted by DNASI in a criminal investigation.

1345. Clark, Meehan, and DNASI negligently hired, supervised, and retained the DNASI personnel assisting Meehan in understanding the rudimentary requirement that every subject of an NTID proceeding must be provided with copies of the results of every test conducted with the subject's DNA.

1346. Clark, Meehan, and DNASI negligently failed to provide them with proper training, and failed to outline proper procedure to them with respect to the preparation and issuance of reports of scientific testing conducted by DNASI in a criminal investigation.

1347. Clark, Meehan, and DNASI negligently breached their duty to use due care with respect to the reporting of DNA evidence, which directly and proximately caused damages to Plaintiffs as alleged herein.

## THIRTY-SIXTH CAUSE OF ACTION:
## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS (DNASI)

*(Against Clark and Meehan in their individual and official capacities, and DNASI)*

1348. Plaintiffs incorporate the foregoing allegations by reference here.

1349. Clark, Meehan, and DNASI, acting individually and in concert, manufactured false and misleading DNA reports purporting to be the final reports of every tests

416

conducted with Plaintiffs' DNA, for the purpose of concealing from Plaintiffs the evidence of Plaintiffs' innocence in order to facilitate the indictment and prosecution of actually innocent Duke lacrosse players on charges of rape, sexual assault, and kidnapping, which charges they knew or reasonably believed were false and unsupported by their own scientific testing.

1350. Clark, Meehan, and DNASI's conduct subjected Plaintiffs to public condemnation, public outrage, and stigmatization in the eyes of millions of people all over the world.

1351. Clark, Meehan, and DNASI's conduct violated DNASI's own internal protocols, as well as generally accepted, governing industry standards, the FBI's standards, and the professional accreditation rules applicable to DNASI.

1352. Clark, Meehan, and DNASI were negligent in engaging in this conduct, from which it was reasonably foreseeable that Plaintiffs would suffer emotional and psychological harm.

1353. As a direct and foreseeable consequence of Clark, Meehan, and DNASI's conduct, Plaintiffs have suffered and continue to suffer from diagnosable emotional and mental conditions causing disabling emotional, mental, and physical harm.

## THIRTY-SEVENTH CAUSE OF ACTION:
## NEGLIGENCE (DUKE POLICE)

*(Against Duke Police Officers Mazurek, Day, Eason, and Falcon, solely in their official capacities with respect to Duke University; Best, Smith Stotsenberg in their individual and official capacities, and Duke University)*

1354. Plaintiffs incorporate the preceding allegations by reference here.

1355. At the time Best, Smith, Stotsenberg, Day, Mazurek, Falcon, Eason, and other Duke Police Officers were conducting the investigation into Mangum's claims, and subsequently when they were assisting Gottlieb's re-investigation and then Nifong's re-re-investigation, they each owed Plaintiffs a duty to use due care with respect to their involvement in these investigations of Mangum's claims, particularly insofar as their involvement required or otherwise threatened to promote the ongoing violation of Plaintiffs' constitutional rights, privacy rights, and rights to be free from gratuitous personal injury, among other things alleged in this action.

1356. At the time of the events alleged above, these Defendants owed Plaintiffs a duty to use due care with respect to the investigation of Mangum's false allegations.

1357. At the time that these Defendants made false and misleading witness statements to prop up Mangum's credibility in the eyes of the public and, ultimately, a jury, each one of those officers writing or otherwise orchestrating the production of those fabricated police statements knew or should have known that such witness statements fabricating evidence of Mangum's credibility and concealing evidence of her incredibility was likely to cause Plaintiffs harm.

1358. At the time these Defendants participated in the fabrication of police witness statements, they knew or should have known that they were violating Duke Police Department policies, procedures, General Orders, SOPs, constitutional commands, and that these multi-dimensional violations would perpetuate and facilitate the framing of the Plaintiffs for crimes these sworn officers—themselves—knew did not happen, and that it would cause Plaintiffs harm.

1359. In committing the foregoing acts and/or omissions, Best, Eason, Falcon, Mazurek, Day, and the Day Chain of Command, negligently breached their duties to use due care to avoid foreseeable harm to the Plaintiffs, which directly and proximately caused the injuries and damages to the Plaintiffs as alleged herein.

