# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

### Civil Action No. 1:07-cv-00953

RYAN MCFADYEN; MATTHEW WILSON; and
BRECK ARCHER,
**Plaintiffs,**
v.

DUKE UNIVERSITY; DUKE UNIVERSITY POLICE
DEPARTMENT; AARON GRAVES; ROBERT DEAN;
LEILA HUMPHRIES; PHYLLIS COOPER; WILLIAM F.
GARBER, II; JAMES SCHWAB; JOSEPH FLEMING;
JEFFREY O. BEST; GARY N. SMITH; GREG
STOTSENBERG; ROBERT K. STEEL; RICHARD H.
BRODHEAD, Ph.D., PETER LANGE, Ph.D.; TALLMAN
TRASK, III, Ph.D.; JOHN BURNESS; LARRY MONETA,
Ed.D.; VICTOR J. DZAU, M.D.; ALLISON HALTON;
KEMEL DAWKINS; SUZANNE WASIOLEK; STEPHEN
BRYAN; MATTHEW DRUMMOND; DUKE
UNIVERSITY HEALTH SYSTEMS, INC.; PRIVATE
DIAGNOSTIC CLINIC, PLLC; JULIE MANLY, M.D.;
THERESA ARICO, R.N.; TARA LEVICY, R.N.; THE
CITY OF DURHAM, NORTH CAROLINA; MICHAEL B.
NIFONG; PATRICK BAKER; STEVEN CHALMERS;
RONALD HODGE; LEE RUSS; STEPHEN MIHAICH;
BEVERLY COUNCIL; EDWARD SARVIS; JEFF LAMB;
MICHAEL RIPBERGER; LAIRD EVANS; JAMES T.
SOUKUP; KAMMIE MICHAEL; DAVID W. ADDISON;
MARK D. GOTTLIEB; BENJAMIN W. HIMAN; LINWOOD
WILSON; RICHARD D. CLAYTON; DNA SECURITY,
INC.; RICHARD CLARK; and BRIAN MEEHAN, Ph.D.
**Defendants.**



**DEFENDANT
LINWOOD WILSON'S
MEMORANDUM OF LAW IN
SUPPORT OF MOTION TO
DISMISS and MOTION TO
DISMISS**

NOW COMES Defendant Linwood Wilson, *Pro Se*, and submits the following Brief in support of his

motion to dismiss this action pursuant to 12(b)(6) of the Rules of Civil Procedure.

## MATTER BEFORE THE COURT

The matter before the Court is Defendant Linwood Wilson's motion to dismiss Plaintiffs'

claims against him, set out in Cause Of Action Fifth, Tenth, Fifteenth, Sixteenth, Seventeenth,

Eighteenth, Nineteenth and Twentieth in their Complaint for failure to state a claim upon which relief

may be granted pursuant to Fed. R. Civ. P. 12(b)(6).

1

Dockets.Justia.com

# STATEMENT OF THE CASE

Plaintiffs filed this action on December 18, 2007, claiming violations of 42 U.S.C. § 1983, § 1985, § 1986 and North Carolina common law. On February 22, 2008, the parties filed a Joint Motion for Leave to File Excess Pages and to Establish a Rule 12 Briefing Schedule. This joint motion was entered into prior to Defendant Linwood Wilson being served in this matter on April 3, 2008. Judge Beaty allowed this motion on March 25, 2008. On April 21, 2008 Defendant Wilson filed a Motion for Extension of Time to Answer. On April 23, 2008, Magistrate/Judge Wallace Dixon allowed this motion. Under the terms of the Order Defendant Wilson has until June 13, 2008, in which to answer or file briefs in support of his motion to dismiss. On March 25, 2008, again unknown to Defendant Wilson, the parties filed a Joint Motion to reestablish deadlines originally set in the Rule 12 briefing schedule. Judge Beaty allowed this motion on April 30, 2008. Under the terms of the Order, Defendants have until July 2, 2008, in which to file briefs in support of their motions to dismiss, not to exceed fifty pages in length. Defendant Wilson's Motion to Dismiss has been filed pursuant to Judge Beaty and Wallace's Orders.

## I.     INTRODUCTION

The instant lawsuit has been brought by Ryan McFadden, Matthew Wilson, and Breck Archer (hereinafter "Plaintiffs") against a number of Defendants including the City of Durham, several members of the Durham Police Department in their individual capacities, DNA Security Incorporated, former Durham District Attorney Michael Nifong (hereinafter "Nifong"), and District Attorney investigator, Linwood Wilson (hereinafter "Wilson"), Duke University, Duke University Police Department, Duke University Health Systems, Inc., several members individually of Duke University, Duke University Police and Duke Health Systems, Inc.. The lawsuit arises from the roles allegedly played by each of the Defendants in the "Duke Lacrosse Case."

## II.    RELEVANT FACTS

As stated in the Plaintiffs' complaint, this action arises out of a combination of actors and entities that we will call the Consortium. Consortium members include the Chairman of Duke University's Board of Trustees, the University, its faculty, and its SANE program; the City of Durham and its police department; a forensic DNA lab, DNASI, its controlling shareholder, and its lab director; and a (now) disbarred prosecutor. (Amended Compl. ¶ 1).

The Consortium's ultimate objective was to railroad the Plaintiffs and their 44 teammates into convictions as either principals or accomplices to a horrific, violent crime they knew never happened. (Amended Compl. ¶ 2). At all relevant times, Defendant Wilson was employed as an investigator with the District Attorney's Office in Durham, NC. (Amended Compl. ¶ 64). The following facts encompass the entire role played by Defendant Wilson, as it is alleged in Plaintiffs' complaint, in the investigation and prosecution of the case.

At all times relevant to this action, Wilson held himself out as many things, but primarily as "an investigator." He was employed by the District Attorney for the Fourteenth Prosecutorial District in North Carolina to "assist" Nifong in undefined ways. For purposes of this action, Wilson shared with Nifong certain final policymaking authority, delegated from City officials, with respect to the investigation of Mangum's false accusations. Further, with supervisory and final policymaking authority delegated to him by the Durham Police Internal Affairs Unit and by Captain Lamb, Wilson conducted an "internal investigation" of District Two Sergeant John Shelton. Lamb directed the investigation of Shelton in retaliation for his intention to testify that he knew Mangum's claims were false, that Gottlieb, Himan and the Himan Chain of Command were conspiring to frame innocents, that the investigation was the Duke Police Department's responsibility, and his refused to abandon his intention to testify to those facts and others that would necessarily expose the Department's misconduct. Wilson is, and at all times relevant to this action, was a citizen and resident of North Carolina. (Amended Compl. ¶ 64).

**DURHAM INVESTIGATOR DEFENDANTS.**

3

Collectively, Gottlieb, Himan, Wilson, and Clayton, are referred to herein as the "Durham Investigator Defendants." (Amended Compl. ¶ 69). Wilson's published statements falsely asserting as fact that Mangum's account of the number of "attackers" did not change. (Amended Compl. ¶ 956(D)) Nifong, Clark, Gottlieb, Himan, Meehan, Wilson, and DNASI continued to conceal the exculpatory DNA evidence until October 2006, when they produced 2,000 pages of electropherograms and bench notes from the tests conducted with every team member's DNA. The exonerating electropherogram reports of Plaintiffs' DNA testing with the rape kit specimens were printed on April 9, 2006 and April 10, 2006. (Amended Compl. ¶ 981).

The City of Durham and Duke University officials having final policymaking authority over Durham Police and Duke Police were made aware, via their chains of command, the Joint Command, and it was otherwise plainly obvious that Nifong, Wilson, Lamb, Ripberger, Gottlieb and Himan, Addison, Michael, Levicy, Arico, Duke faculty members, Duke Administrators and others, acting individually and inconcert, were engaged in a sweeping and ongoing deprivation of Plaintiffs' constitutional rights over the course of a 13-month investigation conducted *after* Plaintiffs and their teammates were conclusively proven innocent by the evidence. (Amended Compl. ¶ 1055). During the Nifong-directed investigation, Nifong, Gottlieb, Wilson, Himan, and various Duke University Defendants, acting individually and in concert, engaged in a number of investigative abuses, including retaliating against Plaintiffs and their teammates for the exercise (real or perceived) of constitutional rights; intimidating Plaintiffs, their teammates, and other witnesses who would be necessary to establish the fact that the sexual assault Mangum alleged never occurred; the manufacture of false forensic medical and DNA evidence; the secretion of exculpatory evidence; the fabrication of identification evidence and the secretion of exculpatory identification evidence, and the deliberate disregard of safeguards designed to prevent negligent and intentional misidentifications in photo identification procedures. (Amended Compl. ¶ 1114).

Under color of law, Nifong, Wilson, the DNASI Defendants, the Duke University Defendants, and the City of Durham Defendants conspired and entered into express and/or implied agreements, understandings, or meetings of the minds among themselves and others to deprive Plaintiffs of their constitutional rights by retaliating against Plaintiffs for exercising their First and Fifth Amendment rights, publicly excoriating their character and that of their teammates, falsely claiming a they and their teammates had history of deplorable conduct, and by charging and prosecuting the three innocent Duke lacrosse players on charges of rape, sexual assault, and kidnapping, which these Defendants knew were not supported by probable cause. (Amended Compl. ¶ 1149).

