# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

### CIVIL ACTION NUMBER 1:07-CV-00953

RYAN McFADYEN, et al.,

        Plaintiffs,

    v.

DUKE UNIVERSITY, et al.,

        Defendants.

Brief in Support of "Duke University Defendants'" Motion to Dismiss Amended Complaint

Pursuant to Federal Rule of Civil Procedure 12(b)(6) and Local Rules 7.2 and 7.3, the "Duke University Defendants"—defined by the Court and the parties for purposes of this motion to comprise Duke University, Richard H. Brodhead, Stephen Bryan, John Burness, Kemel Dawkins, Matthew Drummond, Victor J. Dzau, Aaron Graves, Allison Haltom, Peter Lange, Larry Moneta, Robert K. Steel, Tallman Trask III, and Suzanne Wasiolek—move to dismiss all claims in the Amended Complaint (AC) against them for failure to state a claim on which relief may be granted.[1]

---

[1] (*See* Joint Mot. to Extend Page Limitations and to Establish a Rule 12 Briefing Schedule, Dkt. 23 (defining Duke University Defendants); Order, Dkt. 29 (granting Joint Motion in part); Joint Mot. to Reestablish Deadlines in the Rule 12 Briefing Schedule, Dkt. 37 (treating Second Amended Complaint, filed April 18, 2008, as the First Amended Complaint; referred to herein as the "Amended Complaint," (AC)); Order, Dkt. 38.) Separate briefs are being filed on behalf of the "Duke Police Defendants" and the "Duke SANE Defendants," as defined in the Joint Motions, to dismiss all claims in the Amended Complaint as to those Defendants. The Amended Complaint raises many causes of action against all three groups of Duke Defendants. To avoid repetition, this brief

# I. NATURE OF THE PROCEEDINGS

This case was brought by three members of the Duke men's lacrosse team who feel aggrieved because they were investigated by the Durham Police after a stripper hired to perform at their party made a false allegation of rape. The Plaintiffs in this case were never charged or tried for any offense resulting from that allegation. Nonetheless, they contend that the mere fact that they were *investigated* was unlawful. Moreover, they contend that Duke and its employees violated their legal rights by providing the police with information about the alleged rape during the investigation. In essence, Plaintiffs argue that the University had a legal duty to stand between themselves and the prosecutor, and to try to prevent the police and prosecutor from investigating them for a very serious crime.

No legal system in this country supports such a claim—whether it be labeled as § 1983, negligence, abuse of process, or contract. Our system of justice encourages individuals to cooperate with the police, not to hinder them, and to provide information to prosecutors, not to stonewall them. Duke was not in a position to make judgments about

---

addresses those causes of action that appear directed principally at the Duke University Defendants—namely, Counts 5, 7-10, 12-17, 21, 23, and 30. The Duke Police Defendants address, in their brief, Counts 11, 22, 24, 29, and 37-40. The Duke SANE Defendants address, in their brief, Counts 1-3, 6, 18-20, and 31-33. Counts 4, 25-28, and 34-36 are brought only against non-Duke defendants. (*See* Ex. 1.) Where necessary, this brief discusses issues of liability that are related to certain Duke Police and Duke SANE Defendants. To the extent the arguments presented in the Briefs for the Duke Police Defendants or Duke SANE Defendants are relevant to the claims against the Duke University Defendants, they are incorporated here by reference, as are the Statement of Facts in the Briefs for the Duke SANE Defendants and Duke Police Defendants.

the students' guilt or innocence, especially as both the police and prosecutor were publicly stating with great confidence that a rape had taken place. Duke waited for the investigation by the police and the prosecutor to run its course, and that is exactly what the criminal justice system expected it to do.

What happened to the three indicted members of the Duke men's lacrosse team in 2006—an unfounded indictment obtained by a prosecutor who apparently was well aware that the accusation could not be supported in a court of law—was indeed shocking. That outrage, however, was not the fault of Duke University or any of its employees. Duke did not investigate the crime; Duke was not privy to the DNA test results; Duke did not seek the indictment. Moreover, *these* Plaintiffs were not arrested or indicted on any charge arising out of the incident. Accordingly, this lawsuit lacks any grounding in fact or law, and the Complaint should be dismissed.

## II.  STATEMENT OF FACTS[2]

On March 13, 2006, three members of the Duke men's lacrosse team living at 610 N. Buchanan Boulevard in Durham hosted a party for their teammates. (AC ¶¶ 194-195, 197.) The lacrosse players hired two strippers, Kim Pittman and Crystal Mangum, to entertain them at their party. (*Id.* ¶¶ 195-197.) Mangum arrived appearing impaired, however, and the guests soon lost interest in the performance. (*Id.* ¶¶ 197, 200-202.)

---

[2] Solely for the purpose of this Motion, and as required under Federal Rule of Civil Procedure 12(b)(6), the Duke University Defendants assume the truth of the facts asserted by Plaintiffs in their Amended Complaint.

Pittman and Mangum left the house and drove to a 24-hour grocery store, where Pittman asked a security guard to call 911 because Mangum would not leave her car. (*Id.* ¶¶ 224-225.) Durham Police Sergeant Shelton and Officer Barfield responded to that call (*id.* ¶¶ 229-233), and the two officers transported Mangum to Durham Center Access, a mental health and substance abuse center (*id.* ¶¶ 237, 243). While at Durham Access, Mangum reported that she had been raped. (*Id.* ¶ 251.) She was taken to Duke University Medical Center for a sexual assault examination. (*Id.* ¶ 255.)

Speaking to Durham Police at the hospital, Mangum recanted her rape allegation, but then reasserted it. (*Id.* ¶¶ 262-263, 266.) Emergency room medical personnel found Mangum "anxious," complaining of "extreme pain," and reporting that she had been sexually assaulted. (*Id.* ¶¶ 294-297.) Mangum also told emergency room medical personnel her pain level was "a perfect 10" on a scale of "1 ('mild') to 10 ('worst ever')," including "extreme pain … 'in her vagina.'" (*Id.* ¶¶ 294-295.)

Following this initial medical screening, Dr. Julie Manly conducted a forensic sexual assault examination. (*Id.* ¶¶ 298, 302-306.) Tara Levicy, a Sexual Assault Nurse Examiner (SANE) "in training," assisted Dr. Manly. (*Id.* ¶¶ 38, 301-302.) As part of the forensic sexual assault examination, Dr. Manly initiated a pelvic examination which revealed "diffuse edema"—swelling—of "the vaginal walls." (*Id.* ¶¶ 304, 306.) Oral, vaginal, and rectal swabs from Mangum were also collected as part of the pelvic examination and included in Mangum's Sexual Assault Kit. (*Id.* ¶¶ 308, 746.) As Dr.

Manly proceeded with the pelvic examination, Mangum "quickly protested and insisted" that it cease because she was in "intense pain." (*Id.* ¶ 304.)

The Durham Police Department and Durham County District Attorney Mike Nifong investigated the alleged rape. On March 16, Durham Police Sergeant Mark Gottlieb and Investigator Benjamin Himan interviewed Mangum. (*Id.* ¶ 362.) Based on Mangum's statement to the police, Durham Police secured a search warrant for 610 N. Buchanan. (*Id.* ¶¶ 408, 415, 423, 425.) Several of Mangum's false fingernails and other personal belongings were found during the search. (*Id.* ¶¶ 423, 425.) Durham Police also presented Mangum with photographic arrays of possible suspects, but Mangum failed to identify any of her alleged attackers. (*Id.* ¶¶ 368, 375, 377, 380.)

In the course of the Durham Police Department's investigation of the alleged rape, the Durham Police subpoenaed and subsequently obtained Mangum's medical records from Duke Hospital. (*Id.* ¶ 785.) On March 23, 2006, Judge Stephens of the Durham County Superior Court issued a Non-Testimonial Identification Order (NTID) for the collection of DNA and photographs from members of the lacrosse team. (*Id.* ¶¶ 505 C, 596.) The authorization for the NTID was based on information from Mangum's statement to Durham Police (*id.* ¶ 420), items of Mangum's found during the search of 610 N. Buchanan and the non-custodial interviews of its residents (*id.* ¶¶ 423, 425), and information from Mangum's medical examination and record (*id.* ¶¶ 780-781).

Shortly after Judge Stephens issued the NTID, Durham County District Attorney Mike Nifong began making unequivocal public statements that a rape had occurred. (*Id.*

¶ 502.)  However, on March 27, after being briefed on the evidence in the case by Durham Police officers Gottlieb and Himan, Nifong told them, "You know, we're f****d!"  (*Id.* ¶¶ 591-593 (asterisks in original).)  Nifong nonetheless decided to continue with the prosecution.  (*Id.* ¶ 593.)

On March 30, the State Bureau of Investigation crime lab informed Nifong, Gottlieb, and Himan that the evidence collected by Levicy and Manly for the rape kit and the evidence collected pursuant to the NTID "would not provide DNA evidence linking any [lacrosse] team member to Mangum's rape allegations."  (*Id.* ¶ 660.)  Nonetheless, on March 31, Nifong "summoned" Gottlieb and Himan to his office and "direct[ed]" them to conduct a "yearbook" photo line-up for Mangum, a procedure that allegedly violated Durham Police identification procedures.  (*Id.* ¶¶ 663, 667.)  At this April 4 line-up, Mangum identified three lacrosse players as her attackers.  (*Id.* ¶¶ 668, 688.)  Nifong also requested that a private laboratory conduct a further examination of the DNA samples.  (*Id.* ¶¶ 688-689.)  Nifong, Gottlieb, Himan, and officials from the private laboratory decided to conceal the exculpatory aspects of the test results.  (*Id*. ¶ 756.)

On May 31, 2006, Nifong issued subpoenas to Duke University to produce "Duke Card Transaction Reports," which include electronic records of access to student dormitories, for the lacrosse team.  (*Id*. ¶ 863.)  Duke notified the players of the subpoenas, and some of the players successfully moved to quash them.  (*Id.* ¶¶ 864-865, 869.)  Unbeknownst to the players, however, Nifong had received these reports two months earlier, after Duke Police officers had provided them to the Durham Police.  (*Id.*)

On April 17, Nifong presented to the grand jury indictments for rape against two lacrosse players, Collin Finnerty and Reade Seligmann. (*Id.* ¶¶ 812, 1150 J.) Nifong presented a third indictment against David Evans on May 15. (*Id.* ¶ 775.) No trial was ever held against any of the indicted players, and no other member of the lacrosse team was ever indicted or tried for the alleged rape.

On January 12, 2007, Nifong recused himself from the case, and the Attorney General's office took over. (*Id.* ¶¶ 5, 798, 897.) The Attorney General's office dropped all charges against Finnerty, Seligmann, and Evans, declaring them innocent of the charges. (*Id.* ¶ 5.) Nifong was disbarred on June 16, 2007, and was subsequently found guilty of criminal contempt and jailed for his misconduct. (*Id.* ¶¶ 49, 902.)

## III. QUESTIONS PRESENTED

**A.** Whether Plaintiffs have failed to state a claim under 42 U.S.C. § 1983 (Counts 5, 7-10, 12-15);

**B.** Whether Plaintiffs have failed to state a claim under 42 U.S.C. § 1985 or § 1986 (Counts 16-17);

**C.** Whether Plaintiffs have failed to state a claim for breach of contract (Count 21) or breach of fiduciary duty (Count 23); and

**D.** Whether Plaintiffs have failed to state a claim for negligence (Count 30).

## IV. STANDARD OF REVIEW

On a motion to dismiss for failure to state a claim, the Court should accept well-pleaded factual allegations in the complaint as true, but should give no weight to legal

conclusions cast in the form of factual allegations. *Young v. City of Mount Rainier*, 238 F.3d 567, 577 (4th Cir. 2001). Nor should the Court give any weight to conclusory allegations ungrounded in any assertion of fact. *Papasan v. Allain*, 478 U.S. 265, 286 (1986). Moreover, unsupported allegations of conspiracy are insufficient to survive a motion to dismiss. *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1966 (2007). Neither "a bare assertion of conspiracy" nor "a conclusory allegation of agreement" suffices to raise a claim of conspiracy. *Id.* Instead, Plaintiffs must allege sufficiently specific facts to "raise a right to relief above the speculative level," *id.* at 1965, such that the "claim … is plausible on its face," *id.* at 1974.

