# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

## CIVIL ACTION NUMBER 1:07-CV-00953

RYAN McFADYEN, et al.,

                Plaintiffs,

        v.

DUKE UNIVERSITY, et al.,

                Defendants.

Brief in Support of "Duke SANE Defendants'" Motion to Dismiss Amended Complaint

Pursuant to Federal Rule of Civil Procedure 12(b)(6) and Local Rules 7.2 and 7.3, the "Duke SANE Defendants"—defined by the Court and the parties for purposes of this motion to comprise the Duke University Health System, Inc. (DUHS), the Private Diagnostic Clinic, PLLC (PDC), Theresa Arico, Tara Levicy, and Dr. Julie Manly— move to dismiss all claims in the Amended Complaint against them for failure to state a claim on which relief may be granted.[1]

---

[1] (*See* Joint Mot. to Extend Page Limitations and to Establish a Rule 12 Briefing Schedule, Dkt. 23, at 2 (defining "Duke SANE Defendants"); Order, Dkt. 29 (granting Joint Motion in part); Joint Mot. to Reestablish Deadlines in the Rule 12 Briefing Schedule, Dkt. 37 (treating Second Amended Complaint, filed April 18, 2008, as the First Amended Complaint; referred to herein as the "Amended Complaint," (AC)); Order, Dkt. 38.) Separate briefs are being filed on behalf of the "Duke University Defendants" and the "Duke Police Defendants," as defined in the Joint Motion, to dismiss all claims in the Amended Complaint as to those Defendants. The Amended Complaint raises many Counts against all three groups of Duke defendants. To avoid repetition, this brief addresses those Counts that appear directed principally at the Duke SANE Defendants— namely, Counts 1-3, 6, 18-20, and 31-33. Where necessary, in addressing those Counts,

# I.    NATURE OF THE PROCEEDINGS

This case is one in which Plaintiffs seek to impose novel duties and liabilities against health care providers.  Plaintiffs contend that they were injured by (1) medical treatment provided to an unrelated patient at Duke Hospital, and (2) the conduct of an individual nurse who provided, upon request, information about that medical treatment to police officers and the District Attorney in connection with a criminal investigation.  According to Plaintiffs, these actions were both torts and violations of their constitutional rights.  These theories find no support in precedent, policy, or logic.

The facts relevant to this motion are well known.  Members of the Duke men's lacrosse team attended a party hosted by their teammates at which strippers were hired to perform.  One of the strippers later made a false accusation that she was raped at the party.  The Durham Police investigated the rape allegation.  Notwithstanding the lack of incriminating DNA evidence, reliable eyewitness testimony, or legal identification procedures, the Durham County District Attorney, Mike Nifong, decided to pursue the prosecution and eventually obtained the indictment of three lacrosse players.  None of the Plaintiffs in this case, however, was ever indicted or tried for any offense arising out of the rape allegations.  The criminal case collapsed after it became clear that Nifong was

---

this brief discusses issues of liability that are related to certain Duke University and Duke Police Defendants.  The Duke University Defendants address, in their brief, Counts 5, 7-10, 12-17, 21, 23, and 30.  The Duke Police Defendants address, in their brief, Counts 11, 22, 24, 29, and 37-40.  Counts 4, 25-28, and 34-36 are brought only against non-Duke defendants.  (*See* Ex. 1.)  To the extent the arguments presented in the Briefs for the Duke University Defendants or Duke Police Defendants are relevant to the claims against the Duke SANE defendants, they are incorporated here by reference.

well aware that the accusations against the three indicted players could not be supported in court.

That three young men were indicted on false charges of a grave crime is clearly a disgrace. What is far less clear is why Plaintiffs believe that these defendants—the physician who examined the accuser the night of her reported rape, the nurse who assisted the physician in that examination, that nurse's supervisor, and the hospital that employed them—should be liable for the fact that the police and the prosecutor investigated an alleged crime (for which these Plaintiffs were never even charged). A patient was brought to the hospital claiming an atrocious deed had been done to her; the hospital staff rendered her assistance, as they should have done; and subsequently, when the police officers and prosecutor carrying out the investigation asked a hospital employee for information, the employee cooperated. There is nothing tortious, much less a violation of civil rights, in this conduct.

Plaintiffs' Amended Complaint fails to acknowledge that the decision to investigate the alleged rape and to seek an indictment against three of the players was never in the hands of any health care provider—and certainly not in the hands of the doctor who performed the sexual assault examination or the nurse who assisted that examination the night the accuser, Crystal Mangum, showed up at Duke Hospital. Indeed, Plaintiffs themselves allege that it was Nifong who decided to continue the investigation and prosecution in the face of exculpatory evidence—willful misconduct for which he was disbarred and jailed. In the face of such misconduct, it is hard to

understand how Plaintiffs can believe that anything the health care providers did would have altered the course of events.  In short, the health care providers did their jobs; they did not commit any tort or invade any of Plaintiffs' legal rights.  The claims against them should therefore be dismissed.

## II.    STATEMENT OF FACTS[2]

The Duke SANE Defendants incorporate by reference the Statement of Facts in the Briefs of Duke University Defendants and the Duke Police Defendants in support of their respective motions to dismiss the Amended Complaint.  In addition, the following facts are relevant to the claims brought against the Duke SANE defendants:

The Durham Police transported Crystal Mangum to Duke University Medical Center Emergency Department after she claimed she had been raped.  (AC ¶ 255.) Emergency room medical personnel found Mangum "anxious," complaining of "extreme pain," and reporting that she had been sexually assaulted.  (*Id.* ¶¶ 294-296.)  Following this initial medical screening, Dr. Julie Manly conducted a forensic sexual assault examination.  (*Id.* ¶¶ 298, 302-306.)  Tara Levicy, a Sexual Assault Nurse Examiner (SANE) "in training," assisted Dr. Manly.  (*Id.* ¶¶ 38, 301-302.)  As part of the forensic sexual assault examination, Dr. Manly initiated a pelvic examination, which revealed "diffuse edema"—swelling—of "the vaginal walls."  (*Id.* ¶¶ 304, 306.)  Oral, vaginal, and rectal swabs from Mangum were also collected as part of the pelvic examination and

_____
[2] Solely for the purpose of this Motion, and as required under Federal Rule of Civil Procedure 12(b)(6), the Duke SANE Defendants assume the truth of the facts asserted by Plaintiffs in their Amended Complaint.

included in Mangum's Sexual Assault Kit.  (*Id.* ¶¶ 308, 746.)  As Dr. Manly proceeded

with the pelvic examination, Mangum "quickly protested and insisted" that it cease

because she was in "intense pain."  (*Id.* ¶ 304.)

In the course of the Durham Police Department's investigation of the alleged rape,

the Durham Police subpoenaed Mangum's medical records, which Duke subsequently

produced.  (*Id.* ¶ 785.)  Durham Police also interviewed SANE nurse Tara Levicy, and

Durham Police Sgt. Mark Gottlieb claimed that Levicy had told him that Mangum

showed "signs, symptoms, and injuries consistent with being raped."  (*Id.* ¶¶ 780-781.)

There are no allegations that Dr. Manly was ever questioned by, or spoke with, any police

officer or representative of the District Attorney.

On March 23, 2006, a judge of the Superior Court for Durham County issued a

Non-Testimonial Identification Order (NTID) for the collection of DNA and photographs

from members of the lacrosse team.  (*Id.*  ¶¶ 505 C, 596.)  The authorization for the

NTID was based on information from Mangum's statement to Durham Police (*id.* ¶ 420),

items of Mangum's found during the search of 610 N. Buchanan (*id.* ¶¶ 423, 425),

information from non-custodial interviews of the residents of 610 N. Buchanan in

connection with the search (*id.* ¶¶ 383 D, 421), and information from Mangum's medical

examination and record (*id.* ¶¶ 780-781).

On April 1, 2006, the Durham Herald-Sun newspaper published a story based on

an interview with Theresa Arico, whom the article described as a SANE nurse and SANE

"coordinator" at Duke Hospital.  (*Id.* ¶ 784.)  In the article, Arico was quoted as

explaining that a SANE nurse can diagnose "blunt force trauma," which is an injury consistent with sexual assault, through the use of a colposcope. (*Id.*)

The evidence collected by Levicy and Dr. Manly for the rape kit, together with the evidence collected pursuant to the NTID, produced the DNA evidence that exonerated the members of the lacrosse team. (*Id.* ¶¶ 660, 749-750.) Nifong concealed this exculpatory evidence (*id.* ¶¶ 756, 902), misconduct for which he was subsequently disbarred and jailed (*id.* ¶¶ 49, 901).

## III.    QUESTIONS PRESENTED

**A.**    Whether Plaintiffs have failed to state a basis for their claims under 42 U.S.C. § 1983 (Counts 1-3, 6);

**B.**    Whether Plaintiffs have failed to state a negligence claim (Counts 31-33);

**C.**    Whether Plaintiffs have failed to state a claim for intentional infliction of emotional distress (Count 20); and

**D.**    Whether Plaintiffs have failed to state a claim for obstruction of justice or abuse of process (Counts 18-19).

## IV.    STANDARD OF REVIEW

On a motion to dismiss for failure to state a claim, the Court should accept well-pleaded factual allegations in the complaint as true, but should give no weight to legal conclusions cast in the form of factual allegations. *Young v. City of Mount Rainier*, 238 F.3d 567, 577 (4th Cir. 2001). Nor should the Court give any weight to conclusory allegations ungrounded in any assertion of fact. *Papasan v. Allain*, 478 U.S. 265, 286

(1986). In particular, unsupported allegations of conspiracy—as made in the bulk of Plaintiffs' claims against the health care providers—are insufficient to survive a motion to dismiss. *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1966 (2007). Plaintiffs raising conspiracy claims must allege specific facts to show that an agreement was made; neither "a bare assertion of conspiracy" nor "a conclusory allegation of agreement" suffices. *Id.* Instead, Plaintiffs must allege sufficiently specific facts to "raise a right to relief above the speculative level," *id.* at 1965, such that the "claim … is plausible on its face," *id.* at 1974.

## V. ARGUMENT

### A. Plaintiffs Fail To State A Claim Under 42 U.S.C. § 1983 (Counts 1-3, 6)

Plaintiffs have asserted numerous claims against various Duke Defendants under 42 U.S.C. § 1983 (Counts 1-3, 5-15). This brief addresses the § 1983 claims most relevant to the health care providers, Counts 1-3 and 6 (unlawful search and seizure, abuse of process, and alleged manufacture of exculpatory evidence).[3]

As explained more fully in the Brief for the Duke University Defendants (at pp. 8-15), Plaintiffs' § 1983 claims all fail because they do not adequately allege the two essential elements of any § 1983 claim: state action and the deprivation of a constitutional right. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 150 (1970). First, with respect to the state action requirement, as explained in the Brief for Duke University

---

[3] Counts 5, 7-10, and 12-15 are addressed in the Brief for the Duke University Defendants; Count 11 is addressed in the Brief for the Duke Police Defendants.

