**UNITED STATE DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**
**DURHAM DIVISION**

**File No. 1:07-CV-00953**

RYAN McFADYEN, MATTHEW WILSON;
and BRECK ARCHER,

Plaintiffs,

vs.

DUKE UNIVERSITY et. al,

Defendants.

**MEMORANDUM IN SUPPORT OF DEFENDANT**
**MARK GOTTLIEB'S MOTION TO DISMISS COMPLAINT**

This is one of three civil lawsuits brought by members of the 2006 Duke University Lacrosse Team as the result of rape allegations made by Crystal Mangum. The three young men who are plaintiffs here were never accused of or charged with committing any crime based on Ms. Mangum's allegations. Plaintiffs nevertheless allege that their rights have been violated in two ways. Primarily, Plaintiffs contend that their federal constitutional rights were violated (1) when they were compelled to provide DNA samples and photos pursuant to an order issued by Superior Court Judge Ronald Stephens and (2) when Plaintiff Ryan McFadyen's dormitory room was searched pursuant to a search warrant also issued by Judge Stephens. Secondarily, Plaintiffs assert a series of imaginative claims under both federal and state law based on the notion that their rights were violated because, as members of a group of persons who were present at a party where an alleged rape occurred, they were the subjects of scrutiny in a criminal investigation they contend lasted longer than it should have.

Through this Memorandum, Sgt. Mark Gottlieb ("Sgt. Gottlieb") respectfully requests the Court to dismiss all claims asserted against him in the Plaintiffs' Amended Complaint on grounds that they fail to state a claim upon which relief may be granted against him under Rule 12(b)(6) of the Federal Rules of Civil Procedure. As this Memorandum and the Memorandum filed by the City of Durham (which is incorporated herein by reference) explain, there were ample grounds for Judge Stephens to issue the orders allowing police to obtain DNA samples and photos from the Plaintiffs and to search Ryan McFadyen's room. As also explained in this Memorandum, there is no recognized legal theory under which Plaintiffs, who were never accused of or charged with any crime, are entitled to recover damages merely because a criminal investigation placed them under unwelcome scrutiny.

## STATEMENT OF FACTS

Given its epic 431 page length, the Amended Complaint contains a remarkably limited set of concrete factual allegations that purport to describe conduct of Sgt. Gottlieb towards the three Plaintiffs. Shorn of hyperbole and put in reasonable perspective, the Amended Complaint alleges in essence the following:

Late on the evening of Monday, March 13, 2006, most of the members of the Duke Lacrosse Team, including the three Plaintiffs here, attended a party at a house at 610 N. Buchanan Street in a neighborhood near Duke University. The "entertainment" for this week-day evening was a sexually suggestive performance by two nude or partially clad young women.

In the early morning hours of Tuesday, March 14, one of these young women, Crystal Mangum, was found by a Durham Police Department officer feigning unconsciousness in a car near Duke University. (Amend. Compl. ¶ 232). After a mental health evaluation, she was eventually taken to Duke University Hospital. (Amend. Compl. ¶ 252). Ms. Magnum was at Duke Hospital for approximately 11 hours. (Amend. Compl. ¶ 293). Her statements to various medical personnel and law enforcement officers during this period were not consistent. (*Id*.). She did allege that she had been sexually assaulted by men attending the party at 610 N. Buchanan Street. In the expressed opinion of the Sexual Assault Nurse Examiner who participated in her examination that morning, Ms. Mangum's symptoms and behavior during this time were consistent with a sexual assault. (Amend. Compl. ¶ 781).

On Thursday, March 16, Ms. Mangum told Sgt. Gottlieb and Inv. Benjamin Himan that she had been sexually assaulted that night by three white men. (Amend. Compl. ¶ 362). The same day, the three players who lived at 610 N. Buchanan Street were interviewed by Durham Police Department officers and voluntarily provided DNA samples and photographs. Duke officials urged the other members of the Lacrosse Team, including the Plaintiffs, also to cooperate with the Durham Police Department. (Amend. Compl. ¶ 403). Present counsel for Plaintiffs persuaded the plaintiffs and other players not to talk to law enforcement officers voluntarily or to provide DNA samples and photographs to them. (Amend. Compl. ¶'s 411-12).

On Thursday, March 23, soon after Plaintiffs declined to cooperate voluntarily with the Durham Police Department, Assistant District Attorney Saacks applied for a nontestimonial identification order (the "NTO Application") seeking to require the members of the Lacrosse Team, including the Plaintiffs, to provide DNA samples and photographs. (Amend. Compl. ¶ 415). The NTO Application was supported by an affidavit from Defendant Inv. Benjamin Himan. Superior Court Judge Ronald Stephens issued the NTO requested by Assistant District Attorney Saacks.[1]

Before Sunday, March 26, Plaintiffs' counsel had gathered overwhelming evidence of Plaintiffs' innocence, but this information was not shared with the District Attorney or the Durham Police Department. (Amend. Compl. ¶ 562). The next day, Monday, March 27, Sgt. Gottlieb obtained an e-mail written by Plaintiff McFayden in which he wrote in part: "I've decided to have some strippers" come to my dorm room tomorrow night and "I plan on killing the bitches as soon as they walk in." (Amend. Compl. ¶ 592). There is no allegation that this e-mail was obtained unlawfully. Based on the same information provided in the prior NTO Affidavit, supplemented with a copy of Plaintiff McFayden's threatening email, a search warrant was issued through which investigators searched Plaintiff McFayden's dorm room.[2] (Amend. Compl. ¶ 611).

---

[1] Copies of the NTO Application and the NTO entered by Judge Stephens are being filed herewith as Exhibit 1. A Court may consider documents referenced in the Complaint in determining whether to grant a Rule 12(b)(6) motion so long is there is no question about the authenticity of the documents. *Phillips v. LCI Int'l Inc.*, 190 F.3d 609, 618 (4th Cir. 1999).

[2] A copy of the application for a warrant to search Ryan McFayden's room is attached hereto as Exhibit 2.

After March 27, none of the Plaintiffs were again compelled to participate in the Durham Police Department's investigation of Ms. Mangum's allegations. On April 10, Plaintiffs' counsel was informed that the DNA tests conducted by the SBI did not match the Plaintiffs' DNA. (Amend. Compl. ¶ 800). Around April 21, Plaintiffs' counsel was informed that Ms. Magnum had not identified any of his clients as the persons who raped her on March 12 at 610. N. Buchanan St. (Amend. Compl. ¶ 679).

None of the Plaintiffs has ever been charged, indicted, or tried in connection with any crime based on the events at 610 N. Buchanan St. on the evening of March 13-14, 2006.

## STANDARD OF REVIEW

Under the newly established standard for determining whether to dismiss a complaint under Rule 12(b)(6), the Court must dismiss a complaint unless the plaintiff has alleged "plausible" facts that state a claim for relief. *See Bell Atl. Corp. v. Twombly*, __ U.S. __, 127 S. Ct. 1955, 1973-74, 167 L. Ed. 2d 929 (2007). The case of *Robbins v. Okla. ex rel. Dep't of Human Servs.*, 519 F.3d 1242 (10th Cir. 2008) recently provided an in-depth examination of how this new standard should be applied to a claim that governmental officials are entitled to qualified immunity from suit under 42 U.S.C. § 1983. The Court explained that the term "plausibility" as used by the Supreme Court in *Twombly* "must refer to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs

'have not nudged their claims across the line from conceivable to plausible'" *Robbins, supra*, at 1247, *quoting Twombly, supra*, 127 S. Ct. at 1974.

The court in *Robbins* then explained the special considerations that apply to a court's evaluation of a motion to dismiss based in part upon qualified immunity:

> Although we apply "the same standard in evaluating dismissals in qualified immunity cases as to dismissals generally," *Shero v. City of Grove, Okl.*, 510 F.3d 1196, 1200 (10th Cir. 2007), complaints in § 1983 cases against individual government actors pose a greater likelihood of failures in notice and plausibility because they typically include complex claims against multiple defendants. The *Twombly* standard may have greater bite in such contexts, appropriately reflecting the special interest in resolving the affirmative defense of qualified immunity "at the earliest possible stage of a litigation." *Anderson*, 483 U.S. at 646 n. 6; *Harlow*, 457 U.S. at 818. Without allegations sufficient to make clear the "grounds" on which the plaintiff is entitled to relief, *Twombly*, 127 S. Ct. at 1965 n. 3, it would be impossible for the court to perform its function of determining, at an early stage in the litigation, whether the asserted claim is clearly established.

*Robbins, supra*, 519 F.3d at 1249.

In this case, the Court must carefully weed out the many generalized allegations speculating that various groups of people engaged in wide ranging conspiracies from plausible allegations that Sgt. Gottlieb engaged in identifiable actions that violated the Plaintiffs' clearly established rights. *See Robbins, supra*, at 1250 ("Given the complaint's use of either the collective term "Defendants" or a list of the defendants named individually but with no distinction as to what acts are attributable to whom, it is impossible for any of these individuals to ascertain what particular unconstitutional acts they are alleged to have committed"). Considered in this context, the Amended

Complaint fails to state a claim against Sgt. Gottlieb under Rule 12(b)(6) and must be dismissed.

