**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
CIVIL ACTION NO. 1:07-CV-00953**

| | | |
|---|---|---|
| **RYAN MCFADYEN**, *et al.*, | ) | |
| | ) | |
| **Plaintiffs,** | ) | **BRIEF IN SUPPORT** |
| | ) | **OF DEFENDANT** |
| **v.** | ) | **CITY OF DURHAM,** |
| | ) | **NORTH CAROLINA'S** |
| **DUKE UNIVERSITY**, *et al.*, | ) | **MOTION TO DISMISS** |
| | ) | **SECOND AMENDED** |
| **Defendants.** | ) | **COMPLAINT** |

## I.      STATEMENT OF THE CASE

Plaintiffs are three Duke lacrosse players who attended a team party that featured "entertainment" provided by two exotic dancers.  One of the dancers later claimed to have been raped at the party.  The criminal investigation that ensued focused, not surprisingly, on the partygoers, including the Plaintiffs.

These three Plaintiffs were *not* arrested, *not* indicted, *not* tried, and *not* convicted of any crime.  Yet, in this lawsuit Plaintiffs seek damages from the City of Durham, among many others, on a theory that the Durham Defendants should not have investigated the rape allegations at all and that, by doing so, the Defendants violated their "right" not to be investigated.  No such right exists, nor should it.  Allegations of rape, even when they are made by imperfect witnesses, must and should be investigated.  As the Fourth Circuit instructed in a similar setting:  "[Plaintiffs'] contentions disregard the realities of police work . . . .   Criminal investigations are often conducted under trying conditions over which officers have limited control. . . .   [H]owever, the police were

compelled to take the victim as they found him and do the best they could under the circumstances." *Torchinsky v. Siwinski*, 942 F.2d 257, 263 (4th Cir. 1991). Durham police were entitled—indeed, compelled—to investigate Crystal Mangum's allegations of rape, despite any inconsistencies in her statements or her troubling demeanor. *See id.*

Despite the Complaint's remarkable verbosity and physical heft, and for all its outlandish allegations of overarching conspiracies between Duke and Durham to abuse the rights of Duke students, Plaintiffs fail to state a claim against the City of Durham on which relief can be granted. Plaintiffs' claims should be dismissed.[1]

## II.    STATEMENT OF FACTS[2]

On March 13, 2006, Crystal Mangum and Kim Pittman were hired to perform an exotic dance at a party thrown by Duke lacrosse players at an off-campus residence. SAC ¶ 194-96. Later that night, Mangum was seen staggering in the backyard of that residence, SAC ¶ 388, and exhibiting erratic behavior, SAC ¶ 382(A). Hours later, she told workers at Durham Center Access, a local outpatient mental health clinic, that she had been raped at that party. SAC ¶¶ 251, 268. Over the next several days, to police and hospital personnel, Mangum continued to claim that she was raped. SAC ¶¶ 313-14, 316,

---

[1] Plaintiffs filed their original Complaint on December 18, 2007. *See* Docket No. 1. They amended that Complaint on April 17, 2008. *See* Docket No. 33. Plaintiffs then filed a Second Amended Complaint on April 18, 2008, although that filing remains entitled "First Amended Complaint" under the case caption and the signature date on that document remains April 17, 2008. The Second Amended Complaint on which this motion is based (that filed on April 18, 2008, Docket No. 34) will be referred to in text as "Complaint," and abbreviated "SAC."

[2] Solely for the purpose of this Motion, the City of Durham assumes the veracity of the allegations in the Complaint.

321(I), 380.  Mangum's claims about what happened to her were not always consistent, SAC ¶¶ 262, 267, 291, 362, and at one time she told one police officer that she had not been raped.  SAC ¶ 262.  But both before and after that one interaction, she repeatedly claimed, over the course of several months, that she had been raped at the party.  SAC ¶¶ 266, 316, 321(I), 380.

Hours after the party, Duke medical personnel performed a rape examination on Mangum.  SAC ¶ 298.  They noted diffuse edema of the vaginal walls, and photographs revealed injuries to Mangum's feet and knees.  SAC ¶ 306-07.  Mangum complained of excruciating pain and restated her claim that she had been sexually assaulted by multiple people.  SAC ¶¶ 294-96.

On March 15, 2006, Sergeant Mark Gottlieb was assigned to investigate.  SAC ¶ 335.  The following day, Sergeant Gottlieb assigned Investigator Benjamin Himan to assist him, and the two officers interviewed Mangum.  SAC ¶¶ 346, 362.  Mangum told the officers that she had been raped and provided physical descriptions.  SAC ¶ 362.

Later that day, a magistrate issued a search warrant for the site of the party, 610 North Buchanan Boulevard.  In the house, investigators found Mangum's make-up bag, cellphone, and identification, along with $160.00 of her money, consistent with her statements that her money had been taken.  Ex. 1 (NTID Order & Affidavit).[3]

---

[3] "[A] court may take judicial notice of matters of public record without converting a Rule 12(b)(6) motion into a motion for summary judgment." *Clark v. USDA-RHS*, No. 3:06cv457, 2007 U.S. Dist. LEXIS 80845, at *5 (W.D.N.C. Oct. 22, 2007) (alterations in original) (citations omitted), *aff'd*, 2008 U.S. App. LEXIS 13250 (4th Cir. June 23, 2008).  Publicly recorded papers from prior court proceedings meet the public records exception and the court may consider them in deciding a motion to dismiss.  *Id*.; *see Norfolk Fed'n of Bus. Dists. v. HUD*, 932 F. Supp. 730, 736 (E.D. Va.

Investigators also interviewed the three players who lived at the house, who voluntarily gave statements to police and submitted to DNA testing. SAC ¶¶ 417, 422, 442.

Investigators received reports from Tara Levicy, a member of the DUHS and Duke University nursing staff, SAC ¶ 38, who stated that Mangum was responding to intense pain, and that her physical condition was consistent with having been raped. SAC ¶¶ 299, 304, 309. Plaintiffs allege that Levicy's statements to the officers were false. SAC ¶ 1323. Other medical evidence was not provided to investigators until after the NTID was complete. SAC ¶ 785. Meanwhile, Mangum was not able to identify her attackers in photo arrays conducted by the Durham police. SAC ¶¶ 372, 380.

The lacrosse team members were originally scheduled to report to the Duke Police Department the following day to have DNA samples and photographs taken and to answer questions, but they decided not to after consulting with defense counsel. SAC ¶¶ 405, 407, 411. Plaintiffs allege that Defendants then "retaliated" for this decision by seeking a Non-Testimonial Identification Order ("NTID") for DNA samples, physical exams, and photographs of the players. SAC ¶ 414-44. On March 23, 2006, Judge Ronald Stephens reviewed and signed the NTID. SAC ¶¶ 908, 944; Ex. 1.

At the time of the lacrosse party, Defendant Michael Nifong was serving as an Interim District Attorney for the State of North Carolina, and was running for election to that office. SAC ¶¶ 478-83. On March 24, 2006, Nifong informed Durham police officials that he was taking control over the case. SAC ¶ 487. A police supervisor then

---

1996), *aff'd*, 1996 U.S. App. LEXIS 30037, at *3 (4th Cir. Nov. 20, 1996) ("In short, a court may consider matters of public record, items appearing in the record of the case, as well as exhibits attached to the complaint.")

allegedly instructed the investigators "to conduct the investigation only in the manner Nifong directs." SAC ¶ 487. Three days later, Sergeant Gottlieb and Investigator Himan briefed Nifong on the investigation. SAC ¶ 591. They told him the details of the case, including Mangum's allegations and the contradictions in her accounts. SAC ¶ 592. Despite these reports, Nifong decided to exploit the high visibility of the case for advantage in his campaign for office. *E.g.*, SAC ¶ 495. He made numerous public statements, including interviews in which he stated that he was certain that Mangum had been raped at the party. *E.g.*, SAC ¶¶ 591, 647.

Less than a week after issuance of the NTID, Sergeant Gottlieb obtained an email written by Plaintiff McFadyen the night of the party. SAC ¶ 594. In the email, McFadyen depicted violent acts taken against strippers, which Plaintiffs allege was a reference to *American Psycho*, a novel about a serial killer who skins his victims. SAC ¶¶ 603-04. As a result, investigators sought and obtained a search warrant for McFadyen's room and car. SAC ¶¶ 601, 610.

DNA analysis of the "rape kit" from Mangum and of the samples taken from lacrosse players revealed the existence of DNA characteristics from multiple males in the rape kit, but excluded the lacrosse players as potential sources of that DNA. SAC ¶ 748-49. Nevertheless, Nifong sought and obtained indictments of three of Plaintiffs' teammates. SAC ¶¶ 589, 677, 775, 813, 816. The indictments were later dismissed and the players exonerated. SAC ¶ 5.

## III.  QUESTIONS PRESENTED

The questions before the Court are:

- Whether Plaintiffs have stated cognizable Fourth Amendment claims related to: (1) a nontestimonial identification order (NTID) for DNA samples based on a woman's repeated claims of rape and statements by medical personnel that corroborated her statements; and (2) a search of Plaintiff McFadyen's room and car, after officers discovered an email sent by McFadyen immediately after the party, depicting physical violence against strippers;

- Whether this Court should recognize a federal "abuse of process" claim, despite the Supreme Court's and Fourth Circuit's failure to do so, and despite the fact that the factual allegations do not even meet the elements of a common-law "abuse of process" tort;

- Whether a North Carolina state statute requiring that a criminal suspect be provided results of an NTID creates a "property right" sufficient to state a due process claim, over and above a criminal defendant's right to exculpatory evidence under *Brady v. Maryland*;

- Whether Plaintiffs' "false official statement" claim alleges any cognizable property or liberty deprivations in connection with such statements sufficient to meet the "stigma plus" test under *Paul v. Davis*;

- Whether Plaintiffs' substantive due process claims styled as "manufacture of false evidence" and "concealment of exculpatory evidence" state claims as a matter of law when Plaintiffs were never tried;

- Whether, in cancelling a scheduled meeting with police, Plaintiffs "exercised" a constitutional right which could support a federal retaliation claim;

- Whether Plaintiffs adequately state an Article IV claim, when Plaintiffs do not allege that officers treated the Plaintiff who is a North Carolina citizen differently from those who are not, and the Complaint alleges numerous other reasons for the alleged conduct other than two Plaintiffs' out-of-state citizenship;

- Whether the alleged policy of "Zero Tolerance" for noise and alcohol violations by Duke students is sufficiently connected to the constitutional deprivations of which Plaintiffs complain so that it can plausibly be said to have been the "moving force" behind those deprivations, such that the City may be held liable under *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658 (1978);

- Whether the City of Durham may be held liable for acts of a State Prosecutor over whom the City never exercised control and for whom it was never legally responsible;

- Whether Plaintiffs have stated cognizable claims for conspiracy to deprive them of equal protection of the law even though they have not alleged that they are members of a protected class or that Defendants acted out of racial animus against them;

- Whether Plaintiffs' state law claims—under theories of intentional infliction of emotional distress, obstruction of justice, various permutations of negligence, and a breach of fiduciary duty—allege viable causes of action; and

- Whether Plaintiffs' Complaint otherwise fails to state a claim under which relief may be granted.

