# UNITED STATES DISTRICT COURT
## FOR THE
## MIDDLE DISTRICT OF NORTH CAROLINA

RYAN McFADYEN, et al.,

      Plaintiffs,

             v.

DUKE UNIVERSITY, et al.,

      Defendants.

Civil Action No. 1:07-cv-953

---

## PLAINTIFFS' OPPOSITION TO THE CITY OF DURHAM'S MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT

---

Dated: October 6, 2008

**EKSTRAND & EKSTRAND LLP**
Robert C. Ekstrand (NC Bar #26673)
Attn. Stefanie A. Sparks
811 Ninth Street, Suite 260
Durham, North Carolina 27705

*Counsel for Plaintiffs Ryan McFadyen,*
*Matthew Wilson, and Breck Archer*

# TABLE OF CONTENTS

TABLE OF CONTENTS ...................................................................................................... i

STATEMENT OF THE CASE ......................................................................................... 1

NATURE OF THE CASE.................................................................................................. 1

STATEMENT OF THE FACTS ....................................................................................... 2

QUESTIONS PRESENTED ............................................................................................. 5

I.  STANDARD OF REVIEW .............................................................................. 6

II.  THE AMENDED COMPLAINT STATES ACTIONABLE CLAIMS UNDER
    FEDERAL LAW AGAINST THE CITY............................................................ 7

   A.  The Amended Complaint States Actionable Section 1983 Claims Against
       the City. ...................................................................................................... 7

      1.  The Amended Complaint States Actionable Section 1983 Claims for
          Searches and Seizures in Violation of the Fourth Amendment. ............ 9

         a.  The *Franks* Correcting Process Applied ......................................... 9

         b.  The McFadyen Warrant Affidavit ................................................. 17

            1)  Insufficient Nexus Between Place to be Searched and Things
                to Be Seized.......................................................................... 19

            2)  Gottlieb Knew No Evidence of a Crime Would Be Found in
                McFadyen's Dorm Room....................................................... 20

      2.  The Third Cause of Action States an Actionable Section 1983 Claim
          for Abuse of Process Designed to Coerce Plaintiffs into Submitting to
          Interrogation. ..................................................................................... 21

      3.  The Fourth Cause of Action States a Section 1983 Claim for
          Deprivation of Property in Violation of the Fourteenth Amendment. . 23

      4.  The Sixth and Seventh Causes of Action State a Section 1983 Claim
          for Conduct that Shocks the Conscience, in Violation of the Fourteenth
          Amendment. ....................................................................................... 24

      5.  The Ninth Cause of Action States an Actionable Section 1983 Claim
          for Retaliation and Conspiracy in Violation of Plaintiffs' First, Fifth,
          and Fourteenth Amendment Rights..................................................... 25

6. The Tenth Cause of Action States an Actionable Section 1983 Claim Against the University Defendants for Depriving Plaintiffs of the Privileges and Immunities Afforded to North Carolina Citizens in Violation of 42 U.S.C. § 1983. ............................................................ 27

B. THE AMENDED COMPLAINT STATES ACTIONABLE SECTION 1983 CLAIMS AGAINST THE CITY OF DURHAM. ............................ 28

1. Summary of the Plaintiffs' *Monell* Claims .......................................... 29

2. The Twelfth Cause of Action Sufficiently Alleges the Elements of a § 1983 Claim Against the City of Durham. ............................................ 30

a. The City of Durham and Duke University are Liable Under § 1983 for Civil Rights Violations Caused by Official Custom and Policy. ................................................................................................. 30

b. City of Durham and Duke University are Liable for Constitutional Violations that were Caused and Ratified by Officials with Final Policymaking Authority. ................................................................. 31

c. The City of Durham and Duke University are Liable for Civil Rights Violations Caused by Nifong pursuant to Delegated Authority over the Police Investigation. ......................................... 32

d. The City of Durham is Liable for the Duke Police/Durham Police Supervising Defendants' Failure to Supervise the Duke/Durham Police Defendants. ....................................................................... 34

e. The City of Durham is Liable for Civil Rights Violations Caused by the City's Failure to Train its Police Officers. ......................... 34

III. THE AMENDED COMPLAINT STATES ACTIONABLE CLAIMS FOR PARTICIPATION IN CIVIL RIGHTS CONSPIRACIES. ............................. 35

A. Conspiracies in Violation of 42 U.S.C. § 1983. ......................................... 36

B. The Amended Complaint States Actionable Claims for Conspiracy in Violation of 42 U.S.C. § 1985. ................................................................. 37

C. The Amended Complaint States a Violation of 42 U.S.C. §1986. ............ 39

D. Animus Based on State Citizenship is Actionable Under § 1985. ............ 39

E. The § 1985 Claims Allege Racial Animus of Two Types. ......................... 39

1. Section 1985 Directs Itself to Animus Toward Any Race. .................. 39

2. Defendants Were Motivated by, Fomented, and Took Advantage of Racial Animus. .................................................................................... 40

IV.  THE AMENDED COMPLAINT STATES ACTIONABLE CLAIMS UNDER STATE LAW AGAINST THE SUPERVISING DEFENDANTS. ................. 42

    A.  The Amended Complaint States a Common Law Obstruction of Justice Claim. ....................................................................................... 42

    B.  The Amended Complaint States a Common Law Abuse of Process Claim Against the City. ........................................................................... 43

    C.  The Amended Complaint States an Intentional Infliction of Emotional Distress Claim Against the City. ................................................... 44

    D.  The Amended Complaint States an Aiding or Abetting the Breach of Fiduciary Duty Claim Against the City. ..................................... 46

    E.  The Amended Complaint States a Negligence Claim Against the City. ... 47

V.  DEFENDANTS MAKE NO OTHER ARGUMENTS FOR DISMISSAL; PLAINTIFFS REQUEST LEAVE TO COMMENCE DISCOVERY ............. 50

CONCLUSION ............................................................................................. 51

## STATEMENT OF THE CASE

The Amended Complaint describes a combination of actors and entities referred to as the Consortium. For thirteen months beginning in March 2006, the Consortium's ultimate objective was to railroad the Plaintiffs and their 44 teammates into convictions as either principles or accomplices to a horrific, violent crime they knew never happened. The allegations describe a willful, malicious, and calculating conspiracy of multiple dimensions. Acting individually and in concert, the City's employees, individually, in concert with others (some named as codefendants and others not), and pursuant to the City's policies, customs, and its final policymakers' directives, concealed exonerating evidence, manufactured inculpatory evidence, and stigmatized the Plaintiffs by subjecting them to public outrage, public condemnation, and infamy in the minds of millions of people. The City's policies, customs, and policymaker directives caused the Plaintiffs to be subjected to executive conduct that shocks the conscience. Maybe the most unsettling of all are those who knew of the wrongs conspired to be done to Plaintiffs, and had the power to prevent or aid in preventing them, and instead 'turned a blind eye' and did nothing.

## NATURE OF THE CASE

Plaintiffs filed this action on December 18, 2007 and amended that filing on April 17, 2008. Pursuant to a request from this Court regarding the location of the audio and video exhibits embedded within the First Amended Complaint ("AC"), Plaintiffs re-filed the AC on April 18, 2008 with those embedded exhibits as separate documents. Except for the location of the exhibits, the two "First Amended Complaints" are identical. All Defendants filed Motions to Dismiss pursuant to Fed. R. Civ. P. 12(b) (6) on July 2, 2008. This Memorandum is filed pursuant to the Court's Order of October 7, 2008 [Document #72], granting

Plaintiffs' Motion for Leave to File Opposition Briefs [Document #71], and authorizing Plaintiffs to file their Responses on or before October 10, 2008.[1]

**STATEMENT OF THE FACTS**

The CITY OF DURHAM (the "City") is a municipal corporation formed under the laws of the State of North Carolina. The City is believed to have waived its immunity from civil liability pursuant to N.C.G.S. § 160A-485 by, among other things, procuring a liability insurance policy or participating in a municipal risk-pooling scheme. The City of Durham operates the Durham Police Department, which shares law enforcement authority in the City of Durham with the Duke University Police Department, pursuant to a statutory grant of authority and an agreement between the City of Durham and Duke University. AC ¶ 58.

The City of Durham and its employees played a critical role in the grave miscarriage of justice that became known as the "Duke Lacrosse Rape Case." The allegations involving the City and its employees are detailed throughout Plaintiffs' Amended Complaint; however, the most significant allegations with respect to the City relate to its Zero-Tolerance for Duke Students Policy ("Zero-Tolerance"). The City is not alone in pursuing the policy, and Plaintiffs have pointed directly to their collaborator: Duke University itself. Pursuant to Duke-Durham Zero-Tolerance Policy, virtually every clearly established constitutional

---

[1] Plaintiffs' Opposition Brief is filed in response to City of Durham's Motion to Dismiss [Document #61] and supporting Memorandum [Document #62]. The City of Durham's supporting brief is cited herein as "City Br." The individual supporting briefs of the City's co-defendants are cited herein as: "Gottlieb Br.," "City Super. Br.," "DNASI Br.," "SANE Br.," "Duke Univ. Br." "DUPD Br.," "Himan Br.," "SMAC Br.," "Hodge Br.," and "Wilson Br."

2

protection was lifted in police interactions with Duke Students. Specifically, Zero-Tolerance meant:

- Durham Police and Duke Police abused the power to enforce, disproportionately and unconstitutionally, the criminal laws against Duke Students. A.C. ¶¶ 111, 115.

- Duke students were charged and incarcerated for "alleged" criminal violations of the local ordinance called "Noise. Generally" or the open container ordinance banning open containers on sidewalks adjacent to homes which are not enforced against "permanent residents." AC ¶ 108.

- Police ignored the Warrant requirement if the home to be searched was leased by a Duke Student. AC ¶¶ 116-128.

- Police ignored the probable cause requirement for the seizure of any person if the person to be seized was a Duke student. AC ¶ 113.

- Police fabrication of evidence (offered directly by police officers in courts of law to make baseless charges brought against Duke Students stick.) AC ¶175.

- The use of police power, generally, to intimidate, threaten, and coerce the out of state students into leaving the homes they leased in the Trinity Park neighborhood off of their University's East Campus. AC ¶¶ 113-15.

- Perhaps the Policy's most characteristic feature since its inception has been the Police Department's purposeful violation of the constitutional prohibition upon stigmatization in connection with any deprivation of rights, particularly a seizure or search, AC ¶¶ 120-21.

Zero-Tolerance was a moving force behind the conspiracy to convict the Plaintiffs that is documented in the Amended Complaint. And perhaps the most disturbing fact alleged in the Amended Complaint is the fact that, from the beginning of the "investigation," Duke and Durham had no evidence of a sexual assault save Mangum's recanted claim, and they certainly had clear proof that Plaintiffs and their team had nothing to do with one. A.C.§§VI- XL. They had nothing. AC ¶¶ 52, 57-68, 69-79. Recall Nifong's assessment of the evidence: "You know, we're f****d," (AC ¶ 593) or Himan's reaction to the decision to

proceed to indictment in April: "with what?" AC ¶816. And from that poisoned field nothing emerged but a parade of horrors:

- Fraudulent investigation: Durham Police oversaw an investigation that it should never have had in the first place: the allegations of rape occurring at 610 N. Buchanan. AC § XVIII (discussion on jurisdiction). Durham Sergeant Mark D. Gottlieb seized control of this case as soon as he could, not surprising given his particular interest and history of abusing Duke Students. AC ¶ 171. The investigation was a sham, laden with conspiracies. Defendant knew all of this and "turned a blind eye;" this failure to intervene ratified all of the bad acts. AC §IV(F).

- Retaliation – Public Stigmatization: Defendant engaged in numerous egregious acts of retaliation for Plaintiffs' exercise of constitutional rights, including searches and seizures based on lies and fabricated allegations. AC § XIV(C). Defendant did not do all of this quietly either, but rather launched a national media campaign resulting in the vilification of Plaintiffs and enduring public stigmatization.

- Multiple conspiracies: Defendant was a primary actor in several conspiracies throughout this case, the most outstanding include: the NTID order, the search warrant abuse, the Photo ID sham, the DNA Cover-Up, the SANE fabrications. See AC §§ XIII-XXV, XXIX-XXX, XXXIV. Much of this was engineered through Joint-Command Meetings between Duke and Defendant. AC § XXVI.

This is not the way cities and universities react to patently false accusations, particularly when they are recanted as soon as the accuser is removed from the commitment proceedings in which she made them. The arrogance of the City's policymakers, leaders, administrators, police officers, and employees (and all of their counterparts at Duke) that played out over the course of thirteen months did not just appear on March 14, 2006. It was not the natural consequence of a false allegation made by a drug-addled woman who, at the time, was in the midst of an apparent psychotic break, in police custody, and in the process of being involuntarily committed. It was the product of a well-worn policy and custom of police to deprive "temporary residents" of their constitutional rights in all encounters with law enforcement. So ingrained was Zero Tolerance in the police apparatus that, six months into the "fiasco," when news reports unmistakably documented Sgt. Gottlieb's miserable

record of deliberate, inhumane violations of Duke students' rights, the Durham Police Department's Internal Affairs Chief reflexively held a press conference to say that Sgt. Gottlieb was following *his* "orders." AC ¶ 181. This was true, he said, when Gottlieb raided "temporary residents" homes without a warrant, arrested and charged "temporary residents" students with no evidence of a crime, and maintained a record of arresting roughly seven "temporary residents" students for every "permanent resident." AC § IV.

