UNITED STATES DISTRICT COURT
FOR THE
MIDDLE DISTRICT OF NORTH CAROLINA

RYAN McFADYEN, et al.,

      Plaintiffs,

                v.

DUKE UNIVERSITY, et al.,

      Defendants.

Civil Action No. 1:07-cv-953

---

## PLAINTIFFS' OPPOSITION TO THE CITY SUPERVISING DEFENDANTS' AND HODGE'S MOTIONS TO DISMISS PLAINTIFFS' AMENDED COMPLAINT

---

Dated: October 10, 2008

**EKSTRAND & EKSTRAND LLP**
Robert C. Ekstrand, Esq. (NC Bar #26673)
Attn: Stefanie A. Sparks
811 Ninth Street, Suite 260
Durham, North Carolina 27705

***Counsel for Plaintiffs Ryan McFadyen,***
***Matthew Wilson, and Breck Archer***

# TABLE OF CONTENTS

TABLE OF CONTENTS ...................................................................................... i

STATEMENT OF THE CASE ........................................................................... 1

NATURE OF THE PROCEEDINGS ................................................................ 1

STATEMENT OF THE FACTS ........................................................................ 2

QUESTIONS PRESENTED .............................................................................. 7

ARGUMENT ...................................................................................................... 7

I.     STANDARD OF REVIEW ................................................................... 7

II.    THE AMENDED COMPLAINT STATES ACTIONABLE CLAIMS UNDER FEDERAL LAW AGAINST THE SUPERVISING DEFENDANTS ............... 8

    A.   The Amended Complaint States Actionable Section 1983 Claims Against The Supervising Defendants. .................................................... 8

        1. The Amended Complaint States A § 1983 Stigma-Plus Claim Against Hodge For Stigmatizing Plaintiffs In Connection With The Deprivation Of Their Federal Rights. ....................................................... 10

        2. The Amended Complaint States An Actionable § 1983 Claim Against Hodge For Retaliation In Violation Of The First And Fourteenth Amendments. ......................................................... 10

        3. The Tenth Cause Of Action States An Actionable Section 1983 Claim Against The Supervising Defendants For Depriving Plaintiffs Of Privileges And Immunities Guaranteed By The Fourth And Fourteenth Amendments. ....................................................... 11

        4. The Eleventh Cause Of Action States An Actionable Section 1983 Claim Against The Supervising Defendants For Their Failure To Prevent Or Aid In Preventing The Ongoing Deprivations Of Plaintiffs' Constitutional Rights. ........................................................ 19

    B.   The Amended Complaint Alleges Sufficient Direct And Circumstantial Evidence To Establish An Unlawful Conspiracy. .................................... 20

III.   The Amended Complaint States a Supervisory Liability Claim Against the Durham Police Supervisory Defendants. ........................................................ 20

    A.   This Circuit Has Rejected Heightened Pleading Requirements For Supervisory Liability. ................................................................26

IV.    THE SUPERVISORY DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY. ................................................................26

    A.   The Qualified Immunity Standard ............................................26

        1. The Supervising Defendants Do Not Have Qualified Immunity For Plaintiff's Supervisory Liability Claims. .............................................27

        2. Hodge Is Not Entitled To Qualified Immunity For Stigmatizing Plaintiffs In Connection With The Deprivation Of Plaintiffs Rights...28

        3. Hodge Is Not Entitled To Qualified Immunity For Retaliating Against Plaintiffs For Exercising A Constitutional Right ................................28

        4. Defendants Are Not Entitled To Qualified Immunity For Discriminatory And Abusive Enforcement Of The Criminal Laws Because Plaintiffs Were "Temporary" Residents Of North Carolina..29

        5. The Durham Supervising Defendants Do Not Have Qualified Immunity For Failing To Intervene To Prevent His Fellow Officers From Violating Plaintiffs Constitutional Rights In His Presence Or Within His Knowledge. ...................................................................30

V.    THE AMENDED COMPLAINT STATES ACTIONABLE CLAIMS FOR PARTICIPATION IN CIVIL RIGHTS CONSPIRACIES. .............................31

    A.   Conspiracies In Violation Of 42 U.S.C. § 1983. ........................31

    B.   The Amended Complaint States Actionable Claims For Conspiracy In Violation Of 42 U.S.C. § 1985. ..................................................33

    C.   Animus Based On State Citizenship Is Actionable Under § 1985. ...........35

    D.   The § 1985 Claims Allege Racial Animus Of Two Types. ......................35

        1. Section 1985 Directs Itself To Animus Toward Any Race.................35

        2. Defendants Were Motivated By, Fomented, And Took Advantage Of Racial Animus. ....................................................................36

    E.   The Amended Complaint States A Violation Of 42 U.S.C. §1986. ..........38

VI.    The Amended Complaint States Actionable Claims Under State Law Against the Supervising Defendants. ..............................................................39

    A.   The Amended Complaint States A Common Law Obstruction Of Justice Claim Against Defendant Lamb; He Did Not Address This Brief In His Motion To Dismiss. ...................................................................39

B. The Amended Complaint States An Intentional Infliction Of Emotional Distress Claim Against The Supervising Defendants. ............................... 40

C. The Amended Complaint States An Aiding Or Abetting The Breach Of Fiduciary Duty Claim Against The Supervising Defendants. ................... 42

D. The Amended Complaint States Negligence Claims against the Supervising Defendants. ............................................................. 43

    1. Public Official Immunity ..................................................... 43

E. The Amended Complaint States a Negligent Supervision, Retention, Training, and Discipline Claim Against the Supervising Defendants. ....... 44

F. The Amended Complaint States a Negligent Infliction of Emotional Distress Claim Against the Supervising Defendants. ............................... 44

VII. THE COURT MAY DISMISS OFFICIAL CAPACITY CLAIMS WHERE THE CITY IS ALSO NAMED AS A DEFENDANT AND IS THE REAL PARTY IN INTEREST. .................................................................. 46

VIII. DEFENDANTS MAKE NO OTHER ARGUMENTS FOR DISMISSAL; PLAINTIFFS REQUEST LEAVE TO COMMENCE DISCOVERY ............. 47

CONCLUSION ............................................................................ 47

## STATEMENT OF THE CASE

The Amended Complaint describes a combination of actors and entities referred to as the Consortium. For thirteen months beginning in March 2006, the Consortium's ultimate objective was to railroad the Plaintiffs and their 44 teammates into convictions as either principles or accomplices to a horrific, violent crime they knew never happened. The allegations describe a willful, malicious, and calculating conspiracy of multiple dimensions. Acting individually and in concert, Defendants concealed exonerating evidence, manufactured inculpatory evidence, and stigmatized the Plaintiffs by subjecting them to public outrage, public condemnation, and infamy in the minds of millions of people. Defendants' conduct shocks the conscience. Maybe the most unsettling of all are those who knew of the wrongs conspired to be done to Plaintiffs, and had the power to prevent or aid in preventing them. Instead, they 'turned a blind eye' and did nothing.

## NATURE OF THE PROCEEDINGS

Plaintiffs filed this action on December 18, 2007 and amended that filing on April 17, 2008. Pursuant to a request from this Court regarding the location of the audio and video exhibits embedded within the First Amended Complaint ("AC"), Plaintiffs re-filed the AC on April 18, 2008 with those embedded exhibits as separate documents. Except for the location of the exhibits, the two "First Amended Complaints" are identical. All Defendants filed Motions to Dismiss pursuant to Fed. R. Civ. P. 12(b) (6) on July 2, 2008. This Memorandum is filed pursuant to the Court's Order of October 7, 2008 [Document #72], granting Plaintiffs' Motion for Leave to File Opposition Briefs

[Document #71], and authorizing Plaintiffs to file their Responses on or before October 10, 2008.[1]

## STATEMENT OF THE FACTS

The City Supervisors played a critical role in the grave miscarriage of justice that became known as the "Duke Lacrosse Rape Case." The Durham Police Supervising Defendants are those who were in the chain of command running from Himan to Baker. One Supervising Defendant was not in the decision-making chain: Defendant Mihaich.[2]

***Stephen Mihaich*** was at all relevant times the Commander of the Durham Police Departments Criminal Investigations Division ("CID"). AC ¶ 54. Durham's CID employs specialized and skilled investigators who are trained in the science and techniques of investigating violent crime. AC ¶ 336. In that capacity, Mihaich transferred the supervision of the investigation of Mangum's rape allegations to Gottlieb,

---

[1] Plaintiffs' Opposition Brief is filed as a joint response to the City Supervisors' Motion to Dismiss [Document #55] and supporting Memorandum [Document #56] and Hodge's Motion to Dismiss [Document #57] and supporting Memorandum [Document #58]. The City Supervisors' and Hodges' brief are cited herein as "City Super. Br." and "Hodge Br.", respectively. The City's co-defendants' supporting briefs are cited herein as: "Gottlieb Br.," "DNASI Br.," "SANE Br.," "Duke Univ. Br." "DUPD Br.," "Himan Br.," "SMAC Br.," and "Wilson Br."

[2] Mihaich was the subject of a voluntary dismissal in two pending actions in this Court: Notice of Vol. Dis. (Document #28), *Evans, et al. v. City of Durham, et al.*, 1:07-cv-739 (M.D.N.C.), filed Jan. 14, 2008, and Pl.'s Opp. Mot. (Document #93) at 6 n. 5, *Carrington, et al. v. Duke University et al.*, 1:08-cv-119 (M.D.N.C.), filed Aug. 28, 2008. We explain in this memorandum our rationale for declining the invitation to dismiss Mihaich from this action.

a known and documented abuser of Duke students. AC ¶ 335. This was done in clear violation of the Department's General Orders and CID's Standard Operating Investigative Services for the Durham Police Department. In that capacity, Mihaich was a supervisor and official with final policymaking authority for the Durham Police Department with respect to all investigations of violent crimes, including rape, sexual offense and kidnapping. AC ¶¶ 54, 336. Mihaich was responsible for assigning investigators to cases based upon established criteria: the level of experience and expertise of the investigator and the complexity and sensitivity of the case. Mihaich was also responsible for the Department's adherence to its case management system and its investigators' compliance with the law. AC ¶ 54. Mihaich never revoked his delegation of policymaking authority with respect to the assignment of the investigation of Mangum's claims to Himan, who was "at the bottom" of the list of property crimes investigators in District Two, which, itself, was at the bottom with respect to expertise in complex violent crime investigations. AC ¶¶ 63. By delegating his policymaking authority over the investigation to a patrol chain of command, Gottlieb, Ripberger, and Lamb, and never reclaiming it, Mihaich ratified and condoned all of the gross misconduct alleged in the Amended Complaint. AC ¶¶ 337-41, § XII. Thus, the fact that Mihaich has signed an affidavit stating that he was never in the "decision-making chain" for the investigation only proves his culpability: he should have been. He should have revoked the policymaking authority he had given to Lamb, Ripberger, and Gottlieb, but he did not: instead he turned a blind eye and did nothing. AC ¶¶ 335-39.

**Patrick Baker** was at all times relevant to this action, was acting as the City Manager for the City of Durham. In that capacity, Baker directly supervised the Durham Police Department. The Chief of Police reporting directly to him. Baker was the final element in the Himan Chain of Command, the Addison Chain of Command, and the Michael Chain of Command. Baker was a City of Durham official with final

policymaking authority with respect to, among other things, the Durham Police Department, the Durham Emergency Communications Center, and the investigation of Mangum's false accusations.  AC ¶ 50.

**Steven Chalmers** was, at all times relevant to this action, the Chief of Police for the Durham Police Department. Chalmers reported directly to Baker, and shared final policymaking authority for all matters relating to the Durham Police Department. In that capacity, Chalmers was a supervisory official with final policymaking authority over all activities of the Durham Police Department.  AC ¶ 51.

