## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

### CIVIL ACTION NUMBER 1:07-CV-00953

RYAN McFADYEN, et al.,

                 Plaintiffs,

         v.

DUKE UNIVERSITY, et al.,

                 Defendants.

Reply Brief in Support of "Duke University Defendants'" Motion to Dismiss Amended Complaint

Plaintiffs' opposition brief makes clear that their fundamental contention is that Duke University and its administrators were legally obligated to protect them from the consequences of a police investigation—by quelling media coverage of the case, preventing campus protests, and even interceding to stop the investigation. There is no legal support for that contention, and so the amended complaint should be dismissed.[1]

## I.     PLAINTIFFS FAIL TO STATE A CLAIM UNDER 42 U.S.C. § 1983 (COUNTS 5, 8, 9, 10, 12, 13, 14, 15)

As Duke's opening brief explained (at 8-15), Plaintiffs have failed to allege the elements of their § 1983 claims. Plaintiffs' opposition fails to establish otherwise.[2]

---

[1] The Duke Police Defendants and Duke SANE Defendants join in the arguments in this brief, to the extent they are applicable to claims brought against those Defendants.

[2] As noted in the opening brief (at 9-12), Duke University is a private entity and its administrators are private persons; Plaintiffs' basis for subjecting these Defendants to liability under § 1983 as state actors is their insufficient conclusory allegation that Duke parties conspired with public authorities.

### A.     "Stigma-Plus" (Count 5)

In Count 5, Plaintiffs contend that Defendants violated their constitutional rights by "stigmatiz[ing] Plaintiffs in connection with the deprivation of their federal rights and existing tangible interests."  (Pl. SANE Opp. 13-14.)  Plaintiffs fail to plead any of the essential elements of a "stigma-plus" claim:  (1) defamatory statements about them (the "stigma"); (2) the deprivation of a cognizable liberty or property interest (the "plus"); and (3) the requisite nexus between any such statements and any purported deprivation of Plaintiffs' legal rights.  *See Johnson v. Morris*, 903 F.2d 996, 999 (4th Cir. 1990).

First, Plaintiffs do not point to any allegation in the amended complaint that any Defendant made a stigmatizing statement specifically about Plaintiffs McFadyen, Wilson, or Archer.  Rather, Plaintiffs contend that they are each entitled to relief because Defendants allegedly made defamatory statements about "all members of the lacrosse team."  (Pl. Duke Opp. 12.)  But while some courts have permitted members of very small groups to bring a defamation action when it was clear that the defamatory statement referred to every member of the group, the Duke lacrosse team is not such a small group. There were 47 members on the team during the 2005-2006 season, which is substantially larger than the groups in which unnamed members have been permitted to bring defamation actions under North Carolina law.[3]

---

[3] *See Boyce & Isley, PLLC v. Cooper*, 153 N.C. App. 25, 33, 568 S.E.2d 893, 900 (2002) (plaintiffs alleged that defendants defamed every attorney in a four-person law firm); *Carter v. King*, 174 N.C. 549, 553, 94 S.E. 4, 6 (1917) (members of an eleven-person jury could maintain libel action where the defamatory statement imputed misconduct to

Second, Plaintiffs have failed to plead that they were deprived of a liberty or property interest necessary to support a "stigma-plus" claim. Although the amended complaint alleges a long list of alleged "deprivations of … tangible interests" (*see* AC ¶ 957), none of them is a cognizable "plus" under governing precedent. In every Supreme Court and Fourth Circuit case suggesting that a "stigma-plus" claim might go forward, the deprivation was either a discharge or significant demotion in the context of government employment or the revocation of a state-issued license.[4] Plaintiffs cite no cases, in this jurisdiction or elsewhere, suggesting that the purported deprivation of the "right to compete and participate in Division I intercollegiate athletics" (AC ¶ 957(C)), implicates a liberty or property interest that can give rise to a "stigma-plus" claim.

Third, Plaintiffs have failed to allege the requisite nexus between the "stigma" and the "plus." As noted in Duke's opening brief (at 18-21), the Fourth Circuit has held that, to support a "stigma-plus" claim, the stigma must be closely connected to the "plus"— that is, the stigmatizing statement either must occur "in the course of" the "plus,"

---

the entire group); *see generally* Restatement (Second) of Torts 564(A) cmt. b (1977) (defamation cases in which recovery has been allowed by members of a group "usually have involved numbers of 25 or fewer"). Contrary to Plaintiffs' reading (Pl. Duke Opp. 12), *Algarin v. Town of Wallkill*, 421 F.3d 137 (2d Cir. 2005), did not suggest that a statement that besmirched an entire police department could have given rise to a valid stigma-plus claim, and that case noted that defamation claims resting on statements about groups rather than individuals raise "thorny questions." *Id.* (citation omitted).

[4] *See Owen v. City of Independence*, 445 U.S. 622, 633 n.13 (1980); *Ridpath v. Bd. of Governors of Marshall Univ.*, 447 F.3d 292, 311 (4th Cir. 2006); *cf. Paul v. Davis*, 424 U.S. 693, 705-706 (1976) (concluding, after reviewing earlier Supreme Court cases, that "the Court has never held that the mere defamation of an individual … was sufficient to invoke the guarantees of procedural due process absent an accompanying loss of government employment").

*Ridpath*, 447 F.3d at 309; *see Stone v. Univ. of Md.*, 855 F.2d 167, 173 n.5 (4th Cir. 1988), or it must actually cause the deprivation of the liberty or property interest, *see Johnson v. Morris*, 903 F.2d 996, 999 (4th Cir. 1990); *see also Owen*, 445 U.S. at 633 n.13 (stigmatizing charges "occur[red] in the course of the termination of employment"). Plaintiffs effectively concede that they cannot meet this standard by arguing that the stigmatizing statement need merely be "coupled with" a deprivation, without any direct connection or causation between the two (Pl. Duke Opp. 13 n.15), but they cite no Fourth Circuit law to support that argument. Count 5 should be dismissed.[5]

### B. Interference With The Political Process (Count 8)

Plaintiffs do not dispute that (a) the First Amendment does not govern a private landowner's decision to restrict political expression on its property, and (b) all the alleged efforts to "shut down" their voter registration drive took place on Duke's private property. (Pl. Duke Opp. 15-17.) They argue, however, that the First Amendment was implicated when "uniformed police officers" carried out Duke's alleged decision to

