# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

### CIVIL ACTION NUMBER 1:07-CV-00953

RYAN McFADYEN, et al.,

        Plaintiffs,

    v.

DUKE UNIVERSITY, et al.,

        Defendants.

Reply Brief in Support of "Duke SANE Defendants'" Motion to Dismiss Amended Complaint

Plaintiffs contend that the Duke health care providers, who were responsible for the medical examination of Crystal Mangum on the night she alleged she was raped, should be liable for harms allegedly caused by Durham Police officers and the prosecutor in investigating those allegations. As the Defendants' opening brief made clear, these claims cannot surmount three fundamental obstacles: (1) these health care providers owed their duties of care to their patients, not to nonpatient third parties such as Plaintiffs; (2) the public authorities, not these private health care providers, were responsible for making decisions about whether to investigate the alleged crime; and (3) Plaintiffs were never arrested, indicted, or charged with any crime, and the mere investigation of a crime does not cause legal injury. Plaintiffs fail to refute these points, and so their claims should be dismissed.[1]

---

[1] The Duke University Defendants and Duke Police Defendants join in the arguments in

# I.	PLAINTIFFS FAIL TO STATE A NEGLIGENCE CLAIM (COUNTS 31-33)

In Counts 31-33, Plaintiffs assert negligence-based claims arising out of the sexual assault examination of Crystal Mangum at Duke Hospital.  The SANE Defendants' opening brief showed (at 20-34) that these claims fail as a matter of law for two reasons: first, these Defendants had no actionable duty of care to these Plaintiffs under North Carolina law; and second, on Plaintiffs' own allegations the misconduct of certain Durham Police officers and Nifong was an intervening cause of any injuries Plaintiffs purportedly suffered and therefore precludes them from establishing the essential element of proximate causation.  Plaintiffs concede the causation point by failing to respond to it in their opposition, and Counts 31-33 should be dismissed on that basis.[2]  These claims should also be dismissed because Plaintiffs have failed to identify any basis under North Carolina law for the expansive duties they ask this Court to recognize.

## A.	Defendants Did Not Owe These Plaintiffs A Duty Of Care (Count 31)

The SANE Defendants' opening brief showed (at 22-24) that North Carolina law disallows any claim for medical negligence by persons other than patients.  This established rule precludes any claim by Plaintiffs that they were injured by the way Duke

---

this brief, to the extent they involve claims also asserted against those Defendants.

[2] Elsewhere in their briefs (Pl. Duke Police Opp. 34), Plaintiffs argue that, because Duke employees are alleged to have conspired with Durham officers and Nifong, the intentional, willful misconduct of the latter cannot be an intervening cause, and each conspirator may be liable for the consequences of the others' misconduct.  But conspiracy is not a recognized basis for liability for negligence claims, as explained in the Duke Police Defendants' Reply Brief at 5 n.4.

Hospital personnel examined Mangum and came to conclusions based on their examination.  (*See, e.g.*, Pl. SANE Opp. 5.)[3]

Plaintiffs seek to avoid dismissal by arguing that they have not alleged any negligence arising out of the provision of "health care services."  (*Id.* at 45.)  That argument is unavailing.  In their opposition, Plaintiffs make clear that the health care providers' alleged breach of duty related to Mangum's examination and the provision of "forensic medical evidence collection and analysis services" related to that examination. (*Id.* at 2.)  The examination of Mangum and the "collection and analysis" of forensic medical evidence from that examination involved "the furnishing [of] … professional services … by health care provider[s]."  N.C. Gen. Stat. § 90-21.11 (1999) (defining medical malpractice claims).  That is so because "analysis" of the forensic evidence necessarily involved professional health care services to assess Mangum's complaints of pain, the possible cause of her pain (*e.g.*, blunt force trauma), and her other symptoms (*e.g.*, vaginal edema), and determining whether the complaints, injuries, and symptoms were consistent with Mangum's claims of sexual assault.  (AC ¶¶ 306, 308, 781, 784, 790-792; Pl. SANE Opp. 5.)  A medical professional's analysis of an injury, whether it is a sexual assault nurse examining a possible rape victim or a doctor assessing a possible

---

[3] Plaintiffs also allege in Count 31 that the Duke SANE Defendants owed them (and breached) a duty of care "with respect to public statements and statements to law enforcement."  (AC ¶ 1311.)  The opening brief explained (at 26-27) that a violation of a duty of care in reporting information to a third party sounds in defamation, but any defamation claim here is time-barred.  Plaintiffs make no response to any of those points in their opposition briefs.

gunshot wound, requires the kind of "highly specialized knowledge not within the common knowledge of a layperson" that is the hallmark of medical malpractice claims and that distinguishes those malpractice claims from ordinary negligence claims. *See Estate of Waters v. Jarman*, 144 N.C. App. 98, 100, 547 S.E.2d 142, 144 (2001) (citation and internal quotation marks omitted).[4]

Plaintiffs contend, nonetheless, that their claims are not barred because a sexual assault examination is conducted for evidence collection purposes rather than for medical treatment or diagnosis.[5] The cases Plaintiffs cite (Pl. SANE Opp. 46) provide no support for that contention. In fact, *Glass v. Runnels*, No. 01-4957, 2003 WL 21262372 (N.D.

---

[4] Indeed, Plaintiffs assert that the applicable standard of care in Count 31 is that for medical malpractice claims—not general negligence claims. They quote directly from North Carolina's medical malpractice statute (N.C. Gen. Stat. § 90-21.12 (1999)), which provides that liability for medical malpractice may arise when a health care professional's conduct deviates from "the standard of practice among members of the same health care profession with similar training and experience situated in the same or similar communities." (*See* AC ¶ 1317 (alleging that defendants deviated from "the professional standard of care established for the provision of SANE services and the conduct and record keeping of forensic sexual assault examinations in the same or similar communities").) By contrast, the standard of care in ordinary negligence claims is the "reasonably prudent person" standard. *Estate of Waters*, 144 N.C. App. at 102, 547 S.E.2d at 145.

