IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
Case No. 1:07-CV-953


RYAN McFADYEN *et al.*,

    Plaintiffs,

       v.

DUKE UNIVERSITY *et al.*,

    Defendants.
_____

**REPLY BRIEF IN SUPPORT OF MOTION TO DISMISS
OF DEFENDANTS DNA SECURITY, INC. AND RICHARD CLARK**

Robert J. King III
Kearns Davis
BROOKS, PIERCE, MCLENDON,
   HUMPHREY & LEONARD, L.L.P.
Post Office Box 26000
Greensboro, North Carolina  27420
Telephone:  (336) 373-8850

*Counsel for Defendants DNA Security, Inc.
and Richard Clark*

Robert A. Sar
Nicholas J. Sanservino, Jr.
OGLETREE, DEAKINS, NASH,
   SMOAK & STEWART, P.C.
2301 Sugar Bush Road, Suite 600
Raleigh, North Carolina  27612
Telephone: (919) 787-9700

*Counsel for Defendant DNA Security, Inc.*

Dockets.Justia.com

Defendants DNA Security, Inc. ("DSI") and Richard Clark (collectively, "the DSI Defendants"), through counsel and pursuant to Federal Rule of Civil Procedure 12(b)(6) and Local Rule 7.2, respectfully submit this Reply Brief in support of their Motion to Dismiss.

## I. PLAINTIFFS DO NOT DISPUTE THE LIMITED NATURE OF THE MISCONDUCT ALLEGED AGAINST THE DSI DEFENDANTS

As the DSI Defendants' Opening Brief explains, culling through the 1384 paragraphs of the Amended Complaint reveals that the allegations of wrongdoing against the DSI Defendants are exceedingly narrow. The Amended Complaint, in fact, contains only three allegations of misconduct against these Defendants:

- Plaintiffs complain that they did not receive the results of the DNA testing "as soon as the reports [were] available": Plaintiffs concede that they received the results of the DNA testing (Am. Compl. ¶ 757; *see also* Opp. at 3 (discussing "the report [the DSI Defendants] produced to the Plaintiffs")), but complain that the information was not provided "as soon as the reports [were] available." N.C. Gen. Stat. § 15A-282. Plaintiffs admit, however, that DSI was retained by District Attorney Nifong, that DSI promptly reported all of its findings to the District Attorney, and that the District Attorney decided to withhold information from the lacrosse players. (Am. Compl. ¶¶ 689-90; 749-52, 755-64.)

- Plaintiffs allege that the May 12 Report did not contain information about third-party DNA: Plaintiffs make no effort to explain why they were supposedly entitled to information regarding DNA from unidentified males found on the rape

1

kit samples.  In fact, Plaintiffs disclaim any *Brady* rights (Opp. at 12, 16-21), they were not entitled to discovery under state criminal procedure statutes because they were never arrested (*see* Br. at 16 n.9 (citing N.C. Gen. Stat. § 15A-903)), and § 15A-282 at most entitles a person to receive his or her own "test results."

- Plaintiffs claim that the May 12 Report's conclusions regarding DNA found under a fingernail were "misleading":  Plaintiffs make only a passing reference in their Opposition to this allegation (Opp. at 29) and do not attempt to explain why they were entitled to challenge the accuracy of information relating to a third party's DNA.  As to this claim too, Plaintiffs disclaim any right to *Brady* information, they had no right to conduct discovery, and § 15A-282 is inapplicable.

It should be noted that Plaintiffs' Opposition also suggests that the DSI Defendants concealed the DNA testing that showed that no matches existed between Plaintiffs (and the other lacrosse players) and the evidence samples.  (Opp. at 3, 7, 12.) No such allegation appears anywhere in the 427-page Amended Complaint,[1] however, and Plaintiffs cannot create such an allegation by including it in an opposition to a dispositive motion.  It is "'axiomatic that [a] complaint may not be amended by the briefs in opposition to a motion to dismiss.'"  *Bratcher v. Pharm. Prod. Dev., Inc.*, 545 F. Supp. 2d 533, 542-43 (E.D.N.C. 2008) (citation omitted).

---

[1] The citations to the Amended Complaint on this point simply do not support Plaintiffs' claim.  *E.g.*, Am. Compl. ¶¶ 748-49 (DSI Defendants reported to Nifong that DNA testing confirmed no match between rape kit samples and lacrosse players).

## II.  PLAINTIFFS DO NOT DISPUTE THE ABSENCE OF PROXIMATE CAUSE

In their opening Brief (at pp. 26–29), the DSI Defendants discuss in detail the lack of any causal connection between the limited allegations of wrongdoing lodged against these Defendants and any harm claimed by Plaintiffs.  *Plaintiffs offer no response to those arguments*, thereby effectively conceding the point. *See, e.g.*, *Broussard v. Meineke Discount Muffler Shops, Inc.*, 945 F. Supp. 901, 908 n.4 (W.D.N.C.) (plaintiffs' failure to respond to defendants' summary judgment argument amounted to abandonment of theories of liability), *rev'd on other grounds*, 155 F.3d 331 (4th Cir. 1998); *Mikels v. Unique Tool & Mfg. Co., Inc.*, No. 5:06CV32, 2007 WL 4284727, at *25 n.8 (W.D.N.C. Dec. 3, 2007) (finding failure to reply relevant:  "[A]lthough Plaintiff filed a reply brief in response to Defendant's other arguments against Plaintiff's motion for summary judgment, he did not respond at all to Defendant's argument that the statute of limitations did not apply to its eighth affirmative defense."); *Webb v. Maryland Dept. of Health and Mental Hygiene*, No. RDB 04-387, 2006 WL 2700748, at *10 (D. Md. Sept. 14, 2006). A brief review of Plaintiffs' allegations of harm confirms the lack of causation (and explains why Plaintiffs chose to ignore this issue):

- Plaintiffs were never arrested or charged with any crime; they therefore cannot make the typical claims asserted by criminal defendants in similar circumstances.

- While Plaintiffs complain at length about damage to their reputations, such a complaint does not give rise to damages under § 1983, nor have Plaintiffs asserted a claim for defamation.  In addition, Plaintiffs do not allege that the DSI

Defendants ever made any statements about Plaintiffs, other than the May 12 Report (which helped to exonerate Plaintiffs).

