# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
# CIVIL ACTION NO. 1:07-CV-00953

| | |
|---|---|
| **RYAN MCFADYEN**, *et al.*, ) | |
| ) | |
| Plaintiffs, ) | **SUPPLEMENTAL BRIEF IN** |
| ) | **SUPPORT OF MOTIONS TO** |
| v. ) | **DISMISS OF DEFENDANTS** |
| ) | **GOTTLIEB, HIMAN, AND** |
| **DUKE UNIVERSITY**, *et al.*, ) | **THE CITY OF DURHAM,** |
| ) | **NORTH CAROLINA** |
| Defendants. ) | |

Defendants Mark Gottlieb, Benjamin Himan, and the City of Durham, North Carolina (collectively, "City Defendants"), pursuant to this Court's order (Doc. No. 119), submit this supplemental brief in support of their motions to dismiss. This brief addresses the effect of the Supreme Court's recent decision, *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009).

*Iqbal* makes plain that Plaintiffs' Second Amended Complaint ("Complaint" or "SAC") does not satisfy the pleading requirements of Federal Rule of Civil Procedure 8. In *Iqbal*, the Supreme Court reiterated that a claim cannot stand on factual allegations that are merely *consistent with*, rather than actually *suggesting*, the required elements of the claim. But Plaintiffs' claims are based on factual allegations that, even if true, are at best only consistent with the required elements of the claims, and do not cross the threshold into suggesting those elements. While Plaintiffs assert the required elements in a conclusory fashion, their factual allegations fail to support those assertions.

Plaintiffs attempt to paint a picture of a diabolical conspiracy involving not only the City Defendants and the State Prosecutor but also numerous Duke University administrators and security personnel, Duke University Medical Center nurses, and employees of a private DNA laboratory. Plaintiffs characterize the defendants as collectively bent on persecuting Duke students in general and on maliciously investigating the Duke lacrosse players in particular. But Plaintiffs' factual allegations fail to support these conclusory characterizations. With regard to the City investigators, *Iqbal* makes clear that their actions were—at *best*—*consistent with* the conspiracy to convict innocent people asserted by Plaintiffs, but those actions were also consistent with a far more obvious and innocent scenario: police doing the best they could to faithfully execute their investigatory duties under trying circumstances. Under *Iqbal*, then, Plaintiffs have failed to establish the plausibility of their allegations and their claims must be dismissed.

**I.    *IQBAL* CONFIRMS THE REQUIREMENTS OF FRCP 8 FOR ALL CLAIMS BROUGHT IN FEDERAL COURT**

The City Defendants discuss the central points of the *Iqbal* decision in their supplemental brief in the *Evans* matter.[1] In the interest of avoiding repetition, the City Defendants incorporate that discussion here. To summarize, *Iqbal* provides clear direction on at least four key points:

- Pleadings in federal district court must be plausible, no matter what the cause of action. This includes state law claims.

---

[1] *See* Supplemental Brief in Support of Motions to Dismiss of Defendants Gottlieb, Himan, and the City of Durham at 3-6, *Evans v. City of Durham*, No. 1:07-CV-00739 (M.D.N.C. June 24, 2009) (Doc. No. 100).

- The plausibility requirement cannot be circumvented even if a court intends to limit discovery. Adherence to the plausibility inquiry is "especially important" in suits against Government defendants because of the " heavy costs" litigation extracts "in terms of efficiency and expenditure of valuable time and resources that might otherwise be directed to the proper execution of the work of the Government."[2]

- A court must aggressively cull out conclusory allegations couched as factual allegations, which are not entitled to the assumption that they are true.

- Behavior that is merely consistent with alleged bad intent—but also consistent with an "'obvious alternative explanation,'" *Iqbal*, 129 S. Ct. at 1951 (citation omitted)—is not suggestive of such bad intent. When such an alternative explanation for defendants' conduct exists, the allegations cannot be said to plausibly establish bad intent.

