# UNITED STATES DISTRICT COURT
## FOR THE
## MIDDLE DISTRICT OF NORTH CAROLINA

RYAN McFADYEN, *et al.*,

    *Plaintiffs*

        v.

DUKE UNIVERSITY, *et al.*,

    *Defendants*

Civil Action No. 1:07-CV-953

---

## SUPPLEMENTAL BRIEF SUPPORTING
## PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTIONS
## TO DISMISS THE FIRST AMENDED COMPLAINT

---

Dated: July 14, 2009

**EKSTRAND & EKSTRAND LLP**

Robert C. Ekstrand (NC Bar #26673)
Stefanie A. Sparks [†]
811 Ninth Street
Durham, NC
E-mail:     RCE@ninthstreetlaw.com
E-mail:     SAS@ninthstreetlaw.com
Telephone:  (919) 416-4590

*Counsel for Plaintiffs Ryan McFadyen,
Matthew Wilson, and Breck Archer*

[†] *Student Counsel*

# THE MATTER BEFORE THE COURT

The individuals and entities responsible for subjecting Plaintiffs and their teammates to one of the most chilling abuses of power in modern history ask this Court to spare them from the "burdens of discovery." For support, they rely upon *Ashcroft v. Iqbal,* 129 S. Ct. 1937 (May 18, 2009). Their arguments are meritless. Unlike the lone allegation of unlawful conduct at issue in *Iqbal,* Plaintiffs' Amended Complaint ("AC") pleads (literally) thousands of detailed, specific facts that show "more than a sheer possibility," that each Defendant acted unlawfully. Furthermore, Defendants attempt to liken their own responses to Mangum's allegations to the response of the Attorney General and FBI Director to the devastating terrorist attacks of September 11, 2001. However, they fail to account for the "obvious" difference between the two: the attacks of September 11th actually happened, and these Defendants knew that the "attack" Mangum alleged was a lie.

## I. *IQBAL* REQUIRES PLAINTIFFS TO ALLEGE "MORE THAN A SHEER POSSIBILITY" THAT A DEFENDANT'S CONDUCT WAS UNLAWFUL.

*Iqbal* explicitly confirmed that Rule 8 "does not require 'detailed factual allegations.'" *Iqbal,* 129 S. Ct. at 1949. Instead, Rule 8 merely requires a plaintiff to allege "more than an unadorned, the-defendant-harmed-me accusation." *Id.* To survive a motion to dismiss, plaintiff's complaint must "state a claim for relief that is plausible on its face," that is plaintiff's factual allegations must show "more than a sheer possibility that a defendant acted unlawfully." *Id.* *Iqbal* verified that courts must assume the truth of the complaint's factual allegations and then test the sufficiency of those facts against the substantive law of the cause of action at issue, which is a "context-specific" task requiring courts to draw upon their "judicial experience and common sense." *Id.* at 1950.

In *Ashcroft* the Court applied those principles to a prisoner-complaint filed by Javaid Iqbal against multiple defendants, including former Attorney General John D. Ashcroft and Director of the Federal Bureau of Investigation ("FBI"), Robert S. Mueller, III. The allegations Iqbal directed to Ashcroft and Mueller were exceptionally sparse, particularly in

light of the fact that Iqbal asserted a First Amendment *Bivens* claim against the nation's top law enforcement officials, claiming they had purposely discriminated against him because of his race, religion, or national origin. The substantive law of that claim required Iqbal to show that Ashcroft and Mueller's purpose in enacting the policy was to treat Iqbal differently **because of his** race, religion or national origin. *Id.* at 1948. The Court emphasized, "it is important to recall that [Iqbal's]... claims against [Ashcroft and Mueller] rest solely on their ostensible 'policy of holding post-September-11th detainees' in the ADMAX SHU once they were categorized as 'of high interest'" by *other* defendants. *Id.* at 1952. Thus, the Court held that the substantive law governing Iqbal's *Bivens* claim required Iqbal to plead:

> *facts plausibly showing that [Ashcroft and Mueller] purposefully adopted a policy of classifying post-September-11 detainees as "of high interest" because of their race, religion, or national origin.*

*Id.* (emphasis added). However, Iqbal's only factual allegation supporting his purposeful discrimination claim was the fact that Ashcroft and Mueller "adopt[ed] a policy approving 'restrictive conditions of confinement' for post-September 11 detainees until they were 'cleared' by the FBI." *Id.* The Court held:

> *Accepting the truth of that allegation, the complaint does not show, or even intimate, that petitioners purposefully housed detainees in the ADMAX SHU due to their race, religion, or national origin. All it plausibly suggests is that the Nation's top law enforcement officers, in the aftermath of a devastating terrorist attack, sought to keep suspected terrorists in the most secure conditions available until the suspects could be cleared of terrorist activity. [Iqbal] does not argue, nor can he, that such a motive would violate petitioners' constitutional obligations.*

*Id.*

As a result, the Court dismissed the purposeful discrimination claim against Ashcroft and Mueller. The Court reasoned that Iqbal needed "to allege more by way of factual content" to make a plausible showing that Ashcroft and Muller were motivated by a desire to discriminate on the basis of *race, religion, or national origin*, as opposed to the "obvious alternative explanation" that Ashcroft and Mueller's facially lawful policy was motivated by the legitimate need to respond to the "devastating terrorist attacks" of

September 11, and legitimate fears that other terrorist attacks were imminent. *Id.* at 1951-52.

## A. Defendants' "Alternative Explanations" are—Themselves—Implausible and Should Not Survive the Application of the Court's Judicial Experience and Common Sense.

Every Defendant has seized upon *Iqbal's* recognition of the "obvious alternative explanation" for Ashcroft and Muller's allegedly purposefully discriminatory policy. They each employ a variation on the theme that their misconduct "can be readily explained by the legitimate desire to investigate the alleged rape of Crystal Mangum." Gottlieb, Himan, and City Supp. Br. 4 (Doc. #123) ("City Brief"). The City Brief also presents the alternative explanation that Defendants Gottlieb and Himan were simply "police doing the best they could to faithfully execute their investigatory duties under trying circumstances." *Id.* at 2. However, stigmatizing Plaintiffs publicly, coercing false statements, retaliating against Plaintiffs' for their exercise of their constitutional rights; fabricating warrant affidavits, forensic medical records, and identification evidence; and concealing exculpatory testimonial, medical, DNA, and identification evidence (to name only a few) is a far cry from "faithfully" executing investigatory duties.[1]

Plaintiffs allege that the Defendants committed theses wrongs knowing that no "attack" occurred. Plaintiffs allege that, no later than the Joint Command meeting on March 29th, Defendants had learned that the SBI's testing of the rape kit contradicted Mangum's allegations, that Mangum's descriptions and subsequent identification procedures ruled out Plaintiffs and their teammates as suspects, and that the medical evidence was not consistent with a violent gang-rape and in fact that the Sexual Assault Examination (SAE) was abandoned because the physician conducting the SAE did not believe Mangum's claims. AC ¶ 631; *see also id.* ¶¶ 293-309, 363-81, 617-26. Nonetheless,

---

[1] *See* AC ¶¶ 414-44, 500-58, 591-616, 641-54, 660-65, 666-75, 676-87, 746-78, 779-99.

the Durham Police Supervisors claim in their supplemental brief that "the facts alleged show a legitimate law enforcement basis for continued investigation after May [sic] 29, and any inference that the evidence that day demanded no further investigation is not plausible."  Durham Police Supervising Defs. Supp. Br. 16 (Doc. #122) ("City Supervisors Brief").

Duke University Defendants argue that "the far more plausible explanation" for Plaintiffs' detailed factual allegations that among others include Duke's concealment of its police department's jurisdictional control of the investigation and its power to intervene to prevent the known wrongs to be committed against and constitutional violations of Plaintiffs and their teammates, AC ¶¶ 456-65, Duke's fabrication of false and misleading police reports, *id.* ¶¶ 468-75, Duke's public stigmatization of Plaintiffs and their teammates, *id.* ¶¶ 528-558, and fabrication of medical evidence, *id.* ¶¶ 779-99, is "that Duke University and its employees were properly responding to the inquiries of a facially lawful criminal investigation conducted by the Durham police and the prosecutor."  Duke Supp. Br. 6 (Doc. #120) ("Duke Brief").

Defendants are grasping at smoke.  In fact, the more "plausible alternative explanation" for Duke's conduct, for example, is that their actions were part of a larger conspiracy to convict Plaintiffs and their teammates and alternative plan to avoid the costly burden of discovery and judgments in civil actions, which they knew Plaintiffs and their teammates would bring against the University.  AC ¶¶ 829, 893, 896.  Duke has filed documents lending to prove the latter motive in this Court showing that as of March 30, 2006, following their attendance at the March 29th Joint Command meeting described above, Duke notified its insurance carrier of Plaintiffs' claims attaching "numerous articles from the press regarding the allegations and *Duke's subsequent investigation into the allegations.*"  Complaint, *Duke Univ. v. Nat'l Union Fire Ins. Co.*, No. 1:08-cv-00854 at 6 (Doc. #1) (M.D.N.C. 2008) (emphasis added).

Even if Defendants' alternative explanations were relevant to Plaintiffs' causes of action (which they are not), all of them fail because "legitimate alternative explanations" do not include "implausible alternate realities." Defendants liken the circumstances they faced to those Ashcroft and Mueller confronted, which the Court describes:

> The September 11 attacks were perpetrated by 19 Arab Muslim hijackers who counted themselves members in good standing of al Qaeda, an Islamic fundamentalist group. Al Qaeda was headed by another Arab Muslim—Osama bin Laden-and composed in large part of his Arab Muslim disciples. It should come as no surprise that a legitimate policy directing law enforcement to arrest and detain individuals because of their suspected link to the attacks would produce a disparate, incidental impact on Arab Muslims, even though the purpose of the policy was to target neither Arabs nor Muslims. . . . [T]he arrests Mueller oversaw were likely lawful and justified by his nondiscriminatory intent to detain aliens who were illegally present in the United States and who had potential connections to those who committed terrorist acts. As between that "obvious alternative explanation" for the arrests and the purposeful, invidious discrimination respondent asks us to infer, discrimination is not a plausible conclusion....All [the complaint] plausibly suggests is that the Nation's top law enforcement officers, in the aftermath of a devastating terrorist attack, sought to keep suspected terrorists in the most secure conditions available until the suspects could be cleared of terrorist activity.

*Iqbal*, 129 S. Ct. at 1951-52. Defendants will not get far (factually, legally, or normatively) by drawing analogies between an "attack" they knew did not occur and the tragic events of September 11th, or by likening themselves to noble Americans who risked much to respond to the horrors that unfolded on that day. Even where their "alternative explanations" are relevant in the context of a cause of action, their "alternative explanations" should not survive application of the Court's "judicial experience and common sense."

### B. Iqbal's Lone Allegation of Misconduct Against Ashcroft and Mueller is Dwarfed by Plaintiffs' 483 Pages and Exhibits of Detailed Allegations.

Iqbal's Complaint pled only one factual allegation against Ashcroft and Mueller, and, while Defendants assert that Plaintiffs' AC should be dismissed for the "same reasons" the Court dismissed Iqbal's Complaint, Defendants assiduously avoid any direct comparison of the two. Indeed, while some Defendants employ Iqbal's Complaint as an

exhibit to their Supplemental Briefs in the companion cases, they did not do so when attacking Plaintiffs' 483-page AC in this case.[2]  And for good reason.  As documented below, Plaintiffs' 483-page Amended Complaint and Exhibits (including 15 video clips, 4 audio clips, 9 pictures, 1 chart, and 37 pages of exhibits) plead detailed, factual allegations that show more than a "sheer possibility" that each Defendant's conduct was unlawful.

