IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

RYAN MCFADYEN, MATTHEW WILSON    )
and BRECK ARCHER    )
    )
        Plaintiffs,    )
    )
      v.    )        1:07CV953
    )
DUKE UNIVERSITY, et al.,    )
    )
        Defendants.    )

<u>MEMORANDUM OPINION</u>

This case involves 41 claims set out in an exhaustive 428-page Second Amended Complaint [Doc. #136] by Plaintiffs Ryan McFadyen ("McFadyen"), Matthew Wilson ("M. Wilson"), and Breck Archer ("Archer") against Defendants Duke University ("Duke"), the Duke University Police Department ("Duke Police"), Duke University Associate Vice President for Campus Safety and Security Aaron Graves ("Graves"), Director and Chief of the Duke Police Department Robert Dean ("Dean"), Duke Police Assistant Police Chief Leila Humphries ("Humphries"), Duke Police Major Phyllis Cooper ("Cooper"), Duke Police Medical Center Affairs Manager William F. Garber, II ("Garber"), Duke Police Major James Schwab ("Schwab"), Duke Police Lieutenant Joseph Fleming ("Fleming"), Duke Police Lieutenant Jeffrey O. Best ("Best"), Duke Police First Sergeant Gary N. Smith ("Smith"), Duke Police First Sergeant Greg Stotsenberg ("Stotsenberg"), Chairman of the Executive Committee of the Duke Board of Trustees Robert K. Steel ("Steel"), Duke President Richard H. Brodhead ("Brodhead"), Duke Provost Peter Lange ("Lange"), Duke Executive Vice President Tallman Trask, III ("Trask"), Duke Senior Vice President for Public Affairs and Government Relations

John Burness ("Burness"), Duke Vice President for Student Affairs Larry Moneta ("Moneta"), Duke Chancellor for Health Affairs and President and Chief Executive Officer of Duke University Health Systems, Inc. Victor J. Dzau ("Dzau"), Duke Secretary Allison Haltom ("Haltom"), Duke Vice President for Campus Services Kemel Dawkins ("Dawkins"), Duke Assistant Vice President for Student Affairs and Dean of Students Suzanne Wasiolek ("Wasiolek"), Duke Associate Dean of Students and Director of Judicial Affairs Stephen Bryan ("Bryan"), Duke Auxiliary Services Senior Manager IT and Head of the Duke Card Office Matthew Drummond ("Drummond"), Duke University Health Systems, Inc. ("Duke Health"), Private Diagnostic Clinic, PLLC ("Private Diagnostic"), Duke Health Dr. Julie Manly ("Manly"), Duke Health Nurse Theresa Arico ("Arico"), Duke Health Nurse Tara Levicy ("Levicy"), the City of Durham ("the City"), former District Attorney Michael B. Nifong ("Nifong")[1], Durham City Manager Patrick Baker ("Baker"), Durham Chief of Police Steven Chalmers ("Chalmers"), Durham Deputy Chief of Police Ronald Hodge ("Hodge"), Executive Officer to the Durham Chief of Police Lee Russ ("Russ"), Durham Police Commander of Investigative Services

---

[1] District Attorney Nifong previously filed a Notice of Bankruptcy in the case of Evans v. City of Durham, 1:07CV739. Although the Evans case was stayed against Nifong during his Bankruptcy, it was reopened after the Bankruptcy Court determined that the claims against Nifong in the Evans case were "personal injury tort" claims that must be considered in this Court rather than in the Bankruptcy Court. Nifong has not filed a Notice of Bankruptcy, a Motion to Dismiss, or any other response in the present case, and the parties have not addressed the status of Nifong as a Defendant, other than with respect to Plaintiffs' contentions that the City should be held responsible for Nifong's actions. The Court has addressed that issue and other common legal issues in this Memorandum Opinion, but has not addressed issues specific only to Nifong given this procedural posture. If Plaintiffs intend to proceed against Nifong individually in light of the Court's determinations herein, Plaintiffs should file a Notice in this case addressing Nifong's status as a Defendant and addressing the impact of any remaining bankruptcy issues.

Stephen Mihaich ("Mihaich"), Durham Police Uniform Patrol Bureau Commander Beverly Council ("Council"), Durham Police Patrol District Two Commander Jeff Lamb ("Lamb"), Durham Police Department District Two Lieutenant Michael Ripberger ("Ripberger"), Durham Police Department District Two Sergeant Laird Evans ("Evans"), Director of the Durham Emergency Communications Center James T. Soukup ("Soukup"), Durham Police Public Relations Coordinator and Public Information Officer Kammie Michael ("Michael"), Durham Police Department CrimeStoppers Coordinator David W. Addison ("Addison"), Durham Police Department District Two Sergeant Mark D. Gottlieb ("Gottlieb"), Durham Police Department Investigator Benjamin W. Himan ("Himan"), District Attorney's Office Investigator Linwood Wilson ("Wilson"), Durham Police Department District Two Patrol Officer Richard D. Clayton ("Clayton"), DNA Security, Inc. ("DSI"), DSI President Richard Clark ("Clark"), and DSI Lab Director Brian Meehan ("Meehan").

Defendants have collectively filed multiple, separate Motions to Dismiss, that is, a Motion to Dismiss by Defendant Meehan [Doc. #174], a Motion to Dismiss by Defendants Soukup, Michael, Addison and Clayton [Doc. #169], a Motion to Dismiss by Defendant Linwood Wilson [Doc. #167], a Motion to Dismiss by Defendants Duke, Brodhead, Bryan, Burness, Dawkins, Drummond, Dzau, Graves, Haltom, Lange, Moneta, Steel, Trask, and Wasiolek (collectively, the "Duke University Defendants") [Doc. #175], a Motion to Dismiss by Defendants Duke Health, Private Diagnostic, Arico, Levicy, and Manly (collectively, the "Duke SANE Defendants") [Doc. #177], a Motion to Dismiss by Duke Police, Best, Cooper, Dean, Fleming, Garber, Humphries, Schwab, Smith, and Stotsenberg (collectively, the "Duke

Police Defendants") [Doc. #176], a Motion to Dismiss by Defendant Himan [Doc. #171], a Motion to Dismiss by Defendant Gottlieb [Doc. #168], a Motion to Dismiss by Defendants Baker, Chalmers, Russ, Mihaich, Council, Lamb, Ripberger, Evans, and Hodge [Doc. #170], a Motion to Dismiss by Defendants DSI and Clark [Doc. #173], and a Motion to Dismiss by the City [Doc. #179]. Defendants previously filed various Motions to Dismiss with respect to Plaintiffs' First Amended Complaint, but those Motions to Dismiss were rendered moot by the filing of Plaintiffs' Second Amended Complaint on February 23, 2010. In their present Motions to Dismiss the parties have incorporated the prior briefing filed in connection with the original Motions to Dismiss and, as appropriate, have added additional briefing with respect to new matters raised in the Second Amended Complaint. The new Motions to Dismiss with respect to the Second Amended Complaint were referred to the Court for determination on May 4, 2010, and are addressed in this Memorandum Opinion.[2]

## I.    FACTUAL BACKGROUND

This case arises out of the investigation of members of the Duke University men's lacrosse team on charges of rape, sexual assault, and kidnapping. The Plaintiffs here are three

---

[2] The Court notes that some of the issues raised in the Motions to Dismiss in the present case are similar to certain of the issues raised in two other cases in this District that have been identified by the parties and the Clerk's Office as "related" to the present case: Carrington, et al. v. Duke University, et al. (1:08CV119) and Evans, et al. v. City of Durham, et al. (1:07CV739). Those cases also involve multiple Motions to Dismiss for which briefing has now been completed and which have been referred to the Court for consideration. Orders and Opinions are being entered in those cases contemporaneously with the present Order and Opinion in this case. These cases have not been formally consolidated, and are still proceeding as separate cases, although consolidation of discovery may be appropriate in light of the overlapping issues raised. In addition, given the overlapping legal issues, much of the analysis presented in the three Opinions in these cases is the same. The Court restates the analysis in each case, however, so that each Opinion can stand alone.

members of the lacrosse team who were subject to a Non-Testimonial Order ("NTO") but who were not indicted in that investigation (the "Plaintiffs"). The Court here sets out the facts as alleged in the Second Amended Complaint, which the Court is required to accept as true for purposes of the present Motions to Dismiss.[3]

On the evening of March 13, 2006, members of the lacrosse team hosted a party at a residence at 610 N. Buchanan Avenue. The residence was owned by Duke and rented by members of the lacrosse team, and was located in a neighborhood adjacent to Duke's campus. Two dancers were hired to perform at the party, and the first dancer, Kim Pittman, arrived at 11:15 p.m. The second dancer, Crystal Mangum, arrived at 11:40 p.m. but was "dazed and stumbling." (Second Am. Compl. ¶ 197). Plaintiffs allege that witnesses saw the dancers plan their routine outside of the residence and then enter the residence at midnight, which was corroborated by pictures taken at that time. When the performance began, Mangum was "incapable of dancing in any fashion," fell as she took off her shoes, and "was speaking unintelligibly." (Second Am. Compl. ¶ 201). The dance ended within four minutes and the dancers left the living room without objection from the guests. Mangum left her shoe on the living room floor. By 12:30, Mangum was observed outside the residence "apparently locked out" and "saying she lost her shoe." (Second Am. Compl. ¶ 205-206). Plaintiffs allege that pictures showed Mangum smiling, but stumbling around the backyard, and a picture taken at

---

[3] The Court notes that many of Plaintiffs' factual allegations do not relate directly to the claims that are actually asserted. However, in the interest of completeness, the Court has attempted here to summarize the various allegations.

12:41 showed Mangum being assisted into Pittman's car before Pittman drove away.[4]

Plaintiffs allege that as she drove off, "Pittman made a derogatory racial remark and received one in turn." (Second Am. Compl. ¶ 215). Pittman "made a show of calling the police" and reporting the incident and directing police to 610 N. Buchanan, although Plaintiffs contend that "[i]t was plainly obvious from the 911 call itself that the call was a poorly veiled ruse." (Second Am. Compl. ¶ 216, 218). Durham Police Sergeant Shelton responded to the call but found no one there. Plaintiffs contend that the remaining guests had left based on prior incidents in which students were charged by police regardless of whether any actual offense had been committed, as discussed in greater detail below.

Pittman subsequently drove to a 24-hour grocery store to find a security guard to help get Mangum out of her car. The security guard, Angel Altmon, was unable to coax Mangum out of the car and called 911 for assistance.[5] Plaintiffs allege that Sgt. Shelton and Officer Barfield arrived, and Pittman admitted to them that she had placed the "prank 911 call" reporting a racial epithet at 610 N. Buchanan. (Second Am. Compl. ¶ 230). Sgt. Shelton approached Mangum but she was in the car feigning unconsciousness. Plaintiffs allege that "Sgt. Shelton suspected a ruse, so he broke open an ammonia capsule under Mangum's nose, and Mangum began mouth-breathing, confirming his suspicions." (Second Am. Compl. ¶ 232). Sgt. Shelton tried

---

[4] Plaintiffs allege that all of this information, including corroborating pictures and video clips, was assembled by defense counsel by March 26, 2006, but both District Attorney Nifong and Duke President Brodhead refused the offers to view the information.

[5] Plaintiffs allege that security guard Angel Altmon was interviewed by Plaintiffs' defense counsel and "was confident that Mangum had not been sexually assaulted," but Durham police did not interview Altmon or ask for her statement until 9 months later, in December 2006. (Second Am. Compl. ¶ 239-242).

to pull Mangum out of the car, but she grabbed the parking break and Sgt. Shelton had to apply significant force to get Mangum to let go. Plaintiffs allege that "[w]hen Sgt. Shelton finally got Mangum out of the car, Mangum resumed feigning unconsciousness." (Second Am. Compl. ¶ 233). Plaintiffs allege that Sgt. Shelton interpreted her behavior as a product of drug or alcohol impairment and decided to take her to the Durham County Jail to be detained until she sobered up. Mangum was placed in Officer Barfield's car, and Officer Barfield told the Durham Emergency Communications Center ("DECC") that "She's breathing, appears to be fine. She's not in distress. She's just passed out drunk." (Second Am. Compl. ¶ 235). However, Plaintiffs allege that Sgt. Shelton soon concluded that Mangum was showing signs and symptoms of severe mental illness and concluded that she was in need of immediate psychiatric assistance. However, Plaintiffs allege that the dispatch audio recordings relating to Mangum's involuntary commitment "were not released and were later destroyed or secreted by Captain Lamb or upon his direction after Plaintiffs' defense counsel demanded in writing on May 1, 2006, that the recordings be produced and/or preserved." (Second Am. Compl. ¶ 238).

Plaintiffs contend that after the decision was made to initiate involuntary commitment proceedings at the Durham Access Center, Mangum overheard a radio exchange between officers in which one officer reported that Mangum had two young children at home, and the responding officer directed a police unit to go to Mangum's house to check on the children, and, if there was no adult supervision there, to call Department of Social Services. Plaintiffs contend that during the intake proceedings at the Durham Access Center, a nurse asked Mangum if she was raped and Mangum nodded "yes", thus "extract[ing] herself from the involuntary

commitment proceedings, and spar[ing] herself the possibility of being separated from her children." (Second Am. Compl. ¶ 252). Plaintiffs contend that the intake nurse "thought Mangum's bizarre behavior was consistent with fractured thinking, and a break with reality." (Second Am. Compl. ¶ 253). Officer Barfield then transported Mangum to the Duke University Medical Center ("DUMC") Emergency Department for a sexual assault examination. Plaintiffs allege that during that ride, Mangum did not provide any other information regarding her sexual assault claim, but did provide Officer Barfield with a detailed description of the property she claimed was stolen by Pittman: "her money ($2,000), her ID, her cell phone, and her bag." (Second Am. Compl. ¶ 255). Plaintiffs contend that the Defendants were aware of all of this information and "agreed to conceal the evidence of the events at the Durham Center Access on March 14th, knowing their obvious relevance to Mangum's credibility." (Second Am. Compl. ¶ 259).

Plaintiffs allege that when Mangum arrived at DUMC, Sgt. Shelton questioned Mangum about her rape claim. At that time, Mangum recanted the rape claim, but insisted that her money had been taken. However, "[a]s Sgt. Shelton was reporting that Mangum had recanted her rape claim to his Watch Commander, someone advised him that Mangum was now claiming she was raped again." (Second Am. Compl. ¶ 263). Plaintiffs contend that the audio recording of Sgt. Shelton reporting that Mangum had recanted "was erased by City of Durham Defendants" after Plaintiffs' defense counsel had requested that all audio recordings be preserved. (Second Am. Compl. ¶ 264).

Plaintiffs allege that Mangum then gave wildly varying accounts of the rape. Mangum

was next interviewed by Durham Officer Gwen Sutton, and Plaintiffs allege that Sutton knew that Mangum was lying. During the course of the interviews, Mangum claimed that she had performed at a bachelor party at "610 N. Buchanan" and Sgt. Shelton thereafter established that Mangum and Pittman had both "worked at the address Pittman complained of in her 911 call: 610 N. Buchanan." (Second Am. Compl. ¶ 268, 273). Plaintiffs allege that "[a]s such, the investigation of Mangum's false allegations fell within the Duke Police Department's jurisdiction" and Duke Police Lt. Best was dispatched to DUMC to initiate the investigation for Duke Police. (Second Am. Compl. ¶ 273-274). A "transfer briefing" took place between Durham Police and Duke Police at a loading dock of DUMC shortly after 3:08 a.m. on March 14, 2006. The transfer briefing included Duke Police Major Schwab and "all of the supervisors." (Second Am. Compl. ¶ 277-279). In addition, Plaintiffs allege that the Duke Officer in Charge at DUMC responded to the Emergency Department, and from his observations, concluded that Mangum was "faking," which he reported to Lt. Best. Lt. Best instructed Officer Day and others to go to 610 N. Buchanan to make contact with the occupants, and after leaving 610 N. Buchanan, Officer Day returned to the Emergency Department to assist Lt. Best. While there "Officer Day took a full report of the findings of the Durham Police investigation up to that point" including that involuntary commitment proceedings had been underway, that Mangum had given several conflicting accounts and had recanted her claims, and that "Durham Police decided that the rape investigation should not be pursued any further, leaving open only the possibility of misdemeanors arising out of Mangum's claim that Pittman stole her money, ID, cell phone, and purse." (Second Am. Compl. ¶ 285). Lt. Best was also advised that the 911 call

reporting a racial epithet at 610 N. Buchanan was a ruse made by Pittman. Plaintiffs allege that "[s]ome, but not all, of these findings were included in Officer Day's written report" which was submitted that same morning and was reviewed and approved by Duke Police supervisors Dean and Best and by Duke Police Investigator Smith. (Second Am. Compl. ¶ 287). Duke Police Chief Robert Dean notified Dean Wasiolek of the allegations and advised that Mangum "'kept changing her story and was not credible,'" which was a synopsis from Officer Day's report. (Second Am. Compl. ¶ 288). However, Plaintiffs allege that Officer Day's report was subsequently "buried" and that when the existence of the report was later revealed, "Duke Police and Durham Police agreed to misrepresent what transpired on the loading dock of the E.D. and told reporters that Officer Day was 'eavesdropping' on Durham Police conversations, and had no place in the investigation." (Second Am. Compl. ¶ 290). Plaintiffs allege that Durham City Manager Baker orchestrated the agreement "and the ensuing media campaign to mislead the public about the Duke Police Department's role in the case," and further allege that "Defendants Baker, Graves, Dean, and Burness all participated in the media campaign to impeach Officer Day's report." (Second Am. Compl. ¶ 290).

Plaintiffs allege that Mangum gave another inconsistent account of events to Investigator Jones at 3:50 a.m., and that over the course of the 11 hours that she was present at DUMC, she never gave a consistent account of events. Plaintiffs also contend that Mangum "revealed a propensity to lie when self-reporting her symptoms with a particular proclivity for reporting pain that did not exist." (Second Am. Compl. ¶ 293). Plaintiffs contend that all of this information was documented in Mangum's charts at DUMC. Plaintiffs further allege that Mangum's Sexual

Assault Examination ("SAE" or "Examination") began approximately 6 hours after she arrived at DUMC. Plaintiffs allege that the Sexual Assault Examination Report was signed by Nurse Levicy, but that Levicy did not perform the actual Examination because she was not qualified or authorized to do so under DUMC policy. Instead, the Examination was performed by Dr. Julie Manly, while Levicy observed and filled in the Report form. Plaintiffs allege that by signing the Report even though she did not perform the examination, Levicy "knowingly created a false and misleading medical record in order to create the false impression that DUMC deemed her qualified and competent to collect and interpret forensic medical evidence." (Second Am. Compl. ¶ 299). Plaintiffs allege that Levicy's supervisor, Nurse Arico "knowingly and willfully added credibility to forensic findings that Levicy in fact did not - and could not - make." (Second Am. Compl. ¶ 300). Plaintiffs also allege that although Dr. Manly began the examination, the examination was not completed because Mangum protested and insisted that the examination cease. Plaintiffs allege that during the limited examination that was conducted, Dr. Manly found no injury to Mangum's pelvic region, and "[t]he only notation Manly made was 'diffuse edema of the vaginal walls.'" (Second Am. Compl. ¶ 306). Plaintiffs allege that other minor injuries were photographed and included in the Report, specifically a scratch on Mangum's heel and knee, but these injuries can be seen on Mangum's heel and knee in the photographs taken at the party, and therefore pre-dated her arrival at 610 N. Buchanan. Plaintiffs allege that during her time at DUMC, the medical records consistently noted that she was "'in no obvious discomfort,'" even though Mangum reported that her pain was a "'10 out of 10.'" (Second Am. Compl. ¶ 309). At the conclusion of the examination, Mangum was

discharged, and the evidence was collected, gathered up, and delivered to Duke Police Officer Joyce Sale.

Plaintiffs allege that the next day, Mangum went to UNC hospital claiming intense pain, reporting that she had been sexually assaulted the night before, and seeking prescription pain medication. However, according to Plaintiffs, Mangum's medical history at UNC revealed a long history of severe psychological disorders and current medication with an anti-psychotic drug, and also noted that she frequently came to UNC clinics for prescription pain medication and she was a "'very high risk'" for narcotic abuse. (Second Am. Compl. ¶ 315). Plaintiffs contend that Mangum gave additional inconsistent accounts of the alleged attack while she was at UNC hospital.

Based on this unfolding of events, Plaintiffs allege that within 48 hours after Mangum's original claim of rape, there was substantial evidence establishing that her claim of rape was not true, including her long psychiatric history, her history of feigning symptoms to obtain pain medication, her inconsistent accounts of the alleged rape, the lack of physical injuries, and all of the circumstances surrounding her sudden claim to avoid involuntary commitment. Plaintiffs contend that given this evidence, "in order to justify continuing the investigation, those facts had to be concealed, and, in addition, new, false evidence would have to be fabricated." (Second Am. Compl. ¶ 330).

Plaintiffs allege that on March 14, 2006, Durham Police Sergeant Gottlieb learned of the rape allegations. Plaintiffs allege that Gottlieb had a well-known history of targeting Duke Students and of violating the constitutional rights of Duke Students, including by engaging in

unlawful searches and seizures and fabricating evidence against Duke Students.[6] Plaintiffs allege

that upon learning of the rape allegations, Gottlieb contacted Investigator Jones, who advised

Gottlieb that Mangum's claims were false and that she was going to rule the allegations

"'unsubstantiated.'" (Second Am. Compl. ¶ 333). However, Plaintiffs allege that Gottlieb, who

was Jones' superior in rank, ordered Jones not to close the investigation or make any formal

findings, and instead turn the investigation over to him. Plaintiffs allege that Durham Police

officer Mihaich had final policymaking authority and/or delegated his final policymaking

authority, and that an official with that final policymaking authority had authorized the

assignment of the investigation to Gottlieb, thus removing the investigation from the Criminal

Investigations Division, in violation of the Department's orders and procedures. Plaintiffs allege

that the "chain of command" for the investigation became the "patrol chain of command,"

which was "structurally incompetent to supervise the investigation." (Second Am. Compl.

¶ 337). Plaintiffs contend that a reasonable policymaker would have known that this assignment

would "inexorably lead to deprivations of Plaintiffs' constitutional rights." (Second Am. Compl.

¶ 338). Plaintiffs contend that Durham supervisors Mihaich, Baker, Chalmers, Hodge, and other

City officials failed to return the case to an experienced investigator.

Plaintiffs allege that after assuming control of the investigation, Gottlieb sent an e-mail

alert to neighborhood residents on March 15, 2006, informing them that police were

"conducting an investigation concerning a rape of a young woman by three males at 610 N.

---

[6] Plaintiffs allege that Gottlieb was a "rogue officer" with a known proclivity for abusing Duke Students, and that his supervisors knew of and ratified this behavior, as discussed in greater detail as part of the discussions of Counts 12 and 13.

Buchanan," even though Gottlieb knew that everyone who had interacted with Mangum believed she was lying. (Second Am. Compl. ¶ 342-343). Plaintiffs allege that Gottlieb in his e-mail asserted that the attackers were "three males," even though Mangum had given inconsistent accounts, because he knew that 610 N. Buchanan was occupied by three Duke Students. (Second Am. Compl. ¶ 343-344). Plaintiffs allege that the next day, on March 16, 2006, Gottlieb assigned the rape case to Investigator Himan, who had been an investigator for two months and who had never directly worked with a District Attorney before. Plaintiffs allege that this assignment violated Durham Police Department policy, because the investigation should have been conducted by the Criminal Investigation Division's Violent Crimes Unit.

Plaintiffs contend that on March 15, 2006, Dean Wasiolek informed the captains of the lacrosse team that police were investigating allegations of rape alleged to have occurred at the party, and that they did not need lawyers and should cooperate with police fully. Plaintiffs allege that Duke officials directed Duke Police officers and employees to assist Gottlieb in his investigation, and that Duke Police "delegated their primary supervisory and final policymaking authority with respect to the supervision and conduct of the investigation to Himan, Gottlieb, [and] Nifong." (Second Am. Compl. ¶ 354). Plaintiffs allege that this delegation by Duke was "the product of an established policy or custom not to intervene when Duke students' constitutional rights are being violated." (Second Am. Compl. ¶ 357). Plaintiffs contend that Gottlieb met with Duke Police Sgt. Smith on March 16, and that Detective Smith "provided a CD containing identification photos of Plaintiffs and their teammates for identification procedures, and also provided them a document entitled 'Duke PD Report.'" (Second Am.

Compl. ¶ 360). Plaintiffs allege that Duke also gave Durham Investigators the keys to the residence at 610 N. Buchanan.[7]

Plaintiffs allege that Gottlieb and Himan interviewed Mangum on March 16, and during that interview she gave them purported names and descriptions of her alleged attackers. Mangum identified her alleged attackers as white men, and therefore Devon Sherwood, an African-American team member, was eliminated as a plausible suspect. (Second Am. Compl. ¶ 363). Mangum was presented with photo arrays of team members, including the three Plaintiffs in this case, but Mangum did not identify any of the team members as her "attackers." Mangum was presented with more photo arrays of players a few days later on March 21, but said that she did not recognize any of them. Based on the evidence gathered as of March 21, Plaintiffs allege that Mangum was not credible, and in any event, she had eliminated all of the members of the lacrosse team as plausible suspects.

In addition, Plaintiffs allege that the other dancer, Pittman, spoke with Himan over the telephone on March 20, 2006, and Pittman told Himan that Mangum's claims were "a crock." On March 22, 2006, Gottlieb and Himan commanded Pittman to come to the police station and give them a new, written statement. Plaintiffs allege that Pittman completed a written account that did not allow for enough time in which she was not with Mangum for the alleged sexual assault to have occurred. Plaintiffs allege that Pittman was then served with an outstanding warrant for her arrest on a probation violation that posed a high likelihood of revocation. In

---

[7] Because Plaintiffs were not residents of 610 N. Buchanan, they do not challenge this search. Duke was the owner of the property, renting it to lacrosse team members other than Plaintiffs, and apparently Duke provided police with the keys to the property to execute a search warrant obtained for that residence.

response, Pittman wrote an addendum to her statement "which transparently fabricated a window of opportunity for a sexual assault to have occurred." (Second Am. Compl. ¶ 386).

Plaintiffs contend that Gottlieb and Himan "deliberately avoided taking investigative steps that would have produced even more evidence of Plaintiffs' innocence," including failing to interview a neighboring witness who observed Mangum's arrival and departure. (Second Am. Compl. ¶ 387-389). Plaintiffs also contend that Gottlieb and Himan failed to undertake a record check that would have revealed that Mangum had previously made a false report of rape, and failed to investigate Mangum's prior arrest and conviction. Plaintiffs contend that Himan and Gottlieb also failed to confront Mangum with photographs and other contradictory evidence to challenge her claims. Plaintiffs contend that Gottlieb nevertheless continued with the investigation.

Plaintiffs allege that Duke Police and Duke Officials agreed to "[d]eliver all 47 team members to Gottlieb and Himan, at a designated location, to be interrogated by Durham Police" as part of a conspiracy between Duke and Durham Investigators to "orchestrate the mass interrogation of uncounseled students." (Second Am. Compl. ¶ 402-403). Pursuant to the agreement, on March 21, Plaintiffs were instructed to report to the Durham Police Department the next day, March 22, at 3:00 p.m. Plaintiffs contend that they were advised that they did not need lawyers, and Dean Wasiolek did not revise the advice she had previously given to the team, through the captains, not to tell anyone, even their parents. On the evening of March 21, Plaintiffs' defense counsel spoke with nearly all of the team members, and the team members requested a postponement of the police questioning in order to give them sufficient time to

inform their parents of what they were doing.

Plaintiffs contend that Duke and the City then each undertook to retaliate against the team members for that decision to postpone the police questioning. Specifically, Plaintiffs allege that Gottlieb and Himan knowingly made false, sensational assertions in an affidavit that they submitted in support of an application for a "Non-Testimonial Identification Order" ("NTO") and then leaked the NTO and fabricated affidavit to the media in order to subject Plaintiffs to public condemnation. With respect to the affidavit submitted in support of the application for the NTO, Plaintiffs contend that Gottlieb and Himan added fabricated allegations in the affidavit that were attributed to Mangum, but that were false and that did not come from Mangum or any witness, including an allegation that the women were sexually threatened with a broomstick, that the accuser lost several fingernails in the violent struggle, and that team members used each others' names to disguise their 'true identity.' Plaintiffs allege that these allegations "came from Gottlieb's brain." (Second Am. Compl. ¶ 418). With regard to the "broomstick," Plaintiffs allege that Gottlieb twisted information "into a complete fabrication." (Second Am. Compl. ¶ 422). With regard to the fingernails, Plaintiffs allege that Mangum never claimed to anyone that she lost fingernails in a struggle. Instead, Plaintiffs allege that Mangum told Gottlieb she had "started affixing and painting her false nails" before the party, and that unpainted fingernails and nail polishing and painting accessories were found in Mangum's purse and in the bathroom at 610 N. Buchanan. (Second Am. Compl. ¶ 424-425). Plaintiffs contend that the false information was provided in the affidavit in support of the NTO application, and in public statements made by Addison as the spokesperson for the Durham Police Department.

Plaintiffs contend that the NTO affidavit also falsely claimed that the team members made efforts to conceal their sports affiliation. In addition, Plaintiffs contend that in addition to the fabricated information, the NTO affidavit also failed to reveal that all of the team members had been excluded as plausible suspects based on Mangum's physical descriptions and inability to identify any alleged attacker in the photo arrays.

Plaintiffs allege that Duke Chairman Steel was aware that Mangum's accusations were false and that Gottlieb "was on a vendetta" and that Addison was "lying publicly about the evidence," but that Steel determined that it would be "'best for Duke' if Plaintiffs were tried and convicted on Mangum's false accusations." (Second Am. Compl. ¶ 445-53). Plaintiffs contend that Steel, acting through Brodhead, Trask, Burness, and Graves, directed the Duke Police Department to conceal evidence of the prior investigative role of Duke Police officers, to fabricate false and misleading police reports that covered up the Duke Police officers' personal knowledge of events at DUMC on March 14, and to give false reports about Mangum's appearance at DUMC to lend credibility to Mangum's false claims. Plaintiffs also contend that Duke Police "had the power to revoke its delegated authority and/or to intervene" but refused to do so at the direction of Steel. (Second Am. Compl. ¶ 457-458). Plaintiffs allege that Steel and Brodhead created a "Crisis Management Team" consisting of Steel, Brodhead, Lange, Trask, Burness, Moneta, Dzau, and Secretary Haltom. Plaintiffs contend that the Crisis Management Team "allow[ed] the Gottlieb investigation to proceed unabated" and "misled Plaintiffs and the public" into believing that the Duke Police Department had no power or authority to investigate Mangum's allegations or intervene in the Durham Police investigation. (Second Am. Compl.

¶ 461-465). Plaintiffs allege that Duke Police supervisors similarly "made numerous public statements designed to conceal the fact that Duke Police had the responsibility to investigate Mangum's claims." (Second Am. Compl. ¶ 476).

Plaintiffs further allege that on March 27, 2006, Duke Police supervisors instructed Duke Police Officers who interacted with or observed Mangum on March 14 to provide Nifong with "bystander witness statements" that "deliberately concealed their exculpatory observations of Mangum during the early morning hours of March 14th" and "[r]eveal[ed] observations of Mangum's behavior only to the extent that the observations tended to enhance the reliability of Mangum's claim." (Second Am. Compl. ¶ 466-467). In addition, Plaintiffs allege that these statements "disavow[ed] any role whatsoever in an investigative capacity" and "[c]onceal[ed] the fact that the investigation was a Duke Police investigation, until Duke abdicated its jurisdictional responsibility." (Second Am. Compl. ¶ 466-467). With respect to these contentions, Plaintiffs set out specific allegations regarding the reports of Duke Police Officers Mazurek and Falcon. (Second Am. Compl. ¶ 468-472). In addition, Plaintiffs note that Duke Police Officer Day had prepared a report on March 14 that included much of the exculpatory evidence. However, Plaintiffs allege that Officer Day's original report was not submitted with the "bystander" statements, and that Duke Police instead submitted a "continuation report" that Duke Police supervisors directed Officer Day to write to "deliberately impeach" his own prior report. (Second Am. Compl. ¶ 474-475).

With respect to District Attorney Nifong, Plaintiffs allege that Nifong took over the investigation on March 24, 2006, in order to help him win the upcoming election for District

Attorney. (Second Am. Compl. ¶ 478-485). Plaintiffs allege that Nifong intended to use the media interest in the case, generated by the allegations in the NTO affidavit, to aid in his election campaign. Plaintiffs allege that Nifong contacted Durham Police Captain Lamb on March 24, as Plaintiffs were arriving at the Forensics Unit pursuant to the NTO, and Lamb agreed to "delegate to Nifong his official policymaking authority over the investigation. Lamb then instructed Gottlieb, Himan, and Ripberger to conduct the investigation only in the manner Nifong directs." (Second Am. Compl. ¶ 487). Plaintiffs contend that Nifong used the Plaintiffs' "non-citizen status" to "galvanize public condemnation of the Plaintiffs." (Second Am. Compl. ¶ 490). Plaintiffs also allege that Nifong began making statements to media representatives regarding the charges, without any factual basis, in order to generate media coverage to assist him in his campaign.

Plaintiffs allege that on March 24, Duke Vice President Trask, knowing that the team members were represented by counsel, demanded meetings with team members. Trask met with the team captains and began asking questions. When the captains said that their counsel had advised them not to discuss details of the evening, Trask insisted they answer and "suggested that the conversation was protected from disclosure by a privilege that did not exist." (Second Am. Compl. ¶ 498). Plaintiffs allege that Trask was attempting to coerce a waiver of the team members' rights and subvert their right to counsel. Plaintiffs contend that shortly thereafter the administrators who were at that meeting were compelled to tell the police what the team members had told them. (Second Am. Compl. ¶ 499).

Plaintiffs contend that in retaliation for their assertion of their First, Fifth, and

Fourteenth Amendment rights, the Duke Defendants, Nifong, and the Durham Police Spokesperson Defendants (Addison and Michael) agreed to participate in a media campaign to publicly vilify Plaintiffs and their teammates by falsely asserting that a rape had occurred, that the perpetrators were team members, that all members of the team were involved as principals or accomplices, and that all members of the team were "stonewalling" the police investigation. (Second Am. Compl. ¶ 501). Plaintiffs allege that as part of these media campaign, Nifong made multiple public statements, including false statements that were "not-for-attribution," as set out in the Second Amended Complaint. (Second Am. Compl. ¶ 501-503, 590). Plaintiffs allege that Durham Police Spokesperson Addison also made numerous false public statements designed to stigmatize Plaintiffs, as set out in the Second Amended Complaint, including in an e-mail flyer. (Second Am. Compl. ¶ 504-517). Plaintiffs contend that the e-mail flyer falsely described the alleged assault as an established fact and stated that the "[t]he victim was sodomized, raped, assaulted and robbed," even though Plaintiffs contend that Duke Police knew that there was no evidence of sexual assault. (Second Am. Compl. ¶ 507). Plaintiffs contend that Addison acted with malice, and that all of his statements were made in direct violation of Durham Police Department Orders and Operating Procedures. Plaintiffs contend that Durham supervisors Baker, Chalmers, Russ, and Hodge had final policymaking authority for the City and failed to remedy Addison's conduct. (Second Am. Compl. ¶ 514-517). Plaintiffs also allege that under Commander Lamb's direction, Durham Police and Duke University personnel created a "Wanted" poster using the Plaintiffs' photographs, that was then disseminated across campus by "Duke University personnel at the direction of Duke University officials, and across the city

of Durham at the direction of City of Durham officials by City of Durham personnel." Plaintiffs contend both that the creation and dissemination was directed by Duke and City officials with "final policymaking authority," and that Duke and City officials failed to correct the conduct or prevent the violations of Plaintiffs' rights. (Second Am. Compl. ¶ 521-524). Plaintiffs contend that the publication of the "Wanted" poster was pursuant to a Duke Police and Durham Police policy to create a "poster" and e-mail alert whenever a potentially high-profile crime was reported within the Duke Police Department's jurisdiction. (Second Am. Compl. ¶ 525-527).

Plaintiffs allege that Duke officials also publicly stigmatized Plaintiffs, including in statements made by University Spokesperson Burness in which Burness stated ("not-for-attribution") that what had actually happened was far worse than what was being reported and that everyone on the team was involved. (Second Am. Compl. ¶ 529-533). Plaintiffs contend that Duke Officials Lange and Brodhead also made statements "bolstering the myth that Plaintiffs had erected a 'Stonewall of Silence.'" (Second Am. Compl. ¶ 534). Plaintiffs contend that Brodhead refused the offer by Plaintiffs' defense counsel to view the evidence compiled, and that Brodhead also gave "tacit approval of the Faculty's massive public stigmatization of the Plaintiffs." (Second Am. Compl. ¶ 538-540). Plaintiffs also allege that on March 25, 2005, Steel directed Brodhead and Athletic Director Joe Alleva to publicly announce that the University had forfeited two lacrosse games as "punishment for the party," which Plaintiffs contend was part of Steel's objective to "force a trial and convictions." (Second Am. Compl. ¶ 528, 541).

Plaintiffs allege that Duke faculty members organized a "candlelight vigil" to be held on

the lawn of 610 N. Buchanan, which "transformed into a 'Wake-up Call' held by largely the same protestors, who surrounded 610 N. Buchanan, banged pots and pans, and shouted at the residents to come out and confess." (Second Am. Compl. ¶ 544-548). Plaintiffs allege that the protesters included members of the Duke faculty and administration, and that the Duke Police did not intervene. (Second Am. Compl. ¶ 549-551). Plaintiffs also allege that during a class in which they were present, a Duke professor began the lecture by stating that "'[i]t is a fact' that a rape occurred in the lacrosse house" and that "team members are covering up for their teammates," and Plaintiffs further allege that they were also presumed guilty by clergy members giving a homily at Duke Chapel. (Second Am. Compl. ¶ 552-554). Plaintiffs contend that Duke University officials failed to correct, discipline, or otherwise respond to "their employees who participated in the public stigmatization of the Plaintiffs." (Second Am. Compl. ¶ 558).

Plaintiffs contend that "Nifong, Michael, Addison, Lamb, Michael, Hodge, and Baker, individually and in concert, fabricated and released to the public false evidence that Plaintiffs were racists and that there was a 'deep racial motivation' for the sexual assault they knew did not happen." (Second Am. Compl. ¶ 566). As part of this contention, Plaintiffs allege that Defendant Soukup delegated his final policymaking authority to Hodge, Addison, and Michael, and that pursuant to that authority, they deleted or destroyed the audio recordings from the early hours of March 14 because the recordings contained the exculpatory, contemporaneous reports of Sgt. Shelton and other officers attending to Mangum. Plaintiffs allege that Soukup approved and ratified this conduct. Plaintiffs further allege that while concealing and destroying those recordings, Durham Police Officer Michael "disseminated and then knowingly misrepresented

the source and credibility of Pittman's 911 call reporting a racial slur at 610 N. Buchanan."

(Second Am. Compl. ¶ 570). Plaintiffs contend that although Durham Police knew the call was

from Pittman, they released the call as that of an "unknown, anonymous" caller who was

"fearful of a racist mob spilling out of the residence at 610 N. Buchanan earlier in the evening."

(Second Am. Compl. ¶ 573). Plaintiffs allege that Nifong and Durham Police Officer Michael

continued to falsely insist that they had not identified the caller, even though Pittman had told

Sgt. Shelton and Himan and Gottlieb that she was the one who made the call. Plaintiffs contend

that Nifong also made additional public statements focusing on the "racist dimension" of the

allegations. (Second Am. Compl. ¶ 575). Plaintiffs contend that following release of the 911

call, Brodhead made a statement denouncing "racism and its hateful language," and Duke faculty

members and clergy also responding to the "racist dimension" of the allegations in ways that

Plaintiffs contend were "attempting to stir up racial animus against the Plaintiffs." (Second Am.

Compl. ¶ 581-590).

Plaintiffs contend that on March 27, Nifong met with Gottlieb and Himan to review the

evidence and realized they did not have evidence to counterbalance the contradictions in

Mangum's story. Plaintiffs allege that Nifong nevertheless continued with the investigation

because "he was already committed" based on his statements to the press. (Second Am. Compl.

¶ 593). Nifong instructed Gottlieb and Himan to obtain copies of the e-mails sent by the team

members after the party. Plaintiffs allege that "Gottlieb obtained an email written by Ryan

McFadyen" and "[w]ithin 10 minutes" Gottlieb and Himan were back in Nifong's office "with

a copy of an email exchange that contained [McFadyen]'s email parody of *American Psycho.*"

(Second Am. Compl. ¶ 594). Plaintiffs allege that Gottlieb, Himan, and Nifong discussed the fact that Mangum "did not identify or even recognize [McFadyen] in the March 16th Identification Procedure" but Nifong nevertheless instructed Himan and Gottlieb to obtain a warrant to search McFadyen's room. (Second Am. Compl. ¶ 595). Plaintiffs allege that "[t]he point of obtaining the search warrant was not to search for evidence; it was to place [McFadyen]'s email in a public document, stripped of the reply emails that reveal that [McFadyen]'s email is a parody." (Second Am. Compl. ¶ 595). Plaintiffs contend that as part of the search warrant application, Nifong, Himan, and Gottlieb revised their prior NTO affidavit to include the text of McFadyen's e-mail, with the intent that McFadyen and the other team members would be vilified when the affidavit was provided to the media. Plaintiffs allege that Nifong, Gottlieb, and Himan agreed to falsely include in the warrant application's Description of Crimes "the assertion that police are investigating a 'Conspiracy to Commit Murder,' with strippers as the putative victims." (Second Am. Compl. ¶ 605). Plaintiffs also allege that Nifong, Gottlieb and Himan "added to the list of 'items to be seized' Mangum's white shoe, described as 'Property belonging to a 27 y/o B/F victim to include but not limited to a white 6 inch shoe" even though the investigators had already found and seized that shoe over a week earlier. (Second Am. Compl. ¶ 606). Plaintiffs contend that in the affidavit, Gottlieb and Himan added the false allegation that "further interviews showed" that the players "also used numbers when calling for one another across the room again to hide their identities," but that no witness had told Gottlieb and Himan this and it was another fabrication. (Second Am. Compl. ¶ 609). Plaintiffs allege that Gottlieb, Himan, and Nifong proceeded with the warrant application with

a malicious, evil motive and without probable cause. Nifong, Gottlieb, and Himan obtained the search warrant, but the state court judge sealed the warrant application. Plaintiffs contend that "sealing the warrant frustrated its only purpose" and that in executing the warrant, Gottlieb was "in a rage" and destroyed furniture. (Second Am. Compl. ¶ 612-613). Plaintiffs allege that Duke Police Sgt. Smith stood by while Himan and Gottlieb conducted the search. Plaintiffs allege that "[w]hile there, he indicated that he knew the warrant was not supported by probable cause or reasonable suspicion." (Second Am. Compl. ¶ 614). Plaintiffs contend that Sgt. Smith was aware that Gottlieb and Himan had falsified the material allegations in the Warrant Affidavit and that there was no probable cause to believe the crimes alleged had been committed, but "'turned a blind eye'" to the violations of McFadyen's constitutional rights occurring in his presence. (Second Am. Compl. ¶ 615). Plaintiffs allege that the warrant was unsealed April 5, 2006, and McFadyen was "vilified" as intended by Gottlieb, Himan, and Nifong. (Second Am. Compl. ¶ 616).

Plaintiffs allege that on March 27 and 28, the State Bureau of Investigation advised both Nifong and Himan that they had completed the serology tests on the rape kit items and that there was no semen, blood, or saliva on any of them, and that as a result, no further DNA testing would be performed. Plaintiffs allege that in response, Himan and Nifong sent swabs of a four-foot area of the bathroom floor and a towel collected during the search of 610 N. Buchanan. Plaintiffs allege that Himan informed Nifong and the Durham Police supervisors that the SBI lab tests would produce no DNA match. Plaintiffs further allege that Himan spoke with Mangum about the case and about the negative DNA test results. Plaintiffs contend that

prior to this time, Nifong had taken the public position that the DNA tests would "'reveal who

the attackers were.'" (Second Am. Compl. ¶ 626).

On March 29, 2006, a meeting was held between Duke and City officials, including

Nifong, Baker, Hodge, Russ, Graves, and Dean. Gottlieb and Himan came to report on the

status of the evidence in the investigation. Plaintiffs allege that Gottlieb and Himan failed to

take notes or preserve their timeline of the investigation that they prepared for Baker. However,

Plaintiffs allege that Nifong, Gottlieb, and Himan reported at the meeting the SBI test results

and that they had "no suspects and no evidence that a rape occurred." (Second Am. Compl.

¶ 631). Plaintiffs contend that after the meeting, the Duke Crisis Management Team ( Steel,

Brodhead, Lange, Trask, Burness, Moneta, Dzau, and Haltom), Duke Police supervisors

(Dawkins, Graves, Dean, Humphries, Cooper, Garber, Schwab, Fleming, and Best) and Durham

Police supervisors (Baker, Chalmers, Hodge, Russ, Mihaich, Council, Lamb, Ripberger, Evans,

and Soukup) "all were aware of and willfully blind and/or deliberately indifferent to the repeated

and ongoing violations of Plaintiffs' constitutional rights" by Nifong, Himan, Addison, and

Michael, and also "willfully refused or failed to acknowledge, receive or seize the overwhelming

evidence of innocence that had been amassed in the case." (Second Am. Compl. ¶ 633).

Plaintiffs further allege that the Duke and City officials, acting with deliberate indifference to

Plaintiffs' constitutional rights, and knowing that the Plaintiffs were innocent, directed Nifong

and Himan to "act swiftly to charge, prosecute, and convict Plaintiffs and/or their teammates."

(Second Am. Compl. ¶ 634). Plaintiffs contend that "[a]ll appearances of a legitimate

investigation were abandoned, and replaced by a conspiracy whose final object was to prosecute

and convict Plaintiffs and/or their teammates in the absence of probable cause, reasonable suspicion, or factual possibility for that matter, in violation of Plaintiffs' constitutional rights," by stigmatizing Plaintiffs for the purpose of depriving them of a fair and impartial jury, concealing exculpatory evidence, manufacturing inculpatory evidence, abusing legal process, invading Plaintiffs' financial and educational records, and engaging in "an overarching conspiracy not to intervene among all Defendants who had the power to prevent the wrongs they knew were conspired to be done to Plaintiffs over the course of the next year." (Second Am. Compl. ¶ 639-640).

As the basis for these contentions, Plaintiffs allege first that they were entitled to the SBI report of the test results by March 31, and that Nifong refused to provide the exculpatory report to Plaintiffs for two weeks. Plaintiffs further allege that during that time, Nifong continued to make public statements in which he began to fabricate evidence and allegations to fit the lack of DNA evidence, without revealing that he already knew that there was no DNA evidence. Plaintiffs allege that Nifong, Gottlieb, and Himan received the final SBI report on April 4, 2006, and Nifong instructed Gottlieb and Himan to obtain quotes for additional DNA testing. Plaintiffs allege that Brian Meehan, an employee of testing lab DNA Security, Inc. ("DSI"), had been "lobbying for business from the City" for his DNA lab, and offered to reduce his rates in order to be involved in the "high profile case." (Second Am. Compl. ¶ 656).

Plaintiffs contend that Nifong was also determined to manufacture inculpatory evidence by directing Gottlieb and Himan to prepare another photo identification procedure and "tell Mangum she would see pictures of people they believe were present at the party, and have her

pick three." (Second Am. Compl. ¶ 663). Mangum came to the police station on April 4 and

was shown a PowerPoint presentation of photos of every Caucasian member of the lacrosse

team, using photos obtained as a result of the NTO. Plaintiffs allege that this identification

procedure "violated nearly all of the Department's safeguards against negligent and malicious

misidentification codified in Durham Police Department's" policies, because it was administered

by Gottlieb, who provided feedback during the process, and because it did not include true

fillers and Mangum was told that the photos were a collection of the individuals police believed

were at the party. (Second Am. Compl. ¶ 667-668). Plaintiffs also allege that Mangum was

shown pictures from the party that were in the possession of Durham Police prior to the April

4 identification procedure, which enabled her to identify and describe individuals who were at

the party that she previously had not recognized or identified. (Second Am. Compl. ¶ 669-675,

678). Plaintiffs contend that Nifong and Gottlieb were required to provide them with a written

report of the April 4 procedure since it was conducted with all of the team members'

photographs, but failed to do so and deliberately concealed from Plaintiffs' defense counsel the

fact that the identification procedure had been conducted. Plaintiffs contend that in doing so,

Gottlieb and Himan were violating the NTO processes, were concealing exculpatory evidence,

and were foreclosing Plaintiffs' opportunity to petition the Court to be called as witnesses before

the Grand Jury. (Second Am. Compl. ¶ 677-686). Plaintiffs contend that the fact that Mangum

had previously failed to identify any team members in the two prior identification procedures

was deliberately excluded from the NTO application, the search warrant for McFadyen's room,

and from the Investigation Timeline prepared by Gottlieb for the City Council. (Second Am.

Compl. ¶ 676).

Plaintiffs allege that on April 5, Nifong filed an ex parte motion and obtained an order directing additional DNA testing of certain items by DNA Security, Inc. In the ex parte motion, Nifong revealed that the SBI's DNA test was completed and the results showed no link to any team member, but that information was not revealed to Plaintiffs or their defense counsel. (Second Am. Compl. ¶ 688-692). Plaintiffs further allege that on that same day, the search warrant application for McFadyen's room was unsealed, making it a public record that was picked up by the media. Plaintiffs allege that in response, Defendants Moneta, Bryan, and Wasiolek unilaterally suspended McFadyen as a student without notice, hearing, or inquiry. (Second Am. Compl. ¶ 693-696). Plaintiffs allege that Dean Wasiolek demanded that McFadyen waive his rights under FERPA, and that Duke officials, including Defendant Brodhead, then began giving interviews and making public comments to the media indicating that Duke had suspended him under the "'safety of the community'" provisions of the student code of conduct. (Second Am. Compl. ¶ 693-698). Plaintiffs allege that in contrast, Duke did not take any adverse action against students who sent threatening e-mails to Coach Pressler or to team members and their families.[8]

Plaintiffs allege that Matthew Wilson ("M. Wilson") was also subject to disciplinary sanctions when it was reported that he had pled guilty to a charge of Driving While Impaired in May 2006, even though the incident was during the summer outside of Durham County and

---

[8] Plaintiffs allege that Matthew Wilson and his family are permanent residents of Durham, and were targets for drive-by shootings after their home address was posted on a web site calling for a violent response to the allegations. (Second Am. Compl. ¶ 709).

was not connected with Duke. Plaintiffs allege that Duke unilaterally suspended M. Wilson from the lacrosse team indefinitely and made statements to the press to "ensure the University's disciplinary action against Matthew [Wilson] was widely known." (Second Am. Compl. ¶ 713). Plaintiffs further allege that in response to the citation, Defendant Bryan referred him for a Judicial Board hearing, and falsely informed him that it was "policy" to suspend for two semesters any student who was charged, on campus or off, with a Driving While Impaired offense. Plaintiffs allege that Duke officials refused to allow M. Wilson to transfer to another school as a student in good standing, even though other students had been allowed to transfer as students in good standing in lieu of being suspended. At the Judicial Board hearing, M. Wilson was questioned about the events of March 13-14 and was suspended for two semesters, which was modified to one semester on appeal. Plaintiffs allege that the Judicial Board proceeding violated the Student Code of Conduct, which "clearly does not authorize the Undergraduate Judicial Board to subject students to disciplinary proceedings for conduct that occurs off-campus, out of county, while not enrolled in University courses." (Second Am. Compl. ¶ 720). Plaintiffs also allege that Breck Archer was subject to a disciplinary proceeding in the summer of 2005 for damage to a room he had not yet moved into, and then was suspended for the fall 2005 semester for failing to submit a form after he had completed his community service hours. Plaintiffs allege that this disciplinary proceeding was without basis in the Student Code of Conduct.

As to all of the disciplinary measures, Plaintiffs allege that the Student Code of Conduct is incorporated in the Duke Student Bulletin, which provides disciplinary procedures and

safeguards.  Plaintiffs allege that during the disciplinary proceedings, Duke failed to provide the procedural and substantive protections provided in the Student Bulletin.  As to McFadyen, Plaintiffs contend that the interim suspension did not meet the standard set out in the Bulletin, that McFadyen did not receive notice of the provision he was charged with violating, that he did not receive a hearing within 3 days or an informal review by a 3-person committee as provided in the Bulletin, and that he was not provided with the procedural safeguards set out in the Bulletin.  With respect to M. Wilson, Plaintiffs allege that the Bulletin expressly limited its jurisdictional authority to exclude off-campus conduct except in limited circumstances not applicable to him.  In addition, Plaintiffs allege that the proceedings against M. Wilson were "predetermined" and violated his right to a fair hearing under the Bulletin.  Finally as to Archer, Plaintiffs allege that Duke's "suspension of Archer was unprecedented and remains inexplicable by reason and common sense."  (Second Am. Compl. ¶ 744).  Plaintiffs allege that Defendant Bryan "rigged" the hearing process and deprived Archer of his rights under the procedures set out in the Bulletin.  (Second Am. Compl. ¶ 728-745).

Plaintiffs allege that on April 6, certain items were transferred from the SBI to DSI for DNA testing, pursuant to the order Nifong had obtained the day before.  The results of DSI's testing were provided on April 10 to Gottlieb, Himan, and Wilson and "revealed the existence of DNA characteristics from up to four different males" and excluded Plaintiffs and all of the team members as potential contributors of the DNA.  (Second Am. Compl. ¶ 747-748).  Plaintiffs allege that Nifong nevertheless delayed release of this information by directing Gottlieb and Himan to send more evidence for testing, even though it was not covered by the order

authorizing certain testing by DSI. Plaintiffs also allege that Meehan, the DSI lab director, offered to prepare a report, but Nifong declined because he did not want to have to provide the report to defense counsel, and Meehan acquiesced in Nifong's wish. (Second Am. Compl. ¶ 802). Plaintiffs further allege that Nifong, Gottlieb, and Himan met with Meehan and DSI's president, Defendant Clark, on April 21 and May 12, and that during the May 12 meeting, they agreed to conceal DSI's findings and prepare a final report that did not contain the entirety of DSI's finding. Plaintiffs allege that they were entitled to a written report of every test conducted by DSI with their DNA samples that were provided pursuant to the NTO, and that Nifong, Gottlieb, and Himan did not ever provide them with a complete report. Plaintiffs further allege that the report included a "non-probative" crime scene fingernail even though "Crystal Mangum did not contribute to any DNA found on the fingernail" and that it was included in the report "solely for purposes of intimidating a material and critical witness." (Second Am. Compl. ¶ 769-771). Finally, Plaintiffs allege that after agreeing to the preparation of a misleading report, Nifong continued to tell the media that the DNA results would "favor Mangum's allegations," and sources in Nifong's office provided false information to the media indicating that there was a DNA match with an individual Mangum had identified with 90% certainty. (Second Am. Compl. ¶ 773-775).

Plaintiffs allege that during the investigation, Nifong repeatedly stated that there was medical evidence of an assault. Plaintiffs allege that the "falsified sections" of the NTO application included a claim by Gottlieb that "[m]edical records and interviews that were obtained by a subpoena revealed the victim had signs, symptoms, and injuries consistent with

being raped and sexually assaulted vaginally and anally. Furthermore, the SANE nurse stated the injuries and her behavior were consistent with a traumatic experience." (Second Am. Compl. ¶ 781). Plaintiffs allege that after Nifong made repeated public statements claiming that he believed a rape had occurred based on the medical evidence, Nurse Levicy's supervisor, Theresa Arico, gave an interview in which she references "blunt force trauma" and examination with a coloposcope, and concluding that "I can reasonably say these injuries are consistent with the story she told." (Second Am. Compl. ¶ 784). Plaintiffs allege, however, that significant portions of the Sexual Assault Examination Report ("SAER") were not produced until April 5, several weeks after the March 21 subpoena and subsequent production of medical records. Plaintiffs allege that in that intervening time between March 21 and April 5, "Levicy re-created those portions of the SAER that were not completed on March 14th after the [examination] was abandoned." (Second Am. Compl. ¶ 785). Plaintiffs allege that the information that Levicy produced to Gottlieb on April 5 included "what Levicy claims to be a handwritten transcription of the SANE interview of Mangum, and several pages containing strike-outs and other addenda that do not conform to the facts of the SANE exam, but instead attempted to conform the SANE exam to what Levicy understood to be the evidence at the time." (Second Am. Compl. ¶ 785). Plaintiffs allege that Levicy falsified the medical records by fabricating a transcript of her interview with Mangum "in order to conform the SANE interview to what Gottlieb reported in his sensationalized application" for the NTO. (Second Am. Compl. ¶ 785). Plaintiffs further allege that Levicy falsified the medical record of the examination by revising and annotating Mangum's responses to conform them to the evidence police believed existed at the time. For

example, a question on the form asked if any effort was made to conceal evidence, and the original "no" was struck through and "yes" was checked with a handwritten notation "wiped her off with a rag." Plaintiffs allege that Levicy made this revision to conform the SAER with the fact that a towel containing semen was seized during the search of 610 N. Buchanan, although it was later determined that Mangum's DNA was not on the towel. (Second Am. Compl. ¶ 785).

Plaintiffs allege that the next day, after Levicy submitted the SAER with her revisions, Mangum gave a written statement that was "remarkably consistent" with the interview transcript that Levicy had just provided. Plaintiffs allege that "[t]he falsifications in the SAER were plainly designed to conceal the fact that Mangum did not report any of the detail that appeared in Gottlieb's application" for the NTO and "were designed to corroborate the sensationalized version of Mangum's account that Gottlieb falsely reported in his factual sections of the application" for the NTO. (Second Am. Compl. ¶ 785-786).

Plaintiffs allege that Levicy subsequently met with Nifong, Gottlieb, Himan, and Wilson and "repeatedly proffered false testimony that was clearly designed to fill the chasms in Mangum's case and/or to restore Mangum's glaring credibility problems." (Second Am. Compl. ¶ 788). Plaintiffs allege that Levicy agreed with Nifong, Gottlieb, Himan, and Wilson that she would testify to forensic medical evidence that she did not observe and did not exist. Plaintiffs also allege that Levicy "fabricated a forensic medical observation that the [examination] revealed evidence of penetrating blunt force trauma." (Second Am. Compl. ¶ 790). Plaintiffs allege that Levicy's supervisor, Arico, "had already echoed publicly support for this false claim," even though there was no evidence of blunt force trauma. (Second Am. Compl. ¶ 790). Plaintiffs

further allege that after the results of the DNA testing established no match with any lacrosse team member, Nifong claimed publicly that he believed condoms were used, and "[k]nowing this, on January 10, 2007, Levicy proffered additional fraudulent testimony that the absence of DNA could be explained by the use of condoms" even though the examination report noted repeatedly that condoms were not used. (Second Am. Compl. ¶ 794-796). Finally, Plaintiffs allege that while the evidence established that Mangum was incoherent and potentially suffering from a "psychotic delusion" on March 14, Levicy proffered new testimony claiming Mangum "could always speak articulately" and was "very alert." (Second Am. Compl. ¶ 797). However, Plaintiffs allege that a few days later, after Nifong withdrew from the case, Levicy attempted a "clarification" and "stated that she now believed that the absence of any DNA matching a member of the lacrosse team could be explained by the fact that the rape 'didn't happen.'" (Second Am. Compl. ¶ 799).

Plaintiffs allege that on April 10, the SBI Lab report was provided to Plaintiffs and the results were made public. Plaintiffs allege that on April 11, a public forum was held and was attended by Nifong and Deputy Chief of Police Hodge, who was the Acting Chief of Police "in the unexplained absence of Chalmers." Plaintiffs allege that Hodge, who had participated in meetings reviewing the status of the investigation, was asked about the strength of the case in light of the DNA results, and said "'I don't think we would be here if it wasn't (a strong case)' against the Plaintiffs." (Second Am. Compl. ¶ 809-811).

Plaintiffs allege that on April 14, Nifong was proceeding to indict two team members, Reade Seligmann and Collin Finnerty, although Gottlieb and Himan knew that they had very

little evidence, if any, that either of them was even present at the party at the relevant time. Plaintiffs allege that Gottlieb and Himan therefore "colluded with Duke Police officers to compel several team members to provide the information necessary to place Collin and Reade at 610 N. Buchanan at some point on March 13th if not March 14th. Plaintiffs allege that this included sending an e-mail on April 13 through Breck Archer's "duke.edu" e-mail account that Archer did not send or authorize, which stated "I am going to the police tomorrow to tell them everything that I know." (Second Am. Compl. ¶ 818-819). In addition, Plaintiffs allege that on the evening of April 13, Duke Police officers assisted Himan and Gottlieb in gaining access to the dorm building where most of the sophomore team members lived. Plaintiffs allege that Gottlieb and Himan "cornered team members in their dorms" and asked "who was (and was not) present at the party." (Second Am. Compl. ¶ 821). Plaintiffs allege that they "cornered Michael Young [who is not a Plaintiff in this case], and coaxed him into his room" and questioned him regarding who was at the party. (Second Am. Compl. ¶ 822). Plaintiffs allege that Duke Police "facilitated Himan's and Gottlieb's entry into one of the dorms, and then left them there to sneak into other dorm buildings." (Second Am. Compl. ¶ 823).

Plaintiffs allege that on April 5, their season was cancelled, their coach resigned, and President Brodhead announced the formation of an "Ad Hoc" committee to investigate the Plaintiffs' and their teammates' past in search of prior bad acts by the lacrosse team. Plaintiffs allege that the Committee was given only three weeks so that its report "could be presented in a nationally televised press conference prior to the primary, in order to assure Nifong's election and the continuation of the case to trial and convictions." (Second Am. Compl. ¶ 833).

Plaintiffs allege that "[i]n the absence of evidence of misconduct, the Chairman directed the manufacture of evidence that would." (Second Am. Compl. ¶ 837). Plaintiffs allege that Defendants Moneta and Bryan "provided false and misleading statistics and a body of misleading data for the Committee to use." (Second Am. Compl. ¶ 838-844). Plaintiffs allege that the Committee reached the "preordained public conclusion" announced the day before the election, that there was a "pattern" of "deplorable" conduct by lacrosse team members, and "ratified the premises of Gottlieb's sensationalized application" for the NTO. (Second Am. Compl. ¶ 838, 847, 849). Plaintiffs allege that Defendant Burness "delivered an advance copy" of the report to the City so they could "prepare statements for the press conferences" but did not provide a copy to Plaintiffs or their teammates. (Second Am. Compl. ¶ 851).

Plaintiffs allege that Duke employees, at Steel's direction, accessed Plaintiffs' "federally protected financial records and produced to Durham Police complete, unredacted reports of all activity in Plaintiffs' Duke-issued transaction card accounts between March 13 and March 14," without a warrant or notice to the Plaintiffs or their counsel. (Second Am. Compl. ¶ 853). Plaintiffs allege that the records were obtained by Defendants Drummond and Dawkins and Duke Police Officers Smith and Stotsenberg, and that Smith and Stotsenberg delivered the records to Gottlieb on March 31 at Steel's directive. Plaintiffs allege that Gottlieb used the records to ensure that Mangum "would select three team members whose transaction records were not inconsistent with having been present at the party at the relevant time." (Second Am. Compl. ¶ 857). Plaintiffs allege that Gottlieb gave the reports to Himan, who gave them to Nifong. However, Plaintiffs allege that on May 31, Nifong issued subpoenas ordering

production of the Duke Card Transaction Reports for every member of the team, even though he had received the reports two months earlier. (Second Am. Compl. ¶ 863). Plaintiffs allege that Duke sent a notice to Plaintiffs and their teammates indicating that "the subpoenas had been issued, and the protected materials would be produced pursuant to the subpoenas unless they obtained a court order quashing the subpoenas." (Second Am. Compl. ¶ 864). However, the notice "did not disclose that all of their Duke Card reports covering at least the same time period had already been produced to the State by Duke Police Officers." (Second Am. Compl. ¶ 864). In response, Plaintiffs filed motions to quash the subpoenas and participated in a hearing at which the subpoenas were quashed. Plaintiffs allege that Nifong, Himan, Gottlieb, Smith, Stotsenberg, Drummond and Dawkins all knew that Duke had previously provided the same reports sought in the subpoena and that the subpoena was a fraud.

Plaintiffs also allege that they and their teammates undertook to register voters for the November 2006 election, but the Duke "Crisis Management Team" Defendants (Steel, Brodhead, Lange, Trask, Burness, Moneta, Dzau, and Haltom) directed Duke officials to force Plaintiffs and their teammates to shut down the registration efforts. Plaintiffs allege that other student groups were allowed to set up voter registration tables on campus, but they were denied the right to set up a table at the stadium during the Homecoming Game. Plaintiffs allege that in response, they decided to continue registration as they had in the past by offering the opportunity to register to vote to passers-by on campus, without a table or centralized location. However, after the students began walking on campus with their voter registration materials, wearing "Voice Your Choice" t-shirts, they were stopped by Administrators and Duke Police

officers and were ordered to cease and desist the registration. Plaintiffs allege that the students were required to take off their shirts or turn them inside out. Plaintiffs allege that according to the agents who stopped them, "the decision to shut down the registration effort was made at the 'highest levels' of the University's governing structure." (Second Am. Compl. ¶ 886). Plaintiffs further allege that Defendant Burness made public statements falsifying the results of an investigation into the incident. (Second Am. Compl. ¶ 888).

Plaintiffs allege that Duke and the City conducted internal investigations of their handling of all of these events, and found no wrongdoing, thus condoning and ratifying the violations of Plaintiffs' rights. (Second Am. Compl. ¶ 890). Plaintiffs allege that Defendant Burness continued to make public statements that "falsely accused the Plaintiffs and their teammates of habitual, gross misconduct over the course of years." (Second Am. Compl. ¶ 894). However, Plaintiffs allege that the State Attorney General subsequently "condemned Nifong and his co-conspirators for their 'tragic rush to accuse' and their 'failure to verify serious allegations.'" (Second Am. Compl. ¶ 897). Nifong was disbarred and was convicted of criminal contempt in connection with making "false and misleading representations to the [c]ourt that no one had made any statements to him relating to the DNA evidence beyond what was . . . published in the May 12" report, when he had been conspiring for almost 6 months to conceal the exonerating DNA evidence. (Second Am. Compl. ¶ 902).

In the present suit, Plaintiffs now assert the following claims: Count 1: Search and Seizure in Violation of 42 U.S.C. § 1983 and Conspiracy; Count 2: Search and Seizure in Violation of 42 U.S.C. § 1983 and Conspiracy; Count 3: Abuse of Process and Conspiracy in Violation of 42

U.S.C. § 1983; Count 4: Deprivation of Property in Violation of 42 U.S.C. § 1983; Count 5: False Public Statements in Violation of 42 U.S.C. § 1983; Count 6: Manufacture of False Inculpatory Evidence and Conspiracy in Violation of 42 U.S.C. § 1983; Count 7: Concealment of Exculpatory Evidence and Conspiracy in Violation of 42 U.S.C. § 1983; Count 8: Interfering with Right to Engage in Political Processes in Violation of 42 U.S.C. § 1983 and Conspiracy; Count 9: Retaliation in Violation of 42 U.S.C. § 1983 and Conspiracy; Count 10: Deprivation of the Privileges and Immunities of North Carolina Citizens in Violation of 42 U.S.C. § 1983; Count 11: Failure to Prevent Deprivation of Constitutional Rights in Violation of 42 U.S.C. § 1983; Count 12: <u>Monell</u> Liability for Violations of 42 U.S.C. § 1983; Count 13: Supervisory Liability for Violations of 42 U.S.C. § 1983; Count 14: Failure to Train in Violation of 42 U.S.C. § 1983; Count 15: Conspiracy in Violation of 42 U.S.C. § 1983; Count 16: Conspiracy in Violation of 42 U.S.C. § 1985; Count 17: Failure to Intervene in Violation of 42 U.S.C. § 1986; Count 18: Common Law Obstruction of Justice and Conspiracy; Count 19: Common Law Abuse of Process and Conspiracy; Count 20: Intentional Infliction of Emotional Distress and Conspiracy; Count 21: Breach of Contract; Count 22: Invasion of Privacy; Count 23: Breach of Fiduciary Duty and Aiding and Abetting; Count 24: Fraud; Count 25: Negligence (Durham Police); Count 26: Negligent Hiring, Retention, Supervision, Training and Discipline (Durham Police); Count 27: Negligent Infliction of Emotional Distress (Durham Police); Count 28: Negligent Infliction of Emotional Distress; Count 29: Negligence (Duke Police); Count 30: Negligence (Duke); Count 31: Negligence (SANE); Count 32: Negligent Hiring, Retention, Supervision, Training and Discipline (SANE); Count 33: Negligent Infliction of Emotional

Distress (SANE); Count 34: Negligence (DSI); Count 35: Negligent Supervision, Hiring, Training, Discipline, and Retention (DSI); Count 36: Negligent Infliction of Emotional Distress (DSI); Count 37: Negligence (Duke Police); Count 38: Negligent Supervision (Duke Police); Count 39: Negligent Infliction of Emotional Distress (Duke Police); Count 40: Negligent Entrustment (Duke Police); Count 41: Violations of Article I and Article IX of the North Carolina Constitution and Conspiracy. In considering these various Motions to Dismiss, the Court will first outline the applicable legal standard for considering motions to dismiss, and will then apply that standard to analyze each of the 41 claims raised by Plaintiffs in this case.

## II.     STANDARD OF REVIEW ON MOTIONS TO DISMISS

In reviewing a Motion to Dismiss for failure to state a claim pursuant to Rule 12(b)(6), the Fourth Circuit has directed that "[w]e 'take the facts in the light most favorable to the plaintiff,' but 'we need not accept the legal conclusions drawn from the facts,' and 'we need not accept as true unwarranted inferences, unreasonable conclusions, or arguments.'" Giarratano v. Johnson, 521 F.3d 298, 302, 304 (4th Cir. 2008) (quoting Eastern Shore Mkts., Inc. v. J.D. Assocs. Ltd. P'ship, 213 F.3d 175, 180 (4th Cir. 2000)). In Ashcroft v. Iqbal, the Supreme Court addressed the appropriate standard for analyzing motions to dismiss pursuant to Rule 12(b)(6), noting that "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S. Ct. 1955, 1974, 167 L. Ed. 2d 929 (2007)). The Court in Iqbal laid out "two working principles" for considering Rule 12(b)(6) motions to dismiss. First, the Court in Iqbal noted that "the tenet that

a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." Id. Thus, "[a] pleading that offers 'labels and conclusions' or 'a fomulaic recitation of the elements of a cause of action'" or "'naked assertions' devoid of 'further factual enhancement'" will not do. Id. In this regard, the Iqbal Court noted that Federal Rule of Civil Procedure 8(a)(2) requires that a complaint contain a "short and plain statement of the claim showing that the pleader is entitled to relief," but Rule 8 "does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." Id. at 1949, 1950. Thus, in considering a Rule 12(b)(6) Motion to Dismiss, courts may begin by "identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." Id. at 1950.

Second, the Iqbal Court noted that "only a complaint that states a plausible claim for relief survives a motion to dismiss," and therefore courts must determine whether the facts actually pled in the complaint show that the pleader is entitled to relief. Id. Thus, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." Id. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" Id. at 1949 (internal citations omitted). Thus, dismissal of a complaint is proper where plaintiffs'

factual allegations fail to "produce an inference of liability strong enough to nudge the plaintiff's claims 'across the line from conceivable to plausible.'" <u>Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.</u>, 591 F.3d 250, 256 (4th Cir. 2009) (citing <u>Iqbal</u>, 129 S. Ct. at 1952 (internal quotation omitted)).

In considering claims that are asserted under state law, the Court "must rule as the North Carolina courts would, treating decisions of the Supreme Court of North Carolina as binding, and 'departing from an intermediate court's fully reasoned holding as to state law only if 'convinced' that the state's highest court would not follow that holding.'" <u>Iodice v. United States</u>, 289 F.3d 270, 275 (4th Cir. 2002). However, pleading standards are a matter of procedural law governed in this Court by federal, not state, law. <u>See</u> <u>Jackson v. Mecklenburg County, N.C.</u>, No. 3:07-cv-218, 2008 WL 2982468, at *2 (W.D.N.C. July 30, 2008) ("North Carolina substantive law applies to the elements of Plaintiffs' state law claims but the Federal Rules of Civil Procedure govern procedural law and North Carolina 'pleading requirements, so far as they are concerned with the degree of detail to be alleged, are irrelevant in federal court even as to claims arising under state law.'" (quoting <u>Andresen v. Diorio</u>, 349 F.3d 8, 17 (1st Cir. 2003) (citations omitted))). Therefore, the <u>Iqbal</u> procedural pleading standard applies to both federal and state law claims in this case.

## III.  ANALYSIS

In analyzing the various Motions to Dismiss, the Court will consider each of Plaintiffs' alleged claims to determine whether Plaintiffs have stated a claim under the standards outlined

above and under the applicable state and federal law.[9]  The Court will consider each of the counts individually, in the order in which they are asserted.  As a result, the Court acknowledges that there is some duplication of analysis, except where it can be avoided, but the analysis has been organized in this way in order to ensure that each claim is separately addressed.

**Count 1:  Search and Seizure in Violation of 42 U.S.C. § 1983 and Conspiracy, asserted against Nifong, Gottlieb, Himan, Levicy, Arico, the City, Duke, and Duke Health**[10]

Count 1 is a claim asserted under 42 U.S.C. § 1983, which prohibits any person, acting under color of state law, from depriving an individual of their rights secured under the

---

[9] The Court notes that Plaintiffs previously filed a Motion to Strike [Doc. #73] seeking to strike certain attachments filed by various Defendants with their respective Motions to Dismiss the prior Complaint.  In the Order [Doc. #135] granting Plaintiffs leave to file their Second Amended Complaint, the Court terminated the Defendants' original Motions to Dismiss and Plaintiffs' Motion to Strike as moot.  Plaintiffs did not renew their original Motion to Strike and no such Motion is currently pending before this Court.  Furthermore, there would be no need to strike the exhibits submitted here because a Motion to Strike under Rule 12(f) must be directed to a pleading, not an exhibit to a brief.  However, to the extent Plaintiffs raise objections to Defendants' exhibits, the Court notes that in reviewing the Motions to Dismiss the Court has not considered any items that are not part of or intrinsic to the Second Amended Complaint.  The Court notes that to the extent that Defendants have submitted charts outlining their briefing by count, those exhibits simply relate to the briefing and do not add any matter outside of the Complaint.  In addition, to the extent that the Defendants have submitted the "Duke Card Terms and Conditions" and state court orders directing the State to pay for DSI's services, the Court has not and need not consider those items in analyzing the Motions to Dismiss.

[10] Plaintiffs have asserted this claim against the individuals in both their official and individual capacities.  However, Plaintiffs agree that the "official capacity" claims are appropriately treated as claims against the City.  Claims against the City under § 1983 require additional allegations based on the Supreme Court's decision in Monell v. Department of Social Services, 436 U.S. 658, 694, 98 S. Ct. 2018, 2037-38, 56 L. Ed. 2d 611 (1978), and Plaintiffs have made those allegations as part of Count 12.  Therefore, the "official capacity" claims are considered as part of Count 12.  The Court as part of Count 12 also considers Plaintiffs' contention that the claims against Nifong are brought "in his Individual Capacity and Official Capacity with respect to the City of Durham."

45

Constitution and laws of the United States. Plaintiffs assert the § 1983 claim in Count 1 for alleged violations of Plaintiffs' Fourth and Fourteenth Amendment constitutional rights in connection with the Nontestimonial Order ("NTO"). Plaintiffs allege that the NTO "compelled the Plaintiffs to surrender themselves to the Durham Police and submit to cheek swabbings to obtain DNA samples, to submit to 'mug shot' photographing of their fact, and to disrobe for purposes of close physical inspection and photographing of their bodies." (Second Am. Compl. ¶ 908). Plaintiffs contend that the NTO thus effected a search and seizure under the Fourth and Fourteenth Amendments. Plaintiffs allege that Gottlieb, Himan, and Nifong agreed to seek the NTO, knowing that probable cause did not exist to believe that any of the offenses listed in the NTO application had been committed, and that reasonable grounds did not exist to suspect that Plaintiffs committed any such offenses. Plaintiffs allege that Nifong, Gottlieb, and Himan therefore "conspired to and did fabricate a false affidavit that would be facially sufficient" to obtain the NTO. (Second Am. Compl. ¶ 910). Plaintiffs allege that the fabricated statements were material to the issuance of the NTO, and that no reasonable officer would have believed that the true facts provided sufficient grounds for the NTO directed to Plaintiffs. With respect to Defendants Levicy, Arico, Duke, and Duke Health[11], Plaintiffs allege that these Defendants "agreed to act in concert with Nifong, Gottlieb, and Himan by falsifying Mangum's SAER to harmonize it with the fabricated [NTO] Affidavit, and, subsequently, further falsified the SAER to harmonize it with Mangum's written statement and evidence they hoped would emerge from

---

[11] In the substance of Count 1, Plaintiffs also refer to Defendants Manly and Dzau. However, they are not listed as Defendants against whom Count 1 is asserted. Therefore, Count 1 is not considered as to Defendants Manly and Dzau.

the DNA testing." (Second Am. Compl. ¶ 913).[12]

"'The Fourth Amendment [applicable to the states through the Fourteenth Amendment] prohibits law enforcement officers from making unreasonable seizures, and seizure of an individual effected without probable cause is unreasonable." Miller v. Prince George's County, 475 F.3d 621, 627 (4th Cir. 2007) (quoting Brooks v. City of Winston-Salem, 85 F.3d 178, 183 (4th Cir. 1996)). Moreover, when police officers effect a "seizure" of a person pursuant to a warrant, the officers are still liable for violations of the Fourth Amendment if the officers "intentionally lie in warrant affidavits, or recklessly include or exclude material information known to them." Id. at 630 (citing Franks v. Delaware, 438 U.S. 154, 155-56, 98 S. Ct. 2674, 2675, 57 L. Ed. 2d 667 (1978) (holding that a defendant in a criminal proceeding may raise a constitutional challenge to searches conducted pursuant to a warrant if "a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit" and if the offending information was essential to the probable cause determination)). Thus, "[a]n investigation need not be perfect, but an officer who intentionally or recklessly puts lies before a magistrate, or hides facts from him, violates the Constitution

---

[12] As part of Count 1, which relates to the NTO, Plaintiffs also assert that "Stotsenberg, Smith, at the direction of Graves and Dean, pried into and searched through Plaintiffs' private, password protected email accounts, their private banking records, their private educational records, among other things, all without issuance of any notice, subpoena or warrant, or other legal process, and in the absence of probable cause or reasonable suspicion." (Second Am. Compl. ¶ 915). However, Stotsenberg, Smith, Graves, and Dean are not named as Defendants in Count 1, and it is unclear how this contention relates to the remainder of Count 1. To the extent that Plaintiffs may be referring to their "Duke Card" records, the Court concludes that Plaintiffs do not have a constitutionally-protected expectation of privacy in their "Duke Card" records. In any event, because Plaintiffs have not brought Count 1 against Stotsenberg, Smith, Graves, and Dean, the Court will not consider this contention further.

unless the untainted facts themselves provide probable cause." Id. at 630-31; Brooks v. City of Winston-Salem, 85 F.3d 178, 183-84 (4th Cir. 1996). With regard to omissions, the Fourth Circuit has noted that "[a]n affiant cannot be expected to include in an affidavit every piece of information gathered in the course of an investigation," but a facially sufficient affidavit is still subject to challenge if it includes "omissions that are *designed to mislead*, or that are made in *reckless disregard of whether they would mislead*, the magistrate." United States v. Colkley, 899 F.2d 297, 300-01 (4th Cir. 1990) (emphasis in original). In this context, "'reckless disregard' can be established by evidence that an officer acted 'with a high degree of awareness of [a statement's] probable falsity,' that is, 'when viewing all the evidence, the affiant must have entertained serious doubts as to the truth of his statements or had obvious reasons to doubt the accuracy of the information he reported.'" Miller, 475 F.3d at 627 (quoting Wilson v. Russo, 212 F.3d 781, 788 (3d Cir.2000)). Likewise, as to omissions, "'reckless disregard' can be established by evidence that a police officer 'failed to inform the judicial officer of facts [he] knew would negate probable cause.'" Id. (quoting Beauchamp v. City of Noblesville, Inc., 320 F.3d 733, 743 (7th Cir. 2003)). However, "[a] plaintiff's 'allegations of negligence or innocent mistake' by a police officer will not provide a basis for a constitutional violation." Id. at 627-28 (quoting Franks v. Delaware, 438 U.S. 154, 171, 98 S. Ct. 2674, 2684, 57 L. Ed. 2d 667).

In this case, Plaintiffs allege that they were unconstitutionally seized when they were required to appear and surrender themselves at the Durham Police station, and submit to cheek swabbings to obtain DNA samples, 'mug shot' photographing, and "disrob[ing] for purposes of close physical inspection and photographing of their bodies" pursuant to the NTO. (Second

Am. Compl. ¶ 908).  The NTO was issued pursuant to North Carolina General Statute § 15A-271 to § 15A-282.  Under these statutes, an NTO may be issued by a judge upon an affidavit sworn to before the judge establishing "[t]hat there is 'probable cause' to believe that a felony offense . . . has been committed[,] that there are 'reasonable grounds' to suspect that the person named or described in the affidavit committed the offense[,] and that the results of specific nontestimonial identification procedures will be of material aid in determining whether the person named in the affidavit committed the offense."  N.C. Gen. Stat. § 15A-273.  An NTO includes "identification by fingerprints, palm prints, footprints, measurements, blood specimens, urine specimens, saliva samples, hair samples, or other reasonable physical examination, . . . photographs, and lineups or similar identification procedures requiring the presence of a suspect."  N.C. Gen. Stat. § 15A-271.

In their Motions to Dismiss, Defendants contend that this NTO process itself authorizes a search and seizure of citizens on "reasonable suspicion" rather than "probable cause" and that such a showing is sufficient under the Fourth Amendment.  Defendants further contend that the NTO in the present case was issued by a state magistrate judge upon a finding of "probable cause" to believe that a felony offense had been committed and "reasonable grounds" to suspect that the individuals named in the affidavit committed the offense, and that this Court should defer to the magistrate judge's finding.  See Simmons v. Poe, 47 F.3d 1370, 1378 (4th Cir. 1995).  In addition, Defendants contend that the affidavit for the NTO would support a finding of probable cause, even if the challenged evidence is not considered.  Id. ("[E]ven if an affidavit supporting a search warrant is based in part on some illegal evidence, such inclusion of illegal

evidence does not taint the entire warrant if it is otherwise properly supported by probable cause."). Finally, Defendants raise a "qualified immunity" defense, noting that "[g]overnment officials performing discretionary functions are entitled to qualified immunity from liability for civil damages to the extent that 'their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Washington v. Wilmore, 407 F.3d 274, 281 (4th Cir. 2005) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738, 73 L. Ed. 2d 396 (1982)). Under the doctrine of qualified immunity, even if the violation of a constitutional right is established on the facts alleged, "courts must consider whether the right was clearly established at the time such that it would be clear to an objectively reasonable officer that his conduct violated that right." Brown v. Gilmore, 278 F.3d 362, 367 (4th Cir. 2002).[13]

For their part, Plaintiffs allege that the NTO procedure under state law is unconstitutional insofar as it could be construed as authorizing searches and seizures, which could include blood samples, urine samples, saliva samples and physical examinations, on a showing of less than full probable cause. Plaintiffs further allege that even if the statute itself is constitutional, the NTO in this case - which effected a search and seizure of all 46 lacrosse

___

[13] In determining whether a governmental official is entitled to qualified immunity, the Court must first decide "'whether a constitutional right would have been violated on the facts alleged.'" Brown v. Gilmore, 278 F.3d 362, 367 (4th Cir. 2002) (quoting Saucier v. Katz, 533 U.S. 194, 200, 121 S. Ct. 2151, 2155, 150 L. Ed. 2d 272 (2001)). If the violation of the right is established, "courts must consider whether the right was clearly established at the time such that it would be clear to an objectively reasonable officer that his conduct violated that right." Id. However, pursuant to Pearson v. Callahan, courts are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." 129 S. Ct. 808, 818, 172 L. Ed. 2d 565 (2009).

team members - violated the Fourth Amendment because it was not supported by probable cause or even by "reasonable grounds." Finally, Plaintiffs contend that the NTO resulted in an unconstitutional seizure because the NTO was issued based on an affidavit that was intentionally false and misleading and that would not have supported issuance of the NTO if the false and misleading information were not considered.

Having considered all of these contentions, the Court concludes that Plaintiffs have adequately alleged a seizure and a search of their person implicating their rights under the Fourth Amendment. See United States v. Dionisio, 410 U.S. 1, 8, 93 S. Ct. 764,769, 35 L. Ed. 2d 67 (1973) (noting that "the obtaining of physical evidence from a person involves a potential Fourth Amendment violation at two different levels - the 'seizure' of the 'person' necessary to bring him into contact with government agents . . . and the subsequent search for and seizure of the evidence").[14]    In addition, Plaintiffs have raised substantial questions regarding the constitutionality of the searches and seizures effected pursuant to the NTO in this case, both as to the procedure that was followed and the scope of the NTO that was entered.    In considering the NTO process, the Court notes that the North Carolina state court decisions and interpretations of the NTO process appear conflicting.    On one hand, the North Carolina Supreme Court has recognized that "[t]he invasion of a person's body to seize blood, saliva, and

---

[14] The Court notes that in addition to the "seizure" involved in being compelled to appear at the police station, Plaintiffs have raised a Fourth Amendment challenge to the "search" alleged in this case, which in addition to DNA sampling and "mug shot" photographing, also required them to disrobe for close physical examination, which they contend invaded a "reasonable expectation of privacy" and went beyond what "a person knowingly exposes to the public." Katz v. United States, 389 U.S. 347, 351, 88 S. Ct. 507, 511, 19 L. Ed. 2d 576 (1967).

hair samples is the most intrusive type of search; and a warrant authorizing the seizure of such evidence must be based upon probable cause to believe the blood, hair, and saliva samples constitute evidence of an offense or the identity of a person who participated in the crime." State v. Grooms, 353 N.C. 50, 73, 540 S.E.2d 713, 728 (2000); see also State v. Welch, 316 N.C. 578, 585, 342 S.E.2d 789, 793 (1986) (holding that "[s]ince the withdrawal of a blood sample is subject to fourth amendment requirements, a search warrant must be procured before a suspect may be required to submit to such a procedure unless probable cause and exigent circumstances exist that would justify a warrantless search"). However, on the other hand, the state courts have also indicated that "a nontestimonial identification order authorized by article 14 of chapter 15A of the General Statutes of North Carolina is an investigative tool requiring a lower standard of suspicion that is available for the limited purpose of identifying the perpetrator of a crime." Grooms, 353 N.C. at 73, 540 S.E.2d at 728; see also State v. Pearson, 356 N.C. 22, 28, 566 S.E.2d 50, 54 (2002) (concluding that the "reasonable grounds" standard is "similar to the reasonable suspicion standard applied to brief detentions" under Terry v. Ohio, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968)). Thus, it is unclear whether North Carolina courts would interpret the state NTO statutes as authorizing a search and seizure, including seizure of blood, hair, and saliva samples, on less than a full showing of probable cause.[15] It is also unsettled whether such an interpretation would render the state NTO statutes unconstitutional, at least

---

[15] The Court notes that there is no question, even under the NTO procedure, that there must be probable cause to believe that an offense has been committed. The question is only with respect to whether there must also be probable cause to believe that the subject of the order committed the offense or probable cause to believe that evidence of the crime will be found by conducting the search, rather than a lesser showing of only "reasonable suspicion."

as applied in some instances.  This uncertainty is a product of unsettled U.S. Supreme Court

holdings and dicta in this area.  In this regard, the U.S. Supreme Court in Davis v. Mississippi

held that the Fourth Amendment applies when police require citizens to come to a police station

for fingerprinting, but the Supreme Court left open the possibility that in the "unique nature of

the fingerprinting process" the requirements of the Fourth Amendment could be met by

"narrowly circumscribed procedures for obtaining, during the course of a criminal investigation,

the fingerprints of individuals for whom there is no probable cause to arrest."  394 U.S. 721,

727-28, 89 S. Ct. 1394, 1387-98, 22 L. Ed. 2d 676 (1969).  However, the Supreme Court has not

determined whether or when such "narrowly circumscribed procedures" could be used, although

in Davis this possibility was limited to fingerprinting, and did not include blood sampling or

other more intrusive searches.  Cf. Schmerber v. California, 384 U.S. 757, 770, 86 S. Ct. 1826,

1835, 16 L. Ed. 2d 908 (1966) (holding, with respect to blood sampling, that "search warrants

are ordinarily required for searches of dwellings, and absent an emergency, no less could be

required where intrusions into the human body are concerned"); Dunaway v. New York, 442

U.S. 200, 211-13, 99 S. Ct. 2248, 2256-57, 60 L. Ed. 2d 824 (1979) (noting that Terry v. Ohio

allows only narrowly-defined intrusions absent a showing of probable cause, and concluding that

"any 'exception' that could cover a seizure as intrusive as that in this case would threaten to

swallow the general rule that Fourth Amendment seizures are 'reasonable' only if based on

probable cause").  In a later case, the Supreme Court acknowledged that some states, in reliance

on the suggestion in Davis, have "enacted procedures for judicially authorized seizures for the

purpose of fingerprinting," but the Supreme Court noted that "state courts are not in accord on

the validity of these efforts to insulate investigative seizures from Fourth Amendment invalidation," and the Supreme Court declined to reach any further consideration of that issue. Hayes v. Florida, 470 U.S. 811, 817, 105 S. Ct. 1643, 1647, 84 L. Ed. 2d 705 (1985).

However, this Court need not resolve all of these unsettled issues at this stage in the present case, because even if the procedure and scope of the NTO process would otherwise pass constitutional muster, here Plaintiffs have asserted a claim that the affidavit submitted in support of the NTO application was intentionally and recklessly false and misleading. In response, Defendants raise extensive factual contentions, with factual comparison charts, to dispute these allegations and to demonstrate that probable cause existed even if the allegedly false statements are removed and the material omissions are included. This analysis includes extensive parsing of pieces of the Second Amended Complaint, as well as contentions by Himan as to what information he provided to Nifong, and contentions by Gottlieb and the City as to what information Mangum provided to Gottlieb and Himan during her interviews. However, the analysis suggested by Defendants requires factual analysis beyond the allegations in the Second Amended Complaint, and the cases cited by the Defendants in support of this analysis involve summary judgment determinations, not determinations on a motion to dismiss. Therefore, having considered the parties' contentions in this regard, the Court finds that this parsing of the facts, and certainly any consideration of Defendants' factual contentions in response, is more appropriate at summary judgment after an opportunity for discovery, when the factual record is before the Court for consideration. At this stage in the case, the Court simply concludes that where officers deliberately or recklessly supply false or misleading information to a magistrate

judge to support a warrant application, as alleged in the present case, the officers may be liable under § 1983 for violation of an individual's Fourth Amendment rights, if their actions result in the seizure of an individual without probable cause.[16] Moreover, the Court concludes that there is no question that these rights were clearly established, and no reasonable official could have believed that it was permissible to deliberately or recklessly create false or misleading evidence to present to a magistrate to effect a citizen's seizure. See Miller, 475 F.3d at 631-32 ("'[T]he Supreme Court has long held that a police officer violates the Fourth Amendment if, in order to obtain a warrant, he deliberately or 'with reckless disregard for the truth' makes material false statements or omits material facts. . . . No reasonable police officer . . . could believe that the Fourth Amendment permitted such conduct." (internal citations omitted)); Brooks, 85 F.3d at 183-84.[17] Thus, the Court finds that, taking the allegations as true, Plaintiffs have alleged plausible Fourth Amendment claims as set out in Count 1, based on allegations of deliberate or reckless submission of false and misleading evidence, which require at least some discovery so that Plaintiffs' claims and Defendants' qualified immunity defense can be assessed on a factual record beyond just the allegations in the Second Amended Complaint.

---

[16] The Court acknowledges, as discussed above, the unsettled law regarding whether the search and seizure challenged here could be upheld on a showing of less than full probable cause. The Court will allow the parties to address that issue further at summary judgment. However, the Court concludes that there are sufficient allegations to state a plausible claim in order to go forward at this stage.

[17] The Court notes that in the context of a search or seizure conducted pursuant to a warrant, qualified immunity is analogous to the "good faith" exception to the exclusionary rule applied in criminal cases under United States v. Leon, 468 U.S. 897, 922-23, 104 S. Ct. 3405, 3420-21, 82 L. Ed. 2d 677(1984). See Malley v. Briggs, 475 U.S. 335, 344-45, 106 S. Ct. 1092, 1098, 89 L. Ed. 2d 271 (1986).

However, the Court must still consider whether Plaintiffs have sufficiently stated a claim as to each of the particular Defendants against whom this Count is asserted. In considering this issue, the Court notes that this claim is first asserted against Defendants Himan and Gottlieb. As to these Defendants, Plaintiffs allege that Himan and Gottlieb were directly involved in the intentional and reckless fabrication of evidence that resulted in their seizure pursuant to the NTO, and in the perpetuation of that violation by continued misconduct directed toward the Plaintiffs after the NTO was issued. Based on the factual allegations set out in the Second Amended Complaint, the Court concludes that there are sufficient allegations, if true, to state a plausible § 1983 claim against Defendants Himan and Gottlieb for alleged knowing or reckless presentation of false or misleading evidence that effected a seizure and search of Plaintiffs pursuant to the NTO without probable cause. Of course, Plaintiffs will ultimately be required to present evidence to establish that the Defendants engaged in this alleged conduct, and Defendants will be entitled to present evidence to dispute these allegations. Likewise, Himan and Gottlieb will be entitled to present their qualified immunity defense on a motion for summary judgment, for consideration on the factual record. However, at this stage, as noted above, the Court concludes that at the time of the alleged conduct, it was clearly established that an officer's fabrication of evidence before a magistrate judge to effect a search and seizure of a citizen without probable cause would violate that citizen's constitutional rights. Therefore, the Motions to Dismiss will be denied as to Defendants Gottlieb and Himan.

With respect to Defendants Levicy and Arico, these Defendants contend that they are not liable under § 1983 because they were not acting "under color of state law" and because any

56

alleged constitutional violation was attributable to Nifong, Gottlieb, and Himan. "[T]he under-color-of-state-law element of § 1983 excludes from its reach 'merely private conduct, no matter how discriminatory or wrongful.'" American Mfrs. Mut. Ins. Co. v. Sullivan, 526 U.S. 40, 50, 119 S. Ct. 977, 985, 143 L. Ed. 2d 130 (1999) (internal citations omitted). Thus "the party charged with the deprivation must be a person who may fairly be said to be a state actor. . . . because he is a state official, because he has acted together with or has obtained significant aid from state officials, or because his conduct is otherwise chargeable to the State." Lugar v. Edmondson Oil Co., 457 U.S. 922, 937, 102 S. Ct. 2744, 2754, 73 L. Ed. 2d 482 (1982). "'Under th[e state-action or color-of-law] doctrine, we 'insist []' as a prerequisite to liability 'that the conduct allegedly causing the deprivation of a federal right be fairly attributable to the State.' By doing so, we maintain the Bill of Rights as a shield that protects private citizens from the excesses of government, rather than a sword that they may use to impose liability upon one another.'" Phillips v. Pitt County Mem. Hosp., 572 F.3d 176, 181 (4th Cir. 2009) (quoting Holly v. Scott, 434 F.3d 287, 291, 292 (4th Cir. 2006) ("Statutory and common law, rather than the Constitution, traditionally govern relationships between private parties.")).

"[P]rivate parties may theoretically be sued under § 1983 using several theories, labeled as 'symbiotic relationship; public function; close or joint nexus; joint participation; and pervasive entwinement.'" Id. at 181 n.6 (citation omitted); see also Jackson v. Pantazes, 810 F.2d 426, 429 (4th Cir. 1987) (recognizing potential § 1983 liability "where a private party and a public official act jointly to produce the constitutional injury"). To the extent that a § 1983 claim is based on an alleged "joint participation" or "conspiracy" between private actors and public actors, a bare

assertion of a "conspiracy" is insufficient, and a plaintiff must plead enough factual matter to plausibly suggest that an agreement was made to deprive them of their constitutional rights. See Howard v. Food Lion, Inc., 232 F. Supp. 2d 585, 597 (M.D.N.C. 2002) (holding that in bringing a conspiracy claim under § 1983, the plaintiff "must allege both a mutual understanding to achieve some unconstitutional action reached by the private and state defendants and some factual assertions suggesting a meeting of the minds," and that "[w]hen a complaint contains merely a vague allegation of conspiracy, it cannot withstand a motion to dismiss"); see also Franklin v. Fox, 312 F.3d 423, 445 (9th Cir. 2002) ( "To be liable as a co-conspirator, a private defendant must share with the public entity the goal of violating a plaintiff's constitutional rights.").  Moreover, courts have held that "provision of background information to a police officer does not by itself make [a private actor] a joint participant in state action under Section 1983." Ginsberg v. Healey Car & Truck Leasing, Inc., 189 F.3d 268, 272 (2nd Cir. 1999) (citing Benavidez v. Gunnell, 722 F.2d 615, 618 (10th Cir. 1983) ("The mere furnishing of information to police officers does not constitute joint action under color of state law which renders a private citizen liable under § [ ] 1983. . . ."); Butler v. Goldblatt Bros., Inc., 589 F.2d 323, 327 (7th Cir. 1978) (granting summary judgment to private defendant on Section 1983 claim because defendant "did [nothing] more than supply information to police officers who then acted on their own initiative in arresting [plaintiff]"); see also Moldowan v. City of Warren, 578 F.3d 351, 399 (6th Cir. 2009); King v. Massarweh, 782 F.2d 825, 828-29 (9th Cir. 1986); Arnold v. IBM Corp., 637 F.2d 1350, 1356-57 (9th Cir. 1981).  Thus, to be acting "under color of state law" based on joint participation, the "private action must have a 'sufficiently close nexus' with the

state [so] that the private action 'may be fairly treated as that of the State itself.'" <u>DeBauche v. Trani</u>, 191 F.3d 499, 507 (4th Cir. 1999) (citation omitted).

In the present case, Plaintiffs allege generally that Levicy and Arico were acting under color of state law. (Second Am. Compl. ¶ 905). However, a conclusory allegation that an individual or entity was acting "under color of state law" is not sufficient, and Plaintiffs must instead plead specific facts to survive a motion to dismiss. In considering whether Plaintiffs have pled sufficient facts with respect to Levicy, the Court notes that Plaintiffs contend that Levicy participated in the NTO process and in the subsequent "cover-up" of the constitutional violations in the NTO proceeding. Plaintiffs allege that Levicy had several meetings and interviews with Gottlieb, Himan, and Nifong, and that during those meetings she "repeatedly proffered false testimony that was clearly designed to fill the chasms of Mangum's case and/or restore Mangum's glaring credibility problems," and that this included altering forms and evidence as needed to fit the investigators' case. (Second Am. Compl. ¶ 788; 780-797). Based on those meetings, Plaintiffs allege that Levicy "agreed to act in concert with Nifong, Gottlieb, and Himan by falsifying Mangum's SAER to harmonize it with the fabricated [NTO] Affidavit, and, subsequently, further falsified the SAER to harmonize it with Mangum's written statement and evidence they hoped would emerge from the DNA testing." (Second Am. Compl. ¶ 913). As noted in the Factual Background, Plaintiffs set out specific allegations that Levicy produced falsified medical records and proffered false testimony to corroborate the information in the NTO application.

Having considered these contentions, the Court concludes that Plaintiffs have alleged

sufficient facts to state a claim against Levicy for her alleged role in the claimed constitutional violations. Although Levicy was not employed by the City, Plaintffs' allege that she shared the goal of violating Plaintiffs' constitutional rights, and that she agreed with Nifong, Gottlieb, and Himan to provide the false evidence to them as part of this agreement. These allegations are sufficient to give notice as to how she is alleged to have participated in the conspiracy, and are sufficient to allege action "under color of state law" at this stage in the case. That issue will, however, be subject to further review on a motion for summary judgment to determine whether sufficient evidence exists to support this claim as to Levicy.

However, as to Defendant Arico, Plaintiffs do not allege facts specifically as to Arico to support the conclusion that she entered into an agreement with Gottlieb, Himan, or Nifong to provide false evidence in connection with the NTO and violate Plaintiffs' constitutional rights. The only specific allegation as to Arico is that she gave an interview to a newspaper reporter regarding the sexual assault examination. (Second Am. Compl. ¶ 784). This allegation against Arico is insufficient to state a plausible claim that Arico entered into a conspiracy with Nifong, Gottlieb, and Himan and was acting under color of state law when she gave the interview, or that the interview alone was sufficient to allege joint participation in the alleged violation of Plaintiffs' constitutional rights.[18] Therefore, the Motion to Dismiss will be granted with respect

---

[18] As discussed in greater detail below with respect to the "supervisory liability" claims, § 1983 liability is based on each individual Defendant's own misconduct, not vicarious liability based on misconduct of subordinates. In this case, Plaintiffs have set out allegations that state a plausible claim that Levicy was acting under color of state law, but that does not impute liability or "state action" to Arico, and Plaintiffs have not set out specific, non-conclusory allegations as to Arico that would state a plausible claim for joint activity or conspiracy between Arico and Nifong, Gottlieb, or Himan.

to Count 1 as to Defendant Arico.  Cf. Howard, 232 F. Supp. 2d at 597 (dismissing § 1983 claim against private party where the complaint failed to plead any facts suggesting that the private party and the government actor reached a meeting of the minds).

Finally, the Court notes that all of the "official capacity" claims and the claims against the City, Duke, and Duke Health will be considered as part of Count 12, since Plaintiffs must allege a separate basis for imputing liability to these Defendants, and those allegations are made by Plaintiffs as part of Count 12.  Therefore, with respect to Count 1, the Court concludes that the Motions to Dismiss will be granted in part and denied in part.  Specifically, the Court concludes that Count 1 will go forward as to Defendants Nifong,[19] Gottlieb, Himan, and Levicy in their individual capacities.  However, this claim will be dismissed as to Defendant Arico.  In addition, to the extent that this claim is asserted against Duke, Duke Health, the City, or the individual Defendants in their "official capacities," those claims will be considered as part of Count 12.

**Count 2:** **Search and Seizure in Violation of 42 U.S.C. § 1983 and Conspiracy, asserted against Nifong, Gottlieb, Himan, Levicy, Arico, Stotsenberg, Smith, and the "Day Chain of Command" (Best, Smith, Fleming, Cooper, Humphries, Dean, Graves, Dawkins, Trask, Brodhead, and Steel)[20]**

---

[19] The Court notes that Defendant Nifong has not filed a Motion to Dismiss, so the conclusions here as to Count 1 are without prejudice to any further determination as to Defendant Nifong after his current status as a Defendant is clarified by Plaintiffs.  See supra note 1.

[20] Plaintiffs have asserted this claim against the individuals in both their official and individual capacities.  However, Plaintiffs agree that the "official capacity" claims are appropriately treated as claims against the City.  Claims against the City under § 1983 require additional allegations based on the Supreme Court's decision in Monell v. Department of Social Services, 436 U.S. 658, 694, 98 S. Ct. 2018, 2037-38, 56 L. Ed. 2d 611 (1978), and Plaintiffs have made those allegations as part of Count 12.  Therefore, the "official capacity" claims are considered as part of Count 12.

In Count 2, Plaintiffs assert a claim under 42 U.S.C. § 1983 for violation of Plaintiff McFadyen's Fourth and Fourteenth Amendment rights in connection with the search of his dorm room on March 27, 2006. Plaintiffs allege that "Gottlieb, Himan and Nifong, Levicy, and Arico acting individually and in concert, initiated legal process directed at McFadyen in the form of a Search Warrant Application." (Second Am. Compl. ¶ 920). Plaintiffs further allege that Gottlieb, Himan, and Nifong obtained the search warrant for McFadyen's room and vehicle, and that pursuant to that warrant, Gottlieb and Himan searched his dorm room. Plaintiffs allege that at the time Gottlieb, Himan, and Nifong agreed to seek the search warrant, probable cause did not exist, and therefore Gottlieb, Himan, and Nifong "conspired to fabricate and did fabricate a false affidavit that would be facially sufficient to obtain the Warrant." (Second Am. Compl. ¶ 924). Plaintiffs allege that "the Warrant's material factual assertions were all fabrications" and that "in the absence of the fabricated assertions, the Search Warrant would not have issued." (Second Am. Compl. ¶ 926).

As to Defendant Smith, Plaintiffs allege that as Gottlieb and Himan executed the search, "Duke Police Sgt. Smith stood-by, outside the door of McFadyen's dorm room throughout the entire search and took no affirmative acts to intervene, aware that there was not probable cause to believe the crimes alleged had been committed, much less that McFadyen had committed them." (Second Am. Compl. ¶ 922). As to Defendants Levicy and Arico, Plaintiffs allege that "Levicy and Arico agreed to act in concert with Nifong, Gottlieb and Himan by, among other things, providing and/or ratifying the false claims relating to the forensic medical evidence obtained in the SAE that Levicy and Arico falsely claimed was conducted by Levicy." (Second

Am. Compl. ¶ 925).  Plaintiffs do not separately state any basis for this claim as to Defendants Stotsenberg and the other Defendants who are alleged to be part of the "Day Chain of Command" (Defendants Best, Fleming, Cooper, Humphries, Dean, Graves, Dawkins, Trask, Brodhead, and Steel).

The Fourth Amendment, as applied to the states through the Fourteenth Amendment, prohibits "unreasonable searches and seizures" and specifically provides that "no Warrants shall issue, but upon probable cause supported by Oath or affirmation, and particularly describing the places to be searched and the persons or things to be seized." U.S. Const. amend. IV.  The Fourth Amendment thus protects the rights of citizens not to be searched except upon a showing of probable cause and pursuant to a warrant, unless an exception to the warrant requirement is present.  Probable cause to search exists if there is "a fair probability that contraband or evidence of a crime will be found in a particular place." Illinois v. Gates, 462 U.S. 213, 238, 103 S. Ct. 2317, 2332, 76 L. Ed. 2d 527 (1983).  As discussed with respect to Count 1, where a warrant is issued, the search is still subject to challenge if a "false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit" and if the "false information [is] essential to the probable cause determination." U.S. v. Colkley, 899 F.2d 297, 300 (4th Cir. 1990) (citing Franks v. Delaware, 438 U.S. 154, 155-56, 171-72, 98 S. Ct. 2674, 2676-77, 2684-85, 57 L. Ed. 2d 667 (1978)).

In this case, with respect to the claim alleged in Count 2, the search conducted of McFadyen's dorm room was pursuant to a warrant.  Plaintiffs contend that the affidavit submitted in support of the warrant application was intentionally and recklessly false and

misleading. Plaintiffs set out extensive factual allegations to establish the plausibility of this claim, and generally allege that "the Warrant's material factual assertions were all fabrications, and, in the absence of the fabricated factual assertions, the Search Warrant would not have issued." (Second Am. Compl. ¶ 926). In response, Defendants raise many of the same contentions raised with respect to Count 1, including the extensive factual contentions, and exhibits, to dispute these allegations and to demonstrate that probable cause existed even if the allegedly false statements are removed and the material omissions are included. Defendants' discussion includes analysis of the contents of an e-mail, disputes regarding the source of that e-mail, and additional factual discussion regarding the allegations that were repeated from the NTO affidavit. However, as discussed with respect to Count 1, the analysis suggested by Defendants requires factual analysis beyond the allegations in the Second Amended Complaint, and the cases cited by the Defendants in support of this analysis involve summary judgment determinations, not determinations on a motion to dismiss. Therefore, the Court finds that this type of analysis is more appropriate at summary judgment after an opportunity for discovery, when the factual record is before the Court for consideration. At this stage in the case, the Court simply concludes that where officers deliberately or recklessly supply false or misleading information to a magistrate to support a warrant application, as alleged in the present case, the officers may be liable under § 1983 for violation of an individual's Fourth Amendment rights, if their actions result in a search without probable cause. In addition, as in Count 1, there is no question that these rights were clearly established, and no reasonable official could have believed that it was permissible to deliberately or recklessly create false or misleading evidence to present

to a magistrate in order to obtain a search warrant.  See Miller, 475 F.3d at 631-32 ("The Supreme Court has long held that a police officer violates the Fourth Amendment if, in order to obtain a warrant, he deliberately or 'with reckless disregard for the truth' makes material false statements or omits material facts. . . . No reasonable police officer . . . could believe that the Fourth Amendment permitted such conduct."); Brooks, 85 F.3d at 183-84.  Thus, the Court finds that, taking the allegations as true, Plaintiffs have alleged plausible Fourth Amendment claims as set out in Count 2, based on allegations of deliberate or reckless submission of false and misleading evidence, which require at least some discovery so that Plaintiffs' claims and Defendants' qualified immunity defense can be assessed on a factual record beyond just the allegations in the Second Amended Complaint.

Having so concluded, the Court must again consider whether this claim has been stated against each of the Defendants against whom it is asserted.  First, as to Defendants Gottlieb and Himan, Plaintiffs allege that Gottlieb and Himan were directly involved in the intentional or reckless fabrication of evidence that was submitted to obtain the search warrant that resulted in the search of McFadyen's dorm room.  As with the claims alleged in Count 1, Plaintiffs will ultimately be required to present evidence to establish that the Defendants engaged in this alleged conduct, and Defendants will be entitled to present evidence to dispute these allegations. Defendants will also be entitled to present their qualified immunity defense on a motion for summary judgment, for consideration on the factual record.  However, at this stage, as noted above, the Court concludes that at the time of the alleged conduct, it was clearly established that an officer's fabrication of evidence before a magistrate judge to effect a search would violate the

Fourth Amendment. Therefore, the Motions to Dismiss will be denied as to Defendants Gottlieb and Himan.

With respect to Defendants Levicy and Arico, these Defendants contend that they are not liable under § 1983 because they were not acting "under color of state law" and because any alleged constitutional violation was attributable to Nifong, Gottlieb, and Himan. As discussed with respect to Count 1, "[t]he under-color-of-state-law element of § 1983 excludes from its reach 'merely private conduct, no matter how discriminatory or wrongful.'" American Mfrs. Mut. Ins. Co. v. Sullivan, 526 U.S. 40, 50, 119 S. Ct. 977, 985, 143 L. Ed. 2d 130 (1999). Thus, "the party charged with the deprivation must be a person who may fairly be said to be a state actor. . . . because he is a state official, because he has acted together with or has obtained significant aid from state officials, or because his conduct is otherwise chargeable to the State." Lugar v. Edmondson Oil Co., 457 U.S. 922, 937, 102 S. Ct. 2744, 2754, 73 L. Ed. 2d 482 (1982). To the extent that a § 1983 claim is based on an alleged "joint participation" or "conspiracy" between private actors and public actors, a bare assertion of a "conspiracy" is insufficient, and a plaintiff must plead enough factual matter to plausibly suggest that an agreement was made to deprive them of their constitutional rights. See Howard v. Food Lion, Inc., 232 F. Supp. 2d 585, 597 (M.D.N.C. 2002). In the present case, with respect to Levicy, Plaintiffs allege that Levicy had several meetings and interviews with Gottlieb, Himan, and Nifong, and that during those meetings she "repeatedly proffered false testimony that was clearly designed to fill the chasms of Mangum's case and/or restore Mangum's glaring credibility problems," and that this included altering forms and evidence as needed to fit the investigators' case. (Second Am.

Compl. ¶ 788; 780-797).  Based on those meetings, Plaintiffs allege that Levicy "agreed to act in concert with Nifong, Gottlieb and Himan by, among other things, providing and/or ratifying the false claims relating to the forensic medical evidence" in the sexual assault examination. (Second Am. Compl. ¶ 925).  As noted in the Factual Background, Plaintiffs set out specific allegations that Levicy produced falsified medical records and proffered false testimony to corroborate the information in the warrant application.  Therefore, as in Count 1, the Court concludes that Plaintiffs have alleged sufficient facts to state a claim against Levicy for her alleged role in the claimed constitutional violations, acting "under color of state law," at this stage in the case.  That issue will, however, be subject to further review on a motion for summary judgment to determine whether sufficient evidence exists to support this claim as to Levicy.  However, as to Defendant Arico, Plaintiffs do not allege facts specifically as to Arico to support a plausible claim that she entered into an agreement with Gottlieb, Himan, or Nifong to provide false evidence or to obtain the search warrant and violate Plaintiff McFadyen's constitutional rights.  The only specific allegation as to Arico is that she gave an interview to a newspaper reporter regarding the sexual assault examination.  (Second Am. Compl. ¶ 784).  As in Count 1, this allegation against Arico is insufficient to state a plausible claim that Arico entered into a conspiracy with Nifong, Gottlieb, and Himan and was acting under color of state law when she gave the interview, or that the interview alone was sufficient to allege joint participation in the alleged violation of McFadyen's constitutional rights.  Although Plaintiffs generally allege that Arico "acting individually and in concert" initiated legal process in the form of the search warrant, there are no factual allegations that would support this contention that

she was involved in obtaining the search warrant, and there are no allegations that would support the conclusion that she participated in an agreement to knowingly or recklessly present the false evidence set out in the search warrant. Therefore, the Motion to Dismiss will be granted with respect to Count 2 as to Defendant Arico. Cf. Howard, 232 F. Supp. 2d at 597 (dismissing § 1983 claim against private party where the complaint failed to plead any facts suggesting that the private party and the government actor reached a meeting of the minds).

As to Duke Police Sergeant Smith, Plaintiffs bring this claim based on Smith's presence during the execution of the warrant. This claim is a "bystander liability" claim, pursuant to which "an officer may be liable under § 1983, on a theory of bystander liability, if he: (1) knows that a fellow officer is violating an individual's constitutional rights; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act." See Randall v. Prince George's County, 302 F.3d 188, 202-04 (4th Cir. 2002). As the basis for this claim, Plaintiffs allege that Smith stood by outside the dorm room during the execution of the search and had a reasonable opportunity to prevent the harm, but did not act to intervene in the search. The Supreme Court in Ashcroft v. Iqbal reiterated that "[b]ecause vicarious liability is inapplicable to Bivens and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." 129 S. Ct. 1937, 1948, 173 L. Ed. 2d 868 (2009) (emphasis added). Thus, to be liable for a constitutional violation under § 1983 with respect to Count 2, Smith himself must have had the requisite intent to violate Plaintiff McFadyen's constitutional rights. See id. at 1948-49 (noting that each government actor "is only liable for his or her own misconduct" which requires the requisite intent for the type

68

of constitutional violation pled). For a search conducted pursuant to a warrant, Defendant Smith himself must have known that the sealed warrant affidavit included false and misleading evidence, and Smith must have acted with intent to violate Plaintiff McFadyen's rights or with reckless disregard for those rights. Plaintiffs allege that Smith was "aware that there was no probable cause to believe the crimes alleged had been committed," (Second Am. Compl. ¶ 922), which would not alone be sufficient to establish liability since an officer acting in good faith is entitled to rely on a warrant issued by a magistrate judge. However, Plaintiffs also allege that Smith was "[a]ware that Gottlieb and Himan had falsified the material allegations in the Warrant Affidavit," and that he was physically present for at least the execution of the alleged constitutional violation. (Second Am. Compl. ¶ 614-615). The Court must take these allegations as true at this stage in the case, although it ultimately will be Plaintiffs' burden to establish an evidentiary basis for this contention. Likewise with respect to whether Smith had a reasonable opportunity to intervene, the Court concludes that while the Jurisdictional Agreement between Durham Police and Duke Police did not give the Duke Police any authority over the Durham Police, as discussed with respect to Count 12, a claim for bystander liability relies not on authority but only on reasonable opportunity to intervene, and the question of whether there was a reasonable opportunity to intervene involves factual inquiry beyond a motion to dismiss. Finally, with respect to whether Smith was acting "under color of state law," Plaintiffs allege that Smith was acting "under color of state law" in his role as a Duke Police officer, which provided him with statutory authority over areas within the Duke Police Department's jurisdiction. Defendants do not specifically address this assertion. Moreover, Plaintiffs' allegations as to

Defendant Smith could, as with Levicy, be sufficient to state a claim for "joint participation", because in addition to Plaintiffs' general allegations of conspiracy, Plaintiffs further allege that Smith was directly involved with Gottlieb and Himan in executing the search, knowing that they had falsified allegations in the warrant application. While the claim as to Smith is not particularly strong, the Court concludes that Plaintiffs have stated a plausible § 1983 claim against Smith, although it will be Plaintiffs' burden to establish an evidentiary basis for this claim. Therefore, the Motion to Dismiss Count 2 will be denied as to Defendant Smith.

Finally, the Court notes that Plaintiffs have not included any allegation or basis for asserting this claim against Defendant Stotsenberg, or the remaining members of the "Day Chain of Command" (Best, Fleming, Cooper, Humphries, Dean, Graves, Dawkins, Trask, Brodhead, and Steel). Therefore, the Motions to Dismiss as to Count 2 will be granted as to these Defendants. In addition, all of the "official capacity" claims will be considered as part of Count 12, since the "official capacity" claims are essentially claims against the City, and Plaintiffs must allege a separate basis for imputing liability to the City, as discussed in Count 12.

As a result, the Motions to Dismiss Count 2 will be granted in part and denied in part. Specifically, Count 2 will go forward as to Defendants Nifong,[21] Gottlieb, Himan, Levicy, and Smith, in their individual capacities. However, this claim will be dismissed as to Defendants Arico, Stotsenberg, Best, Fleming, Cooper, Humphries, Dean, Graves, Dawkins, Trask, Brodhead, and Steel. In addition, all of the "official capacity" claims will be treated as claims

---

[21] The Court notes that Defendant Nifong has not filed a Motion to Dismiss, so the conclusions here as to Count 2 are without prejudice to any further determination as to Defendant Nifong after his current status as a Defendant is clarified by Plaintiffs. See *supra* note 1.

against the City and will be considered as part of Count 12.

**Count 3:** **Abuse of Process and Conspiracy in Violation of 42 U.S.C. § 1983, asserted against Nifong, Gottlieb, Himan, Levicy, Arico, Steel, Dzau, Duke Health, and Duke**

In Count 3, Plaintiffs assert a claim under 42 U.S.C. § 1983 for "Abuse of Process." As the basis for this claim, Plaintiffs allege that Nifong, Gottlieb, Himan, Levicy, and Arico obtained the NTO discussed in Count 1 and the McFadyen Search Warrant discussed in Count 2 for the unauthorized purposes of stigmatizing Plaintiffs, retaliating against Plaintiffs for asserting their constitutional rights, and coercing Plaintiffs and their teammates to provide false information in support of the investigation and prosecution. Plaintiffs allege that with these purposes, "the Defendants" fabricated a false and incendiary affidavit for the NTO and Search Warrant applications and then "leaked the [NTO] and Affidavit to the press" so that the media could record Plaintiffs arriving at the Durham Police Department. (Second Am. Compl. ¶ 931-932). Plaintiffs allege that as a result of the wrongful application of the NTO and Search Warrant, they were seized, detained and searched in violation of their rights under Article IV[22] of the Constitution and the First, Fourth, and Fourteenth Amendments.

It is well established that "[a] valid cause of action under § 1983 is not alleged simply by the assertion that a common law tort [such as abuse of process] was committed by a state official. Rather, to have a meritorious claim, a plaintiff must allege that he was deprived of some constitutional right." Cramer v. Crutchfield, 648 F.2d 943, 945 (4th Cir. 1981). Thus, there is

---

[22] Article IV of the Constitution provides that "[t]he Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States." U.S. Const art. IV, § 2. Plaintiffs' claims pursuant to Article IV are discussed as part of Count 10.

no separate § 1983 claim for "abuse of process." Instead, to state a claim under § 1983, Plaintiffs must assert deprivation of a constitutional right.

In Count 3, Plaintiffs generally assert violations of the "First, Fourth and Fourteenth Amendment." However, Plaintiffs in their briefing cite only Rogers v. Pendleton in support of this claim. 249 F.3d 279, 294 (4th Cir. 2001) In Rogers, the Fourth Circuit recognized a potential § 1983 claim for a Fourth Amendment violation where officers allegedly arrested a citizen without probable cause, simply for "refusing to consent to an illegal search." Id. at 295. In light of Rogers, Plaintiffs agree that with respect to Count 3, "the Fourth Circuit [has] located the right violated in analogous circumstances in the Fourth Amendment." (Pl.'s Response, Doc. #81, at 9); see also Rogers, 249 F.3d at 294-295. Thus, the right at issue in Count 3 is the right to be free of unreasonable searches and seizures under the Fourth Amendment, as discussed with respect to Counts 1 and 2.

However, having reviewed Plaintiffs' allegations and the parties' contentions, the Court concludes that the alleged violations of Plaintiffs' Fourth Amendment rights as alleged in Count 3 are the same as the Fourth Amendment violations alleged in Counts 1 and 2, the deliberate or reckless use of false and misleading information to obtain a warrant and NTO that were not supported by probable cause. Although Plaintiffs also raise additional contentions in Count 3 regarding the officers' subjective motivations, the constitutional injury alleged is a Fourth Amendment violation for unlawful search and seizure without probable cause. Under established Fourth Amendment principles, an officer's improper motives do not establish a constitutional violation, and police can arrest citizens if probable cause exists to support the

arrest, regardless of the officers' subjective motivations.  See Rogers, 249 F.3d at 290; Whren v.

United States, 517 U.S. 806, 813, 116 S. Ct. 1769, 1774, 135 L. Ed. 2d 89 (1996).  Thus, if a

search or seizure is properly supported by probable cause, there is no separate constitutional

violation based on the officers' subjective motivations.  As such, in the present case, Plaintiffs

cannot state a claim for a Fourth Amendment violation based on allegations of improper

motives.  Instead, Plaintiffs can state a claim for a Fourth Amendment violation only to the

extent that Plaintiffs allege that the search and seizure were not supported by probable cause and

were unlawful under established Fourth Amendment jurisprudence.  Plaintiffs attempt to state

such a claim based on allegations that their Fourth Amendment rights were violated by the

deliberate or reckless use of false and misleading information to obtain a warrant and NTO that

were not supported by probable cause.  However, these alleged Fourth Amendment violations

are the claims already alleged by Plaintiffs in Counts 1 and 2, and there is no legal basis for

asserting a separate "abuse of process" claim.  Cf. Santiago v. Fenton, 891 F.2d 373, 388 (1st Cir.

1989) ("[A]buse of process-as a claim separate from a claim that there was no probable cause

to make the arrest or institute the prosecution-is not cognizable as a civil rights violation under

§ 1983.").  Therefore, the Court will dismiss Count 3 as a separate claim.

The Court notes, however, that as part of the Fourth Amendment claims remaining in

Counts 1 and 2, the Court does not foreclose the possibility that evidence of the officer's

subjective motivations may be relevant.  See, e.g., Rogers, 249 F.3d at 295 (noting that in

examining the officer's claim of qualified immunity, "we do not lose sight of the possible

inference from the evidence that [plaintiff's] arrest was motivated by the officers' anger at his

'irrevent' refusal to consent to their search").  Therefore, Plaintiffs are free to raise their

contentions as to the officers' motivations as part of their evidence on the Fourth Amendment

claims in Counts 1 and 2, particularly with respect to any qualified immunity defense claimed by

Defendants, but the separate § 1983 claims asserted in Count 3 for "abuse of process" will be

dismissed.[23]  Therefore, the Motions to Dismiss will be granted as to Count 3, and the claims

asserted in Count 3 will be dismissed.

**Count 4:      Deprivation of Property in Violation of 42 U.S.C. § 1983, asserted against Nifong, Gottlieb, Himan, Clayton, Meehan, Clark, DSI, and the City**

In Count 4, Plaintiffs assert a claim under 42 U.S.C. § 1983 for deprivation of property

in connection with the alleged failure of Nifong, Gottlieb, Himan, Clayton, Meehan, and Clark

to provide Plaintiffs the results of the DNA tests.  As the basis of this claim, Plaintiffs allege that

pursuant to North Carolina General Statute § 15A-282, they had "an unconditional, immediate

right to copies of reports of any tests conducted with the DNA and photographs taken"

pursuant to the NTO.  (Second Am. Compl. ¶ 944).  Plaintiffs allege that these test results

included a March 28 and March 30 SBI report provided to Himan, Gottlieb, and Nifong, an

April 4 SBI report provided to Himan, Gottlieb, and Nifong, an April 4 identification procedure,

April 10 DNA testing results from DSI provided to Himan, Gottlieb, and Nifong by Meehan

---

[23] To the extent that the claim in Count 3 relates to reputational injury as a result of the release of the warrant application, that claim is a claim for reputational injury asserted as part of Count 5, and discussed as part of that Count.  The Court also notes that Count 3 includes claims against Steel and Dzau not included as part of Counts 1 and 2.  However, Plaintiffs have not pled a sufficient factual basis to state a claim that Steel and Dzau were acting under color of state law, or that they were involved in the actual constitutional violations asserted in Counts 1 and 2.  The allegations as to the remaining Defendants are addressed as part of Counts 1 and 2.  Therefore, Count 3 is appropriately dismissed as to all of the Defendants against whom it is asserted.

and Clark, an April 21 DNA report from DSI provided to Himan, Gottlieb, and Nifong by Meehan and Clark, and a May 11 photographic identification procedure with Kim Pittman conducted by Clayton, Gottlieb, and Himan. (Second Am. Compl. ¶ 945). Plaintiffs allege that Himan, Gottlieb, Nifong, Meehan, and Clark conspired to conceal the DNA test results, and that Himan, Gottlieb, Clayton, and Nifong conspired to conceal the fact that the photo identification procedures were conducted and conspired to conceal the results of those procedures. Finally, Plaintiffs allege that Nifong, Himan, and Gottlieb refused to disclose the reports and made false statements to Plaintiffs and their counsel regarding the reports. Plaintiffs allege that the conspiracy to deprive them of these reports was connected with the other deprivations of Plaintiffs' federally-protected rights, and deprived them of their rights under Article IV of the Constitution and the First, Fifth, and Fourteenth Amendments.

The Fourteenth Amendment protects citizens against deprivations of property without due process of law. U.S. Const. amend. XIV.[24] However, to state a § 1983 claim for violation of their Fourteenth Amendment rights in this respect, Plaintiffs must establish a federally protected property interest. See Town of Castle Rock v. Gonzales, 545 U.S. 748, 756, 125 S. Ct. 2796, 2803, 162 L. Ed. 2d 658 (2005). The protected property interest may be a property right or benefit created by state law. However, "[t]he procedural component of the Due Process Clause does not protect everything that might be described as a 'benefit': 'To have a property interest in a benefit, a person clearly must have more than an abstract need or desire' and 'more

_____

[24] To the extent that this claim attempts to state a claim for failure to disclose exculpatory evidence in violation of the Fifth Amendment, that claim is separately addressed below in Count 7.

than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it.'" Id. (quoting Board of Regents v. Roth, 408 U.S. 564, 577, 92 S. Ct. 2701, 2709, 33 L. Ed. 2d 548 (1972)). In determining whether a state statute creates federally-protected property rights, the Supreme Court has held that "[a]lthough the underlying substantive interest is created by 'an independent source such as state law,' federal constitutional law determines whether that interest rises to the level of a 'legitimate claim of entitlement' protected by the Due Process Clause." Id. at 757, 125 S. Ct. at 2803-04 (internal quotations omitted); see also Ledford v. Sullivan, 105 F.3d 354, 358 (7th Cir. 1997) ("A state-created procedural right or policy is not itself a property interest within the confines of the Fourteenth Amendment.").

In Count 4, Plaintiffs contend that they had a constitutionally protected property interest in the results of tests conducted with their photographs and DNA samples that were the products of the NTO procedure, pursuant to North Carolina General Statute § 15A-282. That statute provides that "[a] person who has been the subject of nontestimonial identification procedures or his attorney must be provided with a copy of any reports of test results as soon as the reports are available." N.C. Gen. Stat. § 15A-282. However, North Carolina General Statute § 15A-282 is a state criminal procedure statute, and does not create substantive property rights in the test results. Indeed, the State Criminal Procedure Act provides for suppression of evidence obtained as a result of a "substantial" violation of these statutory provisions, but the state courts have not found a substantial violation of § 15A-282 in cases involving delays of months or even years in providing the test results. See, e.g., State v. Pearson, 145 N.C. App. 506, 514-15, 551 S.E.2d 471, 477 (2001); State v. Daniels, 51 N.C. App. 294, 300, 276 S.E.2d

738, 742 (1981); see also N.C. Gen. Stat. § 15A-974; State v. Pearson, 356 N.C. 22, 33, 566 S.E.2d 50, 57 (2002) (finding that failure to provide the required reports in a timely manner was "insignificant" and did not result in a substantial violation of the statutory provisions).

Having considered the contentions of the parties, the Court concludes that the state procedural law set out in North Carolina General Statute § 15A-282 does not create property rights that are subject to the due process protections of the Fourteenth Amendment.[25] The Court finds that the procedural rights set out in that state statute do not "resemble any traditional conception of property." Town of Castle Rock, 545 U.S. at 766, 125 S. Ct. at 2809. In these circumstances, even if one or more of the named Defendants should have provided the results or reports to Plaintiffs under the North Carolina state procedural law, the Court will not expand this state procedural statute into a federally-protected right, the violation of which would expose state actors to potential § 1983 liability. Therefore, the Court concludes that Plaintiffs cannot state a § 1983 claim for the alleged failure to comply with North Carolina General Statute § 15A-282. The Motions to Dismiss as to Count 4 will therefore be granted, and claims asserted in Count 4 will be dismissed.

**Count 5:** **False Public Statements in Violation of 42 U.S.C. § 1983, asserted against Addison, Gottlieb, Hodge, Nifong, Wilson, Arico, Steel, Brodhead, and**

---

[25] Moreover, even if this statute could be viewed as creating a property right, Plaintiffs do not allege what type of pre-deprivation process they were entitled to that was not provided or how the named Defendants failed to provide the process that they contend was due. Cf. Board of Regents, 408 U.S. at 569-70 (describing types of process to be provided, prior to the deprivation of the property interest, such as notice and an opportunity to be heard). The Court concludes that Plaintiffs' failure to address these issues, and the incongruity in trying to define what process is "due" in these circumstances, are further evidence that the procedural law at issue here does not create a property right for which the state must provide procedural due process before deprivation.

### Burness[26]

In Count 5, Plaintiffs assert a claim under 42 U.S.C. § 1983 for "false public statements," alleging that their constitutional rights were violated by the publication of false and stigmatizing statements about them. Plaintiffs allege that Gottlieb published statements falsely asserting that Mangum was raped, sodomized, and strangled by Plaintiffs or by their teammates in their presence. Plaintiffs allege that Addison published multiple false statements regarding the evidence and that Hodge made a statement falsely claiming that police had a strong case against Plaintiffs. Plaintiffs allege that Wilson falsely asserted that Mangum's account had not changed and that Nifong made numerous false statements regarding the evidence and the Plaintiffs.[27] Plaintiffs allege that Levicy published false statements regarding the sexual assault examination, and that Arico published statements falsely asserting that a complete examination was performed, that it was done by a competent sexual assault nurse, and that it "produced evidence of blunt force trauma via a coloposcope." (Second Am. Compl. ¶ 956). Plaintiffs allege that

---

[26] The claims are asserted against all of the individuals in their individual capacities, and against Addison, Gottlieb, Hodge, and Wilson in their official capacities. However, to the extent that this claim is asserted against City employees Addison, Gottlieb and Hodge in their official capacities, that claim is appropriately treated as a claim against the City. All of the § 1983 claims against the City are considered as part of the <u>Monell</u> claim in Count 12. To the extent that this claim is asserted against Defendant Wilson in his "official capacity," the Court notes that Defendant Wilson is not alleged to have been a City employee and does not have an "official capacity" with respect to the City. Similarly, to the extent that Plaintiffs assert this claim against Nifong in his "official capacity with respect to the Durham Police," Nifong does not have an "official capacity" with the Durham Police, as discussed as part of <u>Monell</u> claims in Count 12.

[27] Plaintiffs also allege that Defendant Michael published false public statements regarding Pittman's 911 call, but Defendant Michael is not named as a Defendant in this Count. In addition, Plaintiffs in their briefing refer to Defendant Himan and Defendant Levicy, but these Defendants also are not named in this Count. Therefore, because Count 5 is not asserted against Michael, Himan, or Levicy, the Court will not consider that claim as to those Defendants.

Defendants Steel, Brodhead, and Burness "repeatedly published false statements conveying that Plaintiffs had participated in conduct that was 'far worse' than even the horrific race-motivated gang-rape that was reported, either as participants or as accomplices." (Second Am. Compl. ¶ 956). Plaintiffs allege that the statements were false and were made in conjunction with the deprivations of Plaintiffs' rights under Article IV of the Constitution and the First, Fourth, Fifth and Fourteenth Amendments.[28] Plaintiffs allege that they had no opportunity before or after they were stigmatized by the false public statements to formally and directly clear their good names through any form of proceedings. Plaintiffs allege that as a result of Defendants' conduct, they were deprived of their rights under Article IV of the Constitution and the First, Fourth, Fifth, Sixth, Ninth, and Fourteenth Amendments.

Plaintiffs also allege that with respect to Steel, Brodhead, and Burness, in addition to publishing false public statements on their own, these Defendants "knew of the outrageous, false and stigmatizing Faculty Statements being made publicly in demonstrations on- and off-campus, lectures in University classrooms, in speeches at professional conferences, in local and national newspapers, and on local and national television news programs" and "knew or were deliberately

---

[28] Plaintiffs also allege that the statements were made in connection with other deprivations, including the statutory right to reports of all tests conducted with NTO materials, their rights under election laws, and their privacy rights under federal and state laws. To the extent that these deprivations have been raised as separate claims, they are discussed with respect to Counts 4, 8, and 22. Plaintiffs also raise as potential deprivations the right to compete in Division I athletics and their educational status as students. But see Equity in Athletics, Inc. v. Dep't of Educ., No. 10-1259, 2011 WL 790055, at *13-14 (4th Cir. March 8, 2011) (finding no property interest in intercollegiate athletic participation). In any event, Plaintiffs have not presented any authority that would support recognition of a "stigma-plus" claim in connection with any of those alleged deprivations, and the Court recognizes the claims alleged in Count 5 only to the extent that they are connected with the alleged constitutional violations in Counts 1 and 2.

indifferent to the likelihood that their subordinates' conduct was violating or would likely lead to the violations of Plaintiffs' constitutional rights." (Second Am. Compl. ¶ 963). Plaintiffs allege that Steel, Brodhead, and Burness refused to intervene to correct the unconstitutional conduct. Plaintiffs allege that the Defendants continued to make these statements "long after they were aware . . . that Mangum's accusations were false." (Second Am. Compl. ¶ 965). Plaintiffs allege that the Defendants' "failure to act to prevent or stop the ongoing violations of Plaintiffs' constitutional rights evinces a reckless and callous disregard for, and deliberate indifference to the Plaintiffs' constitutional rights." (Second Am. Compl. ¶ 966). Plaintiffs allege that as a result, they were deprived of their rights under Article IV of the Constitution and the First, Fourth, Fifth, Sixth, Ninth and Fourteenth Amendments.

The Fourteenth Amendment protects against deprivations of liberty or property rights without due process of law. However, to be entitled to procedural due process rights, a claimant must identify the liberty or property interest at issue. In this regard, the Supreme Court has recognized the right to due process "[w]here a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him." Wisconsin v. Constantineau, 400 U.S. 433, 437, 91 S. Ct. 507, 510, 27 L. Ed. 2d 515 (1971). However, the Supreme Court has also held that an injury to reputation alone does not deprive a plaintiff of "liberty" or "property" interests to state a Fourteenth Amendment violation. See Paul v. Davis, 424 U.S. 693, 711-12, 96 S. Ct. 1155, 1165-66, 47 L. Ed. 2d 405 (1976). In Paul, the Supreme Court held that where defamatory flyers were distributed by police officers and caused the plaintiff reputational harm, the plaintiff could not state a Fourteenth Amendment violation

unless the plaintiff alleged, in addition to the defamatory statement, that some other right or status was altered or extinguished. See id. Under Paul, a Fourteenth Amendment claim based on defamatory statements by government actors requires a plaintiff to allege "(1) the utterance of a statement about her that is injurious to her reputation, 'that is capable of being proved false, and that he or she claims is false,' and (2) 'some tangible and material state-imposed burden . . . in addition to the stigmatizing statement.'" Velez v. Levy, 401 F.3d 75, 87 (2d Cir. 2005) (citation omitted). Such a claim is often referred to as a "stigma-plus" claim. Id.; Cooper v. Dupnik, 924 F.2d 1520, 1532 n.22 (9th Cir. 1991) ("The 'plus' part of this test can be met by either the denial of a right specifically secured by the Bill of Rights (such as the right to free speech or counsel), or the denial of a state-created property or liberty interest such that the Fourteenth Amendment's Due Process Clause is violated."). Courts have recognized a "stigma-plus" claim where officers are alleged to have made defamatory statements in connection with unlawful arrests or seizures in violation of the Fourth Amendment. See, e.g., Cooper, 924 F.2d at 1534-36; Marrero v. City of Hialeah, 625 F.2d 499, 517-19 (5th Cir. 1980); see also Albright v. Oliver, 510 U.S. 266, 294-96, 114 S. Ct. 807, 823-26 127 L. Ed. 2d 114 (1994) (Stevens, J., dissenting) (noting that injury to reputation plus unconstitutional prosecution is sufficient to establish "stigma plus"). In addition, the court in Cooper noted that "the law on this point - that defamation in connection with the violation of a constitutional right states a claim under section 1983 - was clear" and "it should have been clear to a reasonable public official" that such claims were actionable. Cooper, 924 F.2d at 1534-36 (denying qualified immunity for § 1983 claim involving defamatory statements "intertwined with" an alleged Fourth Amendment violation for

an unconstitutional arrest).

In light of these cases and in light of the Court's determination that Plaintiffs have stated a potential claim for violation of their Fourth Amendment rights with respect to Counts 1 and 2, the Court concludes that Plaintiffs have alleged a § 1983 claim for violation of their Fourteenth Amendment rights based on the alleged government officials' false public statements that imposed a reputational burden on them without providing due process. Specifically, the Court finds that Plaintiffs have alleged a "stigma-plus" claim with a "tangible state-imposed burden . . . in addition to the stigmatizing statement," because the false public statements were made in connection with the alleged Fourth Amendment violation for alleged unlawful search and seizure as discussed above with respect to Counts 1 and 2. In addition, at this stage in the case, there are sufficient grounds to conclude that this right was clearly established, and any further qualified immunity analysis would be more appropriate at summary judgment on a factual record.[29]

However, as in Counts 1 and 2, the Court must consider whether Plaintiffs have stated a claim against each of the Defendants against whom this claim is asserted. With respect to Gottlieb, Plaintiffs allege that Gottlieb deliberately made false statements in the affidavit in

---

[29] The Court notes that this claim may, to some extent, simply overlap with the damages Plaintiffs would attempt to show with respect to Counts 1 and 2. However, the Court concludes that there is sufficient basis at the present stage in the case to allow this claim to proceed, and further distinctions between the claims, if necessary, will be considered on motions for summary judgment following discovery. Similarly, the Court notes that there are issues regarding which of the Defendant failed to provide Plaintiffs the process to which they contend they were due prior to the deprivation of Plaintiffs' interests. However, the Court concludes that at this stage, Plaintiffs have alleged a joint effort among Nifong, Gottlieb, Himan, Addison, and Wilson to deprive Plaintiffs of their constitutional rights, with direct participation specifically alleged as to each of them. Therefore, the Court will allow these claims to proceed.

support of the NTO and search warrant, with the intent that the information would be published and would stigmatize Plaintiffs. This claim is directly related to the claims asserted in Counts 1 and 2, and the Court finds that Plaintiffs have stated a claim in Count 5 with respect to Gottlieb as a result of allegedly false public statements made in connection with the alleged Fourth Amendment violations in Counts 1 and 2.

With respect to Defendants Addison, Hodge, and Wilson, Plaintiffs contend that Addison, Hodge, and Wilson each made false public statements, and Plaintiffs also contend that Addison, Hodge, and Wilson knew of and participated in the conspiracy to create false and misleading evidence against them. Cf. Velez, 401 F.3d at 88-89 (noting that "[w]hen government actors defame a person and - either previously or subsequently - deprive them of some tangible legal right or status . . . a liberty interest may be implicated, even though the 'stigma' and 'plus' were not imposed at precisely the same time" or by "the same actor," as long as they are "connected"); Marrero, 625 F.2d at 519 (noting that it is sufficient "that the defamation occur in connection with, and be reasonably related to, the alteration of the right or interest"). To the extent that these Defendants contest the particular nature or timing or effect of what was allegedly said, the Court concludes that such a factual inquiry is more appropriate on a motion for summary judgment, and Plaintiffs have alleged that each of the named Defendants made deliberately false public statements in connection with the NTO and the subsequent alleged falsification of evidence to support the NTO and cover-up the constitutional violations.[30]

---

[30] In particular as to Defendant Hodge, the Court notes that Defendant Hodge challenges whether Plaintiffs can state a claim against him for his single statement asserting that police had a "strong case." However, Plaintiffs also allege that Hodge ratified and subsequently participated in the stigmatizing statements by Nifong, Gottlieb, and Addison. The Court

With respect to Defendant Wilson, who was employed by the District Attorney's office, Wilson raises a defense of absolute prosecutorial immunity. See Van de Kamp v. Goldstein, 129 S. Ct. 855, 860, 172 L. Ed. 2d 706 (2009) (holding that prosecutors are absolutely immune from liability for "prosecutorial actions that are 'intimately associated with the judicial phase of the criminal process'" (quoting Imbler v. Pachtman, 424 U.S. 409, 430, 96 S. Ct. 984, 995, 47 L. Ed. 2d 128 (1976))). However, absolute immunity does not apply to investigative or administrative tasks, and the Supreme Court has held that "absolute immunity does not apply when a prosecutor gives advice to police during a criminal investigation [or] when the prosecutor makes statements to the press." Id. at 861. Therefore, absolute prosecutorial immunity would not apply to the claims asserted against Wilson in Count 5. The Court therefore concludes that Plaintiffs have alleged facts to set out a plausible claim in Count 5 as to Defendants Addison, Hodge, and Wilson, although it will of course be Plaintiffs' burden to present evidence in support of these claims, and Defendants will be entitled to raise qualified immunity based on the factual record at summary judgment.

With respect to Defendants Arico, Steel, Brodhead and Burness, these Defendants contend that they are not liable under § 1983 because they were not acting "under color of state law." As noted above, "[t]he under-color-of-state-law element of § 1983 excludes from its reach 'merely private conduct, no matter how discriminatory or wrongful.'" American Mfrs. Mut. Ins. Co. v. Sullivan, 526 U.S. 40, 50, 119 S. Ct. 977, 985, 143 L. Ed. 2d 130 (1999) (internal citations

concludes that at this stage in the case, Plaintiffs have stated a claim against Hodge, and further analysis of Hodge's actual knowledge and participation, and his entitlement to qualified immunity, will be considered on a motion for summary judgment on the record at that time.

omitted).  Thus "the party charged with the deprivation must be a person who may fairly be said to be a state actor. . . . because he is a state official, because he has acted together with or has obtained significant aid from state officials, or because his conduct is otherwise chargeable to the State."  <u>Lugar v. Edmondson Oil Co.</u>, 457 U.S. 922, 937, 102 S. Ct. 2744, 2754, 73 L. Ed. 2d 482 (1982).  "Under th[e state-action or color-of-law] doctrine, we 'insist []' as a prerequisite to liability 'that the conduct allegedly causing the deprivation of a federal right be fairly attributable to the State.'  By doing so, we maintain the Bill of Rights as a shield that protects private citizens from the excesses of government, rather than a sword that they may use to impose liability upon one another."  <u>Phillips v. Pitt County Mem. Hosp.</u>, 572 F.3d 176, 181 (4th Cir. 2009) (quoting <u>Holly v. Scott</u>, 434 F.3d 287, 292 (4th Cir. 2006) ("Statutory and common law, rather than the Constitution, traditionally govern relationships between private parties.")). To the extent that a § 1983 claim is based on an alleged "joint participation" or "conspiracy" between private actors and public actors, a bare assertion of a "conspiracy" is insufficient, and a plaintiff must plead enough factual matter to plausibly suggest that an agreement was made to deprive them of their constitutional rights.  <u>See</u> <u>Howard v. Food Lion, Inc.</u>, 232 F. Supp. 2d 585, 597 (M.D.N.C. 2002) (holding that in bringing a conspiracy claim under § 1983, the plaintiff "must allege both a mutual understanding to achieve some unconstitutional action reached by the private and state defendants and some factual assertions suggesting a meeting of the minds," and that "[w]hen a complaint contains merely a vague allegation of conspiracy, it cannot withstand a motion to dismiss"); <u>see also</u> <u>Franklin v. Fox</u>, 312 F.3d 423, 445 (9th Cir. 2002) ( "To be liable as a co-conspirator, a private defendant must share with the public entity the goal

of violating a plaintiff's constitutional rights."). In addition, to be acting "under color of state law" based on joint participation, "the private action must have a 'sufficiently close nexus' with the state [so] that the private action 'may be fairly treated as that of the State itself.'" DeBauche v. Trani, 191 F.3d 499, 507 (4th Cir. 1999) (citation omitted).

In the present case, Plaintiffs allege generally that Arico, Steel, Brodhead, and Burness were acting under "color of law." (Second Am. Compl. ¶ 955). However, a conclusory allegation that an individual or entity was acting "under color of law" is not sufficient, and Plaintiffs must instead plead specific facts to survive a motion to dismiss. With respect to Defendants Arico, Steel, Brodhead, and Burness, Plaintiffs do not allege facts specifically to support the conclusion that these individuals entered into an agreement with Gottlieb, Himan, or Nifong to provide false evidence in connection with the NTO and violate Plaintiffs' constitutional rights. As noted with respect to Counts 1 and 2, the only specific allegation as to Arico is that she gave an interview to a newspaper reporter regarding the sexual assault examination. (Second Am. Compl. ¶ 784). This allegation against Arico is insufficient to state a plausible claim that Arico entered into a conspiracy with Nifong, Gottlieb, and Himan and was acting under color of state law when she gave the interview, or that the interview alone was sufficient to allege joint participation by Arico in the alleged violation of Plaintiffs' constitutional rights. With respect to Steel, Brodhead, and Burness, Plaintiffs allege generally that Duke officials met with Durham Police officials, but there is not a sufficient factual basis alleged to state a plausible claim that these Defendants reached a meeting of the minds with Nifong, Gottlieb, and Himan to jointly participate in a violation of Plaintiffs' constitutional rights as

alleged in Counts 1 and 2. Moreover, with respect to the particular allegations in Count 5 as to statements made by Steel, Brodhead, and Burness, the Court concludes that Plaintiffs have not stated a plausible claim that this private action "may be fairly treated as that of the State itself." Because there is not a plausible claim that Defendants Arico, Steel, Brodhead, and Burness were acting "under color of state law," the Motion to Dismiss will be granted with respect to Count 5 as to these Defendants. Cf. Howard, 232 F. Supp. 2d at 597 (dismissing § 1983 claim against private party where the complaint failed to plead any facts suggesting that the private party and the government actor reached a meeting of the minds).

Finally, the Court notes that the "official capacity" claims against Addison, Gottlieb, and Hodge will be treated as claims against the City, and those claims against the City and against Duke and will be considered as part of Count 12, since Plaintiffs must allege a separate basis for imputing liability to these Defendants, and those allegations are made by Plaintiffs as part of Count 12.

Therefore, with respect to Count 5, the Court concludes that Count 5 will go forward as to Defendants Nifong,[31] Gottlieb, Addison, Hodge, and Wilson in their individual capacities. However, this claim will be dismissed as to Defendants Arico, Steel, Brodhead, and Burness. In addition, to the extent that this claim is asserted against Duke or the individual Defendants

---

[31] The Court notes that Defendant Nifong has not filed a Motion to Dismiss, so the conclusions here as to Count 5 are without prejudice to any further determination as to Defendant Nifong after his current status as a Defendant is clarified by Plaintiffs. See supra note 1.

in their "official capacities," those claims will be considered as part of Count 12.[32]

**Count 6:** **Manufacture of False Inculpatory Evidence and Conspiracy in Violation of 42 U.S.C. § 1983, asserted against Nifong, Gottlieb, Himan, Clayton, Duke Health, Private Diagnostic, Manly, Arico, Levicy, Clark, Meehan, DSI, Duke, and the City**

In Count 6, Plaintiffs bring a claim under 42 U.S.C. § 1983 for the manufacture of false inculpatory evidence. As the basis for this claim, Plaintiffs allege that Nifong, Gottlieb, Himan, Duke, Duke Health, Private Diagnostic, Manly, Arico, and Levicy conspired to "fabricate inculpatory forensic medical evidence for the purpose of corroborating Mangum's false accusations by altering the SAER and other medical records that contradicted Mangum's claims to conform them to the fabricated [NTO] Affidavit as well as the expected evidence in the case." (Second Am. Compl. ¶ 970). Plaintiffs allege that Levicy, under Arico's supervision, fabricated the medical records by revising the original responses and fabricating responses to match existing and expected evidence. Plaintiffs further allege that Nifong, Gottlieb, Clayton, and Himan designed an identification procedure that was, by design, intended to "facilitate the misidentification of Plaintiffs and/or Plaintiffs' teammates." (Second Am. Compl. ¶ 972). Plaintiffs allege that Nifong, Gottlieb, Himan, Clark, Meehan, and DSI, conspired to produce a false and misleading DNA report, including fabrication of a DNA "match" involving a "crime scene fingernail" without noting that no material on the fingernail matched Mangum, and that the report was fabricated with the specific intent to intimidate other team members. (Second

---

[32] Plaintiffs also allege that Hodge (Durham Police) and Graves (Duke Police) delegated final policymaking authority to Gottlieb, Nifong, and Addison, and then ratified and subsequently participated in the stigmatizing statements by Nifong, Gottlieb, and Addison. However, with respect to Defendant Graves, the Court notes that Graves is not included as a Defendant on this count.

Am. Compl. ¶ 973). Plaintiffs contend that the Defendants engaged in this conduct with the intent of securing indictments of Plaintiffs and their teammates, and with reckless disregard for and deliberate indifference to Plaintiffs' rights, resulting in deprivation of Plaintiffs' rights under Article IV of the Constitution and the First, Fourth, Fifth, and Fourteenth Amendments.

The Fourth Circuit has held that individuals possess a Fourteenth Amendment Due Process "'right not to be deprived of liberty as a result of the fabrication of evidence by a government officer acting in an investigating capacity.'" Washington v. Wilmore, 407 F.3d 274, 282 (4th Cir. 2005) (quoting Zahrey v. Coffey, 221 F.3d 342, 349 (2d Cir. 2000)); see White v. Wright, 150 Fed. Appx. 193, 198-99 (4th Cir. 2005). Indeed, "'if any concept is fundamental to our American system of justice, it is that those charged with upholding the law are prohibited from deliberately fabricating evidence and framing individuals for crimes they did not commit. Actions taken in contravention of this prohibition necessarily violate due process (indeed, we are unsure what due process entails if not protection against deliberate framing under color of official sanction).'" Washington, 407 F.3d at 285 (Shedd, J., concurring) (quoting Limone v. Condon, 372 F.3d 39, 44-45 (1st Cir. 2004)). This Fourteenth Amendment right applies to the use of fabricated evidence at trial. See id. at 282-84. In addition, some courts have recognized a Fourteenth Amendment right in the context of pre-trial proceedings, where the fabricated evidence resulted in the citizen's arrest after his indictment. See id. at 282 (citing Zahrey v. Coffey, 221 F.3d 342, 349-50 (2d Cir. 2000)). Thus, although there is a lack of clear guidance on the structure of the various constitutional doctrines involved here, the Court concludes that there can be no question that the Constitution has been violated when government officials

intentionally fabricate evidence  to frame innocent citizens, if that evidence is then used to deprive those citizens of life, liberty, or property in some manner.

However, there must be some deprivation of a recognized liberty or property interest in order to invoke the protections of the Fourteenth Amendment.  See Zahrey v. Coffey, 221 F.3d 342, 348 (2d Cir. 2000) ("The manufacture of false evidence, 'in and of itself,' . . . does not impair anyone's liberty, and therefore does not impair anyone's constitutional right.").  Plaintiffs nevertheless contend that they can state a claim in Count 6 under the Fourteenth Amendment for conduct by government officials that "shocks the conscience."  However, conduct that "shocks the conscience" may be actionable in a § 1983 claim under the Fourteenth Amendment, but only where the conscience-shocking conduct actually results in deprivation of a life, liberty or property interest.  See County of Sacramento v. Lewis, 523 U.S. 833, 845-49, 118 S. Ct. 1708, 1716-18, 140 L. Ed. 2d 1043 (1998). Thus, established case law simply does not allow this Court to recognize a separate Fourteenth Amendment violation for manufacturing of false inculpatory evidence, where no life, liberty, or property interest is impaired as a result of that misconduct.[33]

In considering these principles in the present case, the Court concludes that Plaintiffs have not alleged any deprivation of a liberty or property interest, other than that alleged as part of Counts 1, 2, and 5, and the Court has already addressed those claims as to each of those

---

[33] Of course, manufacturing false evidence may expose prosecutors and investigators to internal discipline, and may result in a state law claim for obstruction of justice, as discussed with respect to Count 18.  However, there is no violation of a federal constitutional right under the Fourteenth Amendment unless a liberty or property interest is implicated.

respective counts.[34]  However, the Court cannot recognize an additional, separate Fourteenth Amendment claim for fabrication of evidence when no other protected liberty or property interest is implicated.  Plaintiffs here were not indicted or tried or otherwise subject to any other deprivation of a liberty or property interest based on the allegedly fabricated evidence, other than as already recognized with respect to Counts 1, 2, and 5.  Therefore, the Motions to Dismiss as to Count 6 will be granted, and the claims alleged in Count 6 will be dismissed.

**Count 7:**     **Concealment of Exculpatory Evidence and Conspiracy in Violation of 42 U.S.C. § 1983, asserted against Nifong, Gottlieb, Himan, Clayton, Clark, Meehan, DSI, Duke Health, Private Diagnostic, Manly, Arico, Levicy, Steel, Best, Graves, Dean, Duke, and the City**

In Count 7, Plaintiffs assert a claim under 42 U.S.C. § 1983 for concealment of exculpatory evidence.  Plaintiffs allege that Gottlieb, Himan, Nifong, Clark, Meehan, and DSI intentionally and maliciously concealed exonerating DNA evidence with reckless disregard for and deliberate indifference to Plaintiffs' constitutional rights.[35]  Plaintiffs allege that Defendants'

---

[34] The Court notes that where a specific amendment, such as the Fourth Amendment, applies to an alleged claim, the Court will look to the contours and requirements of that more specific provision, rather than the substantive due process provisions of the Fourteenth Amendment.  See Albright v. Oliver, 510 U.S. 266, 273, 114 S. Ct. 807, 813, 127 L. Ed. 2d 114 (1994) ("Where a particular Amendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims.'" (citation omitted)).  To the extent that Plaintiffs invoke the protections of the Fourteenth Amendment as part of their claims in Counts 1, 2, and 5, the Court has already determined that each of those respective Counts is proceeding, and the Court will not further parse those claims between the Fourth and Fourteenth Amendments at this time.

[35] Although this Count is also asserted against Clayton, Duke Health, Private Diagnostic, Manly, Arico, Levicy, Steel, Best, Graves, Dean, and Duke, Plaintiffs do not include any allegations as to those Defendants in Count 7, and instead Count 7 is limited to the alleged concealment of DNA evidence by Gottlieb, Himan, Nifong, Clark, Meehan, and DSI. As such, there is no basis stated for the claim against Clayton, Duke Health, Private Diagnostic, Manly,

conduct deprived them of their rights under Article IV of the Constitution as well as the First, Fourth, Fifth, and Fourteenth Amendments.

However, the right to disclosure of exculpatory information is a trial right, and the Fourth Circuit has held a claim for failure to disclose exculpatory information during an investigation "does not allege a deprivation of any right guaranteed under the Due Process Clause of the Fourteenth Amendment," and is instead cognizable only pursuant to the Fourth Amendment. See Taylor v. Waters, 81 F.3d 429, 436 (citing Albright v. Oliver, 510 U.S. 266, 268-76, 114 S. Ct. 807, 810-14, 127 L. Ed. 2d 114 (1994) and Baker v. McCollan, 443 U.S. 137, 142-46, 99 S. Ct. 2689, 2693-96, 61 L. Ed. 2d 433 (1979)); see also United States v. Ruiz, 536 U.S. 622, 122 S. Ct. 2450, 2454 (2002) (noting that a defendant's right to receive exculpatory material from prosecutors is "a right that the Constitution provides as part of its basic 'fair trial' guarantee" under the Fifth and Sixth Amendments (citing Brady v. Maryland, 373 U.S. 83, 87, 83 S. Ct. 1194, 1196-97, 10 L. Ed. 2d 215 (1963))).

Thus, Plaintiffs cannot state a Fourteenth Amendment claim for failure to disclose exculpatory evidence or for concealment of evidence during the investigation where they were not subject to trial. As discussed above with respect to Count 6, Plaintiffs have asserted Fourth Amendment claims in Counts 1 and 2, and as part of those claims, the Court has considered Plaintiffs' contentions that they were subject to searches and seizures on warrants that were obtained by deliberate concealment of material evidence. However, there is no basis on which Plaintiffs can assert a § 1983 claim for an additional, separate Fourteenth Amendment violation

Arico, Levicy, Steel, Best, Graves, Dean, and Duke. Moreover, this count fails to state a claim against any of the Defendants for the reasons discussed above.

92

for concealment of exculpatory evidence during an investigation, and this claim in Count 7 will therefore be dismissed as to all Defendants against whom it is asserted.

**Count 8:** **Interfering with Right to Engage in Political Processes in Violation of 42 U.S.C. § 1983 and Conspiracy, asserted against Steel, Brodhead, Burness, Duke and "Unknown Duke University Employees"**

In Count 8, Plaintiffs assert a claim under 42 U.S.C. § 1983 for "Interfering with the Right to Engage in Political Processes."  As the basis for this claim, Plaintiffs allege that Steel, Brodhead, Trask,[36] and Burness, acting under color of state law, directed unknown Duke employees and Duke Police Officers to "direct team members who were registering students and other Durham residents to vote in the then upcoming federal and state elections to abandon their registration efforts, surrender their voter registration forms, and take off their shirts, which read 'Voice Your Choice.'"  (Second Am. Compl. ¶ 988).  Plaintiffs allege that the conduct evinced a reckless disregard for and deliberate indifference to Plaintiffs' rights, and deprived Plaintiffs of their rights under Article IV of the Constitution and the First and Fourteenth Amendments.

In considering claims involving alleged violations of the First Amendment on private property, the Supreme Court has held that "the constitutional guarantee of free speech is a guarantee only against abridgment by government, federal or state. Thus, while statutory or common law may in some situations extend protection or provide redress against a private corporation or person who seeks to abridge the free expression of others, no such protection or redress is provided by the Constitution itself." Hudgens v. NLRB, 424 U.S. 507, 513, 96 S.

---

[36] Although listed in the allegations, Trask is not included as a Defendant on this Count.

Ct. 1029, 1033, 46 L. Ed. 2d 196 (1976) (internal citations omitted); Lloyd Corp. v. Tanner, 407 U.S. 551, 567-70, 92 S. Ct. 2219, 2228-29, 33 L. Ed. 2d 131 (1972). Under these decisions, "[b]efore an owner of private property can be subjected to the commands of the First and Fourteenth Amendments the privately owned property must assume to some significant degree the functional attributes of public property devoted to public use." Cent. Hardware Co. v. NLRB, 407 U.S. 539, 547, 92 S. Ct. 2238, 2243, 33 L. Ed. 2d 122 (1972).

In the present case, all of the alleged conduct with respect to Count 8 is alleged to have occurred on the campus of Duke University and to have been committed by Duke employees at the direction of Duke administrators. Thus, the alleged conduct involves actions by Duke, not the government, to control the types of speech the Duke would allow on its own property. The claim is asserted against Duke administrators Steel, Brodhead, and Burness. In these circumstances, having considered Plaintiffs' allegations, the Court concludes that a claim against these private university administrators for actions it takes on its own campus cannot support a claim for violation of the First Amendment. The action taken by Duke and its employees - at the direction of Duke administrators - is not plausibly alleged to be government action taken "under color of state law" under § 1983.[37] Therefore, the Motion to Dismiss Count 8 will be granted, and the claims alleged in Count 8 will be dismissed.

**Count 9:** **Retaliation in Violation of 42 U.S.C. § 1983 and Conspiracy, asserted against Nifong, Gottlieb, Himan, Addison, Michael, Hodge, Steel, Brodhead, Burness, Lange, Stotsenberg, Smith, Best, Fleming, Schwab,**

---

[37] Plaintiffs also contend that this action violated "federal voter registration law." However, Plaintiffs do not identify what law they contend was violated. Moreover, as noted above, the action allegedly taken by Duke administrators was not action by the government and cannot support a claim under § 1983 for action taken "under color of state law."

**Garber, Cooper, Humphries, Dean, Graves, Dawkins, Trask, Duke, Duke Health, Private Diagnostic, and the City**

In Count 9, Plaintiffs assert a claim under 42 U.S.C. § 1983 for "Retaliation." As the basis for this claim, Plaintiffs allege that all of the Defendants named in this Count "directed, participated, condoned or ratified the violations of Plaintiffs' constitutional rights as alleged herein in retaliation for Plaintiffs' decision to exercise their constitutional right not to submit to police interrogation without the benefit of counsel." (Second Am. Compl. ¶ 994). Plaintiffs allege that Nifong, Gottlieb, and Himan retaliated against Plaintiffs by "causing court orders to be issued based upon fabricated sworn Affidavits" including the NTO and Search Warrant. (Second Am. Compl. ¶ 995). Plaintiffs further allege that Nifong, Gottlieb, Levicy, Arico, and Manly retaliated against Plaintiffs by concealing forensic medical evidence and fabricating false and misleading forensic medical evidence. Plaintiffs also allege that Nifong, Gottlieb, Himan, and Clayton retaliated against Plaintiffs by intimidating witnesses and coercing witnesses to make false statements. Plaintiffs allege that Steel, Nifong, and the Duke Police supervisors (Best, Fleming, Schwab, Garber, Cooper, Humphries, Dean, Graves, Dawkins, Trask, and Brodhead) retaliated against Plaintiffs by directing Duke Police Officers to produce reports concealing the officers' exculpatory observations of Mangum at the hospital on March 14. Plaintiffs contend that Defendants' conduct evinced a malicious and corrupt intent and callous disregard for or deliberate indifference to Plaintiffs' rights, and deprived Plaintiffs of their rights under Article IV of the Constitution and the First, Fourth, Fifth, and Fourteenth Amendments.

However, as discussed with respect to Count 3, to the extent that Plaintiffs allege that their Fourth Amendment rights were violated by the deliberate or reckless use of false and

misleading information to obtain a search warrant and NTO that were not supported by probable cause, those claims have already been considered in Counts 1 and 2. Although Plaintiffs also raise additional contentions in Count 9 (as in Count 3) regarding the officers' subjective motivations, an officer's improper motives do not establish a Fourth Amendment violation, and police can arrest citizens if probable cause exists to support the arrest, regardless of the officers' subjective motivations. See Rogers v. Pendleton, 249 F.3d 279, 290 (4th Cir. 2001); Whren v. United States, 517 U.S. 806, 813, 116 S. Ct. 1769, 1774, 135 L. Ed. 2d 89 (1996); cf. Hartman v. Moore, 547 U.S. 250, 260-62, 126 S. Ct. 1695, 1703-05, 164 L. Ed. 2d 441 (2006) (finding that there could be no constitutional claim for "retaliatory prosecution," regardless of the officers' motivation, if there was probable cause to support the prosecution). Thus, if a search or seizure is properly supported by probable cause, there is no separate Fourth Amendment violation based on the officers' subjective motivations. As such, Plaintiffs cannot state a claim for retaliation under the Fourth Amendment, and any Fourth Amendment claims must be analyzed under the standards set out in Counts 1 and 2.[38]

Moreover, to the extent that Plaintiffs' claim in Count 9 is based on alleged retaliation against them for their decision not to submit to voluntary, uncounseled interviews with police officers, the Court notes that the right not to speak to police officers is derived from the Fifth Amendment privilege against self-incrimination, but that right is not violated unless the results

---

[38] In addition, as discussed with respect to Counts 6 and 7, there is no separate Fourteenth Amendment violation for fabrication of false evidence or concealment of exculpatory evidence during an investigation prior to any trial or arrest, regardless of the officers' motivation, unless that misconduct actually deprives a citizen of a constitutionally-protected liberty or property interest.

of the interview are used against the individual in a criminal proceeding.  See Thompson v. Keohane, 516 U.S. 99, 107, 116 S. Ct. 457, 462-63, 133 L. Ed. 2d 383 (1995); Miranda v. Arizona, 384 U.S. 436, 467-69, 86 S. Ct. 1602, 1624-25, 16 L. Ed. 2d 694 (1966); Burrell v. Virginia, 395 F.3d 508, 512-14 (4th Cir. 2005).  Thus, Plaintiffs have not stated a claim for violation of their Fifth Amendment rights.  Plaintiffs do not assert otherwise, and in their Response Briefs, Plaintiffs do not attempt to present any authority recognizing a § 1983 claim for "retaliation" against an individual for exercise of his Fifth Amendment rights.

Instead, Plaintiffs contend that the claim in Count 9 is a claim for retaliation against them for exercising their constitutionally-protected First Amendment free speech rights.  In this regard, the Fourth Circuit has recognized a potential § 1983 "retaliation" claim in cases where government officials retaliate against government employees or other citizens for exercise of their free speech rights.  See The Baltimore Sun Co. v. Ehrlich, 437 F.3d 410, 4116-17 (4th Cir. 2006) (recognizing a potential § 1983 claim based on retaliation by government officials against a reporter, but noting that "the retaliation cause of action must be administered to balance governmental and private interests so as not to impose liability in everyday, run-of-the-mill encounters").  Such a claim requires a plaintiff to establish "[1] that his or her speech was protected[,] . . . [2] that the defendant's alleged retaliatory action adversely affected the plaintiff's constitutionally protected speech[,] [and] . . . [3] that a causal relationship exists between its speech and the defendant's retaliatory action."  Suarez Corp. Indus. v. McGraw, 202 F.3d 676, 686 (4th Cir. 2000) (internal citations omitted).  Plaintiffs contend that they can state such a First Amendment retaliation claim because Defendants retaliated against them for exercising their

right "not to speak." See Wooley v. Maynard, 430 U.S. 705, 714-16, 97 S. CT. 1428, 1435-36, 51 L. Ed. 2d 752 (1977) (recognizing a First Amendment right "to refrain from speaking" with respect to a state motto on a license plate). However, this "right not to speak" has been limited to the context of government-compelled speech with respect to a particular political or ideological message. See United States v. Sindel, 53 F.3d 874, 878 (8th Cir. 1995) (noting that "[a] First Amendment protection against compelled speech . . . has been found only in the context of governmental compulsion to disseminate a particular political or ideological message" and "[t]here is no right to refrain from speaking when 'essential operations of government may require it for the preservation of an orderly society,-as in the case of compulsion to give evidence in court.'" (quoting West Virginia State Bd. of Educ. v. Barnette, 319 U.S. 624, 645, 63 S. Ct. 1178, 1189, 87 L. Ed. 2d 1628 (1943) (Murphy, J., concurring))); Kania v. Fordham, 702 F.2d 475, 478 n.6 (4th Cir. 1983). Plaintiffs cite no authority to support the application of the First Amendment protection against government-compelled ideological or political speech into the context of police interviews, which are covered by the more specific protections of the Fourth, Fifth, and Sixth Amendments. Therefore, the Court rejects Plaintiffs' legal contention that declining to speak to police officers during a criminal investigation raises First Amendment protections. Moreover, even if this novel interpretation of the First Amendment were accepted, there was no clearly established First Amendment right not to speak to police officers at the time of the conduct alleged in the Second Amended Complaint, and therefore a reasonable police officer would not have known that First Amendment protections applied in that situation. As

such, qualified immunity would apply in any event.[39]  Therefore, the Court concludes that Plaintiffs have failed to state any separate § 1983 claim for "retaliation" in violation of the First Amendment, and this claim will therefore be dismissed.

**Count 10:  Deprivation of the Privileges and Immunities of North Carolina Citizens in Violation of 42 U.S.C. § 1983, asserted against "all Defendants in their individual and official capacities"**

In Count 10, Plaintiffs assert a claim under 42 U.S.C. § 1983 alleging that Defendants' conduct deprived Plaintiffs of the "same privileges and immunities they bestowed upon similarly situated citizens of the State of North Carolina because of Plaintiffs' real or perceived status as citizens of other states."  (Second Am. Compl. ¶ 1004).  Plaintiffs allege that Defendants' conduct was "not closely tailored or rationally related to any legitimate or substantial state interest" and deprived Plaintiffs of their rights under Article IV of the Constitution and the Fourteenth Amendment.  (Second Am. Compl. ¶ 1005-1006).

Article IV of the Constitution provides that "[t]he Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States."  U.S. Const art. IV, § 2.  Pursuant to this provision, "a citizen of one State who travels in other States, intending to return home at the end of his journey, is entitled to enjoy the 'Privileges and Immunities of Citizens in the several States' that he visits.  This provision removes 'from the citizens of each State the disabilities of alienage in the other States.'"  Saenz v. Roe, 526 U.S. 489, 501, 119 S. Ct. 1518, 1525, 143 L. Ed. 2d 689 (1999) (quoting Paul v. Virginia, 75 (8 Wall.) 168, 180, 19 L. Ed. 357

---

[39] Of course, as discussed in Count 3, police officers may not arrest, search, or otherwise seize an individual simply for refusing consent to an interview or a search.  However, violation of that right is discussed under the standards applicable to Fourth Amendment claims, as set out at length in Counts 1, 2, and 3.

(1868)).  This provision "was designed to insure to a citizen of State A who ventures into State B the same privileges which the citizens of State B enjoy."  Toomer v. Witsell, 334 U.S. 385, 395, 68 S. Ct. 1156, 1162, 92 L. Ed. 1460 (1948).  Thus, a state may not discriminate against non-residents with respect to the privileges and immunities it provides to its own citizens unless there is a sufficient justification for the discrimination.

In their briefing in support of Count 10, Plaintiffs contend that this claim invokes the "right to travel," including (1) the right of a citizen of one State to enter and to leave another State, (2) the right to be treated as a welcome visitor rather than an unfriendly alien when temporarily present in the second State, and (3) for travelers who elect to become residents of a new State, the right to be treated like other citizens of that State.  However, Plaintiffs do not cite any cases in which a burden on the "right to travel" was recognized in circumstances analogous to those claimed here.  Moreover, the Privileges and Immunities Clause does not protect citizens of a state from actions of their own state.  See Goldfarb v. Supreme Court of Virginia, 766 F.2d 859, 864-65 (4th Cir. 1985) ("[T]he Privileges and Immunities Clause provides 'no security for the citizen of the State in which [the privileges] were claimed.'" (quoting The Slaughterhouse Cases, 83 U.S. (16 Wall.) 36, 77, 21 L. Ed. 394 (1873))); United Bldg. & Constr. Trades Council v. Camden, 465 U.S. 208, 217, 104 S. Ct. 1020, 1027, 79 L. Ed. 2d 249 (1984).  Of the three Plaintiffs in this suit, one of them, Plaintiff Matthew Wilson, is a North Carolina resident who was a "permanent resident" of Durham. Plaintiffs contend that Matthew Wilson was nevertheless discriminated against as a Duke Student who was "perceived" to be an out-of-state resident.  However, the Court concludes that the facts set out in the Second Amended

Complaint would, at most, support the assertion that Plaintiffs were singled out or discriminated against because they were Duke Students, not because they were out-of-state residents. Plaintiffs allege that the City adopted a "Zero Tolerance" policy that involved excessive penalties and criminal enforcement against Duke Students, particularly in the neighborhood areas outside of campus. However, to the extent that any distinction at all was made in enforcement of the criminal laws under the facts alleged by Plaintiffs, the distinction was made between Duke Students (regardless of where they were from) and non-students who were "permanent residents" of the neighborhoods around campus. There is no plausible claim that Plaintiffs were discriminated against on the basis of their status as out-of-state residents, and instead any alleged discrimination was based on their status as Duke Students, applied equally to all Duke Students (including Plaintiff Matthew Wilson, a permanent resident of Durham), regardless of where they were from. Thus, Plaintiffs have failed to allege facts to support the contention that the government made any distinction in the way that they were treated based on residency. Therefore, the Court concludes that Plaintiffs have not stated any plausible claim for violation of the Privileges and Immunities Clause, and Count 10 will be dismissed.

**Count 11:**   **Failure to Prevent Deprivation of Constitutional Rights in Violation of 42 U.S.C. § 1983, asserted against Steel, Brodhead, Lange, Trask, Burness, Moneta, Dzau, Haltom, Dawkins, Graves, Dean, Humphries, Cooper, Garber, Schwab, Fleming, Best, Smith, Stotsenberg, Duke Police, Duke, Baker, Chalmers, Hodge, Russ, Mihaich, Council, Lamb, Ripberger, Evans, Soukup, Michael, Addison, Gottlieb, Himan, Wilson, Clayton and the City**

In Count 11, Plaintiffs bring claims under 42 U.S.C. § 1983 for "Failure to Prevent Deprivation of Constitutional Rights" raising issues of "bystander liability." Plaintiffs divide this

claim into five sections. <u>First</u>, Plaintiffs assert claims against the Duke Police Defendants (Brodhead, Trask, Dawkins, Graves, Dean, Humphries, Cooper, Garber, Schwab, Fleming, Best, Smith, and Stotsenberg) in their individual and official capacities, alleging that Plaintiffs were subjected to violations of their constitutional rights by Duke and Durham officers, and that these Defendants were present and knew of the violations and had a reasonable opportunity to prevent the harm but "turned a blind eye" and did nothing. <u>Second</u>, Plaintiffs assert claims against Steel, Brodhead, Trask, and the other Duke Police supervisors (Dawkins, Graves, Dean, Humphries, Cooper, Garber, Schwab, Fleming and Best), in their individual and official capacities, alleging that these Defendants had "shared final policymaking authority" for Duke and were aware of the violations of Plaintiffs' rights but directed all Duke Police officers to do nothing. <u>Third</u>, Plaintiffs assert claims against Durham Police Defendants (Baker, Chalmers, Hodge, Russ, Mihaich, Council, Lamb, Ripberger, Evans, Soukup, Michael, Addison, Gottlieb, Himan, Wilson, and Clayton) alleging that Plaintiffs were subjected to violations of their constitutional rights by Duke and Durham officers, and that these Defendants were present or knew of the violations and had a reasonable opportunity to prevent the harm but "turned a blind eye" and did nothing. <u>Fourth</u>, Plaintiffs assert claims against Durham supervisors (Baker, Chalmers, Hodge, Russ, Mihaich, Council, Lamb, Ripberger, Evans, and Soukup) and the City, alleging that these Defendants had "final policymaking authority" and were aware of the violations of Plaintiffs' rights but directed Durham Police officers to do nothing. <u>Fifth</u>, Plaintiffs assert claims against Duke and the City alleging that Duke and the City "had an established policy or custom whereby Duke Police Officers and Durham Police Officers, as a

rule, did not act to prevent violations of Duke students' constitutional rights occurring in their presence or within their knowledge," and that this policy led to the violations of Plaintiffs' constitutional rights in this case. (Second Am. Compl. ¶ 1032-1033).

In considering these contentions, the Court notes that the Fifth contention, which asserts a claim against Duke and the City based on an "established policy or custom," is an attempt to establish liability under <u>Monell</u> and is therefore considered as part of Count 12. In addition, the Court concludes that the Second and Fourth contentions against the supervisors with "final policymaking authority" are also attempts to establish liability of Duke or the City under <u>Monell</u> and are therefore also considered as part of Count 12.[40] The First and Third contentions raise claims against the Duke Police Defendants and the Durham Police Defendants alleging that these Defendants were "present and/or knew" of the constitutional violations and had a reasonable opportunity to prevent the harm but "turned a blind eye" and did nothing, raising a theory of "bystander liability," and those claims will therefore be addressed here as part of Count 11.

As discussed previously, "an officer may be liable under § 1983, on a theory of bystander liability, if he: (1) knows that a fellow officer is violating an individual's constitutional rights; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act." <u>See</u> <u>Randall v. Prince George's County</u>, 302 F.3d 188, 202-04 (4th Cir. 2002). However, the Supreme Court

---

[40] In addition, to the extent that these Second and Fourth contentions may also be attempts to state a claim for "supervisory liability," the conclusions set out in Count 13 would apply. Similarly as to the Third contention related to the Durham Police Defendants, Plaintiffs' allegations regarding authority and delegation of authority are considered as part of the supervisory liability raised in Count 13.

in Ashcroft v. Iqbal reiterated that in a § 1983 suit, "a plaintiff must plead that each Government-official defendant, through the officials' own individual actions, has violated the Constitution." 129 S. Ct. 1937, 1948, 173 L. Ed. 2d 868 (2009) (emphasis added). Thus, to be liable for a constitutional violation under § 1983, each individual defendant must have had the requisite intent to violate Plaintiffs' constitutional rights. See id. at 1948-49 (noting that each government actor "is only liable for his or her own misconduct" which requires the requisite intent for the type of constitutional violation pled). Therefore, "bystanders" cannot be liable under § 1983 for simply negligent conduct in failing to intervene. Instead, the bystander must have been present for the violation, with a reasonable opportunity to intervene, and must have had the requisite intent to violate the citizen's constitutional rights.

In addition, under Iqbal, the allegations must offer more than "labels and conclusions" or "naked assertions" or "a formulaic recitation of the elements of a cause of action." Id. at 1949 (internal quotations omitted). The allegations must instead include specific factual allegations. Moreover, the facts pled must not be "merely consistent with a defendant's liability" and instead must be sufficient to state a plausible entitlement to relief. Id. (internal quotations omitted).

In the present case, the Court has concluded that Plaintiffs have stated a potential claim for an unconstitutional search and seizure as alleged in Counts 1 and 2, and for reputational injury suffered as a result of intentionally false public statements made in connection with the allegedly unlawful seizure without due process of law, as alleged in Count 5. These claims include, as discussed with respect to Count 2, a potential "bystander liability" claim with respect

104

to Sergeant Smith, based on allegations that he was present for an unlawful search and based on allegations that he had the requisite knowledge and intent.

However, the claims asserted by Plaintiffs in Count 11 are "group" claims asserting liability against 29 Defendants[41] for their alleged conduct in "turning a blind eye" to the "constitutional violations," without specifying which alleged constitutional violations were at issue, or what conduct any particular individual Defendant "turned a blind eye" toward. Plaintiffs nevertheless contend that they have sufficiently stated a claim against all of the named Defendants because they allege that the Defendants knew that other officers were conspiring to violate Plaintiffs' constitutional rights, had a reasonable opportunity to intervene, and failed to intervene. However, the Court concludes that these general, conclusory "group" allegations are not a sufficient basis to impose bystander liability on all 29 Defendants. Indeed, these "group" allegations do not even put the individual defendants on reasonable notice as to what their involvement is actually alleged to have been. Moreover, the Court further concludes that the facts as alleged do not state a plausible claim that all 29 named Defendants were present, had a reasonable opportunity to intervene, and intentionally or recklessly violated Plaintiffs' constitutional rights with respect to the claims asserted in Counts 1, 2, and 5.[42] The general

_____

[41] This Count is asserted against 38 Defendants, but the factual allegations are "group" allegations that make allegations against groups that include 29 individual Defendants. Although Count 11 is also asserted against the Crisis Management Defendants (Steel, Brodhead, Lange, Trask, Burness, Moneta, Dzau, and Haltom), Plaintiffs do not include Lange, Burness, Moneta, Dzau and Haltom in any of the five groups against whom the allegations are made.

[42] In this regard, the Court notes that it was Plaintiffs' decision to allege claims against 50 Defendants based on multiple alleged constitutional violations under § 1983, many of which failed to state a claim under applicable legal standards as discussed herein. In addition, Plaintiffs in this "bystander liability" claim elected to assert group allegations against 29 Defendants,

nature of Plaintiffs' sweeping allegations inhibits any further ability by the Court to determine which named Defendants are alleged to have been present and able to intervene with respect to Counts 1, 2, and 5, other than the particular Defendants named and discussed in those respective counts. In that regard, the Court notes that the claims in Counts 1 and 2 are going forward as to Defendants Nifong, Himan, Gottlieb, and Levicy, and also against Defendant Smith in Count 2, and those claims would include potential "bystander" and "conspiracy" liability as to those Defendants on those claims. Similarly, the claims in Count 5 are going forward as to Nifong, Gottlieb, Addison, Hodge, and Wilson. As to Defendant Clayton, Plaintiffs contend that Clayton participated in the search challenged as part of Count 2.[43] Plaintiffs also contend in their Response Brief that Clayton knew the search was not supported by probable cause, but Plaintiffs do not contend that Clayton knew that Gottlieb and Himan had falsified the material allegations in the warrant affidavit. Therefore, the Court concludes that Plaintiffs have not stated a separate "bystander liability" claim as to Clayton.

Thus, having reviewed the Second Amended Complaint and Plaintiffs' Response Briefs, the Court concludes that the "group" allegations are insufficient and conclusory, and Plaintiffs have not sufficiently stated a "bystander liability" claim with respect to Counts 1, 2, and 5 as to

---

alleging that all of the group members failed to intervene to prevent violation of Plaintiffs' "constitutional rights," without distinctions among the individual Defendants or the particular constitutional violations they allegedly failed to prevent. The burden is on Plaintiffs to state their claim and the factual basis for their claim as to individual Defendants and specific claims, and "group claims" based on undistinguished "constitutional violations" do not provide sufficient notice or basis for a separate claim.

[43] The Court notes that Clayton is also alleged to have participated with respect to the claims asserted in Counts 4, 6, and 7, but those claims have been dismissed.

the multiple Defendants against whom this claim is asserted (Steel, Brodhead, Lange, Trask, Burness, Moneta, Dzau, Haltom, Dawkins, Graves, Dean, Humphries, Cooper, Garber, Schwab, Fleming, Best, Smith, Stotsenberg, Duke Police, Duke, Baker, Chalmers, Hodge, Russ, Mihaich, Council, Lamb, Ripberger, Evans, Soukup, Michael, Addison, Gottlieb, Himan, Wilson, Clayton and the City). The burden is on Plaintiffs to make sufficient allegations to support a plausible claim as to each named Defendant, and Plaintiffs have failed to do so here.[44] Therefore, the Court will dismiss the general "bystander" claims alleged in Count 11.[45]

**Count 12:** **<u>Monell</u> Liability for Violations of 42 U.S.C. § 1983, asserted against the City and Duke**

In Count 12, Plaintiffs assert their § 1983 claims against the City and against Duke under <u>Monell v. Department of Social Services</u>, 436 U.S. 658, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978). Pursuant to <u>Monell</u>, a municipality is not vicariously liable under § 1983 for actions of its employees; instead, a municipality is only liable under § 1983 if the alleged constitutional violations were the result of a municipal policy or practice. A municipality may be liable under

---

[44] The Court further notes that in their Response Briefs, Plaintiffs assert their "bystander liability" claims against the Duke Police Defendants based on contentions that Duke Police "abdicated their authority" under the Jurisdictional Agreement with Durham Police. However, as discussed with respect to Counts 12 and 13, under state law the Durham Police had their own statutory authority to proceed with the investigation, and the Jurisdictional Agreement does not, as a matter of law, impair that authority or provide the Duke Police with supervisory authority or any other basis on which to intervene in a Durham Police investigation.

[45] Although the "group claims" in Count 11 are being dismissed, the claims in Counts 1 and 2 are going forward as to Defendants Nifong, Himan, Gottlieb, and Levicy, and also against Defendant Smith in Count 2, and those claims would include potential "bystander" and "conspiracy" liability as to those Defendants on those claims, as discussed with respect to those Counts. Similarly, the claims in Count 5 are going forward as to Nifong, Gottlieb, Addison, Hodge, and Wilson. However, no separate "bystander" claims are going forward as a separate claim in Count 11.

§ 1983 "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." Monell, 436 U.S. at 694, 98 S. Ct. at 2037-38.  A plaintiff can establish liability under Monell where the constitutional injury is proximately caused by a written policy or ordinance, or by a widespread practice that is "so permanent and well settled as to constitute a 'custom or usage' with the force of law."  City of St. Louis v. Praprotnik, 485 U.S. 112, 127, 108 S. Ct. 915, 926, 99 L. Ed. 2d 107 (1988) (citation omitted).  In addition, the Supreme Court has also recognized that liability may be imposed on a municipality where the constitutional injury is proximately caused by the decision of an official with final policymaking authority, that is, an official with authority to establish and implement municipal policy in that area.  Id. at 127, 108 S. Ct. at 926. Finally, municipal liability has been recognized based on inadequate training or supervision of employees if the training or supervision was so inadequate as to establish "deliberate indifference" to the rights of citizens and if the deficiency caused the constitutional violation alleged.  See City of Canton v. Harris, 489 U.S. 378, 390-92, 109 S. Ct. 1197, 1206, 103 L. Ed. 2d 412 (1989).  In sum, "[a] policy or custom for which a municipality may be held liable can arise in four ways: (1) through an express policy, such as a written ordinance or regulation; (2) through the decisions of a person with final policymaking authority; (3) through an omission, such as a failure to properly train officers, that 'manifest[s] deliberate indifference to the rights of citizens'; or (4) through a practice that is so 'persistent and widespread' as to constitute a 'custom or usage with the force of law.'"  Lytle v. Doyle, 326 F.3d 463, 471 (4th Cir. 2003) (quoting Carter v. Morris, 164 F.3d 215, 218 (4th Cir. 1999)).  Such a claim only exists if,

"through its deliberate conduct, the municipality was the "moving force" behind the injury alleged. That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." Bd. of the County Comm'rs of Bryan County v. Brown, 520 U.S. 397, 404, 117 S. Ct. 1382, 1388, 137 L. Ed. 2d 626 (1997).

To impose municipal liability based on the decision of a final policymaking official, the final policymaking official must have been "aware of the constitutional violation and either participated in, or otherwise condoned, it." Love-Lane v. Martin, 355 F.3d 766, 783 (4th Cir. 2004). This includes situations where "the authorized policymakers approve a subordinate's decision and the basis for it," since "their ratification would be chargeable to the municipality because their decision is final." Praprotnik, 485 U.S. at 127. Thus, liability may be imposed where the final policymaking official intentionally participates in or ratifies the constitutional violation. In addition, where a final policymaking official makes a decision or acts in a manner that is not in itself unconstitutional, liability may still exist if the final policymaking official acts with "deliberate indifference to the risk that a violation of a particular constitutional or statutory right will follow the decision." Bd. of the County Comm'rs of Bryan County, 520 U.S. at 411, 117 S. Ct. at 1392; see also Carter v. Morris, 164 F.3d 215, 218-19 (4th Cir. 1999) (describing the required connection between the official's deliberate indifference and the ultimate constitutional violation).

In the present case, as the basis for Count 12, Plaintiffs allege that: (A) City and University policies were the moving force behind the deprivations of Plaintiffs' constitutional

rights; (B) officials with final policymaking authority participated in or directed the violations of Plaintiffs' constitutional rights; and (C) Duke and City officials with final policymaking authority with respect to the investigation delegated some or all of their policymaking authority but failed to exercise adequate supervising responsibility over the delegate's exercise of said final policymaking authority. With respect to the first contention, that City and University policies were the moving force behind the deprivations of Plaintiffs' constitutional rights, Plaintiffs allege that the moving force behind the violations was a "Zero-Tolerance" policy, agreed to by the City and Duke, pursuant to which "Durham Police and Duke Police would target Duke Students who lived or strayed off-campus for disproportionate enforcement of the criminal laws." (Second Am. Compl. ¶ 108). Plaintiffs allege that as part of this policy, Nifong agreed to "observe a 'no drop' policy, pursuant to which his office refused to unilaterally dismiss charges brought against Duke students" in the neighborhoods outside the Duke campus. (Second Am. Compl. ¶ 114). Plaintiffs allege that pursuant to this policy, Durham Police conducted searches and seizures of students during "raids" on homes occupied by Duke Students in the neighborhoods around campus in August 2005. (Second Am. Compl. ¶ 116-137). Plaintiffs allege that all of the charges related to these "raids" were ultimately dismissed when a state court judge determined that the actions by the Durham Police were unconstitutional. Plaintiffs contend that soon thereafter, enforcement of this policy led to a violent raid by Durham Police of students at a pool at a neighborhood apartment complex, which Plaintiffs contend was later determined by a state court to be an unprovoked, violent assault by Durham Police on a Duke Student at his own apartment complex. (Second Am. Compl. ¶ 138-144). Plaintiffs contend

that because the officers involved in these various unconstitutional actions were not corrected, reprimanded, or terminated, and because the policy was instead "re-ratified and re-condoned" by the commanding officers, the Durham police officers were emboldened in their targeting of Duke Students. (Second Am. Compl. ¶ 143, 169). Plaintiffs contend that a few weeks later, pursuant to the Zero-Tolerance Policy, and consistent with the "escalating targeting" of Duke Students, Gottlieb was involved in obtaining baseless arrest warrants for Duke Students at another neighborhood property. Plaintiffs allege that Gottlieb executed the warrant at 3:00 a.m. and handcuffed the students sleeping there, ultimately transporting them to the Durham County Jail and charging them with violations of the noise and open container ordinances. Plaintiffs contend that despite a lack of evidence, Gottlieb and Nifong participated in baseless prosecutions resulting in acquittals (Second Am. Compl. ¶ 145-159). Plaintiffs further allege that in January 2006, a 911 caller reported a "banging" near the trash cans at 610 N. Buchanan, and that the Durham Police officer who arrived told the residents he had a "'directive from [his] supervisor' to charge the residents with misdemeanor violations of the City Noise Ordinance, regardless of whether any violations had, in fact, occurred." (Second Am. Compl. ¶ 165-168).

Based on these prior incidents, Plaintiffs allege that the "Zero Tolerance Policy" encouraged and authorized officers to execute warrantless raids of Duke Students' homes, obtain warrants and other legal process against Duke Students for unauthorized purposes, subject Duke Students to unconstitutional searches and seizures in the absence of probable cause for the purpose of publicly humiliating or abusing the Duke Students, fabricate witness accounts of events to obtain convictions of Duke Students, "turn a blind eye" to the deprivation

of Duke Students' constitutional rights, and retaliate against officers who acted to prevent the deprivation of students' constitutional rights. Plaintiffs allege that this policy was ratified by Durham Police Captain Lamb and by his predecessor Captain Sarvis. In addition, Plaintiffs allege that Baker was another policymaker who developed the policy. Plaintiffs allege that it was clear that the policy would lead to a deprivation of Plaintiffs' constitutional rights and that as a direct and foreseeable consequence of the Zero-Tolerance policy, Plaintiffs were deprived of their rights under Article IV of the Constitution and the First, Fourth, Fifth, and Fourteenth Amendments. (Second Am. Compl. ¶ 1045).

With respect to Plaintiffs' contention that Monell liability should attach because "officials with final policymaking authority participated in or directed the violations of Plaintiffs' constitutional rights," Plaintiffs allege that Duke Officials with final policymaking authority, including Steel, Brodhead, Lange, Trask, Burness, Moneta, Dzau, Haltom, Dawkins, Graves, Dean, Humphries, Cooper, Garber, Schwab, Fleming, Best, Arico, and Manly "all directed conduct that directly and proximately caused the deprivation of Plaintiffs' constitutional rights." (Second Am. Compl. ¶ 1062). As to the City, Plaintiffs allege that Baker was a City official with final policymaking authority as to the Police Department and his directives "created the unreasonably high likelihood that Plaintiffs' constitutional rights would be violated." (Second Am. Compl. ¶ 1063). In addition, throughout the claims alleged, Plaintiffs contend that various intermediate officials were "final policymaking officials" whose conduct or decisions violated Plaintiffs' constitutional rights.

Finally, Plaintiffs contend that Monell liability should attach to both Duke and the City

because "Duke and City officials with final policymaking authority with respect to the investigation delegated some or all of their policymaking authority but failed to exercise adequate supervising responsibility over the delegate's exercise of said final policymaking authority." In this regard, Plaintiffs allege that Duke and Durham officials were aware of issues regarding Gottlieb[46] but still assigned him to supervise Mangum's allegations, in deliberate indifference to the likelihood that their decision would result in a violation of Plaintiffs' constitutional rights. Plaintiffs also allege that Durham and Duke officials delegated their authority to Nifong, Gottlieb, Himan, Michael, and Addison to conduct the investigation, and that Duke Police delegated their "primary jurisdiction" to those individuals who violated Plaintiffs' constitutional rights. Plaintiffs allege that Durham officials ratified those violations, including approving the abuse of the NTO process and warrant process and approving the use of fabricated affidavits. Plaintiffs also allege that Duke and Durham officials agreed to allow Nifong to control the

---

[46] Plaintiffs allege that Gottlieb was "a known rogue officer with a proclivity for abusing Duke students." (Second Am. Compl. ¶ 171-172). Plaintiffs allege that based on arrest records and student accounts, "Gottlieb habitually arrested Duke students in circumstances that a 'permanent resident' would not be arrested" and "Gottlieb's interactions with Duke students invariably involved violations of the student's constitutional rights." (Second Am. Compl. ¶ 173-174). Plaintiffs further contend that "[i]n court, Gottlieb would regularly fabricate his testimony to close holes in the State's case" or would "fabricate his account . . . solely to disparage the student-defendant." (Second Am. Compl. ¶ 175). Plaintiffs therefore contend that Gottlieb's continued assignment to areas involving Duke Students "would almost certainly lead to continued and more severe violations of the constitutional rights of the Duke students he would encounter." (Second Am. Compl. ¶ 174). Plaintiffs allege that Gottlieb's supervisors knew of the details of Gottlieb's abusive tactics and disproportionate arrest record, but ratified Gottlieb's behavior. (Second Am. Compl. ¶ 180-183). Plaintiffs allege that this information regarding Gottlieb was collected by Duke officials and was reviewed on February 6, 2006, by Duke Defendants Burness and Trask, who shared the information about Gottlieb with Durham policymaking officials. (Second Am. Compl. ¶ 177). Shortly thereafter, Chief Chalmers transferred Gottlieb to a "desk job, as an on-call supervisor of property crimes investigations," but did not move him to a different district. (Second Am. Compl. ¶ 178).

investigation and agreed to direct Duke Police to abandon its "jurisdictional responsibility" to investigate the claims, even though it was "plainly obvious" this would lead to a violation of Plaintiffs' constitutional rights, and then "ratified and condoned" Nifong's conduct and failed to take corrective action.  In addition as to Nifong, Plaintiffs also bring many of their claims against the City based on the assertion that Nifong was acting in his "official capacity" with respect to the City, and that from March 24, 2006, through January 12, 2007, "by virtue of delegated final policymaking authority from the City of Durham, Nifong was acting as a City of Durham supervisory official with final policymaking authority with respect to the investigation of Mangum's false accusations." (Second Am. Compl. ¶ 49).  Plaintiffs further allege that Wilson, Nifong's investigator, shared that final policymaking authority delegated from City officials. (Second Am. Compl. ¶ 64).

Although "[t]he substantive requirements for proof of municipal liability are stringent," § 1983 claims are not subject to any heightened pleading standard, and "primary reliance must be placed on discovery controls and summary judgment to ferret out before trial unmeritorious suits against municipalities."  Jordan v. Jackson, 15 F.3d 333, 338-40 (4th Cir. 1994).  Thus, where a complaint alleges the existence of municipal policies, alleges that officials with final policymaking authority condoned and ratified unconstitutional conduct of subordinates, and alleges that the policies proximately caused the alleged constitutional violation, the allegations are sufficient at the motion to dismiss stage, although the "required showings are appreciably more demanding" at summary judgment.  Jordan, 15 F.3d at 340.

Having considered Plaintiffs' contentions in the present case with respect to the City, the

Court concludes that Plaintiffs have sufficiently stated a claim for <u>Monell</u> liability against the City at this stage in the case. Specifically, the Court concludes that Plaintiffs have alleged that enforcement of the "Zero-Tolerance" policy led to multiple constitutional violations against Duke Students, particularly by Gottlieb, and that the City through its final policymaking officials nevertheless continued the policy and ratified and condoned those violations. Plaintiffs have stated a plausible claim that this condoning of constitutional violations in the enforcement of the policy led to the constitutional violations alleged by Plaintiffs in the present case.[47] Whether evidence exists to support this contention is not a question before the Court on the present motions. Of course, at later stages in the case, Plaintiffs will be required to present evidence to support these contentions, including evidence to establish the existence of an official policy or custom, and proof that the policy was the cause of the constitutional violation alleged here. <u>See</u> <u>Jordan</u>, 15 F.3d at 339-40. However, given the preliminary stage of this case, the Court concludes that those issues are more appropriately resolved at summary judgment, since resolution of this issue will require consideration of facts and proof beyond the allegations in the

_____

[47] In addition to the "Zero-Tolerance Policy," Plaintiffs allege that Durham had "an established policy or custom of expediting criminal investigations by subjecting the accused to extortionate public condemnation and outrage through inflammatory, incendiary and stigmatizing messages transmitted through multiple mass communications devices, including but not limited to broadcast emails, wide dissemination of posters, and other media." (Second Am. Compl. ¶ 1046). Plaintiffs allege that City officials created and/or condoned this policy by continuing to retain and promote Addison, and by engaging in this conduct themselves as to Graves and Hodge. However, the Court does not reach the issue of whether these allegations are sufficient to state a <u>Monell</u> claim based on this policy, since the Court has already determined that Plaintiffs have alleged a sufficient policy to support a <u>Monell</u> claim at this stage in the case, as discussed above. Any further consideration of this issue is therefore reserved for summary judgment determination. Similarly, to the extent that Plaintiffs contend that the City had a policy of failing to act to intervene in ongoing constitutional violations, the Court does not rely on that alleged policy, but those contentions may be considered at summary judgment.

Second Amended Complaint.

However, with respect to Plaintiffs' contention that <u>Monell</u> liability should attach based on "delegation" to Nifong, or based on Nifong's alleged status as a "final policymaker" for the City, the Court notes that "[w]hether a particular official has 'final policymaking authority' is a question of state law," and is "dependent on the definition of the official's functions under relevant state law." <u>McMillian v. Monroe County</u>, 520 U.S. 781, 786, 117 S. Ct. 1734, 1737, 138 L. Ed. 2d 1 (1997) (internal citation omitted). "A municipal agency or official may have final policymaking authority by direct delegation from the municipal lawmaking body, or by conferral from higher authority" such as state law. <u>Spell v. McDaniel</u>, 824 F.2d 1380, 1387 (4th Cir. 1987) (internal citations omitted); <u>see also</u> <u>Pembaur v. City of Cincinnati</u>, 475 U.S. 469, 481-85, 106 S. Ct. 1292, 1299-1301, 89 L. Ed. 2d 452 (1986) (holding that a County Prosecutor may be a final policymaking official for the County where County officials delegated authority to the Prosecutor and state law authorized the County Prosecutor to establish county policy in appropriate circumstances). "Delegation may be express, as by a formal job-description, or implied from a continued course of knowing acquiescence by the governing body in the exercise of policymaking authority by an agency or official." <u>Spell</u>, 824 F.2d at 1387 (internal citations omitted); <u>see also</u> <u>Praprotnik</u>, 485 U.S. at 130, 108 S. Ct. at 927. ("[G]oing along with discretionary decisions made by one's subordinates . . . is not a delegation to them of the authority to make policy.") In addition, in determining whether an official has final policymaking authority in an area, "[t]he most critical factor is not the practical finality of an official's 'acts and edicts,' but their 'policy' nature." <u>Spell</u>, 824 F.2d at 1386 (noting that

policymaking authority is "authority to set and implement general goals and programs of municipal government, as opposed to discretionary authority in purely operational aspects of government).

Under North Carolina law, the District Attorneys are state actors who act on behalf of the State of North Carolina and answer to the State Attorney General. N.C. Const. art. IV, § 18(1); N.C. Gen. Stat. § 7A-61, 69; see also Nivens v. Gilchrist, 444 F.3d 237, 249 (4th Cir. 2006) (holding that a suit against a District Attorney in his "official capacity" in North Carolina is a suit against the State as is therefore subject to Eleventh Amendment immunity). Although the Second Amended Complaint alleges that the City delegated authority to Defendant Nifong to direct the investigation, the Court concludes that delegation of authority to supervise a particular investigation is not equal to delegation of authority to set City law enforcement policy. Moreover, there is no state law that would allow a city to delegate its policymaking authority to a state prosecutor, and only the state legislature has authority to prescribe duties for District Attorneys or supervise the District Attorney's exercise of authority. See N.C. Const. art. IV, § 18(1) ("The District Attorney shall advise the officers of justice in his district, be responsible for the prosecution on behalf of the State of all criminal actions in the Superior Courts of his district, perform such duties related to appeals therefrom as the Attorney General may require, and perform such other duties as the General Assembly may prescribe."); State v. Smith, 359 N.C. 199, 225, 607 S.E.2d 607, 625 (2005) (Brady, J., concurring); Simeon v. Hardin, 339 N.C. 358, 373, 451 S.E.2d 858, 868 (1994) ("[T]he district attorney's duties, including the docketing of criminal cases, are derived from statutes promulgated by the General Assembly pursuant to

117

authority granted in Article IV, Section 18 of the North Carolina Constitution."). Therefore, the Court concludes that the City could not have delegated its policymaking authority to Nifong, and the claims against Nifong in his "official capacity" are claims against the State, not the City.[48] In light of this conclusion, the City cannot be liable under § 1983 for "official capacity" claims against Defendant Nifong or for alleged conduct by Nifong as a "policymaker." However, the City is still responsible for its own policies that result in constitutional violations by City employees, even if the City employees were acting in coordination with or at the direction of Nifong. As noted above, Plaintiffs have alleged that the constitutional injuries alleged in Counts 1, 2, and 5 were committed by City police officers, were approved or ratified by City officials with final policymaking authority for the City, and were the result of City policies adopted by those City officials. Therefore, although the Court rejects the legal contention that Nifong had final policymaking authority for the City or that the City delegated its policymaking authority to Nifong, the Court has nevertheless concluded that the Plaintiffs have stated a claim against the City pursuant to Monell, and any further consideration or determination of whether liability can be established will be before the Court at summary judgment.[49] The Court notes, however, that a "Monell" claim is not in and of itself a § 1983 claim, and is instead simply the basis for holding

[48] The Court notes that Plaintiffs have not attempted to name the State as a party in this case or otherwise bring this suit against the State, since under the Eleventh Amendment, the State is immune from suits brought in federal court, and the State would not be a "person" subject to suit under § 1983. See Will v. Michigan Dep't of State Police, 491 U.S. 58, 71, 109 S. Ct. 2304, 2312, 105 L. Ed.2d 45 (1989) ("We hold that neither a State nor its officials acting in their official capacities are 'persons' under § 1983.").

[49] The Court notes that Plaintiffs have not alleged that DSI or its employees had "final policymaking authority" for the City. As discussed above, the City can only be liable for its own policies, including decisions made by those with final policymaking authority for the City.

118

the City liable for the underlying constitutional violations.  Therefore, the Court's conclusion as to this <u>Monell</u> claim against the City simply means that the City is properly included as a Defendant on Counts 1, 2, and 5.

However, with respect to the <u>Monell</u> claims asserted against Duke, the Court notes again, as discussed above, that Duke is a private party, and § 1983 claims are not intended to become a basis for private tort claims.  Instead, § 1983 claims arise where the government acts to deprive a citizen of his or her rights under the Constitution or laws of the United States.  As discussed above, "[t]he under-color-of-state-law element of § 1983 excludes from its reach 'merely private conduct, no matter how discriminatory or wrongful.'" <u>American Mfrs. Mut. Ins. Co. v. Sullivan</u>, 526 U.S. 40, 50, 119 S. Ct. 977, 985, 143 L. Ed. 2d 130 (1999) (internal citations omitted). "Misuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law, is action taken 'under color of' state law." <u>United States v. Classic</u>, 313 U.S. 299, 326, 61 S. Ct. 1031, 1043, 85 L. Ed. 1368 (1941).  Thus "the party charged with the deprivation must be a person who may fairly be said to be a state actor . . . because he is a state official, because he has acted together with or has obtained significant aid from state officials, or because his conduct is otherwise chargeable to the State." <u>Lugar v. Edmondson Oil Co.</u>, 457 U.S. 922, 937, 102 S. Ct. 2744, 2754, 73 L. Ed. 2d 482 (1982). "Under th[e state-action or color-of-law] doctrine, we 'insist []' as a prerequisite to liability 'that the conduct allegedly causing the deprivation of a federal right be fairly attributable to the State.' By doing so, we maintain the Bill of Rights as a shield that protects private citizens from the excesses of government, rather than a sword that they may use to impose liability upon one

another." Phillips v. Pitt County Mem. Hosp., 572 F.3d 176, 181 (4th Cir. 2009) (quoting Holly

v. Scott, 434 F.3d 287, 291, 292 (4th Cir. 2006) ("Statutory and common law, rather than the

Constitution, traditionally govern relationships between private parties.")). Thus, liability under

§ 1983 may be imposed for private action only if "the private action 'may be fairly treated as that

of the State itself.'" DeBauche v. Trani, 191 F.3d 499, 507 (4th Cir. 1999) (citation omitted);

Jackson v. Pantazes, 810 F.2d 426, 429 (4th Cir. 1987). Therefore, Duke is only liable if it was

acting "under color of state law" and if its actions can be treated as actions of the State itself.

Plaintiffs' § 1983 claims against Duke are based on three primary contentions. First, Plaintiffs

contend that Duke conspired and joined with the City in adopting the "Zero-Tolerance" policy,

and that Duke is therefore responsible for the subsequent constitutional violations. However,

on this claim, the Court finds that even if Duke, as a private university, met with Durham Police

regarding this policy, and even agreed to such a policy, that is not sufficient to transform Duke

into a government actor, or to treat Duke's actions as the actions of the "state itself," or to hold

Duke responsible for constitutional violations committed Durham Police officers. Second,

Plaintiffs also contend that Duke adopted a policy (which Plaintiffs refer to as the "Chairman's

Directive") that it would be best for Duke if Plaintiffs or their teammates were tried and

convicted. However, the Court likewise concludes that these contentions fail to state a plausible

claim that this alleged directive converted Duke into a state actor or caused the alleged

constitutional violations in Counts 1, 2, and 5. Third, to the extent Plaintiffs point to "Joint

Command" meetings between Duke and Durham officials, the Second Amended Complaint

does not sufficiently allege how those meetings made Duke a state actor responsible for the

alleged constitutional violations in Counts 1, 2, and 5. The Court has considered Plaintiffs' contentions and concludes that these contentions fail to state a plausible claim that Duke was a "state actor" responsible for constitutional violations by Durham Police officers. Cf. Rodriguez v. Smithfield Packing Co., 338 F.3d 348, 356 (4th Cir. 2003). The Court simply cannot extend § 1983 liability, which is meant to be a limit on government action taken "under color of state law," to create federal liability between private parties as Plaintiffs are attempting to do here.

In addition, throughout the Second Amended Complaint, Plaintiffs contend that Duke is responsible for "delegating" authority to the City and to Nifong to conduct the investigation. However, the City and Nifong each had their own statutory authority to conduct the investigation as they chose. In support of their contention, Plaintiffs rely on the "Jurisdictional Agreement" between the Duke Police and Durham Police. Pursuant to this Agreement, Plaintiffs allege that Duke Police had "primary jurisdiction" over the residence at 610 N. Buchanan, and that Duke became responsible for constitutional violations by the City and Nifong because Duke "delegated" its "jurisdiction" to Nifong and the City. However, as discussed above, under state law, Duke could not have delegated "authority" to Nifong, and Nifong could not have been acting in an "official capacity" on behalf of the City or Duke. In addition, the Court concludes that there is no plausible claim that Duke delegated police powers or investigative responsibility to the City. In this regard, as a matter of state law, the Durham Police had complete statutory authority under North Carolina law, on campus and off. See N.C. Gen. Stat. § 15A-402; § 160A-286. The Jurisdictional Agreement between the Durham Police and Duke Police could not reduce the Durham Police Department's statutory authority, nor

could it give the Duke Police any authority over the Durham Police, even on campus or in other areas around campus, regardless of whether the Duke Police had "primary jurisdiction" of an area under the Agreement.  To the extent that Plaintiffs allege that the Duke Police had authority over the Durham Police or delegated authority to the Durham Police, the Court finds that these are legal conclusions that are inconsistent with North Carolina law and that the Court is not bound to accept.  Cf. Rodriguez, 338 F.3d at 356 (concluding that a private party could not have delegated authority to arrest because the company had no authority over county law enforcement policies that it could have delegated).

In addition, although Plaintiffs do not assert a claim directly against Duke Health in Count 12, Plaintiffs allege elsewhere in the Second Amended Complaint that the "Chairman's Directive" was the moving force behind Levicy's conduct or that Dzau, as a policymaker for Duke and Duke Health, ratified and condoned their participation in these unconstitutional acts (Second Am. Compl. ¶ 996).  However, although the Court has concluded that there are sufficient allegations to support at least a plausible claim that Levicy herself jointly participated with Nifong, Gottlieb, and Himan in the constitutional violations alleged as to Counts 1, 2, and 5, that does not transform her supervisors or her employer into state actors.  The allegations against Duke are not sufficient to state a plausible claim that Duke Health was acting as the Government.  Therefore, the Court concludes that Plaintiffs have failed to allege a plausible claim that either Duke or Duke Health was a "state actor" or was acting "under color of state law" so as to impose § 1983 liability on a private university.

Therefore the Motions to Dismiss as to Count 12 will be granted as to Duke but will

denied as to the City, such that the City is properly included as a Defendant in Counts 1, 2, and 5.[50]

**Count 13:     Supervisory Liability for Violations of 42 U.S.C. § 1983, asserted against Brodhead, Trask, Dawkins, Graves, Dean, Humphries, Cooper, Garber, Schwab, Fleming, Best, Steel, Lange, Burness, Moneta, Dzau, Haltom, Wasiolek, Bryan, Drummond, Baker, Chalmers, Hodge, Russ, Mihaich, Council, Lamb, Ripberger, Evans, Soukup, Duke, and the City[51]**

In Count 13, Plaintiffs assert claims under 42 U.S.C. § 1983 for "supervisory liability." As the basis for this claim, Plaintiffs allege that the named Defendants are liable on four bases. First, Plaintiffs allege that the Duke and Durham Supervisors named as Defendants in this Count are liable under § 1983 for failing to "control and supervise" the investigation after Duke Police ceded authority to Gottlieb and told their officers to report to him, and after Durham Police and Duke Police allowed Nifong to control the investigation and directed their officers to report to him. Second, Plaintiffs allege that the named Defendants are liable under § 1983 for failing to "control and supervise Gottlieb" and for recklessly transferring the investigation to Gottlieb. Third, Plaintiffs allege that the named Defendants are liable under § 1983 because they failed to educate and train Addison and because Durham Police Supervisors failed to take "prompt and meaningful preventative or remedial action" against Addison. Plaintiffs allege that

---

[50] To the extent that Plaintiffs in other claims have attempted to assert this Monell claim against DSI, the Court notes that there is no constitutional claim against DSI or its employees asserted in Counts 1, 2, and 5. Instead, the § 1983 claims against DSI and its employees were based on the allegations in Counts 4, 6, and 7, which the Court has dismissed. Therefore, Plaintiffs have not stated a plausible § 1983 claim against DSI for the constitutional violations alleged in Counts 1, 2, and 5.

[51] The claims are asserted against the individual Defendants in their "individual and official capacities," although any official capacity claim against the City employees would be viewed as a claim against the City itself, which is addressed with respect to Count 12.

the Duke and Durham Supervisors and other Duke officials compounded Addison's abuses by making similar statements that they knew or should have known were false.  <u>Fourth</u>, Plaintiffs allege that the Durham Police Supervisors are liable under § 1983 because Communications Officer Michael had previously engaged in a pattern of publishing false statements and failing to preserve communications evidence, and because the Durham Police Supervisors knew or should have known of alleged constitutional violations by Michael with respect to Plaintiffs, but failed to take meaningful action to correct this conduct.

Supervisory officials may be liable under § 1983 if "(1) . . . the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed 'a pervasive and unreasonable risk' of constitutional injury to citizens like the plaintiff; (2) . . . the supervisor's response to that knowledge was so inadequate as to show 'deliberate indifference to or tacit authorization of the alleged offensive practices[]'; and (3) . . . there was an 'affirmative causal link' between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff."  <u>Shaw v. Stroud</u>, 13 F.3d 791, 799 (4th Cir. 1994).  As discussed above, the Supreme Court in <u>Ashcroft v. Iqbal</u> reiterated that "[b]ecause vicarious liability is inapplicable to <u>Bivens</u> and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's <u>own individual actions,</u> has violated the Constitution."  129 S. Ct. 1937, 1948 (2009) (emphasis added).  In <u>Iqbal</u>, the Supreme Court affirmed that under § 1983, supervisors "may not be held accountable for the misdeeds of their agents" and noted that as such, "the term 'supervisory liability' is a misnomer."  <u>Id.</u> at 1949.  Thus, each government actor "is only liable for his or her own misconduct" which requires the requisite intent for the type of constitutional

violation pled. See id. (holding that where the underlying constitutional violation required a showing of "purpose" to discriminate, "a supervisor's mere knowledge of his subordinate's discriminatory purpose" is not sufficient to establish a constitutional violation by the supervisor). However, in applying this standard, circuit courts have concluded that supervisory liability may still be imposed based on "deliberate indifference" where the underlying constitutional violation itself may be established based on deliberate indifference. See Starr v. Baca, No. 09-55233, 2011 WL 477094, at *4 (9th Cir. 2011); see also, e.g., Smith v. Ray, No. 09-1518, 2011 WL 317166, at *8 (4th Cir. Feb. 2, 2011) (continuing to apply the Shaw v. Stroud "deliberate indifference" standard).

In this case, Plaintiffs assert a claim for "supervisory liability" against Durham officials Baker, Chalmers, Hodge, Russ, Mihaich, Council, Lamb, Ripberger, Evans, and Soukup.[52]  In considering these contentions, the Court notes that the potential constitutional violations at issue in this case are the claims in Counts 1 and 2 for unlawful search and seizure, and the claim in Count 5 for false public statements without due process.  With respect to the claims against the Supervisors, Plaintiffs allege that Baker, Chalmers, Hodge, Russ, Council, Lamb, and Ripberger[53] were final policymaking officials for the Durham Police Department, who were responsible for the policies that led to the alleged constitutional violations in Counts 1, 2, and 5, and that these Supervisors were deliberately indifferent to the likelihood that the policies would result in a

---

[52] The claims against Duke Supervisors Brodhead, Trask, Dawkins, Graves, Dean, Humphries, Cooper, Garber, Schwab, Fleming, Best, Steel, Lange, Burness, Moneta, Dzau, Haltom, Wasiolek, Bryan, and Drummond are considered separately below.

[53] Plaintiffs' allegations as to Defendants Mihaich, Evans, and Soukop are considered separately.

deprivation of Plaintiffs' constitutional rights.[54]  Plaintiffs further allege that  Baker, Chalmers, Hodge, Russ, Council, Lamb, and Ripberger were the supervisors of Himan, Gottlieb, and Addison, and that they knew of Gottlieb's prior unconstitutional conduct toward Duke Students and the risk that Gottlieb would engage in future constitutional violations, including unlawful searches and fabrications of evidence, but that they nevertheless "acquiesced" in Gottlieb's decision to take over the investigation, and recklessly transferred the supervision of the investigation to Gottlieb, in deliberate indifference to "the likelihood that their decision to do so would result in violations of Plaintiffs' constitutional rights."  (Second Am. Compl. ¶ 1072).

Plaintiffs contend that these Supervisors thus caused the alleged constitutional violations by failing to correct Gottlieb's prior misconduct and by allowing him to direct the investigation, including obtaining the NTO and search warrant, with deliberate indifference to the risk that he would violate Plaintiffs' constitutional rights in that process.  Plaintiffs also contend that these Supervisors were directly involved in the investigation and were aware of the conduct of Nifong, Gottlieb, Himan, and Addison during the investigation, but refused efforts to receive Plaintiffs' proffered evidence of innocence and were deliberately indifferent to the ongoing violations of Plaintiffs' constitutional rights by Nifong, Himan, Gottlieb, and Addison.  Finally, Plaintiffs

---

[54] In this case, for the claims alleged in Counts 1 and 2, Plaintiffs must allege that a false statement, essential to the probable cause determination, was included by the affiant in the warrant affidavit *knowingly and intentionally, or with reckless disregard for the truth.*  Thus, the requisite intent to establish a constitutional violation and defeat qualified immunity is actual intent or reckless disregard.  As discussed above, under Iqbal, each government actor "is only liable for his or her own misconduct" which requires the requisite intent for the type of constitutional violation pled.  Therefore, "deliberate indifference," which requires a showing of actual intent or reckless disregard, would be sufficient to establish the requisite intent.  See Starr v. Baca, No. 09-55233, 2011 WL 477094, at *2-4 (9th Cir. 2011).

contend that these Supervisors subsequently "ratified the abuse of the [NTO] Process and the Warrant Process approving the use of fabricated Affidavits to obtain those orders, and permitting the general public to continue to believe that the false statements made in the Affidavits were true for over a year." (Second Am. Compl. ¶ 1081).

Although Plaintiffs' allegations are not direct or concise with respect to these Supervisors, the Court concludes that in light of the evolving law regarding supervisory liability after Iqbal, Plaintiffs have sufficiently alleged conduct by these Supervisors to at least raise a plausible claim at this stage in the case.[55] These Defendants raise the defense of qualified immunity, but as discussed above with respect to Counts 1 and 2, a reasonable police officer would have known that it would violate clearly established constitutional law to deliberately or recklessly present false or misleading evidence to obtain an order and effect a search or seizure without probable cause. In addition, under the Fourth Circuit's decision in Shaw, it was clearly established that an official violated the constitution if, in deliberate indifference to the constitutional rights of citizens, the official knew of his subordinate's constitutional violations and failed to act. Here, Plaintiffs allege that these Supervisors knew of Gottlieb's previous constitutional violations against Duke Students, including fabrication of warrants and searches and seizures without probable cause, and were deliberately indifferent to the rights of citizens by condoning and ratifying that behavior and then assigning him to an investigation involving Plaintiffs and other Duke Students. In addition, Plaintiffs allege that these Supervisors knew of the alleged

---

[55] Moreover, it is apparent that these Supervisors will necessarily be involved in the discovery process in this case in any event, given their direct involvement in the alleged events and the ongoing claims against the City and other City employees.

constitutional violations with respect to the NTO and search warrant, and ratified and approved that conduct, including the alleged fabrication of the affidavit. Therefore, the Court will allow the claims against Durham Supervisors Baker, Chalmers, Hodge, Russ, Council, Lamb, and Ripberger to go forward at this time, but at summary judgment, it will be Plaintiffs' burden to "pinpoint[] the persons in the decisionmaking chain whose deliberate indifference permitted the constitutional abuses to continue unchecked," and the Court will scrutinize evidence regarding each Defendant's direct, individual involvement, and evidence regarding their individual intent, in order to determine whether any of them is potentially liable under § 1983 for their own conduct with respect to the alleged constitutional violations that are proceeding in this case. See Shaw, 13 F.3d at 798.

However, as to Defendant Evans, Plaintiffs allege that Evans was a Sergeant with the Durham Police Department who became Himan's supervisor in October 2006, but there is no basis on which to state a claim against Evans for liability for the alleged constitutional violations in Counts 1, 2, and 5, which are alleged to have occurred in March and April of 2006, months before Evans became a supervisor. In addition, as to Defendant Mihaich, Plaintiffs concede that Mihaich was not a direct supervisor of anyone who engaged in alleged constitutional violations. Plaintiffs nevertheless contend that Mihaich should have maintained responsibility for the investigation, but this is an insufficient basis on which to state a claim for supervisory liability against Mihaich. Finally, Plaintiffs allege that Soukup was the Director of the Durham Communications Center and allegedly delegated his authority to Addison and Michael with respect to records and recordings of the investigation, but that is also an insufficient basis on

which to allege liability for the constitutional violations alleged in Counts 1, 2, and 5. Therefore, the supervisory liability claims against Evans, Mihaich, and Soukup will be dismissed.

To the extent that this claim is brought against Duke employees and officials (Brodhead, Trask, Dawkins, Graves, Dean, Humphries, Cooper, Garber, Schwab, Fleming, Best, Steel, Lange, Burness, Moneta, Dzau, Haltom, Wasiolek, Bryan, and Drummond), Plaintiffs contend that the Duke employees and officials are liable for failing to "control and supervise" the investigation after ceding authority to Gottlieb and Nifong, and for failing to "control and supervise Gottlieb," when they "knew or should have known" of alleged past and present constitutional violations. However, on this point, the Court has already determined as a matter of state law that Duke did not have any authority to control or supervise or prevent any investigation or conduct by Durham Police or Nifong. Moreover, the allegation that these officials "knew or should have known" of constitutional violations and failed to intervene is insufficient to state a claim for supervisory liability under Iqbal. To the extent that Plaintiffs allege that the Duke employees and officials "compounded" alleged constitutional violations by Addison, the Court finds that no Duke employees or officials had supervisory authority over Addison, and these allegations do not state a claim for "supervisory liability." In addition, as discussed at length above, the named Duke officials were not "state actors" and were not acting "under color of state law." Therefore, the Court concludes that Plaintiffs have failed to state a claim against any of the Duke officials, and Count 13 will be dismissed as to Brodhead, Trask, Dawkins, Graves, Dean, Humphries, Cooper, Garber, Schwab, Fleming, Best, Steel, Lange, Burness, Moneta, Dzau, Haltom, Wasiolek, Bryan, Drummond, and Duke.

Finally, to the extent that this claim is asserted against the City, there is no basis to hold the City liable for "supervisory liability," and instead any claim against the City is governed by Monell and is considered in Counts 12 and 14.

Based on these determinations, the claim for supervisory liability alleged in Count 13 will be dismissed as to Brodhead, Trask, Dawkins, Graves, Dean, Humphries, Cooper, Garber, Schwab, Fleming, Best, Steel, Lange, Burness, Moneta, Dzau, Haltom, Wasiolek, Bryan, Drummond, Duke, Evans, Mihaich, Soukup, and the City. However, this claim will go forward at this stage as to Defendants Baker, Chalmers, Hodge, Russ, Council, Lamb, and Ripberger.

**Count 14:     Failure to Train in Violation of 42 U.S.C. § 1983, asserted against the City, Duke, and DSI**

In Count 14, Plaintiffs assert a claim under 42 U.S.C. § 1983 for "failure to train." As the basis for this claim, Plaintiffs allege that "the City's training of Nifong, Gottlieb, Himan, and Clayton was obviously deficient" with respect to obtaining evidence, photo identification procedures, forensic science, discovery rules, use of the media, maintenance of case notes, role of a SANE, disproportionate enforcement of criminal laws, use of legal process, use of NTO process, proper division of responsibilities in investigations, and duty to act to prevent constitutional violations. (Second Am. Compl. ¶ 1142). Plaintiffs allege that this failure to train led to the violation of Plaintiffs' constitutional rights and that the City was deliberately indifferent to the need for additional training.

As discussed with respect to Count 12, municipal liability has been recognized based on inadequate training or supervision of employees if the training or supervision was so inadequate as to establish "deliberate indifference" to the rights of citizens and if the deficiency caused the

constitutional violation alleged.  See City of Canton v. Harris, 489 U.S. 378, 390-92, 109 S. Ct. 1197, 1206, 103 L. Ed. 2d 412 (1989); see also Carter v. Morris, 164 F.3d 215, 218-19 (4th Cir. 1999).  In this case, the Court has already determined that Plaintiffs have stated a potential claim against the City for the underlying constitutional violations alleged in Counts 1, 2, and 5.  The allegations in Count 14 are simply another basis for asserting the same claim.  Therefore, the Court will allow the claim against the City in Count 14 to proceed, but only as a basis for asserting claims against the City based on the constitutional violations in Counts 1, 2, and 5.

The Court notes that although this claim is also asserted against Duke and DSI, there are no allegations as to Duke or DSI setting out the basis for the claim.  Moreover, the Court has already concluded, as discussed in Count 12, that Duke is a private entity and was not acting "under color of state law" under the facts alleged.  In addition, there is no basis for a claim against DSI since the underlying constitutional violations asserted against DSI in Counts 4, 6, and 7 have been dismissed.  Therefore, this claim will be dismissed as to Defendants Duke and DSI, but will proceed against the City as a basis for asserting claims against the City based on the constitutional violations in Counts 1, 2, and 5.

**Count 15:** **Conspiracy in Violation of 42 U.S.C. § 1983, asserted against Nifong, Wilson, DSI, Clark, Meehan, Duke, Steel, Brodhead, Lange, Trask, Burness, Moneta, Dzau, Haltom, Dawkins, Wasiolek, Bryan, Drummond, Duke Health, Private Diagnostic, Manly, Arico, Levicy, Duke Police, Graves, Dean, Humphries, Cooper, Garber, Schwab, Fleming, Best, Smith, Stotsenberg, the City, Baker, Chalmers, Hodge, Russ, Mihaich, Council, Lamb, Ripberger, Evans, Soukup, Michael, Addison, Gottlieb, Himan, and Clayton**[56]

[56] This claim is brought against Nifong in his individual capacity and in his "official capacity with respect to the Durham Police and the City of Durham."  However, as discussed in Count 12, Defendant Nifong does not have an official capacity with respect to the Durham

In Count 15, Plaintiffs bring a claim under 42 U.S.C. § 1983 for "Conspiracy." As the basis for this claim, Plaintiffs allege that the named Defendants "conspired and entered into express and/or implied agreements, understandings, or meetings of the minds among themselves and others to deprive Plaintiffs of their constitutional rights by retaliating against Plaintiffs for exercising their First and Fifth Amendment rights, publicly excoriating their character and that of their teammates, falsely claiming [that] they and their teammates had history of deplorable conduct, and by charging and prosecuting the three innocent Duke lacrosse players on charges of rape, sexual assault, and kidnapping, which these Defendants knew were not supported by probable cause." (Second Am. Compl. ¶ 1149). Plaintiffs allege that "these Defendants" engaged in multiple "overt acts," including the previously-asserted constitutional violations. Plaintiffs allege that this conduct "evinces a malicious and corrupt intent to harm the Plaintiffs" and "shocks the contemporary conscience." (Second Am. Compl. ¶ 1153).

"To establish a civil conspiracy under § 1983," Plaintiffs must allege that the Defendants "acted jointly in concert and that some overt act was done in furtherance of the conspiracy which resulted in [Plaintiffs] deprivation of a constitutional right." Hinkle v. City of Clarksburg, 81 F.3d 416, 421 (4th Cir. 1996). To establish such a claim, Plaintiffs must ultimately prove that "each member of the alleged conspiracy shared the same conspiratorial objective," that is, that Defendants "positively or tacitly came to a mutual understanding to try to accomplish a common and unlawful plan." Id. In this case, based on the potential constitutional violations actually stated here, the allegation of an unlawful plan must have related to the unlawful seizure

Police or the City of Durham.

of Plaintiffs without probable cause using false and misleading evidence, and the release of false, defamatory statements in connection with that unlawful seizure.

With respect to Defendants Nifong, Gottlieb, Himan, Levicy, Wilson, Addison, and Hodge, the Court has already discussed the substance of the alleged violations by those Defendants as set out in Counts 1, 2, and 5, including allegations of conspiracy, and there is no basis to assert an additional, separate claim against those particular Defendants in Count 15. With respect to the remaining Defendants, however, the claims asserted here in Count 15 are "group" claims asserting liability against 50 Defendants for their alleged participation in a vast conspiracy, without specifying which Defendants committed or conspired to commit which alleged constitutional violations. In their Response Briefs, Plaintiffs tie this alleged conspiracy claim to the constitutional violations alleged in Counts 6 and 7, which have been dismissed. In addition, Plaintiffs identify the conspiracy as a "conspiracy to convict." However, as discussed above, other than the substance of the claims asserted in Counts 1, 2, and 5, Plaintiffs' allegations do not state a claim for constitutional violations. Plaintiffs contend that they have sufficiently stated a claim against all 50 Defendants for conspiring together. However, the Court concludes that these general, conclusory allegations are not a sufficient basis to state a § 1983 claim against all 50 Defendants. Therefore, the general "conspiracy" claim asserted in Count 15 will be dismissed.

**Count 16:** **Conspiracy in Violation of 42 U.S.C. § 1985, asserted against Nifong, Gottlieb, Himan, Wilson, Addison, Michael, Baker, Chalmers, Hodge, Russ, Mihaich, Council, Lamb, Ripberger, Evans, Soukup, Steel, Brodhead, Lange, Trask, Burness, Moneta, Dzau, Haltom, Dawkins, Graves, Dean, Humphries, Cooper, Garber, Schwab, Fleming, Best, Duke, Duke Health, Private Diagnostic, Manly, Arico, Levicy, Meehan, Clark,**

**DSI, and the City**[57]

In Count 16, Plaintiffs bring a claim under 42 U.S.C. § 1985 for "Conspiracy" asserting four different bases for this count. First, pursuant to 42 U.S.C. § 1985(2), Plaintiffs allege that the named Defendants entered into agreements for the purpose of obstructing justice in the State of North Carolina, with the intent to deny Plaintiffs the equal protection of the law. As part of this contention, Plaintiffs assert that one or more of the Defendants engaged in overt acts that were motivated by invidious racial animus or were intended to incite racial animus or take advantage of invidious racial animus in the community. (Second Am. Compl. ¶ 1159). In addition, Plaintiffs assert that one or more of the Defendants engaged in overt acts that were motivated by or that were intended to take advantage of invidious animus based on "Plaintiffs' state citizenship - real or perceived - as being citizens of other states only temporarily residing in Durham." (Second Am. Compl. ¶ 1160). Second, Plaintiffs allege that the named Defendants[58] entered into agreements among themselves to elicit false statements from Plaintiffs and other witnesses by force, intimidation, and threats. (Second Am. Compl. ¶ 1161). Third, Plaintiffs allege that the named Defendants[59] entered into agreements among themselves for the

---

[57] This claim is brought against Nifong in his individual capacity and in his "official capacity with respect to the Durham Police and Duke Police." However, as discussed in Count 12, Defendant Nifong does not have an official capacity with respect to the Durham Police or Duke Police.

[58] In this allegation, Plaintiffs do not include Michael, Duke, Duke Health, Private Diagnostic, Manly, Arico, Levicy, Meehan, Clark, or DSI. Plaintiffs do include a factual assertion against Clayton, although he is not named as a Defendant in Count 16 in the Second Amended Complaint.

[59] In this allegation, Plaintiffs do not include Wilson, Meehan, Clark, and DSI. Plaintiffs do include a factual assertion against Clayton, although he is not named as a Defendant in Count

purpose of depriving Plaintiffs of the equal protection of the laws. Also as part of this contention, Plaintiffs assert that one or more of the Defendants engaged in overt acts that were motivated by invidious racial animus or were intended to incite racial animus or take advantage of invidious racial animus in the community, and that one or more Defendants engaged in overt acts that were motivated by or that were intended to take advantage of invidious animus based on "Plaintiffs' state citizenship - real or perceived - as being citizens of other states only temporarily residing in Durham." (Second Am. Compl. ¶ 1162-1165). Fourth, Plaintiffs allege that Steel, Brodhead, Lange, Trask, Burness, Moneta, Dzau, Haltom, Dawkins, Graves, Dean, Humphries, Cooper, Garber, Schwab, Fleming, Best, and Duke entered into an agreement among themselves to hinder or prevent the Duke Police and Durham Police from giving or securing to Plaintiffs the equal protection of the laws. (Second Am. Compl. ¶ 1166-1167).

Plaintiffs' contentions are based on the second clause of 42 U.S.C. § 1985(2), which prohibits conspiracies to obstruct justice in state court proceedings "with intent to deny any citizen the equal protection of the laws," and on a similar provision in 42 U.S.C. § 1985(3), which prohibits conspiracies to deprive, "either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws." 42 U.S.C. § 1985(2) & (3); Kush v. Rutledge, 460 U.S. 719, 724-27, 103 S. Ct. 1483, 1486-88, 75 L. Ed. 2d 413 (1983). With respect to both of these claims, "'[t]he language requiring intent to deprive of equal protection, or equal privileges and immunities, means that there must be some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the

16 in the Second Amended Complaint.

conspirators' action.'" Kush, 460 U.S. at 726, 103 S. Ct. at 1487 (quoting Griffin v. Breckenridge, 403 U.S. 88, 102, 91 S. Ct. 1790, 1798, 29 L. Ed. 2d 338 (1971)). The Supreme Court has interpreted these provisions of § 1985 narrowly, and has held that plaintiffs must establish as an element of the cause of action that the conspirators were motivated by a purpose to discriminate against a recognized class of persons. Bray v. Alexandria Women's Health Clinic, 506 U.S. 263, 268-72, 113 S. Ct. 753, 758-60, 122 L. Ed. 2d 34 (1993). This "discriminatory purpose" for purposes of § 1985, "implies more than intent as volition or intent as awareness of consequences. It implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." Id. at 271-72, 113 S. Ct. at 760 (citation omitted). This discriminatory intent must be shared by all of the conspirators, and "willful blindness" to the discriminatory intent of others is insufficient to establish a claim under § 1985. See Simmons v. Poe, 47 F.3d 1370, 1378 (4th Cir. 1995). Thus, to establish a claim under the provisions of § 1985 at issue in the present case, the Plaintiffs must allege that all of the conspirators were motivated by a purpose to discriminate against a recognized class of persons of which Plaintiffs were members.

Further, with respect to the "recognized classes of persons" protected by § 1985, the Supreme Court has noted that § 1985(3) was adopted in 1871 as part of the Ku Klux Klan Act in order to "combat the prevalent animus" against blacks and their supporters. United Bhd. of Carpenters & Joiners of America v. Scott, 463 U.S. 825, 836, 103 S Ct. 3352, 3360, 77 L. Ed. 2d 1049 (1983). Given this statutory purpose, the Supreme Court has further noted that "it is a close question whether § 1985(3) was intended to reach any class-based animus" other than

animus against blacks and "those who championed their cause." Id.; see also Harrison v. Kvat Food Mgmt., Inc., 766 F.2d 155, 157-61 (4th Cir. 1985) (noting that § 1985(3) was "enacted to fulfill a particular purpose and designed to meet particular conditions," in 1871 to afford "a remedy for the vindication of the civil rights of those being threatened and injured, notably blacks and advocates for their cause" and that "the original objective of the 1871 Civil Rights Act and § 1985(3) was the protection of blacks and their supporters in the South"). Although the Supreme Court has not definitively identified all of the "recognized classes of persons" for purposes of § 1985(3), the Court of Appeals for the Fourth Circuit has noted that "the class protected can extend no further than to those classes of persons who are, so far as the enforcement of their rights is concerned, 'in unprotected circumstances similar to those of the victims of Klan violence.'" Buschi v. Kirven, 775 F.2d 1240, 1258 (4th Cir. 1985) (quoting United Bhd. of Carpenters, 463 U.S. at 851, 103 S. Ct. at 3368); see also Harrison, 766 F.2d at 161 (noting the Supreme Court's "lack of enthusiasm for expanding the coverage of § 1985(3) to any classes other than those expressly provided by the Court"); Phillips v. Mabe, 367 F. Supp. 2d 861, 873 (M.D.N.C. 2005) (noting that "[p]laintiffs have standing under § 1985 only if they can show they are members of a class that the government has determined 'requires and warrants special federal assistance in protecting their civil rights'" (citation omitted)). Thus, the Supreme Court and the Court of Appeals for the Fourth Circuit have narrowly interpreted the "recognized classes of persons" who may bring § 1985 claims, and this Court is bound to follow that interpretation in the present suit.

Applying these standards in the present case, the Court finds that Plaintiffs have not

alleged that they were in a classification entitled to protection under § 1985(2) or § 1985(3). Based on the case law set out above, it is clear that "Duke Students" or "Duke Lacrosse Team Members" are not classes entitled to protection under § 1985. Cf. McGee v. Schoolcraft Cmty. Coll., 167 Fed. Appx. 429, 435-36 (6th Cir. 2006) (finding that a group of individuals seeking an advanced degree is not a class entitled to special protection under § 1985(3)); Lewin v. Cooke, 95 F. Supp. 2d 513, 525-26 (E.D. Va. 2000) (holding that a class of students does not qualify as a class entitled to § 1985(3) protection); Murphy v. Villanova Univ., 520 F. Supp. 560, 561-62 (E.D. Pa. 1981) (same); Crain v. Martinez, No. 93-942-CIV-ORL-22, 1994 WL 391672, at *1 (M.D. Fla. July 12, 1994) (same); Naglak v. Berlin, No. 87-3427, 1988 WL 30920, at *4 (E.D. Pa. March 30, 1988) (same); see also Upah v. Thornton Dev. Auth., 632 F. Supp. 1279, 1281 (D. Colo. 1986) (holding that a class composed of out-of-state residents is not a class within the protection of § 1985(3)); Korotki v. Goughan, 597 F. Supp. 1365, 1374 (D. Md. 1984) (same); Ford v. Green Giant Co., 560 F. Supp. 275, 277-78 (W.D. Wash. 1983) (same).

Plaintiffs contend that they have alleged race discrimination as white plaintiffs. However, the § 1985 claims based on this contention fails for two reasons. First, the Supreme Court and Fourth Circuit have indicated an intent to limit the protections of § 1985 to discrimination against "those classes of persons who are, so far as the enforcement of their rights is concerned, 'in unprotected circumstances similar to those of the victims of Klan violence.'" Buschi, 775 F.2d at 1258 (quoting United Bhd. of Carpenters, 463 U.S. at 851, 103 S. Ct. at 3368)); see also Cloaninger v. McDevitt, No. 106cv135, 2006 WL 2570586 (W.D.N.C. Sept. 3, 2006) ("As recognized by the controlling law in the Fourth Circuit, the only class of persons protected by

Section 1985(3) are African Americans." (citing Harrison, 766 F.2d at 161-62)); Stock v.

Universal Foods Corp., 817 F. Supp. 1300, 1310 (D. Md. 1993) (dismissing § 1985(3) claim

because plaintiff, as a white male, was not a member of a class that has suffered historically

pervasive discrimination); Blackmon v. Perez, 791 F. Supp. 1086, 1093 (E.D. Va. 1992)

(dismissing § 1985(3) claims by white plaintiffs because "plaintiffs do not represent a class of

persons who [do] not enjoy the possibility of [ ]effective state enforcement of their rights"

(internal quotations omitted)).[60]

Second, even if the Fourth Circuit decided to extend § 1985 to additional classes of

persons, including 'white plaintiffs' as a class, Plaintiffs here have not sufficiently alleged facts

in support of such a claim. When a plaintiff attempts to assert a conspiracy claim pursuant to

§ 1985(2) and § 1985(3), the Fourth Circuit has made clear that the purported conspiracy must

be alleged in more than just a "conclusory manner," and must include allegations of "concrete

supporting facts." Simmons, 47 F.3d at 1377. "[C]ourts have thus required that plaintiffs

alleging unlawful intent in conspiracy claims under § 1985(3) or § 1983 plead specific facts in a

nonconclusory fashion to survive a motion to dismiss." Gooden v. Howard County, 954 F.2d

960, 969-70 (4th Cir. 1992); see also Jenkins v. Trs. of Sandhills Cmty. Coll., 259 F. Supp. 2d 432,

---

[60] The Court notes that the decision in Waller v. Butkovich, 605 F. Supp. 1137 (M.D.N.C. 1985), cited by Plaintiffs, did not directly address this question, and in any event was based on reasoning that was subsequently repudiated by the Fourth Circuit in Buschi, 775 F.2d 1240, and Harrison, 766 F.2d 155. In addition, the Court further notes that this Court's previous decision in Phillips v. Mabe did not address the question of whether a § 1985 claim could be based on alleged discrimination against whites as a class; instead, Phillips involved § 1985 claims brought by a white plaintiff who alleged discrimination based on his efforts to protect the interests of black students, and the Court concluded that the plaintiff was not a member of a protected class and did not have standing to assert § 1985 claims there. See Phillips, 367 F. Supp. 2d at 873-74.

445 (M.D.N.C. 2003). In this case, the Court finds that the facts alleged in Plaintiffs' Second Amended Complaint would state a claim only for discrimination against them as "Duke Students." Thus, Plaintiffs do not allege any facts that would support the contention that Defendants intended to discriminate against whites as a class, or intended to injure Plaintiffs or deprive them of their rights because they were white. See Bray, 506 U.S. at 268-72, 113 S. Ct. at 758-60 (holding that plaintiffs must establish as an element of the cause of action that the conspirators were motivated by a purpose to discriminate against a recognized class of persons). Plaintiffs contend that "one or more Defendants" engaged in acts that were "motived by invidious racial animus, intended to incite and then galvanize invidious racial animus against Plaintiffs in the Durham community and/or were intended to take advantage of the invidious racial animus that these Defendants had fomented in the Durham community against Plaintiffs." (Second Am. Compl. ¶ 1159, 1163). However, the allegations in the Second Amended Complaint do not support the contention that Defendants were motivated by a purpose to discriminate against whites. Cf. Jordan v. Alt. Res. Corp., 458 F.3d 332, 345-46 (4th Cir. 2006). In addition, an allegation that "one Defendant" acted with racial animus is insufficient to allege a conspiracy in which all of the conspirators were motivated by a shared intent to discriminate on the basis of race. Cf. Simmons, 47 F.3d at 1378; Martin v. Boyce, No. 1:99CV01072, 2000 WL 1264148, at *7 (M.D.N.C. July 20, 2000) (noting that for claims under § 1985(3), "all of the conspirators must share the same forbidden animus" and "when only one conspirator is motivated by a forbidden purpose, there can be no meeting of the minds, no agreement, to deprive another of the equal protection of the laws based on his race").

In addition, to the extent that Plaintiffs allege that one or more Defendants engaged in overt acts that were motivated by or that were intended to take advantage of invidious animus based on Plaintiffs' state citizenship "real or perceived" as being "citizens of other states only temporarily residing in Durham," the Court concludes that Plaintiffs' factual allegations support the contention, at most, that they were discriminated against as "Duke Students," regardless of where they were from, as discussed in greater detail with respect to Count 10. Therefore, the Court concludes that Plaintiffs have failed to state a claim under § 1985(2) or § 1985(3) because Plaintiffs are not members of a "recognized class of persons" entitled to protection under § 1985 and because even if they were members of a recognized class of persons, they have failed to sufficiently allege racial or other class-based invidiously discriminatory animus as the basis of the alleged conspirators' action.[61]

Finally, the Court notes that as part of Count 16, Plaintiffs have included an allegation that the Defendants entered into agreements among themselves to elicit false statements from Plaintiffs and other witnesses by force, intimidation, and threats. Plaintiffs in their Response Briefs indicate that this claim is brought pursuant to the second clause of 42 U.S.C. § 1985(2), which as discussed above, prohibits conspiracies to obstruct justice in state court proceedings "with intent to deny any citizen the equal protection of the laws." See 42 U.S.C. § 1985(2);

---

[61] The Court notes that to the extent Plaintiffs contend that Defendants violated their constitutional rights, the Court has already recognized the ability of Plaintiffs to pursue those claims pursuant to 42 U.S.C. § 1983, without having to alleging facts to establish membership in a protected class or class-based discrimination by Defendants. However, the sections of § 1985 at issue here are very limited in scope. As such, the claims alleged in this case are simply not within the limited scope of those particular provisions of § 1985, at least as those sections have been interpreted by the Supreme Court and the Fourth Circuit.

<u>Kush</u>, 460 U.S. at 724-27, 103 S. Ct. at 1486-88.  However, Plaintiffs have failed to allege racial or other class-based invidiously discriminatory animus, and cannot state a claim under the second clause of 42 U.S.C. § 1985(2), so this claim is properly dismissed.[62]  Count 16 will therefore be dismissed as to all Defendants.

**Count 17:**   **Failure to Intervene in Violation of 42 U.S.C. § 1986, asserted against Nifong, Steel, Brodhead, Wilson, Lange, Trask, Burness, Moneta, Dzau, Haltom, Duke Police, Dawkins, Graves, Dean, Humphries, Cooper, Garber, Schwab, Fleming, Best, Smith, Stotsenberg, Duke Health, Private Diagnostic, Manly, Arico, Levicy, Clark, Meehan, DSI, Baker, Chalmers, Hodge, Russ, Mihaich, Council, Lamb, Ripberger, Evans, Soukup, Michael, Addison, Gottlieb, Himan, Clayton, the City, and Duke**

In Count 17, Plaintiffs bring a claim under 42 U.S.C. 1986 for "Failure to Intervene." As the basis for this claim, Plaintiffs allege that various Defendants had the power to prevent the wrongs conspired to be committed by themselves and other Defendants in violation of 42 U.S.C. § 1985, but neglected or refused to exercise such power.[63]  Thus, Count 17 is brought

---

[62] Plaintiffs may have been attempting to assert this claim based on the first clause of 42 U.S.C. § 1985(2), which prohibits two of more persons from conspiring to deter a witness from testifying truthfully in federal court.  This provision does not require that the conspirators act with the "intent to deprive their victims of the equal protection of the laws." <u>Kush</u>, 460 U.S. at 724-25, 103 S. Ct. at 1487.  However, this provision relates only to conspiracies to use force, intimidation, or threats to deter a party or a witness from attending federal court or testifying truthfully in a matter pending in federal court, which Plaintiffs have not attempted to allege with respect to Count 16.

[63] Plaintiffs specifically assert that Steel, Brodhead, Lange, Trask, Burness, Moneta, Dzau, Haltom, Duke Police, Dawkins, Graves, Dean, Humphries, Cooper, Garber, Schwab, Fleming, Best, Smith, Stotsenberg, Duke Health, Private Diagnostic, Manly, Arico, Levicy, Baker, Chalmers, Hodge, Russ, Mihaich, Council, Lamb, Ripberger, Evans, Soukup, Michael, Addison, Gottlieb, Himan, Wilson, and Clayton had the power to prevent the wrongs conspired to be committed by Steel, Brodhead, Lange, Trask, Burness, Moneta, Dzau, Haltom, Duke Police, Dawkins, Graves, Dean, Humphries, Cooper, Garber, Schwab, Fleming, Best, Duke Health, Private Diagnostic, Manly, Arico, Levicy, Meehan, Clark, DSI, the City, Baker, Chalmers, Hodge, Russ, Mihaich, Council, Lamb, Ripberger, Evans, Soukup, Michael, Addison, Gottlieb, Himan,

pursuant to 42 U.S.C. § 1986, for failure to prevent the violations of 42 U.S.C. § 1985 alleged in Count 16. However, "[a] cause of action based upon § 1986 is dependent upon the existence of a claim under § 1985." Trerice v. Summons, 755 F.2d 1081, 1085 (4th Cir. 1985). Therefore, when the underlying § 1985 claims are dismissed, the § 1986 claims should also be dismissed. See id. In the present case, because all of the § 1985 claims are being dismissed, the Court concludes that the § 1986 claims asserted in Count 17 should also be dismissed as to all of the Defendants.

**Count 18:**     **Common Law Obstruction of Justice and Conspiracy, asserted against Nifong, Steel, Brodhead, Burness, Gottlieb, Himan, Lamb, Wilson, Meehan, Clark, DSI, Levicy, Manly, Arico, Dzau, Private Diagnostic, Duke**

---

Wilson, and Nifong. (Second Am. Compl. ¶ 1173). Plaintiffs further assert that Steel, Brodhead, Lange, Trask, Burness, Moneta, Dzau, Haltom, Dawkins, Graves, Dean, Humphries, Cooper, Garber, Schwab, Fleming, Best, Duke, Nifong, Wilson, Baker, Chalmers, Hodge, Russ, Mihaich, Council, Lamb, Ripberger, Evans, Soukup, and the City had the power to prevent the wrongs conspired to be committed by Steel, Brodhead, Lange, Trask, Burness, Moneta, Dzau, Haltom, Dawkins, Graves, Dean, Humphries, Cooper, Garber, Schwab, Fleming, Best, the City, Baker, Chalmers, Hodge, Russ, Mihaich, Council, Lamb, Ripberger, Evans, Soukup, Addison, Gottlieb, Himan, Wilson, Clayton, and Nifong (Second Am. Compl. ¶ 1177). Plaintiffs also assert that Steel, Brodhead, Lange, Trask, Burness, Moneta, Dzau, Haltom, Duke Police, Dawkins, Graves, Dean, Humphries, Cooper, Garber, Schwab, Fleming, Best, Smith, Stotsenberg, Duke Health, Private Diagnostic, Manly, Arico, Levicy, Clark, Meehan, DSI, Baker, Chalmers, Hodge, Russ, Mihaich, Council, Lamb, Ripberger, Evans, Soukup, the City and Duke had the power to prevent the wrongs conspired to be committed by Steel, Brodhead, Lange, Trask, Burness, Moneta, Dzau, Haltom, Dawkins, Graves, Dean, Humphries, Cooper, Garber, Schwab, Fleming, Best, Duke Health, Private Diagnostic, Manly, Arico, Levicy, Duke, the City, Baker, Chalmers, Hodge, Russ, Mihaich, Council, Lamb, Ripberger, Evans, Soukup, Michael, Addison, Gottlieb, Himan, Clayton, and Nifong. (Second Am. Compl. ¶ 1181). The Court notes that these paragraphs are indicative of Plaintiffs' inconsistent use of overlapping Defendant-groups, which in conjunction with the sheer number of Defendants who are included in conclusory fashion, adds unnecessary technical complexity without adding anything of substance, and all of these paragraphs are essentially just generic assertions that the Defendants had the power to prevent themselves and the other Defendants from committing the alleged violations.

Health, and Duke[64]

In Count 18, Plaintiffs bring claims for common law obstruction of justice and conspiracy. As the basis for this claim, Plaintiffs allege that Gottlieb, Himan, Wilson, Nifong, Meehan, Clark, and DSI obstructed justice by conspiring to manufacture and by manufacturing false and misleading reports of forensic testing, and that Gottlieb, Himan, Wilson, Nifong, and Steel obstructed justice by conspiring to manufacture and manufacturing false and misleading investigative reports, and that Gottlieb, Himan, Wilson, Nifong, Steel, Dzau, Manly, Arico, Levicy, Duke Health, and Duke obstructed justice by conspiring to manufacture and manufacturing false and misleading forensic medical records and reports. Plaintiffs further allege that Gottlieb, Himan, Wilson, Nifong, Meehan, Clark, and DSI obstructed justice by conspiring to deprive Plaintiffs of copies of exonerating DNA test results, and that Gottlieb, Himan, Wilson, and Nifong conspired to obstruct justice and obstructed justice by intimidating and attempting to intimidate Plaintiffs and other witnesses. Plaintiffs also allege that Nifong, Gottlieb, and Himan obstructed justice by manipulating witness identification procedures and by making false public statements. Plaintiffs further allege that Steel, Brodhead, Dzau, and

---

[64] This claim and other state claims are brought against Nifong in his individual capacity and in his "official capacity with respect to Durham Police." However, as discussed in Count 12, Defendant Nifong does not have an official capacity with respect to the Durham Police, and any official capacity claim against Nifong would be a claim against the State, which Plaintiffs have not asserted here. The claims in Count 18 are asserted against the remaining Defendants "in their individual and official capacities." Under state law, "a suit against a defendant in his individual capacity means that the plaintiff seeks recovery from the defendant directly; a suit against a defendant in his official capacity means that the plaintiff seeks recovery from the entity of which the public servant defendant is an agent." Meyer v. Walls, 347 N.C. 97, 110, 489 S.E.2d 880, 887 (1997). Therefore, although the City is not specifically listed as a Defendant in Count 18, the claims asserted in Count 18 against Gottlieb and Himan in their "official capacity," are treated as claims against the City.

Burness obstructed public justice by making plans to conceal their participation in the conspiracies alleged in the Second Amended Complaint, in order to avoid potential civil liability to Plaintiffs or their teammates.[65]  In addition, Plaintiffs allege that Defendant Lamb obstructed justice.  Although no additional allegations are included against Lamb as part of this Count, Plaintiffs in their briefing refer to earlier allegations that Lamb intimidated witnesses and destroyed recordings.

"Obstruction of justice" is a criminal offense under North Carolina General Statutes § 14-221 through §14-227.  It is also a common law tort in North Carolina.  Under North Carolina common law, "'[i]t is an offense to do any act which prevents, obstructs, impedes or hinders public or legal justice.'"  Jones v. City of Durham, 183 N.C. App. 57, 59, 643 S.E.2d 631, 633 (2007) (quoting Broughton v. McClatchy Newspapers, Inc., 161 N.C. App. 20, 33, 588 S.E.2d 20, 30 (2003)); see also 67 C.J.S. Obstructing Justice § 1 (noting that "obstructing justice" means "impeding or obstructing those who seek justice in a court or those who have duties or powers of administering justice in courts").  This tort would include, for example, claims that "[d]efendants attempted to impede the legal justice system through [a] false affidavit," Jackson v. Blue Dolphin Commc'ns of N.C., L.L.C., 226 F. Supp. 2d 785, 794 (W.D.N.C. 2002), and claims that defendants "conspired to impede [the] investigation of this case by destroying . . . records and by falsifying and fabricating records."  Henry v. Deen, 310 N.C. 75, 86, 310 S.E.2d 326, 333 (1984); see also Reed v. Buckeye Fire Equip., 241 Fed. Appx. 917, 928 (4th Cir. 2007) (collecting cases);  Henry, 310 N.C. at 86, 310 S.E.2d at 333 (recognizing a

---

[65] Plaintiffs also include factual allegations as to Graves, Dean, Best, Clayton, Lange, Moneta, and Wasiolek, but Count 18 is not asserted against those Defendants.

potential claim for obstruction of justice where the plaintiff alleged that the defendant had destroyed and falsified medical records and thus impeded plaintiff's wrongful death claims in that civil suit). The North Carolina Court of Appeals recently held that "any action intentionally undertaken by the defendant for the purpose of obstructing, impeding, or hindering the plaintiff's ability to seek and obtain a legal remedy will suffice to support a claim for common law obstruction of justice." Blackburn v. Carbone, 703 S.E.2d 788, 796 (N.C. Ct. App. 2010) (noting that falsification of evidence could support a finding of liability for common law obstruction of justice).

In the present case, Defendants generally contend that a claim for obstruction of justice may only be raised with respect to conduct in a civil lawsuit, not with respect to conduct surrounding a potential criminal investigation. However, the North Carolina Supreme Court in In re Kivett recognized that an "attempt to prevent the convening of the grand jury would support a charge of common law obstruction of justice." In re Kivett, 309 N.C. 635, 670, 309 S.E.2d 442, 462 (1983); see also State v. Wright, 696 S.E.2d 832, 835 (N.C. Ct. App. 2010) (noting that "common law obstruction of justice extends *beyond interference with criminal proceedings*" (emphasis added)); Henry, 310 N.C. at 87, 310 S.E.2d at 334 (recognizing potential obstruction of justice claim even if alleged conduct occurred while no legal proceedings were pending or actually threatened). Therefore, the Court will not interpret this claim more narrowly than the state courts have done, and will not rule out the possibility that a claim could exist for common law obstruction of justice for creation of false evidence or destruction of evidence for the purpose of impeding the justice system, even if the conduct occurred as part of a criminal

146

investigation.  Moreover, even if the state courts would ultimately require that the alleged obstruction of justice occur in connection with a civil proceeding, Plaintiffs assert that the obstruction of justice alleged in this case included destruction and fabrication of evidence to prevent its use in future lawsuits or to "cover-up" misconduct and hinder Plaintiffs' ability to bring a future claim.  Defendants contend that Plaintiffs have not alleged facts to state a claim that Defendants' alleged conduct actually obstructed, impeded, or hindered any aspect of the claim, but the Court concludes that Plaintiffs have alleged significant misconduct in the creation of false and misleading evidence and destruction or alteration of potential evidence, and further analysis of these issues would require consideration of factual issues more appropriately considered at summary judgment to determine if sufficient evidence is presented in support of the claim.  Therefore, the Court concludes that Plaintiffs have stated a state tort claim for obstruction of justice at this stage.

However, general allegations of a "conspiracy" are not sufficient to impose liability on those not themselves involved in alleged acts of obstruction of justice.  Instead, the factual allegations must support a claim that each Defendant against whom the claim is asserted was involved in the obstruction of justice and shared the intent to obstruct justice.  In the present case, Plaintiffs have alleged direct obstruction of justice by Nifong, Gottlieb, Himan, Wilson, and Lamb, including in the falsification of police reports, forensic medical reports, and DNA reports, and the threatening of witnesses and destruction of evidence.  Plaintiffs have also alleged direct obstruction of justice by Levicy to the extent that Plaintiffs allege that Levicy intentionally altered medical records and reports to obstruct justice.  Similarly, the Court notes

that Plaintiffs have also alleged claims against Meehan and Clark[66] for obstructing justice by

conspiring to manufacture and by manufacturing false and misleading reports of forensic testing.

In addition, Plaintiffs have alleged that Steel and Dzau participated in the creation of false

reports, and that Steel, Brodhead, Dzau, and Burness engaged in obstruction of justice by

attempting to conceal their participation in the alleged conspiracies to avoid liability in future

lawsuits. In support of this allegation, Plaintiffs point to an e-mail among Duke officials

regarding the need to meet to "get their stories straight," with additional instructions to destroy

the e-mail immediately. (Second Am. Compl. ¶1198). While not evidence of obstruction in and

of itself, these allegations at least raise a plausible claim that Defendants acted with intent to

obstruct justice, including intent to obstruct Plaintiffs' ability to obtain a legal remedy. It will

ultimately be Plaintiffs' burden to establish actual obstruction of justice by these Defendants,

but the Court will allow this claim to go forward at this time.

However, the Court further concludes that the allegations against Arico and Manly are

conclusory allegations asserting that they participated in a conspiracy with multiple other

Defendants, without specific factual allegations as to what conduct each of them engaged in as

---

[66] With respect to the state law claims against Clark, Meehan, and DSI, the Court notes that under state law, reports made by an expert witness in preparation for being called as an expert witness in a judicial proceeding are subject to absolute privilege under state law. See Sharp v. Miller, 121 N.C. App. 616, 617, 468 S.E.2d 799, 801 (1996); Williams v. Congdon, 43 N.C. App. 53, 55, 257 S.E.2d 677, 678 (1979). However, Plaintiffs contend that their claims here are based on non-testimonial investigative work by Meehan and Clark that included creation of false and misleading evidence during the investigation, not the creation of an expert report or expert testimony. However, the Court will consider this issue at summary judgment if the evidence establishes that the challenged conduct by Clark or Meehan was as an expert witness in the due course of a judicial proceeding. Similarly, the contentions by Clark, Meehan, and DSI that the report was not fabricated or false are more appropriately considered at summary judgment.

the basis for this claim. (Second Am. Compl. ¶ 913, 1215). The Court concludes that these allegations are insufficient to state a plausible claim that Arico and Manly participated in the alleged obstruction of justice, and the claims against Arico and Manly will therefore be dismissed.[67]

Therefore, the claim for Obstruction of Justice will go forward as to Defendants Levicy, Nifong, Gottlieb, Himan, Wilson, Lamb, Clark, Meehan, Steel, Brodhead, Dzau, and Burness, but will be dismissed as to the remaining designated individual Defendants. In addition, to the extent that these individuals, against whom the claims are going forward, are alleged to have been acting in the course and scope of their employment, the principle of *respondeat superior* would apply to this state tort claim. In this regard, with respect to state torts, "liability of a principal for the torts of his agent may arise in three situations: (1) when the agent's act is expressly authorized by the principal; (2) when the agent's act is committed within the scope of his employment and in furtherance of the principal's business; or (3) when the agent's act is ratified by the principal." Hogan v. Forsyth Country Club Co., 79 N.C. App. 483, 491, 340 S.E.2d 116, 121 (1986). Plaintiffs have alleged *respondeat superior* liability for the employers of the individuals against whom this claim is going forward, and therefore this claim will go forward against Duke as the employer of Steel, Brodhead, Dzau and Burness, against Duke and Duke Health as the employer of Levicy, against DSI as the employer of Clark and Meehan, and against

---

[67] It appears that Private Diagnostic was included as Manly's employer, but the allegations against Manly have been dismissed, so the claims against Private Diagnostic will also be dismissed.

the City as the employer of Gottlieb, Himan, and Lamb.[68]

As a result, the Motions to Dismiss Count 18 will be granted in part and denied in part. Specifically, the claims alleged in Count 18 will go forward as to Defendants Levicy, Nifong,[69] Gottlieb, Himan, Wilson, Lamb, Clark, Meehan, Steel, Brodhead, Dzau, Burness, Duke, Duke Health, DSI, and the City, as set forth herein. However, the claims alleged in Count 18 will be dismissed as to Defendants Arico, Manly, and Private Diagnostic.

**Count 19:** **Common Law Abuse of Process and Conspiracy, asserted against Nifong, Addison, Gottlieb, Himan, Clayton, Wilson, Steel, Brodhead, Lange, Trask, Burness, Moneta, Dzau, Haltom, Duke Health, Private Diagnostic, Manly, Arico, Levicy, Duke, and the City**

In Count 19, Plaintiffs assert a claim for common law abuse of process and conspiracy. As the basis for this claim, Plaintiffs allege that Nifong, Gottlieb, Himan, and Wilson manufactured false evidence for the NTO affidavit, that Nifong, Gottlieb, and Himan utilized the NTO process "for purposes of launching the case into the public spotlight," that Nifong, Hodge, and Addison made false and misleading statements, that Gottlieb, Nifong, Levicy, Arico, Manly, Private Diagnostic, Duke Health, and Duke agreed to produce fabricated medical records

---

[68] As noted previously, although the City is not specifically listed as a Defendant in Count 18, the claims asserted in Count 18 are asserted against Gottlieb, Himan and Lamb in their "official capacity," and the "official capacity" claims have been treated by the parties as claims against the City. However, as discussed above, the Court does not accept the legal contention that Nifong or Wilson had an "official capacity" with respect to the City. Based on the Court's determinations above, no *respondeat superior* claim will go forward against the City for the actions of Nifong or Wilson.

[69] The Court notes that Defendant Nifong has not filed a Motion to Dismiss, so the conclusions here as to Count 18 are without prejudice to any further determination as to Defendant Nifong after his current status as a Defendant is clarified by Plaintiffs. See *supra* note 1.

and affirmed Levicy's false statements, and that Dzau failed to correct these fabrications. (Second Am. Compl. ¶ 1204-1208).

Under North Carolina law, "[a]buse of legal process consists in the malicious misuse or misapplication of that process to accomplish some purpose not warranted or commanded by the writ. . . . The distinctive nature of an action for abuse of process is the improper use of process after it has been issued, and not for maliciously causing it to issue." Ellis v. Wellons, 224 N.C. 269, 271, 29 S.E.2d 884, 885 (1944) (internal quotation omitted); Melton v. Rickman, 225 N.C. 700, 703, 36 S.E.2d 276, 278 (1945) ("One who uses legal process to compel a person to do some collateral act not within the scope of the process or for the purpose of oppression or annoyance is liable in damages in a common law action for abuse of process."). "There are two essential elements for an action for abuse of process, (1) the existence of an ulterior motive, and (2) an act in the use of the process not proper in the regular prosecution of the proceeding." Ellis, 224 N.C. at 271, 29 S.E.2d at 885. "The ulterior motive requirement is satisfied when the plaintiff alleges that the prior action was initiated by defendant or used by him to achieve a collateral purpose not within the normal scope of the process used. The act requirement is satisfied when the plaintiff alleges that once the prior proceeding was initiated, the defendant committed some wilful act whereby he sought to use the existence of the proceeding to gain advantage of the plaintiff in respect to some collateral matter." Stanback v. Stanback, 297 N.C. 181, 201, 254 S.E.2d 611, 624 (1979). Under North Carolina law, the second element requires Plaintiffs to establish "malicious misuse or misapplication of that process *after issuance* to accomplish some purpose not warranted or commanded by the writ." Pinewood Homes, Inc.

v. Harris, 184 N.C. App. 597, 602, 646 S.E.2d 826, 831 (2007) (emphasis in original) (quoting

Stanback, 297 N.C. at 200, 254 S.E.2d at 624); see also Barnette v. Woody, 242 N.C. 424, 431,

88 S.E.2d 223, 227 (1955) ("The distinction between an action for malicious prosecution and

one for abuse of process is that malicious prosecution is based upon malice in causing the

process to issue, while abuse of process lies for its improper use after it has been issued.").

Thus, "[e]vil purpose alone is not sufficient" and "[r]egular and legitimate use of process, though

with a bad intention, is not a malicious abuse of process." Melton, 225 N.C. at 704, 36 S.E.2d

at 278 (internal quotation omitted) (concluding that the alleged conduct of the defendant was

"not commendable" but that "his conduct prior to the issuance of the warrant does not give rise

to a cause of action" because "[t]here can be no abuse of a writ before its issuance"); see also

Heck v. Humphrey, 512 U.S. 477, 486 n.5, 114 S. Ct. 2364, 2372 n.5, 129 L. Ed. 2d 383 (1994)

(noting that "[t]he gravamen of that tort [abuse of process] is not the wrongfulness of the

prosecution, but some extortionate perversion of lawfully initiated process to illegitimate ends"

and "[c]ognizable injury for abuse of process is limited to the harm caused by the misuse of

process").

    In the present case, Plaintiffs have not alleged any facts to state a claim for the malicious

misuse or misapplication of the NTO after its issuance. To the extent that Plaintiffs allege

misconduct in connection with the NTO, the Court has recognized potential claims in Counts

1, 2, 5, and 18, to the extent that the alleged misconduct meets the elements for those claims.

However, the Court concludes that there is no allegation of improper use of process sufficient

to state a claim for abuse of process under North Carolina law. Therefore, the Motions to

Dismiss as to Count 19 will be granted, and the claim asserted in Count 19 will be dismissed.

**Count 20:** **Intentional Infliction of Emotional Distress and Conspiracy, asserted against Gottlieb, Himan, Lamb, Wilson, Meehan, Clark, Addison, Hodge, Steel, Brodhead, Burness, Levicy, Manly, Arico, Dzau, Nifong, Duke Health, Private Diagnostic, Duke, and DSI**

In Count 20, Plaintiffs assert a common law claim for intentional infliction of emotional distress. As the basis for this claim, Plaintiffs allege that Addison, Hodge, Steel, Brodhead, Burness, Levicy, and Arico made false and inflammatory statements, that Nifong, Clark, Gottlieb, Himan, Meehan, Wilson, DSI, Levicy, Manly, Arico, Dzau, and Duke Health manufactured inculpatory forensic evidence and concealed exculpatory forensic evidence, and that Nifong, Gottlieb, Himan, and Wilson intimidated witnesses and manipulated identification procedures, all knowing that their conduct would "stigmatize the Plaintiffs as violent criminals motivated by 'deep racial animus.'" (Second Am. Compl. ¶ 1214-1218). Plaintiffs allege that this conduct was extreme and outrageous and was intended to cause Plaintiffs to suffer severe emotional distress, and that as a result, "Plaintiffs have suffered and continue to suffer diagnosable emotional and mental conditions causing Plaintiffs disabling emotional, mental, and/or physical harm." (Second Am. Compl. ¶ 1222).

Under North Carolina law, "liability arises under the tort of intentional infliction of emotional distress when a defendant's conduct exceeds all bounds of decency tolerated by society and the conduct causes mental distress of a very serious kind." West v. King's Dep't Store, Inc., 321 N.C. 698, 704, 365 S.E.2d 621, 625 (1988). "The essential elements of an action for intentional infliction of emotional distress are '1) extreme and outrageous conduct by the defendant 2) which is intended to and does in fact cause 3) severe emotional distress.'" Waddle

v. Sparks, 331 N.C. 73, 82, 414 S.E.2d 22, 27 (1992) (quoting Dickens v. Puryear, 302 N.C. 437, 452, 276 S.E.2d 325, 335 (1981)).  With respect to the first element, conduct is "extreme and outrageous" when it is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."  Hogan v. Forsyth Country Club Co., 79 N.C. App. 483, 493, 340 S.E.2d 116, 123 (1986).  With respect to the second element, "[a] defendant is liable for this tort when he 'desires to inflict severe emotional distress . . . [or] knows that such distress is certain, or substantially certain, to result from his conduct . . . [or] where he acts recklessly . . . in deliberate disregard of a high degree of probability that the emotional distress will follow' and the mental distress does in fact result."  Dickens v. Puryear, 302 N.C. 437, 449, 276 S.E.2d 325, 333 (1981) (quoting Restatement (Second) of Torts § 46 cmt. i (1965)).  With respect to the third element, "the term 'severe emotional distress' means any emotional or mental disorder, such as, for example, neurosis, psychosis, chronic depression, phobia, or any other type of severe and disabling emotional or mental condition which may be generally recognized and diagnosed by professionals trained to do so."  Waddle, 331 N.C. at 83, 414 S.E.2d at 27 (quoting Johnson v. Ruark Obstetrics & Gynecology Assocs., P.A., 327 N.C. 283, 304, 395 S.E.2d 85, 97, reh'g denied, 327 N.C. 644, 399 S.E.2d 133 (1990)).  "Humiliation and worry are not enough."  Jolly v. Acad. Collection Serv., 400 F. Supp. 2d 851, 866 (M.D.N.C. 2005).  The North Carolina Supreme Court has noted that "[e]motional distress passes under various names, such as mental suffering, mental anguish, mental or nervous shock, or the like.  It includes all highly unpleasant mental reactions, such as fright horror, grief, shame, humiliation, embarrassment, anger, chagrin,

disappointment, worry, and nausea," but "*[i]t is only where it is extreme that the liability arises*." Waddle, 331 N.C. 73, 84, 414 S.E.2d 22, 27 (1992) (emphasis in original); see also Pacheco v. Rogers & Breece, Inc., 157 N.C. App. 445, 451, 579 S.E.2d 505, 509 (2003) (applying this standard and noting that "[e]ven assuming, *arguendo*, that some issues are 'too obvious to dispute,' the legal presence of severe emotional distress is not among these," and rejecting the contention that outrageous conduct can substitute for severe emotional distress).

In the present case, with respect to the requirement that Plaintiffs have suffered "severe emotional distress," the Court notes that in the Second Amended Complaint, Plaintiffs do not include any specific allegations of emotional or mental disorders or severe and disabling emotional or mental conditions suffered by any of the Plaintiffs individually. Indeed, the Second Amended Complaint does not include any specific identification of any particular Plaintiff's mental or emotional condition or the nature of his emotional distress. With respect to this issue, this Court has previously dismissed claims for intentional infliction of emotional distress ("IIED") where the complaint included only a conclusory statement of damages, without any "factual allegations regarding the type, manner, or degree of severe emotional distress [the plaintiff] experienced." Swaim v. Westchester Acad., Inc., 170 F. Supp. 2d 580, 585 (M.D.N.C. 2001); see also Vogler v. Countrywide Home Loans, Inc., No. 1:10CV370, 2010 WL 3394034, at *9 (M.D.N.C. Aug. 26, 2010) (dismissing claim as insufficient where "[p]laintiffs assert that they suffered severe emotional distress, but do not allege any facts in support of this assertion"); Baucom v. Cabarrus Eye Ctr., P.A., No. 1:06CV209, 2007 WL 1074663, at *5 (M.D.N.C. Apr. 4, 2007) (noting that "[a]lthough the amended complaint makes the conclusory statement that

Defendant's actions caused 'great emotional distress,' Plaintiff does not allege any facts or conditions from which she suffered to support this motion"); cf. Holleman v. Aiken, 193 N.C. App. 484, 501, 668 S.E.2d 579, 590 (2008) (concluding that the plaintiff had failed to allege a claim for IIED where the "plaintiff has failed to make any specific allegations as [to] the nature of her severe emotional distress"); Soderlund v. Kuch, 143 N.C. App. 361, 371, 546 S.E.2d 632, 639 (2001) ("The crux of establishing 'severe emotional distress' is that the emotional or mental disorder may generally be diagnosed by professionals trained to do so," even if an actual diagnosis has not been made); Fox-Kirk v. Hannon, 142 N.C. App. 267, 281, 542 S.E.2d 346, 356 (2001) (holding that a claim for infliction of emotional distress was "not justiciable" where, at the time of the filing of the complaint, the plaintiff "had not sought any medical treatment or received any diagnosis for any condition that could support a claim for severe emotional distress").

In the present case, Plaintiffs contend that they "suffered and continue to suffer diagnosable emotional and mental conditions causing Plaintiffs disabling emotional, mental and/or physical harm," but a "label and conclusion" or "naked assertion" will not suffice under the pleading standards set out in Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009). Plaintiffs have failed to include any factual allegations as to each Plaintiff's emotional or mental disorders, condition, or diagnosis, in order to state a claim that each of them suffered from severe emotional distress. Plaintiffs also failed to sufficiently allege a link between any emotional or mental disorder or condition and the specific misconduct alleged in this claim.[70]

_____

[70] The Court notes, however, that emotional distress damages are nevertheless recoverable under Counts 1, 2, 5, and 18, which are going forward, without any additional factual

Therefore, Defendants' Motions to Dismiss as to Count 20 will be granted, and Plaintiffs' claims for intentional infliction of emotional distress will be dismissed on this basis.

**Count 21:**   **Breach of Contract, asserted against Steel, Brodhead, Lange, Moneta, Bryan, and Duke**

In Count 21, Plaintiffs assert a claim under state law for breach of contract. As the basis for this claim, Plaintiffs allege that Duke and the Plaintiffs entered into a contractual relationship, and that Duke breached that contract by failing to provide them with certain substantive and procedural safeguards provided in the Student Bulletin and Student Code of Conduct. Specifically, Plaintiffs allege that they were suspended and that the suspensions were imposed without following the procedures provided in the Bulletin and Code of Conduct for disciplinary proceedings. Plaintiffs also allege that Duke breached the contract by condoning and ratifying harassment of Plaintiffs by faculty, administrators, and staff.[71] The Court has considered these contentions, but the Court notes that although this breach of contract claim was asserted against individual Defendants Steel, Brodhead, Lange, Moneta, and Bryan, Plaintiffs do not allege that they had a contractual agreement with any of these individuals, and therefore

_____

allegations regarding the nature, diagnosis, or severity of Plaintiffs' emotional distress.

[71] As part of this claim, Plaintiffs also allege that Duke breached the contract by collecting Plaintiffs' "Duke Card" information and failing to provide notice to Plaintiffs after disclosing that information. In Response, Defendants have submitted as an exhibit the "Duke Card Terms and Conditions." Plaintiffs object to consideration of that document and contend that they do not claim that disclosure of their financial information breached this agreement. Instead, Plaintiffs contend that their claim for disclosure of their "Duke Card" information is based on the contention that disclosure of the information violated state and federal privacy laws, as discussed with respect to Count 22. Therefore, the Court accepts Plaintiffs' statement that their claim for disclosure of the Duke Card information is not based on breach of any agreement or contract, and the Court has not considered the Duke Card Terms and Conditions and has not considered this issue as part of this breach of contract claim.

this breach of contract claim will be dismissed as to individual Defendants Steel, Brodhead, Lange, Moneta, and Bryan. With respect to the breach of contract claim against Duke, the Court notes that there are two types of breach of contract claims here: a claim for failure to follow promised procedures in student disciplinary proceedings imposing suspensions, and a claim for failure to enforce the anti-harassment policy.

Under North Carolina law, "[t]he elements of a claim for breach of contract are (1) existence of a valid contract and (2) breach of the terms of that contract." Parker v. Glosson, 182 N.C. App. 229, 232, 641 S.E.2d 735, 737 (2007) (internal quotations omitted). "No contract is formed without an agreement to which at least two parties manifest an intent to be bound." Id.; see also Elliott v. Duke Univ., Inc., 66 N.C. App. 590, 595, 311 S.E.2d 632, 636 (1984) (noting that a contract does not exist if "one party simply believes that a contract exists, but there is no meeting of the minds."); Horton v. Humble Oil & Ref. Co., 255 N.C. 675, 679, 122 S.E.2d 716, 719 (1961) (noting that a contract must be "definite and certain or capable of being made so" such that the parties "assent to the same thing, in the same sense"). Thus, a contract exists only if there is mutual intent to contract and an agreement on sufficiently definite terms to be enforceable. In the educational context, the North Carolina Court of Appeals has recognized that a student can, in some circumstances, bring a claim against a college or university for breach of contract. See Ryan v. Univ. of N.C. Hosps., 128 N.C. App. 300, 301, 494 S.E.2d 789, 790 (1998) (citing Ross v. Creighton Univ., 957 F.2d 410, 416 (7th Cir. 1992) ("[T]he basic legal relation between a student and a private university or college is contractual in nature." (internal quotations omitted))). However, the plaintiff must "point to an identifiable

contractual promise that the [defendant] failed to honor" and the claim must not involve "inquiry into the nuances of educational processes and theories." Id. at 302, 494 S.E.2d at 791 (internal quotations omitted); Ross v. Creighton Univ., 957 F.2d 410, 417 (7th Cir. 1992) (noting a potential claim if, for example, "the defendant took tuition money and then provided no education, or alternately, promised a set number of hours of instruction and then failed to deliver"). Thus, "not all aspects of the student/university relationship are subject to a contract remedy," and it is a plaintiff's obligation to point to a mutual agreement with sufficiently definite terms or obligations. See Hendricks v. Clemson Univ., 578 S.E.2d 711, 716 (S.C. 2003).

Applying these rules in the academic context, courts in this district have repeatedly concluded that a university's academic bulletins and policies cannot be the basis of a breach of contract claim unless the bulletin or policy provision is a specific, enforceable promise that is incorporated into the terms of a contract between the university and the student. See Love v. Duke Univ., 776 F. Supp. 1070, 1075 (M.D.N.C. 1991) (finding that the academic bulletin was not a binding contract between a student and the university), aff'd, 959 F.2d 231; Giuliani v. Duke Univ., No. 1:08CV502, 2010 WL 1292321, *7-8 (M.D.N.C. Mar. 30, 2010) (dismissing breach of contract claim where the student did not allege the existence of a contract that specifically incorporated the university's handbooks and policy manuals into a contract); Mercer v. Duke Univ., No. 1:97CV959 (M.D.N.C. Sept 28, 2000) (concluding that nondiscrimination policy in the student handbook did not constitute a contract between a student-athlete and the university); see also Tibbetts v. Yale Corp., 47 Fed. Appx. 648, 656 (4th Cir. 2002) (concluding that provisions of the Yale Student Handbook were "not a contract, but merely a university

policy promoting free expression"); Vurimindi v. Fuqua Sch. of Bus., No. 10-234, 2010 WL 3419568, at *6 (E.D. Pa. Aug. 25, 2010) (finding that student had no cognizable breach of contract claim under North Carolina law against a university for failure to prevent harassment by classmates, because "school publications are not generally a valid source of contract" and "[a]ttending a college or university does not warrant a student to file a breach-of-contract suit whenever he or she feels that the experience has not lived up to broad expectations that he or she may have developed after reading materials promulgated by the school's administrators, admissions office, or public relations department"); Gally v. Columbia Univ., 22 F. Supp. 2d 199, 208 (S.D.N.Y. 1998) (holding that the fact that a professor "may have been harsh or even belittling to plaintiff does not create a valid cause of action" for breach of a non-discrimination policy in the Code of Conduct, since such claims would "open the floodgates to a slew of claims by students" and are "better left to the sound handling of school administrators"); cf. Ryan, 128 N.C. App. at 302, 494 S.E.2d at 791 (allowing breach of contract claim to proceed based on identifiable contractual provision specifically incorporated into an agreement regarding employment and medical residency).

In the present case, considering first Plaintiffs' claims for breach of contract by condoning and ratifying harassment of Plaintiffs by faculty, administrators, and staff, there are no factual allegations to support the contention that any general policy against harassment created any specific, enforceable contractual obligations upon Duke. A general policy against harassment does not provide any indication of any mutual agreement between Duke and the students, and Plaintiffs have not alleged any facts that would indicate any intent by Duke to be

bound to any particular obligation or course of conduct based on a general policy against harassment.

However, with respect to Plaintiffs' breach of contract claim for failing to follow promised disciplinary procedures, Plaintiffs contend that the Code of Conduct included specific, potentially enforceable provisions outlining certain procedures to be followed before a student would be suspended for violation of the Code of Conduct. For example, as to Plaintiff McFadyen, Plaintiffs contend that Duke imposed an interim suspension under the Code of Conduct, but that McFadyen did not receive notice of the provision he was charged with violating, that he did not receive a hearing within 3 days or an informal review by a 3-person committee as provided in the Bulletin, and that he was not provided with the procedural safeguards set out in the Bulletin. Although a breach of contract claim would not allow for review of the substance of the disciplinary proceedings, since that is a matter left to educational discretion, a breach of contract claim could potentially reach the limited inquiry of whether Duke failed to follow promised procedures for imposing discipline (particularly suspension) under the Code of Conduct. See Havlik v. Johnson & Wales Univ., 509 F.3d 25, 34-35 (1st Cir. 2007) (noting that a student's relationship to his university is based in contract, and "if the university explicitly promises an appeal process in disciplinary matters, that process must be carried out in line with the student's reasonable expectations"). Therefore, the Court will allow this aspect of Plaintiffs' breach of contract claim to proceed, but only against Duke and only on this limited basis with regard to the failure to follow promised procedures in the disciplinary process. However, the Court will not entertain a substantive challenge to Duke's disciplinary

161

decision or otherwise open up any type of "educational malpractice" claim. The Court will look closely at summary judgment to determine if Plaintiffs have presented evidence of a breach of a specifically enforceable, procedural promise.

Based on all of these determinations, the Court concludes that the breach of contract claims against the individual Defendants Steel, Brodhead, Lange, Moneta, and Bryan, will be dismissed. In addition, the breach of contract claim against Duke will proceed only on a limited basis with regard to the alleged failure to follow promised procedures in the disciplinary process. The other bases for the breach of contract claim against Duke will be dismissed.

**Count 22: Invasion of Privacy, asserted against Steel, Brodhead, Lange, Trask, Burness, Moneta, Dzau, Haltom, Dawkins, Graves, Dean, Humphries, Cooper, Garber, Schwab, Fleming, Best, and Duke**

In Count 22, Plaintiffs bring a state law claim for invasion of privacy against Duke and various Duke employees. As the basis for the claim, Plaintiffs assert that Duke, acting through its employees, intruded upon Plaintiffs' seclusion or private affairs by (1) invading their homes; (2) collecting and disseminating their financial and educational (Duke Card) records; (3) opening their private e-mail accounts; and (4) subjecting them to harassment on campus and in their homes. Although this claim is asserted against Steel, Brodhead, Lange, Trask, Burness, Moneta, Dzau, Haltom, Dawkins, Graves, Dean, Humphries, Cooper, Garber, Schwab, Fleming, and Best individually, Plaintiffs do not allege which individuals they contend engaged in the challenged conduct, and instead the allegations contend only generally that Duke invaded Plaintiffs' privacy through the named Defendants and other employees.

The North Carolina Supreme Court has identified four types of claims for invasion of

privacy: "(1) appropriation, for the defendant's advantage, of the plaintiff's name or likeness; (2) intrusion upon the plaintiff's seclusion or solitude or into his private affairs; (3) public disclosure of embarrassing private facts about the plaintiff; and (4) publicity which places the plaintiff in a false light in the public eye." <u>Renwick v. News & Observer Publ'g Co.</u>, 310 N.C. 312, 322, 312 S.E.2d 405, 411 (1984). However, North Carolina does not recognize the third and fourth types of these claims. <u>See id.</u> at 323, 312 S.E.2d at 412; <u>Miller v. Brooks</u>, 123 N.C. App. 20, 25, 472 S.E.2d 350, 354 (1996); <u>see also</u> <u>Sabrowski v. Albani-Bayeux, Inc.</u>, 1:02CV00728, 2003 WL 23018827, at *10 (M.D.N.C. Dec. 19, 2003). With respect to the first type of claim, Plaintiffs in this case do not assert a claim for appropriation of name or likeness. Therefore, Plaintiffs in this case are attempting to assert the second type of claim, intrusion upon seclusion. North Carolina courts have held that intrusion upon seclusion is "the intentional intrusion physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns . . . [where] the intrusion would be highly offensive to a reasonable person." <u>Toomer v. Garrett</u>, 155 N.C. App. 462, 479, 574 S.E.2d 76, 90 (2002) (internal quotations omitted). "[The] tort does not depend upon any publicity given a plaintiff or his affairs but generally consists of an intentional physical or sensory interference with, or prying into, a person's solitude or seclusion or his private affairs. Some examples of intrusion include physically invading a person's home or other private place, eavesdropping by wiretapping or microphones, peering through windows, persistent telephoning, unauthorized prying into a bank account, and opening personal mail of another." <u>Burgess v. Busby</u>, 142 N.C. App. 393, 405-06, 544 S.E.2d 4, 11 (2001) (internal citation omitted) (quoting <u>Hall v. Post</u>, 85 N.C. App. 610, 615, 355 S.E.2d 819,

823 (1987), <u>rev'd on other grounds</u>, 323 N.C. 259, 372 S.E.2d 711 (1988)).

With respect to the claim alleged in Count 22, Plaintiffs assert this claim against Steel, Brodhead, Lange, Trask, Burness, Moneta, Dzau, Haltom, Dawkins, Graves, Dean, Humphries, Cooper, Garber, Schwab, Fleming, and Best individually. However, Plaintiffs do not allege any factual basis to assert a plausible claim that any of these named Defendants physically invaded Plaintiffs' residences or directly engaged in any conduct that would constitute an intrusion upon seclusion under state law. Instead, Plaintiffs base this claim on the protests that occurred at Plaintiffs' residences and on campus, the media coverage, and the harassment by other students and faculty members on and off campus. However, Plaintiffs do not state a plausible claim that any of the named Defendants themselves participated in the protests or other alleged conduct, or otherwise physically invaded upon Plaintiffs' privacy or seclusion. Plaintiffs generally contend that other students and faculty members engaged in this conduct, but there is not a sufficient basis to hold the named Defendants responsible for an intrusion upon seclusion allegedly perpetrated by other students, faculty members, or members of the media. Therefore, Plaintiffs have failed to state a claim against Steel, Brodhead, Lange, Trask, Burness, Moneta, Dzau, Haltom, Dawkins, Graves, Dean, Humphries, Cooper, Garber, Schwab, Fleming, and Best for intrusion upon seclusion.

Likewise with respect to the claim for intrusion upon seclusion against Duke itself, Plaintiffs cannot state a claim for intrusion upon seclusion based on actions by third parties such as students or members of the media. Plaintiffs contend that they were subject to harassment by Duke faculty members or other employees on campus and off that intruded upon Plaintiffs'

seclusion, and that the faculty members were operating in the scope of their employment, so that Duke is therefore responsible for their tortious conduct. However, it is unclear which specific faculty members Plaintiffs contend intruded upon their seclusion. To the extent that Plaintiffs contend that faculty members engaged in public protests, such participation in a public protest would not constitute intrusion upon seclusion under state law, nor is there a sufficient basis alleged that would support the contention that faculty members engaging in off-campus protests were operating in the scope of their employment with Duke. To the extent that the claim is based on alleged confrontations between faculty members and team members during class or on campus, none of those allegations would constitute intrusion upon seclusion under state law. Therefore, although the Second Amended Complaint alleges conduct by faculty members that is certainly questionable, those allegations do not state a claim against Duke or any of the named Defendants for the state law claim of intrusion upon seclusion.

As discussed with respect to Count 2, Plaintiffs do allege that Duke Police Officer Smith observed the execution of the search warrant for McFadyen's dorm room. However, Plaintiffs do not allege that Smith actually entered McFadyen's room. Therefore, the alleged conduct by Smith, observing Durham Police execute a search warrant, does not state a claim for intrusion upon seclusion. Plaintiffs also contend that Duke Police officers assisted Himan and Gottlieb in gaining access to the dorm building where most of the sophomore team members lived. However, Plaintiffs do not allege that any Duke Defendant entered into any students' residence or dorm room. Instead, this allegation relates to conduct by the Durham Investigators. Moreover, Plaintiffs fail to provide any details regarding this alleged intrusion, and the only

165

specific allegation is that Gottlieb and Himan "cornered Michael Young (who is not a Plaintiff in this case), and coaxed him into his room" and questioned him regarding who was at the party. Therefore, the Court concludes that Plaintiffs have failed to state a claim for intrusion upon seclusion against Duke or the other named Defendants for "invading their homes."

Plaintiffs also contend that the collection and release of their "financial and educational records" could be an intrusion upon seclusion. However, Plaintiffs do not have a reasonable expectation of privacy in a record of their public comings and goings or in information submitted to a third party. United States v. Knotts, 460 U.S. 276, 280, 103 S. Ct. 1081, 1084-85, 75 L. Ed. 2d 55 (1983); United States v. Miller, 425 U.S. 435, 442-43, 96 S. Ct. 1619, 1623-24, 48 L. Ed. 2d 71 (1976). To the extent that Plaintiff may be contending that release of that information violated the Family Educational Rights and Privacy Act ("FERPA"), there is no private right of action under FERPA, and a violation of FERPA does not create a state tort claim for invasion of privacy. Plaintiffs also contend that opening their private e-mail accounts was an intrusion upon seclusion, but Plaintiffs do not present factual allegations sufficient to state a plausible claim against Duke for opening Plaintiffs' e-mail accounts.

Therefore, the Court concludes that Plaintiffs have failed in any respect to state a claim for the state tort of Invasion of Privacy by the named Defendants, and the claims asserted in Count 22 will be dismissed.

**Count 23:    Breach of Fiduciary Duty and Aiding and Abetting, asserted against Steel, Drummond, Dawkins, Moneta, Bryan, Duke, Gottlieb, Himan, Ripberger, Lamb, Council, Hodge, Chalmers, Baker, Nifong, and the City**

In Count 23, Plaintiffs assert a state common law claim for breach of fiduciary duty

against various Duke and City employees. As the basis for this claim, Plaintiffs allege that they were in a fiduciary relationship with Steel, Drummond, Dawkins, Moneta, Bryan, and Duke, because those Defendants were in a "position of special confidence and trust" with regard to Plaintiffs' financial and educational records and e-mail accounts. (Second Am. Compl. ¶ 1237). Plaintiffs further contend that this relation of trust and confidence imposed a fiduciary duty on the Defendants to protect Plaintiffs' accounts from unauthorized disclosure and to notify Plaintiffs of any disclosure.[72] Plaintiffs allege that Steel, Drummond, Dawkins, Moneta, Bryan, and other unknown Duke employees breached their fiduciary duties to Plaintiffs with respect to these records by accessing and disclosing to Nifong and Gottlieb the Plaintiffs' private e-mail accounts, the Plaintiffs' Duke Card information, and Plaintiffs' educational records, with the intent to injure Plaintiffs and to promote Duke's interests. Plaintiffs further allege that Himan, Gottlieb, Nifong, Ripberger, Lamb, Council, Hodge, Chalmers, Baker, and the City were aware of the breach of fiduciary duty and provided assistance in that breach by assisting in accessing the accounts, and by expediting analysis of information in the accounts, and by participating in

---

[72] As part of the basis for the fiduciary relationship, Plaintiffs allege that "[t]he agreement between Plaintiffs and Duke University governing the Plaintiffs' Duke-issued transaction cards required Duke University to safeguard the privacy of Plaintiffs' personal financial accounts on deposit with Duke University and the privacy of reports of Plaintiffs' account activity with their Duke financial transaction cards." (Second Am. Compl. ¶ 1239). This agreement was also raised in the breach of contract claim, and as discussed previously, Duke submitted the "Duke Card Terms and Conditions" as an exhibit to the Motion to Dismiss. However, as with the breach of contract claim, Plaintiffs object to consideration of that document, and Plaintiffs contend that they do not claim that disclosure of their financial information breached this agreement. Instead, Plaintiffs contend that their claim for breach of fiduciary duty is based on the contention that disclosure of the information violated state and federal privacy laws. Therefore, Plaintiffs have disavowed reliance on any "agreement" to support their contentions regarding the release of the Duke Card information, and the Court has not and need not consider the Duke Card Terms and Conditions in analyzing the Motions to Dismiss.

a cover-up after subpoenas were issued for records that had already been provided.

"To state a claim for breach of fiduciary duty, a plaintiff must allege that a fiduciary relationship existed and that the fiduciary failed to 'act in good faith and with due regard to [plaintiff's] interests[.]'" Toomer v. Branch Banking & Trust Co., 171 N.C. App. 58, 70, 614 S.E.2d 328, 337 (2005) (citation omitted). However, the student-administrator relationship is not generally a fiduciary relationship. The North Carolina Court of Appeals has held that interactions between "educators/supervisors" and medical residents do not create a fiduciary relationship, because "[a]lthough defendants were plaintiff's teachers and advisors, they also had to serve other interests" including the objectives of the institution and the interests of the public. Ryan v. Univ. of N.C. Hosps., 168 N.C. App. 729, 2005 WL 465554, at *4 (N.C. Ct. App. Mar. 1, 2005) (table opinion). Therefore, "[b]ecause defendants had divided loyalties," the court concluded that the case was "unlike other fiduciary relationships in which the fiduciary must act primarily for the benefit of another." Id. The court in Ryan also noted that "[o]ther jurisdictions have been reluctant to find fiduciary relationships in academic settings," id., citing the decision of the South Carolina Supreme Court in Hendricks v. Clemson University, in which the court "decline[d] to recognize the relationship between advisor and student as a fiduciary one." Id. (quoting Hendricks v. Clemson Univ., 578 S.E.2d 711, 716 (S.C. 2003)).

Plaintiffs nevertheless contend that a fiduciary relationship exists between them and Duke as keeper of their "educational and financial records." Specifically, Plaintiffs contend that "[f]ederal banking laws and state banking laws required Duke University to safeguard the privacy of Plaintiffs' Duke Card Account transactions." (Second Am. Compl. ¶ 1240). To the extent

Plaintiffs are claiming the existence of a fiduciary relationship based on the Family Educational Rights and Privacy Act ("FERPA"), the Court notes that the provisions of FERPA, 20 U.S.C. § 1232g, "prohibit the federal funding of educational institutions that have a policy or practice of releasing education records to unauthorized persons." See Gonzaga Univ. v. Doe, 536 U.S. 273, 276, 122 S. Ct. 2268, 2271, 153 L. Ed. 2d 309 (2002). However, FERPA does not establish a fiduciary relationship, and the Supreme Court has clearly held that there is no private right of action under FERPA. Therefore, the Court concludes that a violation of FERPA does not create a state tort claim for breach of fiduciary duty.

Plaintiffs nevertheless contend in their briefing that this claim is based on violation of the North Carolina Privacy Act, N.C. Gen. Stat. § 53B-1 to 10. However, that statute only applies to "financial institutions" that are "principally engaged in the business of lending money or receiving or soliciting money on deposit" and under that statute, a "financial record" is a record held by such an institution N.C. Gen. Stat. § 53B-2. Therefore, it does not appear that this statute would apply to Duke. Moreover, there is no legal basis to conclude that this statute creates fiduciary relationship between a university and its students that would support a state common law claim for breach of fiduciary duty. Therefore, the Court concludes that Plaintiffs have failed to state a claim for breach of fiduciary duty.

In addition, the Court notes that Plaintiffs cite no support for asserting a claim for breach of fiduciary duty against police officers and City officials, or for a claim of "aiding and abetting" a breach of fiduciary duty in these circumstances. In any event, since there is no claim for breach of fiduciary duty, there is also no claim for "aiding and abetting" by the other named

Defendants. Therefore, the Motions to Dismiss Count 23 will be granted and the claims alleged in Count 23 will be dismissed.

**Count 24:      Fraud, asserted against Drummond, Smith, Dean, Graves, and Duke**

In Count 24, Plaintiffs assert a state law claim for fraud. As the basis for this claim, Plaintiffs allege that after their Duke Card information had already been provided to Durham Police, Drummond sent a letter to Plaintiffs notifying them that their Duke Card transaction records had been subpoenaed by Nifong. The letters advised Plaintiffs that they would need to move to quash the subpoena if they wished to preserve the privacy of their records, but did not advise Plaintiffs that the records had already been provided to Gottlieb, Himan, and Nifong. Plaintiffs allege that Drummond's letter contained false representations that Drummond knew were false, and that Drummond acted with intent to deceive Plaintiffs and intent to cover up the prior disclosure. Plaintiffs allege that they were deceived and that as a result of the false representations, they obtained counsel and successfully moved to quash the subpoenas, even though the information had already been provided to Durham Police. Plaintiffs allege that Drummond was acting within the course and scope of his employment with Duke, and that Duke employees Smith, Stotsenberg, Dean, and Graves knew that the transaction records had already been provided to Gottlieb, Himan, and Nifong.

Under North Carolina law, "the following essential elements of actual fraud are well established: '(1) [f]alse representation or concealment of a material fact, (2) reasonably calculated to deceive, (3) made with intent to deceive, (4) which does in fact deceive, (5) resulting in damage to the injured party.'" Forbis v. Neal, 361 N.C. 519, 526-27, 649 S.E.2d 382, 387

(quoting <u>Ragsdale v. Kennedy</u>, 286 N.C. 130, 138, 209 S.E.2d 494, 500 (1974)).  Such a claim requires a showing that the "plaintiff acted or refrained from acting in a certain manner due to defendant's representations" and that the plaintiff's reliance on the false representations was "justified or reasonable." <u>Pleasant Valley Promenade v. Lechmere, Inc.</u>, 120 N.C. App. 650, 663, 464 S.E.2d 47, 57 (1995).  In cases alleging fraudulent concealment or nondisclosure, the plaintiff "must additionally allege that all or some of the defendants had a duty to disclose material information to him as silence is fraudulent only when there is a duty to speak." <u>Breeden v. Richmond Cmty. Coll.</u>, 171 F.R.D. 189, 194 (M.D.N.C. 1997).  A duty to disclose may arise from the existence of a fiduciary relationship or where "one party has taken affirmative steps to conceal material facts from the other." <u>Id.</u> at 196.  A duty to disclose may also arise in "other attendant circumstances," and in this regard North Carolina courts have recognized that while a defendant may not initially be under a duty to speak, once the defendant does speak, he is "required to make a full and fair disclosure as to the matters discussed." <u>Shaver v. N.C. Monroe Constr. Co.</u>, 63 N.C. App. 605, 614, 306 S.E.2d 519, 525 (1983); <u>see also</u> <u>Breeden</u>, 171 F.R.D. at 194 n.4 (noting that courts have held that "a duty to disclose in the absence of a fiduciary relationship could arise if a party makes partial ambiguous statements which require other disclosures to prevent confusion"); <u>Wicker v. Worthy</u>, 51 N.C. (6 Jones) 500, 1859 WL 2087, at *2 (1859) (noting that "mere silence" may not be sufficient to create a claim, but if the defendant "says or does any thing intended and calculated to create [a false] impression . . . he will be liable to the action").  Thus, "even if a party otherwise has no duty to disclose a particular matter, should that party speak about it, then a full and fair disclosure may be required."

<u>Breeden</u>, 171 F.R.D. at 196.

In considering whether Plaintiffs have sufficiently alleged a claim of fraud in the present case, the Court also notes that under Federal Rule of Civil Procedure 9(b), "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). Generally, to satisfy this requirement, a plaintiff must identify the time, the place, and the contents of the allegedly false statements, the identity of the person making the representation, and what was obtained as a result of the fraudulent misrepresentation. <u>See</u> <u>Breeden</u>, 171 F.R.D. at 195 (noting that "courts generally require that a plaintiff plead the time, place, and contents of the alleged fraudulent misrepresentation, as well as the identity of each person making the misrepresentation and what was obtained thereby" (internal quotations omitted)); <u>S.N.R. Mgmt. Corp. v. Danube Partners 141, LLC</u>, 189 N.C. App. 601, 610, 659 S.E.2d 442, 449 (2008). Moreover, "[i]n order to comply with the pleading requirements of Rule 9(b) with respect to fraud by omission, a plaintiff usually will be required to allege the following with reasonable particularity: (1) the relationship or situation giving rise to the duty to speak, (2) the event or events triggering the duty to speak, and/or the general time period over which the relationship arose and the fraudulent conduct occurred, (3) the general content of the information that was withheld and the reason for its materiality, (4) the identity of those under a duty who failed to make such disclosures, (5) what those defendant(s) gained by withholding information, (6) why plaintiff's reliance on the omission was both reasonable and detrimental, and (7) the damages proximately flowing from such reliance." <u>Breeden</u>, 171 F.R.D. at 195. "However, a court should hesitate to dismiss a complaint under Rule 9(b) if the court is satisfied:

'(1) that the defendant has been made aware of the particular circumstances for which [it] will have to prepare a defense at trial, and (2) that plaintiff has substantial prediscovery evidence of those facts.'" Adams v. NVR Homes, Inc., 193 F.R.D. 243, 250 (D. Md. 2000) (citation omitted). Finally, "[a]llegations of fraud may be made 'upon information and belief' only when the matters are particularly within the defendants' knowledge, and facts are stated upon which the belief is founded." Breeden, 171 F.R.D. at 197 (citing Andrews v. Fitzgerald, 823 F. Supp. 356, 375 (M.D.N.C. 1993)).

Based on these standards and the allegations set out in the Second Amended Complaint, the Court concludes that Plaintiffs have sufficiently alleged a claim for fraud against Duke, based on the allegations against Drummond, Smith, Graves, and Dean as Duke employees. In the Second Amended Complaint, Plaintiffs allege that Drummond, Smith, Graves, and Dean acted to "cover up" the prior disclosure of the Duke Card records by making a false representation or concealment of a material fact in the letters that Drummond sent to Plaintiffs. Specifically, Plaintiffs allege that Drummond, Smith, Graves, and Dean knew that the Duke Card Records had previously been disclosed to Durham police, and that Drummond nevertheless sent the letters implicitly representing that the Duke Card reports had not been previously disclosed. Plaintiffs have alleged that the misrepresentation was intended to deceive in order to "cover up" and avoid potential liability for the previous disclosure. Plaintiffs allege that the letters did in fact deceive the recipients, causing them to incur specific expenses that they would not otherwise have incurred. Consistent with Rule 9, Plaintiffs have alleged the time, place, and content of the false representations, based on the letters that were sent to the players and their counsel on or

about June 1, 2006. To the extent that this claim is based on a fraudulent omission, Plaintiffs have identified the general content of the information that was withheld and the reason for its materiality, and the identity of those who failed to make such disclosures. Plaintiffs have also alleged the relationship and events giving rise to the duty to speak, based on the actions of Drummond in undertaking to send the letters. Of course, it will ultimately be Plaintiffs' burden to prove all of the elements of this claim, including that Drummond was aware that the Duke Card reports had previously been provided to the Durham police, in order to establish the requisite intent to deceive. Cf. Ausley v. Bishop, 133 N.C. App. 210, 217, 515 S.E.2d 72, 78 (1999) ("For actionable fraud to exist, [the defendant] 'must have known the representation to be false when making it . . . .'" (quoting Fulton v. Vickery, 73 N.C. App. 382, 388, 326 S.E.2d 354, 358 (1985)).[73] However, at this stage in the case, Plaintiffs have sufficiently alleged this claim of fraud as to Drummond, acting in the course and scope of his employment as an employee of Duke.

Therefore, the Motions to Dismiss Count 24 will be denied, and the claim asserted in Count 24 will go forward as to Defendants Smith, Graves, Dean, Drummond, and Duke.

**Count 25:    Negligence, asserted against Gottlieb, Himan, Addison, Michael, Russ, Hodge, and the City**

In Count 25, Plaintiffs assert a state common law claim for negligence against several of the Durham Police Officers in their "individual and official capacities" and against the City. As

---

[73] Likewise as to Smith, Graves, and Dean, although Plaintiffs have alleged that they collaborated with Drummond in making the false representations in the letters, it will be Plaintiffs' burden to ultimately establish Smith's, Graves' and Dean's direct involvement in the false representations to the players and their attorneys.

the basis for this claim, Plaintiffs allege that Gottlieb, Himan, Addison, Michael, Russ, and Hodge owed Plaintiffs a duty of care with respect to "public statements" and with respect to the "investigation of Mangum's allegations," but failed to exercise due care, causing injury to Plaintiffs. (Second Am. Compl. ¶ 1262-1263).

This claim was asserted against the individually named Defendants in both their official and individual capacities, but Plaintiffs concede that the "official capacity" claims are duplicative of the claim against the City and may be dismissed. With respect to the "individual capacity" claims, the individual Defendants have raised the defense of public official immunity to the extent that the claims are asserted against them in their individual capacities. "The public immunity doctrine protects public officials from individual liability for negligence in the performance of their governmental or discretionary duties." Campbell v. Anderson, 156 N.C. App. 371, 376, 576 S.E.2d 726, 730 (2003); see also Thomas v. Sellers, 142 N.C. App. 310, 313, 542 S.E.2d 283, 286 (2001) (noting that under state law, a public officer is not liable in his individual capacity unless his conduct is "malicious, corrupt, or outside the scope of his official authority"); Moore v. Evans, 124 N.C. App. 35, 42, 476 S.E.2d 415, 421 (1996). The named Defendants therefore contend that any state law negligence claims against them in their individual capacities are barred by public official immunity. In their Responses, Plaintiffs contend that "much of Supervising Defendants' conduct was inspired by a malicious, and corrupt conduct" and that public official immunity should not apply. (Pl.'s Resp., Doc. #78, at 44). However, the claims asserted in Count 25 are claims for negligence, not for intentional torts, and Plaintiffs have not presented any sufficient reason why public official immunity would

not apply to claims for negligence against these public officials. Therefore, the "individual capacity" claims asserted in Count 25 will be dismissed on the basis of public official immunity.

However, to the extent that this claim is asserted against the City, the Court concludes that this claim should go forward at the time. As discussed below with respect to Count 41, there are many overlapping issues raised with respect to the claims against the City, including governmental immunity, waiver of that immunity, alternative claims under the North Carolina Constitution, and issues and defenses that require consideration on an evidentiary record beyond what is asserted in the Second Amended Complaint. The Court has already determined that there are claims going forward against the City as discussed above with respect to Counts 1, 2, and 5 (as asserted against the City in Counts 12 and 14) and in Count 18. The Court therefore concludes that further analysis of the other alternative claims against the City under state law are best resolved at summary judgment rather than on the present Motions to Dismiss.[74] Therefore,

---

[74] The Court notes that the City raises the "public duty doctrine," contending that the City is not liable for negligence in failing to perform a public duty such as an investigation. Pursuant to the public duty doctrine, "governmental entities have no duty to protect particular individuals from harm by third parties, thus no claim may be brought against them for negligence." Wood v. Guilford County, 355 N.C. 161, 166, 558 S.E.2d 490, 495 (2002). This doctrine is based on the rule that "a municipality and its agents act for the benefit of the public, and therefore, there is no liability for the failure to furnish police protection to specific individuals." Braswell v. Braswell, 330 N.C. 363, 370, 410 S.E.2d 897, 901 (1991). However, Plaintiffs in the present case raise exceptions to the public duty doctrine. The exceptions to the public duty doctrine arise: "(1) where there is a special relationship between the injured party and the police," and "(2) 'when a municipality, through its police officers, creates a special duty by promising protection to an individual, the protection is not forthcoming, and the individual's reliance on the promise of protection is causally related to the injury suffered.'" Id. at 371, 410 S.E.2d at 902 (citation omitted). Plaintiffs also note that according to the North Carolina Supreme Court, "[t]he purpose of the doctrine, as noted in Braswell, is to respect the limited resources of law enforcement agencies by relieving them of liability for failure to prevent every criminal act." Multiple Claimants v. N.C. Dep't of Health and Human Servs., 361 N.C. 372, 374, 646 S.E.2d 356, 358 (2007). In considering the application of this doctrine in the present case,

the Motions to Dismiss will be granted on the basis of public official immunity as to Gottlieb, Himan, Addison, Michael, Russ, and Hodge, but the Motions to Dismiss will be denied as to the City, and the claims against the City in Count 25 will go forward.

**Count 26:** **Negligent Hiring, Retention, Supervision, Training and Discipline, asserted against Baker, Chalmers, Hodge, Russ, Mihaich, Council, Lamb, Ripberger, Evans, Soukup, and the City**

In Count 26, Plaintiffs assert a state common law claim for negligence against the Durham Police Supervisors, named as Defendants in this Count, in their "individual and official capacities" and against the City. As the basis for this claim, Plaintiffs allege that the Supervisors and the City owed Plaintiffs a duty to use due care in the hiring, training, supervision, discipline, and retention of Durham Police personnel, but negligently supervised Gottlieb by failing to discipline him for his prior abuse of authority as to Duke Students, negligently supervised Himan by allowing him to be assigned to the investigation despite his lack of experience, and negligently supervised Addison, Michael, Gottlieb, and Himan with respect to the conduct of criminal investigations. In addition, Plaintiffs allege that the Supervisors and the City negligently supervised Himan and Gottlieb by ignoring Himan and Gottlieb's misconduct and continuing

---

the Court notes that recent state cases have stated that the public duty doctrine does not apply "when a police officer's affirmative actions have directly caused harm to a plaintiff.," Scott v. City of Charlotte, 691 S.E.2d 747, 752 (N.C. Ct. App. 2010), and that the public duty doctrine does not bar claims based on intentional misconduct. See, e.g., Smith v. Jackson County Bd. of Educ., 168 N.C. App. 452, 459, 608 S.E.2d 399, 406 (2005) (noting that claims against a City based on intentional conduct by an officer were not barred by the public duty doctrine). The Court will therefore consider this issue further at summary judgment to the extent that Plaintiffs' claims against the City are based in negligence and could be barred, at least to some extent, by the public duty doctrine. However, given the factual issues raised, as well as the remaining claims against the City and the need for further proceedings against the City as to those claims, the Court will not resolve the application of the public duty doctrine at this time.

to order them to follow Nifong's directions, and that the Supervisors and City negligently supervised Addison by failing to retract his statements or discipline him.

As with the previous Count, this claim is asserted against the individually-named Defendants in both their official and individual capacities. However, as noted above, the individual Defendants have raised the defense of public official immunity to the extent that the claims are asserted against them in their individual capacities, noting that "[t]he public immunity doctrine protects public officials from individual liability for negligence in the performance of their governmental or discretionary duties." Campbell v. Anderson, 156 N.C. App. 371, 376, 576 S.E.2d 726, 730 (2003); see also Thomas v. Sellers, 142 N.C. App. 310, 313, 542 S.E.2d 283, 286 (2001); Moore v. Evans, 124 N.C. App. 35, 42, 476 S.E.2d 415, 421 (1996). In their Responses, Plaintiffs do not dispute this contention as to Count 26, and Plaintiffs do not oppose the Motions to Dismiss as to Count 26 with respect to the claims asserted against the individual Defendants in their individual capacities.[75] However, to the extent that this claim is asserted against the City, the Court concludes that this claim should go forward at the time. As discussed below with respect to Count 41, there are many overlapping issues raised with respect to the claims against the City, including governmental immunity, waiver of that immunity, alternative claims under the North Carolina Constitution, and issues and defenses that require consideration on an evidentiary record beyond what is asserted in the Second Amended Complaint. The Court

---

[75] The Court further notes that the claims against the individuals would also be subject to dismissal in any event because a claim for negligent hiring, supervision or retention under state law is a claim against the employer, not the supervisors. See Foster v. Crandell, 181 N.C. App. 152, 170-71, 638 S.E.2d 526, 538-39 (2007); Ostwalt v. Charlotte-Mecklenburg Bd. of Educ., 614 F. Supp. 2d 603, 609 (W.D.N.C. 2008).

has already determined that there are claims going forward against the City as discussed above with respect to Counts 1, 2, and 5 (as asserted against the City in Counts 12 and 14) and in Count 18. The Court therefore concludes that further analysis of the other alternative claims against the City under state law are best resolved at summary judgment rather than on the present Motions to Dismiss.[76] Therefore, the Motions to Dismiss will be granted, with Plaintiffs' consent, on the basis of public official immunity as to Baker, Chalmers, Hodge, Russ, Mihaich, Council, Lamb, Ripberger, Evans, and Soukup, but the Motions to Dismiss will be denied as to the City, and the claims against the City as to Count 26 will go forward.

**Count 27:** **Negligent Infliction of Emotional Distress, asserted against Gottlieb, Himan, Ripberger, Lamb, Council, Hodge, Mihaich, Addison, Russ, Chalmers, Duke, and the City**

In Count 27, Plaintiffs assert a state common law claim for negligent infliction of emotional distress against several of the Durham Police Officers in their "individual and official capacities" and against the City and Duke. As the basis for this claim, Plaintiffs allege that Addison, Michael, Hodge, Chalmers, the City, and Duke acted individually and in concert to "subject Plaintiffs to national and international public infamy," that Gottlieb, Himan, Hodge, Ripberger, Lamb, Chalmers, and the City acted individually to manufacture false evidence and

---

[76] To the extent that the City also raises the public duty doctrine as a defense to this claim, the public duty doctrine is discussed in the notes addressing Count 25. However, the North Carolina Court of Appeals has concluded that the public duty doctrine would not apply to claims of negligent supervision. See Smith v. Jackson County Bd. of Educ., 168 N.C. App. 452, 467, 608 S.E.2d 399, 410-11 (2005) ("In Braswell, . . . . [t]he Supreme Court applied the public duty doctrine only to the negligent failure to protect claim; it addressed the merits of the negligent supervision and retention claim. As this Court observed in Leftwich: '[T]he public duty doctrine is not incompatible with negligent supervision.'" (quoting Leftwich v. Gaines, 134 N.C. App. 502, 514, 521 S.E.2d 717, 726 (1999))).

conceal exculpatory evidence, and that Gottlieb, Himan, Nifong, Meehan, Clark, and DSI acted individually and in concert in violation of policies and professional standards, in failing to provide Plaintiffs with the DNA test results.[77] (Second Am. Compl. ¶ 1278-1280). Plaintiffs allege that as a result, Plaintiffs "have suffered and continue to suffer from diagnosable emotional and mental conditions causing disabling emotional, mental, and physical harm." (Second Am. Compl. ¶ 1282).

In order to state a claim for Negligent Infliction of Emotional Distress ("NIED") under North Carolina law, "a plaintiff must allege that (1) the defendant negligently engaged in conduct, (2) it was reasonably foreseeable that such conduct would cause the plaintiff severe emotional distress . . . , and (3) the conduct did in fact cause the plaintiff severe emotional distress." McAllister v. Khie Sem Ha, 347 N.C. 638, 645, 496 S.E.2d 577, 582-83 (1998) (quoting Johnson v. Ruark Obstetrics & Gynecology Assocs., P.A., 327 N.C. 283, 304, 395 S.E.2d 85, 97 (1990), reh'g denied, 327 N.C. 644, 399 S.E.2d 133 (1990)). Thus, to state a claim for NIED, Plaintiffs must allege a sufficient basis to support the contention that they each suffered "severe emotional distress" under North Carolina law, and that the "severe emotional distress was the foreseeable and proximate result" of Defendants' alleged negligence. Id. at 645, 496 S.E.2d at 583. As with a claim for intentional infliction of emotional distress, "severe emotional distress" requires an "emotional or mental disorder . . . which may be generally recognized and diagnosed by professionals trained to do so." Id. However, Plaintiffs have failed

---

[77] Count 27 is not asserted against Michael, Meehan, Clark or DSI. Count 27 is asserted against Council, Mihaich and Russ, but there are no factual allegations as to those Defendants in Count 27.

to include any specific allegations of emotional or mental disorders or severe and disabling emotional or mental conditions suffered by any of the Plaintiffs, and the Second Amended Complaint does not include any specific identification of any particular Plaintiff's mental or emotional condition or the nature of their emotional distress. Cf. Holleman v. Aiken, 193 N.C. App. 484, 502, 668 S.E.2d 579, 591 (2008) (dismissing NIED claim because "plaintiff does not make any specific factual allegation as [to] her 'severe emotional distress'); Swaim v. Westchester Acad., Inc., 170 F. Supp. 2d 580, 585 (M.D.N.C. 2001). Therefore, Defendants' Motions to Dismiss will be granted as to Count 27, and Plaintiffs' claims for negligent infliction of emotional distress in Count 27 will be dismissed.[78]

**Count 28:** **Negligent Infliction of Emotional Distress, asserted against Nifong, Addison, Michael, Baker, Chalmers, Hodge, Russ, Mihaich, Council, Lamb, Ripberger, Evans, Soukup, and the City**

In Count 28, Plaintiffs assert a state common law claim for negligent infliction of emotional distress against several of the Durham Police Officers in their "individual and official capacities" and against the City and Nifong. As the basis for this claim, Plaintiffs allege that the named Defendants[79] acted individually and in concert to make false and inflammatory statements accusing Plaintiffs of criminal conduct and accusing Plaintiffs of failing to cooperate

---

[78] In addition, as discussed with respect to Counts 25 and 26, to the extent that this claim is asserted against the individual Defendants in their individual capacities, those Defendants have asserted public official immunity. In their Responses, Plaintiffs do not dispute this contention, and Plaintiffs do not oppose the Motions to Dismiss as to Count 27 with respect to the individual Defendants in their individual capacities. Therefore, the Motions to Dismiss will be granted on that basis as well.

[79] Although this claim is asserted against Defendant Michael, the factual allegations do not include Defendant Michael.

in the investigation. Plaintiffs allege that as a result, Plaintiffs "have suffered and continue to suffer from diagnosable conditions causing disabling emotional, mental, and physical harm." (Second Am. Compl. ¶ 1288).

As discussed above, in order to state a claim for Negligent Infliction of Emotional Distress ("NIED") under North Carolina law, Plaintiffs must allege a sufficient basis to support the contention that they each suffered "severe emotional distress" under North Carolina law, and that the "severe emotional distress was the foreseeable and proximate result" of Defendants' alleged negligence. McAllister v. Khie Sem Ha, 347 N.C. 638, 645, 496 S.E.2d 577, 583 (1998). As with a claim for intentional infliction of emotional distress, "severe emotional distress" requires an "emotional or mental disorder . . . which may be generally recognized and diagnosed by professionals trained to do so." Id. However, Plaintiffs have failed to include any specific allegations of emotional or mental disorders or severe and disabling emotional or mental conditions suffered by any of the Plaintiffs, and the Second Amended Complaint does not include any specific identification of any particular Plaintiff's mental or emotional condition or the nature of their emotional distress. Cf. Holleman v. Aiken, 193 N.C. App. 484, 502, 668 S.E.2d 579, 591 (2008); Swaim v. Westchester Acad., Inc., 170 F. Supp. 2d 580, 585 (M.D.N.C. 2001). Therefore, Defendants' Motions to Dismiss will be granted as to Count 28, and Plaintiffs' claims for negligent infliction of emotional distress in Count 28 will be dismissed.[80]

---

[80] In addition, as discussed with respect to Counts 25 and 26, to the extent that this claim is asserted against the individual Defendants in their individual capacities, those Defendants have asserted public official immunity. In their Responses, Plaintiffs do not dispute this contention, and Plaintiffs do not oppose the Motions to Dismiss as to Count 28 with respect to the individual Defendants in their individual capacities. Therefore, the Motions to Dismiss will be granted on that basis as well.

**Count 29:**      **Negligence, asserted against Duke and the Duke Police Department**

In Count 29, Plaintiffs assert a state common law claim for negligence against Duke and the Duke Police Department. As the basis for this claim, Plaintiffs allege that the Duke Police Department had "primary jurisdiction" and statutory authority over the investigation of Mangum's claims, but abdicated its obligations and ceded its authority to Gottlieb. Plaintiffs allege that the Duke Police Department employees were negligent in their investigation and were negligent in their failure to insist or demand that Duke Police intervene in the investigation. However, with respect to this claim, the Court has already concluded that, as a matter of law, the Durham Police had complete statutory authority under North Carolina law, on campus and off. See N.C. Gen. Stat. § 15A-402; § 160A-286. The Jurisdictional Agreement between the Durham Police and Duke Police could not reduce the Durham Police Department's statutory authority, nor could it give the Duke Police any authority over the Durham Police, even on campus or in other areas around campus, regardless of whether the Duke Police had "primary jurisdiction" of an area under the Agreement. To the extent that Plaintiffs allege that the Duke Police had authority over the Durham Police or delegated authority to the Durham Police, those are legal conclusions that are inconsistent with North Carolina law and that the Court is not bound to accept. Having considered Plaintiffs' contentions, the Court concludes that North Carolina courts would not recognize a claim for negligence against a University or its police force for failing to intervene or interfere with a municipality's exercise of its statutory police powers. Therefore, the Motions to Dismiss Count 29 will be granted, and the claims asserted in Count 29 will be dismissed.

**Count 30:** Negligence, asserted against Duke, Steel, Brodhead, Lange, Trask, Burness, Moneta, Dzau, Haltom, Dawkins, Wasiolek, Bryan, Drummond, Duke Police, Graves, Dean, Humphries, Cooper, Garber, Schwab, Fleming, Best, Smith, Stotsenberg, Duke Health, Private Diagnostic, Manly, Arico, and Levicy

In Count 30, Plaintiffs assert a state common law claim for negligence against Duke and all of the Duke-related Defendants. As the basis for this claim, Plaintiffs allege that Duke owed them "a duty of care to warn and otherwise affirmatively act to protect Plaintiffs from harm" by virtue of their "unique relationships" as students and student-athletes. (Second Am. Compl. ¶ 1302). Plaintiffs allege that a special relationship of "mutual benefit" existed because they were student-athletes, and that Duke therefore required to "help and/or protect the Plaintiffs." (Second Am. Compl. ¶ 1302). Plaintiffs allege that the named Defendants breached the duty of care owed to Plaintiffs by "failing to act with respect to the known and foreseeable dangers," failing to advise Plaintiffs to seek qualified, competent legal counsel, failing to provide a competent supervisor to oversee the investigation and intervene to prevent Gottlieb's efforts, failing to notify Plaintiffs' parents of the accusations, failing to safeguard e-mail accounts and other records, and failing to correct false and misleading statements made by Duke faculty and staff. (Second Am. Compl. ¶1303). Plaintiffs further allege that the individual Defendants' negligence was the product of Duke's negligent hiring, retention, supervision, and training.

Under North Carolina law, a plaintiff states a claim for negligence if he alleges sufficient facts to establish "(1) that there has been a failure to exercise proper care in the performance of some legal duty which defendant owed to plaintiff under the circumstances in which they were placed; and (2) that such negligent breach of duty was a proximate cause of the injury." <u>Hairston</u>

v. Alexander Tank & Equip. Co., 310 N.C. 227, 232, 311 S.E.2d 559, 564 (1984); see also Estate of Mullis by Dixon v. Monroe Oil Co., 349 N.C. 196, 201, 505 S.E.2d 131, 135 (1998) (noting that a common law negligence claim has four essential elements: "duty, breach of duty, proximate cause, and damages").  As such, "[a]ctionable negligence presupposes the existence of a legal relationship between parties by which the injured party is owed a duty by the other, and such duty must be imposed by law." Davidson v. Univ. of N.C. at Chapel Hill, 142 N.C. App. 544, 553, 543 S.E.2d 920, 926 (2001) (internal quotations omitted).  "In cases involving omissions, negligence may arise where a 'special relationship' exists between the parties." Id. at 554, 543 S.E.2d at 926.  In Davidson v. University of North Carolina, the North Carolina Court of Appeals recognized the existence of a "special relationship" between the university and its athletes.  This "special relationship" imposed a duty of care on the university related to that relationship, in the Davidson case with respect to injuries suffered by the athlete during practice as part of a school-sponsored team. Id. at 557, 543 S.E.2d at 928.  However, the North Carolina Court of Appeals in Davidson noted that "[o]ur holding should not be interpreted as finding a special relationship to exist between a university, college, or other secondary educational institution, and every student attending the school, or even every member of a student group, club, intramural team, or organization.  We agree with the conclusion reached by other jurisdictions addressing this issue that a university should not generally be an insurer of its students' safety, and that, therefore, the student-university relationship, standing alone, does not constitute a special relationship giving rise to a duty of care." Id. at 556, 543 S.E.2d at 928; Kleinknecht v. Gettysburg Coll., 989 F.2d 1360, 1368 (3d Cir. 1993) (noting that a college does

not owe a general duty of care to its students because "the modern American college is not an insurer of the safety of its students" (internal quotations omitted)).

Based on this authority, the Court concludes that Duke was not in a "special relationship" with the lacrosse team members based on their status as students, because under North Carolina law, the student-university relationship "does not constitute a special relationship giving rise to a duty of care." In addition, although Duke was potentially in a "special relationship" with lacrosse team members related to their participation in lacrosse team events, that "special relationship" would not extend outside of the lacrosse team context. Thus, any "special relationship" that may have existed in the lacrosse team context did not transform Duke into an "insurer of the safety" of team members in all other facets of student life. In this case, the allegations asserted in Count 30 are based on Duke's alleged failure to protect Plaintiffs from harm by failing to intervene in a Durham Police investigation, failing to notify Plaintiffs' parents of the investigation, failing to correct statements made by faculty members and failing to safeguard Plaintiffs' student information. These allegations are outside of any University-related lacrosse team function and do not relate to any participation in University-sponsored lacrosse team events. As such, the allegations are outside the scope of any "special relationship" that may have existed between team members and Duke based on their status as lacrosse team members. Therefore, the Court concludes that the claims alleged in Count 30 are outside of any "special relationship" that may have existed, and Duke did not have a "special relationship" with lacrosse team members as students generally that imposed upon Duke a "duty of care to warn and otherwise affirmatively act to protect Plaintiffs from harm" as alleged in Count 30.

In addition, to the extent that Plaintiffs' negligence claim is based on failure to provide competent advice to Plaintiffs, the North Carolina Court of Appeals in Davidson recognized the possibility of a negligence claim based on a "voluntary undertaking" when the university negligently failed to provide sufficient advice or safety information prior to practice. See Davidson, 142 N.C. App. at 558-59, 543 S.E.2d at 929-30. In that case, the court held that the university "voluntarily undertook to advise and educate the cheerleaders regarding safety," and this "voluntary undertaking" established a duty of care upon the University to reasonably advise and educate the squad members regarding safety. Id. at 558, 543 S.E.2d at 929. However, due to significant policy concerns, courts have generally declined to recognize a duty of care between a university advisor and a student for academic advice or guidance. See Hendricks v. Clemson Univ., 578 S.E.2d 711, 715 (S.C. 2003) (cited with approval in Ryan v. Univ. of N.C. Hosps., 168 N.C. App. 729, 2005 WL 465554, at *4 (2005) (table opinion)). For the same reasons, courts have declined to recognize claims for "educational malpractice" given the "policy concerns with recognizing an actionable duty of care owed from educators to students: (1) the lack of a satisfactory standard of care by which to evaluate educators, (2) the inherent uncertainties of the cause and nature of damages, and (3) the potential for a flood of litigation against already beleaguered schools." Id.; see also Thomas v. Charlotte-Mecklenburg Bd. of Educ., 3:06CV238-MU, 2006 WL 3257051, at *1 (W.D.N.C. Nov. 9, 2006) ("North Carolina does not have an action for educational malpractice."); Gupta v. New Britain Gen. Hosp., 687 A.2d 111, 119 (Conn. 1996) ("[C]ourts have almost universally held that claims of 'educational malpractice' are not cognizable."); Key v. Coryell, 185 S.W.3d 98, 106 (Ark. 2004) ("[A] cause of action

seeking damages for acts of negligence in the educational process is precluded by considerations of public policy."); Miller v. Loyola Univ. of New Orleans, 829 So. 2d 1057, 1060 (La. Ct. App. 2002) ("The great weight of authority generally holds that the law recognizes no cause of action for 'educational malpractice', either in tort or contract."). Thus, courts have concluded that "recognizing a duty flowing from advisors to students is not required by any precedent and would be unwise, considering the great potential for embroiling schools in litigation that such recognition would create." Hendricks, 578 S.E.2d at 715; Brown v. Compton Unified Sch. Dist., 80 Cal. Rptr. 2d 171, 172 (Cal. App. 1998) ("To hold [advisors and administrators] to an actionable 'duty of care,' in the discharge of their academic functions, would expose them to the tort claims--real or imagined--of disaffected students and parents in countless numbers" and "[t]he ultimate consequences, in terms of public time and money, would burden them--and society--beyond calculation.").

The cases that do recognize potential liability based on a voluntary undertaking, within and outside of the school setting, do so where physical injury results from alleged negligence in the undertaking. See, e.g., Davidson, 142 N.C. App. at 558-59, 543 S.E.2d at 929-30 (recognizing potential negligence claim for physical injury suffered by cheerleader during team practice based on voluntary undertaking to advise and educate squad members regarding safety); Hendricks, 578 S.E.2d at 715 (noting that negligence claims based on voluntary undertaking "have thus far been limited to situations in which a party has voluntarily undertaken to prevent physical harm, not economic injury"). The Restatement (Second) of Torts § 323 sets out the basis for a negligence claim based on a voluntary undertaking, and specifies that such a claim

exists "for physical harm resulting from [the] failure to exercise reasonable care to perform [the] undertaking." Restatement (Second) of Torts § 323; see also Furek v. Univ. of Delaware, 594 A.2d 506, 520 (Del. 1991) (holding that Restatement (Second) of Torts § 323 provided the framework for considering a university's duty to a student based on the "duty owed by one who assumes direct responsibility for the safety of another through the rendering of services in the area of protection").

Based on this weight of authority, the Court concludes first that the university-student relationship alone does not impose an actionable duty of care on administrators or advisors in the discharge of their academic functions. In addition, to the extent that Plaintiffs contend that a duty of care nevertheless existed in the present case based on a "voluntary undertaking," this Court concludes that under North Carolina law, as set out above, a university may be held liable for negligence if it makes itself responsible for a students' physical safety in a school-related activity, and if the university's alleged negligence contributed to a physical injury to the student. However, administrators and other advisors should be free to communicate and advise students without creating potential tort liability, even if that advice turns out to be misguided or inadequate. Thus, students should not be entitled to recover on a negligence claim against an administrator or university based on the giving of poor advice. This is particularly true where, as here, the alleged injury resulting from the "voluntary undertaking" of the Defendants is economic injury, rather than physical injury. Therefore, the Court concludes that with respect to the present claim in Count 30 for allegedly negligent advice, North Carolina would not recognize a duty of an advisor or administrator to a student that would support a claim for

negligence, particularly where no physical harm results.

Therefore, the Court concludes that Plaintiffs have failed to state a claim against the named Defendants as alleged in Count 30, and the claims asserted in Count 30 will be dismissed.

**Count 31:** **Negligence, asserted against Levicy, Arico, Manly, Dzau, Private Diagnostic, Duke Health, and Duke**

In Count 31, Plaintiffs bring a state law claim for negligence related to the allegations against Arico and Levicy. As the basis for this claim, Plaintiffs allege that Levicy and Arico owed Plaintiffs a duty of care with respect to making public statements and statements to law enforcement regarding Mangum's claims, and with respect to the investigation of Mangum's allegations and the provision of forensic medical evidence. Plaintiffs allege that Levicy and Arico breached their duty of care, and that Levicy and Arico were acting in the scope of their employment with Private Diagnostic, Duke Health or Duke. Plaintiffs further allege that Private Diagnostic, Duke Health or Duke breached its duty of care by assigning Levicy to conduct Mangum's examination and by failing to meet the standard of care for the provision of sexual assault examinations.[81]

As noted above, under North Carolina law, a plaintiff states a claim for negligence if he alleges sufficient facts to establish "(1) that there has been a failure to exercise proper care in the performance of some legal duty which defendant owed to plaintiff under the circumstances in which they were placed; and (2) that such negligent breach of duty was a proximate cause of the injury." Hairston v. Alexander Tank & Equip. Co., 310 N.C. 227, 232, 311 S.E.2d 559, 564

---

[81] Although Count 31 is asserted against Dzau, he is not included in the factual allegations in Count 31. Similarly, although Count 31 is asserted against Manly, there is no allegation of any negligent conduct as to Defendant Manly.

(1984); see also Estate of Mullis by Dixon v. Monroe Oil Co., 349 N.C. 196, 201, 505 S.E.2d 131, 135 (1998) (noting that a common law negligence claim has four essential elements: "duty, breach of duty, proximate cause, and damages"). When a claim is asserted against a health care provider by a third party who was not a patient of the health care provider, the claim should be analyzed to determine whether it is a claim for medical malpractice or for ordinary negligence. See Iodice v. United States, 289 F.3d 270, 275-77 (4th Cir. 2002). Under North Carolina law, a "medical malpractice action" is "a civil action for damages for personal injury or death arising out of the furnishing or failure to furnish professional services in the performance of medical, dental, or other health care by a health care provider." N.C. Gen. Stat. § 90-21.11. In Iodice v. United States, the Fourth Circuit considered claims asserted under North Carolina law by plaintiffs who were injured and killed in an automobile accident caused by another driver, Jones, who was under the influence of alcohol and narcotics. The plaintiffs brought suit against Jones' health care provider, who had prescribed heavy doses of narcotics despite Jones's history of drug and alcohol addiction. In reviewing the claims, the Fourth Circuit held that to the extent the claims were "attacking the quality of the medical care," they were appropriately viewed as medical malpractice claims, and under North Carolina law, "'the relationship of physician to patient must be established as a prerequisite to an actionable claim for medical malpractice.'" Iodice, 289 F.3d at 275 (quoting Easter v. Lexington Mem'l Hosp., Inc., 303 N.C. 303, 305-06, 278 S.E.2d 253, 255 (1981)); see also Estate of Waters v. Jarman, 144 N.C. App. 98, 101, 547 S.E.2d 142, 144 (2001) (noting that medical malpractice claims asserted against a hospital involve claims of negligence in the "clinical care" provided to the patient); Fireman's Mut. Ins. Co. v.

High Point Sprinkler Co., 266 N.C. 134, 141, 146 S.E.2d 53, 60 (1966) ("The relation of physician and patient imposes upon the physician a duty of care for the protection of the patient from injury which he does not owe to others.").

Applying this rule in the present case, the Court notes that Plaintiffs were not patients at Duke Health and did not receive any treatment or examination themselves. Instead, they are third parties attempting to assert a claim for the alleged negligence of the named Defendants. Therefore, the Court concludes that to the extent that Plaintiffs' claim for negligence in the present case is based on the quality of care provided to Mangum, including any claim based on the clinical care, diagnosis, or medical assessment by Defendants, such a claim is a medical malpractice claim and must be dismissed, because this type of claim may not be asserted by individuals who were not patients of Defendants.

The Fourth Circuit in Iodice also considered the alternative claims asserted by the plaintiffs in that case for "ordinary negligence" against the health care providers. The Fourth Circuit noted that under North Carolina law, "when a negligence claim against a health care provider does not 'arise out' of the 'furnishing' of 'professional services,' it is not a medical malpractice claim, but rather may be brought as an ordinary negligence claim." Iodice, 289 F.3d at 276 (citing Estate of Waters, 144 N.C. App. at 103, 547 S.E.2d at 145). In such "ordinary negligence" actions, courts apply the "reasonably prudent person" standard, and "in such ordinary negligence actions the 'liability of the defendant [health care provider] to the plaintiff depends on whether the defendant owed a duty of care to the plaintiff, which duty was violated, proximately causing injury to the plaintiff.'" Id. at 276, 279 (quoting Blanton v. Moses H. Cone

Mem'l Hosp. Inc., 319 N.C. 372, 375, 354 S.E.2d 455, 457 (1987)) (concluding further that "North Carolina would require a tight nexus" between the alleged negligence and the harm to the victim, if it permitted third party plaintiffs to recover at all). Such an "ordinary negligence" claim "presupposes the existence of a legal relationship between the parties by which the injured party is owed a duty which either arises out of a contract or by operation of law. If there is no duty, there can be no liability." Prince v. Wright, 141 N.C. App. 262, 266, 541 S.E.2d 191, 195 (2000) (internal quotations omitted). "'[A] duty, in negligence cases, may be defined as an obligation, to which the law will give recognition and effect, to conform to a particular standard of conduct toward another.'" Peal by Peal v. Smith, 115 N.C. App. 225, 230, 444 S.E.2d 673, 677 (1994) (quoting W. Page Keeton et al., The Law of Torts, § 53 (5th ed. 1984)). "Such duty of care may be a specific duty owing to the plaintiff by the defendant, or it may be a general one owed by the defendant to the public, of which the plaintiff is a part." Paschall v. N.C. Dep't of Corr., 88 N.C. App. 520, 524, 364 S.E.2d 144, 146 (1988) (quoting Pinnix v. Toomey, 242 N.C. 358, 362, 87 S.E.2d 893, 897-98 (1955)). "The existence of a duty is 'entirely a question of law . . . and it must be determined only by the court.'" Peal by Peal, 115 N.C. App. at 230, 444 S.E.2d at 677 (quoting W. Page Keeton et al., The Law of Torts, § 37 (5th ed. 1984)).

In this case, Plaintiffs contend that they have stated claims for ordinary negligence with respect to Levicy's statements to law enforcement, the investigation of Mangum's claims, and provision of forensic evidence, apart from any medical care provided to Mangum. However, even if the conduct alleged as to Defendant Levicy did not comply with professional standards or fell below a reasonable standard of care, Plaintiffs can only bring a negligence claim for the

alleged failure to meet the standard of care if Levicy owed a duty of reasonable care to the Plaintiffs. In the Second Amended Complaint, Plaintiffs allege that Levicy owed them a "duty to use due care with respect to public statements and statements to law enforcement concerning the investigation of Mangum's claims [and] . . . a duty to use due care with respect to their involvement in the investigation of Mangum's false accusations, including the provision [of] forensic medical evidence relating to the investigation." (Second Am. Compl. ¶ 1311-1312). However, the Court finds that there is no basis to support the contention that a sexual assault nurse examiner or a hospital emergency department owes a duty to the general public or to individuals who are members of the public who may subsequently be targeted during a police investigation. Plaintiffs have cited no North Carolina or Fourth Circuit cases supporting such a duty, and this Court concludes that North Carolina public policy would not support imposing such sweeping potential liability on health care professionals for providing assessments and reports to police officers.[82] Indeed, the Fourth Circuit has rejected third party claims that would impose a duty on a physician to third parties, where such a duty could interfere with the physician's primary duty to the patient. Cf. Iodice, 289 F.3d at 276 (""[D]octors should owe their duty to their patient and not to anyone else so as not to compromise this primary duty.'"

---

[82] This public policy is illustrated in North Carolina General Statute § 90-21.20(d), which specifically provides immunity to hospital directors, administrators, physicians, and other designated persons who participate in making a report to police under that statute for certain wounds, injuries and illnesses, unless the director, administrator, physician, or other designated person is acting in bad faith. See N.C. Gen. Stat. § 90-21.20. Thus, North Carolina law would not recognize claims for negligence related to participation in a report provided to police under that statute. Although the parties have not raised this statute in the present case, it provides further evidence that North Carolina law would not recognize negligence claims in these circumstances or impose a duty that would extend to Plaintiffs for claims based on simple negligence.

(quoting <u>Russell v. Adams</u>, 125 N.C. App. 637, 640, 482 S.E.2d 30, 33 (1997) (internal quotation omitted))).  Plaintiffs have not asserted any factual basis on which to conclude that a specific legal duty arose between Levicy and Plaintiffs, and North Carolina law would not support an extension of liability to health care providers in these circumstances.  Therefore, the Court concludes that a nurse or other medical professional does not owe a duty of care to the general public or members of the public who may subsequently be investigated by police based on information provided to the police by the medical professional.[83]  Thus, even if at least some of the conduct alleged as to Defendant Levicy fell below a reasonable standard of care, Plaintiffs have failed to state a claim for negligence because they have not asserted facts that would support the contention that Defendants owed a duty of reasonable care to them.  Count 31, which is based solely on a claim of negligent conduct, will therefore be dismissed.

**Count 32:     Negligent Hiring, Retention, Supervision, Training and Discipline, asserted against Arico, Manly, Private Diagnostic, Duke, and Duke Health**

In Count 32, Plaintiffs bring a state law claim for negligence, alleging negligent hiring, retention, supervision, training and discipline of Levicy.  As the basis for this claim, Plaintiffs allege that Arico, Manly, Private Diagnostic, Duke, and Duke Health owed Plaintiffs a duty of care with respect to the hiring, training, supervision, discipline, and retention of sexual assault examiners and other personnel involved in the investigation of Mangum's claims and the preservation of records. Plaintiffs further allege that Arico, Manly, Private Diagnostic, Duke

---

[83] A health care professional, like any other person, may be liable for defamation if the elements of that tort are established.  However, Plaintiffs here have not asserted a claim for defamation, and therefore the inquiry here is only whether a duty exists that would support potential liability for negligence in the circumstances alleged.

Health, or Duke negligently supervised Levicy by failing to monitor her conduct or performance, failing to provide her with proper training, and ignoring evidence of Arico and Levicy's misconduct in making false statements to the public and to investigators.

"North Carolina recognizes the existence of a claim against an employer for negligence in employing or retaining an employee whose wrongful conduct injures another." Hogan v. Forsyth Country Club Co., 79 N.C. App. 483, 494, 340 S.E.2d 116, 123 (1986). This type of claim "becomes important in cases where the act of the employee either was not, or may not have been, within the scope of his employment." Id. at 495, 340 S.E.2d at 124. "However, before the employer can be held liable, plaintiff must prove that the incompetent employee committed a tortious act resulting in injury to plaintiff and that prior to the act, the employer knew or had reason to know of the employee's incompetency." Id.

As the basis for a claim of negligent supervision or retention, "Plaintiff must demonstrate that [defendant's] employees committed tortious acts, of which [defendant] had actual or constructive knowledge," and as such, the underlying tortious conduct is "an essential element of this claim." Kimes v. Lab. Corp. of Am., Inc., 313 F. Supp. 2d 555, 569 (M.D.N.C. 2004) (granting summary judgment on negligent supervision claim after underlying emotional distress claims were dismissed); see also Guthrie v. Conroy, 152 N.C. App. 15, 26, 567 S.E.2d 403, 411 (2002) (dismissing claim against employer that was based on ratification of employee's behavior when the underlying IIED claim was dismissed). In the present case, the Court has concluded that many of the claims against Levicy should be dismissed, and therefore no negligent supervision claim can be raised as to those dismissed claims. However, the Court has also

concluded that other claims are going forward as to Defendant Levicy.[84] Under North Carolina law, an employer may be held liable for the tortious acts of its employees, based on either a theory of (1) *respondeat superior* if the employee was acting in the scope of his or her employment, or (2) negligent supervision if, "prior to the [tortious] act, the employer knew or had reason to know of the employee's incompetency" even if "the act of the employee either was not, or may not have been, within the scope of his employment" Hogan, 79 N.C. App. at 495, 340 S.E.2d at 124. Thus, the negligent supervision claim may be asserted as an alternative to "*respondeat superior*" liability under state law. Therefore, the Court will not dismiss the claim asserted in Count 32 against Duke and Duke Health for negligent supervision of Levicy, to the extent that other underlying claims are proceeding in this case as to Levicy.

However, a claim for negligent hiring, retention, and supervision would be actionable only against the employer, not the individual supervisors. Cf. Foster v. Crandell, 181 N.C. App. 152, 170-71, 638 S.E.2d 526, 538-39 (2007) (noting that liability for negligent hiring or retention would extend only to an employer who employed an incompetent employee either as an employee or independent contractor, not to co-employees); Ostwalt v. Charlotte-Mecklenburg Bd. of Educ., 614 F. Supp. 2d 603, 609 (W.D.N.C. 2008) ("North Carolina courts have

---

[84] Specifically, the Court has concluded that although there is no underlying claim properly asserted as to Defendant Levicy for negligence, Plaintiffs' claim for obstruction of justice against Levicy may proceed. There are also claims going forward as to Defendant Levicy pursuant to § 1983, but the parties have not addressed the extent to which a state negligent supervision claim could arise based on underlying conduct that involves a violation of § 1983, where the employee has become a "state actor" by her own conduct but the employer has not. Because other state court claims are proceeding on which to base the negligent supervision claim in any event, further resolution of this issue is reserved for subsequent briefing at summary judgment.

determined that no claim for negligent supervision lies when the Defendant is not the employer of the individual who commits the tortious act.").[85] Therefore, this claim is properly dismissed as to Arico and Manly.

As a result of these determinations, the Motion to Dismiss will be granted in part and denied in part, and the claim asserted in Count 32 for negligent supervision will be dismissed as to Defendants Arico, Manly and Private Diagnostic,[86] but will go forward as to Duke and Duke Health to the extent that other underlying claims are proceeding in this case as to Defendant Levicy.

### Count 33: Negligent Infliction of Emotional Distress, asserted against Levicy, Arico, Manly, Private Diagnostic, Duke Health, and Duke

In Count 33, Plaintiffs bring a state law claim for negligent infliction of emotional distress against the named Defendants. As the basis for this claim, Plaintiffs allege that Levicy, Arico, Manly, Private Diagnostic, Duke Health, and Duke acted individually and in concert to manufacture false evidence and conceal exculpatory forensic medical evidence, and that they violated guidelines and regulations and departed from the professional standard of care.

---

[85] North Carolina courts do recognize a physician's independent duty to patients of medical residents or interns when the physician is directly responsible for supervising the residents or interns. See Mozingo v. Pitt County Mem'l Hosp., Inc., 331 N.C. 182, 192, 415 S.E.2d 341, 347 (1992). However, the facts alleged in the present case would not establish a basis for liability under Mozingo, since this case does not involve a claim by a patient, nor does it involve any recognized legal duty to Plaintiffs on the part of any of the named Defendants, as discussed *supra* in Count 31. Thus, to the extent that Plaintiffs are attempting to allege other direct negligence by the named Defendants, the Court concludes that the named Defendants did not owe a legal duty to Plaintiffs, as discussed with respect to the negligence claims asserted in Count 31.

[86] Private Diagnostic is included as a Defendant only as the employer of Manly. Since this claim is being dismissed against Manly, it is also properly dismissed as to Private Diagnostic.

Plaintiffs allege that as a result, Plaintiffs "have suffered and continue to suffer from diagnosable emotional and mental conditions causing disabling emotional, mental, and physical harm." (Second Am. Compl. ¶ 1331).

As discussed above, in order to state a claim for Negligent Infliction of Emotional Distress ("NIED") under North Carolina law, Plaintiffs must allege a sufficient basis to support the contention that they each suffered "severe emotional distress" under North Carolina law, and that the "severe emotional distress was the foreseeable and proximate result" of Defendants' alleged negligence. McAllister v. Khie Sem Ha, 347 N.C. 638, 645, 496 S.E.2d 577, 583 (1998). As with a claim for intentional infliction of emotional distress, "severe emotional distress" requires an "emotional or mental disorder . . . which may be generally recognized and diagnosed by professionals trained to do so." Id. However, Plaintiffs have failed to include any specific allegations of emotional or mental disorders or severe and disabling emotional or mental conditions suffered by any of the Plaintiffs, and the Second Amended Complaint does not include any specific identification of any particular Plaintiff's mental or emotional condition or the nature of their emotional distress. Cf. Holleman v. Aiken, 193 N.C. App. 484, 502, 668 S.E.2d 579, 591 (2008); Swaim v. Westchester Acad., Inc., 170 F. Supp. 2d 580, 585 (M.D.N.C. 2001). Therefore, Plaintiffs' claims for negligent infliction of emotional distress in Count 33 will be dismissed.[87]

**Count 34:      Negligence, asserted against Meehan, Clark, and DSI**

---

[87] This claim is also subject to dismissal because, as discussed in Count 31, Plaintiffs have not stated a negligence claim against Levicy, Arico, Manly, Duke, or Duke Health because those Defendants did not owe Plaintiffs a duty of care.

In Count 34, Plaintiffs assert a state law claim for negligence against Meehan, Clark, and DSI. As the basis for this claim, Plaintiffs allege that Meehan, Clark, and DSI owed Plaintiffs a duty of care with respect to DSI's involvement in the police investigation of Mangum's claims, and that Clark, Meehan, and DSI breached the duty to use due care when they agreed to omit exculpatory test results and then produced a report that misstated the purported results of the DNA testing.

As noted above, under North Carolina law, a plaintiff states a claim for negligence if he alleges sufficient facts to establish "(1) that there has been a failure to exercise proper care in the performance of some legal duty which defendant owed to plaintiff under the circumstances in which they were placed; and (2) that such negligent breach of duty was a proximate cause of the injury." Hairston v. Alexander Tank & Equip. Co., 310 N.C. 227, 232, 311 S.E.2d 559, 564 (1984); see also Estate of Mullis by Dixon v. Monroe Oil Co., 349 N.C. 196, 201, 505 S.E.2d 131, 135 (1998) (noting that a common law negligence claim has four essential elements: "duty, breach of duty, proximate cause, and damages").

However, in the present case, Plaintiffs have not identified any legally cognizable duty of care that Clark, Meehan, and DSI would owe to the Plaintiffs. According to the allegations in the Second Amended Complaint, Clark, Meehan, and DSI were operating pursuant to a request from Nifong or Durham Officials. Therefore, while Clark, Meehan, and DSI may have had an obligation to the City, that did not create a duty to others who were not parties to the agreement. North Carolina has adopted the rule from the Restatement (First) of Contracts § 145, that "'A promisor bound to the United States or to a State or municipality by contract to

do an act or render a service to some or all of the members of the public, is subject to no duty under the contract to such members to give compensation for the injurious consequences of performing or attempting to perform it, or of failing to do so, unless, (a) an intention is manifested in the contract, as interpreted in the light of the circumstances surrounding its formation, that the promisor shall compensate members of the public for such injurious consequences, or (b) the promisor's contract is with a municipality to render services the nonperformance of which would subject the municipality to a duty to pay damages to those injured thereby.'" Matternes v. City of Winston-Salem, 286 N.C. 1, 14-15, 209 S.E.2d 481, 488-89 (1974) (adopting the rule from the Restatement (First) of Contracts § 145 (1932)).  There is no allegation here to support the conclusion that the agreement by Nifong or the City with DSI manifested an intent to compensate members of the public or that nonperformance of the contract would subject the City to damages.  Cf. Walker v. City of Durham, 158 N.C. App. 747, 582 S.E.2d 80, 2003 WL 21499222, at *2 (2003) (table opinion) (finding no liability for City for negligent handling or destruction of evidence or for failing to conduct DNA tests).  Therefore, the Court concludes that Clark, Meehan, and DSI did not owe a duty of care to Plaintiffs, and Plaintiffs cannot recover from Clark, Meehan, or DSI for simple negligence.[88]  Therefore, the Motions to Dismiss will be granted as to Count 34, and this claim will be dismissed.

**Count 35:    Negligent Supervision, Hiring, Training, Discipline, and Retention, asserted against Meehan, Clark, and DSI**

In Count 35, Plaintiffs assert a state law claim for negligence, alleging negligent

---

[88] To the extent that Plaintiffs base their claim on intentional misconduct involving falsification or fabrication of evidence, those claims are considered as part of Plaintiffs' claim for obstruction of justice in Count 18.

supervision, hiring, training, discipline and retention as to the named Defendants. Specifically, Plaintiffs allege that Clark and DSI negligently hired, supervised, and trained Meehan, and that Clark, Meehan and DSI negligently hired, supervised, retained, and trained the DSI personnel who were assisting Meehan.

As discussed above, "North Carolina recognizes the existence of a claim against an employer for negligence in employing or retaining an employee whose wrongful conduct injures another." Hogan v. Forsyth Country Club Co., 79 N.C. App. 483, 494, 340 S.E.2d 116, 123 (1986). This type of claim "becomes important in cases where the act of the employee either was not, or may not have been, within the scope of his employment." Id. at 495, 340 S.E.2d at 124. "However, before the employer can be held liable, plaintiff must prove that the incompetent employee committed a tortious act resulting in injury to plaintiff and that prior to the act, the employer knew or had reason to know of the employee's incompetency." Id.

In the present case, the Court has concluded that many of the claims against Clark and Meehan should be dismissed, and therefore no negligent supervision claim can be raised as to those dismissed claims. However, the Court has also concluded that the claims for obstruction of justice are going forward as to Defendants Clark and Meehan. The claim for obstruction of justice is also going forward against DSI on the basis of *respondeat superior* liability. As discussed above, a negligent supervision claim may be asserted as an alternative to *respondeat superior* liability under state law, and applies even if the employee was not acting within the scope of his employment, if the employer knew or had reason to know of the employee's incompetency. Id. Therefore, the Court will not dismiss the claim asserted in Count 35 for negligent supervision

to the extent that it is asserted against DSI for negligent supervision of Clark and Meehan.

However, a claim for negligent hiring, retention, and supervision would be actionable only against the employer, not the individual supervisors. Cf. Foster v. Crandell, 181 N.C. App. 152, 170-71, 638 S.E.2d 526, 538-39 (2007) (noting that liability for negligent hiring or retention would extend only to an employer who employed an incompetent employee either as an employee or independent contractor, not to co-employees); Ostwalt v. Charlotte-Mecklenburg Bd. of Educ., 614 F. Supp. 2d 603, 609 (W.D.N.C. 2008) ("North Carolina courts have determined that no claim for negligent supervision lies when the Defendant is not the employer of the individual who commits the tortious act."). Therefore, this claim is properly dismissed as to Clark and Meehan. Therefore, the Motions to Dismiss Count 35 will be granted as to Defendants Clark and Meehan individually, and those claims will be dismissed. However, the Motion to Dismiss Count 35 will be denied as to DSI, their employer, and that claim will go forward at this time.

### Count 36: Negligent Infliction of Emotional Distress, asserted against Clark, Meehan, and DSI

In Count 36, Plaintiffs assert a state law claim for negligent infliction of emotional distress against Clark, Meehan, and DSI. As the basis for this claim, Plaintiffs allege that Clark, Meehan, and DSI acted individually and in concert to manufacture false and misleading DNA reports that subjected Plaintiffs to public condemnation and outrage. Plaintiffs allege that as a result, Plaintiffs "have suffered and continue to suffer from diagnosable emotional and mental conditions causing disabling emotional, mental, and physical harm." (Second Am. Compl. ¶ 1353).

As discussed above, in order to state a claim for Negligent Infliction of Emotional Distress ("NIED") under North Carolina law, Plaintiffs must allege a sufficient basis to support the contention that they each suffered "severe emotional distress" under North Carolina law, and that the "severe emotional distress was the foreseeable and proximate result" of Defendants' alleged negligence. McAllister v. Khie Sem Ha, 347 N.C. 638, 645, 496 S.E.2d 577, 583 (1998). As with a claim for intentional infliction of emotional distress, "severe emotional distress" requires an "emotional or mental disorder . . . which may be generally recognized and diagnosed by professionals trained to do so." Id. However, Plaintiffs have failed to include any specific allegations of emotional or mental disorders or severe and disabling emotional or mental conditions suffered by any of the Plaintiffs, and the Second Amended Complaint does not include any specific identification of any particular Plaintiff's mental or emotional condition or the nature of their emotional distress. Cf. Holleman v. Aiken, 193 N.C. App. 484, 502, 668 S.E.2d 579, 591 (2008); Swaim v. Westchester Acad., Inc., 170 F. Supp. 2d 580, 585 (M.D.N.C. 2001). Therefore, the Motions to Dismiss will be granted as to Count 36, and Plaintiffs' claims for negligent infliction of emotional distress in Count 36 will be dismissed.[89]

**Count 37:     Negligence, asserted against Duke, Best, Smith, and Stotsenberg[90]**

In Count 37, Plaintiffs assert a state law claim for negligence against Duke and against

---

[89] Moreover, the Court notes that, as discussed in Count 34, Plaintiffs cannot state a negligence claim against Clark, Meehan, or DSI in any event.

[90] Plaintiffs also assert this claim against "Duke Police Officers Mazurek, Day, Eason, and Falcon, solely in the official capacities with respect to Duke University." However, Mazurek, Day, Eason, and Falcon are not named as Defendants in this case. Moreover, in a state tort action, *respondeat superior* liability is based on whether the alleged torts of an employee were committed within the course and scope of employment.

Duke Police Officers Best, Smith, and Stotsenberg. As the basis for this claim, Plaintiffs allege that the Duke Police Officers owed Plaintiffs a duty of care with respect to the investigation of Mangum's claims, and breached that duty of care by participating in the fabrication of witness statements.

In considering these claims, the Court notes that the North Carolina legislature, in authorizing Duke to enter into agreements with the City to extend the Duke Police Department's jurisdiction, specifically provided that Duke Police officers would enjoy the same "powers, rights, privileges, and immunities" as municipal law enforcement officers. See 2003 N.C. Sess. Laws 329 (local amendment to North Carolina General Statute § 116-40.5(b)); see also State v. Ferebee, 177 N.C. App. 785, 788, 630 S.E.2d 460, 462 (2006) (holding that Duke Police officers are "public officers" under state law). Therefore, the Duke Police officers sued individually would be protected by the state law immunities applicable to Durham Police officers.

With respect to the negligence claims asserted against Duke, as discussed at length above, a negligence claim "presupposes the existence of a legal relationship between the parties by which the injured party is owed a duty which either arises out of a contract or by operation of law. If there is no duty, there can be no liability." Prince v. Wright, 141 N.C. App. 262, 266, 541 S.E.2d 191, 195 (2000) (internal quotations omitted). The existence of a campus police department does not create a duty on the part of the university to prevent harm to its students or otherwise affirmatively act to protect the students. Thus, Plaintiffs have failed to sufficiently allege any legal duty that the Duke Police officers owed to them in conducting the investigation,

or any obligation to conduct an investigation at all. Therefore, the Court concludes that Plaintiffs cannot state a claim against Duke for simple negligence in conducting, or failing to conduct, an investigation. Therefore, the Motion to Dismiss Count 37 will be granted and the claims asserted in Count 37 will be dismissed.

**Count 38:** **Negligent Supervision, asserted against Brodhead, Trask, Dawkins, Graves, Dean, Humphries, Cooper, Garber, Schwab, Fleming, Best, and Duke**

In Count 38, Plaintiffs assert a state law negligence claim, asserting a claim for negligent supervision against the Duke Police Supervisors named as Defendants in this Count. As the basis for this claim, Plaintiffs allege that the Duke Police Supervisors owed Plaintiffs a duty to use due care with respect to their involvement in the investigation of Mangum's allegations. Plaintiffs allege that the Duke Police Supervisors negligently hired, supervised, retained, and trained the "Day Chain of Command" by failing to "outline the proper procedures with respect to the preparation and issuance of police reports of their observations and personal knowledge obtained in the course of their duties on behalf of the Duke Police Department with respect to the conduct of a criminal investigation and the proper chain of command for investigations of criminal activity reported in their jurisdiction." (Second Am. Compl. ¶ 1363). Plaintiffs also allege that the Duke Police Supervisors negligently hired, supervised, retained, and trained DSI personnel and others who participated in or assisted in the criminal investigation of Mangum's accusations.

However, to the extent that this claim is based on the contention that the Supervisors "owed Plaintiffs a duty to use due care with respect to their involvement in the investigation of

Mangum's allegations," the Court has found, as discussed at length above, that Duke did not have any duty to Plaintiffs to conduct an investigation at all, or to meet a particular standard of care in conducting the investigation to the extent they chose to do so. In addition, to the extent that this claim is based on "negligent supervision" of an employee, before an employer can be held liable on a claim for negligent supervision, the, plaintiff must prove that "the incompetent employee committed a tortious act resulting in injury to plaintiff and that prior to the act, the employer knew or had reason to know of the employee's incompetency." Hogan v. Forsyth Country Club Co., 79 N.C. App. 483, 495, 340 S.E.2d 116, 124 (1986). However, all of the allegations in Count 38 relate to negligent supervision and training with respect to proper preparation of police reports or following the proper "chain of command," and there are no underlying torts in this case that state a claim against Duke Police employees for failing to properly file police reports or follow a proper chain of command. As discussed above, Duke Police did not owe Plaintiffs a duty to file police reports or follow a certain chain of command, and therefore Plaintiffs cannot state a claim for negligence on this basis.

Finally, to the extent that this claim is based on negligent supervision of DSI, the Court finds that Plaintiffs cannot state a claim against Duke for "negligent supervision" of DSI or its employees. Duke had no obligation to supervise DSI or its employees, and a claim for negligent supervision or retention is a claim against an employer, not a third party. Cf. Foster v. Crandell, 181 N.C. App. 152, 170-71, 638 S.E.2d 526, 538-39 (2007) (noting that liability for negligent hiring or retention would extend only to an employer who employed an incompetent employee either as an employee or independent contractor, not to co-employees).

For all of these reasons, the Court concludes that, Defendants' Motion to Dismiss as to Count 38 will be granted, and this claim will be dismissed.

**Count 39:** **Negligent Infliction of Emotional Distress, asserted against Steel, Brodhead, Lange, Trask, Burness, Moneta, Dzau, Haltom, Dawkins, Graves, Dean, Humphries, Cooper, Fleming, Smith, Best, and Duke**

In Count 39, Plaintiffs assert a state law claim for negligent infliction of emotional distress. This claim is based on Plaintiffs' contention that the named Defendants and other Duke Police officers, acting individually and in concert, manufactured false and misleading witness statements and concealed their personal knowledge of evidence of Plaintiffs' innocence. Plaintiffs allege that Duke Police officers subjected Plaintiffs to the threat and fear of prosecution and subjected them to public condemnation. Plaintiffs allege that as a result, Plaintiffs "have suffered and continue to suffer from diagnosable emotional and mental conditions causing disabling emotional, mental, and physical harm." (Second Am. Compl. ¶ 1371).

As discussed above, in order to state a claim for Negligent Infliction of Emotional Distress ("NIED") under North Carolina law, Plaintiffs must allege a sufficient basis to support the contention that they each suffered "severe emotional distress" under North Carolina law, and that the "severe emotional distress was the foreseeable and proximate result" of Defendants' alleged negligence. McAllister v. Khie Sem Ha, 347 N.C. 638, 645, 496 S.E.2d 577, 583 (1998). As with a claim for intentional infliction of emotional distress, "severe emotional distress" requires an "emotional or mental disorder . . . which may be generally recognized and diagnosed by professionals trained to do so." Id. However, Plaintiffs have failed to include any specific

allegations of emotional or mental disorders or severe and disabling emotional or mental conditions suffered by any of the Plaintiffs, and the Second Amended Complaint does not include any specific identification of any particular Plaintiff's mental or emotional condition or the nature of their emotional distress. Cf. Holleman v. Aiken, 193 N.C. App. 484, 502, 668 S.E.2d 579, 591 (2008); Swaim v. Westchester Acad., Inc., 170 F. Supp. 2d 580, 585 (M.D.N.C. 2001). Therefore, Plaintiffs' claims for negligent infliction of emotional distress in Count 39 will be dismissed.[91]

**Count 40:     Negligent Entrustment, asserted against Duke, Duke Police, Brodhead, Trask, Dawkins, Graves, Dean, Humphries, Cooper, Garber, Schwab, Fleming, and Best**

In Count 40, Plaintiffs assert a state law negligence claim, alleging "negligent entrustment" against Duke, the Duke Police, and the Duke Police Supervisors named as Defendants in this Count. As the basis for this claim, Plaintiffs allege that Duke and the Duke Police Department "negligently entrusted the Duke Police Department's primary investigative and law enforcement authority and its official policymaking authority with respect to the investigation of Mangum's allegations to Nifong, Gottlieb, Himan, Clayton, Addison, Michael, and the Durham Police." (Second Am. Compl. ¶ 1374). Plaintiffs allege that Duke and the Duke Police had a duty to exercise due care in any delegation of their primary jurisdictional responsibility and authority with respect to the investigation of Mangum's claims, and that they breached that duty of care by delegating that authority to the City, even though they knew or should have known of abuses by Nifong, Gottlieb, Himan, Clayton, Addison, Michael, and the

---

[91] Moreover, the Court notes that, as discussed in Counts 30 and 37, Plaintiffs cannot state a negligence claim against Duke in any event.

Durham Police.

Under North Carolina law, "[n]egligent entrustment is established when the owner of an automobile 'entrusts its operation to a person whom he knows, or by the exercise of due care should have known, to be an incompetent or reckless driver[,]' who is 'likely to cause injury to others in its use[.]' Based on his own negligence, the owner is 'liable for any resulting injury or damage proximately caused by the borrower's negligence.'" See Tart v. Martin, 353 N.C. 252, 254, 540 S.E.2d 332, 334 (2000) (citations omitted). These claims have been extended to include negligent entrustment of a firearm. See, e.g., Lane v. Chatham, 251 N.C. 400, 405, 111 S.E.2d 598, 603 (1959). Thus, claims for negligent entrustment arise against an owner of a firearm or an automobile who negligently permitted a third party to use or have the firearm or automobile.

Based on this case law, there is simply no legal basis for a claim of "negligent entrustment" of an investigation under North Carolina law. Moreover, as discussed with respect to Count 29, the Court has already concluded that, as a matter of law, the Durham Police had complete statutory authority under North Carolina law, on campus and off. See N.C. Gen. Stat. § 15A-402; § 160A-286. The Jurisdictional Agreement between the Durham Police and Duke Police could not reduce the Durham Police Department's statutory authority, nor could it give the Duke Police any authority over the Durham Police, even on campus or in other areas around campus, regardless of whether the Duke Police had "primary jurisdiction" of an area under the Agreement. To the extent that Plaintiffs allege that the Duke Police had authority over the Durham Police or that the Duke Police delegated authority to Nifong or to the Durham Police, those are legal conclusions that are inconsistent with North Carolina law and that the Court is

not bound to accept.

Having considered Plaintiffs' contentions, the Court concludes that North Carolina courts would not recognize a claim for negligent entrustment against a University or its police force for failing to intervene or interfere with a municipality's exercise of its statutory police powers. Therefore, Defendants' Motion to Dismiss as to Count 40 will be granted, and the claims asserted in Count 40 will be dismissed.

**Count 41: Violations of Article I and Article IX of the North Carolina Constitution and Conspiracy, asserted against the City and Duke**

Finally, in Count 41, Plaintiffs bring a claim under Article I and Article IX of the North Carolina Constitution, alleging that all of the foregoing acts and conduct by employees of the Durham Police Department and Duke Police Department constituted willful abuses of police powers and deprived Plaintiffs of their rights under the state constitution. Plaintiffs note that they "plead this direct cause of action under the North Carolina Constitution in the alternative to Plaintiffs' state-law claims should those causes of action be barred in whole or part or otherwise fail to provide a complete and adequate state law remedy for the wrongs committed by the Defendants and their agents and employees." (Second Am. Compl. ¶ 1385).

To the extent that this claim is asserted against the City, the Court notes that there are several claims going forward in this case against the City, including state law claims for obstruction of justice, negligence, and negligent supervision with respect to Counts 18, 25, and 26 that will not be dismissed on a Motion to Dismiss. However, the City has filed a separate Motion for Summary Judgment [Doc. #86], contending that the state law claims are barred by the doctrine of governmental immunity. In this regard, the City enjoys governmental immunity

on these state law claims except to the extent that its immunity has been waived by the purchase of insurance. See Mullins v. Friend, 116 N.C. App. 676, 680, 449 S.E.2d 227, 229 (1994); N.C. Gen. Stat. § 160A-485(a). Plaintiffs have alleged that the City waived its governmental immunity by "procuring a liability insurance policy or participating in a municipal risk-pooling scheme." (Second Am. Compl.¶ 48). However, in the Motion for Summary Judgment, the City contends that it has not purchased insurance that would waive its immunity for the state law claims asserted by Plaintiffs. Specifically, the City contends that while it has purchased insurance coverage, those policies do not extend coverage to claims against the City for which a defense of governmental immunity would otherwise be available.

After the Motion for Summary Judgment was filed, the North Carolina Supreme Court issued a decision in Craig v. New Hanover County Bd. of Educ., 363 N.C. 334, 340, 678 S.E.2d 351, 355 (2009), concluding that a claim may potentially be asserted under the state constitution if other state law claims would be barred by governmental immunity. Therefore, in response, Plaintiffs subsequently added the claim in Count 41 as an alternative claim, should it ultimately be determined that the state law claims would otherwise be barred by governmental immunity.

In their renewed Motions to Dismiss, Defendants contend that Count 41 should be dismissed because Plaintiffs cannot state a claim under the North Carolina constitution. Defendants contend that Plaintiffs have not alleged any constitutional violation and that Plaintiffs have other "adequate remedies" at state law. Under North Carolina law, a claim under the state constitution may only be asserted when there is no other adequate remedy under state law. See id.; see also Corum v. Univ. of N.C., 330 N.C. 761, 782-86 413 S.E.2d 276, 289-92

(1992). Thus, to assert a direct constitutional claim, "a plaintiff must allege that no adequate state remedy exists to provide relief for the injury." Copper v. Denlinger, 363 N.C. 784, 788, 688 S.E.2d 426, 428 (2010). "An adequate state remedy exists if, assuming the plaintiff's claim is successful, the remedy would compensate the plaintiff for the same injury alleged in the direct constitutional claim." Estate of Fennell v. Stephenson, 137 N.C. App. 430, 437, 528 S.E.2d 911, 915-16 (2000), rev'd in part on other grounds, 354 N.C. 327, 554 S.E.2d 629 (2001). Moreover, an adequate remedy is one that "provide[s] the possibility of relief under the circumstances." Craig, 363 N.C. at 340, 678 S.E.2d at 355. Thus, "to be considered adequate in redressing a constitutional wrong, a plaintiff must have at least the opportunity to enter the courthouse doors and present his claim." Id. at 339-40, 678 S.E.2d at 355.

In Craig, the Supreme Court held that where governmental immunity bars a common law negligence claim, that negligence claim does not provide an adequate remedy at state law. Id. The court further held that when a tort remedy is barred by governmental immunity, a "plaintiff may move forward in the alternative, bringing his colorable claims directly under [the] State Constitution based on the same facts that formed the basis for his common law negligence claim." Id. at 340, 678 S.E.2d at 355. The court noted that the "holding does not predetermine the likelihood that plaintiff will win other pretrial motions, defeat affirmative defenses, or ultimately succeed on the merits of his case. Rather, it simply ensures that an adequate remedy must provide the possibility of relief under the circumstances." Id. Thus, the state supreme court has concluded that where a negligence claim is asserted against the municipality but no recovery is available due to the doctrine of governmental immunity, then no adequate state

remedy exists.

In the present case, unresolved questions remain with respect to whether there are other adequate remedies under state law, particularly in light of the City's assertion of governmental immunity. Therefore, to the extent that Defendants contend that Count 41 should be dismissed because there are alternative remedies, the Court will deny the Motion to Dismiss as to Count 41, and allow it to go forward as a potential alternative claim should the City ultimately prevail on its governmental immunity defense.

Moreover, since these claims are going forward on an alternative basis, the Court concludes that there is no need to resolve the City's governmental immunity defense on a preliminary summary judgment determination, and that determination is better made after an opportunity for discovery and consideration with all of the remaining claims and defenses together. This approach is particularly appropriate here given that claims are proceeding against the City in any event under 42 U.S.C. § 1983. Therefore, the Motion to Dismiss as to Count 41 will be denied, and the City's Motion for Summary Judgment [Doc. #86] raising the governmental immunity defense will be denied at this time without prejudice to the City raising the defense as part of a comprehensive Motion for Summary Judgment at the close of discovery.

However, to the extent that this claim is asserted against Duke, the Court concludes that Plaintiffs cannot assert this "alternative" claim against Duke under the Supreme Court's decision in Craig because Duke has not claimed a governmental immunity defense. Moreover, the Court concludes that Plaintiffs cannot state a claim against Duke for "abuses of police power" and deprivations of right under the state constitution in any event because individual rights under

the state constitution are only protected against encroachment by the government. See Craig, 363 N.C. at 339, 678 S.E.2d at 355. In this regard, the North Carolina Supreme Court has held that "[t]he [state] Constitution only recognizes and secures an individual's rights vis-a-vis 'We, the people of the State of North Carolina,' not individual members of that body politic. Of course, the State may only act through its duly elected and appointed officials. Consequently, it is the state officials, acting in their official capacities, that are obligated to conduct themselves in accordance with the Constitution. Therefore, plaintiff may assert his freedom of speech right only against state officials, sued in their official capacity." Corum, 330 N.C. at 788, 413 S.E.2d at 293. As discussed at length above, the Court has already determined that Duke was not a "state actor" acting "under color of state law" for purposes of the § 1983 claims under the U.S. Constitution, and for the same reasons the Court likewise concludes that Duke is not liable for alleged violations of the state constitution. Therefore, Count 41 will be dismissed as to Duke.

For the reasons discussed, the Motion to Dismiss Count 41 will be granted as to Duke, and the claim asserted against Duke will be dismissed. However, the Motion to Dismiss Count 41 will be denied as to the City, and the claim against the City will go forward at this time as a potential alternative claim should the City ultimately prevail on its governmental immunity defense. In addition, the Court concludes that, based on the foregoing analysis, there is no need to resolve the City's governmental immunity defense on a preliminary summary judgment determination, and therefore, the City's Motion for Summary Judgment [Doc. #86] raising the governmental immunity defense will be denied at this time without prejudice to the City raising the defense as part of a comprehensive Motion for Summary Judgment at the close of discovery.

## IV.    CONCLUSION

Having undertaken this comprehensive review of the 41 claims asserted in this case against the various 50 Defendants, the Court concludes that the Motions to Dismiss will be granted in part and denied in part as set out herein.  In summary, Counts 1, 2, and 5 will go forward under 42 U.S.C. § 1983 for alleged constitutional violations.  The claims asserted in Counts 1 and 2 are asserted pursuant to 42 U.S.C. § 1983 for violation of the Fourth and Fourteenth Amendment for unlawful searches and seizures without probable cause based on the Non-Testimonial Order and Search Warrant that were allegedly obtained through the intentional or reckless use of false or misleading evidence or material omissions designed to mislead the magistrate judge.  The claims asserted in Count 5 are asserted pursuant to 42 U.S.C. § 1983 for violation of the Fourteenth Amendment based on alleged false and stigmatizing statements by the government in connection with the alleged Fourth Amendment violations in Counts 1 and 2.  With respect to these claims, to the extent that Defendants contend that there was no constitutional violation because probable cause would still exist to support the searches and seizure, even if the allegedly false and misleading statements are removed and the alleged material omissions are included, the Court has concluded that this contention cannot be resolved on a motion to dismiss in light of the Plaintiffs' allegations here.  Such an inquiry is fact-intensive in the present case given the number of and nature of the alleged misrepresentations and omissions.  Therefore, the Court concludes that this issue is more appropriately considered on an evidentiary record after discovery.

These claims for the alleged constitutional violations in Counts 1 and 2 are going forward

as to Defendants Nifong[92], Gottlieb, Himan, and Levicy based on allegations that they were directly involved in the alleged Fourth Amendment violations, and as to Defendant Smith in Count 2 on the basis of bystander liability.[93] The claims in Count 5 are going forward as to Defendants Nifong, Gottlieb, Addison, Hodge, and Wilson. The claims in Counts 1, 2, and 5 are also going forward as to the City based on the additional allegations contained in Counts 12 and 14, setting out claims for municipal liability. However, to the extent that there are claims proceeding against the City, Plaintiffs may not recover punitive damages from the City. See City of Newport v. Fact Concerts, Inc., 453 U.S. 247, 271, 101 S. Ct. 2748, 2762, 69 L. Ed. 2d 616 (1981). Therefore, the claim for punitive damages against the City will be dismissed. Finally, the Court will allow the § 1983 claims in Counts 1, 2, and 5 to go forward against certain of the Durham Police "supervisors," specifically, Baker, Chalmers, Hodge, Russ, Council, Lamb, and

---

[92] The Court again notes that District Attorney Nifong previously filed a Notice of Bankruptcy in the case of Evans v. City of Durham, 1:07CV739. Although the Evans case was stayed against Nifong during his Bankruptcy, it was reopened after the Bankruptcy Court determined that the claims against Nifong in the Evans case were "personal injury tort" claims that must be considered in this Court rather than in the Bankruptcy Court. Nifong has not filed a Notice of Bankruptcy, a Motion to Dismiss, or any other response in the present case, and the parties have not addressed the status of Nifong as a Defendant, other than with respect to Plaintiffs' contentions that the City should be held responsible for Nifong's actions. The Court has addressed that issue and other common legal issues in this Memorandum Opinion, but has not addressed issues specific only to Nifong given this procedural posture. If Plaintiffs intend to proceed against Nifong individually in light of the Court's determinations herein, Plaintiffs should file a Notice in this case addressing Nifong's status as a Defendant and addressing the impact of any remaining bankruptcy issues.

[93] As to both Defendant Levicy and Defendant Smith, the Court concludes that Plaintiffs have alleged that they became "state actors" by allegedly joining with Nifong, Gottlieb, and Himan to commit the alleged constitutional violations, knowing that the NTO and search warrant were not supported by probable cause and were based on false and misleading assertions and material omissions. As with all of these claims, it will be Plaintiffs' burden to present proof of these allegations.

Ripberger, based on Plaintiffs' allegations as discussed with respect to Count 13. However, at summary judgment, it will be Plaintiffs' burden to "pinpoint the persons in the decision-making chain whose deliberate indifference permitted the constitutional abuses to continue unchecked," and the Court will scrutinize evidence regarding each Defendant's direct, individual involvement, and evidence regarding their individual intent, in order to determine whether any of them is potentially liable under § 1983 for their own conduct with respect to the alleged constitutional violations that are proceeding in this case.[94] The Court notes that the § 1983 claims are not going forward as to Defendant Duke, because the Court finds that Plaintiffs have failed to allege a sufficient basis to support the contention that Duke was a "state actor."

The remaining claims asserted under 42 U.S.C. § 1983 and 42 U.S.C. § 1985 and § 1986, including all of the claims in Counts 3, 4, 6, 7, 8, 9, 10, 11, 15, 16, and 17 do not state plausible, legally viable claims, and will be dismissed.

With respect to the state law claims, the Court concludes that with respect to Count 18, Plaintiffs have stated a state law claim for obstruction of justice against Defendants Nifong, Gottlieb, Himan, Wilson, Clark, Lamb, Meehan, Levicy, Steel, Brodhead, Dzau, and Burness, with potential *respondeat superior* liability against the City, DSI, Duke, and Duke Health. As an alternative to *respondeat superior* under state law, Plaintiffs have also stated a claim for negligent supervision against Duke Health and Duke in Count 32 and against DSI in Count 35. In addition, Plaintiffs have stated a claim in Count 21 against Duke for breach of contract, but

---

[94] In addition, special attention should be given during the discovery process to ensure that these Supervisors are not unduly burdened, in light of the potential qualified immunity defense and the protections it affords.

limited only to the allegation that Duke imposed disciplinary measures against Plaintiffs, specifically suspension, without providing them the process that was promised. Plaintiffs have also stated a claim in Count 24 for fraud against Defendants Smith, Graves, Dean, Drummond, and Duke, based on allegations that Drummond sent letters to Plaintiffs informing them that Duke had received a subpoena relating to Plaintiffs' Duke Card information, and fraudulently misrepresented that Plaintiffs' Duke Card information had not previously been provided to Durham Police.

Finally, with respect to the state law claims against the City in Counts 18, 25, and 26, and the state constitutional claim asserted in Count 41, the Court concludes that these claims, and the governmental immunity defense raised in the City's Motion for Summary Judgment [Doc. #86], are intertwined claims, some of which are pled in the alternative, that must be resolved at summary judgment after an opportunity for discovery.[95]

However, Plaintiffs have failed to state a claim with respect to their remaining state law claims, including all of the claims asserted in Counts 19, 20, 22, 23, 27, 28, 29, 30, 31, 33, 34, 36, 37, 38, 39, and 40. Therefore, all of the claims asserted in those Counts will be dismissed.

Based on this determination, the Court notes that claims are going forward as to Defendant Nifong in Counts 1, 2, 5, and 18; against Defendant Gottlieb in Counts 1, 2, 5, and 18; against Defendant Himan in Counts 1, 2, and 18; against Defendant Levicy in Counts 1, 2, and 18; against Defendant Smith in Counts 2 and 24; against Defendant Addison in Count 5;

---

[95] As with the § 1983 claims, Plaintiffs may not recover punitive damages against the City on these state claims. See Efird v. Riley, 342 F. Supp. 2d 413, 430 (M.D.N.C. 2004) (citing Long v. City of Charlotte, 306 N.C. 187, 208, 293 S.E.2d 101, 115 (1982)).

against Defendant Wilson in Counts 5 and 18; against the City in Counts 1, 2, and 5 (based on the allegations in Counts 12 and 14), as well as in Counts 18, 25, 26, and 41; against Defendants Hodge, Baker, Chalmers, Russ, Council, Lamb, and Ripberger in Counts 1, 2, 5, and 13, plus Count 18 as to Defendant Lamb; against Defendants Clark, Meehan, and DSI in Count 18, plus Count 35 against Defendant DSI; against Defendants Steel, Brodhead, Dzau and Burness in Count 18; against Defendants Graves, Dean, and Drummond in Count 24; against Defendant Duke Health in Counts 18 and 32; and against Defendant Duke in Counts 18, 21,[96] 24, and 32. All remaining claims are dismissed, including all of the claims asserted in Counts 3, 4, 6, 7, 8, 9, 10, 11, 15, 16, 17, 19, 20, 22, 23, 27, 28, 29, 30, 31, 33, 34, 36, 37, 38, 39, and 40, and all of the claims asserted against Defendants Humphries, Cooper, Garber, Schwab, Fleming, Best, Stotsenberg, Lange, Trask, Moneta, Haltom, Dawkins, Wasiolek, Bryan, Private Diagnostic, Manly, Arico, Mihaich, Evans, Soukup, Michael, Clayton, and the Duke Police Department.

Having undertaken this comprehensive review of the 41 claims asserted in this case, the Court is compelled to note that while § 1983 cases are often complex and involve multiple Defendants, Plaintiffs in this case have exceeded all reasonable bounds with respect to the length of their Complaint and the breadth of claims and assertions contained therein. The Western District of Virginia noted similar concerns recently in a § 1983 case pending there, stating that: "There is no question but that [the] Complaint is extravagant not only in its length (29 pages and 114 numbered paragraphs), but also in its tone, containing numerous underlinings and italics for emphasis and provocative bold headings, such as, "Part of a Larger Conspiracy?" and, "Things

---

[96] The Court notes that this breach of contract claim is limited as set out in Count 21.

Go From Bad To Worse". Surely <u>Iqbal</u> does not require such spin and one wonders what counsel's aim is in drafting such a pleading. It certainly does not help to persuade the court." <u>Jackson v. Brickey</u>, No. 1:10CV00060, 2011 WL 652735, at *12 n.4 (W.D. Va. 2011). These concerns are substantially greater in the present case, where Plaintiffs have seen fit to file not 29 pages and 114 numbered paragraphs, but 428 pages and 1,388 numbered paragraphs, with dramatic rhetoric and sweeping accusations against a "Consortium" of 50 Defendants, most of which is not relevant to the actual legally-recognized claims that may be available. Indeed, Plaintiffs' potentially valid claims risk being lost in the sheer volume of the Second Amended Complaint,[97] and Plaintiffs' attempt at "spin" is wholly unnecessary and unpersuasive in legal pleadings. Plaintiffs approach has required the Court to undertake the time-consuming process of wading through a mass of legally unsupportable claims and extraneous factual allegations in an attempt to "ferret out the relevant material from a mass of verbiage." 5 Charles Alan Wright & Arthur R. Miller, <u>Federal Practice & Procedure</u> § 1281 (3d ed. 2004). The Court has nevertheless undertaken this process and has considered each of Plaintiffs' claims, resulting in this rather extensive Memorandum Opinion. The Court trusts that, going forward, all of the parties will reduce both the volume of filings and the rhetoric contained therein, and will proceed on the remaining claims in a direct, professional manner, without requiring unnecessary involvement from the Court.

However, the Court is also compelled to note that the allegations in the Second Amended

---

[97] The claims apparently became unmanageable even to Plaintiffs, based on the inconsistent use of Defendant "groups" and lack of consistency in determining which claims were asserted against which Defendants.

Complaint that are going forward, particularly as to Counts 1, 2, and 5, set out allegations of significant abuses of government power. Indeed, the intentional or reckless use of false or misleading evidence before a magistrate judge to obtain a warrant and effect a search and seizure is exactly the type of "unreasonable" search and seizure the Fourth Amendment is designed to protect against. In this regard, it has been noted that "'if any concept is fundamental to our American system of justice, it is that those charged with upholding the law are prohibited from deliberately fabricating evidence and framing individuals for crimes they did not commit.'" Washington v. Wilmore, 407 F.3d 274, 285 (Shedd, J., concurring) (quoting Limone v. Condon, 372 F.3d 39, 44-45 (1st Cir. 2004)). In addition, "the Supreme Court has long held that a police officer violates the Fourth Amendment if, in order to obtain a warrant, he deliberately or 'with reckless disregard for the truth' makes material false statements or omits material facts. . . . No reasonable police officer . . . could believe that the Fourth Amendment permitted such conduct." Miller v. Prince George's County, 475 F.3d 621, 631-32 (4th Cir. 2007) (internal citations omitted). Thus, there can be no question that the Constitution is violated when government officials deliberately fabricate evidence and use that evidence against a citizen, in this case by allegedly making false and misleading representations and creating false and misleading evidence in order to obtain an NTO against all of the lacrosse team members and obtain a search warrant. This case will therefore proceed to discovery on the claims as set out above, and it will ultimately be Plaintiffs' burden to present proof in support of these claims.

IT IS THEREFORE ORDERED that the Motions to Dismiss [Doc. #167, 168, 169, 170, 171, 173, 174, 175, 176, 177, 179] are GRANTED IN PART and DENIED IN PART as

set out herein. IT IS FURTHER ORDERED that the City of Durham's Motion for Summary Judgment [Doc. #86] is DENIED at this time, without prejudice to the City raising the issues asserted therein as part of a comprehensive Motion for Summary Judgment at the close of discovery.

A separate Order will be entered contemporaneously herewith.

This, the 31st day of March, 2011.

United States District Judge