## THIRTY-EIGHTH CAUSE OF ACTION:
## NEGLIGENT SUPERVISION (DUKE POLICE)

*(Against the Duke Police Supervising Defendants in their individual and official capacities and Duke University)*

1360. Plaintiffs incorporate the foregoing allegations by reference here.

1361. At the time of the events alleged above, the Duke Police Supervising Defendants held supervisory positions at Duke University with respect to the Duke University Police Department.

1362. At the time of the events alleged above, the Duke Police Supervising Defendants owed Plaintiffs a duty to use due care with respect to their involvement in the investigation of Mangum's false accusations.

1363. The Duke Police Supervising Defendants and Duke University negligently hired, supervised, and retained the Day Chain of Command, failed to provide them with proper training and discipline, and failed to outline the proper procedures with respect to the preparation and issuance of police reports of their observations and personal knowledge obtained in the course of their duties on behalf of the Duke Police Department with respect to the conduct of a criminal investigation and the proper chain of command for investigations of criminal activity reported in their jurisdiction.

1364. The Duke Police Supervising Defendants and Duke University negligently hired, supervised and retained the DNASI personnel assisting and directing the Day Chain of Command, Day, Mazurek, Falcon, Eason, and others who participated in and/or assisted in the conduct of the criminal investigation of Mangum's false accusations, including but not limited to the preparation of non-falsified, non-misleading police reports of officers' actual personal observations in the course of the investigation, failed to provide them with proper training, and failed to outline proper procedure to them with respect to the conduct of investigations, the proper chain of command, and the preparation of police reports.

1365. The foregoing acts and omissions of the Duke Police Supervising Defendants and Duke University breached their duties to use due care, which directly and proximately caused the injuries and damages to Plaintiffs alleged herein.

### THIRTY-NINTH CAUSE OF ACTION:
### NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS (DUKE POLICE)
*(Steel, Duke CMT Defendants, and the Day Chain of Command, in their individual and official capacities, and Duke University)*

1366. Plaintiffs incorporate the preceding allegations by reference here.

1367. The Chairman, Duke University, the Duke CMT Defendants, Duke Police Supervising Defendants, the Day Chain of Command, Officers Mazurek, Falcon, Best, and Day, acting individually and in concert and in the course and scope of their employment with Duke University, manufactured false and misleading witness statements to manufacture inculpatory witness statements and conceal their personal

knowledge of evidence of Plaintiffs' innocence for the purpose of obtaining Plaintiffs' convictions on charges of first degree rape, first degree sexual offense and kidnapping, which they knew never happened.

1368. The Day Chain of Command, Officers Mazurek, Falcon, and Day and the Duke Police Supervising Defendants' conduct subjected Plaintiffs to the threat and fear of prosecution and conviction for those crimes, subjected them to public condemnation and infamy, and forced them to endure the extortionate pressures of public outrage directed at them for crimes the Defendants knew never happened.

1369. These Defendants' conduct in fabricating false witness statements, concealing exonerating evidence, and submitting them to Himan, Gottlieb and Nifong for their use in attempting to wrongfully convict Plaintiffs violated Duke Police General Orders, SOPs, accreditation rules for municipal law enforcement entities, Duke University policies and protocols, the Jurisdictional Agreement with the City of Durham, and the criminal laws of the State of North Carolina.

1370. At the time these Defendants engaged in this conduct, it was reasonably foreseeable that Plaintiffs would suffer emotional and psychological harm.

1371. As a direct and foreseeable consequence of the foregoing conduct, Plaintiffs have suffered and continue to suffer from diagnosable emotional and mental conditions causing disabling emotional, mental and physical harm.

## FORTIETH CAUSE OF ACTION:
## NEGLIGENT ENTRUSTMENT (DUKE POLICE)

*(Against Duke University, Duke Police Supervising Defendants, Duke Police)*

1372. Plaintiffs incorporate the preceding allegations by reference here.

1373. At all times relevant to this action, Defendant Duke University operated the Duke University Police Department.

1374. Sometime after March 16, 2006, Duke University and the Duke Police Department, by and through its agents and employees acting in the course and scope of their agency and employment, negligently entrusted the Duke Police Department's primary investigative and law enforcement authority and its official policymaking authority with respect to the investigation of Mangum's allegations to Nifong, Gottlieb, Himan, Clayton, Addison, Michael, and the Durham Police Supervising Defendants.