These Defendants participated in the conspiracy by engaging in overt acts with the intent to further some unlawful purpose of the conspiracy or with the intent to further some lawful purpose of the conspiracy by unlawful means, including the predicate acts and omissions giving rise to the foregoing causes of action; by way of example:

A.      Obtaining search warrants, the March 23rd NTID Order, the March 27th Search Warrant, and other process without probable cause by knowingly presenting the Court with sworn affidavits and statements containing fabricated, false allegations, and condoning the acquisition of those orders and other process with fabricated sworn statements;

B.      Making false public statements to vilify Plaintiffs at the apex of their vulnerability in the criminal justice system; convening University "ad hoc" committees for purposes of unearthing accounts and other evidence of historical misconduct alleged to have been committed by Plaintiffs and their teammates as a rogue prosecutor is threatening indictments of every team member as principals and accomplices in crimes that never occurred; provide those investigative committees with skewed, unreliable data designed to generate an official statement from the Committee damning the conduct of Plaintiffs and their teammates conduct as "deplorable" among other entirely unsupportable conclusions, despite substantial evidence inconsistent with

such conclusions; willfully refusing to be presented with irrefutable evidence of innocence concerning Plaintiffs and every member of the team in order to perpetuate the public condemnation, continue waging a collaborative media campaign to peremptorily impeach the credibility of Plaintiffs and their teammates at a time when they are all putative defendants and witnesses for the defense;

C. Continuing the investigation of Plaintiffs, or condoning or directing the continuation of it, long after it had been established that (1) the complaining witness was not credible for a host of compelling reasons; (2) the complaining witness was incapable of reciting the same account of events twice; and (3) the complaining witness did not recognize any of the Plaintiffs at all two days after the party; and (4) the complaining witness' descriptions ruled out every member of the team as a plausible suspect either by her descriptions or through the six March photo arrays.

D. Depriving, or condoning or directing the deprivation of Plaintiffs' statutory right to reports of the results of all DNA tests and all identification procedures conducted with the DNA samples or mug shot photographs that police obtained pursuant to the March 23rd NTID Order, as soon as the results were available, and condoning the deliberate deprivation of Plaintiffs' right to those reports;

E. Manufacturing misidentifications of Plaintiffs and their teammates as perpetrators or as accomplices to a crime that did not occur;

F. Manufacturing the complaining witness's recollection testimony about details of certain individuals at the party by providing her with photographs containing those details for her to recite during the identification procedures in an effort to conceal the fact that the complaining witness has no significant recollections from the evening in question, and could not reliably recollect those team members who were actually present at the party, all to avoid suppression of

6

the only identification evidence that was available in the absence of any DNA identification evidence (i.e., the victim's identification testimony);

G.     Participating in the DNA conspiracy to manufacture false and misleading DNA evidence, and the conspiracy to conceal the powerful exculpatory findings made by DNASI through Y-plex technology;

H.     Manufacturing false testimonial evidence by intimidating, harassing and threatening defense witnesses with criminal legal process, criminal prosecution, and revocation of probationary status; intimidating, harassing and threatening police witnesses who interacted with Mangum at DUMC on March 14, 2006; and ignoring other witnesses known to have powerful exculpatory evidence based upon their interactions with Mangum, including but not limited to, Mangum's UNC primary providers, Mangum's psychiatrists who attended to her during involuntary commitments and in outpatient treatments, and others who have personal knowledge of Mangum's psychotic episodes, her clinical unreliability, and her drug seeking propensities.

I.     Fabricating false forensic medical evidence; falsifying forensic medical records, and concealing the overwhelming forensic medical evidence of innocence.

J.     Agreeing to present the foregoing false and misleading evidence to the Grand Jury to obtain indictments on April 17, 2006, and May 12, 2006.

K.     Fabricating false evidence to close gaps in the evidence, to avoid the proof of innocence, and otherwise frame Plaintiffs and their teammates as principals and/or accomplices in the crimes charged in the Grand Jury's indictments, including but not limited to Gottlieb's transparent fabrication of notes of Mangum's description of her "attackers" that contradicts Himan's contemporaneous handwritten notes, and Wilson's "interview" of Mangum in which

7

he brought pictures of the defendants in the criminal case in anticipation of a hearing on their motion to suppress Mangum's identifications of them, and to create a new timeline of events with Mangum that Wilson, Nifong, Gottlieb and Himan (incorrectly) believed avoided the irrefutable digital evidence that proved Plaintiffs and their teammates innocent.

L.     Abdicating jurisdictional responsibilities to initiate and conclude an investigation of Mangum's false allegations;

M.     Making false statements to the Superior Court of Durham County and the Plaintiffs' defense counsel in an effort to conceal the unlawful conspiracy.

N.     Destroying, condoning or directing the destruction of exculpatory evidence of police officers' present sense impressions and critical events contained in the audio recordings of police officers' communications with dispatch and with each other during the time they interacted with Mangum on the evening in question, after a specific written request to preserve those audio recordings was made by counsel for the accused; and

O.     Condoning, ratifying, instructing and/or directing any of those wrongful acts. (Amended Compl. ¶ 1150).

These Defendants' actions evinced a reckless and callous disregard for, and deliberate indifference to, Plaintiffs' constitutional rights. (Amended Compl. ¶ 1151).

The Defendants were acting pursuant to a preordained plan that was developed in quiet deliberation and discussions among officials with policymaking authority over the investigation of Mangum's claims, over a significant period of time. (Amended Compl. ¶ 1152).

The Defendants' combined and concerted conduct evinces a malicious and corrupt intent to harm the Plaintiffs, and was so willful, wanton, and depraved that it shocks the contemporary conscience, in violation of the Fourteenth Amendment to the United States Constitution. (Amended Compl. ¶ 1153).

8

As a direct and foreseeable consequence of the conspiracy, Plaintiffs were deprived of their rights under Article IV of the United States Constitution and the First, Fourth, Fifth, and Fourteenth Amendments thereto. (Amended Compl. ¶ 1154).

As a direct and foreseeable consequence of these deprivations, Plaintiffs have suffered loss of education, loss of privacy, loss of property, loss of liberty, physical harm, emotional trauma, and irreparable harm to their reputations, and economic loss, including but not limited to the costs of retaining counsel, forensic experts, investigators and others in order to defend themselves against the false claims and fabrication of evidence throughout the 13-month police investigation of Mangum's claims, as both witnesses and putative defendants in a subsequent prosecution as 'accomplices' to the same crimes. (Amended Compl. ¶ 1155).

Nifong, Gottlieb, Himan, Wilson, Addison, Michael, Durham Police Supervising Defendants, the Chairman, the Crisis Management Team Defendants, the Duke Police Supervising Defendants, the SANE Defendants, Meehan, Clark, DNASI, Duke University, PDC, DUHS, the City of Durham are "persons," as that term is used in 42 U.S.C. § 1985, and, at all relevant times with respect to the following conspiracies, acted under color of state law. (Amended Compl. ¶ 1157).

Under color of state law, Addison, Michael, Nifong, Gottlieb, Himan, Wilson, the Durham Police Supervising Defendants, the City of Durham, Meehan, Clark, DNASI, Steel, the Crisis Management Team Defendants, the SANE Defendants, Graves, Dean, the Duke Police Supervising Defendants, and Duke University conspired and/or entered into express and/or implied agreements, understandings, or meetings of the minds among themselves for the purpose of impeding, hindering, obstructing or defeating the due course of justice in the State of North Carolina, with the intent to deny Plaintiffs the equal protection of the law. (Amended Compl. ¶ 1158).

In furtherance of this conspiracy, one or more of these Defendants engaged in overt acts that were motivated by invidious racial animus, intended to incite and then galvanize invidious racial animus against Plaintiffs in the Durham community, and/or were intended to take advantage of the invidious

9

racial animus that these Defendants had fomented in the Durham community against Plaintiffs. (Amended Compl. ¶ 1159).

In furtherance of this conspiracy, one or more of these Defendants engaged in overt acts that were motivated by invidious animus based upon Plaintiffs' state citizenship—real or perceived—as being citizens of other states only temporarily residing in Durham, North Carolina, and/or was intended to take advantage of the extant invidious animus based upon their belief that Plaintiffs were citizens of otherstates. (Amended Compl. ¶ 1160).

Under color of state law, Nifong, Clayton, Gottlieb, Himan, Wilson, Addison, the Durham Police Supervising Defendants, City of Durham, Steel, the Crisis Management Team Defendants, the Duke Police Supervising Defendants, conspired and entered into express and/or implied agreements, understandings, or meetings of the minds among themselves, to elicit false statements and subsequent testimony from Plaintiffs and other witnesses who were important and/or essential to the proof of Plaintiffs' innocence, by force, by intimidation, and threats, from testifying freely, fully, and truthfully to matters that these Defendants knew were the factual basis of prosecutions that would be brought therein, and with the general objective of ultimately securing Plaintiffs' convictions as principals or accessories to crimes they knew did not happen. (Amended Compl. ¶ 1161).