## V. ARGUMENT

### A. Plaintiffs Fail To State Any Claim Under 42 U.S.C. § 1983 (Counts 5, 7-10, 12-15)

Plaintiffs' principal allegations against the Duke University Defendants are that those Defendants engaged in a sweeping conspiracy with public authorities to deprive them of their constitutional rights. These assertions are unsupported in law. To state a claim under § 1983, Plaintiffs must adequately allege two elements: (1) that Defendants "deprived [them] of a right secured by the Constitution and laws of the United States"; and (2) that Defendants "deprived [them] of this constitutional right under color of any [State] statute, ordinance, regulation, custom, or usage." *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 150 (1970) (internal quotation marks omitted). Plaintiffs fail to allege adequately either of these required elements.

### 1. Plaintiffs Fail To Allege That The Duke University Defendants Acted Under Color Of State Law

Section 1983 reaches only *state action*—that is, conduct taken "under color of state law." "[T]he under-color-of-state-law element of § 1983 excludes from its reach merely private conduct, no matter how discriminatory or wrongful." *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 50 (1999) (internal quotation marks and citation omitted). The Duke University Defendants are private persons and entities whose actions would normally fall outside the reach of § 1983. Thus, before Plaintiffs can establish liability against these Defendants under § 1983, they must first demonstrate that the Duke University Defendants are state actors. *Id.*

Plaintiffs fail to satisfy the state-action requirement. Although Plaintiffs assert several times that the Duke University Defendants acted "under color of state law,"[3] such "[c]onclusory allegations that [a party] acted under color of state law will not suffice." *Wolfe v. Bias*, 601 F. Supp. 426, 428 (S.D. W. Va. 1984); *see Bass v. E.I. Dupont de Nemours & Co.*, 324 F.3d 761, 766 (4th Cir. 2003); *Ijames v. Murdock*, No. 01-00093, 2003 WL 1533448, at *5 (M.D.N.C. Mar. 21, 2003). Nor can Plaintiffs satisfy § 1983's under-color-of-state-law requirement with conclusory assertions that the Duke University Defendants conspired with other defendants who are state actors to deprive Plaintiffs of their constitutional rights.[4] A plaintiff alleging conspiracy under § 1983 must "plead *specific facts* in a nonconclusory fashion to survive a motion to dismiss." *Gooden v.*

---

[3] (*See, e.g.*, AC ¶¶ 905, 919, 955, 969-970, 979, 988, 993, 1003, 1008, 1038, 1149.)

[4] (*See, e.g.*, AC ¶¶ 2-5, 84-85, 110, 257, 402, 500-501, 598, 639-640, 779.)

*Howard County, Md.*, 954 F.2d 960, 969-970 (4th Cir. 1992) (en banc) (emphasis added); *Howard v. Food Lion, Inc.*, 232 F. Supp. 2d 585, 597 (M.D.N.C. 2002) ("To survive a motion to dismiss this conspiracy claim under § 1983, a plaintiff must allege both a mutual understanding to achieve some unconstitutional action reached by the private and state defendants and some factual assertions suggesting a meeting of the minds."). As the Supreme Court recently made clear, a "bare assertion of conspiracy" is insufficient to state a claim; a complaint must include "enough factual matter" to "plausibly suggest[]" that an agreement was made, and factual allegations that are "merely consistent with" an agreement are insufficient to state a valid claim. *See Twombly*, 127 S. Ct. at 1955, 1965-1966.

Plaintiffs do not allege any specific facts that would support a plausible inference that the Duke University Defendants entered into an agreement to deprive Plaintiffs of their constitutional rights. Instead, they offer only bare assertions that a conspiracy existed. Plaintiffs allege, for example, that Duke and Durham defendants conspired to "orchestrate" the mass interrogation of uncounseled students (AC ¶ 402); to retaliate against Plaintiffs by seeking an NTID (*id.* ¶ 414); and to "participate in a media campaign to publicly vilify Plaintiffs and their teammates" (*id.* ¶¶ 500-501). But Plaintiffs point to no specific facts that would plausibly suggest that the Duke and Durham defendants ever

*agreed* to take such actions—even though they use some form of the word "conspiracy" 216 times in their 400-plus page complaint.[5]

Furthermore, Plaintiffs' allegations of conspiracy are implausible on their face. To take just one example, Plaintiffs allege in Count 15 that *every* defendant in this case—including every Duke Defendant, from patrol officers to the Chairman of the Board of Trustees—agreed to deprive Plaintiffs of their (unspecified) constitutional rights. But nowhere do Plaintiffs allege any facts to support their implausible assertion that every Duke Defendant was acting in this conspiracy pursuant to a so-called "Chairman's Directive," which allegedly included the inconceivable goal of convicting innocent Duke students of rape in order to *improve* the public perception of the University. (*See* AC ¶¶ 85, 452-453.) As the Supreme Court cautioned in *Twombly*, Plaintiffs should not be permitted to impose the "potentially enormous expense of discovery" on Defendants and

---

[5] Plaintiffs offer only two factual allegations that implicate their assertion of a conspiracy: (1) Durham and Duke law enforcement officials attended "Joint Command meetings," at which, supposedly, all "appearances of a legitimate investigation were abandoned, and replaced by a conspiracy whose final object was to prosecute and convict Plaintiffs and/or their teammates" (AC ¶¶ 627, 639); and (2) Levicy had "several meetings and interviews" with Durham officials, at which she "repeatedly proffered false testimony that was clearly designed to fill the chasms of Mangum's case and/or restore Mangum's glaring credibility problems" (*id.* ¶ 788). These assertions are insufficient to plead a conspiracy. Plaintiffs' allegations mistake meetings for meetings *of the mind*. Meetings between police officials and interviews with witnesses are routine features of criminal investigations, and it is only Plaintiffs' implausible, conclusory assertions that imbue them with any conspiratorial meaning. *Cf. Twombly*, 127 S. Ct. at 1972 ("Hence, a natural explanation for the noncompetition alleged is that the former Government-sanctioned monopolists were sitting tight, expecting their neighbors to do the same thing.").

this Court based solely on their "anemic" and implausible allegations of conspiracy. *Twombly*, 127 S. Ct. at 1967.[6]

> **2. Plaintiffs Fail To Allege Deprivation Of Any Constitutional Right**
>
> > **a. Because Plaintiffs Were Never Indicted, Let Alone Tried, Their Claims Are Governed Exclusively By The Fourth Amendment, Which Was Not Violated**

Plaintiffs allege that they were deprived of constitutional rights to a fair trial under the Fifth, Sixth, and Fourteenth Amendments. These claims face an insuperable obstacle: Plaintiffs were never indicted, let alone tried or convicted. As such, to the extent Plaintiffs suffered *any* pretrial deprivation of liberty, they may rely only on the Fourth Amendment. *See Albright v. Oliver*, 510 U.S. 266, 274 (1994); *Riley v. Dorton*, 115 F.3d 1159, 1162 (4th Cir. 1997); *Taylor v. Waters*, 81 F.3d 429, 435-436 (4th Cir. 1996).

*Albright* is fatal to Plaintiffs' Fourteenth Amendment claim. As the Supreme Court explained in that decision, "[t]he Framers considered the matter of pretrial deprivations of liberty and drafted the Fourth Amendment to address it." 510 U.S. at 274. In so doing, the Court rejected a claim that there is a "substantive right under the Due Process Clause of the Fourteenth Amendment to be free from criminal prosecution except upon probable cause." *Id.* at 268. To the contrary, the Court stated, "[w]here a

---

[6] Count 15, which raises a claim for "conspiracy in violation of § 1983," fails in any event because conspiracy is not a free-standing claim under § 1983; rather, it is a basis for liability when the plaintiff has demonstrated that his constitutional rights have been violated. *See Hinkle v. City of Clarksburg*, 81 F.3d 416, 421 (4th Cir. 1993). As detailed below, Plaintiffs have not demonstrated any violation of their constitutional rights.

particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing the[] claims." *Id*. at 273. Accordingly, the Court held that, because Albright's allegations arose out of "pretrial" incidents, "it is the Fourth Amendment, and not substantive due process, under which [his] claims must be judged." *Id.* at 271. In this case as well, Plaintiffs were never tried, and so all of their allegations of improprieties in the investigation go to pretrial conduct and must be examined through the lens of the Fourth Amendment. *See id*.; *Brooks v. City of Winston-Salem, N.C.*, 85 F.3d 178, 184 (4th Cir. 1996).

Plaintiffs cannot, however, state any claim under the Fourth Amendment. Their only allegations that could conceivably implicate the Fourth Amendment relate to assertedly illegal searches and seizures in connection with the NTID and McFadyen Search Warrant (Counts 1 and 2). But as explained in the Duke SANE Defendants' Brief (at pp. 9-16), there were no Fourth Amendment violations because the contents of the affidavits used to obtain both the NTID and Warrant were sufficient to establish probable cause *without* any information to which Plaintiffs now object. *See, e.g.*, *Simmons v. Poe*, 47 F.3d 1370, 1378 (4th Cir. 1995).

Even if an Amendment other than the Fourth, such as the Fifth Amendment's Self-Incrimination Clause, were applicable to Plaintiffs' claims, they did not suffer any violation of their rights. First, an individual's Fifth Amendment rights cannot be violated

unless and until his compelled testimony is actually used in a criminal trial. *See, e.g.*, *Chavez v. Martinez*, 538 U.S. 760 (2003); *United States v. Verdugo-Urquidez*, 494 U.S. 259 (1990); *Burrell v. Virginia*, 395 F.3d 508, 513-514 (4th Cir. 2005); *see also Riley*, 115 F.3d at 1165. Plaintiffs, however, were never tried. Second, Plaintiffs do not identify any statements that they allegedly gave to police, much less any incriminating statements. But there is no "Fifth Amendment violation[] where no statements whatsoever [are] made." *Riley*, 115 F.3d at 1165. Third, the taking of physical evidence from a suspect, such as the DNA samples that Plaintiffs gave pursuant to the NTID, is not subject to the Fifth Amendment privilege against self-incrimination. *See Schmerber v. California*, 384 U.S. 757, 761 (1966); *State v. Hollingsworth*, 77 N.C. App. 36, 44, 334 S.E.2d 363, 467 (1985).

Plaintiffs also cannot state a constitutional violation under the Sixth Amendment, which likewise protects trial rights. "The Sixth Amendment right to counsel is triggered at or after the time that judicial proceedings have been initiated, whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." *Fellers v. United States*, 540 U.S. 519, 523 (2004) (internal quotation marks and citation omitted). The only police procedure in which the Plaintiffs even took part was the March 23 non-testimonial identification procedure. Plaintiffs had no Sixth Amendment right to counsel during that procedure, *see Schmerber*, 384 U.S. at 765-766, and in any case they could not have been deprived of their right to counsel because, as Plaintiffs allege, they in fact retained counsel in advance of the procedure. (*See* AC ¶ 407.)