Defendants (at pp. 8-12), Plaintiffs' bare assertions that Duke defendants conspired with Durham defendants (state actors) are insufficient to demonstrate that these Duke health care providers are state actors. *See Twombly*, 127 S. Ct. at 1966. Instead, Plaintiffs must include "enough factual matter" to "plausibly suggest[]" a meeting of the minds to deprive Plaintiffs of their constitutional rights. *See id.* at 1965-1966. Plaintiffs do not allege any such facts with respect to the Duke health care providers and therefore have not sufficiently alleged a conspiracy with Durham or state action on that basis.

Second, all of Plaintiffs' § 1983 claims, including all claims raised against the health care providers, must fail because none of these Plaintiffs was deprived of any constitutional right. *See* Br. for Duke University Defs. at 12-15. Plaintiffs were never charged or indicted, let alone tried, for any offense arising out of Mangum's accusations. As such, they cannot raise any claim based on the Fifth and Sixth Amendments, which protect only trial rights. *See id.* at 13-15. Plaintiffs also cannot raise any claim of pretrial deprivation under the Fourteenth Amendment because the Supreme Court has made clear in *Albright v. Oliver*, 510 U.S. 266 (1994), that only the Fourth Amendment governs pretrial deprivations of liberty. *See* Br. for Duke University Defs. at 12-13. And as explained below, Plaintiffs' Fourth Amendment rights were never violated. Moreover, each of Plaintiffs' § 1983 claims against the health care providers (Counts 1, 2, 3, and 6) is fatally flawed for independent reasons as well.

## 1.     Counts 1 and 2:  Search And Seizure

In Counts 1 and 2, Plaintiffs allege that they were searched and seized in violation of the Fourth and Fourteenth Amendments because the NTID (Count 1) and McFadyen Search Warrant (Count 2) were not supported by probable cause.  (*See* AC ¶¶ 910, 923.) In particular, Plaintiffs allege that Duke health care professionals provided false medical information to the Durham Police (*id*. ¶¶ 913, 925), and that Nifong, Gottlieb, and Himan included those fabricated descriptions of medical evidence in the affidavits supporting the NTID and Search Warrant applications (*id*. ¶¶ 910, 924).[4]  Plaintiffs' claims fail, however, for two independent reasons:  (1) neither the NTID nor the Search Warrant[5] violated the Fourth Amendment because each was supported by probable cause even without the allegedly false information; and (2) no action of the Duke SANE Defendants resulted in the issuance of either the NTID or the Search Warrant.

---

[4] Counts 1 and 2 are also brought against Duke University and Duke Police Defendants who are not part of the Duke SANE Defendants group.  Those individuals join in these arguments.  (*See* Ex. 1.)

[5] Because the affidavits supporting the NTID and McFadyen Search Warrant are substantially similar, these Counts are addressed together.  Plaintiffs have referred to both affidavits, as well as the affidavit supporting the search of 610 N. Buchanan, in their Amended Complaint (*see* AC ¶¶ 415-416, 611), and the Court may consider them when evaluating Defendants' motion to dismiss.  *See Phillips v. LCI Int'l, Inc.,* 190 F.3d 609, 618 (4th Cir. 1999); *see also Waters v. Bass*, 304 F. Supp. 2d 802, 807 n.8 (E.D. Va. 2004) (explaining that for purposes of evaluating a motion to dismiss under Rule 12(b)(6) the court is generally limited to a review of the allegations in a complaint, but the complaint includes any document which is incorporated into it by reference); *Goldman v. Belden*, 754 F.2d 1059, 1065-1066 (2d Cir. 1985).  Copies of these affidavits are attached to this motion as Exhibits 2, 3, and 4, respectively.

### a. The NTID And The McFadyen Search Warrant Were Supported By Probable Cause Even Without The Allegedly False Information

Plaintiffs allege that the NTID and McFadyen Search Warrant violated the Fourth Amendment because they were based in part on allegedly false information provided by Duke health care providers. Specifically, Plaintiffs allege that the affidavits submitted in support of the applications for the NTID and Search Warrant included two sentences containing allegedly false statements about the medical evidence from Duke nurse Tara Levicy. (*See* Ex. 2; Ex. 3; *see also* AC ¶ 781.) Even if that information provided by Duke health care providers and included in the affidavits were fabricated, there was no Fourth Amendment violation because the affidavits established probable cause *without* that information.

As the Fourth Circuit has made clear, "even if an affidavit supporting a search warrant is based in part on some illegal evidence, such inclusion of illegal evidence does not taint the entire warrant if it is otherwise properly supported by probable cause. Thus, unless the tainted information is so important that probable cause did not exist without it, the warrant will be deemed valid." *Simmons v. Poe*, 47 F.3d 1370, 1378 (4th Cir. 1995) (internal quotation marks omitted).[6] The Fourth Circuit, moreover, "has always applied a

---

[6] *See also Wilkes v. Young*, 28 F.3d 1362, 1365 (4th Cir. 1994) ("It is well-established that a false or misleading statement in a warrant affidavit does not constitute a Fourth Amendment violation unless the statement is necessary to the finding of probable cause.") (internal quotations and citation omitted); *Taylor v. Waters*, 81 F.3d 429, 437 (4th Cir. 1996) ("[T]he failure of an officer to disclose exculpatory evidence after a determination of probable cause has been made by a neutral detached magistrate does not

highly deferential standard of review in considering the sufficiency of a finding of probable cause by a magistrate." *Simmons*, 47 F.3d at 1378; *see United States v. Williams*, 974 F.2d 480, 481 (4th Cir. 1992) ("Great deference is to be given a magistrate's assessment of the facts when making a determination of probable cause."). Under this standard, the relevant inquiry is "whether the magistrate had a 'substantial basis' for his conclusion that probable cause existed." *United States v. Jones*, 31 F.3d 1304, 1313 (4th Cir. 1994) (citing cases). On Plaintiffs' own allegations, the affidavits more than meet this standard.

Most significantly, Plaintiffs themselves concede that there would have been probable cause to support the NTID and McFadyen Search Warrant even without any mention of the allegedly fabricated evidence. Plaintiffs explicitly allege that the Probable Cause affidavit for an earlier search of 610 N. Buchanan, which did not contain the allegedly false information from the health care providers, "was sufficient to obtain [that] Search Warrant." (*See* AC ¶ 415.) The Amended Complaint goes on to state that, because that existing affidavit for the search of 610 N. Buchanan already supported a finding of probable cause, "[t]here was no need to revise the Affidavit as a practical matter" for use in obtaining the NTID.[7] (*Id.*) On Plaintiffs' own allegations, then, the NTID and Warrant were "sufficiently supported by evidence of probable cause"—even

render the continuing pretrial seizure of a criminal suspect unreasonable under the Fourth Amendment.").

[7] The same information was included in the McFadyen Search Warrant application. *See* Ex. 3.

without the allegedly fabricated material—"to pass constitutional muster under the Fourth Amendment." *Simmons*, 47 F.3d at 1379. On this ground alone, dismissal of Counts 1 and 2 is warranted. *See Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002) (stating that "Rule 12(b)(6) dismissal is appropriate where the allegations contradict the claim asserted").

Moreover, even if Plaintiffs had not conceded this dispositive point, it is clear that the affidavits supporting the NTID and Search Warrant applications were sufficient *without* the allegedly fabricated evidence (*see* AC ¶¶ 420, 424, 431, 435), and the magistrate judge therefore had a "substantial basis" for determining that probable cause existed. As noted, the affidavits contained only two sentences based on Tara Levicy's allegedly false statements. (*See id*. ¶ 781 ("Medical records and interviews that were obtained by a subpoena revealed the victim had signs, symptoms, and injuries consistent with being raped and sexually assaulted vaginally and anally. Furthermore, the SANE nurse stated the injuries and her behavior were consistent with a traumatic experience.").) Even without those two sentences, as described below, the affidavits provided the magistrate judge with ample reason to support his conclusion that there was probable cause to issue both the NTID and the Search Warrant.

Most important, the affidavits included a lengthy and detailed description of the complaining witness's own statements to the police regarding her alleged sexual assault. (*See id*. ¶¶ 362, 417-418.) These statements were sufficient, without anything more, to establish probable cause. *See, e.g.*, *Ahlers v. Schebil*, 188 F.3d 365, 370-371 (6th Cir.

- 12 -

1999) (holding that a victim's accusation that she had been sexually assaulted, "standing

alone, was sufficient to establish probable cause"). In fact, as noted above, a magistrate

judge had already determined that Mangum's statements alone provided probable cause

for the search of 610 N. Buchanan Blvd. (*See* Ex. 4; *see also* AC ¶ 415.)

If that judge's independent finding of probable cause were not enough, the new

affidavits supporting the NTID and Search Warrant applications were bolstered by

further evidence gathered during the search of 610 N. Buchanan and the attendant non-

custodial interviews of its residents. That evidence, described in the affidavits, included a

list of items that were found during the search of 610 N. Buchanan that appeared to

corroborate Mangum's allegations, including "[t]he victim's make up bag, cell phone,

and identification [found] inside the residence during the search" and "a pile of twenty

dollar bills [that] were recovered inside the residence totaling $160.00 consistent with the

victim claiming $400.000 cash in all twenty dollar bills was taken from her purse

immediately after the rape." (Ex. 2.) The affidavits also stated that the three residents of

610 N. Buchanan Blvd. informed the police during a non-custodial interview that "their

fellow Duke Lacrosse Team Members were the ones who attended th[e] party," that the

three cooperating residents "knew everyone" who was at the party, and that "there were

no strangers who showed up at the event." (*Id.*) Finally, the affidavit supporting the

McFadyen Search Warrant application included an additional piece of evidence that

appeared to strongly support the judge's finding of probable cause—an email sent by

Plaintiff McFadyen only hours after the alleged sexual assault, which contained a

gruesome and apparently explicit threat to kill strippers like the alleged victim.  (*See* AC ¶ 596; Ex. 3 ("tomorrow night, after tonights [sic] show, I've decide to have some strippers over to edens 2c. . . .  i plan on killing the b**** as soon as the walk in and proceding [sic] to cut their skin off while ***** in my duke issue spandex." (lower case in original)).)