## ARGUMENT

**I.**   **PLAINTIFFS' FIRST CAUSE OF ACTION SHOULD BE DISMISSED BECAUSE THE NTO AFFIDAVIT PROVIDED AMPLE GROUNDS FOR JUDGE STEPHENS' ISSUANCE OF THE NTO**

On March 23, 2006, ten days after the date Crystal Mangum claimed she was raped, Assistant District Attorney David Saacks filed an application for a nontestimonial order ("NTO") requiring white members of the Duke Lacrosse team to provide current photos showing their current hair styles, complexion, and body mass; mouth swabbings for DNA to compare against DNA collected from Ms. Mangum's rape kit; and photographs of the players' upper extremities. (Ex. 1 hereto, Amend. Compl. ¶ 415). At 4:00 P.M. on March 23, Superior Court Judge Ron Stephens issued the non-testimonial order requested by ADA Saacks. (Ex. 1).

The players, who were represented by counsel at the time, (*see* Amend Compl. ¶ 411), had the right to object to the NTO and seek a hearing challenging its validity. *See Franks v. Delaware*, 438 U.S. 154, 171, 98 S. Ct. 2674, 57 L. Ed. 2d 667 (1978). They chose to comply with the NTO without objection. On March 28, 2006, five days after the NTO was entered,  the players issued a joint press release in which they denied that a sexual assault occurred and informed the public: "The team has cooperated with the police in their investigation. We have provided authorities with DNA samples." (Amend. Compl. ¶ 563). No DNA from the Plaintiffs was ever found in testing of materials from

Mangum's rape kit or other materials found at 610 N. Buchanan, and none of the Plaintiffs was ever charged with a crime.

Plaintiffs now assert in their first cause of action that the NTO with which they "cooperated" constituted an unreasonable search and seizure in violation of their constitutional rights. Because Plaintiffs are challenging an order that required them to provide saliva swabs, the Fourth Amendment governs their claim, and the constitutional standard governing their claim is the "reasonable suspicion" standard. *In re Shabazz*, 200 F. Supp. 2d 578, 585 (D.S.C. 2002)(and cases cited therein). The "reasonable suspicion" standard "is a less demanding standard than the probable cause standard . . . [and] fall[s] 'considerably short of satisfying a preponderance of the evidence standard.'" *United States v. McCoy*, 513 F.3d 405, 411 (4th Cir. 2008)(*citing Alabama v. White*, 496 U.S. 325, 330 (1990) and *quoting United States v. Arvizu*, 534 U.S. 266, 274 (2002)).

To prevail, Plaintiffs must overcome the presumption of validity that attaches to the NTO Affidavit. *Franks v. Delaware, supra,* at 171. Plaintiffs must show that the NTO Affidavit contained deliberate or reckless falsehoods or omissions. *Id*.; *Miller v. Prince George's County*, 475 F.3d 621, 628, *cert. denied*, __ U.S. __, 128 S. Ct. 109, 169 L. Ed. 2d 24(2007). The only false statements to be considered are those of the affiant – the affiant is entitled to rely upon statements from witnesses so long as those statements are truthfully reported. *Franks, supra*, at 171. If reasonable suspicion would exist upon review of the NTO Affidavit after removal of any allegedly tainted materials, then

Plaintiffs' claim must fail. *Franks, supra* at 172, *Miller v. Prince George's County, supra*, at 628.

The Amended Complaint points to specific portions of the NTO Affidavit which it asserts were both "fabricated" and "material" to the decision to issue the NTO. (Amend. Compl. ¶ 911). The specific "fabricated" portions of the NTO upon which the Plaintiffs rely are:

1.    The NTO Affidavit states: "one male stated to the woman 'I'm gonna shove this up you' while holding a broom stick up in the air so they could see it." Plaintiffs acknowledge that Sgt. Gottlieb and Inv. Himan "learned of the broomstick exchange" from statements provided by the residents of 610 N. Buchanan, but they allege that "no witness" ever used the specific words quoted in the affidavit. (Amend. Compl. ¶'s 421,22).

2.    The NTO Affidavit asserts that four red polished fingernails of Mangum were found at 610 N. Buchanan and this was consistent with Mangum's claim that her nails broke off while she was clawing at one of her attackers' arms during the alleged assault. According to the Amended Complaint, Mangum never claimed she lost her fingernails in a struggle and officers failed to explain that they also found unpainted fingernails at the residence. (Amend. Compl. ¶ 424).

3.    The NTO Affidavit contains the following statement: "the victim stated she did not think the names the suspects were providing her were their own." Plaintiffs allege that this statement is "false and did not come from Mangum." (Amend. Compl. ¶ 431). The plaintiffs acknowledge, however, that the following statement also contained in the NTO Affidavit is accurate: "In a non-custodial interview with Daniel Flannery, resident of 610 N. Buchanan and Duke Lacrosse Team Captain, Mr. Flannery admitted to using an alias to make the reservation to have the dancers attend the Lacrosse Team Party." (Amend. Compl. ¶ 432).

4.    Finally, the NTO Application states: "In addition, the witness/co-worker stated that the men at the party told her that they were members of the Duke Baseball Team and Track Team to hide the true identity of their sports affiliation." (Amend. Compl. ¶ 435). The Amended Complaint does not specifically allege that officials misreported what they were told by the

"witness/co-worker," but asserts that it was obvious that team members were not trying to hide their identity because the walls were covered in posters and banners bearing the words "Duke Lacrosse." (Amend. Compl. ¶ 436).

Assuming, for purposes of this motion to dismiss only, that these specific portions of the NTO Affidavit were fabricated, it remains clear that Judge Stephens had ample grounds to issue the NTO based upon the remaining allegations set forth in the NTO Affidavit. After removing these alleged offending materials, the NTO Affidavit includes the following material assertions:

1.    A 27 year old black female reported that she had been raped and sexually assaulted at 610 N. Buchanan Road after arriving there to perform a routine at 11:30 p.m. on 3/13/2006.

2.    She reported that three males forcefully raped and sexually assaulted her in the bathroom of that residence.

3.    She was "treated and evaluated at Duke University Medical Center Emergency Room shortly after the attack took place," a "Forensic Sexual Assault Nurse (SANE) and Physician conducted the examination," "[m]edical records and interviews that were obtained by a subpoena revealed the victim had signs, symptoms, and injuries consistent with being raped and sexually assaulted vaginally and anally," and "the SANE nurse stated the injuries and her behavior were consistent with a traumatic experience."

4.    The three residents of 610 N. Buchanan "stated during the non-custodial interviews that their fellow Duke Lacrosse Team Members were the ones who attended this party," that "[t]hey knew everyone there, and stated there were no strangers who showed up at the event."

5.    The woman's make up bag, cell phone, and identification were found during execution of the search warrant at 610 N. Buchanan along with a pile of twenty dollar bills totaling $160.00 consistent with the woman's claim that $400 had been taken from her purse following the rape.

Plaintiffs do not contend in the Amended Complaint that Inv. Himan or Sgt. Gottlieb fabricated any of these assertions, which fairly reported information investigators had been provided by Crystal Mangum, SANE Nurse Tara Levicy, and the residents of 610 N. Buchanan.[3]

These assertions were more than sufficient to justify the decision of Judge Stephens to issue the NTO. "[P]olice officers, when making a probable cause determination, are entitled to rely on the victims' allegation that a crime has been committed." *Martinez v. Simonetti*, 202 F.3d 625, 634 (2d Cir. 2000). A victim's accusation that a sexual assault occurred has been adjudged sufficient, "standing alone," to establish probable cause. *See Ahlers v. Schebil*, 188 F.3d 365, 370-71 (6th Cir. 1999).

In this case, of course, investigators did not have to rely upon Ms. Mangum's statement "standing alone" because her statements were corroborated by documents and the assertion of the SANE nurse that Mangum had medical signs and symptoms consistent with her rape and assault allegations. In the words of the Complaint filed by 38 *other* members of the Duke Lacrosse team in a parallel lawsuit, "Duke Hospital's sexual assault examiner advised Durham police, in effect, that a rape had likely occurred." Complaint, *Carrington v. Duke University*, No. 1:08-CV-119, ¶ 154. Officers also had information collected from the alleged crime scene and information from the three residents of the house that corroborated aspects of Mangum's allegations. In short, after

---

[3] The Amended Complaint asserts that police officers and the SANE nurse entered into an alleged conspiracy *after* the NTO was issued to fabricate certain parts of the medical reports to provide additional after-the-fact corroboration of information developed earlier. (Amend. Compl. ¶ 779).

removing the alleged "fabricated" portions of the NTO Affidavit, ample grounds still existed for Judge Stephens to issue the NTO

Courts in the Fourth Circuit have made plain that police officers are duty bound to investigate allegations of criminal activity even when there may be questions about the credibility of the complaining witness. "Neither a police officer nor a magistrate is in a position to engage in a credibility evaluation of a complaining witness. That is an assessment made at trial . . . It might well be that there was some reason to doubt [the accuser], but she was a complaining witness who could not be ignored." *Smith v. Reddy*, 882 F. Supp. 497, 502 (D. Md. 1995)(denying attack on the validity of an arrest warrant despite the omission of information regarding the complaining witness' intoxication and background).

In refusing a plaintiff's challenge to a search warrant based almost entirely upon the statement of a complaining witness who gave multiple conflicting accounts of how he was found injured, the Fourth Circuit in *Torchinsky v. Siwinski*, 942 F.2d 257, 262 (4th Cir. 1991) said:

> Criminal investigations are often conducted under trying conditions over which officers have limited control. Here, for example, there was only one witness to a brutal attack, the victim himself. Ideally, of course, additional witnesses would have been available and the victim would not have been so brutalized. In reality, however, the police were compelled to take the victim as they found him and do the best they could under the circumstances.