## IV. ARGUMENT

### A. <u>Standard of Review</u>

On a motion to dismiss, a court must construe the complaint in the light most favorable to the plaintiffs, and take the facts asserted therein as true. *Chao v. Rivendell Woods, Inc.*, 415 F.3d 342, 346 (4th Cir. 2005). But a complaint must "sufficiently allege[] each element of the cause of action so as to inform the opposing party of the claim and its general basis." *Id.* at 348. Moreover, the "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1965 (2007) (citations omitted). Any claim that is not "plausible on its face" must be dismissed. *Id.* at 1974. Finally, a court is not bound by a plaintiff's legal conclusions. *See, e.g.*, *Young v. City of Mount Ranier*, 238 F.3d 567, 577 (4th Cir. 2001).

## B. The Nontestimonial Order (NTID) Was Consistent with Fourth Amendment Standards (Cause of Action 1)

Plaintiffs complain that their Fourth Amendment rights were violated when investigators sought, and a magistrate issued, an NTID for DNA samples, photographs, and physical inspection. But—even taking Plaintiffs' allegations as true—seeking the NTID was reasonable. At the time they sought the NTID, investigators had: (1) probable cause to believe that a felony had been committed; (2) reasonable grounds to suspect that Plaintiffs and their teammates were involved; and (3) reason to believe that the evidence obtained would materially aid the investigation. Accordingly, the NTID was consistent with both the North Carolina statute providing for such orders, *see* N.C. Gen. Stat. § 15A-273 (setting out these three prerequisites for issuing NTID), and with the standards of the Fourth Amendment. *See Hayes v. Florida*, 470 U.S. 811, 815 (1985) (indicating approval of compulsory fingerprinting on same grounds).

Plaintiffs' own allegations demonstrate that there was probable cause to believe a felony had been committed. First, Mangum's repeated claims that she had been raped at the lacrosse party (SAC ¶¶ 263, 267, 362) were, on their own, enough to establish probable cause. *See Zandhri v. Dortenzio*, 228 F. Supp. 2d 167, 176 (D. Conn. 2002) (citations omitted) ("[A] police officer may rely upon the statements of victims and witnesses to determine the existence of probable cause for the arrest, regardless of the ultimate accurateness or truthfulness of the statements.") (citations omitted) (alteration in original).[4] Plaintiffs assert that police should have immediately dismissed Mangum's

---

[4] *See also Martinez v. Simonetti*, 202 F.3d 625, 634 (2d Cir. 2000) ("[P]olice officers, when making a probable cause determination, are entitled to rely on the victims'

claims because her claims were not consistent.  SAC ¶ 382.  But investigating officers may rely on victim statements even when those statements are inconsistent – especially when statements are made after an apparent trauma like a physical attack.  *Torchinsky*, 942 F.2d at 263 (rejecting argument that probable cause was lacking because putative attack victim had given conflicting accounts of how he had been injured, noting that investigators were entitled to decide which account "was the most credible and reliable").

Second, Plaintiffs acknowledge that Levicy's reports to law enforcement on Mangum's physical condition provided "corroborating evidence" of Mangum's account. SAC § XXXIV.A; SAC ¶ 780.[5]  While Plaintiffs criticize investigators' reliance on Levicy's statements, SAC ¶ 1142(K), they do not dispute that the investigators did so rely. [6]  Nor do Plaintiffs allege that investigators were in a position to check the accuracy of

---

allegations that a crime has been committed.") (citations omitted); *Ahlers v. Schebil*, 188 F.3d 365, 370-71 (6th Cir. 1999) (noting that eyewitnesses' statements are "generally entitled to a presumption of reliability and veracity" and that victim's accusation that she had been sexually assaulted, "standing alone, was sufficient to establish probable cause"); *S.P. v. City of Takoma Park,* 134 F.3d 260, 273 (4th Cir. 1998) (when plaintiff's statements suggested suicidal thoughts, and husband corroborated that wife was suicidal, officers had probable cause as a matter of law to involuntarily detain her).

[5] *See* Ex. 1 ("Medical records and interviews that were obtained by a subpoena revealed the victim had signs, symptoms, and injuries consistent with being raped and sexually assaulted vaginally and anally.  Furthermore, the SANE nurse stated the injuries and her behavior were consistent with a traumatic experience . . . .").

[6] Plaintiffs fault investigators for not recognizing the "perils" of relying on Levicy and for not following up with other persons who saw Mangum that night.  SAC ¶ 1142(K).  But "the failure to pursue potentially exculpatory leads, in itself, is not sufficient to negate probable cause."  *Villeda v. Prince George's County*, 219 F. Supp. 2d 696, 701 (D. Md. 2002) (citing *Clipper v. Takoma Park*, 876 F.2d 17, 20 (4th Cir. 1989)), *aff'd*, 70 Fed. Appx. 720 (4th Cir. 2003).  And though Plaintiffs allege that Levicy's statements were false, SAC ¶ 780, they do not allege that any Durham official lied about Levicy's account.  *See Franks v. Delaware*, 438 U.S. 154, 171 (1978) (truthfulness of

her reports, or had reason to do so. SAC ¶ 1322 (Levicy "[held] herself out to law enforcement and prosecutorial authorities . . . as an expert"). With the alleged victim claiming to have been raped at the lacrosse party and claiming to be in pain, SAC ¶¶ 294-96, 304, and the medical evidence consistent with that allegation, investigators had probable cause to believe that Mangum had been raped.

Other evidence also suggested that an incident involving Mangum had occurred at the party. For example, a 911 call was placed in the vicinity of 610 N. Buchanan at approximately the same time Mangum claimed to have been raped; when police responded to the house, the party guests had all vanished. SAC ¶ 220. During their subsequent search of the house, Mangum's "make up bag, cell phone, and identification were also located inside the residence" and "a pile of twenty dollar bills were recovered inside the residence totaling $160.00 consistent with the victim claiming $400.00 cash in all twenty dollar bills was taken from her purse immediately after the rape." Ex. 1.

Plaintiffs contend that the NTID affidavit included fabricated assertions. For example, they allege that while Mangum's fingernails were indeed found at the house, the officers falsely suggested that this fact was consistent with Mangum's allegations of a violent struggle. SAC ¶¶ 416, 418. They also allege that their teammates' statements threatening Mangum with a broomstick were obvious jokes, but were mischaracterized as serious. SAC ¶ 421. But even if these were purposeful mischaracterizations, as Plaintiffs' claim, that is irrelevant because the statements were immaterial to the finding

_____

witness irrelevant to court's review of probable cause; relevant inquiry is whether the *affiant* engaged in "deliberate falsehood" or acted with "reckless disregard for the truth").

of probable cause. [7]  Indeed, Plaintiffs acknowledge that the Affidavit used to obtain a search warrant for 610 N. Buchanan, which did not include any of the alleged fabrications they cite, was sufficient to obtain an NTID Order.  SAC ¶ 415; Ex. 2 (search warrant for 610 N. Buchanan).  If, as Plaintiffs concede, there was probable cause to search the house, it logically follows that there was probable cause to believe a crime had been committed without reference to those mischaracterizations.

Investigators also had reasonable grounds to suspect[8] that Plaintiffs were involved. Investigators confirmed that Mangum had performed at the party at 610 North Buchanan, and that the party was attended by Duke lacrosse players.  Ex. 1.  When they searched the house, they found her fingernails, money, cellphone, and identification.  SAC ¶¶426, 785; Ex. 1.  There is no question that, if a rape had occurred, City investigators had reason to suspect that lacrosse players at the party were involved.  That suspicion clearly exceeded the "minimal amount of objective justification, something more than an 'unparticularized

_____

[7] *See Miller v. Prince George's County*, 475 F.3d 621, 628, (4th Cir. 2007) (only material statements relevant for review of probable cause finding); *Wilkinson v. Hallsten*, No. 5:06CV2, 2006 U.S. Dist. LEXIS 53822, at * 20 ("even assuming as true that the affidavit [for a search warrant] contains false and fraudulent information, the Court still concludes that the Plaintiffs have failed to meet the two pronged test [for attacking the validity of a search warrant] because Plaintiffs do not allege that such statements were necessary to the finding of probable cause"), *aff'd*, 225 Fed. Appx. 127 (4th Cir. 2007).

[8] "[R]easonable suspicion is a less demanding standard than the probable cause standard . . . [and] . . . fall[s] 'considerably short of satisfying a preponderance of the evidence standard.'" *United States v. McCoy*, 513 F.3d 405, 411 (4th Cir. 2008) (citing *Alabama v. White*, 496 U.S. 325, 330 (1990) and quoting *United States v. Arvizu*, 534 U.S. 266, 274 (2002)).  Courts have consistently applied this lower standard to this aspect of requests for nontestimonial orders and in similar contexts.  *See, e.g.*, *State v. Pearson*, 566 S.E.2d 50, 54 (N.C. 2002) ("The sole requirement is a minimal amount of objective justification, something more than an 'unparticularized suspicion or "hunch."'").

suspicion or hunch'" required to meet the reasonable suspicion standard.  *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (*quoting Terry v. Ohio*, 392 U.S. 1, 27 (1968)).

Finally, it was beyond doubt that the NTID would provide evidence that would be a material aid in determining whether any of the Plaintiffs had been involved in the assault, since DNA had been collected from Mangum during her medical examination.

In sum, even accepting the allegations in the Complaint as true, City investigators possessed sufficient evidence to establish probable cause to believe a crime had been committed, reasonable grounds to suspect that Plaintiffs were involved, and reason to believe that DNA evidence would help determine whether Plaintiffs were in fact involved.[9]  Accordingly, and especially in light of the highly deferential standard of review to which the judge's probable cause determinations are entitled,[10] the requirements of the Fourth Amendment were met when the State prosecutor sought, and the court issued, the NTID.   This claim therefore fails as a matter of law.