## QUESTIONS PRESENTED

The questions presented by the City's Motion to Dismiss are:

- Have the Plaintiffs stated a Fourth Amendment violation actionable under 42 U.S.C. § 1983?

- Have the Plaintiffs stated a § 1983 claim for violations of constitutionally protected property rights created by a state-created entitlement statute?

- Have the Plaintiffs stated § 1983 stigma-plus claim?

- Does the absence of a charge, prosecution, or conviction bar Plaintiffs' §1983 claim for conspiracy to convict, where it is alleged that multiple conspirators engaged in overt acts that deprived Plaintiffs of constitutional rights?

- Is the right not to speak protected by the First Amendment from state action that includes fabricating an affidavit to secure orders authorizing seizures and searches of Plaintiffs?

- Is the right to be free from state-sponsored coercion designed to force the waiver of an asserted constitutional right protected by the First Amendment and Fourteenth Amendments?

- Whether Plaintiffs adequately state a claim under the Privileges and Immunities Clauses of Article IV and the Fourteenth Amendment, when Plaintiffs *do* allege that officers treated the Plaintiff who is a North Carolina citizen differently from those who are not?

- Whether the alleged policy of "Zero Tolerance" for "temporary residents" is a moving force behind the deprivations Plaintiffs allege, including the conspiracy to convict 47

"temporary residents" for a sexual assault that the City's policymakers directed and agreed with Duke University policymakers to pursue when they knew no sexual assault occurred, such that the City may be held liable under *Monell v. Dep't of Social Servs. of N.Y.,* 463 U.S. 658 (1978);

- Whether the City of Durham may be held liable for acts of an interim District Attorney to whom the City's policymakers delegated their policymaking authority over the investigation of Mangum's bogus claims?

- Whether "Race" means "any race" or some undefined subset of races?

- Whether "fomenting racial animus" applies to § 1985 claims in the same way it applies to its companion statutes in the Civil Rights laws?

- Have Plaintiffs stated actionable state law claims against the City?


## ARGUMENT

### I.  STANDARD OF REVIEW

A motion to dismiss for failure to state a claim may be granted "only in very limited circumstances." *Rogers v. Jefferson-Pilot Life Ins. Co.,* 883 F.2d 324, 325 (4th Cir. 1989). In examining a Rule 12(b)(6) motion, "the court should accept as true all well-pleaded allegations and should view the complaint in a light most favorable to the plaintiff." *Salami v. Monroe,* No. 1:07CV621, 2008 WL 2981553, at *5 (M.D.N.C. Aug. 1, 2008) (quoting *Mylan Labs., Inc. v. Matkari,* 7 F.3d 1130, 1134 (4th Cir. 1993)). Though the complaint is not required to encompass detailed factual allegations, "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* (quotations and alterations in original) (quoting *Bell Atl. Corp. v. Twombly*, 127 S.Ct. 1955, 1964-65 (2007)). The complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Id.* (quoting *Twombly*, 127 S.Ct. at 1965). "[O]nce a claim has been

stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Id.* (quoting *Twombly*, 127 S.Ct. at 1969).

Further, where Plaintiffs have asserted a civil rights action, the Court "must be especially solicitous of the wrongs alleged and must not dismiss the complaint unless it appears to a certainty that the plaintiff would not be entitled to relief under any legal theory which might plausibly be suggested by the facts alleged." *Veney v. Wyche,* 293 F.3d 726, 730 (4th Cir. 2002) (internal quotations omitted). With these standards in mind, this Memorandum will identify the factual basis in the Amended Complaint for the causes of action asserted against the City and respond to their arguments for dismissal.

## II. THE AMENDED COMPLAINT STATES ACTIONABLE CLAIMS UNDER FEDERAL LAW AGAINST THE CITY.

### A. The Amended Complaint States Actionable Section 1983 Claims Against the City.

The First through Fifteenth Causes of Action allege violations of 42 U.S.C. § 1983 (the "§ 1983 Claims"). At this early stage, the Court must determine whether each of these Causes of Action alleges facts sufficient to state the elements of Plaintiffs' § 1983 claims against the City.[2] *See Green v. Maroules*, 211 F.App'x 159, 161 (4th Cir. 2006). Based on

---

[2] Section 1983 provides:

> [E]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proceeding for redress[.] 42 U.S.C. § 1983 (2000).

statute's text, the Supreme Court held that a Section 1983 claim requires only two essential allegations:

> By the plain terms of section 1983, two–and only two–allegations are required in order to state a cause of action under that statute. First, the plaintiff must allege that some person has deprived him of a federal right. Second, he must allege that the person who deprives them of that right acted under color of state or territorial law.

*Gomez v. Toledo*, 446 U.S. 635, 640 (1980). Section 1983 does not itself create or establish substantive rights; it provides "a remedy" where a plaintiff demonstrates a violation of a right protected by the federal Constitution, or by a federal statute other than §1983. *Chapman v. Houston Welfare Rights Org.*, 441 U.S. 600, 617 (1979). Analytically, however, it may be more useful to understand a Section 1983 action as having four elements of proof: (1) a violation of rights protected by the federal Constitution or created by federal statute or regulation (2) proximately caused (3) by the conduct of a "person" (4) who acted "under color of any statute, ordinance, regulation, custom or usage, of any State or Territory or the District of Columbia." 42 U.S.C. § 1983 (2000). *See, e.g., Martinez v. California*, 404 U.S. 277 (1980). In addition, where a plaintiff -as here- seeks to hold a municipality liable, under § 1983, there is a fifth element: that the violation of plaintiff's federal right was attributable to the enforcement of a municipal policy or practice. *Monell v. Dep't of Social Servs. of N.Y.*, 463 U.S. 658 (1978).

The Amended Complaint alleges claims of three types against the City. First, the Plaintiffs § 1983 claims against the City for deprivations of federal rights, including the First, Fourth, and Fourteenth. These are the *Monell* claims, arising out of official conduct, policy, and custom attributable either to the City or its policymaking officials. Next, Plaintiffs allege civil rights conspiracy claims under 42 U.S.C. §§ 1983, 1985, and 1986. They are brought against the City, either by naming the City directly or indirectly by naming its employees or agents in their official capacities. The City is the real party of interest in these causes of

action. Third, Plaintiffs state several official capacity claims against the City under North Carolina Law. Here, we respond to the City's arguments for the dismissal of Plaintiffs municipal liability claims and summarize, briefly, the other claims which the City has named.

### 1. The Amended Complaint States Actionable Section 1983 Claims for Searches and Seizures in Violation of the Fourth Amendment.

The First and Second Causes of Action state § 1983 Claims against Gottlieb, Himan, and others for unreasonable searches and seizures in violation of Fourth and Fourteenth Amendments. AC ¶¶ 904-17, 918-28. Plaintiffs identify two discrete searches and seizures: (1) the Non-Testimonial Identification ("NTID Order") (the First Cause of Action), *id.* ¶ 907, and (2) the Search Warrant for Ryan McFadyen's dorm room (the "McFadyen Warrant") (the Second Cause of Action) *id.* ¶ 920. The McFadyen Search Affidavit adds only one new allegation; the two Affidavits are nearly identical. Below, Plaintiffs apply the *Franks* "correcting" analysis to these two affidavits to make the showing required at this early stage to demonstrate that the fabrications and omissions were necessary to the judicial determination of probable cause.

### a. The *Franks* Correcting Process Applied

### PART I

### <u>NTID ORDER</u>

### <u>PROBABLE CAUSE TO BELIEVE A FELONY WAS COMMITTED</u>

**AFFIDAVIT: On 3/14/06 at 1:22am, Durham City Police Officers were called to the Kroger on Hillsborough Road. The victim, a 27 year old black female, reported to the officers that she had been raped and sexually assaulted at 610 North Buchanan Blvd.**

This statement <u>fabricates</u> and <u>omits</u> material facts known to the affiant:

- First, Mangum did not "report to the officers" at Kroger that she was assaulted at all; she nodded in response to a question during her involuntary

9

commitment proceedings after she learned her children may be taken away from her.  AC ¶ 382.

- Second, within the first 48 hours after her initial false accusation,  Mangum was questioned by at least 8 different medical providers and 3 Durham Police Officers, and, in those interviews, (a) Mangum recanted when questioned by Sgt. Shelton, A.C. ¶ 262; (b) in the 11 renditions of the story, Mangum never gave the same story twice, varying even on the question of where she came from-Raleigh or Durham; and (c) the only consistent element of Mangum's account was that Pittman had stolen her money, her purse, her ID, and her phone.  AC ¶¶ 221, 271, 328.

- Third, that the call was for a "10-56" (code meaning "intoxicated pedestrian"); it was placed not by Mangum but by a Kroger security guard, Angel Altmon; and Altmon  reported that Mangum was "an intoxicated lady,  in someone else's car," and "the lady won't get out of the car." AC ¶¶ 225-27, Exh. 9. Third, that the Kroger security guard's opinion was that there "Ain't no way" Mangum had been sexually assaulted, based on her observations.

- Fourth, the reason Kim Pittman took Mangum to the Kroger was to seek the protection and aid of a security guard she knew would be there; Pittman feared for her own safety because Mangum's behavior in the car was bizarre and threatening; that Mangum told Pittman, "go ahead, put marks on me"; and that Pittman claimed Mangum was "talking crazy." AC ¶ 382.

- Fifth, when police approached Mangum in Pittman's car, Mangum "feigned unconsciousness," then fought being removed from the car by holding onto the parking brake, which required Sgt. Shelton to apply a "bent-wrist come-along."  AC ¶ 233.

- Sixth, the entire protracted period Mangum was in the Kroger parking lot, she did not say or suggest to any officer there that she had been assaulted; Mangum gave no indication nor any reason to believe that Mangum had been sexually assaulted; and Durham PD has dispatch audio of the responding officer saying "she's breathing, appears to be fine, not in distress, just passed out drunk."  AC ¶¶ 40-47, Exh. 10.

- Seventh, that Mangum's behavior became so bizarre and dangerous that she met the standards for involuntary commitment; that Sgt. Shelton believed she

needed immediate psychiatric care;   and that Mangum was transported to Durham Center Access, where she refused to cooperate.  AC ¶ 243.

- Eighth, that Nurse Wright asked Mangum a series of questions to which she did not respond, but after Mangum overheard an officer on the radio direct someone to Mangum's house to check on her children and to call DSS if no one is supervising them, Mangum nodded (yes) to Nurse Wright's question, "Were you raped?" AC ¶¶ 225-238; id. § VIII ("Mangum Nods 'Rape'").

**AFFIDAVIT:  After a few minutes, the males watching them began to get excited and aggressive.**

This statement <u>fabricates</u> and <u>omits</u> material facts:

- Police knew from Himan's interview of Pittman on March 22⸴ 2006, that Mangum's behavior was bizarre and the young men present quickly became "uncomfortable and/or disinterested."  AC ¶ 202.

**AFFIDAVIT:  "One male stated to the women "I'm gonna shove this up you" while holding a broom stick up in the air so they could see it.**

This statement <u>fabricates</u> and <u>omits</u> material facts known to the affiant:

- Gottlieb and Himan learned of 'the broomstick exchange' from the March 16th interviews of Evans, Flannery, and Zash.  None of them said that anyone did that.  What was said was far different, and it was Pittman's first excuse for ending the evening before Mangum's behavior got any more bizarre.  Gottlieb and Himan twisted the voluntarily given statements into a complete fabrication.  AC ¶¶  421-422.

**AFFIDAVIT:  The victim and her fellow dancer decided to leave because they were concerned for their safety.  After the two women exited the residence and got into a vehicle, they were approached by one of the suspects.  He apologized and requested they go back inside and continue to dance.**

This statement <u>fabricates</u> and <u>omits</u> material facts known to the affiant:

- Pictures reveal Mangum following the dance trying to get back into the house. She had been locked out by the boys for *their own safety.* She is just standing still, smiling.  There is no indication of fear for her safety.  AC ¶¶ 397.

11

- Mangum's cell phone records reveal that, at that time, she called her agency, Centerfold. Mangum was looking for more work elsewhere. AC ¶¶ 204, 206-207.

**AFFIDAVIT: The victim arrived at the residence and joined the other female dancer around 11:30pm on 3/13/2006.**

This statement <u>omits</u> facts known to the affiant:

- Mangum (1) *was dropped off* at the residence around 11:40pm, (2) she was 40 minutes late, (3) that she was staggering when she arrived, and (4) appeared to have come from another event. AC ¶ 197.

**AFFIDAVIT: Shortly after going back into the dwelling the two women were separated. Two males, Adam and Matt pulled the victim into the bathroom.**

This statement <u>fabricates</u> and <u>omits</u> material facts:

- Kim Pittman told Inv. Himan in a telephone interview that Mangum's accusation was a "crock." AC ¶ 385.

- Even after Pittman was forced to add an addendum to her written statement, Pittman described Mangum as going back into the house to make more money—Pittman does not say that she went back into the house with her and that they were separated. AC ¶¶ 385-386.