**Ronald Hodge** is, and at all times relevant to this action, was the Deputy Chief of Police for the Durham Police Department.  In that capacity, Hodge served as a supervisory official with final policymaking authority with respect to the investigation of Mangum's false accusations.  At all times relevant to this action, Hodge's duties included directly supervising Russ, Mihaich, Council, Soukup, Addison and Michael.  Upon information and belief, on or shortly after March 14, 2006, Hodge assumed the responsibilities of the Chief of Police for the Durham Police Department during the extended period of time in which Defendant Chalmers was on leave or made unavailable during the investigation of Mangum's false accusations, and retained them even after Chalmers returned.  AC ¶ 52.

**Lee Russ** is, and at all times relevant to this action, was the Executive Officer to the Chief of Police in the Durham Police Department with the rank of Major. In that capacity, Russ was a supervisory officer with final policymaking authority with respect to the Durham Police Department's media and community relations activities, and the investigation of Mangum's false accusations. At all times relevant to this action, Russ' duties included supervising Defendant Michael and Defendant Addison.  AC ¶ 53.

**Beverly Council** was, at all times relevant to this action, the Commander of the Uniform Patrol Bureau for the Durham Police Department. In that capacity, Council was an official with supervisory and final policymaking authority for the Durham Police Department's Patrol Units and Districts, including District Two, Lamb, Ripberger, Gottlieb and Himan. Council was in the Chain of Command from Himan to Baker with respect to the investigation of Mangum's false accusations. After the City of Durham conducted an investigation of its Police Department's conduct in that investigation, Council was promoted to Deputy Chief of Police. AC ¶ 55.

**Jeff Lamb** is now retired. Effective no later than March 6, 2006, and at all times relevant to this action, Captain Lamb was the Commander of the Durham Police Department's Patrol District Two. In that capacity, Captain Lamb had supervisory and final policymaking authority over District Two's patrol and property crimes personnel and activities. Captain Lamb was the Captain in the Chain of Command from Himan to Baker for the investigation of Mangum's allegations. AC ¶ 56.

**Michael Ripberger** was, at all times relevant to this action, a Lieutenant in the Durham Police Department's District Two. In that capacity, Lt. Ripberger had supervisory and final policymaking authority with respect to property crimes investigators and investigations in District Two, including the investigation of Mangum's allegations. Lt. Ripberger was the Patrol Lieutenant in the Chain of Command from Himan to Baker with respect to the investigation of Mangum's claims. After the City of Durham conducted an investigation of its Police Department's conduct in that investigation, the City of Durham promoted him. Lt. Ripberger was Sgt. Gottlieb's direct supervisor, and was in the chain of command established for the investigation of Mangum's false accusations. Lt. Ripberger is, and at all times relevant to this action, was a citizen and resident of North Carolina. AC ¶ 57.

***Laird Evans*** is, and at all times relevant to this action, was a Sergeant in the Durham Police Department's District Two. At the inception of the investigation of Mangum's accusations, the City employed Evans as a uniformed patrol officer. Beginning in October of 2006, Evans replaced Gottlieb as Himan's direct supervisor in the continuing investigation of Mangum's false accusations. In that capacity, Evans had supervisory and final policymaking authority over Himan and the investigation. Upon information and belief, Evans is, and at all times relevant to this action, was a citizen and resident of North Carolina. AC ¶ 58.

The Supervising Defendants are responsible for devising, ratifying and enforcing the Zero-Tolerance for Duke Students Policy under which Duke Students were subjected to abuses and police misconduct, and disproportionate enforcement of the criminal laws where "permanent residents" would not be, the logical consequences of were abusive tactics being directed at Duke Students. AC §§ II-IV. This dimension of the Amended Complaint is discussed in Pls. Opp. Br. (City).

The Supervising Defendants participated in the Joint Command meetings with Duke and Durham Officials where the conspiracy to convict was agreed upon, AC § XXVI, they condoned and ratified the fabrication of affidavits to secure warrants and orders authorizing seizures, AC § XXIV, the destruction of DECC tapes that contained proof of the Department's fraud, AC § XXIII, the manufacture of evidence to prove a crime that never happened, AC §§ XXX, XXXIV, the concealment of evidence that exonerated Plaintiffs, AC §§ XXXI, XXXIII, and, in other ways described in the AC, they ratified and tacitly participated in their subordinates' deprivations of the Plaintiffs' rights. *See generally* AC §§ II-XL.

These Defendants were "the Supervisors" in charge of the City's investigation (or, as in the case of Mihaich, should have been). They were responsible for ensuring their

subordinates did not engage in precisely the same persistent, deliberate violations of rights that are documented in the AC. Yet, they condoned, ratified, and even participated directly in the conduct alleged.

## QUESTIONS PRESENTED

1. Have Plaintiffs stated actionable claims against the City Supervising Defendants under 42 U.S.C. § 1983?

2. Have Plaintiffs stated Actionable Claims Against the City Supervising Defendants for Supervisory Liability under Federal Civil Rights Law?

3. Are the City Supervising Defendants Entitled to Qualified Immunity?

4. Have Plaintiffs stated actionable claims against the City Supervising Defendants for Federal Civil Rights Conspiracies under 42 U.S.C. § 1983, 42 U.S.C. § 1985, and 42 U.S.C §1986 (where Plaintiffs allege that each Defendant agreed to the overall objective)?

5. Have Plaintiffs stated actionable claims against the City Supervising Defendants under State Law?

## ARGUMENT

## I. STANDARD OF REVIEW

A motion to dismiss for failure to state a claim may be granted "only in very limited circumstances." *Rogers v. Jefferson-Pilot Life Ins. Co.,* 883 F.2d 324, 325 (4th Cir. 1989). In examining a Rule 12(b) (6) motion, "the court should accept as true all well-pleaded allegations and should view the complaint in a light most favorable to the plaintiff." *Salami v. Monroe*, No. 1:07CV621, 2008 WL 2981553, at *5 (M.D.N.C. Aug. 1, 2008) (quoting *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993)). Though the complaint is not required to encompass detailed factual allegations, "a

plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* (quotations and alterations in original) (quoting *Bell Atl. Corp. v. Twombly*, 127 S.Ct. 1955, 1964-65 (2007)). The complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Id.* (quoting *Twombly*, 127 S.Ct. at 1965). "[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Id.* (quoting *Twombly*, 127 S.Ct. at 1969).

Further, where Plaintiffs have asserted a civil rights action, the Court "must be especially solicitous of the wrongs alleged and must not dismiss the complaint unless it appears to a certainty that the plaintiff would not be entitled to relief under any legal theory which might plausibly be suggested by the facts alleged." *Veney v. Wyche,* 293 F.3d 726, 730 (4th Cir. 2002) (internal quotations omitted).

## II.     THE AMENDED COMPLAINT STATES ACTIONABLE CLAIMS UNDER FEDERAL LAW AGAINST THE SUPERVISING DEFENDANTS.

### A.     The Amended Complaint States Actionable Section 1983 Claims Against The Supervising Defendants.

The Amended Complaint states actionable § 1983 Claims against the Supervising Defendants for two types of conduct: (1) their affirmative acts that caused the deprivation of Plaintiffs' rights; and (2) their failure to supervise the investigation or take any meaningful action to prevent or remedy the numerous abuses that they learned during the investigation, where their failure amounted to 'tacit authorization' or 'supervisory

indifference.' At this early stage, the Court must determine whether each of these Causes of Action alleges facts sufficient to satisfy the elements of § 1983.[3] *See Green v. Maroules*, 211 F.App'x 159, 161 (4th Cir. 2006). Section 1983 claim requires only two essential allegations:

> By the plain terms of section 1983, two–and only two–allegations are required in order to state a cause of action under that statute. First, the plaintiff must allege that some person has deprived him of a federal right. Second, he must allege that the person who deprives them of that right acted under color of state or territorial law.

*Gomez v. Toledo*, 446 U.S. 635, 640 (1980). Supervisory officials may be held directly liable under § 1983 for the constitutional violations of subordinates "if they actually participate in a constitutional violation or if they act with deliberate indifference in permitting constitutional violations to continue unchecked." *Blair v. County of Davidson*, No. 1:05CV00011, 2006 WL 1367420, *10 (M.D.N.C. May 10, 2006) (citing *Shaw v. Stroud,* 13 F.3d 791, 798 (4th Cir. 1994)). These Defendants bear a particularly heavy

---

[3] Section 1983 provides:

> [E]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proceeding for redress[.]

42 U.S.C. § 1983 (2000). Section 1983 does not itself create or establish substantive rights. Instead, § 1983 provides "a remedy" where a plaintiff demonstrates a violation of a right protected by the federal Constitution, or by a federal statute other than §1983. *Chapman v. Houston Welfare Rights Org.*, 441 U.S. 600, 617 (1979).

burden on their motion because § 1983 supervisory liability claims are not, by their nature, conducive to disposition on the pleadings.  This Court has noted that supervisory liability "ultimately is determined 'by pinpointing the persons in the decision-making chain whose deliberate indifference permitted the constitutional abuses to continue unchecked' and this determination 'is ordinarily one of fact, not law.' " *Id.* at *11 (citing *Shaw,* 13 F.3d at 798-99) (quoting *Slakan v. Porter,* 737 F.2d 368, 376 (4th Cir.1984)).[4]

### 1. The Amended Complaint States A § 1983 Stigma-Plus Claim Against Hodge For Stigmatizing Plaintiffs In Connection With The Deprivation Of Their Federal Rights.

The Fifth Cause of Action alleges that Defendant Hodge individually and in concert with others stigmatized Plaintiffs in connection with the deprivation of their federal rights in violation of the Fourteenth Amendment.  AC ¶¶ 954-68.  Plaintiffs establish the basis for Plaintiffs' Fifth Cause of Action and respond to Hodge's arguments for dismissal of that claim in Pls. Opp. SMAC Br. § II.A(2).

### 2. The Amended Complaint States An Actionable § 1983 Claim Against Hodge For Retaliation In Violation Of The First And Fourteenth Amendments.

The Ninth Cause of Action alleges Hodge, individually and in concert with others, engaged in retaliatory conduct in violation of the First and Fourteenth Amendment.  AC ¶¶ 992-1001.  Plaintiffs establish the basis for Plaintiffs' Fifth Cause of Action and respond to Hodge's arguments for dismissal of that claim in Pls. Opp. Duke Br. § II.A(4).

---

[4] *See also Slakan v. Porter*, 737 F.2d 368, 376 (4th Cir. 1984); *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994); *Avery v. County of Burke*, 660 F.2d 111, 114 (4th Cir. 1981).

### 3. The Tenth Cause Of Action States An Actionable Section 1983 Claim Against The Supervising Defendants For Depriving Plaintiffs Of Privileges And Immunities Guaranteed By The Fourth And Fourteenth Amendments.

The Amended Complaint states an actionable Section 1983 Claim for deprivation of Plaintiffs' rights guaranteed by the Privileges and Immunities clauses of Article IV and the Fourteenth Amendment.  AC ¶¶ 1002-07.  This Cause of Action identifies rights within the broader "right to travel."  The "right to travel" includes at least three different components:  (1) the right of a citizen of one State to enter and to leave another State, (2) the right to be treated as a welcome visitor rather than an unfriendly alien when temporarily present in the second State, and, (3) for travelers who elect to become permanent residents in a new State, the right to be treated like other citizens of that State.  Plaintiffs assert that the second and third component of the right to travel are addressed in the Amended Complaint.