---

[5] Even if Plaintiffs could bring a stigma-plus claim under this looser standard, they could not do so against Levicy and Arico. Even the cases outside the Fourth Circuit that have held that the stigmatizing statement need not directly cause or arise in the course of the deprivation have concluded that a defendant cannot be held liable under the stigma-plus theory if she does not personally have the power to "impose the plus" or to "provide process" to the plaintiff in connection with the alleged deprivation. *See, e.g.*, *Velez v. Levy*, 401 F.3d 75, 92-93 (2d Cir. 2005); *see also* Duke Br. at 20 n.10. Plaintiffs do not dispute this argument; nor do they argue that Levicy or Arico had any authority to reverse the alleged deprivation by, for example, reinstating the lacrosse season. Nor do Plaintiffs respond to Duke's arguments (Duke Br. 16-17) that Levicy and Arico's statements are not actionable because they merely discussed Mangum's sexual assault examination and Levicy's qualifications to conduct that examination—*not* Plaintiffs' character.

curtail their registration efforts.  (*Id*. at 15-16.)  That argument lacks merit; courts have

repeatedly held that the police may assist private property owners in exercising their right

to restrict political activities on their property without violating the First Amendment.[6]

Moreover, these Plaintiffs still refuse to state whether *they*—as opposed to other

members of the lacrosse team—were actually "stopped and detained" after trying to

register voters.  (Pl. Duke Opp. 15-16; *cf.* AC ¶¶ 883-884.)  Plaintiffs may not bring a

§ 1983 action based on violations that they did not personally suffer.  *Inmates v. Owens*,

561 F.2d 560, 562-563 (4th Cir. 1977).  Because Plaintiffs decline to allege that they

*personally* were deprived of their First Amendment rights, Count 8 should be dismissed.

## C.    Retaliation (Count 9)

Plaintiffs concede that any retaliation claim based on their Fifth Amendment right

against self-incrimination is "foreclosed" because they were never tried or convicted.  (Pl.

Duke Opp. 18 n.18.)  Instead, they now argue that they had a *First* Amendment right not

to speak to the police during the investigation, and that the grand conspiracy to frame

---

[6] *See Lloyd Corp., Ltd. v. Tanner*, 407 U.S. 551, 554, 556, 567-570 (1972) (no First or
Fourteenth Amendment violation where shopping center's security guards who "ha[d]
police authority within the Center, w[ore] uniforms similar to those worn by city police,
and [we]re licensed to carry handguns" requested, under threat of arrest, that the plaintiffs
stop distributing political handbills); *Radich v. Goode*, 886 F.2d 1391, 1398 (3d Cir.
1989) ("Police action to protect private property rights does not thereby subject that
private property to first amendment constraints."); *Cape Cod Nursing Home Council v.
Rambling Rose Rest Home*, 667 F.2d 238, 243 (1st Cir. 1981) (same); *see also Lansing v.
City of Memphis*, 202 F.3d 821, 833 (6th Cir. 2000) (rejecting First Amendment § 1983
suit based on use of police to remove "street preacher" from private event, because "[i]f
this were all that was required to find state action, then every private citizen who solicited
the aid of the police in resolving disputes or in ejecting unwanted persons would be
transformed into a state actor").

them was in retaliation for their exercising that right.  But Plaintiffs do not cite a single case (nor can Defendants locate any) in which a court has held that the First Amendment, as opposed to the Fifth Amendment, protects the right not to speak to the police, and several courts have indicated to the contrary.[7]

Plaintiffs' reliance on the "right not to speak" under *Wooley v. Maynard*, 430 U.S. 705 (1977), is misplaced.  The right not to speak recognized in *Wooley* is limited to "the context of governmental compulsion to disseminate a particular political or ideological message."  *United States v. Sindel*, 53 F.3d 874, 878 (8th Cir. 1995); *see Kania v. Fordham*, 702 F.2d 475, 478 n.6 (4th Cir. 1983) (rejecting a First Amendment claim based on *Wooley* because the plaintiffs were not forced to "disseminat[e] an official ideology").  Here, Plaintiffs do not argue that they were exercising a right not to promote a particular ideology or political message; instead, they assert only that they did not wish to submit to police interrogations.  (*See* AC ¶ 994; Pl. Duke Opp. 23.)  Because this is not a cognizable exercise of the First Amendment right not to speak, Plaintiffs have failed to allege an essential element of their retaliation claim.

## D.    Privileges and Immunities (Count 10)

Plaintiffs claim (Pl. Duke Opp. 25-27) that their rights under the Privileges and Immunities Clause of Article IV were violated because their investigation for rape

---

[7] *See Albright v. Rodriguez*, 51 F.3d 1531, 1539 (10th Cir. 1995) (finding no "case recognizing a First Amendment right to refuse to identify one's self to a police officer during a lawful investigative stop"); *Niebur v. Town of Cicero*, No. 98-4157, 1998 WL 677155, at *7 (N.D. Ill. Sept. 22, 1998) (holding that the refusal to answer investigators' questions "may be protected, but not by the First Amendment").

resulted from the application of a "Zero Tolerance Policy" against Duke students for

petty offenses.[8]  Duke's opening brief explained (at 24-26) that this claim has at least two

serious flaws.  First, Plaintiffs' discrimination claim rests on the premise that

nonresidents have a "right," equal to that of North Carolina citizens, to avoid

accountability when they break the laws of North Carolina; but the Privileges and

Immunities Clause does not protect such an interest.  (*See* Duke Br. 25-26.)  Second, the

"Zero Tolerance" policy at most applied only to petty offenses (AC ¶¶ 109, 111, 115),

and Plaintiffs have failed to allege plausibly that their investigation (not arrest, trial, or

conviction) for a grave violent felony resulted from application of the Policy.