[5] Plaintiffs relatedly assert that Levicy was performing a law enforcement investigation function, not a medical function, when she examined Mangum. (Pl. SANE Opp. 45.) Even if that conclusory assertion were true, it would only provide yet another reason why Plaintiffs' negligence claims would be barred: the "public duty doctrine," which bars negligence claims for carrying out law enforcement duties. *See Stone v. N.C. Dep't of Labor,* 347 N.C. 473, 482, 495 S.E.2d 711, 716-717 (1998); *see also Walker v. Durham*, 158 N.C. App. 747, 582 S.E.2d 80, 2003 WL 21499222, at *2 (July 1, 2003) (allegations that police technician negligently destroyed evidence he was tasked with collecting and storing "must fail in light of the public duty doctrine," which precludes liability for "deviations from proper performance" of a police investigation); Duke Police Br. 8-10; Duke Police Reply Br. 2-4.

Cal. May 28, 2003), points to the opposite conclusion.  In *Glass*, the court rejected a

habeas corpus petitioner's claim that his trial counsel's failure to object to expert

testimony from a sexual assault nurse constituted ineffective assistance of counsel.  The

court explained that the victim's sexual assault examination was a "medical examination

intended to determine what happened," and that the sexual assault nurse's testimony

about the victim's injuries was "like the analysis of any other wound or injury."  *Id.* at *7.

North Carolina courts agree.  *See State v. Isenberg*, 148 N.C. App. 29, 39, 557 S.E.2d

568, 575 (2001) (upholding admission of statement by minor sexual assault victim to

nurse and doctor under "medical diagnosis" exception to hearsay rule because sexual

assault examination has dual purpose of medical intervention and evidence collection).[6]

Moreover, none of the cases cited by Plaintiffs addressed the question presented

here—whether medical professionals who examine possible crime victims to assess their

injuries can be liable in *tort* to any person who subsequently comes under police

---

[6] The other cases cited by Plaintiffs also fail to support their arguments.  In *State v. Hargett*, No. 01-835, 2002 WL 1542958 (N.C. App. July 16, 2002), the court concluded that a minor sexual assault victim's statement to a SANE nurse could not be admitted under the medical diagnosis exception to the hearsay rule, where the victim was in no need of medical attention when she made her statements.  For that conclusion, the court stressed that the victim "did not complain to [the nurse] of any pain or discomfort before the exam," *id.* at *4, which makes that case dramatically different from this one, where Mangum reported intense pain before and during the SANE examination (AC ¶¶ 294-296; 302-304).  In *United States v. Gardinier*, 65 M.J. 60 (C.A.A.F. 2007), the court similarly ruled that a statement to a sexual assault nurse should have been excluded, but emphasized that the sexual assault examination took place several days after the initial medical examination and was conducted at the behest of law enforcement officers after they had interviewed the victim, not in response to the victim's request for medical treatment.  No such facts are alleged in this case.

suspicion for the crime. As to that question, it is clear that North Carolina has never recognized such an expansive duty. Indeed, North Carolina has a "flat ban" on medical negligence claims by nonpatients. *Iodice v. United States*, 289 F.3d 270, 279 (4th Cir. 2002); *see also* Duke SANE Br. 22-25.

Even if Plaintiffs' claims sounded in ordinary negligence, that could not assist them here. North Carolina law does not allow third-party, nonpatients to assert claims against hospitals and health care providers related to medical services provided at a hospital. *See Blanton v. Moses H. Cone Mem'l Hosp., Inc.*, 319 N.C. 372, 376, 354 S.E.2d 455, 458 (1987) (holding that ordinary negligence claims may be brought *by a patient* against a hospital for claims arising out of policy, administrative, or management deficiencies based on the duty of care that a "hospital owes … *to its patients*" (emphasis added)); *Iodice*, 289 F.3d at 279 (relying on North Carolina's "total absence of ordinary negligence cases permitting recovery against a health care provider" by a nonpatient to dismiss such a claim).[7] Yet the liability that Plaintiffs would impose on health care providers in this case would be even broader than that rejected in *Iodice*, where it was alleged that the patient caused harm to the plaintiff as a direct result of his negligent

---

[7] Plaintiffs allege that these health care providers violated various policies, procedures, and standards related to sexual assault examinations. (Pl. SANE Opp. 42; AC ¶¶ 1316-1317.) These allegations, however, add nothing of substance to Plaintiffs' claims; they still fail because they rest on duties that health care providers owe to their patients, and only to their patients. *See Blanton*, 319 N.C. at 376, 354 S.E.2d at 458; *Estate of Waters*, 144 N.C. App. at 102-103, 547 S.E.2d at 145-146 (describing allowable negligence claims as those brought by the patient (or the patient's estate) and based on duties owed to the patient).

treatment by the health care provider (specifically, negligent prescription of narcotics). Even that link between the alleged negligence and the plaintiff's claimed injury is missing here.

Finally, Plaintiffs invoke the general principle of tort law that every person owes every other person a duty to exercise ordinary care in their conduct to protect others from harm. (Pl. SANE Opp. 42-45.) This general principle does not answer the fundamental tort law question: Does a particular defendant owe a duty to a particular plaintiff? Whether a defendant owes a duty of care to the plaintiff "depends on the relationship between them." *Eisenberg v. Wachovia Bank*, *N.A.*, 301 F.3d 220, 225 (4th Cir. 2002). The relationship between the health care providers who examined Mangum and the players investigated by the police is far less direct than the relationship found *insufficient* to give rise to a legal duty in *Eisenberg* (*i.e.*, the relationship between the bank and a noncustomer who was defrauded by a bank customer through the use of the bank's services). Because Plaintiffs have not stated any actionable legal duty that these Defendants owed to these Plaintiffs, Count 31 should be dismissed.[8]

**B.**    **Plaintiffs Cannot State A Negligent Supervision Claim (Count 32)**

Count 32 seeks to hold Duke University, DUHS, PDC, and Dr. Manly liable for allegedly negligently supervising Arico and Levicy (and Arico for negligently

---

[8] In addition to the named Duke health care providers and their employers, Plaintiffs also bring Count 31 against Victor Dzau, the Chief Executive of the Duke University Health System. But Plaintiffs make no allegations against Dzau in Count 31, nor do they provide any argument in their opposition supporting any basis for liability against him, and so Dzau should be dismissed from Count 31.

supervising Levicy). The opening brief explained (at 27-28) that, even if a Duke, DUHS, or PDC employee had committed a tortious act, Count 32 should be dismissed as to Arico and Manly because, under North Carolina law, only the employer, not individual defendants, can be liable for negligent supervision.