- The DSI Defendants played no role in obtaining DNA samples from Plaintiffs, which occurred *before* DSI was hired. (Am. Compl. ¶¶ 415-18, 441-44, 617-620, 655-56, 688-90, 907-14.)

- There is no allegation that the DSI Defendants played any role in the search of Plaintiff McFadyen's room. (Am. Compl. ¶¶ 594-601, 610-16, 920-27.)

- Finally, Plaintiffs acknowledge that the DSI Defendants fully disclosed their findings to the District Attorney, that the District Attorney had the authority to decide whether to proceed with the investigation, and that the District Attorney decided to proceed with the investigation *despite the lack of DNA evidence.* (Am. Compl. ¶¶ 747-52, 754-56, 765.)

Thus, there is simply no allegation that the limited purported misconduct of the DSI Defendants in any way harmed these Plaintiffs. Plaintiffs do not even attempt to argue to the contrary. Since causation is an element of all of Plaintiffs' claims (Br. at 26-27), the DSI Defendants' Motion to Dismiss should be granted.

## III. ALL OF PLAINTIFFS' CLAIMS FAIL BECAUSE THE DSI DEFENDANTS HAVE ABSOLUTE IMMUNITY

As the DSI Defendants' Opening Brief explains, all of the claims against the DSI Defendants are barred by immunity. The DSI Defendants are entitled to absolute witness immunity because the claims against them arise entirely from Brian Meehan's conduct as

an expert witness for the State in the Criminal Action and his preparation of the May 12 Report. (Br. at 8-9.) Plaintiffs respond to DSI's argument not by challenging the settled doctrine of absolute witness immunity but by disputing Meehan's role in the Criminal Action: They insist that he acted not as an expert witness but as an investigator or "forensic examiner[].' (Opp. at 6-7 (characterizing DSI's work as "in support of a police investigation").) Plaintiffs' own allegations, however, show that DSI and Meehan were in fact retained to conduct forensic testing (and to prepare a report of the test results) with an eye toward providing expert testimony in the eventual Criminal Action. (*E.g.*, Am. Compl. ¶¶ 73-75, 688-91, 746-49, 765.) (The *Evans* plaintiffs similarly admit as much.[2]) That anticipated role in the Criminal Action cloaks the DSI Defendants with absolute immunity and requires the dismissal of each of Plaintiffs' claims.

Plaintiffs next argue that no immunity -- either qualified or absolute -- is available to the DSI Defendants in any event, because a "forensic examiner performing investigatory functions" loses all claim to immunity when he "fabricat[es] evidence." (Opp. at 8.) But the cases Plaintiffs cite in support center on whether the expert witness had *manufactured positive test results* when the results should have been negative. *See Gregory v. City of Louisville*, 444 F.3d 725, 737, 744-45 (6th Cir. 2006) (claim that expert erroneously reported criminal defendant's hairs as a "match," when they were

---

[2]  The *Evans* plaintiffs acknowledge Meehan's role as an "expert" (*Evans* Am. Compl. ¶ 278 (describing Meehan as one of "the experts whom the State intended to call" in the Criminal Action)) and characterize the May 12 Report as an "expert report" (*id*. ¶¶ 342, 489, 500). Plaintiffs' claims against the DSI Defendants in this case arise from precisely the same activities that underlie the *Evans* plaintiffs' claims.

not), *cert. denied by Tarter v. Gregory*, 127 S. Ct. 962 (2007); *Keko v. Hingle*, 318 F.3d 639, 644 (5th Cir. 2003) (claim related to use of unreliable research techniques)[3]; *Pierce v. Gilchrist*, 359 F.3d 1279, 1282, 1291, 1300 (10th Cir. 2004) (defendant falsified report to describe "match" where none existed). While Plaintiffs toss out conclusory charges of "fabrication" to try to fit this case within *Gregory*, *Pierce*, and *Keko*, they actually allege that the DSI Defendants did not disclose supposedly exculpatory evidence (relating to third-party DNA), not that they fabricated false inculpatory evidence. (*See* Am. Compl. ¶¶ 747-49, 756-57, 765-66, 980-81; *see also* Opp. at 8.) Plaintiffs' "fabrication" authority, then, simply does not apply. *Cf. Yarris v. County of Delaware*, 465 F.3d 129, 136-37 (3d Cir. 2006) (denying claims of absolute immunity for *destroying* exculpatory information, but allowing absolute immunity for claims that prosecutors "*intentionally concealed*" exculpatory evidence).

But even if absolute witness immunity is unavailable, the DSI Defendants are nonetheless immune because they made full disclosure of their work and opinions to the prosecutor, and it was the prosecutor who allegedly misrepresented and withheld the information from Plaintiffs. (Am. Compl. ¶¶ 746-52, 755-66.) It is well settled that both prosecutors and police have absolute immunity in the determination of whether evidence is exculpatory and must be disclosed, as well as in the act of disclosure (or non-disclosure) of that evidence to the defense. *Imbler v. Pachtman*, 424 U.S. 409, 431 n.34

---

[3] As set forth in more detail in the district court opinion, *Keko* involved allegations that the expert found a definite match between the defendant and certain bite marks when a match did not exist. *See* 1999 WL 508406, at **1-2 (E.D. La. July 8, 1999).

(1976) (absolute immunity for "deliberate withholding of exculpatory information"); *Carter v. Burch*, 34 F.3d 257, 262 (4th Cir. 1994) (same); *Jean v. Collins*, 155 F.3d 701, 706 (4th Cir. 1998) (*en banc*), *vacated & remanded on other grounds*, 526 U.S. 1142 (1999) (extending *Imbler* to claims against non-prosecutors).[4] Even assuming that these Plaintiffs -- who were, at most, unindicted, unaccused witnesses -- were entitled to disclosure of information they now characterize as "exculpatory," the prosecutor was the person charged with making that disclosure, and he was clothed with absolute immunity for his decision whether and when to do so. The DSI Defendants thus have absolute immunity from any claims alleging concealment of exculpatory evidence.[5]

## IV. PLAINTIFFS HAVE NOT ALLEGED VIABLE § 1983 CLAIMS

### A. Plaintiffs Have No Constitutionally Protected "Property Right" in Earlier Production of the May 12 Report

Plaintiffs' § 1983 claim against the DSI Defendants is based on a single assertion: that Plaintiffs had a constitutionally-protected *property right* to receive the May 12 Report, directly from DSI, "as soon as the report[] [was] available." That is, Plaintiffs contend not simply that they have a property interest in the testing information under

---

[4] *Imbler* held that prosecutors have absolute immunity for even the deliberate withholding of exculpatory information. In *Jean*, the Fourth Circuit, sitting *en banc*, extended the holding of *Imbler* to non-prosecutors. 155 F.3d at 706. The Supreme Court vacated *Jean* to have the Fourth Circuit reconsider its qualified immunity discussion in light of intervening authority. But the Fourth Circuit was not required to reconsider its absolute immunity ruling, and in fact continues to follow that ruling. *Brown v. Daniel*, 230 F.3d 1351 (4th Cir. 2000) (per curiam).