Each of these points demonstrates the fatal defects in Plaintiffs' claims here, as explained below.[3]

## II. PLAINTIFFS' COMPLAINT FAILS TO MEET *IQBAL*'S STANDARDS

Plaintiffs' Complaint proceeds from the same "there-must-have-been-evil-intent" approach underlying the complaint in *Iqbal*. Indeed, every facet of the City's

---

[2] *Iqbal*, 129 S. Ct. at 1953. The importance of adherence to the plausibility standards is consistent with the principles underlying qualified immunity—immunity to which Defendants Gottlieb and Himan are entitled. *See* Memorandum in Support of Defendant Mark Gottlieb's Motion to Dismiss at 5-6, 13-14, 17-18, 20, 29 (Doc. No. 54) ("Gottlieb Open. Br."); Defendant Benjamin Himan's Brief in Support of His Motion to Dismiss at 11, 20, 28-30 (Doc. No. 52) ("Himan Open. Br.").

[3] A fifth point made by *Iqbal* involves the standard for personal liability for supervisors in claims under Section 1983 and *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971). When such suits involve causes of action requiring specific intent (such as intent to discriminate on the basis of race), Plaintiffs must plausibly allege more than simple acquiescence in the discriminatory conduct of subordinates. *See Iqbal*, 129 S. Ct. at 1948-49. Plaintiffs' claims with respect to the Durham Supervisory Defendants utterly fail in this regard. *See* Supplemental Brief of Defendants Baker, Chalmers, Council, Hodge, Lamb, Ripberger, Russ, and Addison, which is hereby incorporated by reference.

investigation is characterized as initiating, supporting, facilitating, or prolonging an effort led by the State Prosecutor to convict innocent people. But as between the "purposeful, invidious" conspiracy alleged by Plaintiffs, and the "'obvious alternative explanation'" of good-faith efforts to identify perpetrators of a terrible alleged crime, the conspiratorial actions and malicious intent alleged by Plaintiffs are "not a plausible conclusion." *Iqbal*, 129 S. Ct. at 1951-52 (citation omitted). The Supreme Court in *Iqbal* found the conclusory allegations of discriminatory purpose implausible because the factual allegations were consistent with an obvious alternative explanation—the legitimate desire to arrest and detain individuals because of their suspected link to the 9/11 attacks. So, here, the conclusory allegations of malicious intent are implausible because Defendants' actions can be readily explained by the legitimate desire to investigate the alleged rape of Crystal Mangum.

Plaintiffs certainly throw out their share of "extravagantly fanciful" allegations, *Iqbal*, 129 S. Ct. at 1951; *see, e.g.*, SAC ¶ 489 (alleging that Duke students have "no natural base of political support"); ¶ 839 (arguing that study group's conclusions about alcohol abuse by Duke lacrosse players was unfounded because no alcohol abuse incidents resulted in emergency medical intervention), ¶¶ 962, 967, 1145 (alleging Ninth Amendment claim). But, as in *Iqbal*, the chief problems with Plaintiffs' claims are the conclusory nature of their characterizations of Defendants' conduct and the fact that their factual allegations do not plausibly suggest bad intent. These deficiencies pervade the Complaint, but are most notable in three areas: allegations of conspiracy; allegations of

malicious, discriminatory, and retaliatory intent; and allegations regarding City "policy" to undertake malicious investigations.

### A. Allegations of Conspiracy

Plaintiffs allege that City investigators were part of a broad conspiracy (ominously dubbed "The Consortium") to convict Plaintiffs and their teammates of crimes the conspirators "knew" never happened. *See* SAC ¶¶ 1-2. This alleged conspiracy included not just governmental actors, but Duke University and Duke University Medical Center employees and employees of a private DNA laboratory. But such conclusory allegations of conspiracy are entitled to no weight. *Iqbal*, 129 S. Ct. at 1949. Moreover, these conclusory allegations are not supported by any factual allegations suggestive of such a conspiracy.