## II.  PLAINTIFFS ALLEGE FACTS SHOWING MORE THAN A "SHEER POSSIBILITY" THAT THE DEFENDANTS ACTED UNLAWFULLY.

### A.  Plaintiffs Allege Facts Showing More than a "Sheer Possibility" that the Chairman Acted Unlawfully.

By March 25, 2006, Robert K. Steel ("the Chairman") had been presented with evidence demonstrating that "Mangum was a deeply disturbed young woman who exhibited signs of psychosis" on the night in question and that "her accusations were false," AC ¶ 445; that Gottlieb was a documented rogue cop who, after having been pulled from the patrol beat, now had "a vendetta in response to the Gottlieb Dossier" (a report that detailed his increasing misconduct in matters involving Duke Students, prepared on behalf of Duke Students for purposes of removing him from the beat).  *Id.* ¶ 446.[3]  The Chairman was aware that Nifong was embroiled in a hotly contested election in which he was trailing his bitter rival by a substantial margin, and that he had already signaled that he was "preparing to ride the case into office."  *Id.* ¶¶ 447, 478-95.  The Chairman was cognizant of the fact that "Addison was lying publicly about the evidence."  *Id.* ¶448.  The Chairman was aware that the investigation belonged to the Duke University Police Department ("DUPD").  *Id.* ¶ 449.[4]  "The Chairman knew that, if the public perceived Duke

---

[2] *See, e.g.,* Supervisory Defs. Supp. Br., *Evans v. City of Durham,* No. 1:07-cv-00739  Exh. 1 (Doc. #99) (M.D.N.C. 2007); Durham Supervisors Supp. Br., *Carrington v. Duke Univ.,* No. 1:08-cv-00119 Exh. 1 (Doc. #134) (M.D.N.C. 2008).

[3] *See also id.* ¶¶ 171-78, 460.

[4] *See also id.* I. THE SECRET: THIS WAS THE DUKE POLICE DEPARTMENT'S CASE, ¶¶ 82-106.

abandoning the Plaintiffs, the public would conclude that Duke knew they were guilty." *Id.* ¶ 450.

Knowing this and other information, AC ¶¶ 256-61, 321-32, the Chairman formed a Crisis Management Team ("CMT") of senior Duke Officials for the purpose of turning Duke University, the institution, its employees, and its resources, against Plaintiffs and their teammates who were defending false accusations of the most serious kind. *Id.* ¶¶ 85-86, 454, 457-59. The CMT originally consisted of Defendants Burness, Brodhead, Trask, Lange, and Moneta. *Id.* ¶ 459. Knowing the proof of their innocence, the Chairman stated that he had determined that it would be "best for Duke" if Plaintiffs and or their teammates were charged and tried on Mangum's false accusations. *Id.* ¶¶ 85, 332, 452-53, 638, 862. In furtherance of what the Chairman believed was "best for Duke," the Chairman issued a directive (the "Chairman's Directive" AC ¶¶ 445-55) to employ the University in the Conspiracy to Convict and its constituent conspiracies. *Id.* The Chairman rejected pleas for Duke to show some measure of support for the students or not, at least, to impugn the innocent student being framed in plain view, explaining that, "sometimes individuals have to be sacrificed for the good of the Organization." *Id.* ¶ 452. The Directive was, in the words of one who received it, "to f***k those lacrosse players." *Id.* ¶ 455.

The original CMT members—Brodhead, Burness, Trask, Lange, and Moneta—agreed to pursue the Chairman's Directive through their offices, their own conduct and their subordinates. Burness agreed to utilize his office, other CMT members, and subordinates to stigmatize Plaintiffs in the local and national media. Trask agreed to utilize his institutional control over the DUPD to ensure the Department abandoned their investigation of Mangum's claims, delegated their authority to Gottlieb, and otherwise carried out the Chairman's Directive. Brodhead agreed to use the Office of the President and the integrity of the University in furtherance of the Chairman's Directive, personally and through AD-Hoc Committee would create to impeach the character of Plaintiffs and

their teammates. Lange agreed to use his position over the Duke Faculty in furtherance of the Chairman's Directive. Moneta agreed to aid police access to students' federally protected information including Duke Card Accounts and electronically stored communications (i.e. emails) protected by the Electronically Stored Communications Act, and to aid in impeaching Plaintiffs' character through Brodhead's Committees.

Shortly after the first CMT meeting, when it became clear that DNA evidence would not be available and Nifong would have to rely on Duke University Health Systems, Inc. ("DUHS") Sexual Assault Nurse Examiner ("SANE") Tara Levicy, the Chairman brought the Chancellor of DUHS, Victor Dzau, into the CMT on a permanent basis. In that role, Dzau agreed to put Duke University Medical Center ("DUMC"), and, in particular, Defendant Levicy, into the service of the Chairman's Directive. The University conducted itself through that structure and those five members of the CMT, at Steel's direction, throughout the ordeal. As a result, the University's acts in furtherance of Conspiracy to Convict appeared in five discrete dimensions, as documented in the Amended Complaint, explained in the following pages, and shown in the diagram below.

**B.** **Plaintiffs Allege Facts Showing More Than a "Sheer Possibility" that the Duke Police Defendants Acted Unlawfully Under CMT Defendant Trask's Direction in Furtherance of the Chairman's Directive.**

The Amended Complaint pleads facts showing that, pursuant to the Chairman's Directive, Trask directed the Duke University Police Defendants to act unlawfully, in furtherance of the Conspiracy to Convict. Plaintiffs' allegations show that the Chairman, through Trask, directed the Duke Police Department not to act to intervene to prevent the ongoing Conspiracy to Convict or any of its constituent conspiracies, despite their duty and opportunity to do so. *See, e.g., id.* ¶¶ 85-86, 457-58, 461. To conceal the authority of the Duke Police to intervene, President Brodhead, other CMT members, and Duke Police Supervisors issued numerous false public statements asserting that the Duke Police had no

power to investigate Mangum's false accusations, when, in fact, the Duke Police Department had the primary responsibility for doing so. AC ¶¶ 461-65, 476-77; *see also id.* 82-106, Attach. 1-3. Next, in furtherance of the Chairman's directive, Trask caused those Duke Police Officers who interacted with and observed Mangum at the hospital to produce fraudulent police reports that concealed their exculpatory observations of Mangum during the early morning hours of March 14th and fabricated inculpatory observations. *Id.* ¶¶ 468-75. As a result, the Duke Officers' statements all (1) concealed their original roles as investigators (describing themselves as mere bystander witnesses), *Id.* ¶ 467; "[c]oncealed the fact that the Duke Police had jurisdiction over the investigation," *id.* ¶ 467(A); "[c]oncealed the fact that the investigation was a Duke Police investigation, until Duke abdicated its jurisdictional responsibility to initiate and conclude an investigation of Mangum's allegations, *id.* ¶ 467(B); "[c]onceal their observations during their interactions with Mangum that tended to prove Mangum's claim was a fraud, *id.* ¶ 467(C); and described Mangum's behavior so as "to (falsely) enhance the reliability of Mangum's claim," *id.* ¶ 467(D). Specifically, the Duke officers' fabricated reports concealed their recorded recollections of Mangum's bizarre behavior, *id.* ¶ 256; Sgt. Shelton's conclusions that he thought Mangum was lying, AC ¶ 472, and that "she was exhibiting signs of a serious mental illness requiring emergency psychiatric intervention, *id.* ¶ 256; Inv. B.S. Jones's conclusions that Mangum's claims were false and that "she determined to rule Mangum's allegations 'unsubstantiated,'" AC ¶ 333; Officer Day's observations that many of the officers who interacted with Mangum believed her claims were a hoax, *id.* ¶ 475, and evidence that Mangum's false accusation was a reaction to a "police radio exchange ordering a patrol unit to Mangum's house to see if her children were alone [and if so, report her to DSS], the suggestive questioning that prompted the half-hearted false claim of rape, the specious circumstances surrounding it, Mangum's troubled psychiatric history, revealed at Durham Center Access, including Mangum's [prior] involuntary commitments." *Id.* ¶¶ 257-61. Further, the Amended Complaint shows that two of the

officers who wrote these fabricated statements "changed [their accounts] significantly when they left the Duke Police Department" because they were no longer subject to the Chairman's Directive.  *Id.* ¶ 467(E).

The Duke Defendants offers an "alternative explanation" for the fabrication of police reports to obtain wrongful convictions and avoid liability in a civil rights action: these facts, they assert, "show only that the two forces [Duke and Durham police departments] were occasionally, and entirely properly, exchanging information about the case."  Duke Br. at 10.  Defendants are free to argue that alternate explanation to a jury. Taking the facts in the Amended Complaint as true, there is more than a "sheer possibility" that the Duke Police Department Defendants acted unlawfully in furtherance of the Chairman's Directive. *Iqbal*, 129 S. Ct. at 1949.  Plaintiffs therefore have stated claims against them.  *See id.*

### C. Plaintiffs Allege Facts Showing More Than a "Sheer Possibility" that Levicy, Under CMT Defendant Dzau's Direction, Acted Unlawfully in Furtherance of the Chairman's Directive.

Early on, at the inception of the media eruption surrounding Mangum's false allegations, Tara Levicy was at the center of the storm.  Despite Mangum's Sexual Assault Exam ("SAE") not revealing any physical injuries indicative of rape or sexual assault of any kind, AC ¶ 324, including no injury to her pelvic region, including the vaginal walls, cervix, rectum, and anus, *id.* ¶ 306, and despite the only documented evidence of injury being nominal scratches on Mangum's foot and knee that digitally time-stamped photos taken during the brief dance at 610 N. Buchanan show the exact same injuries were present prior to Mangum's arrival at 610 N. Buchanan Blvd., *id.* ¶ 326, Levicy reported to Gottlieb and Himan that Mangum's "injuries and her behavior were consistent with a traumatic experience."  *Id.* ¶ 780-81.  This along with the statement that "[m]edical records and interviews that were obtained by a subpoena revealed the victim had signs, symptoms, and injuries consistent with being raped and sexually assaulted vaginally and anally," *id,*

were included in the falsified factual section of the NTID Order. *Id.* Levicy did not produce significant portions of the SAER in compliance with the DUMC March 21, 2006 subpoena, *id.* ¶ 785, nor was Levicy as a "SANE-in-training" deemed "qualified or competent to identify, collect, or interpret forensic medical evidence." *Id.* ¶ 301.

Levicy's role expanded when Nifong, Gottlieb, and Himan learned that there would be no DNA evidence to corroborate Mangum's claims. Levicy agreed to "fabricate proof of 'trauma' where none, in fact, existed" in order to solve the case's physical evidence problem. Corroborating their unlawful agreement, Nifong then began making public statements in the local and national press, explaining he would be relying on SANE-in-Training, Tara Levicy, and DUMC to prove trauma where none was found. AC ¶ 782(A)-(E); Exh. 21; Exh. 22 (documenting Nifong's public statements).