1375. The entrustment of Duke University Police Department's investigative authority to Defendants Gottlieb and Himan by Defendant Duke University and Duke Police Supervising Defendants was negligent in that Duke University knew, or should have known of the City of Durham's established custom and policy and the propensities of Nifong, Gottlieb, Himan, Clayton, Addison, Michael, and the Durham Police Supervising Defendants to violate the constitutional rights of Duke students with whom they come in contact, bearing false witness against them, subjecting them to public humiliation and stigmatization, precipitously and falsely declaring their guilt in criminal matters before trial and before the facts are known, fomenting local animus towards them, and otherwise engaging in, directing, authorizing, condoning and

ratifying official abuses of power under color of state law in their dealings with Duke students.

1376. Duke University, Duke Police Department and Duke University officials with policy making authority with respect to the investigation of Mangum's allegations had a duty to exercise due care in the exercise of its primary jurisdictional authority with respect to Mangum's allegations without injuring others; and, its officials with final policymaking authority over the investigation of Mangum's allegations had the same duty to exercise due care in any delegation of Duke University's and Duke University Police Department's primary jurisdictional responsibility and power with respect to the investigation of Mangum's claims, including but not limited to the duty to conduct a reasonable investigation of those individuals and entities to whom they delegated their final policymaking authority, prior to entrusting them with its responsibility, powers and authority.

1377. Steel and other Duke University officials and employees with final policymaking authority with respect to the investigation of Mangum's allegations were aware of the City of Durham's policies or customs with respect to its enforcement of the criminal laws and investigations of Duke students, abuses of the powers already retained over Duke students, the pattern of misconduct, the alarming and rapid escalation of the nature and degree of the constitutional violations and other misconduct occurring in interactions Duke students had with Gottlieb, Himan, Clayton, Nifong, Addison and other Durham Police Officers, the plainly inadequate training, supervision and correction of Gottlieb, Himan, Clayton, Addison, Michael, Nifong, and those in their

chains of command, and the deliberate indifference of Durham officials with final policymaking authority with respect to these matters.

1378. To a reasonable policymaker it would be plainly obvious that the decision to delegate Duke University's primary investigative and law enforcement powers and authority would result in the same or similar harms to Plaintiffs as alleged herein.

1379. After Duke University officials with final policymaking authority delegated its primary investigative responsibility and law enforcement authority to the City of Durham, the City of Durham Defendants engaged in foreseeable negligent, reckless, deliberately indifferent, intentional, and malicious conduct in the investigation of Mangum's allegations.

1380. The negligent entrustment of Duke University's primary responsibility and authority to investigate Mangum's allegations was a further direct and proximate cause of the deprivations of Plaintiffs' rights under Article IV of the United States Constitution, and the First, Fourth, Fifth and Fourteenth Amendments thereto and the other harms alleged herein.

1381. As a direct and proximate result of those deprivations and harms, Plaintiffs suffered damages in the form of loss of education, loss of privacy, loss of property, loss of liberty, physical harm, emotional trauma, and irreparable harm to their reputations, and economic loss, including but not limited to the costs of retaining counsel, forensic experts, investigators and others in order to defend themselves against the false claims and fabrication of evidence throughout the 13-month police investigation of

Mangum's claims, as both witnesses and putative defendants in a subsequent

prosecution of 'accomplices' to the alleged sexual assault.

## RULE 9(J) PRECERTIFICATION

1382. To the extent that any of the foregoing Causes of Action is construed to constitute a cause of action or complaint alleging medical malpractice by a health care provider as defined in G.S. 90-21.11 in failing to comply with the applicable standard of case under G.S. 90-21.12, undersigned counsel hereby specifically asserts that the medical care has been reviewed by a person who is reasonably expected to qualify as an expert witness under Rule 702 of the Rules of Evidence and who is willing to testify that the medical care did not comply with the applicable standard of care.