Under color of state law, Nifong, Gottlieb, Himan, Clayton, Addison, Michael, the Durham Police Supervising Defendants, Steel, the Crisis Management Team Defendants, the Duke Police Supervising Defendants, the SANE Defendants, the City of Durham, and Duke University conspired and entered into express and/or implied agreements, understandings, or meetings of the minds among themselves for the purpose of depriving Plaintiffs, directly or indirectly, of the equal protection of the laws and/or equal privileges and immunities of the laws. (Amended Compl. ¶ 1162).

In furtherance of this conspiracy, one or more of these Defendants engaged in overt acts that were motivated by invidious racial animus, intended to foment extant invidious racial animus against Plaintiffs in the Durham, national and global community, and/or intended to take advantage of the invidious racial

animus that they had fomented against Plaintiffs. (Amended Compl. ¶ 1163).

In furtherance of this conspiracy, one or more of these Defendants engaged in overt acts that were motivated by invidious animus based upon Plaintiffs' state citizenship—real or perceived—as being citizens of other states only temporarily residing in Durham, North Carolina, and/or was intended to take advantage of the extant invidious animus based upon their belief that Plaintiffs were citizens of other states. (Amended Compl. ¶ 1164).

The conduct of the Defendants evinced a callous disregard of /or deliberate indifference to Plaintiffs' constitutional rights. (Amended Compl. ¶ 1165).

Steel, the Crisis Management Team Defendants and the Duke Police Department Defendants conspired and entered into express and/or implied agreements, understandings, or meetings of the minds among themselves for the purpose of preventing or hindering the Duke Police Department and the Durham Police Department and other duly constituted authorities of the City of Durham and the State of North Carolina from giving or securing to Plaintiffs the equal protection of the laws. (Amended Compl. ¶ 1166).

The conduct of the Defendants evinced a callous disregard of /or deliberate indifference to Plaintiffs' constitutional rights. (Amended Compl. ¶ 1167).

As a direct and foreseeable consequence of each of the foregoing conspiracies to violate 42 U.S.C. § 1985, Plaintiffs were deprived of their rights under Article IV of the United States Constitution, and the First, Fourth, Fifth and Fourteenth Amendments thereto. (Amended Compl. ¶ 1168).

As a direct and foreseeable consequence of the deprivations occasioned by each of the foregoing conspiracies, Plaintiffs have suffered loss of education, loss of privacy, loss of property, loss of liberty, physical harm, emotional trauma, and irreparable harm to their reputations, and economic loss, including but not limited to the costs of retaining counsel, forensic experts, investigators and others in order to defend themselves against the false claims and fabrication of evidence throughout the 13-month police

investigation of Mangum's claims, as both witnesses and putative defendants in a subsequent prosecution as 'accomplices' to the same crimes. (Amended Compl. ¶ 1169).

Steel, Brodhead, Wilson, Nifong, the Crisis Management Team Defendants, the Duke Police Department Defendants, the SANE Defendants, the DNASI Defendants, the Durham Police Department Defendants, the City of Durham and Duke University are "persons," as that term is used in 42 U.S.C. § 1986. (Amended Compl. ¶ 1171).

Steel, the Crisis Management Team Defendants, Duke Police Supervising Defendants, Duke University, Wilson, Nifong, and the Durham Police Supervising Defendants, and the City of Durham had prior knowledge of the wrongs conspired to be committed by Nifong, Clayton, Gottlieb, Himan, Wilson, Addison, the Durham Police Supervising Defendants, City of Durham, Steel, the Crisis Management Team Defendants, the Duke Police Supervising Defendants,. (Amended Compl. ¶ 1176).

Steel, the Crisis Management Team Defendants, Duke Police Supervising Defendants, Duke University, Wilson, Nifong, and the Durham Police Supervising Defendants, and the City of Durham had the power to prevent or aid in preventing the commission of the wrongs conspired to be committed by Nifong, Clayton, Gottlieb, Himan, Wilson, Addison, the Durham Police Supervising Defendants, City of Durham, Steel, the Crisis Management Team Defendants, the Duke Police Supervising Defendants,, and which by reasonable diligence could have been prevented, but they neglected and/or refused to exercise such power. (Amended Compl. ¶ 1177).

The conduct of Steel, the Crisis Management Team Defendants, Duke Police Supervising Defendants, Duke University, Wilson, Nifong, and the Durham Police Supervising Defendants, and the City of Durham evinced a reckless and callous disregard for, and deliberate indifference to Plaintiffs' constitutional rights. (Amended Compl. ¶ 1179).

The refusal and/or failure on the part of Steel, Brodhead, Wilson, Nifong, the Crisis Management Team Defendants, the Duke Police Department Defendants, the SANE Defendants, the DNASI Defendants, the Durham Police Department Defendants, the City of Durham, and Duke University,

knowing of the wrongs conspired to be done to Plaintiffs in violation of 42 U.S.C. §1985 evinced their willful and malicious intent and a reckless and callous disregard for and/or deliberate indifference to Plaintiffs' constitutional rights. . (Amended Compl. ¶ 1186).

As a direct and foreseeable consequence of these Defendants' neglect, failure and/or refusal to intervene, Plaintiffs were deprived of their rights under Article IV of the United States Constitution, and the First, Fourth, Fifth, and Fourteenth Amendments thereto. . (Amended Compl. ¶ 1187).

As a direct and foreseeable consequence of these deprivations, Plaintiffs have suffered loss of education, loss of privacy, loss of property, loss of liberty, physical harm, emotional trauma, and irreparable harm to their reputations, and economic loss, including but not limited to the costs of retaining counsel, forensic experts, investigators and others in order to defend themselves against the false claims and fabrication of evidence throughout the 13-month police investigation of Mangum's claims, as both witnesses and putative defendants in a subsequent prosecution as 'accomplices' to the same crimes. . (Amended Compl. ¶ 1188).

Beginning on March 14, 2006 and continuing to the present Nifong Steel, Brodhead, Burness, Gottlieb, Himan, Lamb, Wilson, Meehan, Clark, DNASI, Levicy, Manly, Arico, Dzau, DNASI, PDC, DUHS, and Duke University, acting individually and in concert, attempted to and did, in fact, prevent obstruct, impede and hinder public and legal justice in the State of North Carolina as alleged herein. . (Amended Compl. ¶ 1190).

Gottlieb, Himan, Wilson, Nifong, Meehan, Clark and DNASI obstructed justice by conspiring to manufacture and by manufacturing false and misleading reports with respect to the forensic testing of evidence in the investigation of Mangum's allegations, knowing that the reports of forensic testing would forensic with the knowledge that these reports would be used to bring and maintain criminal prosecutions against Plaintiffs, as principals or accessories to crimes Defendants knew never happened, or to intimidate Plaintiffs and other witnesses who had personal knowledge necessary to prove their innocence. . (Amended Compl. ¶ 1191).

13

Gottlieb, Himan, Wilson, Nifong, Steel, Graves, Dean, and Best obstructed justice by conspiring to manufacture and manufacturing false and misleading investigative reports designed to conceal exculpatory witness accounts with the knowledge that these reports would be used bring and maintain criminal prosecutions against Plaintiffs, as principals or accessories to crimes Defendants knew never happened, or to intimidate Plaintiffs and other witnesses who had personal knowledge necessary to prove their innocence. . (Amended Compl. ¶ 1192).

Gottlieb, Himan, Wilson, Nifong, Steel, Dzau, Manly, Arico, Levicy, DUHS, and Duke University obstructed justice by conspiring to manufacture and manufacturing false and misleading forensic medical records and reports with respect to the SAE conducted at DUHS reports designed to conceal exculpatory witness accounts with the knowledge that these reports would be used bring and maintain criminal prosecutions against Plaintiffs, as principals or accessories to crimes Defendants knew never happened, or to intimidate Plaintiffs and other witnesses who had personal knowledge necessary to prove their innocence. . (Amended Compl. ¶ 1193).

Gottlieb, Himan, Wilson, Nifong, Meehan, Clark, and DNASI obstructed justice by conspiring to deprive Plaintiffs of copies of reports exonerating DNA test results that existed on or before April 10, 2006, in the form of copies of the raw data from tests conducted with their DNA, which Plaintiffs' retained forensic experts could have expeditiously interpreted—within hours—as conclusively exonerating them when those reports were available on or before April 10, 2006. . (Amended Compl. ¶ 1194).

Gottlieb, Himan, Wilson, and Nifong conspired to obstruct justice and obstructed justice by intimidating and attempting to intimidate Plaintiffs, as putative witnesses in their own defense or the defense of their teammates, and other witnesses with personal knowledge necessary to prove the Plaintiffs' innocence, including Plaintiffs' teammates, Sergeant Shelton, Kimberly Pittman,

and Moezeldin Elmostafa, who had personal knowledge and/or possession, custody or control of evidence their innocence, with the purpose of altering these witnesses' exonerating testimony. . (Amended Compl. ¶ 1195).