Second, Plaintiffs' allegations of violations of their Sixth Amendment right to a fair trial by jury hold no weight because they were never tried. Plaintiffs allege that a litany of public false statements established a presumption of guilt and deprived them of a fair trial. (*See id.* ¶ 959.) But there is no constitutional violation unless and until the allegedly false statements actually impaired juror impartiality. *See Patton v. Yount*, 467 U.S. 1025, 1035 (1984). Because the plaintiffs were never tried, they suffered no constitutionally cognizable injury arising out of the pretrial publicity.[7]

> **b.** **Plaintiffs Fail To Allege Deprivation Of A Constitutional Right Under Any Of Their Individual Counts**[8]
>
> **i.** **Count 5: "False Public Statements"**

---

[7] Plaintiffs also allege violations of their constitutional rights under Article IV and the First, Ninth, and Fourteenth Amendments. Plaintiffs' equal protection claims are addressed *infra* pp. 32-40 (Counts 16-17); their First Amendment claims are addressed *infra* pp. 21-22 (Count 8); and their Article IV claims are addressed *infra* pp. 24-26 (Count 10). The Ninth Amendment claims fail because that Amendment "creates no constitutional rights" and is therefore not cognizable under § 1983. *Wohlford v. U.S. Dept. of Agric.*, No. 87-2043, 1988 WL 24281, at *1 (4th Cir. Mar. 17, 1988); *see Froehlich v. State of Wis., Dep't of Corr.*, 196 F.3d 800, 801 (7th Cir. 1999); *Strandberg v. City of Helena*, 791 F.2d 744, 748 (9th Cir. 1986).

[8] Duke Defendants are named in the captions for Counts 7 and 14, but no allegations are made about these Defendants in the Counts themselves. Because Plaintiffs have not alleged "any personal connection" between the named Duke Defendants and the "denial of [Plaintiffs'] constitutional rights, the action against [them] must fail." *Vinnedge v. Gibbs*, 550 F.2d 926, 928-929 (4th Cir. 1977). Even if the Duke Defendants had been properly named in these Counts, they would nonetheless fail. Count 7 appears to allege that certain (non-Duke) defendants withheld exculpatory evidence from Plaintiffs. However, because Plaintiffs were never tried or convicted, they were not constitutionally entitled to such evidence. *See United States v. Ruiz*, 536 U.S. 622, 628-629 (2002). Count 14 fails to state a "failure to train" claim against any Duke Defendant because, as explained below, the Duke Defendants did not have authority over Durham officials and therefore were not required to have trained them. *See infra* pp. 29-31.

In Count 5, Plaintiffs allege the Duke University Defendants conspired with Durham officials to "publish false and stigmatizing statements" that deprived Plaintiffs of their constitutional rights. (AC ¶ 956.)  The Supreme Court has made clear, however, that injury to reputation is insufficient "to invoke the procedural protection of the Due Process Clause."  *Paul v. Davis*, 424 U.S. 693, 701 (1976); *see Siegert v. Gilley*, 500 U.S. 226, 233 (1991).  Rather, to state a valid claim under § 1983 on the basis of allegedly stigmatizing statements, a plaintiff must allege injury to his or her reputation *plus* the deprivation of a protected legal right or alteration of legal status.  *Davis*, 424 U.S. at 711; *Johnson v. Morris*, 903 F.2d 996, 999 (4th Cir. 1990).

Plaintiffs fail to plead these essential elements of a "stigma-plus" claim.  First, Plaintiffs have not alleged any facts to demonstrate that the Duke University Defendants made public statements that injured their personal reputations; *none* of the allegedly stigmatizing public statements that Plaintiffs attribute to any of the Duke University Defendants is a statement specifically about any of these three Plaintiffs.

Plaintiffs allege that Levicy and Arico published false statements that "there was evidence of blunt force trauma" visible in Mangum's sexual assault examination and that the examination "corroborated Mangum's claim that she was violently gang raped."  (AC ¶¶ 956 G-H.)  But these statements do not stigmatize these Plaintiffs at all; the alleged statements relate to Mangum's sexual assault examination and Levicy's qualifications to conduct that examination—*not* Plaintiffs' character.  A statement cannot implicate a protected liberty interest unless it can "be understood to constitute a charge of a serious

- 16 -

character defect." *Ridpath v. Bd. of Governors of Marshall Univ.*, 447 F.3d 292, 308 (4th Cir. 2006). Similarly, none of the allegedly stigmatizing statements that Plaintiffs attribute to Steel, Brodhead, and Burness refers to any of the Plaintiffs individually. (*See*, *e.g.*, AC ¶¶ 529, 532-535, 956 I.)[9]

Although Plaintiffs allege that these statements referred to the lacrosse team as a group, such "group" references are insufficient as a matter of law to state a due process claim under the "stigma-plus" theory. *See Algarin v. Town of Wallkill*, 421 F.3d 137, 139 (2d Cir. 2005); *Abramson v. Pataki*, 278 F.3d 93, 102 (2d Cir. 2002). In *Algarin*, 23 members of the Wallkill, New York, police department brought a § 1983 action against the town of Wallkill and its police commissioners based on the publication of a report that plaintiffs claimed contained false allegations that "besmirched and sullied their names" and prevented them from being hired by other police departments. 421 F.3d at 138. The Second Circuit affirmed the dismissal of plaintiffs' stigma-plus claim on the ground that the report "was written without naming names or associating alleged incidents … *with specific officers*" and thus, it was "impossible to directly tie any of the [allegedly stigmatizing] statements in the Report to *individual officers*." *Id*. at 139 (emphasis added); *see also Abramson*, 278 F.3d at 102 (affirming dismissal of stigma-

---

[9] The only public stigmatizing statements that Plaintiffs attribute to Burness is a statement on the eve of the Attorney General's exoneration of Evans, Finnerty and Seligmann that, "while [the rape] may not have happened, Plaintiffs were capable of it." (AC ¶ 532.) Although Plaintiffs have paraphrased this statement to make it appear applicable to *them*, on its face, this alleged statement obviously refers to Evans, Finnerty and Seligmann—the only lacrosse players who had been indicted.

plus claim where plaintiffs failed to allege "a specific [defamatory] statement with respect to any one of [the plaintiffs]").  Because the statements alleged by Plaintiffs here as the basis for their claim "merely make[] reference to the plaintiff[s] as a member of a group," Plaintiffs' stigma-plus claim cannot show "stigma" and should be dismissed.

Second, Plaintiffs have not adequately alleged the "plus" element of a "stigma-plus" claim.  Under this theory, a plaintiff must allege (and, eventually, prove) injury to his or her reputation *plus* the deprivation of a protected legal right or alteration of legal status.  *Davis*, 424 U.S. at 711; *Johnson*, 903 F.2d at 999.  Plaintiffs recite a multitude of "tangible" interests of which they were allegedly deprived in connection with the allegedly stigmatizing statements.  (AC ¶¶ 957 A-G.)  But the loss of a "tangible interest" is not enough to state a § 1983 claim under the stigma-plus theory, "unless that loss involve[s] a removal, extinguishment or significant alteration of an interest recognized and protected by law."  *Chaudhry v. Prince George's County, Md.*, 626 F. Supp. 448, 454 (D. Md. 1985).  Plaintiffs' alleged deprivations by Duke do not satisfy this standard, either because they do not involve legally protected rights (*see* AC ¶ 957 C-D (right to play Division I lacrosse and right to "educational status")), or because they involve interests that are so broad and vague as to make it impossible to discern what right Plaintiffs believe has been affected (*id.* ¶¶ 957 E-F).  (Some of the alleged deprivations either never occurred or do not involve Duke at all.  *See id.* ¶ 957 A, B, G.)

Third, Plaintiffs fail to state a claim for stigma-plus under § 1983 because they have not alleged the requisite nexus between the allegedly stigmatizing statements and

the alleged deprivation of legal rights. *See Ridpath*, 447 F.3d at 309; *Hadley v. County of Du Page*, 715 F.2d 1238, 1246-1247 (7th Cir. 1983). *Duggan v. Town of Ocean City*, 516 F. Supp. 1081, 1085 (D. Md. 1981). A stigma-plus plaintiff must demonstrate that the defamatory statement was made (by a state actor) "in the course of" the deprivation of a legal right or alteration of legal status, *see Ridpath*, 447 F.3d at 309, or that the defamatory statement *caused* the deprivation of a legal right or alteration of legal status, *see Johnson*, 903 F.2d at 999-1000. *See also Hart v. Parks*, 450 F.3d 1059, 1070 (9th Cir. 2006). In other words, a plaintiff must allege an intimate connection between the "stigma" and the "plus." *See Marrero v. City of Hialeah*, 625 F.2d 499, 517 (5th Cir. 1980).

Plaintiffs' allegations do not satisfy this standard. For example, Levicy and Arico are alleged to have made statements about the medical evidence that suggested a rape had occurred. (AC ¶¶ 956 G-H.) But Plaintiffs fail to allege any facts to suggest that these statements were made "in the course of" Plaintiffs' alleged deprivations. Nor do Plaintiffs allege that any of these alleged deprivations were actually imposed by Levicy or Arico. Although the Fourth Circuit has not addressed this issue, several courts in other jurisdictions have concluded that a plaintiff cannot state a cognizable stigma-plus claim where the allegedly stigmatizing statements do not originate from the same state actor who imposes the "plus." *See, e.g.*, *Hawkins v. R. I. Lottery Comm'n*, 238 F.3d 112, 116 (1st Cir. 2001); *Pendleton v. City of Haverhill*, 156 F.3d 57, 63 (1st Cir. 1998); *Grimm v. City of Uniontown*, No. 06-1050, 2008 WL 282344, at *29-30 (W.D. Pa. Jan. 31, 2008).

Plaintiffs nowhere suggest that Levicy and Arico did (or could) impose any of Plaintiffs' alleged "pluses,"—*i.e.*, deprivations of their "tangible interests." (AC ¶ 957.)[10]

Similarly, Plaintiffs have failed to allege the requisite nexus between the alleged stigmatizing statements of Steel, Brodhead and Burness and the alleged deprivation of Plaintiffs' "tangible interests." (*Id*. ¶ 957.) For example, Plaintiffs do not allege *when* these Duke Defendants allegedly made statements that "Plaintiffs had participated in conduct that was 'far worse' than even the horrific race-motivated gang-rape." (*Id*. ¶ 956 I.) But for such statements to be actionable under § 1983, they must have been made contemporaneously with—indeed, in the course of—the alleged deprivation. *See Stone v. Univ. of Md. Med. Sys. Corp.*, 855 F.2d 167, 172 n.5 (4th Cir. 1988); *see also Gobel v. Maricopa County*, 867 F.2d 1201, 1205 (9th Cir. 1989).[11] And although Plaintiffs do assign dates to a handful of statements allegedly made by Brodhead and

---

[10] In *Velez v. Levy*, 401 F.3d 75 (2d Cir. 2005), the Second Circuit held that a defendant who makes a defamatory statement cannot be held liable for the deprivation of a liberty interest if that defendant lacks the power to impose the liberty deprivation and/or lacks the power to provide process to the plaintiff in connection with the liberty deprivation. *See id.* at 92-93; *see also Anemone v. Metro. Transp. Auth.*, 410 F. Supp. 2d 255, 270 (S.D.N.Y. 2006). Plaintiffs do not allege that Levicy or Arico had the authority to deprive them of anything, nor do they allege that Levicy or Arico could have provided them with a proceeding to "formally and directly clear their good names." (AC ¶ 961.)

[11] One of the public statements Plaintiffs attribute to Burness—that the Plaintiffs were "capable" of a rape—was allegedly made *more than a year* after the stripper party and the initiation of the Durham police investigation. (AC ¶ 532.) This allegedly stigmatizing statement "was too remote in time to meet the stigma-plus test." *Hadley*, 715 F.2d at 1246 (alleged defamatory statement made almost two years after plaintiff's termination did not give rise to a liberty interest); *see also Martz v. Incorporated Village of Valley Stream*, 22 F.3d 26, 32 (2d Cir. 1994) (affirming dismissal of stigma-plus claim where alleged defamatory statements were not published until several months after plaintiff's termination).