Taken together, this information, including:  (1) Mangum's statements to the police, (2) descriptions of physical evidence found at 610 N. Buchanan, (3) statements by individuals present at the party describing the universe of possible suspects, and, (4) for the McFadyen Search Warrant, an e-mail containing apparent threats to kill strippers, provided more than a "substantial basis" for the magistrate judge's findings of probable cause for the NTID and Search Warrant.  This would be true under any standard of review, but it is certainly true under the Fourth Circuit's "highly deferential" standard. *See Simmons*, 47 F.3d at 1379.  Accordingly, Plaintiffs have not alleged a violation of their constitutional rights, and their § 1983 claims in Counts 1 and 2 should be dismissed.[8]

---

[8] Plaintiffs make three additional allegations in Counts 1 and 2, none of which states a claim.  First, Plaintiffs allege that Duke Police Defendants Stotsenberg, Smith, Graves, and Dean searched through Plaintiffs' e-mail accounts, banking records, and educational records without probable cause.  (*See* AC ¶ 915.)  But those defendants are not named in the Count.  (*See id*. at p. 284.)  And in any event, Plaintiffs had no legitimate expectation of privacy in the information alleged in that paragraph.  *See, e.g.*, *Smith v. Maryland*, 442 U.S. 735, 743-744 (1979) (holding that a person has no legitimate expectation of privacy in information that he shares with third parties); *United States v. Miller*, 425 U.S. 435, 442-444 (1976) (same); *Culbreth v. Ingram*, 389 F. Supp. 2d 668, 676 (E.D.N.C. 2005). Second, Plaintiffs allege that Sgt. Smith "stood-by" McFadyen's dorm room as it was

### b. The Duke SANE Defendants Did Not Cause Or Initiate The Issuance Of The NTID Or Search Warrant

Plaintiffs also fail to state a claim under § 1983 because they cannot show that any actions by the Duke health care providers "caused" or "initiated" the issuance of the NTID or Search Warrant. (AC ¶¶ 907, 920.) Courts have consistently ruled that private individuals do not become liable under § 1983 for providing false information to the police or prosecutors that is later used to secure warrants or arrests. Whether viewing the issue as one of state action or causation, these courts have consistently held that police and prosecutors are presumed to exercise independent judgment in seeking search warrants and deciding to prosecute cases, and so private individuals are not liable for any deprivation of constitutional rights merely because police or prosecutors acted on information that the private individuals provided to them. *See, e.g.*, *Franklin v. Fox*, 312 F.3d 423, 445-446 (9th Cir. 2002); *Ginsberg v. Healey Car & Truck Leasing, Inc.*, 189 F.3d 268, 272 (2d Cir. 1999); *King v. Massarweh*, 782 F.2d 825, 829 (9th Cir. 1986); *Arnold v. IBM Corp.*, 637 F.2d 1350, 1356-1358 (9th Cir. 1981); *Butler v. Goldblatt*

---

being searched and "took no affirmative acts to intervene." (*See* AC ¶ 922.) This allegation is duplicative of Count 11 (Failure to Prevent Deprivation of Constitutional Rights) and should be dismissed for the same reasons discussed in the Brief for the Duke Police Defendants at 31-34. Third, Plaintiffs allege that Duke health care providers falsified medical evidence in order to "cover-up the conspiracy to falsify the NTID Affidavit." (AC ¶ 913.) However, "there is no constitutional violation in conspiring to cover-up an action which does not itself violate the Constitution." *Cefalu v. Village of Elk Grove*, 211 F.3d 416, 423 (7th Cir. 2000) (quoting *Hill v. Shobe*, 93 F.3d 418, 422 (7th Cir. 1996)). Because the NTID was supported by probable cause and therefore did not violate Plaintiffs' constitutional rights, the health care providers cannot be held liable for any alleged cover-up.

*Bros., Inc.*, 589 F.2d 323, 327 (7th Cir. 1979).  As the Tenth Circuit stated, "[w]e know of no case in which the report of a state crime is action under color of law under § 1983." *Benavidez v. Gunnell*, 722 F.2d 615, 618 (10th Cir. 1983).[9]  For this reason as well, Counts 1 and 2 should be dismissed.

### 2.    Count 3:  Abuse Of Process

In Count 3, Plaintiffs allege that Duke health care providers committed "abuse of process … in violation of 42 U.S.C. § 1983" by obtaining the NTID and the McFadyen Search Warrant for "unauthorized purposes," such as "[s]tigmatizing Plaintiffs," "galvanizing the public condemnation" of them, and "[r]etaliating against [them] for asserting their constitutional rights."  (AC ¶ 930.)  To the extent that Plaintiffs premise their claim on the state law tort of abuse of process, their allegations fail to state a valid claim under § 1983.[10]  That is so because a claim under § 1983 requires the deprivation of a *federal* right, and allegations of a tort claim of abuse of process present no such cognizable deprivation.  *See Cramer v. Crutchfield*, 648 F.2d 943, 945 (4th Cir. 1981).

---

[9] Plaintiffs cannot escape the holdings of those cases by arguing that they have alleged a conspiracy between private individuals and public authorities.  "The allegations of the … complaint are in conclusory language which is not enough."  *Benavidez*, 722 F.2d at 618; *see also Gramenos v. Jewel Cos., Inc.*, 797 F.2d 432, 436 (7th Cir. 1986) ("A party may not cry 'conspiracy' and throw himself on the jury's mercy.").  With respect to these Counts, Plaintiffs allege no facts whatsoever that would support an agreement or meeting of the minds between any Duke University Defendant and Gottlieb, Himan, or Nifong to include fabricated material in the NTID or Search Warrant applications.  (*See* AC ¶¶ 414-444; 593-610.)

[10] Indeed, Plaintiffs' allegations do not even satisfy the requirements of the tort under state law.  *See infra* pp. 45-48 (explaining that Count 19 fails to state a claim for abuse of process under state law).

To the extent that Plaintiffs are claiming a violation of the Fourth Amendment, which is the only constitutional provision conceivably relevant to Count 3, that claim also fails. The Fourth Amendment is implicated only by actual searches and seizures. *See County of Sacramento v. Lewis*, 523 U.S. 833, 843-844 (1998); *California v. Hodari D.*, 499 U.S. 621, 626 (1991). But the Duke health care providers had no authority to conduct, and are not alleged to have conducted, any such searches or seizures. Nor did they have any authority as private citizens to "initiate" the process of obtaining an NTID or search warrant, and conclusory allegations that they acted in "concert" with law enforcement cannot imbue them with that authority. These health care professionals are alleged to have provided information to the police; but merely providing information (even false information) does not call the Fourth Amendment into play. *See Landrigan v. City of Warwick*, 628 F.2d 736, 744-745 (1st Cir. 1980) (noting that "the existence of a false police report" does not "by itself deprive[] a person of a right secured by the Constitution"); *Shock v. Tester*, 405 F.2d 852, 855 (8th Cir. 1969) (same).

Even if the Fourth Amendment were implicated here, Plaintiffs did not suffer any Fourth Amendment violation as a result of the NTID and the McFadyen Search Warrant because, as explained *supra* pp. 9-16, both were supported by probable cause. The presence of probable cause secures the constitutionality of the resulting searches irrespective of the alleged subjective motivations of the defendants. *See Whren v. United States*, 517 U.S. 806, 813 (1996) ("Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis."); *id.* (stating that the Supreme Court has

- 17 -

"been unwilling to entertain Fourth Amendment challenges based on the actual motivations of individual officers").[11]  Accordingly, Count 3 warrants dismissal.[12]

### 3.      Count 6:  Manufacture Of False Inculpatory Evidence

In Count 6, Plaintiffs allege that Duke University and Duke health care providers conspired to "fabricate inculpatory forensic medical evidence … by altering [Mangum's sexual assault examination report] and other medical records … to conform them to the fabricated NTID Affidavit[,] … Mangum's police statement[,] and the existing or expected evidence in the case."  (AC ¶¶ 970-971.)  Plaintiffs fail to state a claim under § 1983 here because they cannot show that any of these alleged fabrications resulted in a deprivation of their constitutional rights.

"The manufacture of false evidence, in and of itself, … does not impair anyone's liberty, and therefore does not impair anyone's constitutional right."  *Zahrey v. Coffey*, 221 F.3d 342, 348 (2d Cir. 2000) (internal quotation marks omitted).  To state a claim for a constitutional violation related to the fabrication of false inculpatory evidence, a plaintiff must allege that the defendant "fabricated evidence and that the fabrication *resulted in* a deprivation of [the plaintiff's] liberty."  *Washington v. Wilmore*, 407 F.3d 274, 282 (4th Cir. 2005) (emphasis added); *see also Zahrey*, 221 F.3d at 348, 350-351; *Landrigan*, 628 F.2d at 744.  Plaintiffs cannot satisfy this requirement.  These Plaintiffs

---

[11] *See also Virginia v. Moore*, 128 S. Ct. 1598 (2008) (holding that police did not violate the Fourth Amendment when they made an arrest that was based on probable cause but prohibited by state law).

[12] Count 3 is also brought against Duke University, Victor Dzau, and Robert Steel, who join in these arguments.

were never tried, indicted, or even arrested for any crime.  As such, they appear to contend that the mere fact that they were *investigated* (supposedly based on manufactured evidence) violated their constitutional rights.  But Plaintiffs cannot challenge "the reasonableness of the police's targeting [them] for investigation," because "there is no constitutional right to be free from investigation."  *United States v. Trayer*, 898 F.2d 805, 808 (D.C. Cir. 1990); *see also United States v. Crump*, 934 F.2d 947, 957 (8th Cir. 1991); *Labensky v. County of Nassau*, 6 F. Supp. 2d 161, 175 (E.D.N.Y. 1998) ("[T]he Constitution does not micro-manage criminal investigations.").

Furthermore, the factual allegations related to this Count appear to be limited to the assertion that the health care providers fabricated the sexual assault examination report in order to corroborate claims that had *already* been included in the NTID application.  (*See* AC ¶¶ 970-971.)  According to Plaintiffs, this supposedly falsified report was given to the Durham Police on April 5, 2006.  (*See id*. ¶¶ 785-786.)  By that date, however, the NTID had already been applied for, approved, and executed.  Plaintiffs therefore cannot establish any connection between the alleged fabrication and the alleged deprivation of their Fourth Amendment rights in connection with the execution of the NTID.[13]  Plaintiffs have not, moreover, alleged that any other rights or liberties were

---

[13] To the extent that Plaintiffs are attempting to allege a deprivation related to the use of fabricated evidence in seeking the NTID, that claim is duplicative of Count 1 (*see* AC ¶ 914) and should be dismissed for the reasons discussed *supra* pp. 9-16.

deprived by the mere existence of this allegedly falsified medical evidence—nor could they.[14]  Count 6 should therefore be dismissed.