*Id*. at 263. Certainly in this case, in the early stages of investigation of an alleged violent sexual assault and without the benefit of hindsight, it was appropriate and prudent for law

enforcement officers to seek identifying information that was simple and unintrusive to obtain and – at the very least -- would have a high probability of determining whether one or more of the persons who attended the party on March 13 should be the subject of further investigation.

Indeed, affirmative allegations in the Amended Complaint belie any claim that the NTO would not have issued but for the "fabricated" allegations. The Amended Complaint specifically alleges that a prior Probable Cause Affidavit – which did not include any of the alleged fabricated details -- "was sufficient to obtain a Search Warrant for 610 N. Buchanan" and that the police "as a practical matter" could have obtained the NTO by simply taking the assertions from that prior affidavit and adding "an allegation that each individual on the team was present at the party." (Amend Compl. ¶ 415). In other words, the Plaintiffs affirmatively allege that the police could have obtained the NTO even if every assertion they claim was "fabricated" was excised from the NTO Affidavit. They assert that the purpose for inserting these new "fabricated" allegations was not to obtain the NTO, but rather "to ignite public outrage at the Plaintiffs." (Amend Compl. ¶ 416). Having explicitly claimed that the "fabricated" statements in the NTO Affidavit were not necessary "as a practical matter" to obtain the NTO, Plaintiffs cannot simultaneously assert that the same statements were "material" to the NTO.

Even if this Court determined that Sgt. Gottlieb somehow violated Plaintiffs' constitutional rights through his participation in the drafting of the NTO Application, the doctrine of qualified immunity requires this Court to dismiss the First Cause of Action

because there is no clearly established constitutional right to avoid a "seizure" executed after a police sought and obtained a court order based upon a purported victim's statement that a rape occurred and corroborating medical evidence. *Saucier v. Katz*, 533 U.S. 194, 201, 121 S. Ct. 2151, 2156, 150 L. Ed. 2d 272, 281 (2001)(qualified immunity requires dismissal of civil rights claim unless officer violated a constitutional right of plaintiff that was clearly established at the time of the alleged violation). Plaintiffs' first cause of action must be dismissed.

## II.   PLAINTIFFS' SECOND CAUSE OF ACTION AGAINST SGT. GOTTLIEB MUST BE DISMISSED BECAUSE IT IS UNTHINKABLE POLICE WOULD NOT CONDUCT A FURTHER INVESTIGATION AFTER REVIEWING RYAN MCFADYEN'S DISTURBING EMAIL

According to the tale told by the Amended Complaint, Sgt. Gottlieb and Inv. Himan briefed District Attorney Nifong concerning problems with the investigation of Mangum's claims on March 27th, four days after the NTO was issued. The District Attorney responded by instructing the officers to "obtain incriminating email evidence." Sgt. Gottlieb complied with this request in extraordinary fashion *ten minutes later*. (Amend. Compl. ¶594). He obtained a horrific email written by Plaintiff Ryan McFadyen from e-mail address [ryan.mcfayden@duke.edu](mailto:ryan.mcfayden@duke.edu) at 1:58 a.m. on the morning of March 14, just after the rape allegedly occurred. The email said:

> To whom it may concern:
>
> tomorrow night, after tonight's show, I've decided to have some strippers over to edens 2c. all are welcome.. however there will be no nudity. i plan on killing the bitches as soon as they walk in and proceeding to cut their skin off while cumming in my duke spandex. all in besides arch and tack please respond.

Exhibit 2.

In accordance with the District Attorney's instructions, Sgt. Gottlieb and Inv. Himan prepared a warrant application to search Plaintiff McFayden's dorm room and automobile. (Amend Compl. ¶ 611). The application was supported by an affidavit signed by Inv. Himan. (Ex. 2). Except for the addition of the contents of Plaintiff McFayden's e-mail, the affidavit supporting the request to search Plaintiff McFayden's dormitory room and automobile is identical to the affidavit supporting the affidavit of Mr. Himan supporting the NTO issued by Judge Stephens on March 23. Superior Court Judge Ronald Stephens issued the requested search warrant under seal on March 27, and investigators conducted the search. (Amend. Compl. ¶'s 611, 613).

In their Second Cause of Action, Plaintiffs contend that investigators did not have probable cause to request the search warrant for McFadyen's room. In determining whether to issue a search warrant, a magistrate or judge must decide based upon the "totality of circumstances" whether probable cause exists. *Illinois v. Gates*, 462 U.S. 213, 238, 103 S. Ct. 2317, 2332, 76 L. Ed. 2d 527 (1983). This standard "is not defined by bright lines and rigid boundaries. Instead, the standard allows a magistrate to review the facts and circumstances as a whole and make a common sense determination of whether 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *United States v. Williams*, 974 F.2d 480, 481, (4th Cir. 1992)(*quoting Gates*, 462 U.S. at 238). The duty of a reviewing court is simply to ensure that the

magistrate had "substantial basis for . . . [concluding]" that probable existed. *Gates*, *supra*, 462 U.S. at 238-239.

Here, the circumstances before Judge Stephens included the facts that: (1) Ryan McFadyen's email was discovered just two weeks into the criminal investigation of the alleged gang rape of an exotic dancer; (2) Ryan McFadyen was almost certainly present at the scene of the alleged gang rape; and (3) he wrote a threatening email within a couple of hours after the rape allegedly occurred in which he described a grotesque plan to take perverse sexual pleasure from the murder of strippers before an audience. In addition, Judge Stephens had before him all the information that had been previously included in the NTO Affidavit, pursuant to which he had granted the NTO just four days earlier.[4] There is simply no question that the police and Judge Stephens had ample basis under the totality of these circumstances to conclude that a search of Ryan McFadyen's room could provide evidence material to the investigation of Crystal Mangum's claims.

Despite conclusory allegations to the contrary, Plaintiffs' Amended Complaint essentially concedes that probable cause existed. Plaintiffs acknowledge that "[i]t was plainly obvious that the facts alleged in the application for the NTID Order were sufficient to obtain Judge Stephens authorization to search Ryan's dorm room." Plaintiffs make this admission in the course of alleging that the contents of the email should not have been included in the application because a warrant would have issued even without

---

[4] The sufficiency of the NTO Affidavit to establish probable cause – even after removing portions that were allegedly "fabricated -- was discussed in detail in Section I of this Memorandum.

this additional information. (Amend. Compl. ¶ 596). Plaintiffs cannot escape the logical conclusion that if the warrant application contained more than enough information to justify the issuance of the warrant, then it certainly contained enough.[5] Plaintiffs' Second Cause of Action against Sgt. Gottlieb is insufficient, if not frivolous, and must be dismissed.[6]

## III. PLAINTIFFS' REMAINING FEDERAL CONSTITUTIONAL CLAIMS MUST BE DISMISSED ON GROUNDS OF QUALIFIED IMMUNITY BECAUSE PLAINTIFFS HAVE NO CLEARLY ESTABLISHED RIGHT TO AVOID BEING THE SUBJECTS OF AN INVESTIGATION

Plaintiffs were never charged with or indicted for a crime arising from the investigation of Crystal Mangum's claims. Other than obtaining their DNA and searching Ryan McFadyen's room (actions demonstrated above to be fully justified under the Fourth Amendment), Plaintiffs do not contend that Sgt. Gottlieb engaged in any conduct that deprived them of liberty -- or that he interacted with the Plaintiffs at all.

Generally, claims that the subject of a criminal investigation was deprived of his rights during the period before a criminal trial occurs are governed by the Fourth

---

[5] Plaintiffs contend it was "obvious that Ryan's email was a parody of a book or movie that was readily identifiable as such to the recipients of the email" and that the movie in question was the subject of courses at Duke. (Amend. Compl. ¶'s 603-04). Plaintiffs do not allege that Sgt. Gottlieb saw the movie in question, took any of the courses at Duke that discussed the movie, or found humor in the fact that Ryan McFadyen was authoring this "parody" at approximately the same time in which Crystal Mangum was describing an alleged gang rape to medical personnel.

[6] Alternatively, this claim must be dismissed on grounds of qualified immunity because Plaintiff McFadyen had no clearly established right to avoid having his dorm room searched based upon the circumstances described in the affidavit presented to Judge Stephens.

Amendment. *Albright v. Oliver*, 510 U.S. 266, 274, 114 S. Ct. 807, 127 L. Ed. 2d 114 (1994)( "The Framers considered the matter of pretrial deprivations of liberty and drafted the Fourth Amendment to address it").   In addition to their inadequate Fourth Amendment claims based upon the NTO and the McFadyen search warrant, however, Plaintiffs have tried to assert several constitutional claims based upon the unprecedented notion that Plaintiffs had a constitutional right, apart from their Fourth Amendment right to be free from unreasonable searches and seizures, to avoid being scrutinized as members of a group of persons under investigation because they were present at a party where a woman was allegedly raped.