## C.    The Search of Ryan McFadyen's Room and Car Were Well Within Fourth Amendment Standards (Cause of Action 2)

During the second week of the rape investigation, Durham investigators obtained a copy of an email Plaintiff McFadyen sent to his teammates.  SAC ¶¶ 591, 594.  The email, sent only hours after the party had ended, said, in full:

To whom it may concern

---

[9] Indeed, even Plaintiffs apparently concede that—at least up to the date of the NTID itself—the investigation was "legitimate."  *See* SAC ¶ 644.

[10] *United States v. Williams*, 974 F.2d 480, 481 (4th Cir. 1992) ("Great deference is to be given a magistrate's assessment of the facts when making a determination of probable cause.").

> Tommrow night, after tonights show, ive decided to have some strippers
> over to edens 2c. all are welcome.. however there will be no nudity. i plan
> on killing the bitches as soon as the walk in and proceding to cut their skin
> off while cumming in my duke issue spandex.. all in besides arch and tack
> please respond

Ex. 3.[11]  Despite its reference to Mangum's performance at the party, and its grotesque reference to violence toward strippers, Plaintiffs suggest that investigators should have immediately dismissed the email as all in good fun.  They claim that they are entitled to money damages because investigators believed otherwise and sought a warrant to search McFadyen's room and car.  SAC ¶¶ 603-04.  Plaintiffs are far off base.  Even under the facts as alleged, investigators had probable cause to believe that a crime had occurred and that evidence of the crime would be found in McFadyen's room and car.  Indeed, there is no allegation of doubt as to the email's author.  *See* Ex. 3 (noting that Gottlieb was contacted by a confidential source who provided an email sent from the address "ryan.mcfadyen@duke.edu").  Moreover, the email was dated March 14, 2006 at 1:58 AM—less than two hours after Mangum left 610 N. Buchanan.  SAC ¶ 210.  Finally, it explicitly references Plaintiff McFadyen's dormitory,  "edens 2c."  Ex. 3.

"In evaluating whether probable cause exists, it is the task of the issuing magistrate 'to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place.'"  *United States v. Robinson*, 275

---

[11]The email is found in the search warrant affidavit, attached as Exhibit 2.  It is signed "41" which was McFadyen's jersey number.  Ex. 3.  It is telling that Plaintiffs, who otherwise cannot be faulted for stinting on details, omit the text of the email from the 427-page Complaint.

F.3d 371, 380 (4th Cir. 2001) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)), *amended*, 2002 U.S. App. LEXIS 191 (4th Cir. Jan. 7, 2002). "[G]reat deference is to be given a magistrate's assessment of the facts when making a determination of probable cause. Applying this level of deference, our inquiry is directed to whether the magistrate had a 'substantial basis' for his conclusion that probable cause existed." *United States v. Jones*, 31 F.3d 1304, 1313 (4th Cir. 1994) (citation and punctuation omitted).

As explained in the previous section, investigators had probable cause to believe that Mangum had been raped, and reasonable grounds to suspect that the Duke lacrosse players at the party were involved. It therefore follows logically that McFadyen's email, evincing knowledge of Mangum's performance and suggesting extreme violence toward strippers, gave investigators probable cause to believe that relevant evidence might be found in McFadyen's room or car. *Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006) ("when determining whether probable cause exists courts must consider those facts available to the officer at the time . . . .") (internal punctuation and citations omitted).

Plaintiffs contend that it was "obvious" that McFadyen's email was a parody of a book or movie. SAC ¶ 603. But this highly dubious assertion is irrelevant. The Constitution does not require that investigators assume the most innocent explanation for evidence that suggests serious violence on or near a college campus:

> The probable cause standard does not require officials to possess an airtight case before taking action. The pieces of an investigative puzzle will often fail to neatly fit, and officers must be given leeway to draw reasonable conclusions from confusing and contradictory information, free of the apprehension that every mistaken search or seizure will present a triable issue of probable cause.

*Robinson*, 275 F.3d at 380.

Plaintiffs also contend that investigators fabricated a false affidavit in seeking the warrant. SAC ¶ 924. When assessing whether a search warrant was deficient because it contained false information, the court must determine whether the affiant "deliberately or with a reckless disregard for the truth made material false statements in his affidavit, or omitted from that affidavit material facts with the intent to make, or with reckless disregard of whether they thereby made, the affidavit misleading." *Miller v. Prince George's County*, 475 F.3d 621, 627 (4th Cir. 2007) (internal punctuation and citations omitted). But Plaintiffs offer only conclusory allegations that the affidavit was deliberately falsified, with no specificity as to which facts were allegedly false and which false facts investigators knew were false. *DuBois v. Ford Motor Credit Co.*, 276 F.3d 1019, 1022 (8th Cir. 2002) ("the complaint must contain sufficient facts, as opposed to mere conclusions, to satisfy the legal requirements of the claim to avoid dismissal").

Moreover, Plaintiffs concede that "[i]t was plainly obvious that the facts alleged in the application for the NTID Order were sufficient to obtain Judge Stephens' authorization to search Ryan's dorm room." SAC ¶ 596. They also concede that Mangum repeatedly claimed that she had been raped at 610 N. Buchanan. And Plaintiffs do not dispute that McFadyen authored the email. SAC ¶ 594. If Mangum had been raped, this email suggested that McFadyen knew about, and might have had evidence concerning, the alleged rape. McFadyen's claim therefore fails as a matter of law. [12]

---

[12] Even if the claim were cognizable as to McFadyen, the other two Plaintiffs lack standing to challenge the search warrant for McFadyen's room and car. *See Rakas v. Illinois*, 439 U.S. 128, 142 (1978) (noting that a defendant has standing to challenge the legality of a search on Fourth Amendment grounds only if he has a "legitimate expectation of privacy" in the place searched).

**D.** **Plaintiffs' Federal Abuse of Process Claim (Cause of Action 3) Fails Because No Such Federal Right Exists**

Attempting a second bite at the same apple, Plaintiffs claim that the NTID and McFadyen Search Warrant constituted an "abuse of process" in violation of "Article IV … and the First, Fourth, and Fourteenth Amendments." But this claim is directly at odds with the Supreme Court's holding that the constitutionality of pretrial searches or seizures should be assessed according to traditional Fourth Amendment standards of "reasonableness." *See Albright v. Oliver*, 510 U.S. 266 (1994). Plaintiffs' attempt to invent a federal "abuse of process" claim in this context thus fairs no better than the "malicious prosecution" claim rejected by the Court in *Albright*.[13]

Plaintiffs' claim is also at odds with the Supreme Court's holding that a court's review of the constitutionality of a search or seizure is limited to the objective facts available to the officer. Indeed, the "Fourth Amendment's concern with 'reasonableness' allows certain actions to be taken in certain circumstances, whatever the subjective intent." *Whren v. United States*, 517 U.S. 806, 813 (1996). Creating a new due process right that relies, at its core, on the alleged subjective intentions of the investigating officer would thus run directly counter to *Whren* and its progeny. It is no wonder that, in light of *Albright* and *Whren*, that the Fourth Circuit has never recognized a federal "abuse of process" claim. *Cf. Lambert v. Williams*, 223 F.3d 257, 262 n.2 (4th Cir. 2000) (refusing

---

[13] Even before *Albright*, at least one circuit expressly ruled that no such federal claim exists. *See Santiago v. Fenton*, 891 F.2d 373, 388 (1st Cir. 1989) (affirming directed verdicts for defendants on § 1983 claims for abuse of process since "the Supreme Court has in effect held that abuse of process—as a claim separate from a claim that there was no probable cause to make the arrest or institute the prosecution—is not cognizable as a civil rights violation under § 1983.").

to recognize malicious prosecution claim in light of *Albright*, and viewing the claim as a Fourth Amendment claim).

Even if a federal "abuse of process" claim existed, Plaintiffs still would not have a cognizable claim because Plaintiffs' allegations do not meet the common law elements of the tort that would be incorporated into any such right. *Hartman v. Moore*, 547 U.S. 250, 258 (2006). While Plaintiffs allege that Defendants had bad motives in seeking the NTID and search warrant, they do not allege that, after issuance, the NTID or search warrant was used in some way different from the use for which it was intended. But an abuse of process claim cannot rest simply on allegations of malicious intent. *Melton v. Rickman,* 36 S.E.2d 276, 278 (N.C. 1945) ("'Regular and legitimate use of process, though with a bad intention, is not a malicious abuse of process.'") (quoting 1 Cooley, Torts (3d Ed.) 354). There must also be an improper subsequent use for a corollary purpose. *Barnette v. Woody*, 88 S.E.2d 223, 227-28 (N.C. 1955) (the elements of abuse of process are: "First, the existence of an ulterior purpose and, second, an act in the use of the process not proper in the regular prosecution of the proceeding."); Restatement (Second) of Torts, § 682 (gravamen of the tort is "subsequent misuse" of the process).[14]

Plaintiffs do not allege that the process itself was misused. The NTID was issued by the state court for the purpose of collecting DNA and photographs of Plaintiffs, and that is was it was used for. SAC ¶¶ 402, 414. So too with the search warrant: After

---

[14] *See also Stevens v. Sanpete County*, 640 F. Supp. 376, 385 (D. Utah 1986) (abuse of process must relate to acts taken after arrest process), *aff'd mem*., 846 F.2d 76 (10th Cir. 1988); *Thomas v. Gladson*, 874 A.2d 434, 439 (Md. Ct. App. 2005) ("[A]buse of process 'is concerned with the improper use of criminal or civil process in a manner not contemplated by law after it has been issued . . . .'").

McFadyen's email was received by investigators, the court issued a warrant to search his room and his car. And that is what investigators used the search warrant for. SAC ¶ 613. The type of improper use required to state a claim—such as extorting Plaintiffs for money—is wholly absent from the Complaint. *Stanback*, 254 S.E.2d at 624 (abuse of claim requires an "act" "whereby [the defendant] sought to use the existence of the proceeding to gain advantage of the plaintiff in respect to some collateral matter"); *Vista Food Exch., Inc. v. Joyce Foods, Inc.*, No. 96-CIV-0012, 1996 WL 122419, at *5 (S.D.N.Y. Mar. 20, 1996) (noting that abuse of process typically involves "a form of extortion, by which the defendant invokes legal process to coerce the plaintiff into doing something other than what the process contemplates"). Plaintiffs' federal abuse of process claim therefore should be dismissed.