- The names Adam and Matt were never give during her 11 renditions. AC ¶ 322.[3]

**AFFIDAVIT: The victim stated she tried to leave, but the three males (Adam, Brett, and Matt) forcefully held her legs and arms and raped and sexually assaulted her anally, vaginally, and orally. The victim stated she was hit, kicked, and strangled during the assault. Medical records and interviews that were obtained by a subpoena revealed the victim had signs, symptoms, and injuries consistent with being raped and sexually assaulted vaginally and anally.**

This statement fabricates and omits material facts known to the affiant:

_____

[3] Note, Defendants Levicy's account with the names included is alleged to be a fabrication made to harmonize a "contemporaneous" account with this affidavit).

- There was no swelling, edema, cuts or abrasions (even microscopic) of the anus or the exterior pelvic region. No cuts, abrasions, or abnormalities on or around Mangum's vagina or anus were observed or documented with the high-magnification coloposcope. AC ¶ 308.

- Doctors and nurses concluded that Mangum was making false claims of pain because their tests revealed no associated symptoms of pain at all. AC ¶ 325.

- The only documented injuries in the SAER were injuries to Mangum's knees and ankles. However, digitally time-stamped photos taken during the dance show the exact same injuries were already present on her knees and ankles before she arrived at 610 N. Buchanan. AC ¶ 326.

- Mangum denied receiving any physical blows by the hand, AC ¶ 308, and in the many 'Systems Examinations' that were done by DUMC doctors and nurses on the morning of March 14, 2006 (and the UNC doctors and nurses the next day), all concluded that Mangum's head, back, neck, chest, breast, nose, throat, mouth, abdomen, and upper and lower extremities were 'normal,' and Mangum was consistently noted to be in 'no obvious discomfort,' even when she was scoring her pain as '10 out of 10.' AC ¶ 309.

**AFFIDAVIT: The victim reported that she was sexually assaulted for an approximate 30 minute time period by the three males.**

This statement <u>fabricates</u> and <u>omits</u> material facts known to the affiant:

- During her initial 11 renditions of the night, Mangum claimed that 1, 20, and 5 men raped her. A.C. ¶ 321. Mangum was treated and evaluated at Duke University Medical Center Emergency Room shortly after the attack took place. Mangum was not treated, merely kept for observation.

- Long after she arrived, DUMC staff initiated a Sexual Assault Examination (SAE), which was abandoned in the middle of the first exam. No pelvic exam was conducted. No rectal exam was conducted. No forensic toxicology tests were ordered. No forensic blood drawn was taken.

- The medical staff, Durham police officers and Duke police officers who interacted with her believed she was lying. AC ¶¶ 302-06.

**AFFIDAVIT: She claimed she was clawing at one of the suspect's arms in an attempt to breathe while being strangled.**

This statement <u>fabricates</u> a material fact known to the affiant:

- Mangum did not make this claim in any of the multiple, varying accounts that she gave police officers and medical providers on March 14th, 15th, or 16th, or in her written statement on April 6th. AC ¶ 424.

**AFFIDAVIT: The victim's make up bag, cell phone, and identification were also located inside the residence totaling $160.00 consistent with the victim claiming $400.00 cash in all twenty dollar bills was taken from her purse immediately after the rape.**

- $160.00 is not consistent with $400.00, and she also claimed the amount "stolen" was $2,000.00. Further, Mangum also claimed that her money (1) was stolen, (2) was not stolen, (3) was stolen by "Nikki," (4) stolen by one of several of "the attackers," (5) was deposited into a nearby ATM account, and (6) left in the back seat of Officer Barfield's patrol car. AC ¶ 321.

**AFFIDAVIT: A Forensic Sexual Assault Nurse (SANE) and Physician conducted the examination. Medical records and interviews that were obtained by a subpoena revealed the victim had signs, symptoms, and injuries consistent with being raped and sexually assaulted vaginally and anally. Furthermore, the SANE nurse stated the injuries and her behavior were consistent with a traumatic experience.**

This statement <u>fabricates</u> and <u>omits</u> material facts known to the affiant:

- Levicy was a "SANE-in-Training" and was not qualified or competent to conduct an SAE under accreditation standards or DUHS's internal policies.

- No qualified SANE conducted the exam; a resident, Dr. Julie Manly did.

- Levicy was also not competent to collect or interpret forensic medical evidence. Levicy agreed with Gottlieb and Himan to back up their use of her "observations" in Mangum's SAE, in court as an "expert" if necessary. AC ¶ 301. By signing the SAER and failing to clearly document those facts on the SAER, Levicy deliberately falsified a forensic medical record in order to aid Himan and Gottlieb's attempt to obtain search and seizure orders by defrauding the Court. AC ¶ 299.

- Fourth-year resident Julie Manly found no injury to Mangum's pelvic region whatsoever, including the vaginal walls, cervix, rectum, or anus. The only notation Manly made was 'diffuse edema of the vaginal walls.' Diffuse edema is not an injury; it is a symptom. It is caused by many things. Further diffuse

edema cannot be clinically identified to a reasonable degree of medical certainty without a baseline reference for comparison (e.g., a prior observation of the vaginal walls at a time when they were not edemic). AC ¶ 306.

**AFFIDAVIT: In a non-custodial interview with Daniel Flannery, resident of 610 N. Buchanan and Duke Lacrosse Team Captain; Mr. Flannery admitted using an alias to make the reservation to have the dancers attend the Lacrosse Team Party.**

This statement fabricates and omits material facts known to the affiant:

- During Police questioning on March 16th, Dan Flannery, told police that, when he called the agency, he gave the name Dan Flanagan. No witness ever said that Dan identified himself as Adam, rather everyone was calling him Dan. AC ¶ 432.

**AFFIDAVIT: The victim and her fellow dancer decided to leave because they were concerned for their safety. After the two women exited the residence and got into a vehicle, they were approached by one of the suspects. He apologized and requested they go back inside and continue to dance.**

- Jason Bissey, a neighbor, told police that he saw Mangum staggering around the side of the house, heading toward the back yard saying she was looking for her shoe. AC ¶¶ 387-90. Kim Pittman told police she was afraid of Mangum. AC ¶ 199.

**AFFIDAVIT: During a search warrant at 610 N. Buchanan on 3-16-2006 the victim's four red polished fingernails were recovered inside the residence consistent to her version of the attack.**

- This statement omits the fact that other unpainted fingernails and nail polishing and painting accessories were found in the bathroom, inside Mangum's purse, and on a computer component, which were seized by police in the search of 610 N. Buchanan. AC ¶ 425.

## PART II

## NTID ORDER

## <u>"REASONABLE GROUNDS" TO BELIEVE THAT McFADYEN, WILSON, OR ARCHER COMMITTED ANY FELONY LISTED</u>

**AFFIDAVIT:  All of the parties named in this application with the exception of the last five were named by the three residents of 610 N. Buchanan as being present at the party.  Due to the fact that the residents of 610 N. Buchanan stated that all the attendees were their fellow Duke Lacrosse Team Members and that there were so many attendees, all of the white male Duke Lacrosse Team Members were listed since they were all aware of the party and could have been present.**

This statement raises the most glaring omission of those which should have been included in this section of the Gottlieb-Himan Affidavit:

- On March 16, 2006, Crystal Mangum—herself—ruled out McFadyen, Wilson, and Archer as possible suspects.  On that day, Clayton, Himan, and Gottlieb showed Mangum each of their pictures, and Mangum did not recognize any of them.  AC ¶¶ 383-84.

- By March 21, 2006, additional photo identification procedures coupled with Mangum's "general descriptions" of her "attackers" ruled out every other person at whom the NTID Order was directed.  The failure to advise the judge of this fact is sufficient—standing alone—to hold Gottlieb and Himan liable for the harms caused by their abuse of it.  AC ¶¶ 92-100.

- In the year 2006, a reasonable officer in Gottlieb's, Clayton's, and Himan's position would know—even to a moral certainty—that what they were doing violated clearly established law.  Further, a reasonable officer would also know that leaking the NTID Order they obtained by fraud to the press to ignite a media firestorm  and to publicly vilify Plaintiffs not only violates clearly established law, but is also arbitrary and evinces corrupt, malicious, depraved, and evil motives that shock the conscience.

- The AC alleges additional fabrications and omissions, and this could continue on; however, the foregoing allegations from the AC sufficiently allege that the Affidavits were designed to mislead, egregiously so.

**AFFIDAVIT:  Numerous persons who attended this party are seniors at Duke University and have permanent addresses outside of the State of North Carolina, making it difficult if not impossible to collect the DNA evidence in the future when necessary.**

The Court may take judicial notice that this statement is false, and, if not, the Affidavit establishes its falsity.  AC ¶ 757.

**AFFIDAVIT: She stated one male identified himself as Adam, but everyone as the party told her they were members of the Duke Baseball and Track Team to hide the true identity of their sports affiliation—Duke Lacrosse Team Members. In a non-custodial interview with Daniel Flannery, resident of 610 N. Buchanan and Duke Lacrosse Team Captain; Mr. Flannery admitted using an alias to make the reservation to have the dancers attend the Lacrosse Team Party.**

Both Gottlieb and Himan were involved in the search of 610 N. Buchanan, and, it was obvious that no one who lived there sought to conceal their team or school affiliation. To the contrary, the walls were covered with 'Duke Lacrosse' posters, banners, and other insignia. AC ¶ 436. Further, Dan Flannery had already voluntarily provided a DNA sample, pubic hair sample and everything else the police asked of him. AC ¶ 432; Kim Pittman refers to Dan in her statement and yet makes no reference to any alias. AC ¶ 385.

### b. The McFadyen Warrant Affidavit

The only additional "fact" asserted in the Affidavit for the McFadyen Warrant was text claimed to be excerpted from an email provided by an "anonymous source". *See* Gottlieb Br. Exh. 3 at 94. Because the Affidavit stated that the source of the text allegedly extracted from an email was from an "anonymous source" the Affidavit needed to contain some indicia of the anonymous source's reliability to be considered in the probable cause determination. *Florida v. J.L.,* 529 U.S. 266, 269-70 (2000). Six years prior to the McFadyen Search Warrant, the United States Supreme Court issued a unanimous decision holding that an anonymous tip claiming that a juvenile standing on an identified street corner unlawfully possessed a gun was not sufficient to satisfy the reasonable suspicion standard required to justify the brief *Terry* stop of the individual when police found him standing on the corner. *Id.* at 279. The Court held that the anonymous tip, standing alone, lacked sufficient indicia of the anonymous informant's reliability. *See id.* ("[u]nlike a tip from a known informant whose reputation can be assessed and who can be held responsible if her

---

allegations turn out to be fabricated, 'an anonymous tip alone seldom demonstrates the informant's basis of knowledge or veracity,'" (internal citations omitted) (quoting *Alabama v. White,* 496 U.S. 325, 329 (1990)).

Like the anonymous tip in *J.L.,* Gottlieb and Himan's Search Warrant Affidavit contained no factual material whatsoever relating to the reliability of the "anonymous" source of the disembodied text. *See id.* In addition, Gottlieb and Himan's "anonymous source" had taken affirmative steps to ensure there would be no way for police to discover his identity. Himan, in sworn testimony, later admitted that the other officers tried to identify the anonymous source through an inquiry with the source's email account provider (Google); however, Google advised them that Gottlieb's anonymous e-mailer created the email account used to send the 'tip' without providing Google any of his or her identifying information. The source's deliberate effort to prevent police from discovering his or her identity is devastating to the e-mailer's reliability. *Cf. J.L.,* 529 U.S. at 276 ("If an informant places his anonymity at risk, a court can consider this factor in weighing the reliability of the tip."). Gottlieb omitted that material fact from the Search Warrant Affidavit also. Gottlieb Br. Exh. 2.

Information from an anonymous source, be it the location of a young man with a gun or disembodied text alleged to have been sent from a person's email account, is presumptively unreliable, even as a basis for a minimally intrusive *Terry* stop on the street. *J.L.,* 529 U.S. at 270. Therefore, standing alone, as it must in the *corrected* Affidavit, Gottlieb's disembodied email text would not have justified even a *Terry* stop of Ryan McFadyen under the Supreme Court's cases. *See, e.g., J.L.,* 529 U.S. 266. It goes without saying that "reasonable suspicion" is a far cry from probable cause, and probable cause is what Gottlieb was required to establish in his Affidavit for a Warrant to Search Ryan McFadyen's dorm room. The corrected affidavit offers no indicia of the reliability of the e-mailer. The disembodied e-

mail text is, therefore, unreliable as a matter of law, *see J.L.,* 529 U.S. at 271-73, and it could not be used to support the probable cause determination at the time Gottlieb applied for the McFadyen Search Warrant. Gottlieb and Himan may not use it in this forum. No reasonable officer would believe that supplementing the corrected affidavit with the disembodied text of an email sent by an unknown and unknowable "anonymous source" would establish probable cause. *See generally J.L,* 529 U.S. 266, and the cases cited therein; *Illinois v. Gates,* 462 U.S. 213, 239 (1983); *United States v. Tate,* 524 F.3d 449, 457 (4th Cir. 2008) (officer's affidavit "provided no details regarding the source or context" of information, and, as such, the information could not support issuance of a search warrant); *United States v. Wilhelm,* 80 F.3d 116, 119-21 (4th Cir. 1996) (officer's search warrant affidavit failed to establish "anonymous" caller's reliability where caller provided information that almost anyone who "occasionally watches the evening news" could have given, reversing conviction based on fruits of the search).