The second component of the right to travel is expressly protected by the text of Article IV, Section 2, of the Constitution.  *Saenz v. Roe*, 526 U.S. 489, 501 (1999).  The first sentence of Article IV, Section 2, provides:  "The Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States."  U.S. Const. art. IV, § 2.  "Thus, by virtue of one's state citizenship, a citizen of one State who travels in other States, intending to return home at the end of his journey, is entitled to enjoy the 'Privileges and Immunities of Citizens in the several States' that he visits."  *Saenz*, 526 U.S. at 501.  This provision removes "from the citizens of each State the disabilities of alienage in the other States… ." *Id.*  (quoting *Paul v. Virginia,* 75 U.S. 168, 180 (1868)).

> "[W]ithout some provision ... removing from the citizens of each State the *disabilities* of alienage in the other States, and giving them equality of privilege with citizens of those States, the Republic would have constituted little more than a league of States; it would not have constituted the Union which now exists."

Thus, since 1868, the Supreme Court has consistently held that the removal of the disabilities of alienage is fundamental to our constitutional order. *See Paul,* 75 U.S. 168 . Its guarantees remove disabilities of alienage for nonresidents who enter a State, whether to obtain employment, *Hicklin v. Orbeck,* 437 U.S. 518 (1978), to procure medical services, *Doe v. Bolton,* 410 U.S. 179 (1973), or even to engage in commercial shrimp fishing, *Toomer v. Witsell,* 334 U.S. 385 (1948). Any justification for disparate treatment of citizens of other States must be "substantial." *Saenz,* 526 U.S. at 501. Substantial reasons may require the nonresident to pay more than the resident for a hunting license, *see Baldwin v. Fish & Game Comm'n of Mont.,* 436 U.S. 371, 390-91 (1978), or to enroll in the state university, *see Vlandis v. Kline,* 412 U.S. 441, 445 (1973).

Plaintiffs have also invoked the third aspect of the right to travel—the right of the newly arrived citizen to the same privileges and immunities enjoyed by other citizens of the same State. That right is protected not only by the new arrival's status as a state

citizen, but also by his status as a citizen of the United States.[5]   That additional source of protection is plainly identified in the opening words of the Fourteenth Amendment:

> All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; ... ."

U.S. Const. amend. 14, § 1.

Despite diametrically differing views relating to other dimensions of the Fourteenth Amendment's Privileges or Immunities Clause (most notably articulated in the majority and dissenting opinions in the *Slaughter-House Cases,* 21 L.Ed. 394 (1872)), it has always been commonly accepted that this Clause protects the third component of the right to travel.  For example, in the *Slaughter-House Cases,* Justice Miller explained for the majority that one of the privileges conferred by this Clause "is that a citizen of the United States can, of his own volition, become a citizen of any State of the Union by a *bonâ fide* residence therein, with the same rights as other citizens of that State."  *Saenz,*

---

[5] The Framers of the Fourteenth Amendment modeled this Clause upon the "Privileges and Immunities" Clause found in Article IV.  *Cong. Globe*, 36th Cong., 1st Sess., 1033-34 (1866) (statement of Rep. Bingham).   The Supreme Court had limited the protection of Article IV to rights under state law in *Dred Scott v. Sandford,* 60 U.S. 393 (1856), concluding that emancipated African-Americans could not claim citizenship. The Fourteenth Amendment overruled *Dred Scott*. "The Amendment's Privileges or Immunities Clause and Citizenship Clause guaranteed the rights of newly freed black citizens by ensuring that they could claim the state citizenship of any State in which they resided and by precluding that State from abridging their rights of national citizenship." *Saenz*, 526 U.S. at 503 n. 15.

526 U.S. at 503 (quoting *Slaughter-House Cases,* 21 L.Ed. at 80). In his dissent, Justice Bradley used even more potent language to make the same, uncontested point:

> "The states have not now, if they ever had, any power to restrict their citizenship to any classes or persons. A citizen of the United States has a perfect constitutional right to go to and reside in any State he chooses, and to claim citizenship therein, and an equality of rights with every other citizen; and the whole power of the nation is pledged to sustain him in that right. He is not bound to cringe to any superior, or to pray for any act of grace, as a means of enjoying all the rights and privileges enjoyed by other citizens."

*Id*. at 503-04 (quoting *Slaughter-House Cases,* 21 L.Ed. at 112-13). "That newly arrived citizens have two political capacities, one state and one federal, adds special force to their claim that they have the same rights as others who share their citizenship." *Saenz*, 526 U.S. at 503. (internal quotations omitted). Because the right of every citizen to reside in any state he chooses is "fundamental," neither "mere rationality" nor some intermediate standard of review may be utilized to examine the constitutionality of a state action that discriminates against some of its citizens because they have been domiciled in the State for a short period of time. *Id.* Any classification policy which serves to penalize a person for the exercise of the right to travel is unconstitutional, unless the policy survives "strict scrutiny" (i.e., that the policy is "necessary" to promote "a compelling governmental interest"). *Id.* (citing *Shapiro v. Thompson*, 394 U.S. 618, 634, (1969)); *cf. Sherbert v. Verner*, 374 U.S. 398, 406 (1963); *Bates v. City of Little Rock*, 361 U.S. 516, 524 (1960); *Korematsu v. United States*, 323 U.S. 214, 216 (1944); *Skinner v. Oklahoma*, 316 U.S. 535, 541 (1942). The Supreme Court recently examined their decisions in their Privileges and Immunities cases, and concluded "[o]ur cases have not identified *any* acceptable reason for qualifying the protection afforded by the Clause for the citizen of State A who ventures into State B to settle there and establish a home." *Saenz*, 526 U.S. at 502 (quoting *Zobel v. Williams,* 457 U.S. 55, 74 (1982) (O'Connor, J., concurring in

14

judgment) (internal quotations omitted) (alteration not in original)).   In other words, there is no "permissible justification" for discrimination between residents and nonresidents when a nonresident exercises the right to move into another State and become a resident of that State.  *Id.* [6]

In moving from New York and New Jersey to North Carolina to attend Duke, Plaintiffs McFadyen and Archer were exercising the fundamental constitutional right to "move from State A to State B in order to settle there and establish a home."  AC ¶¶ 6, 8. Because he enrolled in Duke, Plaintiff Matthew Wilson was perceived by Defendants as no less a "temporary" resident than any other student enrolled at Duke.  *See id.* ¶ 115. The Zero-Tolerance for Duke Students Policy classified Plaintiffs based upon the exercise of their fundamental right to travel and their attendant residency status, whether it be 'recently migrated' or 'temporary citizens' or, in the language of the Zero-Tolerance for Duke Students Policy, non-"permanent" residents of North Carolina.  AC ¶¶ 112-16. By operation of that classification, police officers in Durham's District Two, the district covering most of Duke students' off-campus housing, subjected Duke students to disparate enforcement of the criminal laws, including, for example, being subjected to arrests in circumstances where "permanent residents" would not be arrested, AC ¶ 113; being criminally charged in circumstances where "permanent residents" would not be charged, *Id.* , being subjected to warrantless home invasions in circumstances where

---

[6] Under this Clause, the terms "citizen" and "resident" are used interchangeably.  *See Austin v. New Hampshire,* 420 U.S. 656, 662-63 n. 8 (1975).  Pursuant to the Fourteenth Amendment, "[a]ll persons born or naturalized in the United States ... are citizens ... of the State wherein they reside."  U.S. Const. amend. XIV.

"permanent" residents' homes would not be so invaded, AC ¶¶ 116-25, and subjected to unconstitutional searches and seizures, threats, coercion, harassment, invasions of privacy, obstruction of justice, abuse of process, and all of the damages that naturally flow from such abuses of law enforcement powers, *Id*. ¶¶ 125-28. Unless the Defendants can show this policy to be necessary to promote a compelling governmental interest, the Duke-Durham Zero-Tolerance for Duke Students Policy is unconstitutional. *See Saenz*, 526 U.S. 502. Defendants cannot meet the heavy burden that strict scrutiny imposes in this case; and under no circumstances can they do so at this preliminary stage.

Already, at this preliminary stage, the Plaintiffs have presented evidence that constitutes the admission of an official with final policymaking authority – Commander Sarvis – over District Two during the period before Mangum's false allegations, when Zero Tolerance reigned in Trinity Park. When he made this statement, Commander Sarvis was in charge of the Internal Affairs Department at D.P.D. The Commander of District Two admitted the existence of the Zero-Tolerance for Duke Students Policy in two letters to the incoming "temporary" residents and to parents of students charged in the early weeks of the new policy's implementation, AC ¶¶ 113, 170, and a statement made to reporters and published broadly. *Id.* ¶¶ 181-82. The former Commander of District II stated:

> I fully stand behind the decision to make an actual, physical arrest […] They [the "temporary residents"] knew to expect it. Maybe they didn't like it, but they certainly can't say they weren't warned. They were warned… [Gottlieb] was doing his job, and doing what I asked him to do.

The Commander sent these letters to the out-of-state home addresses of all students who had signed leases as part of their arrangements to travel to North Carolina to make a home and obtain an education here. *Id.* ¶ 113. The Commander unequivocally admitted that the Zero-Tolerance for Duke Students Policy directed police to respond to any

"permanent" resident's complaint about a temporary resident a "permanent resident" claimed had violated a law or ordinance, however trivial or severe, by accepting the permanent resident's report as true. Without questioning the validity of the complaint or the complainant, police would subject the accused temporary residents to charges, arrests, incarcerations, unreasonable bail, and prosecutions without any probable cause. *Id.* §§ II-III. Police were directed to charge all Duke students present at the scene of a reported violation irrespective of the proof of their culpability. *Id.* ¶ 166. Those who leased the premises where alleged criminal activity occurred would receive particularly oppressive treatment; the policy directed police to charge them with crimes regardless of their actual participation in or knowledge of the alleged conduct. *Id.* ¶¶ 166, 148-54.

In practice, Zero-Tolerance for Duke Students Policy required the formal suspension of all constitutional guarantees in Duke and Durham Police interactions with Duke Students. AC §§ II-IV. Zero-Tolerance admitted no exceptions. *Id.* Plaintiffs' allegations are grounded in admissions made by Duke and Durham officials with final policymaking authority. *Id.* §§ II-IV. For years, Zero-Tolerance was implemented in everyday enforcement encounters with "temporary residents," and most publicly in pre-designed, pre-planned warrantless student home invasions. *Id.* ¶¶ 116-29. As it happened, until March 13, 2006, only misdemeanors and petty offenses were reported to the police. *Id.* §§ III-IV. Still, students accused of petty offenses were treated as though they were hardened, violent criminals. *Id.* ¶¶ 118-21, 154, 173-75.

On March 14, 2006, the policy was applied to a false claim of a "permanent resident" that "temporary residents" were involved in a thirty-minute, racially motivated gang rape committed by three principals and attended by 44 of their teammates. *See generally* AC §§ II-III, XXII - XL. The accusation was false, and everyone who encountered Mangum in the hours after she made the claim knew it. Mangum herself

recanted the accusation. The police investigation that followed immediately upon her false claim was led by Sgt. Shelton. AC ¶¶ 223-37, 262-65. Shelton had just transferred into District Two from the Police Academy, where he was an instructor. AC ¶¶ 1041, 1084(g). He was transferred to replace Gottlieb shortly after the Gottlieb Dossier was delivered to the City. *Id.* ¶ 179. Shelton's investigation produced evidence that led the properly assigned CID investigator to conclude that Mangum's claim was unfounded and close the case. *Id.*¶ 265. That investigation, however, turned Zero-Tolerance for Duke Students upside down, so the investigation's findings were first ignored and then covered up by Duke and Durham policymakers.