Plaintiffs make no substantial argument in response.  With respect to the first

point, although Plaintiffs contend that the Zero Tolerance Policy required Durham Police

officers to charge Duke students for violations of underage drinking, open container,

noise and public urination laws (AC ¶¶ 108-109, 111, 115), they notably do not claim

---

[8] Although Plaintiffs invoke the "right to travel" (Pl. Duke Opp. 25), that label adds nothing of substance to their claims.  The Supreme Court has explained that the right to travel encompasses three separate components rooted in different provisions of the Constitution.  *See Saenz v. Roe*, 526 U.S. 489, 500-503 (1999).  Only the second component—the right of a noncitizen of a State "to be treated as a welcome visitor rather than an unfriendly alien when temporarily present in the second State," *id.* at 500, which is rooted in Article IV, *id.* at 501, is at issue here.  The third component—the right of newly arrived citizens of a State to be treated on an equal basis with longstanding citizens, *id.* at 500—is not at issue here, because on their own allegations, Plaintiffs McFadyen and Archer are not citizens of North Carolina (AC ¶¶ 6, 8), and that third component protects only persons "who have completed their interstate travel" and have become citizens of the receiving State, *see Saenz*, 526 U.S. at 504.  Moreover, Plaintiff Wilson has no claim under Article IV at all because he is a citizen and resident of North Carolina (AC ¶ 17) and thus cannot assert discrimination against noncitizens.  (*See* Duke Opp. 26 n.15.)

that any Duke students were charged for infractions that they did not in fact commit. (*See* AC ¶ 122 (admitting that students whose alcohol test did not reveal the presence of alcohol were not charged).) Nor do they allege any specific incidents in which the Durham Police failed to investigate similar charges levied against North Carolina citizens. Rather, they merely complain that Duke students (and not even Plaintiffs themselves) were subjected to the fairly promulgated laws of the state of North Carolina. (*See, e.g.*, AC ¶ 109.) But even if it might be true that application of those same laws against local residents was lenient in comparison to its application against Duke students, that does not establish a constitutional violation. A State need not "always apply all its laws … equally to anyone, resident or nonresident, who may request it so to do," *Baldwin v. Fish and Game Comm'n,* 436 U.S. 371, 383 (1978), and "[o]nly with respect to those 'privileges' and 'immunities' bearing upon the vitality of the Nation as a single entity must the State treat all citizens, resident and nonresident, equally." *Id.* The right to avoid prosecution for a violation of law covering petty offenses is not such a fundamental right.

Second, Plaintiffs fail to establish any logical connection between the Zero Tolerance Policy and their investigation for rape. The Policy, Plaintiffs allege, was intended to target Duke students for minor offenses *that they had in fact committed*. (AC ¶¶ 108-109, 111, 112, 115.) The rape investigation, Plaintiffs assert, constituted an effort to frame innocent persons of a violent felony. The two are of an entirely different order, and to survive dismissal, Plaintiffs must do more than assert in conclusory terms that the

two were connected.  *See Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1965, 1966 (2007).

They have failed to do so, and so Count 10 should be dismissed.

      **E.**      ***"Monell* Liability" (Count 12)**

      Duke's opening brief explained (at 26-28) that, even if Plaintiffs had adequately

alleged the deprivation of a constitutional right (which they have not), they have not

adequately alleged that any Duke *policy* was the "moving force" behind any

constitutional violation, as required under *Monell v. Department of Social Services*, 436

U.S. 658 (1978).  Nothing in Plaintiffs' oppositions refutes this point or makes out the

basis for a claim under *Monell*.

      **Count 12(A)(1):**  Plaintiffs identify the "Zero Tolerance Policy" as one basis for

their *Monell* claim.  As explained above (pp. 7-9), Plaintiffs have not explained how a

policy of bringing minor charges of underage drinking and public urination against those

who actually committed such infractions could be related to a decision to pursue a

baseless investigation into a violent felony.  Plaintiffs contend that this inadequacy is a

fact issue for the jury, but Rule 12(b)(6) requires plausible allegations that the alleged

policy caused the supposed constitutional violation.[9]  Plaintiffs have not met that burden.

      **Count 12(A)(2):**  Duke's opening brief demonstrated (at 27-28) that Count

12(A)(2)'s purported "inflaming public outrage" policy could not have caused Plaintiffs

any constitutional harm and, therefore, cannot serve as the basis for *Monell* liability.

---

[9] *Powell v. Barrett*, 496 F.3d 1288, 1320 (11th Cir. 2007); *Brown v. Mitchell*, 308 F. Supp. 2d 682, 694 (E.D. Va. 2004).

Plaintiffs' oppositions do not address this pleading inadequacy. Accordingly, Plaintiffs effectively concede that Count 12(A)(2) fails.

**Count 12(A)(3):** Count 12(A)(3) alleges *Monell* liability based on a purported "bystander officer policy." Plaintiffs do not dispute that the underlying constitutional violation of which they complain here is the same as that alleged in Count 11. For the same reasons that Count 11 fails, Count 12(A)(3) fails to allege any constitutional violation committed under this purported policy.

**Count 12(B):** Count 12(B) alleges that Duke University is liable for unspecified § 1983 violations of unspecified constitutional rights "directed" or "ratified" by unidentified Duke officials with final policymaking authority. Duke's opening brief argued (at 28-29) that this Count is so vague that it fails to give adequate notice of the allegations in it. Plaintiffs, in response, do not identify any § 1983 violation that they allege was "directed" or "ratified" by any Duke official. To the extent that they have added any context to this claim, it is the sweeping assertion (at Pl. Duke Police Opp. 18) that Duke's "'false helplessness' message" somehow establishes liability under *Monell*. Plaintiffs appear to base this argument on allegations that Steel and others purportedly "directed" the "conceal[ment]" of Duke's alleged authority to investigate Mangum's rape accusations. But Plaintiffs nowhere explain how this alleged conduct violated any federal right.

Plaintiffs do not contend (nor could they) that they had a federal right to have the Duke Police, rather than the Durham Police, investigate Mangum's accusations. Rather,

- 10 -

Plaintiffs appear to be arguing that Duke "ratified" constitutional violations by the Durham Police by failing to take the investigation away from Durham in the first instance. This argument fails because, for a ratification to serve as the basis for entity liability, the ratifying officer must have had final policymaking authority over that action. *See City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988) (plurality op.); *Hall v. Marion Sch. Dist. No. 2*, 31 F.3d 183, 196 (4th Cir. 1994). But Plaintiffs do not credibly argue that *Duke* officials had final policymaking authority over the actions of the *Durham* Police Department. To the extent Plaintiffs argue that it is a question of fact whether Duke officials have final policymaking authority over Durham Police, that argument lacks merit. *See Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989).