Plaintiffs contend that, under North Carolina law, individual supervisors may be liable for negligent supervision. But *Mozingo v. Pitt County Mem'l Hosp., Inc.*, 331 N.C. 182, 188, 415 S.E.2d 341, 344 (1992), on which Plaintiffs rely (Pl. SANE Opp. 48 n.32), does not support that position. *Mozingo* held that an attending physician at a teaching hospital who "undert[ook] to care for a patient" by supervising the treating resident could be directly liable to that patient for medical malpractice. 331 N.C. at 189, 415 S.E.2d at 345. *Mozingo* does not suggest that negligent supervision claims can be brought against a nurse's supervisor who is not the employer. Indeed, North Carolina courts have rejected negligent supervision claims brought against an individual who was not the employer.[9]

---

[9] *See Foster v. Crandell*, 181 N.C. App. 152, 171, 638 S.E.2d 526, 539 (2007); *see also Ostwalt v. Charlotte-Mecklenburg Bd. of Educ.*, Nos. 07-534, 08-266, 2008 WL 4567389, at *4 (W.D.N.C. Oct. 8, 2008); *Cox v. Indian Head Indus., Inc.*, 123 F. Supp. 2d 892, 914 (W.D.N.C. 2000); Duke Police Reply Br. 6-8.

The other cases cited by Plaintiffs indicate that an *employer*—not an individual supervisor who is not the employer—may be liable for the negligence of an employee. *See Medlin v. Bass*, 327 N.C. 587, 590-591, 398 S.E.2d 460, 461-462 (1990) (explaining that North Carolina has recognized negligent supervision claims where the negligent act of an incompetent servant (employee) caused injury and the master (employer) had knowledge of the employee's incompetence); *Foster*, 181 N.C. App. at 171, 638 S.E.2d at 539 ("the *Medlin* theory of liability" is "a basis for imposing liability *upon an employer* for negligently hiring or retaining an employee" (emphasis added)); *see also*

### C. Plaintiffs Cannot State A Claim For Negligent Infliction of Emotional Distress (Count 33)

The opening brief (Duke SANE Br. 28-31) explained that Plaintiffs failed to state a claim for negligent infliction of emotional distress in Count 33 because (a) Plaintiffs have failed to allege essential elements of the tort, including a cognizable legal duty and severe emotional distress; (b) North Carolina has limited claims for emotional distress to those plaintiffs (unlike those here) who witnessed or were in close proximity to the negligent act; and (c) Plaintiffs' allegations based on allegedly intentional misconduct cannot support a claim for negligent infliction of emotional distress. As explained above (pp. 2-7), Plaintiffs have not identified a legally cognizable duty owed to them by these Defendants, and Plaintiffs have conceded the latter two points by failing to respond to either in their opposition. Count 33 therefore should be dismissed.

## II. PLAINTIFFS FAIL TO STATE A CLAIM UNDER 42 U.S.C. § 1983 (COUNTS 1-3, 6-7)

### A. Plaintiffs Fail To State A Fourth Amendment Violation (Counts 1-2)

In Counts 1 and 2, Plaintiffs claim that they were searched and seized in violation of the Fourth Amendment because (they contend) the Non-Testimonial Identification Order (NTID) for DNA samples (Count 1) and the search warrant for Ryan McFadyen's dorm room (Count 2) were not supported by probable cause.[10] Defendants' opening brief

---

*Smith v. Jackson County Bd. of Educ.*, 168 N.C. App. 452, 455, 608 S.E.2d 399, 403 (2005) (noting negligent supervision claim against sheriff, the employer, for negligent supervision of his employee).

[10] Because the affidavits supporting the NTID and McFadyen Search Warrant are "nearly

explained that Plaintiffs cannot establish a Fourth Amendment violation because the applications for the NTID and the search warrant established probable cause, even disregarding any allegedly false information provided by Duke health care providers. (Duke SANE Br. 9-16.)[11]  Plaintiffs now contend, however, that the affidavits in support of these applications failed to establish probable cause because the Durham Police intentionally or recklessly omitted exculpatory information or included false statements. (Pl. SANE Br. 12.)  This argument fails to make out a Fourth Amendment violation.

First, the overwhelming majority of Plaintiffs' contentions involve alleged facts that were *not* included in the NTID and Search Warrant affidavits.  (*See* Pl. Durham Opp. 9-15.)  But "[a]n affiant cannot be expected to include in an affidavit every piece of information gathered in the course of an investigation….  The mere fact that the affiant did not list every conceivable conclusion does not taint the validity of the affidavit." *United States v. Colkley*, 899 F.2d 297, 300-301 (4th Cir. 1990) (internal quotation marks

---

identical" (Pl. SANE Opp. 12 n.8), these Counts are addressed together.

[11] The only basis for possibly holding these Defendants liable under 42 U.S.C. § 1983 for alleged Fourth Amendment violations is Plaintiffs' conclusory allegation that Duke and its employees conspired with Durham authorities.  Defendants' opening brief explains that Plaintiffs have failed to allege a conspiracy between Defendants and any Durham official.  (Duke Br. 9-12; Duke SANE Br. 7-8.)  Plaintiffs argue that, weeks and months *after* the NTID and Search Warrant were executed, Levicy allegedly fabricated medical records to retroactively support the information that Gottlieb, Himan, and Nifong used in obtaining the NTID and the search warrant.  (*See* Pl. SANE Opp. 19 (citing AC ¶¶ 785-799).)  But Plaintiffs fail to explain how conduct *after* issuance of the NTID and the search warrant could establish a conspiracy to secure their issuance, and Plaintiffs allege no facts in their complaint to suggest that Levicy conspired with the Durham police *before* the latter secured the NTID and the search warrant.

and citations omitted).[12]  Indeed, the Fourth Circuit has cautioned against requiring law enforcement officers to "include in a warrant affidavit every hunch and detail of an investigation," because that would "open[] officers to endless conjecture about investigative leads, fragments of information, or other matter that might, if included, have redounded to defendant's benefit," and thus "distract police officers from more important duties and … turn every arrest or search into a warrant contest."  *Id.* at 301, 303.