[5] As with other dispositive points, Plaintiffs ignore the argument that the DSI Defendants are covered by prosecutorial immunity, thereby apparently conceding the issue.

N.C. Gen. Stat. § 15A-282, but a property interest in the *prompt delivery* of the DNA test report. Such an argument is absurd, for multiple reasons.[6]

First, Plaintiffs analogize their state-law procedural "right" to a *faster* production of DNA test reports (or test data) under § 15A-282 to a variety of "statutory entitlements" such as public employment, social security benefits, public school education, a state driver's license, and public assistance. (Opp. at 13-14.) The May 12 Report, however, simply does not fit the mold of other property rights recognized by the courts. The right to receive the Report (quickly or otherwise) "does not 'have some ascertainable monetary value,' as even [the Supreme Court's] '*Roth*-type property-as-entitlement' cases have implicitly required." *Town of Castle Rock, Colo. v. Gonzalez*, 545 U.S. 748, 766 (2005) (citation omitted). Put another way, unlike state-created rights to maintain a driver's license or to obtain public assistance, the right to receive the May 12 Report (and, in particular, the right to receive it *more quickly*) has no intrinsic value and does not "resemble any traditional conception of property." *Id.* Indeed, it is remarkable that Plaintiffs suggest, without explanation, that the statutory "right" to receive a prompt copy of test results is tantamount to a "government-dispensed commodit[y]." (Opp. at 14.) The DSI Defendants are unaware of any decision recognizing anything remotely similar to Plaintiffs' "prompt receipt" claim as a *constitutionally protected* property right, and Plaintiffs have cited none.

---

[6] Plaintiffs also complain (*e.g.*, Opp. at 31) that they were entitled to the production of the raw data underlying the May 12 Report. Section 15A-282, however, only requires the production of "reports of test results," not underlying data.

To the contrary, Plaintiffs' argument flies in the face of the weighty authority that a mere entitlement to "procedure" (in this case, timely compliance with a statute requiring the delivery of a report) under state law cannot create a constitutionally protected property interest. *See* Br. at 20-21 & n.11 (citing cases); *see also Town of Castle Rock*, 545 U.S. at 764 ("entitlement to procedure" under state law governing enforcement of restraining orders does not provide "the basis for a property interest"); *Jackson v. Long*, 102 F.3d 722, 729 (4th Cir. 1996) ("procedural rights in themselves do not create substantive property rights protected by the Fourteenth Amendment") (citing cases); *Garraghty v. Commonwealth of Virginia, Dept. of Corrections,* 52 F.3d 1274, 1284 (4th Cir. 1995) (rejecting plaintiff's claim that he had "a property right to receive the precise post-termination process . . . as provided in state law");[7] *cf. Naegele Outdoor Advertising Co. of Louisville v. Moulton*, 773 F.2d 692, 703 (6th Cir. 1985) ("every deviation from state procedures cannot be viewed as a federal constitutional violation") (citation omitted).[8]

---

[7] Numerous decisions of other jurisdictions are to similar effect. *See, e.g.*, *Swartz v. Scruton*, 964 F.2d 607, 610 (7th Cir. 1992) (because "[p]rocedural interests under state law are not themselves property rights that will be enforced in the name of the Constitution," plaintiff lacked constitutionally-protected property right in "the 'method' by which his merit pay increase [was] determined") (citing cases); *Dorr v. Butte County*, 795 F.2d 875, 877 (9th Cir. 1986) (because "a substantive property right cannot exist exclusively by virtue of a procedural right," probationary employee lacked protected property interest in procedures provided under state law, including procedural "right . . . to appeal disciplinary action").

[8] The "mandatory" language of § 15A-282 does not alter the analysis. *Town of Castle Rock* rejected an indistinguishable argument that a statute that directed that law enforcement "shall" enforce a restraining order and "shall" arrest a person who violates

Plaintiffs make no argument that the United States Constitution itself required that they be furnished a copy of the May 12 Report or the data on which it was based on some shorter timetable, much less that the Constitution required *the DSI Defendants* to make the Report or underlying data available sooner.  Indeed, Plaintiffs explicitly *disavow* any reliance on the constitutional right to the production of exculpatory evidence established in *Brady v. Maryland* (Opp. at 16-17, 20) -- as they must, for the reasons articulated in the DSI Defendants' Opening Brief (at 14-16) -- and that disavowal is fatal to their due process claim.

Plaintiffs insist that they "are not asserting the failure to produce *Brady* material or even necessarily *exculpatory* material" but instead that "every subject of NTID procedures has an immediate right to reports of the results of every test conducted -- whether the results are exculpatory or inculpatory -- 'as soon as the results are available.'"  (Opp. at 17.)  Plaintiffs candidly admit, then, that they are asking this Court to recognize as a property right protected by the United States Constitution their "entitlement" under a state statute to receive a report (one they admittedly *did* receive at some point) "*immediate[ly]*."  Recognition of such a "right" would be incongruous in the extreme.  *Brady* entitles a criminal defendant to assert a due process claim for deprivation

such an order created a property interest in enforcement protected by the Due Process Clause.  The court observed that, "even in the presence of seemingly mandatory language," law enforcement discretion remains.  545 U.S. at 761.  And given that discretion, no "property interest" could have arisen from the statute, because a person cannot "be safely deemed 'entitled' to something when the identity of the alleged entitlement is vague."  *Id*. at 763 (citing cases).  Of course, the "identity" of the entitlement Plaintiffs urge here is every bit as vague:  They claim an entitlement to receive a copy of the DNA test report "as soon as [it is] available."