For example, Plaintiffs allege that City investigators conspired with Nurses Tara Levicy and Theresa Arico of the Duke University Medical Center in late March to concoct false affidavits to support an NTID order, which they sought in order to help convict students that they knew were innocent. SAC ¶ 913. But no factual allegations suggest any such conspiracy between the investigators and the medical professionals, particularly at the time of the NTID order. *See* SAC ¶ 779 (alleging that Levicy did not even provide the investigators with full medical records until weeks after the NTID order had been executed). Plaintiffs do allege that Nurse Levicy falsely told City investigators that Crystal Mangum had signs, symptoms, and injuries consistent with being raped and sexually assaulted. *See* SAC ¶ 780; Brief in Support of Defendant City of Durham, North Carolina's Motion to Dismiss Second Am. Compl. at 9 & n.5 (Doc. No. 62) ("City Open.

Br."). Plaintiffs further allege that the City was foolish to ignore the "perils" of relying on those statements. *See* SAC ¶ 1142(K). These allegations do not suggest the bald conclusion that an investigator/medical professional conspiracy was afoot. This is because they are also consistent with the obvious alternative explanation that the City investigators were neither medical experts nor witnesses to the physical examination of Mangum, and thus in no position to second-guess Nurse Levicy's medical diagnosis. Plaintiffs' claims thus fall well short of the "line between possibility and plausibility of 'entitlement to relief.'" *Iqbal*, 129 S. Ct. at 1949 (citations and brackets omitted).[4]

Plaintiffs' other allegations of conspiracy fare no better. For example, they allege that City investigators conspired with Meehan and Nifong to hide exculpatory DNA results and fabricate inculpatory DNA reports. *See* SAC ¶¶ 980-81. But the only factual allegation Plaintiffs cite in support of this conclusory assertion is that the City investigators sat in meetings with the State Prosecutor and representatives of DNASI. *See* SAC ¶ 765. Simply alleging that people attended meetings, however, is insufficient to plausibly suggest a meeting of the minds, let alone a conspiracy to convict innocent people. *See Iqbal*, 129 S. Ct. at 1951 (even though the complaint alleged that Mueller and Ashcroft met shortly after 9/11 to discuss the policy at issue, the complaint nevertheless did not support conclusory allegations as to intent).

---

[4] Moreover, as explained in the City's Opening Brief, with the medical evidence available to the investigators that corroborated Mangum's claims, *see* SAC § XXXIV.A; SAC ¶ 780, and with her inconsistent statements explained by any number of factors, including the trauma of the alleged attack, *see Torchinsky v. Siwinski*, 942 F.2d 257, 263 (4th Cir. 1991), Investigators had ample grounds to seek an NTID. *See* City Open. Br. at 8-12. These allegations are thus inconsistent with the conclusion that the nurses and investigators conspired to produce false affidavits in order to convict innocent people.

Moreover, as *Iqbal* demands, the pleadings must be assessed with the underlying context in mind. Here, Plaintiffs do not allege that either of the City investigators knew anything at all about DNA testing, let alone the customs and industry standards regarding the proper reporting format of such results. Indeed, they imply the opposite by blaming the City for failing to train the investigators on such things. *See* SAC ¶¶ 346, 1142(C). Indeed, Plaintiffs' allegations make clear that State Prosecutor Nifong—not the City investigators—decided not only who would test the DNA, but how those results would be explained to the public and shared with the defense. *See* SAC ¶¶ 648, 688-89, 751-52. No factual allegations suggest that Nifong sought or needed City investigators' agreement in making these decisions.

Similarly, while Plaintiffs allege that investigators began conspiring to convict innocent people the day following Mangum's rape claim, *see, e.g.*, SAC ¶ 345, the factual allegations do not support—and, indeed, belie—this conclusion. For example, investigators were diligent in collecting DNA samples not only from the team captains (March 16, 2006) but from all of their teammates (March 23, 2006) during the NTID process. Those results were sent to the state laboratory for testing. SAC ¶ 617. No accusations of foul play in the SBI testing process (by investigators, the state prosecutor's office, the state laboratory, or anyone else) are made. Giving the benefit of the doubt to Plaintiffs, it is perhaps *possible* that investigators somehow believed that by properly collecting DNA and sending it to the state laboratory for testing, they would actually *advance* an underlying conspiracy to convict innocent people. But the factual allegations do not make such a conclusion *plausible*. The "obvious alternative explanation" is that

the City investigators collected that evidence and processed it with the intention of determining what, if anything, happened to Crystal Mangum, and whether any of the Plaintiffs was involved. The conclusory allegations of conspiracy simply have not been nudged "across the line from conceivable to plausible." *Iqbal*, 129 S. Ct. at 1952 (citation omitted).