The AC alleges that in meetings with Durham investigators, SANE-in-Training, Tara Levicy, deliberately falsified Mangum's Sexual Assault Exam Report ("SAER") by fabricating portions of Mangum's narrative and other portions of Mangum's medical records through contemporaneous responses on the pre-printed SAER including "strike-outs and other addenda that [did] not conform to the facts of the SANE exam," AC ¶ 785, but rather were manufactured attempts by Levicy "to conform the SANE interview to what Gottlieb reported in his sensationalized application for the NTID Order" and Search Warrant for Ryan McFadyen's dorm room, *id.* ¶ 785-86, in addition to other evidence police believed existed at the time. *Id.*

For example, the SAER was altered to change the response to the question whether "efforts were made to conceal evidence." AC ¶ 785(B). Levicy's "original notation, 'no,' was struck through, and the (formerly empty) "yes" blank was checked"; then the words "wiped her off with a rag" were added. *Id.* The fabrication created a false consistency between the SAER and the SBI report that a towel Himan and Gottlieb seized from 610 N. Buchanan contained semen. *Id.* (This fabrication would later be foiled by the fact that DNA testing revealed that no DNA matching Mangum was present on the towel.) *Id.*

To show "more than a sheer possibility" of the concerted conduct of Levicy, Gottlieb, Himan, and Mangum, on April 6, 2006 (one day after Levicy produced the contemporaneous fabricated pages of Mangum's SAER and two days after the rigged identification procedure), Himan and Gottlieb summoned Mangum to make the only written statement of the attack she would give. AC ¶ 785(C). Consistent with the conspiracy to fabricate evidence to support Gottlieb and Himan's fabricated affidavits and Levicy's fabricated SAER, Mangum's statement was written to match up with the fabricated affidavits and the fabricated SAER. *Id.* Thus, Mangum wrote of two events that appear nowhere else in the contemporaneous records of Mangum's accounts on March 14th or thereafter. First, Mangum stated that her attackers wiped her off with a towel (thereby linking the towel, the SAER, and her statement). *Id.* Second, in an "add-on" paragraph annexed to the end of her statement, Mangum wrote that "Adam ejaculated in my mouth and I spit it out onto the floor, part of it fell onto the floor [scratch out]...." *Id.* This was designed to falsely link Mangum's account to semen found on the bathroom floor. *Id.* (This, too, would later be foiled by the results of testing that the specimen contained no DNA belonging to Mangum.)

In furtherance of the Chairman's Directive and in furtherance of the conspiracy to convict, from March 16, 2006 until January 11, 2007, Levicy repeatedly assured her co-conspirators by continuing to proffer false testimony to rebut the overwhelming evidence that Mangum's accusations were false, to perpetuate Plaintiffs' stigmatization, and to secure convictions. AC ¶¶ 787–799. Levicy proffered false testimony to explain why the SAER is rife with statements indicating "no condoms" were used in light of the absence of DNA evidence. *Id.* ¶ 794. Further, Levicy proffered false claims that Mangum "could always speak articulately" and that she was lucid and "very alert" (in other words, capable of accurately recalling the events of the evening, which would be offered to defeat the anticipated motion to suppress Mangum's in-court identifications of her "attackers"). *Id.* ¶ 797.

Plaintiffs allege multiple facts showing that every other medical and law enforcement professional Mangum encountered that evening concluded that Mangum had no accurate or consistent memories of anything (including which city she was in), and was experiencing breaks with reality and suffering from psychosis, AC ¶¶ 253, 256, 291-92; and that this was consistent with Mangum's medical history for quite some time. *Id.* ¶¶ 258, 315-16. In addition, the Amended Complaint documents the contemporaneous reports of the medical professionals who attended Mangum on the evening in question, *id.* ¶¶ 293-309, which show, among other things, that Mangum recanted the rape claim as soon as she was released from the involuntary commitment proceedings (and the threat of a DSS investigation was lifted). *Id.* ¶¶ 243-262. Mangum feigned unconsciousness in an effort to deceive Sgt. Shelton, *id.* ¶¶ 232-34, Mangum feigned symptoms of pain to obtain pain medications she did not require, *id.* ¶¶ 294-96, 309, 312-20, Mangum had been declared clinically unreliable by her prior treating physicians, *id.* ¶¶ 315-16; Mangum had a documented history of habitually lying about events and circumstances that she claimed necessitated prescription medications, *id.*; and, when Mangum was presented for involuntary commitment and later at Duke Hospital for the SAE, Mangum was incoherent, *id.* ¶¶ 245, 291-92; and that Mangum exhibited signs and symptoms of active psychosis in her encounter with Sgt. Shelton, *id.* ¶¶ 237-38, during her brief time at 610 N. Buchanan Blvd., *id.* ¶ 197, and in Pittman's car. *Id.* ¶ 223. Indeed, Sgt. Shelton's observations of Mangum (together with Kim Roberts' reports of Mangum's bizarre behavior (i.e., Mangum's somnolent mantra, "mark me up, mark me up, that's what I want") led Sgt. Shelton to conclude that Mangum was exhibiting signs of psychosis and to initiate a process to involuntarily commit Mangum to the County's psychiatric facility (Durham Center ACCESS, also operated by DUHS). AC ¶¶ 223, 237-38. These and other facts documented in Plaintiffs' 483-page Amended Complaint are sufficient to more than a "sheer possibility" that Levicy acted unlawfully. *See* AC § IX ("ADDITIONAL OVERWHELMING EVIDENCE OF INNOCENCE GATHERED DURING

MANGUM'S 11 HOURS AT DUMC ON MARCH 14, 2006 AND XXXIV (A) (" THE SANE CONSPIRACY: LEVICY'S FALSE CLAIMS OF CORROBORATING EVIDENCE"); *see also* AC ¶¶ 331, 333. Levicy's motion should be denied.

**D. The Amended Complaint Pleads Facts Showing More Than a "Sheer Possibility" that Clark and Meehan Acted Unlawfully.**

"On Apil 10, 2006, ... Clark ...was present at the meeting [where] Meehan reported the results... DNASI had identified multiple sources of male DNA on the rape kit swabs alone [and] had concluded—with 100% scientific certainty—that Ryan, Matt, Breck, and their 43 teammates were excluded as potential contributors to any of the male DNA sources found. *Id.* ¶ 749. Knowing that these results shattered "the case" against the Men's Lacrosse team, *id.* ¶ 750, Himan, Gottlieb, Nifong, Meehan, and Clark met several times, *id.* ¶ 755, and discussed how to conceal from Plaintiffs the explosive findings DNASI had made. *Id.* ¶¶ 765-68. Clark and Meehan orally agreed with Nifong, Himan, and Gottlieb to conceal and obfuscate the exculpatory results of tests conducted with Plaintiffs' DNA. AC ¶ 749; *see also id.* § XXXIII ("THE CONSPIRACY TO CONCEAL DNASI'S TEST RESULTS IN VIOLATION OF N.C.G.S. § 15A-282").

The agreement to withhold those results violated N.C. GEN. STAT. § 15A-282 (2009), a state statute entitling plaintiffs to the results of tests conducted with the fruits of their NTID Procedures "as soon as the results [we]re available." *Id.* ¶¶ 641, 677, 758-64, 1142, 1150.

On April 21, 2006, Clark and Meehan met with Nifong, Gottlieb, and Himan, and agreed to report DNASI's test results by "utilizing an entirely novel reporting methodology that, by design, would conceal from Plaintiffs the fact that multiple male sources of DNA were found in the rape kit and did not match Plaintiffs or any lacrosse player." *Id.* ¶755, 765. These findings were proof of Manugm's lie. The AC explains that Clark and Meehan agreed to conceal "the fact that multiple male sources of DNA were found in the rape kit" and that none of it "match[ed] Plaintiffs or any lacrosse player." *Id.* ¶ 765. These

explosive findings were available before April 10, 2006, but, during the meeting on April 10, and several meetings thereafter, Clark and Meehan agreed not to produce any report of those results. *Id.* ¶¶ 749, 755-56, 801-03, 1334-38. The reporting methodology violated DNASI's internal protocols, Federal Bureau of Investigation standards, and regulations governing accredited DNA testing facilities. *Id.* ¶¶ 756, 802, 1336, 1351.

Finally, at the May 12, 2006 meeting with Gottlieb, Himan, Nifong, Meehan, and Clark agreed to produce a report to Plaintiffs and the court knowing that it would be falsely represented as the complete and final report of all tests conducted with Plaintiffs' DNA, and DNASI's findings with respect to DNA testing. AC ¶¶ 756, 1335. However, pursuant to Clark and Meehan's agreement with Nifong, Gottlieb, and Himan, DNASI's belated report omitted "the results [showing] the presence of spermatozoa" and also failed to disclose the fact that tests were conducted comparing the male epithelial and sperm cells found in Mangum's rape kit with Plaintiffs' DNA. *Id.* ¶ 766.[5]

Plaintiffs show that, if Clark and Meehan reported the test results according to their protocol and as required by NCGS § 15A-282, the report "would have revealed to the Plaintiffs [on April 10th] the presence of multiple unknown unidentified male sources of

_____

[5] Further, in all of their meetings with their co-conspirators, Clark and Meehan agreed to cover up their conspiracy by agreeing that none among them would take notes of the meetings or memorialize their conversations in writing. AC ¶ 629. The facts showing Clark and Meehan's participation in the cover-up not only adds to the factual basis for Plaintiffs' Section 1983 claims; it also shows that the DNA conspiracy was designed to interfere with Plaintiffs' ability to bring this action in this federal court, in violation of § 1985. *See* AC ¶¶ 1156-59; *see also* Pls.' Opp. Br. (DNASI), § IV B-D. Their failure to intervene to prevent the harms to be done in that §1985 conspiracy forms the basis of Plaintiffs' §1986 conspiracy against Clark, Meehan, Gottlieb, Himan, and Nifong. *See* AC ¶¶ 1170-88; *see also* Pls.' Opp. Br. (DNASI) (Doc. #79) § IV B-D. These acts were done in furtherance of a conspiracy to deprive Plaintiffs of statutory entitlements that, as such, are protected by the United States Constitution. Plaintiffs seek redress for the deprivations of those constitutionally protected entitlements in their Section 1983 claims against Meehan, Clark, Nifong, Gottlieb, and Himan. *See, e.g.,* AC ¶¶ 941-53, 969-77, 978-85, 1002-1007, 1147-55.

genetic material in Mangum's rape kit, including the rectal swab, the oral swab, and multiple portions of her underwear." *Id.* ¶ 758. Plaintiffs present a chart illustrating the explosive results that were, by law, required to be reported to them; the chart shows that those results would have revealed the existence of multiple unknown source of male DNA in Mangum's rape kit. *Id.* ¶ 759.

Clark and Meehan respond to these detailed factual allegations by ignoring and distorting them. They assert that "Plaintiffs appear to premise their claims against him on [Clark's and Meehan's] title alone," and "[a]t most . . . allege that [they were] present at meetings." DNASI Supp. Br. 10 (Doc. #121) ("DNASI Brief"). They also assert that the meetings in which Plaintiffs allege with detail that Defendants concocted and agreed upon a plan to implement a novel report methodology in order to conceal exculpatory DNA evidence, AC ¶¶ 765-68, are " 'not only compatible with, but indeed [is] more likely explained by, lawful' interactions between prosecutor and expert," DNASI Br. 4-5 (internal citations omitted), or "the ordinary and expected interaction between key participants in a criminal investigation," *id.* at 4, or ""the commonplace workings of the law enforcement investigative process." *Id.* at 5. These alternative explanations may be true with regard to meetings between law enforcement, experts, and prosecutors that discuss DNA results, but not—as Plaintiffs allege—multiple meetings in which they that discuss and agree upon reporting methodologies to conceal DNA testing results in violation of a constitutionally protected statutory entitlement to those results. Accepting as true the detailed facts Plaintiffs have pled, there is more than a "sheer possibility" that Clark and Meehan acted unlawfully. *Iqbal*, 129 S. Ct. at 1949. *Iqbal*, 129 S. Ct. at 1949.