## JURY DEMAND

1383. Plaintiffs hereby request a trial by jury on all claims and issues so triable

## PRAYER FOR RELIEF

1384. WHEREFORE, to redress the injuries proximately and directly caused by Defendants' conduct as stated in the foregoing paragraphs, and to prevent the substantial risk of irreparable injury to other Duke University Students resulting from the policies, customs, practices, and supervising misconduct alleged herein, Plaintiffs hereby requests the following relief:

A. Compensatory damages for constitutional deprivations; past and future economic loss, physical harm, emotional trauma, loss of privacy, and reputational harm; loss of education and the expenses associated with the criminal investigation and subsequent proceedings maintained by Defendants' unlawful conduct;

B. Damages in an amount to be established at trial to exemplify and punish those Defendants whose conduct in this matter was outrageous, pursued out of actual malice, a reckless and callous disregard, and a deliberate indifference to Plaintiffs' rights sufficient to dissuade them from engaging in similar conduct in the future, and to deter others similarly situated from engaging in similar misconduct in the future.

C. Damages in an amount to be established at trial to exemplify and punish those Defendants whose wrongful conduct in this matter was aggravated by fraud, malice, or willful or wanton conduct, as well as those Defendants whose officers, directors, or managers participated in or condoned the conduct constituting the of the entities that participated in or condoned the wrongful conduct that was aggravated by fraud, malice, or willful or wanton conduct.

D.  An award for reasonable and customary costs, expenses, and interest incurred in pursuit of this action; and

E.  All other and further relief the Court may deem just and proper.

Dated:  April 17, 2008                    Respectfully submitted by:

**EKSTRAND & EKSTRAND LLP**

/s/ Robert C. Ekstrand

_____

Robert C. Ekstrand   (NC Bar No. 26673)
811 Ninth Street, Suite 260
Durham, North Carolina    27705
Telephone:    (919) 416-4590
Email:         rce@ninthstreetlaw.com
Attn:          Stefanie Sparks
               sas233@law.georgetown.edu

# IN THE UNITED STATES DISTRICT COURT

# FOR THE  MIDDLE DISTRICT OF NORTH CAROLINA

RYAN McFADYEN, et al.,

                Plaintiffs,

     v.

DUKE UNIVERSITY, et al.,

                Defendants.

Case No. 1:07-cv-953

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on April 18, 2008, I electronically filed the foregoing FIRST

AMENDED COMPLAINT / JURY TRIAL DEMANDED (including attachments) with

the Clerk of the Court using the CM/ECF system which will send notification of such

filing to the following:

Reginald B. Gillespie, Jr.
FAISON & GILLESPIE
P.O. Box 5517
Durham, NC 27717
***Counsel for Defendant City of Durham, North Carolina***

Patricia P. Kerner
D. Martin Warf
Hannah Gray Styron
TROUTMAN SANDERS, LLP
P.O. Drawer 1389
Raleigh, NC 27602-1389
***Counsel for Defendants Steven Chalmers, Patrick Baker, Beverly Council, Ronald Hodge, Jeff Lamb, Stephen Mihaich, Michael Ripberger, Laird Evans and Lee Russ***

James Donald Cowan, Jr.
Dixie Thomas Wells
SMITH MOORE, L.L.P.
P.O. Box 21927
*Counsel for Defendants Duke University, Duke University Police Department, Aaron Graves, Robert Dean, Leila Humphries, Phyllis Cooper, William F. Garber, II, James Schwab, Joseph Fleming, Jeffrey O. Best, Gary N. Smith, Greg Stotsenberg, Robert K. Steel, Richard H. Brodhead, Ph.D., Peter Lange, Ph.D., Tallman Trask, III, Ph.D., John Burness, Larry Moneta, Ed.D., Victor J. Dzau, M.D., Allison Halton, Kemel Dawkins, Suzanne Wasiolek, Stephen Bryan, and Matthew Drummond*