Nifong, Addison, Gottlieb, Himan, Wilson, Arico, Burness, CMT Defendants, and Duke University, individually and in concert, obstructed public justice by making false public statements intended to generate and galvanize public outrage, racial animus, and to subject Plaintiffs to national and international infamy and condemnation for the purpose of coercing false confessions and/or facilitating their wrongful convictions for crimes they knew never occurred; and to harass, intimidate, and place them in fear of their personal safety for their insistence upon bearing witness to the innocence of their teammates and their own innocence; and to intimidate, harass and otherwise subject Plaintiffs to local and national infamy for the purpose of dissuading Plaintiffs from petitioning the federal or state courts for civil redress of the harms that flowed from the violations of their rights as alleged herein. (Amended Compl. ¶ 1197).

Nifong, Gottlieb, Himan, and Wilson demonstrated malice, spite, ill-will, and wanton disregard for Plaintiffs' rights by conspiring to manufacture and by fabricating false statements for incorporation into the NTID Affidavit, manufacturing false and misleading investigative reports with the knowledge that these reports would be used to advance and perpetuate the criminal investigation against Plaintiffs. (Amended Compl. ¶ 1204).

Nifong, Clark, Gottlieb, Himan, Meehan, Wilson, DNASI, Levicy, Manly, Arico, Dzau, and DUHS acted individually and in concert to manufacture inculpatory forensic evidence and to conceal exculpatory forensic evidence for the purpose of lending scientific credibility to Mangum's accusation that Plaintiffs committed a horrific, violent, racially motivated crime, which these Defendants knew never happened, thereby subjecting Plaintiffs to false charges of rape, sexual offense and kidnapping, charges

that were calculated to shame, humiliate and generate and galvanize racially charged outrage directed at the Plaintiffs and subject Plaintiffs to global infamy and condemnation. (Amended Compl. ¶ 1215).

Nifong, Gottlieb, Himan, and Wilson, acting individually and in concert, intimidated witnesses, including Plaintiffs themselves, manipulated witness identification procedures, and otherwise obstructed justice with the intention of convicting Plaintiffs as principals or accessories to violent, racially motivated criminal acts that they knew never happened. (Amended Compl. ¶ 1216).

In combination with conduct described above, these Defendants' actions evinced a malicious and corrupt intent and a pattern of extreme and outrageous behavior pursued with the intent to cause Plaintiffs to suffer severe emotional distress. (Amended Compl. ¶ 1217).

At the time the Defendants entered into these conspiracies, they knew that their conduct would stigmatize the Plaintiffs as violent criminals motivated by "deep racial animus" in the eyes of hundreds of millions of people; would subject Plaintiffs to global infamy and condemnation; would deprive Plaintiffs of their constitutional rights; would deprive Plaintiffs of complete scientific proof of their innocence; would perpetuate their stigmatization; and would cause Plaintiffs to continue to suffer under the continuing threat of prosecution on charges—as principals or accomplices—to crimes of the most serious kind and terms of incarceration for the better part of their natural lives, for over a year. (Amended Compl. ¶ 1218).

The Defendants' conduct was extreme and outrageous, was intended to cause Plaintiffs to suffer severe emotional distress. (Amended Compl. ¶ 1219).

In light of their knowledge of the concerted conduct of others, the foreseeable consequence of the Defendants' own conduct evinces their deliberate or reckless indifference to the likelihood that their conduct would cause Plaintiffs to suffer severe emotional distress. (Amended Compl. ¶ 1220).

Defendants' conduct will continue to cause harm to Plaintiffs by virtue of Plaintiffs' now-unseverable association with the false accusations maliciously advanced and supported by Defendants

through these conspiracies and maliciously publicized by Addison, Nifong, Hodge, Burness, Brodhead, and Steel. (Amended Compl. ¶ 1221).

As a direct and foreseeable consequence of the Defendants' actions, Plaintiffs have suffered and continue to suffer diagnosable emotional and mental conditions causing Plaintiffs disabling emotional, mental, and/or physical harm. (Amended Compl. ¶ 1222).

## III.    LEGAL STANDARD

Dismissal of a complaint for failure to state a claim shall be granted only when the complaint fails to adequately state a claim for relief. Once a claim has been adequately stated, "it may be supported by showing any set of facts consistent with the allegations in the complaint." *Bell Atl. Corp. v. Twombly*, 197 S. Ct. 1955, 1968 (2007). This principle notwithstanding, the complaint must contain direct allegations or allegations from which a cause of action can be inferred. The Court "need not accept as true unwarranted inferences, unreasonable conclusions, or arguments." *Eastern Shore Mkts., Inc. v. J.D. Assocs. Ltd. P'shp.*, 213 F.3d 175, 180 (4th Cir. 2000).

## IV.    QUESTIONS PRESENTED

1. Have Plaintiffs stated cognizable claims against Defendant Wilson under federal and state law?

2. Can Plaintiffs' claims overcome Defendant Wilson's absolute and qualified immunity for federal claims and absolute immunity from personal liability for state law claims?

## V.    ARGUMENT

Plaintiffs claims against Wilson should be dismissed because Defendant Wilson is entitled to absolute immunity and because some of the claims, such as 42 U.S.C. §1985 are deficient on its face. This brief will first examine immunity the issue of absolute immunity in general, then as it is applied to

Since the *Imbler* decision, the protections of absolute immunity have frequently been extended to

individuals other than prosecutors. In *Buckley v. Fitzsimmons,* 509 U.S. 259, 113 S. Ct. 2606, (1993), the

Supreme Court noted that absolute immunity applies to the "nature of the function performed, not the

identity of the actor who performed it." *Id.* at 269. Other circuits have held that investigators are entitled

to the same absolute immunity as prosecutors. *See Joseph v. Patterson* 795 F.2d 549 (6th Cir. 1986)

(rev'd on other grounds); *Goncalves v. Reynolds* 198 F. Supp.2d 278 (W.D.N.Y. 2001); *Davis v.

Grusemeyer* 996 F.2d 617 (3d Cir.1993); *Gobel v. Maricopa County,* 867 F.2d 1201(9th Cir. 1989). Each

of these cases recognized the principle that investigators performing tasks as a function of an ongoing

investigation at the direction of a prosecutor should be entitled the same absolute immunity given to

prosecutors. *See* e.g., *Davis,* 996 F.2d at 632.

This Circuit implicitly acknowledged the same principle in *Hoover v. Keith,* 2004 U.S. Dist.

LEXIS 27943 (M.D.N.C. 2004). *Hoover* involved a charge of malicious prosecution brought by a

prisoner acting pro se against a prosecutor and the prosecutor's assistant. The charges were based on an

alleged violation of the prisoner's civil rights under 42 U.S.C. §1983. *Id.* at 1. The Court determined that

the prisoner's suit should be dismissed because it was frivolous but alternatively held that the actions of

both the prosecutor and his assistant were covered by absolute prosecutorial immunity. *Id.* at 3-4.

Applying this to the facts of the present case, Defendant Wilson was at all relevant times duly

employed as a prosecutorial investigator acting at the direction of Defendant Nifong as Durham County

District Attorney. (Amended Compl. ¶ 16). Defendant Nifong assigned Defendant Wilson several tasks

related to the investigation of the criminal case. Throughout the performance of these tasks and at all

relevant times, Defendant Wilson acted only when tasks were expressly delegated by Defendant Nifong as

part of the investigation and preparation of the prosecution's case for trial. On separate occasions,

Defendant Nifong, according to Plaintiffs' complaint, ordered Defendant Wilson to investigate and

discredit Elmostafa (Amended Compl. ¶ 247-248, 253); to intimidate and discredit Shelton (Amended

Compl. ¶ 264); and to conduct an interview with Mangum (Amended Compl. ¶ 310). As such, Defendant Wilson's actions in his role as an investigator are entitled to the same protections of absolute immunity which are afforded to a prosecutor.

**D.** **Defendant Wilson's Actions Are Prosecutorial in Nature and Fall Within the Scope of Absolute Immunity as Defined by the Courts**

The doctrine of absolute immunity is not without limits and only extends to actions which can be fairly classified as "prosecutorial." *Burns v. Reed*, 500 U.S. 478, 111 S. Ct. 1934, (U.S. 1991). In *Burns*, the Court held that absolute immunity is extended to those functions which are considered to be prosecutorial in nature, as opposed to those functions which can be classified as "administrative" or "investigative" functions which are not traditionally within the province of a judicial officer. *Id.* at 494-496. Further, the Court in *Imbler* noted that absolute immunity should be granted for actions which "intimately associated with the judicial phase of the criminal process." *Imbler*, 424 U.S. at 430. The precise line between administrative and investigatory functions on the one hand, and prosecutorial functions which are "intimately associated with the judicial process" on the other, is drawn with respect to the factual circumstances present in each case. The administrative/investigatory activity and the prosecutorial functions are examined below.