Burness regarding Plaintiffs' "stonewall of silence" (AC ¶ 535), these claims still fail

because Plaintiffs do not allege that these statements occurred "in the course of" of any

alleged deprivations of their rights. *See Stone*, 855 F.2d at 173 n.5; *see also O'Donnell v.*

*Barry*, 148 F.3d 1126, 1141 (D.C. Cir. 1998) (affirming dismissal of stigma-plus claim

because "[a]lthough [plaintiff] can point to isolated defamatory statements and to a

demotion, he cannot demonstrate that the two occurred together").[12]

### ii. Count 8: Interfering With The Right To Engage In The Political Process

Plaintiffs allege that the Duke University Defendants violated their rights by

directing them to "abandon their [voter] registration efforts, surrender their voter

registration forms, and take off their shirts, which read 'Vote Your Choice.'" (AC

¶ 988.) As with all of their § 1983 claims, Plaintiffs have not adequately alleged state

action, and in this Count, Plaintiffs' allegations of state action are conspicuously

deficient. No Durham defendant is named in this Count, and Plaintiffs make no

allegations that any Duke Defendant conspired with any Durham defendant to interfere

with the voter registration drive. Indeed, there is not a single factual allegation

---

[12] Plaintiffs also contend that the Duke University Defendants can be held liable for the false and stigmatizing statements allegedly made by Duke's faculty and clergy under § 1983 because they "adopted, ratified and condoned" these statements. (AC ¶ 558.) But the Amended Complaint is bereft of any facts to demonstrate that the Duke University Defendants adopted the allegedly stigmatizing statements made by Duke faculty and clergy members, much less that they did so *in the course of imposing any of Plaintiffs' alleged deprivations*. *Cf. Velez*, 401 F.3d at 90 (plaintiff stated cognizable stigma-plus claim that school chancellor expressly adopted school board members' stigmatizing statements in the course of his decision to remove plaintiff from the school board).

suggesting that any Duke Defendant met with, conversed with, or had any dealings with Nifong or any other Durham defendant regarding the voter registration efforts or the election in general.

Absent any well-pleaded allegations of state action, Plaintiffs cannot plead a First Amendment violation against the Duke Defendants. The only activities that allegedly involved their First Amendment rights took place on Duke-owned property. (*See id.* ¶¶ 875, 878, 880, 882-887.) Duke, like any private property owner, may restrict speech on its property without offending the First Amendment. *See PruneYard Shopping Ctr. v. Robins*, 447 U.S. 74, 80-81 (1980); *Hudgens v. NLRB*, 424 U.S. 507, 520 (1976); *Lloyd Corp., Ltd. v. Tanner*, 407 U.S. 551, 568-570 (1972).

### iii.    Count 9:  Retaliation

Plaintiffs allege that certain Duke Defendants retaliated against them for exercising their "constitutional right not to submit to police interrogation without the benefit of counsel." (*See* AC ¶ 994.) To state a claim for retaliation, a plaintiff must adequately allege that (1) he exercised a constitutional right; (2) a government official took action in response to that exercise which adversely affected the plaintiff; and (3) the government official acted with retaliatory motive and, but-for the protected activity, the retaliatory action would not have been taken.[13]  Furthermore, a "plaintiff must allege

---

[13] *See Baltimore Sun Co. v. Ehrlich*, 437 F.3d 410, 416 (4th Cir. 2006); *ACLU v. Wicomico County*, 999 F.2d 780, 785 (4th Cir. 1993); *Huang v. Bd. of Governors*, 902 F.2d 1134, 1140 (4th Cir. 1990); *see also Saleh v. Upadhyay*, 11 F. App'x 241, 256 (4th Cir. 2001) (unpublished).

specific facts supporting his claim of retaliation; bare assertions of retaliation do not establish a claim of constitutional dimension." *Goodman v. Smith*, 58 F. App'x 36, 38 (4th Cir. 2003) (per curiam) (unpublished).  Plaintiffs cannot satisfy these requirements.

First, Plaintiffs have failed to allege the exercise of any constitutional right.  The only right that Plaintiffs claim to have exercised is the right to be free from uncounseled police interrogations.  (*See* AC ¶ 994.)  This protection is derived from the Fifth Amendment's privilege against self-incrimination.  *See Thompson v. Keohane*, 516 U.S. 99, 107 (1995); *Miranda v. Arizona*, 384 U.S. 436, 469 (1966).  However, an individual's Fifth Amendment right against self-incrimination is not violated unless and until his compelled testimony is actually used in a criminal trial.  *See supra* pp. 13-14.  But Plaintiffs (who were never arrested, let alone indicted or tried) cannot allege any exercise of their Fifth Amendment right against self-incrimination.  And absent any constitutionally protected activity against which the Duke University Defendants might have retaliated, Plaintiffs cannot state a claim for retaliation under § 1983.  *See Baltimore Sun Co. v. Ehrlich*, 437 F.3d 410, 416 (4th Cir. 2006).

Second, Plaintiffs do not allege any facts that would suggest that any Duke Defendant acted with a retaliatory motive.  To the contrary, Plaintiffs offer only conclusory assertions that various actions were allegedly taken in response to Plaintiffs' refusal to be questioned by the Durham Police.  For example, Plaintiffs allege that certain Duke Defendants instructed Duke Police officers to "produce reports concealing their exculpatory observations of Mangum at the hospital."  (AC ¶ 998.)  But Plaintiffs

nowhere allege that these efforts were taken in retaliation for Plaintiffs' refusal to be interrogated by the Durham Police (*see id*. ¶¶ 466-475).[14]  Similarly, while Plaintiffs allege that various health care providers concealed, falsified, and fabricated medical evidence (*see id*. ¶ 996), they nowhere allege that those Defendants were even *aware* that Plaintiffs refused to be interviewed, let alone that their alleged actions were motivated by a desire to retaliate.  Without any facts to suggest that these Defendants even knew that Plaintiffs had exercised constitutional rights, Plaintiffs cannot establish that the Defendants' actions were motivated by retaliation, as they must to state a retaliation claim under § 1983.  *See Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 501 (4th Cir. 2005).  Finally, even if Defendants were aware that Plaintiffs had "exercised" their Fifth Amendment rights and possessed some retaliatory motive, Plaintiffs have not alleged any specific facts to suggest that this exercise was a "but for" cause of the retaliatory acts.  *See Huang*, 902 F.2d at 1140 ("[C]laimant must show that 'but for' the protected expression the employer would not have taken the alleged retaliatory action.").  As a result, they have failed to state a § 1983 claim for retaliation.

### iv.    Count 10:  Deprivation Of Privileges And Immunities Of North Carolina Citizens

In Count 10, Plaintiffs allege that all of the Defendants named in the Amended Complaint deprived them of the "same privileges and immunities they bestowed upon

---

[14] Plaintiffs allege that Durham Police Sgt. Gottlieb and Officer Himan sought an NTID because of Plaintiffs' decision to refuse police interrogation (*see* AC ¶¶ 414-418, 995), but they nowhere allege that any *Duke* Defendant was involved in that decision to pursue the NTID (*id*. ¶¶ 414-418, 443).

similarly situated citizens of the State of North Carolina because of Plaintiffs' real or perceived status as citizens of other states." (*See* AC ¶ 1004.) Plaintiffs do not specify which alleged actions or which specific defendants deprived Plaintiffs of these privileges and immunities. In any event, the only specific allegations in the Amended Complaint that conceivably implicate the Privileges and Immunities Clause are Plaintiffs' assertions that the "Zero Tolerance for Duke Students Policy" discriminated against out-of-state students. (*Id*. ¶¶ 108-112, 116, 144, 163-164.) This claim is unavailing.

The Privileges and Immunities Clause of Article IV prevents a state from discriminating against nonresidents with respect to privileges and immunities that it accords its own citizens unless there is a sufficient justification for that discrimination. *See United Bldg. & Constr. Trades v. Mayor & Council of the City of Camden*, 465 U.S. 208, 218 (1984). Not every discrimination against out-of-state residents violates the Privileges and Immunities Clause, however; the only rights protected by that Clause are those interests that are "sufficiently fundamental to the promotion of interstate harmony." *Id.* at 218 (right to pursue one's livelihood); *see, e.g.*, *Toomer v. Witsell*, 334 U.S. 385 (1948) (same); *Saenz v. Roe*, 526 U.S. 489 (1999) (right to travel); *Doe v. Bolton*, 410 U.S. 179 (1973) (right to procure medical services).

Here, Plaintiffs allege that the "Zero Tolerance for Duke Students Policy" violated their fundamental interests by giving Durham police officers "unfettered discretion" to charge out-of-state Duke students for any violations of underage drinking, noise, public urination, and open container laws. (AC ¶¶ 109, 111, 115.) Notably, however, Plaintiffs

do not contend that the policy encompassed charging out-of-state students for offenses of which they were innocent. Thus, Plaintiffs' argument appears to be that out-of-state Duke students have a constitutional entitlement to avoid the consequences of violating North Carolina law so long as others are successfully avoiding punishment for similar infractions. That is not the kind of "fundamental" interest that the Privileges and Immunities Clause protects. *See United States v. Rx Depot, Inc.*, 290 F. Supp. 2d 1238, 1249 (N.D. Okla. 2003) (holding that the "Privileges and Immunities Clause does not apply" because "the defendants have not shown that they have a privilege or fundamental right to facilitate illegal prescription drug importation").[15]

### v.    Count 12:  *"Monell Liability"*

In Count 12, Plaintiffs attempt to establish § 1983 liability against Duke University under the principles of *Monell v. Department of Social Services,* 436 U.S. 658 (1978). Under *Monell* and its progeny, Duke cannot be held liable under § 1983 on a theory of *respondeat superior* or vicarious liability. *See id.* at 691; *see also Powell v. Shopco Laurel Co.*, 678 F.2d 504, 506 (4th Cir. 1982) (finding *Monell* "equally applicable to the liability of private corporations"). Instead, liability may be imposed on Duke University only if Plaintiffs establish that a "policy or custom" of Duke was "the

---

[15] Even if Durham's purported zero-tolerance policy could serve as the basis for a claim under Article IV, Plaintiffs do not allege that they personally were arrested or cited under that alleged policy or otherwise explain how they suffered any harm as a result of it. In addition, one plaintiff, Matthew Wilson, was and is a citizen and resident of North Carolina (AC ¶ 7) and thus has no standing to raise an Article IV claim in any event. *See Russell v. Hug*, 275 F.3d 812, 821 (9th Cir. 2002); *Salem Blue Collar Workers Ass'n v. City of Salem*, 33 F.3d 265, 267 (3d Cir. 1994).

'moving force' behind [their] deprivation of federal rights." *Carter v. Morris*, 164 F.3d 215, 218 (4th Cir. 1999) (quoting *Monell*, 436 U.S. at 694). Plaintiffs' claims in Count 12 are legally deficient under this standard and should be dismissed. Even if Plaintiffs had adequately alleged the deprivation of a constitutional right (which they have not), they have not adequately alleged that Duke was the "moving force" behind any constitutional violation.