### B.  Plaintiffs Fail To State A Claim For Negligence (Counts 31-33)

In Counts 31-33, Plaintiffs claim that the Duke health care providers acted negligently when they carried out the forensic medical examination on Mangum on the night of the alleged rape and when they reported the results of that examination to the Durham Police.[15]  These claims are fatally flawed for two independent reasons.  First, under North Carolina law, these health care providers had no actionable duty of care to *these Plaintiffs* because health care personnel examining a patient have a duty of care only to that patient.[16]  Second, Plaintiffs cannot establish another essential element of their negligence claims—namely, that the actions of the health care providers proximately caused their injuries.  Plaintiffs themselves allege that the decision to pursue

---

[14] *See Landrigan*, 628 F.2d at 744-745 ("[W]e do not see how the existence of a false police report, sitting in a drawer in a police station, by itself deprives a person of a right secured by the Constitution and laws.…  The focus, however, ordinarily should be on the consequences, if any, not on the mere existence of the report."); *see also Washington v. Buraker*, No. 02-00106, 2006 WL 759675, at *5 (W.D.Va. Mar. 23, 2006) ("As the Fourth Circuit noted in *White* [*v. Wright*, No. 04-1934, 2005 WL 2333673 (4th Cir. Sep. 23, 2005)], fabricated evidence sitting in a drawer is not by itself a constitutional violation—it must be used against the petitioner.").

[15] Counts 31-33 also raise the same allegations against Duke University (and, in Count 31, against Victor Dzau).  Those Defendants join in these arguments.

[16] *Prince v. Wright*, 141 N.C. App. 262, 265-266, 541 S.E.2d 191, 195 (2000) ("Negligence 'presupposes the existence of a legal relationship between the parties by which the injured party is owed a duty which either arises out of a contract or by operation of law.'") (quoting *Sinning v. Clark*, 119 N.C.App. 515, 518, 459 S.E.2d 71, 73 (1995)); W. Page Keeton, et al., *Prosser and Keeton on The Law of Torts* § 53, at 357 (5th ed. 1984).

the investigation into the alleged rape was the willful, deliberate, and indeed criminal act of Nifong and certain Durham police officers. Where, as here, it is plain on the face of the complaint that the alleged harm was proximately caused by a different party, dismissal is warranted. *See Ford v. Peaches Entm't Corp.*, 83 N.C. App. 155, 156, 349 S.E.2d 82, 83 (1986); *Tise v. Yates Constr. Co.*, 345 N.C. 456, 460-461, 480 S.E.2d 677, 680 (1997); *Lynn v. Overlook Dev.*, 328 N.C. 689, 697, 403 S.E.2d 469, 473-74 (1991); *see also Townes v. City of New York*, 176 F.3d 138, 147 (2d Cir. 1999).

### 1.    Defendants Did Not Owe These Plaintiffs A Duty Of Care

In Count 31, Plaintiffs assert that the health care providers were negligent in carrying out two purported duties:  the "duty to use due care with respect to public statements and statements to law enforcement concerning the investigation of Mangum's claims" (AC ¶ 1311), and the "duty to use due care with respect to their involvement in the investigation of Mangum's false accusations, including the provision [of] forensic medical evidence relating to the investigation" (*id.* ¶ 1312).  Similarly, in Count 32, Plaintiffs allege that the doctors, nurses, and hospital facility negligently supervised Tara Levicy, the sexual assault nurse examiner, and thus failed to prevent Levicy from mishandling the examination and making inaccurate statements to the police about her examination of Mangum.  (*Id.* ¶¶ 1320-1323.)  Count 33 raises a claim of negligent infliction of emotional distress based on the defendants' providing supposedly inaccurate information to the police.  These claims all fail because the Duke health care providers had no actionable duty of care *to these Plaintiffs* under any of these theories.

### a. The Health Care Providers Had No Duty Of Care To These Plaintiffs With Respect To Forensic Medical Evidence

Plaintiffs allege that the health care providers breached their duty to use due care with respect to forensic medical evidence by performing their professional services—the performance of the sexual assault examination—in a subpar manner. (*See id.* ¶ 1315.) For example, Plaintiffs claim that Dr. Manly improperly "abandoned" the pelvic examination, failed to "diagnose the source of [Mangum's] pain and treat it," and identified a symptom of "diffuse edema of the vaginal walls" using incorrect clinical methods. (*Id.* ¶¶ 303-306.)

Such claims are for medical malpractice, which is defined by North Carolina statute as an action that "aris[es] out of the furnishing [of] … professional services … by health care provider[s]." N.C. Gen. Stat. § 90-21.11 (1999). Because Plaintiffs' negligence claim here arises out of the clinical care provided by doctors and nurses, their claims fall squarely within this definition of a medical malpractice claim. *See, e.g.*, *Estate of Waters v. Jarman*, 144 N.C. App. 98, 104, 547 S.E.2d 142, 145-146 (2001) (claims arising out of clinical care provided by the hospital to the patient sound in medical malpractice; claims arising out of policy, management, or administrative decisions sound in ordinary negligence).

Plaintiffs cannot bring this medical malpractice claim against any of the health care providers, however, because North Carolina law does not allow such claims to be brought by persons other than the patient. "[T]he Supreme Court of North Carolina has

unequivocally held that 'the relationship of physician to patient must be established as a prerequisite to an actionable claim for medical malpractice.'" *Iodice v. United States*, 289 F.3d 270, 275 (4th Cir. 2002) (quoting *Easter v. Lexington Mem'l Hosp*., 303 N.C. 303, 305-306, 278 S.E.2d 253, 255 (1981)). The Fourth Circuit noted that it had not found "a single North Carolina case permitting unrelated third party victims of a patient to sue the patient's health care providers for medical malpractice, or even suggesting that such claims are possible." *Id.*; *see also Russell v. Adams*, 125 N.C. App. 637, 640, 482 S.E.2d 30, 33 (1997) (holding that psychologist had no duty of care to patient's mother).

"North Carolina courts have emphasized the policy reasons counseling rejection of such suits: doctors should owe their duty to their patient and not to anyone else so as not to compromise this primary duty." *Iodice*, 289 F.3d at 275-276 (internal citations and quotation marks omitted). If doctors and nurses owed an actionable duty of care to third parties as well as their patients, their focus on the patient's health and welfare could be compromised. Health care personnel must be free to draw conclusions and make recommendations based on the patient's response and best interest, not anyone else's. *Cf. Russell*, 125 N.C. App. at 640, 482 S.E.2d at 32-33 (acknowledging that psychologist's treatment of a patient "may have adverse consequences on … third parties" but nonetheless declining to extend any legal duties to such third parties).

Even if Plaintiffs' negligence claims were somehow distinguishable from a medical malpractice claim, the claims still fail for several reasons. First, North Carolina law disallows ordinary negligence claims by third parties against health care providers,

just as it disallows third-party medical malpractice claims.  *See Iodice*, 289 F.3d at 277.

North Carolina cases have discussed ordinary negligence claims against health care

providers "as involving a duty that 'a hospital … owes to its patients.'"  *Id.* (quoting

*Blanton v. Moses H. Cone Mem'l Hosp. Inc.*, 319 N.C. 372, 376, 354 S.E.2d 455, 458

(1987)).  Indeed, in North Carolina, there is (with perhaps one exception) a "total absence

of ordinary negligence cases permitting recovery against a health care provider by a third

party victim."  *Id.* at 279.[17]  As Plaintiffs were not patients, the health care providers did

not owe them a duty of care.

Further, even if health care providers might in certain circumstances owe duties to

someone other than their patient, that could not assist Plaintiffs here, where there is, at

most, a highly attenuated connection between the alleged negligence and the harm.

Plaintiffs allege that the health care providers did not use due care "with respect to …

forensic medical evidence" (AC ¶ 1312), and that these supposedly negligent acts

allowed the Durham Police and Nifong to claim that a rape had actually occurred.

Allegations of this sort, however, are far removed from the "tight nexus" that North

Carolina courts require between the alleged negligence and the harm in a third-party

claim.  *Iodice*, 289 F.3d at 279.

---

[17] In *Pangburn v. Saad*, 73 N.C. App. 336, 326 S.E.2d 365 (1985), a North Carolina appellate court held that third-party victims of a wrongly released mental patient may sue the patient's health care providers for negligent release.  *Id.* at 338, 326 S.E.2d at 367. That holding, though, was specifically limited to cases of negligent release of mental patients, *id.*, and North Carolina courts have subsequently refused to extend that holding to other settings, *see, e.g.*, *Iodice*, 289 F.3d at 275-276 (citing cases).

In *Iodice*, for example, the Fourth Circuit affirmed the dismissal of a negligence claim based on the allegation that a doctor had over-prescribed narcotics to a patient, resulting in injury to a third party. Although the court suggested that North Carolina law *might* in some circumstances recognize a third-party negligence claim against medical providers for over-prescribing narcotics to an intoxicated patient, it stressed that such a claim could lie only when the medical provider knew when dispensing the drugs that the patient was already under the influence of alcohol and would be driving a car shortly thereafter. 289 F.3d at 279-281. Similarly, here, Plaintiffs fail to show how the health care providers could have foreseen—much less that they knew—how their supposed negligence might have resulted in harm to these Plaintiffs. Indeed, it was the medical evidence collected by Dr. Manly that *exonerated* the players.[18] (*See* AC ¶ 308.) To find a duty in this case would mean that medical professionals owe a duty of care to unrelated third parties, including *any person* who might be investigated for a crime for which those professionals examined the accuser or collected medical evidence. There is no support in North Carolina law for such an expansive duty. Plaintiffs' claims should therefore be dismissed.

---

[18] Moreover, but-for the unprecedented intervening acts of District Attorney Nifong to suppress this evidence, the exoneration would have occurred within days. (*See* AC ¶¶ 756, 902); *infra* pp. 31-34.

### b. The Health Care Providers Had No Duty Of Care To These Plaintiffs With Respect To Public Statements

There is also no support in North Carolina law for Plaintiffs' assertion that the health care providers owed the Plaintiffs a "duty to use due care with respect to public statements and statements to law enforcement concerning the investigation of Mangum's claims." (AC ¶ 1311.) The "duty" that Plaintiffs are asking this Court to recognize here is a general duty to exercise due care whenever one makes a "public statement" or "reports" information to another party, including law enforcement. No North Carolina or Fourth Circuit case has ever recognized any such duty, and with good reason. Such a duty would be sweeping in scope, even broader than the tort of defamation. The tort of defamation has strict limits because of its potentially broad scope and effect on free speech rights. Recognizing the duty that Plaintiffs seek here, however, would cast aside these strict requirements—namely the one-year statute of limitations[19] (which has passed here) and the requirement that the defamatory speech have referred to an identifiable individual (which Plaintiffs cannot satisfy).[20]

Plaintiffs' theory, if accepted, would also have a chilling effect on efforts to cooperate with law enforcement. Under Plaintiffs' theory, medical personnel who provide information to the police about injuries to possible crime victims would be liable in tort to *any* person who subsequently comes under police suspicion for the crime—

---

[19] *See* N.C. Gen. Stat. § 1-54(3); *Iadanza v. Harper*, 169 N.C. App. 776, 782, 611 S.E.2d 217, 222-223 (2005).