Thus, Plaintiffs contend: that they have a constitutional right to avoid being subjected to investigative procedures – regardless of whether probable cause existed for those procedures – if the motives of the investigators were allegedly impure (e.g., Cause of Action 3, alleging it was an "abuse of process" to seek the NTO and Search Warrant for alleged improper purpose; Cause of Action 9, alleging defendants took investigative actions in retaliation for Plaintiffs' decision not to agree to voluntary police interviews); that the investigation caused them to suffer unconstitutional injuries to their reputations (e.g., Cause of Action 5 for "false and stigmatizing statements"); that Sgt. Gottlieb participated in acts of fabrication or concealment of evidence that were unconstitutional because they allegedly prolonged the investigation (Causes of Action 4, 6, and 7); and that the manner in which the investigation was conducted was somehow influenced by

the Plaintiffs' status as white men or their allegedly "perceived" status as nonresidents of North Carolina. (Causes of Action 10 and 16).

These remaining causes of action all must be dismissed on grounds of qualified immunity because Plaintiffs have no clearly established constitutional right, absent a showing that they were deprived of liberty through an unreasonable search and seizure, to avoid being the subjects of a criminal investigation that they believe should have been concluded earlier than it was. *Saucier v. Katz*, *supra*. For reasons more fully explored in the following sections of this Memorandum, and for the additional reasons explained in the Memorandum submitted on this date on behalf of the City of Durham (which are incorporated herein by reference), Plaintiffs Causes of Action Nos. 3-7, 9-10, and 16 must be dismissed.

## IV. PLAINTIFFS CLAIM FOR ABUSE OF PROCESS UNDER SECTION 1983 MUST BE DISMISSED BECAUSE NO SUCH CAUSE OF ACTION EXISTS AND BECAUSE PLAINTIFFS HAVE FAILED TO ALLEGE THAT THEY SUFFERED A CONSTITUTIONAL INJURY

In their Third Cause of Action, Plaintiffs allege that Sgt. Gottlieb and others violated their constitutional rights and abused process by conspiring to obtain the NTO and the search warrant for McFadyen's room for purposes "unrelated to the purposes for which NTID Orders or Search Warrants were intended." (Amend. Compl. ¶ 930). Other than seeking the NTO and Search Warrant, the only additional act Plaintiffs allege the Defendants undertook in the course of their alleged abuse of process is that "they" (meaning apparently the individual Defendants targeted in this third cause of action)

allegedly leaked the NTID Order and Affidavit to the press, resulting in media attention when the players arrived to provide their photos and DNA.[7]  (Amend. Compl. ¶ 931).

As explained in the preceding section of this Memorandum, claims concerning pretrial deprivations of liberty usually depend upon a finding that police officers conducted unreasonable searches or seizures without cause in violation of the Fourth Amendment.  Sgt. Gottlieb is unaware of any Fourth Circuit case in which a plaintiff successfully pursued a claim for "abuse of process" under Section 1983.  Court decisions from other federal circuits conflict with one another.  *Compare Santiago v. Fenton*, 891 F.2d 373, 388 (1st Cir. 1989) (no right to seek damages for abuse of process under Section 1983) *with Jennings v. Shuman*, 567 F.2d 1213 (3d Cir. 1977)(abuse of process claim approved based upon allegations that defendants engaged in a conspiracy to bring false criminal charges against the plaintiff to extort from him $150,000 and his wife and son).   Under these circumstances, Sgt. Gottlieb violated no clearly established right of the Plaintiffs and he is entitled to qualified immunity.  *See Atiyeh v. Hairson*, 1993 U.S. Dist. Lexis 18059 (E.D. Pa. Dec. 22, 1993)(defendant entitled to qualified immunity dismissing Section 1983 abuse of process claim because no Third Circuit case had recognized, other than in *dicta*, such a claim at the time the events in question occurred); *Edwards v. City of Goldsboro*, 178 F.3d 231, 251 (4th Cir. 1999) ("If a right is recognized

---

[7] Notably, the Complaint in the Carrington Lawsuit alleges only that "[t]he press was tipped off about the NTO Order" without fingering any alleged "tipper."  Carrington Complaint ¶ 216.

in some other circuit, but not in this one, an official will ordinarily retain the immunity defense").

The Third Cause of Action clearly must be dismissed for the additional reason that Plaintiffs have failed to identify any constitutional *injury* they suffered as a result of the alleged "abuse of process." Courts have made clear that, to the extent a Section 1983 abuse of process claim is available at all, a plaintiff must not only plead the elements of the common law tort, but must also plead facts "sufficient to assert arguably a constitutional injury." *Kleiss v. Short*, 805 F. Supp. 726, 727 (S.D. Iowa 1992); *Castro v. Negron*, 475 F. Supp. 2d 147, 152 (D.P.R. 2007). The type of injury that has supported an abuse of process claim is illustrated by the case of *Jennings v. Shuman*, 567 F.2d 1213, 1216 (3rd Cir. 1977), in which the Third Circuit reversed the dismissal of a complaint in which the plaintiff alleged that the defendants engaged in a conspiracy to arrest him upon false charges without probable cause in order to extort from the plaintiff $150,000 and to demand that he "give up his wife [with whom the defendant was having an affair] and son."

In this case, Plaintiffs have alleged no such constitutional injury. As demonstrated in Sections I and II *infra*, Plaintiffs were not subjected to any unlawful search and seizure through the execution of the NTO or the warrant to search Plaintiff McFadyen's room. All the other "injuries" they claim as a result of the alleged abuse of process resulted directly or indirectly from the alleged injury to their reputations that occurred as a result of the criminal investigation of Mangum's claims. Plaintiffs allege in their Third Cause

of Action, among other things, that publicity surrounding the NTO and the search warrant "stigmatized" the Plaintiffs, caused them to suffer "public condemnation," subjected them to "extortionate pressures that naturally flow from public outrage and infamy," led to stigmatizing news reports, and caused consequential losses of privacy, emotional trauma, and reputational harm. (Amend. Compl. ¶'s 930, 933, 940).

Damage to reputation, however, is not a constitutional injury for which a plaintiff is entitled to recover damages under Section 1983 except under limited circumstances that do not apply to this case.[8] *Paul v. Davis*, 424 U.S. 693, 711-12, 96 S. Ct. 1155, 47 L. Ed. 2d 405 (1976); *Siegert v. Gilley*, 500 U.S. 226, 233, 111 S. Ct. 1789, 114 L. Ed. 2d 277 (1991). The injuries Plaintiffs describe in their Amended Complaint all result, directly or indirectly, from alleged reputational damage. As the Supreme Court explained in Seigert, supra, "Most defamation plaintiffs attempt to show some sort of special damage and out-of-pocket loss which flows from the injury to their reputation. But so long as such damage flows from injury caused by the defendant to a plaintiff's reputation, it may be recoverable under state tort law but it is not recoverable in a *Bivens* action." 500 U.S. at 234, 111 S. Ct. at 1794.

Because there is no clearly recognized Section 1983 abuse of process claim, and because Plaintiffs have failed to adequately allege that any abuse of process caused them an injury recognized under the Constitution, Plaintiffs' Third Cause of Action must be dismissed.

---

[8] Further explanation of why Plaintiffs' claims for harm to their reputations must be dismissed is set forth in Section VI of this Memorandum.

**V.  PLAINTIFFS' FOURTH CAUSE OF ACTION MUST BE DISMISSED BECAUSE A POLICE OFFICER IS NOT LIABLE UNDER SECTION 1983 FOR DAMAGES ARISING FROM THE PROSECUTOR'S DELAY OR FAILURE TO DISCLOSE THE RESULTS OF TEST PROCEDURES TO PERSONS WHO WERE NEVER CHARGED WITH, ARRESTED FOR, OR TRIED FOR ANY CRIME**

By letter dated April 6, 2006, Plaintiff's counsel, Mr. Ekstrand, informed District Attorney Nifong that his clients asserted their right under G.S. 15A-282 to receive a copy of all reports of the results of all tests conducted with their photographs and DNA material obtained pursuant to the NTO as soon as those test reports were available. (Amend. Compl. Ex. 19).   There is no allegation in the complaint that Mr. Ekstrand sent a similar letter to Sgt. Gottlieb, that Mr. Ekstrand ever made any oral request to Sgt. Gottlieb for any of those reports or that Sgt. Gottlieb, rather than the District Attorney, had any duty to provide those reports to Mr. Ekstrand or his clients.

According to the Amended Complaint, the District Attorney  received oral reports of the DNA tests conducted by the SBI using plaintiffs' DNA samples on March 28 and March 30 (Amend Compl. ¶ 641) and received a final written report of all SBI DNA test results on Tuesday, April 4 (Amend Compl. ¶ 635).  The District Attorney provided Mr. Ekstrand with the SBI test results on April 10.   (Amend Compl. ¶ 648, 800).   These results demonstrated that no DNA of any of the Plaintiffs was found in Mangum's rape kit materials.  On Wednesday, April 12, the District Attorney acknowledged his duty to provide all test results produced as a result of plaintiffs' compliance with the NTO (Amend Compl. ¶ 764).   Plaintiffs received a report of the April 4 identification procedure conducted with Ms. Mangum using the plaintiffs' photographs on April 21

(Amend Compl. ¶'s 678, 685). The District Attorney did not provide Plaintiffs with copies of the reports of tests conducted by DNASI.

Plaintiffs contend in their Fourth Cause of Action that Sgt. Gottlieb and others violated their Constitutional rights through the District Attorney's ten day delay in providing SBI test results to Mr. Eckstrand, seventeen day delay in providing the results of the April 4 identification procedure, and failure to provide the results of testing by DNASI. Plaintiffs rely upon a state statute, N.C. Gen. Stat. § 15A-282 to support their constitutional claim. This statute provides that "a person who has been the subject of nontestimonial identification procedures or his attorney must be provided with a copy of any reports of test results as soon as the reports are available."