### E. Plaintiffs Cannot State a Due Process Claim Based on a Alleged Violation of N.C. Gen. Stat. § 15A-282 Because That Statute Does Not Create a Cognizable Property Interest (Cause of Action 4)

Plaintiffs allege that City officials deprived them of "property" without due process when those officials failed to provide them with reports of the results of testing done on evidence obtained pursuant to the NTID. They allege that this failure violated N.C. Gen. Stat. Ann. § 15A-282, which provides that "[a] person who has been the subject of nontestimonial identification procedures or his attorney must be provided with a copy of any reports of test results as soon as the reports are available." But the Complaint fails to state a due process claim because the North Carolina law does not create an individual entitlement that rises to the level of a protected "property" interest.

In determining whether a federal due process claim may be brought, a reviewing court must first determine "what it is that the state law provides." *Town of Castle Rock, Colo. v. Gonzales*, 545 U.S. 748, 757 (2005). While the North Carolina statute states that the report must be provided "as soon as the reports are available," North Carolina courts have not found that this creates an entitlement to such reports outside of the context of a criminal trial, when the government seeks to introduce evidence obtained from an NTID. And even in the trial context, courts have refused to suppress NTID evidence if the violation was not prejudicial to the defendant's rights. *See State v. Pearson*, 551 S.E.2d 471 (N.C. Ct. App. 2001) (finding no substantial statutory violation when the results of an NTID were not provided to the accused *until more than 12 years after they were received* and refusing to suppress the evidence); *State v. Daniels*, 51 N.C. App. 294, 300, 276 S.E.2d 738, 742 (N.C. Ct. App. 1981) (five month delay in providing the results of an analysis of the defendant's handwriting does not require exclusion of evidence). These decisions are consistent with the discretion that courts regularly infer from seemingly mandatory legislative commands. *See Town of Castle Rock*, 545 U.S. at 757 (recognizing the "deep-rooted nature of law-enforcement discretion, even in the presence of seemingly mandatory legislative commands").

Even if the state statute created an individual entitlement to the report outside of the trial context, Plaintiffs would still lack a "property" interest for purposes of the Due Process Clause. This is particularly true here, where Plaintiffs seek to enforce a *process*—a provision of a report—rather than to obtain a thing of monetary value. *See id*. at 766 (finding no "property" interest in enforcement of a retaining order for federal due

process purposes, in part because it "does not 'have some ascertainable monetary value'") (citation omitted); *see also id*. (Souter, J. concurring) (rejecting due process claim where "property" interest is asserted in "a state-mandated process in and of itself").

Moreover, the Supreme Court has made it clear that recognition of such rights is particularly inappropriate where the interest "arises incidentally, not out of some new species of government benefit or service, but out of a function that government actors have always performed." *Id*. at 766. Criminal procedure is precisely within that realm— and the Supreme Court's decisions reflect its reluctance to mint new rights in that area. *See, e.g*., *Medina v. California*, 505 U.S. 437, 443 (1992) ("The Bill of Rights speaks in explicit terms to many aspects of criminal procedure, and the expansion of those constitutional guarantees under the open-ended rubric of the Due Process Clause invites undue interference with both considered legislative judgments and the careful balance that the Constitution strikes between liberty and order."). Indeed, the right to exculpatory evidence at issue here is specifically delineated by *Brady v. Maryland*, 373 U.S. 83 (1963), which applies only when a trial occurs, and imposes a burden only on the prosecutor. *Id*.; *see also Jean v. Collins*, 221 F.3d 656, 661 (4th Cir. 2000) (for purposes of § 1983 claims, "the law has already placed ultimate responsibility upon the prosecutor for disclosing [evidence favorable to the accused, as discussed in] *Brady* . . . to the defense.") (*citing Brady*, 373 U.S. at 87). For these reasons, this claim must be dismissed.

**F.      Plaintiffs' Due Process Claim Based on "False Public Statements"
        Claim (Cause of Action 5) Fails the "Stigma Plus" Test**

Plaintiffs allege a constitutional claim based on "false public statements." Recognizing that interest in reputation alone cannot support a claim under the Due Process Clause, *see Paul v. Davis*, 424 U.S. 693, 712 (1976), Plaintiffs assert that they have also been deprived of "educational status," SAC ¶ 957(D), as well as the right to compete in intercollegiate athletics, SAC ¶ 957(C). But these deprivations are, as a matter of law, neither liberty nor property interests sufficient to satisfy the "stigma plus" test outlined in *Paul* and its progeny. Because these deprivations amount to no more than the consequences of the very reputational harm which itself lacks constitutional protection, they fail to support Plaintiffs' claims. *Siegert v. Gilley*, 500 U.S. 226, 233 (1991). This cause of action therefore must be dismissed.

The centerpiece of Plaintiffs' claim is "irreparable harm to their reputations," SAC ¶ 977. The Supreme Court has repeatedly stressed that "injury to reputation by itself [is] not a 'liberty' interest protected under the Fourteenth Amendment." *Siegert*, 500 U.S. at 233; *see also Tigrett v. Rector & Visitors of Univ. of Virginia*, 290 F.3d 620, 628 (4th Cir. 2002) ("The [Supreme] Court has plainly and repeatedly recognized that an injury to reputation alone does not deprive an individual of a constitutionally protected liberty interest," and, therefore, injuries to a person's reputation are not actionable under § 1983."). Nor is it a cognizable "property" interest. *Paul v. Davis*, 424 U.S. 693, 712 (1976) (defamatory statements "did not deprive [the plaintiff] of any 'liberty' or 'property' interests protected by the Due Process Clause").

In light of *Paul*, some courts have held that a plaintiff may recover for reputational harm only if he alleges deprivation of a cognizable property or liberty interest in connection with the harm to reputation. This "stigma plus" test is typically met when an employer not only fires or demotes an employee, but defames him or her in connection with the employment action. *See, e.g.*, *Ridpath v. Bd. of Governors Marshall Univ.*, 447 F.3d 292, 310-11 (4th Cir. 2006) (significant demotion coupled with defamatory statement may trigger due process protection); *Sciolino v. City of Newport News*, 480 F.3d 642, 646 (4th Cir. 2007) (a plaintiff must allege that charges against him both "placed a stigma on his reputation" and "were made in conjunction with his termination or demotion").

Plaintiffs' claims do not meet the "stigma plus" test. Each deprivation of which Plaintiffs complain *flowed from* the alleged damage to reputation. Indeed, Plaintiffs concede as much. *See* SAC ¶ 958 (alleging deprivations "causally connected" to "stigma to which Defendants subjected Plaintiffs"). This bootstrapping approach has been squarely rejected by the Supreme Court:

> Most defamation plaintiffs attempt to show some sort of special damage and out-of-pocket loss which flows from the injury to their reputation. *But so long as such damage flows from injury caused by the defendant to a plaintiff's reputation*, it may be recoverable under state tort law but it is not recoverable in a [constitutional tort] action.

*Siegert*, 500 U.S. at 234 (emphasis added); *see also Valmonte v. Bane*, 18 F.3d 992, 1001 (2d Cir. 1994) (effects of reputational harm, such as impact on "job prospects, or, for that matter, romantic aspirations, friendships, self-esteem" are not sufficient to satisfy "stigma plus" test); *Popovic v. United States*, 997 F. Supp. 672, 680 (D. Md. 1998) ("[H]arm to

reputation, to the extent that it creates difficulty in a pending future employment, is insufficient to establish violation of a liberty interest.").

Here, the alleged deprivations of educational status and athletic opportunities arose, if at all, from the hands of others, including Duke University.  Any actions by those third parties, flowed directly from the alleged reputational damage of which Plaintiffs claim.  But "[t]he 'stigma-plus' test requires that the defamation be accompanied by an injury *directly caused by the Government*, rather than an injury caused by the act of some third party."  *WMX Techs. v. Miller*, 80 F.3d 1315, 1320 (9th Cir. 1996) (emphasis added); *Univ. Garden Apartments Joint Venture v. Johnson*, 419 F. Supp. 2d 733, 741 (D. Md. 2006) (claim fails when deprivation "appears to be the result of actions taken by third parties who acted upon Defendants' statements").  In any event, Plaintiffs' lacrosse-related interests are not of constitutional magnitude.  *See, e.g.*, *Davenport v. Randolph County Bd. of Educ.*, 730 F.2d 1395, 1397 (11th Cir. 1984) ("The privilege of participating in interscholastic activities must be deemed to fall . . . outside the protection of due process" (quotation and citation omitted)); *Walsh v. Louisiana High Sch. Athletic Ass'n*, 616 F.2d 152, 159 (5th Cir. 1980) (same); *Angstadt v. Midd-West Sch. Dist.*, 377 F.3d 338, 344 (3d Cir. 2004) (right of education not constitutionally protected, and "[t]here is no constitutionally protected right to play sports").  Accordingly, Plaintiffs' claims cannot be sustained.

Plaintiffs also attempt to meet the stigma-plus test by essentially alleging that each violation alleged in the Complaint itself meets the "plus" requirement.  *See* SAC ¶ 957. Even if this theory were sustainable, Plaintiffs have failed to state a claim with regard to

each such violation for the reasons set out throughout this Brief.  Thus, the purported

deprivations arising from those claims cannot carry the weight Plaintiffs assign to them.

For this additional reason, Plaintiffs' due process claims must be dismissed.

> **G.** **Plaintiffs' Claims of Manufacturing False Evidence and Concealing Exculpatory Evidence (Causes of Action 6 and 7)  Fail To State A Claim Because Plaintiffs Were Never Tried or Convicted**

Plaintiffs' claims of "manufacture of false evidence" and "concealment of

exculpatory evidence" are deficient because Plaintiffs were never tried, let alone

convicted of any crime.  These claims amount to nothing more than a malicious

prosecution claim dressed up in constitutional clothing.  Yet, the Supreme Court has

rejected just such a claim even where the plaintiff was prosecuted, unlike Plaintiffs here.

No matter what constitutional guise they try to force them into, Plaintiffs' claims fail.

In *Albright v. Oliver*, 510 U.S. 266 (1994), the Supreme Court refused to

recognize a substantive due process right to be free from "malicious prosecution."

*Albright*, 510 U.S. at 275 (plurality opinion) ("Substantive due process with its 'scarce

and open-ended guideposts' can afford [petitioner] no relief.") (quoting *Collins v. Harker

Heights*, 503 U.S. at 115, 125 (1992)).  Rather, it held that complaints about pretrial

deprivations of liberty must be judged solely by the standards of the Fourth Amendment.