### 1) Insufficient Nexus Between Place to be Searched and Things to Be Seized

Furthermore, the Affidavit fails to establish any nexus between the place to be searched (a dorm room on Duke's Main Campus) and the crimes the Affidavit alleges (rape, sexual offense, kidnapping at 610 N. Buchanan Blvd. and a "conspiracy to commit murder" (via the internet)). *See* Gottlieb Br. Exh. 2. Gottlieb submitted the McFadyen Search Warrant two weeks after the alleged "conspiracy to commit murder" was to be consummated, and included no evidence tending to show that there was a conspiracy to commit murder. Id. The "information" was therefore fatally stale at the time Gottlieb included it in the Affidavit. *See, e.g., United States v. Mohn,* No. 1:05CR319-1, 2006 WL 156878 *8 (M.D.N.C. Jan. 20, 2006) (quoting *United States v. Gonzales,* 399 F.3d 1225, 1230 (10th Cir. 2005)). It is also unlikely that any evidence of such a conspiracy would exist in McFadyen's dorm room two weeks later. AC ¶ 605. Finally, there is no evidence of an "agreement" of any kind. The

AC alleges that Gottlieb could not include any reply to the email suggesting agreement because either, (1) he did not have them, or (2) he had them and knew they provided the context that gave the lie to any suggestion of a "conspiracy" to do anything (lawful or unlawful). *See id.* ¶¶ 598-99, 603. Informing all of those allegations is another, very important one: the AC's disquieting allegation that Gottlieb and Himan made the McFadyen Search Warrant Affidavit was within hours after Nifong advised them that they were "f***ed"—his vulgar assessment of their circumstances in light of what Gottlieb and Himan had just told him about the state of the evidence, the lies that were told in the NTID, and the national firestorm it had ignited. *See id.* ¶¶ 591-93, 598-99, 600, 610.

### 2) Gottlieb Knew No Evidence of a Crime Would Be Found in McFadyen's Dorm Room

In addition, the AC alleges ample proof that Gottlieb and his co-conspirators knew the disembodied email text was not evidence of any crime. For example, Gottlieb did not seek a warrant to search the room or home of the young man who replied, "I'll bring the Phil Collins." *See* AC ¶¶ 603, 608. Upon the release of the Affidavit, the police department advised Ryan's counsel that Ryan was free to go to his home in New Jersey because the police department had no plans on arresting him for the conspiracy to commit murder. *Id.* ¶ 701. Finally, many of the "things to be seized" were already in the police department's possession, including, for example the "dancer's white shoe." *Id.* ¶ 606; Gottlieb Br. Exh. 2 at 7.

Taken together, these allegations are sufficient to establish an actionable §1983 Claim against Sgt. M.D. Gottlieb for causing the Plaintiffs to be subjected to NTID procedures without probable cause to believe that the felonies alleged had been committed, or "reasonable grounds" to believe that Plaintiffs committed them. They are also sufficient to state an actionable § 1983 claim against Sgt. M.D. Gottlieb for causing Ryan McFadyen to be subjected to searches and seizures of his home, papers and effects without probable cause

to believe a crime had been committed or probable cause to believe that evidence of any such crime would be found in his dorm room two weeks hence. Gottlieb's motion to dismiss these causes of action must be denied.

> **2. The Third Cause of Action States an Actionable Section 1983 Claim for Abuse of Process Designed to Coerce Plaintiffs into Submitting to Interrogation.**

Having established that both the NTID Order and the McFayden Search Warrant were unconstitutional, the Plaintiffs' Third Cause of Action alleges that Gottlieb, in concert with Nifong, Himan, Levicy, and Arico procured those judicial authorizations to seize and search Plaintiffs in retaliation for refusing to voluntarily submit to interrogations that Gottlieb, Himan, Nifong, and Duke University Administrators planned for them (where they planned to obtain coerce Plaintiffs into consenting also to DNA samples) one day prior to seeking the NTID Order. AC ¶¶ 413-14, 929-40. The Amended Complaint alleges that Gottlieb and his co-defendants were enraged by Plaintiffs' refusal to submit to those interrogations. *See id.* ¶¶ 407, 410-13. They had been given no time to consult w/ counsel. Thus, in a fit of pique, Gottlieb, Himan, and others conspired to concoct the sensationalized, fabricated account of events that they knew never happened. *See id.* ¶¶ 2, 106, 321, 333, 354, 382-85, 387, 402, 1191-93, 1200, 1215-16, 1367-68. Their purpose, of course, was to coerce Plaintiffs into consenting to interrogations that would be unlawful in the absence of their consent. *See id.* ¶¶ 403-04. Their chosen means of coercion was the mob. To incite the mob, Gottlieb, Himan, Clayton, Lamb, Ripberger and others knowingly drafted a fabricated account of a brutal, racially motivated gang rape that they knew did not happen. The City's employees and their supervisors thus set the mob loose upon Plaintiffs, subjecting them to public vilification the likes of which few have ever had to endure. *See id.* 544-54, 700-02, 708. City Police and Supervisors turned Plaintiffs into pariahs in their own communities and in the eyes of—literally—millions of people. *See id.* ¶¶ 414, 443-44, 700-02, 709, 930-36.

The City's Arguments for dismissal of Plaintiffs' Third Cause of Action all fail:

- The City is wrong when it claims that no §1983 Action exists for abusing legal process to achieve a malicious purpose connected to the purpose that the process is meant to serve. The cases the City cites bear that point out. The ulterior purposes are alleged to have been coercion, retaliation, and stigmatization, intended to chill Plaintiffs' exercise of the right not to submit to interrogation.

- The City's employees and supervisors' public and deliberate effort to coerce Plaintiffs into submitting to interrogations is a violation of the Fourteenth Amendment, and their retaliation against Plaintiffs for refusing to speak violates their First Amendment rights. *Id.* ¶¶ 938-39. The Court is not required to limit conduct to the violation of a single right; the notable exception is the *Albright* rule limiting those who are charged, prosecuted, and/or convicted to the 4th, 5th and 6th Amendments. Based upon this discussion and for purposes of this action, to the extent that the right must be located in one of those three amendments at this preliminary stage, the Fourth Circuit located the right violated in similar circumstances in the Fourth Amendment. *See Rogers v. Pendleton*, 249 F.3d 279, 295 (4th Cir. 2001) (authorizing § 1983 claim where police retaliated against citizen for refusing to consent to a search of his home by arresting him, holding "[t]he police do not have the right to arrest citizens for refusing to consent to an illegal search."); *see also id.* at 295 (affirming denial of qualified immunity where evidence showed officers' seizure of a citizen was "motivated by the officers' anger at [plaintiff's] 'irreverent' refusal to consent to their search … which was clearly illegal absent his consent") (alteration not in original). *Rogers* may not limit Plaintiffs to the Fourth Amendment, however, because Plaintiffs allege post-seizure, post-search constitutional violations. *Id.* at 295. Regardless, whether the Court locates the right in the Fourth, First, or the Fourteenth Amendment, the City's Motion to Dismiss this claim must be denied.

### 3. The Fourth Cause of Action States a Section 1983 Claim for Deprivation of Property in Violation of the Fourteenth Amendment.

Next, the Plaintiffs allege a conspiracy among City employees and Supervisors, Nifong (an agent of the City with respect to Mangum's allegations), and DNASI and its policy-making officers Meehan and Clark. The object of the conspiracy was to withhold from Plaintiffs the results of tests conducted with Plaintiffs' DNA to accomplish the objective: they all had to maintain secrecy with respect to the fact that those results existed. The results of these Plaintiffs' test included the explosive fact that at least 4 male DNA sources were present in the rape kit, and all lacrosse players were excluded from the possibility of being contributors to those sources. This conduct forms the basis of a §1983 action because Plaintiffs had a constitutionally protected property interest in the reports of results of tests conducted with the products of their NTID procedures (i.e., Plaintiff's DNA and photographs). AC ¶¶ 941-53. Because the Defendants have asserted similar contentions in arguing for dismissal of this cause of action, Plaintiffs identify the violation alleged in this cause of action and respond to all of the arguments asserted by Gottlieb and his co-defendants along with a more fully developed analysis in Plaintiffs' Opposition to DNASI Defendants Motion to Dismiss ("Pl. Op. to (DNASI), § III(A)(1)."), and, in the interests of judicial economy, Plaintiffs incorporate that analysis here.

The Fifth Cause of Action alleges that the City and its Employees, individually and in concert with other co-defendants, stigmatized Plaintiffs in connection with a deprivation of Plaintiffs' federal rights as well as other present tangible interests. AC ¶¶ 954-62. Plaintiffs' analysis is more fully developed in Plaintiffs' Opposition to Soukup, Michael, Addison, Clayton ("SMAC"). Motion to Dismiss ("Pl. Op. to (SMAC), § II.A.(2)"), and, in the interests of judicial economy, Plaintiffs incorporate that analysis here.

4. **The Sixth and Seventh Causes of Action State a Section 1983 Claim for Conduct that Shocks the Conscience, in Violation of the Fourteenth Amendment.**

In their Sixth and Seventh Causes of Action Plaintiffs allege conspiracies and conduct in furtherance of them that shock the conscience. AC ¶¶ 969-77, 978-85.; s*ee also id.* ¶¶ 414-44, 598-601, 663-64, 765. The conspiracies alleged were systematically carried out over a thirteen month period, beginning shortly after the original Duke and Durham investigation ruled Mangum's allegations 'unfounded' on or about March 15, 2006. *Id.* ¶ 333. The Amended Complaint, alleges (1) a conspiracy to fabricate evidence of a rape that Defendants knew never occurred, *see id.* ¶¶ 2, 106, 321, 354, 382-85, 387, 402, 1191-93, 1200, 1215-16, 1367-68, and (2) to systematically conceal from the Plaintiffs and the enraged public all of the overwhelming proof of the Plaintiffs' innocence, *id.* ¶¶ 562, 676-80, 765. The motives of the conspirators were to retaliate against Plaintiffs for exercising their right not to speak or submit to police interrogations, to coerce Plaintiffs into providing false inculpatory testimony through the continuing threat of a prosecution that Plaintiffs knew to be a frame up in which they were in jeopardy and to prevent the disclosure of the enormity of the misconduct of the City's and Durham's policymakers so they might avoid accountability for it in a federal civil rights action such as this one, or in a federal criminal prosecution for obstruction of justice and criminal conspiracy. The cumulative effect of conduct and conspiracies alleged in these causes of action shocks the conscience and it was directed by Baker, Hodge, Lamb, and other City and Duke policymakers. The Amended Complaint alleges a conscious, deliberate, calculated plan to frame innocents for heinous, racially motivated crimes, *see id.* ¶ 443, 631-34, 638, 663-63, 933, that Defendants knew never occurred, *see id.* ¶¶ 2, 106, 321, 354, 382-85, 387, 402, 1191-93, 1200, 1215-16, 1367-68.

The Amended Complaint states a Section 1983 claim for conduct in violation of the Fourteenth Amendment. AC ¶¶ 969-77, 978-985. Executive action that "shocks the conscience" is actionable under the Fourteenth Amendment. *County of Sacramento v. Lewis*,

523 U.S. 833 (1998). In *Lewis*, the Court refined the "shocks the conscience" standard by distinguishing between official conduct where there is a realistic opportunity to deliberate and official conduct where such an opportunity is not present. *Id.* Where an official has an opportunity to deliberate, official conduct that is "deliberately indifferent" is conscience shocking. *Id.* The rationale is that, when officials with the luxury to deliberate and an opportunity to do better nevertheless exhibit "protracted failure to care, indifference is truly shocking." *Id.* at 853. As examples of the opportunity to deliberate, the Supreme Court cited situations in which officials have the opportunity to deliberate over the provision of medical care to detainees, *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239 (1983), and to prisoners, *Estelle v. Gamble*, 429 U.S. 97 (1976). In situations where there is no time to deliberate and unforeseen circumstances demand an officer's instant judgment, such as the tense, rapidly evolving high speed pursuit at issue in *Lewis*, the officer's conduct will be considered conscience shocking only if carried out with a purpose to cause harm. *Lewis*, 523 U.S. at 853.

> **5. The Ninth Cause of Action States an Actionable Section 1983 Claim for Retaliation and Conspiracy in Violation of Plaintiffs' First, Fifth, and Fourteenth Amendment Rights.**

In their Ninth Cause of Action, Plaintiffs allege the City of Durham policymakers ratified, condoned and participated in retaliation against Plaintiffs in violation of the First Amendment. *Id.* ¶¶ 992-1001. The Fourth Circuit's § 1983 retaliation analysis is more fully developed in Plaintiffs' Opposition to Duke Motion to Dismiss, and, in the interests of judicial economy, Plaintiffs incorporate that analysis here. Gottlieb is alleged to have participated in a § 1983 conspiracy in violation of the First, Fifth, and Fourteenth Amendments. The First Amendment not only protects the right to speak and the right not to speak, but also the right to be free from state-sponsored retaliation for exercising those rights. *Suarez Corp. v. McGraw,* 202 F.3d 676, 685 (4th Cir. 2000); *see ACLU v. Wicomico County,*

*Md.*, 999 F.2d 780, 785 (4th Cir. 1993) ("Retaliation, though it is not expressly referred to in the Constitution, is nonetheless actionable because retaliatory actions may tend to chill individuals' exercise of constitutional rights.") (citations omitted).  To state a cause of action for First Amendment retaliation, a complaint must show that (1) a plaintiff engaged in protected First Amendment conduct or speech;[5]  (2) defendants took some action that adversely affected (i.e., "chilled") Plaintiffs' First Amendment rights; and (3) a causal relationship between the protected conduct and the retaliatory actions alleged.  *McGraw,* 202 F.3d at 686; *Constantine v. Rectors & Visitors of George Mason Univ.,* 411 F.3d 474, 499 (2005).