What wrought so much damage to the Plaintiffs was Defendants' conduct viz. the warrantless raids of "temporary" residents' homes or their baseless searches, seizures, arrests, and charges brought against "temporary" residents since Zero-Tolerance was adopted by Duke and Durham law enforcement policymakers. *Id.* §§ II- III. When Mangum, a "permanent" resident, "nodded" rape in the midst of an involuntary commitment, Gottlieb and Himan, with authorization directly from City and Duke policymakers, never questioned Mangum's veracity, and ignored plainly obvious indices of her fraud and evidence of Plaintiffs' innocence. *Id.* ¶¶ 243-320, §§ XI-XL. The City Police Department's regular CID Investigations Chain of Command followed suit by never questioning Gottlieb and Himan, leaving *this case* in the hands of two property crimes investigators: one a rookie who had never seen a DNA report in his life, and a Sergeant with an axe to grind. Defendant Mihaich's specialized violent crimes investigators within the Criminal Investigations Division played no role. For thirteen months, Mihaich, Hodge, Chalmers and Baker all left the investigation of an alleged violent sexual offense in the hands of plainly incompetent, malevolent "property crimes" investigators. *Id*. 1081(A), 1084(D-F). Thus, what became one of the most chilling abuses of power in memory was different *only in degree* from the constitutional

abridgement that the Zero-Tolerance for Temporary Residents regularly and predictably caused in the months that preceded Mangum's "nod."

The Amended Complaint sufficiently alleges a policy— Zero-Tolerance for Duke Students—that penalized Plaintiffs' exercise of the right to travel, and was designed, adopted, and vigorously enforced by Duke University and the City of Durham. Defendants do not (and cannot plausibly) justify the Zero-Tolerance policy as "narrowly tailored" to any "compelling" interest. Zero-Tolerance therefore *caused* the violations of Plaintiffs' rights under Article IV of the United States Constitution and the Fourteenth Amendment thereto. Therefore, Defendants' motion to dismiss this Cause of Action is baseless and must be denied.

### 4. The Eleventh Cause Of Action States An Actionable Section 1983 Claim Against The Supervising Defendants For Their Failure To Prevent Or Aid In Preventing The Ongoing Deprivations Of Plaintiffs' Constitutional Rights.

The Eleventh Cause of Action states a Section 1983 "bystander liability" claim against the Supervising Defendants. An officer may be liable under § 1983, on a theory of bystander liability, "if he (1) knows that a fellow officer is violating an individual's constitutional rights; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act." *Randall v. Prince George's County,* 302 F.3d 188, 202-04 (4th Cir. 2002). The Amended Complaint sufficiently alleges these elements: Plaintiffs allege that the Supervising Defendants had knowledge that fellow officers and supervisors were conspiring to violate Plaintiffs' constitutional rights, AC ¶ 1021; had a reasonable opportunity to prevent the harm, *id.* ¶ 1022; and chose not to act to prevent the harm, *id.* ¶ 1023.

Defendants' argument that Plaintiffs' claim "asks the Court to impose a duty upon all officers to monitor the investigations of every other officer," City Super Br. at 24,

first, fails to account for the element of the cause of action that requires an officer "to know" that a fellow officer is violating or about to violate an individual's constitutional right. The cause of action has no life in a "failure to monitor" case. Defendants' grievance is with the Circuit, which authorized this cause of action years ago.

Defendants argue that they did not have the "power," "authority," or "reasonable opportunity to prevent the harm" because Nifong was appointed by the governor. They cite no authority that establishes Nifong's right to control the investigation, which the statutes place in the Durham Police Department.

**B. The Amended Complaint Alleges Sufficient Direct And Circumstantial Evidence To Establish An Unlawful Conspiracy.**

Plaintiffs respond to the Defendants' assertions or suggestions that *Twombly* creates a heightened pleading requirement in § 1983 Actions. Plaintiffs address this argument in Plaintiffs Opposition to the SANE Defendants' Brief at §1(A).

**III. THE AMENDED COMPLAINT STATES A SUPERVISORY LIABILITY CLAIM AGAINST THE DURHAM POLICE SUPERVISORY DEFENDANTS.**

The supervisory law enforcement officer's obligation is to insure that his subordinates act within the law. *Randall*, 302 F.3d at 203. Although such a supervisor may not prevent all illegal acts by his subordinates, he is obligated, when on notice of a subordinate's tendency to act outside the law, to take steps to prevent such activity. *Id.* If a supervisory law enforcement officer is deliberately indifferent to that responsibility, he is culpable for the illegal conduct by his subordinates, and he may be held vicariously liable for their illegal acts. *Shaw,* 13 F.3d at 798. There are three elements of a supervisory liability claim: "(1) that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed 'a pervasive and unreasonable risk' of constitutional injury to citizens like the plaintiff; (2) that the supervisor's

response to that knowledge was so inadequate as to show 'deliberate indifference to or tacit authorization of the alleged offensive practices[]'; and (3) that there was an 'affirmative causal link' between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff." *Id.* at 799. The first and second elements are established by either (a) evidence of a supervisor's inaction in the face of conduct that is either "widespread" or that "has been used on several different occasions,"[7] or (b) evidence of the supervisor's affirmative approval of or participation in even a single instance of misconduct.[8] The third element is established by "direct" proof, such as "'where the conduct that posed 'a pervasive and unreasonable risk' of constitutional injury to citizens like the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show 'deliberate indifference to or tacit authorization of the

---

[7] *id.* (citing *Slakan*, 737 F.2d at 373-74),

[8] *See Cranford v. Frick*, No. 1:05CV62, 2007 WL 676687, at *5-6 (M.D.N.C. Feb. 28, 2007) ("Plaintiff's allegation of the Sheriff's affirmative misconduct relieves her from the burden of showing 'deliberate indifference,' and provides a sufficient basis for an individual liability claim under § 1983."); *Blair v. County of Davidson*, No. 1:05CV11, 2006 WL 1367420, at *10-11 (M.D.N.C. May 10, 2006) (denying motion to dismiss where plaintiff alleged that supervisors "were specifically involved in the deprivation of her constitutional rights, knew of the constitutional violations, had the power to prevent them, and failed to act to prevent the constitutional violations"); *see also Jones v. City of Chicago*, 856 F.2d 985, 993 (7th Cir. 1988) (supervisors "had approved every false step, and had done their part to make the scheme work"); *Jasinski v. Adams*, 781 F.2d 843, 848 (11th Cir. 1986) (supervisor participated in decision); *Lavender v. W. Va. Reg'l Jail & Corr. Facility Auth.*, No. 3:06-1032, 2008 WL 313957, at *4 (S.D.W. Va. Feb. 4, 2008) (supervisor "acquiesced" in subordinates' unlawful use of force) (quotation marks omitted); *Pruitt v. Pernell*, 360 F. Supp. 2d 738, 741 (E.D.N.C. 2005), *aff'd*, 173 F. App'x 298 (4th Cir. 2006) (supervisor instructed subordinates to engage in single incident of unlawful conduct).

alleged offensive practices[]'; and (3) that there was an 'affirmative causal link' between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff." *Id.*

The Amended Complaint satisfies each of these elements by showing Supervising Defendants "approved every false step, and [did] their part to make the scheme work."9 First, it details the Supervisory Defendants' contemporaneous knowledge of the repeated abuses that were being committed by Durham Police and Nifong throughout the investigation, AC ¶¶ 500-03; the prior history of misconduct by Gottlieb documented in their own records and in a dossier assembled from court records, *id.* ¶ 171; *see generally id.* § IV ("The Gottlieb Dossier"), and the prior history of improper public statements by Addison, *id.* ¶¶ 505(A)-(H), 507-17. Second, it details not only the Supervisory Defendants' utter inaction in the face of these repeated abuses by alleging that one Supervising Defendant, Russ, responded to Addison's false claims of evidence that did not exist by dismissively saying "that's what Addison always does," *id.* ¶ 517, and elsewhere, *see, e.g., id.* ¶¶ 562, 636-37. The AC also alleges Supervisory Defendants personally participated in, authorized, or ratified the abuses. AC § XL; ¶ 890. Finally, the Amended Complaint alleges that these supervisory failures foreseeably led to the constitutional deprivations suffered by Plaintiffs. *Id.* ¶¶ 1115-18, 1120-24, 1130-33, 1136-40.

The Supervising Defendants' arguments for dismissal of this Cause of Action fail:

---

[9] *See Jones v. City of Chicago*, 856 F.2d 985, 993 (7th Cir. 1988).

Defendants claim that Plaintiffs have failed to state a supervisory liability claim because plaintiffs have "impersonally pled" this cause of action. City Super. Br. at 26. Defendants point to the inclusion of Defendant Laird Evans, and complained that the AC fails to make any allegation as to him beyond jurisdiction and capacity. However, the AC alleges his capacity to be the direct supervisor of Defendant Himan, whose conduct is described fully in Plaintiffs' brief directed to Himan. *See* Pls. Opp. Br. (Himan). His supervision of Himan's conduct in the investigation began in October of 2006. Liability, as to Evans, is therefore in his ratifying and condoning all that had been done before he supervised Himan in the investigation. It also attaches insofar as he is a late-comer to an ongoing conspiracy to convict. Both allegations are sufficient to state a claim against him.

Next, the Supervising Defendants complain that Plaintiffs are engaging in "group" pleading methodology. Plaintiffs are unaware of any authority that bars the method, and the case cited by the supervising defendants, *Jones v. Williams*, 297 F.3d 930, 939 (9th Cir. 2002), hardly supports it. Jones stands for the proposition that "mere presence at a search or membership in a group, without personal involvement or any causal connection to the unlawful act, can create liability under section 1983."

Likewise, the Supervising Defendants' argument that Plaintiffs have alleged in improper *respondeat superior* theory against them is simply inaccurate. Plaintiffs' theory of "supervisory liability" for their subordinate's misconduct does not rest upon mere "allegations of the chain of command or who supervised whom." City Super. Br. at 28. Instead, Plaintiffs seek to hold the Supervisory Defendants liable based upon their deliberate indifference or tacit authorization of their subordinates' misconduct, and Plaintiffs allege further that the supervisory indifference or tacit authorization of their subordinates' misconduct was a causative factor in the constitutional injury inflicted.

This is precisely the conduct that triggers §1983 supervisory liability. *See Shaw,* 13 F.3d at 798 (quoting *Slakan v. Porter,* 737 F2d 368, 372-73 (4th Cir. 1984). In this circuit, supervisory liability "ultimately is determined by 'pinpointing the persons in the decision-making chain whose deliberate indifference permitted the constitutional abuses to continue unchecked.'" *Id*. at 798 (quoting *Slakan*, 737 F.2d at 376). In this circuit, this is typically a question of fact, not law. *Id*. at 799.

Next, the Supervising Defendants' claim that "no one in the DPD has a duty to supervise [Nifong], in particular Defendants" is fighting the facts. City Super. Br. at 31. They assert "North Carolina State and constitutional law places District Attorneys beyond anyone's supervision, save that of the court and State Bar." They cite no authority for this proposition. *See* City Super. Br. at 31 n.4. The Amended Complaint does not allege that the DPD has a duty to supervise Nifong in his capacity as a District Attorney. Instead, the AC alleges that the Supervising Defendants delegated their official policymaking authority to Nifong, and, when it became apparent that Nifong was abusing the power that they had delegated to them, they failed to revoke it.