**Count 12(C):** Plaintiffs also attempt to plead *Monell* liability against Duke under a "delegation" theory. Plaintiffs argue that "the University's … Policymaking officials delegated to Nifong … the authority to direct the Durham Police investigation" (Pl. Durham Opp. 32-33), and that University officials with final policymaking authority "ratified" constitutional violations committed or directed by Nifong in the exercise of this "delegated" authority (*id*. 33). But as just explained, Duke does not possess final policymaking authority over the Durham Police, and so Duke could not have delegated to Nifong something it did not have—the authority to control the Durham Police Department. Nor could Duke have "delegated" the authority to decide whether to bring a prosecution. Under the North Carolina Constitution, "the responsibility and authority to prosecute all criminal actions in the superior courts is vested *solely* in the several District

Attorneys of the State." *State v. Camacho*, 329 N.C. 589, 593, 406 S.E.2d 868, 871 (1991) (emphasis added). As a matter of law, therefore, Duke could neither "delegate" any prosecutorial authority to Nifong nor "ratify" Nifong's conduct in this regard.[10]

### F. "Supervisory Liability" (Count 13)

Count 13 alleges that Duke Defendants, in their "supervisory" capacity, failed to prevent Nifong and Durham Police from causing Plaintiffs constitutional injury. Duke's opening brief (at 31-32) demonstrated that, as a matter of law, the Duke Defendants could not have "supervised" the Durham Police or Nifong. Plaintiffs concede (Pl. Duke Police Opp. 14) that, to establish a supervisory liability claim, the plaintiff must show, among other things, that the supervisor-defendant had knowledge that *his subordinate* was engaged in conduct posing an unreasonable risk of constitutional injury, and that the supervisor's response—*i.e.,* the supervisor's failure to supervise *his subordinate*—was so inadequate as to rise to the level of deliberate indifference. But Plaintiffs nowhere identify the source of Duke's legal authority to "supervise" Durham Police or Nifong, or regard them as Duke's "subordinates." Count 13 thus warrants dismissal.

### G. Conspiracy (Count 15)

In Count 15, Plaintiffs allege a "broad conspiracy" among "all named Defendants in this action." (Pl. Duke Opp. 27.) The asserted objective of this so-called "Conspiracy to Convict" was to "unlawfully force the wrongful indictment, prosecution, and,

---

[10] As with the question of identifying the final policymaker (p. 11), whether Duke could delegate final policymaking authority is a question of law. *See Jett*, 491 U.S. at 736-738.

ultimately, incarceration of the Plaintiffs, as the principals or accomplices in a horrific, racially motivated gang-rape." (Pl. Durham Opp. 36; Pl. Duke Opp. 27.) Plaintiffs maintain that Defendants were "acting pursuant to a preordained plan that was developed in quiet deliberation and discussions among officials with policymaking authority." (AC ¶ 1152; *see* Pl. Durham Opp. 36.) They further argue that the overarching conspiracy alleged in Count 15 "incorporat[es]" the constitutional violations alleged in Counts 1-11—many of which rely on allegations of conspiracy themselves. (Pl. SANE Opp. 27; *see* AC pp. 286-321.) This conspiracy of conspiracies theory fails to state a claim.

Plaintiffs do not dispute that, to establish a conspiracy under § 1983, they must allege that Defendants acted "jointly in concert and that some overt act was done in furtherance of the conspiracy which resulted in [the] deprivation of a constitutional right." *Hinkle v. City of Clarksburg*, 81 F.3d 416, 421 (4th Cir. 1996). They insist that the "required showing of constitutional harm" is "met by incorporation of the constitutional violations alleged in the First through Eleventh Causes of Action." (Pl. SANE Opp. 27.) But as explained in Defendants' opening and reply briefs, Plaintiffs have not adequately alleged the deprivation of any of their constitutional rights. Because no such rights were violated by any of the alleged acts in furtherance of the conspiracy, Plaintiffs cannot state a conspiracy claim under § 1983.[11]

_____

[11] In their discussion of Count 15, Plaintiffs also argue that the "cumulative effect of the concerted wrongdoing among so many is so egregious that it 'shocks the conscience' in violation of the Fourteenth Amendment." (Pl. SANE Opp. 28.) To the extent that Plaintiffs are contending that all of the alleged constitutional violations in Counts 1-11

Plaintiffs also fail to allege facts that would plausibly support the existence of a conspiracy. *See Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1974 (2007). Plaintiffs insist that all Defendants in this case—from Durham and Duke Police officers to junior nurses at Duke Hospital to Duke's President and Board Chairman—agreed to force the conviction of Duke students because "it would be 'best for Duke' if Plaintiffs were tried and convicted on Mangum's false accusations." (AC ¶¶ 452-453.) This asserted objective is implausible on its face, and Plaintiffs raise no concrete allegations to support it. For example, Plaintiffs offer no facts to support their assertion that Defendants Steel, Brodhead, or any other member of the Duke "Crisis Management Team" ever met with, talked to, or otherwise had a meeting of the minds with Durham officials about violating Plaintiffs' constitutional rights. And Plaintiffs fail to respond to Duke's argument (at 11 n.5) that the meetings Plaintiffs *do* allege between Durham and Duke Police officers and other witnesses were routine features of criminal investigations, and that it is only Plaintiffs' conclusory assertions that imbue them with any conspiratorial meaning. Plaintiffs' failure to allege any facts "plausibly suggesting (not merely consistent with) agreement" among *every* Defendant named in this Count cannot be overcome by

---

can be combined to allege a separate violation of the substantive due process component of the Fourteenth Amendment, that claim also fails. Plaintiffs cite no case for the proposition that a collection of independent constitutional claims—ranging from alleged illegal searches to violations of the Article IV Privileges and Immunities Clause—can be amalgamated into a single substantive due process right. Plaintiffs' new hodgepodge right is the kind of substantive due process claim that the Supreme Court has cautioned against. *See Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992).

hundreds of pages of mere "labels and conclusions" that a conspiracy existed. *Twombly*,

127 S. Ct. at 1965-1966.

## II.     PLAINTIFFS FAIL TO STATE A CLAIM UNDER 42 U.S.C. §§ 1985/1986 (COUNTS 16-17)

Plaintiffs concede (Pl. Duke Opp. 32) that, to state a claim under 42 U.S.C.