Nevertheless, Plaintiffs point to reports about Mangum's divergent stories and erratic behavior on the night of the incident, and argue that, had the Durham Police properly taken cognizance of those reports, they could not in good faith have averred that there was probable cause to support Mangum's allegations.  (Pl. Durham Br. 9-15.)  But the Fourth Amendment does not require a police officer to disregard a putative rape victim's account merely because she gives inconsistent versions of the event, behaves bizarrely, or is unable to identify or remember details about the rape or her attackers.  The courts have recognized that "it would be reasonable for an officer … to not place great emphasis on [a rape] victim's … inability to recall the details of the crime clearly," especially in states like North Carolina where evidence of "rape trauma syndrome" is admissible to "assist the jury in understanding a victim's behavior before, during, and after a rape."  *Beauchamp v. City of Noblesville, Ind.*, 320 F.3d 733, 745 (7th Cir. 2003);

---

[12] *See Torchinsky v. Siwinski*, 942 F.2d 257, 264 (4th Cir. 1991); *United States v. Galloway*, 274 F. App'x 241, 249 (4th Cir. 2008) (per curiam); *cf. United States v. Williams*, 504 U.S. 36, 38 (1992) (holding that prosecutors are not obligated to disclose "substantial exculpatory evidence" to a grand jury).

*see State v. Stallings*, 107 N.C. App. 241, 250, 419 S.E.2d 586, 592 (1992).

Moreover, the Durham Police obtained evidence that appeared to strengthen the credibility of Mangum's accusations. During a search of 610 N. Buchanan, Durham officers found physical evidence that corroborated Mangum's story. (*See* Duke SANE Br. Ex. 2.) The police also received an email sent by McFadyen that discussed the events of the night of the alleged rape and appeared to threaten to kill other strippers in a horrific manner. (*See* AC ¶¶ 594-595; Duke SANE Br., Ex. 3.)

Given the totality of these circumstances, the mere fact that the police did not include exculpatory information in their affidavits does not suggest that they intentionally or recklessly made misleading statements to the magistrate, which is what is required for Plaintiffs to establish a Fourth Amendment violation in this case. *See Franks v. Delaware*, 438 U.S. 154 (1978); *see also Simmons v. Poe*, 47 F.3d 1370, 1383-1384 (4th Cir. 1995) (noting that the Fourth Circuit has construed *Franks* "very strictly" and that a claim of a *Franks* violation cannot be stated by "merely conclusory" allegations that "are not supported by specific evidence of any intent to mislead the magistrate"). At most, it indicates that, despite potentially conflicting information, the Durham Police believed that Mangum's accusation could have been true at that early stage, and they chose to investigate it further by seeking an NTID and search warrant. That is all the Fourth Amendment requires. *See Simmons*, 47 F.3d at 1384-1385.[13]

_____

[13] Plaintiffs also point to information that the Durham Police did not know (and are not alleged to have known) at the time they submitted the NTID and search warrant

Plaintiffs next argue (Pl. Durham Opp. 16) that, because Mangum failed to recognize them in a photographic lineup, the police could not have had grounds to obtain an NTID naming them. Mangum's inability to identify the alleged assailants was hardly fatal, however; it is not unusual for victims of violent crime to have difficulty identifying the perpetrators, and the lack of a positive identification does not undermine the force of other evidence establishing probable cause. *See Colkley*, 899 F.2d at 298-299, 302 (holding that a warrant was not "tainted by the affiant's failure to … recount that the eyewitness failed to identify [defendant] in the photospread"). Moreover, the NTID application made clear (and Plaintiffs do not dispute) that the three residents of 610 N. Buchanan told the police that *only* "their fellow Duke Lacrosse Team Members … attended the party" at which the alleged rape occurred. (Duke SANE Br., Ex. 2 at 9; *id*., Ex. 3 at 7.) The Durham Police therefore knew the limited and complete universe of suspects and included only those individuals in the NTID application. This satisfied the "minimal amount of objective justification" required for issuance of an NTID. *State v.*

---

applications. All of that material is irrelevant; the Durham Police could not have acted intentionally or recklessly by failing to include, in their affidavits, information of which they were not aware at the time. *See United States v. Castro*, 273 F. App'x 287, 289 (4th Cir. 2008) (per curiam) (officer did not intend to deceive the magistrate judge or display a reckless disregard for the truth when material information was not known to him at the time his affidavit was filed). For example, Plaintiffs argue that Kroger security guard Angel Alton's opinion that Mangum had not been raped undermined her accusations (Pl. Durham Br. 10), but Alton did not speak with the Durham Police until nine months after the NTID and search warrant were sought (AC ¶ 239). Plaintiffs also repeatedly refer to photographs from the players' party that supposedly conflicted with Mangum's story (Pl. Durham Br. 11-12 (citing AC ¶¶ 202, 206-207, 397)), but the Durham Police did not possess these photographs at the time they filed the NTID and warrant applications (AC ¶¶ 396-397).

*Pearson*, 356 N.C. 22, 29, 566 S.E.2d 50, 54 (2002).

Finally, Plaintiffs argue that the affidavit in support of the McFadyen Search Warrant did not establish the reliability of the source who forwarded to the police the e-mail sent by Ryan McFadyen on the night of the alleged rape, which contained a gruesome threat to kill strippers. (*See* Pl. Durham Opp. 17.) Notably, however, Plaintiffs do not contest that the e-mail was written by McFadyen. Indeed, their amended complaint repeatedly refers to it as "Ryan's email." (AC ¶¶ 594-596, 598-599, 603, 612, 694.) Moreover, the e-mail contains numerous indicia of reliability, including McFadyen's e-mail address, lacrosse jersey number, the name and number of his dorm room, knowledge about the players' stripper party, and his teammates' nicknames. (*See* SANE Br., Ex. 3 at 8.) Given the substantial detail in the e-mail itself that pointed to McFadyen, there was no need for the police also to provide details about the identity of the source. *See United States v. Elston*, 479 F.3d 314, 318 (4th Cir. 2007).[14]