of exculpatory evidence by the prosecutor only where the evidence affected the outcome of a criminal trial, *see, e.g.*, *United States v. Bagley*, 473 U.S. 667, 674-75 (1985); *Taylor v. Waters*, 81 F.3d 429, 436 n.5 (4th Cir. 1996), but Plaintiffs would have this Court recognize a *constitutional right* of a non-defendant witness who was never charged, tried, or convicted to receive evidence the witness concedes may not even have been "exculpatory" directly from a retained expert witness, and more promptly than even *Brady* requires. No such "right" could possibly be squared with the acknowledged limitations on the *Brady* right itself, and Plaintiffs make no cogent argument for the recognition of a *constitutional right* to "disclosure" that exceeds the right acknowledged in *Brady* and its progeny. *See Jean v. Collins*, 221 F.3d 656, 663 (4th Cir. 2000) (Wilkinson, J.) ("the *Brady* violation establishes the requisite threshold of constitutional injury (a conviction resulting in loss of liberty) below which no § 1983 action can lie").

Finally, even if it were assumed that Plaintiffs could have a property interest in the prompt receipt of a report, Plaintiffs' argument founders when viewed in light of the due process analysis applied in the plethora of entitlement-as-property cases: A constitutional deprivation occurs when state-created property rights are taken without constitutionally adequate pre-deprivation procedures. *See, e.g.*, *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542, 546 (1985); *Board of Regents v. Roth*, 408 U.S. 564, 569-70 (1972) ("When protected interests are implicated, the right to some kind of prior hearing is paramount."). It is difficult at best to imagine the sort of "pre-deprivation procedure" that would protect an individual's interest in "prompt" receipt of reports of the sort at issue

here.  Followed to its logical conclusion, Plaintiffs' assertion of a property right arising under § 15A-282 would require the State to provide "notice and an opportunity to be heard" whenever it desired to deprive an individual of the "right" to prompt receipt of a test report.  The absurdities inherent in Plaintiffs' argument are evident.

### B.  Plaintiffs Can Make No Viable Claim for Deprivation of Privileges and Immunities

Plaintiffs insist that they have properly asserted a claim against the DSI Defendants for violation of the Privileges and Immunities Clauses of Article IV and the Fourteenth Amendment.  (Opp. at 21-22.)  They describe their claim as arising from the "right to travel," and in particular their rights to "be treated as . . . welcome visitor[s] rather than . . . unfriendly alien[s] when temporarily present in [North Carolina]" and to "be treated like other citizens of" North Carolina if they elect to become permanent state residents.  (Opp. to City Supervising Defendants' and Hodge's Motions to Dismiss, Doc. 78, at 11.)  Plaintiffs suggest that the various defendants subjected them to "disparate treatment" that reflects the "disabilities of alienage" long considered incompatible with "our constitutional order."  (*Id*. at 12.)  Plaintiffs' lofty rhetoric, however, does nothing to address the deficiencies in their claim that the DSI Defendants have already pointed out: Plaintiff Wilson cannot make an Article IV Privileges and Immunities claim because he is, in fact, a citizen of North Carolina,[9] and Plaintiffs McFadyen and Archer cannot show

---

[9] Plaintiffs continue to insist that Wilson "was perceived" as a "'temporary' resident" because he was enrolled at Duke (Opp. to City Supervising Defendants' and Hodge's Motions to Dismiss, Doc. 78, at 15), but they fail to cite any authority, despite the DSI Defendants' invitation to do so (Br. at 24), for the novel proposition that a state citizen

the requisite "discriminatory treatment" on the basis of out-of-state residence when they allege repeatedly that they were subjected to precisely the same treatment as Wilson, a North Carolina resident.[10]  *See Toomer v. Witsell*, 334 U.S. 385, 395 (1948); *Barefoot*, 306 F.3d at 125 (no Article IV claim where complaint made "no argument regarding any discrimination between citizens of different states").  Nor have they demonstrated the deprivation of any "fundamental" right of the sort protected by Article IV's Privileges and Immunities Clause.  *Supreme Court of Virginia v. Friedman*, 487 U.S. 59, 64 (1988) ("the activity in question must be sufficiently basic to the livelihood of the Nation as to fall within the purview of the Privileges and Immunities Clause") (internal quotations omitted); *Parnell v. Supreme Court of Appeals of West Virginia*, 110 F.3d 1077, 1080 (4th Cir. 1997).[11]  Put simply, Plaintiffs have not suffered the deprivation of *any* constitutional right at all, whether based on their state citizenship or otherwise.

---

enjoys a constitutional right not to be discriminated against based on his *perceived* status as a resident of another state.

[10] Nor can Plaintiffs state a claim under the Fourteenth Amendment Privileges and Immunities Clause.  That Clause protects the "'rights of national citizenship as distinct from the fundamental or natural rights inherent in state citizenship.'"  *Barefoot v. City of Wilmington*, 306 F.3d 113, 126 (4th Cir. 2002) (citation omitted), *abrogation on other grounds recognized by Davani v. Virginia Dept. of Transp.*, 434 F.3d 712, 718-19 (4th Cir. 2006).  Plaintiffs make no claim that the DSI Defendants violated any of their rights as "national citizens" (including their alleged rights to travel to North Carolina and become temporary residents of the State while enrolled at Duke University) or treated them unlike other citizens of North Carolina, and they have pleaded no other violation of their constitutional rights by the DSI Defendants that would support a claim under the Fourteenth Amendment's Privileges and Immunities Clause.