Nor do Plaintiffs' allegations of meetings between Nifong and the City investigators plausibly suggest a conspiracy in light of the "obvious alternative explanation" for such meetings—that police routinely coordinate with prosecutors when conducting a criminal investigation, particularly where the underlying crime is a serious felony. Moreover, to the extent that Nifong was animated by factors having nothing to do with the evidence, he was committed to that course of conduct before he spoke to the investigators, *see* SAC ¶¶ 478-95, and no factual allegation plausibly suggests that City Defendants were acting to advance Nifong's career. Thus, Plaintiffs' claims against the City Defendants that depend on assertions of a conspiracy, *see, e.g.*, Causes of Action 5 & 7-15, must be dismissed.

### B. Malicious Intent

Plaintiffs' allegations of malicious, discriminatory, and retaliatory intent, which pervade the Complaint, are also conclusory and devoid of factual allegations that actually suggest such purposes. For example, Plaintiffs allege that the search of Ryan McFadyen's room and car was malicious; that Investigators recognized immediately that the email was a joke and/or a parody and that there was no reason to further investigate. SAC ¶ 603. Plaintiffs ask this Court to assume the truth of these conclusions without

assessing the context—indeed, without even a chance to review the actual text of the email. *See* City Open. Br. at 13 & n.11. But *Iqbal* demands otherwise. The email in question was sent from Plaintiff McFadyen only a few hours after the party where an alleged rape of a stripper occurred; in no uncertain terms, the email gleefully suggests additional horrific acts against strippers. Plaintiffs' blasé suggestion—that given the supposedly universal appreciation for irony and movie trivia, the email was "obviously" a joke—is far off base. What *is* obvious is that given the evidence that the investigators already had available to them—including Mangum's claims and corroborating medical evidence of rape at the party—this graphic and violent email suggested, at a minimum, the need to investigate further.[5] The investigator's action suggests no maliciousness of any kind.

Plaintiffs also attempt to hang their hats on allegations of Sergeant Gottlieb's alleged previous abuse of Duke students while on patrol. *See, e.g.*, SAC ¶ 171-78. But such allegations do not support Plaintiffs' claim of a conspiracy to convict innocent people. Moreover, Plaintiffs' own allegations suggest the obvious alternative explanation that Sergeant Gottlieb believed that Crystal Mangum may have been telling the truth. *See* SAC ¶ 913 (alleging that investigators were hopeful that positive DNA tests from the state laboratory would corroborate other evidence); *id.* ¶ 358 (criticizing Gottlieb because

---

[5] Plaintiffs' apparent confidence in the distinction between legitimate risks to public safety and mere college hijinks—reflected here and elsewhere in the Complaint, *see, e.g.*, SAC ¶ 132 (alleging that off campus alcohol abuse by Duke students is irrelevant to "safety and well being of the campus community")—only betrays Plaintiffs' misunderstanding of the nature of the risk assessments police officers must make every day (without the benefit of 20/20 hindsight), rather than suggesting maliciousness on anyone's part.

he "assumed" an attack occurred). While Plaintiffs may criticize Gottlieb's belief of Mangum's credibility as being too hasty in retrospect, that is a far cry indeed from suggesting malicious intent to convict innocent people. Sergeant Gottlieb's investigative actions are much more readily explained by the seriousness of Mangum's claim that she was raped at a party held at a residence inhabited by Duke lacrosse players (and by Nurse Levicy's evaluation of the medical evidence) than by any purported dislike for Duke students generally.