E.    **There is More Than a "Sheer Possibility" that Addison's Conduct was Unlawful.**

The AC alleges that Cpl. David W. Addison was presented with facts showing that no crime had occurred and that members of the lacrosse team cooperated—at length—with the police. AC ¶ 560-61. Yet, knowing those things, Addison "engaged in public and

private acts that promoted, reinforced, or asserted four false and interrelated claims: (1) a woman was raped by three men at 610 N. Buchanan Boulevard; (2) the perpetrators were members of the team, (3) all members of the team were involved as principals or accomplices, and (4) all members of the team were 'stonewalling' the police investigation." *Id.* ¶¶ 501, 1085. Further, "[i]n his capacity as spokesperson for the City of Durham Police Department, Addison made numerous public statements to representatives of the news media designed to stigmatize the Plaintiffs in the local community and in the eyes of hundreds of millions of people ("the Addison's Statements")." *Id.* ¶¶ 505-06. Among other things, beginning on March 24, 2006, Addison (falsely) appeared on local and national television and radio programs to broadcast to millions of Americans that "the police investigation had produced 'really, really strong, physical evidence' of rape," and that the evidence included genetic material that would "establish a match with DNA from the lacrosse players who committed the rape," *id.* ¶ 505(A); that "...all of the [lacrosse team] members refused to cooperate with the investigation," *id.* ¶ 505(B), and this "refusal to cooperate with the investigation" caused issuance of the NTID Order for their DNA, *id.* ¶ 505(C); that the lacrosse team was given "several chances to cooperate with police ... [but] still kept silent," *id.* ¶ 505(D); that the "brutal assault, that brutal rape that occurred within that house, cannot be explained by anyone," *id.* ¶ 505(E); that police knew Plaintiffs were present or participated in the gang-rape, "knew what transpired" and are stonewalling the investigation, *id.* ¶ 505(G), and that "the millions of viewers watching him should imagine that Plaintiffs raped their daughter, claiming that the NTID Order (and its Affidavit) were necessary only because Plaintiffs knew who raped Mangum but refused to tell police." *Id.* ¶ 956(B).

Plaintiffs also allege "even more strident statements that provided far richer, fabricated detail" made by Addison on condition of anonymity or "not-for-attribution." AC ¶ 506. Further, the AC alleges the incendiary neighborhood flyer broadcast by Addison. *Id.* ¶¶ 507-514. Addison's statements and inflammatory flier were broadcasted

from March 24th to as late as May 26th. *Id.* ¶¶ 505-10. When Addison was making these statements "on national television, local television, radio programs, in local and national newspapers, and email chains that metastasized out to a national and international audience," *id.* ¶¶ 516; *see also id.* ¶625, in direct violation of the Durham Police Department's General Orders (e.g., G.O. 4060 R-2) and Standard Operating Procedures, *id.* ¶ 515, Addison was aware that there was no DNA evidence that any assault occurred, *id.* ¶ 508, and he knew that members of the team that lived in 610 N. Buchanan had "provided all the assistance, answers, evidence police could think to ask for ... [and then] requested that the police administer a polygraph." *Id.* ¶ 561. These facts among multiple others detailed throughout Plaintiffs' AC show "more than a sheer possibility" that Addison acted unlawfully.[6]

### F. There is More than a "Sheer Possibility" that Michael's Conduct Was Unlawful.

Kammie Michael does not deny she made the false and inflammatory statements alleged in the Amended Complaint; nor could she—they were broadcast to millions of

---

[6]Addison's asserts that, under *Iqbal*, the AC fails to allege specific facts establishing the "plus" element of Plaintiffs' §1983 Stigma-Plus claim, Supervisors Br. 16, but Plaintiffs have already addressed this argument and Ashcroft does not amplify it. Pls.' Opp. Br. (SMAC) (Doc. #82) § II.A. 2-4. Next, Addison's assertion that he was only "attempting to urge witnesses to come forward," (Br. at 16), is only more evidence of his culpability in Plaintiffs claims against him for retaliation against them for asserting their right not to speak to police and attempting to coerce involuntary statements by subjecting them to national scorn and humiliation, and vilifying them in the eyes of millions. *See, e.g.,* Chavez v. Martinez, 538 U.S. 760 (2003) (holding that, because Fifth Amendment is not available to Plaintiff who was not charged or tried, a claim was available under the Fourteenth Amendment's substantive due process prohibition of conduct that shocks the conscience). Because Addison's argument for dismissal fails as a matter of both fact and law, Plaintiffs should be permitted to proceed to discovery on all claims they have asserted against him, including among others stated in the AC, §1983 Claims for Stigma-Plus (and Conspiracy), AC ¶¶ 954-68 ; Retaliation (and Conspiracy), AC ¶¶ 992-1001; Standby-Officer Liability (and Conspiracy), ¶¶ 1008-36; the §1983 Conspiracy to Convict, ¶¶ 1147-55; §1985(3), AC ¶¶ 1156-69; §1986, ¶¶ 1170-88; Negligence, AC ¶¶ 1261-67; Intentional Infliction of Emotional Distress, AC ¶¶ 1213-22; and Negligent Infliction of Emotional Distress, AC ¶¶ 1277-82 and ¶¶ 1283-88.

people via the national news organizations she gave them to.  Instead, Michael insists that the only "plausible" explanation for the AC's allegations of her wrongful conduct is that "at the time Michael made the statements alleged, she did not know all of the details of the investigation."  City Supervisors Br. 18.

However, "context here is everything" in the Rule 8 analysis.   TRO of Oral Argument at 6, *Bell Atlantic Corp. v. Twombly,* 550 U.S. 554 (No. 05-1125), 2006 WL 3422211 (2006); *see also Twombly,* 550 U.S. at 557(2007); *Iqbal,* 129 S. Ct. at 1950. Michael does not address the allegation that her false statements were parallel and complementary to the numerous other statements made in furtherance of the conspiracy to stigmatize and the conspiracy to foment and leverage public racial animus directed to plaintiffs.  AC ¶¶ 566-90.  Michael's "erroneous" statements not only evince her agreement to share those conspiratorial objectives, but also show Michael's own participation in the conspiracies to retaliate, stigmatize, and to convict.  Michael was still making the erroneous statements 19 days after the Durham Police first learned of the truth of the 911 call, 13 days after the truth had been verified by multiple sources.   *Id.* ¶ 574.  During that time period, Michael conspired to destroy the exculpatory portions of the 911 recordings, and continued making statements to foment a racial animus towards the Plaintiffs.  Taken as true, these facts show more than a "sheer possibility" that Michael's conduct was unlawful.

### G.  There is More Than a Sheer Possibility that Gottlieb and Himan's Conduct Was Unlawful.

Plaintiffs allege that Sgt. Mark D. Gottlieb and Benjamin W. Himan fabricated false affidavits to procure a NTID Order directed to Plaintiffs and their teammates, and then to procure a Search Warrant for Ryan McFadyen's dorm room, all in the absence of probable cause.  AC ¶¶ 414-44, 909-12; *see also* Pls. Opp. Br. (City) (Doc. #77) § II.A(1) (*Franks* analysis).  Indeed, the Amended Complaint alleges facts showing that Gottlieb and Himan did this knowing that the accusations they were "investigating" were a lie.  *Id.* ¶ 321-32, 362-84.  The AC pleads facts showing that Gottlieb and Himan committed numerous

unlawful acts designed to stigmatize the Plaintiffs, suppress the conclusive evidence of their innocence, fabricate evidence of their guilt, and otherwise conspire to indict, arrest, and convict Plaintiffs and their teammates for crimes they knew did not happen. *See id.* ¶¶ 627-40, 641-43, 676-87, 746-78, 779-99, 969-77, 978-85, 1147-55. The AC shows that Mangum presented Himan and Gottlieb with multiple inconsistent versions of the accuser's story which were different than those she presented to other officers and medical providers. *See id.* ¶¶ 245-71, 291-92, 294-96, 312-20, 321-28, 362-84, 670-74, 785(C). Gottlieb and Himan knew that every investigator and medical professional who interacted with Mangum on March 14 did not believe her claims (except when she recanted them). *See id.* 262-65, 266-71, 278, 285-88, 331, 333. They knew that Mangum could not recognize the Plaintiffs or their teammates in identification procedures that preceded the rigged April 4, 2006, procedure. *Id.* ¶¶ 362-84. They discussed at the March 27th Briefing that Mangum's story had several glaring contradictions and that she was not credible. *See id.* ¶¶ 382, 591-93. Kim Pittman—a key witness in the case—told them that Mangum's claims were " 'a crock.' " *Id.* ¶ 385. They were told at an April 10th meeting that DNA evidence proved that "a significant number of male sources of sperm and epithelial DNA [were found] in Mangum's rape kit and [that further testing] had concluded—with 100% scientific certainty—that Plaintiffs and their teammates did not match any of the male DNA found in the rape kit." *Id.* ¶ 801. And if the conclusion that Mangum was lying, delusional or both still escaped them, the point was made plainly enough by their co-conspirator, Nifong, who, after receiving Himan and Gottlieb's report summarizing the extraordinary evidence of innocence and the fatal defects in Mangum's claims, told them directly, "'You know, we're f*cked.'" *Id.* ¶ 593.

Gottlieb and Himan assert (again) that they cannot be blamed because Plaintiffs "allege that Nurse Levicy falsely told City investigators that Crystal Mangum had signs, symptoms, and injuries consistent with being raped and sexually assaulted." Gottlieb, Himan, and City Supp. Br. 5 (Doc. #123) ("City Brief"). Plaintiffs allege no such thing.

Paragraph 780 of the AC alleges that "the *falsified* factual sections of the NTID Order ... Gottlieb included the gist of *what he claimed* Levicy reported to him ..." AC ¶780. The AC then quotes the NTID Affidavit's "falsified" account of the Sexual Assault Exam. AC ¶¶ 785-99.[8]

Gottlieb and Himan do not dispute that it was a constitutional violation to deprive Plaintiffs of their statutory entitlement to reports of tests conducted with their DNA and Mug Shots as soon as the results were available. City Br. 6-8. Instead, they blame it on Nifong, asserting that it was Nifong (and not them) who "decided not only who would test the DNA, but how the results would be explained to the public and shared with the defense." City Br. 7. However, if that is true, then the City Defendants only amplify Plaintiff's allegation that the City delegated its policymaking authority to Nifong, who, acted unconstitutionally in exercising it, and, knowing of that, failed to revoke the authority or correct Nifong's conduct. However, the City's argument misses the mark because neither they nor Nifong had any discretion to decide what tests results would be produced to Plaintiffs or when to produce them because the Legislature took all discretion away when it enacted N.C. GEN. STAT. § 15A-282. The statute entitled Plaintiffs to a copy of the results of *every test* conducted with Plaintiffs' DNA or their Mug Shots "*as soon as the reports [we]re available.*" N.C. GEN. STAT. § 15A-282 (emphasis added).