Jamie S. Gorelick
Jennifer M. O'Connor
Paul R.Q. Wolfson
WILMER CUTLER PICKERING HALE AND DOOR, LLP
1875 Pennsylvania Ave., N.W.
Washington, D.C. 20006
*Counsel for Defendants Duke University, Duke University Police Department, Aaron Graves, Robert Dean, Leila Humphries, Phyllis Cooper, William F. Garber, II, James Schwab, Joseph Fleming, Jeffrey O. Best, Gary N. Smith, Greg Stotsenberg, Robert K. Steel, Richard H. Brodhead, Ph.D., Peter Lange, Ph.D., Tallman Trask, III, Ph.D., John Burness, Larry Moneta, Ed.D., Victor J. Dzau, M.D., Allison Halton, Kemel Dawkins, Suzanne Wasiolek, Stephen Bryan, and Matthew Drummond*

William F. Lee
WILMER CUTLER PICKERING HALE AND DOOR, LLP
60 State Street
Boston, MA 02109
*Counsel for Defendants Duke University, Duke University Police Department, Aaron Graves, Robert Dean, Leila Humphries, Phyllis Cooper, William F. Garber, II, James Schwab, Joseph Fleming, Jeffrey O. Best, Gary N. Smith, Greg Stotsenberg, Robert K. Steel, Richard H. Brodhead, Ph.D., Peter Lange, Ph.D., Tallman Trask, III, Ph.D., John Burness, Larry Moneta, Ed.D., Victor J. Dzau, M.D., Allison Halton, Kemel Dawkins, Suzanne Wasiolek, Stephen Bryan, and Matthew Drummond*

Dan Johnson McLamb
YATES, MCLAMB & WEYHER, LLP
P.O. Box 2889
Raleigh, NC 27602-2889
*Counsel for Defendants Duke University Health Systems, Inc., Private Diagnostic Clinic, PLLC, Julie Manly, M.D., Tara Levicy, R.N. and Theresa Arico, R.N.*

James B. Maxwell
MAXWELL, FREEMAN & BOWMAN
P.O. Box 52396
Durham, NC  27717-2396
***Counsel for Defendants David Addison,***
***Kammie Michael, Richard D. Clayton and***
***James T. Soukup***

Joel Miller Craig
KENNON CRAVER BELO CRAIG &
McKEE, PLLC
P.O. Box 51579
Durham, NC  27717-1579
***Counsel for Defendant Benjamin Himan***

Edwin M. Speas, Jr.
Eric P. Stevens
POYNER & SPRUILL, LLP
P.O. Box 10096
Raleigh, NC  27605-0096
***Counsel for Defendant Mark Gottlieb***

Kearns Davis
Robert James King, III
BROOKS PIERCE MCLENDON
HUMPHREY & LEONARD
P.O. Box 26000
Greensboro, NC  27420-6000
***Counsel for Defendant DNA Security, Inc.***
***& Richard Clark***

I further certify that I caused the same to be served by first-class mail, postage prepaid, to

the following non CM/ECF participants:

Paul R. Dickinson, Jr.                           Linwood Wilson
James A. Roberts, III, Esq.                    ***Pro Se***
LEWIS & ROBERTS PLLC                  \*\*Address redacted pursuant to Local Rule
1305 Navaho Drive, Suite 400
Raleigh, NC  27609-7482
***Counsel for Defendant Brian Meehan***

Roger E. Warin                              Robert A. Sar
STEPTOE & JOHNSON LLP               Nicholas J. Sanservino, Jr.
1330 Connecticut Avenue, NW           OGLETREE, DEAKINS, NASH, SMOAK
Washington, DC  2003                    & STEWART, P.C.
***Counsel for Defendant City of Durham,***   2301 Sugar Bush Road, Ste 600
***North Carolina***                       Raleigh, NC  27612
                                     ***Counsel for Defendant DNA Security, Inc.***

Respectfully submitted,


/s/ Robert C. Ekstrand

_____

Robert C. Ekstrand, Esq.
N.C. Bar No.  26673
811 Ninth Street, Suite 260
Durham, North Carolina 27705
Phone: (919) 416-4590
Email:  rce@ninthstreetlaw.com
*Counsel for Plaintiffs Ryan McFadyen,*
*Matthew Wilson and Breck Archer*