### 1. Administrative/Investigatory Activity

None of the alleged actions of Defendant Wilson are administrative or investigatory in nature. Each action was different from the actions taken in *Buckley* because Defendant Wilson acted in each instance either after indictment with a focus on the pending criminal trial, or else his actions were so intimately associated with the judicial process so as to be considered "prosecutorial" in nature and thus entitled to the protections of absolute immunity.

In *Buckley*, the Supreme Court was faced with the question of whether a prosecutor's actions in attempting to identify the source of a bootprint at the scene of a murder were entitled to absolute immunity. The Court noted:

"When a prosecutor performs the investigative functions normally
performed by a detective or police officer, it is "neither appropriate
nor justifiable that, for the same act, immunity should protect the one
and not the other." *Id* at 273-274.

In an effort to charge an unindicted suspect with the crime, the prosecutors sought an expert who would

provide them with a positive identification of the bootprint following three unsuccessful identifications

from previous sources. *Id.* Based on the fact that the attempts to fabricate evidence took place prior to a

grand jury indictment and in the preliminary investigation of the crime, before there was probable cause to

have anyone arrested, the Court held that such activity was essentially police activity that could be

classified as "investigatory" in nature, and therefore not entitled to the protections of absolute immunity.

*Id.* Other actions that have been held to be investigatory in nature are: making public statements to the

media, *Buckley*, 509 U.S. at 277; giving legal advice to the police, *Burns*, 500 U.S. at 565; and preparing

a declaration in support of a search warrant, *Fletcher v. Kalina,* 93 F.3d 653 (9th Cir. 1996).

### 2.    Prosecutorial Functions

All of the actions taken by Defendant Wilson are entitled to absolute immunity because they are

prosecutorial as that term has been defined by courts. Under this definition, any function that cannot be

fairly classified as administrative or investigatory is prosecutorial and thus entitles the actor to absolute

immunity. The scope of what constitutes a prosecutorial function is not governed by the legality or

constitutionality of the action; many actions that could give rise to a cognizable legal claim are protected

by absolute immunity when performed within the scope of prosecutorial duties. *Carter,* 34 F.3d at 261.

In *Carter*, the Fourth Circuit held that the act of withholding materially exculpatory evidence was entitled

to prosecutorial immunity. *Id.* at 263. The Court, citing *Imbler,* noted that withholding evidence both

before and during a trial can fairly be classified as prosecutorial because: "preparation, both for the

initiation of the criminal process and for a trial, may require the obtaining, reviewing and evaluating of

evidence." *Id.*, citing *Imbler,* 424 U.S. at 431.

In addition to the withholding of materially exculpatory evidence, the Fourth Circuit has also held that the decision of "whether and when to prosecute" is entirely within the province of the prosecutor. *Lyles v. Sparks* 79 F.3d 372, 377 (4th Cir. 1996), citing *Imbler*, 424 U.S. at 431. *Lyles* involved allegations of wrongful prosecution against an Assistant United States Attorney and members of the United States Postal Service for their actions in initiating and maintaining criminal charges against a merchant accused of defrauding contact lens suppliers. The Plaintiffs alleged that their indictments in the case were secured through subornation of perjury and that various other false statements were made during judicial proceedings. *Id.* at 375. Nonetheless, The *Lyles* Court recognized that the issue of when a prosecutor functions as an administrator rather than an officer of the court can be a difficult determination, but "absolute immunity protects prosecutors' decisions 'whether and when to prosecute.'" *Id. at 377.*

Other courts dealing with the issue have expanded the scope of absolute immunity to cover other illegal actions taken by judicial officers in the course of performing their judicial duties. The result is a very broad range of conduct which is considered to be prosecutorial and thus protected by absolute immunity. *See Brownlee v. Van Court*, 2007 U.S. Dist. LEXIS 78498 (E.D. Cal. 2007) (concealment of evidence); *Brandley v. Keeshan*, 64 F.3d 196 (5th Cir. 1995) (intimidation of witnesses and suppression of evidence); *Kennedy v. Grattan Twp.*, 2007 U.S. Dist. LEXIS 30980 (W.D. Mich. 2007) (allegations of conspiracy are "irrelevant as a motive" for purposes of absolute immunity).

Even if Cause For Action Fifth, Tenth, Fifteenth, Sixteenth, Seventeenth, Eighteenth, Nineteenth and Twentieth stated viable causes of action under § 1983, they must still be dismissed as Defendant Wilson's actions are protected by the doctrine of qualified immunity and absolute immunity. Even if Defendant Wilson was required by his role as a district attorney investigator to circumvent the prosecutor and decide to conclude the investigation and/or provide all exculpatory evidence directly to defendants or the grand jury, the fact remains that Defendant Wilson's actions did not violate any "clearly established statutory or constitutional rights of which a reasonable person would have known"

by failing to do so. *Simmons v. Poe*, 47 F.3d 1370, 1385 (4th Cir. 1995). As such, his actions are protected by qualified immunity.[1]

    **E.**    **Specific Allegations Against Defendant Wilson**

Under the facts of the present case, the causes of action against Defendant Wilson can be reduced to the following: (1) concealment of evidence; (2) fabrication of false DNA evidence and false photographic arrays by conspiracy; (3) conspiracy in violation of 42 U.S.C. §1983; (4) obstruction of justice in violation of 42 U.S.C. §1985(2); (5) witness tampering in violation of 42 U.S.C. §1985(2); (6) conspiracy in violation of 42 U.S.C. §1985(3); (7) state law conspiracy and obstruction of justice; and (8) intentional infliction of emotional distress arising from the confluence of all of the above actions.

### 1. FALSE PUBLIC STATEMENTS IN VIOLATION OF 42 U.S.C. §1983

Plaintiffs have accused Defendant Wilson of Wilson's published statements falsely asserting as fact that Mangum's account of the number of "attackers" did not change. . (Amended Compl. ¶ 956(D)). All of the actions taken by Defendant Wilson are entitled to absolute immunity because they are prosecutorial as that term has been defined by courts. Under this definition, any function that cannot be fairly classified as administrative or investigatory is prosecutorial and thus entitles the actor to absolute immunity.

### 2. CONCEALMENT OF EXCULPATORY EVIDENCE & CONSPIRACY IN VIOLATION OF 42 U.S.C. § 1983

Nifong, Clark, Gottlieb, Himan, Meehan, Wilson, and DNASI continued to conceal the exculpatory DNA evidence until October 2006, when they produced 2,000 pages of electropherograms and bench notes from the tests conducted with every team member's DNA. The exonerating electropherogram reports of Plaintiffs' DNA testing with the rape kit specimens were printed on April 9, 2006 and April 10,

---

[1] Determination of qualified immunity may be made at either the motion to dismiss or summary judgment stage, however, the Supreme Court has "repeatedly . . . stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Saucier v. Katz*, 533 U.S. 194, 121 S. Ct. 2151, 2156, 150 L. Ed. 2d 272 (2001) (citations omitted).

2006. (Amended Compl. ¶ 981).

The cause of action for concealment of the DNA evidence in violation of 42 U.S.C. §1983 should be dismissed pursuant to the reasoning of this circuit in *Carter* which explicitly held that withholding materially exculpatory evidence is a prosecutorial act which is entitled to absolute immunity. *Carter*, 34 F.3d at 263. Furthermore, the alleged concealment and DNA conspiracy took place after the indictment of David Evans, Reade Seligmann and Colin Finnerty's (1:07CV00739) strategic advantage for presentation of evidence at trial. This is distinguishable from *Buckley* in that the initiation of the judicial process against the Plaintiffs was not foreseeable and had not yet begun. The Plaintiffs in this action was never charged, arrested, indicted or otherwise prosecuted for any criminal offenses. The scope of what constitutes a prosecutorial function is not governed by the legality or constitutionality of the action; many actions that could give rise to a cognizable legal claim are protected by absolute immunity when performed within the scope of prosecutorial duties. *Carter,* 34 F.3d at 261. In *Carter*, the Fourth Circuit held that the act of withholding materially exculpatory evidence was entitled to prosecutorial immunity. *Id.* at 263. The Court, citing *Imbler,* noted that withholding evidence both before and during a trial can fairly be classified as prosecutorial because: "preparation, both for the initiation of the criminal process and for a trial, may require the obtaining, reviewing and evaluating of evidence." *Id.*, citing *Imbler*, 424 U.S. at 431.

In addition to the withholding of materially exculpatory evidence, the Fourth Circuit has also held that the decision of "whether and when to prosecute" is entirely within the province of the prosecutor. *Lyles v. Sparks* 79 F.3d 372, 377 (4th Cir. 1996), citing *Imbler*, 424 U.S. at 431. *Lyles* involved allegations of wrongful prosecution against an Assistant United States Attorney and members of the United States Postal Service for their actions in initiating and maintaining criminal charges against a merchant accused of defrauding contact lens suppliers. The Plaintiffs alleged that their indictments in the case were secured through subornation of perjury and that various other false statements were made during judicial proceedings. *Id.* at 375. Nonetheless, The *Lyles* Court recognized that the issue of when a prosecutor

24

functions as an administrator rather than an officer of the court can be a difficult determination, but "absolute immunity protects prosecutors' decisions 'whether and when to prosecute.'" *Id. at 377.*

Other courts dealing with the issue have expanded the scope of absolute immunity to cover other illegal actions taken by judicial officers in the course of performing their judicial duties. The result is a very broad range of conduct which is considered to be prosecutorial and thus protected by absolute immunity. *See Brownlee v. Van Court,* 2007 U.S. Dist. LEXIS 78498 (E.D. Cal. 2007) (concealment of evidence); *Brandley v. Keeshan,* 64 F.3d 196 (5th Cir. 1995) (intimidation of witnesses and suppression of evidence); *Kennedy v. Grattan Twp.,* 2007 U.S. Dist. LEXIS 30980 (W.D. Mich. 2007) (allegations of conspiracy are "irrelevant as a motive" for purposes of absolute immunity).