**Count 12(A)(1): "Zero Tolerance Policy"** Count 12(A)(1) alleges *Monell* liability on the basis of the aforementioned "Zero Tolerance Policy." But Plaintiffs have failed to plead adequately that this purported policy was a "moving force" behind any constitutional violation. Indeed, Plaintiffs cannot allege that the Zero Tolerance Policy itself is constitutionally impermissible. *See supra* pp. 24-26 (explaining that the Zero Tolerance Policy does not violate Article IV). In any event, Plaintiffs have not alleged that they were ever cited, arrested, or prosecuted under this policy. As such, Plaintiffs cannot allege that this policy caused them any harm, much less that it was the "moving force" behind the investigation into Mangum's alleged rape.

**Count 12(A)(2): "Inflaming Public Outrage Policy"** Count 12(A)(2) alleges *Monell* liability based on an alleged Duke policy of "inflaming public outrage" against those accused of a crime in order to "avoid acquittals" and "stigmatize the accused so thoroughly" that "a plea [is] entered or a false confession [is] extracted." (AC ¶ 1046.) But none of these Plaintiffs were ever arrested or indicted for rape—or any other crime— as a result of the Mangum investigation. Nor did any Plaintiff falsely confess to a crime.

Because such a policy could not have caused these Plaintiffs constitutional harm, they cannot state a claim for liability based on this policy under *Monell*. *See supra* pp. 12-15.

**Count 12(A)(3): "Bystander Officer Policy"** Count 12(A)(3) alleges *Monell* liability based on a "bystander officer policy," under which unidentified Duke University officials with final policymaking authority over Duke Police "approved of or ratified" unidentified "failures to act" by "subordinates," which allegedly deprived Plaintiffs of their constitutional rights. (AC ¶¶ 1057, 1060.) Plaintiffs fail to allege any constitutional violation that was committed under this purported "bystander officer policy."[16] Plaintiffs also do not point to any concrete act or omission that was purportedly ratified by officials with final policymaking authority. Given these conspicuous factual omissions, Plaintiffs' vague allegation of the existence of a "bystander officer policy" is insufficient to state a claim under *Monell*. *See Carter*, 164 F.3d at 218 ("a plaintiff cannot rely upon scattershot accusations of unrelated constitutional violations to prove either that a municipality was indifferent to the risk of her specific injury or that it was the moving force behind her deprivations").

**Count 12(B)** Count 12(B) alleges that Duke University is liable for violations alleged in other (unspecified) § 1983 causes of action against unspecified Duke

---

[16] The only specific allegation of a "failure to intervene" by a Duke Police officer is the assertion that Duke Police Sgt. Gary Smith "stood-by" Plaintiff McFadyen's dorm room (while it was searched by Durham Police) and "'turned a blind eye' to the violations of McFadyen's constitutional rights occurring in Smith's presence." (AC ¶¶ 614-615.) But that pleading does not allege a constitutional violation, because, as explained in the Brief for the Duke Police Defendants (at pp. 32-34), Plaintiffs have failed to allege the underlying elements of a bystander liability claim.

University officials with final policymaking authority who allegedly "directed" such violations. (AC ¶ 1062.) This Count is so vague that it fails to give Duke adequate notice of the allegations in it. *See* Fed. R. Civ. P. 8. Plaintiffs do not indicate which of the numerous alleged policymaking defendants directed what conduct, by which subordinates, that caused the deprivation of what constitutional rights.

**Count 12(C): Failure To Supervise Durham** In Count 12(C), Plaintiffs allege that Duke had final policymaking authority over *Durham* Police and Nifong and, by failing to adequately supervise the Durham Police and Nifong, allowed them to commit constitutional violations. Plaintiffs' theory is that Duke University "delegated" to the Durham Police the authority to investigate Mangum's allegations, and that Duke and Durham then "colluded" to "allow" Nifong "to control and direct" the investigation. (AC ¶¶ 1070, 1074, 1083.) These contentions are erroneous as a matter of law. The Durham Police and Nifong had complete and independent authority to investigate Mangum's allegations; Duke had no authority to control or supervise either investigation, and had no power over either that it could "delegate" to anyone.[17]

As explained more fully in the Brief for Duke Police Defendants (at pp. 10-13), the Durham Police's authority to investigate the alleged rape derived from its own

---

[17] This Court can and should decide as a matter of law that Duke and its officials had no policymaking authority over the Durham Police Department and the District Attorney. *See Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989) (holding that "the identification of those officials whose decisions represent the official policy of the local governmental unit is itself a legal question to be resolved by the trial judge *before* the case is submitted to the jury"); *McMillan v. Monroe County*, 520 U.S. 781 (1997) (deciding a question of "final policymaking authority" on a motion to dismiss).

statutory authority; that authority was not, and could not have been, "delegated" to Durham by Duke. Second, as a matter of law, none of the Duke Defendants could delegate authority to Nifong or otherwise decide to "allow" him to conduct a criminal investigation and prosecution. Under the North Carolina constitution, "[t]he District Attorney shall … be responsible for the prosecution on behalf of the State of all criminal actions in the Superior Courts of his district[.]" N.C. Const. Art. IV § 18 (2007). "The clear mandate of that provision is that the responsibility and authority to prosecute all criminal actions in the superior courts is vested solely in the several District Attorneys of the State." *State v. Camacho*, 329 N.C. 589, 593, 406 S.E.2d 868, 871 (1991). The idea that Duke could "allow Nifong to control and direct" (AC ¶ 1083) the prosecution lacks any legal support, given that those prosecutorial duties were specifically prescribed to Nifong by the North Carolina Constitution.

Nor could Duke have acquired "final policymaking authority" over Durham Police or Nifong through such "delegation." Plaintiffs assert that Duke, by "ceding" its obligation to investigate Mangum's allegations to Durham, somehow placed itself into a supervisory position over Nifong and the Durham Police (*id.* ¶ 1084), and then, by failing to intercede to stop alleged unconstitutional actions by Nifong and Durham Police, "ratified" those actions (*id.* ¶¶ 1070, 1081, 1092, 1101). But, as noted, Durham Police had complete statutory authority under North Carolina law to investigate Mangum's claims. Moreover, nothing in the agreement between the Duke Police Department and the Durham Police Department to provide mutual aid and cooperation granted Duke

"final policymaking authority" over the Durham Police Department, the District

Attorney's office, or any individual police or prosecutors. (*See* Br. for Duke Police Defs.

at 11-13 (discussing mutual aid agreement).)[18]  Accordingly, Duke may not be held liable

under *Monell* principles for any unconstitutional actions of Nifong or the Durham Police.

### vi.     Count 13: "Supervisory Liability"

The crux of Plaintiffs' claim in Counts 13(A)-(C) is that the Duke Defendants, in

their "supervisory" capacity, failed to prevent Nifong and the Durham Police from

causing Plaintiffs constitutional injury.  As set forth above,  however, the Duke

Defendants could not have, as a matter of law, "supervised" the Durham Police or

Nifong.  As such, Plaintiffs cannot state a claim for supervisory liability.[19]  And the only

pleading that implicates Duke Defendants' supervision over their *own* subordinates is the

vague statement that unidentified "Duke University Defendants" engaged in "a number

---

[18] *See also Pond v. Bd. of Trustees*, No. 03-0075, 2003 WL 23220730, at *5 (S.D. Ind.
Nov. 25, 2003) ("The Muncie Police Department did not have any authority to set policy
for the Ball State police officers who allegedly violated Pond's constitutional rights.  The
Agreement between Chief Winkle and the Ball State Police Department was a valid
agreement that gave the Ball State police additional jurisdiction throughout Muncie, and
the Agreement did not confer any policymaking authority on Muncie over Ball State's
officers.  Accordingly, the City of Muncie cannot be held liable under § 1983 even if Ball
State officers violated Pond's constitutional rights.").

[19] To establish an individual's "supervisory liability" under § 1983, the plaintiff must
show (1) "the supervisor had actual or constructive knowledge that his subordinate was
engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury";
(2) "the supervisor's response to that knowledge was so inadequate as to show deliberate
indifference" to that risk; and (3) "an affirmative causal link between the supervisor's
inaction and the particular constitutional injury suffered by the plaintiff."  *Shaw v. Stroud*,
13 F.3d 791, 799 (4th Cir. 1994) (internal quotation marks omitted); *see Davis v. Dep't of
Social Servs.*, No. 90-1864, 1991 WL 157258, at *5 (4th Cir. Aug. 19, 1991).

of" unidentified "investigative abuses," which unidentified Duke Police Supervising Defendants "knew[] or should have known" about. (AC ¶¶ 1114-1115.) That pleading is "so broad and conclusory that it does not give the defendant[s] fair notice of what the plaintiff[s'] claim is and the grounds upon which it rests." *Murphy v. Goord*, 445 F. Supp. 2d 261, 264 (W.D.N.Y. 2006) (internal quotation marks omitted). Accordingly, Counts 13(A)-(C) fail to state a claim against any Duke defendant.[20]

### B. Plaintiffs Fail To State A Claim For Civil Rights Violations Under 42 U.S.C §§ 1985 And 1986 (Counts 16-17)

In Counts 16 and 17, Plaintiffs assert a series of claims based on 42 U.S.C. §§ 1985 and 1986. These provisions are derived from provisions in the Civil Rights Act of 1871, and were passed to stem "widespread violence and acts of terror directed … at blacks and their supporters in the postwar South." *Harrison v. KVAT Food Mgmt., Inc.*, 766 F.2d 155, 156-157 (4th Cir. 1985).

Section § 1985 "outlaw[s] five broad classes of conspiratorial activity." *Kush v. Rutledge*, 460 U.S. 719, 724-25 (1983). The statute prohibits conspiracies that "interfere with (a) the performance of official duties by federal officers; (b) the administration of justice in federal courts; (c) the administration of justice in state courts; (d) the private enjoyment of 'equal protection of the laws' and 'equal privileges and immunities under the laws'; and (e) the right to support candidates in federal elections." *Id.* at 724-725. In Count 16, Plaintiffs press claims against Duke Defendants under several of these § 1985

---

[20] Count 13(D) also warrants dismissal; it does not allege *any* action by *any* Duke Defendant.

categories.  In Count 17, Plaintiffs allege violations of § 1986, a little-used provision that requires persons with the knowledge and power to do so to attempt to deter prohibited conspiracies against civil rights.  These counts all warrant dismissal.[21]

### 1.    Count 16(ii):  Witness Intimidation Under § 1985(2)

Count 16(ii) appears to invoke the *first* clause of § 1985(2), which prohibits a conspiracy to deter parties or witnesses from testifying "in any court of the United States" or to influence proceedings "in any such court."  42 U.S.C. § 1985(2).  This provision applies only to proceedings in *federal courts*; the alleged conspiracy must have "hampered the claimant's ability to present an effective case in *federal* court."  *Rutledge v. Ariz. Bd. of Regents*, 859 F.2d 732, 735 (9th Cir. 1988) (emphasis added).  Nowhere, however, do Plaintiffs allege an attempt at witness tampering in *federal* court.  Accordingly, Count 16(ii) fails to state a claim under § 1985(2).  *See Rhodes v. Smithers*, 939 F. Supp. 1256, 1271 (S.D. W. Va. 1995), *aff'd*, 91 F.3d 132 (4th Cir. 1996).