[20] *See Arnold v. Sharpe*, 296 N.C. 533, 539, 251 S.E.2d 452, 456 (1979).

indeed, to any person who is publicly associated with those who come under suspicion and therefore might suffer the public "obloquy" of which Plaintiffs complain. (AC ¶ 685.) Plaintiffs' theory, moreover, is not just limited to medical personnel who speak with the police; Plaintiffs' theory would allow tort claims against *any* person who discussed a criminal matter with the police. The willingness to cooperate with law enforcement—which public policy should encourage, not discourage—would quickly disappear under such a regime.[21]

> **c.** **The Health Care Providers Had No Duty Of Care To These Plaintiffs That Would Support A Negligent Supervision Claim**

In Count 32, Plaintiffs bring a claim for negligent supervision of certain health care providers. Because Plaintiffs have no negligence claim against any hospital employee, however, they also cannot maintain an action against these employees' employers for negligent supervision. *See Guthrie v. Conroy*, 152 N.C. App. 15, 26, 567 S.E.2d 403, 411 (2002). As explained above, the hospital and health care providers owed no actionable duty to Plaintiffs either (1) with respect to the clinical care provided during Mangum's sexual assault examination or (2) with respect to their interactions with law

---

[21] Although it is good practice for medical professionals to cooperate with police when necessary, such cooperation does not create a duty of care to become educated on all facets of the case, keep abreast of current reporting, or correct the media and investigators. Any duty, if one exists at all, would rest with the police investigators and the District Attorney, not the health care providers. It is law enforcement, after all, that has the responsibility for determining whether to bring criminal charges. And in carrying out this responsibility, Plaintiffs themselves allege that the District Attorney was privy to *all* the information about the case, quite unlike the health care providers.

enforcement.  Because no hospital *employee* is liable for any tortious act alleged in this Amended Complaint, Plaintiffs cannot maintain an action against their *employers* for negligent supervision.  *See Guthrie*, 152 N.C. App. at 26, 567 S.E.2d at 411 ("Absent a viable tort claim, [a] plaintiff cannot maintain an action … for negligent retention and supervision.").

Even if a hospital employee had committed a tortious act, Count 32 should be dismissed as to Arico and Manly; these individuals cannot, as a matter of law, be liable for negligent supervision because neither of them is the "employer."  (*See* AC ¶ 10 (describing Duke University as the employer).)  Only the employer can be liable for negligent supervision, not individual defendants.  *See Smith v. Privette*, 128 N.C. App. 490, 494, 495 S.E.2d 395, 398 (1998) (negligent supervision is based on "the *employer's* liability to third parties*" (emphasis added)); *Cox v. Indian Head Indus., Inc.*, 123 F. Supp. 2d 892, 905 (W.D.N.C. 2000) (applying North Carolina law and dismissing a claim for negligent hiring, retention, and supervision because such a claim is sustainable against only the entity that employs the individual tortfeasor).

> **d.** **The Health Care Providers Had No Duty Of Care To These Plaintiffs That Would Support A Claim For Negligent Infliction Of Emotional Distress**

In Count 33, Plaintiffs allege that the health care providers negligently inflicted emotional distress on them by providing false and inaccurate medical information to the police.  To state such a claim for negligent infliction of emotional distress, "a plaintiff must allege that (1) defendants negligently engaged in conduct, (2) it was reasonably

foreseeable that such conduct would cause severe emotional distress …, and (3) the conduct did in fact cause severe emotional distress." *McAllister v. Ha*, 347 N.C. 638, 645, 496 S.E.2d 577, 582-583 (1998). Plaintiffs fail to allege essential elements of the claim, and Count 33 must therefore be dismissed.

Plaintiffs have failed to allege the first element of this tort—that the health care providers engaged in negligent conduct. Negligence is premised on the breach of a legally cognizable duty, which, as discussed above, Plaintiffs have failed to allege. Absent a breach of a duty of care, a claim for negligent infliction cannot be maintained. *See Guthrie*, 152 N.C. App. at 25, 567 S.E.2d at 411.

Moreover, North Carolina courts have generally limited claims for emotional distress in medical cases to (1) relatives of a patient who (2) witnessed the negligent act or were in close proximity to it. *See Johnson v. Ruark Obstetrics & Gynecology Assoc., P.A.*, 327 N.C. 283, 305, 395 S.E.2d 85, 98 (1990). North Carolina courts have rejected claims where the alleged injury was far less remote from the negligent act than is the case with Plaintiffs' allegations here. *See, e.g.*, *Gardner v. Gardner*, 334 N.C. 662, 666-667, 435 S.E.2d 324, 328 (1993) (granting summary judgment to defendant father on mother's claim for negligent infliction of emotional distress after father's negligent driving caused death of their son; defendant did not know that plaintiff was subject to mental disorder and plaintiff did not observe the negligent act); *Andersen v. Baccus*, 335 N.C. 526, 532-533, 439 S.E.2d 136, 139-140 (1994) (granting summary judgment to defendant motorist on claim for negligent infliction of emotional distress brought by plaintiff husband for

death of his wife and stillborn son in automobile accident).  Here, the Duke health care providers' allegedly negligent examination of Mangum, which allegedly led the police to investigate the rape allegation, which led to an investigation of the lacrosse players, which led to anguish for those players, is far too attenuated from Plaintiffs' alleged injuries to support a negligent infliction of emotional distress claim.  In this case, there is no allegation—and there obviously could be no allegation—that any Plaintiff is a close family member of the patient who witnessed the allegedly negligent treatment of the patient.

Plaintiffs' claim also fails because they failed to allege another element of their claim—that they suffered *severe* emotional distress as a result of the alleged conduct.  A claim for negligent infliction of emotional distress will lie only if the plaintiff has suffered a "*severe and disabling* emotional or mental condition which may be generally recognized and diagnosed by professionals trained to do so."  *McAllister*, 347 N.C. at 645, 496 S.E.2d at 583 (internal citation and quotation marks omitted).  Although Plaintiffs offer the conclusory assertion that they suffered "emotional and mental conditions causing disabling emotional, mental, and physical harm" (AC ¶ 1331), the Court should give no weight to legal conclusions cast in the form of factual allegations.  *See Young*, 238 F.3d at 577 (on motion to dismiss, court should give no weight to "conclusory legal terms").  In the absence of allegations that Plaintiffs have been severely affected by the alleged conduct, the emotional distress claim should not go forward.

Finally, Count 33 also fails because—as this Court has previously held—intentional acts, alleged to be committed negligently, cannot make out a claim for negligent infliction of emotional distress.  *See Sabrowski v. Albani-Bayeux, Inc.*, No. 02-CV-728, 2003 WL 23018827, at *5-6 (M.D.N.C. Dec. 19, 2003), *aff'd*, No. 04-1114, 2005 WL 435416 (4th Cir. Feb. 25, 2005); *see also Barbier v. Durham County Bd. of Educ.*, 225 F. Supp. 2d 617, 631 (M.D.N.C. 2002) (Beaty, J.) ("When the plaintiff's complaint alleges acts … that are intentional in nature, and simply concludes that the acts were committed negligently, it is insufficient to state a claim for negligent infliction of emotional distress.").  To the extent that Plaintiffs base their claim on intentional acts, their assertion that the health care providers "were negligent in engaging in this conduct" (AC ¶ 1329) cannot convert this conduct into the basis for a negligent infliction claim.  *See Barbier*, 225 F. Supp. 2d at 631.

> **2.** **The Allegedly Willful Acts Of The Durham Police And Nifong Are Intervening Acts Precluding Liability Of The Duke Defendants**

Even if the Duke health care providers *had* an actionable duty of care to these Plaintiffs, Plaintiffs' negligence claims in Counts 31-33 still fail because none of their alleged injuries was proximately caused by the alleged actions of any of the health care providers.  On Plaintiffs' own pleadings, the allegedly willful actions of Nifong and certain Durham Police officers constitute intervening acts.

North Carolina has long adhered to the principle that the "willful and malicious act of a third person" is an intervening cause that precludes liability of the initial negligent

actor.  *See Ward v. Southern Ry. Co.*, 206 N.C. 530, 530, 174 S.E. 443, 444 (1934); *see also Tise*, 345 N.C. at 460, 480 S.E.2d at 680.  That principle controls this case.

Plaintiffs acknowledge in their own pleading that any injury that Plaintiffs might have suffered as a consequence of having been investigated for a crime was directly caused by the independent and intentional decision of certain Durham Police officers and the District Attorney to investigate them.  According to Plaintiffs, the Durham Police knew of Mangum's "multiple, varying accounts" (AC ¶ 424), and, by March 21, 2006, that "Mangum herself had already eliminated every member of the Duke lacrosse team as a plausible suspect."  (*Id.* ¶¶ 383.)  Yet Nifong decided to continue with the investigation because, in Plaintiffs' words, he was "already committed."  (*Id.* ¶ 593.)  Further, according to Plaintiffs, it was Nifong who continued to make public statements expressing no doubt that a rape had occurred (*id.* ¶¶ 502-503); it was Nifong who directed the Durham police to conduct the April 4, 2006, photo line-up using pictures only of Duke lacrosse players (*id.* ¶¶ 662-664); it was Nifong who concealed exculpatory DNA evidence (*id.* ¶¶ 756, 902); and it was Nifong who decided to proceed with indictments, despite a lack of evidence (*id.* ¶¶ 816-817).  There are no allegations that any health care provider had any part in making or carrying out any of these decisions.  And had Nifong *not* made these decisions, Plaintiffs would have suffered no injury.[22]

---

[22] Plaintiffs' allegations about the handling of the DNA test results are especially telling. Plaintiffs assert that, on March 27, 2006, Nifong learned that the State DNA analysis of the rape kit would be "futile" (*id.* ¶¶ 619-620), and that, on March 28, 2006, the State DNA lab informed one of the Durham Police investigators (and the investigator informed

Thus, on the face of Plaintiffs' own allegations, any conduct by the health care providers could not have been the proximate cause of any harms allegedly suffered by Plaintiffs. The intervening intentional acts of Nifong broke the chain of causation. *See Ford*, 83 N.C. App. at 156, 349 S.E.2d at 83; *Tise*, 345 N.C. at 460, 480 S.E.2d at 680; *see also Food Lion, Inc. v. Capital Cities/ABC, Inc.*, 964 F. Supp. 956, 961 (M.D.N.C. 1997) ("'[I]f the original wrong only becomes injurious in consequence of the intervention of some distinct wrongful act or omission by another, the injury shall be imputed to the last wrong as the proximate cause, and not to that which was more remote.'") (quoting *Presnell v. Payne*, 272 N.C. 11, 12, 157 S.E.2d 601, 602 (1967)).