Plaintiffs' Fourth Cause of Action depends upon the erroneous notion that a person who has never been charged with, arrested for, or accused of a crime has a freestanding constitutional right to immediate delivery of the fruits of any government investigation. This is not the law. According to the well-worn marker set forth in *Brady v. Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 1196-97, 10 L. Ed. 2d 215, 218 (1963), "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." The *Brady* court, however, explained that the purpose of the duty to disclose favorable evidence to the accused is to ensure that there is a fair criminal trial:

> The principle of *Mooney* v. *Holohan* is not punishment of society for misdeeds of a prosecutor but avoidance of an unfair trial to the accused.

Society wins not only when the guilty are convicted but when criminal trials are fair; our system of the administration of justice suffers when any accused is treated unfairly. An inscription on the walls of the Department of Justice states the proposition candidly for the federal domain: "The United States wins  its point whenever justice is done its citizens in the courts."  A prosecution that withholds evidence on demand of an accused which, if made available,  would tend to exculpate him or reduce the penalty helps shape a trial that bears heavily on the defendant. That casts the prosecutor in the role of an architect of a proceeding that does not comport with standards of justice, even though, as in the present case, his action is not "the result of guile," to use the words of the Court of Appeals. [Citation omitted].

*Id*.  *See also Jean v. Collins*, 221 F.3d 656, 660, (4th Cir. 2000)("First, alleged failures to disclose do not implicate constitutional rights where no constitutional deprivation results therefrom. In this context, the constitutional deprivation must be defined as a deprivation of liberty without due process of law").

In this case, Plaintiffs were never subjected to an unfair trial, or even to an unfair indictment or accusation that they committed a crime.  The Constitution does not demand that the prosecutor or anyone else be punished for an alleged delay in disclosing exculpatory evidence when that delay did not result in an unfair trial, and the Plaintiffs were never criminally accused of wrongdoing.  Sgt. Gottlieb is unaware of any case in which a police officer was held liable in a civil lawsuit for failure to disclose evidence developed in a criminal investigation when the plaintiff was never charged with or convicted of a crime.

Like the *Brady* line of federal constitutional cases, cases interpreting the rights of criminal defendants to disclosure of evidence under statutory protections enacted by the North Carolina General Assembly have been considered only in the context of

determining whether an accused defendant received a fair trial. *See State v. Pearson*, 145 N.C. App. 506, 551 S.E.2d 471 (2001)(the failure to provide the results of a nontestimonial identification procedure to the accused until more than 12 years after they were received did not warrant the suppression of the evidence from those results at trial); *State v. Daniels*, 51 N.C. App. 294, 300, 276 S.E.2d 738, 742 (1981)( rejecting argument that the results of an analysis of the defendant's handwriting should have been excluded at trial because of a five-month delay in turning over the results in violation of N.C.G.S.A § 15A-282). Plaintiffs should not be allowed to craft a new Section 1983 cause of action for suppression of evidence when the purpose of the statutory protections in question – avoidance of an unfair trial – was fully satisfied.

Even if Plaintiffs could establish they had a constitutional right to immediate delivery of reports concerning the NTO procedures in the absence of a criminal indictment or trial, the law is clear that the duty to provide these materials to the Plaintiffs belonged to the District Attorney, not to Sgt. Gottlieb. The Fourth Circuit stated clearly in *Jean v. Collins*, 221 F.3d 656, 660 (4th Cir. 2000) that it is "incorrect" to "speak of the duty" to disclose exculpatory evidence to the accused established by *Brady* as one "binding police officers." Rather, "[t]he Supreme Court has always defined the *Brady* duty as one that rests with the prosecution." *Id.*

Before he decided to seek a large damages recovery against Sgt. Gottlieb and other Durham Police Department defendants, Plaintiffs' counsel apparently recognized that the duty to supply government evidence to the subjects of investigation belonged to

the District Attorney. Mr. Eckstrand authored a letter seeking disclosure of this information to the District Attorney only, not Sgt. Gottlieb or any other police officer. (Amend. Compl. Ex. 19). Plaintiffs have not alleged that they or any of their representatives ever requested this information from Sgt. Gottlieb, or that he ever refused such a request. Plaintiffs' Fourth Cause of Action must be dismissed.

## VI.  PLAINTIFFS HAVE FAILED TO ALLEGE THAT SGT. GOTTLIEB MADE ANY DEROGATORY PUBLIC STATEMENT ABOUT THEM, AND PLAINTIFFS ARE NOT ENTITLED TO RECOVER DAMAGES UNDER THE FEDERAL CONSTITUTION FOR INJURIES TO THEIR REPUTATIONS

Sgt. Gottlieb is named as one of several defendants in Plaintiffs' Fifth Cause of Action brought pursuant to 42 U.S.C. 1983 for violation of Plaintiff's rights under the First, Fourth, Fifth and Fourteenth Amendments and Article IV of the Constitution. The grounds for this claim is that the defendants "published false and stigmatizing statements about and relating to the plaintiffs." (Amend Compl. ¶ 956). Within the Fifth Cause of Action, plaintiffs' assert that Sgt. Gottlieb falsely stated that Ms. Mangum `"was raped, sodomized and strangled"' by the Plaintiffs or by their teammates in their presence." (*Id.*).

There is no assertion within the Fifth Cause of Action itself regarding when, where or under what circumstances Sgt. Gottlieb made this statement. The Amended Complaint catalogs a litany of alleged defamatory statements at pages 154 to 175, but there is no mention of Sgt. Gottlieb in the 58 paragraphs encompassed by those 19 pages. The only reference anywhere in the Amended Complaint to any statement made by Sgt. Gottlieb is to an email he sent to Trinity Park residents on March 15, 2006. (Amend

Compl. ¶ 342)  There is no reference in that email to the lacrosse team, to the plaintiffs or to any member of the lacrosse team.  It simply states that the Durham Police Department "is conducting an investigation concerning a rape of a young woman by 3 males at 610 N. Buchanan that was reported on 3/14/06 in the early morning hours" and asks any resident who "saw or heard anything unusual" to contact Ben Himan.

Even if Plaintiffs theoretically could recover for "false public statements," a claim for defamation requires the alleged defamer to "refer to some ascertained or ascertainable person and that person must be the plaintiff.  If the words used contain no reflection on any particular individual, no averment can make them defamatory."  *Arnold v. Sharpe*, 296 N.C. 533, 539, 251 S.E.2d 452, 456 (1979).   Here, Sgt. Gottlieb is only alleged to have made two very general statements concerning Mangum's rape allegations.  One of these statements did not refer to any particular perpetrator, and the other statement simply referred to "3 males."  These general statements simply cannot give rise to a defamation claim.

As this Memorandum explained in Section IV above, Plaintiffs' claim for damages to their reputations is not only factually deficient, but also legally prohibited.  A plaintiff cannot recover under Section 1983 for damage to reputation alone.  *Paul v. Davis*, 424 U.S. 693, 96 S. Ct. 1155, 47 L. Ed. 2d 405 (1976); *Siegert v. Gilley*, 500 U.S. 226, 111 S. Ct. 1789, 114 L. Ed. 2d 277 (1991).   In *Paul v. Davis*, for instance, the plaintiff's name and photograph were mistakenly included in a flyer listing supposed "active shoplifters."  The Supreme Court held that the plaintiff's Section 1983 claim must

be dismissed because, difficult as being improperly affixed with the "shoplifter" label may have been for the plaintiff, governmental actions that caused consequential harm to plaintiff based upon injury to his reputation simply did not deprive him of any rights under the U.S. Constitution. *Paul v. Davis*, 424 U.S. at 708-09. Similarly, in this case, assuming *arguendo* any statement by Sgt. Gottlieb somehow caused harm to the Plaintiffs' reputation, this reputational harm did not cause the Plaintiffs any injury for which they are entitled to seek recovery under Section 1983. Alternatively, if Sgt. Gottlieb violated any constitutional right of Plaintiffs through any statements he made, Plaintiffs' claims still must be dismissed under the doctrine of qualified immunity because those rights were not clearly established at the time the investigation was taking place. Plaintiffs' Fifth Cause of Action must be dismissed.

## VII. PLAINTIFFS' SIXTH AND SEVENTH CAUSES OF ACTION MUST BE DISMISSED BECAUSE THE PLAINTIFFS WERE NOT ARRESTED, INDICTED, OR TRIED FOR ANY CRIME AS THE RESULT OF ANY ALLEGED FABRICATION OR CONCEALMENT OF EVIDENCE

In their Sixth Cause of Action, Plaintiffs allege that Sgt. Gottlieb and several others violated their federal constitutional rights by manufacturing false evidence. Sgt. Gottlieb, along with others, is alleged to have: conspired to doctor medical records from the report of the SANE examination of Crystal Mangum so the records appeared to corroborate other information gathered in the case; conspired to design a suggestive photo identification procedure that would lead to indictments of the wrong persons; and conspired to produce a DNA report that included a false and misleading report of a match between the Plaintiffs' non-indicted teammates and a crime scene fingernail. (Amend

Compl. ¶'s 970, 972, 973).  In their Seventh Cause of Action, Plaintiffs allege that Sgt.

Gottlieb and several others violated their federal constitutional rights by allegedly

concealing exonerating information obtained from the electropherogram testing

performed by DNASI through a novel reporting methodology until the information was

included in materials produced in October 2006.  (Amend. Compl. ¶'s 980, 981).