*Id.* at 274 ("The Framers considered the matter of pretrial deprivations of liberty and

drafted the Fourth Amendment to address it.").  Moreover, the Court reiterated that "the

accused is not 'entitled to judicial oversight or review of the decision to prosecute.'"  *Id.*

at 274 (quoting *Gerstein v. Pugh*, 420 U.S. 103, 118-119 (1975)); *see also Taylor v.

Waters*, 81 F.3d 429 (4th Cir. 1996) (rejecting claim that investigator's failure to disclose

exculpatory evidence to prosecutor "allege[d] a deprivation of any right guaranteed under the Due Process Clause of the Fourteenth Amendment" where plaintiff had not been subjected to trial); *Becker v. Kroll*, 494 F.3d 904, 918 (10th Cir. 2007) ("'[I]t is evident that substantive due process may not furnish the constitutional peg on which to hang' a claim of malicious prosecution.") (quoting *Albright*, 510 U.S. at 270 n.4).

Plaintiffs attempt to circumvent binding Supreme Court and Fourth Circuit law by styling their claims "manufacture of false evidence" and "concealment of exculpatory evidence," rather than "malicious prosecution," but the effect is the same. The substance of their allegations is no different from those made in the cases rejecting malicious prosecution claims. *See, e.g.*, *Lambert v. Williams*, 223 F.3d 257, 260-61 (4th Cir. 2000) (finding that claims of concealing exculpatory evidence, fabricating evidence, and making false statements failed to state a due process claim). Indeed, the only material difference between Plaintiffs here and the plaintiffs in the "malicious prosecution" cases is that Plaintiffs here were never charged with a crime. Surely Plaintiffs who were not wrongly charged with a crime should not be afforded new constitutional rights when the Supreme Court and the Fourth Circuit have refused to extend such rights to plaintiffs who had been wrongly charged. *See United States v. Trayer*, 898 F.2d 805, 808 (D.C. Cir. 1990) (rejecting attack on "the reasonableness of the police's targeting [them] for investigation" because "there is no constitutional right to be free from investigation"); *see also Labensky v. County of Nassau*, 6 F. Supp. 2d 161, 175 (E.D.N.Y. 1998) ("[T]he Constitution does not micro-manage criminal investigations."), *aff'd*, No. 98-7512, 1999 U.S. App. LEXIS 4241 (2d Cir. Mar. 15, 1999).

Under *Albright*, the only relevant inquiry relevant for alleged pretrial deprivations is whether there was a Fourth Amendment violation during the investigation. As demonstrated above, however, Plaintiffs have not stated a cognizable Fourth Amendment claim based on the NTID or the McFadyen Search Warrant. *See supra* Sections IV.B & IV.C. These claims therefore must be dismissed.

### H. Plaintiffs' Retaliation Claim (Cause of Action 9) Fails as a Matter of Law Because They Do Not Allege They Were Exercising Any Constitutional Right

Plaintiffs assert that Defendants retaliated against them for "exercising their constitutional right not to submit to police interrogation without the benefit of counsel." SAC ¶ 994. That is, Plaintiffs appear to claim that Defendants retaliated against them when unnamed lacrosse team members cancelled the scheduled meeting with police. SAC ¶¶ 411-12. Plaintiffs assert that the NTID, the search of McFadyen's room and car, and apparently the balance of the investigation, all were done in retaliation for the cancellation of this meeting. SAC ¶ 995.

While Plaintiffs again rattle off a number of constitutional provisions within this Cause of Action—Article IV and the First, Fourth, Fifth, and Fourteenth Amendments, SAC ¶ 1000—it is not clear what right they claim to have been exercising when an attorney cancelled the meeting with police. Reading the Complaint in the light most favorable to Plaintiffs, they appear to allege that they were exercising their Fifth Amendment right against self-incrimination. But that right is not implicated outside of a custodial interrogation and is not violated unless compelled testimony is used in a criminal trial. *See Miranda v. Arizona*, 384 U.S. 436, 469 (1966); *Riley v. Dorton*, 115

F.3d 1159, 1165 (4th Cir. 1997) (holding that there is no "Fifth Amendment violation[]

where no statements whatsoever are made"); *Grimm v. City of Uniontown*, 2008 WL

282344, *26 (W.D. Pa. Jan. 31, 2008) (rejecting claim alleging police retaliation for

suspect's exercising Fifth Amendment "right to remain silent").  But Plaintiffs here were

never in custody; never made a statement to the police; and were never tried.  In no way,

then, was the Fifth Amendment violated when cancellation of the meeting allegedly

caused "retaliation" by the Defendants.

To the extent that Defendants might be asserting a First Amendment claim,[15] it is

also deficient for several reasons.  First, the Supreme Court has held that a First

Amendment claim against criminal investigators "for inducing prosecution in retaliation

for speech" is cognizable only if the "want of probable cause [is] alleged and proven."

*Hartman v. Moore*, 547 U.S. 250, 252 (2006).[16]  Here, however, as discussed above, the

NTID, search warrant, and other investigative actions were supported by probable cause

as a matter of law.  Plaintiffs therefore could not possibly prove a First Amendment

retaliation claim.

---

[15] To state a First Amendment retaliation claim, "a Plaintiff must allege that (1) she engaged in protected First Amendment activity; (2) the defendants took some action that adversely affected her First Amendment rights; and (3) there was a causal relationship between her protected activity and the defendants' conduct." *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 499 (4th Cir. 2005) (citing *Suarez Corp. v. McGraw*, 202 F.3d 676, 685 (4th Cir. 2000)).

[16] Notably, though, the Supreme Court declined to address whether a "retaliatory investigation," absent an actual prosecution, "would ever justify recognizing such an investigation as a distinct constitutional violation." *Hartman*, 547 U.S. at 262 n.9.

Second, Plaintiffs do not even allege that they engaged in any protected speech. *See Goodman v. Smith*, 58 F. App'x 36, 38 (4th Cir. 2003) ("[A] plaintiff must allege specific facts supporting his claim of retaliation; bare assertions of retaliation do not establish a claim of constitutional dimension."). Plaintiffs simply allege that unnamed "team members"—not specifically Plaintiffs themselves—requested a postponement of the meeting, and that as a result "[t]he interrogations were postponed." SAC ¶ 407, 410. It is thus not clear who, if anyone, engaged in any speech.

Third, Plaintiffs fail to allege the necessary "but for" causative link between any exercise of First Amendment rights and the alleged retaliatory acts. *See Hartman,* 547 U.S. 250, 256 (2006) ("Retaliation is subject to recovery as the but-for cause of official action offending the Constitution"). Indeed, the Complaint itself demonstrates that Plaintiffs' cancellation of the meeting did not cause Defendants to seek the NTID or search warrant out of retaliation. The rape investigation was already well underway by the time of the NTID. SAC ¶¶ 333-81. Moreover, investigators had already focused—for obvious reasons—on securing DNA evidence from lacrosse team members. Indeed, they had asked for, and successfully obtained, such samples from Plaintiffs' teammates.

Finally, Plaintiffs have alleged no "adverse affect" on their First Amendment rights. Here, the "speech" at issue—if there was any—was team members' decision *not* to talk to police "without the benefit of counsel." Plaintiffs do not allege that they ever decided to talk to police without counsel as a result of the retaliation. Moreover, none of Plaintiffs' teammates is alleged to have talked to police without counsel as a result of the alleged retaliation. SAC ¶¶ 407, 411-12. Thus, Plaintiffs as a matter of law cannot show

that the alleged retaliatory conduct "would likely deter 'a person of ordinary firmness' from the exercise of First Amendment rights." *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474 (4th Cir. 2005). For these reasons, Plaintiffs' retaliation claim fails.

I. **Plaintiffs' Article IV Claim (Cause of Action 10) Fails Because Plaintiffs Do Not Allege That They Were Deprived of Any Protected Right Or That They Were Treated Differently Than North Carolinians**

Plaintiffs claim that they were deprived "of the same privileges and immunities . . . bestowed upon citizens of . . . North Carolina because of Plaintiffs' real or perceived status as citizens of other states." SAC ¶ 1004. This claim fails because Plaintiffs have not alleged deprivation of any right protected under Article IV—a provision which courts have interpreted very narrowly. Moreover, Plaintiffs fail to allege any facts indicating discrimination against them on the basis of their out-of-state residence—indeed, one Plaintiff is from North Carolina.

Article IV applies only to the subset of rights that are protected by the Privileges and Immunities Clause itself, which are limited to those rights recognized as "fundamental." *Supreme Court of Va. v. Friedman*, 487 U.S. 59, 64-65 (1988) ("[I]t is only with respect to those 'privileges' and 'immunities' bearing on the vitality of the Nation as a single entity that a State must accord  residents and nonresidents equal treatment." (citations and quotations omitted)); *United Bldg. & Constr. Trades v. Mayor & Council of the City of Camden*, 465 U.S. 208, 218 (1984) (Article IV protects only those interests "sufficiently fundamental to the promotion of interstate harmony"). Plaintiffs have failed to allege what fundamental rights they were deprived of. Moreover,

to the extent Plaintiffs rely on their other constitutional claims to meet this requirement, that effort fails for the reasons stated herein with respect to each of those claims.

Moreover, Article IV has generally been narrowly interpreted as applying to state statutory provisions that seek to discriminate against out-of-state residents, typically in the area of employment. *O'Reilly v. Bd. of Appeals*, 942 F.2d 281 (4th Cir. 1991); *see generally* Ronald E. Rotunda & John E. Nowak, *Treatise of Constitutional Law: Substance and Procedure* § 11.10 at 256 (4th ed. 2007) ("Historically . . . the [Supreme] Court had resisted acknowledging [Article IV, Section 2] as a broad source of individual rights. It has been interpreted narrowly as a prohibition of local legislation that discriminates against non-residents."). We are not aware of any decision upholding an Article IV claim in circumstances remotely similar to those alleged by Plaintiffs.

But even if such a claim were viable as a general matter, Plaintiffs' factual allegations would not support it. Plaintiffs make *no* factual allegations that investigators distinguished, let alone discriminated against, them on the basis of their state residence in this case. Indeed, Plaintiff Wilson himself is a North Carolina resident, SAC ¶ 7,[17] yet Plaintiffs explicitly allege that he was treated no differently. *See* SAC ¶ 710 ("The likelihood of indictment of each one of them was roughly the same.").