First, the Amended Complaint alleges Plaintiffs participated in protected conduct:  the right not to speak.  AC ¶¶ 411-413.  Second, the Amended Complaint sufficiently alleges retaliatory conduct by Gottlieb that would chill a person of reasonable firmness.  *See id.* ¶¶ 414-18, 431-34, 435-36, 442-43, 597-601, 788-89, 933, 946-48, 959-61.  Finally, the Amended Complaint alleges facts demonstrating a causal relationship between the protected activity and the retaliatory conduct in at least two ways.  First, the AC establishes a temporal nexus between Plaintiffs' protected conduct and Gottlieb's retaliatory acts:  the retaliatory stigmatization began one day after Gottlieb learned that Plaintiffs refused to submit to the interrogations that he, Himan, Clayton, Duke Police, and Wasiolek had planned for them.  Second, Nifong and other co-conspirators have admitted – under oath – to the conspiracy's unlawful purpose: to coerce Plaintiffs' submission to interrogation.  *See,* AC ¶¶ 146-47 Exh. 12.  Analysis for this cause of action is more fully developed in Plaintiffs' Opposition to Duke Univ. Motion to Dismiss ("Pl. Op. to Duke § II.A.(4)"), and, in the interests of judicial economy, Plaintiffs incorporate that analysis here.

---

**6. The Tenth Cause of Action States an Actionable Section 1983 Claim Against the University Defendants for Depriving Plaintiffs of the Privileges and Immunities Afforded to North Carolina Citizens in Violation of 42 U.S.C. § 1983.**

Next, Plaintiffs state §1983 Claims for deprivation of Plaintiffs' rights to the privileges and immunities guaranteed to them by Article IV and the Fourteenth Amendment. This Cause of Action identifies rights within the broader "right to travel." The "right to travel" includes at least three different components: (1) the right of a citizen of one State to enter and to leave another State, (2) the right to be treated as a welcome visitor rather than an unfriendly alien when temporarily present in the second State, and, (3) for travelers who elect to become permanent residents in a new State, the right to be treated like other citizens of that State. In the Amended Complaint, Plaintiffs assert that the second and third components of the right to travel. Plaintiffs have placed an extended discussion of the basis for Plaintiffs' Tenth Cause of Action in Pls. Opp. Br. (City Super. § II.A.(3)).

As it does against Durham, *see id.*, the Amended Complaint also sufficiently alleges a policy— Zero-Tolerance for Duke Students—that penalized Plaintiffs' exercise of the right to travel, by classifying Duke students as "temporary residents" and subjecting them to disproportionate grossly fundamental enforcement of the criminal law, abuses of state power, and the suspension of constitutional rights in police encounters with Duke students. The policy was designed, adopted, and vigorously enforced by Duke University and the City of Durham. Pls. Opp. Br. (Duke Univ. § II.A.(5)). Defendants do not (and cannot plausibly) justify the Zero-Tolerance policy as "narrowly tailored" to any "compelling" interest. The enforcement of the policy against the Plaintiffs therefore was the moving force behind the violations of Plaintiffs' rights to the privileges and immunities of citizenship under Article IV of the United States Constitution and the Fourteenth Amendment thereto. For all the reasons set forth in Pls. Opp. Br. (City Super. II.A.(3)), Defendants' motion to dismiss this Cause of Action is baseless and must be denied.

27

- The City does not dispute that the AC sufficiently allege that Zero Tolerance is a formal "policy" designed by Duke University and City of Durham Policymakers, nor does it contest the sufficiency of the allegations that Zero-Tolerance was implemented primarily through the joint and concerted conduct of the Duke and Durham Police Departments. Instead, the City argues that the Zero Tolerance Policy allegations do not sufficiently allege that the Zero Tolerance Policy was a "moving force" behind the constitutional violations alleged. In doing so, the City is fighting the facts that it must accept as true, and, as such, merely raise a question of fact for the jury.

B. **THE AMENDED COMPLAINT STATES ACTIONABLE SECTION 1983 CLAIMS AGAINST THE CITY OF DURHAM.**

After many years of municipal exclusion from the term "person" as it is used in 42 U.S.C. § 1983, the Supreme Court revisited the issue in *Monell* and concluded that the debates surrounding the enactment of § 1983 revealed clearly that municipalities were meant to be liable under the statute, but not in the manner typically associated with entity liability. In *Monell*, the Supreme Court held that a municipality may be held directly liable under § 1983 "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts . . . may fairly be said to represent official policy, inflicts [constitutional] injury." *Monell*, 436 U.S. at 694. Since then, the courts have applied *Monell* to a variety of circumstances, distinguishing between discretionary acts and "action for which the municipality is actually responsible." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479 (1986); *see also Bennett v. N.C. DOT*, No. 1:05CV764 (JAB), 2007 WL 4208390, at *5 (M.D.N.C. Nov. 26, 2007).

If "*Monell* is a case about responsibility," *Pembaur*, 475 U.S. at 478, then the facts alleged in the Amended Complaint have alleged an actionable claim against both the City of Durham and Duke University. There is no doubt that the City and its Police Department, are responsible for the violations of Plaintiffs' federal rights—just as Duke and its Police Department were responsible for the violations of Plaintiffs' federal rights—through their

28

official policies and their customs. That is particularly true of their jointly devised and jointly executed Zero Tolerance Policy, the application of which the AC describes in vivid detail, from its application in the time before Mangum's bogus claim to the period covering the "investigation." *See* AC ¶¶ 1-903. Duke University and the City are also responsible because of the direct participation and direction of their final policymakers in the violations of Plaintiffs' federal rights (e.g., Baker, Hodge, Mihaich, Lamb, Steel, Brodhead; Burness, Trask, Graves, Dean, and the CMT; and the combined membership of the Joint Command). These policymakers were intimately engaged—extraordinarily so—in the efforts that caused the violations of Plaintiffs' constitutional rights. The City and Duke University are both, therefore, responsible for the damages that were inflicted on Plaintiffs as a result of those violations. The misconduct alleged in the Amended Complaint satisfies several independent grounds for municipal liability under § 1983. We discuss each in turn.

### 1. Summary of the Plaintiffs' *Monell* Claims

Plaintiffs have asserted an actionable § 1983 claim against Duke University, the City of Durham, DUHS, PDC, and DNASI. In that regard, Plaintiffs *do not* seek to hold Duke University liable on a theory of *respondeat superior*, but, rather, on the same principles as the *Monell* claim Plaintiffs have alleged against the City. *Monell* liability attaches upon a showing that a deprivation of the plaintiff's federally protected right was attributable to enforcement of a Municipal policy or practice. The extensive case law concerning this issue establishes that, generally, municipal liability may be based upon: (1) a formally promulgated policy; (2) a well settled custom or practice; (3) a final decision by a policymaker; or (4) deliberately indifferent training or supervision. The *Monell* principles apply equally to a private corporation in these circumstances. *See, e.g., Rodriguez v. Smithfield Packing Co.*, 338 F.3d 348, 355 (4th Cir. 2003) ("'The principles of § 1983 municipal liability . . . apply equally to a private corporation[.]'" (quoting *Austin v. Paramount Parks, Inc.*, 195 F.3d 715, 727-28 (4th Cir. 1999)). One of those principles,

expressly recognized by the Fourth Circuit, is that "corporate liability may . . . 'be imposed for a single decision by [corporate] policymakers under appropriate circumstances.'" *Id.* at 355 (alteration in original) (quoting *Pembaur*, 475 U.S. at 480)

### 2. The Twelfth Cause of Action Sufficiently Alleges the Elements of a § 1983 Claim Against the City of Durham.

#### a. The City of Durham and Duke University are Liable Under § 1983 for Civil Rights Violations Caused by Official Custom and Policy.

A municipality or entity is liable under § 1983 when its implementation of a policy, custom, or practice results in a "deprivation of rights protected by the Constitution." *Monell*, 436 U.S. at 690-91. Liability can be established for civil rights violations caused by, for example, (a) a policy that, if enforced, is likely to result in violations of civil rights, *see id.*; (b) a failure to change an existing policy that has previously caused civil rights violations or provide adequate training to ensure that no further violations occur, *see Bd. of County Comm'rs v. Brown*, 520 U.S. 397, 403 (1997); (c) an institutional or municipal custom or practice that is widespread and "so manifest as to imply the constructive acquiescence of senior policy-making officials," *Sorlucco v. NYPD*, 971 F.2d 864, 871 (2d Cir. 1992); or (d) "an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker," *Oklahoma City v. Tuttle*, 471 U.S. 808, 823-24 (1985).

Here, in Part A (1), (2), and (3) of the Twelfth Cause of Action allege that the violations of Plaintiffs' civil rights were caused by three separate policies, customs, or practices of the City of Durham: (1) the Duke-Durham Zero Tolerance Policy targeting Duke University students and temporary residents for selective and aggressive enforcement of the law; (2) the Duke-Durham "Officer Bystander Policy"; and (3) the Durham Functional Presumption of Guilt and its attendant premature public declarations of guilt. Between the Zero Tolerance Policy and the Bystander Officer Policy, prior to March 14, 2006, the two

had produced multiple, well-publicized violations of the constitutional rights of Duke University's students with only ratification and promises of more of the same from both Duke University's policymakers and the City of Durham's Policymakers. *See, e.g.,* AC § 101-128; 129-133; 138-144. Still the raids continue, even this Spring the same warrantless raids were staged and carried out upon unsuspecting Duke students and temporary residents in the Trinity Park area.

### b. City of Durham and Duke University are Liable for Constitutional Violations that were Caused and Ratified by Officials with Final Policymaking Authority.

In Part B of the Twelfth Cause of Action, Plaintiffs allege that Duke and Durham officials with final policymaking authority for the City (the Himan Chain of Command and the Addison Chain of Command) directly caused the violations of Plaintiffs' civil rights by ordering or ratifying the illegal conduct of their subordinates. AC ¶¶ 1061-1065; 1066-1073; 1074-1077; 445-455; 466-477; 459-465.  These allegations alone are sufficient to state a § 1983 claim against the City and Duke University under *Monell*.  The City does not raise any arguments directly against this part of the Twelfth Cause of Action; it is impossible to argue, of course, that affirmative decisions made by officials with final policymaking authority for the City or for Duke are insufficient to state an entity liability§ 1983 claim.  "If the decision to adopt [a] particular course of action is properly made by that government's authorized decisionmakers, it surely represents an act of official government 'policy'[.]" *Pembaur*, 475 U.S. at 481. Even a single action "directed by those who establish governmental policy" is sufficient to subject the Duke University and the City to liability. *Id.*  Also, if an official with final policymaking authority ratifies unconstitutional conduct that has already caused violations by their subordinates, the Duke University and the City are liable under § 1983. *See City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988) ("If the authorized policymakers approve a subordinate's decision and the basis for it, their ratification [is]

chargeable to the municipality because their decision is final."); *Love-Lane v. Martin*, 355 F.3d 766, 782-83 (4th Cir. 2004) (To establish *Monell* liability, a plaintiff "must demonstrate that the [policymaker] was aware of the constitutional violation and either participated in, or otherwise condoned, it."); *Hall v. Marion Sch. Dist. No. 2*, 31 F.3d 183, 196 (4th Cir. 1994) (decision affirming unconstitutional actions of subordinate sufficient to establish municipal liability); *Jordan by Jordan v. Jackson*, 15 F.3d 333, 340 (4th Cir. 1994) (allegation that policymakers "condoned and ratified the improper and overreaching conduct of" their subordinates sufficient to establish municipal liability under § 1983).

> ### c. The City of Durham and Duke University are Liable for Civil Rights Violations Caused by Nifong pursuant to Delegated Authority over the Police Investigation.

The Supreme Court has recognized a separate form of direct policymaker *Monell* liability: a "delegation" theory of municipal liability under § 1983, whereby a municipality can be held liable under § 1983 for civil rights violations caused by persons acting pursuant to delegated authority. § 1983 delegation liability takes two forms: (1) where a municipality's policymaking officials delegate their own final authority over a particular decision or area to some other person, and that person commits a civil rights violation while acting within the delegated authority, the municipality is liable under § 1983 as if the delegating official had committed the violation personally. *See Praprotnik*, 485 U.S. at 126-27; *Pembaur*, 475 U.S. at 481-85; and (2) where policymaking officials delegate their discretionary authority to another person, and, after misconduct, the delegating official ratifies it. *See Praprotnik*, 485 U.S. at 127.