Next, the Supervising Defendants' claim that "Plaintiffs attempt to show [actual or constructive] knowledge" that the Supervising Defendants' subordinates were engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury merely by demonstrating who was in the chain of command." City Super. Br. at 29. Notably, the cases cited by the Supervising Defendants are all summary judgment cases,[10] which are

---

[10] The cases relied upon are: *Harris v. City of Virginia Beach, VA* 11 Fed.Appx. 212, 217, (4th Cir. 2001); *Reaves v. Fair Bluff,* No. 7:03-CV-103, 2005 U.S. Dist. LEXIS 43084, *15 (2005) ("In short, Reaves has offered *no* competent evidence upon which a

particularly ill-suited as guides to determining motions to dismiss in this particular cause of action. Defendants are liable for their subordinates' violations of Plaintiffs' civil rights that foreseeably resulted from:

(1) the Supervisory Defendants' failure to supervise the investigation generally including their failure to revoke Nifong's authority over the investigation or otherwise take any meaningful action to prevent or remedy the numerous abuses that they learned about during the investigation, AC ¶¶ 1109-18;

(2) the Supervisory Defendants' failure to control and supervise Gottlieb, including their decision to allow him to lead the investigation despite knowledge of his prior history of similar misconduct against Duke students, *id.* ¶¶ 1119-24;

(3) the Supervisory Defendants' failure to train, control, and supervise Addison, who had a known record of reprehensible public statements, at any time before or after he began his extended campaign of false and inflammatory statements proclaiming the guilt of Duke lacrosse players and the supposedly monstrous nature of the purported crime, *id.* ¶¶ 1125-33, and

(4) the Supervisory Defendants' failure to train, control, and supervise Michael, who had a known record of providing false and misleading statements to the public, at any time before or after she began to falsely claim the 911 caller was "anonymous" and a stranger to the case or concealed and/or destroyed exculpatory 911 and CAD audio

---

jury could find that the events that are the subject of this lawsuit were racially motivated.").

evidence that would be used in a civil case against the city. ¶¶1134-40. To be sure, this is "something more" than "pasting the phrase 'deliberate indifference' through over 1300 allegations." City Super. Br. at 31. These are the facts, circumstances, and actions of these Defendants. *See Shaw* at 799 (4th Cir. 1994).

**A. This Circuit Has Rejected Heightened Pleading Requirements For Supervisory Liability.**

Defendants argue that Plaintiffs' allegations are insufficient because, they contend, Plaintiffs were required to plead multiple instances of similar constitutional violations to support the claim of a municipal policy or practice. However, the Fourth Circuit has squarely rejected Defendants' proposition. In *Jordan v. Jackson*, 15 F.3d 333 (4th Cir. 1994), the Fourth Circuit interpreted the Supreme Court's decision in *Leatherman vs. Tarrant County*, 507 US 163 (1993), as having rejected the requirement that a plaintiff plead multiple instances of similar constitutional violations to support an allegation of a municipal policy or practice. *Jordan*, 15 F.3d at 338-40. The court found that the complaint's allegations stated a § 1983 municipal liability claim where plaintiff alleged that the county maintained a policy of inadequate training of its employees on how to determine whether summary removal of a child from the home is proper and on the statutory procedural requirements following removal. *Id*.

**IV. THE SUPERVISORY DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY.**

**A. The Qualified Immunity Standard**

Qualified immunity does not apply to conduct that violates "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). A right is "clearly established" if a reasonable official would have been on fair notice that the conduct at issue was

unconstitutional at the time he engaged in the conduct. *Hope v. Pelzer,* 536 U.S. 730, 739 (2002) (internal quotations omitted). The inquiry is an objective one; it does not depend on "the subjective beliefs of the particular officer at the scene, but instead on what a hypothetical, reasonable officer would have thought in those circumstances." *Owens ex rel. Owens v. Lott*, 372 F.3d 267, 279 (4th Cir. 2004) (quoting *Wilson v. Kittoe,* 337 F.3d 392, 402 (4th Cir. 2003)). A constitutional right is "clearly established" for qualified immunity purposes when either (1) it has been established by closely analogous case law; *see, id.,* or (2) "when the defendants' conduct is so patently violative of the constitutional right that reasonable officials would know without guidance from the courts that the action was unconstitutional[.]" *Clem v. Corbeau*, 284 F.3d 543, 553 (4th Cir. 2002) (internal citations omitted). A Defendant may not avail himself of qualified immunity by ignoring the detailed facts alleged in the Complaint or recasting them into broad general propositions. *Saucer v. Katz,* 533 U.S. 194, 201 (2001). The inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition ..." *Id.* at 194. Therefore, to determine whether Defendants have qualified immunity at this preliminary stage the Court must first describe the Defendants' alleged conduct in the specific context of the circumstantial detail alleged in the Amended Complaint and in the light most favorable to the plaintiff, and then ask if pre-existing law made the unlawfulness of Defendants' conduct apparent. *See, e.g., W.E.T. v. Mitchell,* 2008 WL 151282, * 1 (M.D.N.C. Jan. 10, 2008).

### 1. The Supervising Defendants Do Not Have Qualified Immunity For Plaintiff's Supervisory Liability Claims.

In *Shaw v. Stroud*, 131 F.3d 791, 802 (4th Cir.)*,* the Fourth Circuit, applying qualified immunity to a claim of supervisory liability, found that by 1987 it was clearly established "that a supervisor who was deliberately indifferent in the face of a pervasive and unreasonable risk of harm could be held liable under § 1983 when the inaction bore

an affirmative causal link to the harm suffered by the plaintiff. Plaintiffs have described in detail the facts known to the Supervising Defendants that created a pervasive and unreasonable risk of harm; the Supervising Defendants' deliberate indifference to that pervasive and unreasonable risk; and the harms caused by their deliberate indifference. *See* AC ¶¶ 1107-40 (detailing Supervising Defendants' failure to control and supervise the investigation generally, Addison, Gottlieb, Michael, and Nifong caused the violations of Plaintiffs' constitutional rights).

## 2. Hodge Is Not Entitled To Qualified Immunity For Stigmatizing Plaintiffs In Connection With The Deprivation Of Plaintiffs Rights.

Hodge is not entitled to qualified immunity for participating in stigmatization in connection with deprivations of Plaintiffs' rights for the same reasons that Addison, Michael, Gottlieb, and Himan are not so entitled. Plaintiffs' right to be free from deprivations of constitutional rights or tangible interests in connection with stigmatizing statements was clearly established in the Fourth Circuit well before 2006. *See* Pls. Opp. Br. (SMAC) § II.A(3). In *Buckley v. Fitzsimmons*, the Supreme Court considered a § 1983 claim against prosecutors based on false public statements alleged to have caused a deprivation of the plaintiff's constitutional rights, and held that the prosecutors lacked absolute immunity with respect to the claim. 509 U.S. at 262. The clear "consensus of cases of persuasive authority from other jurisdictions," *Owens*, 372 F.3d at 280 (internal quotations omitted), demonstrates that the right not to be deprived of one's liberty or property interests as a result of false public statements is clearly established.

## 3. Hodge Is Not Entitled To Qualified Immunity For Retaliating Against Plaintiffs For Exercising A Constitutional Right

The Supervising Defendants do not have qualified immunity from Plaintiffs' retaliation claims because the rights alleged were clearly established at the time Hodge

28

engaged in the conduct. AC ¶¶ 992-1001.  In 2001, the Fourth Circuit unequivocally stated:  "[i]t is well established that a public official may not misuse his power to retaliate against an individual for the exercise of a valid constitutional right."  *Trulock v. Freeh*, 275 F.3d 391, 405 (4th Cir. 2001) (citing *Suarez*, 202 F.3d at 685).  The Fourth Circuit has also held that *Suarez*, decided in 2000, clearly established a "bright line" violation of the First Amendment whenever retaliatory or chilling speech "include[s] a threat, coercion, or intimidation."  *Blankenship v. Manchin*, 471 F.3d 523, 533 (4th Cir. 2006) (quoting *Suarez*, 202 F.3d at 688 n. 13 and identifying *Suarez* as establishing the same "bright line" rule that Defendants are alleged to have violated here).   A "reasonable official" in Lamb's and Hodge's positions would understand that abusing police power to retaliate against a citizen by directing, participating in, authorizing, ratifying, and condoning their subordinates' retaliation against Plaintiffs for exercising constitutional rights violates the law.   A reasonable officer would also know that mass producing "Wanted" posters and declaring that evidence exists to prove a crime when none exists, as part of a retaliatory scheme, violates Plaintiffs' clearly established rights.   *Hope,* 536 U.S. at 739.  Further, a reasonable official in the Supervising Defendants' position would know that it violates the law to react with deliberate indifference to a pervasive and unreasonable risk of harm caused by the practice of declaring guilt prematurely (and with no facts to back it up), and other forms of coercive, threatening, and retaliatory conduct.

> **4. Defendants Are Not Entitled To Qualified Immunity For Discriminatory And Abusive Enforcement Of The Criminal Laws Because Plaintiffs Were "Temporary" Residents Of North Carolina.**

The Durham Supervising Defendants are not entitled to qualified immunity from this cause of action.  The Plaintiffs' right to be free from discrimination and disparate treatment because of their status as "temporary" residents was "clearly established" over one hundred years ago, and has been repeatedly upheld ever since.  The ordeal described

in the Amended Complaint is what the Framers sought to avoid when they infused the Constitution with the notion of the dual citizenship of every American, who would, at all times, be a citizen of the United States and a citizen of the state wherein he chooses to reside. To be a citizen of the United States means—exactly—the right to be free from what Zero-Tolerance codified. The right identified in this Cause of Action is so worn into the fabric of our constitutional order that it goes without saying that it was clearly established well before the year 2006. Therefore, the Durham Supervising Defendants are not entitled to qualified immunity from Plaintiffs' Tenth Cause of Action.

5. **The Durham Supervising Defendants Do Not Have Qualified Immunity For Failing To Intervene To Prevent His Fellow Officers From Violating Plaintiffs Constitutional Rights In His Presence Or Within His Knowledge.**

The Supervising Defendants are not entitled to qualified immunity for Plaintiff's § 1983 Bystander Officer Claim because a police officer's obligation to act to protect a citizen from ongoing constitutional violations occurring in their presence or within their knowledge was clearly established well before the conduct alleged in the Amended Complaint, no later than 2002. Four years before the events of this case, the Fourth Circuit clearly established that all law enforcement officers have an affirmative duty to act to intervene when they are aware that a fellow officer is conspiring to violate the constitutional rights of any person. *Randall,* 302 F.3d at 202-04. The Fourth Circuit observed in *Randall* that it had not yet "definitively assessed the circumstances under which bystander liability might attach to a law officer," and so *Randall* undertook to clearly define the scope and contours of officer bystander liability. Prior to *Randall*, the Fourth Circuit indicated that bystander liability would be recognized in a proper case. *Jackson v. Pantazes,* 810 F.2d 426, 430 (4th Cir. 1987). Thus, in *Randall*, the Fourth Circuit recognized the cause of action and defined with great clarity the circumstances in which officers may be subjected to bystander liability under § 1983. 302 F.3d at 203.

30

Bystander liability, its elements and contours were therefore "clearly established" in 2002. The Fourth Circuit's bystander officer rule is informed, appropriately, by the common law rules of accomplice liability. This circuit calls the bystander officer "a tacit collaborator" in the principal's wrongdoing. *Id.* (citing with approval the Second Circuit's use of that label in *O'Neill v. Krzeminski,* 839 F.2d 9, 11-12 (2nd Cir. 1988)). A "reasonable official" in the Supervisory Defendants' position would understand that by failing to act to thwart multiple conspiracies to fabricate SANE evidence, fabricate DNA evidence, fabricate police statements and reports, conceal exonerating evidence to which a citizen has a statutory entitlement, and to procure orders authorizing searches and seizures with fabricated affidavits, he is violating Plaintiffs' clearly established right to the aid of an officer who knows his fellow officers are violating Plaintiffs' constitutional rights. *Hope,* 536 U.S. at 739.