§ 1985, they must establish "some racial, or perhaps otherwise class-based, invidiously

discriminatory animus behind the conspirators' action." *Griffin v. Breckenridge*, 403

U.S. 88, 102 (1971).[12]  Duke's opening brief explained (at 34-39) why Plaintiffs fail to

satisfy this element, and Plaintiffs' arguments in response are without merit.

Plaintiffs' argument (Pl. Duke Opp. 31) that white men are a protected class under

§ 1985 finds no support in Supreme Court or Fourth Circuit precedent.  As demonstrated

in Duke's opening brief (at 34-35), the Supreme Court and the Fourth Circuit have

stressed that § 1985 was intended to protect an exceedingly limited category of persons.

*See United Bhd. of Carpenters & Joiners of Am. v. Scott*, 463 U.S. 825, 836 (1983);

---

[12] Although Count 16(ii) appears to invoke the first clause of § 1985(2), which does not require class-based animus, that clause governs only proceedings in federal courts, and Plaintiffs concede (Pl. Opp. 30) that they cannot state a claim under that clause because there was no federal-court proceeding.  They argue, however, that Count 16(ii) alleges a violation of the second clause of § 1985(2), which prohibits interference with state-court proceedings, and which does require class-based animus.  Under that reading, however, Count 16(ii) is merely duplicative of Count 16(i) and fails for the same reasons.  In addition, Duke's opening brief demonstrated (at 33 n.21) that Plaintiffs fail to state a claim against Duke under §§ 1985-1986 because entity liability under §§ 1985-1986, like entity liability under § 1983, requires that the plaintiff establish an official policy or custom that relates to the alleged conspiracy.  Plaintiffs do not dispute that a policy or custom is required for entity liability under §§ 1985 and 1986.  As explained above with respect to Count 12, Plaintiffs have not adequately alleged a Duke policy or custom. Duke should therefore be dismissed from Counts 16 and 17 as well.

*Griffin*, 403 U.S. at 102; *Harrison v. KVAT Food Mgmt., Inc.*, 766 F.2d 155, 161 (4th Cir. 1985).[13]  Indeed, both courts have expressed substantial doubt that § 1985 protects any class other than African-Americans.  Although the Fourth Circuit has never squarely addressed whether § 1985 reaches conspiracies against white men, *Buschi v. Kirven*, 775 F.2d 1240, 1258 (4th Cir. 1985), strongly suggests that the court of appeals would reject that position—as other courts have done.  (Duke Br. 34-37.)  *Buschi* concluded that "the class protected [under § 1985(3)] can extend no further than to those classes of persons who are, so far as the enforcement of their rights is concerned, in unprotected circumstances similar to those of the victims of Klan violence."  775 F.2d at 1258 (internal quotation marks and citation omitted).  Plaintiffs ignore *Buschi* entirely.[14]

Plaintiffs mistakenly rely on two district court cases—*Waller v. Butkovich*, 605 F. Supp. 1137 (M.D.N.C. 1985), and *Phillips v. Mabe*, 367 F. Supp. 2d 861, 873-874

---

[13] The universe of classes protected by § 1985 is undisputedly more limited than the group of classes protected under general equal protection principles.  For example, discrimination against orphans is actionable under the Equal Protection Clause under rational-basis review, but orphans are not a class protected by § 1985.  *See Bloch v. Mountain Mission Sch.*, No. 86-1279, 1988 WL 45433, at *1 (4th Cir. May 2, 1988).

[14] Plaintiffs also misunderstand *Harrison v. KVAT Food Management, Inc.*, 766 F.2d 155 (4th Cir. 1985), when they argue (Pl. Duke Opp. 32) that "*Harrison*'s passing mention of 'blacks' was merely a counterexample" invoked to contrast a member of a 'race or class' that is protected by § 1985(3), with a political class (Republicans), which *Harrison* held is not covered by the statute.  In *Harrison*, the Fourth Circuit put forth its interpretation of § 1985(3)'s animus requirement in light of then-recent guidance from the Supreme Court in *Scott*.  The court of appeals explained that "the opinion in *Scott* exhibits a noticeable lack of enthusiasm for expanding the coverage of § 1985(3) to any classes other than those expressly provided by the Court…. [and s]ince the Court in *Griffin* provided blacks a remedy under § 1985(3) against private conspiracies, no other group or class has achieved similar status."  *Harrison*, 766 F.2d at 161.

(M.D.N.C. 2005). Although *Waller* suggested that anticommunists and Christians were protected classes under § 1985, it did not decide whether Caucasians are a protected class, and in any event, *Waller* predated *Buschi* and *Harrison* and relied on a construction of § 1985 that those cases expressly rejected.[15] *Phillips* also does not support recognizing whites as a class protected under § 1985. The plaintiff in *Phillips* did not contend that the defendants conspired against him *because* he was a white male. To the contrary, he argued that the defendants conspired against him because he was seeking to protect the interests of African-Americans. In *Phillips*, this Court indicated only that a white plaintiff has standing to bring a § 1985 claim alleging retaliation against him for his actions in support of African-Americans, or for associating with African-Americans. *See id.* at 873-874; *see also* Duke Br. 36 n.24. The Court did not suggest that conspiracies directed at white males are cognizable under § 1985.