### B.      Plaintiffs Fail To State A Substantive Due Process Claim (Counts 6-7)

In Count 6, Plaintiffs allege that Defendants violated their rights under the

---

[14] That is particularly true given that the e-mail alerted the police to what appeared to be "an imminent threat to public safety" from McFadyen and perhaps others. *Elston*, 479 F.3d at 319. Plaintiffs also maintain that the affidavit failed to establish a nexus between the crimes alleged to have been committed and the places to be searched and things to be seized. (Pl. Durham Opp. 19-20.) They argue that any evidence of a "conspiracy to commit murder" (but not any of the other crimes named in the affidavit) would have been stale by the time the warrant was executed. (*Id.*) But there was surely a "fair probability" that other evidence, such as clothing worn the night of the alleged rape and photographs from the players' party (Duke SANE Br. Ex. 3 at 4-5), would be found in McFadyen's dorm room or car. *See United States v. Lalor*, 996 F.2d 1578, 1580 (4th Cir. 1993).

substantive due process component of the Fourteenth Amendment by "fabricating forensic evidence of a crime they knew never occurred." (Pl. SANE Opp. 15.)[15] But Plaintiffs offer no response to Defendants' argument (Duke SANE Br. 18-19) that the "manufacture of false evidence, in and of itself, … does not impair anyone's liberty, and therefore does not impair anyone's constitutional right." *Zahrey v. Coffey*, 221 F.3d 342, 348 (2d Cir. 2000) (internal quotation marks omitted). They likewise offer no response to the settled Fourth Circuit law, cited in Defendants' opening brief (at 18-19), which holds that to state a claim for a constitutional violation related to the fabrication of false inculpatory evidence, a plaintiff must allege that the defendant "fabricated evidence and that the fabrication *resulted in* a deprivation of [the plaintiff's] liberty." *Washington v. Wilmore*, 407 F.3d 274, 282 (4th Cir. 2005) (emphasis added). And they offer no response to Defendants' argument that the mere fact that evidence was purportedly fabricated during a police investigation—untethered to any deprivation of liberty such as

---

[15] Plaintiffs' do not respond to Defendants' argument that, although Duke Defendants are named in the caption of Count 7, no allegations are made against any of these Defendants in the Count itself. (*See* Duke Br. 15 n.8; AC ¶¶ 980-983.) Plaintiffs attempt to elide that point by asserting that the "Seventh Cause of action … is substantially the same as the sixth." (Pl. SANE Opp. 15 n.12.). In fact, the two counts rest on entirely different fact patterns (in Count 6, the fabrication of medical record evidence, but in Count 7, the concealment of exculpatory DNA evidence). Moreover, Count 7 fails even to allege any "personal connection" between the named Duke Defendants and the supposed "denial of [Plaintiffs'] constitutional rights." *Vinnedge v. Gibbs*, 550 F.2d 926, 928 (4th Cir. 1977). In any event, Plaintiffs also fail to respond to Defendants' argument that, because they were never tried or convicted, they were not constitutionally entitled to any exculpatory evidence that any non-Duke defendants allegedly withheld from them. *See United States v. Ruiz*, 536 U.S. 622, 628-629 (2002). Accordingly, Count 7 fails to state a claim as well and should be dismissed.

arrest, indictment, trial, or conviction—does not allege a deprivation of any cognizable liberty interest that gives rise to a substantive due process violation.  *See* Duke SANE Br. 20 n.14; *see also Becker v. Kroll*, 494 F.3d 904, 922 (10th Cir. 2007); *Biasella v. City of Naples, Fl.*, No. 04-320, 2005 WL 1925705, at *4 (M.D. Fla. Aug. 11, 2005).[16]  For these reasons, Counts 6 and 7 should be dismissed.

### C.    Plaintiffs Fail To State A § 1983 Claim For Abuse Of Process (Count 3)

Count 3 should be dismissed because Plaintiffs cannot cite a single case in which a court has recognized a cause of action under § 1983 for "abuse of process."  Indeed, as the First Circuit has recognized, "the Supreme Court has in effect held that abuse of process… is not cognizable as a civil rights violation under § 1983." *Santiago v. Fenton*, 891 F.2d 373, 388 (1st Cir. 1989).[17]  That is because "[t]he basis of the action for abuse of process is the motivation of the officer," *id.*, but under the Fourth Amendment, a police officer's motive in carrying out a search or seizure is irrelevant; if the search or

---

[16] The only judicial or administrative proceedings involving these Plaintiffs that could have implicated a cognizable liberty interest were related to the NTID and McFadyen Search Warrant.  To the extent that Plaintiffs allege deprivations of liberty associated with those proceedings, their claims are governed by the Fourth Amendment. *See Albright v. Oliver,* 510 U.S. 266, 271 (1994); *Riley v. Dorton,* 115 F.3d 1159, 1162 (4th Cir. 1997).  But any Fourth Amendment claims in Count 6 and 7 would be duplicative of Counts 1 and 2, and also should be dismissed for the same reasons Count 1 and 2 should be dismissed.  *See supra* pp. 9-14; Duke SANE Br. 9-16.

[17] Plaintiffs rely on only one case, *Rogers v. Pendleton*, 249 F.3d 279 (4th Cir. 2001), in their discussions of this purported constitutional right against "abuse of process."  (*See* Pl. SANE Opp. 13; Pl. Durham Opp. 22; Pl. Himan Opp. 13; Pl. Gottlieb Opp. 9.)  That case, however, did not involve a constitutional claim for "abuse of process"; it instead involved routine Fourth Amendment claims for false arrest, unreasonable assault, false imprisonment, and malicious prosecution.  *See Rogers*, 249 F.3d at 284-285.

seizure is supported by probable cause, then it is constitutional. *See Whren v. United States*, 517 U.S. 806, 813 (1996).

Even if such a cause of action existed, Count 3 should be dismissed. First, as explained below (pp. 20-22), Plaintiffs cannot establish the elements of the cause of action of abuse of process under North Carolina law; to the extent that the purported § 1983 claim for abuse of process mirrors those elements, it likewise must fail. Second, Plaintiffs' claims of constitutional violations all fail for the numerous reasons set forth in the motions to dismiss, and Plaintiffs cannot escape that result by restyling their constitutional claims as "abuse of process." Thus, although Plaintiffs variously describe Count 3 as alleging First, Fourth, and Fourteenth Amendment violations (*see* Pl. Durham Opp. 22; Pl. Gottlieb Opp. 9), their First Amendment claims fail for the reasons stated in the opening brief for the Duke University Defendants (at 22-24), and in the Reply Brief for Duke University Defendants at 4-6; their Fourth Amendment claims fail for the reasons stated *supra* at pp. 9-14 and in the Duke SANE Defendants' opening brief (at 9-16); and their Fourteenth Amendment claims fail for the reasons stated *supra* at pp. 14-16 and in the Duke SANE Defendants' opening brief (at 18-20).