[11]  Plaintiffs defend their Privileges and Immunities claim against the DSI Defendants by incorporating the arguments made in their opposition to the City Supervising Defendants'

### C. The Amended Complaint Asserts No Claim Against the DSI Defendants for Failure to Train

Undaunted by the lack of any *allegation* against the DSI Defendants in their Fourteenth Cause of Action, Plaintiffs insist that they have properly pleaded a § 1983 claim against these Defendants for "failure to train." (Opp. at 22.) The heading of that claim does indeed list DSI among the defendants against whom the claim is directed, but the allegations made in support of the claim include not a single mention of DSI, much less a description of any action (or failure to act) by DSI that could amount to a "failure to train" actionable under § 1983. Instead, the allegations are devoted entirely to supposed "obvious" deficiencies in the City of Durham's training of Defendants Nifong, Gottlieb, Himan, Clayton, Ripberger, and Lamb. (Am. Compl. ¶¶ 1141-1142, 1144.) Plaintiffs nevertheless maintain that DSI's training of its employees was "deficient in that the [May 12] [R]eport . . . fell far below industry standards, and in fact, testing results had never been reported in such a way by [DSI] before." (Opp. at 22.) But Plaintiffs offer no citation to the Amended Complaint itself, let alone any explanation of how DSI's May 12 Report reflected a "failure to train." Absent even a single supporting factual allegation, any failure-to-train claim against DSI should be dismissed.

---

and Defendant Hodge's motions to dismiss. That Opposition focuses almost entirely on the impact upon Plaintiffs of the alleged "Zero-Tolerance for Duke Students Policy." (Opp. to City Supervising Defendants' and Hodge's Motions to Dismiss, Doc. 78, at 15-19.) Plaintiffs do not allege, however, that the DSI Defendants had any involvement at all in the design, adoption, implementation, or enforcement of the "Zero-Tolerance" policy. Neither the Amended Complaint nor Plaintiffs' voluminous opposition papers describe *any* act by the DSI Defendants supposedly predicated on Plaintiffs' real or perceived state citizenship.

# V. PLAINTIFFS STATE NO ACTIONABLE CLAIMS FOR VIOLATION OF § 1985 AND § 1986

Plaintiffs' claims under 42 U.S.C. §§ 1985 and 1986 fail for the multitude of reasons outlined in the DSI Defendants' Opening Brief (at 31-36). Plaintiffs' Opposition either ignores those arguments altogether or "responds" by citation of inapplicable or invalid caselaw.

- Plaintiffs belittle the suggestion that "only members of a 'minority' or 'traditionally disadvantaged' group may avail themselves of the protections of § 1985" and claim, remarkably, that "no cases in this [C]ircuit [have] held that members of other races have no standing to bring a § 1985(3) claim." (Opp. at 25.) In fact, the Fourth Circuit has made clear that the protections of § 1985 "can extend no further than to those classes of persons who are, so far as the enforcement of their rights is concerned, 'in unprotected circumstances similar to those of the victims of Klan violence.'" *Buschi v. Kirven*, 775 F.2d 1240, 1258 (4th Cir. 1985) (citation omitted). Plaintiffs' cited authority is not to the contrary. The plaintiff in *Phillips v. Mabe*, 367 F. Supp. 2d 861 (M.D.N.C. 2005), was a white law enforcement officer who alleged that he was the victim of retaliation, not because he was white, but because he was engaged in protecting the civil rights of black high school students. *See id.* at 868. Phillips thus made a claim recognized in *Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971), which established that § 1985 protects both African-Americans and "those who championed their cause." *See Phillips*, 367 F. Supp. 2d at 873-74; *United Bhd. of Carpenters v.*

*Scott*, 463 U.S. 825, 836 (1983).  Plaintiffs make no such claim.  And *Waller v.*

*Butkovich*, 605 F. Supp. 1137 (M.D.N.C. 1985), did indeed refuse to dismiss

§ 1985(3) conspiracy claims brought by plaintiffs alleging animus against them as

Christians and "anti-Communists," *id*. at 1143, "reject[ing] the notion that

Section 1985(3) requires that animus be directed against a traditionally

disadvantaged group." *Id*. at 1144.  But just months after *Waller*, the Fourth

Circuit issued its opinion in *Buschi*, effectively overruling *Waller*.[12]  Plaintiffs do

not mention *Buschi* at all.

- Plaintiffs do not dispute that this Court has established that, in order to state a
  § 1985 claim, "all of the conspirators must share the same forbidden animus."
  *Martin v. Boyce*, No. 1:99CV01072, 2000 WL 1264148, at *7 (M.D.N.C. July 20,
  2000).[13]  Plaintiffs insist that unspecified "Defendants' acts in furtherance of the
  § 1985 conspiracies were motivated by invidious animus based on race and were

---

[12] *Waller* relied on three decisions from other circuits adopting the dubious proposition that § 1985(3) applies to "members of groups besides blacks -- or advocates of equal rights for blacks," including Republicans and "critics of the President."  605 F. Supp. at 1144 (relying on *Keating v. Carey*, 706 F.2d 377 (2d Cir. 1983), *Glasson v. City of Louisville*, 518 F.2d 899 (6th Cir. 1975), and *Action v. Gannon*, 450 F.2d 1227 (8th Cir. 1971)).  In *Harrison v. KVAT Food Mgmt., Inc.*, 766 F.2d 155 (4th Cir. 1985), the Fourth Circuit described each of those three decisions as adopting an expansive view of § 1985 that the Fourth Circuit decisively rejected.  *Id*. at 159-60, 161; *see also Buschi*, 775 F.2d at 1258 (cases discussed in *Harrison* -- including *Keating*, *Glasson* and *Action* -- are of "doubtful . . . continued precedential reliability").

[13] Plaintiffs cite a handful of Seventh Circuit cases that they claim stand for the contrary position that "stirring up" the racial animosity of others is sufficient.  (Opp. at 28.)  But those cases interpret statutes other than § 1985, and Plaintiffs ignore this Court's on-point decision in *Martin*.

intended to foment and take advantage of racial animus against Plaintiffs" (Opp. at 26), but they cite (repeatedly) only to passages that allege the racial animus of Nifong and various Duke and Durham defendants (*id*. at 26-27). Neither the Amended Complaint nor Plaintiffs' Opposition alleges that the DSI Defendants had any discriminatory animus toward Plaintiffs, much less that they shared the same animus as all of the other Defendants.

- Plaintiffs do not dispute that their § 1985 and § 1986 claims must fail if they have not alleged any underlying constitutional claims. *See, e.g.*, *Great American Fed. Sav. & Loan Ass'n v. Novotny*, 442 U.S. 366, 372 (1979) (§ 1985(3) "provides no substantive rights itself; it merely provides a remedy for violation of the rights it designates"); *Phillips*, 367 F. Supp. 2d at 874. For the reasons noted above and in the DSI Defendants' Opening Brief, they have not alleged any deprivation of constitutional magnitude.[14]

- As the DSI Defendants' Opening Brief noted (at 34-35), Plaintiffs have not sufficiently alleged a conspiracy to support either claim.