With respect to Investigator Himan, the Complaint is utterly devoid of any factual allegation suggestive of malicious intent. Plaintiffs merely identify the individual steps of the investigation and then conclusorily assign malicious intent to each step. Indeed, they go so far as to brainstorm investigative steps that, in retrospect, would have been helpful, and then conclude that Investigator Himan *deliberately and maliciously* avoided these steps. SAC ¶¶ 387-401. Plaintiffs' effort to alchemize the normal steps of a criminal investigation into a nefarious conspiracy pervades the Complaint. One example is an allegation related to Plaintiffs counsel's questioning of Investigator Himan about the April 4, 2006, identification procedure. When Investigator Himan—who Plaintiffs themselves allege "was not present" for that procedure, SAC ¶ 682—says he "can't comment on that, really, I'm not allowed to comment on the investigation" (SAC ¶ 681), Plaintiffs conclude: "By saying 'I can't comment on that' in response to Plaintiffs' defense counsel's direct inquiry, Himan was acting in furtherance of a conspiracy to violate [Plaintiffs' alleged procedural due process rights]." SAC ¶ 683. But while a police officer's not commenting to defense counsel might be *consistent with* the grand

conspiracy Plaintiffs have painted, it is far more suggestive of an investigator who legitimately recognized that such questions from counsel were more appropriately answered by the State Prosecutor. Moreover, Plaintiffs' own allegations regarding the conversation belie the notion of a conspiracy, and support the more likely explanation that Himan was simply trying his best to do his job as he understood it, under difficult and highly charged circumstances. As Plaintiffs themselves allege, Himan told defense counsel: "I can only present the information that I have to Mr. Nifong, and he has to make the decisions about what to do with it. I'm giving him all the information I have, so that's basically . . . that's where I'm coming from." SAC ¶ 681.

The second category of bad intent alleged by Plaintiffs is invidious discrimination, of two distinct types: discrimination based on racial animus; and discrimination against citizens of other states. SAC ¶¶ 1004-05, 1159. But *Iqbal*—which also involved bare claims of discriminatory intent—forcefully underscores the deficiency of these claims. As the City has pointed out, not one factual allegation supports a conclusion that any Defendant acted out of racial animus. *See* City Open. Br. at 32-33.[6] Moreover, the allegations of discrimination in *Iqbal* were, at least, levied against two specific

---

[6] Plaintiffs' alternative reasoning—that the equal protection claim may stand on a "fomenting of racial animosity" theory in the absence of racial animus, *see* SAC ¶ 1159—clearly fails under *Iqbal*. "[P]urposeful discrimination requires more than intent as volition or intent as awareness of consequences. . . . It instead involves a decisionmaker's undertaking a course of action because of, not merely in spite of, [the action's] adverse effects upon an identifiable group." *Iqbal*, 129 S. Ct. at 1948 (citation and quotations omitted). Neither "fomenting" racial animosity to accomplish another purpose (such as winning an election), nor acquiescing in the discrimination of others for any other animating reason, *see id.* at 1948, is a substitute for the specific discriminatory animus required to state a claim.

individuals.  Here, in contrast, the allegations are made against dozens of defendants, yet with nary a hint as to which, if any, of them were actually animated by an intent to discriminate against Plaintiffs on the basis of race.  As to claims of discrimination against out-of-state residents, Plaintiffs' allegations similarly lack substance.  While Plaintiffs have alleged that Sergeant Gottlieb expressed disdain for out-of-state residents on some unspecified occasion, *see* SAC ¶ 174, that general allegation—belatedly added in a transparent attempt to buttress a faltering claim—hardly suffices in a case such as this. *Iqbal* commands a common sense consideration of context:  Here Plaintiffs allege targeting of *college students*.  Moreover, Plaintiffs allege that each of them—in-state and out-of-state students alike—was treated exactly the same. *See* City Open. Br. at 29-31. There is no plausible right to recovery in such a context.  After *Iqbal*, there can be no question that the discrimination claims are fatally deficient and must be dismissed.[7]

The same defects apply equally to Plaintiffs' allegations of retaliatory intent.  The factual underpinnings of such a claim arise, apparently, from one fact:  A scheduled meeting between the police and the lacrosse players was canceled and/or postponed. *See* SAC ¶¶ 411-12.  City investigators, working with the district attorney's office, then prepared and filed a nontestimonial order seeking DNA of the players.  On these naked facts, Plaintiffs summarily conclude that the NTID must have been in retaliation for the