> *A person who has been the subject of nontestimonial identification procedures or his attorney must be provided with a copy of any reports of test results as soon as the reports are available.*

---

[8] Gottlieb and Himan, like Clark and Meehan, assert that AC's only allegation of their participation in the DNA Conspiracy is, they summarize, they "sat in meetings with the State Prosecutor and representatives of DNASI." City Br. 6 (citing AC ¶ 765). However, the AC does far more to support the allegation than merely name participants of meetings. *See* AC ¶¶ 641-44, 746-68, 801-03, § XXV ("THE DNA CONSPIRACY"); *see also* discussion *supra* § 2(d) ("Clark and Meehan Acted Unlawfully").

*Id.* Taking these facts as true, Plaintiffs show more than a "sheer possibility" that Gottlieb, Himan, Nifong, Clark, and Meehan agreed to deprive Plaintiffs of the DNA reports to which they were *entitled* by statute. And even if they didn't, the transcript of Meehan's confession to the Conspiracy in a hearing on his DNA testing does.

The City Defendants misunderstand the Conspiracy to Convict when they allege that Plaintiffs only allegations supporting it relate to their presence at "meetings between Nifong and the City investigators." City Br. 8. First, those who participated in the Conspiracy to Convict shared the unlawful objective of wrongfully convicting Plaintiffs and their teammates for a crime they knew did not occur. All of the §1983 conspiracies (Plaintiffs First through Eleventh Causes of Action) are pled in the Twelfth Cause of Action as unlawful acts in furtherance of the Conspiracy to Convict. Thus, Gottlieb and Himan's participation in just the DNA conspiracy described above is sufficient to establish their participation in the overarching Conspiracy to Convict. (They are also implicated in the Conspiracy to Convict by participation in the Fourth Amendment Conspiracies, the Stigma Plus Conspiracy, among others). *See* AC ¶¶ 904-17, 918-28, 929-40, 954-68.

Finally, Gottlieb and Himan assert that their use of text from an email that an anonymous source claimed was sent by Ryan McFadyen was not malicious, and that *Iqbal* confirms his right to Public Officer Immunity. City Br. 8-9. However, malice is not an element of Plaintiffs constitutional claims relating to their use of the illegally obtained email (i.e., Plaintiffs First and Second Causes of Action (alleging Fourth Amendment violations)). *See* AC ¶¶ 904-17, 918-28. With respect to any claims that do require malice and, Plaintiffs have already shown that black letter Fourth Amendment law prohibits the use of information from anonymous sources as a basis for probable cause. *See discussion*, Pls' Opp. Br. (City), §II.(A)(1)b (and the cases cited therein). No reasonable officer would believe otherwise. *Id.* Because Himan and Gottlieb's original fabrications were sufficient to deceive a judge into issuing 46 NTID orders, including one directed to McFadyen, it is not "plausible" to suggest, as Gottlieb and Himan do, that a reasonable officer would think

their original fabrications (which they simply copied to obtain the search warrant) required additional material, particularly when the material may not be considered as a matter of law in determining probable cause.

Moreover, *Iqbal* does not "confirm[] . . . Gottlieb and Himan's right" to public officer immunity. City Br. 13-14. *Iqbal* never even addresses public officer immunity. And, the immunity is not available to defendants who, like Himan and Gottlieb, "violate clearly established rights because an officer acts with malice when he does that which a man of reasonable intelligence would know to be contrary to his duty." *Bailey v. Kennedy*, 349 F.3d 731, 742 (4th Cir. 2003)(internal quotations omitted). The immunity also does not protect public officials who do not "keep within the scope of their official authority and act without malice or corruption." *Id.* (citing *Grad v, Kaasa*, 321 S.E.2d 888, 890 (N.C. 1984)).[9] *Iqbal* does nothing to save the City Defendants' Motion, and it should be denied.

### H. There Is More Than A "Sheer Possibility" That Clayton's Conduct Was Unlawful.

The Amended Complaint alleges that Clayton participated in one of the most chilling dimensions of the conspiracies alleged: the rigged April 4, 2006, photo identification procedure, and the cover-up of the exculpatory identification procedures that preceded it. AC ¶¶ 363-84, 441-44, 611-15, 666-75, 972, 978-85. Having participated in the prior identification procedures on March 16th and 21st, Clayton knew that Mangum had no recollection of Plaintiffs or their teammates in the days and weeks after the party.

---

[9] The City Defendants argue that it is implausible to infer deliberate indifference to Plaintiffs' constitutional rights because they conveyed to Nifong and their chains of command the utter lack of evidence to support Mangum's claims and the overwhelming evidence supporting Plaintiffs innocence. *See* City Br. 10-11. To the contrary, what is not "plausible" is that communicating the absence of probable cause with a co-conspirator prior to fabricating probable cause to obtain NTID Orders and Search Warrants somehow precludes the inference of malice.

*Id.* ¶¶ 362-84, 611-615.  Further, Clayton completely ignores the allegations of the chilling misconduct that pervaded the rigged April 4th photo identification procedure, including the facts showing that Clayton and Gottlieb fabricated false evidence of Mangum's ability to recall the events of the evening in question by showing her photographs taken at 610 N. Buchanan shortly before the party.  *Id.* ¶¶ 670-75.  With the aid of those photographs, Mangum was able to recall from memory specific individuals from the party, what they were wearing and where they were sitting.  *Id.*  The purpose of fabricating Mangum's ability to recall those details was to enable the State to survive a motion to suppress Mangum's in-court identification of the three team members that she would select as her "attackers" in the April 4th identification procedure.  *See id.* 661-64, 797.  We know that Mangum did not recall those details from memory because, on April 4th, Mangum purported to recall what several individuals were wearing and, in the prior identification procedures, Mangum could not recall ever seeing them before.  *See id.* ¶¶ 362-84, 666-75, 676-81(explaining that the specific and dramatic improvements in Mangum's memory over time was the result of her being shown pictures from David Evans' camera taken before Mangum arrived).

The Amended Complaint alleges facts that show more than a "sheer possibility" that Clayton acted unlawfully.

I.      **The Amended Complaint Pleads Facts Showing More Than a 'Sheer Possibility' that Baker, Chalmers, Hodge, Russ, Mihaich, Council, Lamb, Ripberger, Evans, and Soukup, Acted Unlawfully.**

Contrary to the Duke Defendants' assertion, *Iqbal* did not "establish[] important precedent " in stating that "a plaintiff in a §1983 action cannot hold supervising employees vicariously liable for the wrongful actions of their subordinates."  Duke Supp. Br. 15 (Doc. #120) ("Duke Brief").[11]  The rule against vicarious liability has been the law of § 1983

_____

[11] While Duke stands alone in suggesting that a rule barring vicarious liability in §1983 suits is somehow 'new', their co-defendants nevertheless assert that *Iqbal's* application of the rule is relevant to their Motions.  *See* City Supervisors Br. 2-3; City Br. 2 n.3; DNASI Br. 10-11.

actions for nearly a century.[13]  That is why Plaintiffs do not seek to hold any defendant liable on that basis.  *See, e.g.*, Pls.' Opp. Br. (City Supervisors) 23-26  (Plaintiffs do not seek to hold defendants liable on a theory of *respondeat superior*.).   Instead, Plaintiffs have pled facts showing that each of the Supervising Defendants personally engaged in unconstitutional conduct.

In addition, *Iqbal* does nothing to alter the rule that dismissal is not appropriate where "supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care." *Shaw v. Stroud*, 13 f.3d 791, 798(4th Cir. 1994) (citing cases) (internal citations and quotation marks omitted); *see also Bodkin v. Strasburg*, No. 5:08CV00083, 2009 WL 1806656, *4 n.5 (W.D. Va. June 24, 2009) (noting that municipalities cannot be held liable under § 1983 on a *respondeat superior* theory, but denying, under *Iqbal*, a motion to dismiss § 1983 claims against municipality and employee in his official capacity because municipal officers "who potentially had 'final policymaking authority'" rejected plaintiff's attempt to rescind his resignation) (citing *City of St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988)(plurality); *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978)); *Riddick v. Sch. Bd.*, 238 F.3d 518, 523 (4th Cir.2000)).

---

[13] In *Iqbal*, it was "undisputed that supervisory *Bivens* liability cannot be established solely on a theory of *respondeat superior*"). Resp. Opp. Br. at 9, *Iqbal*, 129 S. Ct. 1937 (2008) (No. 07-1015), 2008 WL 2095715.  *See also Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691, (1978) (finding no vicarious liability for a municipal "person" under 42 U.S.C. § 1983); *Robertson v. Sichel*, 127 U.S. 507, 515-16 (1888) ("A public officer or agent is not responsible for the misfeasances or positive wrongs, or for the nonfeasances, or negligences, or omissions of duty, of the subagents or servants or other persons properly employed by or under him, in the discharge of his official duties."). *Dunlop v. Munroe*, 11 U.S. 242, *269* (1812) (a federal official's liability "will only result from his own neglect in not properly superintending the discharge" of his subordinates' duties).

1.     **Plaintiffs Allege Specific Facts Showing the Supervisors' Direct Participation in the Deprivation of Plaintiffs' Constitutional Rights.**

The Amended Complaint pleads that, before March 24, 2006, [the Duke Police Supervising Defendants] had "primary" responsibility to initiate and conclude the investigation of Mangum's false accusation of a sexual assault within the Duke Police Department's jurisdiction.  AC  ¶¶ 82-106, 188-93, 1289-94, ATTACHMENTS 2,3, 7**.** The AC alleges that Duke Police  ruled Mangum's accusations of sexual assault unfounded, based upon the reports of the Durham and Duke Police officers and the medical personnel who interacted with her (including those who initiated involuntary commitment proceedings because she showed symptoms of psychosis).  *Id.* ¶¶ 235-37, 247-61, 262-71, 278-81, 285-88, 291-92, 293-309, 321-31.  The Amended Complaint alleged that, on or before March 24, 2006, Defendants Baker, Chalmers, Hodge, Mihiach, Council, Lamb, Ripberger, and other City officials with policymaking authority with respect to the investigation of Mangum's false allegations, agreed to assign Gottlieb and Himan to the investigation, *id.* ¶¶ 333-40, 436-49, 1270-71, and on March 24, 2006, they agreed to grant Nifong policymaking authority over the police investigation.  *Id.* ¶¶ 486-87.  That same day, pursuant to that delegation of policymaking authority, Gottlieb's supervisor, Lamb instructed Gottlieb, Himan, and Ripberger to take direction—not from Lamb—but from Nifong, *id.* ¶ 487, despite the fact that both the Durham and Duke Police Supervisors knew that Nifong had no police experience or training, *id.* ¶ 1084(A); that he had not tried a felony case in nearly a decade, *id.* ¶ 480; that he was in losing an election to retain his job in a race against a bitter rival, *id.* ¶ 1084(B); that he had a history of unpredictable, explosive, irrational, and unstable behavior, *id.* ¶ 1084(C); that he was looking for a sensational case to establish name recognition, *see id.* ¶¶ 480-85, 1084(B); and that he already had made numerous public and private statements committing the investigation to a determinate outcome.  *Id.* ¶¶491-95, 1085; *see also id.* ¶¶ 447, 488-490, 1303(C).