### 3. DEPRIVATION OF THE PRIVILEGES AND IMMUNITIES OF NORTH CAROLINA CITIZENS IN VIOLATION OF 42 U.S.C. §1983

The *Lyles* Court recognized that the issue of when a prosecutor functions as an administrator rather than an officer of the court can be a difficult determination, but "absolute immunity protects prosecutors' decisions 'whether and when to prosecute.'" *Id. at 377.* Other courts dealing with the issue have expanded the scope of absolute immunity to cover other illegal actions taken by judicial officers in the course of performing their judicial duties. The result is a very broad range of conduct which is considered to be prosecutorial and thus protected by absolute immunity. *See Brownlee v. Van Court,* 2007 U.S. Dist. LEXIS 78498 (E.D. Cal. 2007) (concealment of evidence); *Brandley v. Keeshan,* 64 F.3d 196 (5th Cir. 1995) (intimidation of witnesses and suppression of evidence); *Kennedy v. Grattan Twp.,* 2007 U.S. Dist. LEXIS 30980 (W.D. Mich. 2007) (allegations of conspiracy are "irrelevant as a motive" for purposes of absolute immunity). Defendant Wilson is protected by "absolute immunity".

### 4. CONSPIRACY IN VIOLATION OF 42 U.S.C. § 1983

Under the reasoning in *Kennedy*, the fact that there might have been a conspiracy to engage in these actions is irrelevant because the motives of Defendant Wilson do not provide the standard for determining whether he is entitled to immunity for his actions. *Kennedy* at 14. The proper inquiry is to

look to the nature of the underlying action and not necessarily to the motives of the actors. *See e.g.,* *Burns,* 500 U.S. at 506. Since the actions of Defendant Wilson are entitled to absolute immunity because they were done in preparation for trial, it is of no consequence that there might have been a conspiracy to engage in the actions. The nature of the action protected by absolute immunity does not become any more or less protected simply because it is undertaken as part of an alleged conspiracy. These alleged actions of Defendant Wilson were performed as part of his official duties in his role as an assistant acting at the direction and supervision of a prosecutor. For compelling policy reasons, there can be no tort action against a public official, in an individual capacity, whose conduct falls within the accepted boundaries for absolute immunity. *Barr v. Matteo,* 360 U.S. 564, 79 S. Ct. 1335 (1959); *See also, Andrejko v. Sanders,* 638 F. Supp. 449 (W.D. Pa. 1986). The cause of action for conspiracy against Defendant Wilson (Amended Compl. ¶ 1147-1155) individually must therefore be dismissed because all of the actions giving rise to a potential claim for conspiracy are prosecutorial in nature and protected by the doctrine of absolute immunity. .

### 5. CONSPIRACY IN VIOLATION OF 42 U.S.C. § 1985

Claims under 42 U.S.C. §1985; 42 U.S.C. §1985(2) and 1985(3) Should be Dismissed for Failure to State a Claim Founded on Racial or Class-Based Animus.

In their complaint, Plaintiffs have alleged action against Defendant Wilson for violations of 42 U.S.C. §1985 Under established federal law, clause three and the relevant portion of part two of clause two of 42 U.S.C. §1985 require that alleged violators take the actions with respect to some racial or class-based animus in order to make out an actionable legal claim. (Amended Compl. ¶ 1156-1169).

#### a. 42 U.S.C. §1985(3)

The Fourth Circuit has considered whether 42 U.S.C. §1985(3) requires that a Plaintiff allege some racial or class-based animus as an underlying motive for the conduct of a Defendant and has answered affirmatively. In *Hughes v. Ranger Fuel Corp., Div. of Pittston Co,* 467 F.2d 6 (4th Cir. 1972), the Court explicitly held that clause three of §1985 required an allegation of a racial or class-based discriminatory

behavior in order to bring a cause of action. *Hughes* involved a suit by a group of whistleblowers who attempted to report violations committed by the Defendant coal company in discharging unauthorized materials into a nearby stream. The Plaintiffs' attempts to report this activity were thwarted by the Defendant coal company, and the Plaintiffs subsequently brought suit for violations of civil rights based on 42 U.S.C.§1985(3). The court stated:

> Accordingly, it is an essential element of any action under the statute as construed in *Griffin*, that there be in the case "the kind of invidiously discriminatory motivation stressed by the sponsors of the limiting amendment. This requires that, *there must be some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action.* (emphasis added)*Id.* at 10.

### b. 42 U.S.C. §1985(2)

42 U.S.C. §1985(2) is a two-part clause with an essential distinction between clauses which is relevant to stating a claim under the statute. The first part of 42 U.S.C. §1985(2) proscribes witness intimidation at the federal court level. Part two of 42 U.S.C. §1985(2) deals with allegations of obstruction of justice or conspiracy which take place at the state level. Plaintiffs' complaint states a cause of action based on part two of the statute because it alleges that Defendants took actions to deprive Plaintiffs of their rights under the First, Fourth, Fifth and Fourteenth Amendments thereto based on the pending criminal trial in the state courts of North Carolina.

In *Kush v. Rutledge*, 460 U.S. 719 (U.S. 1983), the Supreme Court affirmed a lower court judgment which held that part two of 42 U.S.C.§1985(2) required that a Plaintiff make an allegation of race or class-based animus in order to sustain a cause of action against a Defendant based on proceedings in state courts. *Kush*, 460 U.S. at 722. In contrast, the Court held that a claim under part one of clause two did not require a claim of racial or class-based animus. However, it is important to note that part one of clause two applies only to claims made by Plaintiffs based on action taken at the federal court level. *Id.* at 1487.

*Merrigan v. Affiliated Bankshares of Colorado, Inc.*, 775 F. Supp. 1408 (D. Colo. 1991) explicitly held that, in order to state a cause of action under clause two based on conspiracy or obstruction of justice which has taken place at the state level, the Plaintiff must allege an action motivated by racial or class-based animus. *Id.* at 1411. Other courts dealing with this issue have held that an allegation of race or class-based animus is an essential element to a claim under the second part of 42 U.S.C. §1985(2). *Daigle v. Gulf State Utilities Co.*, 794 F.2d 974, 979 (5th Cir. 1986); *Harrison v. Springdale Water & Sewer Com'n.*, 780 F.2d 1422, 1429 (8th Cir. 1986); *Phelps v. Wichita Eagle Bacon*, 886 F.2d 1262, 1269 (10th Cir. 1989).

### c. Plaintiffs Allege No Racial or Class-Based Invidious Discrimination

Applying this law to the present case, Plaintiffs' claims based on Defendant Wilson's alleged violations of clauses two and three of 42 U.S.C. §1985 must be dismissed. Plaintiffs' complaint entirely fails to allege any racial or class-based animus on the part of Defendant Wilson as motivation for engaging in any of the purported actions. There is no reference to Wilson's motivation for acting with racial or class-based animus or what actions that he took with any racial or class-based animus. This case clearly involves conduct taken at the state court level and thus a claim of racial or class-based animus is required to sustain a claim based on part two of 42 U.S.C. §1985(2). 42 U.S.C. §1985(3) unequivocally requires a claim based on racial or class-based animus. As a result, there is no cognizable legal claim made by Plaintiffs' pursuant to alleged violations of 42 U.S.C. §1985.

### 6. Plaintiffs' Claims of Conspiracy Against Defendant Wilson Must Be Dismissed for Failure to Allege Conspiracy

### a. Conspiracy under 42 U.S.C. §1985

As already noted, in order to bring an action under 42 U.S.C. §1985, a Plaintiff must allege the existence of discrimination founded on race or class-based animus. In *Hoffman v. Baltimore*, 379 F. Supp. 2d 778, 796 (D. Md. 2005), the court stated that one element of a conspiracy charge pursuant to 42 U.S.C. §1985(2) and (3) is that the conspiracy must be carried out by "two or more persons who are motivated by

a specific class-based, invidiously discriminatory animus." As stated above, the Plaintiffs have completely failed to allege the requisite race or class-based animus in their complaint on the part of Wilson. As a result, the allegations of conspiracy for obstruction of justice, witness tampering, and general conspiracy pursuant to §1985 must be dismissed.