### 2.    Counts 16(i), 16(iii), 16(iv):  Conspiracy To Obstruct Justice And Deny Equal Protection

In Counts 16(i), 16(iii), and 16(iv), Plaintiffs allege that various defendants conspired to (a) obstruct proceedings in state courts, in violation of § 1985(2); (b) deprive

---

[21] Plaintiffs fail to state a claim under §§ 1985-1986 against Duke University for the additional reason that entity liability under §§ 1985-1986, like entity liability under § 1983, requires the plaintiff to establish "an official policy or custom which relates to matters stemming from or resulting in the conspiracy."  *Alexander v. City of South Bend*, 320 F. Supp. 2d 761, 785 (N.D. Ind. 2004); *see Owens v. Haas*, 601 F.2d 1242, 1247 (2d Cir. 1979)**;** *Brown v. City of New York*, 306 F. Supp. 2d 473, 478 (S.D.N.Y. 2004); *Gueson v. Feldman*, No. 00-1117, 2002 WL 32308678, at *5 (E.D. Pa. Aug. 22, 2002).

them of their right to equal protection of the laws, in violation of the first clause of

§ 1985(3); and (c) prevent or hinder the constituted authorities from securing to them the

equal protection of the laws, in violation of the second clause of § 1985(3). Although

those provisions of § 1985 provide distinct causes of action, they all require proof of an

element that Plaintiffs cannot establish here: invidious discriminatory animus against a

protected class. In *Griffin v. Breckenridge*, 403 U.S. 88 (1971), the Supreme Court held

that to state a claim under § 1985(3), the plaintiff must allege "some racial, or perhaps

otherwise class-based, invidiously discriminatory animus behind the conspirators'

action." *Id*. at 102; *see Simmons*, 47 F.3d at 1376-1377. This requirement of a

discriminatory animus against a protected class also applies to claims of conspiracy to

prevent the State from securing to its citizens the equal protection of the laws under the

second clause of § 1985(3), *see, e.g.*, *Libertad v. Welch*, 53 F.3d 428, 446-448 (1st Cir.

1995); *Magnum v. Archdiocese of Philadelphia*, 253 F. App'x 224, 230 n.2 (3d Cir.

2007); *cf. Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 280-282 (1993), and

to claims of conspiracy to interfere with "the due course of justice" in state courts under

§ 1985(2), *see Bloch v. Mountain Mission Sch.*, No. 86-1279, 1988 WL 45433, at *1 (4th

Cir. May 2, 1988).

### a. Plaintiffs Are Not Members Of A Protected Class

The Supreme Court has stressed that the language of § 1985 pertinent here

"requir[es] intent to deprive of *equal* protection, or *equal* privileges and immunities,"

which as noted means that "there must be some racial, or perhaps otherwise class-based,

invidiously discriminatory animus behind the conspirators' action." *Griffin*, 403 U.S. at

102; *see also Bray*, 506 U.S. at 268-269 (declining to extend § 1985(3) to class of

"women seeking abortion[s]"). The Fourth Circuit, stressing that § 1985 was enacted to

enforce the Thirteenth and Fourteenth Amendments by preventing violence against the

newly freed slaves, has expressed strong doubt that § 1985 protects any classes other than

African-Americans, and has indicated that "the class protected [under § 1985(3)] can

extend no further than to those classes of persons who are, so far as the enforcement of

their rights is concerned, in unprotected circumstances similar to those of the victims of

Klan violence." *Buschi v. Kirven*, 775 F.2d 1240, 1258 (4th Cir. 1985) (internal

quotation marks and citation omitted).[22]

To the extent that Plaintiffs intend to rely on their status as "real or perceived …

citizens of other states" or "Duke students" to establish membership in a protected class,

they have not identified a class covered by the civil rights statute. Even if § 1985 does

extend to classes other than racial minorities, those classes must encompass "immutable

characteristics comparable to those characterizing classes such as race, national origin

and sex." *Buschi*, 775 F.2d at 1257 (quotation marks and citation omitted). "Out-of-

---

[22] *See also United Bhd. of Carpenters & Joiners of Am. v. Scott*, 463 U.S. 825, 836
(1983) (noting, after reviewing background of § 1985, that "it is a close question whether
§ 1985(3) was intended to reach any class-based animus other than animus against
Negroes and those who championed their cause"; declining to extend § 1985(3) to
economically motivated conspiracies); *Harrison*, 766 F.2d at 161 (stressing that "[w]e are
concerned here with a statute enacted to fulfill a particular purpose and designed to meet
particular conditions," and declining to extend § 1985(3) to politically motivated
discrimination).

Staters" or "University students" is not such a class, and courts have consistently held

that "residents of a different State" and "students" are not classes protected by § 1985.[23]

To the extent Plaintiffs are claiming that the defendants engaged in a conspiracy

directed against white men, that claim also fails. White men are not a "class[] of persons

… in unprotected circumstances similar to those of the victims of Klan violence."

*Buschi*, 775 F.2d at 1258. Although the Fourth Circuit has never squarely addressed

whether § 1985(3) reaches conspiracies against white males, its consistently restrictive

reading of § 1985(3) strongly suggests that it would reject that position—as other courts

have done.[24]  *See Stock v. Universal Foods Corp.*, 817 F. Supp. 1300, 1310 (D. Md.

---

[23] For decisions holding that residents or citizens of another State do not constitute a class protected under § 1985, see, for example, *Upah v. Thornton Dev. Auth.*, 632 F. Supp. 1279, 1281 (D. Colo. 1986); *Korotki v. Goughan*, 597 F. Supp. 1365, 1371-1375 (D. Md. 1984); *Miami Int'l Realty Co. v. Town of Mt. Crested Butte*, 579 F. Supp. 68, 75 (D. Colo. 1984); *Ford v. Green Giant Co.*, 560 F. Supp. 275, 277 (D. Wash. 1983). For cases declining to recognize "students" as a protected class, see, for example, *McGee v. Schoolcraft Cmty. Coll.*, 167 F. App'x 429, 435-436 (6th Cir. 2006); *Murphy v. Villanova Univ.*, 520 F. Supp. 560, 562 (E.D. Pa. 1981); *Crain v. Martinez*, No. 93-00942, 1994 WL 391672, at *1 (M.D. Fla. July 12, 1994); *Naglak v. Berlin*, No. 87-3427, 1988 WL 30920, at *4 (E.D. Pa. Mar. 30, 1988). *See also Lewin v. Cooke*, 95 F. Supp. 2d 513, 526 (E.D. Va. 2000) (rejecting a § 1985(3) claim brought by a self-described "class of students who challenge academic authority by trying to enforce student rights," because "'whistleblowers,' academic or otherwise, simply do not qualify as a class entitled to § 1985(3) protection."), *aff'd*, 28 F. App'x 186 (4th Cir. 2002).

[24] In *Phillips v. Mabe*, 367 F. Supp. 2d 861, 873-874 (M.D.N.C. 2005), this Court stated that "Defendants' argument that Plaintiff cannot rely on § 1985(3) because he is not a minority is without merit." Unlike the Plaintiffs in this case, however, the plaintiff in *Phillips* did not contend that the defendants had conspired against him *because* he was a white male. To the contrary, he argued that the defendants conspired against him because he was seeking to protect the interests of African-Americans. This Court indicated that a white plaintiff has standing to bring a § 1985 claim alleging retaliation against him for his actions in support of African-Americans, or for associating with African-Americans. *See*

1993); *Blackmon v. Perez*, 791 F. Supp. 1086, 1093 (E.D. Va. 1992); *Moore v. City & County of Denver,* 744 F. Supp. 1028, 1031 (D. Colo. 1990); *Marsh v. Bd. of Ed.*, 581 F. Supp. 614, 617-18 (E.D. Mich. 1984), *aff'd without opinion*, 762 F.2d 1009 (6th Cir. 1985), *vacated on other grounds*, 476 U.S. 1137 (1986); *cf. Cloaninger v. McDevitt*, No. 06-00135, 2006 WL 2570586, at *6 (W.D.N.C. Sep. 3, 2006) (declining to recognize disabled veterans as a protected class under § 1985(3) because, "[a]s recognized by the controlling law in the Fourth Circuit, the only class of persons protected by Section 1985(3) are African-Americans" (internal citation omitted)).[25]

### b. Plaintiffs Have Failed To Plead A Conspiracy Based On Class-Based Animus (Or At All)

Even if Plaintiffs could establish that they were members of a class protected by § 1985, their claims under that section would still fail, because they have failed to allege that the conspiracy against them was motivated by a shared animus against their protected class. Count 16(iv) fails entirely to plead that class-based animus motivated the purported conspiracy. Counts 16(i) and 16(iii) plead that at least one unidentified defendant committed unidentified acts motivated by racial animus (*see* AC ¶¶ 1159-1160, 1163-1164), but that is insufficient to state a claim for conspiracy under § 1985. A

---

*id.* However, the Court ultimately dismissed the claim in *Phillips* because (a) in essence, the white plaintiff was arguing that he was a "'whistle blower' … trying to enforce the rights of black students," and "whistle blowers" are not a protected class under § 1985, and (b) the plaintiff was not African-American, and therefore had no standing to argue for the rights of African-Americans. *See id.* This Court did not hold that conspiracies directed at white males are cognizable under § 1985.

[25] *But see Triad Assocs., Inc. v. Chicago Housing Auth.*, 892 F.2d 583, 593 (7th Cir. 1989); *Bliss v. Rochester City Sch. Dist.*, 196 F. Supp. 2d 314, 338 (W.D.N.Y. 2002).

conspiracy under § 1985 requires a *shared* objective—in this context the objective to deprive persons of equal protection on a racial basis; it does not make an individual potentially liable for *someone else's* racial animus. *See Simmons*, 47 F.3d at 1376-1377 (stressing that "participants in the conspiracy must share the general conspiratorial objective") (internal quotation marks omitted); *Martin v. Boyce*, No. 1:99-CV-1072, 2000 WL 1264148, at *7 (M.D.N.C. July 20, 2000) ("[A]ll of the conspirators must share the same forbidden animus.").

Indeed, Plaintiffs have failed adequately to plead conspiracy at all. Plaintiffs allege only that Defendants "conspired and/or entered into express and/or implied agreements, understandings, or meetings of the minds among themselves," without indicating who allegedly conspired with whom. (*See* AC ¶¶ 1158, 1162, 1166.) Nor do Plaintiffs identify a shared conspiratorial objective. Thus, Plaintiffs fail to plead a conspiracy under any standard. But the "threshold requirement" for a § 1985 conspiracy claim in particular is "very high." *Brissett v. Paul*, No. 97-6898, 1998 U.S. App. LEXIS 6824, at *10 (4th Cir. Apr. 6, 1998). The Fourth Circuit has "specifically rejected § 1985 claims whenever the purported conspiracy is alleged in a merely conclusory manner, in the absence of concrete supporting facts." *Simmons*, 47 F.3d at 1377. "[R]ecogniz[ing] the danger of litigants' adducing unfounded conspiracy allegations in order to block" summary disposition of weak claims, the Court of Appeals has instructed that "plaintiffs alleging unlawful intent in conspiracy claims under § 1985(3) … [must] plead specific facts in a nonconclusory fashion to survive a motion to dismiss." *Gooden*, 954 F.2d at

969-970 (internal quotation marks omitted); *see also Jenkins v. Trs. of Sandhills Cmty. Coll.*, 259 F. Supp. 2d 432, 445 (M.D.N.C. 2003); *Mbadiwe v. Union Mem'l Reg'l Med. Hosp. Ctr.*, No. 05-00049, 2005 U.S. Dist. LEXIS 31674, at *7 (W.D.N.C. Nov. 28, 2005). Plaintiffs' bald assertions of conspiracy are insufficient to meet this standard.[26]

### 3. Count 17: 42 U.S.C. § 1986

42 U.S.C. § 1986 is a "good Samaritan" law that requires persons with the power to prevent violations of § 1985 to do so. Section 1986 imposes liability on one who, "having knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 of [title 42], are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses so to do, if such wrongful act be committed." 42 U.S.C. § 1986. Count 17 fails to state a claim under that statute.