In addition, the Amended Complaint itself makes clear that the health care providers could not have reasonably foreseen the series of events that led to Plaintiffs' alleged injuries. According to Plaintiffs' own allegations, Nifong directed Gottlieb and Himan to conduct a photographic line-up that violated Durham Police Department procedures and was designed specifically to allow Mangum to identify lacrosse players as her attackers. (AC ¶¶ 662-664.) They further allege that Nifong purposely withheld the

the District Attorney) that the lab tests would produce no DNA match between the rape kit and any member of the lacrosse team. (*Id.* ¶¶ 621, 623.) Plaintiffs further allege that District Attorney and Durham Police investigators conspired to withhold test results that proved that the rape allegations were untrue. (*Id.* ¶¶ 644, 756.) Thus, on Plaintiffs' own allegations, the investigation would have ended, and harm to Plaintiffs would have been averted, on March 30, had Nifong, Gottlieb, and Himan not decided to suppress the test results: "The perversion of the investigation into a media circus would have ended on March 30th, if Nifong, Gottlieb and Himan" had revealed the DNA test results as required by law. (*Id.* ¶ 644.) Plaintiffs do not (and cannot) allege that the health care providers played any part in their non-disclosure.

DNA test results that would have exonerated members of the lacrosse team. (*Id.* ¶¶ 623, 644, 756, 902.) Such extraordinary acts—in particular, actions for which the District Attorney ultimately was disbarred and jailed—could not have been reasonably foreseen by any health care provider. Plaintiffs themselves repeatedly characterize actions by the District Attorney and police investigators as "unprecedented." (AC ¶¶ 373, 493, 600, 644, 647, 1078(E), 1088, 1097.) Where, as here, the health care providers could not have anticipated the events that led to Plaintiffs' alleged injuries, dismissal is warranted. *See Ford*, 83 N.C. App. at 156, 349 S.E.2d at 83 ("An essential element of causation is foreseeability, that which a person of ordinary prudence would reasonably have foreseen as the probable consequence of his acts. A person is not required to foresee all results but only those consequences which are reasonable.") (internal quotation marks omitted); *Williamson v. Liptzin*, 141 N.C. App. 1, 11, 539 S.E.2d 313, 319 (2000); *Tise*, 345 N.C. at 460, 480 S.E.2d at 681; *cf. Warrior & Gulf Navigation Co. v. United States*, 864 F.2d 1550, 1554 (11th Cir. 1989) (determining that defendant's actions were not the proximate cause of plaintiff's injuries where an "unprecedented" event caused the chain of events that led to the alleged damage).[23]

---

[23] A contrary determination would have adverse policy consequences. In essence, Plaintiffs contend that when an individual gives information to the police, that individual will be liable for the subsequent willful misuse of that information by law enforcement officials. That prospect of liability will surely deter witnesses from cooperating with police and prosecutors in the future. Where recovery by Plaintiffs would yield such an undesirable outcome, the Court may and should conclude as a matter of law that the link between the alleged actions and claimed injuries is too attenuated to be actionable. *See Williamson*, 141 N.C. App. at 17, 539 S.E.2d at 323 (relying on "public policy concerns"

### C. Plaintiffs Fail To State A Claim For Intentional Infliction Of Emotional Distress (Count 20)

In Count 20, Plaintiffs allege that Duke Defendants[24] intentionally inflicted

emotional distress on them in two different ways:  First, Plaintiffs allege that Levicy,

Manly, Arico, Dzau, and DUHS conspired with Durham officials to "manufacture

inculpatory forensic evidence and to conceal exculpatory forensic evidence for the

purpose of lending scientific credibility to Mangum's accusation[s]" that a rape had

occurred.  (AC ¶ 1215.)  Second, Plaintiffs allege that Levicy, Arico, Steel, Brodhead,

and Burness made "false, insulting, offensive and inflammatory statements" that were

"calculated to shame" and "humiliate" Plaintiffs.  (*Id*. ¶ 1214.)[25]  These allegations are

insufficient to state a claim for intentional infliction of emotional distress.

---

to decline to impose liability on a psychiatrist for the subsequent actions of an outpatient); *Food Lion*, 964 F. Supp. at 960 (noting that, under North Carolina law, an essential element of the proximate cause inquiry, to be decided by the Court, is "whether the tort-feasor's liability should as a matter of public policy extend to those injuries") (citation omitted).

[24] This Count is also directed at several Duke University Defendants who are not in the Duke SANE Defendants group:  Steel, Brodhead, Burness, Dzau, and Duke University. Those Defendants join in these arguments.

[25] Duke University and PDC are named in the caption of this Count, but there are no factual allegations related to either entity (indeed there is no mention of either).  Because there is no indication of what Duke or PDC did or how they might have injured Plaintiffs, the claim should be dismissed with respect to these Defendants.  *See Tolley v. Kivett*, No. 01-00410, 2002 WL 31163773, at *2 (M.D.N.C. July 1, 2002) (noting that "where the complaint names a defendant in the caption but contains no allegations indicating how the defendant violated the law or injured the plaintiff, a motion to dismiss the complaint in regard to that defendant should be granted") (internal quotation marks and citation omitted).

Under North Carolina law, "[t]he essential elements of an action for intentional infliction of emotional distress are: (1) extreme and outrageous conduct by the defendant (2) which is intended to and does in fact cause (3) severe emotional distress." *Waddle v. Sparks,* 331 N.C. 73, 82, 414 S.E.2d 22, 27 (1992) (internal quotation marks omitted). Plaintiffs' claim fails because they have not adequately pleaded these elements.[26]

North Carolina law imposes very strict standards to satisfy the "extreme and outrageous conduct" requirement. To satisfy that requirement, Plaintiffs must allege (and eventually prove) conduct "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Guthrie*, 152 N.C. App. at 22, 567 S.E.2d at 408-409 (citation omitted). Plaintiffs are unable to satisfy this requirement because, under North Carolina law, reporting a possible crime to the police and prosecutors is not "extreme and outrageous," even if that report is inaccurate—indeed, even if that report is false or fabricated, as alleged here. *See Dobson v. Harris*, 134 N.C. App. 573, 521 S.E.2d 710 (1999), *rev'd on other grounds*, 352 N.C. 77, 530 S.E.2d 829 (2000). In so holding, North Carolina courts have recognized that the law should encourage individuals to report suspicions of crime to the police, and should place the responsibility to

---

[26] Both questions are appropriate for resolution on a motion to dismiss. *See Pruett v. Town of Spindale*, 162 F. Supp. 2d 442, 447 (W.D.N.C. 2001) (holding, on motion to dismiss, that plaintiff had not alleged sufficiently severe emotional distress); *Thomas v. N. Telecom, Inc.*, 157 F. Supp. 2d 627, 635 (M.D.N.C. 2000) (holding, on motion to dismiss, that alleged conduct did not satisfy the "extremely rigorous standard" required for "extreme and outrageous" conduct as a matter of law).

determine whether the reports are well-founded with the public authorities. *See, e.g.*, *Shillington v. K-Mart Corp.*, 102 N.C. App. 187, 196, 402 S.E.2d 155, 160 (1991) (concluding that security guard's reporting of alleged trespass and looting to police, resulting in the police officer's decision to arrest plaintiff, was not "extreme" or "outrageous" conduct).

The North Carolina Court of Appeals' decision in *Dobson* is particularly instructive. The claims in that case, like Plaintiffs' claims here, involved an allegation that the defendant, a department store employee, had made a false report of a serious crime to authorities. In *Dobson*, the plaintiff sued a department store and its employee for falsely reporting to the County Department of Social Services ("DSS") that the plaintiff abused and neglected her child while in the store. The Court of Appeals concluded that, although the employee might have "exaggerated or *fabricated* the events [of child abuse that] she reported to DSS, the report served only to initiate an investigatory process" and therefore was not "extreme" or "outrageous." 134 N.C. App. at 578-579, 521 S.E.2d at 715 (emphasis added). The Court reached this conclusion even though the false report "subject[ed] the reported parent to questioning and investigation." *Id.* at 579, 521 S.E.2d at 715. Here, Plaintiffs' allegation against Levicy, like that against the employee in *Dobson*, is that Levicy falsely provided evidence to the police suggesting

that a crime had occurred.  But *Dobson* and similar cases make clear that Levicy's

statement to the police is not actionable as "extreme" or "outrageous" conduct.[27]

The alleged conduct of Arico is even less susceptible to characterization as

"extreme or outrageous."  Plaintiffs allege that Arico, in a news article, was quoted as

saying that "[y]ou can say with a high degree of certainty that there was a certain amount

of blunt force trauma present to create injury" and that "I can reasonably say these

injuries are consistent with the story she told."  (AC ¶ 784; *see also id.* ¶¶ 300, 790.)

Nothing about these statements "exceed[s] all bounds of decency tolerated by society."

*Guthrie*, 152 N.C. App. at 22, 567 S.E.2d at 408-409 (internal quotation marks

omitted).[28]

The remaining conduct alleged to be "extreme and outrageous" also fails to meet

the rigorous standard for this tort.  Plaintiffs allege that Levicy, Arico, Steel, Brodhead,

and Burness made "false, insulting, offensive and inflammatory statements" that were

---

[27] *See, e.g.*, *Dobson*, 134 N.C. App. at 578-579, 521 S.E.2d at 715; *see also Ausley v. Bishop*, 133 N.C. App. 210, 221, 515 S.E.2d 72, 79-80 (1999) (determining that employer's report to the police that a former employee had embezzled from the company, which resulted in the filing of charges against the employee, was not "extreme and outrageous," even though the allegation was baseless); *Shillington*, 102 N.C. App. at 198, 402 S.E.2d at 161 (concluding that security guard's reporting of alleged trespass and looting to police, resulting in plaintiff's arrest, was not "extreme and outrageous"); *Sullivan v. County of Pender, N.C.*, No. 04-26, 2006 WL 4664321, at *13 (E.D.N.C. June 28, 2006) (determining that the plaintiff's public arrest, on charges that he claimed were "bogus" and were ultimately dropped, did not constitute "extreme and outrageous conduct" because such conduct did not "shock the conscience").

[28] There are no allegations that Manly, Dzau, or DUHS did anything at all to "manufacture inculpatory evidence," other than a bald assertion that they all conspired with Durham officials to do so.  (AC ¶¶ 913, 1215.)  Such a conclusory allegation is insufficient to state a claim.  *See Twombly*, 127 S.Ct. at 1965.