At the outset, it is important to note that each of these alleged wrongful acts is

alleged to have taken place *after* the dates of execution of the NTO Order and the search

warrant for Ryan McFadyen's room.   The Amended Complaint alleges that the plots to

create a suggestive photo identification procedure and to fabricate medical records were

hatched after March 28, 2006.  (Amend. Compl. ¶ 779).   Similarly, the DNASI test result

that included information regarding the "fingernail" was delivered to the District

Attorney on May 12, 2006 and "exonerating electropherogram reports" were printed on

April 9 and 10, 2006.  (Amend. Compl. ¶ 981).  The Amended Complaint does not allege

Sgt. Gottlieb or any other member of the Durham police department took any action that

directly affected the liberty or property of the Plaintiffs as a result of, or after, the alleged

acts of fabrication or concealment.

The fundamental element missing from Plaintiffs' Sixth and Seventh Causes of

Action is the allegation that these Plaintiffs suffered any constitutionally cognizable

injury as a result of any alleged fabrication or concealment of evidence.   None of the

Plaintiffs was ever arrested, charged, or tried for any crime as a result of the challenged

conduct.   According to the Plaintiffs' Amended Complaint, the consequence Plaintiffs

suffered as a result of the alleged fabrication and concealment of evidence was the "perpetuation" of the investigation into Crystal Mangum's claims beyond March 28, 2006.  (See Amend. Compl. ¶ 779).

There is, however, no constitutional right to be free from official government investigation or to a formal, public declaration that an investigation has ended.  *United States v. Allibhai,* 939 F.2d 244, 249 (5th Cir. 1991), *cert denied* 502 U.S. 1072, 112 S. Ct. 967, 117 L. Ed. 2d 133 (1992); *Hale v. Townley*, 45 F.3d 914 (5th Cir. 1995); *United States v. Jacobson*, 916 F.2d 467, 469 (8th Cir. 1990)(en banc); *Sloane v. HUD,* 231 F.3d 10 (2000); *United States v. Trayer*, 898 F.2d 805 (D.C. Cir. 1990); *United States v. Crump*, 934 F.2d 947 (8th Cir. 1991); *United States v. Miller*, 891 F.2d 1265 (7th Cir. 1989); *United States v. Jannotti*, 673 F.2d 578 (3d Cir. 1982); *United States v. Myers*, 635 F.2d 932 (2d Cir. 1980); *Biasella v. City of Naples*, 2005 U.S. Dist. Lexis 20211 (M.D. Fla. Aug. 11,  2005).

Due process grants wide leeway to law enforcement agents in their investigation of crime.  *United States v. Jacobsen, supra*, 916 F.2d at 469.  The Constitution does not require reasonable suspicion of wrongdoing before the government can begin an investigation.  *Id.  See also Biasella, supra*, at 13 ("There is no particular level of evidence constitutionally required before a person may seek to instigate an investigation by authorities").   "To hold otherwise would give the federal judiciary an unauthorized 'veto over law enforcement practices of which it [does] not approve.' *" Jacobsen, supra*,

at 469 (*quoting United States v. Russell*, 411 U.S. 423, 435, 93 S. Ct. 1637, 36 L. Ed. 2d 366 (1973).

Even where the government starts an investigation for improper or retaliatory motives with no reason to suspect that the target of the investigation has committed a crime, the person investigated has no constitutional grievance. In *Hale v. Townley*, for instance, plaintiff Hale had been arrested for kidnapping, but the grand jury did not return an indictment. Hale successfully sued an official with the local Louisiana sheriff's department and an FBI agent for damages under Section 1983. Shortly after his successful trial, Hale alleged that "he was the target of a campaign by law enforcement officers from different agencies to harass him and to implicate him in criminal activity" in retaliation for his suit against the government. *Hale*, 45 F.3d at 916. Among other things, local police officers issued thirty citations to the nightclub where Hale worked, though they did not target any other similar establishments for such violations; a narcotics task force initiated a narcotics investigation into the nightclub; a deputy sheriff attempted to find an underage female willing to have sex with Hale so he would be arrested; and the nightclub was raided on two occasions during which Hale was beaten and mistreated by law enforcement officers. *Id*. at 916-17.

Hale filed a second Section 1983 suit against numerous law enforcement defendants. Among other things, he claimed that law enforcement officers targeted him and his nightclub in order to retaliate against him for having successfully sought damages against law enforcement officers in the earlier Section 1983 suit. The district court held

that Hale had stated a claim against three officers for violation of his "constitutional right of access to the courts, free of retaliation." *Id* at 919. The Fifth Circuit reversed the district court's decision, holding that the officers were entitled to qualified immunity. Even if the officers acted in retaliation for the successful prosecution of a prior lawsuit, Hale had no constitutional right to be free from official investigation. *Id*. at 920. At the time of the alleged conduct, there was no clearly established "constitutional tort of retaliation against an individual for having filed and won a lawsuit" against law enforcement officials. *Id*. There is no such clearly established right now.

Similarly, in *Biasella, supra*, the plaintiff contractor filed suit against the City of Naples in the wake of a dispute over his company's $166,000 bill to the city to clean damages caused by a fire at a city boat house. According to the Amended Complaint, the city harassed the plaintiff and destroyed his reputation and business during the four years following his work for the city. Id. at 4-5. The Amended Complaint alleged that the city and several individual officials instituted eleven investigations against plaintiff all the while knowing the plaintiff had not committed any crime or wrongful act. Plaintiff contended that city officials "maliciously instigated investigations solely to further their own political careers." *Id*. at 11-12.

The district court dismissed plaintiff's claim for violation of his alleged due process right "to be free from maliciously instigated and baseless investigations." *Id*. at 12. The Court explained:

> The Court concludes that this is not one of those fundamental rights and
> liberties which is implicit in the concept of ordered liberty such that neither

liberty nor justice would exist if they were sacrificed. There is no particular level of evidence constitutionally required before a person may seek to instigate an investigation by authorities. While there is a cause of action as to the investigators if they conduct a constitutionally deficient investigation and an arrest results from the investigation, *Kingsland v. City of Miami*, 382 F.3d 1220, 1228-31 (11th Cir. 2004), the Amended Complaint asserts that all investigations ended favorably towards plaintiff and he was never arrested or charged with anything. While defendants may have committed a state tort, the alleged conduct does not amount to a constitutional violation within the Due Process clause.

*Id*. at 13.

Similarly, in this case, the constitutional rights of Plaintiffs were not violated merely because, in their view, police improperly continued their investigation into Crystal Mangum's claims beyond March 28, 2006, because this investigation never led to any arrest or charges against the Plaintiffs. Plaintiffs suffered no violation of their constitutional rights as a result of any fabrication or concealment of evidence, and their Sixth and Seventh Claims for Relief must be dismissed.

## VIII. PLAINTIFFS' NINTH CAUSE OF ACTION FOR RETALIATION MUST BE DISMISSED BECAUSE SUFFICIENT GROUNDS EXISTED TO SEEK THE NTO AND THE WARRANT TO SEARCH RYAN MCFAYDEN'S ROOM

In their Ninth Cause of Action, Plaintiffs seek relief under Section 1983 on grounds that Sgt. Gottlieb engaged in investigative activities that allegedly violated their constitutional rights in retaliation for Plaintiffs' decision not to submit to police interrogation without the benefit of counsel. (Amend. Compl. ¶ 994). This cause of action is expressly based upon the premise that Sgt. Gottlieb violated *other* alleged constitutional rights of the Plaintiffs, and that the motive for this violation was retaliation. This Cause of Action must be dismissed because, as the remainder of this Memorandum

demonstrates, the Amended Complaint fails to state a claim that Sgt. Gottlieb violated any "other" constitutional right of the Plaintiffs. Cause existed to obtain the NTO and search Ryan McFadyen's room, and the Plaintiffs had no constitutional right to an earlier end to the investigation of Crystal Mangum's claims.

Plaintiffs had no clearly established right to avoid being subjected to investigative procedures that were otherwise constitutional merely because the alleged motive for officers to engage in such procedures was retaliation, and their Ninth Cause of Action should be dismissed.. *See Holland v. City of Portland*, 102 F.3d 6, 11 (1st Cir. 1996)(refusing claim that police officers arrested plaintiff for minor driving charge in retaliation for his refusal to cooperate with a separate investigation because probable cause existed to arrest plaintiff and the court is not permitted to evaluate the officer's subjective motivation for making an arrest under the Fourth Amendment).

IX.  **PLAINTIFFS' AMENDED COMPLAINT ALLEGES NO FACTS TO SUPPORT THE CONCLUSORY ALLEGATION THAT SGT. GOTTLIEB DISCRIMINATED AGAINST PLAINTIFFS BASED UPON THEIR PERCEIVED STATUS AS NONRESIDENTS OF NORTH CAROLINA**

In their Tenth Cause of Action, Plaintiffs assert that Sgt. Gottlieb is liable to them under Section 1983 because he allegedly treated them differently because of their real or perceived status as nonresidents of North Carolina in violation of the "Privileges and Immunities" clause of the U.S. Constitution.[9]  (Amend. Compl. ¶ 1004).  Similarly, one portion of the Plaintiffs' Sixteenth Cause of Action asserts that Plaintiffs are entitled to

_____

[9] This provision of the Constitution provides:  "The Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several states."  U.S. Const. art. IV, § 2.

relief under 42 U.S.C. § 1985 on grounds that Sgt. Gottlieb and others engaged in a conspiracy "motivated by invidious animus based upon Plaintiffs' state citizenship - - real or perceived." (Amend. Compl. ¶'s 1159 and 1164).