Moreover, the underlying premise of Plaintiffs' claim is that Defendants acted with discriminatory intent against *Duke students* due to complaints by local residents about noise and drinking violations. SAC ¶¶ 108-09, 113-15, 173. Plaintiffs attempt to

---

[17] Wilson, accordingly, lacks standing to sue under Article IV. *United Bldg. & Constr. Trades Council of Camden v. Mayor of Camden*, 465 U.S. 208, 217 (1984).

twist this central premise into the basis of an Article IV claim by further stating that the disgruntlement of local residents, and the conduct of police, were based on the (dubious) perception that Duke students are typically not residents of North Carolina. *See* SAC ¶¶ 113, 115, 490, 1004, 1160, 1164. But a "perception" of out-of-state residence is hardly the same thing as actual out-of-state residence, and is insufficient grounds for an Article IV claim. Accordingly, Plaintiffs fail to state a claim under Article IV.

**J.** **Plaintiffs Fail to State a Claim Under Sections 1985 and 1986 (Causes of Action 16 & 17) Because They Do Not Allege that They Are Members of A Protected Class or that Defendants Acted Out of Racial Animus Against Them**

Plaintiffs claim that they were denied equal protection of the law on the basis of their race. This claim is deficient for two reasons. First, Plaintiffs do not allege that they are members of a protected class. *See Williams v. City of Mount Vernon*, 428 F. Supp. 2d 146, 159 (S.D.N.Y. 2006) (dismissing Equal Protection claims when "plaintiff makes no allegation regarding class membership" and "the Complaint fails even to mention the plaintiff's race, let alone that of the [defendant] police officers"). Nor *could* they have made such an allegation here, since the Fourth Circuit has held that only those classes of people "'in unprotected circumstances similar to those of the victims of Klan violence'" are protected under § 1985. *Buschi v. Kirven*, 775 F.2d 1240, 1258 (4th Cir. 1985) (citation omitted); *see also Harrison v. KVAT Food Mgmt.*, 766 F.2d 155, 161-62 (4th Cir. 1985) (rejecting Republicans as a protected class because the Supreme Court "provided no authority on which to base the extension of § 1985(3) protection" to any class beyond African Americans).

Second, Plaintiffs have not alleged that the Defendants acted with racial animus against them. Plaintiffs' allegations of "animus" are made in the alternative—the Defendants acted with racial animus "and/or" they took advantage of animus in the community. SAC ¶¶ 1159, 1163. Neither theory suffices. Plaintiffs do not identify any Defendant in particular, let alone one with any connection to the City, who acted with racial animosity towards these three Plaintiffs because they are white. A mere conclusory statement that the Defendants were motivated by racial animus, with no alleged facts supporting that statement, does not state a claim under § 1985. *Jordan v. Alternative Res. Corp.*, 458 F.3d 332, 353 (4th Cir. 2006) (dismissing Equal Protection claim when based only on a "legal conclusion" of "racial animus" rather than on supporting factual allegations). Here, Plaintiffs repeatedly allege a *different* type of discrimination—against *Duke students*—but offer not a single factual allegation to justify leveling a *racial* discrimination charge. Moreover, the case law makes clear that a plaintiff must allege that the defendant *himself* was motivated by racial animus against the plaintiff in order to state a claim under Section 1985, not simply that he sought to create racial tensions or take advantage of racial animus on the part of others in order to achieve some other objective. *See, e.g.*, *Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971) ("The language requiring intent to deprive of equal protection, or equal privileges and immunities, means that there must be some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action."); *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 271-72 (1993) ("'Discriminatory purpose' . . . implies more than intent as volition or intent as awareness of consequences. It implies that the

decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group.") (citations omitted).  Accordingly, Plaintiffs' Section 1985 and 1986 claims fail.[18]

### K.  Plaintiffs' *Monell* Claim (Cause of Action 12) Alleges Policies and Customs that Are Neither the "Moving Force" Behind the Alleged Constitutional Deprivations Nor Facially Relevant to Them

Plaintiff's "*Monell*" claim against the City is redundant of each of the individual federal claims brought against City employees in their official capacity or naming the City of Durham specifically.  This claim should be dismissed for that reason alone. However, because this claim sets out Plaintiffs' theories for why the City should be held liable for its employees actions under *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658 (1978), the City will address those particular allegations here.

As stated throughout this Brief, Plaintiffs have failed to state a federal constitutional claim against any individual City defendants.  The City thus cannot be held liable on any of those claims as a matter of law.[19]  Moreover, even if Plaintiffs had stated a constitutional claim against a City employee, the City itself would not be liable under *Monell* unless the alleged deprivation was caused by a City policy or custom.[20]  For the reasons stated herein, Plaintiffs have failed to allege such a City policy or custom.[21]

---

[18] Because a section 1986 claim is dependent upon the existence of a section 1985 claim, section 1986 also requires that plaintiffs be members of a protected class.  *See Brissett v. Paul*, No. 97-6898, 1998 U.S. App. LEXIS 6824, at *4 (4th Cir. Apr. 6, 1998). Thus, Cause of Action 17 must be dismissed for the reasons discussed in the text.

[19] Claims 14 ("failure to train") and 15 ("conspiracy") should be dismissed for the same reason.

[20] Under *Monell*:

1. *The "Zero-Tolerance" Policy Relates to Underage Drinking and Noise at College Parties, Not Investigations of Rape Charges, and Cannot Be the "Moving Force" Behind the Complained-of Deprivations (Claim 12(A)(1))*

Plaintiffs claim that the City had a policy or custom of disproportionate enforcement of the criminal laws with respect to Duke students, referred to as the "Zero-Tolerance for Duke Students Policy." *E.g.*, SAC ¶¶ 108, 1039. They allege that the "primary tools" used by police in implementing the Zero-Tolerance policy were city and state misdemeanor statutes, specifically the City of Durham's Noise, Open Container, and Public Urination Ordinances, and the North Carolina statutes criminalizing the underage possession of alcohol. SAC ¶ 109. Plaintiffs assert that they were deprived of their constitutional rights as a "direct and foreseeable consequence" of the Zero-Tolerance Policy. SAC ¶ 1045.

But in order to state a claim for municipal liability under *Monell*, Plaintiffs must allege facts from which a factfinder may infer that the alleged policy or

---

[A] local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983.

*Id.* at 694.

21 A policy or custom may be established by showing: (1) an express municipal policy, such as a written ordinance or regulation; (2) affirmative decisions by persons with final policymaking authority for the city; (3) an omission, such as a failure to properly train officers, that "manifest[s] deliberate indifference to the rights of citizens"; or (4) a practice that is so "'persistent and widespread' as to constitute a 'custom or usage with the force of law.'" *Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003) (quoting *Carter v. Morris*, 164 F.3d 215, 217 (4th Cir. 1999)).

custom was the "moving force" behind the violation. *Monell*, 436 F.2d at 694; *see also Polk County v. Dodson*, 454 U.S. 312, 326 (1981).

> [A] plaintiff cannot rely upon scattershot accusations of unrelated constitutional violations to prove either that a municipality was indifferent to the risk of her specific injury or that it was the moving force behind her deprivation. Instead, a "plaintiff must demonstrate that a municipal decision reflects deliberate indifference to the risk that a violation of a *particular* constitutional or statutory right will follow the decision.

*Carter v. Morris*, 164 F.3d 215, 218 (4th Cir. 1999) (quoting *Board of County Commr's v. Brown*, 520 U.S. 397, 411 (1997)); *see also Spell v. McDaniel*, 824 F.2d 1380, 1388 (there must be an "'affirmative link'" between policy or custom and violation; "the causal connection must be 'proximate'") (internal citations omitted).

Plaintiffs' allegations demonstrate no such connection. The disproportionate enforcement of minor noise and alcohol violations against college students is not related to the deprivations alleged here, which all arose in connection with a serious felony investigation into an alleged rape—a "horrific, violent crime." SAC ¶ 2. In fact, Plaintiffs' factual allegations make clear that the "moving force" for any constitutional deprivations arose not from the alleged Zero-Tolerance policy, but from other sources, including Mangum's allegations, corroborating statements by Duke medical personnel, and Prosecutor Nifong's political ambitions. Indeed, the Complaint is riddled with allegations of Nifong's "unprecedented" behavior, upon which Plaintiffs' constitutional claims depend. *See, e.g.*, SAC ¶ 493 ("Nifong launched an unprecedented media campaign"); SAC ¶ 644 (Nifong made "unprecedented public statements condemning the

accused Plaintiffs); SAC ¶ 647 (Nifong "renewed his campaign of unprecedented statements to reporters about his certainty that Mangum was raped").

Given the scope of misdeeds alleged, and the critical importance of acts by Mangum, Levicy, Nifong, and others not connected to the Zero-Tolerance Policy, Plaintiffs cannot simultaneously allege that a cooperative effort between Duke and Durham in enforcing noise and alcohol regulations was the moving force behind the harm of which they complain. Because Plaintiffs offer no more than a "nebulous chain" of causation, *Carter*, 164 F.3d at 219, a theory which is itself inconsistent with their own factual allegations, and because the alleged custom or policy is not "closely related to the ultimate injury," *City of Canton v. Harris*, 489 U.S. 378, 391 (1989), this theory of Monell liability cannot be sustained.

2.   *The City Is Not Responsible for the Actions of Michael Nifong (Claim 12(C)(2), 12(C)(4), and 12(C)(5))*

With grounding in neither law, alleged facts, nor common sense, Plaintiffs assert that State Prosecutor Nifong, by virtue of taking over the rape investigation, was thereby transformed into a "Durham Investigator," subject to the City's direction and supervisory control. *See, e.g.*, SAC ¶¶ 49, 487, 949, 964, 966.[22] But whether a government entity may be held liable for the acts of a particular official depends on "the definition of the

---

[22] While not explicitly included in their *Monell* claim, Plaintiffs also apparently seek to hold the City responsible for the acts of DNASI and its employees, Clark and Meehan, by suing them in their "official capacit[ies]." *See* Causes of Action 34-36. Even assuming that the DNASI Defendants acted under color of state law, their conduct is the responsibility of the State of North Carolina, not the City of Durham. State prosecutor Nifong was responsible for involving the DNASI Defendants in this case. SAC ¶ 655, 689. Nifong's office sought a court order to allow transfer of the rape kit items to DNASI. SAC ¶ 689. And the State then paid for DNASI's services. *See* Ex. 4.

official's functions under relevant state law." *McMillian v. Monroe County, Ala.*, 520 U.S. 781, 786 (1997). And under North Carolina law, there is no question that District Attorneys act solely on behalf of the State of North Carolina.[23] Any claims predicated on the City's alleged responsibility for Nifong's actions therefore fail as a matter of law.[24]

Plaintiffs' allegation that the City somehow "delegated" authority to Nifong does not alter the legal standard. The focus must remain on how state law defines the scope of authority of the official in question. *See Pembaur v. City of Cincinnati*, 475 U.S. 469, 484-85 (1986) (examining Ohio law to determine when and under what conditions a sheriff or prosecutor could establish county policy).[25] Accordingly, Plaintiffs cannot, as a matter of law, hold the City responsible for Nifong's actions, or for failing to supervise

---

[23] *See, e.g.*, N.C. Const. art. IV, § 18(1) (District Attorney shall "be responsible for the prosecution on behalf of the State of all criminal actions in the Superior Courts of his district") (emphasis added). The fact that Nifong might have been involved in "investigative" rather than "prosecutorial" activity with regard to Plaintiffs does not alter the fact that at all times he was acting as a state, not a City, official. *See* N.C.G.S. § 7A-69 (District Attorney is entitled to investigatory assistant whose sole duty is to "investigate cases preparatory to trial and to perform such other Duties as may be assigned by the district attorney").