Plaintiffs allege both types of § 1983 delegation liability here. In this case, the University's and the City's policymaking officials delegated to Nifong and Steel, respectively, the authority to direct the Durham Police investigation. They also told their respective police departments (DUPD and DPD) to take direction from Nifong, as opposed to

the appropriate CID chain of command. AC ¶¶ 1066-1073; 1074-1077; 1078-1082; 1083-1087;1088-1106. Nifong and Steel later caused and directed others to cause the violations of Plaintiffs' constitutional rights while acting in this delegated investigatory capacity. *Id.* §§.929-940; 941-953; 954-969; 969-977; 978-985; 986-991992-1001; 1008-1036. The Amended Complaint separately alleges that the City's and the University's policymaking officials ratified the misconduct caused by Nifong and Steel, and by those officers in the Day Chain of Command and the Himan Chain of Command working according to Steel's Directive and Nifong's directions. At all times, those policymaking officials were aware or deliberately indifferent to the likelihood, that those acts would result in violations of Plaintiffs' constitutional rights." *Id.* ¶ 1088. They all then ratified the conduct that caused the Plaintiffs constitutional rights, *id.* 1092. These allegations are sufficient to state a § 1983 delegation claim against the University and the City, regardless of whether Nifong had final or discretionary authority over the police investigation. [6]

None of the City's or the University's arguments defeats Plaintiffs' 1983 delegation claim. Instead they both attack the facts as "implausible" or worse; that is a jury argument. Because Plaintiffs' allegations are accepted as true at this stage, this argument must fail.

---

[6] *See Praprotnik*, 485 U.S. at 126-27 (policymaker's ratification of acts pursuant to delegated authority sufficient for § 1983 liability); *Pembaur*, 475 U.S. at 481-85 (municipality liable where sheriff instructed officers to take direction from county prosecutor); *Love-Lane*, 355 F.3d at 782-83; *Hall*, 31 F.3d at 196; *Jordan*, 15 F.3d at 340; *Bennett*, 2007 WL 4208390, at *6 n.3 ("recogniz[ing] that an official 'policy or custom' can, in some limited circumstances, be inferred from an official's ratification of a constitutional violation"); *Cranford v. Frick*, No. 1:05CV62, 2007 WL 676687, at *4 (M.D.N.C. Feb. 28, 2007) (allegations that law enforcement officers sought and received approval and direction from supervisor sufficient to state official capacity claim).

**d. The City of Durham is Liable for the Duke Police/Durham Police Supervising Defendants' Failure to Supervise the Duke/Durham Police Defendants.**

Finally, in The Thirteenth Cause of Action, Plaintiffs allege three other independent grounds for § 1983 liability against the University and the City: the Supervisory Defendants' deliberate indifference to Plaintiffs' rights (1) by initially assigning Gottlieb and Himan to the investigation into Mangum's allegations and later failing to remove him after learning of his misconduct; and (2) by delegating authority to Nifong over the Durham Police investigation and later failing to take corrective action after learning that Nifong had engaged and directed Durham and University Police officers to engage in misconduct. Municipalities are liable under § 1983 for deliberate indifference evidenced by supervisors and policymakers in the hiring and supervision of municipal and University employees and agents Performing police functions. *See Bd. of County Comm'rs*, 520 U.S. at 410-11 (recognizing supervisory liability for hiring decisions evidencing deliberate indifference in light of past conduct that would have been evident by "adequate scrutiny" of officer's background); *Griffin v. City of Opa-Locka*, 261 F.3d 1295, 1313-14 (11th Cir. 2001) (municipality liable for constitutional harm resulting from deliberate indifference in single hiring decision); *Barreto-Rivera v. Medina-Vargas*, 168 F.3d 42, 49 (1st Cir. 1999) (municipality can be held liable for deliberate indifference demonstrated by failure to discipline police officer for pattern of abuses). Here, the Amended Complaint alleges two classic examples of such indifference.

**e. The City of Durham is Liable for Civil Rights Violations Caused by the City's Failure to Train its Police Officers.**

Failure to train can, in some limited circumstances, constitute a policy or custom actionable under § 1983. *See, e.g., Jordan v. Jackson,* 15 F.3d 333, 341 (4th Cir.1994); *see also, Semple v. City of Moundsville,* 195 F.3d 708, 712 (4th Cir.1999). In other words, a municipal custom may be inferred where Plaintiffs have made a showing of deficient. A §

1983 municipal liability claim based on a theory of inadequate training is actionable "where the municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference'" to a citizen's constitutional rights. *Jordan*, 15 F.3d. at 341, citing *City of Canton v. Harris*, 489 U.S. 378, 388, (1989). "Only if in light of the duties assigned to specific officers or employees, the need for more or different training is so obvious, and the inadequacy so likely to result in a violation of constitutional rights, can a municipality reasonably be said to have been deliberately indifferent to that need." *Id.* (internal quotations omitted). Therefore, a plaintiff must "point to a specific deficiency and not a general ineffectiveness of the training." *Semple*, 195 F.3d at 713. Further, "a plaintiff must show a direct causal connection between a specific deficiency in training and the specific injury alleged." *Id.* (internal citations omitted). Finally, "[n]either a policy or custom of deficient training, nor the required causal connection can be shown by proof of a single incident of unconstitutional activity alone." *Jordan*, 15 F.3d at 341. With respect to both the University and the City, the Plaintiffs have identified such deficiencies in detail and established a direct causal connection between them. AC 1141-1146.

## III. THE AMENDED COMPLAINT STATES ACTIONABLE CLAIMS FOR PARTICIPATION IN CIVIL RIGHTS CONSPIRACIES.

Plaintiffs have alleged multiple conspiracies against City-related Defendants and the City itself. They arise under 42 USC § 1983 and § 1985. In addition, Plaintiffs have asserted the related cause of action under 42 USC § 1986 for failing to intervene.

A.  **Conspiracies in Violation of 42 U.S.C. § 1983.**

The Fifteenth Cause of Action alleges a broad conspiracy, agreement, or understanding shared by all named Defendants in this action.[7]  AC ¶ 1147-1155.  The objective of the unifying conspiracy alleged in the Fifteenth Cause of Action was to unlawfully force the wrongful indictment, prosecution, and, ultimately, incarceration of the Plaintiffs, as the principals or accomplices in a horrific, racially motivated gang-rape, which all Defendants in this action knew did not occur or were deliberately indifferent to that likelihood.

Plaintiffs meet the required showing of constitutional harm done in furtherance of the conspiracy mainly through the allegations made in the First through Eleventh Causes of Action (the "Predicate Violations").  The Predicate Violations are constitutional deprivations caused by acts in furtherance of the Conspiracy to Convict, and were the direct and proximate cause of the damages alleged.  In the Fifteenth Cause of Action, the acts and omissions that establish the Predicate Violations are alleged to have been done in furtherance of the unifying common objective and plan of the larger Conspiracy to Convict.  The Amended Complaint alleges the combined and concerted conduct of many, pursuant to a preordained plan, AC ¶ 1152, that was "made in quiet deliberation and discussion" among officials with final policymaking authority with respect to the matters described in the Amended Complaint. *Id.* The acts and omissions described in the Amended Complaint evince a malicious and corrupt intent to harm the Plaintiffs.  AC ¶¶ 1153; 1147-1155.  The cumulative effect of the concerted wrongdoing among so many is so egregious that it

---

[7] To allege a cause of action under 42 U.S.C. § 1983 for conspiracy, a plaintiff must allege facts that show that two or more defendants "acted jointly [and] in concert and that some overt act was done in furtherance of the conspiracy" that resulted in the deprivation of a federal right. *Hinkle v. City of Clarksburg*, 81 F.3d 416, 421 (4th Cir. 1996).

"shocks the conscience" in violation of the Fourteenth Amendment. AC ¶ 1153. The Fifteenth Cause of Action alleges that the City Defendants violated § 1983 by conspiring to deprive Plaintiffs of their rights under the Fourth and Fourteenth Amendments, including the substantive Due Process protections of the Fourteenth Amendment, and, in furtherance of the conspiracies, committing overt acts that caused actual violations of Plaintiffs' rights. AC ¶ 1150(A)-(O).

B. **The Amended Complaint States Actionable Claims for Conspiracy in Violation of 42 U.S.C. § 1985.**

The Sixteenth Cause of Action alleges Four Conspiracies in violation of § 1985(2) and (3). To state a cause of action under 42 U.S.C. § 1985(2), a plaintiff must allege that "two or more persons conspire[d] for the purpose of impeding, hindering, obstructing, or defeating, in any manner, the due course of justice in any State or Territory, with intent to deny to any citizen the equal protection of the laws...." 42 U.S.C. § 1985(2).

The Sixteenth Cause of Action alleges that Addison, Michael, Nifong, Gottlieb, Himan, Wilson, Steel, the DNASI Defendants, the Crisis Management Team Defendants, the SANE Defendants, Graves, Dean, the Duke Police Supervising Defendants, and Duke University conspired to impede or obstruct the due course of justice in North Carolina generally with the intent to deny Plaintiffs the equal protection of the laws in violation of 1985(2). AC ¶¶ 1156-59. Defendants, motivated by race-based invidiously discriminatory motives, violated this statute by conspiring to deprive Plaintiffs of their federally secured rights as alleged elsewhere in the First through Eleventh Causes of Action and by fomenting race-based animus within the Plaintiffs' community. *See Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971). Additionally, Sixteenth cause of action alleges that Nifong, Gottlieb, Himan, Clayton, Addison, Michael, the Durham Police Supervising Defendants, the SANE Defendants, the City of Durham, and Duke University conspired to impede or obstruct the due course of justice in North Carolina generally with the intent to intimidate witnesses,

including the Plaintiffs, elicit false statements and testimony from Plaintiffs and other witnesses, and to prevent them from testifying truthfully to matters with the general objective of securing Plaintiffs' convictions as principals or accessories in state court for crimes they knew did not happen. AC ¶¶ 1161.

To establish a violation of 42 U.S.C. § 1985(3), a plaintiff must allege that "two or more persons in any State or Territory conspire…(1)for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; (2)or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws." 42 U.S.C. § 1985(3).

First, the Sixteenth Cause of Action alleges that, in violation of 42 U.S.C. § 1985(3) (cl.2), Nifong, Gottlieb, Himan, Clayton, Addison, Michael, the Durham Police Supervising Defendants, Steel, the Crisis Management Team Defendants, the Duke Police Supervising Defendants, the SANE Defendants, the City of Durham and Duke University, conspired with others to deprive Plaintiffs of their federal rights with the purpose of targeting "temporary residents" for disparate treatment and abusive enforcement of the criminal laws depriving Plaintiffs of the equal privileges or immunities of national citizenship under the laws thereby violating this statute by conspiring to deprive Plaintiffs of their federally secured rights. AC ¶¶ 1156-1169; *Phillips v. Mabe*, 367 F. Supp. 2d 861, 873 (M.D.N.C. 2005). Plaintiffs also allege in the Sixteenth Cause of Action an independent §1985(3) Claim arising out of animus directed to Plaintiffs status as "temporary residents" and, on that basis, subject them to discriminatory and abusive police tactics, thereby imposing "disabilities of state citizenship" in deprivation of their equal protection and immunities under laws. AC ¶ 1164-65.

C. **The Amended Complaint States a Violation of 42 U.S.C. §1986.**

Plaintiffs' Seventeenth Cause of Action (the "Section 1986 Claims") alleges that the City Defendants violated 42 U.S.C. § 1986 by refusing or neglecting to prevent or aid in the preventing of the § 1985 Conspiracies (alleged in the Sixteenth Cause of Action), despite having the power and knowledge to do so. The Plaintiffs have stated actionable Section 1986 Claims against Gottlieb. AC ¶¶ 1170-88. Appropriately, the City makes no argument for dismissal of conspiracies in violation § 1986 claim on the merits; the City instead argues that Plaintiffs have failed to allege a predicate §1985 claim.

D. **Animus Based on State Citizenship is Actionable Under § 1985.**

The Supervising Defendants call this theory "a crafty attempt to establish a protected class status beyond their race," and cite to cases that have rejected §1985 claims brought pursuant to its racial animus clause. City Super Br. at 35. However, those cases were not brought pursuant to the "privileges and immunities" clause of § 1985. They are, therefore, inapposite to Plaintiffs claims. Plaintiffs establish the factual basis for the § 1985 violation in the analysis of the violations of the Privileges and Immunities clauses alleged in Plaintiffs' Tenth Cause of Action, *infra* § II.A.(6).[8] The same factual basis applies with equal force in the Plaintiffs' §1985 conspiracy claim. The Supervising Defendants offer no other arguments in opposition to this cause of action.