## V. THE AMENDED COMPLAINT STATES ACTIONABLE CLAIMS FOR PARTICIPATION IN CIVIL RIGHTS CONSPIRACIES.

### A. Conspiracies In Violation Of 42 U.S.C. § 1983.

The Fifteenth Cause of Action states a §1983 claim against all Defendants for unlawful conspiracies that deprived Plaintiffs of their civil rights.[11] AC ¶¶ 1147-55. The Fifteenth Cause of Action alleges a broad conspiracy, agreement, or understanding shared by all named Defendants in this action. The objective of the unifying conspiracy alleged

_____

[11] To allege a cause of action under 42 U.S.C. § 1983 for conspiracy, a plaintiff must allege facts that show that two or more defendants "acted jointly [and] in concert and that some overt act was done in furtherance of the conspiracy" that resulted in the deprivation of a federal right. *Hinkle v. City of Clarksburg*, 81 F.3d 416, 421 (4th Cir. 1996).

in the Fifteenth Cause of Action was to unlawfully force the wrongful indictment, prosecution, and, ultimately, incarceration of the Plaintiffs, as the principals or accomplices in a horrific, racially motivated gang-rape, when all Defendants in this action knew or were deliberately indifferent to the likelihood that it did not occur. The conduct giving rise to the Fifteenth Cause of Action is alleged in the Fifteenth Cause of Action by incorporation of the First through Eleventh Causes of Action (collectively, "the Predicate Violations").

Plaintiffs meet the required showing of constitutional harm done in furtherance of the conspiracy by their showings of constitutional violations in the First through Eleventh Causes of Action. The Predicate Violations are constitutional deprivations caused by acts in furtherance of the Conspiracy to Convict, and were the direct and proximate cause of the damages alleged. The acts and omissions that establish the Predicate Violations are alleged to be done in furtherance of the unifying common objective and plan of the larger conspiracy to convict. In addition, the predicate elements of causation, state action and/or joint action (with respect to the private party and private entity Defendants), and the Defendants status as a § 1983 "person." The Amended Complaint alleges the combined and concerted conduct of so many pursuant to a preordained plan. AC ¶ 1152. The plan was "made in quiet deliberation and discussion" among officials with final policymaking authority with respect to the matters described in the Amended Complaint. *Id.* The acts and omissions described in the Amended Complaint evince a malicious and corrupt intent to harm the Plaintiffs. AC ¶¶ 1153, 1147-55. The cumulative effect of the concerted wrongdoing among so many is so egregious that it "shocks the conscience" in violation of the Fourteenth Amendment as to shock the contemporary conscience. AC ¶ 1153. The Fifteenth Cause of Action alleges that Defendants violated § 1983 by conspiring to deprive Plaintiffs of their rights under the Fourth and Fourteenth Amendments, including the substantive Due Process protections of the Fourteenth

Amendment, and, in furtherance of the conspiracies, committing overt acts that caused actual violations of Plaintiffs' rights.  AC ¶ 1150(A)-(O).

**B.    The Amended Complaint States Actionable Claims For Conspiracy In Violation Of 42 U.S.C. § 1985.**

The Sixteenth Cause of Action alleges Four Conspiracies in violation of § 1985(2) and (3).  AC ¶¶ 1156-69.  To state a cause of action under 42 U.S.C. § 1985(2), a plaintiff must allege that "two or more persons conspire[d] for the purpose of impeding, hindering, obstructing, or defeating, in any manner, the due course of justice in any State or Territory, with intent to deny to any citizen the equal protection of the laws...." 42 U.S.C. § 1985(2).

The Sixteenth Cause of Action alleges that Addison, Michael, Nifong, Gottlieb, Himan, Wilson, Steel, the DNASI Defendants, the Crisis Management Team Defendants, the SANE Defendants, Graves, Dean, the Duke Police Supervising Defendants, the Durham Police Supervising Defendants, the City of Durham, and Duke University conspired to impede or obstruct the due course of justice in North Carolina generally with the intent to deny Plaintiffs the equal protection of the laws in violation of 1985(2).  AC ¶¶ 1156-69.  Defendants, motivated by race-based invidiously discriminatory motives, violated this statute by conspiring to deprive Plaintiffs of their federally secured rights as alleged elsewhere in the First through Eleventh Causes of Action and by fomenting race-based animus within the Plaintiffs' community. *See Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971).  Additionally, Sixteenth cause of action alleges that Nifong, Gottlieb, Himan, Clayton, Addison, Michael, the Durham Police Supervising Defendants, the SANE Defendants, the City of Durham, and Duke University conspired to impede or obstruct the due course of justice in North Carolina generally with the intent to intimidate witnesses, including the Plaintiffs,  elicit false statements and testimony from Plaintiffs and other witnesses,  and to prevent them from testifying truthfully to matters with the

33

general objective of securing Plaintiffs' convictions as principals or accessories in state court for crimes they knew did not happen. AC ¶¶ 1161.

To establish a violation of 42 U.S.C. § 1985(3), a plaintiff must allege that "two or more persons in any State or Territory conspire…(1)for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; (2)or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws." 42 U.S.C. § 1985(3).

The Sixteenth Cause of Action alleges that, in violation of 42 U.S.C. § 1985(3) (cl.2), Nifong, Gottleib, Himan, Clayton, Addison, Michael, the Durham Police Supervising Defendants, Steel, the Crisis Management Team Defendants, the Duke Police Supervising Defendants, the SANE Defendants, the City of Durham and Duke University, conspired with others to deprive Plaintiffs of their federal rights with the purpose of targeting "temporary residents" for disparate treatment and abusive enforcement of the criminal laws depriving Plaintiffs of the equal privileges or immunities of national citizenship under the laws thereby violating this statute by conspiring to deprive Plaintiffs of their federally secured rights. AC ¶¶ 1156-69; *Phillips v. Mabe*, 367 F. Supp. 2d 861, 873 (M.D.N.C. 2005). Plaintiffs also allege in the Sixteenth Cause of Action an independent §1985(3) Claim arising out of animus directed to Plaintiffs status as "temporary residents" and, on that basis, subject them to discriminatory and abusive police tactics, thereby imposing "disabilities of state citizenship" in deprivation of their equal protection and immunities under laws. AC ¶ 1164-65.

The Supervising Defendants' arguments for dismissal of Plaintiffs' §1985 Conspiracy Claims all fail.

### C.     Animus Based On State Citizenship Is Actionable Under § 1985.

By its terms, §1985 captures conspiracies directed at any imposition of the disabilities of state citizenship. Obviously, enacted pursuant to the Fourteenth Amendment, §1985 clearly incorporates the Fourteenth Amendment's version of the clause.

The Supervising Defendants call this theory "a crafty attempt to establish a protected class status beyond their race," and cite to cases that have rejected §1985 claims brought pursuant to its *racial* animus clause. City Super Br. at 35. However, those cases were not brought pursuant to the "privileges and immunities" clause of § 1985. They are therefore inapposite to Plaintiffs claims. Plaintiffs establish the factual basis for the § 1985 violation in their extended analysis of the violations of the Privileges and Immunities clauses asserted in Plaintiffs' Tenth Cause of Action, *infra*. The same factual basis applies with equal force in the Plaintiffs' §1985 conspiracy claim. The Supervising Defendants offer no other arguments in opposition to this cause of action.

### D.     The § 1985 Claims Allege Racial Animus Of Two Types.

#### 1.  Section 1985 Directs Itself To Animus Toward Any Race.

The Supervising Defendants, like many other co-defendants, have asserted that only members of a "minority" or "traditionally disadvantaged" group may avail themselves of the protections of § 1985. At step one, by its terms, the statute applies to

any person or class of person. 42 U.S.C. § 1985(3) (2000). Consistent with the statutory language, we have found no cases in this circuit that held that members of other races have no standing to bring a § 1985(3) claim.[12] That is consistent with the broader equal protection principles of the statute itself. Further, courts, including this one, have consistently rejected the argument. In addition, this Court and others have expressly permitted white plaintiffs to bring claims under § 1985 in response to animus against them based on their race or even their perceived racist beliefs. *See Waller*, 605 F. Supp. 1137. The Fourth Circuit's decision in *Harrison v. KVAT Food Management*, urged by many Defendants held only that "victims of purely political conspiracies" do not have standing on that basis to bring a § 1985(3) claim. 766 F.2d 155, 161 (4th Cir. 1985). *Harrison*'s passing mention of "blacks" was merely a counterexample invoked to explain the difference between a victim of political conspiracy and a member of a "race or class" that is protected by § 1985(3). *See id.*

### 2. Defendants Were Motivated By, Fomented, And Took Advantage Of Racial Animus.

Civil rights conspiracies under § 1985(2) and § 1985(3) require proof of invidious animus based on race or other protected status. *See Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 340 (1993). Defendants argue (1) that Plaintiffs have failed to allege membership in any such class; (2) that Plaintiffs are alleging that "Duke students"

---

[12] *See, e.g., Mabe*, 367 F. Supp. 2d at 873-74. ( Contention that Plaintiff "cannot rely on §1985(3) because he is not a minority is without merit."); *Waller v. Butkovich*, 605 F. Supp. 1137, 1144-45 (M.D.N.C. 1985) (rejecting the assertion that Section 1985(3) requires the alleged animus be directed at a traditionally disadvantaged group).

or "Duke lacrosse players" are a protected class; or (3) that Plaintiffs have failed to allege animus at all. Each of these arguments is incorrect.

Plaintiffs allege that Defendants' acts in furtherance of the § 1985 conspiracies were motivated by invidious animus based on race and were intended to foment and take advantage of racial animus against Plaintiffs. AC ¶ 1375. Race—any race—is an established protected classification. *See § II.E.(1), infra.* The Amended Complaint is replete with details from which to infer Defendants' invidious racial motives. See, AC §§ XX-XIII.

These allegations are based on fact, not "legal conclusion." *See Green v. Maroules*, 211 F. App'x 159, 162-63 (4th Cir. 2006) (holding that plaintiff who alleged she was target of racial profiling and conspiracy to falsely arrest her alleged racial animus and properly stated a claim under § 1985).

Defendants assert that "invidious racial animus" is not satisfied by deliberate acts designed to "create racial tensions or take advantage of racial animus on the part of others in order to achieve some other objective." City Br. at 32, citing *Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971). That is not the holding of *Griffin* which defined the "racial animus" element to require that the alleged "conspiracy . . . must aim at a deprivation of the equal enjoyment of rights secured by the law to all."

This treatment is given to the same requirement in actions brought under 42 U.S.C. § 1982.[13] There, as in § 1985, the plaintiff proves invidious animus based on

_____

[13] 42 U.S.C. § 1982 was enacted pursuant to Congress' Thirteenth Amendment authority; it secures to all citizens the right, enforceable against private and public defendants, to "inherit, purchase, lease, sell, hold and convey real and personal property."

race or class. With respect to fomenting racial animus "regardless of defendants' ultimate motivation, the fact that they deliberately stirred up and harnessed the racial animosity of others to serve their own ends is sufficient to find a violation." *Lac Du Flambeau Band of Lake Superior Chippewa Indians v. Stop Treaty Abuse-Wisconsin, Inc.*, 41 F.3d 1190, 1194 (7th Cir. 1994); *see also Clark v. Universal Builders, Inc.*, 501 F.2d 324, 331 (7th Cir. 1974) (defendants cannot escape liability for acting with racial animus in violation of § 1982 by "proclaiming that they merely took advantage of a discriminatory situation created by others"); *Ortega v. Merit Ins. Co.*, 433 F. Supp. 135, 140-41 (N.D. Ill. 1977) (quoting *Clark*, 501 F.3d at 331). The conclusion that the §1982 theory of "racial animus" applies with equal force in § 1983 actions was recently reinforced by the Supreme Courts' 7 to 2 decision in *CBOCS West, Inc. v. Humphries* 128 S.Ct. 1951 (2008) and its 6 to 3 ruling in *Gomez-Perez v. Potter*, 128 S.Ct. 1931 (2008), holding that a theory of liability (i.e., retaliation) that was recognized as actionable in one civil rights statute was actionable in another.