Plaintiffs also argue (Pl. Duke Opp. 32-33) that, even if the Defendants' actions against them were not motivated by racial animus, that conduct is actionable under § 1985 because the Defendants intended to take advantage of racial tension in the community. The sole authority Plaintiffs invoke to support this argument is a line of

---

[15] In *Waller*, the district court "reject[ed] the notion that Section 1985(3) requires that animus be directed against a traditionally disadvantaged group," relying on earlier case law recognizing various groups, such as Republicans, as classes protected by the statute. 605 F. Supp. at 1144 (citing *Keating v. Carey*, 706 F.2d 377, 386-388 (2d Cir. 1983) (finding that Republicans are a covered class)). *Buschi* and *Harrison* both repudiated that reading of § 1985, and *Harrison* in particular declined to recognize Republicans as a class protected by § 1985, explicitly disagreeing with the Second Circuit's decision in *Keating*. *See* 766 F.2d at 161.

cases from the Seventh Circuit recognizing an "exploitation" theory of liability under a separate statute—42 U.S.C. § 1982—that guarantees equal rights to own property for all citizens regardless of race. (*See* Pl. Duke Opp. 34.) But cases decided under § 1982 cannot be mechanically translated to § 1985. Indeed, the exploitation theory adopted in the § 1982 cases Plaintiffs invoke *rejects* racial animus (or intent) as an element of a § 1982 claim, emphasizing instead the discriminatory *effect* of perpetuating past discrimination or relying on others' racial fears as an obstacle to achieving Congress's goal of equal access to housing markets. *See Clark v. Universal Builders, Inc.*, 501 F.2d 324, 331 (7th Cir. 1974). To the extent this reading of § 1982 is correct—and the correctness of that reading is disputed[16]—it is inapplicable to § 1985, where discriminatory animus is a key element. *See Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 269-270 (1993) (holding that *if* women are a covered class, § 1985(3) would "demand … at least a purpose that focuses upon women *by reason of their sex*") (second emphasis in original).[17]

---

[16] *See, e.g., Love v. DeClaro Homes, Inc.*, 482 F.2d 613, 615-616 (5th Cir. 1973); *see also City of Memphis v. Greene*, 451 U.S. 100, 120 (1981).

[17] Plaintiffs argue (Pl. Durham Opp. 42) that *CBOCS West, Inc. v. Humphries*, 128 S. Ct. 1951 (2008), and *Gomez-Perez v. Potter*, 128 S. Ct. 1931 (2008), somehow "reinforce[]" the argument that the exploitation theory of liability under § 1982 applies to § 1985 claims. The argument is without merit. Those cases held that the civil rights statutes at issue encompass a claim for retaliation, in part because they shared some common language and a common statutory purpose with other civil rights legislation previously found to cover retaliation claims. But they certainly do not stand for the proposition that, because § 1982 might not require a showing of discriminatory intent, all civil rights statutes—or all equal protection claims—should no longer require it. Indeed, the Supreme Court *reversed* the Seventh Circuit when it attempted to extend the

Plaintiffs also contend (Pl. Duke Opp. 29) that they have alleged § 1985(3) violations because "out-of-state citizens" constitutes a class protected by § 1985(3). But Duke's opening brief cited (at 36 n.23) a long line of cases holding that citizens of other States do *not* constitute a class protected under § 1985. Plaintiffs do not cite a single case recognizing out-of-state citizens as a class protected by the statute.[18]

In addition, as Duke's opening brief explained (at 37-39), Plaintiffs' § 1985 claims fail to allege that any conspiracy against them was motivated by a *shared* animus against their protected class. Plaintiffs counter (Pl. Duke Opp. 32) that their complaint is "replete with details from which to infer Defendants' invidious racial motives." But the pleadings to which Plaintiffs point do not support even an inference of racial animus motivating the Duke Defendants who allegedly participated in the conspiracies of Counts 16(i) and 16(iii). Accordingly, those claims should be dismissed against the Duke Defendants.[19]

---

"exploitation" theory to claims brought directly under the Fourteenth Amendment. *See Village of Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252 (1977).

[18] Plaintiffs seek to distinguish the cases cited by Duke on the ground that they "were not brought pursuant to the 'privileges and immunities' clause" of § 1985. That is incorrect. *See Korotki v. Goughan*, 597 F. Supp. 1365, 1372-1374 (D. Md. 1984) (§ 1985(3) claim failed, despite having "proven the existence of a conspiracy designed to interfere with his right to interstate travel," because "non-resident drivers" is not a protected class); *Griffin*, 403 U.S. at 102, 105-106 (requiring animus even in case involving allegations of interference with interstate travel); *see also Scott*, 463 U.S. at 838 (§ 1985(3) was not enacted to protect "animus against either labor or capital, *or against persons from other states* … [t]he animus was against [African Americans] and their sympathizers" (emphasis added).)

[19] Finally, Plaintiffs acknowledge that, to state a cause of action against Duke under § 1986 in Count 17, they must establish a § 1985 claim in Count 16. (*See* Pl. Duke Opp. 30-31.) Because Count 16 fails to state a claim under § 1985, Count 17 also warrants dismissal.

## III. PLAINTIFFS' COMMON LAW CLAIMS FAIL (COUNTS 21, 23, 30)

### A. Breach of Contract (Count 21)

In Count 21, Plaintiffs allege that Defendants breached a contract with Plaintiffs by failing to comply with the terms of the Duke student bulletin.[20]  This Count fails, however, because the Duke bulletin is not a valid contract.  As explained in Duke's opening brief (at 41-43), this Court has twice held that the very same Duke bulletin is not a binding contract.  *See Love v. Duke Univ.*, 776 F. Supp. 1070, 1075 (M.D.N.C. 1991), *aff'd*, 959 F.2d 231 (4th Cir. 1992) (table); *Mercer v. Duke Univ.*, No. 97-00959, slip op., at 14-15 (M.D.N.C. Sept. 28, 2000) (attached to Duke Br. as Ex. 2).  Plaintiffs do not dispute that *Love* and *Mercer* held that Duke's student bulletin is not a valid contract. They contend, however, that *Love* and *Mercer* were overruled by *Ryan v. Univ. of North Carolina Hosp.*, 128 N.C. App. 300, 494 S.E.2d 789 (1998).  (*See* Pl. Duke Opp. 38-39.) There is no merit to Plaintiffs' contention.

*Ryan*'s narrow holding does not affect, much less overrule, either *Mercer* or *Love*.[21]  *Ryan* did not address whether a student bulletin was a valid contract, but rather

---

[20] Plaintiffs have now made clear that they are not raising any contract claim based on any agreement regarding the Duke Card, and that the only "duty" to safeguard the information on the Duke Card allegedly arises out of a "non-contract" fiduciary duty under the North Carolina Financial Privacy Act.  (*See* Reply in Support of Plaintiffs' Motion to Strike at 4 (Dkt. 94); Pl. Duke Opp. 38-40; *see also* Pl. Duke Police Opp. 29.)