## III. PLAINTIFFS' INTENTIONAL TORT CLAIMS FAIL (COUNTS 18-20)

### A. Plaintiffs Fail To State A Claim For Obstruction of Justice (Count 18)

Plaintiffs identify two bases for their obstruction of justice claim: first, that various defendants obstructed the criminal investigation (in which Plaintiffs were never charged); and, second, that the Duke Defendants obstructed Plaintiffs' ability to bring the

current lawsuit.  (Pl. Duke Opp. 35; Pl. SANE Opp. 31.)  Both fail to state an obstruction of justice claim under North Carolina law, and Count 18 should therefore be dismissed.

First, Plaintiffs have failed to establish that there is a civil tort of obstruction of justice for alleged misconduct in a criminal case.  (*See* Duke SANE Br. 41-45.)  Plaintiffs cite three cases to support their proposition that the tort of obstruction of justice extends to criminal suspects, but none supports that position.  In *Jones v. City of Durham*, 183 N.C. App. 57, 59, 643 S.E.2d 631, 633 (2007), the plaintiff, a pedestrian who was injured when a police car collided with her, brought an obstruction of justice claim against the city and police officer because the police's misplacing or destroying of a videotape recording of the accident hindered her ability to pursue her civil claim for negligence. Similarly, in *Jackson v. Blue Dolphin Communications*, 226 F. Supp. 2d 785, 794 (W.D.N.C. 2002), the plaintiff alleged that her employer attempted to force her to sign a false affidavit that "would have been used in a civil suit later filed" by one of her co-workers.  Lastly, in *Henry v. Deen*, 310 N.C. 75, 87, 310 S.E.2d 326, 334 (1984), the plaintiff alleged obstruction of justice based on the defendant's efforts to impede a civil medical malpractice suit by creating misleading entries in a medical chart.

As Defendants pointed out in their opening brief (at 43), moreover, allowing criminal suspects to sue witnesses for obstruction of justice based on evidence or statements they gave to the police would seriously chill the willingness of potential witnesses to cooperate with the police and thus undermine the criminal justice system. Although Plaintiffs dismiss this concern (Pl. SANE Opp. 34), they overlook that in *Henry*

*v. Deen*, the North Carolina Supreme Court noted that it had previously "expressed concern that witnesses might be intimidated from testifying if they feared they would be subjected to subsequent lawsuits for false testimony." 310 N.C. at 88, 310 S.E.2d at 335. The *Henry* Court suggested that this consideration (namely, that "witnesses will be intimidated and will hesitate to testify because of fears of subsequent actions against them") may be less vexing in cases where a plaintiff aims to redress misconduct occurring in a *civil* context, *see* 310 N.C. at 90, 310 S.E.2d at 336, but it in no way retreated from its opinion that allowing *criminal* suspects to sue witnesses could have the effect of harassment and intimidation.[18]

Second, Plaintiffs allege that the Duke Defendants impeded their ability to bring the current civil action when Larry Moneta, in January 2007, allegedly "sent an email to a list of senior University administrators requesting that the recipients meet … [to] 'get[] their stories straight'" and "directed the recipients of his email to destroy the email

---

[18] Plaintiffs argue that allowing criminal suspects to sue witnesses cannot be a legitimate concern because, Plaintiffs allege, there is just such a civil cause of action under 42 U.S.C. § 1985(2). Plaintiffs are incorrect. In fact, the portion of § 1985(2) directed to federal court proceedings (which is the portion invoked by Plaintiffs here) has the opposite purpose and effect. The first clause of § 1985(2), which provides a civil remedy against those who conspire to intimidate a witness, by force or threat, from testifying or from testifying truthfully, is designed to *protect* witnesses from such intimidation. *Haddle v. Garrison*, 525 U.S. 121, 125 (1998) (the "gist of the wrong at which § 1985(2) is directed is … intimidation or retaliation against witnesses in federal-court proceedings"). Moreover, § 1985(2)'s prohibition on improper influence on jurors does not extend to conspiracies to commit perjury because such actions, unlike the use of intimidation, force or threats, do not constitute a *direct* influence on jurors. *See Brawer v. Horowitz*, 535 F.2d 830, 840 (3d Cir. 1976); *Dooley v. Reiss*, 736 F.2d 1392, 1396 (9th Cir. 1984). As such, contrary to Plaintiffs' argument, § 1985(2) has precisely the same goal as that enunciated in *Henry*—to prevent the intimidation of witnesses (or jurors).

immediately." (AC ¶ 1198.) Even if true, that conduct does not establish a claim of obstruction of justice. To make out such a claim, a plaintiff must establish that the defendant's acts actually "judicially prevented, obstructed, impeded, or hindered" his case or the disposition thereof. *Broughton v. McClatchy Newspapers, Inc.*, 161 N.C. App. 20, 33, 588 S.E.2d 20, 30 (2003). Here, Plaintiffs do not allege any such facts. Plaintiffs do not allege that Moneta and the e-mail recipients ever met or discussed Plaintiffs' civil lawsuit, much less fabricated or destroyed any evidence. Nor does the amended complaint suggest that the recipients of the e-mail took any action to hinder Plaintiffs' ability to initiate the current lawsuit, or that Plaintiffs' civil action was in fact adversely impacted. Under these circumstances, where there is no allegation that the Duke Defendants actually impeded justice, there can be no claim for obstruction. *See id*. at 30, 588 S.E.2d at 33.[19]

### B. Plaintiffs Fail To State A Claim For Abuse of Process (Count 19)

Plaintiffs concede that a claim for abuse of process can be maintained only where process has been improperly used *after* it has issued, and not merely for maliciously causing process to issue. (*See* Pl. Duke Opp. 36 n.25 (acknowledging that "ulterior motive, malice or bad intent in getting process issued does not alone give rise to an action for abuse of process").) Instead, Plaintiffs argue that their claim is adequately pled based on the following allegations: first, "the NTID was abused after issuance when Gottlieb,

---

[19] Although this aspect of Plaintiffs' obstruction of justice claim appears to focus on Duke administrators rather than Duke health care providers, for reasons of economy it is addressed here with other aspects of the obstruction claim.