- Plaintiffs do not dispute that their § 1986 claim is time-barred. The Opposition is entirely silent with respect to the DSI Defendants' argument (Br. at 36) that the one-year limitations period embodied in the statute forecloses their claim.

---

[14] Plaintiffs also do not dispute the settled proposition that their § 1986 claims are dependent upon their underlying § 1985 claims, and thus the latter fail when the former fail. *See Trerice v. Summons*, 755 F.2d 1081, 1085 (4th Cir. 1985); Br. at 35.

- Plaintiffs' § 1986 claim fails because the DSI Defendants did not have the "power to prevent or aid in preventing the commission" of constitutional violations by others. 42 U.S.C. § 1986; Br. at 35-36. The Amended Complaint concedes both that the DSI Defendants fully disclosed the DNA testing results to the prosecutor and that Nifong had enough evidence to bring the case to a jury even apart from the DNA evidence. (Am. Compl. ¶¶ 749, 754, 765.) The DSI Defendants had no power to control Nifong's exercise of his prosecutorial discretion -- and in particular no power to control or direct Nifong's decision about how or when to disclose the DNA test results to these Plaintiffs or others. Absent such "power to prevent" the alleged constitutional violations, Plaintiffs' § 1986 claim fails.

## VI. PLAINTIFFS' STATE LAW CLAIMS MUST BE DISMISSED

### A. Plaintiffs Cannot State Any Negligence Claims Against the DSI Defendants Because the DSI Defendants Owed No Duty to Plaintiffs

As noted in the DSI Defendants' Opening Brief, the threshold barrier to Plaintiffs' state-law claims is the lack of any duty owed by an expert to a third party. Indeed, to state the essence of Plaintiffs' position is to appreciate its absurdity. According to Plaintiffs:

- a retained expert has a common-law duty to by-pass his client (the district attorney) and immediately deliver reports of tests to every person tested, and

- a retained expert has a common-law duty to a third party to completely and accurately describe in a written report all information relating to an unrelated party.

Of course, Plaintiffs cannot cite to a single case, treatise, or law review article supporting such extraordinary theories. Instead, Plaintiffs simply argue that North Carolina law imposes on *every person* a duty to *every other person* who might foreseeably be injured by that person's conduct, in *every context*. (Opp. at 34.)

It is true that, in many circumstances, a person owes a duty to those who might foreseeably be injured by his conduct. But this is not an automobile accident case. When an injury arises out of a contractual or professional undertaking, North Carolina courts limit the existence of legal duties, even when injury would have been reasonably foreseeable. For example, in what is probably the most closely analogous North Carolina case, the Court of Appeals held that an attorney owes no duty to an opposing party. *Petrou v. Hale*, 43 N.C. App. 655, 661, 260 S.E.2d 130, 135 (1979); *see also Eisenberg v. Wachovia Bank, N.A.*, 301 F.3d 220, 224-26 (4th Cir. 2002) (bank owed no duty to noncustomer); *Vickery v. Olin Hill Constr. Co.*, 47 N.C. App. 98, 103, 266 S.E.2d 711, 715 (1980) (seller and real estate agent owed no duty to buyer); *Sterner v. Penn*, 159 N.C. App. 626, 630-31, 583 S.E.2d 670, 673-74 (2003) (brokerage firm owed no duty to supervise actions of customer). Plaintiffs simply decline to address any case contrary to

their theory about the scope of North Carolina tort law, and they similarly ignore the cases cited from other jurisdictions.[15]

Moreover, Plaintiffs confuse the separate elements of duty and breach when they suggest (Opp. at 35) that the DSI Defendants' alleged breach of DSI's own "internal protocols" means that the DSI Defendants owed a duty to Plaintiffs. As the Court of Appeals made clear in *Hall v. Toreros II, Inc.*, 176 N.C. App. 309, 626 S.E.2d 861 (2006), *rev. allowed*, 361 N.C. 219, 642 S.E.2d 248 (2007), company policy may help establish "a method by which the defendants could comply with the underlying legal duty already existing under law," but *company policy cannot establish a legal duty if none otherwise exists*. 176 N.C. App. at 317, 626 S.E.2d at 867. In cases where courts have recognized a negligence claim, "the legal duty already existed, and the failure to follow an adopted rule, policy, or procedure was merely some evidence of a breach of that legal duty." *Id.* at 317, 626 S.E.2d at 867. Here, no duty exists, so Plaintiffs' negligence claims against the DSI Defendants should be dismissed.

Ultimately, Plaintiffs are asking this Court to recognize a claim for "negligent speech" -- or, more specifically, "negligent failure to speak" -- such that every person becomes liable for every negligent statement, or failure to speak, in every circumstance. Such a claim not only does not exist (in North Carolina or elsewhere) but would fly in the face of existing law relating to communication-based torts. For example, if a person

---

[15] Every jurisdiction that has considered similar claims against experts has rejected those claims. (Br. at 37-38.) Plaintiffs not only ignore those cases, but they fail to explain why North Carolina would apply a different rule.

claims that a false statement caused damage to his reputation, his remedy is a claim for defamation, which has its own particular and stringent requirements (including a one-year statute of limitations and, in many cases, constitutional limitations). If a person alleges harm arising from a negligent or intentional misrepresentation, his remedy is a claim for fraud or negligent misrepresentation, with all of the attendant requirements for such claims (such as reasonable reliance and stringent pleading requirements). The same holds true for claims for professional malpractice (*e.g.*, when a professional negligently provides bad advice).

In this case, Plaintiffs do not and cannot make out specific claims for communication-based torts. Instead, they ask this Court to create from whole cloth a general duty, and a concomitant claim for "negligent speech or failure to speak." Such a claim would not only be without precedent, but would swallow whole more particularized torts such as fraud and defamation.[16] No such claim exists, because no such duty exists. Plaintiffs' negligence-based claims should be rejected.