---

[7] The pleading requirements of *Iqbal* also provide additional support for the Fourth Circuit's approach to Section 1985 claims. *See, e.g.*, *Brisset v. Paul*, No. 97-6898, 1998 U.S. App. LEXIS 6824, at *10 (4th Cir. 1998) ("To prove a § 1985 conspiracy . . . [t]he threshold requirement is very high, and this court "has rarely, if ever, found that a plaintiff has set forth sufficient facts to establish a section 1985 conspiracy") (citation omitted); *see also* City Open. Br. at 31-33.

cancellation or postponement. *See* SAC ¶ 995. Of course, taking *any* further investigative steps after the meeting fell through may arguably be *consistent with* retaliatory intent. But filing the NTID is also consistent with (and much more obviously explained as) a natural investigatory step given the context: When the meeting was cancelled, investigators lost an opportunity to question individuals who were apparent eyewitnesses of the events (and potential suspects) and to quickly get to the bottom of Mangum's allegations. Having lost that opportunity, investigators attempted to gather what evidence they could through the NTID process. But their basic investigatory goals had not changed at all: Plaintiffs concede that the investigators planned to seek the players' consent to collect DNA samples during the scheduled interviews, just as they had earlier done with the three team captains. *See* SAC ¶ 403(D). Thus, as to the direction of the investigation, the cancellation of the meeting made no difference whatsoever. Investigators filed for the NTID only because the DNA evidence they sought through consensual agreement was no longer available through those channels. Given this "obvious alternative explanation," Plaintiffs' bald conclusion of retaliatory intent is not plausible.

In short, under the standards set forth by the Supreme Court in *Iqbal*, the Complaint utterly fails to properly plead malicious, discriminatory, or retaliatory intent, and those deficiencies doom Plaintiffs' claims against the City Defendants. *See* Causes of Action 1-7, 9-10, 15-16, 18-20. Indeed, in underscoring the deficiencies of Plaintiffs' Complaint in this regard, *Iqbal* confirms Sergeant Gottlieb's and Investigator Himan's rights to public officer immunity: Under North Carolina law, public officials acting

within the scope of their authority may be liable in tort only if their conduct is intentionally harmful, malicious, or corrupt. *See Moore v. Evans*, 476 S.E.2d 415, 421 (N.C. Ct. App. 1996). In the absence of plausible allegations of such intent under *Iqbal*, Defendants Gottlieb and Himan are immune from all state law claims. *See* Causes of Action 18-20, 23, 25, 27; *see also* Gottlieb Open. Br. at 44-46; Himan Open. Br. at 36-38.

### C. City Policy

Plaintiffs allege two types of City policy: (1) actual approval and/or ratification of the allegedly malicious conduct of its investigators and spokespersons; and (2) longstanding customs that made the alleged constitutional violations inevitable under *Monell*. Particularly after *Iqbal*, however, neither theory holds water.

Plaintiffs make conclusory allegations that the Supervisory Defendants participated in, had knowledge of, and acquiesced in the actions by the investigators, *see, e.g.*, SAC ¶ 1061; and/or ratified those actions after the fact, *see, e.g.*, SAC ¶ 890 (alleging that when the City conducted an internal investigation, it concluded that no wrongdoing by City officials had occurred). They make such allegations not only to try to hold the Supervisory Defendants individually liable, but also to establish a City policy or custom sufficient for *Monell* liability. But these allegations are the very embodiment of the threadbare recitation of elements which *Iqbal* held is not entitled to the presumption of truth. And there are simply no factual allegations that actually suggest approval of unconstitutional conduct by investigators, or the purposeful establishment of City policy to engage in such conduct. Moreover, Plaintiffs fail even to identify *which* Supervisory Defendant approved or ratified investigators' conduct, thus falling even

further short of the *Iqbal* standards than the plaintiff in *Iqbal* itself, who at least specified the two policymakers who allegedly authorized and approved the alleged unconstitutional conduct. *See Iqbal*, 129 S. Ct. at 1951. Allegations that the undifferentiated Supervisory Defendants collectively knew of and ratified the underlying malicious and conspiratorial actions of Durham investigators are conclusory at best. And *Iqbal* demands that, whether the cause of action applies to a government official or a municipality, *see id*. at 1948 (citing *Monell*), the allegations must be minimally plausible to survive a motion to dismiss. Plaintiffs catch-all claims of Supervisory Defendants participating in conspiracies to maliciously convict innocent people, or discriminate on the basis of race, or retaliate for the exercise of constitutional rights, are fundamentally deficient in this regard.