The Duke and Durham Police Supervising Defendants were made aware of the overwhelming evidence that no assault had occurred, *see id.* ¶¶ 256, 262-77, 285-88, 291-92, 293-309, 321-32, 333, 353-54, 363-84, 402, 498-99, yet—cowed by intense pressure from the community they had allowed Nifong, Gottlieb, Himan, Addison to foment on March 29, 2006, the Duke Police Supervising Defendants and the Durham Police Supervising Defendants summoned Himan and Gottlieb to one or more Joint Command Meetings, during which they reported to all of the Police Supervising and Officials Defendants the state of the evidence in the case. The Amended Complaint devotes dozens of pages to the state of the evidence in the case, all of which Plaintiffs allege was reported to the Defendants, who were all present at the Joint Command Meeting on March 29th. AC ¶¶ 243-56, 262-88, 291-310, 321-31, 351-53, 362-84, 385-86, 414-44, 441-42, 466-75, 559-65, 568-76, 591-606, 617-24, 627-40, 1242(A)-(C).

Upon learning that all of the evidence developed in the case proved Plaintiffs and their teammates were innocent, and that Mangum's allegation was the product of either duress or psychosis (or both), that Gottlieb and Himan had fabricated the Affidavits submitted to the Court to obtain the NTID Orders and the Search Warrant of Ryan McFadyen's Room, that Duke personnel violated the Federal Electronic Communications act by obtaining Ryan McFadyen's email and disclosing it to foment public outrage, AC ¶¶ 597-610, among other unconstitutional acts, the Supervising Defendants at the Joint Command Meeting, in addition to Senior Duke University and City Officials in attendance, agreed and directed Himan and Gottlieb to move quickly to charge three white Duke lacrosse players, so they could be brought to trial by Nifong, who was assured by Duke's CMT members (which included the Chairman and DUHS Chairman Victor Dzau) he would have the aid of Levicy's fabricated evidence of "blunt force trauma" that she did not observe (nor could she). *Id.* ¶¶ 459, 790-91. The Supervising Defendants issued this directive knowing the overwhelming evidence—including the newly released DNA evidence—that demonstrated Plaintiffs' innocence. *See id.* ¶¶ 632-40, 641-42, 1244-45.

The Directive was in response to the openly admitted fear that the outrage the public acts and statements by Duke University Defendants and City of Durham Defendants had fomented would be directed upon University and City Officials accompanied by race riots and the fear that "Durham would surely burn." AC ¶ 637.

In response to the Supervising Defendants directive at the Joint Command Meeting, Nifong, Gottlieb and Himan designed a new, suggestive photo array procedure to present to Mangum. *Id.* ¶¶ 660-64. Consistent with the Joint Command's directive, two days later, Duke and Durham Police Supervising Defendants approved the proposed procedure despite the fact that it constituted a violation and/or a change in Durham Police policy from the requirements of General Order No. 4077, which had been implemented to prevent deprivations of constitutional rights. *See id.* ¶¶ 666-69, 677-78, 972, 1078-79. As a result of that rigged Procedure, Mangum identified Plaintiff Matthew Wilson as an attacker in a manner not materially different that Mangum's identification of David Evans. As the only native North Carolinian on the team (Matthew grew up in Durham), it would appear that he was spared indictment by virtue of his state residency. The City Defendants offer no other "obvious alternative explanation" for Gottlieb's decision not to follow up on Mangum's quasi-identification of him as he did with Evans.

Throughout the investigation of Plaintiffs and their teammates, Duke and Durham Supervisors learned "through the chain of command" and by other means, including nationally televised broadcasts, that Nifong and Durham Police officers were conducting manipulative identification procedures that violated constitutional standards, AC ¶¶ 666-69, making false stigmatizing statements, *id.* ¶¶ 500-35, 540-58, 570-75, 577-90, 809-11, 827-51, ATTACHMENT 23 (evidence of stigmatization), fabricating medical evidence, *id.* ¶¶ 779-799, intimidating witnesses who had information about Plaintiffs' innocence, *id.* ¶¶ 385-86, 770-72, 816-22, 896, 1114, 1150(H), 1195, 1216, concealing evidence of Plaintiffs' innocence, *id.* ¶¶ 595, 441-44, 617-59, 746-99, fabricating false evidence, *id.* ¶¶ 660-75, 779-99, and making false public statements regarding Plaintiffs and the Duke lacrosse

team," *id.* 414, 500-16, 529-35, 577-80, 809-11, 827-51, 956(D), they did not act to intervene, despite having the power and opportunity to do so. *Id.* ¶¶ 1170-88. Instead, the Duke and Durham Police Supervising Defendants and Steel personally, aided, abetted, ratified and condoned the unconstitutional conduct by continuing to recognize Nifong's authority over the police investigation, both by example and by directing the Duke Police officers and the Day Chain of Command to not intervene but instead to conceal and cover up the evidence in their possession and knowledge of Plaintiffs' innocence, AC ¶¶ 212, 256-62, 445-458, 466-75, 523-24, 536-39, 632-33, 1114-16, by directing Durham Police officers not to intervene but instead to continue reporting to Nifong and ratify and/or condone the ongoing violations of Plaintiffs' federally protected rights occurring in plain view and to act swiftly to charge, prosecute, and convict Plaintiffs and/or their teammates, *id.* ¶¶ 516-17, 523-24, 576, 634-36, 890-91, 964, 1114-16, and by directing Levicy to continue providing false and fabricated evidence to prop up Mangum's claims. *See id.* ¶¶ 788-89.

The Durham Police Supervising Defendants directed Nifong, Wilson, Lamb, Gottlieb and Himan to intimidate and discredit Sergeant Shelton by subjecting him to an internal investigation, accusations of unprofessional conduct, and threats of disciplinary action for reporting Mangum's recantation of her rape claim while at DUMC on March 13th. *See id.* ¶¶ 64, 262-65, 1041, 1084; *see also id.* ¶179. The Durham Police Supervisors and Wilson directed Himan to use "an outstanding warrant against Pittman for an alleged parole violation in an attempt to intimidate and tamper with her testimony that Mangum's allegations were false," or approved of his doing so. *Id.* ¶¶ 285-86.

The Duke and Durham Police Supervisors knew—from a freshly produced report documenting Gottlieb's misconduct in matters involving Duke students—about Gottlieb's history of selective and malicious prosecution, excessive use of force, manufacturing of false evidence, and filing of false police reports, the Duke Police Supervising Defendants and Steel nonetheless delegated their "primary" authority over the investigation to Nifong,

Gottlieb, Himan, and his Chain of Command, AC ¶¶ 84-86, 354-56, and throughout the ordeal, the Duke Police Supervising Defendants failed to rescind or overrule the Chairman's Directive not to intervene, or revoke their delegated authority from Nifong and Gottlieb, *id.* ¶¶ 357, 457, 1101, 1377-78, and the Durham Police Supervising Defendants failed to take adequate or meaningful steps to discipline Gottlieb, correct his behavior, or terminate his employment, and/or adequately supervise Nifong. *See id.* ¶¶ 143, 183, 339-40, 1069, 1083-94, 1101, 1119-24.[16]

The Durham Supervisors in the Addison Chain of Command (Russ, Hodge, Chalmers, and Baker) were aware of Addison's false public statements expressing premature conclusions of guilt and illegality, and they failed to stop him from continuing to disseminate them. AC ¶¶ 510, 517, 558, 964. In particular, they took no corrective action following Addison's publication of a series of inflammatory statements expressing the Department's official conclusion that Crystal Mangum had been raped, sodomized, sexually assaulted, and kidnapped Plaintiffs and their teammates, and that Plaintiffs and their teammates were actively obstructing justice. *Id.* ¶¶ 1125-31. The Amended Complaint alleges that Addison's statements and his Supervisors promotion of them were acts in furtherance of the conspiracies to coerce Plaintiffs into submitting to Police interrogation, to retaliate against them for asserting their right not to submit to police interrogation, and to stigmatize them in connection with the deprivations of their rights

---

[16] The Duke Defendants incorrectly assert that Plaintiffs seek to hold them liable for failing to supervise Gottlieb, Himan, and Nifong Duke Br. 12 n.6; however, Plaintiffs have pled that their conduct was actionable because they *delegated* their "primary" law enforcement authority to a known rouge (Gottlieb) and a rookie investigator (Himan) and an unstable, politically motivated, untrained prosecutor (Nifong), did not revoke the delegated authority or otherwise intervene when it became plainly obvious that they were using the delegated authority to deliberately violate Plaintiffs' constitutional rights. The Amended Complaint also shows that these decisions were caused by the Chairman's Directive. *See* ¶¶ 445-58, 1109-17.

caused by the fraudulently procured NTID Orders and Search Warrants. *Id.* ¶¶ 501, 507-28, 956(B), 1206, 1210.

Further, the Supervisory Defendants personally participated in or approved of the campaign to inflame the public and vilify Plaintiffs, including a series of public statements expressing the Durham Police Department's official conclusion that Mangum had been raped, sexually assaulted, and kidnapped by members of the Duke lacrosse team, and the publication of a series of stigmatizing "Wanted" posters that contained inflammatory and conclusory allegations Plaintiffs guilt as principal or accomplices in a horrific they depict. *See* AC ¶¶ 507-17, 518-24. The Amended Complaint also alleges that Supervisors participated in the same conduct. *Id.* ¶¶ 1061-65. Knowing that DNASI's tests revealed multiple male sources of DNA in Mangum's rape kit, which the lab said with 100% scientific certainty could not have come from Plaintiffs or their teammates, Defendant Hodge, in his role as Durham's "acting Chief of Police," stated publicly that the Durham Police had a strong case against Plaintiffs and their teammates. *Id.* ¶¶809-11, 945(E).

The City Defendants' contention that Addison's misconduct can be explained as Addison acting on his own in a misguided but "good faith" effort to elicit witnesses to come forward. City Supervisors Br. 17. But that argument is (at best) for the jury, who will surely require an explanation of the contradictory Affidavit the City filed in a related case that insists that the City retains tight control over the statements its employees make to the media, particularly in high-profile cases.

Arico, Manly, and Dzau also participated in the public vilification of the Plaintiffs and their teammates. Dzau, a member of the Chairman's Crisis Management Team, enforced the Chairman's Directive to bring Plaintiffs and their teammates to trial by ensuring that Levicy continued to fabricate false testimony to cover up Mangum's glaring credibility problems, and even to fabricate false inculpatory medical evidence of "trauma" that no one found (nor could they find without a colposcope, which was not used). AC ¶¶ 28, 459, 906, 913, 937, 996, *see* discussion *supra* § 2(c). The Amended Complaint

pleads that Arico engaged personally in the §1983 Stigma-Plus conspiracy by making statements that were reported in the press confirming (falsely) that Levicy obtained evidence of "blunt force trauma" in Mangum's SAER. *Id.* ¶¶ 784-91, 956(H). Manly and Dzau knew this was a false statement did not take corrective action of any kind, consistent with the Chairman's Directive. *Id.* ¶¶ 937, 996, 1207-09. Further, when Levicy claimed that "no condoms were used" and fabricated the SAER to harmonize it with Gottlieb and Himan's affidavits, they did not remove, re-educate, or otherwise take any corrective action viz. Levicy's proffered false testimony. *Id.* ¶¶ 1207-09, 1320-24.

The faculty's public excoriation of Plaintiffs and their teammates and the failure of the University to correct and reprimand them resulted in the deprivation of Plaintiffs' constitutional rights. AC ¶¶ 547-557. The University's failure to correct, reprimand, suspend, terminate, or otherwise respond to their employees resulted in the University's adoption and ratification of the faculty's public acts and statements and the furtherance of Nifong's conspiracy to "impeach the character of the putative defendants, their fact witnesses, and their character witnesses before charges were brought." *Id.* ¶¶ 558, 584-90.