### b. Other Claims of Conspiracy

In addition to the conspiracy causes of action under §1985, Plaintiffs also allege in their eighteenth causes of action that Defendant Wilson and others "acted in concert" to manufacture and conceal DNA evidence by developing and to manufacture "a false and misleading DNA report." (Amended Compl. ¶ 1190-1195, 1197). This "DNA conspiracy" is described in detail in Plaintiffs' complaint and lays the foundation for a conspiracy cause of action pursuant to 42 U.S.C. §1983, §1985 and common law. (Amended Compl. ¶ 1203-1204). The law in this area is well-settled that allegations of conspiracy cannot be merely conclusory in nature. *Sales v. Murray*, 862 F. Supp.2d 1511, 1517 (W.D. Va. 1994); *Ruttenberg v. Jones* 464 F. Supp. 2d 536, 551 (E.D. Va. 2006); *Scinto v. Preston* 170 Fed. Appx. 834, 836 (4th Cir. 2006).

Plaintiffs' allegations with respect to Defendant Wilson's role in the alleged DNA conspiracy to fabricate and conceal evidence are nothing more than conclusory. The alleged DNA conspiracy and cover-up began in April, 2006 with a meeting between Defendants Nifong, Meehan, Himan, Gottlieb, and Clark. (Amended Compl. 800-803). Defendant Wilson is not mentioned as a participant in this meeting. Another meeting was held on May 12, 2006 between Defendants Meehan, Clark and Nifong. (Amended Compl. ¶ 755-756). Again, there is no allegation of Defendant Wilson's involvement in the alleged DNA conspiracy or attendance at the meeting.

Defendant Wilson is never mentioned as one of the individuals who engaged in meetings, which were allegedly designed to conceal and withhold exculpatory evidence and develop the "manufacture or concealment of findings" (Amended Compl. ¶ 755-772, 1190-1202). These secretive meetings were essential to the development and implementation of the alleged DNA conspiracy among

the Defendants. There is nothing else in the complaint which indicates that Defendant Wilson was ever aware of these meetings or otherwise actively participated in the alleged conspiracy to conceal or withhold exculpatory DNA evidence. The allegations against Defendant Wilson arising from the DNA conspiracy are conclusory and must therefore be dismissed for failure to state a cause of action.

## 7. FAILURE TO INTERVENE IN VIOLATION OF 42 U.S.C. § 1986

As already noted in 6. a. above, this claim must be dismissed because the Plaintiffs have completely failed to allege the requisite race or class-based animus in their complaint on the part of Wilson.

## 8. COMMON LAW ABUSE OF PROCESS & CONSPIRACY

With respect to the common law abuse of process and conspiracy this claim should be dismissed based on Plaintiffs own complaint which states: Nifong, Gottlieb, Himan, and Wilson demonstrated malice, spite, ill-will, and wanton disregard for Plaintiffs' rights by conspiring to manufacture and by fabricating false statements for incorporation into the NTID Affidavit, manufacturing false and misleading investigative reports with the knowledge that these reports would be used to advance and perpetuate the criminal investigation against Plaintiffs. (Amended Compl. ¶ 1204)

The complaint then states, in the next paragraph: Nifong, Gottlieb, and Himan utilized the NTID process for purposes of launching the case into the public spotlight, creating a media firestorm touched off by the fraudulent NTID Affidavit and Order. The Plaintiffs were thereby subjected to unprecedented public condemnation, public outrage, and infamy. (Amended Compl. ¶ 1205) Defendant Wilson is not mentioned in the affidavit or order for NTID and Plaintiffs state in their compliant that it was Nifong, Gottlieb, and Himan.

## 9. INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS AND CONSPIRACY

Under the reasoning in *Kennedy*, the fact that there might have been a conspiracy to engage in these actions is irrelevant because the motives of Defendant Wilson do not provide the standard for determining whether he is entitled to immunity for his actions. *Kennedy* at 14. The proper inquiry is to look to the nature of the underlying action and not necessarily to the motives of the actors. *See e.g., Burns*, 500 U.S. at 506. Since the actions of Defendant Wilson are entitled to absolute immunity because they were done in preparation for trial, it is of no consequence that there might have been a conspiracy to engage in the actions. The nature of the action protected by absolute immunity does not become any more or less protected simply because it is undertaken as part of an alleged conspiracy.

These alleged actions of Defendant Wilson were performed as part of his official duties in his role as an assistant acting at the direction and supervision of a prosecutor. For compelling policy reasons, there can be no tort action against a public official, in an individual capacity, whose conduct falls within the accepted boundaries for absolute immunity. *Barr v. Matteo*, 360 U.S. 564, 79 S. Ct. 1335 (1959); *See also, Andrejko v. Sanders*, 638 F. Supp. 449 (W.D. Pa. 1986). The cause of action for intentional infliction of emotional distress against Defendant Wilson individually must therefore be dismissed because all of the actions giving rise to a potential claim for intentional infliction of emotional distress are prosecutorial in nature and protected by the doctrine of absolute immunity.

Nifong, Gottlieb, Himan, and Wilson, acting individually and in concert, intimidated witnesses, including Plaintiffs themselves, manipulated witness identification procedures, and otherwise obstructed justice with the intention of convicting Plaintiffs as principals or accessories to violent, racially motivated criminal acts that they knew never happened. (Amended Compl1216).

With respect to the claim of witness intimidation, all of the relevant actions involving Defendant Wilson also took place after indictment and in preparation for the pending criminal trial. The alleged intimidation involved Defendant Wilson interviewing and evaluating the testimony of important potential witnesses, including a December, 2006 interview with Mangum after indictment of Evans, Finnerty and Seligmann, and an April 24, 2006 interaction with Plaintiff Seligmann's alibi witness, Moezeldin

Elmostafa, which occurred after the indictment of Plaintiff Seligmann. In any event, interviewing, evaluating or otherwise attempting to discredit potential witnesses prior to trial is an activity that is at the heart of the adversarial system and fits squarely within the judicial functions of a prosecutor. *See Burns*, 500 U.S. at 492. In fact, Plaintiffs' complaint notes that the purpose of this "manufacture" was to "obtain accounts to be used in the criminal proceedings." The decision in *Brandley* affords absolute immunity to attempts by prosecutors to intimidate or tamper with witnesses. According to Plaintiffs' complaint, Defendant Wilson tampered with or otherwise intimidated three separate witnesses: Sergeant John Shelton, Moezeldin Elmostafa, and Kimberly Pittman (Amended Compl. ¶ 1195). Defendant Wilson's actions with respect to these three witnesses were taken based on the contents of each individual's projected testimony in court proceedings. The alleged actions were done after indictment of the Criminal Defendants Evans, Seligmann and Finnerty, not the Plaintiffs in this action, and were not taken in the preliminary investigation of a crime as in *Buckley*. Even though Defendant Wilson's alleged actions might have lead to a deprivation of a constitutional right or are otherwise illegal, absolute immunity still applies where the conduct is done, as here, in preparation for a criminal trial. *Carter*, 34 F.3d at 261.

## VI.  CONCLUSION

All causes of action against Defendant Wilson must be dismissed because they are either insufficiently pled, barred by the doctrine of absolute immunity, or both. Accordingly, Defendant Wilson respectfully moves this Court to dismiss all claims with prejudice.

The 2nd day of July, 2008.

Linwood Wilson
*Pro Se*
**Address redacted pursuant to Local Rule

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

### Case No. 1:07-cv-953

RYAN MCFADYEN; MATTHEW WILSON; and
BRECK ARCHER,
**Plaintiffs,**
v.

DUKE UNIVERSITY; DUKE UNIVERSITY POLICE
DEPARTMENT; AARON GRAVES; ROBERT DEAN;
LEILA HUMPHRIES; PHYLLIS COOPER; WILLIAM F.
GARBER, II; JAMES SCHWAB; JOSEPH FLEMING;
JEFFREY O. BEST; GARY N. SMITH; GREG
STOTSENBERG; ROBERT K. STEEL; RICHARD H.
BRODHEAD, Ph.D.; PETER LANGE, Ph.D.; TALLMAN
TRASK, III, Ph.D.; JOHN BURNESS; LARRY MONETA,
Ed.D.; VICTOR J. DZAU, M.D.; ALLISON HALTON; KEME
DAWKINS; SUZANNE WASIOLEK; STEPHEN BRYAN;
MATTHEW DRUMMOND; DUKE
UNIVERSITY HEALTH SYSTEMS, INC.; PRIVATE
DIAGNOSTIC CLINIC, PLLC; JULIE MANLY, M.D.;
THERESA ARICO, R.N.; TARA LEVICY, R.N.; THE
CITY OF DURHAM, NORTH CAROLINA; MICHAEL B.
NIFONG; PATRICK BAKER; STEVEN CHALMERS;
RONALD HODGE; LEE RUSS; STEPHEN MIHAICH;
BEVERLY COUNCIL; EDWARD SARVIS; JEFF LAMB;
MICHAEL RIPBERGER; LAIRD EVANS; JAMES T.
SOUKUP; KAMMIE MICHAEL; DAVID W. ADDISON;
MARK D. GOTTLIEB; BENJAMIN W. HIMAN; LINWOOD
WILSON; RICHARD D. CLAYTON; DNA SECURITY, INC.;
RICHARD CLARK; and BRIAN MEEHAN, Ph.D.
**Defendants.**