First, as the language of § 1986 makes clear, "[a] cause of action based upon § 1986 is dependent upon the existence of a claim under § 1985." *Trerice v. Summons*, 755 F.2d 1081, 1085 (4th Cir. 1985). Because Plaintiffs fail to state a claim under § 1985, there can be no liability under § 1986. Second, to be liable under § 1986, the

---

[26] Count 16(iv) also fails for an independent reason. To establish a cause of action under the prevention or hindrance clause of § 1985(3), the plaintiff must allege a conspiracy to *interfere* with State or local authorities in their efforts to secure equal protection of the laws. In contrast, the thrust of the 1000-plus pleadings is that the Duke defendants *collaborated* with Durham Police and Nifong when they should not have. Plaintiffs do not allege a single fact demonstrating interference by Duke defendants in actions by Durham to secure Plaintiffs' constitutional rights. *See Levi v. Safeway*, No. c-94-0946 MHP, 1994 WL 706341, at *8 n.10 (N.D. Cal. 1994) (stating that the complaint fails because plaintiff "[n]owhere … allege[s] any conspiracy to *interfere* with police protection of his rights …. [but instead] alleges at every turn that [the defendants and] the [San Francisco Police Department] conspired *together* to deprive him of his rights").

Duke Defendants must have had the "power to prevent or aid in preventing the commission" of the alleged harms under § 1985. *See Glass v. City of Philadelphia*, 455 F. Supp. 2d 302, 365 (E.D. Pa. 2006). As explained above, the Duke Defendants lacked the power to control an investigation by District Attorney Nifong, the Durham Police, or the DNA laboratory. *See supra* pp. 29-31. Accordingly, the Duke Defendants cannot be liable under § 1986 for failing to prevent Nifong and the Durham police from pursuing an investigation into Mangum's allegations.

### C. Plaintiffs Have Failed To State A Claim For Breach Of Contract Or Breach Of Fiduciary Duty (Counts 21 and 23)

#### 1. Count 21: "Breach Of Contract"

In Count 21, Plaintiffs assert that Duke's "Student Bulletin is a contract between Plaintiffs and the University." (AC ¶ 1224.) Plaintiffs allege that Duke failed to live up to the terms of this bulletin, and thereby breached its contract with Plaintiffs, by failing to protect them from harassment, "subject[ing them] to suspensions," and collecting and disclosing their "federally protected, private financial information." (*Id.* ¶ 1226 A-E.) These claims should be dismissed because Plaintiffs have failed to identify any contractual obligation as the basis of their claim.[27]

---

[27] Where, as here, Plaintiffs have failed to identify a relevant contractual obligation in their complaint, the Court may dismiss the case for failure to state a claim as a matter of law. *See, e.g.*, *Brewer v. Jefferson-Pilot Standard Life Ins. Co.*, 333 F. Supp. 2d 433, 439 (M.D.N.C. 2004); *Norman v. Tradewinds Airlines, Inc.,* 286 F. Supp. 2d 575, 585-586 (M.D.N.C. 2003); *Johnson v. Mayo Yarns, Inc.*, 126 N.C. App. 292, 297, 484 S.E.2d 840, 843 (N.C. App. 1997).

Plaintiffs assert that the bulletin "is a contract" that was formed "[u]pon Plaintiffs' enrollment," and that the bulletin "incorporates the Undergraduate Student Code of Conduct, the policies forbidding harassment, and the disciplinary processes and procedures attendant to violations of the Code." (AC ¶¶ 1224-1225.) Plaintiffs fail, however, to allege the essential elements of any valid contract—the mutual manifestation of an intent to be bound. *See Parker v. Glosson*, 182 N.C. App. 229, 232, 641 S.E.2d 735, 737 (2007). North Carolina courts have consistently held that internal bulletins of this nature—including Duke's own student bulletin—are not binding contracts. Indeed, this Court has twice specifically ruled that Duke University's student bulletin is not an enforceable contract. *See Love v. Duke Univ.*, 776 F. Supp. 1070, 1075 (M.D.N.C. 1991), *aff'd*, No. 91-2263, 1992 WL 60230 (4th Cir. Mar. 30, 1992); *Mercer v. Duke Univ.*, No. 97-cv-00959, slip op. at 13 (M.D.N.C. Sept. 28, 2000) (Ex. 2).

In *Love*, this Court granted Duke University's motion for summary judgment on a plaintiff's claim that Duke's student bulletin entitled him to contractual rights, holding that Duke's "bulletin is not a binding contract." 776 F. Supp. at 1075. The Fourth Circuit affirmed that decision "for the reasons stated by [this] court in its memorandum opinion." 1992 WL 60230, at *1.[28] Once again, in *Mercer*, this Court ruled that the

[28] The Fourth Circuit has independently ruled that student bulletins are not contracts. In *Tibbetts v. Yale*, 47 F. App'x 648, 656 (4th Cir. Sept. 26, 2002), the Fourth Circuit applied Virginia law and denied a plaintiff's motion to amend his complaint to add a breach of contract claim against Yale University. The plaintiff argued that a chapter in Yale's student bulletin constituted a contract between him and the university. The Fourth

nondiscrimination policy in Duke's bulletin was not part of a contract between a former student and Duke University. *Mercer*, No. 97-cv-00959, at 13. This Court analogized the student bulletin to a company's employee handbook, and stressed that "[t]he uniform answer" in North Carolina courts is that employee handbooks are not part of a contract between employer and employee unless expressly incorporated therein. *See id.* at 15; *see also Mayo Yarns, Inc.*, 126 N.C. App. at 297, 484 S.E.2d at 843; *Black v. W. Carolina Univ.*, 109 N.C. App. 209, 213, 426 S.E.2d 733, 736 (1993); *Harter v. Vernon*, 953 F. Supp. 685, 694 (M.D.N.C. 1996).[29]

The reason the courts have declined to recognize an employee handbook as part of a contract between an employer and an employee—avoiding excessive interference in an employer's internal affairs—apply with even greater force to the university setting, where university policies (such as anti-harassment policies) must be balanced against principles of academic freedom, including the right of professors and students to speak out on issues of public concern, and the right of the university to insist that its students and employees observe standards of behavior. *See Rollins v. Cardinal Stritch Univ.*, 626 N.W.2d 464, 470-71 (Minn. Ct. App. 2001) (rejecting contract claim based on student bulletin as

---

Circuit concluded that his claim was "without merit," stating "Chapter 11 of the Student Handbook is not a contract but merely a university policy." *Id.*

[29] Because Plaintiffs have referred to (and quoted from) the bulletin in their Amended Complaint (AC ¶¶ 583-584), the court may consider the bulletin (attached as Ex. 3) when evaluating Defendants' motion to dismiss. *See Phillips v. LCI Int'l, Inc.,* 190 F.3d 609, 618 (4th Cir. 1999); *Waters v. Bass*, 304 F. Supp. 2d 802, 807 n.8 (E.D. Va. 2004).

"interfering beyond an acceptable degree in the university's discretion to manage its affairs").[30]

### 2. Count 23: "Breach of Fiduciary Duty"

In Count 23, Plaintiffs allege that certain Duke University Defendants breached a fiduciary duty to Plaintiffs by allegedly "[a]ccessing, copying and disclosing" to "Gottlieb, Nifong, and others … Plaintiffs' private personal email accounts[,] … transaction card accounts[,] … and educational records." (AC ¶ 1242.) To "state a claim for breach of fiduciary duty, a plaintiff must allege that a fiduciary relationship existed and that the fiduciary failed to act in good faith and with due regard to [plaintiff's] interests." *Toomer v. Branch Banking & Trust Co.*, 171 N.C. App. 58, 70, 614 S.E.2d 328, 337 (2005). Because Plaintiffs have failed to allege the existence of a fiduciary relationship between themselves and the Duke University Defendants, Count 23 should be dismissed.

---

[30] The claim that Duke breached a contract by "subject[ing Plaintiffs] to suspension" fails for the same reason as Plaintiffs' claim for breach based on Duke's failure to protect them from harassment—the bulletin on which these claims is based is not part of a contract between Plaintiffs and Duke. Plaintiffs also claim that Duke breached this contract by collecting and disclosing financial information that is stored on the students' Duke-issued identification card ("Duke Card"). Although Plaintiffs base their claim on the contract allegedly formed by the student bulletin (AC ¶ 1225), they also allege that Duke was "contractually bound to safeguard" the information on these Duke Cards as part of the "Duke Transaction Card Agreement." There is no such thing as a "Duke Transaction Card Agreement." In any event, the Terms and Conditions applicable to the Duke Card expressly authorize Duke to "disclose information to third parties about [the student's] account or the transfer [the student] make[s] … [t]o comply with a … request from a … law enforcement authority." (Ex. 4 (Duke Card request form and accompanying Terms and Conditions).)

Courts have uniformly rejected the proposition that a fiduciary relationship exists between universities (or their administrators) and the students enrolled there.[31] *See, e.g.*, *Davidson v. Univ. of N.C. at Chapel Hill*, 142 N.C. App. 544, 556, 543 S.E.2d 920, 928 (2001); *Hendricks v. Clemson University*, 578 S.E.2d 711, 715 (S.C. 2003). In *Ryan v. University of North Carolina Hospitals*, No. COA04-16, 2005 WL 465554 (N.C. Ct. App. Mar. 1, 2005), the North Carolina Court of Appeals refused to extend the concept of fiduciary relationship to interactions between educator/supervisors and medical residents. *See id.* at *4. The court stated two rationales for its conclusion that, as a matter of law, no fiduciary relationship existed—both of which apply with equal force here. First, a fiduciary relationship requires that the fiduciary owe undivided loyalty to the beneficiary. *See id.* But these university educators and administrators cannot satisfy that condition, because they always remain charged with carrying out the "rules and regulations" of the university. *Id.* Second, fiduciary relationships have traditionally been confined to the legal and business contexts, where the consequences of assuming such a relationship are well-understood and predictable. *See id.* (emphasizing that "[h]istorically, this Court has reserved imposition of fiduciary duties to legal or business settings, often in which one

---

[31] Where, as here, the question whether a fiduciary duty exists turns on the nature of the relationship rather than disputed facts, the court can decide as a matter of law that no fiduciary duty exists. *See Dalton*, 353 N.C. at 652, 548 S.E.2d at 708; *Tin Originals, Inc. v. Colonial Tin Works, Inc.*, 98 N.C. App. 663, 665-666, 391 S.E.2d 831, 833 (1990); *Ryan v. Univ. of N.C. Hosp.*, No. COA04-16, 2005 WL 465554 (N.C. Ct. App. Mar. 1, 2005); *see generally Pacheco v. Rogers and Breece, Inc.*, 157 N.C. App. 445, 452, 579 S.E.2d 505, 510 (2003) ("Determination of whether a particular set of facts establishes the existence of a fiduciary relationship may present a question of law for the court.").

person entrusts money to another, such as with lawyers, brokers, corporate directors, and corporate promoters").[32]

Not only have North Carolina (and other) courts declined to recognize a fiduciary duty based on the student-university relationship in general, but North Carolina has not recognized any fiduciary relationship arising out of a university's maintenance of a student's educational records, such as the "financial records, banking records, and email accounts" that Plaintiffs allege were improperly disclosed here. (AC ¶ 1237.)[33] Plaintiffs assert that the "agreement between Plaintiffs and Duke University governing the Plaintiffs' Duke-issued transaction cards required Duke University to safeguard the privacy of Plaintiffs' personal financial accounts on deposit with Duke University and the privacy of reports of Plaintiffs' account activity with their Duke financial transaction cards." (*Id.* ¶ 1239.) But North Carolina courts have expressly held that "parties to a

---

[32] Other courts have similarly declined to find a fiduciary relationship between a University and its students. In *Morris v. Brandeis University*, for instance, the plaintiff, a student at Brandeis University, alleged that the college "had a fiduciary relationship with him because of his status as a student," and "that Brandeis breached that fiduciary duty by failing to provide him with true and accurate information and guidance [during] his [college] disciplinary process." No. CA002161, 2001 WL 1470357, at *6 (Mass. Super. Sept. 4, 2001). The Massachusetts court decided that no fiduciary relationship existed between the college and the student. *Id.* at *6; *see also Shapiro v. Butterfield*, 921 S.W. 2d 649, 651 (Mo. Ct. App. 1996) (plaintiff, a graduate student, failed to allege a fiduciary relationship between herself and a faculty advisor).