"calculated to shame" and "humiliate" Plaintiffs and to "galvanize the public

condemnation" against them.  (AC ¶ 1214.)  North Carolina law makes clear, however,

that such "insults" and "indignities" are not enough.  *Guthrie*, 152 N.C. App. at 22, 567

S.E.2d at 409; *see also Hogan v. Forsyth Country Club Co*., 79 N.C. App. 483, 492-493,

340 S.E.2d 116, 122-123 (1986).  Certainly, commenting publicly about a matter of

urgent public interest and concern—which is, at bottom, what Plaintiffs allege these

Defendants did[29]—is not "utterly intolerable in a civilized community," even if Plaintiffs

find the content of the statements offensive.  As the North Carolina courts have

explained, there "is no occasion for the law to intervene in every case where someone's

feelings are hurt … [t]here must still be freedom to express an unflattering opinion, and

some safety valve must be left" through which to do so.  *Hogan*, 79 N.C. App. at 493-

494, 340 S.E.2d at 123.

    Plaintiffs' claim also fails because they have not adequately alleged another

essential element of the tort—that they suffered "emotional distress of a *very* serious

---

[29] (*See, e.g.*, AC ¶¶ 462-463 (alleging that Brodhead's public remarks that it was important to "learn the full truth as quickly as possible" and that Duke had "to look to the Durham Police to take the lead in the investigation" and did not "have the power to compel testimony from citizens … and lack[ed] access to warrants, DNA records, and other confidential information" were false and misleading); *id.* ¶¶ 464-465 (alleging that Brodhead and Burness commented publicly that it would be inappropriate for Duke to conduct its own inquiry into the rape charges and instead had to rely on the local authorities to conduct the criminal investigation); *id.* ¶ 535 (alleging that Brodhead and Burness encouraged the lacrosse players "to provide any information they have to the police"); *id.* ¶¶ 581-583 (complaining that Brodhead allegedly did not check with defense counsel before commenting publicly that he found a 911 tape that referenced a racial slur "disgusting").)

kind" as a result of the claimed conduct. *Waddle*, 331 N.C. at 83, 414 S.E.2d at 27

(internal quotation marks omitted) (emphasis added). As explained above, with respect

to Plaintiffs' claim for *negligent* infliction of emotional distress (pp. 28-31), a claim for

emotional distress will lie only if the plaintiff has suffered an "emotional or mental

disorder, such as, for example, neurosis, psychosis, chronic depression, phobia, or any

other type of *severe and disabling* emotional or mental condition which may be generally

recognized and diagnosed by professionals trained to do so." *Id.* (emphasis in original).

Although Plaintiffs assert that they have suffered "diagnosable emotional and mental

conditions causing Plaintiffs disabling emotional, mental, and/or physical harm" (AC

¶ 1222), the Court should give no weight to such legal conclusions cast in the form of

factual allegations. *See Young*, 238 F.3d at 577; *see also Venable v. GKN Auto.*, 107

N.C. App. 579, 584, 421 S.E.2d 378, 381 (1992) (dismissing plaintiff's claim for

intentional infliction of emotional distress where his allegations were "conclusory in

nature" and "failed to allege sufficient facts" to establish the cause of action).

### D. Plaintiffs Fail To State A Claim For Obstruction Of Justice Or Abuse Of Process (Counts 18-19)

Plaintiffs assert two additional common law claims against the health care

providers in Counts 18 and 19, for obstruction of justice and abuse of process. Neither

Count states a valid claim.

## 1.    Count 18 (Obstruction of Justice)

In Count 18, Plaintiffs allege a common law tort of obstruction of justice, claiming that Defendants, "attempted to and did, in fact, prevent, obstruct, impede, and hinder public and legal justice in the State of North Carolina."[30]  (AC ¶ 1190.)  Plaintiffs allege that the Duke Defendants obstructed justice in three ways:  (1) by conspiring to manufacture and manufacturing false and misleading investigative and forensic medical reports (*id*. ¶¶ 1192, 1193); (2) by making false public statements intended to generate public outrage against Plaintiffs (*id*. ¶ 1197); and (3) by "making plans to conceal their participation" in the various conspiracies alleged in the Amended Complaint in order to "defeat or diminish the award of damages in civil actions they assumed would be brought against them and the University" (*id*. ¶ 1198).  North Carolina's obstruction of justice tort

---

[30] This claim is brought against Duke University Defendants and Duke SANE Defendants.  The Duke University Defendants join in this argument.  This cause of action is also alleged as a conspiracy to obstruct public justice.  (AC at p. 375.)  To the extent that Plaintiffs are alleging a separate claim for "conspiracy," that allegation fails because there "is not a separate civil action for civil conspiracy in North Carolina."  *Dove v. Harvey*, 168 N.C. App. 687, 690, 608 S.E.2d 798, 800 (2005) (internal quotation marks omitted).  Recovery for civil conspiracy "must be on the basis of sufficiently alleged wrongful overt acts," *id*. at 690, and as explained in the text, Plaintiffs have failed to allege a substantive claim for abuse of process.  In addition, Plaintiffs have failed to allege adequately a conspiracy between Duke and Durham.  *See* Br. for Duke University Defs. at 8-12.  Plaintiffs do not allege any facts to support an agreement or a meeting of the minds to obstruct justice.  *See Shope v. Boyer*, 268 N.C. 401, 405, 150 S.E.2d 771, 774 (1966) ("We must judge the sufficiency of the complaint by the facts alleged and not by pleader's conclusions.  The repeated use of the words combined, conspired, and agreed together to injure the plaintiff, are … insufficient to state a cause of action and cannot survive the demurrer." (internal citation omitted)).

does not reach such actions, however, and Plaintiffs cannot shoehorn their grievances into a cognizable obstruction claim.

While the North Carolina case law on the tort of obstruction of justice is extremely sparse, in every reported North Carolina case involving the tort,[31] the plaintiff claimed that the defendant took some action that impaired its ability to pursue a *civil* case (usually against the defendant) for redress of an injury.[32]  There are apparently *no* civil obstruction of justice cases in North Carolina involving a criminal suspect as a plaintiff who contended that the defendant's actions facilitated a criminal investigation or prosecution. There is good reason for this absence of criminal-plaintiffs, and even better reason for this Court not to make this cause of action available to aggrieved criminal suspects, in

---

[31] *See, e.g.*, *Henry v. Deen*, 310 N.C. 75, 310 S.E.2d 326 (1984); *Grant v. High Point Reg'l Health Sys.*, 184 N.C. App. 250, 645 S.E.2d 851 (2007) (finding that plaintiff had stated a claim for obstruction of justice), *disc. rev. granted*, 362 N.C. 234, 659 S.E.2d 441 (Mar. 6, 2008); *Broughton v. McClatchy Newspapers, Inc.*, 161 N.C. App. 20, 588 S.E.2d 20 (2003); *Burgess v. Busby*, 142 N.C. App. 393, 544 S.E.2d 4 (2001); *see also Reed v. Buckeye Fire Equip.*, 241 Fed. Appx. 917, 928 (4th Cir. 2007).  The North Carolina Supreme Court has recently granted discretionary review in *Grant v. High Point Regional Health System*, *see* 362 N.C. 234, 659 S.E.2d 441 (Mar. 6, 2008), in which it will consider whether North Carolina law recognizes a civil claim for obstruction of justice for the alleged destruction of evidence by one who is not a party to any pending judicial proceeding at the time of the destruction.

[32] The only North Carolina case that arguably implicates a criminal case is *In re Kivett*, 309 N.C. 635, 309 S.E.2d 442 (1983).  That case involved a civil disciplinary proceeding of North Carolina's Judicial Standards Commission.  The question before the Commission was whether Judge Kivett had engaged in "willful misconduct in office."  Kivett had attempted to prevent the convening of a grand jury that was going to consider an indictment against him.  That conduct, the North Carolina Supreme Court concluded, could support a *criminal* charge of obstruction of justice, which would thereby constitute "willful misconduct in office."  *Id*. at 670, 309 S.E.2d at 462.  The Court did not consider or decide whether criminal suspects could bring civil claims for obstruction of justice for allegedly having been wrongfully investigated for a crime.

particular those who were never formally charged. Allowing criminal suspects to assert obstruction of justice claims against witnesses who provide information to the police during criminal investigations could open the floodgates to litigation by a new and sizeable class of plaintiffs—potentially, anyone who had ever been under investigation by the police. Moreover, expanding this cause of action to include claims by criminal suspects who feel mistreated by the mere fact of their investigation would jeopardize the overriding societal interest in ensuring that alleged crimes are properly investigated.

Extending the cause of action to criminal suspects would also deter witnesses from coming forward with evidence. In *Henry v. Deen*, 310 N.C. 75, 310 S.E.2d 326 (1984), the North Carolina Supreme Court cited this risk as a principal reason that the North Carolina courts have not recognized a civil claim for perjury. By contrast, the Court concluded that this chilling effect did not weigh as heavily in typical obstruction of justice claims because those claims are limited to "potential parties to lawsuits" who commit acts like "falsification or concealment of evidence" in order to "avoid litigation or liability," *id.* at 90, 310 S.E.2d at 336—thus recognizing that the cause of action for obstruction of justice has been available only to disappointed *civil* litigants. To expand the obstruction of justice cause of action to criminal suspects, as Plaintiffs ask this Court to do, would upset the delicate balance established by the North Carolina Supreme Court in *Henry*.[33]

---

[33] Plaintiffs also allege that certain Duke Defendants obstructed justice "by making plans to conceal" their conduct with respect to Mangum's rape accusations in order to "defeat

Plaintiffs' invocation of obstruction of justice appears to reflect the fact that they cannot bring a claim for malicious prosecution under North Carolina law. In North Carolina, a malicious prosecution plaintiff must prove that (1) the defendant instituted, procured, or participated in a criminal proceeding against the plaintiff; (2) without probable cause; (3) with malice; and (4) the criminal proceeding terminated in favor of the plaintiff. *See Cook v. Lanier*, 267 N.C. 166, 169, 147 S.E.2d 910, 913 (1966). Because no criminal proceedings were ever instituted against Plaintiffs, they have no cognizable claim for malicious prosecution. Plaintiffs therefore seek to recover under other theories that do not apply (*e.g.*, common law negligence or obstruction of justice). The law has placed careful and narrow restrictions on the malicious prosecution tort for

---

or diminish the award of damages in civil actions they assumed would be brought against them and the University." (AC ¶ 1198.) Plaintiffs offer only one factual allegation to support this claim: that in January 2007, Larry Moneta allegedly sent an email to senior Duke administrators requesting that they meet to "'get[] their stories straight,'" and that Moneta "directed the recipients of his email to destroy the email immediately." (*Id.*) But Plaintiffs do not allege that any Duke Defendant actually did anything in response to this invitation. And an "invitation to meet," without more, cannot obstruct justice. More importantly, to state a claim for obstruction of justice, a plaintiff must allege facts "as to the disposition" of a civil action or "any [other] showing" that would suggest that a defendant's actions "adversely impacted that case." *Broughton*, 161 N.C. App. at 30, 588 S.E.2d at 33. Here, however, Plaintiffs have failed to allege any facts suggesting that the Duke Defendants' supposed concealments adversely impacted any civil action— including and especially the instant one. In addition, no Duke SANE Defendant is named in paragraph 1198 of the Amended Complaint, and any allegations made therein should be dismissed as to those Defendants.

good reason,[34] however, and the Court should not approve Plaintiffs' effort to escape these limits by shoehorning their claim into a tort theory that does not fit.