These claims must be dismissed because Plaintiffs' Amended Complaint provides no support for the conclusory allegation that Sgt. Gottlieb discriminated against Plaintiffs based on their actual or perceived nonresident status. According to the Amended Complaint, Sgt. Gottlieb conducted an investigation focused on Duke Lacrosse players – some of whom happened to reside out of state -- because Crystal Mangum alleged she had been raped at a party that was attended by Duke Lacrosse players. There is no allegation or suggestion that Sgt. Gottlieb made any effort to determine what members of the team were or were not residents of North Carolina, or that he treated out of state members of the team differently as he conducted the investigation. Indeed, there is no allegation in the Amended Complaint that Sgt. Gottlieb treated Plaintiff Matthew Wilson, who is alleged to be a North Carolina resident, differently than he treated the other two Plaintiffs, who are alleged to be residents of other states. (See Amend Compl. ¶'s 6-8).

The Amended Complaint attempts to remedy the glaring absence of evidence that Sgt. Gottlieb treated nonresident members of the Duke Lacrosse team differently from members who resided in North Carolina by describing unrelated efforts by the Durham Police Department and Duke University in 2005 to address ongoing complaints of noise and underage drinking by Duke students who lived in neighborhoods off campus. (Amend. Compl. ¶ 108). This lengthy pile of allegations, however, shows nothing more

than the unremarkable notion that police near a college campus gear their law enforcement efforts towards addressing noise complaints and complaints of underage drinking by college students.

The Amended Complaint alleges that, according to "statistics'" complied in 2005 by plaintiff's counsel Mr. Ekstrand as part of a "dossier" about Sgt. Gottlieb (see Original Compl. ¶ 174, Amend. Compl. ¶ 173), during 2005 Sgt. Gottlieb charged 32 people with crimes, 19 of whom (59%) were Duke students, and that 13 of the 19 Duke students charged (68%) were incarcerated while only 6 of 13 (46%) of the Durham residents arrested by Sgt Gottlieb were incarcerated. (Amend. Compl. ¶ 173A). Given that Sgt. Gottlieb was assigned to the Trinity Park area where a large number of Duke students reside (Amend. Compl. ¶ Ex. 5, p. 3), there is reason to question whether these "statistics" provide evidence that Sgt. Gottlieb "targeted" Duke students as alleged. It is clear, however, that these statistics provide zero support for the notion that Sgt. Gottlieb unfairly treated persons who reside out of state. It is also clear that Sgt. Gottlieb's arrest statistics have little to do with Plaintiffs, who were never arrested or charged with a crime.

Plaintiffs also include detailed allegations concerning an incident at 203 Watts Street, also in 2005, in apparent support of the notion that Sgt. Gottlieb treated out of state residents poorly in the past . (Amend. Compl. ¶ 145-164). Plaintiffs allege that Sgt. Gottlieb and Duke Police officers raided that location on the evening of October 8, 2005, "solely because the subject of the neighbor's complaint was perceived to be a non-citizen

of North Carolina."(Amend. Compl. ¶ 163). The "raid" was conducted pursuant to a search warrant issued by a magistrate based on an affidavit by Sgt. Gottlieb, a copy of which is attached to Plaintiffs' Amended Complaint as Exhibit 5. Plaintiffs do not allege that the warrant affidavit contained any false statements. The Affidavit fully explained the reasons Sgt. Gottlieb sought a warrant for the home. As stated in the affidavit, Lee Coggins of 204 Watts Street informed Sgt. Gottlieb that "people were urinating on her home and throwing beer cans on her lawn" and that "a second male threw a 40-ounce bottle in her direction." Another neighbor, Nathan Isley, informed Sgt. Gottlieb that "one male was urinating on [Ms. Coggins] fence and a second male was urinating on the white house" next to Ms. Coggins. Mr. Isley also "positively identified" the person who threw a beer bottle at Ms. Coggins. The affidavit also notes: "For several years the Durham Police Department has received numerous complaints about liquor and noise violations concerning 203 Watts and its residents. In addition, police records indicate multiple complaints have been generated just since the return of the Duke students to this home [203 Watts St.] since August 2005" (Amend. Compl. Ex. J, p. 3).

Significantly, the affidavit also listed the names and home addresses of the seven persons who lived in the home. (*Id*.). Six of the individuals were out of state residents and one of the individuals lived in Raleigh, North Carolina. The Amended Complaint does not allege that the North Carolina resident received any preferential treatment as a result of his "in state" status during the execution of this "raid".

In sum, while the Amended Complaint unsurprisingly alleges that police who operated in an area near a college campus engaged in efforts to reduce and deter disruptive behavior by exuberant college students, nothing in the Amended Complaint lends support, plausible or otherwise, for the notion that Sgt. Gottlieb ever treated any of the Plaintiffs in this lawsuit differently because he resided or was perceived to reside outside of North Carolina. Plaintiffs' Tenth Cause of Action must be dismissed, as must that portion of Plaintiffs' Sixteenth Cause of Action that alleges Sgt. Gottlieb discriminated against Plaintiffs on grounds of their actual or perceived nonresident status.

## X.  THE AMENDED COMPLAINT CONTAINS NO ALLEGATIONS THAT SGT. GOTTLIEB ACTED WITH RACIAL ANIMUS

In a portion of their Sixteenth Cause of Action, Plaintiffs seek damages against Sgt. Gottlieb pursuant to 42 U.S.C. § 1985, asserting in conclusory fashion that Sgt. Gottlieb was one of the "defendants" who allegedly conspired to deprive the Plaintiffs of equal protection rights under the Constitution because of invidious racial animus. (Amend. Compl. ¶ 1159). Plaintiffs' claims of acts motivated by racial animus are at paragraphs 566 to 590 on pages 178 to 187 of the Amended Complaint. Sgt. Gottlieb's name does not appear in any of those paragraphs and there is no allegation elsewhere in the Amended Complaint that any actions by Sgt. Gottlieb were motivated by racial animus. Because Sgt. Gottlieb is not alleged to have taken any of the actions that Plaintiffs contend entitles them to recover under Section 1985, the Sixteenth Cause of Action's allegations that Sgt. Gottlieb engaged in racial discrimination must be dismissed.

## XI. PLAINTIFFS' EIGHTEENTH CAUSE OF ACTION FOR COMMON LAW OBSTRUCTION OF JUSTICE SHOULD BE DISMISSED.

Plaintiffs' common law obstruction of justice claim (their Eighteenth Case of Action) is asserted against a plethora of defendants, including Sgt. Gottlieb. The essential theory of Plaintiffs' claim against Sgt. Gottlieb appears to be that he engaged in a series of investigative activities with knowledge that those investigative activities "would be used to bring and maintain criminal prosecutions against Plaintiffs, as principals or accessories, to crimes Defendants knew never happened, or to intimidate the Plaintiffs and other witnesses who had personal knowledge necessary to prove their innocence." (Amend Compl. ¶'s 1191, 1192, 1193, 1195, 1196).

Of course, not one of the Plaintiffs here was ever charged with any crime as a consequence of any of the investigative activities about which they complain. The gravamen of their claim is that the tort of obstruction of justice encompasses freedom from investigation or alternatively the right to prove that no one should ever have suspected plaintiffs of a crime in the first place.

The scope of the tort of obstruction of justice has been little explored by the courts in North Carolina. It seems to have been first recognized in *In Re Kivitt*, 309 NC 635, 309 S.E.2d, 442 (1983), a case involving the removal of a judge from office. There this tort was broadly and vaguely defined in dicta as "any act which prevents, obstructs impedes or hinders public or legal justice." *Id*. at 670, 309 S.E.2d at 462. To be sure, however, obstruction of justice, whatever its breadth, does not encompass the right to be free from suspicion or investigation as the Plaintiffs now claim, and they can cite no case

to support such a proposition. Indeed, by definition, the tort cannot extend that far. After all the essence of the tort is interference with "public or legal justice." "Justice" surely encompasses investigations to ferret out criminal acts and to identify the perpetrators of those acts. Plaintiffs' theory would pervert the tort of obstruction of justice to impede the investigations necessary to assure justice. Their theory should be dismissed.

## XII. PLAINTIFFS' NINETEENTH CAUSE OF ACTION FOR ABUSE OF PROCESS SHOULD BE DISMISSED.

Plaintiffs' Nineteenth Cause of Action is captioned a "common law" claim for abuse of process but within the body of that cause of action the Plaintiffs assert that defendants' actions derived them of their federal constitutional rights. (Amend. Compl.1211). To the extent this cause of action asserts an "abuse of process" claim under 42 USC § 1983, this cause of action should be dismissed for the reasons stated in Argument IV, *infra*. To the extent this cause of action is intended to assert an abuse of process claim under state law it is also defective and should be dismissed.

To survive a motion to dismiss, a state law abuse of process claim must allege: "[f]irst, the existence of an ulterior purpose and, second, an act in the use of the process not proper in the regular prosecution of the proceeding." *Barnette v Woody*, 242 N.C. 424, 431, 88 S.E.2d 223, 227-28 (1955). Plaintiffs have alleged an ulterior motive for issuance of the NTO (Amend. Compl. ¶ 1205) but there is no dispute that the NTO was requested by Assistant District Attorney Saacks and issued by Judge Stephens for the purpose of collecting and preserving evidence and that the evidence gathered was used in the criminal investigation of Crystal Mangum's claims. A bad motive does not convert

the legitimate use of process into a tort.  *Melton v. Rickman*, 225 N.C. 700,703-04, 36 S.E.2d 276, 278 (1945).