[24] *See Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989) (holding that "the identification of those officials whose decisions represent the official policy of the local government unit is itself a legal question to be resolved by the trial judge before the case is submitted to the jury").

[25] Even if the City had wanted to delegate policymaking authority to Nifong, it had no legal authority to do so, and Nifong had no legal authority to accept such a delegation. N.C. Const. art. IV, § 18(1) (giving only the General Assembly of the State authority to prescribe additional duties for the District Attorneys). Nor did the City have any authority under North Carolina law to supervise Nifong. *State v. Smith*, 607 S.E.2d 607, 625 (N.C. 2005) (State Legislature supervises the District Attorney's exercise of authority to decide who should be criminally charged). Under this or any other theory, Nifong could not, as a matter of law, be a City "policymaker."

him.  *See, e.g.*, *Jones v. Ziegler*, 894 F. Supp. 880, 893 & n.12 (D. Md. 1995) (county

could not be held liable for alleged acts of state prosecutor because the prosecutor is a

state official who acts only pursuant to state mandate), *aff'd sub nom. Jones v. Wellham*,

104 F.3d 620 (4th Cir. 1997).[26]

### L.    Causes of Action 11 and 13 Simply Restate Claims Made Elsewhere in the Complaint and Should be Dismissed as Repetitive

As it relates to the City, Claims 11 and 13 are repetitive and should be dismissed.

Claim 11 alleges simply that the City allowed its subordinates to deprive Plaintiffs of

constitutional rights, which is nothing more than a rewording of their *Monell* claim.

*Compare* Causes of Action 11 *with* Cause of Action 12.  Claim 13 is a "supervisory

liability" claim that alleges, essentially, the same thing—that the City failed to "control

and supervise" its subordinates in the conduct of the investigation, leading to alleged

constitutional deprivations.  *See* SAC at 346.  Thus, in addition to being flawed for the

reasons described in Section IV.K (discussing *Monell* claims), these claims should be

dismissed because they are repetitive.[27]

---

[26] The notion that the City delegated authority to Nifong is also facially implausible.  Indeed, Plaintiffs do not claim that Nifong was intending to accomplish *anything* on behalf of the City.  Rather, they allege that he was plainly motivated to pursue *State* charges and to win election to a *State* office.  *See, e.g.*, SAC ¶¶ 478-95; *id.* Section XXXV (entitled "Nifong Determines to Indict to Win Election").  Nor do they allege that the City asked, encouraged, or even contacted Nifong to act on their behalf; rather, it was Nifong who allegedly called the City to inform them that the case was now proceeding under his own (State) authority.  SAC ¶ 487.

[27] Without grounding in any of Plaintiffs' forty enumerated Causes of Action, Plaintiffs appear to assert several additional federal claims, including a Sixth Amendment claim, *see, e.g.*, SAC ¶¶ 962, 967, 1054, 1105, 1117, and a Ninth Amendment claim, SAC ¶¶ 962, 967, 1145.  Even if Sixth Amendment rights could support a 1983 action as a general matter, it cannot do so when those rights have not attached as a matter of law.

## M.    Plaintiffs' Obstruction of Justice Claim (Cause of Action 18) Fails Because That Tort Does Not Apply to Criminal Investigations

Plaintiffs assert an obstruction of justice claim based, in essence, on every allegation made throughout Plaintiffs' other Causes of Action.  *See* SAC ¶¶ 1191-98.  But this common law tort is not available to Plaintiffs in this context; obstruction of justice claims remedy interference with a plaintiff's pursuit of a *civil* claim.  *E.g.*, *Broughton v. McClatchy Newspapers, Inc.*, 588 S.E.2d 20, 30 (N.C. Ct. App. 2003); *see also Burgess v. Busby*, 544 S.E.2d 4, 12 (N.C. Ct. App. 2001).  No such obstruction of Plaintiffs' ability to use the civil process or resort to the courts is even alleged here.

While the elements of an obstruction of justice claim are broadly worded,[28] North Carolina courts have never held that an "obstruction of justice" claim is available in circumstances even remotely akin to those presented here, and for good reason.  Allowing criminal suspects subsequently cleared of wrongdoing to proceed against investigators—or witnesses who assist the police—would have an undeniable chilling

---

*See Rothgery v. Gillespie County, Texas*, No. 07-440, 2008 WL 2484864, at *5 (U.S. June 23, 2008) (Sixth Amendment right to assistance of counsel "'does not attach until a prosecution is commenced'" upon "the initiation of adversary judicial criminal proceedings—whether by way of formal charge, preliminary hearing, indictment, information, or arraignment") (citations omitted).  Similarly, the Fourth Circuit has foreclosed any Ninth Amendment claim.  *See, e.g.*, *Mykjaaland v. Burch*, No. 91-2575, 1992 WL 17934, at *1 (4th Cir. Feb. 6, 1992) (dismissing § 1983 claim brought under Ninth Amendment because that amendment "'has never been recognized as independently securing any constitutional right, for purposes of pursuing a civil rights claim'") (quoting *Strandberg v. City of Helena*, 791 F.2d 744, 748 (9th Cir. 1986)).

[28] Obstruction of justice provides liability for "any act which prevents, obstructs, impedes or hinders public or legal justice."  *Broughton v. McClatchy Newspapers, Inc.*, 588 S.E.2d 20, 30 (N.C. App. 2003) (citing *Burgess v. Busby*, 544 S.E.2d 4, 12 (N.C. App. 2001)).

effect on the proper investigation of crimes.  *Cf. Henry v. Deen*, 310 S.E.2d 326 (N.C. 1984) (noting North Carolina's refusal to recognize common law tort for perjury in light of chilling effect on citizens coming forward with evidence).  The chilling effect would be particularly crippling if such a remedy were available to suspects, like Plaintiffs here, who were never tried, jailed, or arrested.

Under Plaintiffs' formulation, the obstruction of justice tort in this context would mirror a malicious prosecution claim[29]—except without the necessity of proving Plaintiffs were ever prosecuted.  Indeed, recognizing such a claim in these circumstances would render the malicious prosecution tort superfluous, upsetting the careful balance of interests set forth by North Carolina between the needs of law enforcement and the rights of citizens.  In light of the fact that no such claim has ever been recognized in North Carolina in this context—or anything close to it—this claim should be dismissed.[30]

### N.    Plaintiffs Fail to State a Claim for Abuse of Process under North Carolina Law (Cause of Action 19)

Plaintiffs' state-law abuse of process claim fails for reasons already discussed in Section IV.D.2, *supra*.  Such a claim must be supported by allegations of subsequent

---

[29] *Cook v. Lanier*, 147 S.E.2d 910 (N.C. 1966) (malicious prosecution tort requires four elements: (1) defendant initiated, procured, or participating in a criminal proceeding against plaintiff; (2) without probable cause; (3) with malice; and (4) the criminal proceeding terminated in favor of the plaintiff).

[30] To the extent Plaintiffs rely on their allegation of conspiracy to fill the glaring gaps in their allegations, their claim still falls short since they make no factual allegations to suggest there was a "meeting of the minds" between any of the parties to obstruct justice.  The allegations thus fall woefully short of meeting the pleading standard for conspiracy.  *Twombly*, 127 S. Ct. at 1966; *S.N.R. Mgmt. Corp. v. Danube Partners LLC*, 659 S.E.2d 442, 449 (N.C. Ct. App. 2008) (dismissing factually deficient conspiracy claim).

misuse of process, not on allegations of improper motives in securing the process in the first instance. Because Plaintiffs' allegations do not meet this element, their state-law abuse of process claim must be dismissed.

O. **Plaintiffs Have Failed to State a Claim for Intentional Infliction of Emotional Distress (Cause of Action 20) Because They Have Not Alleged Extreme and Outrageous Conduct or Severe Emotional Distress**

In order to claim intentional infliction of emotional distress, a plaintiff must allege: (1) extreme and outrageous conduct (2) which is intended to cause and does cause (3) severe emotional distress. *Dickens v. Puryear*, 276 S.E.2d 325, 335 (N.C. 1981). Plaintiffs' allegations fail to satisfy at least the first and third elements.

First, Plaintiffs have not sufficiently alleged any behavior by City officials sufficient to constitute "extreme and outrageous" behavior. The tort extends only to conduct "'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded [as] atrocious, and utterly intolerable in a civilized community.'" *Bradley v. Lowe's Cos.*, No. 3:05CV488-MU, 2007 U.S. Dist. LEXIS 69872, at *10 (W.D.N.C. Sept. 20, 2007) (citation omitted). Here, City officials investigated Mangum's allegations of rape. Plaintiffs claim that they did so maliciously, and "manufacture[d] inculpatory false evidence [and] conceal[ed] exculpatory forensic evidence." SAC ¶¶ 970, 1215. But Plaintiffs must allege much more than malice akin to that underlying "malicious prosecution" claims—North Carolina imposes an "extremely rigorous standard" for this element. *Thomas v. N. Telecom, Inc.*, 157 F. Supp. 2d 627, 635 (M.D.N.C. 2000). Indeed, courts have rejected claims resting on allegations such as

Plaintiffs'—including fabrication of evidence[31]—as not meeting that strict standard. And

here, of course, Plaintiffs weren't prosecuted, jailed, or even arrested by investigators.