E. **The § 1985 Claims Allege Racial Animus of Two Types.**

1. **Section 1985 Directs Itself to Animus Toward Any Race.**

The City Defendants, like many other codefendants, have asserted that only members of a "minority" or "traditionally disadvantaged" group may avail themselves of the

_____

[8] Plaintiffs' most extensive analysis of their Privileges and Immunities Claims is in Pls. Opp. Br. (City Super.), II.A.(3).

protections of § 1985. At step one, by its terms, the statute applies to any person or class of person. 42 U.S.C. § 1985(3) (2000). Consistent with the statutory language, we have found no cases in this circuit that held that members of other races have no standing to bring a § 1985(3) claim.[9] That is consistent with the broader equal protection principles of the statute itself. Further, courts, including this one, have consistently rejected the argument. In addition, this Court and others have expressly permitted white plaintiffs to bring claims under § 1985 in response to animus against them based on their race or even their perceived racist beliefs. *See Waller*, 605 F. Supp. 1137 The Fourth Circuit's decision in *Harrison v. KVAT Food Management*, urged by many Defendants held only that "victims of purely political conspiracies" do not have standing on that basis to bring a § 1985(3) claim. 766 F.2d 155, 161 (4th Cir. 1985). *Harrison*'s passing mention of "blacks" was merely a counterexample invoked to explain the difference between a victim of political conspiracy and a member of a "race or class" that is protected by § 1985(3). *See id.*

## 2. Defendants Were Motivated by, Fomented, and Took Advantage of Racial Animus.

Civil rights conspiracies under § 1985(2) and § 1985(3) require proof of invidious animus based on race or other protected status. *See Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 340 (1993). The City argues (1) that Plaintiffs have failed to allege membership in any such class; (2) that Plaintiffs are alleging that "Duke students" or "Duke lacrosse players" are a protected class; or (3) that Plaintiffs have failed to allege animus at all. Each of these arguments is incorrect.

---

[9] *See, e.g., Mabe*, 367 F. Supp. 2d at 873-74. ( Contention that Plaintiff "cannot rely on §1985(3) because he is not a minority is without merit."); *Waller v. Butkovich*, 605 F. Supp. 1137, 1144-45 (M.D.N.C. 1985) (rejecting the assertion that Section 1985(3) requires the alleged animus be directed at a traditionally disadvantaged group).

Plaintiffs allege that Defendants' acts in furtherance of the § 1985 conspiracies were motivated by invidious animus based on race and were intended to foment and take advantage of racial animus against Plaintiffs. AC ¶ 1375. Race—any race—is an established protected classification. *See infra* § II.E.(1). The Amended Complaint is replete with details from which to infer Defendants' invidious racial motives. *See, e.g.*:

- The Racist Dimension of The Conspiracy. AC ¶ 566-90.
- Spoilation of DECC Evidence. AC ¶ 568-69.
- Nifong's Acts in Furtherance of the Conspiracy. AC ¶¶ 577-80.
- Nifong's Public Acts and Statements, AC ¶¶ 502-03.
- Addison Publicly Stigmatized the Plaintiffs, AC ¶ 504-506.

*See also,* AC ¶¶ 500-06; 544-59; 568-69; 570-76; 577-90; 1375. These allegations are based on fact, not "legal conclusion." *See Green v. Maroules*, 211 F.App'x 159, 162-63 (4th Cir. 2006) (holding that plaintiff who alleged she was target of racial profiling and conspiracy to falsely arrest her alleged racial animus and properly stated a claim under § 1985).

Defendants assert that "invidious racial animus" is not satisfied by deliberate acts designed to "create racial tensions or take advantage of racial animus on the part of others in order to achieve some other objective." City Br. at 32, citing *Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971). That is not the holding of *Griffin* which defined the "racial animus" element to require that the alleged "conspiracy . . . must aim at a deprivation of the equal enjoyment of rights secured by the law to all."

The treatment given to the same requirement in actions brought under 42 U.S.C. § 1982.[10] There, as in § 1985, the plaintiff prove invidious animus based on race or class.

---

[10] 42 U.S.C. § 1982 was enacted pursuant to Congress' Thirteenth Amendment authority; it secures to all citizens the right, enforceable against private and public defendants, to "inherit, purchase, lease, sell, hold and convey real and personal property.'

With respect to fomenting racial animus "regardless of defendants' ultimate motivation, the fact that they deliberately stirred up and harnessed the racial animosity of others to serve their own ends is sufficient to find a violation." *Lac Du Flambeau Band of Lake Superior Chippewa Indians v. Stop Treaty Abuse-Wisconsin, Inc*., 41 F.3d 1190, 1194 (7th Cir. 1994); *see also Clark v. Universal Builders, Inc.*, 501 F.2d 324, 331 (7th Cir. 1974) (defendants cannot escape liability for acting with racial animus in violation of § 1982 by "proclaiming that they merely took advantage of a discriminatory situation created by others"); *Ortega v. Merit Ins. Co.*, 433 F. Supp. 135, 140-41 (N.D. Ill. 1977) (quoting *Clark*, 501 F.3d at 331). The conclusion that the §1982 theory of "racial animus" applies with equal force in § 1983 actions was recently reinforced by the Supreme Courts' 7 to 2 decision in *CROCS West v. Humphries*, CBOCS West, Inc. v. Humphries 128 S.Ct. 1951 (2008) and its 6 to 3 ruling in *Gomez-Perez                                    v.                                    Potter*, 128 S.Ct. 1931 (2008), holding that a theory of liability (i.e., retaliation) that was recognized as actionable in one civil rights statute was actionable in another.

To the extent that the City asserts as a basis for dismissal that they did not harbor any invidious animus personally, they are merely raising an issue of fact.  There are sufficient allegations in the AC to overcome these objections.

IV.     **The Amended Complaint States Actionable Claims Under State Law Against the Supervising Defendants.**

A. **The Amended Complaint States a Common Law Obstruction of Justice Claim.**

First, Plaintiffs state a claim for Common Law Obstruction of Justice and conspiracy against Defendant the City of Durham.   To state an obstruction of justice claim under North Carolina law, a plaintiff may allege "any act which prevents, obstructs, impedes or hinders public or legal justice." *Jones v. City of Durham*, 643 S.E.2d 631, 633 (N.C. Ct. App. 2007) (quoting *Broughton v. McClatchy Newspapers, Inc.,* 588 S.E.2d 20, 30 (N.C. Ct. App.

2003)).  The cause of action is a broad one, and courts have held that plaintiffs have stated actionable claims in a variety of contexts.  *See, e.g., Jones,* 643 S.E.2d at 633 (claim stated against the City of Durham for its Police Department's failure to produce evidence); *Jackson v. Blue Dolphin Commc'ns of N.C.*, 226 F.Supp.2d 785, 794 (W.D.N.C. 2002) (cause of action stated upon allegation of soliciting a false affidavit); *Henry v. Deen*, 310 S.E.2d 326, 334 (N.C. 1984) (cause of action stated by allegation of conspiracy to conceal evidence of medical negligence).[1]

The City has misdirected his "chilling effect" argument at this court; it is meant for the legislature or the North Carolina Supreme Court, which has authorized this Cause of Action under NC law.  The Amended Complaint alleges that the City "prevented, obstructed, impeded, or hindered" public justice in North Carolina.

B. **The Amended Complaint States a Common Law Abuse of Process Claim Against the City.**

The Nineteenth Cause of Action states an actionable claim for Common Law Abuse of Process.  To state a claim for Abuse of Process, a complaint must allege (1) a willful act by the defendant, (2) done with bad intent or ulterior motive, (3) after valid process has been issued at defendant's behest, (4) whereby the defendant attempts to use the process to accomplish a purpose for which it was not intended.  *Carson v. Moody*, 394 S.E.2d 194 (1990).  It is the malicious perversion of a legally issued process whereby a result not lawfully or properly obtainable under it is [intended] to be secured. *Stanback*, 254 S.E.2d 611 (1979) (quoting *Barnette v. Woody*, 88 S.E.2d 223 (1955)); W. Page Keeton, Prosser and Keeton on the Law of Torts, Section 121 (5th ed. 1984) ("The gist of the tort is the misuse of process for an end other than that which it was designed to accomplish").[11]

---

[11] The existence of an ulterior motive, malice or bad intent in getting process issued does not alone give rise to an action for abuse of process. There must also be a willful act by the defendant whereby the defendant attempts to use that process to harass or pressure the

The only argument offered by the City for dismissal of this claim merely raises a fact issue. The City incorrectly contends that Plaintiffs do not allege a subsequent abuse or misuse of the process (i.e., the NTID Order or McFadyen Warrant). But the AC contradicts the City by alleging those legal processes were used – subsequent to their issue – to coerce Plaintiffs to provide false evidence or to submit to interrogation where such evidence could be fabricated.

## C. The Amended Complaint States an Intentional Infliction of Emotional Distress Claim Against the City.

The Twentieth Cause of Action states an actionable claim for Intentional Infliction of Emotional Distress ("IIED"). To state a claim for IIED under North Carolina law, a plaintiff must allege: "(1) extreme and outrageous conduct by the defendant; (2) which is intended to and does in fact cause (3) severe emotional distress." *W.E.T. v. Mitchell*, No. 1:06CV487, 2007 WL 271294, at *8 (M.D.N.C. Sept. 14, 2007) (citing *Harris v. County of Forsyth*, 921 F.Supp. 325, 335-36 (M.D.N.C. 1996)); *see also Waddle v. Sparks*, 414 S.E.2d 22, 27 (N.C. 1992) (stating same essential elements for IIED). "A claim may also exist where the defendant's actions indicate a reckless indifference to the likelihood that they will cause severe emotional distress." *W.E.T., at* *8 (citing to *Hogan v. Forsyth Country Club Co.*, 340 S.E.2d 116, 119-20 (N.C. Ct. App. 1986)). "It is a question of law for the court to determine,

---

plaintiff regarding a matter outside the scope of the original writ. *Melton v. Rickman,* 36 S.E.2d 276 (N.C. 1945). Although many decisions state that the act, such as an extortion attempt, must occur after process issues,8 Professor Keeton states that "[m]ost of these cases probably stand only for the narrower proposition that there must be an overt act and that bad purpose alone is insufficient. Thus, a demand for collateral advantage that occurs before the issuance of process may be actionable so long as process does in fact issue at the defendants behest, and as a part of the attempted extortion. W. Page Keeton, Prosser and Keeton on the Law of Torts, § 212 (5th ed 1984); *See also*, *Carson, 394 S.E.2d 194.*

from the materials before it, whether the conduct complained of may be reasonably found to be sufficiently outrageous as to permit recovery." *Id.* (citing *Beck v. City of Durham*, 573 S.E.2d 183, 191 (N.C. Ct. App. 2002)). As distilled by the North Carolina Supreme Court, "[o]ne who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm." *West v. King's Dep't Store, Inc.*, 365 S.E.2d 621, 625 (citing *Dickens v. Puryear*, 276 S.E.2d 325, 332 (N.C. 1981)) (quoting Restatement (Second) of Torts § 46 (1965)).

Next, the City relies upon the familiar refrain that pursuing an investigation is not extreme or outrageous. Plaintiffs allege that the investigation had been concluded and ruled "unsubstantiated" by an investigator who was actually employed as a violent crimes investigator, as opposed to a property crimes investigator. The City attempts to analogize this case to *Dobson v. Harris,* 521 S.E.2d 710 (N.C. App. 1999), rev'd on other grounds, 352 N.C. 77, 530 S.E.2d 829 (2000) in order to assert that fabricated statements within an investigation are by definition not extreme or outrageous. Gottlieb Br. at 43. In *Dobson*, the court assumed that the Plaintiff was correct, as it must in Rule 12 Motions, in asserting that the defendant falsified or exaggerated the child abuse claim; but, it found that because this merely initiated an investigation it did not cause severe and outrageous harm. Plaintiffs do not contend that they have the right to remain free of investigation or that investigations by nature are extreme and outrageous conduct. Instead, the difference is that in this instance, the fabrication and other actions of the City Defendants were used to continue the investigation, in furtherance of the Conspiracy to Convict, even after they knew that neither Plaintiffs nor their teammates were guilty of anything, and thereby continued to subject them to public trauma and humiliation.

Finally, the Defendants assert, as a catch-all, assert that Plaintiffs allegation inadequately state the standard because Plaintiffs do not claim to have suffered "severe emotional distress. In this instance, the Defendants misstate the law. In *Waddle v. Sparks*, the claim was dismissed because the Plaintiffs did not "forecast … any medical documentation of plaintiff's alleged "severe emotional distress" nor any other forecast of evidence of "severe and disabling" psychological problems within the meaning of the test laid down in *Johnson v. Ruark,* 327 N.C. at 304, 395 S.E.2d at 97." *Waddle v. Sparks* 331 N.C. 73, 85; 414 S.E.2d 22, 28 (1992). Other cases have also cited to the test in Johnson which is laid out as defining "severe emotional distress," as "any emotional or mental disorder, such as, for example, neurosis, psychosis, chronic depression, phobia, or any other type of severe and disabling emotional or mental condition which *may be generally recognized and diagnosed by professionals trained to do so.' Johnson,* 327 N.C. 283, 304, 395 S.E.2d 85, 97 "(emphasis in original)." *Soderland v. Korch*, 143 N.C.App. 361 367, 546 S.E.2d 632 637, (2001) . As noted above, the Plaintiffs allege that Defendants acted in such with intent to cause "severe emotional distress" and did in fact cause "diagnosable emotional and mental conditions causing disabling emotional, mental and/or physical harm." (AC ¶¶1217, 1222). Therefore, Plaintiff's allegations more than sufficiently meet the pleading standards for intentional infliction of emotional distress.