To the extent that the Supervising Defendants assert as a basis for dismissal that they did not harbor any invidious animus personally, their claims fail. In doing so, they are merely raising an issue of fact. There are sufficient allegations in the AC to overcome these objections.

### E. The Amended Complaint States A Violation Of 42 U.S.C. §1986.

Plaintiffs' Seventeenth Cause of Action (the " § 1986 Claims") alleges that Himan violated 42 U.S.C. § 1986 by refusing or neglecting to prevent or aid in the preventing of the § 1985 Conspiracies (alleged in the Sixteenth Cause of Action), despite having the power and knowledge to do so. The Plaintiffs have stated actionable Section 1986 Claims against the Supervising Defendants and other co-conspirators, having alleged the predicate § 1985 Conspiracies in the Sixteenth Cause of Action, as well as the § 1985

elements and facts from with they may be inferred. AC ¶¶ 1170-88. Appropriately, the Supervising Defendants makes no argument for dismissal of the § 1986 conspiracy claim on the merits.

## VI. THE AMENDED COMPLAINT STATES ACTIONABLE CLAIMS UNDER STATE LAW AGAINST THE SUPERVISING DEFENDANTS.

The remaining causes of action asserted against the Supervising Defendants are alleged under North Carolina law.

### A. The Amended Complaint States A Common Law Obstruction Of Justice Claim Against Defendant Lamb; He Did Not Address This Brief In His Motion To Dismiss.

The Eighteenth Cause of Action states an actionable claim for Common Law Obstruction of Justice against Defendant Lamb. AC ¶¶ 1189-1202. The Supervising Defendants make no argument for dismissal of this action.

To state an obstruction of justice claim under North Carolina law, a plaintiff may allege "any act which prevents, obstructs, impedes or hinders public or legal justice." *Jones v. City of Durham*, 643 S.E.2d 631, 633 (N.C. Ct. App. 2007) (quoting *Broughton v. McClatchy Newspapers, Inc.,* 588 S.E.2d 20, 30 (N.C. Ct. App. 2003)). The cause of action is a broad one, and courts have held that plaintiffs have stated actionable claims in a variety of contexts. *See, e.g., Jones,* 643 S.E.2d at 633 (claim stated against the City of Durham for its Police Department's failure to produce evidence); *Jackson v. Blue Dolphin Commc'ns of N.C.*, 226 F. Supp. 2d 785, 794 (W.D.N.C. 2002) (cause of action stated upon allegation of soliciting a false affidavit); *Henry v. Deen*, 310 S.E.2d 326, 334 (N.C. 1984) (cause of action stated by allegation of conspiracy to conceal evidence of medical negligence).

The Amended Complaint alleges that Defendant Lamb "prevented, obstructed, impeded, or hindered" public justice in North Carolina, by way of example he:

- Directed Defendant Wilson to conduct an internal investigation of Sergeant Shelton in retaliation for Shelton's intention to testify that he knew Mangum to be lying. AC ¶ 64.

- Destroyed or otherwise secreted the DECC communication relating to Mangum's involuntary commitment. AC ¶ 238.

- Participated in the creation of the "wanted" poster. AC ¶ 520.

- Additionally, received Nifong's call (his first known act in the case) to Captain Lamb soon after the Plaintiffs arrived at the Forensics Unit. *Id.¶ 486.* Nifong explained that he wanted to take control of the investigation; Lamb agreed to delegate to Nifong his official policymaking authority over Gottlieb and the District Two investigation. *Id.¶ 487.* Lamb then instructed Gottlieb, Himan, and Ripberger to conduct the investigation only in the manner that Nifong directs. *Id.*

### B. The Amended Complaint States An Intentional Infliction Of Emotional Distress Claim Against The Supervising Defendants.

The Twentieth Cause of Action states an actionable claim for Intentional Infliction of Emotional Distress ("IIED"). AC ¶¶ 1213-22. To state a claim for IIED under North Carolina law, a plaintiff must allege: "(1) extreme and outrageous conduct by the defendant; (2) which is intended to and does in fact cause (3) severe emotional distress." *W.E.T. v. Mitchell,* No. 1:06CV487, 2007 WL 271294, at *8 (M.D.N.C. Sept. 14, 2007) (citing *Harris v. County of Forsyth*, 921 F. Supp. 325, 335-36 (M.D.N.C. 1996)); *see also Waddle v. Sparks*, 414 S.E.2d 22, 27 (N.C. 1992) (stating same essential elements for IIED). "A claim may also exist where the defendant's actions indicate a reckless indifference to the likelihood that they will cause severe emotional distress." *W.E.T., at* *8 (citing to *Hogan v. Forsyth Country Club Co.*, 340 S.E.2d 116, 119-20 (N.C. Ct. App. 1986)). "It is a question of law for the court to determine, from the materials before it, whether the conduct complained of may be reasonably found to be sufficiently

outrageous as to permit recovery." *Id.* (citing *Beck v. City of Durham*, 573 S.E.2d 183, 191 (N.C. Ct. App. 2002)). As distilled by the North Carolina Supreme Court, "[o]ne who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm." *West v. King's Dep't Store, Inc.*, 365 S.E.2d 621, 625 (citing *Dickens v. Puryear*, 276 S.E.2d 325, 332 (N.C. 1981)) (quoting Restatement (Second) of Torts § 46 (1965)).

Lamb argues for dismissal of Plaintiffs IIED Claim, contending that his name does not appear in the exemplars below the heading and that his conduct was not outrageous. City Super. Br. § V.A. Defendant Lamb had sufficient notice of an IIED claim. For example, he oversaw the production of the poster. In *Woodruff v. Miller,* 307 S.E.2d 176 (1983), an IIED claim was upheld posters when Defendant placed posters public places, and showing portions of papers about the plaintiff's *nolo contendere* plea while a college student decades earlier. Lamb helped to create a poster that was prominently displayed and widely distributed across Plaintiffs' campus and community. It vilified the Plaintiffs, and transformed them into the 'most wanted' in the area at the height of their peril.

Hodge argues that the IIED claim against him should be dismissed as a defamation claim and his actions were not extreme or outrageous. City Super. Br. § V.A. Plaintiffs allege that, while acting as the Chief of Police in Chalmers' unexplained absence, Hodge made a public statement that gave credence to false allegations he knew to be false. Hodge made the statement on television, and, by its terms, he was speaking for all law enforcement officers involved in the investigation. Hodge made the statement on April 11, 2006, with the knowledge that the SBI DNA tests were negative and one day after he learned that DNASI's tests were not only negative as to the team members, but also revealed the presence of at least four male contributors of genetic material in the

Mangum's rape kit.  Thus, unlike the shopkeeper in *West*, who refused to accept evidence of the purchase, Hodge knew the Plaintiffs were innocent when he announced with Nifong his determination to continue the persecution of Plaintiffs and their teammates.

### C. The Amended Complaint States An Aiding Or Abetting The Breach Of Fiduciary Duty Claim Against The Supervising Defendants.

The Twenty-Third Cause of Action states an actionable claim for Aiding and Abetting the Breach of a Fiduciary Duty against Chalmers, Council, Hodge, Lamb, and Ripberger.  AC ¶¶ 1235-48.  To state a claim for aiding or abetting breach of fiduciary duties, Plaintiff must allege "(1) the existence of fiduciary duty by the primary party; (2) knowledge of the violation on the part of the aider and abettor; and (3) substantial assistance by the aider and abettor in the achievement of the primary violation."  *Blow v. Shaughnessy*, 364 S.E.2d at 490; *see also In re EBW Laser, Inc.*, Nos. 05-1022OC-7G, 05-102216-7G, 2008 WL 1805575, at *2 (Bankr. M.D.N.C. Apr. 21, 2008) (quoting *Blow v. Shaughnessy*); *Battleground Veterinary Hosp., P.C. v. McGeough*, No. 05 CVS 18918, 2007 WL 3071618, at *7 (N.C. Super Oct. 19, 2007) (citing *Blow v. Shaughnessy*). The Amended Complaint alleges that the City Supervising Defendants accepted from a bank, (i.e., Duke University)[14], protected financial data.  AC § XXXVIII. They then conspired with Duke officers to issue false subpoenas and then conduct a hearing to cover up the fact they already possessed the protected data and they had retrieved it in violation of the N.C. Financial Privacy Act which requires a subpoena in

---

[14] Plaintiffs Establish That University Was Operating As A "Bank" With Respect To Plaintiffs' Duke Card Account In Pls. Opp. Br. (Duke) Within The Argument In Support Of Plaintiffs Cause Of Action For Breach Of Fiduciary Duty.

order for law enforcement to garner protected financial data.  *Id*; N.C. GEN. STAT. § 53-B (2008).

### D.   The Amended Complaint States Negligence Claims against the Supervising Defendants.

The Twenty-Fifth, Twenty-Sixth, Twenty-Seventh, and Twenty-Eighth Causes of Action state an actionable negligence claim against the Supervising Defendants.  AC ¶¶ 1261-88.  To state a negligence claim, a plaintiff must allege that (1) defendant owed plaintiff a duty of care, (2) the defendant breached that duty, and (3) defendant's breach was the actual and proximate cause of plaintiff's injury.  *Cameron v. Merisel Props., Inc.*, 652 S.E.2d 660, 664 (N.C. Ct. App. 2007).  The Supervising Defendants do not dispute that Plaintiffs have alleged the elements of their Negligence claim against some of the Supervising Defendants.  Instead, they rely upon the protections of Public Official Immunity.  Their reliance is misplaced.

### 1.  Public Official Immunity

Plaintiffs acknowledge that police officers are immune from suit in their individual capacity for suits in negligence that relate to discretionary functions.  "As long as a public officer lawfully exercises the judgment and discretion with which he is invested by virtue of his office, keeps within the scope of his official authority, and acts without malice or corruption, he is protected from liability." *Smith v. State,* 222 S.E.2d 412, 430 (N.C. 1976) (citations omitted).  Public official immunity does not protect an official's malicious or corrupt conduct in the performance of their official duties. *Slade v. Vernon,* 429 S.E.2d 744 (N.C. Ct. App. 1993).  Public official immunity from negligence suits does not extend to an official, in his official capacity, when the governmental employer "has waived immunity by the purchase of liability insurance."  *Thompson v. Town of Dallas* 543 S.E.2d 901, 905 (N.C. Ct. App. 2001).  Plaintiffs have asserted that

the City of Durham is part of a municipal risk pool scheme the extent of which will not be known until Discovery is conducted. AC ¶ 48. City Supervising Defendants have asserted public official immunity as a blanket claim to all liability under state law for individual capacity claims of negligence. Because much of Supervising Defendants' conduct was inspired by a malicious, and corrupt conduct such as Baker overseeing an investigation or directing the violation of Plaintiffs' constitutional rights, the immunity does not apply. *See* AC ¶¶ 333-41, 346-49, 1270-76.

### E. The Amended Complaint States a Negligent Supervision, Retention, Training, and Discipline Claim Against the Supervising Defendants.

The Twenty-Sixth Cause of Action states an actionable claim for Negligent Supervision, Retention, Training, and Discipline ("Negligent Supervision") against the Supervising Defendants.[15] AC ¶¶ 1268-76. Plaintiffs are not seeking to impose liability on the Supervisory Defendants in their individual capacities on this claim, only to hold the City liable both directly and based on official capacity. Therefore, the Court does not need to reach the Supervisory Defendants' arguments with respect to this cause of action.

### F. The Amended Complaint States a Negligent Infliction of Emotional Distress Claim Against the Supervising Defendants.