[21] *Mercer* was decided in 2000—two years *after* the 1998 *Ryan* decision—and therefore could not possibly have been overruled by *Ryan*.  Moreover, *Mercer* expressly acknowledged *Ryan*'s holding that "'a student can bring an action for breach of contract arising from a dispute related to an educational contract' … when the plaintiff can point to 'an identifiable contractual promise' that has not been honored."  *Mercer*, slip op. at

- 20 -

whether a particular document called the "Essentials of Accredited Residencies" was a valid contract. Moreover, *Mercer* and *Love* did not rest on reasoning that is contrary to *Ryan*. Neither case held that a student could *never* bring a breach of contract claim against a university. Instead, these cases simply held that the Duke student bulletin did not contain any identifiable contractual promises between the University and its students, and it therefore did not constitute a valid contract. *Mercer*, slip op. at 14-15; *Love*, 776 F. Supp. at 1075. Because Plaintiffs have failed to plead such a contractual promise, Count 21 should be dismissed.

###    B.    Breach of Fiduciary Duty (Count 23)

Plaintiffs do not dispute that a fiduciary relationship generally does not exist between universities (or their administrators) and the students enrolled there. (Duke Br. 44.) Plaintiffs nevertheless maintain that they have adequately alleged a fiduciary relationship for two reasons. First, Plaintiffs contend that Duke's operation of the Duke Card system makes it "quite literally, 'a bank'" and thus establishes a common law fiduciary relationship between Duke and the Plaintiffs. (Pl. Duke Police Opp. 28-29.) But Plaintiffs cite no authority for the proposition that, even if Duke were operating as a "bank," that would give rise to a fiduciary relationship between it and Plaintiffs. They simply ignore the cases cited in Duke's opening brief (at 46), which hold that the bank-customer relationship does *not* create a fiduciary relationship under North Carolina law.

---

13-14 (quoting *Ryan*, 494 S.E.2d at 790-791).

Second, Plaintiffs argue that the North Carolina Financial Privacy Act, N.C. Gen. Stat. Ann. § 53B, provides a statutory basis for a fiduciary relationship between Duke and its students.  (Pl. Duke Police Opp. 28-29.)[22]  There is no merit to this argument.  Even if Duke were a "financial institution" covered by the statute, that Act provides no basis for a fiduciary relationship between Duke and the Plaintiffs.  The Act does not expressly provide that it creates a fiduciary relationship, no case has held that the Act creates such a relationship, and Plaintiffs have failed to identify any basis for construing the Act to give rise to such a relationship.  Therefore, Plaintiffs' claim for breach of fiduciary duty should be dismissed.[23]

### C.  Negligence (Count 30)

Count 30 raises a negligence claim.  Plaintiffs contend that Defendants had a duty to protect them from harm "by virtue of the unique relationships that existed between the University and the Plaintiffs as students and as student-athletes."  (AC ¶ 1302; *see* Pl. Duke Opp. 45.)  As explained in Duke's opening brief (at 47-49), however, Plaintiffs' allegations fall outside the scope of any special relationship that might have existed

---

[22] Plaintiffs assert that a "federal Financial Privacy Act[]"also provides a "statutory basis" for a fiduciary relationship between Duke and Plaintiffs.  (Pl. Duke Police Opp. 28.) Plaintiffs cite no cases (let alone the Act itself, which Defendants assume is the federal Right to Financial Privacy Act, 12 U.S.C. § 3401, *et seq*.) to support that assertion.

[23] In their opposition brief, Plaintiffs assert *for the first time* an "independent cause of action" under the North Carolina Financial Privacy Act.  (*See* Pl. Duke Police Opp. 28-30.)  There is no such cause of action cited in Count 23 (or anywhere in the amended complaint), nor does the caption to Count 23 or the discussion of Plaintiffs' claims indicate they intended to bring an independent cause of action arising from the Act.  A plaintiff cannot add new claims in opposition to a motion to dismiss.  *See Beck v. City of Durham*, 129 F. Supp. 2d 844, 855 (M.D.N.C. 2000) (Beaty, J.).

between themselves and Duke because Plaintiffs were not injured while playing lacrosse. Plaintiffs do not contest that liability under the special relationship doctrine lies only where the risk of harm arises in the course of that relationship, and Plaintiffs concede that special relationships between universities and student-athletes generally give rise to duties only arising out of "dangers *on the field* over which the school has control." (Pl. Duke Opp. 45 n.31 (emphasis added).) That concession is fatal to Plaintiffs' claim.

In their opposition, however, Plaintiffs assert a new theory of liability: that their special relationship claim is "primarily based" on Duke's "negligent legal advice, control over its own investigation, and the hospital's control over fabrication of evidence." (*Id.*) But Plaintiffs cite no case (and the Duke Defendants have not found any) that supports their theory that these bases can give rise to a special relationship. Nor do they offer any explanation how these asserted bases exhibit the "mutual dependence" that "most often" forms the "premise[]" for special relationships. *Davidson v. Univ. of N.C.*, 142 N.C. App. 544, 555, 543 S.E.2d 920, 927 (2001).[24]

---

[24] Plaintiffs also fail to allege a negligence claim against the Duke Defendants based on the "voluntary undertaking" doctrine. Plaintiffs do not dispute the general principle that university administrators do *not* voluntarily assume a duty of care by giving students advice. (*See* Duke Br. 50 n.34.) Plaintiffs contend, however, that "Dean Wasiolek's statement to the Plaintiffs [sic] team that they would not need counsel constitutes such an undertaking" because Wasiolek was a "licensed attorney" and "Plaintiffs relied on her advice as legal advice." (Pl. Duke Opp. 46.) But the fact that Wasiolek is a "licensed attorney" does nothing to change the nature of her relationship to the students: she was their Dean, not their lawyer. *See* Restatement (Third) of Law Governing Lawyers § 48 cmt. d (2000) (lawyer acting exclusively in capacity of non-lawyer, such as trustee, escrow agent, or expert witness, is only subject to fiduciary obligations that applicable law assigns *that* capacity); *see also id.* § 49, cmt. a. Moreover, the advice that Dean