Nifong, and others leaked the procedure to the media" (Pl. SANE Opp. 35);[20] and second, the Defendants purportedly engaged in and oversaw the fabrication of medical evidence that was used to obtain the NTID (Pl. Duke Opp. 36).  Even were these allegations true, they would not satisfy the elements of abuse of process under North Carolina law.

First, as a matter of law, an allegation of leaking a judicial document such as the NTID cannot state a claim for abuse of process.  Under North Carolina law, an NTID is a public record.  *See* N.C. Gen. Stat. Ann. § 132-1.4(k)(2008) (nontestimonial identification orders "are public records and may be withheld only when sealed by court order").  To the extent Plaintiffs argue that it is the subsequent media "leak" that is the abuse of process, their claim must therefore fail.  A claim of abuse of process requires an *improper* use of process after it issues, but the disclosure of the NTID was perfectly proper.  *See Gannett Pac. Corp. v. North Carolina State Bureau of Investigation*, 164 N.C. App. 154, 161, 595 S.E.2d 162, 166 (2004) (concluding that news organizations were "clearly entitled to information classified as 'public records'" under provision of Public Records Act related to records of criminal investigations, including nontestimonial identification orders).  Although Plaintiffs allege that the NTID was obtained with the ulterior motive of ensuring that "the sensationalized allegations would be widely reported

---

[20] Although Plaintiffs do not argue that any Duke Defendant leaked the NTID to the media, they allege that the SANE Defendants are liable for the Durham authorities' conduct because they all participated in a conspiracy.  (Pl. SANE Opp. 35.)  Defendants have elsewhere pointed out that Plaintiffs' conspiracy claims are insubstantial and will not repeat those arguments here, except to note that, in the absence of a well-pleaded allegation of conspiracy, this claim must also fail against the SANE Defendants.

by the media and to subject Plaintiffs to public condemnation" (AC ¶ 414(C)), that is insufficient, for mere bad intentions do not establish abuse of process. *See Petrou v. Hale*, 43 N.C. App. 655, 659, 260 S.E.2d 130, 134 (1979).

Second, Plaintiffs claim that the University is liable for abuse of process because it oversaw the SANE Defendants' alleged fabrication of medical evidence (Pl. Duke Opp. 36), which was then used to obtain the NTID (AC ¶¶ 1207-09). But a claim for abuse of process requires improper use of the process *after* it has issued, and not merely malicious acts that caused it to issue. *See Ellis v. Wellons*, 224 N.C. 269, 271, 29 S.E.2d 884, 885 (1944). And, as stated above, Plaintiffs have not alleged any improper post-issuance use of the NTID. Accordingly, the claim for abuse of process fails.

### C. Plaintiffs Fail To State A Claim For Intentional Infliction of Emotional Distress (Count 20)

In their amended complaint, Plaintiffs alleged two factual bases for their intentional infliction of emotional distress claim: (1) Levicy, Arico, Steel, Brodhead, and Burness supposedly made "false, insulting, offensive and inflammatory statements" about Plaintiffs (AC ¶ 1214); and (2) Duke health care providers purportedly conspired with Durham officials to "manufacture inculpatory forensic evidence … for the purpose of lending scientific credibility to Mangum's accusations" (AC ¶ 1215).[21] Defendants'

---

[21] Plaintiffs bring Count 20 against Duke University, Duke University Health System, PDC, individual Duke health care providers (Levicy, Arico, and Manly), the Chief Executive of the Duke Health System (Dzau), the Chairman of the Duke Board of Trustees (Steel), and senior Duke administrators (Brodhead and Burness). The Duke SANE Defendants' opening brief noted (at 35 n.25) that Duke University and PDC

opening brief demonstrated (at 35-39) that these two allegations fail to state a claim for intentional infliction because they do not allege the "extreme and outrageous" conduct required for such claims. With respect to the alleged insulting and offensive statements, North Carolina law is clear that even severe "insults" and "indignities" do not constitute extreme and outrageous conduct. *See Guthrie v. Conroy*, 152 N.C. App. 15, 22, 567 S.E.2d 403, 409 (2002); *see also* Duke SANE Br. 38-39.[22] And the allegations of manufactured evidence fail in light of North Carolina cases rejecting intentional infliction claims based on false crime reports. (*See* Duke SANE Br. 37-38 (discussing cases).)[23]

---

should be dismissed from Count 20 because the amended complaint makes no factual allegations against either; Plaintiffs concede this argument by failing to respond to it in their opposition. Similarly, Plaintiffs do not respond to (and thereby concede) the point (Duke SANE Br. 38 n.28) that Count 20 should be dismissed as to Manly, Dzau, and DUHS because the amended complaint contains no factual allegations against them other than the inadequate conclusory assertion that those Defendants conspired with Durham officials to "manufacture inculpatory forensic evidence." (AC ¶ 1215.) *See Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1965 (2007). Finally, Count 20 does not allege that Dzau made *any* statements, and there are no factual allegations anywhere in the amended complaint that Dzau made any public statements.

[22] Moreover, the administrators' statements of which Plaintiffs complain could scarcely be considered insulting or offensive. According to Plaintiffs, Brodhead stated that it was "important to learn the full truth as soon as possible" and that Duke was relying on local law enforcement to conduct the criminal investigation (AC ¶¶ 462-465), Brodhead and Burness encouraged the lacrosse players "to provide any information they had to the police" (AC ¶ 535), and Brodhead said he found a 911 tape that referenced a racial slur "disgusting" (AC ¶¶ 581-583). This falls short of commentary that is "utterly intolerable in a civilized community." *Guthrie*, 152 N.C. App. at 22, 567 S.E.2d at 408-409.