### B. Plaintiffs Fail to State a Claim for Obstruction of Justice

Plaintiffs insist that the common-law obstruction of justice tort "is a broad one" applicable "in a variety of contexts." (Opp. at 30.) They describe the tort as "sprawling, particularly in light of its statutory counterpart." (*Id*. at 31.) In truth, neither the common law nor the "statutory counterpart" referenced by Plaintiffs extends claims for

---

[16] If a claim existed for "negligent speech/failure to speak," it is difficult to imagine why anyone would bring claims such as fraud, negligent misrepresentation, or defamation. An aggrieved party could simply claim that the defendant had a duty to speak (or to speak in a non-negligent way) and should be held liable for breaching that supposed duty.

obstruction of justice to either a delay in producing documents or the production of supposedly incomplete reports. The DSI Defendants' Opening Brief reviewed the relevant civil cases (Br. at 39-40), and nothing in Plaintiffs' Opposition calls that authority into question. Instead, Plaintiffs cite Article 30 of Chapter 14 of the North Carolina General Statutes, entitled "Obstruction of Justice." Offenses described in those provisions include entering jails for the purpose of killing or injuring prisoners, resisting or obstructing a public officer, picketing courthouses with the intent to interfere with the administration of justice, harassing jurors, and intimidating witnesses. But as to *documents*, the specified offenses extend only to "altering, destroying, or stealing . . . evidence" (N.C. Gen. Stat. § 14-221.1) and forging or altering judgments, criminal process, or civil process (N.C. Gen. Stat. § 14-221.2).

Undaunted, Plaintiffs ask the Court to decide that delaying the production of documents, or producing incomplete expert reports, constitutes obstruction of justice. No North Carolina court has so held, nor has the General Assembly so decided. And with obvious reason: If a litigant in either the criminal or civil context delays in producing documents, or produces incomplete reports, the Court has various remedies, including heavy sanctions under N.C. R. Civ. P. 37 and N.C. Gen. Stat. § 15A-910, available to address and compensate for any resulting harms. In Plaintiffs' view, however, not just the parties but even their attorneys and experts could be hauled into court on a claim of obstruction of justice in such situations. Discovery disputes, then, would be transformed into new, stand-alone tort lawsuits. This case well illustrates the extremity of Plaintiffs'

position: According to Plaintiffs, an expert who fully discloses to his client all of his findings is nonetheless liable for obstruction of justice if the client does not immediately give all of the expert's opinions to the opposing party. This is not the law in North Carolina (or, apparently, anywhere else). This Court should not create such a claim.[17]

## C. Plaintiffs Fail to State a Claim for Intentional Infliction of Emotional Distress

Plaintiffs make what can be described at best as a half-hearted defense of their claim for intentional infliction of emotional distress. Apart from reciting the elements of the claim -- and agreeing with the DSI Defendants that a claim will lie only for sufficiently "extreme and outrageous conduct" (Opp. at 32-33, citing, *inter alia*, *W.E.T. v. Mitchell*, No. 1:06CV487, 2007 WL 2712924, at *8 (M.D.N.C. Sept. 14, 2007)) -- Plaintiffs do nothing more than insist that DSI's conduct was indeed "extreme and outrageous and beyond the societal norms." (Opp. at 33.) In support, they cite to a handful of passages in the Amended Complaint that make exceedingly general accusations against the large, undifferentiated group of supposed conspirators motivated by "malicious and evil intent." (*E.g.*, Am. Compl. ¶¶ 3, 951, 1215, 1218.)

Plaintiffs' allegations specific to the DSI Defendants paint a very different picture. Plaintiffs suggest only that the DSI Defendants (1) accurately tested the DNA samples; (2) accurately determined that no matches existed between the rape kit samples and

---

[17] It is important to keep in mind that Plaintiffs are not seeking to enforce their *Brady* rights (because they have none). Instead, they contend that the failure of an expert to by-pass the district attorney and immediately produce all DNA information, whether exculpatory or not, to every person tested constitutes obstruction of justice.

Plaintiffs; (3) accurately reported their findings to Nifong and the investigators; (4) prepared a written report that contained accurate information but omitted some conclusions about third parties; and (5) produced all of the underlying raw data to the prosecutor.[18] That alleged conduct does not approach the type of extreme and outrageous behavior necessary to sustain a claim for intentional infliction of emotional distress.

## VII. PLAINTIFFS' RESPONDEAT SUPERIOR AND SUPERVISORY LIABILITY CLAIMS SHOULD BE DISMISSED

Even if Plaintiffs could state a § 1983 claim against DSI based upon the timing or content of the May 12 Report -- which they cannot, for the myriad reasons discussed above -- the Amended Complaint does not suggest that DSI implemented a "policy" of reporting DNA test results in the manner that Plaintiffs object to here, or that DSI ever applied the Mangum reporting "protocol" in any other case. Instead, Plaintiffs affirmatively allege that DSI's reporting methodology in this case was *contrary to established company policy*. (Am. Compl. ¶¶ 756, 765 (describing May 12 Report "methodology" as "entirely novel"), 770, 980 (alleging that various Defendants "invent[ed] a reporting form" for the May 12 Report).) Those allegations are fatal to their § 1983 claims against DSI. *See Austin v. Paramount Parks, Inc.*, 195 F.3d 715, 728 (4th Cir. 1999) (private corporation, like municipality, can be held liable under § 1983 only if "an official policy or custom of the corporation causes the deprivation of federal

---

[18]  Plaintiffs nowhere allege that the DSI Defendants made any false statements, destroyed documents, falsified evidence, testified before the grand jury, attempted to intimidate anyone, made any public statements regarding Plaintiffs, or participated in the decision to prosecute anyone. There is no allegation that the DSI Defendants ever met or spoke to any Plaintiff (or any other lacrosse player).

rights"); *J.S. v. Isle of Wight County School Bd.*, 368 F. Supp. 2d 522, 526 (E.D. Va. 2005) (no § 1983 municipal liability where "individual defendants act[ed] *contrary* to the school board's policy") (emphasis in original).[19]

Perhaps uneasy about the strength of their claim against DSI under *Monell*, Plaintiffs insist that DSI can be held liable for the torts of its agents on a traditional theory of *respondeat superior* liability. (Opp. at 37-38.).[20] They ignore altogether *Austin* and the other cases cited in the Opening Brief (at 29-30) for the settled proposition that a private corporation *cannot* be held liable under § 1983 on a theory of *respondeat superior*. To the extent that Plaintiffs purport to assert *respondeat superior* claims against DSI, those claims fail as a matter of law.