As to the second type of policy allegations, Plaintiffs refer to preexisting "policies and customs" of the City; but these "policies and customs" are alleged in precisely the same conclusory way as the policies at issue in *Iqbal*, which the Supreme Court found insufficient to state a claim. For example, Plaintiffs allege that the City "disproportionately and unconstitutionally enforced the criminal laws against Duke students." SAC ¶ 1039. But no specific factual allegations support this bare assertion. Plaintiffs do allege that the Supervising Defendants allowed Sergeant Gottlieb to patrol City areas in which Duke students lived, as though this established a policy of selective enforcement of the law. But Plaintiffs' own allegations then undercut the notion of such a policy, since they note that the police department transferred Sergeant Gottlieb from such neighborhood patrols. SAC ¶ 178. Plaintiffs also allege a policy of "Zero

Tolerance," whereby the City attempted to clamp down on underage drinking, DUI, and public urination. *See* SAC ¶¶ 116-170. But for all the mind-numbing detail Plaintiffs offer about the City's efforts to enforce such a policy, there are no factual allegations to support Plaintiffs' conclusory assertion that this alleged policy regarding public nuisances had anything to do with the completely different circumstances in this case—an investigation of a serious felony. *See* Reply Brief in Support of Defendant City of Durham, North Carolina's Motion to Dismiss Second Am. Compl. at 18-19 (Doc. No. 107) (outlining fundamental differences between so-called "Zero Tolerance" enforcement efforts and the investigation of Mangum's rape claims). Moreover, any targeting of Duke students regarding drinking and public disturbance hardly suggests an odious policy of "selective enforcement." Rather, it is more readily explained as an understandable response to complaints from neighboring residents about the behavior of Duke students living nearby. Just as the disparate impact on Muslims arising from law enforcement efforts following the September 11 attacks was found by the Supreme Court not to be suggestive of discriminatory intent, so any disparate impact on Duke students arising from enforcement efforts to counter underage drinking and noise complaints is hardly suggestive of a City policy to maliciously and selectively enforce the laws against Duke students.[8] Again, while it may be *possible* that such a policy underlies the conduct of

---

[8] Of course, unlike in *Iqbal*, the group allegedly targeted is not even a protected class under federal law. *See* City Open. Br. at 31.

police investigators, there are no factual allegations that make the existence of such a policy *plausible* under the analysis required by *Iqbal*.[9]

*Iqbal* makes clear that allegations that simply restate elements of causes of action, such as those which Plaintiffs employ to recite the required elements of *Monell* claims, are entitled to no weight. And with no underlying well-pleaded factual allegations to support them, the claims against the City must be dismissed.

### D. Damages

Plaintiffs make threadbare allegations of economic, emotional, and physical harm they have suffered as a result of the alleged conduct of Defendants. *See, e.g.*, SAC ¶ 917. But, again, *Iqbal* makes clear that unsupported recitation of the required elements of the claims at issue is insufficient to survive a motion to dismiss. Plaintiffs have not provided specific factual allegations to support their conclusory allegations of harm, let alone described the severe emotional distress required for several of their claims. *See* Causes of Action 20, 27-28 (intentional and negligent emotional distress claims); *see also Oshop v. Tenn. Dept. of Children's Servs.*, No. 3:09-CV-0063, 2009 WL 1651479, at *9 (M.D. Tenn. June 10, 2009) (dismissing claim for negligent infliction of emotional distress because allegation of "infliction of severe emotional harm" and similar unspecified harms were simply "[t]hreadbare recitals of the elements of a cause of action" and could not state a claim under *Iqbal* (citations omitted)); *DiPietro v. N.J. Family Support Payment Center*, No. 08-4761, 2009 WL 1635568, at *8 (D.N.J. June 10, 2009) (same). This is

---

[9] Other alleged "customs," such as "expediting criminal investigations by subjecting the accused to extortionate public condemnation," SAC ¶ 1046, enjoy even less support, since no previous examples of such conduct are even hinted at by Plaintiffs anywhere in their Complaint.

particularly true here, where Plaintiffs acknowledge that the Attorney General of North Carolina has publicly cleared Plaintiffs' indicted teammates of wrongdoing and declared that no attack occurred. SAC ¶¶ 5. For this additional reason, Plaintiffs' Second Amended Complaint is deficient.