These facts show more than mere "acquiescence in the discriminatory conduct of subordinates." City Br. 6 n.2. Rather, they allege that each of the Supervisory Defendants actively participated in the commission of unconstitutional acts. ("As a direct and foreseeable consequence of these acts and omissions, Plaintiffs were deprived of their rights under the Fourth and Fourteenth Amendments to the United States Constitution."). Some Supervisory Defendants argue that Plaintiffs have failed to show direct participation because, they contend, Plaintiffs do not allege specifically enough the causal connection between their conduct and a deprivation of rights. *See, e.g.,* DNASI Br. These arguments are merely variations on the theme that it was all someone else's fault, and they do not account for the settled rule of §1983 liability that plaintiffs need only show that a defendant "'set[] in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury.'" *Spell v. McDaniel,*

591 F. Supp. 1090, 1110 (E.D.N.C. 1984) (quoting *Johnson v. Duffy*, 588 F.2d 740, 743-44 (9th Cir. 1978)). No defendant contends that *Ashcroft* disturbs this rule of §1983 liability, nor could they. *See, e.g., Padilla v. Yoo*, No. C 08-00035, 2009 WL 1651273, *21 (N.D. Cal. June 12, 2009) (the required causal connection between conduct and the deprivation of constitutional rights may be shown not only by direct participation, "but also by setting in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury."). The rule swallows up, among others, DNASI's argument that DNASI did not control how or when Nifong and the City police would produce their (deliberately misleading and statutorily insufficient) report, and the City's argument that they did not control Nifong's decisions about the same. The Amended Complaint in this case pleads facts sufficient to defeat this and other causation arguments by pleading far more detailed facts concerning each of the Supervisory Defendants than the facts pleaded by Padilla against Yoo. 17

2. **The Supervisors are Liable under the Well-Pled Allegations of Conspiracies to Violate Plaintiffs' Constitutional Rights**

Even if a Supervising Defendant can still maintain that Plaintiffs have not alleged sufficient direct evidence of his or her misconduct, that does not support dismissal. The Motion still should still be denied under settled conspiracy law (which *Iqbal* left undisturbed). The Fourth Circuit has recognized that an alleged unlawful agreement need not be established by "direct evidence," but rather, that a plaintiff may instead "come forward with specific circumstantial evidence that each member of the alleged conspiracy

---

[17] In *Padilla,* the plaintiff alleged that Yoo: "on information and belief. . . intended or was deliberately indifferent to the fact that Mr. Padilla would be subjected to the illegal policies [Yoo] set in motion and to the substantial risk that Mr. Padilla would suffer harm as a result"; "personally recommended Mr. Padilla's unlawful military detention as a suspected enemy combatant and then wrote opinions to justify the use of unlawful interrogation methods against persons suspected of being enemy combatants"; and took these actions where "[i]t was foreseeable that the illegal interrogation policies would be applied to Mr. Padilla." *Id.*

shared the same conspiratorial objective." *Hinkle*, 81 F.3d at 421; *Al Shimari, v. CacI Premier Technology, Inc.*, No. l:08cv827, 2009 U.S. Dist. LEXIS 29995 (E.D. Va. Mar. 18, 2009) (finding that plaintiffs sufficiently pleaded facts to support a conspiratorial liability claim under *Twombly* because, "[u]nlike the *Twombly* plaintiffs, who relied solely on parallel conduct and an agreement not to compete to state their conspiracy claim, here Plaintiffs point to at least two suggestive facts that push their claims into the realm of plausibility"). Allowing civil rights conspiracy cases to go forward is especially important because "direct evidence of a conspiracy is rarely available and . . . the existence of a conspiracy must usually be inferred from the circumstances." *Crabtree ex rel. Crabtree v. Muchmore*, 904 F.2d 1475, 1481 (10th Cir. 1990); *see also Veney v. Wyche*, 293 F.3d 726, 730 (4th Cir. 2002) ("[Courts] must be especially solicitous of the wrongs alleged [in civil rights actions]." (quotation marks omitted)); *Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir. 1999) ("While conclusory allegations of a § 1983 conspiracy are insufficient, we have recognized that such conspiracies are by their very nature secretive operations, and may have to be proven by circumstantial, rather than direct, evidence." (citations and internal quotation marks omitted)); *Waller v. Butkovich*, 584 F. Supp. 909, 931 (M.D.N.C. 1984) ("All that can be required at the pleading stage is that a defendant be given notice of how he is alleged to have participated in the conspiracy, so that he may intelligently prepare his answer and defense.").

After *Iqbal*, a New York federal court held that a *pro se* plaintiff sufficiently stated a §1983 conspiracy claim for deprivation of a prisoner's right to be free from pre-trial punishment under the Fifth Amendment. *Tyree v. Zenk*, No. 05-cv-2998, 2009 U.S. Dist. LEXIS 43872, *20-21 (E.D.N.Y. May 22, 2009). The Court held that Plaintiff adequately pled the conspiracy by alleging that one prison officer stopped a video recorder pursuant to a signal given by another prison officer (his co-conspirator). Here, the 467-page, detailed narrative of Defendants' concerted misconduct is plainly no less sufficient than Tyree's lone allegation to show a conspiracy to violate Plaintiffs' civil rights.

**J.     The Amended Complaint Pleads Facts Showing More Than a 'Sheer Possibility' that Wilson acted Unlawfully.**

The Amended Complaint alleges that, despite Defendant Wilson's knowledge of the overwhelming evidence of Plaintiffs' innocence, as well as the overwhelming lack of evidence that any assault occurred, he nevertheless engaged in numerous unlawful acts in furtherance of the Conspiracy to Convict during the investigation of the Duke Lacrosse case. *See, e.g.,* A.C. §§ IX, XI, XIII, XXVII, XXXIII, XXXIV. In concert with Defendants Nifong, Lamb, Gottlieb, and Himan, Wilson attempted to intimidate and discredit Sergeant Shelton by subjecting him to an internal investigation, accusations of unprofessional conduct, and threats of disciplinary action for reporting Mangum's recantation of her rape claim while at DUMC on March 13th;conducted an unwitnessed and unsupervised interview of Mangum on December 21, 2006, in violation of Durham Police procedures, to persuade her to alter her statements to conform to the lack of DNA evidence. *See, id.* Wilson also published false statements asserting that Mangum's account of the number of "attackers" did not change." *Id.* ¶ 954(D).  These facts, taken as true, demonstrate "more than a sheer possibility" that Wilson acted unlawfully. *Iqbal,* 129 S. Ct. at 1949.[18]

## III.  DEFENDANTS REMINAING AREGUMENTS HAVE NO MERIT.

**A.     Plaintiffs' Allegations Show More Than A "Sheer Possibility" That The City's Policies Caused The Deprivation Of Plaintiffs' Constitutional Rights.**

The City makes no argument  as to the sufficiency of the AC's allegations of the City's Monell liability based upon policymaker decisions to adopt a course of

---

[18] Further, Wilson's assertion that he was a late-comer to the conspiracy to convict, even if that is true, is irrelevant because his participation in the conspiracy to convict renders him liable for all of the harms caused by it and its constituent conspiracies.  *See, e.g., Kottler v. Deutsche Bank AG,* 607 F.Supp. 2d 447 (S.D.N.Y. 2009) ("one who enters a conspiracy late, with knowledge of what has gone before, and with the intent to pursue the same objective, may be charged with preceding acts in furtherance of the conspiracy.") (internal citations and quotations omitted)).

unconstitutional conduct pursuant to Pembaur.[20] Plaintiffs may therefore proceed against the City on that basis. Nevertheless, the City claims Plaintiffs are insufficient to show the City's Monell liability alleged in the AC. (i.e. policymakers participated in unconstitutional conduct and ratified or condoned it).[21]

First, the City asserts that Plaintiffs' Monell claims against the City based upon City policymaker's ratification of unconstitutional conduct should be dismissed because "no factual allegations that actually suggest approval" of its investigators' unconstitutional conduct. Br. at 14. The City is wrong. The AC alleges that the City's officials not only approved of the unconstitutional conduct, but also did so in public statements to the media. *See, e.g.,* A.C. ¶ 180-184 (In September, 2006, after Gottlieb's abuses were published in newspapers, Commander Sarvis publicly approved of Gottlieb's abusive tactics, "fully stand[ing] behind" them). The same is true of Duke's official policymakers. *See, e.g.,* A.C. ¶464(G) (On April 8, 2007, Burness admits that Board of Trustees supported the decisions and conduct alleged in the Amended Complaint).

---

[20] "If the decision to adopt [a] particular course of action is properly made by that government's authorized decisionmakers, it surely represents an act of official government 'policy' as that term is commonly understood." *Pembaur*, 475 U.S. at 481. Even a single action "directed by those who establish governmental policy" is sufficient to subject the City to liability. *Id.*

[21] Pursuant to theses theories, the City (and Duke) is liable under § 1983 where its policymakers ratify the unconstitutional conduct already caused by their subordinates. *See City of St. Louis v. Praprotnik*, 485U.S. 112, 127 (1988) ("If the authorized policymakers approve a subordinate's decision and the basis for it, their ratification [is] chargeable to the municipality because their decision is final."); *Love-Lane v. Martin*, 355 F.3d 766, 782-83 (4th Cir. 2004) (To establish *Monell* liability, a plaintiff "must demonstrate that the [policymaker] was aware of the constitutional violation and either participated in, or otherwise condoned, it."); *Hall v. Marion Sch. Dist. No. 2*, 31 F.3d 183, 196 (4th Cir. 1994) (decision affirming unconstitutional actions of subordinate sufficient to establish municipal liability); *Jordan by Jordan v. Jackson*, 15 F.3d 333, 340 (4th Cir. 1994) (allegation that policymakers "condoned and ratified the improper and overreaching conduct of" their subordinates sufficient to establish municipal liability under § 1983).

Second, the City asserts that Plaintiffs' Monell claims against it based upon unconstitutional policies or customs should be dismissed because "no factual allegations that actually suggest . . . the purposeful establishment"[23] of an unconstitutional City policy or custom." Br. at 14. To support that conclusory assertion, the City merely offers another by asserting that the AC offers no "specific allegations to support [its] bare assertion" that "the City 'disproportionately and unconstitutionally enforced the criminal laws against Duke Students." Br. at 15. The AC impugns that assertion in the first 150 pages, which are devoted exclusively to establishing the City's policy by alleging detailed accounts of the City's policy in action, all of which occurred in the months and years leading up to the Policy's ultimate expression in the conduct at issue in this action.

## B.    The Duke Defendants Acted under Color of State Law.

Plaintiffs allege specific, detailed facts and attach public records and documents showing that the University and its employees are state actors insofar as they act (or fail to act) through or with the law enforcement officers in the University's Police Department. A.C. §§II-III, XII, XIV-XVIII, XX-XXI, XXIII-XXIV, VI-Xl; see also Attachments 1,2,3,4,5 (documenting North Carolina's grant of jurisdiction and the Duke Durham jurisdiction allocation agreement). The Duke Defendants assert that Plaintiffs do not plead state action, however, their argument merely cherry-picks phrases from the Amended Complaint's legal framework, and ignores the hundreds of allegations of Duke Defendants engaging in state action directly through its own police department, in joint action with its police department, in joint action with the Durham Police Department, and in conspiracies with Nifong, city officials and other state actors.[24] They also ignore the

---

[23] Contrary to the claim at issue in *Iqbal*, there is no "purposeful" intent element required to show an unconstitutional policy or custom under *Monell*.