**DEFENDANT
LINWOOD WILSON'S
MEMORANDUM OF LAW IN
SUPPORT OF MOTION TO
DISMISS and MOTION TO
DISMISS**

---

### CERTIFICATE OF SERVICE

I hereby certify that, on July 2, 2008, I filed the foregoing Motion To Dismiss with the Clerk of the Court

using the USPS and I further certify that I caused the same to be served by first-class mail, postage

prepaid, to the following participants:

Reginald B. Gillespie, Jr.
FAISON & GILLESPIE
P.O. Box 5517
Durham, NC 27717
*Counsel for Defendant City of Durham, North Carolina*

Patricia P. Kerner
D. Martin Warf
Hannah Gray Styron
TROUTMAN SANDERS, LLP
P.O. Drawer 1389
Raleigh, NC 27602-1389
*Counsel for Defendants Steven Chalmers,
Patrick Baker, Beverly Council, Ronald
Hodge, Jeff Lamb, Stephen Mihaich,
Michael Ripberger, Laird Evans and Lee
Russ*

James Donald Cowan, Jr.
Dixie Thomas Wells
SMITH MOORE, L.L.P.
P.O. Box 21927
*Counsel for Defendants Duke University,
Duke University Police Department,
Aaron Graves, Robert Dean, Leila
Humphries, Phyllis Cooper, William F.
Garber, II, James Schwab, Joseph
Fleming, Jeffrey O. Best, Gary N. Smith,
Greg Stotsenberg, Robert K. Steel,
Richard H. Brodhead, Ph.D., Peter Lange,
Ph.D., Tallman Trask, III, Ph.D., John
Burness, Larry Moneta, Ed.D., Victor J.
Dzau, M.D., Allison Halton, Kemel
Dawkins, Suzanne Wasiolek, Stephen
Bryan, and Matthew Drummond*

Jamie S. Gorelick
Jennifer M. O'Connor
Paul R.Q. Wolfson
WILMER CUTLER PICKERING HALE
AND DOOR, LLP
1875 Pennsylvania Ave., N.W.
Washington, D.C. 20006
*Counsel for Defendants Duke University,
Duke University Police Department,
Aaron Graves, Robert Dean, Leila
Humphries, Phyllis Cooper, William F.
Garber, II, James Schwab, Joseph
Fleming, Jeffrey O. Best, Gary N. Smith,
Greg Stotsenberg, Robert K. Steel,
Richard H. Brodhead, Ph.D., Peter
Lange, Ph.D., Tallman Trask, III, Ph.D.,
John Burness, Larry Moneta, Ed.D.,
Victor J. Dzau, M.D., Allison Halton,
Kemel Dawkins, Suzanne Wasiolek,*

34

*Stephen Bryan, and Matthew Drummond*

William F. Lee
WILMER CUTLER PICKERING HALE
AND DOOR, LLP
60 State Street
Boston, MA 02109
*Counsel for Defendants Duke University,*
*Duke University Police Department,*
*Aaron Graves, Robert Dean, Leila*
*Humphries, Phyllis Cooper, William F.*
*Garber, II, James Schwab, Joseph*
*Fleming, Jeffrey O. Best, Gary N. Smith,*
*Greg Stotsenberg, Robert K. Steel,*
*Richard H. Brodhead, Ph.D., Peter Lange,*
*Ph.D., Tallman Trask, III, Ph.D., John*
*Burness, Larry Moneta, Ed.D., Victor J.*
*Dzau, M.D., Allison Halton, Kemel*
*Dawkins, Suzanne Wasiolek, Stephen*
*Bryan, and Matthew Drummond*

Dan Johnson McLamb
YATES, MCLAMB & WEYHER, LLP
P.O. Box 2889
Raleigh, NC 27602-2889
*Counsel for Defendants Duke University*
*Health Systems, Inc., Private Diagnostic*
*Clinic, PLLC, Julie Manly, M.D., Tara*
*Levicy, R.N. and Theresa Arico, R.N.*

James B. Maxwell
MAXWELL, FREEMAN & BOWMAN
P.O. Box 52396
Durham, NC 27717-2396
*Counsel for Defendants David Addison,*
*Kammie Michael, Richard D. Clayton and*
*James T. Soukup*

Joel Miller Craig
KENNON CRAVER BELO CRAIG &
McKEE, PLLC
P.O. Box 51579
Durham, NC 27717-1579
*Counsel for Defendant Benjamin Himan*

Edwin M. Speas, Jr.
Eric P. Stevens
POYNER & SPRUILL, LLP
P.O. Box 10096

Raleigh, NC 27605-0096
**Counsel for Defendant Mark Gottlieb**

Kearns Davis
Robert James King, III
BROOKS PIERCE MCLENDON
HUMPHREY & LEONARD
P.O. Box 26000
Greensboro, NC 27420-6000
**Counsel for Defendant DNA Security, Inc.
& Richard Clark**

Paul R. Dickinson, Jr.
James A. Roberts, III, Esq.
LEWIS & ROBERTS PLLC
1305 Navaho Drive, Suite 400
Raleigh, NC 27609-7482
**Counsel for Defendant Brian Meehan**

Roger E. Warin
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, NW
Washington, DC 2003
**Counsel for Defendant City of Durham,
North Carolina**

Robert A. Sar
Nicholas J. Sanservino, Jr.
OGLETREE, DEAKINS, NASH, SMOAK
& STEWART, P.C.
2301 Sugar Bush Road, Ste 600
Raleigh, NC 27612
**Counsel for Defendant DNA Security, Inc.**

Robert C. Ekstrand, Esq.
811 Ninth Street, Suite 260
Durham, North Carolina 27705
**Counsel for Plaintiffs Ryan McFadyen,
Matthew Wilson and Breck Archer**

Respectfully submitted,

Linwood Wilson
*Pro Se*
**Address redacted pursuant to Local Rule

36



Recycled Paper

PRESS HARD. *YOU ARE MAKING 3 COPIES.*

UNITED STATES POSTAL SERVICE

**EXPRESS MAIL**®

*PLEASE PRESS FIRMLY*

EB907406380S

**ORIGIN (POSTAL SERVICE USE ONLY)**

PO ZIP Code

Day of Delivery
☐ Next ☐ 2nd ☐ 2nd Del. Day

Date Accepted

Scheduled Date of Delivery
Month    Day

Postage
$

Mo.   Day   Year

Scheduled Time of Delivery
☐ Noon ☐ 3 PM

Return Receipt Fee
$

Time Accepted
☐ AM
☐ PM

Military
☐ 2nd Day ☐ 3rd Day

COD Fee
$

Flat Rate ☐ or Weight

Int'l Alpha Country Code

Insurance Fee
$

lbs.        ozs.

Total Postage & Fees
$

Acceptance Emp. Initials

**FROM:** (PLEASE PRINT)

PHONE (     )

**FOR PICKUP OR TRACKING**
Visit **WWW.USPS.COM**
Call: 1-800-222-1811

**Flat Rate**
**Mailing Envelope**
Label 11-B, March 2004

*For Domestic and International Use*

**Visit us at usps.com**

**EXPRESS MAIL**
UNITED STATES POSTAL SERVICE®

**Post Office To Addressee**

**DELIVERY (POSTAL SERVICE USE ONLY)**

Delivery Attempt
Mo.   Day

Time
☐ AM
☐ PM

Employee Signature

Delivery Date
Mo.   Day

Time
☐ AM
☐ PM

Employee Signature

**CUSTOMER USE ONLY**

☐ NO DELIVERY
Weekend   Holiday

☐ WAIVER OF SIGNATURE (Domestic Mail Only)
Additional merchandise insurance is void if customer requests waiver of signature. I wish delivery to be made without obtaining signature of addressee or addressee's agent (if delivery employee judges that article can be left in secure location) and I authorize that delivery employee's signature constitutes valid proof of delivery.

Mailer Signature

**TO:** (PLEASE PRINT)          PHONE (     )

ZIP + 4 (U.S. ADDRESSES ONLY, DO NOT USE FOR FOREIGN POSTAL CODES)

FOR INTERNATIONAL DESTINATIONS, WRITE COUNTRY NAME BELOW.

*Print postage online - Go to usps.com/postage*

*PLEASE PRES*

**Addressee Copy**




UNITED STATES POSTAL SERVICE

0000

U.S. POSTAGE
PAID
DURHAM, NC
27712
JUL 01 '08
AMOUNT
**$16.50**
00012086-01

When used internationally affix customs declarations (PS Form 2976, or 2976A)



Cradle to Cradle Certification is awarded to products that pursue an innovative vision of ecologically-intelligent design that eliminates the concept of waste.
This USPS® packaging has been certified for its material content, recyclability and manufacturing characteristics.

Please recycle.





# UNITED STATES POSTAL SERVICE

**EXPRESS MAIL**

## EXTREMELY URGENT

*Please Rush To Addressee*

Flat Rate
Mailing Envelope

**For Domestic and International Use**

*Visit us at usps.com*