[33] The maintenance of educational records is governed by the Family Educational Records and Privacy Act (FERPA), 20 U.S.C. § 1232(g). It is well-settled that there is no private right of action for violations of FERPA's non-disclosure provisions. *See Gonzaga Univ. v. Doe*, 536 U.S. 273, 290-291 (2002). In any event, a university's maintenance of its students' educational records is an aspect of the student-university relationship that falls squarely within the reasoning of *Ryan*.

contract do not thereby become each others' fiduciaries; they generally owe no special

duty to one another beyond the terms of the contract and set forth in the U.C.C."

*Toomer*, 171 N.C. App. at 61, 614 S.E.2d at 699; *Broussard v. Meineke Disc. Muffler*

*Shops, Inc.*, 155 F.3d 331, 348 (4th Cir. 1998).  Accordingly, on Plaintiffs' own

allegations (*see* AC ¶ 1239), any duty that the Duke Defendants might have owed

Plaintiffs with respect to the "financial," "banking," or other information stored on their

Duke Cards is limited to the terms and conditions that govern the use of those Duke

Cards.  And as discussed above, those terms and conditions expressly authorize the

disclosure of Plaintiffs' information in certain circumstances, including at the request of

law enforcement.  *See supra* note 30.

    Plaintiffs also appear to allege that certain unspecified federal and state banking

laws gave rise to a fiduciary relationship with respect to the Duke Card information.  (*Id.*

¶ 1240; *see also id.* ¶¶ 853-854.)  However, because Plaintiffs do not indicate which state

or federal laws supposedly generated this relationship, Plaintiffs have failed to provide

Defendants fair notice of the basis of their claim.  *See* Fed. R. Civ. P. 8; *see also*

*Twombly*, 127 S. Ct. at 1964.  But even if Plaintiffs had adequately specified these state

and federal banking laws, the ordinary bank-customer relationship does not create a

fiduciary relationship under North Carolina law.  *See Angell v. Kelly*, 336 F. Supp. 2d

540, 551 (M.D.N.C. 2004); *Rosenstein v. Mechs. & Farmers Bank*, 304 N.C. 541, 543,

284 S.E.2d 504, 506 (1981).

**D.      Plaintiffs Fail To State A Claim For Negligence (Count 30)**

In Count 30, Plaintiffs allege that that, by virtue of a "special relationship" between Duke University and the Plaintiffs as students and as student-athletes, the Duke University Defendants had a duty of care to warn and protect plaintiffs from harms relating to Mangum's accusation of rape and the criminal prosecution that ensued.  (*See* AC ¶¶ 1302-1303.)  But the alleged omissions fall outside the scope of any special relationship that might have existed between Duke and the members of the lacrosse team.

The "special relationship" doctrine is a limited exception to the general common law rule that one has no duty to protect another from harm caused by a third party.  *See Davidson*, 142 N.C. App. at 554, 543 S.E.2d at 926 (noting that the rule applies "to a limited group of relations, in which custom, public sentiment and views of social policy have led the courts to find a duty of affirmative action").  In a special relationship, "the plaintiff is typically in some respect particularly vulnerable and dependent upon the defendant who, correspondingly, holds considerable power over the plaintiff's welfare. In addition, such relations have often involved some existing or potential economic advantage to the defendant."  Logan & Logan, *North Carolina Torts* § 2.20, at 28 (internal quotation marks omitted).

Under North Carolina law, the "student-university relationship, standing alone, does not constitute a special relationship giving rise to a duty of care."  *Davidson*, 142 N.C. App. at 556, 543 S.E.2d at 928.  In so holding, *Davidson* embraced "the conclusion reached by other jurisdictions addressing this issue that a university should not generally

be an insurer of its students' safety." *Id.* This conclusion reflects the fact that, today, university students, the vast majority of which are at least 18 years old, are adults in the eyes of the law and responsible for the consequences of their actions. "College students today are no longer minors; they are regarded as adults in almost every phase of community life." *Bradshaw v. Rawlings*, 612 F.2d 135, 139 (3d Cir. 1979); *see id.* at 140 ("society considers the modern college student an adult, not a child of tender years"). *Accord Univ. of Denver v. Whitlock*, 744 P.2d 54, 60-61 (Colo. 1987); *Beach v. Univ. of Utah*, 726 P.2d 413, 419 (Utah 1986); *Baldwin v. Zoradi*, 176 Cal. Rptr. 809, 816-817 (Cal. Ct. App. 1981). Thus, "students today demand and receive increased autonomy and decreased regulation on and off campus." *Whitlock*, 744 P.2d at 60.

Plaintiffs seek to avoid this well-settled rule by claiming that a special relationship existed between the University and themselves as student-athletes (rather than as members of the general student body of the University). (*See* AC ¶¶ 1301-1302.) But courts have recognized such a special relationship for members of college sports teams only where the activity that led to the injury forming the basis of the claim was an official, school-sponsored activity over which the school exercised considerable control—unlike the case here, where the activity was a private, impromptu, off-campus stripper party not sponsored by the University. *See* Restatement (Second) of Torts § 314A, cmt. C (1965) (special relationship rule applies only where "the risk of harm … *arises in the course of that relation*") (emphasis added). Thus, in *Davidson*, where the North Carolina Court of Appeals found a special relationship between the university and

its cheerleading squad, the court "emphasize[d]" that its holding was "based on the fact

that [the student plaintiff] was injured while practicing as part of a school-sponsored,

intercollegiate team" and cautioned that its holding should not be read to imply that a

special relationship exists between a university and "every member of a student group,

club, intramural team, or organization." 142 N.C. App. at 556, 543 S.E.2d at 928.

Here, plaintiffs do not allege that they were injured in the course of playing

lacrosse. Instead, they claim that, because they were members of a varsity sports team

that participated in intercollegiate athletics, Duke had a duty to protect them from the

repercussions of their decision to attend a private party with hired strippers and underage

drinking. Finding a special relationship in this context would contravene basic equity

among students, for it would make the university legally liable for the private, off-

campus conduct of varsity sports teams—but not, seemingly, for members of a school

choir, or French club. Such a holding would also discourage students from taking

responsibility for their actions. As the Colorado Supreme Court observed:

> By imposing a duty on the University in this case, the
> University would be encouraged to exercise more control
> over private student recreational choices, thereby effectively
> taking away much of the responsibility recently recognized in
> students for making their own decisions with respect to
> private entertainment and personal safety. Such an allocation
> of responsibility would produce a repressive and inhospitable
> environment, largely inconsistent with the objectives of a
> modern college education.

*Whitlock*, 744 P.2d at 60.[34]

## VI.    CONCLUSION

The Amended Complaint against the Duke University Defendants should be

dismissed in its entirety for failure to state a claim on which relief may be granted.


/s/ Jamie S. Gorelick                                          /s/ J. Donald Cowan, Jr.
_____                    _____
Jamie S. Gorelick                                                J. Donald Cowan, Jr.
District of Columbia Bar No. 101370               N.C. State Bar No. 0968
Wilmer Cutler Pickering Hale and Dorr LLP    Smith Moore LLP
1875 Pennsylvania Ave., N.W.                        P.O. Box 21927 [27420]
Washington, D.C. 20006                                 300 N. Greene Street, Suite 1400
Telephone: (202) 663-6500                            Greensboro, N.C. 27401
Facsimile: (202) 663-6363                              Telephone: (336) 378-5329
Email: jamie.gorelick@wilmerhale.com           Facsimile: (336) 378-5400
                                                                       Email: don.cowan@smithmoorelaw.com

---

[34] Plaintiffs also allege that Duke breached this duty of care by giving bad advice to Plaintiffs regarding legal counsel.  (AC ¶ 1303 N.)  To the extent Plaintiffs are attempting to allege a duty under the "voluntary undertaking" doctrine, that attempt fails.  Courts have declined to conclude that a university administrator assumes a duty of care to a student by giving that student advice, however misguided or inadequate the advice may turn out to be.  *See, e.g.*, *Hendricks*, 578 S.E.2d at 711 ("recognizing a duty flowing from advisors to students is not required by any precedent and would be unwise"); *Thomas v. Charlotte-Mecklenburg Bd. of Educ.*, No. 06-238, 2006 WL 3257051, at *1 (W.D.N.C. Nov. 9, 2006) (noting that North Carolina does not recognize analogous claims for educational malpractice).  Plaintiffs also allege that "Duke's negligence was the product of … negligent hiring, retention, supervision, and training of those whose negligence caused Plaintiffs' harm."  (AC ¶ 1306.)  Because Plaintiffs have not stated a claim against any Duke employee for negligence, Plaintiffs cannot maintain an action against their employer for negligent hiring, supervision, training, or retention.  *See Guthrie v. Conroy*, 152 N.C. App. 15, 26, 567 S.E.2d 403, 411 (2002); (*see also* Br. for Duke SANE Defs. at 27-28.)

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on July 2, 2008, I electronically filed the foregoing Brief in Support of "Duke University Defendants'" Motion to Dismiss Amended Complaint with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

*Counsel for the Plaintiffs*
Robert C. Ekstrand
Email: rce@ninthstreetlaw.com

*Counsel for City of Durham and Edward Sarvis*
Reginald B. Gillespie, Jr.
Email: rgillespie@faison-gillespie.com

*Counsel for Patrick Baker, Steven Chalmers, Ronald Hodge, Lee Russ, Stephen Mihaich, Beverly Council, Jeff Lamb, Michael Ripberger, and Laird Evans*

Patricia P. Kerner
Email: tricia.kerner@troutmansanders.com

D. Martin Warf
Email: martin.warf@troutmansanders.com

Hannah Gray Styron
Email: hannah.styron@troutmansanders.com

*Counsel for James T Soukup, Kammie Michael, David Addison, Richard D. Clayton*
James B. Maxwell
Email: jmaxwell@mfbpa.com

*Counsel for Brian Meehan*
James Avery Roberts, III
Email: jimroberts@lewis-roberts.com

        *Counsel for Mark Gottlieb*
            Edwin M. Speas, Jr.
            Email:  espeas@poynerspruill.com

            Eric P. Stevens
            Email:  estevens@poyners.com

        *Counsel for Benjamin Himan*
            Henry W. Sappenfield
            Email:  hsappenfield@kennoncraver.com

            Joel Miller Craig
            Email:  jcraig@kennoncraver.com

        *Counsel for DNA Security, Inc., Richard Clark*
            Kearns Davis
            Email:  kdavis@brookspierce.com

            Robert James King, III
            Email:  rking@brookspierce.com

        *Counsel for J. Wesley Covington*
            Kenneth Kyre, Jr.
            Email:  kkyre@pckb-law.com

As of the date of this filing, no attorneys have made an appearance on behalf of the following Defendant.  I hereby certify that I served the following Defendant by U.S. Mail:

        Linwood Wilson
        6910 Innesbrook Way
        Bahama, NC 27503-9700

This 2d day of July 2008.

/s/ Jamie S. Gorelick
Jamie S. Gorelick

Attorney for Duke University, Richard H.
Brodhead, Stephen Bryan, John Burness, Kemel
Dawkins, Matthew Drummond, Victor J. Dzau,
Aaron Graves, Allison Haltom, Peter Lange,
Larry Moneta, Robert K. Steel, Tallman Trask
III, and Suzanne Wasiolek