## 2. Count 19 (Abuse of Process)

In Count 19, Plaintiffs allege that Duke health care providers deliberately provided the Durham police with "false" medical information, which the Durham police then used to secure the NTID to obtain DNA evidence from the members of the lacrosse team. (*See* AC ¶¶ 1207-1209.) Plaintiffs also allege that the Durham Police improperly "utilized the NTID process for purposes of launching the case into the public spotlight" and thereby subjected Plaintiffs to public criticism. (*Id.* ¶ 1205.) These allegations do not state a claim for abuse of process against the Duke health care providers.

"The distinctive nature of an abuse of process is the improper use of process *after* it has been issued, and *not* for maliciously causing it to issue." *Ellis v. Willons*, 224 N.C. 269, 270, 29 S.E.2d 884, 885 (1944) (emphasis added). Two elements must be proved to recover on an abuse of process claim: (1) the defendant had an ulterior motive to achieve a collateral purpose not within the normal scope of the process used, and (2) the defendant committed some act that is a "malicious misuse or misapplication of that process *after issuance* to accomplish some purpose not warranted or commanded by the writ." *Pinewood Homes, Inc. v. Harris*, __ N.C. App. __, 646 S.E.2d 826, 831 (2007)

---

[34] *See* W. Page Keeton, et al., *Prosser and Keeton on The Law of Torts* § 119, at 871 (5th ed. 1984) ("The individual interest in freedom from unjustifiable litigation and the social interest in supporting resort to law have traditionally been balanced by the requirement that the plaintiffs must prove four elements to establish a malicious prosecution action.").

(internal quotation marks omitted) (emphasis added); *see Beroth Oil Co. v. Whiteheart*, 173 N.C. App. 89, 100, 618 S.E.2d 739, 747 (2005). Thus, to be liable for abuse of process, one must misuse "legal process to compel a person to do some collateral act not within the scope of the process." *Fowle v. Fowle*, 263 N.C. 724, 727, 140 S.E.2d 398, 401 (1965).

Plaintiffs do not, and cannot, allege these elements. First, regardless of what use the Durham *Police* made of the NTID, the Duke *doctors and nurses* made no use of the NTID for any purpose after it issued, and Plaintiffs do not allege otherwise.[35] Since these health care providers never *used* the NTID for any purpose once it was issued, they cannot be liable for having *abused* it.[36] Indeed, no North Carolina case appears to hold that providing information to the police—at least where the individual was not the complaining witness—constitutes abuse of process. This absence of cases is understandable, for it is the police, not the witness providing evidence, who make the decision to secure the process from the court. If the law were otherwise, every witness

---

[35] At most, Plaintiffs allege that certain Duke SANE Defendants (as well as Victor Dzau, Chancellor for Health Affairs for Duke University, who joins in this argument) "acquiesced" in the allegedly false claims about the medical evidence in the NTID or otherwise failed "to correct the public record" of the NTID. (AC ¶¶ 28; 1207-1208.) But Plaintiffs do not allege that any Duke Defendant actually *used* the NTID in any way, much less used it "to accomplish some purpose not warranted" by the NTID. *See Pinewood Homes, Inc.*, __ N.C. App. __, 646 S.E.2d at 831. The NTID was used, moreover, for its intended and proper purpose: to collect evidence that exonerated the players. The Amended Complaint itself makes clear that the only reason that exoneration did not happen within days of the NTID's issuance was Nifong's intentional misconduct. (*See, e.g.*, AC ¶¶ 643, 756, 902.)

who provided information to the police would potentially be a defendant to a lawsuit for abuse of process.

Second, even if (contrary to fact) the Duke health care providers had a malicious purpose in providing information to the police, which the police then used to secure the NTID, Plaintiffs nowhere suggest that defendants misused the NTID *after* it issued for any "collateral purpose." To the contrary, the police used the NTID for exactly the purpose for which it was issued—to secure DNA samples from members of the lacrosse team. "There is no abuse of process where it is confined to its regular and legitimate function…" *Mfrs. & Jobbers Fin. Corp. v. Lane*, 221 N.C. 189, 196-97, 19 S.E.2d 849, 853 (1942). The fact that the collection of these DNA samples also happened to result in "public condemnation, public outrage, and infamy" (AC ¶ 1205) is of no legal significance so long as these alleged consequences flowed from the regular and legitimate use of the NTID process, as it did here.[37]

---

[37] *See Sara Lee Corp. v. Pro Sports, Inc.*, No. 03-00276, 2004 WL 537926, at *4-5 (M.D.N.C. Mar. 12, 2004) (rejecting a claim for abuse of process alleging that "that Sara Lee, relying on its economic power … is bringing, this action in order to assert a far greater trademark right than that which it knows it actually has, and thereby hopes defendant will capitulate" because such allegations could not establish that Sara Lee was "using this action for any purpose outside the legitimate scope of relief obtainable in such actions"); *Crutcher v. Coleman*, No. 01-2048, 2003 WL 21077433, at *1-2 (D. Kan. May 9, 2003) (dismissing an abuse of process claim, which alleged that defendant improperly used "litigation to harass and punish," because the "the law imposes no liability for abuse of process if a defendant has done nothing more than carry out the process to its logical conclusion"); *see generally* W. Page Keeton, et al., *Prosser and Keeton on The Law of Torts* § 121, at 898 (5th ed. 1984) ("[T]here is no liability where the defendant has done nothing more than carry out the process to its authorized conclusion.") (citing *Barnette v. Woody*, 242 N.C. 424, 88 S.E.2d 223 (1955)).

Similarly, the North Carolina Supreme Court has long held that a cause of action for abuse of process does *not* "arise out of the issuance of the process alone." *Melton v. Rickman*, 225 N.C. 700, 704, 36 S.E.2d 276, 278 (1945); *see Vista Food Exch., Inc. v. Joyce Foods, Inc.,* No. 96-0012, 1996 WL 122419, at *5 (S.D.N.Y. Mar. 20, 1996) (Mukasey, J.) (applying North Carolina law and explaining that "issuance of process alone is not enough—the process used must involve an unlawful interference with one's person or property after the judicial process appropriately has been invoked"). But here, the basis of Plaintiffs' complaint is that the issuance of the NTID *itself* "touched off" a "media firestorm" that subjected Plaintiffs to public condemnation. (AC ¶ 1205.) Under well-settled North Carolina law, however, allegations that the mere issuance of the NTID caused the public condemnation are not sufficient to state a claim for abuse of process. *See Melton*, 225 N.C. at 704, 36 S.E.2d at 278.[38]

---

[38] Finally, to the extent Plaintiffs allege a separate claim for "conspiracy" to engage in abuse of process, that allegation also fails because, as explained *supra* note 30, North Carolina law does not recognize an independent cause of action for civil conspiracy. At a minimum, Count 19 should be dismissed as to all the other Duke Defendants named in this Count (who join in these arguments) because it does not plead—even in a conclusory manner—any conspiracy involving Duke University or the Crisis Management Team (CMT). Indeed, the claim does not state *any* basis for liability for Duke or the CMT, and the claim does not make any allegation that Duke or the CMT should be held vicariously liable under theories of express authorization, ratification, or *respondeat superior*.

## VI.    CONCLUSION

The Amended Complaint against the Duke SANE Defendants should be dismissed

in its entirety for failure to state a claim on which relief may be granted.


/s/ Dan J. McLamb
_____
Dan J. McLamb
N.C. State Bar No. 6272
Yates, McLamb & Weyher, LLP
421 Fayetteville Street, Suite 1200
Raleigh, N.C. 27601
Telephone: (919) 835-0900
Facsimile: (919) 835-0910
Email: dmclamb@ymwlaw.com


/s/ Jamie S. Gorelick
_____
Jamie S. Gorelick
District of Columbia Bar No. 101370
Wilmer Cutler Pickering Hale and Dorr LLP
1875 Pennsylvania Ave., N.W.
Washington, D.C. 20006
Telephone: (202) 663-6500
Facsimile: (202) 663-6363
Email: jamie.gorelick@wilmerhale.com

## CERTIFICATE OF SERVICE

I hereby certify that on July 2, 2008, I electronically filed the foregoing Brief in Support of "Duke SANE Defendants'" Motion to Dismiss Amended Complaint with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

*Counsel for the Plaintiffs*
Robert C. Ekstrand
Email: rce@ninthstreetlaw.com

*Counsel for City of Durham and Edward Sarvis*
Reginald B. Gillespie, Jr.
Email: rgillespie@faison-gillespie.com

*Counsel for Patrick Baker, Steven Chalmers, Ronald Hodge, Lee Russ, Stephen Mihaich, Beverly Council, Jeff Lamb, Michael Ripberger, and Laird Evans*

Patricia P. Kerner
Email: tricia.kerner@troutmansanders.com

D. Martin Warf
Email: martin.warf@troutmansanders.com

Hannah Gray Styron
Email: hannah.styron@troutmansanders.com

*Counsel for James T Soukup, Kammie Michael, David Addison, Richard D. Clayton*
James B. Maxwell
Email: jmaxwell@mfbpa.com

*Counsel for Mark Gottlieb*
Edwin M. Speas, Jr.
Email: espeas@poynerspruill.com

Eric P. Stevens
Email: estevens@poyners.com

*Counsel for Benjamin Himan*
    Henry W. Sappenfield
    Email:  hsappenfield@kennoncraver.com

    Joel Miller Craig
    Email:  jcraig@kennoncraver.com

*Counsel for DNA Security, Inc., Richard Clark*
    Kearns Davis
    Email:  kdavis@brookspierce.com

    Robert James King, III
    Email:  rking@brookspierce.com

*Counsel for J. Wesley Covington*
    Kenneth Kyre, Jr.
    Email:  kkyre@pckb-law.com

*Counsel for Brian Meehan*
    James Avery Roberts, III
    Email:  jimroberts@lewis-roberts.com

As of the date of this filing, no attorneys have made an appearance on behalf of the following Defendants.  I hereby certify that I served the following Defendants by U.S. Mail:

Linwood Wilson
6910 Innesbrook Way
Bahama, NC 27503-9700

This 2d day of July 2008.

        /s/ Jamie S. Gorelick
        Jamie S. Gorelick

        Attorney for Duke University Health System, Inc., the Private Diagnostic Clinic, PLLC, Theresa Arico, Tara Levicy, and Dr. Julie Manly