## XIII.  PLAINTIFFS TWENTIETH CAUSE OF ACTION FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS SHOULD BE DISMISSED.

Sgt. Gottlieb is one of many defendants named in Plaintiffs' Twentieth Cause of Action for Intentional Infliction of Emotional Distress (Amend Compl. ¶'s 1213-1222). The actions by this list of defendants alleged to constitute intentional infliction of emotional distress are: (a) manufacturing inculpatory forensic evidence and concealing exculpatory forensic evidence "for the purpose of loaning scientific credibility to Mangum's accusations" (Amend Compl. ¶ 1211) and (b) manufacturing "witness identification procedures with the intention of connecting Plaintiffs as principles or accessories to violent racially motivated criminal attacks that never happened." (Amend Compl. ¶ 1216).  Neither of these actions, even if true, is sufficient to satisfy the elements of the tort of intentional infliction of emotional distress.

Conduct is not sufficient to constitute intentional infliction of emotional distress unless it is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly "intolerable in a civilized society."  *Briggs v. Rosenthal*, 73 N.C. App. 672, 677, 327 S.E.2d 308, 311 (1985).  Whether the misconduct alleged is sufficient to merit this standard is a question of law for the court.  *Lenins v. K-Mart Corp.,* 98 N.C. App. 590, 599, 391 S.E.2d 843, 848 (1990).

Allegations akin to fabrication of evidence and false allegation of a serious crime have been held not to meet this stringent standard. *See*, *e.g.*, *Dobson v. Harris*, 134 N.C. 573, 578-79, 521 S.E.2d 710 (1999), *rev'd on other grounds*, 352 N.C. 77, 530 S.E.2d 829 (2000) (exaggerated or fabricated report of child abuse that initiated an investigation not "extreme" or "outrageous"); *Darnell v. BP Exploration & Oil*, No. 97-2040, 1998 U.S. App. LEXIS 4651, 5-6 (4th Cir. N.C. Mar. 13, 1998) (pursing investigation not extreme or outrageous.

Additionally, in this case the acts alleged to rise to the level of utter intolerability (manufacturing or concealing evidence or conducting an improper investigative procedure) had no impact on the Plaintiffs. The "manufactured medical evidence" did not implicate any of the plaintiffs; it merely corroborated Ms. Mangum's statements that she had been raped. The DNA test results did not implicate any of the Plaintiffs and those results, according to the allegations of the Plaintiffs' own complaint, were provided to Plaintiffs' counsel on April 10, within two weeks of the date the plaintiffs provided DNA samples for those tests. Lastly, not one of the Plaintiffs was identified by Ms. Mangum during the allegedly improper identification procedure.

Lest every difficult criminal investigation become a font of tort liability for our law enforcement officers, Plaintiffs' claim against Sgt. Gottlieb for intentional infliction of emotional distress should be dismissed.

## XIV. PLAINTIFFS' TWENTY-THIRD CAUSE OF ACTION AGAINST SGT. GOTTLIEB FOR AIDING AND ABETTING DUKE SHOULD BE DISMISSED.

Plaintiffs' Twenty-Third Cause of Action is principally against Duke University for alleged breach of a fiduciary duty not to disclose various records containing information about the Plaintiffs. As an after-thought, Plaintiffs append to this cause of action a claim that Sgt. Gottlieb and other members of the Durham Police Department "were actually aware" that Duke officials "violated these fiduciary duties," and thereby "aided and abetted" the alleged unlawful acts of the Duke officials. (Amended Complaint §1247).

The linchpin of this cause of action against Sgt. Gottlieb -- that Duke had a fiduciary obligation to the Plaintiffs -- has no foundation in the law. The relationship between a university and its students is not a fiduciary relationship. *Davidson v. University of North Carolina*, 142 N.C. App. 544, 543 S.E.2d 920, 925 (2001). "Aiding and abetting" an act that is not itself a tort cannot constitute a tort.

XV. **PLAINTIFFS TWENTY-FIFTH CAUSE OF ACTION FOR NEGLIGENCE IS BARRED BY THE DOCTRINE OF PUBLIC OFFICIAL IMMUNITY AND IS OTHERWISE DEFECTIVE.**

Sgt. Gottlieb is named as one of six defendants in Plaintiffs' Twenty-Fifth Cause of Action for negligence. (Amend Compl. ¶ 1261-1267). His alleged negligence was "with respect to his public statements concerning the investigation of Mangum's claims," (Amend. Compl. 1262), and "with respect to the investigation of Mangum's claims". (Amend Compl. ¶ 1263). The public statements allegedly made negligently by Sgt. Gottlieb are not identified or described anywhere in the Amended Complaint and Sgt.

Gottlieb's investigation of Ms. Mangum's claims is consistently characterized in the Amended Complaint as a series of intentional rather than negligent acts.

To the extent the Complaint may contain any plausible factual allegation that any of Sgt. Gottlieb's actions in investigating Ms. Mangum's claims reflected some failure to exercise a proper level of care, this cause of action is barred by public official immunity principles. Under long established North Carolina law, public officials, including law enforcement officers, engaged in performing discretionary acts within the scope of their authority are not liable as individuals for acts that are merely negligent. *Moore v. Evans*, 124 N.C. App. 35, 42, 476 S.E.2d 415,421 (1996); *Campbell v. Anderson*, 156 N.C. App. 371, 376, 576 S.E.2d 726,730 (2003).

To the extent Plaintiffs seek by this cause of action to hold Sgt. Gottlieb liable on a negligence theory for intentional acts, their cause of action fails under this Court's decision in *Barbier v. Durham County Bd. Of Educ*., 225 F. Supp. 2d 617, 631 (M.D.N.C. 2002) ("When the plaintiff's complaint alleges acts … that are intentional in nature, and simply concludes that the acts were committed negligently, it is insufficient to state a claim for negligent infliction of emotional distress.").

## XVI. PLAINTIFFS' TWENTY-SEVENTH CAUSE OF ACTION FOR NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS IS FACTUALLY DEFICIENT AND BARRED BY THE PUBLIC OFFICIAL IMMUNITY DOCTRINE

Sgt. Gottlieb is one of many defendants named in Plaintiffs' Twenty-Seventh Cause of Action for negligent infliction of emotional distress (Amend Compl. ¶'s 1277-1282). His actions alleged to constitute negligent infliction of emotional distress were

manufacturing "false evidence, concealing evidence proving Plaintiffs' innocence" (Amend Compl. ¶'s 1279) and failing "to provide Plaintiffs copies of the reports of DNASI test results" (Amend Compl. ¶ 1286).

This claim is defective as a matter of law and should be dismissed. As the Fourth Circuit Court of Appeals observed in *Shaw v. Stroud*, 13 F.3d 791, 803 (4th Cir. 1994), "[a] negligent infliction of emotional distress claim, by its very definition, necessarily alleges only negligence." In North Carolina, a claim against a public official founded on negligence that arises from the public official's performance of duties involving the exercise of discretion and judgment is barred by the doctrine of public official immunity. *Id*. This doctrine applies fully to claims against police officers like Sgt. Gottlieb. *Wright v. Hill*, No. 1:03-CV-109, 2004 N.S. Dist. LEXIS 13667, *17 (M.D.N.C. July 16, 2004).

## CONCLUSION

For the foregoing reasons, Sgt. Gottlieb respectfully requests the Court to dismiss all claims asserted against him in the Amended Complaint (Counts 1-7, 9-10, 16, 18-20, 23, 25, and 27) pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

This the 2nd day of July, 2008.

**POYNER & SPRUILL LLP**

By: /s/Edwin M. Speas, Jr.
       Edwin M. Speas, Jr.
       North Carolina Bar #4112
       Eric P. Stevens
       North Carolina Bar # 17609
       P.O. Box 10096
       Raleigh, N.C. 27605-0096
       Tel.   (919) 783-6400
       Fax   (919) 783-1075
       Email  espeas@poynerspruill.com
       Email: estevens@poyners.com

*Attorneys for Defendant Mark Gottlieb*

## CERTIFICATE OF SERVICE

I hereby certify that I have this day served a copy of the foregoing **MEMORANDUM IN SUPPORT OF DEFENDANT MARK GOTTLIEB'S MOTION TO DISMISS COMPLAINT** with the Clerk of Court using the CM/ECF system which will send notification of filing and service to the following:

James Donald Cowan, Jr.
Joel Miller Craig
Kearns Davis
Robert C. Ekstrand
Reginald B. Gillespie, Jr.
Jamie S. Gorelick
Patricia P. Kerner
Robert James King, III
William F. Lee
James B. Maxwell
Dan Johnson Mclamb
Jennifer M. O'Connor
Shirley Maring Pruitt
James Avery Roberts, III
Henry W. Sappenfield
Hannah Gray Styron
D. Martin Warf
Dixie Thomas Wells
Paul R.Q. Wolfson
Thomas Carlton Younger, III

**Service via US Mail:**

Linwood Wilson, Pro Se
6910 Innesbrook Way
Bahama, NC 27503-9700

This the 2nd day of July, 2008.

By: /s/Edwin M. Speas, Jr.
      Edwin M. Speas, Jr.

RALEIGH/559008v1