Second, Plaintiffs fail to allege that they suffered a "severe and disabling"

emotional condition. *Waddle v. Sparks*, 414 S.E.2d 22, 27-28 (N.C. 1992) (claim may be

sustained only where emotional harm is "*so severe that no reasonable man could be*

*expected to endure it*"). Plaintiffs allege that Defendants *intended to cause* "severe

emotional distress," SAC ¶ 1217, but claim only conditions "diagnosable" in the future

that cause "disabling" harm; they fastidiously avoid describing the harm they suffer as

"severe." SAC ¶ 1222. Given the degree of severity required to state a claim for

emotional distress, however, courts have imposed a strict pleading requirement in this

regard. *See Pruett v. Town of Spindale*, *N.C.*, 162 F. Supp. 2d 442, 444, 447 (W.D.N.C.

2001) (dismissing claim when complaint alleged only "emotional distress," not "severe

emotional distress," and noting that amendment of the complaint in this regard is

typically futile "unless a plaintiff can allege ongoing emotional or mental-health

---

[31] *See, e.g.*, *Peck v. Lake Lure*, No. 1:00cv183-T, 2001 U.S. Dist. LEXIS 13179 (W.D.N.C. Feb. 23, 2001) (allegations did not meet "outrageousness" standard even when alleged conduct included fabricating evidence against plaintiffs during arson investigation, wrongful arrest in plaintiff's home, and conspiring to bring repeated criminal claims against plaintiffs that were all dismissed); *Shillington v. K-Mart Corp.*, 402 S.E.2d 155, 161 (N.C. App. 1991) (security guard's reporting of trespass and looting to police, resulting in plaintiff's arrest, not "extreme and outrageous," even though security guard refused to listen to plaintiff's explanation); *Ausley v. Bishop*, 133 N.C. App. 210, 221 (1999) (false report to police resulting in embezzlement charges "deplorable" but did not meet "high standard" for intentional infliction claim); *Dobson v. Harris*, 521 S.E.2d 710, 715 (N.C. Ct. App. 1999) (exaggerated or fabricated report of child abuse that initiated an investigatory process not "extreme" or "outrageous"), *rev'd on other grounds*, 530 S.E.2d 829 (N.C. 2000); *Walker v. City of Durham*, 582 S.E.2d 80 (N.C. App. 2003) (standard not met even though police "destroyed . . . evidence and subsequently submitted false statements" regarding evidence).

treatment for severe emotional distress that has been diagnosed as related to the alleged conduct") (citations omitted); *Peck v. Lake Lure*, No. 1:00cv183-T, 2001 U.S. Dist. LEXIS 13179, at *15 (W.D.N.C. Feb. 23, 2001) (dismissing emotional distress claim because plaintiffs "failed to allege any diagnosed mental illness or professional care attributable to defendants' alleged conduct." (citation omitted)).  This claim thus must be dismissed.

> **P.**   **Plaintiffs Have Failed to State a Claim Against the City for Aiding and Abetting Breach of Fiduciary Duty (Cause of Action 23)**

Plaintiffs claim that the City "aided and abetted" Duke University in violating a fiduciary duty owed to Plaintiffs.  This claim fails because (1) no such duty exists as to Duke; and (2) even if it did, it should not be extended to reach the conduct alleged here, where the City simply collected evidence for a criminal investigation.

First, Duke does not owe Plaintiffs a fiduciary duty as a matter of North Carolina law.  In *Davidson v. University of North Carolina*, 543 S.E.2d 920, 928 (N.C. Ct. App. 2001), the court stated, "[W]e agree with the conclusion reached by other jurisdictions addressing this issue that a university should not generally be an insurer of its students' safety, and that, therefore, the student-university relationship, standing alone, does not constitute a special relationship giving rise to a duty of care."  *Id.*  The court expressly limited recognition of the University's duty to "special" circumstances."  *Id.*; *see also Ryan v. UNC Hosp.*, 609 S.E.2d 498 (N.C. Ct. App. 2005) (finding no North Carolina case "which determined that the interactions between educators/supervisors and medical residents created a fiduciary relationship" and declining "to extend the concept in the present case."), *available at* 2005 WL 465554, at *4; *Dalton v. Camp*, 548 S.E.2d 704,

707-08 (N.C. 2001) (fiduciary relationship exists only where one party exerted "domination and influence on the other") (quotation and citation omitted).

Plaintiffs' Complaint is bereft of any "special circumstances" which would create a fiduciary duty between these Plaintiffs and the University. Members of the lacrosse team hired strippers to perform at an off-campus party. Such circumstances are a far cry from the university-sponsored and monitored cheerleading practice at issue in *Davidson*. No fiduciary duty exists here.

Even if such a duty existed on Duke's part toward Plaintiffs, this claim against the City still must fail. Plaintiffs here merely allege that City officials received evidence from Duke employees while investigating Mangum's claims. North Carolina has never recognized such an "aiding and abetting" claim against a City in any context similar to this, and for good reason: doing so would enact a barrier to proper criminal investigations, which should not be sidetracked by analysis of the intricacies of fiduciary duties between citizens and their employers or educators.

## Q. Plaintiffs' Negligence-Based Claims (Causes of Action 25-28) Are Barred by the Public Duty Doctrine

Plaintiffs' negligence claims fail as a matter of law because the City defendants owed Plaintiffs no duty of care in conducting their investigation; without such a duty of care, these claims cannot stand. *Prince v. Wright*, 141 N.C. App. 262, 266, 541 S.E.2d 191, 195 (2000) (negligence "presupposes the existence of a legal relationship between the parties by which the injured party is owed a duty which either arises out of a contract or by operation of law.") (citation and quotation omitted).

Under the "public duty" doctrine, a municipality generally acts for the benefit of the public at large—it does not have a duty of care towards individual persons. *Braswell v. Braswell*, 410 S.E.2d 897, 901 (N.C. 1991) ("The general common law rule . . . is that a municipality and its agents act for the benefit of the public . . . .") (citations omitted). Thus where "the allegations of the complaint involve the exercise of defendants' police powers," no negligence claim may be brought. *Little v. Atkinson*, 524 S.E.2d 378, 380-81 (N.C. App. 2000), (affirming dismissal of "infliction of emotional distress" and "gross negligence" claims against city and police officers where plaintiffs alleged negligence by police in handling of remains of murder victim); *see also Walker v. City of Durham*, No. COA01-1297, 2003 WL 21499222, at *2 (July 1, 2003 N.C. Ct. App.) ("Because [defendant police technician's] actions were an exercise of Durham's police powers for the benefit of the general public, any claim based on negligence, from simple to willful, must fail in light of the public duty doctrine . . . ."); *Myers v. McGrady*, 628 S.E.2d 761, 766 (N.C. 2006) ("The rule provides that when a governmental entity owes a duty to the general public . . . individual plaintiffs may not enforce the duty in tort." ). The exceptions to the doctrine—a special relationship arising from overt promises of protection or from a "special duty,"[32] are neither pleaded here nor supported by the alleged facts. Plaintiffs' negligence-based claims, therefore, should be dismissed against the City.[33]

---

[32] *See Little*, 524 S.E.2d at 380 ("These exceptions are to be narrowly applied.") (citation omitted).

[33] Plaintiffs' "negligent infliction of emotional distress" claims (Causes of Action 27-28) fail for two additional reasons. First, Plaintiffs allege only intentional conduct by

**R. Plaintiffs' Claims for Punitive Damages Against the City Must Be Dismissed**

To the extent Plaintiffs seek punitive damages against the City (or against City defendants in their official capacity), *see* SAC ¶ 1384, they must be dismissed. The City is immune from such claims. *See City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271 (1981); *Efird v. Riley*, 342 F. Supp. 2d 413, 430 (M.D.N.C. 2004).

**V. CONCLUSION**

For the foregoing reasons, to the extent Plaintiffs' Second Amended Complaint alleges claims against the City, they should be dismissed.

---

the City and other Defendants throughout the Complaint. Plaintiffs emphasize this deficiency by alleging only intentional acts *within* these Causes of Action themselves. *See, e.g.*, SAC ¶¶ 1279-80 (alleging manufacture of false evidence to prosecute Plaintiffs on charges they knew were false). Allegations of intentional acts do not support a claim for negligent infliction of emotional distress. *See Sheaffer v. County of Chatham*, 337 F. Supp. 2d 709, 734 (M.D.N.C. 2004) (dismissing plaintiff's claim where she alleged only intentional acts); *Barbier v. Durham County Bd. of Educ.*, 225 F. Supp. 2d 617, 619 (M.D.N.C. 2002) ("When the plaintiff's complaint alleges acts . . . that are intentional in nature, and simply concludes that the acts were committed negligently, it is insufficient to state a claim for negligent infliction of emotional distress."). Second, Plaintiffs fail to allege severe emotional distress. *See supra*, Section IV.O (discussing same requirement with respect to intentional infliction of emotional distress).

This the 2nd day of July, 2008.

FAISON & GILLESPIE                              STEPTOE & JOHNSON LLP

By: /s/ Reginald B. Gillespie, Jr.              By: /s/ Roger E. Warin
Reginald B. Gillespie, Jr.                      Roger E. Warin*
North Carolina State Bar No. 10895              Michael A. Vatis*
5517 Chapel Hill Boulevard, Suite 2000          Matthew J. Herrington*
Post Office Box 51729                           John P. Nolan*
Durham, North Carolina  27717-1729              Steptoe & Johnson LLP
Telephone:  (919) 489-9001                      1330 Connecticut Avenue, NW
Fax: (919) 489-5774                             Washington, DC  20036
E-Mail: rgillespie@faison-gillespie.com         Telephone: (202) 429-3000
                                                Fax: (202) 429-3902
                                                E-Mail: rwarin@steptoe.com
                                                *(Motion for Special Appearance to be
                                                filed)

*Attorneys for Defendant City of Durham, North Carolina*

## CERTIFICATE OF ELECTRONIC FILING AND SERVICE

The undersigned hereby certifies that, pursuant to Rule 5 of the Federal Rules of Civil Procedure and LR5.3 and LR5.4, MDNC, the foregoing pleading, motion, affidavit, notice, or other document/paper has been electronically filed with the Clerk of Court using the CM/ECF system, which system will automatically generate and send a Notice of Electronic Filing (NEF) to the undersigned filing user and registered users of record, and that the Court's electronic records show that each party to this action is represented by at least one registered user of record, to each of whom the NEF will be transmitted, except that, with respect to the following party, a copy is being transmitted via first class mail to the address listed below:

Linwood Wilson
*Pro Se*
[Home Address redacted per LR 7.1(b), MDNC and ECF P&P Manual, part J]

This the 2nd day of July, 2008.

FAISON & GILLESPIE

By: /s/ Reginald B. Gillespie, Jr.
       Reginald B. Gillespie, Jr.
       North Carolina State Bar No. 10895