D. **The Amended Complaint States an Aiding or Abetting the Breach of Fiduciary Duty Claim Against the City.**

The Twenty-Third Cause of Action states an actionable claim for Aiding and Abetting the Breach of a Fiduciary Duty. To state a claim for aiding or abetting breach of fiduciary duties, Plaintiff must allege "(1) the existence of a securities law violation by the primary party; (2) knowledge of the violation on the part of the aider and abettor; and (3) substantial assistance by the aider and abettor in the achievement of the primary violation." *Blow v. Shaughnessy*, 364 S.E.2d at 490; *see also In re EBW Laser, Inc.*, Nos. 05-1022OC-7G, 05-

102216-7G, 2008 WL 1805575, at *2 (Bankr. M.D.N.C. April 21, 2008) (quoting *Blow v. Shaughnessy*); *Battleground Veterinary Hosp., P.C. v. McGeough*, 2007 WL 3071618, at *7 (citing *Blow v. Shaughnessy*).[12]  The AC alleges that the City of Durham employees knowingly accepted protected financial informed without a warrant from a bank, putting both in violation of N.C.G.S. § 53.B; thereby aiding a breach of fiduciary duty.  An analysis of Plaintiffs' Claim for Aiding or Abetting the Breach of Fiduciary Duty is more fully developed Plaintiffs' in Plaintiffs' Opposition to DUPD Motion to Dismiss ("Pl. Op. to DUPD § V.C."), and, in the interests of judicial economy, Plaintiffs incorporate that analysis here..

E.  **The Amended Complaint States a Negligence Claim Against the City.**

The Twenty-Fifth Cause of Action states an actionable negligence claim against the City.  To state a negligence claim, a plaintiff must allege that (1) defendant owed plaintiff a duty of care, (2) the defendant breached that duty, and (3) defendant's breach was the actual and proximate cause of plaintiff's injury.  *Cameron v. Merisel Props*, Inc., 652 S.E.2d 660, 664 (N.C. Ct. App. 2007) (quoting *Thomas v. Weddle*, 605 S.E.2d 244 (N.C. Ct. App. 2004)).  The Amended Complaint states an actionable negligence claim against the City. Plaintiffs allege that the City was negligent in that:

---

[12] "It remains an open question whether North Carolina law recognizes a claim for aiding and abetting breach of fiduciary duty." *Battleground Veterinary Hosp., P.C. v. McGeough* No. 05 CVS 18918, 2007 WL 3071618, at *7 (N.C. Super. Ct. Oct. 19, 2007). Recently, however, the North Carolina Court of Appeals cited to the case creating the tort in North Carolina, *Blow v. Shaughnessy*, 364 S.E.2d 444 (N.C. Ct. App. 1988), in order to distinguish the factual basis of the complaint, thereby giving credence to their ongoing acceptance of the tort. *Hinson v. Jarvis*, 660 S.E.2d 604, 607 (N.C. Ct. App. 2008).

- Gottlieb, Himan, Addison, Michael and Hodge each owed Plaintiffs a duty to use due care with respect to his public statements concerning the investigation of Mangum's claims. AC ¶ 1262.

- Gottlieb, Himan and all others within the Durham Police Department owed Plaintiffs a duty to use due care with respect to the investigation of Mangum's allegations. AC ¶ 1263.

- Addison and Hodge each knew or should have known that such statements were false and inflammatory and likely to cause Plaintiffs harm at the time they made them, and by making them they breached a duty of care owed to the Plaintiffs. AC ¶ 1264.

- At the time Gottlieb. Himan and others within the Durham Police Department who committed the acts and omissions alleged above or ratified said acts, knew or should have known that they violated or departed from Durham Police policies and procedures, violated or departed from professional standards of conduct, violated constitutional rights, and were likely to cause Plaintiffs harm and thereby breach a duty of care owed to Plaintiffs. AC ¶ 1265.

- In committing the aforementioned acts and/or omissions, Addison, Gottlieb, Himan, and Hodge negligently breached said duties to use due care, which directly and proximately resulted in the injuries and damages to the Plaintiffs as alleged herein. AC ¶ 1266.

The City argues that the Plaintiffs' negligence claims should be dismissed because, they contend, they owed Plaintiffs no "duty" due to the Public Duty Doctrine. City Br. at 44. Their argument fails because, under North Carolina law, "every person" who engages in an active course of conduct that creates the risk of foreseeable harm to other persons, owes a duty of care to such other persons. The City asserts no reason not to hold it liable for negligence except for the Public Duty Doctrine. The Public Duty Doctrine is available to municipalities. The overwhelming rule is that a municipality and its agents act for the benefit of the public; therefore, there is no liability for the failure to furnish police protection to specific individuals. *Coleman v. Cooper,* 366 S.E.2d 2, 6 (N.C. App, 1987),*disc. rev.*

*denied,* 371 S.E.2d 275 (N.C. 1988). "This rule recognizes the limited resources of law enforcement and refuses to judicially impose an overwhelming\* burden of liability for failure to prevent every criminal act." *Braswell v. Braswell* 410 S.E.2d 897, 901 (1991). In general, there are two exceptions to this doctrine "(1) where there is a special relationship between the injured party and the police, for example, a state's witness or informant who has aided law enforcement officers; and (2) when a municipality, through its police officers, creates a special duty by promising protection to an individual, the protection is not forthcoming, and the individual's reliance on the promise of protection is causally related to the injury suffered." *Braswell* 401 S.E. 2d at902.

In 2007 the State Supreme Court limited the public duty doctrine's applicability in police cases by stating "the purpose of the doctrine, as noted in *Braswell*, is to respect the limited resources of law enforcement agencies by relieving them of liability for **failure to prevent every criminal act**." *Multpl. Claimants v. N. C. Dept. of Health and Human Sevcs.*, 646 S.E. 2d 356, 358 (2007). ; *Lumsden v. U.S.* 555 F.Supp.2d 580, 594 (E.D.N.C.,2008) ("The North Carolina Supreme Court recently explained that: [t]he public duty doctrine, which this Court first adopted in *Braswell v. Braswell,* 330 N.C. 363, 410 S.E.2d 897 (1991), provides that a municipality and its agents act for the benefit of the public, and therefore, there is no liability for the failure to furnish police protection to specific individuals."(internal citation omitted)).

Plaintiffs are not contending that the City failed to protect them from crime; Plaintiffs allege that the negligent actions of city actors while investigating an alleged crime that they knew to be false caused Plaintiffs foreseeable harm. Therefore, the doctrine does not apply to the Plaintiffs' claims. Because Plaintiffs have stated a claim for negligence and the public duty doctrine does not apply, North Carolina's common law of negligence must be used to evaluate the claims.

**V.  DEFENDANTS MAKE NO OTHER ARGUMENTS FOR DISMISSAL; PLAINTIFFS REQUEST LEAVE TO COMMENCE DISCOVERY.**

Defendants have made no other arguments in support of dismissal of Plaintiffs' claims.  Defendants have, however, requested oral argument on their motions, pointing to the complexity of the issues raised by the Amended Complaint.  Any complexity that Defendants could not clarify in the course of the 825 pages that has already been extended to them likely will not clarify in oral argument.  That is particularly true if, at oral argument, Defendants persist in recasting Plaintiffs' allegations to find a foothold for their arguments.  With respect, Plaintiffs request that the Defendants' request for oral argument be denied, and Plaintiffs request for leave to schedule the Rule 26(f) discovery conference.

## CONCLUSION

For the foregoing reasons, the Court should deny Defendants' Motions to Dismiss, except that, where the City is already named as a defendant in the Causes of Action, the Court may dismiss the official capacity claims alleged in those causes of action. Defendants' request for oral argument should be denied, and Plaintiffs' request for leave to conduct the Rule 26(f) discovery conference should be granted.

Dated:  October 10, 2008                                    Respectfully submitted,

                                                            **EKSTRAND & EKSTRAND LLP**

                                                            /s/ Robert C. Ekstrand
                                                            _____
                                                            Robert C. Ekstrand, Esq. (NC Bar #26673)
                                                            Attn:  Stefanie A. Sparks
                                                            811 Ninth Street, Suite 260
                                                            Durham, North Carolina 27705
                                                            Email:  rce@ninthstreetlaw.com
                                                            Email:  sas233@law.georgetown.edu
                                                            Phone: (919) 416-4590
                                                            *Counsel for Plaintiffs Ryan McFadyen,*
                                                            *Matthew Wilson, and Breck Archer*

# UNITED STATES DISTRICT COURT
## FOR THE
## MIDDLE DISTRICT OF NORTH CAROLINA

RYAN MCFADYEN, ET AL.,

     Plaintiffs,

          V.

DUKE UNIVERSITY, ET AL.,

     Defendants.

**Civil Action No. 1:07-cv-953**

CERTIFICATE OF SERVICE

I hereby certify that, on October 6, 2008, I electronically filed the foregoing PLAINTIFFS' OPPOSITION TO THE CITY'S MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

James Donald Cowan, Jr.
Ellis & Winters, LLP
100 North Greene Street, Suite 102
Greensboro, NC  27401
*Counsel for the University Defendants*

Dixie Wells
Ellis & Winters, LLP
100 North Greene Street, Suite 102
Greensboro, NC  27401
*Counsel for the University Defendants*

Jamie S. Gorelick
Wilmer Cutler Pickering Hale and Dorr, LLP
1875 Pennsylvania Avenue, NW
Washington, DC 20006
***Counsel for the University Defendants***

Jennifer M. O'Connor
Wilmer Cutler Pickering Hale and Dorr, LLP
1875 Pennsylvania Ave., N.W.
Washington, DC  20006
***Counsel for the University Defendants***

Paul R.Q. Wolfson
Wilmer Cutler Pickering Hale and Dorr, LLP
1875 Pennsylvania Avenue, NW
Washington, DC 20006
***Counsel for the University Defendants***

William F. Lee
Wilmer Cutler Pickering Hale and Dorr, LLP
60 State Street
Boston, MA  02109
***Counsel for the University Defendants***

Dan J. McLamb
Yates, McLamb & Weyher, LLP
One Bank of America Plaza, Ste 1200
421 Fayetteville Street
Raleigh, NC 27601
***Counsel for the Sane Defendants***

Reginald B. Gillespie, Jr.
Faison & Gillespie
P.O. Box 51729
Durham, NC 27717
***Counsel for City of Durham, North Carolina***

Patricia P. Kerner
Troutman Saunders, LLP
434 Fayetteville Street, Suite 1900
Raleigh, NC 27601
***Counsel for Steven Chalmers, Patrick Baker, Beverly Council, Ronald Hodge, Jeff Lamb, Stephen Mihaich, Michael Ripberger, Laird Evans, and Lee Russ***

D. Martin Warf
Troutman Sanders LLP
P.O. Drawer 1389
Raleigh, North Carolina 27602
***Counsel for Steven Chalmers, Patrick Baker, Beverly Council, Ronald Hodge, Jeff Lamb, Stephen Mihaich, Michael Ripberger, Laird Evans, and Lee Russ***

James B. Maxwell
Maxwell, Freeman & Bowman
P.O. Box 52396
Durham, NC  27717-2396
***Counsel for David Addison, Kammie Michael, Richard D. Clayton and James T. Soukup***

Joel M. Craig
Kennon, Craver, Belo, Craig & McKee
4011 University Drive, Suite 300
Durham, NC 27707
***Counsel for Benjamin W. Himan***

Edwin M. Speas, Jr.
Poyner & Spruill, LLP
P.O. Box 10096
Raleigh, NC 27605-0096
***Counsel for Mark Gottlieb***

Eric P. Stevens
Poyner & Spruill, LLP
P.O. Box 10096
Raleigh, NC 27605-0096
***Counsel for Mark Gottlieb***

Kearns Davis
Brooks, Pierce, McLendon, Humphrey & Leonard, L.L.P.
P.O. Box 26000
Greensboro, NC  27420
***Counsel for DNA Security, Inc. and Richard Clark***

Robert J. King, III
Brooks, Pierce, McLendon, Humphrey & Leonard, L.L.P.
P.O. Box 26000
Greensboro, NC  27420
**Counsel for DNA Security, Inc. and Richard Clark**

Linwood Wilson
**\*\* Address Redacted Pursuant to Local Rule**


I further certify that I caused the foregoing document to be served by first-class mail, postage prepaid, to the following non CM/ECF participants:

Paul R. Dickinson, Jr.
Lewis & Roberts, PLLC
5960 Fairview Road, Suite 102
Charlotte, NC  28210
**Counsel for Brian Meehan**

James A. Roberts, III
Lewis & Roberts, PLLC
1305 Navaho Drive, Suite 400
Raleigh, NC  27609-7482
**Counsel for Brian Meehan**

Roger E. Warin
Steptoe & Johnson, LLP
1330 Connecticut Avenue, NW
Washington, DC 20003
**Counsel for City of Durham, North Carolina**

Robert A. Sar
Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
2301 Sugar Bush Road, Suite 600
Raleigh, NC  27612
**Counsel for DNA Security, Inc.**

Nicholas J. Sanservino, Jr.
Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
2301 Sugar Bush Road, Suite 600
Raleigh, NC  27612
**Counsel for DNA Security, Inc.**

Respectfully submitted,


**EKSTRAND & EKSTRAND LLP**

/s/ Robert C. Ekstrand
Robert C. Ekstrand, Esq.
NC Bar #26673
811 Ninth Street, Suite 260
Durham, North Carolina 27705
Email:  rce@ninthstreetlaw.com
Phone: (919) 416-4590
Counsel for Plaintiffs