The Twenty-Seventh and Twenty-Eighth Causes of Action states an actionable claim for Negligent Infliction of Emotional Distress ("NIED") against the Supervising

---

[15] To state a claim for negligent supervision, a plaintiff must allege that: (1) an incompetent employee committed a tortious act resulting in injury to the plaintiff, and that (2) prior to the tortious act, the employer knew or had reason to know of the employee's incompetence. *Privette*, 495 S.E.2d at 398 (citing *Graham v. Hardee's Food Sys., Inc.*, 465 S.E.2d 558, 560 (N.C. Ct. App. 1996)).

Defendants.[16]  AC ¶¶ 1277-88.  Defendants assert that because Plaintiffs allege that many of the acts may have been done intentionally, they may not pursue a claim under negligence.  This is a fallacy – Defendants are permitted under the Federal Rules to Plead alterative theories of recovery, even those that may be mutually exclusive. Fed. R. Civ. Pro 8 (d).   Plaintiffs have asserted that the City Supervising Defendants knew there was never any evidence of a sexual assault, knew that there was overwhelming evidence that the allegation was a lie, and turned a blind eye and did nothing as their subordinates engaged in a conspiracy to frame Plaintiff and their teammates for a crime they knew did not happen, and the obvious and foreseeable consequence of such negligent oversight is emotional harm to the victims of the false statements.  *See generally* AC §§ XXII- XL.  Nevertheless, Plaintiffs do not seek to impose liability on the Supervising Defendants in their individual capacities in this claim, but instead only seek to hold the City liable both

_____

[16] To state a claim for Negligent Infliction of Emotional Distress ("NIED"), the plaintiff must allege that the defendant (1) negligently engaged in conduct, (2) under circumstances in which it was reasonably foreseeable that the conduct would cause the plaintiff severe emotional distress; and (3) the conduct caused the plaintiff severe emotional distress. *Johnson v. Ruark Obstetrics & Gynecology Assoc.*, 395 S.E.2d 85, *reh. den.*, 399 S.E.2d 133 (N.C. 1990).  The term "severe emotional distress" means any emotional or mental disorder, such as, for example, neurosis, psychosis, chronic depression, phobia, or any other type of severe and disabling emotional or mental condition which may be generally recognized and diagnosed by a professional trained to do so.  *Sorrells v. M.Y.B. Hospitality Ventures*, 435 S.E.2d 320, 322 (N.C. 1993).

directly and based on their official capacity.[17]  Therefore, the Court does not need to reach the Supervisory Defendants' arguments with respect to this cause of action.

## VII. THE COURT MAY DISMISS OFFICIAL CAPACITY CLAIMS WHERE THE CITY IS ALSO NAMED AS A DEFENDANT AND IS THE REAL PARTY IN INTEREST.

Plaintiffs agree that under the Civil Rights statues, a claim against an official in their official capacity in which the governmental is also named is "in all respects other than name, to be treated as a suit against the [City]. Claims against the official in his or her official capacity which are duplicative of claims against a government entity are subject to dismissal. *W.E.T. v. Mitchell,* No. 1:06CV487, 2007 WL 2712924 at *10 (M.D.N.C. Sept. 14, 2007) (citing to *Kentucky v. Graham,* 473 U.S. 159, 166 (1985)*; see Shaeffer v. County of Chatham,* 337 F. Supp. 2d 709, 721 (M.D.N.C. 2004)  (claims against a defendant in their official capacity were dismissed as duplicative of the municipality).   Therefore the Court may dismiss all official capacity claims against Defendants Baker, Chalmers, Russ, Mihaich, Council, Lamb, Ripberger, Evans and Hodge in the Fifth, Ninth through Eleventh, and Fifteenth through Seventeenth Causes of Action because the City of Durham is the real party in interest in those claims.

---

[17] The North Carolina Supreme Court has held that supervisors may be liable for negligent supervision, *see Mozingo v. Pitt County Mem'l Hosp., Inc.*, 415 S.E.2d 341, 344 (N.C. 1992), and does not mention the word "employer" in the elements of the tort, *see Medlin v. Bass*, 398 S.E.2d 460, 462 (N.C. 1990). *Accord Smith v. Jackson County Bd. of Educ.*, 608 S.E.2d 399, 410 (N.C. Ct. App. 2005); *Block v. County of Person*, 540 S.E.2d 415, 421-22 (N.C. Ct. App. 2000); *Herndon v. Barrett*, 400 S.E.2d 767, 767 (N.C. Ct. App. 1991).

Without conceding that the same principle applies to state law claims, Plaintiffs will waive the official capacity claims asserted against the Supervisory Defendants in the state law claims in which the City of Durham is named as a defendant in the cause of action. Therefore, the official capacity claims asserted against City employees and agents are not duplicative of any claim against the City, and may not be dismissed unless the City is substituted as a defendant directly in those causes of action.

## VIII. DEFENDANTS MAKE NO OTHER ARGUMENTS FOR DISMISSAL; PLAINTIFFS REQUEST LEAVE TO COMMENCE DISCOVERY.

The City Supervisors and Hodge have made no other arguments in support of dismissal of Plaintiffs' claims. Defendants have, however, requested oral argument on their motions, pointing to the complexity of the issues raised by the Amended Complaint. Any complexity that Defendants could not clarify in the course of the 825 pages that has already been extended to them likely will not clarify in oral argument. That is particularly true if, at oral argument, Defendants persist in recasting Plaintiffs' allegations to find a foothold for their arguments. With respect, Plaintiffs request that the Defendants' request for oral argument be denied, and Plaintiffs request leave to schedule the Rule 26(f) discovery conference.


## CONCLUSION

For the foregoing reasons, the Court should deny Defendants' Motions to Dismiss, except that, where the City is already named as a defendant in the Causes of Action, the Court may dismiss the official capacity claims alleged in those causes of action. Defendants' request for oral argument should be denied, and Plaintiffs' request for leave to conduct the Rule 26(f) discovery conference should be granted.

Dated:  October 10, 2008

Respectfully submitted,

**EKSTRAND & EKSTRAND LLP**

/s/ Robert C. Ekstrand

_____

Robert C. Ekstrand, Esq. (NC Bar #26673)
Attn:  Stefanie A. Sparks
811 Ninth Street, Suite 260
Durham, North Carolina 27705
Email:  rce@ninthstreetlaw.com
Email:  sas233@law.georgetown.edu
Phone: (919) 416-4590
*Counsel for Plaintiffs Ryan McFadyen,*
*Matthew Wilson, and Breck Archer*

# UNITED STATES DISTRICT COURT
## FOR THE
## MIDDLE DISTRICT OF NORTH CAROLINA

RYAN MCFADYEN, ET AL.,

      Plaintiffs,

          V.

DUKE UNIVERSITY, ET AL.,

      Defendants.

**Civil Action No. 1:07-cv-953**

## CERTIFICATE OF SERVICE

I hereby certify that, on October 10, 2008, I electronically filed the foregoing PLAINTIFFS' OPPOSITION TO THE SUPERVISING DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

James Donald Cowan, Jr.
Ellis & Winters, LLP
100 North Greene Street, Suite 102
Greensboro, NC  27401
***Counsel for the University Defendants***

Dixie Wells
Ellis & Winters, LLP
100 North Greene Street, Suite 102
Greensboro, NC  27401
***Counsel for the University Defendants***

Jamie S. Gorelick
Wilmer Cutler Pickering Hale and Dorr, LLP
1875 Pennsylvania Avenue, NW
Washington, DC 20006
***Counsel for the University Defendants***

Jennifer M. O'Connor
Wilmer Cutler Pickering Hale and Dorr, LLP
1875 Pennsylvania Ave., N.W.
Washington, DC  20006
***Counsel for the University Defendants***

Paul R.Q. Wolfson
Wilmer Cutler Pickering Hale and Dorr, LLP
1875 Pennsylvania Avenue, NW
Washington, DC 20006
***Counsel for the University Defendants***

William F. Lee
Wilmer Cutler Pickering Hale and Dorr, LLP
60 State Street
Boston, MA  02109
***Counsel for the University Defendants***

Dan J. McLamb
Yates, McLamb & Weyher, LLP
One Bank of America Plaza, Ste 1200
421 Fayetteville Street
Raleigh, NC 27601
***Counsel for the Sane Defendants***

Reginald B. Gillespie, Jr.
Faison & Gillespie
P.O. Box 51729
Durham, NC 27717
***Counsel for City of Durham, North Carolina***

Patricia P. Kerner
Troutman Saunders, LLP
434 Fayetteville Street, Suite 1900
Raleigh, NC 27601
***Counsel for Steven Chalmers, Patrick Baker, Beverly Council, Ronald Hodge, Jeff Lamb, Stephen Mihaich, Michael Ripberger, Laird Evans, and Lee Russ***

D. Martin Warf
Troutman Sanders LLP
P.O. Drawer 1389
Raleigh, North Carolina 27602
***Counsel for Steven Chalmers, Patrick Baker, Beverly Council, Ronald Hodge, Jeff Lamb, Stephen Mihaich, Michael Ripberger, Laird Evans, and Lee Russ***

James B. Maxwell
Maxwell, Freeman & Bowman
P.O. Box 52396
Durham, NC  27717-2396
***Counsel for David Addison, Kammie Michael, Richard D. Clayton and James T. Soukup***

Joel M. Craig
Kennon, Craver, Belo, Craig & McKee
4011 University Drive, Suite 300
Durham, NC 27707
***Counsel for Benjamin W. Himan***

Edwin M. Speas, Jr.
Poyner & Spruill, LLP
P.O. Box 10096
Raleigh, NC 27605-0096
***Counsel for Mark Gottlieb***

Eric P. Stevens
Poyner & Spruill, LLP
P.O. Box 10096
Raleigh, NC 27605-0096
***Counsel for Mark Gottlieb***

Kearns Davis
Brooks, Pierce, McLendon, Humphrey & Leonard, L.L.P.
P.O. Box 26000
Greensboro, NC  27420
***Counsel for DNA Security, Inc. and Richard Clark***

Robert J. King, III
Brooks, Pierce, McLendon, Humphrey & Leonard, L.L.P.
P.O. Box 26000
Greensboro, NC  27420
***Counsel for DNA Security, Inc. and Richard Clark***

Linwood Wilson
**\*\*ADDRESS REDACTED PURSUANT TO LOCAL RULE**

I further certify that I caused the foregoing document to be served by first-class mail, postage prepaid, to the following non CM/ECF participants:

Paul R. Dickinson, Jr.
Lewis & Roberts, PLLC
5960 Fairview Road, Suite 102
Charlotte, NC  28210
***Counsel for Brian Meehan***

James A. Roberts, III
Lewis & Roberts, PLLC
1305 Navaho Drive, Suite 400
Raleigh, NC  27609-7482
**Counsel for Brian Meehan**

Roger E. Warin
Steptoe & Johnson, LLP
1330 Connecticut Avenue, NW
Washington, DC 20003
**Counsel for City of Durham, North Carolina**

Robert A. Sar
Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
2301 Sugar Bush Road, Suite 600
Raleigh, NC  27612
**Counsel for DNA Security, Inc.**

Nicholas J. Sanservino, Jr.
Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
2301 Sugar Bush Road, Suite 600
Raleigh, NC  27612
**Counsel for DNA Security, Inc.**

Respectfully submitted,

**EKSTRAND & EKSTRAND LLP**

/s/ Robert C. Ekstrand
Robert C. Ekstrand, Esq.
NC Bar #26673
811 Ninth Street, Suite 260
Durham, North Carolina 27705
Email:  rce@ninthstreetlaw.com
Phone: (919) 416-4590
*Counsel for Plaintiffs Ryan McFadyen, Matthew Wilson, and Breck Archer*