Plaintiffs also argue that general principles of tort law impose a duty of care on every person "who enters upon an active course of conduct" and therefore the Duke Defendants owed Plaintiffs a duty of care. (Pl. Duke Opp. 42-45.)[25] That argument is unavailing. As an initial matter, Plaintiffs' asserted "active course of conduct" consists almost entirely of allegations that Duke negligently *failed to act*—for example, that Duke failed to correct false and misleading statements made to the media, failed to safeguard Plaintiffs' private email accounts, and failed to monitor (and presumably stop) Durham's "policies and customs" with respect to the investigation. (Pl. Duke Opp. 43-44.) Indeed, only *one* of the many newly asserted duties of care conceivably involved an "active course of conduct": the University had a duty to exercise due care "[h]aving undertaken to recommend counsel." (*Id*. at 44.) But as explained above (p. 23 n.24) and in the Duke University Defendants' opening brief (at 50 n.34), there is no basis for imposing a duty based on any alleged "bad advice" by Duke Defendants.

Moreover, general principles of tort law do not answer the question whether a particular defendant owes a duty to a particular plaintiff. Whether a defendant owes a

---

Wasiolek allegedly gave the players was not legal in nature. There is nothing distinctly "legal" about advice whether to seek legal advice from someone else. Indeed, Wasiolek's purported recommendation could just as easily have been made by Coach Pressler, the students' parents, or any other non-lawyer.

[25] In asserting this new general negligence theory, Plaintiffs attempt to amend their amended complaint by converting all of their alleged "breache[s]" (AC ¶ 1303) into duties of care. This conflation of duty and breach, under the guise of a newly-asserted general theory of negligence, lacks any legal basis. Moreover, Plaintiffs may not, in their opposition to a motion to dismiss, introduce new theories of liability that are not present in their complaint. *See* p. 22 n. 23, *supra*.

duty of care to a plaintiff "depends on the relationship between them." *Eisenberg v. Wachovia Bank, N.A.*, 301 F.3d 220, 225 (4th Cir. 2002). As explained in Defendants' opening brief (at 47-48), the "student-university relationship, standing alone," does not give rise to a duty of care. *Davidson*, 142 N.C. App. at 556, 543 S.E.2d at 928. Plaintiffs do not dispute this well-settled rule, nor do they point to any other possible relationship between themselves and Defendants that would give rise to a duty of care under their general negligence theory. Because Plaintiffs have not stated any actionable legal duty that these Defendants owed to these Plaintiffs, Count 30 should be dismissed.[26]

## IV.    CONCLUSION

The Amended Complaint against the Duke University Defendants should be dismissed in its entirety for failure to state a claim on which relief may be granted.

/s/ Jamie S. Gorelick                                                /s/ J. Donald Cowan, Jr.

Jamie S. Gorelick                                       J. Donald Cowan, Jr.
District of Columbia Bar No. 101370            N.C. State Bar No. 0968
Wilmer Cutler Pickering Hale and Dorr LLP    Ellis & Winters LLP
1875 Pennsylvania Ave., N.W.                   100 N. Greene Street, Suite 102
Washington, D.C. 20006                          Greensboro, North Carolina 27401
Telephone: (202) 663-6500                       Telephone:  (336) 217-4193
Facsimile: (202) 663-6363                       Facsimile:  (336) 217-4198
Email: jamie.gorelick@wilmerhale.com           Email:  don.cowan@elliswinters.com

---

[26] In Count 27, Plaintiffs bring a claim for negligent infliction of emotional distress against several Durham officials, the City of Durham, and Duke University. Because the caption explicitly describes the Count as being brought against the "Durham PD" (*see* AC at p. 398), the Duke University Defendants did not address that Count in their opening brief. Nonetheless, Count 27 should be dismissed because it does not identify the basis for any actionable duty of care between Plaintiffs and Duke University, and as stated above, no such duty exists.

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on November 25, 2008, I electronically filed the foregoing Reply Brief in Support of "Duke University Defendants'" Motion to Dismiss Amended Complaint with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

> *Counsel for the Plaintiffs*
> Robert C. Ekstrand
> Email: rce@ninthstreetlaw.com
>
> *Counsel for City of Durham and Edward Sarvis*
> Reginald B. Gillespie, Jr.
> Email: rgillespie@faison-gillespie.com
>
> *Counsel for Patrick Baker, Steven Chalmers, Ronald Hodge, Lee Russ, Stephen Mihaich, Beverly Council, Jeff Lamb, Michael Ripberger, and Laird Evans*
>
> Patricia P. Kerner
> Email: tricia.kerner@troutmansanders.com
>
> D. Martin Warf
> Email: martin.warf@troutmansanders.com
>
> Hannah Gray Styron
> Email: hannah.styron@troutmansanders.com
>
> *Counsel for James T Soukup, Kammie Michael, David Addison, Richard D. Clayton*
> James B. Maxwell
> Email: jmaxwell@mfbpa.com
>
> *Counsel for Mark Gottlieb*
> Edwin M. Speas, Jr.
> Email: espeas@poynerspruill.com

Eric P. Stevens
Email: estevens@poyners.com

*Counsel for Benjamin Himan*
Henry W. Sappenfield
Email: hsappenfield@kennoncraver.com

Joel Miller Craig
Email: jcraig@kennoncraver.com

*Counsel for DNA Security, Inc., Richard Clark*
Kearns Davis
Email: kdavis@brookspierce.com

Robert James King, III
Email: rking@brookspierce.com

*Counsel for J. Wesley Covington*
Kenneth Kyre, Jr.
Email: kkyre@pckb-law.com

*Counsel for Brian Meehan*
James A. Roberts, III
Email: jimroberts@lewis-roberts.com

*Linwood Wilson, Pro Se*
Email: ADDRESS REDACTED

This 25th day of November 2008.

/s/ Jamie S. Gorelick
Jamie S. Gorelick

Attorney for Duke University, Richard H. Brodhead, Stephen Bryan, John Burness, Kemel Dawkins, Matthew Drummond, Victor J. Dzau, Aaron Graves, Allison Haltom, Peter Lange, Larry Moneta, Robert K. Steel, Tallman Trask III, and Suzanne Wasiolek