[23] *See Dobson v. Harris*, 134 N.C. App. 573, 578-579, 521 S.E.2d 710, 715 (1999) (false accusation of child abuse), *rev'd in part on other grounds*, 352 N.C. 77, 530 S.E.2d 829 (2000); *Ausley v. Bishop*, 133 N.C. App. 210, 221, 515 S.E.2d 72, 79-80 (1999) (false accusation of embezzlement); *Shillington v. K-Mart Corp.*, 102 N.C. App. 187, 198, 402 S.E.2d 155, 161 (1991) (false accusation of trespass and looting); *Troxler v. Charter Mandala Ctr., Inc.*, 89 N.C. App. 268, 274, 365 S.E.2d 665, 669 (1988) (false accusation

Plaintiffs' opposition fails to refute either showing. On the first point, Plaintiffs assert—without citing anything in their own amended complaint—that various Duke officials "actively spoke out in public to prop up allegations they knew to be false, while refusing to acknowledge evidence to the contrary." (Pl. Duke Opp. 37.) But even if the amended complaint contained allegations that Defendants' public statements "propped up" false reports of a crime, such statements would still fail to constitute intentional infliction of emotional distress; as just noted, North Carolina courts have repeatedly rejected intentional infliction claims based on false crime reports, and the same would be true, *a fortiori*, of statements that supposedly "prop up" such reports.

On the second point, Plaintiffs acknowledge that North Carolina case law has "held that fabricated statements within an investigation are by definition not extreme or outrageous." (Pl. SANE Opp. 38 (citing *Dobson v. Harris*, 134 N.C. App. 573, 578-579, 521 S.E.2d 710, 715 (1999), *rev'd in part on other grounds*, 352 N.C. 77, 530 S.E.2d 829 (2000)).)[24] Yet making "fabricated statements within an investigation" is exactly what Levicy and the other health care providers are accused of doing. (*See* AC ¶¶ 780-781, 784-799, 1215.) Plaintiffs' reliance (Pl. SANE Opp. 36-37) on *West v. King's Dep't*

---

of sex with a minor); *Lay v. Mangum*, 87 N.C. App. 251, 255-256, 360 S.E.2d 481, 484 (1987) (false accusation of criminal failure to pay child support).

[24] Plaintiffs contend that *Dobson* is distinguishable because the false accusation in that case "merely initiated an investigation." (Pl. SANE Opp. 38.) But Levicy's alleged statements did even less than that; the Durham Police had already initiated an investigation of Mangum's rape allegations before they talked to Levicy. (*See* AC ¶¶ 262-271, 333-349.) Moreover, Plaintiffs provide no authority in support of their suggestion that, while a false criminal report to the police is not "extreme and outrageous," false statements to police in support of *someone else's* report can be.

*Store, Inc.*, 321 N.C. 698, 365 S.E.2d 621 (1988) does not aid their claim because the circumstances that the North Carolina Supreme Court found important in that case are absent here. Although *West* also involved false allegations of a crime, the Court found it significant that the defendant was advised that the plaintiff "was receiving out-patient treatment at a local hospital and could not withstand a confrontation," and therefore knew that the plaintiff was unusually emotionally fragile, but nevertheless publicly confronted her and accused her of stealing. *Id.* at 700-701, 705-706, 365 S.E.2d at 622-623, 625-626. No such allegations are made here. Because Plaintiffs fail to allege that the SANE Defendants engaged in similar extreme and outrageous behavior directed at the Plaintiffs, this claim should be dismissed.

## IV. CONCLUSION

For the foregoing reasons, as well as those set forth in the opening brief, all claims in the amended complaint against the Duke SANE Defendants should be dismissed.

/s/ Jamie S. Gorelick
_____

Jamie S. Gorelick
District of Columbia Bar No. 101370
Wilmer Cutler Pickering Hale and Dorr LLP
1875 Pennsylvania Ave., N.W.
Washington, D.C. 20006
Telephone: (202) 663-6500
Facsimile: (202) 663-6363
Email: jamie.gorelick@wilmerhale.com

/s/ Dan J. McLamb
_____

Dan J. McLamb
N.C. State Bar No. 6272
Yates, McLamb & Weyher, LLP
421 Fayetteville Street, Suite 1200
Raleigh, N.C. 27601
Telephone: (919) 835-0900
Facsimile: (919) 835-0910
Email: dmclamb@ymwlaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on November 25, 2008, I electronically filed the foregoing Brief in Support of "Duke SANE Defendants'" Motion to Dismiss Amended Complaint with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

*Counsel for the Plaintiffs*
Robert C. Ekstrand
Email: rce@ninthstreetlaw.com

*Counsel for City of Durham and Edward Sarvis*
Reginald B. Gillespie, Jr.
Email: rgillespie@faison-gillespie.com

*Counsel for Patrick Baker, Steven Chalmers, Ronald Hodge, Lee Russ, Stephen Mihaich, Beverly Council, Jeff Lamb, Michael Ripberger, and Laird Evans*

Patricia P. Kerner
Email: tricia.kerner@troutmansanders.com

D. Martin Warf
Email: martin.warf@troutmansanders.com

Hannah Gray Styron
Email: hannah.styron@troutmansanders.com

*Counsel for James T Soukup, Kammie Michael, David Addison, Richard D. Clayton*
James B. Maxwell
Email: jmaxwell@mfbpa.com

*Counsel for Mark Gottlieb*
Edwin M. Speas, Jr.
Email: espeas@poynerspruill.com
Eric P. Stevens
Email: estevens@poyners.com

*Counsel for Benjamin Himan*
>Henry W. Sappenfield
>Email:  hsappenfield@kennoncraver.com
>
>Joel Miller Craig
>Email:  jcraig@kennoncraver.com

*Counsel for DNA Security, Inc., Richard Clark*
>Kearns Davis
>Email:  kdavis@brookspierce.com
>
>Robert James King, III
>Email:  rking@brookspierce.com

*Counsel for J. Wesley Covington*
>Kenneth Kyre, Jr.
>Email:  kkyre@pckb-law.com

*Counsel for Brian Meehan*
>James A. Roberts, III
>Email:  jimroberts@lewis-roberts.com

*Linwood Wilson, Pro Se*
>Email: ADDRESS REDACTED

This 25th day of November 2008.

>/s/ Jamie S. Gorelick
>Jamie S. Gorelick
>
>Attorney for Duke University Health System, Inc., the Private Diagnostic Clinic, PLLC, Theresa Arico, Tara Levicy, and Dr. Julie Manly