## CONCLUSION

For the reasons stated above as well as those set forth in their Opening Brief, DNA Security, Inc. and Richard Clark respectfully request that the claims against them be dismissed.

---

[19] As the DSI Defendants have explained, Plaintiffs' supervisory liability claims against Clark are similarly flawed. (Br. at 30-31.) Plaintiffs' Opposition is silent with respect to Clark: They offer no response to the argument that they have failed to plead the elements necessary to impose "supervisory" liability upon him.

[20] The mere allegation that Meehan and Clark had (unexercised) "final policymaking authority" for DSI (Am. Compl. ¶¶ 74-75) does *not* state a claim against the organization. *See, e.g.*, *Pineda v. City of Houston*, 291 F.3d 325, 328 (5th Cir. 2002) ("Actions of officers or employees of a municipality do not render the municipality liable under § 1983 unless they execute official policy."). Liability can attach where, and only where, the individual's actions and decisions established DSI's *official policy*.

Respectfully submitted,

/s/ Robert J. King III
Robert J. King III
N.C. State Bar No. 15946
Kearns Davis
N.C. State Bar No. 22014
Brooks, Pierce, McLendon, Humphrey, &
　Leonard, L.L.P.
Post Office Box 26000
Greensboro, North Carolina  27420
Telephone:  336-373-8850
Facsimile:  336-378-1001

*Counsel for Defendants DNA Security, Inc. and
Richard Clark*


Robert A. Sar
N.C. State Bar No. 22306
Nicholas J. Sanservino, Jr.
N.C. State Bar No. 36557
Ogletree, Deakins, Nash, Smoak &
　Stewart, P.C.
2301 Sugar Bush Road, Suite 600
Raleigh, North Carolina 27612
Telephone: (919) 787-9700
Facsimile: (919) 783-9412

*Counsel for Defendant DNA Security, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on November 25, 2008, I electronically filed the foregoing **Reply Brief in Support of Motion to Dismiss of Defendants DNA Security, Inc. and Richard Clark** with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:

Robert C. Ekstrand
Ekstrand & Ekstrand, LLP
811 Ninth Street, Ste. 260
Durham, NC 27705
*Counsel for Plaintiffs Ryan McFadyen, Matthew Wilson,and Breck Archer*

Jamie S. Gorelick
Paul R. Q. Wolfson
Jennifer M. O'Conner
Wilmer Cutler Pickering Hale and Dorr, LLP
1875 Pennsylvania Avenue, NW
Washington, D.C. 20006

*and*

William F. Lee
Wilmer Cutler Pickering Hale and Dorr, LLP
60 State Street
Boston, MA 02109

*and*

James Donald Cowan, Jr.
Dixie Thomas Wells
Ellis & Winters, LLP
100 N. Greene Street, Ste. 102
Greensboro, NC 27401
*Counsel for Defendants Duke University, Duke University Police Department, Aaron Graves, Robert Dean, Leila Humphries, Phyllis Cooper, William F. Garber, II, James Schwab, Joseph Fleming, Jeffrey O. Best, Gary N. Smith, Greg Stotsenberg, Robert K. Steel, Richard H. Brodhead, Ph.D., Peter Lange, Ph.D., Tallman Trask, III, Ph.D., John Burness, Larry Moneta, Ed.D., Victor J. Dzau, M.D., Allison Halton, Kemel Dawkins, Suzanne Wasiolek, Stephen Bryan, and Matthew Drummond*

Jamie S. Gorelick
Paul R. Q. Wolfson
Jennifer M. O'Conner
Wilmer Cutler Pickering Hale and Dorr, LLP
1875 Pennsylvania Avenue, NW
Washington, D.C. 20006

*and*

William F. Lee
Wilmer Cutler Pickering Hale and Dorr, LLP
60 State Street
Boston, MA 02109

*and*

Dan Johnson McLamb
Shirley M. Pruitt
Thomas Carlton Younger, III
Yates, McLamb & Weyher, LLP
P.O. Box 2889
Raleigh, NC 27602-2889
*Counsel for Defendants Duke University Health Systems, Inc., Private Diagnostic Clinic, PLLC, Julie Manly, M.D., Theresa Arico, R.N., and Tara Levicy, R.N.*

Reginald B. Gillespie, Jr.
Faison & Gillespie
P.O. Box 5517
Durham, NC 27717-1729
*Counsel for Defendants City of Durham, North Carolina and Edward Sarvis*

Patricia P. Kerner
D. Martin Warf
Hannah Gray Styron
Troutman Sanders, LLP
434 Fayetteville Street, Ste. 1900 (27601)
P.O. Box 1389
Raleigh, NC 27602
*Counsel for Defendants Patrick Baker, Steven Chalmers, Ronald Hodge, Lee Russ, Stephen Mihaich, Beverly Council, Jeff Lamb, Michael Ripberger, and Laird Evans*

James B. Maxwell
Maxwell, Freeman & Bowman, P.A.
P.O. Box 52396
Durham, NC 27717-2396
*Counsel for Defendants James T. Soukup, Kammie Michael, David W. Addison, and Richard D. Clayton*

Edwin M. Speas, Jr.
Eric P. Stevens
Poyner Spruill, LLP
P.O. Box 1801
Raleigh, NC  27602-1801
*Counsel for Defendant Mark D. Gottlieb*

Joel M. Craig
Henry W. Sappenfield
Kennon Craver Belo Craig & McKee, PLLC
4011 University Drive, Ste. 300
P.O. Box 51579
Durham, NC 27717-1579
*Counsel for Defendant Benjamin W. Himan*

James A. Roberts, III
Paul R. Dickinson, Jr.
Lewis & Roberts, PLLC
1305 Navaho Dr., Ste. 400 (27609-7482)
P.O. Box 17529
Raleigh, NC 27619
*Counsel for Defendant Brian Meehan, Ph.D.*

Linwood Wilson
*Address redacted pursuant to Local Rule
*Pro Se*

Respectfully Submitted,

/s/ Robert J. King