## III. CONCLUSION

Plaintiffs' claims must be dismissed.[10]

---

[10] Plaintiffs should not be permitted to amend their Complaint at this stage of the proceedings. First, this matter has already undergone extensive briefing; re-pleading would entail significant additional burden on all parties, including many defendants entitled to qualified immunity; second, Plaintiffs cannot claim unfair surprise, since *Iqbal* merely clarified the pleading standards previously set out in *Twombly*; and third, given the length of Plaintiffs' Complaint, it is unlikely that Plaintiffs can muster more factual material in an attempt to cure their pleading deficiencies.

This the 24th day of June, 2009.

| FAISON & GILLESPIE | STEPTOE & JOHNSON LLP |
|---|---|
| By: /s/ Reginald B. Gillespie, Jr.<br>Reginald B. Gillespie, Jr.<br>North Carolina State Bar No. 10895<br>5517 Chapel Hill Boulevard, Suite 2000<br>Post Office Box 51729<br>Durham, North Carolina  27717-1729<br>Telephone:  (919) 489-9001<br>Fax: (919) 489-5774<br>E-Mail: rgillespie@faison-gillespie.com | By: /s/ Roger E. Warin<br>Roger E. Warin*<br>Michael A. Vatis*<br>Matthew J. Herrington*<br>John P. Nolan*<br>Leah M. Quadrino*<br>Steptoe & Johnson LLP<br>1330 Connecticut Avenue, NW<br>Washington, DC  20036<br>Telephone: (202) 429-3000<br>Fax: (202) 429-3902<br>E-Mail: rwarin@steptoe.com<br>*(Motion for Special Appearance to be filed) |

*Attorneys for Defendant City of Durham, North Carolina*

| POYNER & SPRUILL LLP | KENNON, CRAVER, BELO, CRAIG & MCKEE, PLLC |
|---|---|
| By: /s/ Eric P. Stevens<br>David W. Long<br>North Carolina State Bar No. 2779<br>Eric P. Stevens<br>North Carolina State Bar No. 17609<br>Post Office Box 1801<br>Raleigh, North Carolina 27602-1801<br>Telephone: (919) 783-6400<br>Fax: (919) 783-1075<br>E-Mail: estevens@poynerspruill.com | By: /s/ Joel M. Craig<br>Joel M. Craig<br>North Carolina State Bar No. 9179<br>Henry W. Sappenfield<br>North Carolina State Bar No. 37419<br>4011 University Drive<br>Post Office Box 51579<br>Durham, North Carolina 27717-1579<br>Telephone: (919) 490-0500<br>Fax: (919) 490-0873<br>E-mail: jcraig@kennoncraver.com |
| *Attorneys for Defendant Mark Gottlieb* | *Attorneys for Defendant Benjamin Himan* |

CERTIFICATE OF ELECTRONIC FILING AND SERVICE

The undersigned hereby certifies that, pursuant to Rule 5 of the Federal Rules of Civil Procedure and LR5.3 and LR5.4, MDNC, the foregoing pleading, motion, affidavit, notice, or other document/paper has been electronically filed with the Clerk of Court using the CM/ECF system, which system will automatically generate and send a Notice of Electronic Filing (NEF) to the undersigned filing user and registered users of record, and that the Court's electronic records show that each party to this action is represented by at least one registered user of record (or that the party is a registered user of record), to each of whom the NEF will be transmitted.

This the 24th day of June, 2009.

                              FAISON & GILLESPIE

                              By: /s/ Reginald B. Gillespie, Jr.
                                  Reginald B. Gillespie, Jr.
                                  North Carolina State Bar No. 10895

                                  *Attorneys for Defendant the City of Durham,*
                                      *North Carolina*