[24] *See*, Duke Br. (citing only the statements of state action within the Causes of Action (i.e., 905, 919, 955, 969-970, 979, 988, 993, 1003, 1008, 1038, 1149) and omitting all other facts in the Amended Complaint).)

Exhibits to the Amended Complaint, which show (1) that Duke University's Police Department has all of powers and immunities that the state grants to municipal police departments, AC, ¶¶93-95, ATTACHMENT 3; (2) that Duke University's Police Department had "primary" authority over the investigation of Mangum's false accusations, *see, id.,* AC, ¶¶82-86, ATTACHMENT 2; and (3) that Duke University routinely exercises its "primary" responsibility to investigate any report of a crime alleged to have occurred within its jurisdiction (which includes 610 N. Buchanan Blvd.). A.C. ¶¶188-93, ATTACHMENT 7 (Deed). Duke also ignores the scores of allegations showing that the Chairman, Trask, Dawkins and others directed the unlawful acts of the Duke Police Department to refuse to intervene when Durham Police officers were violating Plaintiffs' constitutional rights were violated in their presence and within their knowledge, and conspiring to continue to do so; to fabricate false police reports designed to prop up mangum's claims; and to accompany Duke University officials the Chairman directed to stop Plaintiffs and their teammates from registering voters, to take their registration materials, and to detain them as necessary to do so. *See* discussion *supra,* § II(B). Plaintiffs have plainly shown that Defendants were acting under color of law with respect to Plaintiffs §1983 claims.[25]

---

[25] In a footnote, Duke Defendants assert multiple Section 1983 claims are insufficiently pled under Iqbal, however, they do not suggest how, with one exception in which they assert that Plaintiffs' Fifth Cause of Action, alleging that Plaintiffs were stigmatized in connection with deprivations of specific, tangible interests (Plaintiffs' "Stigma-Plus" claim). They concede that Plaintiffs have sufficiently alleged stigmatizing public statements and the deprivation of specific tangible interests, but they assert that Plaintiffs to not sufficiently allege a connection or nexus between the two. *Id.* To support their assertion, Defendants cite only allegations within the Fifth Cause of Action itself (AC ¶¶ 956-958). Plaintiffs have briefed this issue in Pls. Opp. Br. (SMAC Defendants), to which the Duke Defendants offer no response. Instead, Defendants ignore those arguments and the allegations that establish the connection between the stigmatization and the deprivations that are pled in the 953 paragraphs that precede the Fifth Cause of Action, all of which Plaintiffs explicitly incorporated into the Fifth Cause of Action. (AC ¶954.)

**C.** **Plaintiffs' Specific, Factual Allegations Show More Than a "Sheer Possibility" they Suffered Severe Emotional Distress.**

Defendants assert that Ashcroft requires dismissal of Plaintiffs' claims for Intentional and Negligent Infliction of Emotional Distress. (City Br. at 13.) Defendants concede that the AC sufficiently alleges their extreme and outrageous conduct and that their outrageous conduct caused the mental and emotional trauma alleged. Instead, Defendants assert that the AC does not show entitlement to relief because, they contend, *Ashcroft* requires Plaintiffs "specify what sort of 'diagnosable emotional and mental conditions' Plaintiffs have suffered ... ." City Br. at 13. For support, Defendants rely on *Oshop v. Tenn. Dept. of Children's Servs.*, No. 3:09-CV-0063, 2009 WL 1651479, at *9 (M.D. Tenn., June 10, 2009), and *DiPietro v. N.J. Family Support Payment Center*, No. 08-4761, 2009 WL 1635568, at *8 (D.N.J., June 10, 2009).) However, Oshop and DiPietro apply the substantive law of Tennessee and New Jersey, respectively, neither of which govern Plaintiffs' NIED and IIED claims. Furthermore, neither decision turns upon the "severe emotional distress" element, and neither decision suggests that Ashcroft requires the complaint to identify the specific mental or psychological condition Plaintiff suffered. In *Olshop*, plaintiffs' NIED claim was dismissed (with leave to amend) because the complaint failed to allege any facts from which the court could infer that the misconduct caused the alleged emotional harm. In *DiPietro*, the court dismissed the claim as patently frivolous. Neither decision asserts that the plaintiff was required to identify a specific psychological condition, and nothing in North Carolina's substantive law requires a different result. *See, Johnson v. Ruark Obstetrics & Gynecology Assocs., P.A.*, 327 N.C. 283, 304 (1990) ("[In this context, the term "severe emotional distress" means any emotional or mental disorder, *such as, for example*, neurosis, psychosis, chronic depression, phobia, *or any other type of severe and disabling emotional or mental condition* which may be generally recognized and diagnosed by professionals trained to do so." (emphasis supplied)).

## REQUEST FOR LEAVE TO AMEND

Defendants state that "Plaintiffs should not be allowed/permitted" to amend the AC. *See* Duke Br. 16-17 n.8; City Br. 18 n.10. However, Plaintiffs have not moved for leave to amend, and Defendants' briefing has given little reason for Plaintiffs to do so. Moreover, Defendants assert that "it is unlikely that Plaintiffs are capable of inserting any more factual material" and that "it is unlikely that Plaintiffs can muster more factual material" in the event the Court finds "deficiencies" in the AC's claims. Duke Br. 16-17 n.8.; City Br. 18 n. 10. However, Defendants offer no basis for their assertion, except insofar as they point to the extraordinarily detailed Amended Complaint, which, of course, belies the premise that amendment is necessary. Lest there be any doubt, Plaintiffs affirmatively state there is more: detailed factual allegations, more audio files, and more video files available to Plaintiffs to allege additional facts that the Court may deem necessary to cure any deficiency of pleading in the Amended Complaint. As such, Plaintiffs conditionally request leave to do so if the Court finds that any allegations against any Defendant require amplification.

Dated: July 14, 2009

Respectfully submitted,

**EKSTRAND & EKSTRAND LLP**

By: _/s/ Robert C. Ekstrand_

Robert C. Ekstrand, Esq. (NC Bar #26673)
Stefanie A. Sparks*
811 Ninth Street, Suite 260
Durham, North Carolina 27705
Email: rce@ninthstreetlaw.com
Email: sas@ninthstreetlaw.com
Phone: (919) 416-4590

***Counsel for Plaintiffs Ryan McFadyen, Matthew Wilson, and Breck Archer***

***\*Student Counsel, N.C. State Bar Certified Legal Intern under the Supervision of Robert C. Ekstrand.***

# UNITED STATES DISTRICT COURT
## FOR THE
## MIDDLE DISTRICT OF NORTH CAROLINA

RYAN McFADYEN, et al.,

    Plaintiffs,

      v.          Civil Action No. 1:07-cv-953

DUKE UNIVERSITY, et al.,

    Defendants.

## CERTIFICATE OF SERVICE

   I hereby certify that, on July 14, 2009, I electronically filed the foregoing Supplemental Brief Supporting Plaintiffs' Opposition to Defendants' Motions to Dismiss the First Amended Complaint with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

James Donald Cowan, Jr.
Ellis & Winters, LLP
100 North Greene Street, Suite 102
Greensboro, NC 27401
*Counsel for the University Defendants*

Dixie Wells
Ellis & Winters, LLP
100 North Greene Street, Suite 102
Greensboro, NC 27401
*Counsel for the University Defendants*

Jamie S. Gorelick
Wilmer Cutler Pickering Hale and Dorr, LLP
1875 Pennsylvania Avenue, NW
Washington, DC 20006
*Counsel for the University Defendants*

Jennifer M. O'Connor
Wilmer Cutler Pickering Hale and Dorr, LLP
1875 Pennsylvania Ave., N.W.
Washington, DC  20006
*Counsel for the University Defendants*

Paul R.Q. Wolfson
Wilmer Cutler Pickering Hale and Dorr, LLP
1875 Pennsylvania Avenue, NW
Washington, DC 20006
*Counsel for the University Defendants*

William F. Lee
Wilmer Cutler Pickering Hale and Dorr, LLP
60 State Street
Boston, MA  02109
*Counsel for the University Defendants*

Dan J. McLamb
Yates, McLamb & Weyher, LLP
One Bank of America Plaza, Ste 1200
421 Fayetteville Street
Raleigh, NC 27601
*Counsel for the Sane Defendants*

Reginald B. Gillespie, Jr.
Faison & Gillespie
P.O. Box 51729
Durham, NC 27717
*Counsel for City of Durham, North Carolina*

Patricia P. Kerner
Troutman Saunders, LLP
434 Fayetteville Street, Suite 1900
Raleigh, NC 27601
*Counsel for Steven Chalmers, Patrick Baker, Beverly Council, Ronald Hodge, Jeff Lamb, Stephen Mihaich, Michael Ripberger, Laird Evans, and Lee Russ*

D. Martin Warf
Troutman Sanders LLP
P.O. Drawer 1389
Raleigh, North Carolina 27602
*Counsel for Steven Chalmers, Patrick Baker, Beverly Council, Ronald Hodge, Jeff Lamb, Stephen Mihaich, Michael Ripberger, Laird Evans, and Lee Russ*

James B. Maxwell
Maxwell, Freeman & Bowman
P.O. Box 52396
Durham, NC  27717-2396
*Counsel for David Addison, Kammie Michael, Richard D. Clayton and James T. Soukup*

Joel M. Craig
Kennon, Craver, Belo, Craig & McKee
4011 University Drive, Suite 300
Durham, NC 27707
*Counsel for Benjamin W. Himan*

David W. Long
Poyner & Spruill, LLP
P.O. Box 10096
Raleigh, NC 27605-0096
*Counsel for Mark Gottlieb*

Eric P. Stevens
Poyner & Spruill, LLP
P.O. Box 10096
Raleigh, NC 27605-0096
*Counsel for Mark Gottlieb*

Kearns Davis
Brooks, Pierce, McLendon, Humphrey & Leonard, L.L.P.
P.O. Box 26000
Greensboro, NC 27420
*Counsel for DNA Security, Inc. and Richard Clark*


Robert J. King, III
Brooks, Pierce, McLendon, Humphrey & Leonard, L.L.P.
P.O. Box 26000
Greensboro, NC 27420
*Counsel for DNA Security, Inc. and Richard Clark*

Linwood Wilson
**\*\* Home Address Redacted Pursuant to Local Rule and ECF P&P Manual.**

Paul R. Dickinson, Jr.
Lewis & Roberts, PLLC
5960 Fairview Road, Suite 102
Charlotte, NC 28210
*Counsel for Brian Meehan*

James A. Roberts, III
Lewis & Roberts, PLLC
1305 Navaho Drive, Suite 400
Raleigh, NC 27609-7482
*Counsel for Brian Meehan*

Roger E. Warin
Steptoe & Johnson, LLP
1330 Connecticut Avenue, NW
Washington, DC 20003
*Counsel for City of Durham, North Carolina*

Robert A. Sar
Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
2301 Sugar Bush Road, Suite 600
Raleigh, NC 27612
*Counsel for DNA Security, Inc.*

Nicholas J. Sanservino, Jr.
Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
2301 Sugar Bush Road, Suite 600
Raleigh, NC  27612
*Counsel for DNA Security, Inc.*

Respectfully submitted,

**EKSTRAND & EKSTRAND LLP**

/s/ Robert C. Ekstrand

Robert C. Ekstrand, Esq.(NC Bar #26673)

*Counsel for Plaintiffs Ryan McFadyen,*
*Matthew Wilson, and Breck Archer*